GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
Melinda.Lemoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC,<br><br>         Plaintiffs,<br><br>vs.<br><br>AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC.,<br><br>         Defendants. | CASE NO.  CV 07-03314 PSG (MANx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:    Hon. Philip S. Gutierrez<br>Date:     January 5, 2009<br>Time:     1:30 P.M.<br>Crtrm:    Roybal 790<br><br>Discovery Cut-Off:  November 3, 2008<br>Final Pretrial Conference:  January 12, 2009<br>JURY TRIAL:  FEBRUARY 3, 2009 |

# **TABLE OF CONTENTS**

I.       INTRODUCTION ................................................................................... 3

II.      Factual Background ............................................................................. 5

     A.   The Structure Of Artist Recording Agreements ........................... 5

     B.   The Music Market Today ............................................................. 8

     C.   The Recording Agreements at Issue Here .................................. 11

          1.   The 1998 And 2003 Agreements ....................................... 12

          2.   The 2000 Novation ............................................................. 13

          3.   The 2004 Amendment ........................................................ 14

     D.   Plaintiffs' Claims In This Case .................................................. 15

III.     PLAINTIFFS' FIRST CAUSE OF ACTION FAILS ........................ 16

     A.   Legal Standards .......................................................................... 16

     B.   The Eminem Agreements Are Not Reasonably Susceptible
          To Plaintiffs' Interpretation ....................................................... 18

          1.   The Plain Text Of The Eminem Agreements
               Includes The Sale Of Permanent Downloads And
               Mastertones Within The "Records Sold" Royalty
               Provisions. ......................................................................... 18

          2.   Another Federal District Court Has Already
               Dismissed The Exact Same Claim Based On Very
               Similar Contractual Language. .......................................... 20

     C.   Even If Extrinsic Evidence Is Considered, Plaintiffs Still
          Cannot Prevail ............................................................................ 21

          1.   The Admissible, Competent Extrinsic Evidence
               Supports Aftermath's Reading Of The Agreements ......... 22

          2.   Plaintiffs' Extrinsic Evidence is Incompetent and
               Inadmissible. ..................................................................... 24

IV.      Conclusion .......................................................................................... 27

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Allman Brothers v. SonyBMG Music Entertainment*,
2008 WL 2477465, at *2 (S.D.N.Y June 18, 2008) ............................4, 19, 26

*Wang Labs v. Mitsubishi Electronics America*,
860 F. Supp. 1448 (C.D. Cal. 1993) ............................................................16

**State Cases**

*Bank of the West v. Superior Court*,
2 Cal. 4th 1254 (1992) ...............................................................................16

*Beneficial Fire and Casualty Insurance v. Kurt Hitke & Co.*,
46 Cal. 2d 517 (1956) ................................................................................25

*Crestview Cemetery Assn. v. Dieden*,
54 Cal. 2d 744 (1960) ................................................................................22

*General Motors v. Superior Court*,
12 Cal. App. 4th 435 (1993) ......................................................................20

*Oakland-Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.*,
197 Cal. App. 3d 1049 (1988) ...................................................................22

*Richeson v. Hilel*,
158 Cal. App. 4th 268 (2007) ......................................................................3

*Wagner v. Columbia Pictures Industries, Inc.*,
146 Cal. App. 4th 586 (1988) ....................................................................16

*Wolf v. Walt Disney Pictures and Television*,
162 Cal. App. 4th 1107 (2008) ..................................................................16

**State Statutes**

Cal. Civ. Code § 1636 ......................................................................................16
Cal. Civ. Code § 1638 ......................................................................................16

**Federal Rules**

Fed. R. Civ. Proc. 56(a) ...................................................................................16
Fed. R. Civ. Proc. 56(b) ...................................................................................16
Fed. R. Civ. Proc. 56(c) ...................................................................................16

**Other Authorities**

Tim Arango, "Digital Sales Surpass CDs at Atlantic",
*N.Y. Times*, November 26, 2008 ……………………………………………8

## INDEX OF SUPPORTING DECLARATIONS AND EXHIBITS

| Description | Page |
|---|---|
| **Declaration of Rand Hoffman** | 26 |
| Exhibit A - 1998 Recording Agreement (Filed Under Seal) | 32 |
| Exhibit B - 1998 Inducement Agreement (Filed Under Seal) | 50 |
| Exhibit C - 2000 Novation (Filed Under Seal) | 62 |
| Exhibit D - 2003 Agreement (Filed Under Seal) | 83 |
| Exhibit E - 2004 Amendment (Filed Under Seal) | 110 |
| Exhibit F - Excerpts of Artist Royalty Statements (Filed Under Seal) | 114 |
| | |
| **Declaration of Melinda E. LeMoine** | 175 |
| Exhibit A - 1995 Recording Agreement (Filed Under Seal) | 180 |
| Exhibit B - November 9, 2005 email (Filed Under Seal) | 193 |
| Exhibit C - *Allman Brothers v. SonyBMG Music Entertainment,* 2008 WL 2377265 (S.D.N.Y. June 18, 2008) | 195 |
| Exhibit D - November 25, 2008 *New York Times* article entitled "Digital Sales Surpass CDs at Atlantic" | 198 |
| Exhibit E - May 8, 2007 letter (Filed Under Seal) | 202 |
| Exhibit F - October 16, 2008 email | 210 |
| Exhibit G - March 24, 2004 letter | 214 |
| Exhibit H - Excerpts of Deposition Transcript of Joel Martin | 218 |
| Exhibit I - Excerpts of Deposition Transcript of Mark Levinsohn | 259 |
| Exhibit J - Excerpts of Deposition Transcript of Gary Cohen | 285 |
| Exhibit K - Excerpts of Deposition Transcript of Jeffrey Bass | 299 |
| Exhibit L - Excerpts of Deposition Transcript of Mark Bass | 304 |
| Exhibit M - Excerpts of Deposition Transcript of Peter Paterno | 311 |
| Exhibit N - Excerpts of Deposition Transcript of David Weinberg | 345 |
| Exhibit O - Excerpts of Deposition Transcript of David Weinberg (Filed Under Seal) | 383 |
| Exhibit P - Excerpts of Deposition Transcript of Rand Hoffman | 390 |
| Exhibit Q - Excerpts of Deposition Transcript of Larry Kenswil | 418 |
| Exhibit R - Excerpts of Deposition Transcript of Lisa Rogell | 451 |
| Exhibit S - Excerpts of Deposition Transcript of Michael Ostroff | 461 |
| Exhibit T - Excerpts of Deposition Transcript of Eddy Cue (Filed Under Seal) | 477 |
| Exhibit U - Excerpts of Deposition Transcript of Steve Jobs (Filed Under Seal) | 493 |
| Exhibit V - Excerpts of Deposition Transcript of Jimmy | 502 |

MEMORANDUM OF P'S & A'S IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

| Description | Page |
|---|---|
| Iovine | |
| Exhibit W - Excerpts of Deposition Transcript of Ethan Gustav (Filed Under Seal) | 510 |

MEMORANDUM OF P'S & A'S IN
SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

## I.      INTRODUCTION

The Plaintiffs—three people who formed two LLCs and own a recording studio where they produce records—had the good luck to meet Marshall B. Mathers, p/k/a Eminem, when he was unknown.  Eminem later became one of the world's most popular recording artists through collaboration with his record label, defendant Aftermath Records.  Meanwhile, the Plaintiffs became very rich by taking a cut of over one-third of Eminem's royalties.  Plaintiffs now sue Aftermath Records and its owners[1] for breach of Eminem's recording agreements (the "Eminem Agreements"). In their first cause of action,[2] Plaintiffs dispute which of two royalty provisions applies to the distribution of Eminem recordings as permanent downloads and mastertones.[3]  Aftermath pays Plaintiffs royalties for sale of these digital products under the same contractual royalty provision that indisputably applies to sales of compact discs (CDs), cassette tapes and vinyl albums containing Eminem recordings.  Plaintiffs contend that Aftermath should instead account under the contractual royalty provision that applies when Aftermath licenses an Eminem recording to a third party for use in a movie, television commercial or other similar ancillary use.  As shown below, the clear language of the Eminem Agreements is alone sufficient to show that Aftermath is applying the correct royalty provision to the sale of permanent downloads and mastertones.  Moreover, even if one were to consider extrinsic evidence, the undisputed evidence confirms that Aftermath should prevail now as a matter of law.

---

[1] Aftermath Records is a joint venture among UMG Recordings, Inc., Interscope Records and ARY, Inc. (whose principal is Andre Young, p/k/a/ Dr. Dre, another recording superstar and sometime producer of Eminem).  (Hoffman Decl., ¶ 1-2.)  Aftermath Records and its owners are all named Defendants, and this brief refers to them collectively as "Universal," or Aftermath Records individually as "Aftermath."

[2] Universal does not move for summary judgment on Plaintiffs' second cause of action.

[3] Plaintiffs' claim encompasses the royalty treatment for permanent downloads, the digital recordings distributed through services like Apple's iTunes store, and "mastertones," which are records consumers use as ringtones to play as their phone rings that are distributed through cellular providers.

California law is clear that summary judgment should be granted for a defendant if the language of a contract is not reasonably susceptible to the interpretation proffered by the plaintiff.  *See Richeson v. Helal*, 158 Cal. App. 4th 268, 276 (2007) ("If the language is not [reasonably susceptible to the interpretation urged], the case is over.")  Here, several portions of the Eminem Agreements cannot be reconciled with Plaintiffs' interpretation.  Perhaps the clearest example is language from a 2004 amendment between Aftermath, Eminem and Plaintiffs (the "2004 Amendment"), in which the parties explicitly agreed as follows:

> Sales of Albums by way of permanent download shall be treated as USNRC [US normal retail channel] Net Sales for the purposes of escalations, provided that the sales price concerned falls within a top-line sales price category applicable to such method of sale.

(Declaration of Rand Hoffman (Hoffman Decl.), Ex. E ¶ 2(a) at 112.)  This language makes no sense under Plaintiffs' proffered construction of the Eminem Agreements, because Plaintiffs' construction requires the Court to conclude that the downloads are only "licensed," not "sold," to retailers, and therefore there is no such thing as a "Sale of Albums by way of permanent download" through normal retail channels.  Equally telling, the 2004 Amendment, which is the only agreement among the parties that mentions permanent downloads, expressly clarified the royalty provision that Aftermath has applied to downloads and never even mentions the royalty provision that Plaintiffs now seek to have applied.  Indeed, by expressly treating permanent downloads as "USNRC Net Sales," the 2004 Amendment *applied* the very royalty provision to permanent download sales that Plaintiffs now allege *does not apply* to permanent download sales.  The language of the 2004 Amendment and other express language from the Eminem Agreement (which we discuss more fully below) demonstrate that Plaintiffs' proffered construction is not a reasonable reading of the contract language, and summary judgment should be granted on this basis alone.  *See, e.g.*, *Allman Brothers v. SonyBMG Music Entertainment*, 2008 WL 2477465, at *2 (S.D.N.Y June 18, 2008) (granting motion to dismiss because "the

emergence of a new era of digital sound recordings does not afford plaintiffs the right, under the guise of contract interpretation, to rewrite the terms" of their contracts to obtain a more favorable royalty formula) (*provided at* Declaration of Melinda LeMoine "LeMoine Decl.," Ex. C at 197.)

Even if this Court were to consider extrinsic evidence, it leads to the same conclusion.  None of the well-recognized forms of extrinsic evidence create a disputed issue of fact that could be resolved by a jury to favor Plaintiffs' contract interpretation.  No contract negotiator has testified that things said during the negotiations of the Eminem Agreements support Plaintiffs' interpretation; no draft of any agreement supports Plaintiffs' interpretation; and no evidence about the performance of the Agreements supports Plaintiffs' interpretation.  Instead of these established kinds of extrinsic evidence, Plaintiffs cite either to evidence that has nothing to do with the Agreements, or they cite to law about the legal meaning of the term "license," which has absolutely no relevance to an inquiry about what the parties intended by the royalty provisions in the Eminem Agreements.  For the reasons explained in greater detail below, Aftermath is entitled to summary judgment on the first cause of action.

## II.    FACTUAL BACKGROUND

### A.    The Structure Of Artist Recording Agreements

The structure of the Eminem Agreements follows a common pattern for artist recording agreements.[4]  The basic deal is this:  the artist creates "master" recordings for the record company; the record company owns the masters; the record company markets, promotes and sells records that embody the masters; and the record company pays the artist some combination of "advance" (i.e., up-front) money and royalties from such sales of records.  (Hoffman Decl., ¶ 3 at 27; LeMoine Decl., Ex. M at 314:1-315:18.)

---

[4] Universal negotiates artist recording agreements every day, and the result of those negotiations often yields different terms.  It is the structure, and not the terms, that are shared among recording agreements generally.

MEMORANDUM OF P'S & A'S IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Royalties from the sale of the core product envisioned by the recording agreement – records comprised of "master" recordings of the artist – are typically calculated on the basis of a percentage of a price (for example, 22% of the suggested retail list price). (Hoffman Decl., ¶ 4 at 28.) This basic royalty provision typically applies to the sales of "full-price records sold in the United States" through "normal retail channels," referring to the record company's retail distribution network. (*Id.*; LeMoine Decl., Ex. I at 281:24-283:6; *Id.*, Ex. P at 402:16-24) ("The basic business of a record company getting music of an artist to a consumer, is sales through normal retail channels."). Royalties for other types of sales (e.g. foreign sales, mid-price records, etc.) are typically expressed as a percentage of the basic rate. (Hoffman Decl., ¶ 4 at 28.)

The range for the artist's basic royalty rate on record sales varies with the artist's popularity (and hence bargaining power). (*Id.*) While an unknown artist may have a royalty scale of 13%-16%, a more established artist may receive closer to 18%-22%. (*Id.*) The specific royalty rate that applies within that range to particular sales varies based upon a number of factors. For example, an artist will receive a certain percentage of the "Royalty Base Price" from the sales of records sold as albums, and another percentage from the sales of records sold as singles (i.e., individual recordings). (*Id.*; LeMoine Decl., Ex. H at 233:18-234:23.) Recording contracts also can provide for "escalations," meaning that the rate increases as certain sales targets are met (*e.g.*, the artist may receive a 13% royalty for the first 500,000 albums sold, and a 14% royalty for subsequent albums sold). (Hoffman Decl., ¶ 4 at 28.) A record company incurs numerous costs to get records of the artist's music to the customer, including recording costs, marketing and promotion costs, and distribution costs, and payment of mechanical royalties to the publishers of the compositions embodied by the recordings. (Hoffman Decl., ¶ 6 at 28-29; LeMoine Decl., Ex. M at 337:7-338:23.)

While the sale of records (regardless of form) is the record company's core business, this is not the only way that the record company may receive revenue from the use of the artist's masters. Third parties may seek to exploit the masters in their own products. For example, a soft drink company might want to use a portion of one of the artist's master recordings as a part of an ad campaign. Or, a third party record company may wish to couple the master with masters of other recording artists on a compilation record released by that record label. (LeMoine Decl., Ex. H at 242:18-244:2, 245:9-248:2; Ex. I at 272:20-281:14.) When the artist's record company licenses masters to be included as part of these third-party products, they are often referred to as "ancillary" uses. (LeMoine Decl., Ex. I at 281:15-283:6.) When the record company licenses one of its masters, the third party (and not the record company issuing the license) is responsible for many of the usual costs associated with the release of a record or other exploitation, including all marketing, promotion and distribution costs, and the payment of mechanical royalties to the publisher of the composition embodied by the master. (*Id*., Ex. I at 275:14-19; Hoffman Decl., ¶ 6 at 29.) Because these are ancillary (as opposed to core) uses of the master recordings, Aftermath pays the artist a higher royalty rate for these third-party uses than the rate that applies when Aftermath sells records and incurs these costs. (LeMoine Decl., Ex. N at 374:13375:14; Hoffman Decl., Ex. A , ¶ 4(c)(v); at 37; Ex. D, ¶ 5(c)(v) at 88.) That royalty rate typically is 50% of the record company's net receipts from the license of the master. (*Id*.; LeMoine Decl., Ex. N at 348:8-350:4.) The provision covering these third-party products in the Eminem Agreements is the provision Plaintiffs refer to as the "masters licensed" provision, and they argue it applies to the sale of permanent downloads and mastertones. Second Amended Compl., ¶ 4 (Docket No. 100.)

One other general feature of recording agreements important to understanding the background of this case is that such agreements expressly contemplate that the technology for delivering music to the consumer will inevitably change in the future

1  – as it has in the past, evolving from shellac records to vinyl to eight-track tapes to

2  cassettes to CDs – and yet the contract and its economic royalty provisions will

3  apply in the same way to these new technologies.  (Hoffman Decl., ¶ 5 at 28;

4  LeMoine Decl., Ex. M at 342:16-343:3.)  The definition of "record," for example,

5  typically encompasses "all forms of reproduction" regardless of whether that form is

6  "now or hereafter known."  (*Id*.; Hoffman Decl., ¶ 5 at 28.)  The word "record"

7  simply refers to whatever method exists, now or in the future, for capturing and

8  distributing the reproduction of the sound recording.  *Id*.  Recording agreements, in

9  short, are technologically neutral.[5]

10       **B.    The Music Market Today**

11       Today, the music industry is in the midst of the latest evolutionary stage of

12  the "record" —digital music delivery.  The sale of CDs through brick-and-mortar

13  record stores is declining, while the consumption of digital music is on the rise.

14  (LeMoine Decl., Ex. Q at 423:16-424:5.)  Customers receive music digitally in

15  many different forms. (*Id*. at 420:23-421:16.)  Some purchase records in the form of

16  permanent digital copies from online music stores, such as Apple's iTunes.  Some

17  purchase records in the form of "mastertones" for their cell phones.  The popularity

18  of such formats has increased to the point that one major record company

19  announced recently that, for the first time ever, "more than half of its music sales in

20  the United States are now from digital products, like downloads on iTunes and ring

21  tones for cellphones."  *See* Tim Arango, "Digital Sales Surpass CDs at Atlantic",

22  *N.Y. Times*, November 26, 2008 (LeMoine Decl., Ex. D at 199).  In addition to

23  purchasing records in digital configurations, some others subscribe to online music

24  services whereby he or she can listen to streams of digital music during the period of

25  his or her subscription.  (LeMoine Decl., Ex. N at 360:9-364:18.)

26

27       [5] This is true not only of the Eminem Agreements, but also of Plaintiffs' *own*
   "Exclusive Recording Agreement" to which they signed Eminem, in the years
28  before he became famous.  (*Compare* Hoffman Decl., Ex. A ¶ 8 at 40, ¶ 16(e) at 45
   with LeMoine Decl., Ex. A ¶ 5(a) at 182, ¶ 24(d) at 187.)

MEMORANDUM OF P'S & A'S IN
SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

1   While the forms of consumption of music have changed, the distribution
2   model has not.  Online music stores run by Apple, Amazon.com and others, are no
3   different than "brick and mortar" stores such as Best Buy or Wal-Mart, or Tower
4   Records and Sam Goody before them, which bought records in the form of compact
5   discs or cassettes from Aftermath's distributor and resold them to consumers.
6   (LeMoine Decl., Ex. T at 488:5-489:7; Ex. Q at 432:3-8; Ex. N at 357:17-358:5.)
7   As before, the customer can browse the catalogue of available records, make a
8   selection, and leave the store with a permanent copy of the record.  (LeMoine Decl.,
9   Ex. T at 482:15-483:4.)  What is different between the Apple of today and the
10  Tower Records of yesterday is that today's sales model is more efficient.  (LeMoine
11  Decl., Ex. Q at 441:6-17; Ex. T at 486:1-487:19.)  Rather than Aftermath's
12  distributor manufacturing compact discs, cassettes and vinyl albums, and then
13  storing them in a warehouse until they are shipped to a retailer that has ordered
14  them, now Aftermath's distributor can provide a single copy of the record in digital
15  form to an online music retailer and the retailer can then instantaneously buy the
16  record from the distributor at a wholesale price and re-sell it as a permanent
17  download or a mastertone at a retail price to the consumer who has ordered it.
18  (LeMoine Decl., Ex. T at 484:21-485:24; Ex. Q at 427:12-428:23, 437:6-438:25;
19  Ex. N at 355:20-357:1, 357:17-359:3.)  The technological change in the nature of
20  the distribution does not change the reality that Apple and the other digital retailers
21  are simply making a retail sale of Aftermath's records to consumers.  (LeMoine
22  Decl., Ex. O at 385:21-388:7.)

23  The payment of royalties for digital transactions follows the commercial
24  reality of the transaction.  When the record company sells a permanent download
25  through an online store, the customer leaves with their own permanent copy of the
26  recording.  Accordingly, the record company pays an artist his or her royalty for that
27  sale under the standard "records sold" provision of the recording agreement.
28  (Hoffman Decl., Ex. A, ¶ 4(a)(i) at 36; Ex. D, ¶ 5(a)(i) at 87; LeMoine Decl., Ex. O

at 385:21-388:7; Ex. M at 314:23-315:18.)  The record company pays according to the same royalty structure for mastertones, which are just permanent downloads that the customer chooses to have play on his or her cell phone device.[6]  (LeMoine Decl., Ex. N at 355:20-357:1; Ex. P at 415:11-416:1; Ex. J at 296:3-14.)  Unlike the third-party products encompassed within the "masters licensed" provision, the record company performs the same marketing, sales and promotion functions for these digital records as it does for physical records. (Hoffman Decl., ¶ 6 at 28-29; LeMoine Decl., Ex. Q at 433:20-434:13.)  It also bears responsibility for the publishing royalty payments, which are often higher for permanent downloads and mastertones sales than for physical records.  (Hoffman Decl., ¶ 6 at 29.)

Some digital uses of music do not constitute sales of records, but are instead third-party products incorporating Universal masters.  For example, streaming music is typically offered through a subscription service, where a listener pays a flat monthly rate for the right to listen to his or her choice of tens of thousands of recordings by numerous recording artists and owned by many different record companies.  However, once that subscription ends, the listener's ability to listen to those recordings ends as well.  Other subscription services offer "conditional" or "tethered" downloads, which are downloads that the consumer can access only for as long as the consumer subscribes to the service.  (LeMoine Decl., Ex. Q at 425:21-426:15.)  In those instances, because the consumer does not buy any Aftermath records, but receives only temporary access to masters across a spectrum of artists and record labels, Aftermath accounts for the revenue it receives from such third-party subscription services under the "masters licensed" of the Eminem Agreements and not the "records sold" provision.  (LeMoine Decl., Ex. N at 360:9-364:18; Ex. S

---

[6] Actually, under the Eminem Agreements and as a matter of policy, Aftermath (and the rest of the Universal entities) pays the artist more favorably for a sale of a permanent download and a mastertone than it is contractually required to under the standard "records sold" provision. For such sales, even if it sells a single track, Aftermath pays the artist the higher percentage rate typically reserved for albums, and does not take certain deductions it would otherwise be permitted to take.

at 466:21-467:19.)  The application of different royalty provisions simply and accurately reflects whether Aftermath's record is being sold to a consumer (e.g., a permanent download or mastertone), or whether the customer is subscribing to a third-party product offering temporary and non-permanent access to the master (e.g., a streaming subscription). (LeMoine Decl., Ex. N at 360:9-364:18.)

### C.    The Recording Agreements at Issue Here

Although this dispute concerns Eminem's recording agreements, Eminem is not a party or witness in this case.[7]  Plaintiffs here are his former managers and producers who receive a substantial share of his royalties by virtue of their fortuity in signing him to an exclusive record deal in 1995, years before he was discovered by Dr. Dre and recorded his first album for Aftermath.  (LeMoine Decl., Ex. A at 181.) Plaintiffs are LLCs owned by three people: Jeff and Mark Bass, known as the "Bass Brothers," and Joel Martin.  (LeMoine Decl., Ex. H at 220:13-222:3.)  As the Bass Brothers readily admit, Martin is the manager of both entities and the spokesperson for Plaintiffs, at least where their businesses are concerned. (LeMoine Decl., Ex. K at 301:11-302:24; Ex. L at 306:25-307:11.)

The Eminem Agreements underlying this dispute consist of four different contracts.  There are two main recording agreements—a March 9, 1998 recording agreement whereby Plaintiff F.B.T. Productions, LLC ("F.B.T."), to whom Eminem had been signed exclusively, agreed to furnish Eminem's recording services to Aftermath (the "1998 Agreement) (Hoffman Decl., Ex. A), and a July 3, 2003 recording agreement (the "2003 Agreement") (Hoffman Decl., Ex. D), between Aftermath and Eminem directly (with F.B.T. and its co-plaintiff Em2M LLC being passive income participants only).  Two other agreements illuminate the terms of those recording agreements:  a September 27, 2000 novation to the 1998 Agreement among Eminem, F.B.T, and Aftermath (the "2000 Novation) (Hoffman Decl., Ex.

---

[7] Plaintiffs have stipulated that Eminem will not be a witness in the event there is a trial.  LeMoine Decl., Ex. F at 211.

C), and a November, 2004 amendment to the 2003 Agreement between Eminem, Aftermath, F.B.T., and Em2M (the "2004 Amendment") (Hoffman Decl., Ex. E). The clear language of all of the Eminem Agreements, considered together as the law requires, demonstrates that Plaintiffs' royalty accounting theory has no merit. *See Ghirardelli v. Peninsula Properties Co.*, 16 Cal. 2d 494, 496-97 (1940) (contracts must be interpreted as a whole).

### 1. The 1998 And 2003 Agreements

Unsurprisingly, the 1998 Agreement contains a typical royalty structure, applying a graduated scale of royalties for Aftermath's distribution and sale of records. (Hoffman Decl., Ex. A, ¶ 4(a) at 36.) Section 4(a), the basic "records sold" provision, applies royalties for all "full-price records sold in the United States." (*Id.*) The royalties consist of a range of percentages of the "Royalty Base Price" on sales of records, depending on factors such as whether the record is Eminem's first or fourth album delivered under the agreement, whether it is sold as an album or a single, and whether it is the first unit sold or the one millionth. (*Id.* at ¶ 4(a)(i). For example, on Eminem's first three albums, the royalty is "eighteen percent (18%) for the first five hundred thousand (500,000) net sales through normal retail channels in the United States ('USNRC Sales')." (*Id.*) That royalty increases by 0.5% when the sales exceed the first escalation target of 500,000 units, and by another 0.5% when sales exceed 1,000,000 units. (*Id.*) It is undisputed that "records sold" "through normal retail channels" includes Aftermath's sale of albums and singles of Eminem recordings in the form of compact discs through physical retailers, like Best Buy or Wal-Mart. (LeMoine Decl., Ex. H at 231:4-232:4; Ex. I at 267:21-269:22).

Also unsurprisingly, the 1998 Agreement defines "record" broadly and without limitation to distribution technology in use circa 1998. Hoffman Decl., Ex. A, ¶ 16(e) at 45. "Records" are "*all forms of reproductions*," and Aftermath has the right to sell them "in any or all forms of media now known and hereinafter developed." (*Id.*, ¶ 8 at 40.)

The 1998 Agreement also includes a provision for the income that Aftermath receives from ancillary uses other than record sales.  That section provides:  "On masters licensed by us or our NRS Licensees to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts. . ."  (*Id.*, ¶ 4(c)(v) at 37.)

The 2003 Agreement is almost identical in structure to the 1998 Agreement, but includes a higher advance and higher royalty rates for the sale of records, both a reflection of the fact that Eminem had become an international superstar in the intervening years.  (LeMoine Decl., Ex. P at 405:10-406:5, 407:2-13; Ex. M at 325:13-20.)  Rather than negotiate a new contract form, the parties used the 1998 Agreement as a template and changed only what was necessary to effectuate the new financial terms.  (LeMoine Decl., Ex. P at 407:2-24; Ex. M at 331:17-332:5; Ex. R at 453:7-455:15.)  Section 4(a) of the 1998 Agreement is renumbered as section 5(a) of the 2003 Agreement, and still provides that Eminem will receive certain (higher) percentages of the "Royalty Base Price" "on full-price records sold in the United States."  (Hoffman Decl., Ex. D, ¶ 5(a) at 87.)  Section 5(c)(v), the provision regarding the licensing of masters is also materially identical to the provision numbered 4(c)(v) in the 1998 Agreement.   (*Id.*, ¶ 5(c)(v) at 88.)

### 2.  The 2000 Novation

There are two relevant amendments to the 1998 and 2003 Eminem Agreements.  The first is the "2000 Novation," which (among other things) established a direct contractual relationship between Eminem and Aftermath.  The 2000 Novation transferred the obligation to provide Eminem's recording services from F.B.T. (which had provided Eminem's services under the 1998 Agreement) directly to Eminem, and made F.B.T. a "passive income participant," with an interest in a substantial share of Eminem's royalties for the next five albums to be released by Aftermath.  (Hoffman Decl., Ex. C at 64; LeMoine Decl., Ex. H at 223:4-25.)

Significantly for purposes of this case, the 2000 Novation makes it clear that the "masters licensed" provision in the 1998 Agreement covers "ancillary uses" and not the sale of records.  (Hoffman Decl., Ex. C, ¶ 6 at 67.)  Specifically, after discussing the split of income from the sale of records, in referring to the split of income subject to the "masters licensed" provision, the 2000 Novation states that F.B.T. and Eminem will split "any advances or fees payable to Artist *in connection with any ancillary uses* of each master recording."  (*Id*.)  (emphasis added).

### 3.    The 2004 Amendment

In November 2004, Eminem released "Encore," the fourth album delivered under the Eminem Agreements.  That same month, the parties entered into the 2004 Amendment, which amended the Eminem Agreements to provide Eminem with another lucrative advance.  (LeMoine Decl., Ex. M at 333:23-335:8; Ex. P at 411:21- 412:14.)

In addition, and most significant to this dispute, the 2004 Amendment includes the only explicit reference to either permanent downloads or mastertones in any of the Eminem Agreements.  The 2004 Amendment modified Section 5(a), the standard "records sold" royalty provision of the 2003 Agreement, to provide for an increase in royalty rates.  (Hoffman Decl, Ex. E, ¶ 2(a) & (b) at 112.)  It also specifically addressed the sales of permanent downloads within Section 5(a):

> Sales of Albums by way of permanent download shall be treated as USNRC Net Sales for the purposes of escalations, provided that the sales price concerned falls within a top-line sales price category applicable to such method of sale.

(*Id*., ¶ 2(a) at 112.)  By amending the standard royalty provision in the 2003 Agreement to permit albums sold as permanent downloads to be treated as "USNRC Net Sales" for the purpose of escalations, the 2004 Amendment treated downloads as sales under the exact provision that Plaintiffs claim is inapplicable to permanent downloads and mastertones in this lawsuit.  (*Id*.) Plaintiffs' members Joel Martin

1   and Mark Bass executed and approved this Amendment on behalf of both Plaintiffs

2   in this case.  (LeMoine Decl., Ex. H at 250:2-25, 254:22-255:16; Ex. L at 308:3-15)

3            This portion of the 2004 Amendment did not change the applicable royalty

4   provision for permanent downloads—the parties knew that they always had been

5   accounted for as "USNRC Net Sales" under the "records sold" provision.  (Hoffman

6   Decl., ¶¶ 11-12 at 30-31; *see also e.g.* Ex. F at 118; LeMoine Decl., Ex. P at 413:1-

7   414:11).  Rather, the provision was simply a clarification that albums sold as

8   downloads were *also* counted for escalations purposes, provided that such albums

9   were sold within a certain price category.  (*Id.*)  Absent this clarification, Aftermath

10  would not have been technically required to include albums sold as downloads in

11  counting units sold toward escalations, because escalations apply only to "full price

12  records sold"  (Hoffman Decl, Ex. D, ¶ 5(a)(i) at 87), and, in 2004, the price for

13  albums sold as downloads was lower than what qualified as "full price."  (Hoffman

14  Decl., ¶ 11 at 30-31.)

15          **D.    Plaintiffs' Claims In This Case**

16          Plaintiffs claim that the sales of Eminem recordings in permanent downloads

17  and mastertones configurations should not be treated as core product "sales of

18  records," but should instead be accounted for under the "masters licensed" royalty

19  provision applicable to ancillary revenue received from third-party uses of masters.

20  Second Amended Compl. at ¶ 4 (Docket No. 100).   Rather than recognizing the

21  downloads and mastertones as "records sold" by Aftermath through its distributor,

22  Plaintiffs contend that Aftermath licenses the Eminem masters to third-parties like

23  Apple or Sprint who then create and sell their own products as permanent

24  downloads or mastertones.  Based upon that premise, Plaintiffs assert that they are

25  entitled to 50% of Aftermath's net receipts, as opposed to the standard royalty

26  applicable to "records sold."

27          In making this claim, Plaintiffs rely on the unremarkable evidence that

28  representatives of other artists have sought this more favorable royalty treatment for

MEMORANDUM OF P'S & A'S IN
SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

the sale of records in digital formats.  (LeMoine Decl., Ex. G at 215-217; Ex. P at 394:20-400:22)  They ignore the lack of evidence of any Universal artist (or any other artist) ever actually receiving such royalty treatment, even "superstar" artists who negotiated or renegotiated their recording agreements after the advent of Apple's iTunes store.  (LeMoine Decl., Ex. M at 316:11-320:3; Ex. J at 287:19-288:10; Ex. I at 265:12-266:20.)  They rely also on examples of Universal and Apple executives' casual use of the word "license," on a wholesale import of copyright and licensing law principles into the Eminem Agreements, and on economic arguments based on Universal's allegedly decreased costs for digital distribution.  Plaintiffs' argument boils down to this:  Universal's agreements with digital music providers are "licenses," so Aftermath owes Plaintiffs 50% of the net receipts generated from its sales of records through those digital music services.

Plaintiffs first raised this issue in February of 2006 after their royalty auditor, Gary Cohen, reported that they were missing out on "significant $$" by not demanding that Aftermath account for the sale of permanent downloads under the "masters licensed" provision, rather than as the sale of records. (LeMoine Decl., Ex. B at 194.)  When Aftermath denied the audit claim, Plaintiffs brought this lawsuit. (LeMoine Decl., Ex. E at 204.)

## III.   PLAINTIFFS' FIRST CAUSE OF ACTION FAILS

### A.   Legal Standards

Summary judgment is appropriate "on all or part" of a case "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a), (b), (c); *see Wang Labs v. Mitsubishi Electronics America*, 860 F. Supp. 1448, 1451 (C.D. Cal. 1993).

The proper interpretation of the Eminem Agreements is for this Court to decide. *See Wolf v. Walt Disney Pictures and Television*, 162 Cal. App. 4th 1107,

1125 (2008).[8]  In interpreting a contract, the Court's goal is to give effect to the parties' mutual intent.  *See Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264-65 (1992) (citing Cal. Civ. Code § 1636).  If the contractual language is clear and explicit, it controls. *Id.* at 1264; *see also* Cal. Civ. Code § 1638.

Whenever possible, the Court should determine the parties' intent from the writing alone.  *Wolf*, 162 Cal. App. 4th at 1126.  If the Court confronts a provision that is "reasonably susceptible" to two competing interpretations, extrinsic evidence may resolve the ambiguity.  *Wagner v. Columbia Pictures Industries, Inc.,* 146 Cal. App. 4th 586, 588 (1988).  But the admission of extrinsic evidence does not convert the interpretation of a contract into a fact question, unless the extrinsic evidence conflicts in a manner that requires a credibility assessment to resolve. *Wolf*, 162 Cal. App. 4th at 1134; *id*. at n. 18.  If the extrinsic evidence involves only competing inferences, not competing facts, no factual question exists and the contract's proper interpretation remains a question for the Court.  *Id.*

The Eminem Agreements indisputably treat the sales of permanent downloads and mastertones as "records sold," subject to the ordinary core-product royalty provisions.  Plaintiffs do not offer a contrary interpretation to which the Eminem Agreements are "reasonably susceptible," so extrinsic evidence is unnecessary.  But even if this Court considers such evidence, the relevant and admissible extrinsic evidence here supports Aftermath's interpretation.  In any event, none of the extrinsic evidence requires a credibility determination, so the question here remains one for the Court to resolve, whatever the body of evidence considered.

---

[8] The parties agree that California law governs the Eminem Agreements. (Hoffman Decl., Ex. A ¶ 21 at 46-47; Ex. D ¶ 22 at 105.)

**B.    The Eminem Agreements Are Not Reasonably Susceptible To Plaintiffs' Interpretation**

    1.    The plain text of the Eminem Agreements includes the sale of permanent downloads and mastertones within the "records sold" royalty provisions.

The 2004 Amendment's treatment of "sales of permanent downloads" as "USNRC Net Sales" within the "records sold" provision cannot be read consistently with Plaintiffs' royalty theory, which attempts to treat the same sales under an entirely separate royalty provision.  The parties agree that the "masters licensed" provision in 5(c)(v) applies only to third-party products, *not* Aftermath's sales of records. (LeMoine Decl., Ex. I at 274:7-275:2; Ex. N at 370:14-375:22.)  The parties also agree that "USNRC Net Sales" in 5(a)(i) applies only to Aftermath's sale of records, *not* to third-party products.  (LeMoine Decl., Ex. I at 267:21-269:2; Ex. J 291:7-17, 294:15-295:5; Ex. P at 401:2-402:24.) The 2004 Amendment's inclusion of  "the sale of albums by way of permanent downloads" as "USNRC Net Sales"– or sales *by Aftermath* – in Section 5(a)(i) is entirely inconsistent with Plaintiffs' theory that 5(c)(v) applies.  (Hoffman Decl., Ex. E ¶ 2(a) at 112.)  If Plaintiffs are correct, Aftermath (or its distributor) never itself sells permanent downloads at all – it only licenses the masters to third parties to sell permanent downloads.  Treating "the sale of albums by way of permanent download" as sales by Aftermath cannot be reconciled with Plaintiffs' theory, which rests on the premise that Aftermath does not sell downloads at all.  (LeMoine Decl., Ex. I at 274:7-275:2; Ex. H at 246:10-247:9.)

Even though this inconsistency undermines Plaintiffs' royalty theory, it is precisely what they rely on to try to avoid the damage the 2004 Amendment does to their case.  Instead of reconciling these two provisions – which they cannot do – Plaintiffs simply say that albums sold through permanent download are treated as Aftermath's sales *only* for the purposes of escalations, and not for the purpose of determining which royalty provision applies.  But counting permanent downloads as Universal sales at all, for whatever purpose, undermines their royalty theory.  If, as

1   Plaintiffs claim, Aftermath only licenses masters to third-parties to distribute
2   downloads, there never has been a sale of a permanent download by Aftermath to
3   count toward escalations, or for any other purpose.

4          The 2004 Amendment is the only instance in which the parties *ever*
5   specifically addressed in any contract which royalty provision applied to permanent
6   downloads.  They explicitly agreed that they would be treated under the "records
7   sold" provision in 5(a)(i), the provision Aftermath has applied since the advent of
8   these digital formats.  (Hoffman Decl., Ex. E ¶ 2(a) at 112.)  The 2004 Amendment
9   never mentions the "masters licensed" provision, nor is there any other document
10  between the parties that Plaintiffs can point to that includes permanent downloads or
11  mastertones within the provision they contend applies.  The plain text of the 2004
12  Amendment eliminates any doubt about what royalty treatment the plain language
13  of the Eminem Agreements requires.

14         The plain text of the 1998 and 2003 Agreements also demonstrates the
15  infirmity of Plaintiffs' royalty theory.  The Eminem Agreements define records to
16  encompass "all forms of reproduction," indisputably including permanent
17  downloads and mastertones.  (Hoffman Decl., Ex. A, ¶ 16(e) at 45; Ex. D ¶ 16(e) at
18  103.)  Aftermath's sale of records in permanent download and mastertone
19  configurations are properly treated as "records sold" through "normal retail
20  channels" in the 1998 and 2003 Agreements.  (Hoffman Decl., Ex. A, ¶ 4(a)(i) at 36;
21  Ex. D, ¶ 5(a)(i) at 87.)

22         "Normal retail channels" (or USNRC Sales) indisputably refers to the
23  ordinary business of Aftermath distributing records through retailers for sale.
24  (LeMoine Decl., Ex. I at 267:21-269:2; Ex. J at 291:7-17, 294:15-295:5; Ex. P at
25  401:2-402:24.) Aftermath's sale of records to customers through digital music
26  retailers is functionally indistinguishable from sales through brick-and-mortar
27  retailers.  In both situations, the customer buys Aftermath's records through a
28  retailer, and concludes the transaction with receipt of his or her own permanent copy

MEMORANDUM OF P'S & A'S IN
SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

1   of the record.  To be sure, with respect to permanent downloads and mastertones,

2   the record "store" exists in cyberspace rather than on Main Street.  And the copy of

3   the record is made nearly simultaneously with the customer's purchase of the record

4   (*i.e.*, when the user clicks his or her computer mouse to complete the sales

5   transaction), rather than being pressed onto vinyl or a CD and shipped to a physical

6   record store for ultimate sale to a consumer months or years later.  But the nature of

7   the transaction is exactly the same in cyberspace as it was in the physical world, *i.e.*,

8   the sale of Aftermath's core product to a purchasing customer.  It is a sale of a

9   record under the plain language of the 1998 and 2003 Agreements, and thus the

10  standard royalty provisions covering Aftermath's sale of records apply.

11              2.      Another federal district court has already dismissed the exact
                        same claim based on very similar contractual language.

12          Another federal court facing the same issue ruled for the record company

13  based on the plain language of the agreements, even without the benefit of an

14  express clarification like the 2004 Amendment.  In *Allman Brothers,* the popular

15  recording group The Allman Brothers Band claimed that their record company was

16  obligated to pay them 50% of net receipts for the sale of permanent downloads and

17  mastertones under an analogous "masters licensed" royalty provision.  *Allman

18  Brothers*, 2008 WL 2477465, at *2 (LeMoine Decl., Ex. C at 197.) The district court

19  dismissed the claim, and interpreted the comparable provisions of the Allman

20  Brothers' recording agreement to require the royalty treatment of permanent

21  downloads and mastertones under the standard royalty provisions applicable to the

22  sales of records.  The critical point for the *Allman Brothers* court was the expansive

23  definition of the term "Phonograph Record."  Like the Eminem Agreements, the

24  Allman Brothers' contracts provided for the distribution of sound recordings

25  through "all forms of reproduction, now or hereafter known."  (*Id.*).  Once the court

26  found digital music files fell within that definition—as they indisputably do here—

27  the case was over.  As in *Allman Brothers*, "the emergence of a new era of digital

28

1   sound recordings does not afford plaintiffs the right, under the guise of contract

2   interpretation, to rewrite the terms" of their contracts to obtain a more favorable

3   royalty formula.  (*Id*.)

4   **C.     Even If Extrinsic Evidence Is Considered, Plaintiffs Still Cannot**

5        **Prevail**

6        Resort to extrinsic evidence is unnecessary because the Eminem Agreements

7   are not "reasonably susceptible" to Plaintiffs' proposed interpretation.  But even if

8   the Court were to consider extrinsic evidence, none of the evidence creates a

9   question of fact about the objective, mutual intent of the parties to the Eminem

10  Agreements at the time of contracting.  All of the evidence relevant to determining

11  the parties' contractual intent—the understanding of the parties, the parties'

12  performance under the agreements, and the custom and practice in the industry—

13  indisputably supports Aftermath's royalty treatment of permanent downloads and

14  mastertones under the "records sold" provision in the Eminem Agreements.  *See*

15  *General Motors v. Superior Court*,  12 Cal. App. 4th 435, 442 (1993) (defining

16  universe of extrinsic evidence as the evidence relevant to show what the parties

17  understood).

18       To raise an issue of fact about the Eminem Agreements' interpretation,

19  Plaintiffs must come up with *some* evidence that the parties understood the "masters

20  licensed" provision to apply to revenue from sales of permanent downloads and

21  mastertones.  They cannot do that.  In Opposition to this Motion, Plaintiffs will

22  submit no drafts of the Eminem Agreements, no correspondence from the

23  negotiations of the Agreements, no testimony from the Agreements' negotiators, and

24  no evidence of the course of performance in support of their royalty theory.  None of

25  the evidence they will submit has any bearing on what the parties understood at the

26  time of contracting—the only relevant inquiry—because all such evidence supports

27  Aftermath.  Without any extrinsic evidence of the parties' intent to support their

28  claim, Plaintiffs must venture far afield to bring in an irrelevant and inadmissible

hodgepodge of information that reveals nothing about what the parties understood at the time of contracting, whether about the competing royalty provisions at issue here or anything else.

1. The admissible, competent extrinsic evidence supports Aftermath's reading of the Agreements

The evidence of what the parties understood about the application of these competing royalty provisions proves that there is no factual dispute about whether Aftermath applies the proper royalty provision to the sales of permanent downloads and mastertones.  The evidence is undisputed that the parties understood the "records sold" provision to cover sales of Aftermath's core product: records.  Ex. ____ (LeMoine Decl., Ex. I at 267:21-269:2; Ex. H at 229:7-16, 230:19-232:4 233:18-235:10; Ex. J at 294:15-25; Ex. P at 401:2-402:24.)  For records sold through Aftermath's distributors in the course of their primary business, Aftermath must pay the artist the applicable royalty under the "records sold" provision.  (*Id.*; LeMoine Decl., Ex. H at 256:16-257:8.)  The parties also understood that the "masters licensed" provision does *not* apply to Aftermath's core product sales, but, as confirmed by the 2000 Novation, instead applies to ancillary revenue from third-party sources, such as synchronization licenses and compilation albums.  (LeMoine Decl., Ex. I at 272:20-283:6; Ex. H at 242:18-243:14, 246:15-247:8, 248:11-249:22; Ex. N at 374:6-376:12.)  There is no dispute that is how these provisions have historically been applied, and that is how they were understood by the parties.[9]

Neither can there be any real dispute as to whether permanent downloads and mastertones are records sold by Aftermath that are subject to the core product

---

[9] Plaintiffs have disclosed a conclusory "expert report" from a former record company executive, David Berman, whose experience in the industry ended before the distribution of records as permanent downloads and mastertones.  Mr. Berman's opinions are uninformed.  He says that the "masters licensed" provision is a "catch-all" for any use not specifically provided for, without addressing anywhere the definition of the word "record" and whether permanent downloads or mastertones fall within it.  He also claims that downloads are "ancillary" based not on the intentions of the parties, but on four-year-old sales data.  Mr. Berman's expert report, and any similarly uninformed, conclusory declaration offered in opposition to this motion, will be the subject of a motion to strike.

royalty provisions in the Eminem Agreements.  Plaintiffs cannot dispute that
permanent downloads are "forms of reproduction," and thus are "records" under the
plain terms of the agreement.  It is undisputed that the *only* time the parties
addressed in any of their contracts whether permanent downloads or mastertones
should be treated as sales of records within the standard royalty provisions, they
agreed that they should be.  The 2004 Amendment is the only explicit reference to
permanent downloads or mastertones in any of the Eminem Agreements, and it
specifically provides for the treatment of permanent download sales under the
standard "records sold" royalty provision.  (Hoffman Decl., Ex. E ¶ 2(a) at 112.)

Since permanent downloads and mastertones emerged as a means of
distributing sound recordings, Aftermath has accounted for their sales under the
standard royalty provisions for the sale of records.  That has been well understood
by all of the parties.  Both Eminem and Plaintiffs have received royalty statements
from Aftermath covering the sale of permanent downloads and mastertones, and
showing how those digital uses are accounted for.  (Hoffman Decl. ¶ 12 at 31; Ex. F
at (for example) 118.)   The Eminem Agreements have been amended twice since
these digital formats were introduced, both the 2003 Agreement and the 2004
Amendment.  But there is no evidence that Plaintiffs ever expressed in the course of
negotiations that the sale of Eminem recordings in digital formats should be treated
as licensing revenue, rather than as core-product sales of records.  To the extent the
Plaintiffs believed that this treatment was warranted but said nothing, that evidence
is irrelevant as unexpressed intent.  *Oakland-Alameda County Coliseum, Inc. v.
Oakland Raiders, Ltd.,* 197 Cal. App. 3d 1049, 1058 (1988).  Instead, the objective
evidence demonstrates that Plaintiffs and Aftermath performed under the Eminem
Agreements for years in exactly the manner Plaintiffs now challenge, without
objection until their auditor raised the point during the 2006 audit.  *See Crestview
Cemetery Ass'n. v. Dieden*, 54 Cal. 2d 744, 753 (1960) (stating that the "acts of the

MEMORANDUM OF P'S & A'S IN
SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

1   parties under the contract afford one of the most reliable means of arriving at their

2   intention").

3              2.    Plaintiffs' extrinsic evidence is incompetent and inadmissible.

4        Instead of presenting evidence of what the parties understood when they

5   negotiated and agreed to the Eminem Agreements, Plaintiffs cite to a March 2004

6   letter from several music industry lawyers to the heads of major record companies,

7   including Universal, arguing, without reference to the Eminem Agreements or to

8   *any* specific recording agreements, that the sales of permanent downloads should be

9   treated as licensing income.  (LeMoine Decl., Ex. G at 215-17.)  The signatories

10  include Peter Paterno and Gary Stiffelman, negotiators on the Eminem Agreements

11  in 1998 and 2003, respectively.  (*Id.* at 217; LeMoine Decl., Ex. M at 321:16-

12  322:25; Ex. R at 456:5-458:23.)  Whatever royalty treatment these lawyers sought

13  for their unnamed clients *in early 2004*, it has no relationship to what the parties

14  here understood they were agreeing to when negotiating the Eminem Agreements *in*

15  *1998 and 2003*.  That the March 2004 letter does not represent the parties'

16  understanding is confirmed by the 2004 Amendment, entered into several months

17  after the March 2004 letter, where the parties (including Mr. Stiffelman on behalf of

18  Eminem) specifically acknowledged that the sales of albums by way of permanent

19  download constituted "records sold" under the Eminem Agreements.  (Hoffman

20  Decl., Ex. E ¶ 2(a) at 112; LeMoine Decl., Ex. H at 250:2-251:10.)

21       Second, Plaintiffs seize on extraneous uses of the word "license" by Universal

22  and Apple senior executives in interviews and statements, none of whom had any

23  connection whatsoever to the negotiation of the Eminem Agreements.  By collecting

24  stray examples of the word "license" by Steve Jobs, the CEO of Apple Inc. or

25  Jimmy Iovine, the Chairman of Interscope/Geffen/A&M, Plaintiffs attempt to prove

26  that Universal and Apple's relationship is that of licensor and licensee and not

27  wholesaler and retailer.  But the use of the term "license" by people who are not

28  music lawyers and had no role in the negotiation of the Eminem Agreements cannot

MEMORANDUM OF P'S & A'S IN
SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

create an issue of fact as to what the parties to the Eminem Agreements understood about which royalty provision would apply to certain types of exploitation.  The testimony of these executives who used the term "license" bears that out—their use of the term had nothing to do with which royalty provision of the Eminem Agreements (or any recording agreement) applies to the sale of permanent downloads or mastertones.  (LeMoine Decl., Ex. V at 504:18-505:24.)  Rather, it demonstrates only that people within the industry sometimes use the terms "license" and "sale" loosely, without any intent to incorporate their legal meaning.  (LeMoine Decl., Ex. V at 507:4-508:10; Ex. U at 495:7-496:15.)

Third, Plaintiffs import wholesale into the Eminem Agreements esoteric concepts of copyright and licensing law.  They dissect the agreements between Universal and digital music retailers, like Apple, for any indication that such agreements are "licenses," as that term is legally understood.[10]  They submit expert legal testimony opining on when title to the digital file passes from Universal to Apple to the end user in an iTunes transaction and the "first sale" doctrine, without any insight into the parties' understanding of the royalty provisions of the Eminem Agreements.[11]  Plaintiffs have absolutely no evidence that any party or party

---

[10] Plaintiffs seize upon isolated agreements' uses of the term "license," much like they have done with Messrs. Iovine and Jobs.  The evidence shows that these were form agreements proposed by the digital retailer, and that the essential character of the business transaction that triggers the royalty obligation is unchanged whether the agreement with the digital retailer uses the terms "license", "sale", "authorize", "permit" or any other terms  (LeMoine Decl., Ex. W at 512:21-518:21.)  Moreover, Plaintiffs cannot introduce any evidence to show that either they or Aftermath thought a different royalty provision would apply to a record sold, depending on whether the template for the digital provider agreement used the word "license" or "reseller", especially given that there is no evidence that any of the negotiators of the Eminem Agreements negotiated (or ever saw) any of Universal's agreements with digital retailers.

[11] Plaintiffs' theory as to the significance of title passing is wrong in any event.  As their own representative, Mark Levinsohn testified, there are examples of ordinary sales of physical product that do not include the passing of title.  (LeMoine Decl., Ex. I at 270:5-272:15).  Plaintiffs agree that ordinary physical sales to retailers like Best Buy or Wal-Mart are properly treated under the "records sold" provision.  Those sales occasionally involve transactions in which title never passes to the retailer, *id.*, so it is unclear why title passing is relevant to the question of the proper royalty treatment at all.

MEMORANDUM OF P'S & A'S IN
SUPPORT OF DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT

negotiator understood the words "license" or "sale" to include these scholarly legal concepts at the time of contracting.

Rather, the undisputed evidence shows that the parties understood the competing royalty provisions in the same way, in accord with custom and usage in the music business:  one royalty provision is for the record company's own core product distribution (i.e., the sale of the record company's records) and the other is for ancillary third-party revenue.  (For the parties understanding of the "masters licensed" provision, *see* LeMoine Decl., Ex. I at 272:20-283:6; Ex. H at 242:18-243:14, 246:15-247:9, 248:11-249:22; for the parties' understanding of the "records sold" provision, *see* LeMoine Decl. Ex. I at 267:21-269:2; Ex. H at 233:18-235:10, 229:7-16, 230:19-232:4; Ex. J at 294:15-295:5; Ex. P at 401:2-402:24.)  Under settled California law, that trade usage is relevant and can define the terms of a contract between two parties in the same business who understand contractual terms in the same way. *See Beneficial Fire and Casualty Insurance v. Kurt Hitke & Co.*, 46 Cal. 2d 517, 525-26 (1956).

Finally, Plaintiffs insist that the economics of permanent download and mastertone distribution require that they receive a more favorable royalty treatment than the "records sold" provision affords.  Because the actual distribution of downloads and mastertones is more efficient and less costly than physical distribution, Plaintiffs believe that they are entitled to a larger piece of the revenue pie.  Plaintiffs ignore Aftermath's significant marketing, promotion and distribution costs, which remain the same sales in physical and digital distribution, as well as the obligation to pay mechanical royalties, which is often higher for permanent downloads and mastertone sales.  (Hoffman Decl., ¶ 6 at 28-29.) And they ignore that, under the typical practice, third parties would be incurring those costs for their products falling within the "masters licensed" provision.  (*Id.*) Plaintiffs simply contend that Aftermath's costs have decreased under a digital distribution model, which is not relevant to what the parties understood about the applicable royalty

provision.  Without relevance to the parties' intent, this cannot give rise to a factual dispute about the Eminem Agreements' meaning.

Nothing in the Eminem Agreements ties the proper royalty treatment to the cost of distribution.  If those costs had increased, Aftermath would not be entitled to pay Plaintiffs *less* than the parties bargained for.  There is no reason why any decrease in costs would have the inverse effect.  The parties negotiated and agreed to the royalties in the Eminem Agreements.  If the parties renegotiate, Plaintiffs then can argue for a greater share of royalties in light what they see as Aftermath's costs.  Until that renegotiation, Plaintiffs' emphasis on the economics of digital distribution in this lawsuit is an effort to persuade this Court to rewrite the contract to give them a better deal than they bargained for.   Like the *Allman Brothers* Court, this Court should decline that invitation.  *See Allman Brothers*, 2008 WL 2477465, at *2 (LeMoine Decl., Ex. C at 197.)

## IV.   CONCLUSION

The Court should summarily adjudicate that Plaintiffs' first cause of action is without merit and dismiss it with prejudice.

DATED:   December 3, 2008                    MUNGER, TOLLES & OLSON LLP


                                             By:___/s/ Glenn D. Pomerantz_____
                                                  Glenn D. Pomerantz

                                             Attorneys for Defendants