# EXHIBIT H

CERTIFIED
COPY

```
 1

 2     UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA
 3     ---------------------------x
       F.B.T. PRODUCTIONS, LLC,    )
 4     and Em2M, LLC,              )
                      Plaintiffs,)
 5               v.               )Case No. CV 07-03314
       AFTERMATH RECORDS doing    )PSG (MANx)
 6     business as AFTERMATH      )
       ENTERTAINMENT; INTERSCOPE  )
 7     RECORDS; UMG RECORDINGS,    )
       INC.; and ARY, INC.,       )
 8                      Defendants.)
       ---------------------------x
 9     UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF MICHIGAN
10     SOUTHERN DIVISION
       ---------------------------x
11     EIGHT MILE STYLE, LLC and  )
       MARTIN AFFILIATED, LLC,     )
12                      Plaintiffs,)
                 vs.              )Case No. 2:07-cv-13164
13     APPLE COMPUTER, INC. and   )Hon. Anna Diggs Taylor
       AFTERMATH RECORDS d/b/a     )
14     AFTERMATH ENTERTAINMENT,    )
                      Defendants.)
15     ---------------------------x

16                     May 14, 2008

17                     10:06 a.m.

18

19           Deposition of JOEL MARTIN, held at the

20     law offices of Jenner & Block, 919 Third Avenue,

21     New York, New York, pursuant to notice and

22     agreement, before Donald R. DePew, an RPR, CRR and

23     Notary Public within and for the State of

24     New York.

25
```

|          |    |                                                    |
|----------|----|----------------------------------------------------|
|          | 1  | Joel Martin                                        |
| 10:08:07 | 2  | announcer in Detroit and he was professionally     |
| 10:08:11 | 3  | known as Bill Martin on the radio.  One of the     |
| 10:08:14 | 4  | first jobs I got in the recording business was     |
| 10:08:17 | 5  | from a friend of his in the Detroit market, who    |
| 10:08:20 | 6  | knew me as his son, Joel Martin, and I was         |
| 10:08:24 | 7  | commonly known as Joel Martin thereafter.          |
| 10:08:28 | 8  | Q.    What is your home address?                   |
| 10:08:29 | 9  | A.    25564 Wareham, Huntington Woods,             |
| 10:08:35 | 10 | Michigan.                                          |
| 10:08:36 | 11 | Q.    Zip?                                         |
| 10:08:37 | 12 | A.    48070.                                       |
| 10:08:39 | 13 | Q.    And what is your business address?          |
| 10:08:40 | 14 | A.    1525 East Nine Mile Road, Ferndale,         |
| 10:08:47 | 15 | Michigan, 48220.                                   |
| 10:08:48 | 16 | Q.    And what business is located at that        |
| 10:08:50 | 17 | address?                                           |
| 10:08:53 | 18 | A.    My recording studio, the general            |
| 10:08:56 | 19 | offices for Eight Miles Style, the general offices |
| 10:09:01 | 20 | for Martin Affiliated, and F.B.T. Productions,     |
| 10:09:12 | 21 | Chrome Bumper Films.  I think that would be it.    |
| 10:09:18 | 22 | Q.    Do you own or control each of those         |
| 10:09:20 | 23 | entities?                                          |
| 10:09:24 | 24 | MR. BUSCH:  Object to form, control.               |
| 10:09:27 | 25 | Could you --                                       |

5

Exhibit H, Page 220

|  |  | Joel Martin |
|---|---|---|
| 10:09:28 | 1 | |
| | 2 | A.    I don't own each of those entities.    I |
| 10:09:30 | 3 | am the agent, in fact, for the entities that I |
| 10:09:35 | 4 | don't own. |
| 10:09:35 | 5 | Q.    Which of those entities do you have an |
| 10:09:37 | 6 | ownership interest in? |
| 10:09:39 | 7 | A.    Martin Affiliated; 54 Sound, which is |
| 10:09:42 | 8 | the recording studio; Chrome Bumper Studios; and |
| 10:09:50 | 9 | Em2M, LLC. |
| 10:09:54 | 10 | Q.    Who owns Eight Miles Style? |
| 10:09:58 | 11 | A.    Eight Miles Style is an LLC with its |
| 10:10:01 | 12 | partners being Mark Bass and Jeff Bass. |
| 10:10:06 | 13 | Q.    And what is your role at Eight Miles |
| 10:10:08 | 14 | Style? |
| 10:10:09 | 15 | A.    I'm the managing -- I'm the manager for |
| 10:10:13 | 16 | Eight Miles Style. |
| 10:10:14 | 17 | Q.    Do you have any ownership interest at |
| 10:10:16 | 18 | all in Eight Miles Style? |
| 10:10:17 | 19 | A.    No. |
| 10:10:19 | 20 | Q.    Who owns F.B.T. Productions? |
| 10:10:23 | 21 | A.    Again, it's an LLC.  The members are |
| 10:10:26 | 22 | Mark Bass and Jeff Bass. |
| 10:10:28 | 23 | Q.    Do you have any ownership interest? |
| 10:10:30 | 24 | A.    No. |
| 10:10:30 | 25 | Q.    What is your role at F.B.T. |

6

**Exhibit H, Page 221**

```
                    1              Joel Martin
10:10:32            2    Productions?
10:10:33            3         A.    Again, I'm the manager.
10:10:37            4         Q.    Have you ever had your deposition taken
10:10:38            5    before?
10:10:39            6         A.    Yes, I have.
10:10:40            7         Q.    How often?
10:10:41            8         A.    How often?
10:10:44            9         Q.    How many times?
10:10:45            10        A.    Three or four.
10:10:46            11        Q.    Can you tell me what matters those were
10:10:52            12   taken in.
10:10:52            13        A.    I believe one would have been in a
10:10:54            14   lawsuit relating to The Romantics, a group from
10:11:01            15   Detroit, versus their managers and their attorney.
10:11:12            16   This was litigation in Detroit in the late 1980s
10:11:18            17   and early 1990s.
10:11:27            18             There was litigation involving a group
10:11:30            19   called Sponge that was on Sony Records, that I was
10:11:34            20   deposed for as it related to that matter.  It was
10:11:38            21   a lawsuit, I believe in 1993, '94.  I might have
10:11:46            22   been deposed in 1995, I believe I was.
10:11:50            23        Q.    And what matter is that?
10:11:51            24        A.    Sponge was a group, a recording group.
10:11:53            25        Q.    You gave me two matters.
```

                                                                    7

**Exhibit H, Page 222**

Joel Martin

| | | |
|---|---|---|
| 12:04:34 | 2 | Q.    When was The Eminem Show released? |
| 12:04:38 | 3 | A.    I believe it was 2002. |
| 12:04:41 | 4 | Q.    Now, between the time that The Marshall |
| 12:04:42 | 5 | Mathers LP was delivered and The Eminem Show was |
| 12:04:46 | 6 | delivered -- |
| 12:04:47 | 7 | A.    Yes. |
| 12:04:47 | 8 | Q.    -- did your -- did the relationship |
| 12:04:50 | 9 | between and among F.B.T., Mr. Mathers, and |
| 12:04:55 | 10 | Aftermath change? |
| 12:04:57 | 11 | MR. BUSCH:  Can you explain what you |
| 12:04:58 | 12 | mean by change. |
| 12:05:01 | 13 | MR. POMERANTZ:  Contractual |
| 12:05:02 | 14 | relationship. |
| 12:05:08 | 15 | A.    I believe we entered into a novation of |
| 12:05:10 | 16 | our agreement with Aftermath. |
| 12:05:12 | 17 | Q.    And after the novation did your role on |
| 12:05:16 | 18 | either the creative or business side change in any |
| 12:05:20 | 19 | way? |
| 12:05:25 | 20 | A.    Not -- to the extent that I didn't have |
| 12:05:27 | 21 | approvals over things that I did before, for |
| 12:05:29 | 22 | example, video budgets and other things, yes, it |
| 12:05:32 | 23 | did. |
| 12:05:32 | 24 | Q.    But only to that extent? |
| 12:05:34 | 25 | A.    Yes. |

95

**Exhibit H, Page 223**

1                          Joel Martin

12:08:21   2       A.     Well, as it related to compositions, in

12:08:24   3   terms of being a publisher, I mean, I tried my

12:08:28   4   best to make sure that there were exploitations of

12:08:30   5   the compositions and doing things that were

12:08:32   6   customary of a publisher to promote the albums, so

12:08:35   7   that they would be promoted and we would receive

12:08:41   8   income as it related to the publishing.

12:08:44   9       Q.     Did you do anything else to promote any

12:08:45   10  of the Eminem albums?

12:08:53   11      A.     I wouldn't characterize it as

12:08:55   12  promoting, per se, other than that.

12:09:13   13             MR. POMERANTZ:  Richard, I'm going to

12:09:13   14        start with Exhibit 200, just to skip some and

12:09:16   15        let you have the first 200 numbers for your

12:09:19   16        depositions.

12:09:20   17             MR. BUSCH:  Thank you.  I very much

12:09:20   18        appreciate it.  Those are my favorite

12:09:22   19        numbers, so that works out well.

12:09:25   20             MR. POMERANTZ:  Well, since you already

12:09:25   21        started it I figured I'd pick up from there.

12:09:28   22             MR. BUSCH:  That's fine.

12:09:29   23      Q.     Mr. Martin, I'm going to show you what

12:09:31   24  I've marked as Exhibit 200.  And this is the 1995

12:09:34   25  Exclusive Artist Recording Agreement between

99

**Exhibit H, Page 224**

1                    Joel Martin

12:09:39   2   F.B.T. and Mr. Mathers.

12:09:40   3              (Exhibit 200, Multipage document

12:09:40   4        entitled Exclusive Artist Recording

12:09:40   5        Agreement, dated 11/28/95, bearing Bates

12:09:40   6        stamp Nos. FBT - 001 through FBT - 0012,

12:09:40   7        marked for identification, as of this date.)

12:09:47   8              (Witness looks at document.)

12:09:50   9              MR. POMERANTZ:  Richard, do me a favor,

12:09:51  10        if you could save what I'm giving you today

12:09:53  11        for tomorrow so that we --

12:09:55  12              MR. BUSCH:  I will.

12:09:56  13              MR. POMERANTZ:  -- we'll have them.

12:09:58  14              MR. BUSCH:  I will.

12:10:05  15              (Witness looks at document.)

12:10:23  16        Q.    Mr. Martin, have you seen Exhibit 200

12:10:26  17   prior to today?

12:10:32  18              (Witness looks at document.)

12:10:40  19        A.    Yes.

12:10:42  20        Q.    Did you see it in 1995?

12:10:44  21        A.    Yes.

12:10:51  22        Q.    And if you'll turn to the eighth page

12:10:53  23   of this agreement, can you tell me whose

12:10:56  24   signatures are on the bottom of that page?

12:10:58  25        A.    That's Marshall Mathers and Mark Bass.

                                                          100

**Exhibit H, Page 225**

```
                    1                  Joel Martin
12:11:01            2        Q.    And did you participate in signing up
12:11:07            3    Mr. Mathers to this agreement?
12:11:08            4        A.    I'm not sure what that means.
12:11:11            5        Q.    Well, did you talk to him before this
12:11:12            6    agreement was signed, Mr. Mathers?
12:11:14            7              Let me state that again, that was a
12:11:16            8    poorly worded question.
12:11:19            9              Did you talk to Mr. Mathers about the
12:11:20           10    terms of this recording agreement before he signed
12:11:22           11    it?
12:11:23           12        A.    Personally I did not, no.
12:11:24           13        Q.    Do you know if anybody did?
12:11:26           14        A.    I would imagine his lawyer.
12:11:29           15        Q.    Do you know if he was represented by a
12:11:30           16    lawyer in connection with this agreement?
12:11:32           17        A.    I believe he was.
12:11:33           18        Q.    Do you recall who that lawyer was?
12:11:35           19        A.    No.
12:11:38           20        Q.    Did you ever speak to Mr. Mathers
12:11:41           21    lawyer in connection with the signing of this
12:11:42           22    recording agreement?
12:11:44           23        A.    I did not.
12:11:44           24        Q.    Do you know if anybody for F.B.T. did?
12:11:47           25        A.    I don't know.
```

101

Joel Martin

12:11:52  2    Q.    Do you recognize the form of this

12:11:56  3    agreement as a form that F.B.T. was using around

12:11:58  4    1995 to sign artists?

12:12:01  5    A.    Yes.

12:12:02  6    Q.    This is a standard form for F.B.T.?

12:12:04  7    A.    This was a form that F.B.T. used.

12:12:07  8    Q.    Do you know where this form came from?

12:12:10  9    A.    It probably came from an attorney that

12:12:13  10   I used to work with as well as the Bass brothers

12:12:16  11   and still do work with, Howard Hertz.

12:12:22  12   Q.    So your best recollection is that

12:12:23  13   Mr. Hertz drafted this form for F.B.T.?

12:12:26  14   A.    I don't know if he drafted anything.

12:12:29  15   My belief is that this was probably obtained from

12:12:32  16   his office in some way, shape, or form.

12:12:40  17   Q.    Had you read this form prior to the

12:12:41  18   time that Mr. Mathers signed the agreement in

12:12:46  19   1995?

12:12:47  20   A.    I was familiar with the form, yes.

12:12:49  21   Q.    And did you understand the terms in the

12:12:51  22   agreement?

12:12:53  23   A.    Generally speaking, I believe I did.

12:12:57  24   Q.    Do you know if Mr. Mathers or his

12:12:59  25   representatives negotiated to try to change any of

102

**Exhibit H, Page 227**

```
                1                    Joel Martin
12:13:02        2    the terms in this agreement?
12:13:05        3         A.    I don't know.
12:13:11        4         Q.    Is this agreement still in effect?
12:13:13        5         A.    Yes.
12:13:20        6         Q.    Could you turn to page 2 of this
12:13:24        7    agreement.  I'm going to focus your attention
12:13:32        8    first on paragraph No. 5.
12:13:34        9         A.    Uh-huh.
12:13:35       10         Q.    And if you could just take a moment to
12:13:37       11    read that.  I'm only going to ask you about 5(a).
12:13:42       12         A.    Uh-huh.
12:13:43       13               (Witness looks at document.)
12:13:49       14         Q.    Have you read that 5(a) paragraph, 5
12:13:53       15    and 5(a)?
12:13:55       16               (Witness looks at document.)
12:14:05       17         A.    Yes.
12:14:06       18         Q.    All right.  And you understand that
12:14:07       19    paragraph 5 delineates certain rights that F.B.T.
12:14:12       20    has to the recordings by Mr. Mathers, correct?
12:14:19       21         A.    To the sides and phonograph records,
12:14:22       22    yes.
12:14:22       23         Q.    And you understand that those sides and
12:14:24       24    phonograph records refer to recordings by
12:14:26       25    Mr. Mathers, correct?
```

103

1                          Joel Martin

13:53:01    2        Q.    Do you see that provision there?

13:53:02    3        A.    Yeah.

13:53:03    4        Q.    And you're familiar with that

13:53:04    5    provision, correct?

13:53:06    6        A.    Yes.

13:53:06    7        Q.    All right.  And you understand that

13:53:08    8    paragraph 4(a) on page 4 pertains to records that

13:53:13    9    are sold under this agreement, correct?

13:53:21   10        A.    Full price records that are sold, yes.

13:53:24   11        Q.    Is that correct?

13:53:25   12        A.    On full price records that are sold.

13:53:27   13        Q.    So you understand that paragraph 4(a)

13:53:30   14    pertains to full price records that are sold under

13:53:32   15    this agreement, correct?

13:53:33   16        A.    Yes.

13:53:35   17        Q.    And you understand that paragraph

13:53:36   18    4(c)(v) refers to masters that are licensed under

13:53:40   19    this agreement, correct?

13:53:42   20        A.    Yes.

13:53:43   21        Q.    And you understand that the issue in

13:53:46   22    dispute here is whether permanent downloads should

13:53:51   23    be accounted for under paragraph 4(a) or under

13:53:54   24    paragraph 4(c)(v), correct?

13:53:57   25              MR. BUSCH:  Let me just interpose an

                                                              142

**Exhibit H, Page 229**

1          Joel Martin

13:53:59    2      objection.

13:53:59    3          Our lawsuit is not relegated to just

13:54:02    4      permanent downloads.  We make -- I believe

13:54:04    5      we've raised issues relating to mastertones

13:54:07    6      and potentially other forms of digital

13:54:10    7      downloads, or whatever you might want to call

13:54:12    8      them, under which Universal is not accounting

13:54:15    9      to us for 50 percent of the royalties.

13:54:17   10          MR. POMERANTZ:  Okay.  I'm not sure I

13:54:18   11      agree with what you just said, but I'll

13:54:22   12      reword my question to try to get around the

13:54:22   13      issue.

13:54:22   14          MR. BUSCH:  Our lawsuit is quite clear

13:54:24   15      on that.

13:54:24   16          MR. POMERANTZ:  All I know is the

13:54:25   17      breach is not.

13:54:28   18      Q.    If you could look at --

13:54:30   19          Do you understand that an issue in this

13:54:32   20      case is whether downloads should be accounted for

13:54:36   21      under paragraph 4(a) or under paragraph 4(c)(v)?

13:54:46   22      A.    As to whether or not they're licensed,

13:54:48   23      yes.

13:54:49   24      Q.    Or whether or not they are full price

13:54:49   25      records sold under the agreement, correct?

143

Exhibit H, Page 230

|          | 1  | Joel Martin |
|----------|----|-------------|
| 13:55:07 | 2  | A.    Repeat the question. |
| 13:55:09 | 3  | Q.    Yeah, I'll do it a little different. |
| 13:55:11 | 4  | You understand that it is Aftermath's |
| 13:55:13 | 5  | position that downloads are full price records |
| 13:55:16 | 6  | sold under this agreement and therefore should be |
| 13:55:18 | 7  | accounted for under 4(a), correct? |
| 13:55:20 | 8  | A.    I don't necessarily know that. |
| 13:55:21 | 9  | Q.    Is that what you understand Aftermath's |
| 13:55:24 | 10 | position to be? |
| 13:55:24 | 11 | A.    That they are full priced records? |
| 13:55:27 | 12 | No, I don't know that. |
| 13:55:28 | 13 | Q.    Well, do you understand that they |
| 13:55:29 | 14 | believe they should be accounted for under 4(a)? |
| 13:55:36 | 15 | (Witness looks at document.) |
| 13:55:42 | 16 | A.    I don't know that because it refers to |
| 13:55:44 | 17 | them as full priced records. |
| 13:55:47 | 18 | Q.    What do you understand the term full |
| 13:55:50 | 19 | price to mean? |
| 13:55:52 | 20 | MR. BUSCH:  Object to form, calls for |
| 13:55:53 | 21 | speculation, lack of foundation. |
| 13:56:41 | 22 | (Witness looks at document.) |
| 13:56:41 | 23 | A.    Records sold through at the time normal |
| 13:56:44 | 24 | retail channels which we -- which would have been |
| 13:56:52 | 25 | compact discs sold through retail channels. |

144

Exhibit H, Page 231

|   |   |
|---|---|
|   | 1 |            Joel Martin |
| 13:57:00 | 2 |     Q.    That was your understanding back in |
| 13:57:02 | 3 | 1998 when this agreement was signed? |
| 13:57:04 | 4 |     A.    I believe so, yeah. |
| 13:57:09 | 5 |     Q.    All right.  And then if you -- strike |
| 13:57:11 | 6 | that. |
| 13:57:12 | 7 |            Do you understand whether there's a |
| 13:57:13 | 8 | difference between the term full price and top |
| 13:57:17 | 9 | line, as you've heard those terms? |
| 13:57:20 | 10 |            MR. BUSCH:  Objection, lack of |
| 13:57:21 | 11 |        foundation. |
| 13:57:22 | 12 |     A.    I'm not sure. |
| 13:57:23 | 13 |     Q.    You're not sure if there is a |
| 13:57:25 | 14 | difference or not? |
| 13:57:26 | 15 |     A.    I'm not sure, no. |
| 13:57:27 | 16 |     Q.    And if you look at Exhibit 10, which is |
| 13:57:31 | 17 | the 2003 agreement. |
| 13:57:35 | 18 |     A.    Uh-huh. |
| 13:57:36 | 19 |     Q.    And turn to page 4.  And if you can |
| 13:57:39 | 20 | keep the other agreement open as well. |
| 13:57:41 | 21 |     A.    Okay. |
| 13:57:43 | 22 |     Q.    I want to compare the royalty |
| 13:57:45 | 23 | provisions here, just to make sure you and I are |
| 13:57:47 | 24 | on the same page here. |
| 13:57:51 | 25 |            (Witness looks at document.) |

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

**Exhibit H, Page 232**

1           Joel Martin

15:12:11    2        A.    I can't tell you if I specifically
15:12:16    3    recall that.  There was reference to whether or
15:12:19    4    not they should be included as it related to
15:12:26    5    computations.
15:12:27    6        Q.    Who did you have --
15:12:29    7              Do you recall that -- discussing that
15:12:30    8    with somebody?
15:12:31    9        A.    I don't exactly recall.  I know I had
15:12:32   10    conversations with my lawyer about it, yes.
15:12:36   11        Q.    Which lawyer?
15:12:36   12        A.    It would have been Mark Levinsohn.
15:12:39   13        Q.    Do you recall a conversation with
15:12:39   14    anyone other than Mr. Levinsohn on that subject?
15:12:45   15        A.    As I sit here today, I can't recall
15:12:47   16    specifically.  I want to say Gary Stiffleman, but
15:12:50   17    I cannot be 100 percent sure.
15:12:53   18        Q.    Look at paragraph 4(a)(i), the second
15:12:57   19    paragraph 4(a)(i) in this.
15:12:59   20        A.    Yes.
15:13:00   21        Q.    Do you see that?
15:13:00   22        A.    Uh-huh.
15:13:01   23        Q.    And that says "Twelve percent for
15:13:02   24    records other than LPs," do you see that?
15:13:06   25        A.    Uh-huh.  Yeah.

199

Exhibit H, Page 233

1                    Joel Martin

15:13:07   2        Q.    Do you know what records other than LPs

15:13:10   3    that was referring to?

15:13:20   4              (Witness looks at document.)

15:13:44   5        A.    Other than LPs?

15:13:46   6        Q.    Yes.

15:13:57   7        A.    Just other physical configurations for

15:14:00   8    records other than LPs.

15:14:03   9        Q.    Such as?

15:14:17   10       A.    It could have been certain CDs.  It

15:14:20   11   could have been certain vinyl product.  I'm not

15:14:24   12   quite sure, but for physical product other than

15:14:28   13   LPs.  It could have been a variety of other

15:14:34   14   things.

15:14:34   15       Q.    Do you know what a single is?

15:14:36   16       A.    A single?

15:14:37   17       Q.    A single in the music business, have

15:14:38   18   you ever heard the expression a single?

15:14:41   19       A.    Yeah, it's a 45 rpm release.

15:14:45   20       Q.    Do you understand that 4(a)(i), the

15:14:47   21   second (i) referring to the 12 percent rate,

15:14:49   22   applies to singles?

15:14:52   23       A.    For physical singles, yes.

15:14:54   24       Q.    What were you --

15:14:55   25              MR. BUSCH:  Let me just make one thing

                                                                    200

**Exhibit H, Page 234**

```
                    1              Joel Martin
15:14:57            2         clear, so I'm not raising an objection to
15:14:59            3         every one of these.
15:15:00            4              When you're talking about applies to
15:15:01            5         singles you're talking about applies to
15:15:05            6         singles released by Universal?
15:15:08            7              MR. POMERANTZ:  That's what I -- yes,
15:15:09            8         that's what I mean.
15:15:09            9              MR. BUSCH:  Okay.
15:15:10           10              THE WITNESS:  Okay.
15:15:10           11              MR. BUSCH:  That's fine.  I just want
15:15:11           12         to make sure.
15:15:14           13         Q.   Do you --
15:15:15           14              You keep using the word physical.
15:15:18           15         A.   Yes.
15:15:18           16         Q.   Do you see that word in this royalty
15:15:20           17         provision?
15:15:22           18         A.   Physical?
15:15:22           19         Q.   Yeah, in 4(a).
15:15:23           20         A.   No.
15:15:24           21         Q.   Did you see it in the definition of
15:15:27           22         record?
15:15:28           23         A.   No.
15:15:29           24         Q.   Have you seen it anywhere in this
15:15:32           25         agreement?
```

MERRILL  LEGAL  SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com

**Exhibit H, Page 235**

1                        Joel Martin

15:15:42   2        A.      Physical?

15:15:43   3        Q.      Yes.

15:15:43   4        A.      I don't know.  I don't know if I do or

15:15:45   5    don't.

15:15:45   6        Q.      Well, why do you keep qualifying your

15:15:48   7    answers with the word physical?

15:15:50   8        A.      Because 12 percent essentially is a

15:15:53   9    royalty that for many, many, many, many years has

15:16:00   10   been arrived at as it relates to packaging,

15:16:06   11   manufacturing, the expense, and so on and so forth

15:16:09   12   of product that's not meant to be an LP, but that

15:16:13   13   could be expensively prohibitive to be able to pay

15:16:18   14   a higher royalty rate to.

15:16:22   15       Q.      So can you give me an example of what

15:16:24   16   you're referring to.

15:16:25   17       A.      Sure.  A 12-inch single that's packaged

15:16:29   18   and that the record company might not make any

15:16:32   19   money on as it relates to -- or very little money

15:16:35   20   on as it relates to the expense of manufacturing,

15:16:37   21   and stocking, and doing things for a single that

15:16:42   22   might cost $1.49.  They typically would pay a

15:16:48   23   lower royalty as a result of it being a physical

15:16:56   24   configuration.

15:16:57   25       Q.      Is a single track of music that is sold

                                                        202

**Exhibit H, Page 236**

|   |   |   |
|---|---|---|
| | 1 | Joel Martin |
| 15:17:01 | 2 | through Apple's iTunes Store an LP in your view? |
| 15:17:07 | 3 | MR. BUSCH:  Say that again.  I'm sorry, |
| 15:17:09 | 4 | I missed that. |
| 15:17:11 | 5 | Mr. Court Reporter, would you read that |
| 15:17:12 | 6 | back, please. |
| 15:17:13 | 7 | (Record read.) |
| 15:17:25 | 8 | MR. BUSCH:  Note my objection to the |
| 15:17:26 | 9 | phrase sold through, it's vague and |
| 15:17:30 | 10 | ambiguous, mischaracterizes Mr. Martin's |
| 15:17:37 | 11 | testimony, as far as what he views an Apple |
| 15:17:41 | 12 | song to be on iTunes.  It's a -- lack of |
| 15:17:45 | 13 | foundation and an incomplete hypothetical. |
| 15:17:51 | 14 | It calls for speculation. |
| 15:17:53 | 15 | A.    If you're talking about one song? |
| 15:17:55 | 16 | Q.    Yes. |
| 15:17:56 | 17 | A.    I consider one song available on iTunes |
| 15:17:59 | 18 | to be a digital download. |
| 15:18:02 | 19 | Q.    Not an LP? |
| 15:18:03 | 20 | A.    I'm not sure what the definition of LP |
| 15:18:06 | 21 | is as it relates to single and what the difference |
| 15:18:09 | 22 | is here in this agreement.  I have to look at it |
| 15:18:12 | 23 | again. |
| 15:18:13 | 24 | But if it's available as a download, |
| 15:18:18 | 25 | it's a download, that's what I would call it. |

203

**Exhibit H, Page 237**

1          Joel Martin

15:18:21  2       Q.    Do you see any provision in paragraph

15:18:23  3    4(a) that to you refers to a sale of a download by

15:18:27  4    Apple to a consumer?

15:18:31  5       A.    No, I don't.

15:18:37  6       Q.    Do you see anything in 4(a) that refers

15:18:39  7    to the sale by any Universal customer or licensee

15:18:47  8    to its customers?

15:18:50  9             MR. BUSCH:  Well, you use the phrase

15:18:52  10            customer, that's vague and ambiguous, and --

15:18:54  11      A.    Okay.  I --

15:18:54  12            MR. BUSCH:  -- you're combining two

15:18:55  13            different thoughts here.

15:18:56  14            MR. POMERANTZ:  Okay.  What I'm trying

15:18:57  15            to do is, I don't want to get into the battle

15:18:59  16            that is at the essence of this lawsuit, which

15:19:01  17            is is Apple buying downloads from Universal

15:19:05  18            or licensing from Universal?

15:19:07  19            THE WITNESS:  Right.  Okay.

15:19:09  20      Q.    We understand that there's just a

15:19:10  21    disagreement on that.

15:19:12  22            So regardless of whether you view the

15:19:14  23    Apples of this world as purchasers or licensees,

15:19:17  24    do you understand whether any provision in

15:19:23  25    paragraph 4(a) refers to a sale by that purchaser

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

```
                    1              Joel Martin
15:19:28            2    or licensee to its customers?
15:19:31            3              MR. BUSCH:  That is a completely vague
15:19:33            4         and ambiguous question.
15:19:36            5              It's -- it is actually incoherent and
15:19:38            6         it's impossible to answer.
15:19:40            7         A.   I just -- I truly don't understand the
15:19:42            8    question.  If you could rephrase it.
15:19:45            9              My inclination would be to say I don't
15:19:48           10    know based on what I'm hearing.
15:19:49           11         Q.   Okay.  Do you see the term U.S. net
15:19:52           12    sales in paragraph 4(a)?
15:19:53           13         A.   Yes, I do.
15:19:54           14         Q.   Does that refer to a sale by Apple to
15:19:56           15    its customer?
15:19:57           16              MR. BUSCH:  Objection, he's -- asked
15:19:58           17         and answered --
15:19:58           18              Of what, a download?
15:20:00           19         A.   Of a download?
15:20:00           20              MR. BUSCH:  He's already answered the
15:20:00           21         question.
15:20:01           22         Q.   Yes.
15:20:01           23         A.   Of a download?
15:20:01           24         Q.   Yes.
15:20:02           25              MR. BUSCH:  He's answered the question.
```

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

```
                    1              Joel Martin
15:20:04            2       It's asked and answered.
15:20:05            3       Q.    Does U.S. net sales refer to the sale
15:20:07            4   of a download by Apple to its customers?
15:20:10            5              MR. BUSCH:   Objection, asked and
15:20:13            6         answered, lack of foundation, calls for
15:20:15            7         speculation.
15:20:16            8       A.    Okay.   I don't believe it refers to
15:20:20            9   downloads.
15:20:24           10       Q.    Does the phrase full price records sold
15:20:28           11   refer to a sale of a download by Apple to its
15:20:32           12   customer?
15:20:33           13              MR. BUSCH:   Again, the same objections.
15:20:39           14         The same objections, asked and answered,
15:20:42           15         calls for speculation, lack of foundation,
15:20:45           16         calls for a legal conclusion and expert
15:20:49           17         testimony.
15:20:50           18       A.    I don't necessarily refer to it as a
15:20:52           19   download.
15:20:53           20       Q.    So you don't understand full price
15:20:55           21   records sold as referring to a sale of a download
15:20:57           22   by Apple to its customer?
15:20:59           23       A.    As it relates to this agreement?
15:21:00           24       Q.    Yes.
15:21:01           25       A.    No.
```

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

**Exhibit H, Page 240**

1          Joel Martin

15:21:03    2        Q.    Do you understand the term net sales
15:21:05    3    through normal retail channels in the U.S. as
15:21:08    4    referring to the sale of a download by Apple to
15:21:11    5    its customer?
15:21:12    6              MR. BUSCH:   Asked and answered.
15:21:14    7        A.    As it relates to this paragraph?
15:21:18    8        Q.    Yes.
15:21:18    9        A.    No.
15:21:37   10        Q.    Could you turn to the next page of
15:21:38   11    Exhibit 5, page 5.
15:21:40   12        A.    Yeah.
15:21:40   13        Q.    Look at paragraph 4(c)(ii) in the
15:21:44   14    middle of the page.  That provision states, "On
15:21:50   15    Mid-price records the royalty rate will be
15:21:54   16    two-thirds of the otherwise applicable royalty
15:21:57   17    rate, and on Budget records the royalty rate will
15:22:00   18    be one-half of the otherwise applicable royalty
15:22:04   19    rate."
15:22:05   20              Do you see that?
15:22:05   21        A.    The royalty rate for what?
15:22:06   22              Other -- what otherwise applicable
15:22:09   23    royalty rate?
15:22:10   24        Q.    Do you see what I'm reading?
15:22:12   25        A.    Yeah, but what are they referring to?

                                                              207

**Exhibit H, Page 241**

```
                1           Joel Martin
15:23:28        2      Q.    So generally -- you don't have a
15:23:29        3    general understanding of mid price record, how
15:23:32        4    that's used by a record distributor?
15:23:34        5      A.    Cutouts.
15:23:35        6      Q.    How about budget records, have you ever
15:23:36        7    heard that terminology before?
15:23:37        8      A.    Cutouts, things that you can't sell.
15:23:39        9      Q.    All right.  So do you understand why
15:23:41       10    this agreement provides for a reduced royalty rate
15:23:46       11    for mid price and budget records?
15:23:48       12      A.    I don't have the definition of what
15:23:49       13    mid price is here.  As it relates to this
15:23:51       14    agreement, I couldn't tell.
15:23:53       15      Q.    So you can't answer my question without
15:23:55       16    that?
15:23:55       17      A.    It would be difficult for me to, yes.
15:23:58       18      Q.    All right.  Let's look down at
15:24:00       19    paragraph 4(c)(v).
15:24:01       20      A.    Uh-huh.
15:24:04       21      Q.    When you signed this agreement back in
15:24:06       22    1998, what kind of licenses were you contemplating
15:24:12       23    that Aftermath might enter into with respect to
15:24:17       24    the Eminem master recordings?
15:24:19       25           MR. BUSCH:  Objection, lack of
```

210

Exhibit H, Page 242

|   | 1 | Joel Martin |
|---|---|---|
| 15:24:20 | 2 | foundation, assumes that he had in mind what |
| 15:24:23 | 3 | type of licenses they might enter into.  It |
| 15:24:26 | 4 | calls for pure speculation, vague and |
| 15:24:31 | 5 | ambiguous. |
| 15:24:32 | 6 | A.    There would be a variety of licenses |
| 15:24:34 | 7 | that we would potentially always enter into if the |
| 15:24:42 | 8 | records were in demand, so to speak. |
| 15:24:46 | 9 | Q.    What kind of licenses? |
| 15:24:47 | 10 | A.    Synchronization licenses, licenses for |
| 15:24:51 | 11 | commercials, licenses for other people to record |
| 15:24:56 | 12 | versions of the records, third-party licenses, |
| 15:25:05 | 13 | licenses for uses not contemplated in the |
| 15:25:08 | 14 | agreement, so on and so forth. |
| 15:25:19 | 15 | Q.    All right.  Let's go through each of |
| 15:25:21 | 16 | those. |
| 15:25:21 | 17 | A.    Okay. |
| 15:25:21 | 18 | Q.    Your first one was synchronization and |
| 15:25:24 | 19 | your second one was commercials. |
| 15:25:26 | 20 | A.    Yeah. |
| 15:25:27 | 21 | Q.    I take it commercials are |
| 15:25:28 | 22 | synchronization licenses, correct? |
| 15:25:30 | 23 | A.    Well, sometimes.  Not necessarily. |
| 15:25:31 | 24 | Q.    Give me an example when it's not a |
| 15:25:33 | 25 | synchronization license. |

211

Exhibit H, Page 243

1          Joel Martin

15:25:34    2        A.    When it's a radio commercial.

15:25:36    3        Q.    And then are you licensing the master

15:25:38    4    recording?

15:25:40    5        A.    We would have had at some point

15:25:42    6    approval to license the master recording.

15:25:45    7    Certainly the composition, yes.

15:25:47    8        Q.    Okay.  So do you understand paragraph

15:25:49    9    4(c)(v) to be referring to the licensing of the

15:25:53   10    composition, the master recording, or both?

15:25:57   11              (Witness looks at document.)

15:26:00   12        A.    Let me get back to 4(c)(v).

15:26:03   13              4(c)(v).

15:26:06   14              I'm sorry?

15:26:07   15              Say that again.

15:26:09   16        Q.    Do you understand 4(c)(v) to be

15:26:10   17    referring to a situation where the master is

15:26:12   18    licensed, the composition is licensed, or both?

15:26:18   19        A.    This is referring to the masters.

15:26:20   20        Q.    All right.  So when you say licenses

15:26:29   21    for uses -- strike that.

15:26:31   22              When you say for licenses for other

15:26:33   23    people to record the music --

15:26:35   24        A.    Correct.

15:26:36   25        Q.    -- you're not referring to master

212

Exhibit H, Page 244

```
             1                    Joel Martin
15:26:38     2    licenses, correct?
15:26:39     3         A.    No.   These would be new masters.
15:26:42     4         Q.    Right.   So you're not referring to
15:26:43     5    4(c)(v) then --
15:26:44     6         A.    No.
15:26:44     7         Q.    -- in that situation, correct?
15:26:48     8         A.    Correct.
15:26:48     9         Q.    So let's talk about synchronization
15:26:50    10    licenses, that's a situation where an Eminem
15:26:53    11    master recording may be licensed to a movie so
15:26:55    12    that it can be used in a movie, correct?
15:26:58    13         A.    Correct.
15:26:58    14         Q.    Or it might be licensed to a television
15:27:00    15    producer to be used in a TV show or commercial,
15:27:03    16    correct?
15:27:04    17         A.    Correct.
15:27:04    18         Q.    And in those situations, if Aftermath
15:27:08    19    got paid $100 for that use you would expect
15:27:15    20    Aftermath to turn around and pay $50 to F.B.T.?
15:27:19    21         A.    Of its net receipts, whatever its net
15:27:23    22    receipts are, yes.
15:27:24    23         Q.    And that would be a situation where the
15:27:26    24    master was being used in some other product, like
15:27:29    25    a movie, or a commercial, or something like that,
```

213

Exhibit H, Page 245

```
             1                    Joel Martin
15:27:32     2     correct?
15:27:32     3          A.    Potentially.
15:27:33     4          Q.    And similarly, if it was licensed to a
15:27:37     5     radio station for a radio advertisement, then the
15:27:42     6     master recording would be used in some
15:27:44     7     advertisement that the radio would be putting on,
15:27:48     8     correct?
15:27:49     9          A.    Yes.
15:27:50    10          Q.    And again, whatever the net receipts
15:27:52    11     were that Aftermath received from licensing the
15:27:54    12     master for that purpose would then be split with
15:27:58    13     F.B.T., correct?
15:27:59    14          A.    Or credited, yes.
15:28:03    15          Q.    And then you said third-party licenses,
15:28:07    16     what kinds of third-party licenses were you
15:28:10    17     thinking about there?
15:28:11    18          A.    Generally speaking, anything that was
15:28:15    19     not manufactured and distributed directly by
15:28:19    20     Universal.
15:28:22    21          Q.    So can you give me examples of
15:28:24    22     third-party licenses of that type?
15:28:27    23               MR. BUSCH:  Objection, asked and
15:28:27    24          answered.
15:28:30    25               If you can narrow it.
```

214

**Exhibit H, Page 246**

```
              1                    Joel Martin
15:28:31      2        A.    Then, you know -- I mean, we've
15:28:33      3    licensed compilations -- we've licensed a variety
15:28:36      4    of different things as it relates to the --
15:28:39      5             Are you talking about -- which license
15:28:41      6    are you talking about here?
15:28:42      7        Q.    I'm talking about master licenses that
15:28:44      8    you believe are covered by 4(c)(v).
15:28:54      9             MR. BUSCH:  And what's your question?
15:28:55     10             MR. POMERANTZ:  I'm looking for
15:28:57     11        examples of the third-party licenses that he
15:28:59     12        was referring to.
15:29:01     13        A.    I assume that -- my assumption is that
15:29:03     14    anything for which they license we receive
15:29:07     15    50 percent of the net receipts of that license --
15:29:10     16        Q.    All right.  We've --
15:29:10     17        A.    -- whatever it is.
15:29:11     18        Q.    We've already discussed synchronization
15:29:14     19    licenses, that's one type of license.
15:29:15     20        A.    Well, I'm talking about licenses as it
15:29:18     21    relates to third parties.
15:29:19     22        Q.    And one third party that I think you
15:29:21     23    mentioned was a third party that wanted to license
15:29:24     24    an Eminem master to use on a compilation record
15:29:27     25    that that third party was putting out, correct?
```

215

Exhibit H, Page 247

|   |   | Joel Martin |
|---|---|---|
| 15:29:30 | 2 | A.    Correct. |
| 15:29:30 | 3 | Q.    Can you give me any other examples? |
| 15:29:32 | 4 | A.    Well, similar uses. |
| 15:29:34 | 5 | MR. BUSCH:  Objection. |
| 15:29:35 | 6 | A.    Similar uses. |
| 15:29:36 | 7 | MR. BUSCH:  Hold on. |
| 15:29:37 | 8 | Objection, asked and answered. |
| 15:29:38 | 9 | He said several times what his |
| 15:29:40 | 10 | intention was.  You're ignoring it. |
| 15:29:43 | 11 | Q.    Can you give me other examples of |
| 15:29:44 | 12 | licenses -- strike that.  I'll restate it. |
| 15:29:49 | 13 | Can you give me any other examples |
| 15:29:50 | 14 | where master is licensed for a purpose other than |
| 15:29:56 | 15 | synchronization or a compilation record? |
| 15:30:01 | 16 | MR. BUSCH:  Objection, asked and |
| 15:30:01 | 17 | answered. |
| 15:30:03 | 18 | A.    Soundtracks. |
| 15:30:03 | 19 | Q.    Any other examples? |
| 15:30:09 | 20 | MR. BUSCH:  You're talking about in |
| 15:30:10 | 21 | 1998? |
| 15:30:12 | 22 | MR. POMERANTZ:  Let's start there. |
| 15:30:18 | 23 | A.    I'm going to ask you to repeat the |
| 15:30:19 | 24 | question again. |
| 15:30:20 | 25 | Q.    Sure. |

216

Exhibit H, Page 248

```
              1                Joel Martin
15:30:21      2         Can you give me any examples of
15:30:23      3    situations in which masters would be licensed in a
15:30:29      4    manner covered by 4(c)(v), other than
15:30:31      5    synchronization licenses for movies, or television
15:30:34      6    shows, or commercials, compilation records, and
15:30:37      7    soundtracks?
15:30:38      8         MR. BUSCH:  Objection.  You've
15:30:39      9         mischaracterized his testimony.  It's been
15:30:41     10         asked and answered.
15:30:42     11         He said any other license for the
15:30:45     12         manufacture and sale of records by a
15:30:47     13         third party, and you keep ignoring that in
15:30:49     14         your recitation of things that he said.
15:30:51     15         And I object to your constant
15:30:52     16         mischaracterization of the record.
15:30:54     17    Q.    Any other examples that you can give?
15:30:56     18         MR. BUSCH:  And you're talking about in
15:30:57     19         1998, what his mind set was in 1998; is that
15:31:00     20         correct?
15:31:01     21         MR. POMERANTZ:  Yes.
15:31:05     22    A.    Those are my general recollections.
15:31:07     23    Q.    Okay.  As you sit here today, you can't
15:31:08     24    think of any other kinds of licenses --
15:31:12     25         MR. BUSCH:  Back in 19 --
```

217

Exhibit H, Page 249

|   |   | Joel Martin |
|---|---|---|
| 16:39:21 | 2 | Q.    Did you have any role in negotiating |
| 16:39:24 | 3 | the amendment that has been marked as Exhibit 17? |
| 16:39:31 | 4 | A.    Role? |
| 16:39:32 | 5 | Q.    Yes. |
| 16:39:33 | 6 | A.    As it related to directly negotiating |
| 16:39:36 | 7 | with Interscope or Aftermath directly? |
| 16:39:40 | 8 | No. |
| 16:39:40 | 9 | MR. BUSCH:  When you -- |
| 16:39:41 | 10 | MR. POMERANTZ:  I'll clarify it. |
| 16:39:42 | 11 | MR. BUSCH:  Yeah. |
| 16:39:43 | 12 | Q.    So is it fair to say that you did not |
| 16:39:45 | 13 | talk directly with any Aftermath or Interscope |
| 16:39:48 | 14 | representative in the course of negotiating the |
| 16:39:50 | 15 | amendment that's -- |
| 16:39:52 | 16 | A.    Directly, no. |
| 16:39:53 | 17 | Q.    All right.  Did -- strike that. |
| 16:39:57 | 18 | Who -- |
| 16:39:58 | 19 | Is that your signature on the last |
| 16:40:00 | 20 | page? |
| 16:40:00 | 21 | A.    Yes. |
| 16:40:03 | 22 | Q.    Who negotiated this agreement on your |
| 16:40:05 | 23 | behalf? |
| 16:40:08 | 24 | A.    On my behalf it would be |
| 16:40:10 | 25 | Mark Levinsohn. |

269

**Exhibit H, Page 250**

|   |   | Joel Martin |
|---|---|---|
| 16:40:11 | 2 | Q.    Who else participated in the |
| 16:40:13 | 3 | negotiation, to your knowledge? |
| 16:40:14 | 4 | A.    Gary Stiffleman. |
| 16:40:16 | 5 | Q.    Who else? |
| 16:40:21 | 6 | A.    On my behalf, nobody else, other than |
| 16:40:24 | 7 | Mark Levinsohn. |
| 16:40:24 | 8 | Q.    Who else participated in the |
| 16:40:26 | 9 | negotiation on anyone's behalf? |
| 16:40:28 | 10 | A.    I don't know, that I don't know. |
| 16:40:31 | 11 | Q.    Did you talk to Mr. Levinsohn during |
| 16:40:33 | 12 | the course of the negotiations of this amendment? |
| 16:40:36 | 13 | A.    I talked to him, yes. |
| 16:40:38 | 14 | Q.    And did you discuss the terms that were |
| 16:40:39 | 15 | being negotiated? |
| 16:40:40 | 16 | A.    Yes. |
| 16:40:41 | 17 | Q.    And did you discuss the language that |
| 16:40:42 | 18 | was being contemplated? |
| 16:40:44 | 19 | MR. BUSCH:  I'm not going to allow any |
| 16:40:46 | 20 | further questions.  The fact is he spoke to |
| 16:40:48 | 21 | his attorney about it and that's the end of |
| 16:40:50 | 22 | it, attorney-client privilege. |
| 16:40:52 | 23 | Q.    Did you talk to Mr. Stiffleman during |
| 16:40:54 | 24 | the course of the negotiations? |
| 16:40:56 | 25 | A.    Yes. |

270

**Exhibit H, Page 251**

1              Joel Martin

16:40:56    2        Q.    What did you and Mr. Stiffleman

16:40:58    3    discuss?

16:41:01    4        A.    Issues as it related to this document.

16:41:03    5        Q.    What issues did you and Mr. Stiffleman

16:41:06    6    discuss?

16:41:06    7        A.    I can't quite remember at this point.

16:41:08    8        Q.    Can you remember any issue that you and

16:41:10    9    Mr. Stiffleman discussed during the course of the

16:41:13   10    negotiation of the 2004 amendment?

16:41:15   11        A.    Not expressly at this point.

16:41:18   12        Q.    Generally?

16:41:27   13        A.    The fact that we were giving up --

16:41:31   14    F.B.T. was giving up some portion of royalties due

16:41:39   15    to it as it related to a modification of a

16:41:43   16    paragraph here in terms of fractions and

16:41:45   17    percentages.

16:41:47   18        Q.    You're talking about paragraph 2(c)

16:41:49   19    here?

16:41:49   20        A.    That's correct.

16:41:53   21        Q.    Did you discuss permanent downloads

16:41:55   22    with Mr. Stiffleman at any point during the course

16:41:58   23    of the negotiations of the November 2004

16:42:00   24    amendment?

16:42:01   25        A.    Me personally?

271

Exhibit H, Page 252

1          Joel Martin

16:42:02    2        Q.    Yes.

16:42:03    3        A.    No.

16:42:10    4        Q.    Did you provide comments to your lawyer

16:42:11    5    on the wording of this particular amendment?

16:42:14    6        A.    Me provide comments?

16:42:16    7        Q.    Yes.

16:42:17    8              MR. BUSCH:   I would object.

16:42:18    9              I'll tell you not to answer the

16:42:19   10    question on the grounds of the

16:42:22   11    attorney-client privilege.

16:42:28   12              MR. POMERANTZ:   I'm going to mark as

16:42:35   13    Exhibit 203 an e-mail chain.

16:42:50   14              (Exhibit 203, Six-page e-mail chain,

16:42:50   15    bearing Bates stamp Nos. AFT-0020323 through

16:42:50   16    AFT-0020328, marked for identification, as of

16:42:50   17    this date.)

16:42:57   18              (Witness looks at document.)

16:43:00   19        Q.    I don't think you need to spend a lot

16:43:02   20    of time on this, Mr. Martin.   But I just want to

16:43:06   21    direct your attention to the e-mail from

16:43:07   22    Mr. Levinsohn that starts on the bottom of the

16:43:10   23    page that -- of the second page of this e-mail

16:43:14   24    chain.

16:43:14   25        A.    Yeah.

272

**Exhibit H, Page 253**

|   |   |
|---|---|
| | 1 |
| 16:44:05 | 2 |
| 16:44:06 | 3 |
| 16:44:07 | 4 |
| 16:44:10 | 5 |
| 16:44:12 | 6 |
| 16:44:13 | 7 |
| 16:44:16 | 8 |
| 16:44:17 | 9 |
| 16:44:18 | 10 |
| 16:44:20 | 11 |
| 16:44:20 | 12 |
| 16:44:21 | 13 |
| 16:44:21 | 14 |
| 16:44:22 | 15 |
| 16:44:22 | 16 |
| 16:44:22 | 17 |
| 16:44:22 | 18 |
| 16:44:22 | 19 |
| 16:44:22 | 20 |
| 16:44:22 | 21 |
| 16:44:22 | 22 |
| 16:44:22 | 23 |
| 16:44:22 | 24 |
| 16:44:22 | 25 |

1                     Joel Martin

2        and I'm entitled to question him about that.

3             MR. BUSCH:  Yeah, but my point is, is

4        that what is in this document you're entitled

5        to ask about that was sent to Aftermath, but

6        not to ask about conversations that might

7        have otherwise existed between Mr. Levinsohn

8        and Mr. Martin.

9             MR. POMERANTZ:  I'm just asking what's

10        already in the e-mail, Joel has asked me to

11        send you the draft.

12             MR. BUSCH:  Okay.

13             MR. POMERANTZ:  And it's just -- it's

14        just -- in the e-mail.  It's not privileged

15        because it was sent to Aftermath.

16             MR. BUSCH:  I'm just saying you've been

17        asking a lot of questions about the

18        conversation and forcing me to object.

19             MR. POMERANTZ:  I'm not going to go

20        into the substance of the conversation.

21             MR. BUSCH:  Okay.

22        Q.    I just want to establish that you were

23        aware and had the opportunity to comment on this

24        draft, correct?

25        A.    This is my recollection, yes.

MERRILL  LEGAL  SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com

**Exhibit H, Page 254**

1                     Joel Martin

16:44:22    2        Q.    And the language that ended up in the

16:44:22    3    amendment is language that was acceptable to you,

16:44:22    4    correct?

16:44:22    5              (Witness looks at document.)

16:44:22    6        A.    To the best of my recollection, this is

16:44:22    7    what the e-mail appeared to suggest, if, in fact,

16:44:22    8    this is what ended up in the final draft.

16:44:22    9        Q.    All right.  And I'm sorry, I'm going

16:44:22   10    back to the final now.  So let's go back to

16:44:22   11    Exhibit 17.

16:44:22   12        A.    Okay.

16:44:22   13        Q.    The language that ended up in

16:44:22   14    Exhibit 17 was language that was acceptable to

16:44:22   15    you, correct?

16:44:22   16        A.    It was language that I agreed to.

16:44:22   17        Q.    Therefore it was acceptable to you,

16:44:22   18    correct?

16:44:22   19        A.    It was language that I agreed to.

16:44:22   20        Q.    Do you see a difference between agreed

16:44:22   21    to and acceptable?

16:44:22   22        A.    In some cases, yes.

16:44:22   23        Q.    How about in this case?

16:44:22   24        A.    Well, we were giving up income.  And in

16:44:22   25    some ways it was not acceptable to -- for me to

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

**Exhibit H, Page 255**

                                   1                          Joel Martin

17:25:33    2      a license.

17:25:33    3            Q.    And if it was a sale then they're

17:25:35    4      obligated to pay the rates in 4(a), and if it's a

17:25:38    5      license they're obligated to pay what's in

17:25:40    6      4(c)(v), correct?

17:25:42    7            A.    Are you saying it can't be a sale

17:25:44    8      and -- a sale through a license?

17:25:46    9                  MR. BUSCH:  He's not getting at the

17:25:47    10                 sales/license issue.  He's getting at -- he's

17:25:48    11                 making another -- he's trying to make another

17:25:50    12                 point.

17:25:50    13                 MR. POMERANTZ:  Absolutely.

17:25:51    14                 MR. BUSCH:  He's looking at the word

17:25:52    15                 "will."  He's making another point.

17:25:56    16           Q.    Did you understand that Aftermath was

17:25:57    17     obligated to pay those rates when you signed this

17:26:01    18     contract?

17:26:16    19           A.    On sales of records through its

17:26:17    20     distributor, for USNRC?

17:26:23    21           Q.    Yes.

17:26:23    22           A.    Yes.

17:26:25    23           Q.    And you didn't think that Aftermath had

17:26:26    24     to -- strike that.

17:26:30    25                 You didn't think that the parties

                                                                    312

**Exhibit H, Page 256**

Joel Martin

| | | |
|---|---|---|
| 17:26:32 | 2 | needed to sign another agreement before Aftermath |
| 17:26:36 | 3 | was bound to pay you that royalty rate, correct? |
| 17:26:44 | 4 | A.    On records as it's defined in this |
| 17:26:47 | 5 | agreement? |
| 17:26:48 | 6 | Q.    Correct. |
| 17:26:48 | 7 | A.    The definition of records? |
| 17:26:54 | 8 | No. |
| 17:26:58 | 9 | Q.    And if we go to paragraph 4(b) where it |
| 17:27:03 | 10 | says, "On records sold in Canada, your royalty |
| 17:27:06 | 11 | rate will be 85 percent" -- |
| 17:27:08 | 12 | A.    Yes. |
| 17:27:08 | 13 | Q.    -- "of the U.S. rate." |
| 17:27:10 | 14 | Do you see that? |
| 17:27:11 | 15 | A.    Yes. |
| 17:27:11 | 16 | Q.    And even though it says will be |
| 17:27:13 | 17 | 85 percent, you understood that Aftermath and |
| 17:27:16 | 18 | F.B.T. were already bound to accept that rate, |
| 17:27:19 | 19 | correct? |
| 17:27:21 | 20 | A.    For records as it's defined in this |
| 17:27:23 | 21 | agreement, that's correct. |
| 17:27:24 | 22 | Q.    And you didn't need to sign another |
| 17:27:26 | 23 | agreement before the parties were bound to that |
| 17:27:28 | 24 | royalty rate, correct? |
| 17:27:30 | 25 | A.    No. |

313

**Exhibit H, Page 257**

```
1

2              C E R T I F I C A T E

3    STATE OF NEW YORK  )

4                        : SS.

5    COUNTY OF NEW YORK )

6

7              I, DONALD R. DePEW, a Registered

8    Professional Reporter, Certified Realtime Reporter

9    and Notary Public within and for the State of

10   New York, do hereby certify:

11             That JOEL MARTIN, the witness whose

12   deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony given by the witness.

15             I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage, and that I am in no way interested in

18   the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto set

20   my hand this 19th day of May, 2008.

21

22                    DONALD R. DePEW, RPR, CRR

23

24

25
```