1  Richard S. Busch (TN Bar No. 014594) (*pro hac vice*)
   rbusch@kingballow.com
2  KING & BALLOW
   315 Union Street, Suite 1100
3  Nashville, TN 37201
   (615) 259-3456    Facsimile: (615) 726-5417
4
5  Paul H. Duvall (State Bar No. 73699)
   pduvall@kingballow.com
   KING & BALLOW
6  9404 Genesee Avenue, Suite 340
   La Jolla, CA 92037-1355
7  (858) 597-6000    Facsimile: (838) 597-6008
8  Mark L. Block (State Bar No. 115457)
   mblock@glaserweil.com
9  GLASER, WEIL, FINK, JACOBS, & SHAPIRO, LLP
   10250 Constellation Blvd., 19th Floor
10 Los Angeles, CA 90067
   (310) 553-3000   Facsimile: (310) 556-2920
11 Attorneys for Plaintiffs F.B.T. Productions, LLC and Em2M, LLC

12              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
13

| | | |
|---|---|---|
| 14 **F.B.T. PRODUCTIONS, LLC, et al.,** | ) | **Case No. CV 07-03314 PSG (MANx)** |
| 15 | ) | **PLAINTIFFS' SEPARATE** |
| 16 **Plaintiffs,** | ) | **STATEMENT OF UNCONTROVERTED FACTS** |
| 17 v. | ) | **AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION** |
| 18 **AFTERMATH RECORDS doing business as AFTERMATH** | ) | **FOR SUMMARY JUDGMENT** |
| 19 **ENTERTAINMENT, et al.,** | ) | **Date: January 5, 2009** |
| 20 | ) | **Time: 1:30PM** |
| 21 **Defendants.** | ) | **Place: Roybal, Courtroom 790 Honorable Philip S. Gutierrez** |
| 22 | ) | |
| 23 | ) | **Discovery Cut-Off:  Nov. 3, 2008** |
| 24 | ) | **Final Pretrial Conference:  Jan. 12, 2009** |
| 25 | ) | **Jury Trial:  Feb. 3, 2009** |
| 26 | ) | |

27

28

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment        1        Case No.  CV 07-03314 PSG (MANx)

Pursuant to Federal Rules of Civil Procedure, Rule 56, United States District Court, Central District of California, Local Rule 56-1, and the Honorable Philip S. Gutierrez's Standing Order, plaintiffs F.B.T. Productions, LLC and Em2M, LLC hereby submit this Separate Statement of Uncontroverted Facts and Conclusions of Law in support of their Motion for Summary Judgment, in favor of plaintiffs and against defendants Aftermath Records d/b/a Aftermath Entertainment, Interscope Records, UMG Recordings and ARY, Inc.

## I.
## UNCONTROVERTED MATERIAL FACTS

### A. Aftermath/F.B.T. agreements

| Undisputed Fact | Evidentiary Support |
| --- | --- |
| 1. Plaintiffs' contracts with defendants state, "On masters licensed by us or our Licensees to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts…" | 1. Declaration of Richard Busch ("Busch Decl.") Ex. 1 ¶ 4(c)(v); Busch Decl. Ex. 7 ¶ 5(c)(v) |
| 2. Defendants admit they have improperly calculated the allocation of certain costs as between Eminem and plaintiffs resulting in an underpayment to plaintiffs of $159,332. | 2. Doc. No. 100 (Second Amended Complaint) ¶¶ 7, 8, 36, 44-52. |
| 3. Plaintiffs are entities made up of the individuals who discovered and signed the superstar rap artist Marshall B. Mathers, III p/k/a Eminem ("Eminem") | 3. Declaration of Joel Martin ("Martin Decl.") ¶¶ 1-2; See Doc. No. 100 ¶¶ 12-13, 21 |
| 4. Aftermath Records d/b/a Aftermath Entertainment is a joint venture made up of 1) Interscope Records, a California general partnership; 2) Interscope Records, an unincorporated division of UMG Recordings, Inc.; and 3) ARY, Inc. | 4. Doc. No. 100, ¶¶ 14-18 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                2                Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 5. Defendants have acknowledged the $159,332 underpayment in writing but have refused to pay plaintiffs this amount. | 5. Busch Decl. Ex. 33; Busch Decl. ¶ Ex. 35; Deposition of Ping Hu ("Hu Dep.," attached to Busch Decl. as Exhibit 41) at 29:16-21, 30:2-20. |
| 6. The brothers Jeff and Mark Bass are the individuals who, in approximately 1995, discovered the budding rapper Marshall B. Mathers, III p/k/a Eminem ("Eminem") and signed him to their production company, F.B.T. Productions | 6. Martin Decl. ¶ 2. |
| 7. In 1995, F.B.T. had only recently been formed and was not affiliated or partnered with any larger or better-known entity in the music business | 7. Deposition of Jeff Bass ("Bass Dep.," attached to Busch Decl. as Exhibit 36) at 14:8-17; Deposition of Joel Martin ("Martin Dep.," attached to Busch Decl. as Exhibit 44) at 14:24-15:10; Martin Decl. ¶ 5. |
| 8. Pursuant to their 1995 agreement with Eminem, F.B.T. was engaged to produce records containing master recordings of performances by Eminem | 8. Martin Decl. ¶ 2, Ex. 1. |
| 9. Joel Martin serves as the managing agent of F.B.T. and has been granted a share of F.B.T.'s royalties payable under its agreements with and involving Eminem. | 9. Martin Dep. at 6:25-7:3, 97:5-98:17; Bass Dep. at 40:16-25. |
| 10. Plaintiff Em2M, LLC is a limited liability company to which Mr. Martin assigned his royalty participation, and of which Mr. Martin is the sole member | 10. Doc. No. 100 ¶ 13, Martin Decl. ¶ 4. |
| 11. Eminem's debut album, Infinite, was released in approximately 1996 and was not commercially successful. | 11. Martin Dep. at 82:22-83:10, 85:2-3 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    3                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 12. In 1998, Eminem was little known as a rap artist outside the Detroit community, and he was represented by Paul Rosenberg, a lawyer fresh out of law school with little professional experience in the music industry. | 12. Martin Decl. ¶¶ 6-7. |
| 13. As of 1998, Mr. Rosenberg had never negotiated a contract with a major record label | 13. Martin Decl. ¶ 8. |
| 14. In approximately late 1997, Eminem came to the attention of Jimmy Iovine, the head of Universal division Interscope Records, and the well-known rap artist and record producer Andre Rommel Young, Jr., p/k/a Dr. Dre. | 14. Martin Decl. ¶ 9. |
| 15. Mr. Martin pooled funds with Jeff and Mark Bass to arrange a trip to Los Angeles to meet with Interscope Records executives regarding a potential contract for Eminem, and Dr. Dre decided to offer Eminem a record deal. | 15. Martin Decl. ¶ 10. |
| 16. Dr. Dre wanted Eminem signed quickly. | 16. Deposition of Peter Paterno ("Paterno Dep.," attached to Busch Decl. as Exhibit 47) at 33:2-17; Deposition of Marnie Nieves ("Nieves Dep.," attached to Busch Decl. as Exhibit 45) at 44:21-45:7. |
| 17. Aftermath and Interscope's representatives presented Eminem (and his representatives) with a form based on prior agreements entered into by Aftermath | 17. Paterno Dep. at 33:2-17; Nieves Dep. at 37:6-17, 44:21-45:7. |
| 18. The royalty rates remained largely unchanged throughout the negotiation process of the 1998 Agreement | 18. Paterno Dep. at 33:9-17; Nieves Dep. at 44:21-45:7; Busch Decl. Exs. 2-5. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                4                Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 19. The 1998 Agreement was finalized in "four or five days." | 19. Paterno Dep. at 33:9-17; Nieves Dep. at 44:21-45:7; Busch Decl. Exs. 2-5. |
| 20. There was no other record label negotiating for Eminem's services at that time | 20. Martin Decl. ¶ 11. |
| 21. The 1998 Agreement provides a royalty rate for "full-price records sold in the United States" by defendants that varies between 12% (for "records other than LPs") to 20% (for LPs 4 through 7, after escalation) of the Suggested Retail List Price | 21. Busch Decl. Ex. 1 ¶ 4(a)(i). |
| 22. Paragraph 4(c)(v) of the 1998 Agreement is a provision contained in many artist recording agreements | 22. Nieves Dep. at 51-58, 64-69; Paterno Dep. at 170-76; Deposition of Lisa Rogell ("Rogell Dep.," attached to Busch Decl. as Exhibit 49) at 21, 26-28, 32-33, 58-66, 132;Declaration of David Berman ("Berman Decl.") ¶ 1, Ex. 1 ¶ 1; Declaration of Peter Menell ("Menell Decl.") ¶ 3, Ex. 1 ¶ 74. |
| 23. The purpose of 4(c)(v) is to provide for a higher royalty rate when the record company licenses the master recordings to third parties because in such situations the record company does not incur the expensive incremental costs associated with manufacturing, packaging and distributing the physical product records associated with a release by a third party. | 23. Nieves Dep. at 51-58, 64-69; Paterno Dep. at 170-76; Rogell Dep. at 21, 26-28, 32-33, 58-66, 132; Menell Decl. ¶ 3, Ex. 1 ¶ 74. |
| 24. The Master License provision is a catch-all intended to apply to all licensed uses of the master recordings not specifically provided for in the recording agreement | 24. Busch Decl. Ex. 1 ¶ 4(c)(v); Berman Decl. ¶ 4, Ex. 1 ¶ 1. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    5                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 25. The Master License provision is drafted by the record company as broadly as possible | 25. Deposition of Rand Hoffman ("Hoffman Dep." attached to Busch Decl. as Exhibit 40) at 258:4-259:10 |
| 26. The Master License provision is essentially "non-negotiable" in the case of a new artist without a competing record company bidding for his services | 26. Berman Decl. ¶ 5, Ex. 1 ¶ 1. |
| 27. At the time of the 1998 Agreement, at least some of the attorneys in charge of drafting and negotiating the agreement were unaware of the existence (or impending existence) of permanent downloads or limited downloads as a method of legitimate commercial distribution of music. | 27. Nieves Dep. at 76:4-6 |
| 28. An agreement dated September 27, 2000 altered the legal relationship among F.B.T., Eminem and Aftermath to give Aftermath a direct relationship with Eminem. | 28. Busch Decl. Ex. 6 ¶ 1. |
| 29. Plaintiffs retained their right to royalty income under this agreement. | 29. Busch Decl. Ex. 6 ¶¶ 6, 13 |
| 30. Aftermath agreed to render separate accountings to FBT and Eminem, and the 2000 Novation specified the royalty share of each. | 30. Busch Decl. Ex. 6 ¶ 6 |
| 31. The 2000 Novation increased the royalty rates payable for certain sales of records | 31. Busch Decl. Ex. 6 ¶¶ 7, 9 |
| 32. The 2000 Novation removed or modified the reductions on some configurations. | 32. Busch Decl. Ex. 6 ¶ 9 |
| 33. The 2000 Novation amended other provisions of the 1998 Agreement. | 33. Busch Decl. Ex. 6. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                6                Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 34. The 2000 Novation made no changes to the Master License provision found in ¶ 4(c)(v) of the 1998 Agreement | 34. Busch Decl. Ex. 6 |
| 35. The 2000 Novation made no reference to permanent download or any other digital configuration | 35. Busch Decl. Ex. 6 |
| 36. Compact Discs are digitally encoded | 36. Berman Decl. ¶ 7. |
| 37. A new term artist agreement was entered into dated July 2, 2003 between Aftermath and Eminem which terminated the Term of the 1998 Agreement. | 37. Busch Decl. Ex. 7. |
| 38. As of 2003, Eminem had been a superstar recording artist for several years, had released very successful records in 1999, 2000 and 2002 and had starred in the movie 8 Mile.  A number of songs by Eminem were featured prominently in the movie | 38. Martin Decl. ¶ 12 |
| 39. The 2003 agreement increased advances and royalty percentages | 39. Busch Decl. Ex. 7 ¶¶ 4-5 |
| 40. As of the 2003 Agreement, F.B.T. was no longer "furnishing the services" of Eminem (as it had been in 1998) due to the 2000 Novation | 40. Busch Decl. Ex. 6 ¶ 1. |
| 41. Both F.B.T. and Joel Martin (for Em2M) remained royalty participants under the 2003 Agreement | 41. Busch Decl. Ex. 7 ¶¶ 12-12A |
| 42. Royalty rates for sales of LPs were increased in the 2003 Agreement. | 42. Busch Decl. Ex. 7 ¶ 5 |
| 43. The structure and wording of the royalty provisions was not altered between the 1998 and 2003 Agreements | 43. Busch Decl. Ex. 7 ¶ 5 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    7                    Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 44. The Master License clause (¶ 4(c)(v) of the 1998 Agreement) was left unchanged in the 2003 Agreement but was renumbered and falls in paragraph 5(c)(v). | 44. Busch Decl. Ex. 7 ¶ 5(c)(v). |
| 45. The reference to "NRS" Licensees was deleted in the 2003 Agreement; defendants have explained that the reference to "NRS" in the 1998 Agreement was inconsequential | 46. Nieves Dep. at 62:7-63:3 |
| 47. By 2003, UMG Recordings, Inc. had entered into its initial agreement with Apple Computer, Inc., for iTunes. | 47. Deposition of Lawrence Kenswil ("Kenswil Dep.," attached to Busch Decl. as Exhibit 43) at 228:13-230:18; Deposition of Michael Ostroff ("Ostroff Dep." attached to Busch Decl. as Exhibit 46) at 31:9-32:7, 33:2-34:7, 41:25-46:12; Hoffman Dep. at 75:25-77:3; Busch Decl. Ex. 20 |
| 48. UMG was aware of the impact its arrangements with permanent download providers could have on its royalty obligations. | 48. Busch Decl. Ex. 20; Kenswil Dep. at 228:13-230:18; Ostroff Dep. at 31:9-32:7, 33:2-34:7, 41:25-46:12; Hoffman Dep. at 75:25-77:3. |
| 49. In early 2003, UMG and its affiliated labels, including defendants in this action, began requiring that all new agreements with artists contain a separate provision expressly specifying how royalties would be paid for the licensing of that artist's master recordings for permanent download, as well as for conditional or limited downloads. | 49. Rogell Dep. at 110:18-118:21, 132-33; Hoffman Dep. at 75:25-77:3, 135:16-22; Busch Decl. Exs. 8-12. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    8                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 50. During the negotiation of the 2003 Agreement with Eminem there was no discussion of what royalty rates would apply to digital uses of the Eminem masters, whether permanent download, Mastertone, streaming, or anything else, and no additional language proposed by UMG similar to that required by UMG to be contained in other artist contracts. | 50. Martin Dep. at 260:24-262:9; Hoffman Dep. at 14:17-15:12, 16:7-15. |
| 51. Hoffman drafted and negotiated the 2003 Agreement on behalf of Interscop | 51. Hoffman Dep. at 46:23-47:2, 51:3-7 |
| 52. Mr. Hoffman testified in this action that there were no discussions during negotiations as to whether the Master License provision applied to digital downloads | 52. Hoffman Dep. at 96:2-9 |
| 53. Mr. Hoffman acknowledges that the Master License provision would apply to permanent downloads if the agreements between defendants and the download providers are indeed licenses | 53. Hoffman Dep. at 87:17-88:2 |
| 54. Mr. Hoffman claims that the unspoken intent of the parties was that the provision would not apply. | 54. Hoffman Dep. at 80:22-81:23 |
| 55. An email produced by Mr. Hoffman after discovery shows that Mr. Stiffelman, at least, believed the Master License provision would apply to permanent downloads of the Eminem masters. | 55. Busch Decl. ¶ 35, Ex. 34. |
| 56. An amendment was made to the 2003 Agreement dated November 1, 2004. | 56. Busch Decl. Ex. 13. |
| 57. The amendment only applied to releases occurring after the date of the amendment. | 57. Busch Decl. Ex. 13. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                9                Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 58. The November 1, 2004 amendment altered the advance for an upcoming LP the  fraction of F.B.T.'s passive income participation and certain royalty rates (e.g., the rate for "singles" was increased from 12% to 14%). | 58. Busch Decl. Ex. 13 ¶¶ 1-3 |
| 59. The November 1, 2004 amendment stated that, for full-price records sold in the United States, "[s]ales of Albums by way of permanent download shall be treated as USNRC Net Sales for the purposes of escalations…" | 59. Busch Decl. Ex. 13 ¶ 2(a). |
| 60. Recording agreements frequently specify that the royalty rate for sales of a given album will be increased when certain sales levels are reached; these increases are known as "escalations." | 60. Declaration of Mark Levinsohn ("Levinsohn Decl.") ¶ 3. |
| 61. Eminem's representative Mr. Stiffelman requested that this language be inserted to clarify how permanent downloads of albums would be treated when determining escalations | 61. Hoffman Dep. at 236:2-239:24 |
| 62. The 1998 Agreement provided for a royalty rate of 18% on the first 500,000 copies of LPs 1 through 3 sold, 18.5% for sales between 500,000 and 1 million, and 19% for sales in excess of 1 million. | 62. Busch Decl. Ex. 7 ¶ 4(a)(i). |
| 63. During negotiation of the 2004 Amendment, it was discussed that full album sales by way of permanent downloads would count toward escalations, but would have no other impact on the 2003 Agreement | 63. Martin Dep. at 268:14-19 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment

10

Case No. CV 07-03314 PSG (MANx)

## B. Digital Downloads and Other Third Party Uses

| Undisputed Fact | Evidentiary Support |
|---|---|
| 64. 1998, UMG had created a specialized department to explore the digital marketplace for music. | 64. Kenswil Dep. at 11:8-12:3 |
| 65. In 1998, the market for digital distribution of sound recordings was still undeveloped and very little legal commerce in music over the internet was taking place. | 65. Menell Decl. ¶ 4, Ex. 1 ¶ 67. |
| 66. By July 2003, when the 2003 Agreement was entered into, the digital marketplace had developed significantly, as compared to 1998. | 66. Menell Decl. ¶ 5, Ex. 1 ¶ 70; Kenswil Dep. at 32:19-35:12, 45:10-46:11; Deposition of David Weinberg ("Weinberg Dep." attached to Busch Decl. as Exhibit 50) at 16:1-4, 116:22-117:7. |
| 67. Several recording industry initiatives to release digital downloaded music, including some by defendants and their parent, Universal Music Group, had been attempted but failed or produced only limited consumer interest, such as Farm Club, Full Audio, Music Net and Pressplay. | 67. Menell Decl. ¶ 5, Ex. 1 ¶ 70; Kenswil Dep. at 45:10-46:11; Ostroff Dep. at 24:6-20. |
| 68. In 2003 UMG was actively seeking relationships with third parties such as Apple, Cingular, Sprint and T-Mobile, to whom UMG could license the master recordings, and who had the technology and infrastructure in place to then reproduce and make downloaded music available to consumers. | 68. Menell Decl. ¶ 6, Ex. 1 ¶ 70; Kenswil Dep. at 45:10-46:11; Ostroff Dep. at 24:6-20, 24:23-25:13 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                11                Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 69. Apple's iTunes Music Store launched in 2003 | 69. Deposition of Eddy Cue ("Cue Dep.," attached to busch Decl. as Exhibit 38) at 23:10-12; Weinberg Dep. at 16:1-4; Busch Decl. Ex. 26 ¶¶ 4, 6-7; Busch Decl. Ex. 27. |
| 70. iTunes quickly became the largest source of legal permanent downloads on the internet. | 70. Cue Dep. at 23:10-12; Weinberg Dep. at 16:1-4; Dep. Busch Decl. Ex. 26 ¶¶ 4, 6-7; Busch Decl. Ex. 27. |

### C. Types of digital downloads

| Undisputed Fact | Evidentiary Support |
|---|---|
| 71. iTunes and other companies offer to consumers "permanent downloads." | 71. Kenswil Dep. at 34:13-17; Busch Decl. Ex. 26 ¶¶ 4, 10-11; Busch Decl. Ex. 27. |
| 72. iTunes is the most prominent service offering permanent downloads. | 72. Busch Decl. Ex. 26, Busch Decl. Ex. 27 |
| 73. Permanent downloads are digital copies of master recordings that reside permanently on an end-user's computer once downloaded. | 73. Kenswil Dep. at 34:13-17; Busch Decl. Ex. 26 ¶¶ 4, 10-11; Busch Decl. Ex. 27. |
| 74. Under its arrangement with UMG, iTunes receives a digital audio file from UMG, encodes the digital file with Digital Rights Management technology ("DRM"), reproduces that digital file, and maintains it on its servers and the servers of yet another third party ("Akamai") so that the file is available when an end user wishes to purchase it from iTunes for permanent download. | 74. Kenswil Dep. at 60:25-63:14, 69, 74:9-17; Cue Dep. at 54:21-62:3 |
| 75. Apple's "Fairplay" DRM limits, for example, how many computers the user can then put a given song on. | 75. Cue Dep. at 191:18-193:4 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    12                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 76. "Streaming" of music refers to a process whereby a user can listen to a song but no copy is created on his local machine | 76. Busch Decl. Ex. 16, Exhibit A ¶ 14(gg). |
| 77. In the "streaming" scenario, the streaming service receives the master recording from the record label, and manufactures and reproduces it in the same way as with respect to permanent downloads. | 77. Weinberg Dep. at 85:19-86:23 |
| 78. When a user "streams" a song, no copy is created on the user's machine. | 78. Busch Decl. Ex. 15 at 9; Busch Decl. Ex. 16, Exhibit A ¶ 14(gg). |
| 79. It is not possible to listen to a stream or to re-listen to a song that has just been streamed, without re-connecting or maintaining a connection to the provider | 79. Busch Decl. Ex. 16, Exhibit A ¶ 14(gg). |
| 80. "Conditional downloads" are a form of download but are restricted such that a user must maintain a subscription to a given service in order to be able to download songs or continue to listen to songs downloaded. | 80. Busch Decl. Ex. 15 at 9; Kenswil Dep. at 44:4-8; Busch Decl. Ex. 16, Exhibit A ¶ 14(f). |
| 81. The process of making the songs available to end users for conditional or "limited" download by the third party licensee is the same as discussed above with respect to permanent downloads | 81. Kenswil Dep. at 49:5-20 |
| 82. "Mastertones" are a category of digital uses that are typically short clips (approximately 30 seconds) of a master recording that plays on a mobile device to signal an incoming telephone call. | 82. Deposition of Rio Caraeff ("Caraeff Dep.," attached to Busch Decl. as Exhibit 37) at 33:11-35:20; Busch Decl. Ex. 15 at 12. |
| 83. The most common Mastertones are those that a user purchases and permanently downloads from a provider. They are functionally similar to a permanent download. | 83. Caraeff Dep. at 33:11-35:20; Busch Decl. Ex. 15 at 12. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    13                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 84. Other forms of mastertones (for example, T-Mobile's "ringback tones") play not for the purchaser, but rather for a third party who calls the purchaser, and are stored on a central server and "streamed" to the third party caller. | 84. Deposition of Ethan Gustav ("Gustav Dep.," attached to Busch Decl. as Exhibit 39) at 140:24-141:17. |
| 85. A mastertone provider receives a master recording from the record label and then makes it available for download in the same manner as that discussed above for permanent downloads. | 85. Weinberg Dep. at 85:19-86:23 |

**D. UMG's Contracts with Third Party Permanent Download and Mastertone Providers**

| Undisputed Fact | Evidentiary Support |
|---|---|
| 86. Since approximately 2001, UMG has entered into agreements with various third parties, granting those entities the rights to manufacture, reproduce, and offer UMG music to consumers over the internet in the forms discussed above | 86. Kenswil Dep. at 45:10-46:11; Ostroff Dep. at 24:6-20, 24:23-25:13; Busch Decl. Exs. 16-25. |
| 87. UMG has produced approximately eighty agreements granting various entities the rights to reproduce and sell UMG's music (including the Eminem masters) as permanent downloads and mastertones | 87. Busch Decl. ¶ 56. |
| 88. The remaining 120 or so agreements are for conditional downloads, streaming, and other services | 88. Busch Decl. ¶ 56. |
| 89. Most of these contracts are broadly similar in terms of the rights granted to the third parties and the general structure of the agreements | 89. Busch Decl. ¶ 57. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    14                    Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 90. Defendants have confirmed that the process by which digital files are transferred to the third party digital download providers and then offered and reproduced for end-users, are largely identical no matter the digital use in question. | 90. Weinberg Dep. at 85:19-86:23 |
| 91. The contracts discussed in plaintiffs' motion are representative of the other contracts and relationships at issue | 91. Busch Decl. ¶ 58. |
| 92. On December 13, 2002, UMG and Apple entered into an agreement under which UMG licenses to Apple numerous rights | 92. Busch Decl. Ex. 20. |
| 93. The 2002 Apple agreement was "amended and restated" dated April 28, 2006, and the provisions discussed in this motion did not change substantively. | 94. Busch Decl. ¶ 21, Busch Decl. Ex. 19. |
| 95. In the 2002 and 2006 agreements, UMG specifically grants Apple the rights "to make available to End Users Downloads of Universal Sound Recordings" and "to make Reproductions of the Universal Sound Recordings solely insofar as they are necessary to the Performance or Download of the Universal Sound Recordings." | 95. Busch Decl. Ex. 20 ¶ 1. |
| 96. Exhibit A to the iTunes Agreement, titled "Additional Terms and Conditions" states that nothing in the agreement gives Apple any ownership interest in the Universal Sound Recordings, including any copyright ownership interest. | 96. Busch Decl. Ex. 20 Exhibit A ¶ 2(f). |
| 97. The 2002 and 2006 agreements give UMG the right to terminate the agreement at any time | 97. Busch Decl. Ex. 20 ¶¶ 1(b), 4 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment          15                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 98. UMG may demand that iTunes cease selling some or all of the master recordings licensed to it. | 98. Busch Decl. Ex. 20 ¶¶ 1(b), 4 |
| 101. UMG has reserved to itself "any and all rights not expressly granted" | 101. Busch Decl. Ex. 20 ¶ 1(a) |
| 102. The agreement contains territorial limitations and prohibitions on modifying Universal Sound recordings | 102. Busch Decl. Ex. 20 Exhibit A ¶ 2 |
| 103. The 2002 agreement states that upon termination, Apple "shall be required to immediately cease using the Universal Sound Recordings on the Service," must return any physical CDs received from Universal, and must destroy all digital files embodying Universal Sound recordings. | 103. Busch Decl. Ex. 20 ¶ 4(c). |
| 104. For each song (or album) "sold" by iTunes, the agreement requires Apple to pay UMG a "wholesale price" of a minimum of $0.70 for each individual song download and $7.00 for each download of a full album, or 70% of the price Apple charges to its customers | 104. Busch Decl. Ex. 20 ¶ 2(a). |
| 105. The agreement states the "wholesale price" serves as consideration "for each compliant Reproduction made by Apple of a Universal Sound Recording | 105. Busch Decl. Ex. 20 ¶ 2(b) |
| 106. Apple retains the right to set the price at which it will offer permanent downloads to users | 106. Kenswil Dep. at 84:19-23. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                16                Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 107. The iTunes service operates on an "on demand" basis such that when a user selects a song to download and pays Apple for that song, the sound recording file is digitally replicated and transmitted to the user, resulting in a copy on the user's computer. | 107. Kenswil Dep. at 69-70 |
| 108. Apple does not maintain an inventory that is "depleted" when a user downloads a file and it cannot "run out" of copies | 108. Cue Dep. at 140:5-141:4; Kenswil Dep. at 130:9-17 |
| 109. Paragraph 2(h) of Exhibit A to the agreements is titled "No Further Licensing or Obligation" and states that "Except for the rights granted by Universal to Apple in section 1 of the Agreement, no further rights are granted to Apple in or under the agreement…" | 109. Busch Decl. Ex. 19, Exhibit A, ¶ 2(h); Busch Decl. Ex. 20, Exhibit A, ¶ 2(h). |
| 110. The iTunes "Terms of Service" agreement refers to content "owned by Apple and/or its licensors." | 110. Busch Decl. Ex. # ¶ 14(a). |
| 111. Steve Jobs, CEO of Apple, discussed his company's relationship with UMG as that of a "license" in an essay titled "Thoughts on Music" dated February 6, 2007 | 111. Busch Decl. Ex. 27 |
| 112. In his "Thoughts on Music Essay," Mr. Jobs discussed Apple's need to "license rights to distribute music from others," specifically mentioned Universal and the other large record companies, and referenced Apple's subsequent success in "licens[ing] their music to distribute legally over the Internet." | 112. Busch Decl. Ex. 27 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    17                    Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 113. When deposed in this case, Mr. Jobs claimed not to know whether his company's relationship with Universal was, in fact, a license. | 113. Deposition of Steve Jobs ("Jobs Dep.," attached to Busch Decl. as Exhibit 42) at 26, 99. |
| 114. In a written statement submitted to the Copyright Royalty Board, Mr. Cue repeatedly stated that iTunes had "licensed" "millions of songs" from copyright holders, and explained that "royalty payments" pursuant to these "licensing agreements" are the most significant cost faced by iTunes | 114. Cue Dep. at 148:4 – 154:24; Busch Decl. Ex. 26 ¶¶ |
| 115. Mr. Cue claimed not to know whether the iTunes Agreement was a license when deposed | 115. Cue Dep. at 74:22-75:10 |
| 116. No title to any UMG master recordings or to the digital audio files embodying those recordings passes to Apple under the iTunes agreements, nor does title pass to any third party permanent download provider under UMGs permanent download agreements. | 116. Busch Decl. Ex. 20 ¶ 4(c), Exhibit A ¶ 2(f). |
| 117. Defendants claim that Apple is a "reseller" of UMG master recordings, not a licensee. | 117. Weinberg Dep. at 71-73, 76-78; Ostroff Dep. at 79; Kenswil Dep. at 218-23 |
| 118. Neither the 2002 nor the 2006 agreement calls Apple a "reseller." | 118. Busch Decl. Exs. 19, 20. |
| 119. UMG and Apple claim that the sale from UMG to Apple and the supposed resale to the consumer occur simultaneously at the time of the download. | 119. Ostroff Dep. at 80:2-13, Kenswill Dep. at 218:18-219:6, 222:21-223:12; Weinberg Dep. at 72:6-73:3; Cue Dep. at 75:19-76:2 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                18                Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 120. In approximately 2003, UMG began negotiating agreements with various third party entities who wanted to offer UMG songs to consumers for use on mobile phones as Mastertones | 120. Busch Decl. Exs. 22-25 |
| 121. UMG has entered into agreements with the major cellular telephone network carriers, including Sprint, Nextel, Cingular, and T-Mobile | 121. Busch Decl. Exs. 22-25 |
| 122. These contracts were primarily drafted by representatives of the third party Mastertone Providers due to their superior bargaining power and were presented to UMG on a "take it or leave it" basis | 122. Weinberg Dep. at 31:13-32:2, 134:21-135:7. |
| 123. Some of these agreements, unlike the permanent download agreements discussed above explicitly state they are granting the Mastertone provider in question a "license" to reproduce and distribute mastertones embodying UMG music (among other things) | 123. Busch Decl. Ex. 22 ¶¶ 6.1-6.2; Busch Decl. Ex. 23 ¶¶ 6.1-6.2; Busch Decl. Ex. 25 ¶ 2.1. |
| 124. The only one of the agreements referenced above between UMG and a Mastertone provider that does not explicitly call the grant of rights from UMG a "license" is the agreement with T-Mobile. | 124. Busch Decl. Ex. 24 ¶ 4 |
| 125. UMG was able to negotiate the wording of provisions in the T-Mobile agreement. | 125. Gustav Dep. 103:8-106:7 |
| 126. The initial draft of the T-Mobile agreement referred to the grant of rights allowing T-Mobile to offer mastertones to its customers a "license." | 126. Busch Decl. Ex. 30 ¶ 4 |
| 127. The word "license" was changed to "authorization" and "right" in a March 18, 2004 revision by UMG. | 127. Gustav Dep. at 103:8-106:7, Busch Decl. Ex.  31 at TM 001279 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    19                    Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 128. T-Mobile did not oppose or question this change because they "did not feel it was material." | 128. Gustav Dep. at 106:9-22. |
| 129. All of the "grant of rights" provisions, including that in the T-Mobile agreement, grant rights to reproduce and distribute UMG's intellectual property. | 129. Busch Decl. Ex. 22 ¶¶ 6.1-6.2; Busch Decl. Ex. 23 ¶¶ 6.1-6.2; Busch Decl. Ex. 24 ¶ 4; Busch Decl. Ex. 25 ¶ 2.1. |
| 130. All of the mastertone agreements make it clear that all intellectual property rights in UMG's master recordings (and the mastertones embodying those recordings) are reserved to UMG and that no ownership rights therein are granted. | 130. Busch Decl. Ex. 22 ¶¶ 7.1, 7.3; Busch Decl. Ex. 23 ¶¶7.1, 7.3; Busch Decl. Ex. 24 ¶ 4(e); Busch Decl. Ex. 25 ¶ 2.2. |
| 131. All of these agreements are for a limited term and most explicitly state that the Mastertone providers' rights in the UMG content expire upon termination. | 131. Busch Decl. Ex. 22 ¶ 4; Busch Decl. Ex. 23 ¶ 4; Busch Decl. Ex. 24 ¶¶ 8, 8(f); Busch Decl. Ex. 25 ¶¶ 5.1, 5.3. |
| 132. Most of the agreements have provisions giving UMG the right to unilaterally request the removal of any of its recordings from the Mastertone providers' services. | 132. Busch Decl. Ex. 23 ¶ 2.9; Busch Decl. Ex. 24 ¶ 2(c); Busch Decl. Ex. 25 ¶ 3.1.2 |
| 133. The mastertone agreements provide for recurring and ongoing benefits to UMG in the form of payments based on the quantity and price of the Mastertones delivered to subscribers | 133. Busch Decl. Ex. 22 ¶ 3; Busch Decl. Ex. 23 ¶ 3; Busch Decl. Ex. 24 ¶ 7; Busch Decl. Ex. 25 ¶ 4. |
| 134. For each Mastertone delivered to a subscriber UMG under these agreements, UMG is owed the greater of $1.00 or 50% of the price charged consumers. | 134. Busch Decl. Ex. 22 ¶ 3; Busch Decl. Ex. 23 ¶ 3; Busch Decl. Ex. 24 ¶ 7; Busch Decl. Ex. 25 ¶ 4. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    20                    Case No. CV 07-03314 PSG (MANx)

## E. UMG's Royalty Treatment of Revenues from Digital Uses

| Undisputed Fact | Evidentiary Support |
|---|---|
| 135. In about late 2002, approximately the same time the iTunes agreement was being negotiated, UMG made a company-wide decision to pay royalties for permanent downloads reproduced and distributed by third party providers under the royalty provision applicable to defendants' sales of physical product, as opposed to under the Master License provision in artist contracts. | 135. Ostroff Dep. at 30:3-43:16, 52:7-20. |
| 136. Before the 2003 Agreement was entered into, UMG, on a company-wide basis, altered its standard form artist contract to expressly state that royalties for permanent downloads would be paid under the "record" royalty provision. | 136. Ostroff Dep. at 53:9-55:1; Rogell Dep. at 110:18-118:21. |
| 137. UMG treats income from streaming and conditional download agreements as licenses of master recordings, and pay royalties, under the Master License provision, based on 50% of their net receipts. | 137. Hoffman Dep. at 177:17-184:13, 245:2-246:6; Rogell Dep. at 134-40; Kenswil Dep. at 152; Weinberg Dep. at 82-86; Ostroff Dep. at 61-68. |
| 138. UMG refers to streaming and conditional download agreements, collectively, as "subscription agreements." | 138. Kenswil Dep. at 44:4-7; Hoffman Dep. at 245:15-24; Busch Decl. Exs. 16, 18. |
| 139. UMG provides the same audio files to its third party partners whether they are destined for use via streaming, conditional download or permanent download | 139. Weinberg Dep. at 85:19-86:23 |
| 140. UMG has no manufacturing, packaging or distribution costs for the digital uses discussed herein. | 140. Menell Decl. ¶ 7, Ex. 1 ¶¶ 75-78; Kenswil Dep. at 58:6-14; Paterno Dep. at 52; Busch Decl. Ex. #. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment

21

Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 141. The third party digital download providers incur costs related to reproduction and distribution of the Eminem masters over their networks. | 141. Menell Decl. ¶ 7, Ex. 1 ¶¶ 75-78 (citing sources); Kenswil Dep. at 58:6-14; Paterno Dep. at 52 |
| 142. UMG's agreements with the third parties are virtually identical whether they are for permanent download or subscription services | 142. Busch Decl. Exs. 16-21. |
| 143. Rand Hoffman, head of Business and Legal Affairs for defendant Interscope (a part of UMG), and defendants' 30(b)(6) witness on the Master License provision, admits the Master license provision would apply to permanent downloads if the agreements between defendants and the download providers are licenses. | 143. Hoffman Dep. at 87:17-88:2 |
| 144. A "new medium" deduction is included in artist contracts with the anticipation that new technologies may have increased costs for the record company. | 144. Berman Decl. ¶¶ 6-8, Ex. 1 ¶¶ 6-7 |
| 145. UMG does not take a "new medium" deduction either for conditional downloads and streams (which are paid under the Master License provision) or permanent downloads and mastertones. | 145. Declaration of Gary Cohen ("Cohen Decl.") ¶ 4, Ex. 1 at 4; Ostroff Dep. at 43:21-44:7 |
| 146. UMG witness David Weinberg, who negotiated many of UMG's agreements with the digital providers, when asked what made conditional downloads and streams "license" but not permanent downloads and mastertones, could only offer the res ipsa reasoning that "one involves the sale of records, the other does not." | 146. Weinberg Dep. at 84:5-85:1 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment        22        Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 147. Mr. Weinberg acknowledged that the Master License provision would apply to masters licensed to third parties for use on a compilation album that is sold by that third party | 147. Weinberg Dep. at 106:24-109:15 |
| 148. On March 24, 2004, approximately 27 attorneys representing both prominent artists and record companies in the music industry signed a letter to the heads of the major record labels protesting their royalty treatment of permanent downloads | 148. Busch Decl. Ex. 14 |
| 149. Mr. Gary Stiffelman, who represents Eminem and negotiated the 2003 Agreement on his behalf, signed this letter. | 149. Nieves Dep. at 79:10-19 |
| 150. Mr. Paterno, who represents Aftermath and negotiated all of the relevant agreements with Eminem in this case on Aftermath's behalf signed this letter. | 150. Nieves Dep. at 79:10-19 |
| 151. Defendants acknowledge that the mere fact that record companies began paying for digital downloads under the provisions applicable to physical sales does not establish an industry custom | 151. Kenswil Dep. at 192:20-193:9. |
| 152. Paterno said artists should be paid whatever they are able to negotiate | 152. Paterno Dep. 36:25-37:3. |
| 153. The "major" record labels as of March 2004 consisted of Sony Music Entertainment, Warner Music Group, EMI Recorded Music, Universal Music Group and BMG Entertainment. | 153. Levinsohn Decl. ¶ 5. |
| 154. BMG and Sony merged in approximately 2006. | 154. Levinsohn Decl. ¶ 5. |

## F. UMG's Characterization of Its Arrangements

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    23                    Case No. CV 07-03314 PSG (MANx)

| Undisputed Fact | Evidentiary Support |
|---|---|
| 155. UMG representatives have referred to to UMG's actions as "licensing" their music in public statements. | 155. Busch Decl. Exs. 15, 28, 29 |
| 156. In sworn written testimony given before the Copyright Royalty Board, Lawrence Kenswil, Universal's Executive Vice President of Business Strategy, formerly the head of Universal eLabs, refers to UMG's actions as "licensing" sound recordings and "digital rights." | 156. Busch Decl. Ex. 15; Kenswil Dep. at 29:11-24, 32:15-33:15. |
| 157. Mr. Kenswil claimed that as used in certain places in his written testimony, "electronic distribution" included only "customized radio, subscription services, video streaming," and not permanent downloads or mastertones – i.e., only the forms that UMG concedes are licenses– yet he claims that the phrase "electronic distribution" used on the very next page in the same statement <u>does</u> include permanent downloads. | 157. Kenswil Dep. at 27:11-24, 32:15-33:15 |
| 158. Jimmy Iovine, head of defendant Interscope Records, is quoted in a magazine article as referring to Apple's need to "secure licenses from…the labels" | 158. Deposition of Jimmy Iovine ("Iovine Dep.," attached to Busch Decl. as Exhibit 29) at 81:20-84:4; Busch Decl. Ex. 28 |
| 159. Mr. Iovine referenced labels "licensing" music for various uses in a videotaped interview | 159. Iovine Dep. at 106:12-112:18 |
| 160. In a case in the Eastern District of Michigan, Aftermath has argued it licenses the compositions which are embodied in the Eminem masters to Apple for use on the iTunes service. | 160. Busch Decl. ¶ 55, Ex. 54. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    24                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 161. Eight Mile Style v. Apple concerns the question of whether Aftermath had the right to grant licenses in the Eminem compositions to Apple. | 161. Busch Decl. ¶ 54, Ex. 53. |
| 162. David Weinberg, Senior Vice President, Business and Legal Affairs for Universal's eLabs, advanced the position that the Master License provision applied only to "ancillary receipt income" or "ancillary income. | 162. Weinberg Dep. 68:13-69:6, 94:21-96:24. |
| 163. Neither the phrase "ancillary receipt income" nor "ancillary income" appears in the Master License provision of either agreement | 164. Weinberg Dep. at 63:24-64:7 |
| 165. Mr. Hoffman stated that nothing in the 1998 or 2003 Agreements states that only licenses that are "ancillary to the main business" would fall under the Master License Provision | 165. Hoffman Dep. at 120:15-121:3. |
| 166. Mr. Weinberg testified that because UMG viewed the Master License provision as limited to "ancillary receipts" and they considered Mastertones and permanent downloads "sales of their records," they paid royalties pursuant to the royalty provision applicable to physical sales by defendants. | 166. Weinberg Dep. at 68:10-72:5. |
| 167. When asked why UMG considered conditional downloads licenses (and thus, "ancillary"), but permanent downloads "sales of records," Mr. Weinberg could give only answer that conditional download contracts "did not involve the sale of records | 167. Weinberg Dep. at 84:5-85:1 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                25                Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 168. As of 2007, the most recent year for which figures are available, permanent downloads plus mastertones account for only approximately 20% of total sales in the United States | 168. Menell Decl. ¶ 9, Ex. 2 |
| 169. Master recordings are normally subject to licensing | 169. Ravine Dep. at 17:13-25; Weinberg Dep. at 106:24-107:12; Kenswil Dep. at 152:9-13. |
| 170. The process of providing permanent downloads and mastertones to end users involves reproducing and distributing the master recordings | 171. Kenswil Dep. at 131:7-11; Cue Dep. at 60:6-15; Gustav Dep. at 52:10-20; Weinberg Dep. at 74:16-21 |
| 172. Mr. Cue and Mr. Jobs of Apple, when deposed during this case, declined to offer an opinion on whether their agreements with UMG were licenses. | 172. Jobs Dep. at 26:7-17, 99:5-16; Cue Dep. at 74:22-75:11 |
| 173. Mr. Cue and Mr. Jobs of Apple took the view that Apple's agreements with UMG provided whatever rights Apple needed to offer, reproduce and distribute UMG sound recordings through its iTunes store. | 173. Cue Dep. at 74:22-75:11; Jobs Dep. at 46:5-47:11, 66:2-68:21 |

### G. UMG's Royalty Treatment of Third Party Compilation Albums

| Undisputed Fact | Evidentiary Support |
|---|---|
| 174. Any income UMG receives for the license of one or more Eminem masters for use on a third-party compilation album would be accounted to plaintiffs under the Master License provision | 174. Weinberg Dep. at 105:5-107:12, 108:4-15 |
| 175. Royalties due UMG under a compilation album license are a percentage of the retail price | 175. Ravine Dep. at 79:24-80:10, 81:20-25 |
| 176. The retail price of a third party compilation album is set by the third party licensee, not UMG. | 176. Ravine Dep. at 68:9-15. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                26                Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 177. A license of a master for use on a third party compilation album grants that third party the rights to reproduce, distribute and sell the master recording, among other things. | 177. Ravine Dep. at 18:11-14, 19-20, 21:2-23 |
| 178. UMG provides a copy of the master recording to the third party licensee in whatever format the licensee requests, possibly including digital | 178. Ravine Dep. at 61:10-62:9 |
| 179. The rights granted in a licence of a master for use on a third party compilation album are limited to the specific configurations requested. | 179. Ravine Dep. at 30:14-16, 30:22-31:2, 31:9-16 |
| 180. The rights granted in a license for use on a third party compilation album cease upon termination of the license agreement or shortly thereafter. | 180. Ravine Dep. at 54:2-4, 54:12-55:1 |
| 181. Title to the master recording or the embodiment of the master provided to the third party does not pass when a master has been licensed for use on a compilation album. | 181. Ravine Dep. at 75:12-76:19, 77:9-13 |
| 182. In compilation albums the record company does not pay for manufacturing, distribution, transportation, packaging and many other costs and its costs are substantially lower than when it puts out physical product itself. | 182. Menell Decl. ¶¶ 7-8 |
| 183. The cost to defendants' to provide an entire album to a third party for use on a digital download service is approximately $800.00. | 183. Busch Decl. ¶ 52, Ex. 51. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    27                    Case No.  CV 07-03314 PSG (MANx)

| Undisputed Fact | Evidentiary Support |
|---|---|
| 184. UMG representatives have admitted they incur essentially no additional cost for each copy of the sound recording subsequently sold | 184. Kenswil Dep. at 58:6-14, 67:23-68:9 |
| 185. The only cost to UMG for a synchronization license is that of providing a copy of the master recording in question to the licensee. | 185. Kenswil Dep. at 67:23-68:9. |
| 186. When the record company manufactures, reproduces and distributes physical product through its own subsidiaries and affiliates, it incurs costs ranging from 25% to 40% of the price it ultimately charges to retailers | 186. Menell Decl. ¶ 8, Ex. 1 ¶ 75. |
| 187. At least some of UMG's compilation licenses appear to allow a "sell-off period" after termination so that remaining inventory is not a total loss to the licensee | 190. Ravine Dep. at 53:9-55:1 |

## H. The Royalty Audit

| Undisputed Fact | Evidentiary Support |
|---|---|
| 191. A royalty audit was conducted by the Gary Cohen Corporation on behalf of plaintiffs and Eminem covering the period January 1, 2002 to June 30, 2005 | 191. Busch Decl. Ex. 32 |
| 192. The audit showed UMG paying plaintiffs royalties on permanent downloads and mastertones based on the royalty rate applicable to full price records sold by defendants in the United States, not the royalty rate in the Master License provision. | 192. Busch Decl. Ex. 32 ¶ 5 |
| 193. The audit calculated the resulting underpayment to F.B.T. and Eminem as over $650,000 | 193. Busch Decl. Ex. 32 ¶ 5 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    28                    Case No. CV 07-03314 PSG (MANx)

| | |
|---|---|
| 194. Through April 2008, this underpayment has reached at least $1,340,754 | 194. Cohen Decl. ¶ 3, Ex. 1 pp. 1, 4. |
| 195. The audit revealed other accounting inconsistencies separate and apart from the issue related to royalties for permanent downloads and mastertones. | 195. Busch Decl. Ex. 32 ¶¶ 1-4, 6-24 |
| 196. Defendants' May 8, 2007 written response to the audit denied almost all the claims in the audit, including the claim related to royalties for permanent downloads and mastertones, but admitted an underpayment to F.B.T. of $159,332 stemming from incorrect allocation of costs as between Eminem and plaintiffs. | 196. Busch Decl. Ex. 33 |
| 197. UMG's 30(b)(6) witness in this action admits that the $159,332 is owed to plaintiffs and could not articulate any potential set-off amounts. | 197. Hu Dep. at 29:16-21, 30:2-20 |
| 198. Plaintiffs have repeatedly requested that defendants pay this amount, and defendants only response has been to claim that plaintiffs should seek recovery instead from Eminem | 188. Busch Decl. ¶ 36, Ex. 35. |
| 199. It is the duty of Aftermath to account directly to plaintiffs and pay the amounts due under the contracts. | 189. Busch Decl. Ex. 1 ¶ 14; Dep. Busch Decl. Ex. 6 ¶ 6; Busch Decl. Ex. 7 ¶¶ 12, 12A, 14. |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment

29

Case No. CV 07-03314 PSG (MANx)

# II.

## CONCLUSIONS OF LAW

### A. The Plain Language of the 1998 and 2003 Agreements Entitles Plaintiffs to 50% of UMG's Net Receipts for Licensed Uses of the Eminem Masters

| Conclusions of Law | Authority |
|---|---|
| 1. Under California law, where the language of a contract is clear and not absurd, it will be followed. | 1. Cal. Civ. Code, § 1638 |
| 2. If parties dispute the meaning of contractual language, "the first question to be decided is whether the disputed language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over. | 2. *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 132 Cal. Rptr. 2d 151, 157 (Cal. Ct. App. 2003) |
| 3. The trial court "must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning," and it is reversible error to refuse to do so based on the Court's conclusion that the language of the contract is clear and unambiguous on its face | 3. *Morey v. Vannucci*, 64 Cal. App. 4th 904, 75 Cal. Rptr. 2d 573, 578 (Cal. Ct. App. 1998) (citations omitted) |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    30                    Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 4. The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed | 4. Cal. Civ. Code, § 1644 |
| 5. Taking a novel position that is immediately opposed by the only other parties affected cannot constitute evidence of industry custom or practice, since custom must be "certain and uniform in order that it may be recognized as valid and enforceable in a court of law. | 5. *May v. American Trust Co.*, 135 Cal. App. 385, 393 (Cal. App. 1933) |
| 6. The language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. | 6. Cal. Civ. Code § 1654 |
| 7. This rule is applied with particular force in the case of "adhesion contracts." | 7. *Badie v. Bank of America*, 67 Cal. App. 4th 779 (Cal. App. 1st Dist. 1998); *Neal v. State Farm Ins. Cos.*, 188 Cal. App. 2d 690, 695 (Cal. App. 1st Dist. 1961) |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment

31

Case No.  CV 07-03314 PSG (MANx)

| 8. A contract of adhesion is one which is "imposed and drafted by the party of superior bargaining strength," and thus "relegates to the subscribing party only the opportunity to adhere to the contract or reject it. | 8. *Neal v. State Farm*, 188 Cal. App. 2d at 694 (Cal. App. 1st Dist. 1961) (citing Kessler, Contracts of Adhesion (1943), 43 Columb. L. Rev., p. 629.) |
| --- | --- |
| 9. A contract of adhesion may be found even when certain provisions of a contract are negotiable | 9. *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 812-818 (1981) |

### B.    The Third Party Digital Download Providers are Licensees

| Conclusions of Law | Authority |
| --- | --- |
| 10. In determining whether a transaction is a sale or a license, courts must analyze the "economic realities" of the transaction | 10. *Microsoft Corp. v. DAK Indus. (In re DAK Indus.)*, 66 F.3d 1091, 1095 (9th Cir. 1995) |
| 11. The label on an agreement does not determine whether or not it will be construed as a license | 11. *UMG Recordings v. Augusto*, 558 F. Supp. 2d 1055, 1060 (C.D. Cal. 2008) |
| 12. The distributor of a copyrighted product's intent to regain possession is strong evidence that the product was licensed, not sold, to the recipient. | 12. *Augusto*, 558 F. Supp. 2d at 1060; *United States v. Wise*, 550 F.2d 1180, 1190 (9th Cir. 1977) |
| 13. UMG's contracts with the third party digital download providers here explicitly requires either return or destruction of UMG Content at termination. | 13. SOF ¶¶ 103, 131, 180 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    32                    Case No.  CV 07-03314 PSG (MANx)

| | |
|---|---|
| 14. Licenses generally provide "recurring benefits," and the absence of such a benefit there argued against the finding of a license. | 14. *Augusto*, 558 F. Supp. 2d at 1061 (citing *DAK Indus.*, 66 F.3d at 1096; *SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075 (C.D. Cal. 2001)) |
| 15. The arrangements UMG has with iTunes and other digital download providers explicitly require recurring benefits in the form of a fee to be paid to UMG for each permanent download or Mastertone | 15. SOF ¶¶ 104-105, 134 |
| 16. Reproducing and distributing copyrighted material are two rights exclusive to the copyright owner. | 16. 17 U.S.C. § 106(1), (3) (2008). |
| 17. Defendants cannot take the inconsistent position that the same words grant one thing with regard to the composition copyright (a license) but another with regard to the master recording copyright. | 17. *Rissetto v. Plumbers & Steamfitters Local*, 343, 94 F.3d 597, 600-601, 605 (9th Cir. 1996.) |

## C. Defendants Underpaid Plaintiffs $159,332 Based on a Misallocation of Costs Between Plaintiffs and Eminem

| Conclusions of Law | Authority |
|---|---|
| UMG's written response to the 2005 Audit Report acknowledged that defendants had underpaid plaintiffs by $159,332 | SOF ¶ 197 |
| It is the duty of Aftermath to account directly to plaintiffs and pay the amounts due under the contracts. | SOF ¶¶ 29-30 |

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    33                    Case No. CV 07-03314 PSG (MANx)

1

2  DATED:  December 3, 2008                Respectfully submitted,

3
                                          KING & BALLOW
4

5                                         /s/ Richard S. Busch
6                                         Richard S. Busch (TN Bar No. 014594)
                                          rbusch@kingballow.com
7                                         Paul H. Duvall (State Bar No. 73699)
                                          pduvall@kingballow.com
8                                         KING & BALLOW
9                                         9404 Genesee Avenue, Suite 340
                                          La Jolla, CA 92037-1355
10                                        Telephone:  (858) 597-6000
                                          Facsimile:   (838) 597-6008
11

12                                        - and -

13
                                          Mark L. Block (State Bar No. 115457)
14                                        mblock@glaserweil.com
15                                        Glaser, Weil, Fink, Jacobs & Shapiro, LLP
16                                        10250 Constellation Blvd. 19th Floor
17                                        Los Angeles, CA 90067
                                          Telephone:  (310) 282-6240
18                                        Facsimile:  (310) 556-2920
19

20                                        Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

Plaintiffs' Separate Statement of
Uncontroverted Facts and Conclusions of law
re: Plaintiffs' Motion for Summary Judgment                    34                    Case No.  CV 07-03314 PSG (MANx)