GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
Melinda.Lemoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC.,<br><br>Defendants. | CASE NO. CV 07-03314 PSG (MANx)<br><br>DEFENDANTS' NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 4, TO EXCLUDE MARCH 24, 2004 LETTER TO THE MAJOR RECORD COMPANIES<br><br>[DECLARATION OF MELINDA LEMOINE IN SUPPORT FILED CONCURRENTLY HEREWITH]<br><br>Judge: Hon. Philip S. Gutierrez<br>Date: February 3, 2009<br>Time: 9:00 a.m.<br>Ctrm: Roybal 790 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on February 3, 2009 at 9:00 a.m., or as soon thereafter as this matter can be heard, in Courtroom 790 of the United States District Court, Central District of California, located at 255 E. Temple Street, Los Angeles, California, defendants Aftermath Records doing business as Aftermath Entertainment, Interscope Records, UMG Recordings, Inc., and ARY, Inc, (collectively, "Defendants") will and hereby do move, *in limine*, for an order precluding Plaintiffs from introducing into evidence or making reference to a March 24, 2004 Letter signed by 28 attorneys and addressed to the Major Record Companies.

This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the declaration of Melinda E. LeMoine and exhibits thereto ("LeMoine Decl."), filed concurrently herewith, any papers submitted in reply to any opposition to this Motion, facts of which this Court may take judicial notice, the record in this case, arguments of counsel, and any other matter as may properly come before this Court.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on December 16, 2008.

DATED: December 19, 2008                MUNGER, TOLLES & OLSON LLP

                                                          GLENN D. POMERANTZ
                                                          KELLY M. KLAUS
                                                          MELINDA E. LEMOINE

                                                       By:   /s/ Melinda E. LeMoine
                                                              Melinda E. LeMoine

6621757.1

DEFENDANTS' MOTION IN LIMINE NO. 4, TO EXCLUDE MARCH 24, 2004 LETTER TO THE MAJOR RECORD COMPANIES

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants hereby move, *in limine*, to exclude at trial the introduction of any reference to a March 24, 2004 letter that Plaintiffs have produced bearing the signatures of 27 self-described "music industry attorneys" to the heads of the "major record companies" (hereinafter the "Letter," LeMoine Decl., Ex. C at 74).

The Letter does not refer to or discuss any of the parties or agreements at issue in this case. Rather, the Letter states a generic advocacy position about how record companies should treat their "arrangements" with "independent electronic distributors" for purposes of calculating royalties under the un-described and un-defined artist recording agreements. On its face, the Letter is a clear bargaining maneuver. It says that "digital distribution raises ... legal and philosophical issues[,]" and invites the record companies to work with the lawyers who signed it to "devise a consistent and mutually acceptable position on these issues," so as to avoid "artist indifference, consumer apathy and the imposition of legislation that could further threaten our collective livelihoods." *Id*. at 75.

What does this Letter – sent in March of 2004 – have to do with interpreting what the parties agreed <u>six years earlier</u> (in March of 1998) when they signed the agreement that has the contractual provisions that are actually in issue in this case? The answer is, absolutely nothing. What Plaintiffs want to do is to use the Letter as a "Gotcha" with one of its signatories, Peter Paterno, who negotiated the 1998 Agreement and who has testified unequivocally that under <u>that</u> Agreement – which, unlike the Letter, is binding on the parties to this case – sales of permanent downloads through online retailers like Apple's iTunes are sales of records and are not subject to the Agreements' royalty provision of 50% of Aftermath's net receipts for "masters licensed." The Letter is inadmissible, and both it and any references to it should be excluded, for multiple reasons:

- 1 -

<u>First</u>, the Letter is textbook hearsay. It is an out-of-court statement over the signature of 27 different people that Plaintiffs want to use to prove the "truth" of its contents, *i.e.*, that revenues from the sales of permanent downloads pursuant to digital distribution agreements between the Defendants (most notably, UMG Recordings, Inc. ("UMG")) and online stores like iTunes are subject to the "masters licensed" provision of the Agreements at issue in this case. The Letter is not subject to any hearsay exception.

<u>Second</u>, even if the Letter were not hearsay (and it clearly is), the Letter is irrelevant and inadmissible under Fed. R. Evid. 402. The Letter clearly does not refer or relate to any of the contracts at issue *here*. Moreover, Plaintiffs have no evidence that either Mr. Paterno or another signatory to the Letter, Gary Stiffelman (Eminem's attorney at the time of the parties' 2003 Agreement), ever expressed the views contained in the Letter in the course of negotiating the agreements at issue in this case.

<u>Third</u>, admission of the Letter will lead to a distracting and confusing sideshow about what sorts of negotiation posturing the lawyers who signed the Letter in 2004 were trying to achieve. This will waste the time of the Court and the jurors, and the introduction of this evidence threatens to prejudice Defendants.

For all of these reasons, the Letter is irrelevant, and its admission (or reference to it) would be prejudicial and confusing. The Letter should be excluded at trial.

## II. FACTUAL BACKGROUND

### A. **Plaintiffs' Claim**

The agreements underlying this dispute consist of four different contracts: (1) a March 9, 1998 recording agreement ("1998 Agreement"); (2) a September 27, 2000 amendment to the 1998 Agreement (the "2000 Novation"); (3) a July 3, 2003 recording agreement ("2003 Agreement"); and (4) a November 1, 2004 amendment

- 2 -

to the 2003 Agreement (the "2004 Amendment"). Collectively, these agreements are referred to herein as the "Eminem Agreements."

Plaintiffs' claim is that the sales of Eminem recordings in permanent downloads and mastertones configurations should not be treated as "sales of records" under the Eminem Agreements, but should instead be accounted for under the "masters licensed" royalty provision applicable to ancillary revenue received from third-party uses of masters. Second Amended Compl. at ¶ 4. The evidence is clear that the "masters licensed" provision has always been understood to apply to a narrow range of transactions whereby a record company licenses some other entity to incorporate the record company's sound recording into someone else's product, be it a compilation record (*e.g.*, "Greatest Hip-Hop Hits of 2000") or background music in a television commercial. (*See* LeMoine Decl., Ex. EE, Paterno Dep. at 595:4-18). The provision has never applied to a record company's sale of <u>its own product</u> – *i.e.*, the record contracted for under the agreement – sold "through normal retail channels," as the iTunes Store obviously is. (*See* LeMoine Decl., Ex. M ¶ 4(a)(i)(A) at 189 (1998 Agreement). Rather than recognizing the downloads and mastertones as "records sold" by Defendants through online retailers like Apple's iTunes, Plaintiffs contend that the transactions are subject to the "masters licensed" provision.

### B. The March 24, 2004 Letter

The Letter, on its face, does not relate to any specific contract, and certainly not the Eminem Agreements at issue in this case. (LeMoine Decl., Exh. C at 74.) The Letter is purportedly signed by 27 "music industry attorneys" and addressed to individuals at each of the 5 major record companies. The Letter asserts that the record companies should account for permanent downloads as "licenses" rather than "records sold." It is clearly a piece of advocacy, signed by the attorneys at issue to secure more favorable royalty treatment for their clients.

Of course, the Letter post-dates all but one of the Eminem Agreements, and thus certainly has no relevance to the intent of the parties in entering into the 1998 Agreement, 2000 Novation or 2003 Agreement. Further, although the Letter predates the 2004 Amendment, the position articulated in the Letter is in direct conflict with the terms agreed to by the parties in that Amendment, whereby the parties acknowledged that Aftermath *sold* "Albums by way of permanent downloads" and that such sales would be treated as "records sold" pursuant to the Eminem Agreements. As such, the Letter has no relevance to the meaning of the 2004 Amendment.

## III.   ARGUMENT

### A.   Even If Extrinsic Evidence Regarding The Meaning Of The Eminem Agreements Is Admissible (It Is Not), Such Evidence Is Limited To What The Parties Intended At The Time.

Because the clear language of the Eminem Agreements do not support their position, Plaintiffs' case is built almost entirely on extrinsic evidence, which is inadmissible. However, even if the Court considers extrinsic evidence, the sources of extrinsic evidence must be relevant to the parties' intent <u>at the time they entered into the contract at issue</u>. *See General Motors v. Superior Court*, 12 Cal. App. 4th 435, 442 (1993) (defining universe of extrinsic evidence as the evidence relevant to show what the parties understood "at the time the [contract] was executed."). As discussed below, the Letter is textbook hearsay that has no bearing on what the parties understood at the time they entered into the Eminem Agreements – the only relevant inquiry. As such, it is inadmissible.

### B.   The Letter is Inadmissible Hearsay Subject to No Exception

Before they can even introduce the Letter, Plaintiffs must surmount the insurmountable barrier that it is quite obviously textbook hearsay. Plaintiffs seek to establish through the Letter – an out-of-court statement over the signature of 27 different people – the truth of its contents, *i.e.*, that revenues from the sales of

- 4 -

permanent downloads pursuant to digital distribution agreements between the Defendants (most notably, UMG) and online stores like iTunes are subject to the "masters licensed" provision of the Eminem Agreements. That is exactly what Federal Rule of Evidence 801(c) defines as "hearsay," deemed inadmissible by Federal Rule of Evidence 802.

The Letter is not subject to any hearsay exception, and this ground alone is sufficient to bar its introduction into evidence in this case. Two attorneys who purportedly signed the letter – Messrs. Paterno and Stiffelman – happen to represent Defendant Aftermath and nonparty Eminem, respectively. But there is no basis to hold that the statements included in the letter are party admissions. Neither attorney is a party to this case, nor were they purporting to sign this letter on behalf of any particular client.

### C. The Letter Is Not Relevant To The Parties' Intent In Entering Into Any Of The Eminem Agreements Nor To the Meaning of Any of Universal's Agreements with Digital Music Distributors.

If the hearsay bar were not sufficient, on its face, the Letter has no relevance to any of the 1998 Agreement, 2000 Novation or 2003 Agreement. The Letter post-dates each of those agreements – in some cases by several years – and is not signed by any parties to those agreements. The Letter is entirely irrelevant and inadmissible to the intent of the parties in entering into those agreements.

Moreover, although the Letter pre-dates the 2004 Amendment, it directly contradicts the terms of that agreement. The 2004 Amendment expressly states that "Sales of Albums by way of permanent downloads shall be treated as USNRC Net Sales for purposes of escalations, provided that the sales price concerned falls within a top-line sales price category applicable to such methods of sale." (LeMoine Decl., Ex. KK, ¶ 2(a) at 620.) This provision refers directly to the calculation of royalties for the "sales of Albums by way of permanent downloads" – not for "masters licensed" – and thus is flatly inconsistent with the statements in the

- 5 -

Letter regarding the meaning of other, unspecified recording agreements.

Not only is the Letter irrelevant to what the Eminem Agreements require, the Letter also is irrelevant to the question of whether UMG's agreements with digital distributors like Apple's iTunes store are wholesaler-retailer agreements or are licenses of master recordings. There is no evidence that any of the signatories ever saw *any* such agreements between the addressee record companies and digital distributors, much less that any of the signatories saw *UMG's* agreements with digital distributors. The opinion expressed in the Letter thus is entirely irrelevant and without foundation as to what those agreements require.

### D. The Letter's Use At Trial Would Create An Unnecessary And Time-Consuming Sideshow

Finally, admission of the Letter will result in confusion of the issues and an undue consumption of time at trial. If Plaintiffs are permitted to introduce the Letter at trial, Defendants will be forced to put on their own evidence (already developed in discovery) establishing that: (1) Mr. Paterno did not want to sign the Letter at all, REDACTED

(LeMoine Decl., Exs. FF at 597; HH at 609; II at 611; GG at 603) and (2) the Letter was not truly directed to UMG, but rather at the other record companies REDACTED

(LeMoine Decl., Ex. JJ at 615), and that the signatories to the Letter were really hoping to persuade the other record companies to follow UMG's lead on this issue.[1] Introduction of the Letter also will inevitably lead to a distracting and time-

---

[1] For example, there has been deposition testimony in this case that Mr. Stiffelman – one of the signatories to the Letter – was aware of and accepted UMG's method of accounting for sales of permanent downloads and, in writing the Letter, was hoping that the other record companies would act in the same manner as UMG. (LeMoine Decl., Ex. Q (Ostroff Depo.) at 343:14--349:18.)

- 6 -
6621757.1

consuming "mini-trial" on which position reflects the true intent of one of the Letter's signatories – Gary Stiffelman (Eminem's lawyer) – what he put together in a generic letter done for negotiating posturing, or the provision that he negotiated on Eminem's behalf in the 2004 Amendment? Even assuming that Mr. Stiffelman would be dragged into Court to try to explain the apparent inconsistencies, this would be a sideshow from the main event in this case, which is construing <u>the Eminem Agreements</u>, not the Letter. The Court can and should avoid such "mini-trials" on issues of minimal to no probative value.

The introduction of the irrelevant hearsay embodied in the Letter threatens to significantly prejudice Defendants. If admitted, the jury may improperly rely on the Letter as some kind of analysis of the competing royalty provisions in the Eminem Agreements, or of the nature of UMG's agreements with digital music providers. This would be significantly more prejudicial than probative. *See* Fed. R. Evid. 403. The Letter has no connection to the Eminem Agreements, is directly contradicted by the 2004 Amendment, and is signed by people who have no basis to opine about the nature of UMG's agreements with digital music providers because there is no evidence any of them have ever seen such agreements.

## IV. CONCLUSION

For the foregoing reasons, the Court should exclude the introduction of, or any reference to, the March 24, 2004 Letter at trial.

DATED: December 19, 2009

MUNGER, TOLLES & OLSON LLP

GLENN D. POMERANTZ
KELLY M. KLAUS
MELINDA E. LEMOINE

By: /s/ Melinda E. LeMoine
Melinda E. LeMoine

- 7 -

6621757.1