GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
Melinda.Lemoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC,<br><br>          Plaintiffs,<br><br>     vs.<br><br>AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC.,<br>    Defendants. | CASE NO. CV 07-03314 PSG (MANx)<br><br>DEFENDANTS' NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 1, TO EXCLUDE PUTATIVE EXPERT TESTIMONY OF LAW PROFESSOR PETER S. MENELL<br><br>Judge: Hon. Philip S. Gutierrez<br>Date: February 3, 2009<br>Time: 9:00 a.m.<br>Ctrm: Roybal 790 |

# TABLE OF CONTENTS

**Page**

I.   FACTUAL BACKGROUND ........................................................................... 2

    A.   Plaintiffs' Claim Regarding Revenue From Digital Download
    Sales ................................................................................................... 2

    B.   Prof. Menell And His "Expert" Opinions ........................................ 3

II.  ARGUMENT ............................................................................................... 5

    A.   Legal Standards:  Under Rule 702 And *Daubert*, This Court
    Must Exercise A Gatekeeping Function With Respect To Expert
    Testimony .......................................................................................... 5

        1.   The Court's Gatekeeping Function ......................................... 5

        2.   Expert Testimony On Legal Issues Is Inadmissible ............... 6

    B.   Prof. Menell's Construction Of The 1998 And 2003 Agreements,
    As Well As His Purported Interpretation Of The Agreements
    Between UMG And Third Parties, Are Inadmissible Legal
    Opinions ............................................................................................ 7

        1.   Prof. Menell's Legal Interpretation Of The "Masters
        Licensed" Provision ............................................................... 7

        2.   Prof. Menell's Legal Interpretation Of UMG's
        Agreements With Third Parties ............................................. 10

        3.   Plaintiffs Cannot Disguise Prof. Menell's Legal
        Interpretation Of The Various Agreements By Calling It
        An "Economic" Analysis ...................................................... 11

    C.   Prof. Menell's Opinion That The 1998 And 2003 Contracts Are
    "Contracts Of Adhesion" Is Inadmissible Legal Opinion, And Is
    Based On An Inappropriate Foundation ........................................... 12

    D.   Prof. Menell's Theories About The Purported "Economic
    Assumptions" That Underlie And Inform The Purpose Of The
    "Masters Licensed" Provision Have No Foundation And Should
    Be Excluded ..................................................................................... 15

    E.   The Handful Of Additional Paragraphs In Prof. Menell's Report
    Is Legal Argument That Will Not Assist The Trier Of Fact ............. 19

III. CONCLUSION ........................................................................................... 20

1

**FEDERAL CASES**

2

*Aguilar v. Int'l Longshoremen's Union Local No. 10,*
966 F.2d 443 (9th Cir. 1992) ............................................................. 6

3

*Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.,*
753 F.2d 1512 (9th Cir. 1985) ......................................................... 10

4

5

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ......................................................... 5, 6, 7, 18

6

*DSU Med. Corp. v. JMS Co. Ltd.,*
296 F. Supp. 2d 1140 (N.D. Cal. 2003) ........................................... 5, 6

7

8

*General Elec. Co. v. Joiner,*
522 U.S. 136 (1997) ......................................................................... 18

9

*Grant v. Bristol-Myers Squibb,*
97 F. Supp. 2d 986 (D. Ariz. 2000) ..................................................... 7

10

*GPF Waikiki Galleria, LLC v. DFS Group, L.P.,*
No. 07-00293 DAE-LEK, 2007 WL 3195089 (D. Hawai'i Oct. 30, 2007) .... 9, 10

11

*Hall v. Baxter Healthcare Corp.,*
947 F. Supp. 1387 (D. Or. 1996) ......................................................... 7

12

13

*In re Initial Pub. Offering Sec. Litig.,*
174 F. Supp. 2d 61 (S.D.N.Y. 2001) ..................................................... 6

14

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ........................................................................... 6

15

*Lust v. Merrell Dow Pharmaceuticals,*
89 F.3d 594 (9th Cir. 1996) ................................................................. 7

16

*Marx & Co., Inc. v. The Diners' Club, Inc.,*
550 F.2d 505 (2d Cir. 1977) ......................................................... 9, 11

17

*Pinal Creek Group v. Newmont Mining Corp.,*
352 F. Supp. 2d 1037 (D. Ariz. 2005) ................................................. 6

18

19

*United States v. Brodie,*
858 F.2d 492 (9th Cir. 1988) ......................................................... 1, 6

20

*United States v. Curtis,*
782 F.2d 593 (6th Cir. 1986) ............................................................. 7

21

*United States v. Fosher,*
590 F.2d 381 (1st Cir. 1979) ............................................................. 5

22

23

*United States v. Lumpkin,*
192 F.3d 280 (2d Cir. 1999) ............................................................. 5

24

*United States v. Morales,*
108 F.3d 1031 (9th Cir. 1997) (en banc) ............................................. 6

25

*United States v. Scholl,*
166 F.3d 964 (9th Cir. 1999) ............................................................. 7

26

27

28

### STATE CASES

*AIU Ins. Co. v. Superior Court*,
　51 Cal. 3d 807 (1990) ..................................................................................... 13

### FEDERAL STATUTES

17 U.S.C. §§106(1), (2), (3), (6) ............................................................................... 8
17 U.S.C. §§107 ........................................................................................................... 8

### STATE STATUTES

Cal. Civ. Code § 1654 ..................................................................................... *passim*

### FEDERAL RULES

Fed. R. Evid. 702 ...................................................................................... 5, 6, 7, 19
Fed. R. Evid. 703 .............................................................................................. 14
Fed. R. Evid. 704(b) ............................................................................................. 6

DEFENDANTS' NOTICE OF MOTION AND MOTION
*IN LIMINE* NO. 1, TO EXCLUDE TESTIMONY OF LAW
PROF. PETER S. MENELL

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that, on February 3, 2009 at 9:00 a.m., or as soon

3    thereafter as this matter can be heard, in Courtroom 790 of the United States District

4    Court, Central District of California, located at 255 E. Temple Street, Los Angeles,

5    California, defendants Aftermath Records doing business as Aftermath

6    Entertainment, Interscope Records, UMG Recordings, Inc., and ARY, Inc,

7    (collectively, "Defendants") will and hereby do move, *in limine*, for an Order to

8    exclude the putative expert testimony of Plaintiffs' proposed "expert," Law

9    Professor Peter S. Menell.

10        This Motion is based upon this Notice of Motion and Motion, the attached

11   Memorandum of Points and Authorities, the declaration of Melinda E. LeMoine and

12   exhibits thereto, submitted concurrently herewith, any papers submitted in reply to

13   any opposition to this Motion, facts of which this Court may take judicial notice, the

14   record in this case, arguments of counsel, and any other matter as may properly

15   come before this Court.

16        This Motion is made following the Local Rule 7-3 Conference of Counsel,

17   which took place on December 16, 2008.

18

19   DATED: December 19, 2008          MUNGER, TOLLES & OLSON LLP

20                                     GLENN D. POMERANTZ
                                       KELLY M. KLAUS
21                                     MELINDA E. LEMOINE

22

23                                     By:   /s/ Kelly M. Klaus
                                             Kelly M. Klaus
24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs in this breach of contract action propose to call as a putative "expert" witness Professor Peter S. Menell.  Prof. Menell is a professor of intellectual property law at the University of California, Berkeley, Boalt Hall School of Law.  As confirmed by Prof. Menell's expert report (and later deposition testimony), Plaintiffs propose to have Prof. Menell offer his opinion to the jury on a host of legal issues, including having Prof. Menell opine that:

- The word "license" in the 1998 and 2003 Eminem Agreements has the same meaning that Prof. Menell claims it does under the <u>copyright laws</u>, namely, "a grant of permission by the owner of an intellectual property right."  (LeMoine Decl. Ex. T (Menell Report) ¶ 24 at 387).

- The agreements between Defendant UMG Recordings, Inc. ("UMG") and several third-party digital download providers (including Apple, Sprint and T-Mobile) are "licenses" under Prof. Menell's legal definition, as supposedly confirmed by his legal analysis of provisions of the same agreements.  *Id*. ¶ 58 at 402-03.

- "[T]he 1998 Agreement, which included the masters licensing provision, has the hallmarks of a contract of adhesion," and the jury should apply the doctrine of *contra preferentem*, under Cal. Civ. Code § 1654, to construe any ambiguities in the Agreement against the drafter.  *Id*. ¶ 85 at 409.

None of these opinions, or any of the related opinions that Plaintiffs propose to elicit from Prof. Menell, are the proper subject of expert testimony.  It is black-letter law that there is one legal "expert" in the Courtroom:  the Judge.  *See, e.g.*, *United States v. Brodie*, 858 F.2d 492, 496-97 (9th Cir. 1988).  Bringing in a law professor to tell the jury what the contracts at issue mean, what the legal significance is of various facts (including legal provisions in third-party agreements), and how to apply legal principles for contractual ambiguities usurps

- 1 -

the role of the District Judge, confuses the jury, and prejudices Defendants' right to have the law explained by a neutral jurist rather than a paid consultant. Indeed, if Prof. Menell were to be able to testify on the law, then Defendants would have to be allowed to bring in a different law professor to offer her or his own opinions on legal issues. The Federal Rules of Evidence and well-established law barring expert testimony on the law does not allow for such a result. Plaintiffs can pay Prof. Menell to help their lawyers draft their legal briefs or advise them on their legal theories. His proposed "expert" report and testimony, however, are inadmissible and should be excluded in their entirety.

## I.    FACTUAL BACKGROUND

### A.    Plaintiffs' Claim Regarding Revenue From Digital Download Sales

Plaintiffs' main cause of action (their first) alleges that Defendants have incorrectly calculated royalties on the sales of permanent digital downloads (including cell-phone "mastertone" recordings of songs).

The resolution of this issue turns on the construction of terms that are found in four separate written contracts: (1) a March 9, 1998 recording agreement ("1998 Agreement"), whereby Plaintiff F.B.T. agreed to furnish to Defendant Aftermath the recording services of Marshall B. Mathers III, pka "Eminem"[1]; (2) a September 27, 2000 "novation" to the same, whereby Eminem entered into a direct contractual relationship with Aftermath (the "2000 Novation"), and the parties specified the "cut" of certain of Eminem's royalties that Plaintiffs would receive in the future; (3) a July 3, 2003 recording agreement between Eminem and Aftermath ("2003 Agreement"); and (4) a November 1, 2004 amendment to the 2003 Agreement (the "2004 Amendment"). Collectively, these agreements are referred to herein as the "Eminem Agreements."

---

[1] Aftermath is a joint venture whose owners include UMG Recordings, Inc. ("UMG") and the other named defendants in the case.

1    Plaintiffs' claim is that the sales of Eminem recordings in permanent
2    downloads and mastertones configurations should not be treated as "sales of
3    records" under the Eminem Agreements, but should instead be accounted for under
4    the "masters licensed" royalty provision applicable to ancillary revenue received
5    from third-party uses of masters.  Second Amended Compl. at ¶ 4.

6    **B.    Prof. Menell And His "Expert" Opinions**

7    Prof. Menell teaches copyright and other intellectual property classes at Boalt
8    Hall.  LeMoine Decl. Ex. U (Menell Dep.) at 465.  He has never taught contract law,
9    *id*. at 470:8, and he admitted that none of the many academic articles, papers or
10   presentations he has ever authored (or his many expert consulting arrangements, for
11   that matter) have discussed or analyzed whether a "records sold" or "masters
12   licensed" royalty provision applies to the sale of permanent downloads.  *Id*. at
13   469:8-475:24.  Prof. Menell does state in his expert report that he has "been
14   developing teaching materials for a course on intellectual property in the
15   entertainment industries since 2000."  LeMoine Decl. Ex. T (Menell Report) ¶ 2 at
16   381.  However, Prof. Menell admitted that those teaching materials – which
17   constitute the sum total of anything that might be considered his "hands-on"
18   experience with the substance of artist recording agreements – have nothing to do
19   with the royalty dispute in this case.  LeMoine Decl. Ex. U (Menell Dep.) at 452:2-
20   23.

21   Prof. Menell describes his assignment as follows:

22   FBT, through its counsel, has asked me to provide my opinion as
23   to whether the allocation of revenue that Aftermath Entertainment
24   ("Aftermath") has received (and continues to receive) from third parties
25   (such as Apple, Sprint PCS, T-Mobile, Nextel, and Cingular Wireless)
26   for permanent digital downloads (including master tones) of sound
27   recordings covered by the 1998 and 2003 Aftermath-FBT agreements
28   are governed by the ***standard record royalty provision*** (§4(a)(i[i] [sic])

of the 1998 agreement and §5(a)(ii) of the 2003 agreement (providing a royalty rate of "[t]welve percent (12%) for records other than LPs"), the ***masters license provision*** (§4(c)(v) of the 1998 agreement and §5(c)(v) of the 2003 agreement providing "fifty percent (50%) of our net proceeds from the sale of those records or from those uses of the masters" on "masters licensed by [Aftermath] to others for their manufacture and sale of records or for any other uses"), or some other clause.

(LeMoine Decl. Ex. T (Menell Report) ¶ 4 at 381-82.)  Prof. Menell's bottom-line opinion on that ultimate issue in the case is "that the revenues from permanent digital downloads (including master tones) ... properly fall within the master license provision[.]"  (*Id.* ¶ 100 at 414.)

Prof. Menell gets to this conclusion through the following chain of analysis:

First, Prof. Menell opines that the term "license" in the "masters licensed" provision unambiguously incorporates a purported "intellectual property," *i.e.*, copyright, definition of "license" as "simply a grant of permission."  (*Id.* ¶ 24 at 387.)  Based on this definition – which has no foundation in any evidence of industry custom or practice (and indeed is contradicted by the testimony of Plaintiffs' own purported "custom and practice" expert) - Prof. Menell marches through the provisions of third-party agreements between UMG and six different digital download providers, culling out any contractual language in those agreements that he believes is consistent with a copyright "license" rather than a "sale."

Second, Prof. Menell opines that, even if the "masters licensed" provision is ambiguous, Cal. Civ. Code § 1654 should be applied so that any ambiguity is construed against Defendants because they drafted the contracts and because, in Prof. Menell's "opinion," the 1998 Agreement "has the hallmarks of a contract of adhesion."  (*Id.* ¶¶ 84-85 at 409.)

1  Third, Prof. Menell opines – without any foundation in the record of the

2  negotiations of the parties or any custom or practice in the music industry – that the

3  "economic assumption" underlying the "masters licensed" provision is that, if the

4  record company incurs minimal manufacturing and distribution costs, then a 50/50

5  division of the record company's net receipts is appropriate because (according to

6  Prof. Menell) this "better reflects the economic reality of [the record company's]

7  actual services."  (*Id.* ¶ 78 at 407.)  Prof. Menell concludes that, based on these

8  "economic assumptions," it is appropriate to construe the "masters licensed"

9  provision to apply to any revenues from the providers of permanent digital

10  downloads.

## II.    ARGUMENT

### A.    Legal Standards:  Under Rule 702 And *Daubert*, This Court Must Exercise A Gatekeeping Function With Respect To Expert Testimony

#### 1.    The Court's Gatekeeping Function

"Expert evidence can be both powerful and quite misleading because of the

difficulty in evaluating it."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579,

595 (1993).  Moreover, an "added aura of reliability" necessarily attaches to

testimony offered by an expert witness.  *United States v. Lumpkin*, 192 F.3d 280,

289 (2d Cir. 1999).  This creates a "substantial danger" that expert testimony will

confuse and unduly prejudice the jury.  *United States v. Fosher*, 590 F.2d 381, 383

(1st Cir. 1979).

For this reason, Rule 702 of the Federal Rules of Evidence "places limits on

the areas of expertise and the methodologies of analysis which may be covered and

used by an expert witness."  *DSU Med. Corp. v. JMS Co. Ltd.*, 296 F. Supp. 2d

1140, 1146 (N.D. Cal. 2003).  The Rule permits an expert witness with "scientific,

technical, or other specialized knowledge" to testify in the form of an opinion only

if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the

- 5 -

1    product of reliable principles and methods, and (3) the witness has applied the

2    principles and methods reliably to the facts of the case," and only if the witness's

3    opinions will "assist the trier of fact."  Fed. R. Evid. 702.

4         Under *Daubert,* this Court must act as a "gatekeeper" to ensure, with respect

5    to each proposed expert witness and subject of expert opinion testimony, that "the

6    reasoning or methodology underlying the testimony is scientifically valid" and "can

7    properly be applied to the facts at issue."  *DSU Med. Corp.*, 296 F. Supp. 2d at 1146

8    (quoting *Daubert*, 509 U.S. at 592-93); *see also Kumho Tire Co. v. Carmichael*, 526

9    U.S. 137, 147-49 (1999) (extending the trial court's gatekeeping obligation under

10   *Daubert* to all forms of expert testimony, whether or not such testimony is

11   "scientific").

12                    **2.    Expert Testimony On Legal Issues Is Inadmissible**

13        The law is clear that experts may not testify on issues of law.  *Aguilar v. Int'l*

14   *Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992); *Pinal*

15   *Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1042-43 (D. Ariz.

16   2005) (holding that testimony from legal experts regarding the law is inadmissible,

17   and collecting cases regarding same); *In re Initial Pub. Offering Sec. Litig.*, 174 F.

18   Supp. 2d 61, 64 (S.D.N.Y. 2001) (noting that "every circuit has explicitly held that

19   experts may not invade the court's province by testifying on issues of law").  The

20   reason for this rule is simple:  "[T]he judge instructs the jury in the law.  Experts

21   'interpret and analyze factual evidence.  They do not testify about the law because

22   the judge's special legal knowledge is presumed to be sufficient, and it is the judge's

23   duty to inform the jury about the law that is relevant to their deliberations.'"  *United*

24   *States v. Brodie*, 858 F.2d 492, 496-97 (9th Cir. 1988) (emphasis added)[2] (*quoting*

25

26   [2] An unrelated portion of *Brodie* (that Rule 704(b) precludes an expert from
     testifying to a predicate matter from which a fact-finder may extrapolate *mens rea*)
27   was overruled by the Ninth Circuit, en banc, in *United States v. Morales*, 108 F.3d
     1031 (9th Cir. 1997) (en banc).  The law in the Ninth Circuit (and all others)
28   remains, however, that experts do not testify about American law.

DEFENDANTS' NOTICE OF MOTION AND MOTION
*IN LIMINE* TO EXCLUDE TESTIMONY OF LAW
PROF. PETER S. MENELL

*United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986)); *see also United States v. Scholl*, 166 F.3d 964, 972-73 (9th Cir. 1999) (experts who were to testify regarding tax and accounting law were properly excluded).

Because Plaintiffs offer Menell's expert testimony, they have the burden of demonstrating by a preponderance of the evidence that the requirements of *Daubert* and Rule 702 have been satisfied. *See Lust v. Merrell Dow Pharmaceuticals*, 89 F.3d 594, 598 (9th Cir. 1996); *Grant v. Bristol-Myers Squibb*, 97 F. Supp. 2d 986, 988 (D. Ariz. 2000); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1395 (D. Or. 1996). Plaintiffs cannot satisfy their burden.

**B.    Prof. Menell's Construction Of The 1998 And 2003 Agreements, As Well As His Purported Interpretation Of The Agreements Between UMG And Third Parties, Are Inadmissible Legal Opinions**

The bulk of Prof. Menell's report is devoted to establishing two legal propositions: (1) that the "masters license" provision in the 1998 and 2003 Agreement unambiguously adopts a supposed copyright law definition of the word "license," and therefore is triggered anytime the copyright owner grants "permission" to any third party to exercise any copyright interests in the masters; and (2) following from the first opinion, that the agreements between UMG and several third parties (Apple and several mastertone providers) are "licenses" according to Prof. Menell's copyright definition. (LeMoine Decl. Ex. T (Menell Report) ¶¶ 19-60, 100, at 385-403, 414.) These opinions consist of impermissible legal opinion testimony and must be excluded.

**1.    Prof. Menell's Legal Interpretation Of The "Masters Licensed" Provision**

As reflected in his report, Prof. Menell proposes to instruct the jury on the meaning of the term "license" in the "masters licensed" provisions of the 1998 and 2003 Agreements. Specifically, Prof. Menell opines:

A "license" is simply a grant of permission. An intellectual property license is a grant of permission by the owner of an intellectual

1   property right.  A "masters" license refers to a license of a sound
2   recording "master."  Such masters are protected by federal copyright
3   law.  The owner of a sound recording master possesses the exclusive
4   rights to reproduce, adapt, distribute, and digitally perform the sound
5   recordings, see 17 U.S.C. §§106(1), (2), (3), (6) subject to various
6   limitations, see, e.g., 17 U.S.C. §§107 (fair use exception), 114.
7   Without a license from the owner of a sound recording master, others
8   cannot exercise the rights to reproduce, adapt, distribute, or digitally
9   perform the works (except within the limitations (such as fair use) set
10   forth in the Copyright Act).

11   (LeMoine Decl. Ex. T (Menell Report) ¶ 24 at 387.  *See also id*. ¶¶ 19-23, 57-60, at

12   386-87, 402-03 (Menell's analysis of language of 1998 and 2003 Agreements).)

13   All this is legal opinion, pure and simple.  Prof. Menell does not even purport

14   to describe any industry practice or custom of adopting a supposed copyright

15   definition of the term "license."  Rather, drawing on his core competence in the area

16   of copyright law, Prof. Menell is offering a legal definition of the core disputed term

17   in the case.  The issue in this case is <u>not</u> whether a transaction is a "sale" or a

18   "license" for purposes of the Copyright Act.  The issue instead is what the parties to

19   <u>these</u> Agreements understood to be included within the "sale of records" and

20   "masters license" royalty provisions.  Prof. Menell has no evidence – because there

21   is none – that the parties believed they were incorporating a Copyright Act

22   definition of "license" in defining these provisions.[3]  Prof. Menell instead is

23

24   _____

25   [3] Plaintiffs have <u>no</u> evidence of such an industry custom or practice, as reflected by
    the sworn testimony of their own purported "custom and practice" expert, David
    Berman.  Defendants asked Mr. Berman whether he believed "one way or the other
26   as to whether the word license as used in a provision like [the "masters licensed"]
    provision] means precisely the same thing as the definition of license under the
27   copyright laws."  Mr. Berman replied: "I don't know what the definition is under the
    copyright laws, so I don't have an opinion."  (LeMoine Decl. Ex. V (Berman Dep.)
28   at 533:13-19 (emphasis added).)

purporting to incorporate his opinions about what the law is in this area into the parties' agreement.

Plaintiffs' attempt to use a law professor to tell the jury how it should interpret the parties' Agreements is plainly improper under the rule barring expert testimony on legal opinions. Indeed, Plaintiffs' attempted use of Prof. Menell for these purposes is strikingly similar to the improper use of legal opinion testimony in a leading case on the issue, *Marx & Co., Inc. v. The Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977). In *Marx & Co.*, the plaintiffs called a securities law expert "to give his opinion as to the legal obligations of the parties under the contract." *Id.* at 508. The Second Circuit held that the legal expert's "objectionable testimony did not concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed Diners' conduct. He testified not so much as to common practice as to what was necessary 'to fulfill the covenant' (of the contract)." *Id.* at 509 (emphasis added). As an example, the court noted that the expert offered testimony that he "construe[d] 'best efforts' in the context of a covenant to register shares as the assumption on the part of the person who gives the covenant an absolute unconditional responsibility, to set to work promptly and diligently to do everything that would have to be done to make the registration statement effective [.]" *Id.* The Second Circuit held that this and similar opinions were inadmissible "legal opinions as to the meaning of the contract terms at issue." *Id.* (emphasis added).

Prof. Menell's opinion regarding the meaning of the "masters licensed" provision is no different. Prof. Menell is not testifying – because he has no basis to testify – that parties in the music industry understand a "masters licensed" provision to incorporate his copyright law definition of license. He is simply looking at the language of the 1998 and 2003 Agreements and purporting to tell the jury what that language means. As the Court stated in *GPF Waikiki Galleria, LLC v. DFS Group,*

*L.P.*, No. 07-00293 DAE-LEK, 2007 WL 3195089 (D. Hawai'i Oct. 30, 2007), this "mak[es] him an advocate, not an expert." *Id.* at *6 (citing *Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1517-18 (9th Cir. 1985)).  Coming, as it does, from a law professor at one of the country's most respected law schools, this advocacy has the undeniable potential to mislead and confuse the jurors that Prof. Menell is an expert on the meaning of the contract.  The testimony should be excluded.

### 2.    Prof. Menell's Legal Interpretation Of UMG's Agreements With Third Parties

Plaintiffs propose to compound the error of Prof. Menell's legal opinions by having him testify not only to the legal meaning of the 1998 and 2003 Agreements, but also to the legal meaning of several third-party agreements between UMG and resellers of permanent downloads.  In Paragraphs 26 through 56 – with text that comprises nearly half of his entire report – Prof. Menell proceeds seriatim through provisions that he has culled from the third-party agreements and purports to opine on the legal significance of those terms and why, for purposes of his copyright law definition, these terms show a "licensing" of master recordings.  (LeMoine Decl. Ex. T at 387-401.)

For example, in analyzing the agreement between UMG and Apple, by which Apple obtained the authorization to resell UMG sound recordings through the iTunes Store, Prof. Menell states:

> [A]s is conventional in the licensing of intellectual property, the iTunes Agreement features a "Grant of Rights."  See § 1.  As noted above (see ¶ 24, supra, <u>that is the essential ingredient and requirement of a license</u>.

(*Id.* ¶ 26 at 387 (emphasis added).)  Prof. Menell then examines a series of provisions within the Apple-UMG Agreement and concludes that each one is legally significant because it is consistent with a license of the master recording.  *See, e.g.,*

1  *id.* ¶ 28(a) at 388 (reviewing language of clause stating that "[a]ny and all rights not

2  expressly granted" are reserved, and concluding that "[t]his provision makes clear

3  UMG is not transferring the underlying intellectual property right; rather, it is

4  merely granting limited licenses to rights associated with its copyright[s].").

5      Once again, it is clear that Prof. Menell is not bringing any non-legal

6  expertise to bear on his analysis of the Apple-UMG agreement (or any of the other

7  third-party agreements that he analyzes).  Prof. Menell is simply reviewing

8  contractual language and offering his opinion as to the legal significance of that

9  language with respect to the principal dispute in this case.  This type of legal

10  analysis is inadmissible as expert testimony.  *See, e.g.*, *Marx & Co.*, 550 F.2d at 510

11  ("Not only did [the securities law expert] construe the contract, but he also

12  repeatedly gave his conclusions as to the legal significance of various facts adduced

13  at trial.").  To the extent consistent with the Court's instructions, Plaintiffs can point

14  to the language of the third-party agreements and ask the jury to draw the inferences

15  that Plaintiffs want the jury to draw from those agreements.  What Plaintiffs may <u>not</u>

16  do, however, is to bring a law professor before the jury to tell them what the

17  language in the various contracts means and what its legal significance is to the

18  dispute in this case.

19  **3.    Plaintiffs Cannot Disguise Prof. Menell's Legal**
20  **Interpretation Of The Various Agreements By Calling It An**
   **"Economic" Analysis**

21      Recognizing that his testimony falls squarely within the proscription against

22  legal opinions, Prof. Menell at deposition tried to claim that "I'm dealing with the

23  economic realities on which the legal question is based. . . . I don't have – you

24  know, I'm not trying to substitute my legal judgment.  I'm just saying these are the

25  economic realities."  (LeMoine Decl. Ex. U (Menell Dep.) at 489:19-490:4.)  But

26  Prof. Menell is not bringing to bear on his analysis any "economic realities" of the

27  transactions in issue.  There is no "economic" analysis involved in reading the

28  words of a contract between UMG and a third party and opining (as Prof. Menell

does) that, for example, "[b]y stating that UMG owns copyrights in the sound recording masters, the only way in which Apple could lawfully make and distribute copies of the sound recording masters is through a license of those rights."[4] (LeMoine Decl. Ex. T (Menell Report) ¶ 27 at 388 (emphasis added).) Instead, in agreement after agreement, Prof. Menell is simply looking at the words of the contract, and purporting to state what their legal significance is vis-à-vis the purely legal question whether, for purposes of the copyright law, the agreement defines a "license" or a "sale." This type of legal opinion testimony is plain inadmissible, and the Court should exclude it.

### C.    Prof. Menell's Opinion That The 1998 And 2003 Contracts Are "Contracts Of Adhesion" Is Inadmissible Legal Opinion, And Is Based On An Inappropriate Foundation

Prof. Menell next purports to opine that, even if the Eminem Agreements are ambiguous, the ambiguity should be construed against the drafter of the contract, Aftermath. Prof. Menell states that "to the extent there is uncertainty or ambiguity the California Civil Code § 1654 provides, following the doctrine of *contra preferentem* (interpreting ambiguous agreements against the drafter), that "'the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.'" (LeMoine Decl. Ex. T (Menell Report) ¶ 84 at 409.) Prof. Menell goes on to state that "[t]his rule applies with particular force in

---

[4] Near the end of his report, Prof. Menell does offer the speculation that, "[a]s an economic matter, the third party distributors of permanent digital downloads do not want to deal with the receipt, tracking, and inventory entailed by purchasing individual products from UMG." (LeMoine Decl. Ex. T (Menell Report) ¶ 97 at 412.) While terms like "receipt, tracking, and inventory" make this sound like an "economic" opinion, it turns out that Prof. Menell has no foundation for his surmise that third party distributors would find such costs prohibitive in operating a business where UMG sent the distributors multiple electronic copies in inventory. Prof. Menell tried to say that such an arrangement was "expensive," and that "margins in this area are really tight," but when pressed for specifics, Prof. Menell could say only, "I've had people from Apple on panels," and "[y]ou know, I follow this closely. Whenever there is a news story about it, you know, I look at it. .... We're taking out a lot of the middle layers, and that's why I don't think there's a lot of money in the middle layers right now." (LeMoine Decl. Ex. U at 482:2-484:10.) Prof. Menell obviously does not have sufficient factual data for even this purportedly "economic" opinion.

1  the context of 'contracts of adhesion' – in which a party with strong bargaining

2  power drafts and offers a standardized contract on a 'take-it-or-leave-it' basis." *Id.*

3  Relying on his purported knowledge of the circumstances surrounding the drafting

4  of the original Eminem Agreement – in 1998 – Prof. Menell goes on to opine that

5  "[i]n my opinion, the 1998 agreement, which included the masters licensing

6  provision, has the hallmarks of a contract of adhesion."[5]  (*Id*. ¶ 85 at 409.)  This

7  testimony is inadmissible for two reasons.

8      First, Prof. Menell is offering a legal opinion concerning the rules of contract

9  interpretation under California law – and he barely pretends he is doing otherwise.[6]

10  If Plaintiffs believe the evidence supports an instruction under California Civil Code

11  § 1654 (and Defendants believe it will not), Plaintiffs can ask the Court to give the

12  jury an instruction.  What Plaintiffs may not do – and what they have plainly tried to

13  do here – is to substitute a law professor to instruct the jury on the rules on contract

14  construction.

15      Second, Prof. Menell's entire discussion of "the circumstances surrounding

16  formation of the agreements" is a backdoor attempt by Plaintiffs to smuggle in

17  _____

18  [5] The objectionable portions of Prof. Menell's report addressed in this section are at
    ¶¶ 61-70 and 84-87 (LeMoine Decl. Ex. T at 403-05, 409-10).

19  [6] Even as to his interpretation of California law, Prof. Menell's analysis is erroneous.
    His quotation of California Civil Code § 1654 <u>omits</u> the introductory clause to the

20  statutory section.  The clause reads in full "<u>in cases of uncertainty not removed by
    the preceding rules</u>, the language of a contract should be interpreted most strongly

21  against the party who caused the uncertainty to exist."  Cal. Civ. Code § 1654
    (emphasis added).  The underscored language makes clear that the doctrine of

22  *contra preferentem* is a rule of construction of <u>last</u> resort, not first.  Prof. Menell
    admitted at his deposition that his expert analysis does not "discuss" any of the rules

23  of contract construction that precede the interpretive rule in Civil Code § 1654
    (LeMoine Decl. Ex. U (Menell Depo.) at 503:5-7.)  Prof. Menell also is wrong that

24  the 1998 Agreement should be treated as a "contract of adhesion."  A contract of
    adhesion is one in which there is no opportunity to negotiate.  Where parties do have

25  the opportunity to negotiate a contract's terms, the courts do not resolve ambiguities
    against a party just because it may have superior bargaining power.  *See, e.g.*, *AIU*

26  *Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 823 (1990).  In this case, the parties <u>did</u>
    negotiate the 1998 Agreement, as reflected by the parties' exchange of multiple

27  drafts of that Agreement.  (LeMoine Decl. Exs. Z-CC at 546-90 (Depo. Ex. 5A-D).)
    Hence, there is no foundation for Prof. Menell (or any other witness of Plaintiffs) to

28  call the Agreement a "contract of adhesion."  Of course, these are all legal issues.

layers and layers of inadmissible and irrelevant hearsay concerning Eminem's rise in the rap world. For example, Prof. Menell states that in 1995, "[Eminem] had fathered a child out of wedlock and was struggling to make ends meet." (LeMoine Decl. Ex. T (Menell Report) ¶ 63 at 404.) He also describes Eminem's lawyer, Paul Rosenberg, in 1998 as someone who "had only recently graduated from law school and was working primarily as a personal-injury lawyer," and plaintiff F.B.T. as "a small, fledgling record label ... run by two brothers" who "borrowed $1,500 from their mother so they could press 500 copies" of Eminem's first album. (*Id.*)

Prof. Menell's color commentary on Eminem's rags-to-riches rise is irrelevant to any issues in the case. Moreover, Prof. Menell has no proper foundation to testify to anecdotal stories about Eminem or Mr. Rosenberg. Prof. Menell admitted that he culled together this story from hearsay statements from Plaintiffs' counsel (Messrs. Busch, Guilford and Levinsohn) and from his reading of a sensationalist "biography" of Eminem, Whatever You Say I Am, written by a former Rolling Stone reporter, Anthony Bozza. Prof. Menell is not, and cannot possibly be qualified as, any sort of expert in the subject of a rock star's biography.[7] Plaintiffs have already said that they are not going to call Eminem or Mr. Rosenberg as witnesses (and they did not take their depositions during discovery). To the extent Plaintiffs think there are any relevant facts regarding F.B.T.'s founding in Detroit, they can call Jeff and Mark Bass – two of the three Plaintiffs-in-interest – to testify about themselves. There is no need, and it is improper, to have a law professor from Boalt Hall try to paint a sympathetic portrait of these individuals before the jury.

---

[7] While Prof. Menell's entire opinion about the 1998 Agreement being a contract of adhesion is inadmissible legal opinion, the testimony based on Mr. Bozza's book should be excluded because it is hardly the type of work "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" Fed. R. Evid. 703. Even assuming there is a field of expert biography, Mr. Bozza's work is not historical research but a series of personal anecdotes about his travels with Eminem (including, for example, claiming to have bought drugs for Eminem through the window of a limousine). (LeMoine Decl. Ex. W at 538)

**D.    Prof. Menell's Theories About The Purported "Economic Assumptions" That Underlie And Inform The Purpose Of The "Masters Licensed" Provision Have No Foundation And Should Be Excluded**

Plaintiffs also propose to have Prof. Menell testify as to the "purpose" of the "masters license" provision in the 1998 and 2003 Agreements. As set forth in the declaration from Prof. Menell that plaintiffs have filed in support of their summary judgment motion, Plaintiffs would have Prof. Menell tell the jury that "the purpose of" the "masters license" provision "is to provide for a higher royalty rate when the record company licenses master recordings to third parties <u>because in such situations the record company does not incur the expensive incremental cost associated with manufacturing, packaging and distributing the physical records associated with the release</u>."  (LeMoine Decl. Ex. DD (Menell Decl.) ¶ 3 at 592 (emphasis added).)

The "basis" for Prof. Menell's opinion about the "purpose" behind the "masters license" provision is set forth at Paragraphs 71-79 of Prof. Menell's report (*see* LeMoine Decl. Ex. T at 405-08). There, Prof. Menell articulates the following theory of "economic assumptions":  When records were distributed through brick-and-mortar retailers, record companies "could justify relatively low royalty rates to artists based on the substantial manufacturing, marketing, and distribution services they provided." (*Id*. Ex. T (Menell Report) ¶ 73 at 406.)  In contrast, Prof. Menell says, when sound recordings are licensed to third-parties, record companies effectively avoid manufacturing and distribution costs (which are borne by the licensee), and thus "the typical sound recording masters licensing provision provides the recording artist with a 50%/50% division of net receipts…." (*Id*. ¶ 74 at 406.) Prof. Menell next posits that record companies have lower manufacturing and distribution costs with permanent downloads than with physical product, because most of those costs are borne by the distributor, such as Apple's iTunes. (*Id*. ¶ 77 at 407.) Hence, Prof. Menell concludes that "allocating Aftermath's revenues associated with licenses of sound recording masters to permanent digital download

- 15 -

providers to the 50/50 provisions of subsection 4(c)(v), as opposed to the recoupable 12% conventional record royalty provision of subsection 4(a), <u>better reflects the economic reality of Aftermath/UMG's actual services</u>." (*Id*. ¶ 78 at 407.)

Although plaintiffs try to characterize this testimony as "economic," Prof. Menell's opinions are inadmissible for the simple reason that they have no foundation in the actual facts of this case, or in the evidence of the recording industry more generally. Prof. Menell admitted at deposition that he had no evidence that any of the parties who negotiated the 1998 Agreement believed that the "masters licensed" provision would apply if the record company had reduced manufacturing or distribution costs. Prof. Menell said that he was "making an inference" that "this is an assumption that people in the industry were making." (LeMoine Decl. Ex. U (Menell Depo.) at 495:12-496:3.)

The problem with Prof. Menell's opinion is that it has absolutely no foundation in any evidence about what the parties to the Agreement understood, or even in the music industry. Prof. Menell admitted that he had no understanding of what the lawyer for Eminem and F.B.T. in 1998 knew in regard to these economic assumptions (or any other issue). (*See id*. at 496:21-22 ("I've never spoken to Mr. Rosenberg, so I can't say what he knew or didn't know"). Prof. Menell obviously has no firsthand knowledge of the "economic assumptions" that he claims are shared in the music industry. Prof. Menell's experience with artist recording agreements has been in hypothetical case studies used in his class on entertainment law. By Prof. Menell's own admission, even these hypothetical materials have nothing to do with the issues in this case. (*Id*. at 452:2-22.)

Prof. Menell purported to derive support for his "economic assumptions" from two sources of industry custom and practice. But neither source provides the support that Mr. Menell claims.

<u>First</u>, Prof. Menell asserted that "Mr. Berman's deposition goes into this issue as well, his report goes into it as well, and I think it's just an understanding that

1  where a record company is providing more services, he [sic] gets a bigger share.

2  When it provides fewer services, it gets a lesser share." (*Id.* at 496:4-9.)  Mr.

3  Berman, however, said no such thing either in his report, *id.* Ex. P (Berman report),

4  or in his deposition.  In facts, at his deposition, Mr. Berman testified that he "wasn't

5  paying much attention" when he and Prof. Menell spoke by telephone before the

6  expert reports were submitted, because Prof. Menell

7      was talking about industry economics, and I generally - not that I never

8      discussed industry economics, <u>but for purposes of this agreement I</u>

9      <u>wasn't - that wasn't a consideration for me</u>.

10  (*Id.* Ex. V (Berman Depo.) at 513:7-23 (emphasis added).)

11      Mr. Berman's testimony not only fails to support Prof. Menell's hypothesis

12  about supposedly shared "economic assumptions"; that testimony undermines Prof.

13  Menell's thesis.  At deposition, Mr. Berman was asked, "if it turns out that the

14  manufacturing costs are a very small percent of the total costs of putting out a

15  record, would that have any effect whatsoever on any of the opinions you are

16  offering in this matter?"  If Mr. Berman had the opinions that Prof. Menell ascribed

17  to him, one would have expected Mr. Berman to say that lower manufacturing costs

18  means it is more reasonable to expect a transaction to fall within a "masters

19  licensed" provision, *i.e.*, the opinion that Plaintiffs want Prof. Menell to offer.  But

20  that is <u>not</u> what Mr. Berman said.  Instead, he said that issues about the record

21  company's manufacturing costs were irrelevant.  When asked why that was the case,

22  Mr. Berman testified:

23      Because the issue is whether or not the agreements between Universal

24      and iTunes, etcetera is a license or not.  <u>And if it's a license, then it</u>

25      <u>comes under the provisions, the licensing provisions of the relevant</u>

26      <u>agreements and none of the other stuff matters</u>."

27  (*Id.* at 530:21-531:8 (emphasis added).)  In short, Mr. Berman does not provide any

28  support – in his pre-report phone call with Prof. Menell; in his expert report; or in

1  his deposition – for Prof. Menell's hypothesis about the "economic assumptions"

2  underlying the "masters licensed" provision.

3      <u>Second</u>, Prof. Menell claimed that evidence of industry practice supporting

4  his "economic assumptions" could be found in a publication entitled <u>All You Need</u>

5  <u>to Know About the Music Business,</u> by Donald Passman, a music industry lawyer.

6  Prof. Menell testified, "as someone who teaches in this area, this is how I explain

7  the provision.  I think other people like Mr. Passman who are pretty well-known see

8  this provision as reflecting this economic reality.  <u>He may not say exactly as I do,</u>

9  <u>but I think it's - you know that's - and the idea is that the functions that the parties</u>

10 <u>bring to a relationship are reflected in the terms.  So that's where I'm getting it</u>

11 <u>from</u>." (LeMoine Decl. Ex. U (Menell Depo.) at 496:22-497:6 (emphasis added).)

12     It is not the case that Mr. Passman does "not say exactly" as Prof. Menell

13 does about the "economic assumptions" that supposedly underlie the "masters

14 licensed" provision.  Mr. Passman <u>does not say at all</u> that such assumptions underlie

15 that clause.  Mr. Passman's book (which has been revised and reprinted several

16 times) includes a single paragraph discussion of the "masters licenses" provision in

17 artists recording agreement.  That discussion says not one word about the "economic

18 assumptions" that Prof. Menell hypothesizes was incorporated into the parties'

19 "masters licensed" provision.  (LeMoine Decl. Exs. X & Y at 539-45 (Passman

20 excerpts).)

21     It is the burden of Plaintiffs and Prof. Menell to establish a link between the

22 "economic assumptions" that he hypothesizes underlie the "masters licensed"

23 provision and the actual evidence in this case.  "[N]othing in either *Daubert* or the

24 Federal Rules of Evidence requires a district court to admit opinion evidence that is

25 connected to existing data only by the *ipse dixit* of the expert."  *General Elec. Co. v.*

26 *Joiner*, 522 U.S. 136, 146 (1997).  *Ipse dixit* is all that connects Prof. Menell's

27 theories about "economic assumptions" in the music industry and the "masters

28

licensed" provision.  Because these opinions have no foundation, the Court should preclude Plaintiffs from offering Prof. Menell to testify about them.

### E.    The Handful Of Additional Paragraphs In Prof. Menell's Report Is Legal Argument That Will Not Assist The Trier Of Fact

The handful of additional paragraphs from Prof. Menell's report not discussed in the preceding sections are found in a section that he calls "The Parties' Subsequent Conduct," and also in a section that he calls a response to what are purported to be "several alternative theories that the defendants appear to be advancing in this litigation."  (LeMoine Decl. Ex. T (Menell Report) ¶¶ 80-83, 88-99 at 408-13.)  All these additional paragraphs contain Prof. Menell's legal analysis of various issues in the lawsuit.  For example, under the heading "Subsequent Conduct," Prof. Menell opines that a change in Interscope Records' long-form recording agreement to address permanent downloads "reflects a recognition by UMG that its prior form was ambiguous regarding the treatment of download revenues," or "[m]ore plausibly ... reflects a recognitions by UMG that the masters licensing provision of the 1998 and 2003 Agreements at issue ... afforded recording artists a 50/50 share of digital revenues ...."  (*Id*. ¶ 81 at 408.)  This is just legal argument, as reflected by the fact that Plaintiffs' Motion for Summary Judgment repeats this point, as well as a number of Prof. Menell's points under the heading "Primary/Ancillary Exploitation."  (*Compare id*. *with* Plaintiffs' Mot. for Summ. Jmt. at 5:1-14; *compare also* Menell Report ¶¶ 89-94 (Ex. T at 410-12) *with* Plaintiffs' Mot. for Summ. Jmt. at 20-21.)  Plaintiffs have every right to have Prof. Menell consult with their lawyers about the arguments they want to make in summary judgment briefing and at trial.  But this legal argument, like the others discussed in the foregoing sections of this Motion, is inadmissible.[8]

---

[8] Even if it were not legal argument, none of these auxiliary points in Prof. Menell's report will assist the trier of fact in understanding issues or determining facts.  Fed. R. Evid. 702.  On the contrary, having Prof. Menell come in to testify to these excess points will only serve to confuse the jury's evaluation of the evidence and prolong the trial.

1  **III.    CONCLUSION**

2          For the foregoing reasons, Defendants respectfully request that the Court

3  enter an Order excluding the testimony of Prof. Menell.

4

5  DATED: December 19, 2009                    MUNGER, TOLLES & OLSON LLP

6                                              GLENN D. POMERANTZ
                                               KELLY M. KLAUS
7                                              MELINDA E. LEMOINE

8
                                               By:    /s/ Kelly M. Klaus
9                                                        Kelly M. Klaus

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6631493.1