1  GLENN D. POMERANTZ (State Bar No. 112503)
   Glenn.Pomerantz@mto.com
2  KELLY M. KLAUS (State Bar No. 161091)
   Kelly.Klaus@mto.com
3  MELINDA E. LEMOINE (State Bar No. 235670)
   Melinda.Lemoine@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
5  Thirty-Fifth Floor
   Los Angeles, CA  90071-1560
6  Telephone:  (213) 683-9100
   Facsimile:   (213) 687-3702
7
   Attorneys for Defendants
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                   WESTERN DIVISION

12

13  F.B.T. PRODUCTIONS, LLC, and        CASE NO.  CV 07-03314 PSG (MANx)
    Em2M, LLC,
14
              Plaintiffs,
15                                       DEFENDANTS' MEMORANDUM OF
       vs.                               CONTENTIONS OF FACT AND LAW
16                                       [CIVIL LOCAL RULE 16-4]
    AFTERMATH RECORDS doing
17  business as AFTERMATH               Judge:      Hon. Philip S. Gutierrez
    ENTERTAINMENT; INTERSCOPE
18  RECORDS; UMG RECORDINGS,
    INC.; and ARY, INC.,                Pretrial Conference: January 12, 2009
19                                       Jury Trial: February 3, 2009
              Defendants.
20

21

22

23

24

25

26

27

28

6652685.2

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .......................................................................................... 1

II.  PLAINTIFFS' FIRST CAUSE OF ACTION: BREACH OF THE EMINEM AGREEMENTS IN THE CALCULATION OF ROYALTIES FOR THE SALE OF PERMANENT DOWNLOADS AND MASTERTONES THROUGH THIRD-PARTY ONLINE RETAILERS ........................................................................................... 2

    A.  Summary of Plaintiffs' First Cause of Action ...................................... 2

    B.  Elements Of Plaintiffs' First Cause of Action ..................................... 4

III.  AFTERMATH'S CONTENTIONS OF FACT AND LAW IN RESPONSE TO PLAINTIFFS' FIRST CAUSE OF ACTION ...................... 4

    A.  Factual Background ............................................................................. 5

        1.  The Eminem Agreements at Issue in this Case ......................... 5

            a.  The 1998 And 2003 Agreements .................................. 5

            b.  The 2000 Novation ....................................................... 7

            c.  The 2004 Amendment ................................................... 8

        2.  The Evolution of the Market for Music ..................................... 9

    B.  Under The Plain Language of the Eminem Agreements, Aftermath Applies the Correct Royalty Provisions to the Sale of Permanent Downloads and Mastertones .............................................. 12

        1.  Permanent Downloads Are Records Sold Through Normal Retail Channels Under The Clear Language Of The Agreements ........................................................................ 12

        2.  The 2004 Amendment Confirms That Sales of Permanent Downloads Are Sales Through Normal Retail Channels ........ 13

        3.  Plaintiffs' Claim That the "Masters Licensed" Provision Covers Permanent Download Sales Cannot Be Reconciled With the Contractual Language ............................................... 14

    C.  The Admissible, Relevant Extrinsic Evidence, Even If Considered, Demonstrates That Aftermath's Royalty Treatment Is The Only One To Which The Agreements Are Reasonably Susceptible ........................................................................................ 16

    D.  Plaintiffs' Extrinsic Evidence Is Inadmissible And In Any Event Irrelevant ......................................................................................... 19

IV.  PLAINTIFFS' SECOND CAUSE OF ACTION:  BREACH OF THE EMINEM AGREEMENTS IN THE ALLOCATION OF COSTS ............... 23

    A.  Summary of Plaintiffs' Second Cause of Action ................................ 23

    B.  Elements of Plaintiffs' Second Cause of Action ................................ 24

V.  AFTERMATH'S CONTENTIONS OF FACT AND LAW IN RESPONSE TO PLAINTIFFS' SECOND CAUSE OF ACTION .............. 24

# TABLE OF CONTENTS
## (continued)

**Page**

VI.   PLAINTIFFS' THIRD CAUSE OF ACTION:  FOR
      DECLARATORY RELIEF ON THEIR FIRST CLAIM .............................. 25

VII.  AFTERMATH' CONTENTIONS OF FACT AND LAW IN
      RESPONSE TO PLAINTIFFS' THIRD CAUSE OF ACTION .................. 26

VIII. AFTERMATH'S AFFIRMATIVE DEFENSES ...................................... 27

      A.   Statute of Limitations ................................................................. 27

      B.   Waiver/Estoppel ......................................................................... 27

      C.   Set-off ........................................................................................ 28

      D.   Failure to Provide Notice ........................................................... 28

      E.   Failure to Mitigate ..................................................................... 29

IX.   ANTICIPATED EVIDENTIARY ISSUES ........................................... 29

      A.   Parol Evidence ........................................................................... 29

      B.   Hearsay ...................................................................................... 30

      C.   In Limine Motions ..................................................................... 30

X.    BIFURCATION OF ISSUES .............................................................. 31

XI.   JURY TRIAL .................................................................................... 31

XII.  ATTORNEY'S FEES ......................................................................... 32

XIII. ABANDONMENT OF ISSUES .......................................................... 32

1

**Federal Cases**

2

*Allman Brothers v. SonyBMG Music Entertainment*,
    2008 WL 2477465 (S.D.N.Y June 18, 2008)....................................................13

3

*DeFeo v. Procter & Gamble Co.*,
    831 F. Supp. 776 (N.D. Cal. 1993) ...............................................................26

4

*Douros v. State Farm Fire & Cas. Co.*,
    508 F. Supp. 2d 479 (E.D. Va. 2007)..............................................................26

5

6

*FCE Benefit Adm'rs, Inc. v. George Washington University*,
    209 F. Supp. 2d 232 (D.D.C. 2002.................................................................26

7

*Government Employees Ins. Co. v. Dizol*,
    133 F.3d 1220 (9th Cir. 1998)........................................................................26

8

9

*Guerra v. Sutton*,
    783 F.2d 1371 (9th Cir. 1986) .......................................................................26

10

*Kinghorn v. Citibank, N.A.*,
    1999 WL 30534 (N.D. Cal. 1999) .................................................................26

11

12

*Microsoft Corp. v. DAK Indus.*,
    66 F.3d 1091 (9th Cir. 1995).........................................................................23

13

*Pakideh v. Ahadi*,
    99 F. Supp. 2d 805 (E.D. Mich. 2000)..........................................................26

14

15

*SoftMan Prod. Co. v. Adobe Sys., Inc.*,
    171 F. Supp. 2d 1075 (C.D. Cal. 2001)..........................................................23

16

*Welles v. Turner Entertainment Co.*,
    503 F.3d 728 (9th Cir. 2007).........................................................................19

17

18

**State Cases**

19

*Carmel Valley Fire Protection Dist. v. California*,
    190 Cal. App. 3d 521 (1987)........................................................................29

20

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe*,
    30 Cal. App. 4th 54 (1994)..........................................................................29

21

22

*Ermolieff v. R.K.O. Radio Pictures*,
    19 Cal. 2d 543 (1942)..................................................................................23

23

*General Motors Corp. v. Superior Court*,
    12 Cal. App. 4th 435 (1993).........................................................................21

24

25

*Ghirardelli v. Peninsula Properties Co.*,
    16 Cal. 2d 494 (1940)....................................................................................5

26

*Molybdenum Corp. of America v. Kasey*,
    176 Cal. App. 2d 357 (1959)........................................................................23

27

28

*Neal v. State Farm Ins. Co.*,
   188 Cal. App. 2d 690 (1961)..........................................................................20

*Wagner v. Columbia Pictures Industries, Inc.*,
   146 Cal. App. 4th 586 (1988).................................................................16, 31

*Wolf v. Walt Disney Pictures and Television*,
   162 Cal. App. 4th 1107 (2008)....................................................................33

### **Statutes And Rules**

28 U.S.C. § 2201(a) ........................................................................................26

Cal. Civ. Code § 1641......................................................................................15

Civil Local Rule 16-4 ..................................................................................1, 2

Fed. R. Evid. 403 ...........................................................................................32

Fed. R. Evid. 702 ...........................................................................................32

### **Other Authorities**

CACI, Civil Jury Instruction § 303 .............................................................25

CACI, Civil Jury Instructions § 320.............................................................20

CACI, Civil Jury Instructions § 336.............................................................29

Tim Arango, "Digital Sales Surpass CDs at Atlantic", *N.Y. Times*,
   November 26, 2008 .....................................................................................10

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

Pursuant to Civil Local Rule 16-4, Defendants Aftermath Records d/b/a Aftermath Entertainment, Interscope Records, UMG Recordings, Inc. ("UMG" or "Universal") and ARY, Inc. (collectively "Aftermath") respectfully submit the following Memorandum of Contentions of Fact and Law.

## I.    **INTRODUCTION**

The Plaintiffs are two LLCs comprised of three people who operate a recording studio in Detroit.  In the mid-1990s, Plaintiffs signed Marshall B. Mathers, p/k/a Eminem, when he was an unknown rapper, to an "Exclusive Artist's Recording Agreement."  Eminem later became one of the world's most popular recording artists.  Plaintiffs claim a contractual entitlement to a cut of certain of his royalties.  Plaintiffs sue Aftermath and its owners[1] for two claims of breach of the Eminem recording agreements with Aftermath (collectively, including their amendments, the "Eminem Agreements"), and for declaratory relief as to one of those breach claims.

Aftermath will prevail at trial because Plaintiffs' claims of breach are not supported by fact or law.  Aftermath has complied with its contractual obligations.  Even if extrinsic evidence is considered – which it need not be – Aftermath still must prevail.

Pursuant to Civil Local Rule 16-4, this Memorandum is organized to include:

- Summaries of Plaintiffs' claims and their elements;
- Brief descriptions of Aftermath's key evidence in opposition to each claim;
- Summaries of Aftermath's affirmative defenses and their elements;
- Brief descriptions of Aftermath's key evidence in support of its affirmative defenses;
- A list of anticipated evidentiary issues; and

---

[1] Aftermath Records is a joint venture among UMG Recordings, Inc., Interscope Records and ARY, Inc. (whose principal is Andre Young, p/k/a/ Dr. Dre, another recording superstar and sometime producer of Eminem).

- • Aftermath's position on attorney's fees, issues triable to the jury, and any issues that have been abandoned.[2]

## II. PLAINTIFFS' FIRST CAUSE OF ACTION: BREACH OF THE EMINEM AGREEMENTS IN THE CALCULATION OF ROYALTIES FOR THE SALE OF PERMANENT DOWNLOADS AND MASTERTONES THROUGH THIRD-PARTY ONLINE RETAILERS

### A. Summary of Plaintiffs' First Cause of Action

Plaintiffs' first claim alleges that Aftermath breached the Eminem Agreements by applying the wrong royalty provision for royalties from revenues received from the distribution of Eminem recordings in two digital configurations: permanent downloads and mastertones. Permanent downloads are digital recordings that Aftermath (through its co-owner, Universal) sells to consumers through online retailers like Apple's iTunes store. Mastertones are a type of permanent download that consumers can play as their cell phone rings. Cellular service providers re-sell mastertones for Universal/Aftermath through the cellular service's own retail facilities.

Aftermath pays Eminem (and, by extension, Plaintiffs) royalties for sale of these digital products based on the royalty provision applicable to "net sales" of records "through normal retail channels in the United States[.]"[3] Indeed, Aftermath

---

[2] Civil Local Rule 16-4 also calls for, where applicable, a section identifying "any issues of law, such as the proper interpretation of a governing statute, which are germane to the case, together with the party's position on these issues." Civil L.R. 16-4.1(*i*). Because this case arises under contract, not statute, Aftermath does not include a separate section on legal issues. To the extent anticipated legal issues arise in connection with the interpretation of the relevant agreements, those matters are discussed in the text below.

[3] This "records sold" provision is found in Section 4(a) of the 1998 Agreement and Section 5(a) of the 2003 Agreement. So that the Court will have ready access to the Eminem Agreements in reviewing this Memorandum, Aftermath submits with the Chambers' Copy of this Memorandum a copy of Docket No. 172, the Declaration of Rand Hoffman, which attaches Eminem Agreements as exhibits. The royalty provisions Aftermath applies – Sections 4(a) and 5(a) of Eminem's 1998 and 2003 recording agreements – are located at Ex. A ¶ 4(a) at 36 and Ex. D, ¶ 5(a) at 87 of the Hoffman Declaration. This document is part of the Court's record in this case, as it was filed with Defendants' Motion for Summary Judgment. The same will be served with this Memorandum on Plaintiffs' counsel.

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

pays Plaintiffs a royalty that is ***more*** favorable than the royalty that would be paid pursuant to a strict application of this "records sold" provision. Aftermath pays Plaintiffs according to the royalty rate for *albums* sold, even though the majority of permanent downloads (and all mastertones) sold by Aftermath are of *singles*, whose royalty is calculated at a lower rate. Aftermath also voluntarily refrains from taking contractually permissible container and "new media" deductions.

The "records sold" provision applies to Aftermath's sales through third-party retailers of Eminem records in physical configurations, such as compact discs (CDs), cassette tapes and vinyl albums. The Agreements themselves are explicit that Aftermath has "the exclusive right to exploit all ... masters in any and all forms of media now known [*i.e.*, as of 1998 and 2003] and hereinafter developed[,]" which indisputably encompasses online permanent download and mastertone sales.[4] Because online permanent download sales are just the latest manifestation of selling records to consumers "through normal retail channels" – whether those channels are cyberspatial record stores or brick-and-mortar record stores – Aftermath properly calculates the royalties due to Plaintiffs under the "records sold" provision.

Plaintiffs contend in their first claim that selling records in the form of permanent downloads is not selling them "through normal retail channels," but instead is activity that is subject to a very different – and significantly higher – royalty provision. Specifically, Plaintiffs claim that such sales are subject to a so-called "masters licensed" provision. That section of the Agreements provides: "On masters licensed by ... to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts. . ." (Ex. A ¶ 4(c)(v) at 37.[5]) As discussed herein, and as the evidence will

---

[4] Aftermath's broad right to exploit the masters "in any and all forms of media now known and hereinafter developed" is found in the "Ownership" provision, sections 8 of both the 1998 and 2003 Eminem Agreements.

[5] The "masters licensed" provision of the 2003 Eminem Agreement is found at Ex. D ¶ 5(c)(v) at 88.

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1  show, the "masters licensed" provision is and always has been understood in the

2  record industry to apply to a narrow range of transactions, whereby the record

3  company that owns the master licenses its use for a third party to incorporate the

4  music on that record **into a different product, namely the third party's own**

5  **product**.  In particular, the "masters licensed" provision has always been

6  understood to apply where the record company licenses the master recording for

7  inclusion in a compilation album put out by a third party (*e.g.*, "K-Tel's Greatest

8  Hits" of a particular year) or incorporated into the soundtrack of a movie, TV show

9  or commercial (a so-called "master-use license").  Such ancillary uses of the

10  masters are completely distinct from the sale of permanent downloads, which are

11  just another form of the record company selling its own core product to consumers

12  through normal retail channels.

## B.  Elements Of Plaintiffs' First Cause of Action

14  California law governs the construction of the Eminem Agreements.  Under

15  California law, Plaintiffs must prove each and every one of the following elements

16  to prevail on their breach of contract claim: (1) the parties entered into a contract,

17  (2) Plaintiffs performed or were excused from performing all that was required

18  under the contract, (3) the Defendants breached the contract, and (4) Plaintiffs

19  suffered damages as a result.  *See* Judicial Council of California Civil Jury

20  Instructions ("CACI"), Civil Jury Instruction No. 303 ("Breach of Contract -

21  Essential Factual Elements").  Plaintiffs will lose the First Cause of Action at trial

22  because they cannot prove Defendants have breached the Eminem Agreements.

## III.  AFTERMATH'S CONTENTIONS OF FACT AND LAW IN RESPONSE TO PLAINTIFFS' FIRST CAUSE OF ACTION

24  Aftermath pays Plaintiffs royalties for its sales of permanent downloads or

25  mastertones under Sections 4(a) and 5(a) of the 1998 and 2003 Eminem

26  Agreements.  (Ex. A, ¶ 4(a) at 36; Ex. D, ¶ 5(a) at 87).  These provisions

27  indisputably apply to Aftermath's sale through normal retail channels of records in

28

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1   their physical configurations.  The Eminem Agreements' language demonstrates

2   that Aftermath's royalty treatment is proper, and that Plaintiffs' theory that

3   Aftermath instead should account for such sales under the "masters licensed"

4   provision has no merit.  *See Ghirardelli v. Peninsula Properties Co.*, 16 Cal. 2d

5   494, 496-97 (1940) (contracts must be interpreted as a whole).

6   **A.    Factual Background**

7   **1.    The Eminem Agreements at Issue in this Case**

8       Four different written contracts comprise the "Eminem Agreements."  There

9   are two main recording agreements—a March 9, 1998 recording agreement

10  whereby Plaintiff F.B.T. Productions, LLC ("F.B.T."), to whom Eminem had been

11  signed, agreed to furnish Eminem's exclusive recording services to Aftermath (the

12  "1998 Agreement) (Ex. A) , and a July 3, 2003 recording agreement (the "2003

13  Agreement") (Ex. D), between Aftermath and Eminem directly (with F.B.T. and its

14  co-plaintiff Em2M LLC being passive income participants).  Two other agreements

15  are part of the parties' contractual relationship and contain critical language that

16  informs the resolution of this case.  These are a September 27, 2000 amendment to

17  the 1998 Agreement among Eminem, F.B.T, and Aftermath (the "2000 Novation")

18  (Ex. C), and a November 1, 2004 amendment to the 2003 Agreement between

19  Eminem, Aftermath, F.B.T., and Em2M (the "2004 Amendment") (Ex. E).

20  a.    **The 1998 And 2003 Agreements**

21      As is typical in the music business, the 1998 Agreement sets up a process for

22  Eminem to record music and produce "master recordings," or "masters," that

23  Aftermath will own; and that Aftermath will sell copies of those masters as

24  "records."  Aftermath pays royalties to Eminem (and, by extension, Plaintiffs) in

25  exchange for Aftermath's distribution and sale of those records.  (Ex. A, ¶ 4(a) at

26  36.) Section 4(a), the "records sold" provision, establishes the royalties for all "full-

27  price records sold in the United States."  (*Id*.)  The royalties consist of a range of

28  percentages applied to the records' "Royalty Base Price."  The applicable

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

percentage depends on factors such as whether the record is Eminem's first or fourth album delivered under the agreement; whether it is sold as an album or a single; and whether it is the first unit sold or the one millionth.  (*Id.* at ¶ 4(a)(i)).  For example, for "full price records sold" of one of Eminem's first three albums, the royalty is "eighteen percent (18%) for the first five hundred thousand (500,000) net sales through normal retail channels in the United States ('USNRC Sales')."  (*Id.*)  That royalty increases by 0.5% when the sales exceed the first escalation target of 500,000 units, and by another 0.5% when sales exceed 1,000,000 units.  (*Id.*)  The parties agree that "records sold . . . through normal retail channels" in this provision encompasses Aftermath's sale of albums and singles of Eminem recordings in physical configurations like CDs, through retailers like Best Buy or Wal-Mart.

The 1998 Agreement defines "record" broadly and without limitation to distribution technology in use circa 1998.  (Ex. A, ¶ 16(e) at 45). "Records" are "*all forms of reproductions*."  (*Id.*)  Moreover, Aftermath has the right to sell them "in any or all forms of media now known and hereinafter developed."  (*Id.*, ¶ 8 at 40.)

The 1998 Agreement also includes a provision for the income that Aftermath receives from ancillary uses of masters.  That section provides:  "On masters licensed by us or our NRS Licensees to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts. . ."  (*Id.*, ¶ 4(c)(v) at 37.)

The 2003 Agreement is almost identical in structure to the 1998 Agreement, but includes a higher advance and higher royalty rates for the sale of records, both reflections of the fact that Eminem had become an international superstar in the intervening years.  Rather than negotiate a new contract form, the parties used the 1998 Agreement as a template and changed only what was necessary to effectuate the new financial terms.  Section 4(a) of the 1998 Agreement is renumbered as section 5(a) of the 2003 Agreement, and still provides that Eminem will receive

1    certain (higher) percentages of the "Royalty Base Price" "on full-price records sold

2    in the United States." (Ex. D, ¶ 5(a) at 87.) Section 5(c)(v), the provision

3    regarding the licensing of masters is also materially identical to the provision

4    numbered 4(c)(v) in the 1998 Agreement. (*Id.*, ¶ 5(c)(v) at 88.)

5                          b.      **The 2000 Novation**

6            There are two significant amendments to the 1998 and 2003 Eminem

7    Agreements. The first is the "2000 Novation," which (among other things)

8    established a direct contractual relationship between Eminem and Aftermath. The

9    2000 Novation transferred the obligation to provide Eminem's recording services

10    from F.B.T. (which had provided Eminem's services under the 1998 Agreement)

11    directly to Eminem, and made F.B.T. a "passive income participant," with an

12    interest in a substantial share of Eminem's royalties for the next five albums to be

13    released by Aftermath. (Ex. C at 64)

14            The 2000 Novation makes it clear that the "masters licensed" provision in the

15    1998 Agreement covers "ancillary uses" and not Aftermath's sale of records. (Ex.

16    C, ¶ 6 at 67.) Specifically, after discussing the split of income from the sale of

17    records, in referring to the split of income subject to the "masters licensed"

18    provision, the 2000 Novation states that F.B.T. and Eminem will split "any

19    advances or fees payable to Artist *in connection with any ancillary uses* of each

20    master recording." (*Id.*) (emphasis added). These provisions from the 2000

21    Novation are incorporated into the 2003 Agreement, in paragraph 12, which details

22    what split of Eminem royalties F.B.T. receives both for Aftermath's records sold,

23    and for "any advances or fees payable to Artist *in connection with any ancillary*

24    *uses* of each master recording." (Ex. D, ¶ 12(c) at 95.) Plaintiffs' auditor, Gary

25    Cohen, has admitted that the claim that Plaintiffs are entitled to 50% of Aftermath's

26    net receipts from permanent download sales must arise, if at all, pursuant to the

27    payment split for "ancillary uses of each master recording." As discussed below,

28    however, the sale of records in the form of permanent downloads through normal

1    retail channels is not an "ancillary use" of the master recording.  It is the

2    straightforward sale of the record company's core product in the latest

3    technological configuration for selling records.

4                           c.    **The 2004 Amendment**

5         In November 2004, the parties entered into the 2004 Amendment, which

6    makes it clear that sales of permanent downloads are USNRC Net Sales.  The 2004

7    Amendment modified Section 5(a), the standard "full price records sold" royalty

8    provision of the 2003 Agreement, to provide for an increase in royalty rates.  (Ex.

9    E, ¶ 2(a) & (b) at 112.)  It also specifically addressed the sales of permanent

10   downloads within Section 5(a):

11        Sales of Albums by way of permanent download shall be treated as
12        USNRC Net Sales for the purposes of escalations, provided that the
          sales price concerned falls within a top-line sales price category
13        applicable to such method of sale.

14
15   (*Id*., ¶ 2(a) at 112.)  By amending the standard royalty provision in the 2003

16   Agreement to permit albums sold as permanent downloads to be treated as

17   "USNRC Net Sales" for the purpose of escalations, the 2004 Amendment treated

18   downloads as sales under the exact provision that Plaintiffs claim is inapplicable to

19   permanent downloads and mastertones in this lawsuit.  (*Id*.) Plaintiffs' members

20   Joel Martin and Mark Bass executed and approved this Amendment on behalf of

21   both Plaintiffs in this case.

22        This portion of the 2004 Amendment did not change the applicable royalty

23   provision for permanent downloads.  The parties knew that they always had been

24   accounted for as "USNRC Net Sales" under the "records sold" provision.  Rather,

25   the provision established that albums sold as downloads *also* counted for

26   escalations purposes, provided that such albums were sold within a "top-line" price

27   category.  (*Id*.)  Absent this clarification, Aftermath would not have been

28   technically required to include albums sold as downloads in counting units sold

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1  toward escalations, because escalations apply only to "full price records sold" (Ex.

2  D, ¶ 5(a)(i) at 87), and, in 2004, the price for albums sold as downloads was lower

3  than what qualified as "full price."

### 2.    The Evolution of the Market for Music

5         Since the advent of the sale of recorded music, the methods by which sound

6  recordings have been distributed have constantly transformed.  From shellac

7  records to vinyl to eight-track tapes to cassettes to CDs, the configuration in which

8  recordings are sold has evolved as the technology has evolved.  Recording

9  agreements generally anticipate that change will occur, and that it cannot be

10  predicted.  For that reason, recording agreements typically define the term "record"

11  broadly enough to encompass any form of reproduction of sound recordings,

12  without regard to the specific technology employed to transfer the copy of the

13  sound recording from the master to the end user.  The 1998 and 2003 Agreements

14  are no different – both define the term "record" to include "all forms of

15  reproduction," without limitation as to the particular technology employed to

16  perform and deliver the reproduction.[6]

17         Today, the music industry is in the midst of the latest evolutionary stage of

18  the "record" – digital music delivery.  The sale of CDs through brick-and-mortar

19  record stores is declining, while the consumption of digital music is on the rise.

20  Customers receive music digitally in many different forms. Some purchase records

21  in the form of permanent digital copies from online music stores, such as Apple's

22  iTunes.  Some purchase records in the form of "mastertones" for their cell phones.

23  The popularity of such formats has increased to the point that one major record

24  company announced recently that, for the first time ever, "more than half of its

25  music sales in the United States are now from digital products, like downloads on

26

27         [6] Plaintiff F.B.T. Productions, Inc.'s 1995 "Exclusive Artist's Recording
    Agreement" with Eminem similarly defines "record" broadly to encompass future
28  technologies.

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1  iTunes and ring tones for cellphones."  *See* Tim Arango, "Digital Sales Surpass

2  CDs at Atlantic", *N.Y. Times*, November 26, 2008.  Apple's iTunes recently

3  announced that its sales of permanent downloads have surpassed the number of

4  hard-goods recordings sold by Wal-Mart, making iTunes the world's leading retail

5  store for the sale of records.  *See*

6  http://www.apple.com/pr/library/2008/04/03itunes.html.

7          While the configurations in which music is embodied has changed, the basic

8  nature of the sale model has not.  Online music stores run by Apple, Amazon.com

9  and others, are no different than "brick and mortar" stores such as Best Buy or Wal-

10  Mart, or Tower Records and Sam Goody before them, which bought records in the

11  form of compact discs or cassettes from Aftermath's distributor and resold them to

12  consumers.  As before, the customer can browse the catalogue of available records,

13  make a selection, and leave the store with a permanent copy of the record, complete

14  with cover art and liner notes.  What is different between the Apple of today and the

15  Tower Records of yesterday is that today's sales model is more efficient.  Rather

16  than Aftermath's distributor manufacturing compact discs, cassettes and vinyl

17  albums, and then storing them in a warehouse until they are shipped to a retailer

18  that has ordered them, now Aftermath's distributor can provide a single copy of the

19  record in digital form to an online music retailer and the retailer can then

20  instantaneously buy a copy of the record from the distributor at a wholesale price

21  and re-sell it as a permanent download or a mastertone at a retail price to the

22  consumer who has ordered it.  The technological change in the nature of the

23  distribution does not change the reality that Apple and the other digital retailers are

24  simply making a retail sale of Aftermath's records to consumers.

25          The payment of royalties for digital transactions follows the commercial

26  reality of the transaction.  When the record company sells a permanent download of

27  its record through an online store, the customer leaves with their own permanent

28  copy of the recording.  Accordingly, the record company pays an artist his or her

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

royalty for that sale under the standard "records sold" provision of the recording agreement. The record company pays according to the same royalty structure for mastertones, which are just permanent downloads that the customer chooses to play on his or her cell phone device. [7] Unlike the third-party products encompassed within the "masters licensed" provision, the record company performs the same marketing, sales and promotion functions for these digital records as it does for physical records. It also bears responsibility for the publishing royalty payments, which are often higher for permanent downloads sales and are substantially higher for mastertones sales than for physical records.

Some digital uses of music do not result in a purchase by the consumer of a permanent copy of an Aftermath record, but are instead third-party products incorporating Universal masters. For example, streaming music is typically offered through a subscription service, where a listener pays a flat monthly rate for the right to listen to his or her choice of tens of thousands of recordings by numerous recording artists and owned by many different record companies. However, once that subscription ends, the listener's ability to listen to those recordings ends as well. Other subscription services offer "conditional" or "tethered" downloads, which are downloads that the consumer can access only for as long as the consumer subscribes to the service (i.e., once the subscription terminates, so does the subscriber's ability to listen to any recordings downloaded during the term of the subscription). In those instances, because the consumer does not buy any Aftermath records, but receives only temporary access to masters across a spectrum of artists and record labels, Aftermath accounts for the revenue it receives from such third-party subscription services under the "masters licensed" of the Eminem Agreements and not the "records sold" provision. The application of different

---

[7] As discussed above, Aftermath pays Eminem *more* favorably for a sale of a permanent download and a mastertone than it is contractually required to under the standard "records sold" provision.

royalty provisions simply and accurately reflects whether Aftermath's record is being sold to a consumer (e.g., a permanent download or mastertone), or whether the consumer is subscribing to a third-party product offering temporary and non-permanent access to the master (e.g., a streaming subscription).

**B. Under The Plain Language of the Eminem Agreements, Aftermath Applies the Correct Royalty Provisions to the Sale of Permanent Downloads and Mastertones.**

**1. Permanent Downloads Are Records Sold Through Normal Retail Channels Under The Clear Language Of The Agreements**

The "records sold" royalty rate applies to the "net sales" of "records sold" "through normal retail channels in the United States ('USNRC Sales')." Sections 4(a) and 5(a) of the 1998 and 2003 Agreements, respectively (Ex. A ¶ 4(a) at 36 and Ex. D, ¶ 5(a) at 87). Under this language, sales through iTunes and other online retailers are sales "through normal retail channels," *i.e.*, USNRC Sales.

First, the 1998 and 2003 Agreements define a "record" expansively, as "all forms of reproductions," that Aftermath has the right to sell "in all forms of media now known or hereafter developed." (Ex. A, ¶ 16(e) at 45, ¶ 8 at 40; Ex. D, ¶ 16(e) at 103, ¶ 8 at 91). Their royalty provisions explicitly apply not only to "vinyl discs," "cassette tapes," and "Compact Discs," but also to "all records *in any other form now known or hereafter devised*." (Ex. A, ¶ 4(e)(iii) at 38; Ex. D, ¶ 5(e)(iii) at 89.) That broad language encompasses within the term "records" configurations made possible by new technologies, even if those configurations were not anticipated by the parties at the time of contracting. Indeed, the only federal court to decide the issue presented by this lawsuit has found that the broad definition of the term "record" in an artist recording agreement includes permanent downloads. *See, e.g., Allman Brothers v. SonyBMG Music Entertainment*, 2008 WL 2477465, at *2 (S.D.N.Y June 18, 2008).

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Second, sales through iTunes and other digital retailers are sales through "normal retail channels." It is preposterous for Plaintiffs to claim that iTunes is not a "normal retail channel." It is, in fact, the nation's largest record retailer. *See* http://www.apple.com/pr/library/2008/04/03itunes.html. That is a "normal" channel under any conceivable definition of the term. Even Plaintiffs' putative "experts" on industry "custom and practice" admitted (as they had to) that iTunes is a "normal retail channel."

Aftermath's sale of records in the form of permanent downloads and mastertones are thus properly treated under the ordinary royalty provisions indisputably applicable to Aftermath's sale of records in other, physical configurations. The Eminem Agreements do not distinguish among record configurations for royalty purposes. Records that are sold through normal retail channels are accounted for under Section 4(a) and 5(a). It does not matter whether those records are sold as CDs, vinyl discs, cassettes, or permanent downloads.

## 2. The 2004 Amendment Confirms That Sales of Permanent Downloads Are Sales Through Normal Retail Channels

If there were any doubt from the plain language of the 1998 and 2003 Agreements that permanent downloads are "records sold" "through normal retail channels" – and there is not – then that doubt would be removed by the plain language of the 2004 Amendment, which is also part of the Eminem Agreements and which makes it clear that permanent downloads "***shall be treated as USNRC Net Sales***," *i.e.,* sales "through normal retail channels."

Specifically, the 2004 Amendment modifies Section 5(a) – the "records sold" provision of the 2003 Agreement – to state that:

> Sales of Albums by way of permanent download *shall be treated as USNRC Net Sales* for the purposes of escalations, provided that the sales price concerned falls within a top-line sales price category applicable to such method of sale.

(Ex. E , ¶ 2(a) at 112) (emphasis added). The 2004 Amendment thus provided that "Sales of Albums by way of permanent download" would be treated as Aftermath's

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

1 sales through normal retail channels ("USNRC Net Sales"), expressly including

2 permanent download sales within the scope of Section 5(a). Plaintiffs' entire claim

3 of breach depends on whether these sales are properly treated under 5(a) or under

4 Section 5(c)(v), the "masters licensed" provision. The 2004 Amendment's

5 inclusion of "Sales of Albums by way of permanent downloads" within Section

6 5(a) is fatal to Plaintiffs' claim.

7      Forced to explain away the plain language of the 2004 Amendment, Plaintiffs

8 assert that it applies only for a limited purpose. Specifically, Plaintiffs assert that it

9 is limited to treating permanent downloads as Section 5(a) sales only for the limited

10 purpose of counting units toward escalation targets. Plaintiffs' theory makes no

11 sense under the plain language of the Agreements.

12     Moreover, section 5(c)(v), the "masters licensed" provision, applies only

13 when Aftermath licenses masters "*to others* for *their* manufacture and sale of

14 records or any other uses." (Ex. A, ¶ 4(c)(v) at 37; Ex. D, ¶ 5(c)(v) at 88 (emphasis

15 added.) By its terms, the "masters licensed" provision applies to third party uses –

16 *others* who incorporate the masters into *their* products. *Id.* By contrast, the

17 "records sold" provision amended in the 2004 Amendment applies not to third-

18 party products, but to *Aftermath's* sales of *Aftermath's* records through normal

19 retail channels. (Ex. A ¶ 4(a) at 36; Ex. D, ¶ 5(a) at 87.) Plaintiffs' concession that

20 the 2004 Amendment treats permanent downloads as Aftermath sales through

21 normal retail channels for any purpose puts the sales of permanent downloads

22 squarely within the "records sold" provision of the Eminem Agreements for all

23 purposes. The same sale cannot simultaneously be an Aftermath sale through

24 normal retail channels *and* a master licensed to a third-party.

### 3. Plaintiffs' Claim That the "Masters Licensed" Provision Covers Permanent Download Sales Cannot Be Reconciled With the Contractual Language

27     Plaintiffs focus their claim with tunnel vision on one provision – the "masters

28 licensed" provision – ignoring the "records sold," "record" definition, and

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1    ownership provisions almost entirely.  In particular, Plaintiffs focus on a single

2    two-word phrase in the royalty provision they claim applies: "masters licensed",

3    and ignore the rest of the sentence in the very provision Plaintiffs contend applies.

4    Plaintiffs' failure to consider the entire contract defeats their interpretation.  *See*

5    Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to

6    give effect to every part, if reasonably practicable, each clause helping to interpret

7    the other.").

8         Not every license of a master is covered by the "masters licensed" provision

9    in Section 4(c)(v) and 5(c)(v).  The provision only applies when masters are

10   licensed to "*others* for *their* manufacture and sale of records or for any other uses."

11   In other words, the master must be licensed to a third party, who then incorporates

12   those masters into *their* products.  It does not apply to the sale of Aftermath's

13   records.[8]  But that is exactly what the digital distributors who sell permanent

14   downloads and mastertones of Eminem recordings are selling:  Aftermath records.

15   When a customer buys a copy of an Eminem album on iTunes, she buys the same

16   copy of that Eminem album that is available for sale in physical format in other

17   retail stores.  The album has the same tracks, the same cover art, the same liner

18   notes as the CD available from Best Buy or Target or amazon.com.  It is

19   Aftermath's Eminem record, not some wholly new third party product.  The

20   contracts' provisions for royalties on "net sales through retail channels" and express

21   recognition of Aftermath's right to exploit records "in any and all forms of media

22   now known and hereinafter developed," make it clear that the sale of Aftermath's

23   *own* records in the form of permanent downloads are properly accounted for like

24   the sales of the same records in any other configuration.

25

26

---

27   [8] It does not apply, for instance, when Aftermath licenses a master to a CD
     manufacturer to press CDs, which Aftermath then sells through normal retail
28   channels.

DEFENDANTS' MEMORANDUM OF
CONTENTS OF FACT AND LAW

**C.    The Admissible, Relevant Extrinsic Evidence, Even If Considered, Demonstrates That Aftermath's Royalty Treatment Is The Only One To Which The Agreements Are Reasonably Susceptible.**

Plaintiffs rely heavily on extrinsic evidence to support their First Cause of Action.  Under California law, extrinsic evidence is inadmissible if the contractual text is not "reasonably susceptible" to Plaintiffs' competing interpretation.  *See Wagner v. Columbia Pictures Industries, Inc*., 146 Cal. App. 4th 586, 590 (1988).  Plaintiffs' theory is plainly unreasonable in the face of the 2004 Amendment's express treatment of "the sale of albums by way of permanent downloads" as "USNRC Net Sales," the intent of the Eminem Agreements to encompass all forms of new technologies within the term "record," and the inapplicability of the "masters licensed" provision to Aftermath's own products.  But even if extrinsic evidence is considered, all of the competent and admissible evidence supports Aftermath's royalty treatment.

For example, witnesses on both sides will testify that they understood at the time of contracting that the "records sold" provision would apply to Aftermath's sales of its own physical product through brick-and-mortar retailers.  When Aftermath sells records in CD format through retailers like Best Buy, the "records sold" provisions indisputably control.  There is no principled basis for treating Aftermath's sales of *the same records* differently just because technology has advanced and they are now sold online, rather than in a store.  When Aftermath sells its product – a record – through a retailer – a "normal retail channel"– the royalty for "records sold . . . through normal retail channels" applies.  In both cases, the customer browses available titles and purchases a permanent copy of the record.  It does not matter whether the retailer sells the CDs from a storefront in a local mall or from a storefront accessed at a web address.

Evidence of industry custom and practice also fully supports treating sales of permanent downloads as "records sold" "through normal retail channels."  Plaintiffs' witnesses, including their purported "industry" expert, could identify

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

only two uses typically accounted for under the "masters licensed" provision: the use of a master in a television commercial or a movie, or the inclusion of a master by another record company in their own compilation records. Aftermath's sale of its own records in the form of permanent downloads and mastertones is entirely unlike either of these typical applications of the "masters licensed" provision.

When a record company licenses masters to a production company to use in a television commercial, or to a different record company to incorporate the single recording into one of that record company's compilation records, the third party is creating a new product. That third party is responsible for marketing and promoting its own product. By contrast, Aftermath's records in permanent download form are not different products; they are Aftermath's own records, marketed and promoted by Aftermath, just like it does with its physical records, but in a digital configuration. Likewise, when Aftermath sells its own records (in whatever form), Aftermath clears the mechanical rights for those sales. When masters are licensed to third parties, those third parties have the obligation to pay mechanical royalties for the use of a composition.

The evidence also will show that the "masters licensed" provision applies to "ancillary" uses of the master, not to core product sales of records. The plain language of the Eminem Agreements confirms this. After defining the split of income between F.B.T. and Eminem from the sale of records, the 2000 Novation states that the same fractional split will apply to "any advances or fees payable to Artist *in connection with any ancillary uses* of each master recording." (Ex. C ¶ 6 at 67 (emphasis added).) These provisions from the 2000 Novation are incorporated into the 2003 Agreement, in paragraph 12, which details what split of Eminem royalties F.B.T. receives both for Aftermath's records sold, and for "any advances or fees payable to Artist *in connection with any ancillary use*s of each master recording." (Ex. D, ¶ 12(c) at 95.) This reference to "ancillary uses" of the masters in contrast to "records sold" must refer to the licensing provision that

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1    Plaintiffs claim applies.  Indeed, when asked what right F.B.T. had to royalties from

2    5(c)(v) (i.e., the "masters licensed" provision they contend applies here), Plaintiffs'

3    own damages expert testified that the right possibly came from the reference in the

4    2003 Agreement to "ancillary uses of all master recordings."

5        Aftermath's sales of its records as permanent downloads and mastertones

6    cannot be an "ancillary" use of the master recordings.  When a record company

7    sells copies of sound recordings as albums or singles, it is not participating in some

8    kind of "ancillary" exploitation of the masters.  Instead, its doing exactly what

9    record companies do – selling records.  While Plaintiffs will contend that the word

10   "ancillary" has some connection to market share, there is no evidence that is how

11   the term is understood in the industry.  Regardless of what percentage of

12   Aftermath's record sales are in permanent download form, the sales of permanent

13   downloads are still sales of records.

14       Finally, industry practice undermines Plaintiffs' royalty theory because it is

15   unprecedented – dramatically so.  Plaintiffs contend that they are entitled to 50% of

16   net receipts from the sales of downloads and mastertones, but they have no

17   evidence of any other artist actually receiving such royalty treatment under a

18   "masters licensed" provision.  In addition, even now that permanent downloads

19   have become an important format for selling records, Plaintiffs have no evidence

20   that any artist has succeeded in persuading a record company that it should pay

21   50% of net receipts for permanent downloads, rather than the royalty rate applicable

22   to the sale of records.

23       Industry standards are not only a relevant extrinsic aid in interpreting the

24   Eminem Agreements, they are specifically incorporated into the terms.  In both the

25   1998 and 2003 Agreements, the parties agreed that they were entering into the

26   material terms of an agreement, but that they would later enter into a long form

27   agreement that spelled out in more detail their rights and obligations to one another.

28   (Ex. A at 33; Ex. D at 84.)  In the event a long form is not entered into, as it was not

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

here, the parties agreed that they would "negotiate in good faith" an agreement that included "all of the provisions usually included in 'high end' recording agreements." *Id*. In this action, Plaintiffs demand a royalty treatment that there is no evidence any artist, "high end" or otherwise, has ever been able to negotiate in the era of mainstream digital distribution. To the contrary, the evidence will show that when "high end" artists enter into agreements that explicitly address how permanent downloads are accounted for, those "high end" artists do not receive close to the royalty treatment Plaintiffs here claim to be entitled to. Typically, they receive what the Plaintiffs receive today – the artist's royalty rate for "records sold." The fact that, in the era of widespread digital distribution, Plaintiffs have no evidence that any artist has received the royalty treatment Plaintiffs now claim to be entitled to is strong evidence that no reasonable negotiator would have given it to them in 1998 or 2003. *See Welles v. Turner Entertainment Co*., 503 F.3d 728, 734 (9th Cir. 2007) (in case involving parties' understanding regarding future technology rights under a contract, a court "look[s] for the meaning that reasonable persons in the positions of the parties would have attached had they thought about the matter."). Indeed, Plaintiffs failure to agree to terms comparable to those found in "high end" recording agreements pursuant to their contractual obligation represents a failure of performance on their part, which is an additional reason their First Cause of Action fails.

### D. Plaintiffs' Extrinsic Evidence Is Inadmissible And In Any Event Irrelevant.

Plaintiffs do not even try to rely on any of the traditional sources of extrinsic evidence typically considered in interpreting a contract. Rather than present evidence of the parties' understanding of the competing royalty provisions, of their performance under the agreements, or of drafts of the agreements, Plaintiffs will focus at trial instead on evidence that has no relationship to what the parties meant when they entered into the Eminem Agreements.

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

1    First, Plaintiffs make the extraordinary claim that the Eminem Agreements

2    are "contracts of adhesion" that must be construed against Aftermath.  A contract of

3    adhesion is "a standardized contract, which, imposed and drafted by the party of

4    superior bargaining strength, relegates to the subscribing party only the opportunity

5    to adhere to the contract or reject it." *Neal v. State Farm Ins. Co.*, 188 Cal. App. 2d

6    690, 694 (1961).  That definition is plainly in applicable here to either the 1998 or

7    the 2003 Agreements.[9]

8    In 1998, Eminem and Plaintiff F.B.T. were represented by counsel who made

9    suggested revisions and edits to the drafts of the recording agreement.  Far from a

10    "take-it-or-leave-it" offer, the 1998 Agreement evolved with each revision as the

11    parties negotiated.  Eminem's counsel, Paul Rosenberg, asked for extensive

12    changes, and later drafts reflected his comments.  And there is no conceivable

13    world in which the 2003 Agreement may be considered a "contract of adhesion."

14    By 2003, Eminem was a world-class superstar.  That was reflected in the lucrative

15    advance he received as part of the 2003 Agreement. (Ex. D, ¶ 4(a) at 86).  He also

16    was represented by Gary Stiffelman, a prominent music lawyer.  It is implausible,

17    to say the least, to suggest that any aspect of the 2003 Agreement was a "contract of

18    adhesion."

19    Second, Plaintiffs have scoured the Internet looking for any reference in any

20    inapposite context to the word "license" uttered by any senior executives at Apple

21    and Universal in relation to online music distribution.  Although the executives who

22    made the statements Plaintiffs point to had no role in the negotiation of the Eminem

23    Agreements – and, indeed, had never seen the Eminem Agreements at the time the

24    [9] Moreover, the principle of construing a contract against its drafter is not a

25    substantive rule applied in all cases.  It only applies as a last resort to contract

26    construction, when all other interpretive rules have failed to eliminate ambiguity.
In the standard jury instructions on California law, an instruction to interpret a

27    contract term against the drafter "should only be given to a deadlocked jury, so as
to avoid giving them this tool to resolve the case before they have truly exhausted
the other avenues of approach."  CACI, Civil Jury Instructions § 320

28    ("Interpretation - Construction Against Drafter").

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

statements were made – Plaintiffs attempt to use these public statements to show that UMG's agreements with digital distributors are "licenses" as that term is used in the Eminem Agreements.   Stray uses of the word "license" years after the fact by people with no connection to the Eminem Agreements cannot illuminate the Agreements' terms. *See General Motors Corp. v. Superior Court*, 12 Cal. App. 4th 435, 442 (1993) (admissible extrinsic evidence is evidence relevant to show what the *parties* understood "at the time the [contract] was executed").

Third, Plaintiffs have gathered examples of different parties – not Plaintiffs – who have advocated for the same position Plaintiffs here advance.  In March of 2004, a group of artists' representatives wrote a letter to the heads of the major record companies, arguing that revenue from the sale of permanent downloads and mastertones is properly treated under the "masters licensed" provision of artist agreements rather than the "records sold" provision.  The letter makes no reference to the Eminem Agreements (or to any other specific recording agreement).  Two of the lawyers who signed the letter – Peter Paterno and Gary Stiffelman  – were negotiators of the Eminem Agreements.  Peter Paterno negotiated on behalf of Aftermath in 1998 and 2003, and Gary Stiffelman negotiated on behalf of Eminem in 2003 and 2004.  The 1998 and 2003 Eminem Agreements, however, predate the letter significantly, and there is no evidence that either Paterno or Stiffelman espoused these views in the context of those negotiations.  Paterno, in fact, disavowed the letter at the time it was signed, as was revealed when Plaintiffs subpoenaed his internal communications with his law partners.  Stiffelman negotiated the subsequent 2004 Amendment, which directly conflicts with the position set forth in the letter.  If Stiffelman held the belief the letter attributes to him in March of 2004 specifically with regard to the Eminem Agreements, the conflicting position in the November 2004 Amendment suggests that he ultimately agreed to a contrary position.

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

Fourth, Plaintiffs dissect UMG's wholly separate agreements with digital distributors and attempt to prove that those agreements are "licenses" of the Eminem "masters."  Plaintiffs have scoured the five-hundred-plus agreements with third-party digital distributors Defendants have produced in this action, searching for stray uses of the term "license." They have cherry-picked those agreements that they think contain terms that are found in "licenses," as that term is understood under the copyright law.  They have hired a Berkeley law professor to review the cherry-picked agreements (and only these), and to opine on whether the agreements are "licenses," as those terms are understood under the copyright law, rather than under the parties' understanding of what types of transactions would be encompassed within the "masters licensed" provision.

As a matter of contractual interpretation, the term "license" in the Eminem Agreements must be interpreted to mean what the parties understood it to mean. *See Molybdenum Corp. of America v. Kasey*, 176 Cal. App. 2d 357, 363 (1959) (extrinsic evidence admissible to "clarify the intent of the *parties* in the contractual language which they used.") (emphasis added).  The parties to the Eminem Agreements did not understand section 5(c)(v) to apply whenever a third-party agreement used the term "license."  Nor is there any evidence they intended to import wholesale concept of copyright law into the Eminem Agreements.  Indeed, in contracts like the Eminem Agreements, when the parties are all involved in the same "trade," the "plain, ordinary, popular or legal meaning" of words may be trumped by a particular "trade usage."  *See Ermolieff v. R.K.O. Radio Pictures*, 19 Cal. 2d 543, 550 (1942).  The evidence shows that by "masters licensed to others for their manufacture and sale of records or for any other uses," the parties meant two things:  compilation records and "master use" licenses for use of the master in movies, TV shows or commercials.  It is not a copyright law definition.[10]

---

[10] Even if Plaintiffs' analytical framework were somehow relevant to what the Eminem Agreements mean, Plaintiffs' emphasis on single words in the contracts or copyright law concepts is misplaced.  The agreements use words like

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

Finally, Plaintiffs make many arguments about what it costs Universal to distribute records as permanent downloads and mastertones, claiming that a decrease in Universal's manufacturing and distribution costs requires the application of a more favorable royalty rate. Nothing in the Eminem Agreements provides for different royalty provisions to apply if distribution technology becomes more efficient and less expensive. The "records sold" royalty provisions are meant to apply regardless of whether distribution models become more or less efficient. Arguments about Universal's decreased costs – like Plaintiffs' entire First Cause of Action – are merely an attempt to renegotiate a more favorable royalty rate through litigation, which will ultimately fail.

## IV. PLAINTIFFS' SECOND CAUSE OF ACTION: BREACH OF THE EMINEM AGREEMENTS IN THE ALLOCATION OF COSTS

### A. Summary of Plaintiffs' Second Cause of Action

Plaintiffs' Second Cause of Action alleges that Aftermath breached the Eminem Agreements by failing to account and pay them the correct royalty amounts due, as purportedly reflected in Plaintiffs' 2005 audit report and Aftermath's response thereto. Plaintiffs do <u>not</u> specify which portion of the Eminem Agreements Aftermath is alleged to have breached. Rather, Plaintiffs state that, "for example and without limitation" Aftermath has "incorrectly calculated the royalty payable to certain producers." Second Amended Compl., ¶ 45-46. The

---

"sale" or "license" interchangeably to communicate concepts of permission or authorization. In any event, the use of a particular label or word within an agreement is not what defines whether the transaction as a "sale" or a "license." Rather, the "economic realities" of the transaction govern. *See Microsoft Corp. v. DAK Indus.*, 66 F.3d 1091, 1095 (9th Cir. 1995); *SoftMan Prod. Co. v. Adobe Sys., Inc.*, 171 F. Supp. 2d 1075, 1084 (C.D. Cal. 2001). Analyzing that economic reality, Universal's relationships with digital providers are ordinary wholesaler-retailer relationships. Universal, Aftermath's distributor, sells Aftermath records at a wholesale price. The digital distributor (be it Apple or a mastertone provider) then resells that Aftermath record to customers at a retail price. Beyond the increased efficiencies that digital distribution provides, these wholesale-retail transactions are no different from the sale of physical records through brick-and-mortar record stores. The artists' royalty treatment simply follows the economic reality of the transaction.

6652685.2

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

only specific allegation that Plaintiffs make in this regard is that Aftermath purportedly has acknowledged that Plaintiffs were underpaid $159,333 on the basis of certain recording cost allocations. Plaintiffs assert that they seek damages for Aftermath's alleged incorrect calculations in "at least" that amount.

### B.    Elements of Plaintiffs' Second Cause of Action

Under California law, Plaintiffs breach of contract claim requires them to prove the following elements: (1) the parties entered into a contract, (2) Plaintiffs performed or were excused from performing all that was required under the contract, (3) the Defendants breached the contract, and (4) Plaintiffs suffered damages as a result. *See* CACI, Civil Jury Instruction No. 303 ("Breach of Contract - Essential Factual Elements"). Plaintiffs will lose the Second Cause of Action at trial because they cannot prove Defendants have breached the Eminem Agreements.

### V.    AFTERMATH'S CONTENTIONS OF FACT AND LAW IN RESPONSE TO PLAINTIFFS' SECOND CAUSE OF ACTION.

Plaintiffs have made it difficult for Aftermath to respond to their Second Cause of Action because they have stated it so generally and so amorphously. Plaintiffs' Second Cause of Action alleges a purported failure by Aftermath to properly allocate "producer costs," and says that Aftermath has admitted this error, and an underpayment to Plaintiffs in the claimed amount of $159,332, in Aftermath's response to Plaintiffs' 2005 Audit Report. However, Plaintiffs try to leave themselves wiggle room in the complaint to assert ***other*** claimed errors purportedly identified in the Audit Report. Plaintiffs state that the alleged "producer cost" error giving rise to the claim for $159,332 is "***For example and without limitation***." (Second Am. Compl. ¶ 45 (emphasis added).)

Plaintiffs' Second Cause of Action fails for several reasons. First, Plaintiffs allege that Aftermath admitted that it mis-allocated what Plaintiffs call "producer costs." As Aftermath explained in its response to Plaintiffs' audit, however,

Aftermath accounted for "producer costs" correctly.  Second, there is more to Aftermath's claimed "admission" of owing $159,332 to Plaintiffs than Plaintiffs indicate.  What Aftermath actually said in response to Plaintiffs' 2005 Audit Report was that Aftermath had inadvertently allocated certain recording costs between Eminem and Plaintiffs in such a way as to over-compensate Eminem, and to simultaneously under-compensate Plaintiffs.  Aftermath has repeatedly requested that Plaintiffs obtain confirmation from Eminem that he agrees with the mis-allocation of costs, so that Aftermath is not subject to having to pay the same amounts twice.  This should not be a difficult confirmation for Plaintiffs to provide, given that they and Eminem shared the same auditor who purported to identify the error.  Plaintiffs, however, have refused to provide the requested confirmation.  Third, Aftermath's purported "admission" of this error was part of an audit counter-claim, to which the claimed $159,332 is subject.  Fourth, Plaintiffs have not provided the contractually required notice for any element of the audit (excepting the disagreement over permanent downloads included in the First Cause of Action) other than the $159,332.  Hence, any other elements of Plaintiffs' 2005 Audit Report that Plaintiffs have (or could have) asserted in their Second Cause of Action are now extinguished.

## VI.    PLAINTIFFS' THIRD CAUSE OF ACTION:  FOR DECLARATORY RELIEF ON THEIR FIRST CLAIM

Plaintiffs' third cause of action seeks a judicial declaration that Aftermath is obligated to pay royalties for the distribution of permanent downloads and mastertones under the "masters licensed" provision, at a rate of 50% of net receipts.  This is simply Plaintiffs' first cause of action recast as a declaratory judgment claim.

The elements of a claim for declaratory relief are (1) a justiciable controversy; and (2) a demonstration that the claim is a proper subject for declaratory relief. 28 U.S.C. § 2201(a); *Government Employees Ins. Co. v. Dizol*,

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

133 F.3d 1220, 1222 (9th Cir. 1998).  Declaratory relief is appropriate where the judgment will "serve a useful purpose in clarifying and settling the legal relations in issue, and ... will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *DeFeo v. Procter & Gamble Co.,* 831 F. Supp. 776, 778 (N.D. Cal. 1993) (quoting *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986)).

However, when the claim for declaratory relief merely echoes the determination of rights necessary to resolve a claim for breach of contract, the declaratory relief claim is superfluous, and the Court may dismiss it.  *Douros v. State Farm Fire & Cas. Co.*, 508 F. Supp. 2d 479 (E.D. Va. 2007) (concluding that a breach of contract would be more appropriate to determining liability than the declaratory judgment claim); *FCE Benefit Adm'rs, Inc. v. George Washington University*, 209 F. Supp. 2d 232 n.16 (D.D.C. 2002.) (noting that the request for declaratory relief was unnecessary); *Pakideh v. Ahadi,* 99 F. Supp. 2d 805, 808-09 (E.D. Mich. 2000) (declaratory judgment request duplicative of simple breach of contract action for damages); *Kinghorn v. Citibank, N.A.,* 1999 WL 30534 (N.D. Cal. 1999) ("Where a party seeks declaratory relief and a substantially similar alternative remedy, the court may exercise its discretion to dismiss the declaratory judgment claim.").

## VII.   AFTERMATH' CONTENTIONS OF FACT AND LAW IN RESPONSE TO PLAINTIFFS' THIRD CAUSE OF ACTION

Plaintiffs' request for declaratory relief is superfluous.  Once the Court and the jury adjudicate Plaintiffs' affirmative breach claim in their First Cause of Action, there will be no need for a declaration.  In any event, Plaintiffs' declaratory relief claim is simply a carbon copy of Plaintiffs' first cause of action, and it fails for all the reasons discussed above.

## VIII. AFTERMATH'S AFFIRMATIVE DEFENSES

### A. Statute of Limitations

The applicable statute of limitations for a breach of contract action in California is four years. Cal. Civ. Proc. Code § 337. Plaintiffs may not obtain damages for harm that occurred outside the limitations period. Plaintiffs' initial complaint was jurisdictionally defective, and the Court issued an order to show cause why it should not be dismissed on May 23, 2007. Plaintiffs thereafter replaced that complaint with their first amended complaint, on June 13, 2007, which included the first and third causes of action discussed above. Plaintiffs filed their second amended complaint, which added the second cause of action discussed above, on June 10, 2008.

To prove the defense that harm occurred outside the relevant limitations period, Aftermath must show that Plaintiffs seek damages from acts that occurred more than four years earlier than the filing of the Complaint. *See* CACI, Civil Jury Instructions § 338 (Affirmative Defenses - Statute of Limitations). On the first cause of action, Aftermath will show that any damages claimed to have accrued before June 13, 2003, are time-barred. On the second cause of action, Aftermath will show that any damages claimed to have accrued before June 10, 2004, are time-barred.

### B. Waiver/Estoppel

The elements of the defense of waiver are that (1) Plaintiffs knew Aftermath was supposed to calculate royalties in a particular way under the Eminem Agreements (2) but gave up their asserted right to have Aftermath perform those obligations differently. *See* CACI, Civil Jury Instructions § 336 (Affirmative Defenses - Waiver). Estoppel requires, in addition, Aftermath's reasonable reliance on Plaintiffs' knowing conduct. *See, e.g., DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe*, 30 Cal. App. 4th 54, 59-60 (1994).

The evidence will show that Plaintiffs knew that Aftermath was accounting for permanent downloads as "records sold" since the introduction of permanent downloads into the market place in or around 2002.  Plaintiffs, however, never objected to Aftermath's royalty calculation for download sales until years later, in June 2006.  Under the circumstances, Plaintiffs have waived their right to object to Aftermath's royalty calculation based on the "records sold" provision.  In addition, Aftermath has reasonably relied on Plaintiffs' acceptance of royalties pursuant to the contracts' provisions for the sale of records "through normal retail channels."

## C.    Set-off

Under the doctrine of set-off, "[e]ither party to a transaction involving mutual debits and credits can strike a balance, holding himself owing or entitled only to the net balance."  *Carmel Valley Fire Protection Dist. v. California*, 190 Cal. App. 3d 521, 550 (1987).   A claim of set-off in an answer is a "defense of payment in that the two demands are compensated so far as they equal each other."  Cal. Code Civil Proc. § 431.70.

Any damages claim that Plaintiffs may obtain against Aftermath would be subject to a set-off.  On the First Cause of Action, Aftermath is entitled to a set-off not only of the royalty amounts it has paid to Plaintiffs, but also a set-off to account for the charges and deductions (including the "new medium" deduction of 25% off the otherwise applicable royalty rate) for any royalties claimed to be owed to Plaintiffs.  On the Second Cause of Action, Aftermath is entitled to a set-off of all damages claimed by Aftermath's counter-claim in response to Plaintiffs' audit report.

## D.    Failure to Provide Notice

Aftermath cannot be in breach of the Eminem Agreements unless Plaintiffs have given notice of their claim and a 30-day opportunity for Aftermath to cure. (Ex. A, ¶ 15(b) at 44; Ex. D, ¶ 15(b) at 99).

6652685.2

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Plaintiffs failed to give notice of all claims other than the claim relating to the royalty for permanent downloads asserted in the First Cause of Action and the claim for $159,332 asserted in the Second Cause of Action. The failure to provide notice as to any other claim asserted in Plaintiffs' accounting audit and that Plaintiffs may have attempted to assert in their Second Cause of Action means that Plaintiffs are precluded from pursuing such claims.

###    E.    Failure to Mitigate

Plaintiffs are under a duty to mitigate their claimed damages. As to their Second Cause of Action, Plaintiffs have failed to mitigate their claimed losses. As Aftermath has said since its response to Plaintiffs' 2005 Audit Report, the claimed under-compensation of Plaintiffs because of recording cost allocations resulted in a corresponding *over*-compensation to Eminem. Aftermath has repeatedly requested that Plaintiffs obtain confirmation from Eminem that he agrees with the mis-allocation of costs, in which case Eminem could correct the allocation with a payment of the difference directly to Plaintiffs. Doing so would be simple, given that Plaintiffs and Eminem shared the same auditor who purported to identify the error. Plaintiffs, however, have steadfastly refused to avail themselves of this avenue to make themselves "whole" on the $159,332 claim.

## IX.    ANTICIPATED EVIDENTIARY ISSUES

###    A.    Parol Evidence

This case is all about the proper interpretation of the Eminem Agreements. Because the plain language of the Eminem Agreements does not support Plaintiffs' royalty treatment, Aftermath expects that Plaintiffs will attempt to rely on extrinsic evidence. Under California law, extrinsic evidence is inadmissible if the contractual text is not "reasonably susceptible" to Plaintiffs' competing interpretation. *See Wagner v. Columbia Pictures Industries, Inc*., 146 Cal. App. 4th 586, 590 (2007). The parties will dispute whether the Eminem Agreements are "reasonably susceptible" to Plaintiffs' competing interpretation. If the Court

DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

considers extrinsic evidence, the parties will dispute what pieces of extrinsic evidence have any bearing on the meaning of the Eminem Agreements.  Most of Plaintiffs' extrinsic evidence consists of evidence unrelated to what the parties intended when they entered in to the Eminem Agreements.  For example, Plaintiffs rely heavily on stray and irrelevant uses of the word "license" by persons, such as Steve Jobs, unconnected to the negotiation, formation or performance of the Eminem Agreements.  Extrinsic evidence unrelated to the parties' intent is irrelevant and inadmissible.

### B.    Hearsay

Plaintiffs have elected to pursue this action without deposing or choosing to call as a witness the recording artist who is a party to the Eminem Agreements, namely, Eminem.  Plaintiffs have indicated in pretrial filings that they will attempt to describe purported facts or circumstances concerning Eminem's signing and the experience and conduct of one of Eminem's lawyers (Paul Rosenberg, also not on Plaintiffs' witness list) without calling those individuals.  Defendants will object (among other grounds, including without limitation lack of relevance or Fed. R. Evid. 403) to any attempt by Plaintiffs to introduce evidence that is hearsay.

### C.    In Limine Motions

Defendants filed seven timely in limine motions on December 19, 2008.  Those motions are:

1.    To exclude the putative expert testimony of Plaintiffs' "legal expert," Law Professor Peter S. Menell, on the grounds he may not offer opinion testimony on legal issues and/or that certain of his opinions lack any proper foundation.

2.    To exclude the opinion of Plaintiffs' putative industry "custom and practice" expert David Berman as unreliable under Fed. R. Evid. 702 and *Daubert* and as in violation of his contractual and ethical duties to his former employer, Geffen Records, Inc.

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

3. To exclude the opinion of Plaintiffs' putative damages expert Gary Cohen as unreliable.

4. To exclude a March 24, 2004 letter to the major record companies as hearsay that is irrelevant to the meaning of the Eminem Agreements and more prejudicial than probative under Rule 403.

5. To preclude Joel Martin and Mark Levinsohn from testifying about the intent of the parties to the Eminem Agreements or the meaning of the pertinent terms therein.

6. To exclude evidence of parties unconnected to the Eminem Agreements' using the word "license."

7. To exclude references to alleged statements made regarding "licensing" musical compositions in *Eight Mile Style, LLC et. al. v. Apple Computer*, *Inc.* et. al., a case pending in the Eastern District of Michigan brought by the same Plaintiffs-in-interest through two other LLCs, represented by the same counsel.

## X. **BIFURCATION OF ISSUES**

No request has been made to bifurcate issues for trial in this matter.

## XI. **JURY TRIAL**

Plaintiffs requested a jury trial, but not every issue in this case is triable to the jury. The proper interpretation of the Eminem Agreements is for this Court to decide. *See Wolf v. Walt Disney Pictures and Television*, 162 Cal. App. 4th 1107, 1125 (2008). The jury decides questions of fact related to the construction of the Eminem Agreements but only if those questions give rise to conflicts in the evidence that a finder-of-fact must resolve. *Id*. at 1134 & n. 18 If the only conflict concerns the inferences to be drawn from evidence – and not the truth *vel non* of a piece of factual evidence – the Court decides what inference is properly drawn. *Id*.

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW

## XII.  ATTORNEY'S FEES

The Eminem Agreements provide for attorney's fees to the prevailing party in a dispute.  (Ex. D, ¶ 25 at 106).  Aftermath will seek attorney's fees upon prevailing at trial.  Aftermath assumes the attorney's fees proceeding will be based on an evidentiary submission and briefing according to the relevant standards, with an evidentiary hearing if the Court believes one is necessary.

## XIII.  ABANDONMENT OF ISSUES

As stated above, it appears that Plaintiffs have abandoned all claims alleged to arise out of the audit other than those set forth in their claimed notices of breach and in the operative Second Amended Complaint.  As to the Second Cause of Action, this means an apparent abandonment by Plaintiffs of all but their claim for $159,332 based on allegations of a mis-allocation of certain recording costs.

Aftermath intends to pursue those affirmative defenses included in this Memorandum.


DATED:  December 22, 2008          MUNGER, TOLLES & OLSON LLP


By:   /s/ Melinda E. LeMoine
          Melinda Eades LeMoine

Attorneys for Defendants

DEFENDANTS' MEMORANDUM OF
CONTENTIONS OF FACT AND LAW