Richard S. Busch (TN Bar No. 014594) (*pro hac vice*)
rbusch@kingballow.com
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456    Facsimile: (615) 726-5417

Paul H. Duvall (State Bar No. 73699)
pduvall@kingballow.com
KING & BALLOW
9404 Genesee Avenue, Suite 340
La Jolla, CA 92037-1355
(858) 597-6000    Facsimile: (838) 597-6008

Mark L. Block (State Bar No. 115457)
mblock@glaserweil.com
GLASER, WEIL, FINK, JACOBS, & SHAPIRO, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
(310) 553-3000   Facsimile: (310) 556-2920
Attorneys for Plaintiffs F.B.T. Productions, LLC and Em2M, LLC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| F.B.T. PRODUCTIONS, LLC, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT, et al.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. CV 07-03314 PSG (MANx)<br><br>**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>**[L.R. 16-4]**<br><br>**Honorable Philip S. Gutierrez**<br><br>**Discovery Cut-Off:  Nov. 3, 2008**<br>**Final Pretrial Conference:  Jan. 12, 2009**<br>**Jury Trial:  Feb. 3, 2009** |

I.    FACTS COMMON TO ALL CLAIMS...........................................................1

    A.    Aftermath/F.B.T. Agreements................................................1

        1.    1995 Agreement between F.B.T. and Eminem..............................1

        2.    The 1998 Recording Agreement....................................................1

        3.    The 2000 Novation ...................................................................2

        4.    The 2003 Recording Agreement....................................................3

        5.    The 2004 Amendment................................................................4

    B.    The Royalty Audit....................................................................5

II.    FACTUAL CONTENTIONS COMMON TO COUNTS 1 AND 3................6

    A.    Defendants' Contracts with Third Party Permanent Download and

        Mastertone Providers ..............................................................6

    1.    Permanent Download Agreements ...........................................6

    2.    Mastertone Agreements............................................................8

    B.    Defendants and the Download Providers All Acknowledge these

        agreements to be Licenses........................................................9

    C.    Defendants' Royalty Treatment of Revenues from Digital Uses........11

    1.    Protests of Defendants' Royalty Decision by Artist Representatives .......11

    D.    Defendants' Royalty Treatment of Third Party Compilation Albums

        and other Licenses of Masters..................................................12

    E.    The Economic Considerations Concerning Royalty Payments for

        Permanent Downloads and Mastertones are the same as those for other

        Licensed Uses  ........................................................................13

III.    PLAINTIFFS' CLAIMS AND DEFENDANTS' AFFIRMATIVE

DEFENSES        ...........................................................................................15

    A. Count 1: Breach of Contract ............................................................15

        1. Facts and Law Supporting the Claim ...................................15

        2. Defendants' defenses .......................................................16

**B. Count 2: Breach of Contract** ...........................................................................21

    **1. Facts and Law Supporting the Claim** ...............................................21

    **2. Defendants' defenses** ...........................................................................22

**C. Count 3: Declaratory Judgment** ..................................................................24

    **1. Facts and Law supporting the claim** ..................................................24

    **2. Defendants' defenses** ...........................................................................25

**IV. Anticipated Evidentiary Issues** ....................................................................25

**V. Issues of Law** ...............................................................................................26

    1.    **Whether defendants' relationships with permanent download and Mastertone providers constitute licenses of the Eminem masters** ..........27

    2.    **If defendants' relationships with permanent download and Mastertone providers constitute licenses, whether the Master License provision of the 1998 and 2003 Recording Agreements specifies the applicable royalty** .........................................................................................28

    3.    **If the 1998 and 2003 Recording Agreements, the 2000 Novation, or the 2004 Amendment to the 2003 Recording Agreement is ambiguous, whether they should be construed against defendants** ...........................29

**VI.    JURY TRIAL** ..........................................................................................29

**VII.    ATTORNEY'S FEES** .............................................................................29

**VIII.  ABANDONMENT OF ISSUES** ...............................................................29

# I.    FACTS COMMON TO ALL CLAIMS

## A. Aftermath/F.B.T. Agreements

### 1.    1995 Agreement between F.B.T. and Eminem

Jeff and Mark Bass are the individuals who, in approximately 1995, discovered the budding rapper Marshall B. Mathers, III p/k/a Eminem ("Eminem") and signed him to their production company, F.B.T. Productions.  F.B.T. was formed in or around 1995 and was unaffiliated with any large or well-established entity in the music business.  Pursuant to their agreement with Eminem, F.B.T. was engaged to produce records containing master recordings of performances by Eminem.  Joel Martin serves as the managing agent of F.B.T. and has been granted a share of F.B.T.'s royalties payable under its agreements with and involving Eminem.   Mr. Martin later formed plaintiff Em2M, LLC ("Em2M") and assigned it his royalty share; Mr. Martin is the sole member of Em2M.

### 2.    The 1998 Recording Agreement

Eminem's debut album, *Infinite,* was released in approximately 1996 but was not commercially successful, selling only a few copies.  Eminem was little known as a rap artist outside the Detroit area and was represented by Paul Rosenberg, a lawyer fresh from law school with little professional experience in the music industry who, as of 1998, had never negotiated a contract with a major record label.

Eminem remained in relative obscurity until coming to the attention of Jimmy Iovine, head of Universal Music Group's label Interscope Records, and the well-known rap artist and record producer Andre Rommel Young, Jr., p/k/a Dr. Dre.  Mr. Martin and Jeff and Mark Bass pooled funds to arrange a trip to Los Angeles for Eminem and to meet with Interscope Records executives, and Dr. Dre decided to offer Eminem a record deal.  Aftermath and Interscope's representatives presented him with a form based on prior Aftermath agreements and, because Dr. Dre "wanted Eminem signed quickly," the deal was finalized in just four or five days.  Although drafts do show Eminem was able to negotiate some increased advances, the royalty provisions

remained largely unchanged throughout the negotiation process.  No other record label was negotiating for Eminem's services at that time.

The 1998 Recording Agreement provides a royalty for "full-price records sold in the United States" that varies from 12% to 20% of the "Suggested Retail List Price."  The 1998 Recording Agreement further states, however, that "notwithstanding the foregoing" "on masters licensed by us or our NRS licensees to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from those other uses of the masters" (the "Master License" provision).

Master License provisions are contained in many artist recording agreements, the purpose of which is to provide a higher royalty when the record company licenses the master recordings to third parties, since in such situations the record company does not incur the expensive incremental costs associated with manufacturing and distributing potentially millions of records associated with a release.  The Master License provision is a catch-all intended to encompass all licensed uses of the master recordings that had not been thought of or provided for in the recording agreement.  The Master License provision in the 1998 Recording Agreement is particularly broad, since, on its face, it applies to licenses whether they are for the "manufacture and sale of records" or for "any other uses."  Record companies pay under the "record royalty" provision when they reproduce, distribute and sell records through infrastructure they own or control, but pay 50% of the money they receive when they license masters and a third party then reproduces and sells records through *its* infrastructure.

Peter Paterno, whose firm represents Aftermath and whose office drafted the 1998 Recording Agreement, later executed a letter in which he took the position that Master License provisions such as the one in the 1998 Recording Agreement covered permanent downloads.

3.    The 2000 Novation

An agreement dated September 27, 2000 (the "2000 Novation") altered the legal relationship among F.B.T., Eminem and Aftermath to give Aftermath a direct relationship with Eminem.  Plaintiffs retained a right to royalty income under this agreement.  Aftermath agreed to render separate accountings to FBT and Eminem, and the 2000 Novation specified the royalty share of each.

The 2000 Novation increased the royalties payable for certain sales of records, removed or modified the reductions on some configurations (e.g., CDs), and amended various other provisions of the 1998 Recording Agreement.  The 2000 Novation made no changes to the Master License provision and made no reference to permanent downloads or any other digital configuration.[1]

### 4.    The 2003 Recording Agreement

A new term artist agreement dated July 2, 2003 was entered into between Aftermath and Eminem (the "2003 Recording Agreement") which, by its terms, terminated the term of the 1998 Recording Agreement.  By this time, Eminem had been a superstar recording artist for several years, having released hugely successful records in 1999, 2000 and 2002; Eminem had also starred in the movie *8 Mile* and a number of songs by Eminem were featured prominently in the movie.

The 2003 Recording Agreement made a number of changes, increasing advances and royalty percentages as befit Eminem's increased stature.  Although F.B.T. was no longer "furnishing the services" of Eminem (as it had been under the 1998 Recording Agreement) due to the 2000 Novation, both F.B.T. and Joel Martin/Em2M remained royalty participants.  Although certain royalties, such as those for sales of LPs, were increased in the 2003 Recording Agreement, the structure and

---

[1] While Compact Discs are digitally encoded (as opposed to the "analog" encoding on, for example, vinyl records) the phrase "digital configuration" and similar phrases such as "digital uses" are used herein to apply only to digital formats intended for transmission over the internet or mobile phone networks.

wording of the royalty provisions was not altered.  The Master License provision went substantively unchanged.[2]

5.     The 2004 Amendment

An amendment was made to the 2003 Recording Agreement dated November 1, 2004 (the "2004 Amendment").  The 2004 Amendment increased the advance for an upcoming LP and changed the share of plaintiffs' passive income participation, among other things.  The amendment is the only one of the agreements between plaintiffs and defendants which contains any explicit reference to permanent downloads or Mastertones.  In the course of negotiating this amendment, Eminem's representative, Gary Stiffelman, asked that a provision be inserted stating that permanent downloads of *albums* would be tallied as sales for the purposes of escalations.  The resulting language reads:

> Sales of Albums by way of permanent download shall be treated as USNRC Net Sales *for the purposes of escalations*, provided that the sales price concerned falls within a top-line sales price category applicable to such method of sale.

This sentence was inserted only because Mr. Stiffelman specifically requested that the amendment specify that permanent downloads of albums would count toward escalations in the 2003 Recording Agreement, and the language was phrased to limit its application to escalations because that is all Mr. Stiffelman requested.  The language explicitly limits its effect to permanent downloads of *albums* and has no effect on the treatment of permanent downloads of single songs or of Mastertones, as defendants' expert witness admits.

The phrasing of the language described above in the 2004 Amendment stands in stark contrast to similar language in a 2003 Interscope "form" contract.  The final sentence of paragraph 9.01(c)(i) of a 2003 Interscope form recording agreement reads,

---

[2] Certain paragraphs were renumbered, and the Master License provision now fell in paragraph 5(c)(v).  Also, the reference to "NRS" Licensees in the 1998 Master License provision was deleted; defendants have explained that the reference to "NRS" in the 1998 Recording Agreement was inconsequential.

1    "Sales of Albums by way of Permanent Download shall be treated as USNRC Net

2    Sales *for the purposes of Article 9 hereof*, provided that the sales price concerned falls

3    within a top-line sales price category applicable to such method of sale."  (Emphasis

4    added.)  Article 9 of the Standard Terms is titled "Royalties" and is "the entire section

5    [] that relates to royalties," according to defendants' expert witness.  The sentence

6    referencing permanent downloads in the 2004 Amendment is identical but replaces

7    "for the purposes of Article 9 hereof" with "for the purposes of *escalations*."

8    (Emphasis added.)

9          Finally, the 1998 Recording Agreement is not affected at all by the 2004

10   Amendment, which by its express terms is an amendment of the 2003 Recording

11   Agreement, only.

12   **B. The Royalty Audit**

13         A royalty audit conducted by the Gary Cohen Corporation on behalf of

14   plaintiffs and Eminem covering the period January 1, 2002 to June 30, 2005 showed

15   UMG was paying plaintiffs royalties on permanent downloads and Mastertones based

16   on the royalty applicable to full price records sold by defendants in the United States

17   instead of the rate under the Master License provision.  This royalty treatment resulted

18   in an underpayment of over $650,000 to plaintiffs and Eminem through June 30, 2005,

19   the period covered by the audit.  Through April 2008, this underpayment has reached

20   at least $1,340,754.

21         The audit revealed numerous other accounting inconsistencies separate and

22   apart from the digital issue discussed above.  Defendants' written response to the

23   audit, a letter dated May 8, 2007, denied almost all the claims in the audit, including

24   the digital claim described above, but admitted an underpayment to F.B.T. of $159,332

25   stemming from incorrect allocation of costs as between Eminem and plaintiffs.

26   UMG's 30(b)(6) witness in this action admits that the $159,332 is owed to plaintiffs,

27   and could not articulate any potential set-off amounts.

28

On February 27, 2007, plaintiffs sent a letter, pursuant to paragraph 15(b) of the 1998 and 2003 Recording Agreements, giving defendants notice that they were in breach of those agreements by failing to pay plaintiffs the appropriate royalty for permanent downloads and Mastertones, and demanding that defendants cure such breach.  On March 21, 2007, defendants replied by letter, rejecting plaintiffs'' demand. On November 26, 2007, plaintiffs sent a letter, pursuant to paragraph 15(b) of the 1998 and 2003 Recording Agreements giving defendants notice they were separately in breach of those agreements from their failure or refusal to remit payments on the other claims in the audit report, including the $159,332 that defendants conceded plaintiffs were owed.

## II.    FACTUAL CONTENTIONS COMMON TO COUNTS 1 AND 3

### A. Defendants' Contracts with Third Party Permanent Download and Mastertone Providers

Defendants have entered into agreements with third party digital download and Mastertone providers under which the master recordings at issue in this action have been licensed to such third parties.  Among other things, the licenses authorize those third parties to reproduce, distribute, and sell permanent downloads and Mastertones of the master recordings involved herein.  Defendants have produced approximately eighty such agreements.

With the exception of several Mastertone agreements drafted by the third party Mastertone providers (Cingular, Sprint, Nextel, T-Mobile), rather than by defendants, the agreements are similar in terms of the rights granted to the third parties and their general structure,  Defendants have confirmed that the process by which digital files are transferred to the third party digital download providers and then offered and reproduced for end-users, are largely identical.

### 1.    Permanent Download Agreements

Those agreements license to the third parties numerous rights, including the right "to make available to End Users Downloads" of defendants' sound recordings

and "to make Reproductions of" defendants' sound recordings as they are necessary to allow the permanent downloads to take place.  The agreements also make it clear that no ownership interest in the defendants' sound recordings is being granted, including any copyright ownership interest.  Other provisions give defendants the right to terminate the agreements at any time and to demand that the third party cease selling some or all of defendants' master recordings licensed to it.  "[A]ny and all rights not expressly granted" in the agreements are reserved to defendants, and other specific limitations (such as territorial limitations) are spelled out.  Upon termination of one of these agreements, the third party permanent download provider is required to immediately stop offering defendants' sound recordings on its service, return any physical CDs received from defendants, and destroy all digital files embodying defendants' sound recordings.

The agreements are structured such that, for each song (or album) "sold" by the third party in question, it must pay a fee to defendants, frequently the larger of $0.70 for each individual song download and $7.00 for each download of a full album, or 70% of the price the third party charges to its customers.  Some permanent download agreements incorporate one or more advances paid by the third party to defendants, which advances are generally recoupable through the permanent download "fees" described above.

Pursuant to their agreements, the permanent download providers receive digital audio files from defendants, encode them with DRM technology, reproduce them and place them on their servers or the servers of third parties with whom they have contracted.  The permanent download providers reproduce defendants' master recordings again, whenever a user selects a song to download and pays for that song – the song is replicated and transmitted to the user, resulting in a copy on the user's computer.  The permanent download providers do not maintain an "inventory" that is depleted when a user downloads a file, so they cannot "run out" of copies (as a store selling physical product might).

Although the permanent download agreements avoid characterizing themselves as "licenses," other provisions with titles such as "No Further Licensing or Obligation," state that "Except for the rights granted by [defendants] to [the third party]…., no further rights are granted to [the third party] in or under the agreement…"  Contractually, no title to any of defendants' master recordings or to the digital audio files embodying those recordings passes to the third party permanent download providers.

2.    *Mastertone Agreements*

Defendants have negotiated licensing agreements with various third party entities who then sell Mastertones to consumers, which play in place of the normal "ringing" sound when someone calls the consumer's mobile phone.  Defendants have entered into agreements with the major cellular telephone network carriers, including Sprint, Nextel, Cingular, and T-Mobile. These contracts were primarily drafted by representatives of the third party Mastertone Providers and presented to defendants on a "take it or leave it" basis due to the superior bargaining position of the Mastertone providers.  These agreements are similar with one another, and defendants grant similar if not identical rights to each Mastertone provider.

Most of these agreements, unlike the permanent download agreements discussed above, explicitly state they are granting the Mastertone provider in question a "license" to reproduce and distribute Mastertones embodying defendants' music (among other things).  The only one of the agreements referenced above between defendants and a Mastertone provider that does not explicitly call the grant of rights from defendants a "license" is the agreement with T-Mobile, the only one for which defendants were able to negotiate certain wording.  However, the initial draft of the agreement *did* refer to this grant as a "license," but the word "license" was subsequently changed to "authorization" and "right" in a March 18, 2004 revision by defendants, clearly in order to attempt to camouflage the agreement as something other than a license.  T-Mobile did not oppose or question this change because they

"did not feel it was material." All of these "grant of rights" provisions, including that in the T-Mobile agreement, explicitly grant the rights to reproduce and distribute defendants' intellectual property.

Other provisions in these contracts also contain indicia of a license. All of the agreements make it clear that all intellectual property rights in defendants' recordings (and the Mastertones embodying those recordings) are reserved to defendants and no ownership rights therein are granted. They are also all for a limited term and most explicitly state the Mastertone providers' rights in the defendants' content expire upon termination. Defendants keep tight control over its content subject to these agreements, as shown by provisions giving defendants the right to unilaterally request the removal of any of their recordings from the Mastertone services.

The Mastertone agreements, like the permanent download agreements described above, provide for recurring and ongoing benefits to defendants: payments based on the quantity and price of the Mastertones delivered to subscribers. For each Mastertone delivered to a subscriber, defendants are owed the greater of $1.00 or 50% of the price charged consumers.

## B. Defendants and the Download Providers All Acknowledge these agreements to be Licenses

Although defendants are careful to avoid use of the word "license" in most of their agreements with permanent download providers,[3] their representatives continually refer to defendants' actions as "licensing" their music in public statements. For example, in sworn written testimony given before the Copyright Royalty Board, Lawrence Kenswil, Universal's Executive Vice President of Business Strategy, formerly the head of Universal eLabs, repeatedly refers to defendants' actions as

---

[3] With the exception of the T-Mobile agreement, UMG has had less success in excluding this word from their Mastertone agreements. (SOF ¶¶ 123-124.) When questioned about this, Mr. Weinberg explained that these agreements were largely presented on a "take it or leave it" basis (*id.* ¶ 122) meaning UMG did not have the opportunity to negotiate the removal of the word "license."

"licensing" sound recordings and "digital rights."[4]  Jimmy Iovine, head of defendant Interscope Records, is quoted in a magazine article as referring to Apple's need to "secure licenses from…the labels" and made similar references to labels "licensing" music for various uses in a videotaped interview.  Even defendants' own expert witness, Jeffrey Harleston, despite maintaining in his deposition that defendants' relationships with third party permanent download and Mastertone providers are not licenses, gave testimony before the U.S. Senate Committee on the Judiciary and stated that defendants "license the use of [their] recordings to hundreds of companies," specifically mentioning Verizon and licensing recordings to be "downloaded to an iPod."  When asked what he was referring to in this statement, if not the agreements he had spent his deposition claiming were not licenses, Mr. Harleston replied, "I don't know."

Similarly, Steve Jobs, CEO of Apple, discussed his company's relationship with UMG as that of a "license" in an essay titled "Thoughts on Music" dated February 6, 2007.  Mr. Jobs explained Apple's need to "license rights to distribute music from others," mentioning Universal and the other large record companies, and Apple's subsequent success in "licens[ing] their music to distribute legally over the Internet." Although he consistently referred to Apple "licensing" music from "the big four music companies," when deposed in this case Mr. Jobs claimed not to know whether his company's relationship with defendants is, in fact, a license.

Mr. Cue, Vice President of iTunes, has also characterized Apple's relationship with defendants (and other rights-holders) as a license.  In a written statement submitted to the Copyright Royalty Board, Mr. Cue repeatedly stated that iTunes has "licensed" "millions of songs" from copyright holders, and explains that "royalty payments" pursuant to these "licensing agreements" are the most significant cost

---

[4] Although Mr. Kenswil claimed that in *this* sentence, "electronic distribution" included only "customized radio, subscription services, video streaming," and *not* permanent downloads or Mastertones  – i.e., only the forms defendants concede are licenses – he claims that the phrase "electronic distribution" used *on the very next page* in the same statement <u>does</u> include permanent downloads.

10

1   faced by iTunes.  Yet, like Mr. Jobs, Mr. Cue professed not to know whether the

2   iTunes Agreement was a license when deposed.

3   **C. Defendants' Royalty Treatment of Revenues from Digital Uses**

4          By early 2003, defendants made a company-wide decision to pay royalties for

5   permanent downloads reproduced and distributed by third party entities under the

6   royalty provision applicable to defendants' sales of physical product, instead of under

7   the Master License provision described above.  As part of this decision, defendants

8   directed their personnel to insert royalty provisions specifically addressing royalties

9   for permanent downloads (and other digital uses) in "new recording agreements,"

10  agreements "currently in draft," and to "offer to amend any existing recording contract

11  (even if the term has expired)" to provide for this calculation of royalties.  As a part of

12  this process, in early 2003, UMG's record labels, including Interscope, altered their

13  standard form recording contracts to include such provisions, as discussed above.  The

14  2003 Recording Agreement was not amended to include this language.

15         In contrast to their royalty treatment of permanent downloads, defendants treat

16  income from streaming and conditional download agreements as licenses of master

17  recordings, and pay royalties under the Master License provision, despite the fact that

18  defendants provide the same audio files to their third party partners whether they are

19  destined for use via streaming, conditional download or permanent download.

20         Defendants' costs for these digital uses are low, since they expend only minimal

21  amounts for manufacturing, packaging or distribution.  To the extent any of these costs

22  (or something analogous to them) exist, the third party digital download providers

23  incur them, not defendants.

24         *1.   Protests of Defendants' Royalty Decision by Artist Representatives*

25         Although defendants characterized their decision with respect to the royalty

26  treatment for permanent downloads as "more generous" than their contracts required,

27  some artist representatives, including Mr. Stiffelman, who represents Eminem, were

28  not impressed.  For example, Mr. Stiffelman, in the fall of 2003, sent an email to Mr.

Hoffman, head of Business and Legal Affairs for Interscope, contending this treatment was contrary to the language of Eminem's contracts with defendants and demanding that he be paid at the 50% rate provided in the Master License provision.

Mr. Stiffelman, along with approximately 26 other industry attorneys, including defendant Aftermath's outside counsel Mr. Paterno, jointly drafted a letter which was sent on March 24, 2004 to the heads of the major record companies protesting this royalty treatment and argued that artists should be paid for permanent downloads under the Master License provisions of their recording agreements.

### D. Defendants' Royalty Treatment of Third Party Compilation Albums and other Licenses of Masters

Any income defendants receive for the license of one or more Eminem masters for use on a third-party compilation album would be accounted to plaintiffs under the Master License provision, despite the fact that the third party would sell physical CDs containing the Eminem master (along with other songs).  There are a number of similarities between defendants' licensing of master recordings for use on compilation albums and the permanent download and Mastertone agreements described above, including: 1) royalties due defendants under a compilation album license are a percentage of the retail price of the compilation album; 2) The retail price of the final product is set by the third party licensee, not defendants; 3) a compilation license grants the third party licensee similar rights to those granted in the permanent download and Mastertone agreements defendants have produced, including the rights to reproduce, distribute and sell the master recording; 4) defendants provide a copy of the master recording to the third party compilation album licensee; 5) limiting the rights granted to specific listed configurations; 6) specifying that the rights granted cease upon termination of the agreements or shortly thereafter;[5] and 7) neither title to

---

[5] At least some of UMG's compilation licenses appear to allow a "sell-off period" after termination so that remaining inventory is not a total loss to the licensee.  (SOF ¶ 187.)

the master recording nor title to the record embodying the master recording provided

pursuant to the license passes to the third party.

Similarly, income from sales of records by a record club are split with the artist 50/50. A record club sale is, pursuant to a license from the record company, the sale by the record club to a consumer of the same record that the label itself is selling, but with a different applicable royalty. Nor are record club sales anything like a premium or a conditional download. A "premium" is a record that is given away or sold very cheaply in connection with the sale of another product; a conditional download is where a consumer must continue to make periodic payments in order to continue to have access to the record. None of these factors for a premium or conditional download are applicable to a sale by a record club where the consumer is not obligated to purchase something other than a record and where he or she owns the record that is purchased in perpetuity. When a consumer purchases a record from a record club they are purchasing the same piece of product that defendants consider as their "core" product (triggering the "sale of records" royalty provision), but defendants nevertheless split the receipts from this sale 50/50 with the artist.

**E. The Economic Considerations Concerning Royalty Payments for Permanent Downloads and Mastertones are the same as those for other Licensed Uses**

The reason the music industry lawyers described above that the Master license provision applies to permanent downloads is because the Master License provision has always applied to all licenses. In cases where the record label licenses the masters to third parties to reproduce and distribute, record labels have paid artists 50% of net receipts. Where some other party bears the costs of the reproduction, distribution (and usually marketing) through its own platform that it controls, and obtains the right to sell a record through a license, the record label is not selling records and there is no legitimate reason not to apply the master licensing provision of the recording agreement. The master license provision has been applied this way irrespective of the

fact that the record label may have originally incurred artist and repertoire, marketing, or other costs associated with the creation of the album and its sales thereof. Therefore, when defendants license their master recordings to a third party who then encodes it with Digital Rights Management technology, and/or otherwise reproduces it using the technology and platform that it owns and controls, and then distributes and sells it itself, there is no legitimate basis not to apply the master licensing provision of the recording agreement, as it has been under similar circumstances.

In the compilation album scenario, for example, defendants send their third party licensee a copy of the master recording and grant the licensee the right to reproduce and distribute copies of that recording, and the licensee does so. Because the record company does not incur costs for the manufacturing, distribution, transportation, packaging, and so forth for the product the third party releases, its costs are substantially lower, and this dynamic justifies the increased royalty.

In the context of Mastertones and permanent downloads, defendants have admitted they incur minimal costs in creating digital copies of existing master recordings for third party permanent download and Mastertone providers - the cost to provide an entire album to such a third party is approximately $800.00. Beyond that, defendants' representatives have admitted they incur essentially no additional cost for each copy of the sound recording subsequently sold. The same is true of synchronization licenses (income from which is admittedly accounted to artists under the Master License provision), whereby a master recording is synchronized with audiovisual works (e.g., is used in TV or movies): the only cost to defendants is that of providing a copy of the master recording in question to the licensee.

By contrast, when the record company itself manufactures, reproduces and distributes physical product through its own subsidiaries and affiliates, it incurs costs ranging from 25% to 40% of the price it ultimately charges to retailers. These substantial costs are used to rationalize the much lower royalty applicable to such physical sales – between 12% and 20%, for Eminem.

### III.    PLAINTIFFS' CLAIMS AND DEFENDANTS' AFFIRMATIVE DEFENSES

Plaintiffs' initial complaint was filed on May 21, 2007 against defendants Aftermath Records d/b/a Aftermath Entertainment ("Aftermath"), Interscope Records ("Interscope"), ARY, Inc. ("ARY") and UMG Recordings, Inc. ("UMG") (collectively, "defendants") in the United States District Court for the Central District of California for breach of contract and declaratory judgment.  Plaintiffs' First Amended Complaint was filed June 13, 2007.  On June 9, 2008, plaintiffs filed a Second Amended Complaint against the same defendants, adding a second claim of breach of contract (Count 2).

### A. Count 1: Breach of Contract

#### 1.  Facts and Law Supporting the Claim

The model jury instructions setting forth the elements of breach of contract and the appropriate standards for damages provide as follows:

**Elements Required to Establish Plaintiffs' Claim for Breach of Contract:**

1.    Plaintiffs and Defendants entered into a contract;
2.    Plaintiffs did all, or substantially all, of the significant things that the contract required them to do;
3.    All conditions required by the contract for Defendants' performance had occurred;
4.    Defendants failed to do something that the contract required them to do; and
5.    That Plaintiffs were harmed by that failure.

*See* CACI NO. 303. BREACH OF CONTRACT-ESSENTIAL FACTUAL ELEMENTS.

**Elements Required to Establish Plaintiffs' Claim for Damages for Breach of Contract:**

1.    The harm plaintiffs suffered was likely to arise in the ordinary course of events from the breach of the contract; or

2.    When the contract was made, both parties could have reasonably foreseen the harm as the probable result of the breach.

3.    The amount of money due to plaintiffs which has not been paid.

*See* CACI No. 350 Introduction to Contract Damages; CACI No. 355 Obligation to Pay Money Only.

Count 1 is based on defendants' failure to pay plaintiffs under the proper royalty provision for certain "digital uses" of master recordings by Eminem.  Plaintiffs contend the facts described above in section II will be proven at trial and will demonstrate that defendants breached their contracts with plaintiffs and caused recoverable damage to plaintiffs.

The evidence in support of these facts (and to counter defendants' defenses) will include the agreements between plaintiffs and defendants; communications among plaintiffs, defendants and representatives of Eminem relating to these agreements and to royalty payments thereunder; the agreements between defendants and various third party digital download providers, including drafts of the same; defendants' practices, policies and procedures relating to the drafting of recording agreements with royalty provisions explicitly encompassing the uses at issue; royalty provisions in defendants' agreements with other recording artists; statements of employees of defendants characterizing their agreements with third parties as "licenses;" testimony of various employees of defendants, including the negotiators of defendants' agreements with plaintiffs and the negotiators of defendants' agreements with third parties; testimony of plaintiffs, plaintiffs' negotiators, and negotiators on behalf of Eminem; testimony of plaintiffs' expert witnesses; as well as other documentary evidence and testimony.

## 2.  Defendants' defenses

Defendants have indicating they are maintaining five affirmative defenses to Count 1: Statute of limitations; waiver, estoppel; unjust enrichment; and setoff.

## Elements Required to Establish Defendants' Affirmative Defense of the Statute of Limitations

1.    More than four years passed between the time of the most recent breach of the contract between plaintiffs and defendants and the date plaintiffs filed their initial complaint.

*See* CACI No. 338 AFFIRMATIVE DEFENSES – STATUTE OF LIMITATIONS.

Defendants' affirmative defense of the statute of limitations is based on their contention that some of plaintiffs damages accrued – that is, some royalties were paid at the incorrect rates – more than four years before the initial complaint in this action was filed (May 21, 2007), and that therefore any damages accruing prior to May 21, 2003 are barred by the statute of limitations.  Plaintiffs contend the following facts will be proven at trial and will demonstrate that defendants' affirmative defense of the statute of limitations has no merit:

1.    Plaintiffs did not receive accounting for permanent downloads until well after May 21, 2003 statute of limitation date, and accounting for Mastertones did not begin until well after that date.

2.    Plaintiffs put defendants on notice of the breach of contract following the audit report dated February 10, 2006, which is the event that put plaintiffs on notice of defendants' improper payment of permanent downloads.

3.    Defendants continue, through the current date, to account to plaintiffs under the incorrect royalty provision for permanent downloads and Mastertones, and plaintiffs are entitled to all damages relating to permanent downloads and Mastertones sold by third party download providers pursuant to their license agreements with defendants.

4.    Even if some sales by third party permanent download providers pursuant to their licenses with defendants, occurred outside the statute of limitations, which they did not, the only bar would be plaintiffs' inability to recover damages for those particular sales.  *See Peterson v. Highland Music,* 140 F.3d 1313, 1321 (9th Cir. 1998) ("California courts have held that each breach starts the clock afresh for statute of limitations purposes.")

**Elements Required to Establish Defendants' Affirmative Defense of Waiver**:

1. Plaintiffs knew Defendants were required to comply with the contractual provisions at issue in this case; and

2. Plaintiffs freely and knowingly gave up their right to have Defendants perform these obligations.

SEE CACI 336. BREACH OF CONTRACT - AFFIRMATIVE DEFENSE-WAIVER.

Defendants' claim of waiver is based on their contention that plaintiffs accepted royalties from defendants for permanent downloads and Mastertones without objection.    Plaintiffs contend the following facts will be proven at trial and will demonstrate that defendants' affirmative defense of waiver has no merit:

1. Plaintiffs were unaware that defendants were accounting to them under the incorrect royalty provision until receiving the audit report dated February 10, 2006.

2. Plaintiffs immediately put defendants on notice of the breach, and took no action to knowingly give up their right to receive royalties under the Master License provision for permanent downloads and Mastertones of the Eminem masters.

**Elements Required to Establish Defendants' Affirmative Defense of Equitable Estoppel:**

1. Plaintiffs must know the facts;

2. Plaintiffs must intend that their conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

3. Defendants asserting estoppel must be ignorant of the true facts; and

4. Defendants must rely on plaintiffs' conduct to their injury.

*See Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960); *Robbins v. Lee*, 285 Fed. Appx. 462 , 462 (9th Cir. 2008).

Defendants' claim of waiver is based on their contention that plaintiffs accepted royalties from defendants for permanent downloads and Mastertones without objection.    Plaintiffs contend the following facts will be proven at trial and will demonstrate that defendants' affirmative defense of estoppel has no merit:

1.  Plaintiffs were unaware that defendants were accounting to them under the incorrect royalty provision until receiving the audit report dated February 10, 2006.

2.  Plaintiffs immediately put defendants on notice of the breach, and took no action to knowingly give up their right to receive royalties under the Master License provision for permanent downloads and Mastertones of the Eminem masters.

3.  Plaintiffs did not intend that defendants to act in reliance upon their passive receipt of royalty payments.

4.  Defendants knew they were required to pay royalties for permanent downloads and Mastertones under the Master License provision.

5.  Other parties entitled to royalties under the 1998 and 2003 Recording Agreements had objected to defendants' royalty treatment of permanent downloads and Mastertones.

6.  Defendants knew plaintiffs were unaware of how they were being accounted for permanent downloads and Mastertones until the February 10, 2006 audit report.

7.  Defendants can show no reliance on plaintiffs' passive receipt of royalties.

8.  To the extent defendants relied on plaintiffs' passive receipt of royalties, defendants cannot prove they suffered any detriment from doing so.

**Elements Required to Establish Defendants' Affirmative Defense of Unjust Enrichment**

1.   Receipt of a benefit;

2.   Unjust retention of the benefit at the expense of another.

*See Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726, 91 Cal. Rptr. 2d 881 (2000).

Defendants' claim of unjust enrichment is premised upon their claim that, if the court rules that the royalty specified in the Master License provision applies to permanent downloads and Mastertones, plaintiffs will be unjustly enriched by receiving an un-bargained-for benefit.  Plaintiffs contend that defendants' affirmative defense is meritless: if the Court rules their agreements with defendants mandate that the royalty in the Master License provision applies to defendants' agreements, plaintiffs' retention of the "benefit" – payment at the appropriate under the contract – would not be unjust.  Under California law a claim for unjust enrichment will not lie if there is an express agreement between the parties which covers the "same subject matter, existing at the same time." Wal-Noon Corp. v. Hill, 45 Cal. App. 3d 605, 613-14, 119 Cal. Rptr. 646 (1975).   The same facts which will be proven at trial to establish the merit of plaintiffs' claim in Count 1 will demonstrate that defendants' affirmative defense of unjust enrichment has no merit.

Plaintiffs' expert retained to testify concerning the damages suffered by defendants as a result of defendants' incorrect royalty treatment of permanent downloads and Mastertones, based on figures provided by defendants, has calculated plaintiffs' total damages through April 2004 as $1,340,754.  Despite having promised updated financial figures over a month ago, defendants have not yet provided such figures but assure plaintiffs they will do so soon.  When updated figures are made available to plaintiffs, Mr. Cohen will update his expert report to take these new figures into account. Plaintiffs will show at trial that Mr. Cohen's expert report on damages constitutes the correct calculation of plaintiff's damages in this action, subject to this additional revenue information defendants' have promised to provide.

**Defendants' Affirmative Defense of Set-off**

Defendants claim they have a setoff for certain deductions they claim they could have taken but did not. Plaintiffs will prove this claim of set-off is meritless. Defendants have not set forth any facts entitling them to a set-off, or to any legal right to a set-off. For example, while defendants claim they have a right to a setoff in connection with the "new media" provision in the 1998 and 2003 Recording Agreements, the "new medium" provision only applies to offset the greater costs defendants sometimes incur associated with the introduction of new technologies. With respect to digital downloads, the new medium provision could be justified to the extent it covered a company setting up its own digital distribution operation as a means of offsetting the higher costs associated with such an undertaking. Furthermore, consistent with this interpretation of the recording agreements, defendants have not taken any new medium deductions for conditional downloads or streams. Defendants have likewise set forth no factual basis for any other form of setoff, including "container charges," which would not apply to downloads, or any other similar claims.

B. <u>**Count 2: Breach of Contract**</u>

1. **Facts and Law Supporting the Claim**

The model jury instructions setting forth the elements of breach of contract and the appropriate standards for damages provide as follows:

**Elements Required to Establish Plaintiffs' Claim for Breach of Contract Regarding the Applicable Royalty:**

1. Plaintiffs and Defendants entered into a contract;
2. Plaintiffs did all, or substantially all, of the significant things that the contract required them to do;
3. All conditions required by the contract for Defendants' performance had occurred;
4. Defendants failed to do something that the contract required them to do; and

5.  That Plaintiffs were harmed by that failure

*See* CACI No. 303. Breach of Contract-Essential Factual Elements.

Count 2 is based solely on defendants' failure to allocate certain costs correctly as between plaintiffs and Eminem, resulting in an underpayment of royalties to plaintiffs.  Plaintiffs contend the following facts will be proven at trial and will demonstrate that defendants breached their contracts with plaintiffs and caused recoverable damage to plaintiffs:

Plaintiffs' audit report included claims stemming from various accounting irregularities, including misallocation of certain costs as between plaintiffs and Eminem.  Defendants' written reply to the audit report contested most claims therein, but conceded an underpayment to plaintiffs totaling $159,332 due to an error in the allocation of certain costs as between plaintiffs and Eminem.  Since acknowledging the above amount was due plaintiffs, defendants have refused to pay the amount in question.  Plaintiffs have suffered actual damages as a result of defendants' failure to correctly allocate costs as between plaintiffs and Eminem, and their failure to correct such deficiency.

The evidence in support of these facts (and to counter defendants' defenses) will include the agreements between plaintiffs and defendants; the royalty audit which gave rise to this case; defendants' written response to the royalty audit letter; the testimony of plaintiffs' auditor Gary Cohen; the testimony of defendants' 30(b)(6) witness on this claim; as well as other documentary evidence and testimony.

### 2.  Defendants' defenses

Defendants have asserted affirmative defenses of failure to mitigate, statute of limitations, and setoff.

# Elements Required to Establish Defendants' Affirmative Defense of Failure to Mitigate.

1          1. That Plaintiffs could have avoided some or all of the harm alleged with

2              reasonable efforts or expenditures.

3  *SEE* CACI 356. BREACH OF CONTRACT – MITIGATION OF DAMAGES.

4        Defendants' claim that plaintiffs failed to mitigate their damages is based on

5  plaintiffs failure to recover the incorrect cost allocation from Eminem, as opposed to

6  from defendants.  Plaintiffs contend the following facts will be proven at trial and will

7  demonstrate that defendants' affirmative defense of failure to mitigate has no merit

8         1. Defendants have a duty to account to both plaintiffs and Eminem in the

9            proper amounts.

10        2. Plaintiffs are not required to seek recovery of sums incorrectly paid to

11           Eminem from Eminem.

12        3. Eminem has no obligation under the contracts at issue to pay plaintiffs

13           amounts incorrectly paid to him by defendants.

14        4. Plaintiffs raised this issue with representatives of Eminem, who refused

15           to remit to plaintiffs the amounts alleged owed by defendants in Count 2.

16

17  **Elements Required to Establish Defendants' Affirmative Defense of the Statute of**

18  **limitations**

19         1. More than four years passed between the time of the most recent breach

20           of the contract between plaintiffs and defendants and the date plaintiffs

21           filed their initial complaint.

22  *See* CACI NO. 338 AFFIRMATIVE DEFENSES – STATUTE OF LIMITATIONS.

23        Defendants' affirmative defense of the statute of limitations is based on their

24  contention that some of plaintiffs damages accrued – that is, plaintiffs were underpaid

25  some amounts due to defendants' incorrect allocations of costs as between plaintiffs

26  and Eminem – more than four years before the initial complaint encompassing this

27  claim was filed (March 6, 2008), and that therefore any damages accruing prior to

28  March 6, 2004 are barred by the statute of limitations.  Plaintiffs contend the

following facts will be proven at trial and will demonstrate that defendants'
affirmative defense of the statute of limitations has no merit:

1.  Plaintiffs were unaware of defendants' failure to correctly allocate costs
    as between Eminem and plaintiffs until the February 10, 2006 audit
    report.

2.  Plaintiffs put defendants on notice of the breach of contract following the
    audit report by a letter dated November 26, 2007.

3.  None of the cost allocation errors occurred outside the applicable statute
    of limitations.

4.  Even if some portion of the cost allocation errors occurred outside the
    statute of limitations, which they did not, the only bar would be plaintiffs'
    inability to recover damages for those particular sales. *See Peterson v.
    Highland Music,* 140 F.3d 1313, 1321 (9th Cir. 1998) ("California courts
    have held that each breach starts the clock afresh for statute of limitations
    purposes.")

### C. **Count 3: Declaratory Judgment**

#### 1. **Facts and Law supporting the claim**

Plaintiffs seek a declaration that they are judgment ordering defendants to pay
plaintiffs according to the royalty treatment alleged to be due in Count 1 and is based
on a breach of contract claim.

A party seeking declaratory relief must establish: 1) that the federal court has
subject matter jurisdiction and 2) the existence of an actual controversy.  Once this
threshold is satisfied, the court has discretion to grant or deny declaratory relief.  28
U.S.C. §§2201, 2202.  *See also Moore's Federal Practice (3d)* § 57.09.

Here, the Court has diversity jurisdiction under 28 U.S.C. s 1332: plaintiffs are
citizens of Michigan while defendants are citizens of California and Delaware, and the
amount in controversy far exceeds $75,000.

1    Because Count 3 is premised on the same legal basis as Count 1, the same facts

2    will be proven at trial to demonstrate that plaintiffs are entitled to the relief requested.

3    **2.  Defendants' defenses**

4    Because Count 3 is premised on the same legal basis as Count 1, defendants

5    assert the same affirmative defenses on the same bases, which are baseless for the

6    reasons articulated above.

7    **IV.    ANTICIPATED EVIDENTIARY ISSUES**

8    The anticipated evidentiary issues are contained within the parties' motions in

9    limine and/or their objections to items listed on the joint exhibit list.

10    Defendants have filed seven motions in limine: 1) to exclude the expert

11    testimony of law professor Peter S. Menell as impermissible opinion testimony

12    regarding the law; 2) to exclude expert testimony of David Berman for failing to

13    satisfy the requirements of Federal Rule of Evidence 702 and because of a

14    confidentiality agreement he had with a company now a part of defendants; 3) to

15    exclude expert testimony of Gary Cohen because Cohen's opinion does not meet the

16    reliability requirement of Federal Rule of Evidence 702; 4) to exclude the March 24,

17    2004 letter to the major record companies because the letter is inadmissible hearsay, is

18    irrelevant and inadmissible under Federal Rule of Evidence 402, and is likely to

19    confuse the jury; 5) to preclude Joel Martin and Mark Levinsohn from testifying about

20    the intent of the parties or the meaning of the terms of the recording agreements

21    because such testimony is speculative and lacks foundation; 6) to exclude evidence of

22    certain individuals using the word "license" because it is irrelevant, likely to confuse

23    the jury, and prejudice the defendants; 7) to exclude statements in the *Eight Mile Style*

24    case of defendants' "licensing" rights in musical compositions to Apple because they

25    are misleading and prejudicial.  Plaintiffs oppose each of defendants' motions for

26    reasons which will be articulated in their responses to those motions.

27    Plaintiffs have filed five motions in limine: 1) (under seal) to exclude highly

28    prejudicial and irrelevant evidence concerning one of the owners of plaintiff F.B.T.; 2)

to exclude evidence of royalties received by other artists for permanent downloads and Mastertones as lacking foundation, irrelevant, and inadmissible under Rule 403 of the Federal Rules of Evidence; 3) to exclude certain documents produced by plaintiffs as irrelevant; 4) to exclude improper evidence and argument relating to "luck" or "good fortune" of plaintiffs in discovering and signing Eminem as irrelevant; 5) to exclude the testimony of Charles Ciongoli and Steve Berman because defendants failed to timely disclose these witnesses.  Defendants oppose each of plaintiffs' motions in limine.

## V.    ISSUES OF LAW

### 1.    Whether defendants' relationships with permanent download and Mastertone providers constitute licenses of the Eminem masters

Plaintiffs contend defendants' relationships with permanent download and Mastertone providers constitute licenses based on the terms of the agreements and the economic realities of the transactions at issue.  In determining whether a transaction is a sale or a license, courts must analyze the "economic realities" of the transaction. *Microsoft Corp. v. DAK Indus. (In re DAK Indus.), 66 F.3d 1091, 1095 (9th Cir. 1995).* The label on an agreement does not determine whether or not it will be construed as a license.  *UMG Recordings v. Augusto*, 558 F. Supp. 2d 1055, 1060 (C.D. Cal. 2008) (citing *DAK Indus.*, 66 F.3d at 1095 n.2).

*UMG Recordings v. Augusto*, a recent case from the Central District of California, is instructive, having involved this same question of whether or not something had been "licensed" or "sold."  *Id.*  There, plaintiff UMG sued Augusto alleging copyright infringement by his actions of selling promotional CDs ("Promo CDs") sent to "music industry insiders."  *Id.* at 1058.  Augusto purchased the CDs from music shops and online auctions and sold them through the online auction site eBay.  *Id.*  UMG alleged the Promo CDs were "licensed," not sold, as evidenced by language printed on each CD stating that it remained the property of UMG, was only "licensed" to the recipient and could not be sold.  *Id.*  On cross-motions for summary judgment, the Court

considered whether the CDs had in fact only been licensed to Augusto, or whether title had passed. *Id.* at 1060.

First, the Court considered whether the owner (UMG, both there and here) intended to regain possession. "[T]he distributor of a copyrighted product's intent to regain possession is strong evidence that the product was licensed, not sold, to the recipient." *Id.*; *see also United States v. Wise*, 550 F.2d 1180, 1190 (9th Cir. 1977) (finding that movies "licensed" to theaters for distribution, and which required the return to Universal following expiration of the agreements, were licenses). While the Court found UMG "gives the Promo CDs" away, "never to be returned," *id.* at 1061, here UMG's contracts with the third party digital download providers explicitly requires either return or destruction of UMG Content at termination. This is "strong evidence" that the Eminem masters were licensed. *See Augusto*, 558 F. Supp. 2d at 1060.

Second, the Court noted that licenses generally provide "recurring benefits," and the absence of such a benefit there argued against the finding of a license. *Id.* at 1061 (citing *DAK Indus.*, 66 F.3d at 1096; *SoftMan Prods. Co. v. Adobe Sys.*, 171 F. Supp. 2d 1075 (C.D. Cal. 2001)). Here, the arrangements defendants have with digital download providers explicitly require recurring benefits in the form of a fee to be paid to defendants for each permanent download or Mastertone.

Third, the *Augusto* Court considered whether there was any "benefit" to a license for UMG, and found there was none; this was in contrast to prior cases involving software which "must be copied onto a computer to function." *Augusto*, 558 F. Supp. 2d at 1061-62. Although the *Augusto* case involved packaged music CDs which "are not normally subject to licensing," this case involves *master recordings*, which *are* normally subject to licensing, as multiple witnesses for defendants testified. The benefit of licensing here is plain: because the process of providing permanent downloads and Mastertones to end users involves reproducing

and distributing the master recordings, and these are two rights exclusive to the copyright owner (defendants) (*see* 17 U.S.C. § 106(1), (3)), the permanent download and Mastertone providers must have licenses in order to engage in these activities without infringing on copyright.

Defendants' contention that the permanent download providers and Mastertone providers are merely "reselling" defendants' permanent downloads and Mastertones is a legal fiction. For the same reasons defendants are indisputably licensing their master recordings to these third parties, they are not "selling" anything – no title to property is passing and defendants retain ownership and title to their master recordings. Defendants do not send multiple individual audio files to permanent download and Mastertone providers for them to provide to customers; rather, they sends a single file to the third party which the third party then reproduces and distributes to its customers.

>    2.  **If defendants' relationships with permanent download and Mastertone providers constitute licenses, whether the Master License provision of the 1998 and 2003 Recording Agreements specifies the applicable royalty**

Plaintiffs contend that, the plain language of the 1998 and 2003 Recording Agreements is clear and unambiguous and should be given effect. *See* Cal. Civ. Code § 1638. On its face, the Master License provision applies to all licenses of the Eminem masters to third parties. Plaintiffs' claim is based on the plain language of the provision in question, which states that, "notwithstanding" the prior-specified royalty provisions, "On masters licensed by us or our Licensees to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts…."

The 1998 and 2003 Recording Agreements are not "'reasonably susceptible" to the interpretation urged by defendants, and accordingly defendants' contentions are

1   meritless.  *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th

2   516, 132 Cal. Rptr. 2d 151, 157 (Cal. Ct. App. 2003).

3       **3.  If the 1998 and 2003 Recording Agreements, the 2000 Novation, or the**

4           **2004 Amendment to the 2003 Recording Agreement is ambiguous,**

5           **whether they should be construed against defendants**

6       Plaintiffs contend that, if any of the agreements between plaintiffs and

7   defendants are ambiguous on their face, they should be construed against the drafter

8   pursuant to California contract law.  Cal. Civ. Code § 1654.  Plaintiffs further contend

9   that, because the 1998 and 2003 Recording Agreements are contracts of adhesion, this

10  rule should be applied with particular force.  *See, e.g.*, *Badie v. Bank of America*, 67

11  Cal. App. 4th 779 (Cal. App. 1st Dist. 1998); *Neal v. State Farm Ins. Cos.*, 188 Cal.

12  App. 2d 690, 695 (Cal. App. 1st Dist. 1961).

13  **VI.   JURY TRIAL**

14      Plaintiffs made a timely request for a trial by jury upon the initial filing of their

15  complaint and at the time of filing both their First Amended Complaint and Second

16  Amended Complaint.  Plaintiffs seek a jury trial on all claims.

17  **VII.   ATTORNEY'S FEES**

18      Plaintiffs seek to recover their attorney's fees under the contracts at issue.  The

19  contracts provide, "should any party hereto institute any action or proceeding at law or

20  in equity to enforce any provision of this Agreement, including an action for

21  declaratory relief, or for damages by reason of an alleged breach of any provision of

22  this Agreement, or otherwise in connection with this Agreement, or any provision

23  hereof, the prevailing party shall be entitled to recover from the non-prevailing party

24  reasonable and actual attorneys' fees and costs for services rendered to the prevailing

25  party in such action or proceeding."

26  **VIII.   ABANDONMENT OF ISSUES**

27      Plaintiffs do not abandon any issues.

28

DATED:  December 22, 2008          Respectfully submitted,

KING & BALLOW

/s/ Richard S. Busch
Richard S. Busch (TN Bar No. 014594)
rbusch@kingballow.com
KING & BALLOW

Attorneys for Plaintiffs