GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
Melinda.Lemoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC,<br><br>           Plaintiffs,<br><br>     vs.<br><br>AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC.,<br><br>           Defendants. | CASE NO. CV 07-03314 PSG (MANx)<br><br>**CORRECTED DECLARATION OF RAND HOFFMAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:     The Honorable Philip S. Gutierrez<br>Date:      January 12, 2009<br>Time:     1:30 P.M.<br>Crtrm:    Roybal 790<br><br>Discovery Cut-Off: November 3, 2008<br>Final Pretrial Conference: January 12, 2009<br>Jury Trial: February 3, 2009 |

6635801.1

DECLARATION OF RAND HOFFMAN IN
SUPPORT OF DEFENDANTS' OPP. TO
MOTION FOR SUMMARY JUDGMENT

## DECLARATION OF RAND HOFFMAN

I, Rand Hoffman, declare as follows:

1. I have worked as a lawyer in the music business since 1981. Starting in January 1999, I have been employed by the Universal Music Group as the head of Business and Legal Affairs for Interscope Geffen A&M Records ("Interscope"), a division of UMG Recordings, Inc. ("UMG"). As part of my job duties and responsibilities, I negotiate and draft, and supervise a staff of attorneys who negotiate and draft, artist and joint venture agreements by which UMG and its affiliates acquire the rights to exploit sound recordings. Except as otherwise indicated, I have personal knowledge of the facts set forth herein. If called as a witness in this action, I could and would testify competently to the contents of this declaration.

2. Interscope and ARY, Inc. ("ARY") are joint venture partners of defendant Aftermath Records ("Aftermath"). ARY is owned by Andre Young (p/k/a Dr. Dre), a prominent recording artist and producer. Interscope is responsible for, among other things, the distribution and exploitation of the sound recordings created by the artists signed to Aftermath, including the popular recording artist Marshall B. Mathers III (p/k/a Eminem).

3. Record companies, such as Interscope and Aftermath, enter into recording agreements with recording artists or with production companies furnishing the artists' services whereby the record company obtains the exclusive recording services of the artists. The terms of these agreements often differ, but the structure of these agreements follows a common pattern. Pursuant to the recording agreement, the record company pays for the artist to create "master" recordings, which the record company will own. The record company markets, promotes, and sells records that embody those masters. In exchange, the record company pays the artist royalties based upon its sale of records. Generally, the record company also will pay the artist an advance against royalties.

4. The sale of records constitute the record company's "core product." Royalties from the sale of records are typically calculated on the basis of a percentage of a particular price (for example, 22% of the suggested retail list price). This percentage is typically applied to a "Royalty Base Price" for the different categories of records sold (i.e., full price records in album format, singles, budget price records, etc.). The most basic royalty provision typically applies to the sales of "full-price records sold in the United States" through "normal retail channels." The range of royalty rates on record sales varies depending on the artists' popularity (and bargaining power). While the actual range of royalties paid to any artist is subject to negotiation, it is not atypical for a brand new artist to receive a royalty rate in the range of 13%-16%, while an established "superstar" artist may receive a royalty rate as high as 18%-22%. Some recording agreements also provide for escalations, meaning that an artist's royalty rate for a particular album increases as certain sales targets are met.

5. Recording agreements typically allow the record company to exploit an artists' masters in "records" without regard to a particular form those records may take. The form that records are sold in has changed over time from, among other things, shellac records to vinyl, from eight-track tapes to cassettes to CDs. Because technological change is essentially a given, recording agreements are drafted to confer the necessary distribution rights on the record company regardless of what changes may occur in distribution technology. As an example, recording agreements often define the term "record" to include "all forms of reproductions" regardless of whether that form is "now or hereafter known."

6. Record companies incur costs in getting records to consumers, including but not limited to recording costs, marketing and promotion costs, distribution costs, and the payment of mechanical royalties to publishers of compositions embodied in the recordings. In the case of sales of permanent downloads and mastertones, the record company retains all of the same obligations

in terms of marketing and promotion costs, recording costs, and mechanical royalty costs that it incurs when releasing physical product. Indeed, the mechanical royalty to publishers is often higher in the case of permanent download and mastertone sales. When a record company licenses a master to a third party, the third party typically assumes those obligations.

7. True and correct copies of the recording agreements with Eminem (the "Eminem Agreements") are attached as Exhibits A-E, as described in greater detail below. The Eminem Agreements are no different from the typical recording agreements described above. In their simplest terms, all of the agreements contemplated that Eminem would record masters, and grant Aftermath the worldwide right to exploit those recordings in exchange for advances and royalties. More specifically, the agreements provided for the following:

- That Aftermath would have the "exclusive right to exploit all" master recordings created under the agreements "in any and all forms of media now known and hereinafter developed." (1998 and 2003 Agreements ¶ 8.) This would include all forms of media used to exploit master recordings, such as compact discs, permanent digital downloads and mastertones.
- That the Eminem recordings would be exploited through the sales of "records" by Aftermath and its affiliates (1998 Agreement ¶ 4(a); 2003 Agreement ¶ 5(a)) and through licenses of the masters to third parties. (1998 Agreement ¶ 4(c)(v); 2003 Agreement ¶ 5(c)(v)). "Records" is expressly defined to include "all forms of reproductions." (1998 and 2003 Agreements ¶ 16(e)).

8. Eminem initially signed a recording agreement with F.B.T. Productions, LLC ("F.B.T."), who then furnished Eminem's services to Aftermath pursuant to a March 9, 1998 agreement (the "1998 Agreement"). **(A true and correct copy of the 1998 Agreement is attached hereto as Exhibit A.)** When

there is a furnishing company (such as F.B.T.), the artist will also typically enter into an "inducement agreement" directly with the record company whereby the artist agrees to be bound by, and to perform all of, the obligations under the furnishing agreement to the extent those obligations apply to the artist. Eminem did just this by entering into a March 9, 1998 inducement agreement directly with Aftermath (the "1998 Inducement Agreement"). **(A true and correct copy of the 1998 Inducement Agreement is attached hereto as Exhibit B.)**

9. Subsequently, pursuant to a September 27, 2000 agreement, F.B.T. assigned its rights and obligations under the 1998 Agreement to Eminem (the "2000 Novation"). **(A true and correct copy of the 2000 Novation is attached hereto as Exhibit C.)** The 2000 Novation provided that Eminem and F.B.T. would each be paid a portion of the contractual royalties on a going-forward basis.

10. Thereafter, pursuant to a July 2, 2003 agreement (the "2003 Agreement"), Aftermath, Eminem, and F.B.T. entered into a new recording agreement. **(A true and correct copy of the 2003 Agreement is attached hereto as Exhibit D).**

11. In November of 2004, the parties amended the 2003 Agreement to allow for a substantial advance and an increase in the royalty rate, and to specifically provide that sales of albums by way of permanent download "shall be treated as USNRC Net Sales for the purposes of escalations, provided that the sales price concerned falls within a top-line sales price category applicable to such method of sale." **(A true and correct copy of the 2004 Amendment is attached hereto as Exhibit E).** When calculating escalations, recording agreements typically (and in the Eminem Agreements) count only "full price records sold" in reaching sales targets. While the 2004 Amendment did not change the way that Aftermath had been accounting to Eminem for permanent downloads, in 2004, the price for albums sold as permanent downloads was generally lower than what ordinarily qualified as "full price" (i.e., the prices were lower than for a compact disc of the

same album). As a result, the amendment provided that albums sold by way of permanent downloads would count for escalation purposes provided that such albums fell within the "top-line sales price category" for permanent downloads.

12. I am informed and believe that Plaintiffs have stated that it is an "Uncontroverted Fact" that, "During negotiation of the 2004 Amendment, it was discussed that full album sales by way of permanent downloads would count toward escalations, but would have no other impact on the 2003 Agreement." I further am informed and believe that Plaintiffs have cited as support for the preceding statement a portion of the deposition transcript of Joel Martin. I have no recollection of Mr. Martin having been involved in any negotiations concerning the 2004 Amendment. Furthermore, I do not recall anyone who was involved in the negotiations concerning the 2004 Amendment making any statement about the impact or effect of the 2004 Amendment being limited only to escalations, or that the 2004 Amendment would have no other impact on the 2003 Agreement.

13. Plaintiffs and Eminem's representatives have known for years how Aftermath accounts to them for the sale of records in permanent download and mastertone form. Since this exploitation began, UMG's royalty department has sent royalty statements to Plaintiffs and Eminem, which reflect the sale and royalty treatment for permanent downloads and mastertones. **(A true and correct copy of an excerpt from such an artist royalty statement is attached hereto as Exhibit F).**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 19 day of December 2008 at Santa Monica, California.

_____
RAND HOFFMAN