O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

Present:   The Honorable Philip S. Gutierrez, United States District Judge

| Wendy K. Hernandez | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

Attorneys Present for Plaintiff(s):         Attorneys Present for Defendant(s):

Not Present                                                  Not Present

**Proceedings:**   (In Chambers) Order Denying Plaintiffs' Motion for Summary Judgment and Defendants' Motion for Partial Summary Judgment

Before the Court are Plaintiffs' Motion for Summary Judgment and Defendants' Motion for Partial Summary Judgment. The Court finds the matters appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local R. 7-15. After considering the moving and opposing papers, the Court hereby DENIES the motions.

I.   Background

Plaintiffs F.B.T. Productions, LLC ("FBT") and Em2M, LLC ("Em2M") are entities that receive royalties payable for the use and exploitation of master recordings by Marshall B. Mathers III, better known as the rapper Eminem. Defendants are Aftermath Records ("Aftermath"), a joint venture, and its owners, Interscope Records ("Interscope"), UMG Recordings, Inc. ("UMG"), and Ary, Inc. ("Ary"). The primary question presented by this case is what royalty is due Plaintiffs when a consumer downloads an Eminem song to her computer or purchases an Eminem ringtone for her mobile phone.

   A.   The Eminem Agreements

In approximately 1995, Jeff and Mark Bass signed Eminem to an exclusive record deal with FBT, their production company. On March 9, 1998, FBT entered into an agreement ("the 1998 Agreement") to furnish Eminem's recordings to Aftermath. The 1998 Recording Agreement contains two royalty provisions. First, paragraph 4(a) sets a royalty for "full-price records sold in the United States" that varies between 12 and 20% (the "Records Sold"

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

provision).[1] *Hoffman Decl*. Ex. A ¶ 4(a)(i). "Records" are defined as "all forms of reproductions, whether embodying sound alone or sound together with visual images, manufactured or distributed primarily for home use." *Id*. at ¶ 16(e).

Second, paragraph 4(c)(v) of the 1998 Agreement states that "[o]n masters licensed by us . . . to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from other uses of the masters" ("the Masters Licensed" provision). *Id*. at ¶ 4(c)(v). A "master" is defined as "a recording of a sound, without or with visual images, which is used or useful in the recording, production or manufacture of records." *Id*. at ¶ 16(d).

In 2000, the parties to the 1998 Agreement entered into a novation that established a direct contractual relationship between Eminem and Aftermath ("the 2000 Novation"). *Plfs' UF* ¶ 28. The 2000 Novation transferred the obligation to provide Aftermath with Eminem's recording services from FBT directly to Eminem. FBT became a "passive income participant," retaining a right to royalty income from Eminem's recordings. *Plfs' UF* ¶ 29; *Dfts' UF* ¶ 2. Aftermath agreed to render separate accountings to FBT and Eminem, and the 2000 Novation specified the royalty share of each. *Plfs' UF* ¶ 30.

In 2003, Aftermath and Eminem entered into a new recording contract, which terminated the 1998 Agreement ("the 2003 Agreement"). *Plfs' UF* ¶ 37. Plaintiffs retained the right to royalties from Eminem's recordings under the 2003 Agreement. *Plfs' UF* ¶ 41. The structure of the 2003 Agreement was similar to the 1998 Agreement, but included an increased advance and higher royalties reflecting Eminem's rise to stardom. *Plfs' UF* ¶¶ 38-39. Like the 1998 Agreement, the 2003 Agreement set forth two royalty rates, one for "records sold," *Hoffman Decl*. Ex. D ¶ 5(a)(i), and one for "masters licensed . . . to others for their manufacture and sale of records or for any other uses," *Id*. at ¶ 5(c)(v).

In November 2004, the parties entered into the "2004 Amendment," which altered the 2003 Agreement to increase the advance for an upcoming LP, the fraction of FBT's passive income participation, and certain royalty rates. *Plfs' UF* ¶¶ 56, 58.

---

[1] According to Defendants, the artist's basic royalty rate varies with the artist's popularity. *Hoffman Decl*. ¶ 4. The 1998 Agreement provides for "escalations," meaning that the royalty rate increases as certain sales targets are met. *Id*.; *see also Hoffman Decl*. Ex. A 4(a)(i).

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

  B. <u>UMG's Agreements with Third Party Digital Media Providers</u>

  Since approximately 2001, UMG has entered into agreements with various third parties granting those entities rights to distribute music to consumers over the internet in various forms, including permanent downloads. *Plfs' UF* ¶ 86. Permanent downloads are digital copies of recordings that, once downloaded, remain permanently on an end-user's computer, iPod, or other hardware device. *Plfs' UF* ¶ 73.[2] Apple's iTunes music store, which launched in 2003, quickly became the largest source of legal permanent downloads. *Plfs' UF* ¶¶ 69-70.

  In approximately 2003, UMG began entering into contracts with major cellular telephone network carriers, including Sprint, Nextel, Cingular, and T-Mobile, to provide UMG recordings for use on mobile phones as mastertones. *Plfs' UF* ¶¶ 120-21. "Mastertones" is a term that refers to more than one type of digital media; most commonly, mastertones are short clips of a song that play on a cellular phone to signal an incoming call. *Plfs' UF* ¶ 82. Typically, the user permanently downloads the mastertone onto her mobile device. *Plfs' UF* ¶ 83. Another form of mastertones play for a third party who calls the purchaser; they are stored on a central server and "streamed" to the caller. *Plfs' UF* ¶ 84.

  In 2005, FBT and Eminem hired an accounting firm to audit Defendants' accounting records for the period beginning January 1, 2002 and ending June 30, 2005. *Plfs' UF* ¶ 191. The audit revealed that UMG was paying Plaintiffs royalties for permanent downloads and mastertones based on the rate set forth in the "Records Sold" provision of the Eminem Agreements. *Plfs' UF* ¶ 192. Based on Plaintiffs' belief that royalties on permanent downloads and mastertones should be paid at the higher rate set forth in the "Masters Licensed" provision, the auditor calculated that Defendants had underpaid Plaintiffs by at least $650,000. *Plfs' UF* ¶ 192-93. Defendants responded to the audit report in a letter dated May 8, 2007, contesting the determination that certain royalties had been underpaid. *Plfs' UF* ¶ 196; *Dfts' SGI* ¶ 196.

  On May 21, 2007, Plaintiffs filed a complaint for breach of contract and declaratory

---

  [2] In contrast, the "streaming" of music allows a user to listen to a song online, but no copy is created on her local machine. *Plfs' UF* ¶¶ 76, 78. A consumer can only listen to a streamed song contemporaneously with its transmission; it is not possible to listen to the song again without reconnecting to the provider. *Plfs' UF* ¶ 79. "Conditional downloads" are a form of download restricted such that a user must maintain a subscription to a given service in order to continue to listen to the downloaded songs. *Plfs' UF* ¶ 80.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

judgment based on Defendants' alleged underpayment of royalties for digital uses of Eminem's recordings. On March 6, 2008, Plaintiffs filed a second lawsuit for breach of contract and declaratory judgment, also claiming that Defendants had failed to properly account and pay royalties due to Plaintiffs. *See F.B.T. Productions, LLC, et al. v. Aftermath Records, et al., No. CV 08-1563 PSG (CWx)* (Docket No. 1). The Court consolidated the two actions on May 19, 2008 and ordered Plaintiffs to file an amended complaint. Plaintiffs did so and later filed a second amended complaint ("SAC"), which asserted two counts for breach of contract and a third count for declaratory relief.

Plaintiffs now move for summary judgment on all claims. Defendants move for partial summary judgment on the first and third causes of action.

II.     Legal Standard

Federal Rule of Civil Procedure 56(c) establishes that summary judgment is proper only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If the moving party satisfies the burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial. *See id.* at 257.

A non-moving party who bears the burden of proving at trial an element essential to its case must sufficiently establish a genuine dispute of fact with respect to that element or face summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Such an issue of fact is a genuine issue if it reasonably can be resolved in favor of either party. *See Anderson*, 477 U.S. at 250-51. If the moving party seeks summary judgment on a claim or defense for which it bears the burden of proof at trial, the moving party must use affirmative, admissible evidence. Admissible declarations or affidavits must be based on personal knowledge, must set forth facts that would be admissible evidence at trial, and must show that the declarant or affiant is competent to testify as to the facts at issue. *See* Fed. R. Civ. P. 56(e).

III.    Discussion

     A.     Royalties Due on Permanent Downloads and Mastertones (Counts 1 and 3)

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

Plaintiffs' first cause of action seeks damages resulting from Defendants' alleged breach of contract with respect to the payment of royalties due on permanent downloads and mastertones of Eminem's recordings. *SAC* ¶ 38. Plaintiffs' third cause of action seeks a declaration that Defendants are obligated to pay royalties equal to fifty percent (50%) of Defendants' net receipts "from the licensing by Defendants or Defendants' Licensees of the Eminem Masters to Music Download Providers and Mastertone Providers." *SAC* ¶¶ 54-56. Because both counts necessitate a determination of the royalty due on these digital uses, the Court will treat the first and third causes of action together for the purpose of summary judgment.

Two provisions in the Eminem Agreements are central to the instant dispute. First, the "Records Sold" provision in the 1998 and 2003 Agreements sets a royalty for "full-price records sold in the United States" that varies between 12 and 20%. *Hoffman Decl*. Exs. A ¶ 4(a) and D ¶ 5(a). Second, the "Masters Licensed" provision provides that "[o]n masters licensed by us . . . to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from other uses of the masters." *Hoffman Decl*. Exs. A ¶ 4(a)(v) and D ¶ 5(c)(v). To date, Aftermath has paid Plaintiffs royalties for permanent downloads and mastertones of Eminem recordings under the Records Sold provision. Plaintiffs contend that they are entitled to summary judgment because the Eminem Agreements unambiguously require Defendants to account for royalties on permanent downloads and mastertones under the "Masters Licensed" provision. Defendants argue that Plaintiffs' proffered construction is not a reasonable reading of the contract language and that summary judgment should be granted for Defendants on this basis.

Under California law, when the meaning of the words in a contract is disputed, the Court must provisionally consider all extrinsic evidence that is relevant to show whether the contractual language is reasonably susceptible to either of the competing interpretations advanced by the parties. *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 39, 69 Cal Rptr. 561 (1968); *Wolf v. Sup. Ct.*, 114 Cal. App. 4th 1343, 1351, 8 Cal. Rptr. 3d 649 (2004). This is the case even if the contract appears unambiguous on its face, because "the fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms." *Pac. Gas,* 69 Cal. 2d at 39. "Extrinsic evidence can include the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." *Cedars-Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 980-81 (2006). Whether a contract is ambiguous is a matter of law. *Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir. 1993). If the Court determines that the contractual

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

provision in question is ambiguous, summary judgment is inappropriate because the differing views of the parties' intent will raise genuine issues of material fact. *Id.* Summary judgment is appropriate only if the contract is unambiguous. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).

The Eminem Agreements do not expressly state whether royalties on permanent downloads and mastertones are to be calculated under the Records Sold provision or the Masters Licensed Provision. Furthermore, neither Plaintiffs nor Defendants have submitted evidence of the negotiating parties' discussions, drafts, or other contemporaneous expressions of intent as to how permanent downloads and mastertones were to be treated under the Agreements.[3] Accordingly, the Court must look to the nature of the contract and the surrounding circumstances to interpret the contractual language. *Wolf*, 114 Cal. App. 4th at 1357; *Gen. Motors Corp. v. Sup Ct.*, 12 Cal. App. 4th 435, 442, 15 Cal. Rptr. 2d 622 (1993).

Plaintiffs argue that the plain language of the Masters Licensed provision, which states: "[o]n masters licensed by us . . . to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from other uses of the masters," applies to *all* "licenses" of Eminem recordings to third parties. Plaintiffs maintain that the relationship between UMG and third-party permanent download and mastertone providers are "licenses" within the legal meaning of that term. Therefore, according to Plaintiffs, the Eminem contracts entitle them to a 50% royalty on these digital uses.

Plaintiffs have submitted evidence which would support a finding that at least some of the agreements between Defendants and third-party permanent download providers are licenses. "The distributor of a copyrighted product's intent to regain possession is strong evidence that the produce was licensed, not sold, to the recipient." *UMG Recordings, Inc. v. Augusto*, 558 F.

---

[3] Plaintiffs and Defendants have submitted deposition testimony of various individuals who offer their understanding of which provision of the Eminem Agreements applies to permanent downloads and mastertones. However, the parties have not shown that (1) each of those individuals was involved in negotiating or drafting the Agreements and (2) that the individual's understanding was expressed during negotiations. Indeed, it is undisputed that the parties did not discuss the treatment of digital uses during the negotiation of the 2003 Agreement. *Plfs' UF* ¶ 50. The parties' undisclosed intent or understanding is irrelevant to contract interpretation. *Cedars-Sinai*, 137 Cal. App. 4th at 980 (citation omitted).

Case 2:07-cv-03314-PSG-MAN    Document 349    Filed 01/20/2009    Page 7 of 11

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

Supp. 2d 1055, 1060 (C.D. Cal. 2008). For example, Plaintiffs have submitted an agreement between UMG and Apple Computer, Inc. *Busch Decl.* Ex. 20. The agreement indicates that UMG may withdraw any of its sound recordings from the iTunes online music store, *id.* at ¶ 1(b), which is indicative of a license, not a sale. The iTunes agreement provides recurring benefits for UMG, the copyright holder, which also suggests that the agreement constitutes a license. *See id.* at 1061 ("Generally, licenses provide recurring benefits for the copyright owner."). For each song or album sold, Apple agrees to pay a certain amount to UMG. *Busch Decl*. Ex. 20 ¶ 2(a). Thus, under the 2002 iTunes agreement, Apple appears to lack many of the critical rights of ownership, such as the right to perpetual possession and freedom from obligations to UMG. This suggests that the agreement was a license. *See UMG Recordings*, 558 F. Supp. 2d at 1062.

Plaintiffs state that Defendants have produced approximately 80 such agreements, which are "similar in terms of the rights granted to the third parties and their general structure." *Plfs' Opp*. 8:25-26. Defendants contest this assertion, however, arguing that they have produced over 500 third-party agreements that vary and cannot be generalized as to their grant of rights. *Dfts' SGI* ¶¶ 86-87.[4] Therefore, the Court cannot conclude that all of the permanent download agreements are licenses.

Furthermore, Defendants dispute that the parties intended the term "license" in the Eminem Agreements to have a copyright law definition. Under California law, "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by the usage, in which case the latter must be followed." Cal. Civ. Code § 1644. According to Defendants, the parties intended for the Masters Licensed provision to apply only to "ancillary uses" of the master recordings. Defendants define "ancillary uses" as transactions ancillary to the record company's main business of selling records, such as licensing an Eminem song for use in a movie or for inclusion in a compilation album. *Dfts' Opp*. 4:10-15. However, there is no limiting provision in the Masters Licensed Provision or elsewhere in the Eminem Agreements that indicates that the Masters Licensed provision only applies to

---

[4] Plaintiffs also argue that by 2003, UMG had entered into agreements with Apple and other digital providers, so it knew that the Masters Licensed provision would apply to permanent downloads. However, Defendants correctly point out that there is no evidence that the negotiators of the Eminem contracts had read or were aware of the relevant third party digital provider contracts.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

"ancillary" uses or income. Defendants point to a sentence in the 2000 Novation which states:

> [I]t is agreed that the foregoing fractions of the applicable royalty rate shall also be applied to any advances or fees payable to Artist in connection with any ancillary uses of each master recording recorded by Artist pursuant to the Agreement after the Delivery of LP 2 and prior to the Delivery of LP 7 . . . .

*Hoffman Decl.* Ex. C ¶ 7(e). Based on the record before it, it is not clear to the Court that this sentence is modifying, limiting, or referring to the Masters Licensed Provision. Defendants insist that the reference to royalties on "ancillary uses" must refer to the Masters Licensed provision; however, this reference is not clear from the plain language of the contract, and Defendants have not convinced the Court that this section of the Novation must refer to the Masters Licensed Provision.

    Next, both parties argue that industry custom supports their interpretation of the Eminem Agreements. Plaintiffs assert that the "purpose" of a "masters licensed" provision is "to provide for a higher royalty rate when the record company licences the master recordings to third parties because in such situations the record company does not incur the expensive incremental cost associated with manufacturing, packaging and distributing the physical records associated with a release by a third party." *Plfs' UF* ¶ 23. Plaintiffs also maintain that this type of language in a recording contract usually serves as a "catch all" provision intended to apply to all licensed uses of the master recordings not specifically provided for in the contract. *Plfs' UF* ¶ 24. Defendants fervently dispute this assertion, contending that provisions such as the Masters Licensed section typically apply only to compilation records and incorporation into movies, TV shows, and commercials. *Dfts' SGI* ¶¶ 23-24. The Court finds that neither party has conclusively established that "custom and practice" mandates a particular interpretation of the Masters Licensed provision. Instead, the parties' conflicting evidence creates a triable issue of fact.[5]

---

    [5] The Court notes that much of Plaintiffs' expert testimony appears to be inadmissible, as it sets forth an opinion on the proper interpretation of the Eminem Agreements. *See generally Menell Decl.* An expert may testify to industry custom and usage with respect to particular contract terms, but may not offer an opinion on the ultimate contract interpretation issue. *Morrow v. Los Angeles Unified Sch. Dist.*, 149 Cal. App. 4th 1424, 1444-45, 57 Cal. Rptr. 3d 885 (2007).

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

      Defendants also contend that Plaintiffs' proffered understanding of the Eminem Agreements ignores a key provision of the 2004 Amendment. This provision states: "Sales of Albums by way of permanent download shall be treated as USNRC Net Sales for the purpose of escalations, provided that the sales price concerned falls within a top line sales price category applicable to such method of sale." *Hoffman Decl*. Ex. E. ¶ 2(a). Plaintiffs argue that the 2004 Amendment's treatment of downloads is only relevant for the purpose of calculating units toward escalation targets. However, Defendants point out that referring to downloads as "sales of albums" would be nonsensical if, as Plaintiffs contend, downloads are never "sold" but merely licensed. Plaintiffs' response is that the Masters Licensed provision explicitly references "the manufacture and sale of records" by third parties. Therefore, the 2004 Amendment's provision does not conclusively resolve the ambiguity.[6]

      Defendants maintain that the "Records Sold" provision unambiguously applies to permanent downloads and mastertones because these are forms of "records." It is undisputed that the 1998 and 2003 Agreements define a "record" as "all forms of reproductions, whether embodying sound alone or sound together with visual images, manufactured and distributed primarily for home use." *Dfts' UF* ¶ 4. Furthermore, the Agreements give Aftermath the right to sell "records" "in any [or] all forms of media now known and hereinafter developed." *Hoffman Decl*. Ex. A 8 at ¶ 40. Thus, Defendants maintain that their interpretation is more consistent with the contracts' expansive grant of rights to Defendants to distribute "records" embodying the Eminem master recordings.

      Finally, Defendants also point to the fact that Plaintiffs never objected to Defendants' payment of royalties under the Records Sold provision until the auditor raised the issue in 2006. Construction given to a contract by acts and conduct of parties with knowledge of the contract terms and before a controversy arises is relevant to contract interpretation. *S. Pac. Trans. Co. v. Sante Fe Pac. Pipelines, Inc*., 74 Cal. App. 4th 1232, 1242, 88 Cal. Rptr. 2d 777 (1999). Therefore, this evidence of Plaintiffs' conduct is also relevant to show their intent.

      "The purpose of the law of contracts is to protect the reasonable expectations of the parties." *ASP Props. Group v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1268, 35 Cal. Rptr. 3d 343 (2005) (citation omitted). Here, there is no direct evidence of objective manifestations of the parties' intent at the time the Eminem Agreements were negotiated, and the Agreements do not explicitly indicate under which royalty provision permanent downloads and mastertones are to

---

[6] Additionally, the Court notes that this provision does not address mastertones.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

be treated. Indeed, it is undisputed that parties did *not* discuss the treatment of downloads and mastertones while negotiating the most recent version of the contract. *Plfs' UF* ¶ 50. Based on the conflicting extrinsic evidence before the Court, the contracts are reasonably susceptible to more than one interpretation. Therefore, Plaintiffs' and Defendants' reasonable expectations regarding royalties due on permanent downloads and mastertones when they entered into the Eminem Agreements remain triable issues of material fact. *See Wolf*, 114 Cal. App. 4th at 1359-60. Accordingly, the motions for summary judgment must be DENIED.

      B.      <u>Underpayment due to Misallocation of Costs (Count 2)</u>

Plaintiffs' remaining cause of action alleges that Defendants have underpaid royalties due Plaintiffs in the amount of $159,332. *SAC* ¶¶ 45-47. Plaintiffs claim that they are entitled to summary judgment on this claim because Defendants admitted this underpayment in writing on May 8, 2007. *SAC* ¶ 47.

Defendants correctly point out that Plaintiffs have not fully explained the basis for this claim. Plaintiffs' Statement of Uncontroverted Facts in support of their motion for summary judgment claims that in a letter dated May 8, 2007, Defendants "admitted an underpayment to F.B.T. of $159,332 stemming from incorrect allocation of costs as between Eminem and Plaintiffs." *Plfs' UF* ¶¶ 196, 2. However, in that letter, Defendants disputed the auditor's determination that Defendants had misallocated producer royalties, expressly maintaining that no adjustment was necessary under this provision of the Eminem Agreements. *Dfts' SGI* ¶ 2; *See Busch Decl.* Ex. 33 ¶ 16. According to Defendants, the $159,332 figure represents an "interim net figure calculated as part of Aftermath's audit response, which netted Plaintiffs' claim against some, but not all, of Defendants' counterclaims seeking recovery of certain overpayments." *Dfts' SGI* ¶ 2; *see also Busch Decl.* Ex. 33, p.5-6.; Ex. 41 (Hu Dep.) 29:16-30:20.

Furthermore, as Defendants correctly argue, it is unclear whether $159,332 is the entirety of Plaintiffs' second cause of action. The SAC introduces the second claim for breach of contract with the statement, "*For example and without limitation*, Defendants have violated the terms of the Agreements as set forth in the following paragraphs." *SAC* ¶ 45 (emphasis added). The following paragraphs describe Defendants' alleged misallocation of producer royalties as between Plaintiffs and Eminem. *Id*. ¶¶ 46-49. However, because Plaintiffs did not limit their second cause of action to this specific breach, Plaintiffs may be improperly moving for summary judgment as to part of a claim without notice to Defendants.

In summary, Plaintiffs have failed to show that there is no genuine issue of material fact

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

link#170/175/257

CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | January 20, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

for trial on their second cause of action. Therefore, the motion for summary judgment as to the second claim is DENIED.

IV.     Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment and Defendants' motion for partial summary judgment are DENIED.

**IT IS SO ORDERED.**