1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3       HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4    F.B.T. PRODUCTIONS, LLC,          )
                                        )
5                                       )
                                        )
6                        Plaintiffs,    )
                                        )
7                                       )
                                        )
8          Vs.                          )   No. CV 07-3314-PSG
                                        )
9                                       )
                                        )
10   AFTERMATH RECORDS, ET AL.,         )
                                        )
11                                      )
                                        )
12                       Defendant.     )
                                        )
13   _____   )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               *JURY TRIAL, DAY 1*

18                   *PART I*

19            LOS ANGELES, CALIFORNIA

20          FRIDAY, FEBRUARY 20, 2009

21   _____

22

23            MIRIAM V. BAIRD, CSR 11893
          OFFICIAL U.S. DISTRICT COURT REPORTER
24          255 EAST TEMPLE STREET, # 181-K
            LOS ANGELES, CALIFORNIA 90012
25                 (213) 894-2853
                 MVB11893@aol.com

1                    **A P P E A R A N C E S**

2


3    **IN BEHALF OF THE PLAINTIFF,**        RICHARD BUSCH
     **F.B.T. PRODUCTIONS:**                315 UNION STREET
4                                           NASHVILLE, TN 37201
                                            - and -
5                                           GLASER, WEIL, FINK, JACOBS
                                            & SHAPIRO, LLP
6                                           BY:  MARK L. BLOCK
                                            10250 CONSTELLATION
7                                           BOULEVARD
                                            NINETEENTH FLOOR
8                                           LOS ANGELES, CALIFORNIA
                                            90067
9

10

11

12

13   **IN BEHALF OF THE DEFENDANT,**        MUNGER, TOLLES & OLSON, LLP
     **AFTERMATH RECORDS, ET AL.:**         BY:  GLENN D. POMERANTZ
14                                               KELLY KLAUS
                                                 MELINDA LEMOINE
15                                          355 SOUTH GRAND AVENUE
                                            THIRTY-FIFTH FLOOR
16                                          LOS ANGELES, CALIFORNIA
                                            90071
17

18

19

20

21

22

23

24

25

```
 1        LOS ANGELES, CALIFORNIA; FRIDAY, FEBRUARY 20, 2009; 0930

 2                              ---

 3

 4            THE COURT:  Good morning, ladies and gentlemen.

 5   And welcome to the courtroom, Courtroom 790.

 6            At this point would you please rise -- the jurors

 7   please rise to be sworn in by Ms. Hernandez.

 8            THE CLERK:  Would you please raise your right hand.

 9            (Prospective jurors sworn.)

10            THE COURT:  Again, welcome, and thank you for --

11   thank you in advance for your time and attention in this

12   case.  We are here this morning to select a jury in a civil

13   case entitled F.B.T. Productions, LLC, and Em2M, LLC, versus

14   Aftermath Records, doing business as Aftermath Entertainment,

15   Interscope Records, UMG Recording, Inc., and Ary, Inc.

16            Let me introduce myself.  I'm Judge Gutierrez.  My

17   courtroom deputy is Wendy Hernandez, and the court reporter

18   is Miriam Baird.

19            Once you are selected as jurors in this case,

20   you'll be given our telephone numbers so you can contact us

21   if there is any kind of emergency or something that comes up

22   that you need to let us know about.

23            Since you've now been sworn in as jurors, it's

24   important that everybody arrive on time because we can't get

25   started unless everyone is here together.  If somebody is
```

1    missing, we have to wait for that missing person.

2    And having said that as well, in a moment I'll give

3    you the -- our schedule.  I want to let you know that the

4    lawyers and I are doing everything that we can to keep to

5    that schedule.  We're going to start on time.  We're going to

6    end when we tell you we're going to end so that we don't

7    waste your time.

8    But having told you that we're giving our best

9    efforts to that, sometimes it works beautifully and there

10   aren't any delays, and other times it works miserably and

11   there are delays.  But I want to assure you that everyone is

12   doing everything that they can to make sure we don't waste

13   your time.

14   If at any point in time you have difficulty hearing

15   me, later on hearing the lawyers, witnesses, or you have

16   difficulty seeing something that is being shown or

17   demonstrated, please do something to get my attention, either

18   raise your hand, put your hand by your ear.  I'm usually

19   looking around the courtroom, and I want to make sure

20   everyone can see and hear everything that goes on in the

21   courtroom over the next few days.

22   This case is estimated to proceed as follows.

23   We're going to pick a jury today.  That's all we're going to

24   do.  That may take a couple hours.  And then by the end of --

25   by lunch time you'll know whether or not you're going to be

1    a juror in this case.

2              Also, our typical schedule is 9:00 to 12:00, 1:30

3    to 4:30.  So we're going to pick a jury today.

4              On Tuesday morning you'll hear opening statements,

5    and then we're going to proceed until Friday.  Just in terms

6    of worst estimate, I suspect that the case will be to you for

7    your decision by the following Tuesday.  So it is

8    essentially, including this day, six days.  Given that

9    schedule, does anyone have an extraordinary hardship in

10   staying on this case?  If you do, please raise your hand.

11   Once you've raised your hand, I'll identify where you're

12   sitting.  Please tell me your name, give me a moment to find

13   you on my list, and then I'll follow up with whatever the

14   "yes" answer may be.

15             And I'll start with my right side in the first row.

16   If you would give me your name, please.

17             PROSPECTIVE JUROR:  Michelle Diblosi.

18             THE COURT:  Ms. Diblosi, can you tell me the

19   difficulty.

20             PROSPECTIVE JUROR:  I'm traveling Friday to Europe.

21             THE COURT:  And is that for business or is it a

22   trip that you preplanned or --

23             PROSPECTIVE JUROR:  I preplanned it, yes.

24             THE COURT:  All right.  Thank you.

25             PROSPECTIVE JUROR:  Thank you.

```
 1               PROSPECTIVE JUROR:  Rosio Espeleta.

 2               THE COURT:  Ms. Espeleta, could you tell me the

 3     reasons.

 4               PROSPECTIVE JUROR:  I direct activities at the

 5     school that I teach and we have student officer applications,

 6     and we have interviews on Thursday and Friday of next week.

 7               THE COURT:  All right.  Anyone else to the right

 8     side?

 9               (No response.)

10               THE COURT:  Okay.  Now moving to the middle.

11               PROSPECTIVE JUROR:  Nancy Berman.

12               THE COURT:  Ms. Berman.

13               PROSPECTIVE JUROR:  I have a family trip to do

14     Friday morning to Oregon, and I also have -- next week?  Is

15     next week March 1st?  Okay.  No, no.

16               THE COURT:  Next week is the -- where are we at?

17               PROSPECTIVE JUROR:  Yes.  Next Friday -- what's

18     today?  Next Friday.  I have a problem.

19               THE COURT:  Okay.  Well, next Friday you're going

20     to Oregon?

21               PROSPECTIVE JUROR:  Right.

22               I could do Monday after that, but I was scheduled

23     to go to Oregon on Friday.

24               THE COURT:  So if we keep you on the jury, you'll

25     have to leave Friday but you could come back on Monday of the
```

```
 1    next week.

 2              PROSPECTIVE JUROR:  That's true.

 3              THE COURT:  Thank you.

 4              PROSPECTIVE JUROR:  If it closes on Tuesday, you

 5    know, because I've been -- I made my two weeks available

 6    already.

 7              THE COURT:  Thank you.

 8              PROSPECTIVE JUROR:  Xiomara Tovar.

 9              THE COURT:  I'm sorry.

10              Ms. Tovar.

11              PROSPECTIVE JUROR:  Yeah.  I have two doctor's

12    appointments next week.

13              THE COURT:  When are they?

14              PROSPECTIVE JUROR:  One for Tuesday and one for

15    Friday.

16              THE COURT:  What time on Tuesday?

17              PROSPECTIVE JUROR:  Tuesday at 11:00.

18              THE COURT:  And Friday?

19              PROSPECTIVE JUROR:  Friday at 2:00.

20              THE COURT:  Thank you.

21              I'm sorry.  Is there any way that those -- I'm not

22    necessarily going to ask to reschedule those --

23              PROSPECTIVE JUROR:  Uh-huh.

24              THE COURT:  -- but are they --

25              PROSPECTIVE JUROR:  I have gestational diabetes.
```

```
1    I'm eight and a half months pregnant.

2              THE COURT:  That's more than I need to know.

3              Thank you.

4              PROSPECTIVE JUROR:  Jarlath Dolan.

5              THE COURT:  Would you say that again.

6              PROSPECTIVE JUROR:  Jarlath Dolan.

7              THE COURT:  One moment, Mr. Dolan.

8              Go ahead.

9              PROSPECTIVE JUROR:  I'm a Catholic priest in the

10   Ventura county area.  I'm the only full-time priest in a

11   congregation of 3,000 families.  We begin Lent, which is a

12   spiritual season for us, on Wednesday; so I have three

13   services.

14             And in addition, the morning service is at 7:45.

15   So getting here from Ventura County is quite a challenge.

16   Plus I deal with deaths and everything else you can imagine

17   that happens in a congregation.

18             THE COURT:  All right.  Thank you.

19             PROSPECTIVE JUROR:  Sergio Shimabukuro.

20             THE COURT:  Okay.

21             PROSPECTIVE JUROR:  I am a temp employee, which

22   means I get paid by the hour.  If I'm not there to work, I

23   don't get paid.

24             THE COURT:  All right.  Thank you.

25             PROSPECTIVE JUROR:  Thank you.
```

```
 1              PROSPECTIVE JUROR:  I'm Bessie Archie.  And --

 2    okay.

 3              THE COURT:  Ms. Archie.

 4              PROSPECTIVE JUROR:  Yes.  I had cataract surgery

 5    done on both eyes, and I haven't had a chance to see the

 6    optometry to get my glasses yet.  I have an appointment

 7    March 10th.  And my ophthalmologist says it's okay to drive

 8    without the glasses because I can see, but it is really,

 9    really hard.  I'm getting -- having bifocals made.  I have

10    little reading glasses, but I have to leave home, like,

11    midnight to get down here and try to get a park.

12              THE COURT:  Okay.  All right.  Thank you.

13              PROSPECTIVE JUROR:  Jennifer Lurey.

14              THE COURT:  Ms. Lurey.

15              PROSPECTIVE JUROR:  Two things.

16              I have a creative job at a studio, and if I'm not

17    there to cast the movies that are being cast right now they

18    don't get cast.  And, also, we just found out that my mother

19    has a very bad disease, and she may have to have surgery at

20    some point in the next two weeks.  I won't know for sure more

21    until the end of Monday or Tuesday.  I won't know when her

22    surgery has to be.

23              THE COURT:  Okay.  Thank you.

24              PROSPECTIVE JUROR:  I'm Gail Johnson.

25              THE COURT:  Ms. Johnson.
```

```
1              PROSPECTIVE JUROR:  I have difficulty driving at

2    night; so I just want to make sure that we would be done at

3    least by 4:30 because I have about at least an hour and a

4    half to two-hour drive to get back home in the light.

5              THE COURT:  Is -- if we end at 4:30, is that going

6    to get -- is that enough time to get home before dark?

7              PROSPECTIVE JUROR:  It will be close, but I think I

8    probably could.

9              THE COURT:  Okay.  Thank you.

10             PROSPECTIVE JUROR:  Wing Lam.

11             THE COURT:  Repeat your name.

12             PROSPECTIVE JUROR:  Wing Lam.

13             THE COURT:  Ms. Lam.

14             PROSPECTIVE JUROR:  I'm a full-time college student

15   in Cal State L.A.  And then I have my exam on the 25th, and

16   then the other final presentation on the second.

17             THE COURT:  Did you try to postpone your service?

18             PROSPECTIVE JUROR:  They sent me a four-week jury

19   duty report.  Then I postponed it.

20             THE COURT:  You postponed it before --

21             PROSPECTIVE JUROR:  Yeah.

22             THE COURT:  -- to a time that you weren't in

23   school?

24             PROSPECTIVE JUROR:  Uh-huh.

25             THE COURT:  Okay.
```

```
 1              PROSPECTIVE JUROR:  Thanks.

 2              THE COURT:  Anyone else?

 3              PROSPECTIVE JUROR:  My name is Eve Lopez.

 4              THE COURT:  Ms. Lopez.

 5              PROSPECTIVE JUROR:  My son has a doctor's

 6    appointment today at 4:00.

 7              May I be excused earlier today?

 8              THE COURT:  Okay.

 9              PROSPECTIVE JUROR:  Thank you.

10              THE COURT:  Anyone else?

11              PROSPECTIVE JUROR:  Your Honor, I've been

12    working -- I've been out two weeks with on call -- this is --

13              Oh, my name is Juana Beteta, and this is my second

14    week.

15              THE COURT:  Give me one second.

16              Go ahead.

17              PROSPECTIVE JUROR:  This is my second week on call;

18    so I've been going to work four hours, then I come home.

19    It's been like that for two weeks.  And I don't know.  This

20    is my second week like that.

21              THE COURT:  I'm sorry.  You're not getting paid or

22    are you losing work or --

23              PROSPECTIVE JUROR:  It's because I've been calling,

24    and sometimes I go work only four hours and then I come home.

25    And then I work weekends, but I -- usually I go to church.
```

```
 1    But these two weeks I didn't go because I have to be working.

 2             THE COURT:  Did you --

 3             PROSPECTIVE JUROR:  This is my second week on call.

 4             THE COURT:  But my question is, if you don't go to

 5    work -- if you're here on jury duty, are you getting paid?

 6             PROSPECTIVE JUROR:  No.  I don't think so.  I have

 7    to go work weekends.  That's why.

 8             THE COURT:  All right.

 9             PROSPECTIVE JUROR:  Thank you.

10             THE COURT:  Okay.  Thank you.

11             Anyone else?

12             THE CLERK:  We have somebody, Your Honor.

13             THE COURT:  All right.

14             PROSPECTIVE JUROR:  Luís Cruz.

15             THE COURT:  Mr. Cruz.

16             PROSPECTIVE JUROR:  Judge, I have a doctor's

17    appointment next Thursday.

18             THE COURT:  What time?

19             PROSPECTIVE JUROR:  3:30.

20             THE COURT:  Can that appointment be rescheduled to

21    the following week?

22             PROSPECTIVE JUROR:  They have already scheduled it

23    two months ago.

24             THE COURT:  All right.  Thank you.

25             Anyone else?
```

```
 1                    (No response.)

 2                    THE COURT:  Can I see counsel at sidebar with the

 3       reporter.

 4                    (Sidebar discussion.)

 5                    THE COURT:  Stipulation to excuse first Ms. Tovar,

 6       who has two doctor's appointments.

 7                    Counsel stipulate to excuse?

 8                    MR. BUSCH:  We stipulate.

 9                    MR. POMERANTZ:  We stipulate.

10                    THE COURT:  Ms. Beteta, who was the person in the

11       front row appears to not be paid.

12                    MR. POMERANTZ:  That's fine, Your Honor.

13                    MR. BUSCH:  That's fine with us as well,

14       Your Honor.

15                    THE COURT:  Mr. Cruz, who has got a doctor's

16       appointment that was scheduled for two months next week.

17                    MR. BUSCH:  That's fine, Your Honor.

18                    MR. POMERANTZ:  We agree, Your Honor.

19                    THE COURT:  Mr. -- Ms. Berman, who is leaving to go

20       to Oregon next Friday.

21                    MR. BUSCH:  That's fine with us, Your Honor.

22                    MR. POMERANTZ:  That's fine with us too,

23       Your Honor.

24                    THE COURT:  Mr. Shimabukuro, who is not being paid.

25                    MR. BUSCH:  That's fine.
```

```
 1              MR. POMERANTZ:  We agree.

 2              THE COURT:  Ms. Diblosi, who is traveling to

 3   Europe.

 4              MR. BUSCH:  That's fine.

 5              MR. POMERANTZ:  We agree.

 6              THE COURT:  The remaining jurors who asked for

 7   excuse I would not excuse.

 8              MR. BUSCH:  Thank you, Your Honor.

 9              (Sidebar discussion concluded.)

10              THE COURT:  The following jurors have been excused

11   at this point.  If you are excused from this case, go back to

12   the jury assembly room and let them know you've been excused

13   from this case.

14              Ms. Tovar, you are excused.

15              Ms. Beteta, you are also excused.

16              Mr. Cruz, you are excused.

17              Ms. Berman, are you excused.

18              Mr. Shimabukuro, you are excused.

19              Ms. Diblosi, you are excused.

20              At this point in time I'm going to ask counsel to

21   introduce themselves to the jurors and the other persons at

22   counsel table.

23              MR. BUSCH:  Good morning.

24              My name is Richard Busch.  And I have with me

25   Mark Block and Mr. Gilford, Mark Gilford.  And my client is
```

```
 1   Joel Martin, who is sitting here as well.  And Mr. Levinson
 2   as well.
 3                THE COURT:  Thank you.
 4                MR. POMERANTZ:  Good morning.
 5                I'm Glenn Pomerantz.  I will be representing
 6   Aftermath.  With me and assisting me during the trial will
 7   be Melinda LeMoine and at the end Kelly Klaus, who are both
 8   co-counsel here.  And my client from Universal Music is
 9   Scott Ravine.
10                THE COURT:  Thank you.
11                Now that you've been introduced to the lawyers and
12   their counsel, if the answer is "yes" to any question that I
13   ask again, please raise your hand and I'll have you clarify
14   whatever the "yes" answer may be.
15                Now having met the lawyers and their clients, do
16   any of you know any of them, recognize their names in any
17   way?  Please raise your hand if you do.
18                All right.  The person right in front of me, if you
19   would stand.
20                Please hand her the microphone.
21                And, again, tell me your name.
22                PROSPECTIVE JUROR:  My name is Jennifer Lurey.
23                Through my business in entertainment for the last
24   years I've dealt with Universal.  And I've dealt with --
25   I don't know Mark Levinson personally, but I definitely know
```

```
 1    his name through different companies that I have worked

 2    through.

 3            THE COURT:  Anything about your contacts with

 4    the -- with the -- Universal, Ms. Lurey, that would prevent

 5    you from being fair in this case?

 6            PROSPECTIVE JUROR:  I know all people in all of

 7    their business affairs department.  I work with them

 8    constantly.

 9            THE COURT:  All right.  But anything about those

10    contacts that would prevent you from being fair in this case?

11            PROSPECTIVE JUROR:  I think I could be fair.  But

12    I do -- I want to be honest with you that I am familiar with

13    them on a business level.

14            THE COURT:  I'll follow up with that.

15            Thank you.

16            PROSPECTIVE JUROR:  Thank you.

17            THE COURT:  Anyone else?

18            (No response.)

19            THE COURT:  The following witnesses may be called

20    to testify in this particular case:  Mark Bass.  Eddy Cue.

21    Jeffrey Haroldson.  Rand Hoffman.  Ping Hu.  Steve Jobs.

22    Marni Nieves.  Michael Ostroff.  Peter Paterno.  Scott

23    Ravine.  David Weinberg.  Punch Andrews.  Jeff Bass.  David

24    Berman.  Rio Caraeff.  Gary Cohen.  Jay Cooper.  Ethan

25    Gustav.  James Harrington.  Jimmy Iovine.  Larry Kenswil.
```

```
1    Mark Levinson.  Jeff Light.  Joel Martin.  Peter Monel.  Lisa
2    Rogell.  Gary Stiffelman.  Steve Berman.  Charles Ciongali.
3              Does anyone recognize or know any of those
4    potential witnesses?
5              We have two hands and -- one and a half hands.
6              Ms. Lurey, again, do you recognize them from your
7    business dealings?
8              PROSPECTIVE JUROR:  Jennifer Lurey.
9              Several of them I have worked with before and dealt
10   with on a -- in business.
11             THE COURT:  Okay.  Thank you.
12             I'll follow up with that, though.  Thank you for
13   bringing that to my attention.
14             Can I have your name again, please.
15             PROSPECTIVE JUROR:  My name is Frank Blumer.
16             THE COURT:  Mr. Blumer.
17             PROSPECTIVE JUROR:  Well, it's a very common name,
18   but I know a Steve Berman, who is in the music business.  I
19   don't know if this is the same fellow.  I think it's a pretty
20   common name.
21             THE COURT:  But the Steve Berman that you know is
22   in the music business?
23             PROSPECTIVE JUROR:  Yeah.
24             THE COURT:  All right.  Anyone else?
25             (No response.)
```

```
 1                 THE COURT:  Okay.  Could I have counsel at sidebar
 2    with the reporter.
 3                 (Sidebar discussion.)
 4                 THE COURT:  Mr. Blumer, if you would approach us.
 5                 You mentioned that you know a Steve Berman who is
 6    in the music business.  Can you tell me about the Steve that
 7    you know.
 8                 PROSPECTIVE JUROR:  He's a composer --
 9                 THE COURT:  Keep your voice down.
10                 PROSPECTIVE JUROR:  -- does musicals, stuff like
11    that.
12                 THE COURT:  Composer?
13                 PROSPECTIVE JUROR:  For, like, that kind of thing.
14                 THE COURT:  Anything else, other than he's a
15    composer, does musicals?  How do you know him?
16                 PROSPECTIVE JUROR:  Through my church.
17                 THE COURT:  How often do you see him?
18                 PROSPECTIVE JUROR:  Oh, I'll see him couple times
19    a year.
20                 THE COURT:  About how old is he?
21                 PROSPECTIVE JUROR:  Approximately my age; so
22    between 55 and 62.
23                 THE COURT:  Thank you.
24                 It's a different Steve Berman.
25                 MR. BUSCH:  Yes.
```

```
 1              MR. POMERANTZ:  I think so.

 2              THE COURT:  With regard to Ms. Lurey, I can make

 3    inquiry.  She apparently knows quite a few people in this

 4    case.

 5              Can I have a stipulation to excuse Ms. Lurey?

 6              MR. BUSCH:  Yes, Your Honor.

 7              MR. POMERANTZ:  Yes, we agree.

 8              (Sidebar discussion concluded.)

 9              THE COURT:  All right.  Ms. Lurey, you are excused

10    from this case.  Thank you very much.

11              I'm going to read you a brief statement.  It gives

12    a brief outline of what this case is about.

13              This is a lawsuit brought by two plaintiffs, a

14    production company called F.B.T. Productions, LLC, and

15    another company called Em2M, LLC, against four different

16    defendants:  Aftermath Records, a joint venture; and its

17    co-owners Interscope Records, UMG Recording, Inc., and

18    Ary, Inc.  F.B.T. Aftermath and the recording artist known

19    as Eminem are parties to recording agreements that provide

20    for, among other things, the creation and dissemination of

21    music by Eminem and for the payment of royalties for that

22    dissemination to F.B.T. and Eminem.

23              Eminem is not a party to this lawsuit.

24              In their first cause of action, plaintiffs claim

25    that defendants licensed Eminem master recordings to third
```

1    parties and that those third parties then sold permanent

2    downloads and ring tones of the Eminem recordings.

3    Plaintiffs claim that defendants have not paid them under the

4    royalty provision of the parties' recording agreements that

5    plaintiffs claim apply to this situation.  As a result,

6    plaintiffs' claim that defendants paid less -- paid them less

7    in royalties than they would have received under the

8    provision that plaintiffs contend should apply.

9              In their second cause of action, plaintiffs claim

10   that the recording agreements require defendants to split

11   certain producer royalties and certain costs between F.B.T.

12   and Eminem but that defendants failed to do so correctly.

13             Plaintiffs claim that incorrect splitting of costs

14   resulted in underpayment of royalties to F.B.T.  Plaintiffs

15   have the burden of proving both of these claims.

16             Defendants contend that the sale of permanent

17   downloads and ring tones is subject to the royalty that

18   applies when Eminem albums are sold in other forms, like CDs,

19   cassettes, and vinyl.  Defendants contend that Aftermath has

20   paid plaintiff correctly.  Defendants also contend that

21   Aftermath correctly allocated producer royalties between

22   F.B.T. and Eminem and that if plaintiffs claim that Eminem

23   was overpaid, they should seek any claimed underpayment from

24   him.

25             Defendants also raise various affirmative defenses

1    to plaintiffs' claims.  For example, defendants claim that

2    plaintiffs knew what royalty provisions Aftermath applied to

3    pay royalties to plaintiffs for permanent downloads and ring

4    tones, and that plaintiffs waive any claim that they should

5    be paid under a different royalty provision.  Aftermath has

6    the burden of proof as to its affirmative defenses, all of

7    which plaintiffs deny.

8           Now that I've read a statement of the case, do any

9    of you know anything about this case?  Please raise your hand

10   if you do.

11          (No response.)

12          THE COURT:  All right.  No one has raised their

13   hand.

14          We will now begin the jury selection in this case.

15   In the trial of this case each side is entitled to have a

16   fair, unbiased, and unprejudiced jury.

17          The purpose of the jury is to find and determine

18   the facts.  Under our system of justice you are the sole

19   judges of the facts, and the goal of the jury is -- the jury

20   selection is to choose jurors who can be fair and impartial

21   jurors to both sides in this case and who will be able to

22   decide the questions presented them based solely on the

23   evidence presented during the course of the trial.  If there

24   is any fact or any reason why you might be biased or

25   prejudiced in any way, you must disclose the facts or reasons

1    when you are asked to do so.  It is your duty to make that

2    disclosure.

3         During the jury selection the Court will ask you

4    about certain background experience and your state of mind to

5    help you determine whether or not you are a qualified juror.

6    Qualified means that you can be fair and impartial and that

7    you can decide the case based on the evidence presented in

8    the courtroom and nothing else.  There is no such thing as

9    a right or wrong answer.  Answers are either complete or

10   incomplete.

11        I'm going to call up 14 jurors.  When your name is

12   called please take a jury -- a seat in the jury box.  The

13   first person will take Seat Number 1, which is the seat

14   closest to the audience but in the back row, filling in to

15   the next person.  And then the ninth person called will fill

16   in to the second row closest to the audience, filling into

17   Seat Number 14.

18        For the jurors that remain out in the audience,

19   please pay close attention to the questions that I ask and

20   the answers that are given because it's very likely that you

21   will be asked to substitute for one of the 14 jurors sitting

22   in the jury box, and you're going to be asked the same

23   identical questions.  So as you sit back there, think about

24   what your answers would be to the questions.

25        Also, the questions that I ask are not in any way

```
 1    intended to pry into your personal life.  But having said
 2    that, some of the questions may be personal.  If at any point
 3    in time you feel that blurting out the answer in open court
 4    will be embarrassing to you, just tell me and we'll go to
 5    sidebar like we've done before, and we'll discuss whatever
 6    the answer may be.
 7              Ms. Hernandez.
 8              THE CLERK:  Shawna Denise Thrower, T-h-r-o-w-e-r.
 9              Jarlath Dolan, D-o-l-a-n.
10              Paula McGehee, M-c-G-e-h-e-e.
11              Aimee Vargas, V-a-r-g-a-s.
12              Nidia Zapon, Z-a-p-o-n.
13              Eleanor Hinson, H-i-n-s-o-n.
14              William Moyle, M-o-y-l-e.
15              Rebecca Prevot, P-r-e-v-o-t.
16              Ernesto Escobar-Medina.
17              James Healy, H-e-a-l-y.
18              Gail Johnson, J-o-h-n-s-o-n.
19              Steve Stropski, S-t-r-o-p-s-k-i.
20              Melissa Raylene Juarez, J-u-a-r-e-z.
21              Rosio Espeleta, E-s-p-e-l-e-t-a.
22              THE COURT:  Welcome to the jury box.  I'm going to
23    start with the juror sitting way back there in Seat Number 1.
24              Ms. Thrower, if you would answer the questions on
25    the slip of paper that has been handed to you.
```

```
 1                  PROSPECTIVE JUROR:  Area of residence, Ventura
 2      County.
 3                  THE COURT:  I'm sorry.  You can sit down as well.
 4                  PROSPECTIVE JUROR:  Area of residence, Ventura
 5      County.
 6                  Highest educational degree, B.A.
 7                  I work at Belhanz (phonetic) Automotive doing
 8      accounting.
 9                  I'm single.
10                  The occupation of adults living with me, one is a
11      buyer.  One is a public affairs officer.
12                  I've not served in any jury service.
13                  And I do not have ties to the legal system.
14                  THE COURT:  And the person who is a buyer, which
15      kind of a business?
16                  PROSPECTIVE JUROR:  Well, he works at the
17      Ventura -- for the County negotiating contracts and buying,
18      you know, necessary supplies for the County.
19                  THE COURT:  And the other person is -- you said a
20      public affairs --
21                  PROSPECTIVE JUROR:  Public affairs officer
22      for Point Mugu base.
23                  THE COURT:  And you've never served on a jury
24      before?
25                  PROSPECTIVE JUROR:  Yes.
```

1                THE COURT:  You have not?

2                PROSPECTIVE JUROR:  Yes, I have not.

3                THE COURT:  Okay.  Any ties to the legal system,

4    such as lawyers, judges, court employees?

5                PROSPECTIVE JUROR:  No.

6                THE COURT:  Thank you.

7                Juror in Seat Number 2.

8                PROSPECTIVE JUROR:  Jarlath Dolan.

9                I'm a Ventura County resident.

10               B.A. degree.

11               Employment -- my employer is the Roman Catholic

12    Archbishop of the Archdiocese of Los Angeles.

13               Not married.

14               There is nobody living with me.

15               I have no prior jury experience.

16               I have no direct connection with the legal system.

17               I know a number of attorneys and judges.

18               THE COURT:  All right.  And the attorneys and

19    judges that you know, were they current parishioners or past

20    parishioners?

21               PROSPECTIVE JUROR:  Some of them are current

22    parishioners, Your Honor.

23               THE COURT:  Do you ever discuss with them their

24    work?

25               PROSPECTIVE JUROR:  If they bring it to my

 1    attention, yes, I do.

 2            THE COURT:  All right.  If during the course of

 3    the -- if you're left as a juror on this case and you have

 4    a question that you would like to have answered, either

 5    you're confused about the law or have some kind of question

 6    about the process, do you think that you would call one of

 7    your parishioner friends who is a lawyer or a judge?

 8            PROSPECTIVE JUROR:  No, I would not.

 9            THE COURT:  All right.  And the reason I point that

10    out, in one of the instructions that the jurors will get on

11    this case is that basically everything you learn about this

12    case needs to come from the courtroom.  So you can't consult

13    other persons; you can't consult reference books, even things

14    likes dictionaries; you can't go on the Internet and do

15    research.  Again, everything you learn about the case has to

16    come from the witness stand and from me as I instruct on the

17    law.

18            Thank you.

19            Juror Number 3.

20            PROSPECTIVE JUROR:  Paula McGehee.

21            I live in Whittier, California.

22            Some college.

23            I work for the County of Los Angeles as a contract

24    analyst.

25            I am married.  My husband is a police officer.

1            And my mother also lives with me, and I have a

2    14-year-old son.

3            I did serve in a civil case many, many years ago.

4            THE COURT:  And in that civil case, did the jury

5    reach a verdict?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  And your mother who lives with you at

8    home, what does she do?

9            PROSPECTIVE JUROR:  Stay home.

10            THE COURT:  Okay.  And your husband is a police

11    officer for what agency?

12            PROSPECTIVE JUROR:  For the City of Irvine.

13            THE COURT:  How long has he been a police officer?

14            PROSPECTIVE JUROR:  Five years.

15            THE COURT:  Thank you.

16            Juror in Seat Number 4.

17            PROSPECTIVE JUROR:  Hello.  My name is

18    Aimee Vargas.

19            I live in Los Angeles, California.

20            I have a B.S.

21            Currently unemployed.

22            Single.

23            And people living at home, one is unemployed as

24    well.  The other one is self employed.

25            I have served in a civil case before.

```
 1              THE COURT:  Did that jury reach a verdict?

 2              PROSPECTIVE JUROR:  Yes.

 3              THE COURT:  The person that is in your household

 4    that is self employed, what does he or she do?

 5              PROSPECTIVE JUROR:  She's a driver.

 6              THE COURT:  What kind of a driver?

 7              PROSPECTIVE JUROR:  Catering truck driver.

 8              THE COURT:  Okay.  And you mentioned somebody else

 9    in the household who is unemployed.

10              What did they do last?

11              PROSPECTIVE JUROR:  Forklift driver, lumber,

12    construction.

13              THE COURT:  Okay.  Now, you have a B.S.?

14              PROSPECTIVE JUROR:  Right.

15              THE COURT:  What -- what level -- what kind of

16    specialty?

17              PROSPECTIVE JUROR:  Finance.  Finance.

18              THE COURT:  Violence?

19              PROSPECTIVE JUROR:  Finance.

20              THE COURT:  Finance.  I thought you said violence.

21    I was wondering.  It's become a subspecialty.  There's so

22    much there's a subspecialty.  Finance.

23              Okay.  How long ago did you graduate and get your

24    degree in finance?

25              PROSPECTIVE JUROR:  December of '06.
```

```
 1              THE COURT:  What would you like to do?
 2              PROSPECTIVE JUROR:  I don't know.  I'm just trying
 3    to find a job right now.
 4              THE COURT:  Yeah.
 5              What was the last thing you did?
 6              PROSPECTIVE JUROR:  Oh, what was the last thing I
 7    did?  I worked at Wells Fargo Financial.  I was a credit
 8    manager.
 9              THE COURT:  Thank you.
10              Juror in Seat Number 5.
11              PROSPECTIVE JUROR:  My name is Nidia Zapon.
12              I reside in Los Angeles, California.
13              I have a B.S. degree.
14              Not currently employed.
15              I'm single.
16              And I have never served in jury service.
17              And I do live with two other college students.
18              THE COURT:  And other than being college students,
19    do they have part-time jobs or other jobs?
20              PROSPECTIVE JUROR:  One of them works at USC.  The
21    other one is unemployed.
22              THE COURT:  And what do you have your B.S. in?
23              PROSPECTIVE JUROR:  Civil engineering.
24              THE COURT:  And what was the last job that you
25    held?
```

```
 1              PROSPECTIVE JUROR:  I worked for a construction
 2    management firm.
 3              THE COURT:  How long ago was that?
 4              PROSPECTIVE JUROR:  September of '08.
 5              THE COURT:  And is there anything that you're
 6    looking to do next or --
 7              PROSPECTIVE JUROR:  I want to get into the medical
 8    field now.
 9              THE COURT:  So you're going to go back to school?
10              PROSPECTIVE JUROR:  Oh, yes.
11              THE COURT:  Oh, okay.  Thank you.
12              Juror Number 6.
13              PROSPECTIVE JUROR:  My name is Eleanor Hinson.
14              I live in Studio City.
15              I have a couple years of college.
16              I'm employed by McCain's.  I'm a customer service
17    supervisor.
18              I'm single.
19              I have two children, ages are 28 and 33.
20              I have served on a jury before, a criminal case,
21    and there was a verdict.
22              THE COURT:  And your 28 year old, what does he or
23    she do?
24              PROSPECTIVE JUROR:  She is unemployed right now.
25              THE COURT:  What did she last do?
```

```
 1              PROSPECTIVE JUROR:  She worked as a factory worker.
 2              THE COURT:  And then your 33 year old?
 3              PROSPECTIVE JUROR:  My son, he is a scout for the
 4    N.F.L.
 5              THE COURT:  And what is -- what type of business is
 6    McCain's?
 7              PROSPECTIVE JUROR:  Beverage dispensing.  Our main
 8    distributors are Coke and Pepsi.
 9              THE COURT:  All right.  Thank you.
10              May I just follow up briefly, the juror in Seat
11    Number 5, have you ever served on a jury before?
12              PROSPECTIVE JUROR:  No.
13              THE COURT:  Juror in Seat Number 7.
14              PROSPECTIVE JUROR:  William Moyle.
15              Santa Monica, California.
16              Bachelor of arts.
17              I'm retired.
18              I'm in a domestic relationship.  My partner's
19    occupation is general manager of catering at U.C.L.A.
20              No children.
21              Criminal case, burglary.
22              And no one in the legal system.
23              THE COURT:  Did the jury reach a verdict?
24              PROSPECTIVE JUROR:  Yes.
25              THE COURT:  And what are you retired from?
```

```
 1              PROSPECTIVE JUROR:  I was associate director of

 2    alumni relations at Cal State Long Beach.

 3              THE COURT:  How long have you been retired?

 4              PROSPECTIVE JUROR:  18 months.

 5              THE COURT:  All right.  Thank you.

 6              PROSPECTIVE JUROR:  I did work at Landmark

 7    Education for a while, but that's --

 8              THE COURT:  What did you do there?

 9              PROSPECTIVE JUROR:  I just ran their office.

10              THE COURT:  Okay.  Thank you.

11              Juror in Seat Number 8.

12              PROSPECTIVE JUROR:  Rebecca Prevot.

13              West Los Angeles.

14              Bachelors of science.

15              I currently work in fashion at Chic Little Devil

16    Style House, and I also freelance as an associate producer.

17              And I am not married, but I am engaged.  I have a

18    photographer who is my fiance that lives with me.

19              No children.

20              No prior jury service.

21              And no ties to the legal system that I know of.

22              THE COURT:  Okay.  And you mentioned your fiance is

23    a photographer.

24              PROSPECTIVE JUROR:  Correct.

25              THE COURT:  What kind -- any kind of specialty?
```

1              PROSPECTIVE JUROR:  Celebrities, not paparazzi,

2     but, you know, like, for album packaging, for magazines, for

3     advertising.

4              THE COURT:  Do you talk about his work?

5              PROSPECTIVE JUROR:  Yes.  All of the time.

6              THE COURT:  So the album packaging that he does,

7     how often does he do that?

8              PROSPECTIVE JUROR:  Pretty regularly.  Most of his

9     portfolio are musicians.  And I also do work with his agent

10    and producer as an associate producer on some shoots;

11    however, I did not know any of the names that you mentioned

12    earlier.

13             THE COURT:  Tell me about your work as an associate

14    producer.

15             PROSPECTIVE JUROR:  You know, I help to set up the

16    location for the shoot and just make sure that everything

17    goes well on set.  You know, book the catering, do some

18    casting, if need be.  If it's a fashion shoot, I'll

19    coordinate the styling, just kind of make sure all of the

20    ducks are in a row, that everything goes off perfectly.

21             THE COURT:  How long have you known your fiance?

22             PROSPECTIVE JUROR:  Two years.

23             THE COURT:  Has he always been in the photography

24    business?

25             PROSPECTIVE JUROR:  Yes.

```
 1            THE COURT:  What percentage of this work is in
 2    album shoots?
 3            PROSPECTIVE JUROR:  I would say maybe 50 percent.
 4            THE COURT:  Tell me a little bit about -- do you do
 5    anything with his accounting work in his business?  Anything
 6    like that to help out with that?
 7            PROSPECTIVE JUROR:  Yes.
 8            THE COURT:  If he goes out and does a shoot for,
 9    let's say, a musician --
10            PROSPECTIVE JUROR:  Uh-huh.
11            THE COURT:  -- as you understand they're going to
12    take pictures for not necessarily -- I don't know if you sell
13    albums anymore -- but for a CD?
14            PROSPECTIVE JUROR:  Yeah.  For an album package; so
15    it could be all of the photos that go on the CD, as well as
16    up on iTunes, any type of images that go with the album.
17            THE COURT:  Since you work with the business --
18    okay.  So he takes the picture of a musician.
19            PROSPECTIVE JUROR:  Uh-huh.
20            THE COURT:  How is he paid?
21            PROSPECTIVE JUROR:  He's paid from the record
22    label.
23            THE COURT:  Is it just a flat fee or is there --
24            PROSPECTIVE JUROR:  Typically -- there's typically
25    the fee for the production that will include his creative
```

1    fee, as well as, like, all of the other elements that go in,

2    as far as location and -- and so on.  And then beyond that

3    there's usage fees, but typically, I think, with the record

4    industry they do a buyout so that they actually own all of

5    the images; so then I don't think he can syndicate and I

6    don't think there's any additional, like, usage, as far as

7    royalties whereas -- because I think that they just determine

8    that it is for album packaging, and they can negotiate

9    whether or not it's used for advertising or anything else,

10   but --

11           THE COURT:  So, basically, once they pay him that's

12   the end of the relationship?  Those pictures go on and --

13           PROSPECTIVE JUROR:  Yes.  Correct.

14           THE COURT:  -- they do whatever they want with

15   them?

16           PROSPECTIVE JUROR:  Uh-huh.

17           THE COURT:  Is that correct?

18           PROSPECTIVE JUROR:  Uh-huh.

19           THE COURT:  "Yes"?

20           PROSPECTIVE JUROR:  I believe it is correct for the

21   ones that I've dealt with before.

22           THE COURT:  Okay.  All right.  And one of the other

23   things that is kind of funny, when you talk to people, I can

24   see that someone is nodding their head yes or nodding their

25   head no, but the court reporter is taking down everything

```
 1    that is being said; so I'll say, "Is that yes or is that no?"
 2    And I don't mean to be rude because everybody knows what
 3    you're saying.  And then other expressions like "huh-uh" or
 4    "uh-huh," when you go back and read them they don't mean
 5    anything; so a lot of times I'll ask you, "Does that mean yes
 6    or does that mean no?" just so that it is clear for the
 7    record.
 8              All right.  Thank you.
 9              Will you pass the microphone to the juror in Seat
10    Number 9.
11              PROSPECTIVE JUROR:  My name is Ernesto
12    Escobar-Medina.
13              I live in La Verne, California.
14              I'm a foreign architect by profession.  I work in
15    the -- actually, I've been recently laid off from the
16    entertainment industry.  I used to work for Stars Media Film
17    as a background designer.  I've been working there for
18    13 years.
19              I'm married.
20              My wife is a special ed teacher.
21              My kids are already grownups and out of the nest.
22              I do have prior jury service.  It was a civil case
23    a long time ago, like maybe more than ten years.  Yes, the
24    jury reached a verdict.
25              And I don't have ties to the legal system.
```

```
1            THE COURT:  You mentioned -- when you described

2    your occupation, you said a foreign architect.  What is the

3    difference -- what is the -- when you attach the word foreign

4    to architect, what does that mean?

5            PROSPECTIVE JUROR:  Foreign, is that my -- I have

6    a diploma from a different country than this one.  And I

7    don't have a license as per, you know, having legal

8    implications, but I work as an architectural designer for

9    13 years before getting to the entertainment industry.

10           THE COURT:  What would you like to do next?

11           PROSPECTIVE JUROR:  If I get a new job, I would

12   continue probably going into the entertainment business,

13   yeah.

14           THE COURT:  And you mentioned that your wife is a

15   special ed teacher.

16           What grade does she work with?

17           PROSPECTIVE JUROR:  That's small children.  It's in

18   the -- from six to nine years old.  And, actually, she's not

19   a teacher.  She's a teacher's aide.

20           THE COURT:  Okay.

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  And you told me that your kids were out

23   of the house.

24           But how many children do you have?

25           PROSPECTIVE JUROR:  I have three.  My daughter
```

```
1    lives in Pittsburgh.  She has a masters degree in art.  In

2    Denver -- my two other kids, one is still working in the

3    entertainment industry, in the show the Simpson's.  And my

4    other son is a chef.

5              THE COURT:  And your child that works in the

6    entertainment business on the Simpson's Show, what does he or

7    she do on that show?

8              PROSPECTIVE JUROR:  He is a storyboard artist and

9    also a layout artist.  He's more related with the animating

10   characters.

11             THE COURT:  Okay.  And you mentioned -- you talked

12   to me about your daughter in Pittsburgh and her educational

13   background, her degree.

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  What does she do in Pittsburgh?

16             PROSPECTIVE JUROR:  In Pittsburgh at this point

17   it's -- she's got a baby.  After being in the yoga business

18   and as an actress too, you know, now she is staying home,

19   taking care of the business.

20             THE COURT:  All right.  Thank you.

21             Juror in Seat Number 10.

22             PROSPECTIVE JUROR:  My name is James Healy.

23             I live in northwest Los Angeles County.

24             I have some college education.

25             I am currently unemployed.  I was in real estate --
```

1    residential real estate from 2002 until 2006.  Then I did a

2    little bit of grocery and a little bit of retail.

3              I'm single.  I live with someone else who is still

4    in the real estate industry.

5              No children.

6              And I have never served on a jury.

7              And I don't know anyone in the legal system.

8              THE COURT:  And what -- when you were in the real

9    estate business what did you do?

10             PROSPECTIVE JUROR:  I was -- my position was

11   transaction coordinator.  I was an unlicensed office worker,

12   and agents would come to me on a deal-by-deal basis and have

13   me process the paperwork and basically timeline the escrow to

14   make sure that everything that needed to happen did.

15             THE COURT:  And you mentioned you're unemployed.

16             What would you like to do next?

17             PROSPECTIVE JUROR:  Anything that pays.

18             THE COURT:  Okay.  All right.  And you mentioned

19   that there's a person in the household was also in the real

20   estate business.

21             What is he or she doing?

22             PROSPECTIVE JUROR:  They're an agent for both

23   buyers and listings, residential.

24             THE COURT:  And no prior jury experience?

25             PROSPECTIVE JUROR:  No, sir.

1                    THE COURT:  All right.  Thank you.

2                    Juror in Seat Number 11.

3                    PROSPECTIVE JUROR:  I'm Gail Johnson.

4                    I live in the Thousand Oaks area.

5                    I have a B.S.

6                    And I'm -- my employer is Employers Insurance.

7     I handle work comp claims, work comp examiner.

8                    Married.

9                    No kids.

10                   Prior was criminal.  There was a verdict.

11                   And I know a lot of attorneys in the work comp

12    industry.

13                   THE COURT:  Okay.  And that's lawyers that are

14    handling claims on behalf of applicants or claims on behalf

15    of the company?

16                   PROSPECTIVE JUROR:  Yeah.  Both sides, applicants

17    and defense.

18                   THE COURT:  And what does your spouse do?

19                   PROSPECTIVE JUROR:  Engineer.

20                   THE COURT:  What kind of engineer?

21                   PROSPECTIVE JUROR:  Mechanical, I guess you would

22    call it.

23                   THE COURT:  For what kind of business or industry?

24                   PROSPECTIVE JUROR:  Aerospace.

25                   THE COURT:  Thank you.

```
 1              PROSPECTIVE JUROR:  Oh, one other thing.

 2              THE COURT:  Sure.

 3              PROSPECTIVE JUROR:  I don't believe in doing civil

 4     suits.  I think that the parties should go to arbitration on

 5     that.

 6              THE COURT:  Okay.  I'll follow up with that.

 7              Thanks for telling me that.  Okay.

 8              PROSPECTIVE JUROR:  Steve Stropski.

 9              I live in Woodland Hills.

10              I have a B.A. degree.

11              I'm retired.

12              I have a domestic partner who is also retired.

13              I've served on two criminal trials.  We reached

14     verdicts on both of those.

15              And I have no ties to the legal system.

16              THE COURT:  And what are you are retired from?

17              PROSPECTIVE JUROR:  Phone company.

18              THE COURT:  What did you do at the phone company?

19              PROSPECTIVE JUROR:  I was a budget and financial

20     analyst.

21              THE COURT:  And your partner who is also retired,

22     what did he do at the --

23              PROSPECTIVE JUROR:  Budget and financial analyst.

24              THE COURT:  Same kind of industry?

25              PROSPECTIVE JUROR:  Same kind of industry.
```

```
 1                   THE COURT:  Thank you.

 2                   Juror in Seat Number 13.

 3                   PROSPECTIVE JUROR:  Okay.  I'm Melissa Juarez.

 4                   And I live in Ventura County.

 5                   Highest education would be just some college.

 6                   Marital status is single.

 7                   Well, my employer would be Anthem Blue Cross.  I'm

 8      a sales assistant.

 9                   Occupation of adults would be my brother, which is

10      a warehouse worker.  My sister does customer service.

11                   No children.

12                   And no prior jury service.

13                   No ties to the legal system.

14                   THE COURT:  And your sister who is in customer

15      service, what kind of business or industry?

16                   PROSPECTIVE JUROR:  Like, tools, Harbor Freight,

17      that company.

18                   THE COURT:  Thank you.

19                   PROSPECTIVE JUROR:  Uh-huh.

20                   THE COURT:  Juror in Seat Number 14.

21                   PROSPECTIVE JUROR:  Rosio Espeleta.

22                   Residence of where I live -- I live in Los Angeles,

23      California.

24                   Highest level of education, masters.

25                   My employer is L.A.U.S.D.  My occupation, I am a
```

 1   high school teacher, and I also direct activities.  So I work

 2   with -- I worked with record companies and with the music

 3   industry in the past.

 4            I'm married.

 5            Children, not yet.

 6            My husband's occupation, he works as a foreman and

 7   as a mechanic for refineries and electric plants.

 8            I've served -- jury, called in July and in the

 9   past, but never actually had a -- served on a -- I guess a

10   case.

11            And do I have any ties with the legal system?  No.

12            THE COURT:  And then you talked about in your work

13   at the high school you have had dealings with recording

14   studios.

15            PROSPECTIVE JUROR:  Yes, I have.

16            THE COURT:  Tell me about your dealings.

17            PROSPECTIVE JUROR:  I've dealt Universal Records

18   and a couple other record companies.  I have refused to allow

19   them on the campus because they do things they shouldn't.

20   For example, at the -- last year I had Universal Records.

21   They brought a fellow named Dylon.  (Phonetic) and there are

22   protocols that they have to follow and abide by.  And they

23   would -- first of all, they can't remove any clothes, and he

24   ripped his shirt off during a performance at lunch.  And they

25   were also selling CDs and also asking the kids for their

1   personal information, which is highly illegal to do that.

2   And they were also filming, and I asked them several times to

3   not film.  Later on, about the next day or two days after I

4   saw them put whatever they filmed on youtube, and they cannot

5   do that.  That is completely illegal.

6          So after that I limited what performers came on.

7   And I allowed a few after that, like D.J. Flex and a couple

8   of other bands to come in, but they all do something shady;

9   so I decided to no longer allow any performers.

10         THE COURT:  What kind of -- I'm just curious.  When

11  I went to high school we didn't haven't recording artists

12  come to high school.  So what kind -- is there something

13  different about your high school?

14         PROSPECTIVE JUROR:  They -- well, we're another

15  performing school; so they want to use us to promote

16  themselves and make themselves look like they're providing

17  a service.  I feel they're using us to make themselves look

18  like, oh, well, we're helping these poor, little kids taking

19  artists and things like that.  But that's the way I see it

20  because that's -- that's what I think they're doing.

21         Most of the time it's trying to remember the name.

22  It's a promotion department that I deal with, I believe or

23  community relations.  I believe those are the departments.

24  But they -- they can't follow -- they need to understand

25  they're on a school campus of a public school, and their

1    first concern should be the protection of students.  And they

2    should not be servicing themselves, which sometimes they do.

3            THE COURT:  Okay.  All right.  Thank you.

4            Now I'm going to ask you questions in general.  If

5    the answer is "yes" to any particular question that I ask,

6    please raise your hand.  And give me a moment to note who has

7    raised their hand, and then I'll follow up with whatever the

8    "yes" answer may be.

9            Have you or anyone in your immediate family ever

10    participated in a lawsuit as a party or in any other

11    capacity?

12            Okay.  Juror Number 14, you have the microphone.

13            Go ahead.

14            PROSPECTIVE JUROR:  My sister is currently in a

15    lawsuit with L.A.U.S.D.

16            THE COURT:  Okay.  And is it employment related, or

17    what is it about?

18            PROSPECTIVE JUROR:  It's regarding a child abuse

19    case.

20            THE COURT:  Okay.  Is she a plaintiff in the case

21    or a defendant in the case?

22            PROSPECTIVE JUROR:  I'm not quite sure what the

23    details are.

24            THE COURT:  All right.  But you know that the

25    lawsuit is ongoing?

```
 1                    PROSPECTIVE JUROR:  Yes.

 2                    THE COURT:  All right.  Okay.

 3                    Juror in Seat Number 2.

 4                    PROSPECTIVE JUROR:  I've been involved in a number

 5      of legal actions because of my position with the church.

 6      Most of them were worker comp cases.  Unfortunately, all but

 7      one was my favorite.  That was filed two days ago.

 8                    THE COURT:  What was filed two days ago?

 9                    PROSPECTIVE JUROR:  Former employee is filing

10      harassment case, age related.

11                    THE COURT:  Okay.

12                    PROSPECTIVE JUROR:  And in addition to that there

13      was a construction litigation that eventually went to

14      mediation.

15                    THE COURT:  All right.  And then the construction

16      litigation, did it relate to building something on the church

17      premises?

18                    PROSPECTIVE JUROR:  It was a building that had been

19      constructed before I got this particular assignment.  And

20      water intrusion would be the main issue.

21                    THE COURT:  So it was a defect in what was built?

22                    PROSPECTIVE JUROR:  Correct.

23                    THE COURT:  Anyone else?

24                    (No response.)

25                    THE COURT:  Okay.  I don't see any other hands.
```

```
 1              Okay.  Everybody heard me read what the case is
 2     about.  As you were sitting out in the audience, I started
 3     using the words "fair," "impartial."  What I really mean by
 4     that, fair and impartial, that you decide this case -- I'm
 5     not telling you to leave your common sense in the hallway,
 6     but what I'm asking you to do is if you can decide this case
 7     based solely on the evidence, what you hear from the witness
 8     stand, and then whether or not -- and then you decide the
 9     facts based on what I instruct you to be the law.  That's
10     basically what a fair and impartial juror is.
11              Does anyone feel at this point in time, just having
12     heard what the case is about, that they couldn't be fair and
13     impartial to both sides?  Please raise your hand if you have
14     that -- if you're in that mind frame.
15              Okay.  Juror Number 13 -- or 14, rather, you have
16     raised your hand.
17              Does it relate to what you talked about before?
18              PROSPECTIVE JUROR:  Yes.
19              THE COURT:  All right.  Thank you.
20              Anyone else?
21              Juror Number 11.  Could you pass the microphone
22     over to Juror Number 11.  You said something about
23     arbitration.  So you have some views that -- what -- you
24     started to tell me your view, something like civil suits
25     belong in arbitration.  Tell me -- tell me what your thinking
```

```
 1   is.
 2             PROSPECTIVE JUROR:  It is just my opinion that I
 3   don't think that they should waste the Court's time in civil
 4   litigation when you could do arbitration and that is usually
 5   a more qualified person, that is, the arbitrator than, you
 6   know, a jury.
 7             THE COURT:  Okay.  Now, you have that personal
 8   view, and now you're here as a juror.  And so here you are.
 9             Can you decide this case based on the evidence you
10   hear and what I tell you the law is?
11             PROSPECTIVE JUROR:  Probably not.  I don't know,
12   but I don't think I probably could.
13             THE COURT:  Why not?
14             PROSPECTIVE JUROR:  Because I just don't think it
15   should be here.
16             THE COURT:  So -- but let's say, for example --
17   let's say you go to a different field.
18             Just because you don't think you should be here,
19   does that mean you wouldn't --
20             PROSPECTIVE JUROR:  Probably -- oh, I'm sorry.  Not
21   me personally.  Just --
22             THE COURT:  The group.  The group shouldn't be
23   here.
24             PROSPECTIVE JUROR:  Right.
25             THE COURT:  But now you have -- you have this task,
```

1    and you are saying you wouldn't do it or you can't do it?

2              PROSPECTIVE JUROR:  Well, I think I will have --

3    I won't -- I won't be as open to the people that are pursuing

4    it, put it that way, as far as their views.

5              THE COURT:  So you would have a bias against the --

6    well, it takes two people to agree to arbitration; right?

7              PROSPECTIVE JUROR:  Right.

8              THE COURT:  So you would have a bias against the

9    plaintiff because of the case, not -- or just a bias against

10   both or just resent being here.

11             PROSPECTIVE JUROR:  Yeah.  Kind of that.  I -- like

12   I said, I'm not sure what the case is about, but I'm sure

13   that it could be resolved in arbitration.  That's my opinion.

14   So I'm not -- I don't agree with it being taken to trial on

15   it.  So I'm not going to be real open to -- as open minded as

16   I might be on another type of case.

17             THE COURT:  All right.  Okay.  Thank you.

18             Again, question of the group as a whole.  If the

19   answer is "yes," raise your hand and give me that moment to

20   identify who has raised their hand.

21             Have any of you ever downloaded music from the

22   Internet?  Keep your hands up for me.

23             Okay.  Who has the microphone?  Where is the

24   microphone.

25             Juror in Seat Number 14, you raised your hand.  If

```
1    so, from what Websites?

2              PROSPECTIVE JUROR:  From iTunes.  I've downloaded

3    from iTunes.

4              THE COURT:  All right.  Any other Websites?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.  Juror in Seat Number 13, you

7    also raised your hand.

8              PROSPECTIVE JUROR:  Napster, when it was available.

9              THE COURT:  Okay.  All right.  Juror in Seat

10   Number 11, you raised your hand.

11             PROSPECTIVE JUROR:  I don't recall, but I know that

12   I've done it before.

13             THE COURT:  Okay.  Juror Number 10.

14             PROSPECTIVE JUROR:  I use the Napster and the

15   Person to Person before they cut back on that.  And also the

16   iTunes.

17             THE COURT:  All right.  Juror Number 9.

18             PROSPECTIVE JUROR:  I download from iTunes and

19   youtube.

20             THE COURT:  All right.  And then back to Juror

21   Number 1, back there.

22             PROSPECTIVE JUROR:  Napster, when it was available.

23   I have a Zune.  I forgot what it's called, but that Website.

24   The Zune Marketplace.  And then youtube.

25             THE COURT:  All right.  Juror Number 4.
```

1              PROSPECTIVE JUROR:  iTunes.  And I think I did

2    Limewire in the past or something like that.

3              THE COURT:  Juror Number 5.

4              PROSPECTIVE JUROR:  iTunes.

5              THE COURT:  Juror Number 7.

6              PROSPECTIVE JUROR:  iTunes.

7              THE COURT:  And Juror Number 8.

8              PROSPECTIVE JUROR:  iTunes and Limewire and Napster

9    back in college.

10             THE COURT:  And -- give me a moment to identify

11   you.

12             Have any of you purchased music in the form of

13   permanent downloads from iTunes?  You already told me the

14   ones, iTunes.  But from any other online music store other

15   than iTunes?  Anyone else?

16             All right.  Juror Number 1.

17             PROSPECTIVE JUROR:  It's the Zune Marketplace that

18   acts like iTunes, and you can get music off there.

19             THE COURT:  Have any of you ever purchased music in

20   the forms of master tones or clips of songs that play when

21   your cell phone rings?

22             PROSPECTIVE JUROR:  On the Cingular, slash, AT&T

23   Website.

24             THE COURT:  And Juror in Seat Number 10.

25             PROSPECTIVE JUROR:  Also from the AT&T Website.

```
 1              THE COURT:  And was it for your cell phone?

 2              PROSPECTIVE JUROR:  Yes.  That is correct.  It was

 3      a ring tone.

 4              THE COURT:  Okay.  And juror in Seat Number 5.

 5              PROSPECTIVE JUROR:  From Verizon.

 6              THE COURT:  For your cell phone?

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  Okay.  Juror Number 4, you raised your

 9      hand up.

10              PROSPECTIVE JUROR:  Cingular.  That was a while

11      back, though.

12              THE COURT:  Now, everybody's memories --

13              PROSPECTIVE JUROR:  AT&T Cingular.

14              THE COURT:  For your phone?

15              PROSPECTIVE JUROR:  For my phone.

16              THE COURT:  Okay.  And juror in Seat Number 8.

17              PROSPECTIVE JUROR:  I have purchased ring tones

18      before from T-Mobile or whatever service it directs me to.

19              THE COURT:  And so then your phone rings and you

20      hear the music?

21              PROSPECTIVE JUROR:  Yes.  Correct.

22              THE COURT:  Okay.  All right.  Thank you.

23              Have any of you purchased music on a compact disc

24      from *Amazon.com* or any other online retail?

25              All right.  Okay.  Juror Number 7.
```

1           And *Amazon* or which --

2           PROSPECTIVE JUROR:  *Amazon*.

3           THE COURT:  Anyone else?

4           PROSPECTIVE JUROR:  No.

5           THE COURT:  Okay.  Juror Number 5.

6           PROSPECTIVE JUROR:  *Amazon*.

7           THE COURT:  Okay.  Juror Number 4?

8           PROSPECTIVE JUROR:  Best Buy, Sony.

9           THE COURT:  Okay.  That was online?

10          PROSPECTIVE JUROR:  Yeah.

11          THE COURT:  Okay.  And did I miss somebody else?

12          The juror in Seat Number 10?

13          PROSPECTIVE JUROR:  I also down- -- or I have

14   purchased discs from *Amazon.com*.

15          THE COURT:  Thank you.

16          Have any of you ever subscribed to a digital music

17   service that made music available by streaming it over the

18   Internet?

19          Juror Number 11.  Seat Number 11.

20          PROSPECTIVE JUROR:  XM Sirius.

21          THE COURT:  Thank you.

22          Juror Number 8.

23          PROSPECTIVE JUROR:  Pandora.

24          Does that qualify?

25          THE COURT:  I have no idea of what all of you are

```
 1    talking about.  The parties know more about this than I do.

 2    So you're telling me things that I, you know -- just give us

 3    the information.  They'll filter it.

 4              PROSPECTIVE JUROR:  Okay.  I listen to music on

 5    Pandora, which is an Internet streaming radio.

 6              THE COURT:  Did I look like I understood what you

 7    were talking about?

 8              All right.  Thank you.

 9              Anyone else?

10              (No response.)

11              THE COURT:  All right.  Any of you familiar with

12    the recording artist Eminem?

13              Keep your hands up for me.

14              Okay.  Do you have any particular views of Eminem

15    or his music?

16              Juror Number 8.

17              PROSPECTIVE JUROR:  I don't like him.

18              THE COURT:  Okay.  All right.  Anything about that

19    feeling, okay, that would prevent you from being fair in this

20    particular case?

21              PROSPECTIVE JUROR:  No.  Nothing.  It would not

22    prevent me from being fair.

23              THE COURT:  Okay.  Do you own any of his

24    recordings?

25              PROSPECTIVE JUROR:  No, I do not.
```

```
 1                    THE COURT:  And the juror in Seat Number 7, go
 2       ahead.
 3                    PROSPECTIVE JUROR:  I think he's a brilliant artist
 4       personally.  I don't have any feelings about him other than
 5       that, and I don't own anything.
 6                    THE COURT:  You don't own any of his recordings?
 7                    PROSPECTIVE JUROR:  No.
 8                    THE COURT:  All right.  You do think he's a
 9       brilliant artist.
10                    Is that going to cause to you favor one side or the
11       other or are you going to base your decision based on what
12       you hear and see from the witness stand?
13                    PROSPECTIVE JUROR:  Won't sway me one way or the
14       other.
15                    THE COURT:  All right.  Juror in Seat Number 6.
16                    PROSPECTIVE JUROR:  I just don't like his music.
17                    THE COURT:  Okay.  So if you don't like his music
18       you don't have his recordings?
19                    PROSPECTIVE JUROR:  I don't have his recordings.
20                    THE COURT:  Anything about not liking his music
21       that would prevent you from being fair to both sides?
22                    PROSPECTIVE JUROR:  No.
23                    THE COURT:  Okay.  Juror Number 5.
24                    PROSPECTIVE JUROR:  I have a couple of his
25       recordings.  I've listened to them occasionally, but he's
```

```
 1    just a musician.

 2              THE COURT:  Okay.  What recordings do you have?

 3              PROSPECTIVE JUROR:  Well, I have the newest song

 4    that came out and a couple of older songs.  I don't recall

 5    the names.

 6              THE COURT:  How did you purchase them?

 7              PROSPECTIVE JUROR:  iTunes.

 8              THE COURT:  Okay.  All of the recordings that you

 9    have from -- that relate to Eminem you have purchased on

10    iTunes?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  Okay.  Anything about your buying his

13    recordings, liking his music that would prevent you from

14    being fair to both sides?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  Okay.  All right.  Juror in Seat

17    Number 4.

18              PROSPECTIVE JUROR:  I don't have any of his

19    recordings.

20              THE COURT:  Okay.  But you know who he is?

21              PROSPECTIVE JUROR:  Yeah.

22              THE COURT:  Anything about how you feel about who

23    he is that would prevent you from being fair in this case?

24              PROSPECTIVE JUROR:  No.

25              THE COURT:  Juror Number 3.
```

```
 1                    PROSPECTIVE JUROR:  I don't like him either, his

 2      music or what he represents.

 3                    THE COURT:  Okay.

 4                    PROSPECTIVE JUROR:  And -- but I feel that I would

 5      be fair.

 6                    THE COURT:  You don't have any --

 7                    PROSPECTIVE JUROR:  No.

 8                    THE COURT:  Okay.  Juror in Seat Number 1.

 9                    PROSPECTIVE JUROR:  I like some of his music.

10      Sometimes I think he goes too far in some of the things he

11      does.  I do not own any of his music.

12                    THE COURT:  Anything about his music and your sense

13      that some is good, some goes too far that would prevent you

14      from being fair in this case?

15                    PROSPECTIVE JUROR:  No.

16                    THE COURT:  All right.  Thank you.

17                    Juror in Seat Number 10.

18                    PROSPECTIVE JUROR:  I first became aware of Eminem

19      back in my freshman year of high school, and I listened to

20      the *Slim Shady* L.P. and then I purchased the *Eminem Show* from

21      Best Buy.  I have enjoyed his music for a couple of years,

22      but I haven't really, you know, listened to him recently.

23                    THE COURT:  And the music that you purchased, you

24      mentioned you got one thing from Best Buy.

25                    Where did you get the music from?
```

1          PROSPECTIVE JUROR:  I copied it from a friend.

2          THE COURT:  Okay.  Anything about his music or

3   recordings that would pretty much prevent you from being fair

4   to both sides?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  All right.  Juror Number 11.

7          PROSPECTIVE JUROR:  I don't really have any opinion

8   on him, and I don't have any of his music; so I don't think

9   it would affect anything as far as a decision.

10          THE COURT:  Okay.  Juror Number 12.

11          PROSPECTIVE JUROR:  I don't know much about him,

12   just heard some of his music.  Not my -- not my thing.

13          THE COURT:  Okay.  Anything about his music or what

14   you've heard that would prevent you from being fair to both

15   sides?

16          PROSPECTIVE JUROR:  I don't think so.

17          THE COURT:  Okay.  Juror Number 13.

18          PROSPECTIVE JUROR:  I'm just familiar with some of

19   his songs.  I don't own any of his CDs or anything.

20          THE COURT:  Anything about what you have heard that

21   would prevent you from being fair to both sides?

22          PROSPECTIVE JUROR:  I don't believe so.

23          THE COURT:  Juror Number 14.

24          PROSPECTIVE JUROR:  I have one of his CDs that is

25   still in the shrink wrap.  I got it many years ago, the

1    "8 Mile" one.  I don't like all his songs.  I might like one

2    or two.

3              THE COURT:  And the music that you have, how did

4    you purchase them?

5              PROSPECTIVE JUROR:  I don't remember.  It was a

6    long time ago.

7              THE COURT:  Okay.  Thank you.

8              PROSPECTIVE JUROR:  Uh-huh.

9              THE COURT:  Are any of you familiar with Dr. Dre?

10             Juror Number 14, what are your views about him or

11   his music?

12             PROSPECTIVE JUROR:  Well, he sings with other

13   people, but I don't particularly like him.  I'm not a fan of

14   him.

15             THE COURT:  Okay.  All right.  Juror Number 13.

16             PROSPECTIVE JUROR:  I'm familiar with who he is.

17   I mean, I listened to his music from years ago.  I might have

18   a CD that I purchased a while ago.

19             THE COURT:  Okay.  Juror in Seat Number 10.

20             PROSPECTIVE JUROR:  I started listening to him

21   about, probably -- I don't know -- sixth grade or so, when

22   the original *Chronic* album came out, and then also the second

23   album *Chronic 2001*.  So I still do enjoy his music.

24             THE COURT:  Okay.  Juror Number 1.

25             PROSPECTIVE JUROR:  I like Dr. Dre.  I like his

 1   music.  And I have some songs that I've gotten from friends,

 2   but I have never bought his albums.

 3            THE COURT:  Juror Seat Number 4.

 4            PROSPECTIVE JUROR:  I've heard of Dr. Dre.  I've

 5   listened to him, but I don't have any of his CDs.

 6            THE COURT:  Okay.  Juror Number 5.

 7            PROSPECTIVE JUROR:  I own a couple of his CDs.  I

 8   do listen to him on occasion.

 9            THE COURT:  Okay.  Juror Number 7.

10            PROSPECTIVE JUROR:  I do know of him.  I don't own

11   any CDs.

12            THE COURT:  Okay.

13            PROSPECTIVE JUROR:  No opinion.

14            THE COURT:  Juror Number 8.

15            PROSPECTIVE JUROR:  I used to listen to him years

16   ago.  Probably have some of his music then.

17            THE COURT:  Now, for all the ones that have raised

18   their hands that have told me about Dr. Dre, do any of you

19   think, based on any of the things that you have listened to

20   or what you think that you would -- that those would prevent

21   you from being fair to both sides?  Please raise your hand if

22   you think that based on having heard Dr. Dre's recordings or

23   whatever you may have heard that you couldn't be fair to both

24   sides?

25            (No response.)

fuerte

```
1            THE COURT:  Okay.  No one has raised their hands.

2            Juror Number 14 told us a little bit about this

3   topic.

4            But what -- do any of you have any strong views

5   about record companies and their relationship with recording

6   artists?  Do any of you have any strong views on that topic?

7   Please raise your hand if you do.

8            All right.  Juror Number 1 has raised their hand.

9   Will you pass the microphone to Juror Number 1.

10           PROSPECTIVE JUROR:  My perception has always

11  been -- mainly from what I've heard in the media -- that the

12  record labels are not fair to the artist.

13           THE COURT:  Okay.  Now, again, I don't want you to

14  leave your common sense in the hallway.

15           Can you put aside anything you may have read in the

16  newspapers or the media and just figure this case out based

17  solely on what the evidence is and what I tell you the law

18  is?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Okay.  Anyone else?

21           Go back to Juror Number 8.

22           PROSPECTIVE JUROR:  Also having friends that are in

23  the music industry as artists, I do feel that they can be

24  taken advantage of sometimes by the record label; however,

25  you know, they do enter into any contracts that they enter
```

```
1    into knowingly.

2              And I could be fair in the courtroom.

3              THE COURT:  Okay.  Thank you.

4              Anyone else?

5              (No response.)

6              THE COURT:  Is anyone familiar with F.B.T.

7    Productions, LLC?  Does anyone have any familiarity with

8    that entity?

9              (No response.)

10             THE COURT:  Okay.  I don't see any hands.

11             Anyone have any familiarity with Universal Music

12   Group?

13             Okay.  Juror Number 8.

14             PROSPECTIVE JUROR:  I've heard of it.  And I knew

15   some people that worked there in the past that are not there

16   anymore.

17             THE COURT:  Okay.  Based on your friends that

18   worked there and what you've heard, anything about those

19   things that you know about that would prevent you from being

20   fair to both sides?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  What did your friends do at Universal?

23             PROSPECTIVE JUROR:  Artist development.

24             THE COURT:  And how long ago did they work there?

25             PROSPECTIVE JUROR:  Probably three or four years
```

```
 1   ago.
 2              THE COURT:  Did you talk to them about their work?
 3              PROSPECTIVE JUROR:  I did talk to -- it was one
 4   friend in particular about his work at the time, but I have
 5   not spoken to him in a couple of years.
 6              THE COURT:  All right.  Anything about what you've
 7   talked to -- about with him that would have anything to hold
 8   against Universal or you couldn't be fair to both sides in
 9   this case?
10              PROSPECTIVE JUROR:  No.  I don't think so.
11              THE COURT:  Okay.  Juror Number 1.
12              PROSPECTIVE JUROR:  I recognize the name and I know
13   that some artists are on that label.  That's pretty much the
14   extent, yes.
15              THE COURT:  Could you be fair to both sides?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  Anybody have any familiarity with
18   Interscope Records?
19              Okay.  Juror Number 1.
20              PROSPECTIVE JUROR:  It's the same thing.  Like, I
21   just know there's artists on the label.
22              THE COURT:  Okay.  Juror Number 5.
23              PROSPECTIVE JUROR:  I have heard of the record
24   label.  I know there are several artists that are signed to
25   that label.
```

```
 1              THE COURT:  Juror Number 8.

 2              PROSPECTIVE JUROR:  I'm not sure if Universal and

 3   Interscope were the same entity, but my same friend worked

 4   for Universal, went on and worked for Interscope as well,

 5   doing the same thing.

 6              THE COURT:  Are they working at Interscope as well?

 7              PROSPECTIVE JUROR:  I don't know for sure.

 8              THE COURT:  You haven't talked to him for a couple

 9   years?

10              PROSPECTIVE JUROR:  Right.

11              But when I did he was at Interscope last.

12              THE COURT:  And what does he do at Interscope?

13              PROSPECTIVE JUROR:  Artist development.

14              THE COURT:  All right.  Thank you.

15              Do any of you have strong views about rap music or

16   hip-hop?

17              All right.  Juror Number 8.

18              PROSPECTIVE JUROR:  You know, I'll listen to it

19   sometime, hip-hop music and rap music, but for the most part,

20   I do not believe what it stands for and what it represents as

21   far as womanizing and, you know, violence and those type of

22   activities are -- are really good.  So I don't listen to it

23   anymore.

24              THE COURT:  Okay.  And same question I would ask

25   over and over.
```

1          Is that going to have an impact on your decision?

2          PROSPECTIVE JUROR:  It should not make a

3     difference.

4          THE COURT:  All right.  Juror Number 4 -- in the

5     middle.  14 for sure.  There was someone else back there.

6          Okay.  Juror Number 14.

7          PROSPECTIVE JUROR:  I do have views since I work in

8     a high school and I hear kids singing to some of those songs

9     that are not rated PG.  I don't appreciate that, but --

10         THE COURT:  Thank you.

11         Juror Number 3.

12         PROSPECTIVE JUROR:  I pretty much agree with both

13     jurors.  And I think it's a shame that our kids are being

14     filled with all this trash.

15         THE COURT:  Can you put that feeling aside and

16     figure this case out based on the facts and the law as I give

17     it to you?

18         PROSPECTIVE JUROR:  Yes, sir.

19         THE COURT:  All right.  Anyone else?

20         Has anyone ever been involved in lawsuit

21     regarding -- involving music or the music industry?

22         All right.  Juror in seat --

23         Do any of you have any preconceived notions or

24     strong beliefs about people who bring lawsuits that would

25     prevent you from being impartial?

```
 1                    Juror Number 11, basically what you told us before?
 2             PROSPECTIVE JUROR:  Yes.
 3             THE COURT:  Okay.  Anyone else have a strong view
 4   like that?
 5                    Juror Number 14?
 6             PROSPECTIVE JUROR:  Well, my sister right now is
 7   dealing with a lawsuit, and I don't know if I will be
 8   sympathetic at this point because of the lawsuit.  They put
 9   her name on the news and they did horrible things to her, and
10   that has really, really affected her that she doesn't like to
11   talk about the case.  So that's -- that's how I feel about
12   lawsuits.
13             THE COURT:  All right.  Thank you.
14             Has anyone ever been involved with negotiating
15   contracts or agreements in the music industry?
16             (No response.)
17             THE COURT:  No one has raised their hand.
18             Have any of you heard of the term royalties as
19   pertaining to the music industry?
20             Okay.  One moment.  Keep your hands up for me,
21   please.
22             Okay.  Where's the microphone right now?
23             Juror Number 14, what have you been told -- or what
24   do you know about royalties?
25             PROSPECTIVE JUROR:  I think royalties are when they
```

```
 1    give money to somebody.  It's like when you -- like a tip,

 2    sort of.

 3              THE COURT:  Okay.

 4              PROSPECTIVE JUROR:  That's all I know.

 5              THE COURT:  Juror Number 12, you raised your hand.

 6              PROSPECTIVE JUROR:  You asked if I had heard of

 7    royalties.  I've heard of them.  I don't really understand

 8    how it works.

 9              THE COURT:  Okay.  All right.  Juror Number 11.

10              PROSPECTIVE JUROR:  Same.  I know they get some

11    kind of money, but I'm not sure how it works.

12              THE COURT:  Okay.

13              Juror Number 10.

14              PROSPECTIVE JUROR:  From what I understand,

15    isn't -- I think it has to do with the volume of sales, like

16    the number of units you sell.  If you sell more, then I guess

17    you make more.

18              THE COURT:  Okay.  All right.  Juror Number 1.

19              PROSPECTIVE JUROR:  Yeah.  Just a basic

20    understanding that what -- you get a portion of what you

21    sell.

22              THE COURT:  All right.  Juror Number 2.

23              PROSPECTIVE JUROR:  I'm familiar with it only from

24    church music circles.

25              THE COURT:  Okay.
```

1          PROSPECTIVE JUROR:  I know it's very expensive.  I
2    believe in it.  I think it's fair.
3          THE COURT:  Okay.
4          PROSPECTIVE JUROR:  It's money for the author or
5    composer.
6          THE COURT:  Now, when I talked about hip-hop and
7    rap you didn't raise your hand.  Okay?
8          Have you -- haven't you ever given a homily about
9    maybe content of music?
10         PROSPECTIVE JUROR:  No, I have not, Your Honor.
11   I was in the African-American community for ten years, and
12   I thought my life was more important than going against some
13   of the -- part of that society right then.
14         THE COURT:  Okay.
15         PROSPECTIVE JUROR:  So I think it's a free choice.
16   I have a choice to listen to it.  I have a choice to not
17   listen to it.
18         THE COURT:  All right.
19         PROSPECTIVE JUROR:  I've dealt with people long
20   enough to realize they're going to choose what they're going
21   to choose, irrespective of what I may take or say.
22         THE COURT:  All right.  Juror Number 6.
23         PROSPECTIVE JUROR:  I think the same.  The most I
24   just heard of the royalties is something they get for the
25   music that they do.

1          THE COURT:  All right.

2          PROSPECTIVE JUROR:  Same.

3          THE COURT:  Okay.  Juror Number 8.

4          PROSPECTIVE JUROR:  I have heard of royalties and

5    understand them to be money paid beyond whatever flat fee for

6    usage and or sales.

7          THE COURT:  Okay.  All right.  Could I see counsel

8    at sidebar?

9          (Sidebar discussion.)

10         THE COURT:  Challenges for cause first from the

11    plaintiff.

12         MR. BUSCH:  Yes.  Number 8.  She -- her

13    husband/boyfriend works in the -- is a photographer, depends

14    on his revenue from the record labels.  She also says that

15    she doesn't like rap music and womanizing that goes on with

16    it.  And the other point that she's made in connection with

17    her personal views, I think she should be excused.

18         THE COURT:  Any other?

19         MR. BUSCH:  Number 11, Gail Johnson.  She's the one

20    who said she doesn't believe in civil lawsuits and can't be

21    fair.

22         THE COURT:  Any others?

23         MR. BUSCH:  Number 14 said she cannot be fair or

24    impartial also.

25         THE COURT:  Challenges for causes to 8 is denied.

```
 1    She indicated she could be fair and impartial.

 2              Defense, any thoughts on 11 and 14?

 3              MR. POMERANTZ:  We agree on 14.  We don't agree on

 4    11.

 5              THE COURT:  I would grant for cause as to 11 and

 6    not 14.

 7              MR. POMERANTZ:  As to peremptories, if you pass, do

 8    you lose it?

 9              THE COURT:  You can save.

10              Let's do the peremptories.

11              As it stands right now, the first eight would be

12    our jurors, so....

13              MR. BUSCH:  Can I have a second to consult with my

14    client, please?

15              THE COURT:  Absolutely.  Go ahead.

16              Okay.

17              MR. BUSCH:  We would challenge Number 6 as well.

18              THE COURT:  Juror in Seat Number 6.

19              Now it's basically 1 through 9 that are the jurors.

20              THE COURT:  Next peremptory is with the defense.

21              MR. POMERANTZ:  Juror Number 1 we would challenge.

22              THE COURT:  Next peremptory is with the plaintiff.

23    Again 1 through 10 would be the jurors.

24              MR. BUSCH:  We would challenge --

25              THE COURT:  1 through 10.
```

```
 1              MR. BUSCH:  Number 9.
 2              THE COURT:  1 through 12 would be the jurors.
 3              Next peremptory is the defense.
 4              MR. POMERANTZ:  Number 3, Your Honor.
 5              THE COURT:  I'm going to substitute these jurors in
 6     the first eight.  I'll bring four down.  We'll make inquiry
 7     of those.  Then the last peremptory.  Move everybody up in
 8     the eight slots.  Those would be the eight jurors.  Call four
 9     more.  Then you each have one more.
10              MR. POMERANTZ:  Thank you.
11              MR. BUSCH:  Thank you.
12              (Sidebar discussion concluded.)
13              THE COURT:  The following jurors are excused at
14     this stage:
15              Juror in Seat Number 1.  Thank you.
16              Juror in Seat Number 3.
17              Juror in Seat Number 6.
18              Juror in Seat Number 14.
19              Juror in Seat Number 11.
20              Juror in Seat Number 9.
21              Okay.  I'm going to ask you -- the remain- -- I'm
22     going to rearrange your seating position.  Juror in Seat
23     Number 10, go back to Seat Number 1.  Juror in Seat
24     Number 12, go back to seat Number 3.  Juror in Seat
25     Number 13, go back to Seat Number 6.
```

```
 1              We're going to call four jurors.  When your name is
 2   called, take a seat in the front row, starting with Seat
 3   Number 9.
 4              THE CLERK:  David Cheng, C-h-e-n-g.
 5              Franklin Blumer, B-l-u-m-e-r.
 6              Jessica Alexander, A-l-e-x-a-n-d-e-r.
 7              Gabriela Garcia, G-a-r-c-i-a.
 8              THE COURT:  Which one is Ms. Garcia?
 9              PROSPECTIVE JUROR:  Me.
10              THE COURT:  Okay.  Hang on and let the other juror
11   go first.
12              PROSPECTIVE JUROR:  Oops.
13              THE COURT:  That's okay.
14              Ladies and gentlemen, we're going to take a
15   15-minute break.  After 15 minutes reassemble out in the
16   hallway and we'll bring you in in 15 minutes.
17              For the jurors sitting in the jury box remember
18   where you're sitting because I'm going to ask you to sit in
19   exactly the same seats when you come back into the courtroom.
20              A couple of things I also want to let you know as
21   well.  You may see any one of us in the hallway.  You may see
22   us down in the snack bar downstairs.  We're going to treat
23   you as if you don't exist.  We won't acknowledge your smiles.
24   We won't say hello.  We won't ask you -- answer any
25   questions.  And everybody is just following my order that no
```

1    one is to have contact the with the jurors or prospective

2    jurors.  So none of us are being rude; we just can't have

3    contact with you.

4           Second, we're still in the jury selection process,

5    and I'll talk about this in the instructions throughout the

6    process.  Do not discuss this case among yourselves or with

7    anyone else.  Do not form or express any opinions about the

8    case until it is finally submitted to you.  What that means

9    is you've been selected and sworn as a juror, you have heard

10   the opening statements, you've heard the evidence, you've

11   heard the closing arguments, I've instructed you on the law

12   and we're finally done, and then that's when you can talk

13   about the case among yourselves and express opinions.  But

14   until then you cannot.

15          And we'll see you in 15 minutes.

16          (Open court - jury not present.)

17          THE COURT:  All right.  We're going to take this

18   short break, and then we'll complete the jury selection

19   process.  We'll take another short break and discuss the

20   pending matters.

21          (Recess from 2:24 p.m. to 2:47 p.m.)

22          THE COURT:  The juror who is currently sitting in

23   Seat Number 4, let Ms. Hernandez know that she had a message

24   on her answering machine that she has a job interview for

25   this coming Monday or Tuesday.  She returned the message

1    asking for the job interview on Monday, but she could only

2    leave a message; so she doesn't know whether or not she is

3    going to have an interview on Monday or Tuesday.

4            MR. BUSCH:  Ms. Vargas?

5            THE COURT:  Yes.  What we could do is make the

6    inquiry of these four jurors, take a short break, let her

7    make the phone call and see if we still have her or not, and

8    then you'll at least have a picture of who is behind her if

9    we need to substitute her in.

10           Response, Mr. Pomerantz?

11           MR. POMERANTZ:  That's fine, Your Honor.

12           THE COURT:  Yeah.  All right.  Okay.

13           MR. BUSCH:  That's acceptable to us.

14           THE COURT:  Okay.  Let's go ahead and bring the

15    jurors in.

16           (Open court - jury present.)

17           THE COURT:  For the jurors now sitting in the first

18    row, starting with the juror in Seat Number 9, if you would

19    pass the microphone over to Mr. Cheng.

20           If you would answer those questions for me.

21           PROSPECTIVE JUROR:  My name is David Cheng.

22           My area of residence, Bradbury, California.

23           And I have an M.B.A.

24           I am employed by L.A. County as a network engineer.

25           I'm married.  My wife is a pediatrician.

```
 1                  I have her parents living with me.  They are both
 2       retired.
 3                  I have an eight year old and a six year old.
 4                  No prior jury service.
 5                  And a couple of my friends are lawyers.
 6                  THE COURT:  What kind of -- do you know what kind
 7       of lawyers they are?
 8                  PROSPECTIVE JUROR:  I believe one is in the State
 9       Attorney General's Office.  And I believe another one is
10       in-house counsel, I think, for Seagate.  It's a hard drive
11       manufacturer.
12                  THE COURT:  And you're a network engineer for the
13       County, any specific agency that you work with?
14                  PROSPECTIVE JUROR:  Internal services division --
15       or department.
16                  THE COURT:  And your in-laws are living with you
17       now.
18                  Do you know what they did before they retired?
19                  PROSPECTIVE JUROR:  Banking -- one of them was in
20       banking.  The other one was property management.
21                  THE COURT:  No prior jury service?
22                  PROSPECTIVE JUROR:  Never selected for a panel.
23                  THE COURT:  All right.  Thank you.
24                  Juror in Seat Number 10.
25                  PROSPECTIVE JUROR:  My name is frank Blumer.
```

```
 1              I live in Winnetka.

 2              I have one year of college.

 3              My company is American Creative Enterprises, Inc.

 4     I'm one of the owners.

 5              I'm married.  The occupation of the adult living

 6     with me is a composer, musician, and music copyist.

 7              Two children, ages 19 and 26.  One is -- they live

 8     with us now.  One is a student.  One is a bookkeeper.

 9              No prior jury service.

10              And I have a nephew who is a lawyer.

11              THE COURT:  Tell me a little bit about your

12     business, American Creative -- what does it do?

13              PROSPECTIVE JUROR:  American Creative Enterprises,

14     what we do is manage and take care of all of the money-making

15     music activities of one person, and that is Betty Ross.  And

16     she is a composer, she's a musician, and she's a music

17     copyist.  She made most of her income in the last ten years

18     as a music copyist.  She's earned over a 120 gold and

19     platinum albums working as a music copyist.

20              THE COURT:  What is a music copyist?

21              PROSPECTIVE JUROR:  A music copyist is the person

22     who prepares the scores, the music -- the written music for

23     the orchestras that are playing on all these albums by all

24     these stars.  I actually don't know if she's ever worked for

25     Eminem, but she's worked -- out of the Billboard Top 100 for
```

```
 1   the year, she works about on 30 of those people a year.
 2           THE COURT:  And your -- the role of your company is
 3   to manage her financial affairs?
 4           PROSPECTIVE JUROR:  Well, she's my partner and
 5   she's my wife.  So it's to manage all of the affairs.
 6           THE COURT:  And now I have got the connection.  All
 7   right.  Okay.
 8           PROSPECTIVE JUROR:  It's -- so in other words,
 9   it's -- so she can work all of the time and make lots of
10   money I take care of everything else.
11           THE COURT:  Is part of her income royalties?
12           PROSPECTIVE JUROR:  Uh-huh.
13           THE COURT:  Is that "yes"?
14           PROSPECTIVE JUROR:  Yeah.
15           THE COURT:  And have you developed -- so do you
16   hire other people or do you examine royalty statements and
17   things like that or --
18           PROSPECTIVE JUROR:  Do we hire other people -- two
19   questions you asked.
20           THE COURT:  Yeah.
21           PROSPECTIVE JUROR:  Do we hire other people?  Once
22   in a while when she can't handle all herself.  And -- so not
23   particularly often.  And no.  We don't pay royalties; we
24   collect them.
25           THE COURT:  Right.
```

```
1              In collecting royalties, do the companies pay you

2       royalties, do they give you a statement of some kind to tell

3       you --

4              PROSPECTIVE JUROR:  Well, ASCAP sends us a

5       statement.

6              THE COURT:  Okay.  And have you ever gotten into a

7       dispute over royalties?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Have you ever examined any of the

10      agreements relating to royalties?

11             PROSPECTIVE JUROR:  Yes.  But it's not like this.

12      It's not like Eminem and these companies that are dealing

13      with each other.  It's not like that.

14             THE COURT:  What is it like?

15             PROSPECTIVE JUROR:  It's like she works on some

16      film or recorded piece of music that's -- that is going to

17      be -- or does a composition that is going to be eligible for

18      royalty payments, and then if that music is performed on

19      television or performed on the radio, then she gets a nickel,

20      you know, or two cents or whatever and --

21             THE COURT:  How was it --

22             PROSPECTIVE JUROR:  At the end of the year, she

23      gets -- you know, it's real money.

24             THE COURT:  How does it work with your wife --

25      well, you just used the hypothetical nickel or two cents or
```

```
 1    whatever it is.

 2            How is that -- how does that come about?  Is there

 3    a contact, or who decides it's a nickel or two cents?

 4            PROSPECTIVE JUROR:  It's not a contract negotiation

 5    like this at all.  Nothing like that.  It's like I said,

 6    she -- in other words, there is a contract that exists for

 7    an artist, and then she's on it as her little piece of the

 8    contribution.

 9            THE COURT:  And have you ever been a part of the

10    negotiation for those contracts?

11            PROSPECTIVE JUROR:  Never.

12            THE COURT:  Have you ever reviewed those contracts

13    for her?

14            PROSPECTIVE JUROR:  Like that?  Of that type?  No.

15            THE COURT:  And you mentioned one of your kids is a

16    bookkeeper.

17            For what kind of a business?

18            PROSPECTIVE JUROR:  For Duke's restaurant in

19    Malibu.

20            THE COURT:  And your student, what is he or she

21    studying.

22            PROSPECTIVE JUROR:  She is studying culinary arts.

23            THE COURT:  And your nephew, the lawyer, what kind

24    of law?

25            PROSPECTIVE JUROR:  Actually, I have no idea.  He's
```

```
 1    private, and I -- I don't even know.

 2               THE COURT:  And no prior jury experience?

 3               PROSPECTIVE JUROR:  No.

 4               THE COURT:  Thank you.

 5               Juror Number 11.

 6               PROSPECTIVE JUROR:  My name is Jessica Alexander.

 7               I live in Long Beach.

 8               Highest education, bachelor in science.

 9               I work -- my employer is Frank Orth & Associates.

10    I'm a field manager for fisheries observers.

11               I'm single.

12               The person I live with, he's the project manager

13    for the same company.

14               No children.

15               No prior jury service.

16               And no ties to the legal system.

17               THE COURT:  What is fisheries observers?

18               PROSPECTIVE JUROR:  We put biologists out on

19    commercial fishing boats.  We are contracted through

20    Noah Fisheries.

21               THE COURT:  And to see if they're following

22    regulations or -- or what?

23               PROSPECTIVE JUROR:  To see what they're catching,

24    where they're fishing.  Yeah.  Following regulations, yeah.

25               THE COURT:  All right.  Juror Number 12, Seat
```

```
 1    Number 12.
 2             PROSPECTIVE JUROR:  Okay.  Hi.  My name is Gabriela
 3    Garcia.
 4             And I live in El Sereno, California.
 5             I did some college.
 6             I am currently unemployed.
 7             I'm single.  I live with my mom.
 8             And I have a three-year-old son.
 9             I -- no.  I've never done any jury service.
10             And I have no legal ties.
11             THE COURT:  And what does your mom do?
12             PROSPECTIVE JUROR:  She is unemployed.
13             THE COURT:  What was the last thing she did?
14             PROSPECTIVE JUROR:  She's always been a teacher.
15    She used to be a teacher and have students be appointed by
16    court.  Parental, you know.  If their kids did anything bad,
17    they had to go and learn about being a better parent and
18    stuff like that.
19             THE COURT:  Like parenting classes?
20             PROSPECTIVE JUROR:  Just parenting classes, yeah.
21             THE COURT:  And you're unemployed.
22             What did you do last?
23             PROSPECTIVE JUROR:  I was last working at an herb
24    place.  I was a supervisor for an herb store.  I usually work
25    hospitals, but, you know, I went natural.  So I'm not working
```

```
1    right now.
2            THE COURT:  What would you like to do next?
3            PROSPECTIVE JUROR:  I want to go to school to --
4    well, maybe just medical assistant so that I can maybe get
5    into, like, a holistic medical office or something.
6            THE COURT:  Thank you.
7            Now, the four new jurors that were sitting out in
8    the audience, I read to you what the case is about and you
9    heard my interactions with the other jurors this morning.
10           Based on anything you have heard about the case or
11   the questions and answers that you've heard while you were
12   sitting out in the audience, anything about any of that that
13   leads you to believe that you just cannot be fair and
14   impartial to both sides in this case?  Please raise your hand
15   if you believe that.
16           Okay.  Juror Number 9, you raised your hand.  Tell
17   me what you're thinking.
18           And Juror Number 10 also raised his hand.
19           Go ahead.
20           PROSPECTIVE JUROR:  I think in my job one of the
21   things that we do is we do monitor for music downloads, that
22   type of thing, using County network.  So I'm familiar with a
23   lot of the different technologies out there that are used for
24   that.
25           The other thing I follow is there is a blog.  I
```

1    believe it's called R.I.A.A. Against American Citizens or

2    something like that, by Ray Beckerman.  And basically his

3    attitude is that the R.I.A.A. industry and the firms

4    associated with it don't necessarily provide that much of

5    a service to the American people.

6                THE COURT:  Okay.  So you mentioned those.

7                So do you follow that blog?

8                PROSPECTIVE JUROR:  Yes, I do.

9                THE COURT:  How often do you log onto that blog?

10               PROSPECTIVE JUROR:  I would say I probably go in

11   there maybe every week or so just to see what is going on.

12               THE COURT:  So you've talked to me about two

13   things.  One of the things is, okay, people at work

14   downloading music instead of working or whatever they're

15   doing, or using equipment that they shouldn't be using that's

16   not for County business.

17               Is there something about that that makes you

18   believe that you couldn't be fair or is there something you

19   wanted to talk to me about?

20               PROSPECTIVE JUROR:  In terms of not being -- okay.

21   In terms of not being fair, my feeling is that this is

22   probably something that we don't necessary need to do; so

23   it's something that I'm able to underprioritize compared to

24   other -- compared to other computer priorities.

25               THE COURT:  You would rather be doing other things?

```
1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Okay.  All right.  And let's say I

3    enforced my priorities on you and you had to do this.  Okay?

4    All of a sudden all of the stuff at the office that is going

5    on has to wait, and for the next week you're here.

6              Will you then make it a priority and focus and tell

7    me -- and make your decision based on the evidence and the

8    law that I instruct you on?

9              PROSPECTIVE JUROR:  Yes.  I believe I would.

10             THE COURT:  Now, let's talk about the second part.

11   You talked to me about the blog.

12             Is there anything about that information on the

13   blog that you're going to bring into this courtroom and

14   decide this case based on what you read or see on a blog?

15             PROSPECTIVE JUROR:  I don't believe so, but I do

16   believe that some of the points that he has brought up in

17   some of the different cases that -- he's a lawyer in

18   New York.  And so some of the cases that he's brought up I

19   believe may influence the way that I see this case.  So --

20             THE COURT:  I'm not familiar with the blog.  I'm

21   not -- but is he saying basically that artists who perform in

22   today's world aren't providing a service to the state -- to

23   the -- to America?

24             Is that sort of a general premise of what you're

25   saying?
```

```
1            PROSPECTIVE JUROR:  I believe the general premise

2       is more that the recording industry is not providing a

3       service that is necessary.  So as a result of going through

4       the blog and some of the other things, when I make my music

5       purchases they generally are from independent artists.  I

6       don't purchase music from somebody like Universal or --

7            THE COURT:  Okay.  Do you think you could put that

8       aside and figure this case out, though, based on what you

9       hear in the evidence and what I tell you is the law in this

10      case?

11           PROSPECTIVE JUROR:  I believe I can, yes.

12           THE COURT:  All right.  Now, Juror Number 10, you

13      didn't raise your hand at first and then you raised your hand

14      upon reflection.

15           PROSPECTIVE JUROR:  Yeah.  I would be remiss if

16      I didn't bring up the fact that -- and this isn't a direct

17      answer to what you asked, but it's very relevant.  I believe

18      that virtually all major record labels, such as Universal,

19      are complete scam artists and that they rip off their artists

20      mercilessly and have forever and still do.  And I base this

21      on the fact that I have at least one very well-known friend

22      who was an accountant who had a record label -- a record

23      deal --

24           THE COURT:  Okay.

25           PROSPECTIVE JUROR:  -- and audited his own books
```

 1    and found exactly that.

 2            THE COURT:  Now, let's -- now, if you -- if you

 3    think one industry rips people off, do you think you're the

 4    right person for this juror -- for this jury?

 5            PROSPECTIVE JUROR:  Well, I sure feel that if I

 6    didn't bring it up I would be remiss.

 7            THE COURT:  Right.

 8            And you did the right thing.  Absolutely.  But are

 9    you --

10            PROSPECTIVE JUROR:  Do I think I could do it

11    fairly?  Yes.  I think I could do it fairly as long as the

12    fair answer was to find them at fault.

13            THE COURT:  No.

14            PROSPECTIVE JUROR:  That's kind of begging the

15    question, isn't it?

16            THE COURT:  Well, no.  That just sounds result

17    driven; right?  You're -- you want to find fault with the

18    defendants in this case.

19            PROSPECTIVE JUROR:  Yeah.

20            THE COURT:  Okay.  That's --

21            PROSPECTIVE JUROR:  Because I'm sure -- I'm already

22    sure it's there.

23            THE COURT:  Okay.  So that's the glass -- those are

24    the lenses that you look at in this case?

25            PROSPECTIVE JUROR:  It's true.

```
 1            THE COURT:  Okay.  Okay.  Thank you.
 2            Anyone else?
 3            (No response.)
 4            THE COURT:  Has anyone -- any of you four jurors,
 5    has anyone in your immediate family ever participated in a
 6    lawsuit as a party or in any other capacity?
 7            Juror Number 12.
 8            Well, Juror Number 10 you have the microphone.
 9            PROSPECTIVE JUROR:  I mean, I have participated in
10    lawsuits with my company that I owned before this one, which
11    was a toy company.
12            THE COURT:  Okay.  Was it contract disputes or --
13            PROSPECTIVE JUROR:  It had to do with copyrights.
14            THE COURT:  All right.  Okay.  Thank you.
15            PROSPECTIVE JUROR:  On the toys, not on anything
16    musical or artistic.
17            THE COURT:  Okay.
18            PROSPECTIVE JUROR:  On the toys.
19            THE COURT:  Juror Number 12.
20            PROSPECTIVE JUROR:  Well, my mom currently has a
21    case open, but it was from the last job she was at.  She had
22    a fall.  She didn't originally want to do a case until, you
23    know, years went by.  The company went out of business, and
24    her knee was still messing with her where, you know, it was
25    really, really impeding, you know, her walking right; so she
```

```
 1    decided to open up the case.  So it's about to finish up, but
 2    it has really nothing to do with anything.
 3              THE COURT:  Thank you.
 4              Again, the four jurors if the answer is "yes," give
 5    me a moment to note who has said "yes."
 6              Have any of you ever been involved in a lawsuit
 7    involving music or the music industry?
 8              (No response.)
 9              THE COURT:  All right.  No hands.
10              Do any of you have any preconceived notions or
11    strong feelings about people who bring lawsuits that would
12    prevent you from being fair and impartial to both sides?
13              (No response.)
14              THE COURT:  No one has raised their hand.
15              Have any of you ever been involved in negotiating
16    contracts or agreements in the music industry?
17              Juror Number 10, does that relate to your wife?
18              PROSPECTIVE JUROR:  No.  I negotiated contracts for
19    myself when I was a musician years ago.  And they were not
20    big-deal recording contracts.  They were performance
21    contracts, playing in nightclubs and places like that.
22              THE COURT:  One-shot things?
23              PROSPECTIVE JUROR:  Well, not necessarily one shot,
24    but you play for a couple of weeks in some casino or
25    something like that.
```

```
 1              THE COURT:  Okay.

 2              PROSPECTIVE JUROR:  I negotiated lots of those

 3   contracts.

 4              THE COURT:  Have any of you ever heard of the term

 5   "royalties" as pertaining to the music industry?

 6              All right.  Juror Number 9, tell me what you know.

 7              PROSPECTIVE JUROR:  Just the idea that royalties

 8   are paid based on how much a piece of music is played,

 9   whether it's on the radio or the Internet or wherever.

10              THE COURT:  Okay.  Juror Number 10.

11              PROSPECTIVE JUROR:  Royalties are paid on a fairly

12   complex scale, including mechanicals and performance and a

13   certain amount for each mechanical sale or each performance

14   and that's how they're paid.  It gets added up, and then the

15   artist receives the amount at the end of the year.

16              THE COURT:  Juror Number 11, what do you know?

17              PROSPECTIVE JUROR:  I don't know any of the

18   specifics, but I've heard of the term; that artists receive

19   them.

20              THE COURT:  Juror Number 12.

21              PROSPECTIVE JUROR:  Yeah.  I sound like everyone

22   else.  I mean, this -- they get -- based on how many times

23   it's played on the radio or how much music they sell.

24   I mean, that's it.

25              THE COURT:  Okay.  Have any one of you downloaded
```

 1  music over the Internet?

 2          Okay.  Juror Number 12, what Website?

 3          PROSPECTIVE JUROR:  Oh, you know, I'm not quite

 4  sure on the Website.  It's usually holistic stuff.  Nothing

 5  out of, like, the regular known Websites.

 6          THE COURT:  Okay.  Juror Number 10?

 7          PROSPECTIVE JUROR:  iTunes, and only once or twice,

 8  and I bought a CD on *CDbaby*.  It's a Website called *CDbaby*.

 9          THE COURT:  Juror Number 9.

10          PROSPECTIVE JUROR:  Okay.  iTunes and *Amazon*.

11  Nothing within the last year or 18 months based on some of my

12  readings.

13          THE COURT:  What you said before?  Based on what

14  you said before?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Okay.  Separate and apart from

17  iTunes -- have any of you purchased music in the form of a

18  permanent download from any other online music store, other

19  than iTunes?

20          Okay.  Juror Number 9.

21          PROSPECTIVE JUROR:  It was the *Amazon* .mp3 store

22  when it first opened.

23          THE COURT:  Have any of you ever purchased music in

24  the form of master tones or clips of songs that played when

25  your cell phone rings?

```
1                    Juror Number 9.

2                    PROSPECTIVE JUROR:  From the AT&T Cingular store

3       for ring tones.

4                    THE COURT:  Anyone else?

5                    (No response.)

6                    THE COURT:  Have any of you ever purchased music on

7       a compact disc from Amazon.com or any other online retailer?

8                    Juror Number 9.

9                    PROSPECTIVE JUROR:  From Amazon.com, from CDbaby,

10      and then I buy used ones off of eBay or Craig's list.

11                   THE COURT:  And Juror Number 10.

12                   PROSPECTIVE JUROR:  CDbaby, that's where you

13      purchase an actual CD.

14                   THE COURT:  Have any of you ever subscribed to a

15      digital music service that made music available by streaming

16      it over the Internet?

17                   Juror Number 9.

18                   PROSPECTIVE JUROR:  That would be Pandora, and I

19      believe it was Shockcast at one point.

20                   THE COURT:  Okay.  Are any of you familiar with the

21      recording artist Eminem?

22                   Okay.  Juror Number 9, do you have any views, if

23      any, on Eminem or his music?

24                   PROSPECTIVE JUROR:  No views.  I've heard the name.

25      Yeah.  Just heard the name.
```

1          THE COURT:  Do you own any of his recordings?

2          PROSPECTIVE JUROR:  No, I do not.

3          THE COURT:  Juror Number 10.

4          PROSPECTIVE JUROR:  I'm aware of him as a

5     personality and as a recording artist.  And I really have no

6     views on him.

7          THE COURT:  Do you own any of his recordings?

8          PROSPECTIVE JUROR:  No, I don't.

9          THE COURT:  Juror Number 11.

10         PROSPECTIVE JUROR:  I'm aware of him.  I don't own

11    any of his music, and no particular views.

12         THE COURT:  Okay.  Juror Number 12.

13         PROSPECTIVE JUROR:  Yeah.  I'm familiar with

14    Eminem, but I don't really listen to any of his music or --

15         THE COURT:  You don't have any of his recordings?

16         PROSPECTIVE JUROR:  No.  Nothing.

17         THE COURT:  Are any of you familiar with Dr. Dre?

18         Okay.  Juror Number 12.

19         PROSPECTIVE JUROR:  Yeah.  The same.  I don't

20    really have any of his music.  I just know he's a music

21    artist, but that's it.

22         THE COURT:  Okay.  And Juror Number 11.

23         PROSPECTIVE JUROR:  The same.  I know of him, but

24    I don't have any of his music.

25         THE COURT:  Okay.  We talked about this earlier

1    with Juror Number 10 and his views.

2              Do any other of the three of you have any strong

3    views about record companies and their relationships with

4    recording artists?

5              Okay.  Juror Number 9, again, does it relate to

6    what we talked about before and your reading on the blogs?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Okay.  Are any of you familiar with

9    F.B.T. Productions, LLC?

10             (No response.)

11             THE COURT:  Okay.  No one has raised their hand.

12             Are any -- is anyone familiar with Universal Music

13   Group?

14             All right.  Juror Number 10, same as you said

15   before?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  All right.  Okay.  Anyone else?

18             (No response.)

19             THE COURT:  Is anyone familiar with

20   Interscope Records?

21             (No response.)

22             THE COURT:  Okay.  No one has raised their hands.

23             And does anyone have strong views on rap music or

24   hip-hop music?

25             (No response.)

1              THE COURT:  Okay.  No one has raised their hands.

2              Juror in Seat Number 4, you have a potential job

3   interview next week; right?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  You're waiting for a call back.

6              PROSPECTIVE JUROR:  Yes.  They actually left me a

7   message, and I gave her a call back to see if it's Monday or

8   Tuesday.  But I guess it's lunch time right now.

9              THE COURT:  So you don't know yet?

10             PROSPECTIVE JUROR:  Yeah.  I don't know yet.

11             THE COURT:  What I'd like to do is this because I'm

12  not going to make you miss a job interview on Tuesday.

13  Can -- let's just take -- I want to take a short five-minute

14  break.  Can you check your messages and see if you could tell

15  us Monday or Tuesday or whether you still don't know?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  All right.  Let's take -- I'll just

18  take a five-minute break.

19             Remember not to discuss the case among yourselves

20  or with anyone else.  Don't form or express any opinions

21  about the case.

22             And we'll see you in five minutes.

23             THE CLERK:  All rise.

24             (Open court - jury not present.)

25             THE COURT:  Be seated.

1           With regard to the four new jurors, any challenges

2     for cause from the plaintiffs' side?

3           MR. BUSCH:  Not on the plaintiffs' side.

4           THE COURT:  Challenges for cause, Mr. Pomerantz?

5           MR. POMERANTZ:  Yes, Your Honor.

6           I think it's clear that Jurors 9 and 10 cannot be

7     fair in this case, and I'd be happy to elaborate if

8     Your Honor --

9           THE COURT:  Well, Juror 10 is pretty clear.  He has

10    already said he's going to look at the case in a way to sort

11    it out against Universal.  So Juror Number 10 is granted.

12          Juror Number 9, I think might be a plague on all of

13    your houses.

14          MR. POMERANTZ:  Well, Your Honor --

15          THE COURT:  Well, that -- I would excuse him for

16    that reason.  I mean, if he doesn't seem -- if at the end of

17    the day, if everybody goes home with nothing, then forget

18    everybody.

19          But what are your thoughts, Mr. Busch?

20          MR. BUSCH:  My thought is that he said at the end

21    of the day he could be fair.  So we would -- for the same

22    reason that another juror who had expressed some feelings one

23    way ultimately said they could be fair, we would say that

24    that juror should not be excused for cause.

25          THE COURT:  All right.  Mr. Pomerantz.

 1          MR. POMERANTZ:  Yes, Your Honor.

 2          He said a few things that I think clearly show that

 3    there's a clear bias against record companies.  That blog is

 4    a blog against record companies.  That is what it stands for.

 5    He then said --

 6          THE COURT:  Are you talking about -- again, it

 7    seemed -- when I looked at the parties, they seemed to

 8    recognize the blog.  I have no idea --

 9          MR. POMERANTZ:  R.I.A.A. Against American Citizens.

10    R.I.A.A. is the trade association of record companies.  And

11    when you then asked him the question of whether you think

12    that there is a -- you have views about the relationship

13    between record companies and artists, while F.B.T. is not the

14    artist, there's going to be a perception in this courtroom

15    that is on the side of the artist, the producer for the

16    artist.  And I think that his answers -- although you did

17    not, Your Honor, properly so ask him to elaborate on his

18    views about record companies versus artists, you just

19    referred back to the blog -- it is because the blog is

20    basically a statement every single week that is -- that is

21    basically spilling out venom against record companies.

22          THE COURT:  Mr. Busch, want to weigh in on the

23    blog?

24          MR. BUSCH:  The only thing that I would say about

25    the blog, Your Honor, is I am not familiar enough to say

1    whether Mr. Pomerantz is right that day after day it is

2    spewing out venom against the record companies, but what I

3    will say is --

4            THE COURT:  At least on some occasions.

5            MR. BUSCH:  Yeah.

6            But what I will say is that whether someone visits

7    a blog from time to time or whatever the case might be that

8    takes position, when Your Honor asked him the question can he

9    be fair and impartial he said yes.  And we had a similar

10   situation with the first round where someone said they felt

11   a very strong way against one side, and then Your Honor came

12   back and said the same thing, "Could you be fair and honest

13   or impartial," and that person said yes, and he was not

14   excused for cause -- she was not excused for cause.

15           THE COURT:  But I think I -- let me just try

16   to make a statement.  I think there was a difference.  That

17   expressed view, whether it was about Eminem or his music or

18   anything like that, is that the same as on a regular basis

19   visiting a blog that has a view one way or the other?  For

20   example, if she visited a blog that -- on a regular basis

21   that said, you know, Eminem's music is horrible.  It's

22   violence against women.  It's all these other things that are

23   stated publicly, wouldn't that -- wouldn't that be a little

24   different?

25           Drawing a similar analogy, let's say you had

1   somebody -- a drunk-driving case, visiting a blog of Mothers

2   Against Drunk Drivers, and she said she could be fair, but on

3   a regular basis she's visiting that type of blog or Internet

4   site just on a regular basis.

5          Can you talk to me about that difference?

6          MR. BUSCH:  Well, the only thing I would say,

7   Your Honor, is a person's view is their view.  The person who

8   expressed the negative sentiment about Eminem or about his

9   music or about how he or she felt about that person could

10  have derived that from all types of different sources, but

11  that was not that person's view.  And when -- when Your Honor

12  asked whether that person could still be fair and impartial,

13  she said, "Yes, I could."

14         This person -- I have not seen that blog enough,

15  and I'm relatively sure Mr. Pomerantz doesn't visit it very

16  often himself to say what the exact views that are

17  expressed -- that contained therein.  But what I will say is

18  that this juror, again, when Your Honor asked can this person

19  be fair and impartial said yes.  And I think given that

20  answer, he should not be excused for cause.

21         MR. POMERANTZ:  Your Honor --

22         THE COURT:  At the very least, though, and as

23  Mr. Pomerantz said, I didn't follow-up with that more

24  specific question about recording artists and studios because

25  I didn't want to go there at that point in time.  And at

1    least in my mind there was enough to excuse him for cause.

2    But I think I need to at least go into that area -- that

3    specific area as to how often he visits the blog and what are

4    his specific thoughts about recording artists and record

5    companies.

6            MR. POMERANTZ:  Your Honor, if I could just

7    follow-up for a second.

8            First, if Your Honor is going to do that I would

9    request that we could do that at sidebar.

10           THE COURT:  No.  We're going to do -- I'm just

11   going to bring him in by himself.

12           MR. POMERANTZ:  Second, remember what he also said.

13   He said he wouldn't purchase music from Universal.  He said

14   he would only buy from independent labels.  He is clearly

15   biased against record companies.  There's a big difference

16   between saying, "I don't like Eminem."  They are Eminem's

17   producer.  We are Eminem's record company.  Eminem is not a

18   party in case.  So Eminem -- the fact that there is a bias

19   against Eminem, I'm not sure where that lies in this

20   courtroom.  But when there's a bias against a record company,

21   and a specific bias against Universal -- he specifically said

22   he wouldn't buy music from Universal, to me he was telling us

23   he can't be fair against a record company.  Every week he

24   goes to an anti record company Website, and it's just crystal

25   clear that this guy has a particular bias against record

```
 1   companies, and that does sway the fairness in this courtroom,

 2   unlike views of Eminem, where it's not clear that it would

 3   sway one side or the other in this courtroom.

 4           THE COURT:  All right.

 5           MR. BUSCH:  The only thing that I would add is I

 6   don't think it's fair to draw a distinction and say someone

 7   says they wouldn't buy a song from Universal and -- versus

 8   someone saying, "I don't like Eminem.  I won't buy his music,

 9   but I'll still be fair and impartial to the people who are

10   on the side of Eminem on this lawsuit."  I don't see seat

11   distinction there or the reason to draw the distinction.

12           THE COURT:  But one relates to -- one relates to

13   his personal taste as opposed to saying, "I am making the

14   statement with my dollars, and I won't even -- I won't give a

15   penny."

16           MR. BUSCH:  Juror Number 8, Your Honor, said, "I

17   don't agree with Eminem's" -- I believe she said womanizing

18   or those types of things that are prevalent maybe in rap

19   music or Eminem's music, but yet -- so she's not going to buy

20   Eminem's music as a result.  I'm -- so I'm not sure what

21   distinction there really is there.

22           THE COURT:  All right.  I would grant the

23   challenges for cause as to 9.

24           All right.  Let's go ahead and bring Juror Number 4

25   back in to sort out what her situation is.
```

```
 1                (Juror Number 4 entered the courtroom.)

 2                THE COURT:  Juror Number 4, did you have any luck

 3      contacting these folks?

 4                PROSPECTIVE JUROR:  No.

 5                THE COURT:  So you still don't know whether it's

 6      Monday or Tuesday?

 7                PROSPECTIVE JUROR:  No.

 8                THE COURT:  Okay.  Could you wait outside for me,

 9      please.

10                (Juror Number 4 exited the courtroom.)

11                THE COURT:  Two things.

12                One, we could excuse for now; or if she stays on,

13      excuse her and then we'll have seven jurors instead of eight.

14                But Mr. Busch?

15                MR. BUSCH:  May I have one second, Your Honor?

16                THE COURT:  You may.

17                MR. BUSCH:  Your Honor, our view is that we do like

18      this Juror Number 4.  And so we would like her to remain on

19      the panel.  And if she is forced to leave on Tuesday, then I

20      guess we would have to live with seven.  But we want to keep

21      her.

22                THE COURT:  All right.  Mr. Pomerantz.

23                MR. POMERANTZ:  Your Honor, we would -- we would

24      very much like eight jurors, and we would request that we

25      either seat a ninth so in case she leaves, or we excuse her
```

```
 1    now and seat an eighth right now.
 2             THE COURT:  Mr. Busch, would you object to seating
 3    nine now, relieving what we would call Number 9 in the event
 4    we keep 4?
 5             MR. BUSCH:  That's fine, Your Honor.
 6             THE COURT:  All right.  Let's do that.
 7             Do you agree Mr. Pomerantz on behalf of your client
 8    that we're going to empanel nine, but on Tuesday we're
 9    cutting loose the person in the ninth slot --
10             MR. POMERANTZ:  That's fine, Your Honor.
11             THE COURT:  -- if -- if Number 4 stays.
12             MR. POMERANTZ:  That's fine with us, Your Honor.
13             THE COURT:  All right.  Okay.  Then what I'm going
14    to do is excuse 9 and 10, move 11 and 12 to Slots 9 and 10
15    respectively, and then I'll make inquiry of two more jurors.
16             All right.  Let's go ahead and bring in the jurors.
17             (Open court - jury present.)
18             THE COURT:  Jurors in Seat Numbers 9 and 10, you're
19    excused from this case.  Thank you very much.
20             Okay.  Jurors in Seat Numbers 11 and 12, would you
21    slide over to Seat Numbers 9 and 10.
22             Could I see counsel at sidebar briefly.
23             (Sidebar discussion.)
24             THE COURT:  The next two people we have coming up,
25    Mr. Beshore, the person after that is Ms. Lam.  Ms. Lam, if
```

1    you recall, postponed her jury service to this week.  She's

2    got final exams.  I didn't excuse her at that point.  I

3    didn't appreciate that she continued her jury service to this

4    week.  I think you know it's going to create a problem.

5              Stipulate to excuse Lam and call the next person

6    up?

7              MR. BUSCH:  That's fine.

8              MR. POMERANTZ:  That's fine.

9              (Sidebar discussion concluded.)

10             THE COURT:  Ms. Lam, you are excused from this case

11   as well.

12             We're going to call two more jurors.  When you hear

13   your name called, please take a seat in Numbers 11 and 12.

14             THE CLERK:  David Beshore, B-e-s-h-o-r-e.

15             Eve Lopez, L-o-p-e-z.

16             THE COURT:  Okay.  Starting with juror in Seat

17   Number 11, if you would answer the questions on, hopefully,

18   the slip of paper, if we could get one to you.  If you could

19   answer those questions for me.

20             PROSPECTIVE JUROR:  My name is David Beshore.

21             I live in Thousand Oaks.

22             I have a masters in science.

23             I work for the aerospace corporation.  I'm a senior

24   project engineer.

25             I'm married with my wife living with me.  I have --

```
 1    oh, her occupation is high school counselor.

 2               I have three children, 32, 30, and 28.  One is in

 3    the medical supply business.  The other is a financial

 4    advisor and a patent reviewer.

 5               I've had prior jury service.  It was a criminal

 6    case, statutory rape.  There was a verdict.

 7               No ties.

 8               THE COURT:  How long has -- the child that is a

 9    patent reviewer, how long has he or she done that?

10               PROSPECTIVE JUROR:  Two years.  U.S. Patent Office.

11               THE COURT:  So does she work in Washington?

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  Okay.  And do you ever talk to her

14    about her work?

15               PROSPECTIVE JUROR:  Yes.  I have a patent pending,

16    and she knows the status of it.

17               THE COURT:  What kind of a patent is it?

18               PROSPECTIVE JUROR:  It's a process for assessment.

19               THE COURT:  You don't have to tell us too much

20    about it.

21               PROSPECTIVE JUROR:  Yeah.  It's a process for an

22    assessment.

23               THE COURT:  All right.  Thank you.

24               Juror in Seat Number 12.

25               PROSPECTIVE JUROR:  My name is Eve Lopez.
```

```
 1              And I live in the Silver Lake area in Los Angeles
 2    County.
 3              Educational, hopefully I'll be finishing my B.A. by
 4    October of this year.
 5              Divorced.
 6              I have a 12-year-old son and my parents, who is
 7    living with me.  They're both retired.
 8              My employer -- I'm sorry.  I didn't go through the
 9    process.  My employer, I work for the County of Los Angeles.
10    My position is Staff Assistant II.
11              I don't have any prior jury service.
12              And no legal ties whatsoever.
13              THE COURT:  As a Staff Assistant II, do you work
14    with a particular agency?
15              PROSPECTIVE JUROR:  Yes.  Department of Public
16    Social Services.
17              THE COURT:  And what did your parents do before
18    they retired?
19              PROSPECTIVE JUROR:  My dad was working for this
20    bakery company called Hostess, I think it is.  It is a
21    continental -- Hostess something -- company.  And my mom was
22    a C.N.A.
23              THE COURT:  What is a C.N.A.?
24              PROSPECTIVE JUROR:  Certified nurse assistant.  I'm
25    not really sure about the company.
```

```
 1                  THE COURT:  And what was the occupation of your
 2    former spouse?
 3                  PROSPECTIVE JUROR:  For what?
 4                  THE COURT:  Your former spouse, what was his
 5    occupation?
 6                  PROSPECTIVE JUROR:  He works for -- he still works
 7    for the Xerox company as a field engineer.
 8                  THE COURT:  Now, Jurors 11 and 12, you heard me
 9    when you were sitting in the audience, what this case is
10    about.  You have heard my other interactions with the other
11    jurors and their thoughts and answers.
12                  Jurors Number 11 and 12, anything about what you
13    have heard so far that would prevent you from being fair and
14    impartial to both sides?  Please raise your hand if you feel
15    that way.
16                  Juror Number 11, you raised your hand pretty
17    quickly.  You do not believe you could be fair and impartial?
18                  PROSPECTIVE JUROR:  Well, I need to let you know my
19    opinion of rap.
20                  THE COURT:  Okay.  Go ahead.
21                  PROSPECTIVE JUROR:  I think it's evil and corrupt
22    on our society --
23                  THE COURT:  All right.  And --
24                  PROSPECTIVE JUROR:  -- in general.
25                  THE COURT:  And you feel -- and you feel pretty
```

```
 1   strongly?
 2           PROSPECTIVE JUROR:  Yes.  I think it is corrupting
 3   our children's mind.
 4           THE COURT:  All right.  Is that going to slant you
 5   to one side against the other or --
 6           PROSPECTIVE JUROR:  No.  If this is about business,
 7   no.  I will be fair and balanced.
 8           THE COURT:  Okay.  All right.  Thank you.
 9           PROSPECTIVE JUROR:  Uh-huh.
10           THE COURT:  All right.  Anyone else?  Juror
11   Number 12, anything else you should tell?
12           PROSPECTIVE JUROR:  No.
13           THE COURT:  Juror Numbers 11 or 12, have you or
14   anyone close to you ever been a participant in a lawsuit?
15           (No response.)
16           THE COURT:  All right.  No one has raised their
17   hand.
18           You two jurors, have any of you ever downloaded
19   music over the Internet?
20           Juror Number 11, what Websites?
21           PROSPECTIVE JUROR:  *Shopcast*.  I have downloaded
22   international radio stations.
23           THE COURT:  Have any of you ever purchased music in
24   the form of permanent downloads from iTunes or any other
25   store -- online music store?
```

```
 1                    (No response.)

 2              THE COURT:  No one has raised their hand.

 3              Have any of you purchased music in the form of

 4    master tones or clips or songs that played when your cell

 5    phone rings?

 6                    (No response.)

 7              THE COURT:  No other jurors have raised their hand.

 8              Any of you ever subscribed to a digital music

 9    service that made music available by streaming it over the

10    Internet?

11                    (No response.)

12              THE COURT:  No one raised their hand.

13              Are either of you familiar with the recording

14    artist Eminem?

15              Okay.  Juror Number 11, you talked about your views

16    about rap and hip-hop.  Do you have those same feelings as it

17    relates to the artist Eminem?

18              PROSPECTIVE JUROR:  Only through the news.  I've

19    heard about Eminem through the news.

20              THE COURT:  But do you believe he's corrupting

21    society --

22              PROSPECTIVE JUROR:  Yes.

23              THE COURT:  -- because of his music?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Juror Number 12, are you familiar with
```

1   Eminem?

2          PROSPECTIVE JUROR:  Yes.  Just as a musical artist

3   and that's it.  As a musical artist and that's it.

4          THE COURT:  Okay.  Do you have any of his

5   recordings?

6          PROSPECTIVE JUROR:  No, I don't.

7          THE COURT:  Anything about your views that would

8   prevent you from being fair in this case?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Are either of you familiar with

11  Dr. Dre?

12          Juror Number 12, what do you know?

13          PROSPECTIVE JUROR:  It's the same thing.  A musical

14  artist.  That's it.

15          THE COURT:  Do any of you have -- what views, if

16  any, about record companies and their relationships with

17  recording artists?

18          (No response.)

19          THE COURT:  No one has raised their hand.

20          Any of you familiar with F.B.T. Productions, LLC?

21          (No response.)

22          THE COURT:  Okay.  No one has raised their hand.

23          Any of you familiar with Universal Music Group?

24          (No response.)

25          THE COURT:  No one has raised their hand.

```
 1                 Any of you familiar with Interscope Records?

 2                 (No response.)

 3                 THE COURT:  Okay.  I've already talked about it,

 4       but Juror Number 11, Juror Number 12, do you have any strong

 5       views about rap music or hip-hop music?  Is that no?

 6                 (No response.)

 7                 THE COURT:  Have any of you ever been involved in

 8       a lawsuit involving music or the music industry?

 9                 (No response.)

10                 THE COURT:  Okay.  No one has raised their hand.

11                 Do any of you have preconceived notions or strong

12       feelings about people who bring lawsuits that would prevent

13       you from being fair to both sides?

14                 (No response.)

15                 THE COURT:  Neither one raised their hand.

16                 Have any of you been involved in negotiating

17       contracts or agreements in the music industry?

18                 (No response.)

19                 THE COURT:  No hands have been raised.

20                 Have any of you ever heard of the term "royalties"?

21                 Okay.  Juror Number 11, tell me what you know.

22                 PROSPECTIVE JUROR:  It's a reward for sales.

23                 THE COURT:  Okay.  Could I see counsel at sidebar

24       with the reporter.

25                 (Sidebar discussion.)
```

1          THE COURT:  Challenge for cause?

2          MR. BUSCH:  That would be Number 11.  He said that

3   Eminem is evil and corrupt, ruining this country.

4          THE COURT:  It goes a step further than 8.

5          MR. POMERANTZ:  The issue, Your Honor, is that

6   Eminem is not a party here.  We would -- we are Eminem's

7   record company.  They are Eminem's producer.  Which way --

8   I'm not exactly sure why they see it as observation for them

9   as worse for us.

10          THE COURT:  I saw -- I see it both as a plague on

11   both your houses.  It's what I see.  If it's a plague on both

12   your houses, sometimes people would say zero.

13          MR. POMERANTZ:  He said he saw it as a business

14   dispute.  That is what this is.  I think he has indicated

15   that's the way he would look at it.  I don't see the bias

16   against rap music as being a bias on the merits of either

17   party of this case.

18          THE COURT:  I'd grant his.

19          Next peremptory with the plaintiff.  Again, Jurors

20   1 through 9 would be --

21          MR. BUSCH:  I don't want to test your Honor's

22   patience.  Can I have 30 seconds?

23          THE COURT:  Yes.  Go ahead.

24          MR. BUSCH:  We would challenge Number 7.

25          THE COURT:  Now the jurors in peremptories,

```
 1    Jurors 1 through 10.

 2              MR. POMERANTZ:  Challenge Number 1, Your Honor.

 3              THE COURT:  Thank you.

 4              (Sidebar discussion concluded.)

 5              THE COURT:  The following jurors are now excused

 6    from this case:

 7              Juror in Seat Number 1.

 8              Juror in Seat Number 7.

 9              Juror in Seat Number 11.

10              Will the clerk please swear in the jury.

11              (Jury sworn.)

12              THE COURT:  The jurors in the audience, you are

13    excused.  Please return to the jury room and let them know

14    you've been excused from this case.  Thank you.

15              Ladies and gentlemen, you are now the jury in this

16    case.  It is my duty to instruct you on the law.  You must

17    not infer from these instructions or from anything that I say

18    or do as indicating that I have an opinion regarding the

19    evidence or what your verdict should be.

20              It is your duty to find the facts from all of the

21    evidence in this case.  To those facts you will apply the law

22    as I give it to you.  You must follow the law as I give it to

23    you, whether you agree with it or not.  And you must not be

24    influenced by any personal likes or dislikes, opinions,

25    prejudices, or sympathy.  That means that you must decide the
```

1   case solely on the evidence before you.  You will recall that

2   you took an oath to do so.

3          In following my instructions you must not -- you

4   must follow all of them and not single out some or ignore the

5   others.  They are all important.

6          To help you follow the evidence I will give you a

7   brief -- a summary of the positions of the parties.

8          The plaintiffs claim, first, that the defendants

9   failed to pay them under the proper royalty provision for

10  Eminem recordings in the form of permanent downloads and what

11  are commonly known as master tones.  The plaintiffs claim,

12  second, that the defendants failed to allocate certain costs

13  correctly as between plaintiffs and Eminem, resulting in an

14  underpayment of plaintiffs' royalties.  The plaintiffs have

15  the burden of proving these claims.

16         The defendants deny those claims and contend that

17  the plaintiffs have been paid under the proper royalty

18  provision for Eminem recordings in the form of permanent

19  downloads and master tones.

20         As to the plaintiffs' second claim, the defendants

21  contend that plaintiffs should recover from Eminem any cost

22  plaintiffs claim were incorrectly -- allocated incorrectly.

23  The defendants also assert the affirmative defenses of the

24  statutes of limitation, waiver, estoppel set off in

25  mitigation of damages.

1         The plaintiffs deny the affirmative defenses.

2         When a party has the burden of proof on any claim

3    or affirmative defense by a preponderance of the evidence, it

4    means you must be persuaded by the evidence that the claim or

5    affirmative defenses is more probably true than not true.

6         You should base your decision on all of the

7    evidence, regardless of which party presented it.

8         The evidence you are to consider in deciding what

9    the facts are consist of, one, the sworn testimony of any

10   witness, whether appearing live or by deposition.

11        Two, the exhibits which are received into evidence.

12        And, three, any facts to which the lawyers have

13   agreed.

14        In reaching your verdict, you may consider only

15   the testimony and exhibits received into evidence.  Certain

16   things are not evidence, and you may not consider them in

17   deciding what the facts are.  I will list them for you.

18        One, arguments and statements by lawyers are not

19   evidence.  The lawyers are not witnesses.  What they say in

20   their opening statements, closing arguments, or at any other

21   time -- times is intended to help you interpret the evidence,

22   but it is not evidence.  If the facts as you remember them

23   differ from the way the lawyers have stated them, your memory

24   of them controls.

25        Two, questions and objections by lawyers are not

1    evidence.  Attorneys have a duty to their clients to object

2    when they believe a question is improper under the Rules of

3    Evidence.  You should not be influenced by the objection or

4    by the Court's ruling on it.

5            Three, testimony that has been excluded or stricken

6    or that you have been instructed to disregard is not evidence

7    and you must not -- and it must not be considered.

8            In addition, sometimes testimony and exhibits are

9    received for a limited purpose.  When I give a limiting

10   instruction, you must follow it.

11           Anything you have seen or heard when the court was

12   not in session is not evidence.  You are to decide the case

13   solely on the evidence received at the trial.

14           Some evidence may be admitted for a limited purpose

15   only.  When I instruct you that an item of evidence has been

16   admitted for a limited purpose, you must consider it only for

17   that limited purpose and for no other.

18           Evidence may be direct or circumstantial.  Direct

19   evidence is direct proof of a fact, such as testimony by a

20   witness about what the witness personally saw or heard or

21   did.  Circumstantial evidence is proof of one or more facts

22   from which you could find another fact.

23           By way of example, if you wake up in the morning

24   and see that the sidewalk is wet, you may find from that fact

25   that it rained during the night.  However, other evidence,

 1    such as a turned-on garden hose may provide a different

 2    explanation for the presence of water on the sidewalk;

 3    therefore, before you decide that a fact has been proved by

 4    circumstantial evidence you must consider all of the evidence

 5    in light of reason, experience, and common sense.

 6            You should consider both kinds of evidence.  The

 7    law makes no distinction between the weight to be given to

 8    either direct or circumstantial evidence.  It is for you to

 9    decide how much weight to give to any evidence.

10            The Rules of Evidence that control what can be

11    received into -- the rules of -- there are Rules of Evidence

12    that control what can be received into evidence.  When a

13    lawyer asks a question or offers an exhibit into evidence and

14    a lawyer on the other side thinks that it is not permitted by

15    the Rules of Evidence, that lawyer may object.  If I overrule

16    the objection, the question may be answered or the exhibit

17    received.  If I sustain the objection, the question cannot be

18    answered and the exhibit cannot be received.

19            Whenever I sustain an objection to a question, you

20    must ignore the question and must not guess what the answer

21    might have been.  Sometimes I may order that evidence be

22    stricken from the record and that you disregard or ignore the

23    evidence.  That means that when you are deciding the case,

24    you must not consider the evidence that I told you to

25    disregard.

1          In deciding the facts in this case you may have to

2     decide which testimony to believe and which testimony not to

3     believe.  You may believe everything a witness says or part

4     of it or none of it.

5          Proof of a fact does not necessarily depend on the

6     number of witness who testify about it.  In considering the

7     testimony of any witness, you may take into account, one, the

8     opportunity and ability of the witness to see or hear or know

9     the things testified to.

10          Two, the witness's memory.

11          Three, the witness's manner while testifying.

12          Four, the witness's interest in the outcome of the

13     case and any bias or prejudice.

14          Five, whether other evidence contradicted the

15     witness's testimony.

16          Six, the reasonableness of the witness's testimony

17     in light of all of the evidence.

18          And, seven, any other factors that bear on

19     believability.

20          The weight of the evidence as to a fact does not

21     necessarily depend on the number of witnesses who testify

22     about it.

23          I will now say a few words about your conduct as

24     jurors.

25          First, you are not to discuss this case with

1   anyone, including members of your family, people involved in

2   the trial, or anyone else.  That includes discussing the case

3   in Internet chat rooms or through Internet blogs, Internet

4   bulletin boards, or e-mails.  Nor are you allowed to permit

5   others to discuss the case with you.  If anyone approaches

6   you and tries to talk to you about the case, please let me

7   know about it immediately.

8          Second, do not read or listen to any news stories,

9   articles, radio, television, or online reports about the case

10  or about anyone who has anything to do with it.

11         Third, do not do any research, such as consulting

12  dictionaries, searching the Internet, or using other

13  reference materials, and do not make any investigation about

14  the case on your own.

15         Fourth, if you need to communicate with me, simply

16  give a signed note to the bailiff or courtroom deputy to give

17  to me.

18         And, fifth, do not make up your mind about what the

19  verdict should be until after you have gone to the jury room

20  to decide the case and you and your fellow jurors have

21  discussed the evidence.  Keep an open mind until then.

22         Finally, until this case is given to you for your

23  deliberation and verdict you are not to discuss the case with

24  your fellow jurors.

25         During deliberations you will have to make your

1    decision based on what you recall of the evidence.  You will

2    not have a transcript of the trial.  I urge you to pay close

3    attention to the testimony as it is given.  If at any time

4    you cannot hear or see testimony, evidence, questions, or

5    arguments, let me know so that I can correct the problem.

6            If you wish, you may take notes to help you

7    remember the evidence.  If you do take notes, please keep

8    them to yourself until you and your fellow jurors go to the

9    jury room to decide the case.

10           Do not let note taking distract you.  When you

11   leave, your notes should be left in the courtroom.  No one

12   will read your notes.  They will be destroyed at the

13   conclusion of the case.

14           Whether or not you take notes, you should rely on

15   your own memory of evidence.  Notes are only to assist your

16   memory.  You should not be overly influenced by your notes or

17   those of your fellow jurors.

18           From time to time during the trial it may become

19   necessary for me to talk with the lawyers out of the hearing

20   of the jury, either by having a conference at the bench when

21   the jury is present in the courtroom or by calling a recess.

22   Please understand that while you are waiting we are working.

23   The purpose of these conferences is not to keep relevant

24   information from you but to decide how certain evidence is to

25   be treated under the Rules of Evidence and to avoid confusion

1    and error.

2            Of course we will do what we can to keep the number

3    and length of these conferences to a minimum.  I may not

4    always grant an attorney's request for a conference.  Do not

5    consider my granting or denying a request for a conference as

6    any indication of my opinion of the case or what your verdict

7    should be.

8            Trials proceed in the following way.  First, each

9    side may make an opening statement.  A party is not required

10   to make an opening statement.  An opening statement is not

11   evidence.  It is simply an outline to help you understand

12   what the party expects the evidence will show.

13           Also, because it is often difficult to give you the

14   evidence in the order we would prefer, the opening statement

15   also allows you to keep an overview of the case in mind

16   during the presentation of the evidence.

17           Plaintiffs will present their evidence first.

18   Because the parties may call many of the same witnesses,

19   defendants may present some of their evidence during the

20   plaintiffs' case.  Then, when the plaintiffs are finished,

21   the defendants will present the rest of their evidence.  One

22   or both parties may call witnesses who are employed by or

23   otherwise associated with the other side or whose interests

24   run contrary to those calling the witness for some reason.

25           These witnesses are known as adverse witnesses.

 1   There are tactical reasons that a party may call such a

 2   witness.  It is permissible for them to do so, and you should

 3   not be confused by the fact that a party, as a part in its

 4   case-in-chief, called a witness -- called as a witness a

 5   person associated with the other side.  You should treat

 6   testimony of these witnesses the same as you would the

 7   testimony of any other witnesses.

 8        After the evidence has been presented I will

 9   instruct you on the law that applies to this case, and the

10   attorneys will make closing arguments.  After that you will

11   go to the jury room and your deliberation -- and you will

12   deliberate on your verdict.

13        As I stated this morning, we're going to adjourn

14   for the day.  We're going to start the trial on Tuesday at

15   9:00 o'clock.  At 9:00 o'clock counsel, if they choose to do

16   so, will be able to make an opening statement, and then the

17   evidence will then be presented to you.

18        Remember not to discuss the case among yourselves

19   or with anyone else.  Do not form or express any opinions

20   until the case has been submitted to you.

21        I'm going to ask you to go to the jury deliberating

22   room for one moment, and we'll give you our telephone numbers

23   as well as instructions on how to get back to the jury room.

24        And Juror Number 4, if you would let us know as

25   soon as you find out the status of your job interview.  All

```
 1   right?

 2            Thank you.  We'll see you Tuesday.

 3            THE CLERK:  The jurors can follow me, please.

 4            (Open court - jury not present.)

 5            THE COURT:  We'll take a 15-minute break.

 6            (Recess from 1:31 p.m. to 1:46 p.m.)

 7            THE COURT:  All right.  First, with regard to the

 8   issue of the time limitations.  I've read the plaintiffs'

 9   memorandum of points and authorities concerning estimated

10   examinations, and I've read the defendants' response to

11   plaintiffs' memorandum of points and authorities concerning

12   the estimated examinations.  And I'll initially just share my

13   thoughts.

14            I think I said at the final pretrial conference

15   that my initial estimate in my mind was eight hours a side.

16   I went up to ten hours.  And then after ruling on the motions

17   in limine I again reconsidered and said if eight hours was

18   the correct amount, and then now, looking at the papers,

19   plaintiff says ten plus and defendant says six.

20            And Mr. Busch, I'll let you have the last word.  I

21   still think in looking at the list, I still think the

22   presentation is still cumulative.  We have multiple people

23   talking about the negotiations when I think both sides

24   concede that this issue was never contemplated in the

25   negotiations.  And then there are multiple cumulative
```

```
 1   witnesses as they relate to the third-party agreements.
 2           Mr. Busch, you may be heard.
 3           MR. BUSCH:  Your Honor, just going through, if we
 4   could, let me just start off by just saying something very
 5   briefly, which is that -- and we set this out in our papers.
 6   I have worked very hard to craft our examinations in this
 7   case in a non duplicative, non cumulative way, and to work to
 8   cut down those examinations.  And even having done that,
 9   there is no way I believe that I can put this case on
10   effectively for my clients in less than ten hours.  And I'm
11   not even sure if ten hours -- I don't believe ten hours would
12   be enough at the end of the day.
13           But let me just address the two things that
14   Your Honor said, which were that, A, the examinations for the
15   agreements seemed to be a bit cumulative; and then, B, they
16   were cumulative as to the third-party agreement.
17           THE COURT:  Right.
18           But doesn't everybody -- as a starting point, the
19   reason we're here is because nobody discussed what this
20   lawsuit is about at the point of negotiations or else it
21   would be in the agreement clearly and unambiguously?
22           MR. BUSCH:  No, Your Honor.  We don't -- we
23   don't -- first of all, the answer to the question is we think
24   it is clear by virtue of the licensing language what the
25   intent of the parties was, which was that anything that is
```

1    licensed is paid as -- at a certain rate, royalty.

2           But there are several agreements here.  There's the

3    1998 agreement, and as to the 1998 agreement, really, the

4    only witnesses that we are having or we are calling is

5    Peter Paterno, who negotiated the agreement on behalf of the

6    defendants.  And then with respect -- and then we have also

7    Lisa Rogell from Universal, but she's more related to the

8    2000 novation and the 2003 agreement.

9           So as to the 1998 agreement, I do not believe it is

10   cumulative as all because from a lawyer's perspective, the

11   person actually negotiated the agreement -- we're not

12   calling, for example, Paul Rosenberg, other people who might

13   have been involved.  Marni Nieves was initially on our list,

14   but we're only calling -- but we're only intending, because

15   of time issues, to call Peter Paterno with respect to that

16   agreement.

17           THE COURT:  Slow down, Mr. Busch.

18           MR. BUSCH:  That's okay.

19           But now let's go to the 2003 -- the 2000 novation.

20   With respect to the 2000 novation, the defendants have raised

21   various issues relating to a particular paragraph where the

22   word -- or two paragraphs where the word ancillary appears.

23           With respect to that agreement, the 2000 novation,

24   we are going to call Mr. Stiffelman, who was involved in some

25   negotiations or some discussions about that on -- for Eminem

1     on Eminem's side; Mr. Martin, who is also involved in some

2     discussions, but it's not going to be necessarily cumulative

3     as to people who are involved in negotiations and discussions

4     on a very discrete point.

5              And then from the other side, Lisa Rogell, who was

6     the one who was actually inputting the information.  We do

7     not believe that would be cumulative at all.

8              And then we get to the 2003 agreement.  That is a

9     new agreement.  That is a new agreement that I think needs to

10    be made clear that in 2003, unlike 1998 -- or I should say

11    2003 is a new agreement terminating the term of the '98

12    agreement.  And by 2003, the defendants were putting into

13    agreements specific language about permanent downloads in

14    some of their form treatments.  We're going to call with

15    respect to that Mr. Hoffman -- Rand Hoffman, who is with

16    Universal; and on our side Gary Stiffelman, who negotiated

17    that agreement.

18             And we do not agree that there were not

19    conversations in connection with that agreement with

20    respect to permanent downloads.  We absolutely do not

21    agree with that.

22             So we are -- I don't see how any of that is

23    cumulative.  I think I'm going to get them on and off

24    relatively quickly.  And I think -- and you can see by my

25    time estimates, no one with respect to examinations are more

```
 1    than 30 to 45 minutes of total time, and each one is

 2    important for purposes of this case.  So that's with respect

 3    to the agreements themselves.

 4           And, also, Mr. Stiffelman and Mr. Hoffman were

 5    involved in the 2004 amendment.  And there was a 2004

 6    amendment as well where there was discussions and

 7    negotiations about this issue.

 8           THE COURT:  But just by way of one example, then

 9    you have somebody else who wants to testify about urgency.

10    I mean --

11           MR. BUSCH:  We're talking about the '90 -- we're

12    talking about the circumstances -- when you say urgency,

13    that's Jimmy Iovine you're referring to.

14           THE COURT:  Right.

15           So why does Mr. Iovine have to -- why do we need

16    Mr. Iovine to talk about urgency?  Why can't somebody else

17    talk about urgency?

18           MR. BUSCH:  Well, Mr. Iovine was the head of

19    Interscope Records.  And, first of all, I have 15 minutes

20    for Mr. Iovine on my -- I believe I have 15 minutes for

21    Mr. Iovine.

22           THE COURT:  Well, talk to me about the budget.

23    A billion here and a billion there, and then you're talking

24    about real money.  22 witnesses, come on.

25           MR. BUSCH:  Jimmy Iovine was in charge of
```

1    Interscope Records.  Certainly the nature and circumstances

2    surrounding the transaction is a legitimate issue with

3    respect to the extrinsic evidence.  We're going to show

4    you --

5            THE COURT:  You need another witness to do that?

6    You can't use one of the ones you already have?

7            MR. BUSCH:  Mr. Iovine was the one -- there's only

8    two people that were involved in the '98 agreement.  We'll

9    have Jeff Bass, who had a lawyer.  But from Universal's

10   perspective, they drafted this agreement.  Universal drafted

11   this agreement.  Aftermath drafted this agreement.  It was

12   done in four days.  And it was done in four days because

13   Mr. Iovine was demanding that it be done quickly.

14           And to the extent the defendants are going to come

15   in and say that this agreement doesn't mean what it says or

16   there's some problem with the agreement or it's not clear,

17   the fact that Mr. Iovine, Jimmy Iovine, the chairman of

18   Interscope was directing that this thing be done immediately

19   and it was done in four days is very important.  The need and

20   the urgency to get this done with respect to our issues, with

21   respect to the adhesion contract, with respect to their

22   drafting of the agreement, with respect to their crafting of

23   the agreement and how it was done, it was all done at

24   Mr. Iovine's direction.

25           So to suggest that we can't call Mr. Iovine to say,

```
 1    "I -- yes.  I directed this be done quickly.  I directed this

 2    be done immediately.  This was done in three or four days at

 3    my direction," is -- is an important issue.

 4           And we're not talking about the difference between,

 5    you know, 20 hours.  We're talking about the difference

 6    between 8 to 10 hours.  I believe that's what we're talking

 7    about at this point in time.  And that's part of our case;

 8    that the way this was crafted in this exam -- in this

 9    agreement was done in urgency and direction by Jimmy Iovine,

10    and it was done in four days because of Mr. Iovine's

11    direction to get this done quickly.  And I think that's

12    important.

13           But, again, going back to Your Honor's question.

14    The defendants have raised a lot of different defenses, very

15    nuanced -- that take this out from under just the master's

16    license provision.  As I said, they're raising the 2000

17    novation and use of the word "ancillary" there -- the use of

18    the word "ancillary" in the 2003 agreement as having some

19    kind of impact on this case.

20           They've raised the 2004 amendment as an issue.

21    They raised language in the 2004 amendment, and with respect

22    to all of that, I'm going to have Rand Hoffman, on the 2003

23    agreement from Universal, to discuss the nature and

24    circumstances; and from our side Gary Stiffelman, who was

25    directly involved in these conversations with these
```

 1    agreements.

 2            I'm not wasting time.  I'm trying to prove my case.

 3    And if I can't put on the witnesses who are -- who were

 4    directly involved in these negotiations to show what truly

 5    went on, then I can't prove my case -- or I'm going to have

 6    a very difficult time doing it.

 7            THE COURT:  What truly went on?  What did they

 8    say about whether or not downloads or ring tones would be

 9    a royalty or license?  What did they say during the

10    negotiations about that?

11            MR. BUSCH:  In 2003?

12            THE COURT:  In any of them.

13            MR. BUSCH:  In 2003, Your Honor, I believe that the

14    evidence will show that Mr. Hoffman attempted to get the same

15    provision in the record -- in the Eminem agreement in 2003

16    for record sales that they were putting in all of their other

17    agreements, and Mr. Stiffelman refused, saying the license

18    provision covered it.

19            The whole issue, Your Honor -- and, again, the

20    defendants put this back on us as far as what was discussed

21    and what was not discussed.

22            The record -- there's two -- there's two

23    provisions.  There's the record royalty provision.  That has

24    to do with Universal is selling records themselves; when

25    they're manufacturing, distributing, packaging, warehousing,

1    shipping -- all of the things involved with that.  So the

2    question is not just whether the intent was that the master

3    license provision applied to downloads.  No.  The question

4    is was it envisioned by the parties that that record royalty

5    provision would apply when all they're doing is applying a

6    digital file -- licensing a digital file to a third party.

7             And the point is that the evidence in this case and

8    what it is going to show very clearly, we think, is that the

9    intent of the parties is whenever there's a license, whenever

10   we're not doing the sale -- and Universal -- when we don't

11   have these manufacturing, shipping --

12             THE COURT:  Slow down.

13             MR. BUSCH:  Yes.  Sorry.

14             Manufacturing, shipping, distribution costs,

15   these -- all these different costs that we have, and we're

16   not selling it directly, but we're licensing it so someone

17   else has that, that's when it applies.

18             So these issues are much -- the defendants have

19   raised multiple issues with respect to these agreements.

20   It's not just the master's license provision.

21             And I'll also say, Your Honor, that Your Honor has

22   denied Plaintiffs' Motion in Limine Number 6, I believe.  And

23   that raises another issue that is going to take some

24   testimony where Mr. Hoffman was involved in some conver- --

25   some agreements.  And there will be additional examinations

```
 1    required on the issue of whether "Lose Yourself" falls within

 2    this -- this matter or doesn't.

 3              That -- that is not a simple issue.  It's

 4    complicated.

 5              THE COURT:  It is not a complicated case.  It is

 6    not.  You could talk -- you could talk to any stranger on the

 7    street and in five minutes tell him what this case is about.

 8    You use that word "complicated."  The lawyers may be

 9    complicated.  This case is not complicated.

10              MR. BUSCH:  I agree with Your Honor -- I agree with

11    Your Honor on one point that Your Honor just said, which is

12    that the base issue about whether this is a license, our view

13    of it is it is simple as far as the base issue, which is it

14    is a license from Universal to these digital download

15    companies and master tone companies.  If it is, we win.

16    That's the issue.  And I agree with Your Honor.

17              Unfortunately, there are a lot of defenses being

18    raised by defendants about ancillary, about this, about that,

19    about the soundtrack album, about whether the soundtrack

20    album applies to "Lose Yourself," to these different songs

21    that we are required to respond to.  They have all types of

22    affirmative defenses that we are required to respond to.  We

23    have different people who have -- who have negotiated these

24    agreements, who discussed -- who discussed these agreements.

25    There are all types of extrinsic evidence, subsequent
```

 1    conduct, and the nature and purpose of the transaction, the

 2    different things that we pointed out that we intend to prove

 3    show, clearly, what the intent of the parties was.

 4             For example, Your Honor, as I said, Peter Paterno

 5    and Universal in 2001 -- beginning in 2001 carved out

 6    specific language for permanent downloads because they knew

 7    and understood that without it the licensing provision would

 8    cover it.  And I -- and I have -- I need to go through those

 9    to show the provisions, to show how they carved that out.

10    There are examination -- those are topics of examination.

11    I tried to lay those out for Your Honor.

12             And without the time to just go through and show

13    how their subsequent conduct proves what they -- what they

14    knew was the nature and purpose of the licensing provision

15    prevents me from showing -- proving our case because I'm not

16    able to show, for example, based on one of Your Honor's

17    rulings, that all of the people on their side of the table

18    constantly, before this litigation began, said we license our

19    music.  That -- Your Honor precluded me from showing that.

20    So I can't show that they admitted that these are license

21    agreements because our view is --

22             THE COURT:  Why do you even raise that?  Because

23    that's another concern that I have that I see from the

24    documentation, but I get the suspicion you're going to

25    attempt to relitigate my prior rulings.

1          MR. BUSCH:  Absolutely not.

2          THE COURT:  For example, the letter that you

3    proposed for impeachment that is not impeachment.  You

4    dropped it in the footnote and its referenced.  You're not

5    going to introduce that letter to Mr. Paterno.  It's not

6    relevant to this case.

7          And I get the sense that my motions -- that the

8    rulings that I've made, in your mind it's not over.  Well, it

9    is over.  And why even raise what I precluded you from doing?

10   It's done.  You're not reconsidering it.  Why even raise it

11   to me?

12         MR. BUSCH:  The reason why I am raising it,

13   Your Honor, is because I have to prove my case other ways.

14   I can't prove my case now by showing that the defendants

15   admitted that these are licenses; so I need to prove my case

16   other ways, additional ways from circumstantial evidence,

17   from their subsequent conduct, from their acts.  I can't take

18   the language out of their mouth, but I've got to be able to

19   prove my case a different way.

20         And the way I'm going to prove my case is to show

21   what the custom and practice of this provision is, what the

22   nature and purpose is.  What everyone understood in 1998 was

23   that if you licensed it, you just provide a digital file and

24   the other person does the rest, it's a license under the

25   licensing provision.

1        And I'm also going to show that there's subsequent

2    conduct, the different agreements they entered into

3    subsequently when they tried to carve that out.

4        THE REPORTER:  I'm sorry, Your Honor, can he please

5    slow down.

6        MR. BUSCH:  I'm sorry.

7        When they tried to carve that out, proves that they

8    knew that to be the case.  And I have to show, Your Honor, or

9    respond to their various defenses that they have raised to

10   this, this ancillary stuff, the 2004 amendment that they --

11   that they've raised, the issue with respect to Motion in

12   Limine Number 6.  I need to raise those things.  I'm not

13   calling cumulative witnesses.  I promise, Your Honor.  I have

14   no intention of wasting this jury's time or this Court's

15   time, but I do need to protect -- to prove my case.  I do

16   have the burden of proof.

17       One other thing Your Honor mentioned -- and, again,

18   with respect to all of this, we're not talking about that

19   many different witnesses.  From the plaintiffs' side, as far

20   as the negotiations of the agreements that are relevant --

21   the '98, 2000, 2003, 2004 -- we're going to have Gary

22   Stiffelman; and as to conversations he had with respect to

23   the 2000 novation, Joel Martin; and we would have Jeff Bass

24   just talking about the -- what he did in the days leading up

25   to the '98 agreement.  But as far as the actual negotiations

```
1    of terms, we're talking about Rand Hoffman with respect to
2    his communications and with respect to what Universal was
3    doing with their form agreements; Lisa Rogell, who had direct
4    communications with Mr. Martin and Mr. Stiffelman with
5    respect to the 2000 novation and the addition of ancillary
6    language, specifically that they have raised as a defense;
7    and Mr. Martin and Mr. Stiffelman.
8            With respect to the third-party agreements -- let's
9    talk about the third-party agreements for a moment.
10           With respect to the actual negotiations of the
11   third-party agreements, as Your Honor referred to them, we
12   have done a lot of work.  In fact, I was going to hand up to
13   Your Honor -- or offer Your Honor, if Your Honor wanted a
14   copy of it.  We have -- what we have done, Your Honor, is we
15   have provided summaries of these voluminous documents.  And
16   what we've done is most of the documents, most of these
17   third-party agreements --
18           THE COURT:  Have you exchanged the --
19           MR. BUSCH:  Yes, we have -- we have provided it
20   to --
21           THE COURT:  Then that issue is gone?
22           MR. BUSCH:  I believe it is, yes.  Your Honor.
23           MR. POMERANTZ:  I'm sorry, Your Honor?
24           THE COURT:  I just asked Mr. Busch if the -- if
25   these summaries have been exchanged because the --
```

1          I'll hear from Mr. Pomerantz.  How do you feel

2    about it?

3          MR. POMERANTZ:  We have an issue on the binders.

4    I will raise that with Your Honor.

5          THE COURT:  All right.  My question was there was

6    an issue raised in the -- in the defendant's memorandum that

7    the summaries were presented but not allowed to be copied

8    they -- they don't have them.

9          MR. BUSCH:  No.  That's not true, Your Honor.  What

10   happened was -- I have an e-mail exchange with Mr. Pomerantz

11   about this that I'll hand up to Your Honor.

12          What happened was that we provided -- after

13   Your Honor ruled limiting the examination to ten hours,

14   we realized that in order to effectively put on our case

15   we needed to provide -- to prepare summaries of these

16   third-party agreements.  And so what we did was -- because

17   the terms are very similar in the agreement is we provide --

18   we prepared a chart that has direct cutouts -- we didn't

19   change anything -- of the language that is the same in the

20   various agreements identified by the exhibit number and

21   parties.  That's it.

22          I contacted Mr. Pomerantz immediately and said this

23   is what we're going to do.  If you have any problem with

24   this, let me know immediately.  And I would be happy to

25   provide you with an example.

1          It took literally hundreds of hours of work to get

2     this done, and we were revising up until as late as last

3     week.  And so we -- Mr. Pomerantz said yes.  I would like to

4     see an example.  And so I provided Mr. Pomerantz with an

5     example, and Mr. Pomerantz said to me -- wrote back to me

6     said, "I don't believe I have an objection to this."

7          And then we had subsequent conversations that

8     I have memorialized where Mr. Pomerantz reiterated to me, and

9     I put it in writing back to him, our conversation where he

10    said he doesn't object to it, and I have that e-mail

11    correspondence.

12         Now, what we have done is we have provided him --

13    Mr. -- even though it wasn't, we don't believe, required,

14    Mr. Gilford went over to their office.  We were exchanging a

15    review of documents.  It was -- today is Friday -- Wednesday

16    afternoon with the binder for them to review.  And

17    they asked -- just to see because I wanted to do that as a

18    courtesy to them.  So if they wanted a copy of it they could.

19    Mr. Gilford went over there.  They asked for a copy.  He did

20    bring it back.  But then we contacted them that evening and

21    said we'll make a copy for you.  And first thing yesterday

22    morning we provided that material to them.

23         THE COURT:  Okay.  Let me just say this, though,

24    and what is required and what is not required.

25         I'll say this, though, what I expect that the

1    parties will do is before the day of testimony that they will

2    have exchanged what -- impeachment is different.  Okay?  They

3    will have exchanged or presented to the other side what

4    documents will be examined upon, and I'll tell you why.

5    Because -- that they have seen them and they know what's

6    coming because if I get a request, I've never seen that

7    document before and I want to review it, it's going to be

8    on -- the meter is running on the person who caused the

9    delay.  So if those documents are not exchanged from either

10   side and the other side says I need a chance to look at this

11   because I haven't -- it wasn't provided to me yesterday or

12   whenever, well, that side is going to get the opportunity to

13   review the document, and the meter is running in any event.

14          MR. BUSCH:  Yeah.  We gave everything to them

15   yesterday morning.  Let me explain, Your Honor, what our

16   agreement was between Mr. Pomerantz and I because this is

17   important to understand.

18          We previously agreed that you can cut out -- we

19   will have the sanctions program here that Your Honor is

20   obviously familiar with.  And you can cut out direct language

21   from agreements and put it up on the screen and put

22   different -- you know, the same language from different

23   agreements on the screen right below to show that these --

24   for example, that these agreements are all similar.

25          But when Your Honor -- when Your Honor ruled that

1    we had ten hours, we realized in speaking to our technician

2    that there was no way we could do that, pull and then pull

3    and then pull, it would be too much of a delay.  So we just

4    prepackaged what we ordinarily do with the sanctions program.

5    And we told -- and Mr. Pomerantz and I agreed that that is

6    not the type of demonstrative exhibit that needed to be

7    exchanged.  We agreed with that; it is in writing.

8           Because we agreed with each other that that was --

9    that that could be used and it was not the type of

10   demonstrative exhibit that needed to be exchanged, our view

11   was that just because we were prepackaging, what we would

12   have been able to do at trial if we had more time would be --

13   wasn't something that needed to be exchanged.

14          However, I didn't want to be in the problem that

15   Your -- I didn't want to have the problem that Your Honor

16   just mentioned.  So about two weeks ago, when we started this

17   process and we were doing this, I -- as I said, I have the

18   e-mail exchange.  I provided Mr. Pomerantz with an example.

19   He wrote back that he doesn't have the -- he doesn't believe

20   he has an objection to it.  He needed to speak to his client

21   about it.  Then we had another conversation later that I

22   memorialized where he said if the documents that you have are

23   similar to what you've provided me as an example, we don't

24   have any objection to any of them.

25          THE COURT:  I'm going to interrupt you.

1          Let's get back to third-party agreement.

2          MR. BUSCH:  Okay.  So my point is -- my point is,

3    Your Honor, with respect to the third-party agreements, there

4    are essentially two witnesses from Universal that we are

5    going to question.  One is Larry Kenswil, who is the head of

6    the eLabs division; and one was the person who negotiated

7    virtually all these agreements.  We're going to question him

8    about his testimony, the structure of these agreements, and

9    the terms contained therein, and things related to those

10   agreements.  He's going to be the primary third-party witness

11   we're going to examine.

12          In addition to --

13          THE COURT:  Now, he's a lawyer; right?

14          MR. BUSCH:  He's a lawyer.

15          THE COURT:  Are you going to ask questions that you

16   know are going to trigger an objection concerning attorney

17   client or work product?

18          MR. BUSCH:  Absolutely not, Your Honor.

19          In fact, I deposed Mr. Kenswil, and that's actually

20   a bench brief we're going to be asking for permission to

21   submit.  The information that we are going to be questioning

22   Mr. Kenswil comes straight out of things he was allowed to

23   testify to and did testify to in his deposition.

24          We have a -- we have the reverse concern, actually,

25   and that is to certain questions that we thought were

1  important to ask Mr. Kenswil was instructed not to answer on

2  the ground of the attorney-client privilege.  What I don't

3  want to have happen is now that we're in trial Mr. Pomerantz

4  all of a sudden allows him to answer questions that I was

5  prohibited from getting into on the grounds of

6  attorney-client privilege, and we're going to ask Your Honor

7  for a ruling saying that he can't do that.  And we have some

8  case law and we have a bench brief that we would hand up at

9  the appropriate time.

10         THE COURT:  Okay.

11         MR. BUSCH:  Okay.  So the answer to Your Honor's

12  question is no.  My examination is based upon things that I

13  asked him in his deposition and that he was allowed to

14  answer.

15         The second witness on the third-party agreements --

16         THE COURT:  I'm sorry.  Mr. Busch, again, slow

17  down.

18         MR. BUSCH:  I'm sorry.  I talk fast.  I apologize.

19         THE COURT:  I understand.  It's a big deal for you.

20  Still, you really need to slow down.

21         MR. BUSCH:  All right.  The second -- the second

22  person that I plan to examine on the third-party agreements

23  is David Weinberg.  And the reason I'm going to call David

24  Weinberg is because he specifically -- he specifically

25  negotiated some of the key agreements.  And, for example,

1    Mr. Weinberg, in one or two -- in a draft of one of the

2    agreements that Universal was not able to negotiate on their

3    own form but it was done on T-Mobile's form, in draft struck

4    out the word "license" and replaced it with a different word,

5    which we view -- and I think is circumstantial evidence of

6    and part of our theory of this case, which is that these

7    defendants went to the great lengths to camouflage these

8    agreements as something other than licenses.  And we want to

9    question him about his striking out of the word "licensing

10   agreement" and certain other things that he testified to that

11   he has specific knowledge about that is different from

12   Mr. Kenswil.  I don't think his examination will be very

13   long.

14            And that's who we are going to examine from

15   Universal's side on the third-party agreements.

16            On -- two other witnesses we have on the

17   third-party agreements are Eddy Cue from Apple by videotaped

18   deposition and -- and Ethan Gustav from T-Mobile.  I'm

19   working to try and actually cut down on the Ethan Gustav

20   examination.

21            But on the Eddy Cue examination, it's very

22   important and vital.  And a couple of the reasons.  One is

23   Universal, in their -- one of their defenses -- one of the

24   things that their expert witness and Mr. Kenswil has

25   repeatedly said is that we sell downloads, or we provide

1    downloads to the digital download companies.  And it appears

2    that what they're trying to say is it's not a license of the

3    master.  It's a record already in record form; and,

4    therefore, maybe the master's license provision doesn't

5    apply.

6            The evidence will show that's nonsense.  And

7    Eddy Cue specifically testified at length about how they

8    receive two digital files, perhaps three, from Universal.

9    One is just a master recording.  And then there's information

10   on some of the others that Apple then has a responsibility to

11   manufacture into what ultimately becomes the download, and

12   they reproduce it and manufacture it.  And so it fits

13   squarely within the masters license provision.

14           It's relevant to respond to and to show what

15   they're doing is doing the same thing in the digital world

16   that they do when they license masters in the -- in the

17   physical world.  They're doing to the digital world the same

18   thing they do when they license masters in the physical

19   world.

20           He also is going to provide testimony about -- or

21   his deposition also provides testimony about all of Apple's

22   marketing, their responsibilities for the marketing, the fact

23   that the record label doesn't really market the things on

24   iTunes that Apple does.

25           It also goes to the fact that they are a licensee

1   that does the things that a licensee does because, for

2   example, when Universal sells something to a record store,

3   they pretty much subsidize the marketing that goes on to the

4   record store.  That doesn't happen with Apple.  Apple is

5   responsible for those costs.  And it's important to get into

6   the fact that they are a licensee selling things just like a

7   licensee does in the physical world.

8           Also, one of their defenses is that Apple is a

9   reseller.  They're selling digital files to Apple and Apple

10  is reselling.  Mr. Cue's testimony on that where -- and, you

11  know, I'm going to just suggest it is so unbelievable and so

12  nonsensical about this sale and resale, I think it goes right

13  to -- and the heart and the theory of our case is that

14  these -- you know, Universal and Apple try to camouflage what

15  was a license for various reasons, and the credibility of

16  these witnesses and the extent they went to avoid the

17  licensing provision, is crucial to our case, and we need to

18  be able to put that on for purposes of credibility.

19          So we've got Kenswil primarily on the digital

20  agreements; Weinberg, just a belt and suspenders on a few

21  things; and then Eddy Cue and Ethan Gustav because he

22  testifies about the master tones and the ring tones and

23  specifically what is done and how they do it and the fact

24  that they're selling; they're not buying anything from

25  Universal.  In fact, Mr. Gustav says they're not in the

 1    business of buying, of owning things.  They basically -- they

 2    get the master recording.  They do things with it, and then

 3    they -- they sell it.  And the process and procedures

 4    Mr. Gustav in his -- and this is a videotaped deposition.

 5              THE COURT:  For example, you're not going to use

 6    Jobs then?

 7              MR. BUSCH:  Well, Steve Jobs goes to -- Steve --

 8    I understand the defendants' point on Steve Jobs, and I

 9    understand Your Honor's ruling, and I understand loud and

10    clear that I'm not to revisit Your Honor's rulings, and I

11    wasn't intending do that.  That was not the purpose of that

12    footnote.

13              But on Steve Jobs, I have him listed for 15 or

14    20 minutes only because, again, it fits into the same idea

15    as --

16              THE COURT:  Well, the operative word is "same."

17              MR. BUSCH:  I know.  I understand that.

18              But Mr. Jobs -- and I understood what Your Honor

19    was saying.

20              But with respect to Mr. Jobs, it is the -- with --

21    his testimony similar to Mr. Cue's in connection with this

22    idea of reselling and how he has no idea what a license is.

23    You know, Your Honor, to be quite honest with you, it goes,

24    again, for this jury to be able to gauge the credibility of

25    the people on this side of the table and their business

 1    partners.

 2            When Steve Jobs says in his videotaped deposition,

 3    "I don't -- I didn't go to college."  The man who invented

 4    the iPhone and who licenses things from -- you know, every

 5    day -- Apple -- he is -- the CEO of Apple says, "I didn't go

 6    to college; so I don't know what a license is, and I don't

 7    know -- I don't understand what it means to license, and I

 8    don't understand what my" -- when I showed him software

 9    license agreements and asked him whether these are licenses

10    or not and he says he didn't know, I think that preposterous

11    testimony like that is -- should be allowed for purposes of

12    gauging the lack of credibility of the people on this side of

13    the table.  It's laughable what we have had to put up with.

14            And I do think we should have the right -- and I

15    understand what Your Honor says.  It's like one of the jurors

16    said today, oh, we get a penny or three pennies or five

17    cents, and then after, you know, a while, it's real money.

18    I understand that.  I understand that.

19            But I have a job to do, and I'm trying to put on

20    the evidence that I think will prove my case and prove that

21    these people are not credible in any way, shape, or form.

22            THE COURT:  And then I'll hear from the respondent

23    because I want to wrap this up.

24            You used the words "lack of credibility."

25    "Laughable."  How many people -- and if that's the case --

```
 1              MR. BUSCH:  I don't --

 2              THE COURT:  -- how many people do you need?  It's

 3      been so apparent --

 4              MR. BUSCH:  Well, I've got to put on the evidence

 5      in order to make it apparent.  And so when you think -- when

 6      you say how many people do I need, I'm going to have

 7      Larry Kenswil with respect to the third-party agreements

 8      talking about the agreements; Weinberg, just belts and

 9      suspenders; I'm going to play Eddy Cue's videotaped

10      deposition; and then I plan on putting, you know, a 15-minute

11      videotaped deposition or 20 minutes of Steve Jobs on some of

12      these things.

13              THE COURT:  Okay.  I'm not going to leave the

14      courtroom.  Let's just take a short break and change

15      reporters -- Okay.  We have reporters now waiting.

16              MR. BUSCH:  I'm going to be responsible for cramped

17      fingers.

18              THE COURT:  Let me hear from Mr. Pomerantz.

19              MR. BUSCH:  May I hand up the exchange of

20      correspondence from Mr. Pomerantz and I on the summary -- the

21      summary agreements?

22              THE COURT:  Not at this point.

23              MR. BUSCH:  All right.

24              THE COURT:  Thank you.

25              MR. POMERANTZ:  Your Honor, the brief they filed
```

1    a few days ago and then the comments here today continue to

2    give me great concern that -- that F.B.T. is not seeing the

3    rules of contract construction and Your Honor's rulings in

4    the way that I think are important to deciding what comes

5    into evidence and, therefore, how long this case should take.

6            We have two types of witnesses in this case, as in

7    most cases, the fact witnesses and the expert witnesses.  And

8    I think the rules of contract construction and Your Honor's

9    ruling have made it pretty clear that the fact witnesses are

10   going to come in and talk about these transactions, these

11   agreements, what was said.  I have no problem with them

12   calling them whatever witness who remembers something that

13   was said in a negotiation that is relevant to the issues in

14   this case.  No problem at all.  And I'll go over who those

15   are and who they're not.

16           If there was actual performance under the agreement

17   that somebody thinks is relevant to the interpretation of the

18   agreement, fine.  That can come in too.

19           But if you want to get to custom and usage, how are

20   these terms -- these provisions, records sold through normal

21   retail channels or masters license -- those are the two

22   provisions that I show, how are they customarily understood

23   in the industry?  None of the fact witnesses are testifying

24   to that.  That's why we each have an expert who is going to

25   come in and testify to that.

 And what they're trying to do is they use terms like nature and purpose of the agreement. And there is a case out there that use the terms nature and purpose. But they're not talking about what they're talking about. They're not saying that they're going to let Mr. Martin get on the stand and under the guise of nature and purpose give his unexpressed intent of what records sold through normal retail channels or masters license means. And it doesn't matter if he's had 34 minutes in the industry or 34 years in the industry, that's not the way that evidence gets in. They can designate an expert on custom and usage.

And what's going on here is Your Honor's rulings are consistent in the in limine. We didn't win them all. But Your Honor's rulings are consistent, and I think, Your Honor, it's clear, if anybody reads them objectively, what you think is a fact testimony and what you think is expert testimony.

And I am just -- I really do worry that the extent of the testimony he's trying to bring in from the negotiators isn't what was said. Let me tell you what the evidence shows of what was actually said.

I'm going to put aside Mr. Stiffelman for one second. He's Eminem's lawyer. He's not a lawyer for anybody in this room, and he wasn't deposed. So I want to put him to one side because I don't know for sure what he's going to

```
 1    say.

 2              No one remembers a single conversation in 19 --

 3    from the 1998 agreement that is relevant to this case; that

 4    is relevant to the issues here, to the terms.  So when they

 5    say they're going to call Peter Paterno, he's going to say,

 6    "I don't remember a conversation," because he doesn't

 7    remember.  Now, Peter Paterno will say this agreement was

 8    done in very short order at the instruction -- I don't think

 9    it's Jimmy Iovine.  I think the record actually shows it's

10    Dr. Dre.  I can't be 100 percent certain.  But Peter Paterno

11    is going to say that.  If they want to call him, he's already

12    said it under oath.  He's going to say it.

13              In the 2000 novation, up until recently there were

14    no conversations that anybody remembered either.  Lisa Rogell

15    didn't remember it; Peter Paterno didn't remember it; Rand

16    Hoffman didn't remember it.

17              Now Mr. Martin remembers a conversation that he

18    had with Ms. Rogell that he thinks relates to the word

19    "ancillary" in the agreement.  He can testify to that.  I'm

20    not -- we're not -- we're not trying to block that.  And I

21    understand Your Honor is going to reconsider that aspect of

22    the in limine ruling.

23              If they call Ms. Rogell to testify, she's going to

24    say what she said in her deposition, "I don't remember any

25    conversations."  So even if they want to call Ms. Rogell,
```

1    it's about a three-minute questioning, if what they want

2    to do is get her side of a conversation with Mr. -- with

3    Mr. Martin.

4         Now roll forward to 2003.  The only people who have

5    testified about negotiations in 2003 are Mr. Hoffman, who

6    doesn't really have a recollection of any conversation that

7    was relevant; and I don't think there's anybody else who is

8    going to testify that -- I don't think Ms. Rogell remembered

9    anything from '03.  I don't think anybody else did.

10        Move forward to '04.  Mr. Hoffman sort of has a

11   general recollection of '04.  And they can call Mr. Hoffman

12   and have him testify to that.

13        Whatever Mr. Stiffelman is going to come in and

14   say -- I assume they're going to put him on as a witness, and

15   if he says that he remembers a discussion in 2000 or 2003 or

16   2004, have at it.  If he remembers that and it's a relevant

17   conversation, he can testify.

18        So -- but I feel that is what is going on here is

19   they're throwing a lot of names of people who were in some

20   way involved in negotiations, but none of them remember

21   anything.  We know it from the deposition record.  And what

22   they're trying to do is because Mr. Martin or Mr. Stiffelman

23   had some connection to the negotiations, they want to try

24   to ask them questions to get at unexpressed intent or custom

25   and usage, neither of which is proper.  And they're trying to

1    package it as nature and purpose or subsequent conduct.

2          Mr. Busch, just a few minutes ago, he said that he

3    wanted to point to agreements -- not the agreements in this

4    case -- other agreements that a witness might have worked on,

5    a Mr. Paterno or a Mr. Hoffman, and say, look at what you

6    wrote over in those agreements.  Now compare it to the

7    agreements in this case.  You must have meant something

8    different.  And, again, what they're trying to do is not take

9    what the parties said and did and wrote and performed in this

10   agreement.

11          And so I think that if Your Honor were to enforce

12   the rules of contract interpretation and consistent with

13   Your Honor's in limine's ruling, I am confident that if Mr. -

14   first of all, Mr. Busch wouldn't call some of these

15   witnesses, and if he did, truly their testimony would be 5,

16   10, 15 minutes.

17          As to the issue of Mr. Iovine, I do want to come

18   back to him.  He is a very senior executive in our -- in our

19   company who has a business trip next week.  We have told him

20   we're having this hearing this afternoon, and please don't

21   leave until we get the word from the Judge.  Truly, what they

22   have written on their brief tells you that the only reason

23   they're keeping him on the list is because he's really senior

24   and they want to keep him in this courtroom for whatever the

25   reason.  But -- it's truly the piece of testimony they want

1    is that this was done -- that the original agreement in '98

2    was done because they really wanted to get it done quickly,

3    including people on our side -- we're not running away from

4    that fact.  Those are the facts, and there are a number of

5    witnesses who will testify to that.  We don't need to keep

6    him here for that reason.

7          There are a number of witnesses, by the way, that

8    MR. Busch has on his list that he didn't mention.  And one of

9    the ones he barely mentioned was Mr. Bass, Jeff Bass.

10         Again, we know what he said in his deposition.  He

11   has nothing to do with the negotiation, the drafting of the

12   1998 agreement.  That's what he said.  So what are they

13   bringing him in for?  It must be to try to color the issue in

14   some way that has nothing to do with what are the terms that

15   we agreed on and were they breached or not.  We are very,

16   very concerned that the ten hours is an invitation to go

17   beyond the rules and go beyond the orders.

18         With respect to -- I'll give you another example:

19   Mr. Kenswil and Mr. Weinberg.  Mr. Kenswil is Mr. Weinberg's

20   superior.  Mr. Weinberg is the one who actually negotiated

21   with the T-Mobiles and the Apples of the world.

22         I -- their testimony is going to be totally

23   cumulative except that Mr. Weinberg will be able to testify

24   about discussions he directly had with T-Mobile and the

25   interaction there, where Mr. Kenswil cannot.  But virtually

1    everything that Mr. Kenswil can testify to is something that

2    Mr. Weinberg can testify to.  And then he also goes on to

3    the -- goes on to the negotiations.

4         So I -- you know, I am sure there is some strategy

5    behind it all, but it sure seems like a case in which the

6    only issue is does Contract Provision A apply or does

7    Contract Provision B apply, you don't need 22 witnesses.

8         On the privilege issue Your Honor pointed to,

9    can somebody ask a question that they know will elicit a

10   privilege claim by the other side?  He pointed to Mr. Kenswil

11   and said their -- actually, their concern is that we're going

12   to do something we have no intent on doing.

13        But it wasn't just Mr. Kenswil.  There were several

14   witnesses.  Mr. Ostroff, for example.  He's the general

15   counsel of Universal Music Group.  And if you look at the

16   description of what they want to ask Mr. Ostroff, the general

17   counsel, it clearly goes to questions that I instructed

18   Mr. Ostroff not to answer on grounds of privilege in the

19   deposition.  And I don't see how they're going to snake their

20   way through it without asking a question that doesn't call

21   for the privilege.

22        Now, I asked Mr. Martin questions during the

23   deposition -- his deposition that were -- he was instructed

24   not to answer on grounds of privilege, and that was fair.

25   But I don't want to get into this issue where I will ask

1    Mr. Martin a question to elicit the privilege so that the

2    jury doesn't think we're the only ones trying to hide

3    something here.  That's not the way we're supposed to be

4    playing.

5            So I would hope that the rule -- it's clear that

6    both parties should not ask questions where they know from

7    deposition testimony --

8            THE COURT:  I'll tell you this.

9            If it happens, I will not only just sustain the

10   objection, I will tell the jurors what is going on.

11           MR. POMERANTZ:  All right.

12           THE COURT:  All right?  So both sides know that.

13   So if there is any gamesmanship going on -- okay.  I

14   understand, maybe someone will slip once.  If it happens

15   twice the jurors are going to hear from me exactly what is

16   going on.

17           All right?

18           MR. POMERANTZ:  All right.  And then the only other

19   point I wanted to mention just for a few minutes was the

20   binder.  I haven't seen the binder.  It was sent to our

21   offices, I guess, yesterday, and I was in mediation with

22   Mr. Busch all day.  So I haven't yet had a chance to look at

23   it.

24           But what my position was -- and I haven't looked at

25   e-mail that he is sending; so I -- you know, I'll stand

1    corrected if the e-mail says something different.  But what

2    I said to Mr. Busch is the Court rules have an exchange on

3    demonstratives, and there's a deadline for it.  And we agreed

4    that what we mean by demonstratives does -- for that exchange

5    was not words that just are extracted from a document.  And,

6    Your Honor, with this technology now you can just extract a

7    paragraph or a sentence or a word from a document.  And we

8    both agreed that if you're taking an admissible exhibit and

9    just lifting a sentence out of it, that's not a demonstrative

10   that needed to be exchanged two or three weeks ago when the

11   deadline occurred.  We exchanged all of the other

12   demonstratives at that time except one.

13        What I did say, though, is we -- we're not agreeing

14   that if you pull a word from here and a word from there and

15   you put it together in a misleading fashion, we're not

16   agreeing, without ever having seen the document, that you can

17   use that document.  We're just agreeing that it doesn't have

18   to be exchanged at that deadline that the local rules

19   establish and that the Court will establish.

20        He sent me one example of, like, one provision that

21   was in 27 different agreements.  And I looked at that, and

22   I said, "That looks okay."  You know, if you wanted to

23   summarize and say all 27 of these agreements have the same

24   provision and put them together in one screen, you know, I

25   don't know what you're going to use it for, but as a

 1    practical matter I don't really object to you putting that

 2    together.

 3              That was sort of the last I heard until I got --

 4    until Mr. Klaus and Ms. LeMoine were given a binder that is,

 5    like, yay thick.  I don't know if that is misleading in the

 6    way it's presented or not.  I don't know if it's a fair

 7    presentation.  I am objecting on timeliness grounds, although

 8    I did ask for copies.  I'm not going to agree to something

 9    without looking at it and having a chance to -- you know, to

10    comment on it.

11              So the bottom line is I'm not objecting on

12    timeliness grounds.  I don't even know if I'm objecting to

13    anything in that binder yet.  I will look at it.  I will

14    discuss it with Mr. Busch.  If I think it's misleading or

15    unfair in some way, I will tell Mr. Busch why.  If I have a

16    problem, we'll bring it to Your Honor.

17              THE COURT:  All right.

18              MR. BUSCH:  Just a few things that I would like to

19    briefly respond to, if I could, Your Honor.

20              THE COURT:  Very briefly.

21              MR. BUSCH:  Yes.

22              THE COURT:  I'm ready to move on.

23              MR. BUSCH:  Okay.  We -- A, we don't intend to

24    offer anything that was objected to on the ground of the

25    attorney-client privilege.

1           THE COURT:  I don't expect you to.

2           MR. BUSCH:  Okay.  All right.  Secondly, we don't

3    intend to backdoor subjective intent.

4           THE COURT:  Unexpressed intent.

5           MR. BUSCH:  Unexpressed -- unexpressed subjective

6    intent.  Everything that we're doing to show -- and it's not

7    just -- there's two things that I want to add.  The

8    defendants moved -- we moved to exclude a third-party

9    agreement that -- that is an agreement from a related company

10   that Mr. Martin has, and the defendants responded by saying

11   there are terms in that that would help explain different

12   terms in this agreement.  And Your Honor denied our motion

13   in limine and agreed with the defendants.

14          All we're trying to do with Mr. Paterno is, with

15   respect to the various agreements -- they've stipulated to

16   the admissibility on them -- Your Honor, to show subsequent

17   conduct, change in terms that will explain what the parties

18   understood this provision -- these provisions to mean and

19   capture.  And I think it's a fair use of subsequent conduct.

20          And we're not talking about other agreements that

21   Mr. Paterno negotiated or that Mr. Hoffman did.  We're

22   talking about the form agreements used by Aftermath, the form

23   agreements used by Interscope, which we think clearly

24   demonstrate subsequent conduct -- and contemporaneous

25   conduct, by the way -- because they tried to get that same

1    provision into the 2003 Eminem agreement and couldn't.  And

2    we wouldn't agree to it.

3              And so, therefore, they knew that without it the

4    permanent downloads would fall into the licensing provision.

5              All of this is -- is there are certain types of

6    extrinsic evidence that are allowed.  We're going to follow

7    the rules.  We're going to get what we can under the rules.

8              But we do need, Your Honor, the ten hours that

9    we've asked for.  We would ask Your Honor to do this.  If

10   Your Honor is inclined at all to limit beyond ten hours,

11   I would ask Your Honor to keep an open mind as the trial

12   goes on.  And if Your Honor feels like we are putting on

13   cumulative evidence or not doing -- trying this case in an

14   expedient way in the way we could, then Your Honor can rule.

15             But I would ask Your Honor to see how this evidence

16   plays out before Your Honor reduces the time because I -- I'm

17   just saying we do not believe we can put our case on in less

18   than ten hours.  But I will try.

19             THE COURT:  All right.  I've, again, read the

20   briefs.  I have given counsel the opportunity to be heard

21   because I realized it's an important issue to both sides.

22             And I simply believe that the case can be presented

23   in eight hours; so it's eight hours a side.

24             I have received the index of portions of deposition

25   to be offered.  I do want some assistance on the plaintiffs'

 1    case.

 2              Are there any for Tuesday that you need to have my

 3    rulings on?  Or Tuesday -- if you could outline for me maybe

 4    Tuesday and Wednesday so I can, first thing, tell you -- or

 5    tell you Monday or tell you Tuesday first thing as to what

 6    the rulings are on the objections.

 7              MR. BUSCH:  We don't intend to play any of the

 8    videotaped deposition testimony on the first day of trial,

 9    Your Honor.

10              THE COURT:  Okay.  So on Wednesday, who should I --

11    who should I look at first without -- so let's say on Tuesday

12    I can give you rulings for Wednesday and Thursday.

13              MR. BUSCH:  We have -- I would say we have Eddy Cue

14    and Steve Jobs.  You know, depending on -- based on

15    Your Honor's ruling there may be some changes to some of

16    this, Your Honor, I have to say.  You know, I don't -- I

17    would say Eddy Cue and Steve Jobs.  And we're going to

18    discuss, you know, the Steve Jobs issue in light of

19    Your Honor's ruling on the time frame.

20              THE COURT:  But the bottom line is I need to take a

21    look at Eddy Cue first.

22              MR. BUSCH:  Yes.  I would say Eddy Cue first.

23              THE COURT:  All right.  Okay.  And Mr. Pomerantz,

24    looking at -- maybe there are valid reasons, but it just

25    seems you have objections for almost every entry.

 1          Is that going to be the -- and I'll go through and

 2  I'll rule on them, but are you just preserving things or what

 3  are you -- what do you really mean?  You know, that's what

 4  I'm asking you.  And, you know, I'll start reading on it, and

 5  it will become apparent, you know, Mr. Pomerantz is right or,

 6  you know, maybe Mr. Pomerantz is being obstreperous.  I don't

 7  know, but there seems to be an objection to every entry as it

 8  relates to Cue.

 9          MR. POMERANTZ:  Your Honor, I have -- I don't have

10  the Cue deposition transcript in my head.  I wasn't the one

11  who actually went through that and did that one.  We divided

12  it up amongst the three of us, and I'll take them to task for

13  doing that, whoever did Cue.  But we can look at it, Your

14  Honor, if you want us to.

15          I don't know when you're -- are you going to look

16  at it over the weekend?

17          THE COURT:  I'm probably -- most likely I'll look

18  at it this weekend.

19          MR. POMERANTZ:  If we're going to withdraw -- I'll

20  tell what we'll try to do.

21          THE COURT:  Why don't you do this.

22          MR. POMERANTZ:  Can we e-mail to you and copy

23  Mr. Busch on it if there is some -- something we can

24  withdraw?

25          THE COURT:  E-mail Ms. Hernandez sort of what

 1    your -- what your bottom line is as to Mr. Cue, and then

 2    discuss it with Mr. Busch, cc him on the e-mail and let me

 3    know a revised -- if it's not revised, that's fine.  I'll

 4    look at each of the objections and make rulings.  But it just

 5    seemed to me there's an objection for every -- and I'm not

 6    sure if someone was trying to preserve something, but I'll go

 7    through and rule on all of them, but I -- I won't -- I would

 8    like to have the bottom line.

 9            MR. POMERANTZ:  Well, if you could go up and have

10    a happy Friday night, we'll try to look at it and have it to

11    you before tomorrow morning.

12            THE COURT:  Okay.  All right.  And I'll look --

13    I'll start off by looking at Mr. Cue.

14            I'm going to ask for your help also on -- I did

15    sign a protective order as it related to non party Apple,

16    Inc.  And they're not going to be here -- I assume they're

17    not going to be here to protect their interest, but I can see

18    very easily all of us forgetting about their protective order

19    and proceeding and ignoring it.  So I'll stay on top of it,

20    but I also expect your assistance so that -- nobody objected

21    to them, but as we deal with those exhibits that we're

22    careful as to what is going on in the courtroom.

23            There was also the -- a stipulation regarding

24    admission of exhibits, which I'll sign now and present to

25    the C.R.D., and those exhibits identified are admitted.

1    I will revisit 5 -- Motion in Limine Number 5 first

2    thing Tuesday, but I think, as everybody knows, if there is

3    any testimony with regard to the negotiations, that was not

4    intended to be precluded; so I'll clarify that on Tuesday.

5    It's really just relating to any unexpressed intent, but,

6    again, I'll clarify that exactly on Tuesday.

7         There's one other motion that I have not ruled on,

8    and that's Motion in Limine Number 5.  And I'm going to

9    reserve ruling on that until after the plaintiff has

10   presented their -- their case-in-chief.  That relates to

11   Mr. Berman and Mr. Ciongali.

12        But I will say this, Mr. Pomerantz.  Just looking

13   at it briefly, it seems -- even though, okay, they are

14   response to witnesses presented by the plaintiffs, it seemed,

15   my initial sense, that these were issues that everybody knew

16   about in the first place and really aren't rebuttal.  So my

17   initial impression was -- is to grant, but I want to see how

18   the evidence plays out.

19        Both witnesses are testing -- testifying about

20   issues that really are at the core of the case.  Mr. Berman,

21   downloads are simply another configuration of the same music

22   being marketed and sold through retailers to consumers; and

23   Ciongoli, again -- maybe the surprise is that the expert

24   would not have excluded the cost, but those are issues I

25   think were upfront and really not rebuttal, but I'll hold off

1    until the plaintiffs' case-in-chief.

2              (First session concluded at 2:40 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25