```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                             ---

 4         THE HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

 5

 6

 7    F.B.T. Productions, LLC,          )

 8                     Plaintiff,       )

 9                                      )

10    vs.                              )    Case No.

11                                      )    CV 07-3314-PSG(MANx)

12    Aftermath Records (dba Aftermath  )

13    Entertainment), et al.,           )

14                     Defendants.       )

15    _____ )

16

17

18           REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                        Session 2

20                  Los Angeles, California

21                 Friday, February 20, 2009

22    Pamela A. Seijas, CSR, FCRR
      Official Reporter
23    Roybal Federal Building
      255 East Temple Street
24    Room 181-I
      Los Angeles, California  90012
25    (213) 687-0446
```

```
 1   APPEARANCES:

 2

 3    FOR PLAINTIFF:        KING & BALLOW

 4                          RICHARD BUSCH

 5                          315 UNION STREET

 6                          SUITE 1100

 7                          NASHVILLE, TN  37201

 8                          (615) 259-3456

 9                              - AND -

10                          GLASER, WEIL, FINK, JACOBS &

11                          SHAPIRO, LLP

12                          BY:  MARK L. BLOCK

13                          10250 CONSTELLATION BOULEVARD

14                          19TH FLOOR

15                          LOS ANGELES, CA  90067

16                          (310) 553-3000

17

18    FOR DEFENDANT:        MUNGER, TOLLES & OLSON, LLP

19                          BY:  GLENN D. Pomerantz

20                               MELINDA EADES LeMOINE

21                               KELLY M. KLAUS

22                          355 SOUTH GRAND AVENUE

23                          35TH FLOOR

24                          LOS ANGELES, CA  90071-1560

25                          (213) 687-3702
```

1       Los Angeles, California, Friday, February 20, 2009

2                          2:40 p.m.

3                           -oOo-

4           THE COURT:  The last issue relates to Mark Bass and

5    the issue to compel.  I'll say this, given -- it's interesting

6    having your prior order cited to yourself, but, I mean, it is

7    consistent with my thinking that Mr. Bass is a principal, and if

8    he's asked to be here, I certainly have the authority and power

9    to do it.  My question is -- the last question, Mr. Pomerantz,

10   do you really want him, do you really need him, and tell me your

11   final thoughts.  I think if I'm going to be consistent, I think

12   he needs to be compelled.

13          MR. POMERANTZ:  Yes, Your Honor.  We believe that what

14   the -- what F.B.T. is trying to do is to try to present a

15   positive picture of F.B.T. and who they are and what they do by

16   presenting Mr. Jeff Bass and Mr. Joel Martin.  And if they

17   believe that their story is relevant to this case, then their

18   full story is relevant to this case, and Mr. Mark Bass is

19   another part of that story, and even an important of part of the

20   story he is trying to tell because he is the one who actually

21   worked with Eminem in the first instance when he was an unknown

22   artist.

23          So we do believe that if this so-called surrounding

24   circumstances is relevant evidence that they think Jeff Bass is

25   going to testify to, then we have the right to call Mark Bass to

1  those same surrounding circumstances and establish through him

2  what really happened so the jury can get a fair view of who

3  F.B.T. is.

4          Mark Bass also, in addition to -- and different from

5  Jeff Bass -- had a conversation with someone at Universal and

6  which is in dispute and which he -- he says that what he said

7  was that this lawsuit was nonsense.  That isn't really the

8  primary reason that we're bringing him here.  He is just going

9  to deny that, that he said that.  Our true reason for bringing

10 him here is because if there is going to be a presentation by

11 F.B.T. of something other than "here is what was said in the

12 negotiations, here is what the contract says" -- and that's

13 clearly what they are intending do because otherwise they

14 would've called Jeff Bass as a witness -- then we have a right

15 to call Mark Bass as a witness, too.

16          THE COURT:  Mr. Busch?

17          MR. BUSCH:  You know, it's interesting that

18 Mr. Pomerantz said he had a conversation with someone at

19 Universal.  You know who that someone at Universal was, and

20 Mr. Pomerantz specifically didn't say?  Jim Iovine.  So they

21 want to compel Mark Bass, who lives in Detroit, to come here --

22          THE COURT:  I -- I --

23          MR. BUSCH:  But my point is this --

24          THE COURT:  I am sorry to interrupt you again.  But

25 just because he is in Detroit, 2000 miles away -- that was one

1    of the points in the brief.  The plaintiff selected this forum.

2    We are here.  2000 miles away doesn't matter to me.

3              MR. BUSCH:  But I --  I'm sorry, Your Honor.

4              THE COURT:  But he said -- I'm sorry.  But he said --

5    I am sympathetic to he doesn't know anything and why are we

6    dragging this poor guy out here, but he is the principal of the

7    company.

8              MR. BUSCH:  It's more than that.  It's a couple of

9    things.  If they intend on calling Mr. Bass to question about

10   his conversations with Jim Iovine, I want Mr. Iovine here

11   questioned about that same conversation.  I think that's fair.

12             THE COURT:  Fair enough.

13             MR. BUSCH:  Okay.  No. 2, they moved to preclude

14   subjective intent.  They took 30 minutes.  They flew all the way

15   out to Detroit and deposed Mr. Bass in, I don't know,

16   38 minutes, I think, and Mr. Bass said, "I have no idea about

17   any of these contracts.  I don't know anything about them.  I

18   haven't read them.  I don't know anything about them."

19             So what do -- what are they really putting him on the

20   witness stand for?  What they are putting him on the witness

21   stand for is because they know from our filings what issues he

22   has, and they hope that somehow, based upon those issues --

23   somehow he acts in an embarrassing way to F.B.T.  It has nothing

24   to do --

25             THE COURT:  Let me give you this assurance.  For

1  whatever reason, if he has got this problem with this illness,

2  this disease, and he is not competent to testify, we can handle

3  it outside the presence of the jury.  I think there is, you

4  know, undue prejudice if he shows up and has got a problem.  All

5  right.

6      MR. BUSCH:  My thought is this, though, Your Honor.

7  Is that they are saying that they want to show what F.B.T. is

8  really like.  So they are saying in 2008 a man that has somewhat

9  of a problem is relevant to 1998 and the circumstances

10  surrounding that agreement, and it's just not --

11      THE COURT:  His problem is not going to be presented

12  to the jury, so, I mean, you're just going to have to alert me

13  to that and say "we've got a problem," and we will take it

14  outside the hearing, and if he is not a competent witness to

15  testify because he is under influence of whatever or medication

16  or narcotics or whatever it is, we will deal with it.

17      MR. BUSCH:  All right, Your Honor.  Just to be clear,

18  if they intend to question about this Jim Iovine conversation,

19  we intend to call Mr. Iovine as well.

20      THE COURT:  The Motion to Compel is granted.  And,

21  counsel, alert me if there is any issue with regard to

22  competency or undue prejudice because of certain issues that we

23  have previously addressed in camera.

24      Anything else?

25      MR. POMERANTZ:  Yes, Your Honor.  If I could bring up

1    a few witness issues.  First with respect to Mr. Iovine, we

2    certainly would be willing not to ask Mr. Bass about the

3    conversation with Mr. Iovine in exchange for Mr. Iovine not

4    having to come down here and be able to do his business trip.

5         THE COURT:  It sounds like there is horse trading

6    going on.  They might trade Mr. Iovine for Bass, so I'm not

7    going to get involved in the horse trading --

8         MR. POMERANTZ:  It's not for.  That is not the issue

9    we want to question Mr. Bass about.  We are happy to drop that

10   one conversation.  It's a he said/she said thing.

11        THE COURT:  Right.

12        MR. POMERANTZ:  What Mr. Iovine -- if you remember,

13   the only sentence they had in their proffer of Mr. Iovine was

14   that somehow there was some urgency surrounding the '98

15   negotiation.  We would ask, Your Honor -- they know they can

16   prove that through umpteen witnesses, and we're not walking away

17   from it.

18        So the idea of dragging Mr. Iovine here for that one

19   purpose for 15 minutes to preclude a business trip next week

20   seems a bit unfair, and they know they don't need that -- they

21   don't need that testimony to establish that one fact that they

22   say they are proffering.

23        THE COURT:  But they are saying the same thing about

24   Mr. Bass.  That's way I see it, but I am not going to --

25        MR. POMERANTZ:  All right.  Let me raise a couple of

1    other witness issues, if I may, Your Honor.  I had told Mr.

2    Busch about this yesterday or the day before.

3              One of the witnesses you heard about is Mr. Kenswil.

4    He was at Universal for a number of years and recently left and

5    is now working at a law firm.  And he has a conference next week

6    on Wednesday and Thursday in New York where he is one of the

7    speakers and then new client meetings on Friday.

8              We asked him if he would -- and he had a problem the

9    whole week.  We asked him if he would take the red-eye on

10   Tuesday night so that he could be here Tuesday afternoon and be

11   able to testify.  Mr. Busch objects to that timing because it's

12   not when he would want to call Mr. Kenswil as a witness, and so

13   we're sort of at an impasse.

14             He is not our employee anymore, and he has asked us if

15   there is any way we could get him on and off on Tuesday, and if

16   so, he would be willing to take the red-eye to New York.

17             THE COURT:  Has he been subpoenaed?

18             MR. POMERANTZ:  Yes.

19             THE COURT:  I think -- let me just say this.  You may

20   not -- you know, Mr. Busch, if you can grant the professional

21   courtesy, that's fine.  As I pointed out in the phone call, you

22   have the burden of proof.  I have limited you to eight hours.  I

23   am not going to now change the order of your presentation.

24             MR. BUSCH:  Thank you, Your Honor.

25             THE COURT:  I think -- from your perspective, I've

1    done enough.

2          MR. POMERANTZ:  Your Honor, maybe you could help us

3    with one more thing.  We don't know who he is calling or when he

4    is calling --

5          THE COURT:  That was supposed to be done today.  He is

6    raising his hand, so you're going to --

7          MR. BUSCH:  I have got it on this piece of paper.

8          MR. POMERANTZ:  I remember Your Honor saying when

9    Mr. Busch pled at the last conference or on the conference call

10   that you expected that there would be some accommodations from

11   that list if he needed to move somebody around.  I think we are

12   entitled to the same accommodation, and while I understand what

13   you're saying about Mr. Kenswil and I don't know what we can do

14   about it -- I know he is under subpoena, and I will tell him

15   that, and he -- you know, I think he respects the powers of the

16   Court.  But, you know, he does have a new job, and he has

17   commitments there, and it's very hard for him, and, you know,

18   from my discussions -- I actually have three other witnesses who

19   have some scheduling concerns.  Rather than raising them here, I

20   will raise them with Mr. Busch and see if we can work them out.

21          We have 17 witnesses, and we just changed the schedule

22   of the case -- 17 witnesses that he wants to call that we have

23   some people who we control and we have accepted subpoenas on

24   behalf of.  We changed the schedule.  All of these people were

25   available this week.  And so I think it's fair to try to have

1    some accommodation for our people, given that they are now

2    trying to make things work.

3            THE COURT:  I agree, and there should be professional

4    accommodation, and it's unfortunate if there isn't, but I think

5    given the posture of the case and I have now have limited the

6    plaintiff's case to eight hours, and I think appropriately, when

7    they were asking for three or four times that, and they, again,

8    have the burden of proof in the case, that at some point I need

9    to respect their ability to present their case and the burden of

10   proof that they carry.

11           So, you know, if I can help, I will help, but I don't

12   necessarily want to push Mr. Busch any more as it relates to the

13   order that he thinks he needs to present his case.

14           MR. POMERANTZ:  All right, Your Honor.

15           Coud I just -- two other, I hope, just housekeeping

16   matters.  One of them is more than that.

17           Mr. Busch and I had spent some time yesterday during a

18   break in the mediation talking about the openings.  And I just

19   want to put on the record to make sure we're all clear as to

20   some of the things that we agreed to.

21           First, neither one of us plans on showing any

22   deposition video or reading questions and answers from a

23   deposition transcript during the opening.  So, therefore, we

24   don't have to worry about whether one of us objects to that, and

25   we agree to that.

1    And the second thing we agree to is that neither one

2    of us would show or refer to an exhibit that the other side has

3    objected to during the opening.  So that, again, that issue can

4    be taken care of beforehand.  I just want to make sure that

5    is --

6    THE COURT:  Is that your understanding, Mr. Busch?

7    MR. BUSCH:  As far as the first point, yes.  There is

8    a disagreement we have on one demonstrative exhibit that I

9    don't --

10    MR. POMERANTZ:  I was going to get to that last.

11    MR. BUSCH:  But as far as exhibits that one side has

12    objected to beside this one issue, that is correct.  If it's --

13    if it's not -- if it's not -- if it's unobjected to, then it's

14    fair game.  But if it's objected to, then either side can use it

15    in their opening, as far as using the exhibit itself.

16    THE COURT:  Right.  Okay.

17    MR. POMERANTZ:  Just to be clear, either using it or

18    referring to it, because otherwise that raises the same issue.

19    MR. BUSCH:  I don't know what "referring to" means.

20    It's too broad.  I don't --

21    THE COURT:  Well, work it out.  I mean, neither one of

22    you wants to be interrupted during your opening statement and so

23    if -- for example, if there is an exhibit that everyone is --

24    one side is objecting to and certainly during your opening you

25    are not going to say, "well, in the correspondence dated

1  November 10th it says" --

2          MR. POMERANTZ:  Right.  That's correct.

3          THE COURT:  That's clear.

4          MR. POMERANTZ:  That's clear.

5          THE COURT:  So neither side wants to be interrupted

6  during their opening statements, so work it out.

7          MR. POMERANTZ:  That's fine.

8          The last point is this demonstrative issue, and there

9  is one demonstrative that we don't agree on.  We had -- the

10  Court rules actually set a deadline for when we are supposed to

11  exchange exhibits, and at the Pretrial Conference, Your Honor

12  raised whether we had exchanged our demonstratives or whether we

13  were going to do so in the future.

14          Mr. Busch, in my recollection, is the one who said,

15  "no, we have already done this," and I agreed.  And we had.  We

16  had exchanged the demonstratives.  Both sides had some

17  demonstratives, and we exchanged them.

18          Thereafter, Mr. Busch took the position that because

19  Your Honor had changed the trial date, that that now said that

20  it's fair game again and there is a new deadline now for

21  demonstratives, and we disagreed and said that moving the trial

22  date doesn't reopen deadlines that had already passed.

23          THE COURT:  Right.

24          MR. POMERANTZ:  And in addition, we felt that if

25  somebody were now to come up with a demonstrative, it's in

1    response to the other side's demonstratives, and the whole point

2    of having a mutual exchange is so that no one side is gauging

3    their demonstratives on the others; we are just exchanging them

4    fairly at the same time.

5          So we would object to this additional demonstrative

6    that they created after the exchange and after the Pretrial

7    Conference because we think it's untimely, and we think it's

8    unfair because they were doing it in response to seeing the

9    demonstratives that we had already prepared.  We would object to

10   it being used.

11         Mr. Busch has told me he plans on using it in his

12   opening, so I wanted to raise it now so we could deal with it

13   before the opening.

14         THE COURT:  All right.  Mr. Busch, on that issue.

15         MR. BUSCH:  Your Honor, the -- at the Pretrial

16   Conference, Your Honor stated that before the trial of the

17   matter, the parties should exchange demonstratives so there is

18   no surprises.  The local rules of this Court have a deadline

19   that is tied to the actual trial date, and it says seven days or

20   eleven days, whatever the case might be.  And so we did believe

21   and we do believe that under the rules of this Court and

22   Your Honor's statement that it should be exchanged before trial,

23   that when the trial was moved, we thought both sides could, if

24   they wanted to, based on the local rules, do a demonstrative.

25   So we did one extra demonstrative that had not been exchanged.

1    I spoke to Mr. Pomerantz about it that day and said

2    that's what we believe based on the local rules and the Court's

3    comment about exchange of demonstratives before trial because

4    Your Honor's concern was no one should be surprised.  And so we

5    did that.  I have a copy of it.  It is not controversial, I

6    don't believe.  I don't think it should be  -- it's going to --

7    basically going to track exactly what I am going say in my

8    opening anyway.  I don't believe it's prejudicial in the least,

9    and it will be assisting -- assisting to the jury.  So that's my

10   view of it.

11         THE COURT:  I understand the local rules, and my

12   comments are always this, too.  That, you know, in most cases,

13   at least, demonstratives change because they could be a damages

14   calculation.  It could be somebody finds a mistake, all these

15   things that happen when people are rushing around to make

16   demonstratives.  And so people should have the ability to change

17   demonstratives in the sense that the math is wrong, there is

18   misspellings, there is things that nobody thought about.

19         But I think the exchange should be -- separate and

20   apart from those types of things, I think the exchange should

21   be mutual, at the same time.  Otherwise, I think it does become

22   unfair in terms of each side's ability to keep tweaking the

23   demonstratives.  So I would not allow that demonstrative.

24         Anything else before --

25         MR. POMERANTZ:  Your Honor, I guess there is one other

1   issue I need to raise.  If Mr. Iovine really does have to appear

2   for trial, there is one issue I guess I want to make sure

3   because we -- neither we nor Mr. Iovine wants to show any

4   disrespect to Your Honor or to the courtroom or to the jurors.

5           But Mr. Iovine -- always wears a baseball cap, always.

6   And people have seen him come out of the shower wearing a

7   baseball cap.  He truly always wears a baseball cap in his

8   public and private persona.  And it is something that is not

9   meant in any way disrespectful to anybody.  But it is who he is,

10  and it is something that is important to him.  He would be happy

11  to explain it to the jurors so that there is no disrespect.

12          THE COURT:  I will say this.  If it was a court trial,

13  I might accommodate him, but not a jury trial.  If it was for

14  religious reasons, certainly, absolutely.  Headdress.  But I'm

15  sorry.  Nobody is going to wear a baseball cap during a jury

16  trial.

17          Anything else?

18          MR. BUSCH:  Yes, Your Honor.  I have a few things.

19  Don't be alarmed by this big binder.  I just have a few things

20  that I would like to ask about, Your Honor, or just address very

21  briefly.

22          We have a few bench briefs on evidentiary issues that

23  I think might come up during the trial that we would just like

24  permission to submit.  For example, one exhibit on defendant's

25  exhibit list is they intend to introduce some settlement

1  discussion documents that took place prior to the trial where

2  Gary Stiffelman was acting as an intermediary between the two

3  sides as far as settlement, and they have said that they intend

4  to introduce that.

5        We think that is precluded on various grounds from 408

6  to relevance and 403.  And we have a bench brief that we would

7  like to submit if Your Honor -- we just don't want them to get

8  it in and have to do the objection on the fly.  We would like to

9  submit a bench brief if Your Honor would be willing to accept

10  it.

11        THE COURT:  I'm pausing because I don't want my

12  granting the party to file bench briefs to reopen the Motions in

13  Limine.  I have looked at 14.  I think that's enough.  Why

14  wasn't it a subject of a Motion in Limine then?

15        MR. BUSCH:  I was discussing it with Mr. Pomerantz.

16  We actually were having conversations.  I thought that he was

17  going to not introduce it.  I raised it with him very early --

18        THE COURT:  Let's just discuss it -- the day before

19  someone is proposing to use it, let's discuss at the end of the

20  day.  I really don't want to invite any further briefing on

21  evidentiary issues.

22        MR. BUSCH:  There is one or two others I just want to

23  ask Your Honor.  There is a trial transcript where the CFO of

24  Interscope testified, and we intend to introduce it as a

25  certified transcript from -- not a deposition, from a trial

1    where the CFO -- he made certain admissions that we think are

2    relevant to this case, and the defendants have objected on a

3    couple of grounds, and to the extent Your Honor would want a

4    bench brief on why this document should be allowed to be

5    admissible in this case, we would ask to be able to submit that

6    bench brief.

7            THE COURT:  What's the -- now, whose testimony?

8            MR. BUSCH:  This is Clive Ellis.  He was the CFO of

9    Interscope Records, a defendant in this case, and his testimony

10   related to the fact that when Universal sells a physical CD,

11   that title passes to the retailer at the time of the purchase.

12   And so the issue of the sale versus license being an issue in

13   this case, we want to introduce that testimony because the

14   defendant's either taking the position to the contrary or not

15   knowing that type of thing, I think it's relevant to the issue

16   of sales versus license.

17           THE COURT:  It's a party admission of some sort?

18           MR. BUSCH:  Yes.  Exactly.

19           THE COURT:  Again, just let me know the evening

20   before.  I will have it in front of me and I will hear argument

21   and make a ruling.

22           MR. BUSCH:  I have a couple of other things.

23   Your Honor, based upon Your Honor's rulings, both today and then

24   in the in limine motions -- and no disrespect by this is

25   obviously intended -- but to preserve our record -- we hope we

1    win, we think we are going to win, but just to preserve the

2    record on appeal, we will want to do some offers of proof, and

3    we have a bench brief on the appropriate procedure in the Ninth

4    Circuit on offers of proof.

5            THE COURT:  That's fine.  That's fine.  Submit your

6    offer at the close of your case.  When I say you have run out of

7    time, make the request for more time, present your offer of

8    proof, and your record will be preserved.

9            MR. BUSCH:  And can I ask one other question along

10   those lines?

11           THE COURT:  Sure.

12           MR. BUSCH:  I know Your Honor has said eight hours is

13   it.  I just want to ask Your Honor -- and I'm not asking to

14   reconsider it.  I am just saying as the testimony goes on, if

15   Your Honor sees that we are acting in good faith and things are

16   proceeding and we're not delaying, I will -- I have submitted

17   some Ninth Circuit case law, and I just want to make sure that

18   no one ever criticizes me down the road for not being clear

19   about this.  And --

20           THE COURT:  I mean, I assume you are going to do this.

21   Again, based on the way I see this case, I think eight hours is

22   appropriate.  If something happens that you think all of a

23   sudden you need another hour, two hours, ten hours, whatever it

24   is, make your pitch.

25           MR. BUSCH:  Okay.  Thank you.

1          The other thing is that I have -- I know Mr. Pomerantz

2     said he may not have an objection to the types of -- the

3     summaries that we have provided --

4          THE COURT:  Right.

5          MR. BUSCH:  But -- and I hope he doesn't, and I assume

6     that he won't because -- based on our conversation, but I do

7     have emails that are not consistent with what Mr. Pomerantz

8     said --

9          THE COURT:  The day is going long.  He may not have an

10    objection, so --

11         MR. BUSCH:  Can I provide Your Honor with it so

12    Your Honor can see the summaries --

13         THE COURT:  I don't want to see it yet.  If he doesn't

14    have an objection, that's one less thing I have to read.  I am

15    going to get started on the depositions.  If he doesn't have an

16    objection, then there is no reason to lose sleep over it.

17         MR. BUSCH:  The last thing that we have, Your Honor,

18    is as I look back at the jury instructions -- and I mentioned

19    this in the brief that we filed -- I noticed that there was no

20    jury instruction that either side submitted on what types of

21    extrinsic evidence the jury could consider, the substantive

22    conduct, those types of things.  And if Your Honor would like to

23    consider something like that so the jury has some explanation or

24    something in their mind about what they can and can't consider

25    as extrinsic evidence, I think that would be helpful to the

1  jury, and we would ask for permission to submit something for

2  Your Honor's consideration.

3        THE COURT:  All right.

4        Mr. Pomerantz, anything else?  Please be brief.

5        MR. POMERANTZ:  No, Your Honor.  I don't really think

6  there is a need for that instruction, but we haven't seen their

7  proposal.  But to me, whatever the Court allows into evidence is

8  what the jury is allowed to consider, and I think what he is

9  really trying to do is to take words like "subsequent

10 performance" -- I mean, it's interesting what he just did here

11 again today.  When he is talking about subsequent performance,

12 what he said was it's when Mr. Paterno, a lawyer who represents

13 many artists, goes and works on a different artist's agreement

14 or when Mr. Hoffman works on a different artist's agreement,

15 that is somehow subsequent performance.  That is not what the

16 law of subsequent performance says.

17        What the law of subsequent performance is talking

18 about is performance under this agreement, what did the parties

19 actually do before there was a dispute.  And if you see what the

20 parties actually did before there was a dispute, as they

21 performed under this agreement, that is relevant in looking at

22 what both parties must have understood this agreement to mean.

23        THE COURT:  But isn't -- the only example that is

24 coming to mind, let's take a quick look at an insurance policy,

25 okay, that doesn't have an exclusion on water damage, whatever

1    it is, or -- and then -- and so the insurance company has taken

2    the position water damage is excluded.  Well, on their next form

3    insurance policy now there is a provision that says water damage

4    is explicitly excluded.  Isn't that helpful as to what he --

5            MR. POMERANTZ:  Where that is going to come in in this

6    case, Your Honor, is we are going to hand to our experts all of

7    these agreements, whether it's an Interscope agreement, whether

8    it's an F.B.T. agreement.  They are going to look at these and

9    say let's look at what the custom and usage is in the industry.

10           But subsequent performance under this agreement

11   doesn't mean what happened in some other agreement.  And I think

12   when you start letting fact witnesses start talking about what

13   was going on in another agreement where parties had whatever

14   intent they had under those agreements --

15           THE COURT:  What happens to the way that Mr. Busch has

16   described it as a form?  And I'm describing it the same way.

17   The example that I used is insurance policies have forms, and

18   you can follow the forms, and they take on different lives, but

19   if, let's say if insurance company acts as saying this policy

20   does not cover water damage and then that same -- the

21   next iteration of that policy there is Exclusion No. 1

22   explicitly saying water damage isn't covered, can the jury

23   consider that, say look, maybe the insurance company never

24   thought about it or water damage is covered under the policy?

25           MR. POMERANTZ:  It depends on what the evidence is

1    under the original contract, and there is law on this stuff.  I

2    mean, it's not something that we need to wing.  There really is

3    law.  And here it's not the law of subsequent performance.

4           The law of subsequent performance is a defined area

5    of -- body of evidence that one is allowed to consider in how to

6    interpret a contract, and, indeed, some courts say that

7    performance under the agreement is the best evidence of the

8    parties' intent, at least before they get into their dispute.

9           So I just -- I just want to be careful here that there

10   is a jury instruction that says one can look at subsequent

11   conduct -- that's as an example -- subsequent performance.  That

12   body of law is sort of a circumscribed area of law.  And I'm

13   just not sure that we need a jury instruction, or if we do, I

14   better see what he is proposing first.

15          THE COURT:  Let's do this, Mr. Busch.  Give it to

16   Mr. Pomerantz.  If he doesn't object, fine.  If he objects,

17   let's talk about it later.

18          MR. BUSCH:  Just one last thing.  There is a

19   difference between subsequent performance and subsequent

20   conduct.

21          THE COURT:  I understand.  Conduct versus performance.

22   Okay.  We'll see you on Tuesday.  Let's get here at 8:30 so if

23   there is --

24          MR. BUSCH:  There is one more thing.  I'm sorry.

25   Stipulation on electronic equipment.  We have that.  The --

1    there is certain electronic equipment that we're going to use

2    that the defendants are not going to use.  They don't object to

3    it.  It's the same people from Executive Presentations that were

4    here on the Univision trial and --

5            THE COURT:  They are going to set up on Monday?

6            MR. BUSCH:  Yes.

7            THE COURT:  Present the order, and I will sign it.

8    The only thing I will say is make sure -- they know what they

9    are doing.  Just make sure it works Tuesday morning.  Because I

10   don't -- the first thing I don't want to do is break for

11   20 minutes for technical difficulties.  When they leave Monday

12   night, they better be ready.

13           MR. BUSCH:  There is one last thing, and my client

14   reminded me.  We have one other minor dispute.  Both sides

15   agreed that we could use physical copies of the records.  And we

16   put on the exhibit list all configurations, and we were able to

17   find some Eminem singles, and they are taking the position that

18   the singles are not a configuration of the album.  They are

19   objecting to singles.

20           So there -- it's absolutely no prejudice.  We agreed

21   that these physical records could be used and shown to the jury,

22   and we want permission to use it, and they object to the singles

23   that we found.

24           MR. POMERANTZ:  I haven't seen the singles yet because

25   of yesterday.  I will look at them --

```
1              THE COURT:  This shouldn't be a problem.

2              MR. POMERANTZ:  I don't expect -- sometimes you are

3    using different --

4              THE COURT:  It's a little nostalgic to look at

5    singles.

6              MR. BUSCH:  Thank you, Your Honor.

7              THE COURT:  Good night.

8

9         (Proceedings adjourned at 3:15 p.m.)

10

11

12

13

14

15

16

17                         CERTIFICATE

18

19      I hereby certify that pursuant to Section 753, Title 18,
     United States Code, the foregoing is a true and correct
20   transcript of the stenographically reported proceedings held in
     the above-entitled matter and that the transcript page format is
21   in conformance with the regulations of the Judicial Conference
     of the United States.

22

23   _____        _____

24   Pamela A. Seijas, CSR No. 3593                Date
     Official Reporter

25
```