```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                        ---

 4      THE HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

 5

 6

 7   F.B.T. Productions, LLC,           )

 8                    Plaintiff,        )

 9                                      )

10   vs.                               )   Case No.

11                                      )   CV 07-3314-PSG(MANx)

12   Aftermath Records (dba Aftermath  )

13   Entertainment), et al.,           )

14                    Defendants.       )

15   _____  )

16

17

18        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

19                  Day 2 (P.M. Session)

20               Los Angeles, California

21              Tuesday, February 24, 2009
```

22   Pamela A. Seijas, CSR, FCRR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

```
 1   APPEARANCES:

 2

 3     FOR PLAINTIFF:          KING & BALLOW

 4                            RICHARD BUSCH

 5                            315 UNION STREET

 6                            SUITE 1100

 7                            NASHVILLE, TN  37201

 8                            (615) 259-3456

 9                                 - AND -

10                            GLASER, WEIL, FINK, JACOBS &

11                            SHAPIRO, LLP

12                            BY:  MARK L. BLOCK

13                            10250 CONSTELLATION BOULEVARD

14                            19TH FLOOR

15                            LOS ANGELES, CA  90067

16                            (310) 553-3000

17

18   FOR DEFENDANT:          MUNGER, TOLLES & OLSON, LLP

19   BY:                     GLENN D. POMERANTZ

20                            MELINDA EADES LeMOINE

21                            KELLY M. KLAUS

22                            355 SOUTH GRAND AVENUE

23                            35TH FLOOR

24                            LOS ANGELES, CA  90071-1560

25                            (213) 687-3702
```

1      <u>Los Angeles, California, Tuesday, February 24, 2009</u>

2                          1:30 p.m.

3                           -oOo-

4                        (Jury Out)

5          THE COURT:  Mr. Pomerantz.

6          MR. POMERANTZ:  Yes.  A couple of things.  Actually

7    one thing for myself and then Mr. Klaus has one thing to raise

8    for the next witness.  Mr. Busch and I were talking about the

9    schedule, and I think Your Honor will be happy to hear, we are

10   moving faster than I think either Mr. Busch or I thought, as we

11   have been talking about the witness schedule.  And we are most

12   certainly going to get to -- not only Mr. Stiffelman off the

13   stand very quickly now but Mr. Paterno is next.  He will get on

14   and off very quickly.  Mr. Iovine is next.  He will get on and

15   off very quickly.  And Mr. Bass -- Jeff Bass is after that, and

16   he will get on and off we are both, I think, expecting today.

17         If Mr. Bass finishes and we're before 4:30, the next

18   witness, according to their schedule, is Ms. Rogell, who is the

19   witness who is flying back tonight, and Mr. Ostroff, the next

20   one, is not in a position where he can get here by 4:30 -- or

21   before 4:30.  We are confident, I think, as we talked about it

22   over the lunch break, that we will finish this, all the

23   witnesses by Friday.  And if it's sooner -- it may be, depending

24   on how quickly it goes -- but I just wanted Your Honor to know

25   we may get to 3:30, 4:00, 4:15 and not have another witness to

1    put on the stand.

2            THE COURT:  Fine.  Anything else?

3            MR. POMERANTZ:  And Mr. Klaus had something to raise.

4            MR. KLAUS:  Good afternoon, Your Honor.

5            THE COURT:  Afternoon.

6            MR. KLAUS:  Two things, actually, I believe in terms

7    of we had a witness exclusion agreement that other than one

8    party representative from each of the two sides here, that until

9    a witness had been excused, no one who was a witness or a

10   potential witness in the case would be in the courtroom.  And I

11   just thought I would make that formal request that the

12   witnesses --

13           THE COURT:  That motion to exclude witnesses is

14   granted.

15           MR. KLAUS:  Thank you, Your Honor.

16           The second issue concerns a matter in connection with

17   Mr. Paterno's testimony.  And at Mr. Paterno's deposition,

18   Mr. Busch asked him about the sale of Dr. Dre's -- a portion of

19   Dr. Dre's interest in Aftermath Records to Interscope.  And

20   the -- we asked Mr. Busch last night whether he intended to

21   raise the issue again this morning.  We don't think that it's --

22   we don't think that it's relevant evidence to any issue in the

23   case, and it's a confidential amount that we think should not be

24   released in an open court proceeding.

25           We couldn't reach agreement on it.  Mr. Busch thinks

 1  that it's a legitimate question, and we think it has nothing to

 2  do with the case.

 3          THE COURT:  Mr. Busch, what's the offer of proof as to

 4  the relevance of how much it took to buy out Mr. -- Dr. Dre?

 5          MR. BUSCH:  Yes, sir.  As Your Honor has heard

 6  throughout the entire morning, one of the defendants' themes of

 7  their case is that F.B.T. made a lot of money off of these songs

 8  and Eminem did as well, and that somehow we're being piggish, I

 9  think, by asking for the contract to be honored.  And their

10  argument about the amount of money that F.B.T. has made and

11  the -- and Eminem has made, we believe, very clearly, opens the

12  door to discussing just how much money these defendants have

13  made.  ARY is a defendant that's owned by Dr. Dre.  At the time

14  of the agreements, Aftermath was owned by Dr. Dre.  The evidence

15  will show that Eminem was the first and main artist on

16  Aftermath, that it wasn't a profitable venture before Eminem and

17  that as a result of Eminem's success, Dr. Dre was able to make a

18  lot of money.

19          So if it's relevant about how much money the

20  plaintiffs have made or that Eminem has made, to try to suggest

21  to the jury that we don't have the right to have our contract

22  honored, I think then that opens the door to talk about just how

23  much money these people have made off the work of F.B.T. and

24  Eminem.

25          THE COURT:  All right.

1          MR. KLAUS:  Your Honor, just briefly, they're apples

2    and oranges comparison.  What Mr. Busch is talking about with

3    his client is their interest in selling their or giving up a

4    portion of their exclusive recording interest.  What is being

5    talked about with respect to Dr. Dre's sale of his interests in

6    Aftermath Records is his sale of a portion of ownership of a

7    record company, of a completely different record company that's

8    not just comprised of Eminem.  It's comprised of Dr. Dre

9    himself, it's comprised of Eminem, it's comprised of 50 Cent as

10   well.  I think it's prejudicial, it's irrelevant and it's

11   misleading and should be excluded.

12          THE COURT:  I would allow inquiry.

13          MR. BUSCH:  Thank you.

14          MR. POMERANTZ:  Your Honor, if I may follow up on that

15   one point, if -- Your Honor I understand is going to allow

16   inquiry.  Because it is sensitive to Dr. Dre, I think Your Honor

17   has addressed certain similar issues as they are sensitive to

18   Apple, and we would request that the courtroom be closed only as

19   to that portion of the questioning so that what is confidential

20   to Dr. Dre, while if Your Honor thinks that it's something that

21   the jury needs to hear, okay, we understand, but we don't think

22   it should be made public and in the press in order to respect

23   Dr. Dre's confidentiality rights and interests.

24          THE COURT:  Mr. Busch?

25          MR. BUSCH:  We don't -- we don't have a position on

1   that, Your Honor.  We don't object to that.

2           THE COURT:  When do you propose to ask them that

3   question so we can just mechanically deal with it?

4           MR. BUSCH:  I will be asking that question during the

5   examination of Mr. Paterno and I would assume it would be

6   relatively early in the examination.

7           THE COURT:  Does it matter to you if it's front loaded

8   or back loaded?

9           MR. BUSCH:  No, sir.

10          THE COURT:  If you do it at the back load, we can just

11  clear out the courtroom and ask the question.

12          MR. BUSCH:  Whatever Your Honor prefers.

13          THE COURT:  At the end of your inquiry, let me know,

14  and then I will ask -- I will close the courtroom.

15          MR. BUSCH:  Thank you.

16          THE COURT:  All right.  Let's bring the jurors out.

17                      (Jury In)

18          THE COURT:  You may inquire.

19                  CROSS-EXAMINATION (RESUMED)

20  BY MR. POMERANTZ:

21  Q.    I think it's good afternoon now, Mr. Stiffelman.  I want to

22  put a couple of provisions in front of you.  Phil is putting up

23  4C(v).  That is from the 1998 agreement.  And I hope you can see

24  this.  This is a board that I had created, and this is 4A of the

25  1998 agreement.

1    Can you see this, Mr. Stiffelman?  Okay.  Well, I'll

2    try -- these are words that you are probably familiar with.  I

3    will point them out, but if we need to pull them up on the

4    screen, we can.

5    You had talked about that back in 2003, I think you

6    said, or maybe 2004, that one of the issues that you were

7    discussing with Mr. Hoffman was whether the provision on the

8    screen, masters licensed, or whether the provision on this

9    board, records sold through normal retail channels, which of

10   those applies to downloads?  You recall that testimony?

11   A.    Yeah.  I can't see that, but, yeah, I recall we talked

12   about that.  Although, again, we didn't have much of a

13   conversation on the subject at the time.

14   Q.    All right.  All right.

15   And let me talk about this provision over here.

16   Maybe -- you know what?  I want to help you out.  Phil, can you

17   pull up 4A for Mr. Stiffelman out of that '98 agreement?  Can

18   you pull that up?  It's on -- yeah.  Right there.  You got it.

19   All right.  So let's start with this one,

20   Mr. Stiffelman.

21   Now, this provision is the provision that applies when

22   a full priced Eminem CD is sold through a retailer like Best Buy

23   to a consumer; correct?

24   A.    If it's not a license, yeah.

25   Q.    Okay.

1          And this is the provision that applies when a full

2   priced Eminem cassette is sold through a retailer like Target to

3   a consumer; correct?

4   A.    If it's not sold pursuant to a license, correct.

5   Q.    And this is the provision that applies when an Eminem vinyl

6   LP is sold through Wal-Mart to a consumer; correct?

7   A.    Same answer.  As long as it's not sold under a license,

8   that's correct.

9   Q.    All right.

10          So now let's go to 4C(v) of this same agreement, the

11   masters licensed rovision.  And Phil will put that up where

12   hopefully we can all see it.

13          All right.  Now, this is the provision that applies

14   when Aftermath licenses an Eminem recording to be used in

15   someone else's movie; correct?

16   A.    That's one illustration, yes, but it's -- -- it's not the

17   only illustration.

18   Q.    No.  It's one illustration.

19          Another illustration would be when Aftermath licenses

20   an Eminem recording to put in someone else's TV show like *CSI*

21   *Miami*; correct?

22   A.    Correct.

23   Q.    And this would be the provision that would apply if

24   Aftermath were to license an Eminem recording to be put into a

25   compilation record such as *Best of Rap City*; correct?

1    A.     Yes.

2    Q.     I'm sorry.  Was that yes?

3    A.     Yes.

4           MR. POMERANTZ:  I have no further questions,

5    Your Honor.  Thank you.

6           THE COURT:  Redirect.

7           MR. BUSCH:  Yes.  I have a few questions.

8                      REDIRECT EXAMINATION

9    BY MR. BUSCH:

10   Q.     Just a few questions more, Mr. Stiffelman.

11          I want to direct your attention first to the questions

12   that Mr. Pomerantz asked you about the advances that Eminem

13   received.  He was talking about millions of dollars in advances

14   here and millions of dollars in advances there.

15          Do you recall that line of questioning?

16   A.     I do.

17   Q.     What is an advance?

18   A.     It's a -- it's an amount of money that is paid in order to

19   get the artist to -- excuse me -- to deliver a new record, or

20   part of it goes to pay the cost of delivering a new record, and

21   it's paid for each record and then it's recouped from the

22   royalties that the artist would otherwise earn on that record.

23   Q.     What does "recouped" mean for the jury, please?

24   A.     Basically, the way it works is that if the royalty is a

25   dollar a record and you get an advance of a million dollars,

1  that means basically they paid you on the first million records

2  already.  So if you get -- if -- basically it's a -- it's an

3  amount of money that you're going to get that they can get --

4  that they are going to take back from the money that they would

5  otherwise owe you in respect to the sale of records.  It's just

6  a timing issue.

7  Q.   Okay.  Thank you.

8       Now, they have also talked to you at great lengths

9  about the money that F.B.T. made and the money that Eminem made.

10  How much money, if you know, has Universal, Aftermath and

11  Interscope made off of the work of F.B.T. and Eminem?

12       MR. POMERANTZ:  Objection, Your Honor.  Lack of

13  foundation.  No showing.

14       THE COURT:  Foundation, sustained.

15  BY MR. BUSCH:

16  Q.   Do you know what Interscope and Aftermath have made gross

17  off of the sales of Eminem albums in your capacity as an

18  attorney for Eminem?

19  A.   I know the relative amount that a record company makes

20  compared to what an artist makes, but I don't have privy to

21  Interscope's books.

22  Q.   What percentage does a record company make vis-a-vis an

23  artist?

24       MR. POMERANTZ:  Objection, Your Honor.  It's

25  irrelevant, and it's also custom and usage evidence.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  It's usually three to four times the

 3    amount that the artist makes.

 4    BY MR. BUSCH:

 5    Q.    Okay.

 6              Could you put up Paragraph 4 of the 1998 and 2003

 7    agreement, both up on the screen.  Can you put them both up?

 8    Exhibits 4 and 5, please.  Exhibit 5 and 10.  I'm sorry.

 9    Paragraphs 4 and 5.  And then just all the way down to the

10    bottom.  Right there.  And if you could highlight that whole

11    thing.  Highlight that whole thing on Paragraph 4.  That's fine.

12    I'm sorry, Mike.  If you could -- all the way down to

13    "notwithstanding the foregoing," please.  Do you have to do it

14    one at a time?  Okay.  That's okay, Mike.  That's all right.

15    Just the last -- "notwithstanding the foregoing," please, at the

16    bottom.  There you go.  Okay.

17              Mr. Pomerantz, in his last examination or in his last

18    questions of you, do you recall him asking you questions about

19    Paragraph 4, the records sold provision at the very end of your

20    examination?

21    A.    Yeah.

22    Q.    Okay.

23              Did -- he didn't show you the "notwithstanding the

24    foregoing" provision, did he?

25    A.    We didn't go over it.
```

1   Q.    Okay.

2        Do you have an understanding what "notwithstanding the

3   foregoing" means in the context of this agreement?

4        MR. POMERANTZ:  Objection, Your Honor.  It's

5   unexpressed intent.

6        THE COURT:  Sustained.  Rephrase.

7   BY MR. BUSCH:

8   Q.    Okay.

9        Did you have any discussion with Mr. Hoffman about the

10  "notwithstanding the foregoing" provision in the '98 or 2003

11  agreement?

12  A.    Candidly, I'd have to see what follows.

13  Q.    Okay.  Would you show Mr. Stiffelman what follows?  And if

14  you would highlight the record club and the --

15  A.    So this is the -- this page follows the previous page?

16  Q.    Yes, sir.

17  A.    Okay.

18  Q.    Did you have any discussion about the "notwithstanding the

19  foregoing" language that follows the records sold provision that

20  Mr. Pomerantz continues to make reference to and what follows

21  it?

22        MR. POMERANTZ:  Objection, Your Honor.  Compound, if

23  he's just asking about the "notwithstanding the foregoing".

24        THE COURT:  Sustained.  Rephrase.

25  BY MR. BUSCH:

1    Q.    First, did you have any conversations about the

2    "notwithstanding the foregoing"?

3    A.    I'm sorry.  This is the '98 agreement?

4    Q.    Or in the context of this agreement or the 2003 agreement.

5    A.    Well, we had -- I'm sorry.  I'm a little confused.  We had

6    conversations about the applicability of these concepts to

7    downloads but not per se the words "notwithstanding the

8    foregoing."  The idea was the "notwithstanding the foregoing"

9    says that whatever that said doesn't apply to what's about to be

10   said.  So put that aside, and now look at what we are about to

11   say because it overrides whatever we just said.  And so this

12   then became the relevant language as to these types of sales.

13             MR. POMERANTZ:  Your Honor --

14             MR. BUSCH:  No further questions.

15             MR. POMERANTZ:  -- I would move to strike.  That isn't

16   something he discussed with Mr. Hoffman.  It would be

17   unexpressed intent.

18             THE COURT:  Motion to strike denied.

19             MR. BUSCH:  Thank you, Mr. Stiffelman.

20             THE COURT:  Mr. Pomerantz?

21             MR. POMERANTZ:  No questions.

22             THE COURT:  You may step down.  Thank you.

23             MR. BUSCH:  We would call Peter Paterno.

24             THE WITNESS:  Do you want to leave this book up here?

25             MR. BUSCH:  May I?

```
1              THE COURT:  You may approach.
2              MR. POMERANTZ:  Your Honor, Mr. Klaus is going to
3   handle this witness.  We will change seats.
4              THE COURT:  Plaintiff's next witness.
5              THE CLERK:  Please stand next to the court reporter
6   and raise your right hand.
7        Peter Thomas Paterno, Plaintiff's witness, was sworn
8              THE CLERK:  Thank you.  Please take a seat.
9              THE WITNESS:  Thank you.
10             THE CLERK:  For the record, sir, can you please state
11  your full name and spell your last name.
12             THE WITNESS:  Peter Thomas Paterno, P-A-T-E-R-N-O.
13                        DIRECT EXAMINATION
14  BY MR. BUSCH:
15  Q.   Good morning, Mr. Paterno.  Good afternoon, I should say.
16  A.   Hi.
17  Q.   Mr. Paterno, you are an attorney for Aftermath Records; is
18  that correct?
19  A.   Yes.
20  Q.   Okay.
21            And, Mr. Paterno, you have been an attorney for
22  Aftermath Records since when?
23  A.   Since it was formed in 1996.
24  Q.   Okay.
25            And, Mr. Paterno, have you drafted the recording or
```

1    recording agreements on your forms for artists that are signed

2    to Aftermath Records?

3    A.    There are a lot of questions there, but in general me or

4    somebody at my firm will draft recording agreements for

5    Aftermath Records.

6    Q.    And do you recall the circumstances by which F.B.T. -- the

7    F.B.T. agreement was prepared by your office in connection with

8    its deal with Aftermath Records?

9    A.    Generally, yes.

10   Q.    Okay.  And would it be fair to say that you were instructed

11   by -- let me back up for one second.  At the time of the

12   Eminem/F.B.T. deal with Aftermath Records, is it correct that

13   Interscope and Dr. Dre both had an ownership interest in

14   Aftermath Records?

15   A.    At the time -- yes.  I mean, I -- I don't know the exact

16   entities, but an Interscope entity and a Dr. Dre entity owned --

17   co-owned Aftermath Records.

18   Q.    And did you have discussions with or -- with Dr. Dre

19   concerning the signing of Eminem to Aftermath Records?

20   A.    Yes.

21   Q.    Okay.

22         And isn't it correct that Dr. Dre instructed you to

23   get the deal done with Eminem very quickly?

24   A.    Yes.

25   Q.    And isn't it true that Jimmy Iovine of Interscope Records

1  instructed you to get the deal done with Eminem very quickly?

2  A.   I don't recall talking to Jimmy about it, but I know Dre

3  was very excited about signing Eminem and wanted to get him in

4  the fold as quickly as he could.

5  Q.   And it's your testimony that that deal took place in four

6  or five days; is that right?

7  A.   That's my recollection, yes.

8  Q.   And it's also your testimony that the time in which that

9  deal was done was about ten times faster than is generally done

10  in the record industry to sign an artist; isn't that right?

11  A.   Yeah.  I don't remember saying that but generally, record

12  deals in those days took two or three months.  Now they can take

13  six or eight months.  So, yeah, it was very, very quick.

14  Q.   And that was because Dr. Dre and Interscope and Aftermath

15  were concerned that Eminem might get away to a different label;

16  right?

17  A.   Yes.  There is competition for artists in the record

18  business, and they wanted to sign him before one of the

19  competitors.

20  Q.   And at the time that Aftermath signed Eminem, isn't it

21  correct -- and F.B.T., isn't it correct that Aftermath was

22  having financial problems because there were no records and

23  there were no revenue but there were expenses?

24  A.   Well, I mean, I don't know if they were having financial

25  problems.  It was funded by Interscope.  But they hadn't shown a

1    profit particularly until that point.

2    Q.   Didn't you tell me in a deposition that they were having

3    financial problems because there were no records and no revenue

4    but there were expenses?

5    A.   I mean, that's not inconsistent with what I just said.  I

6    can't remember -- I can't remember exactly what the -- what the

7    balance sheet looked like, but, yeah, there had been no revenue

8    and there were no records.

9    Q.   And isn't it true, sir, that --

10   A.   No, it's not true.  There were some records but they didn't

11   perform, you know, to the level that Dr. Dre is accustomed to.

12   They had a gold record with the one record they put out, but,

13   you know, Dr. Dre aims higher than that.

14   Q.   Okay.

15        Well, isn't it true that there was no revenue and

16   there were no records but there were expenses?  Isn't that what

17   you told me in the deposition when I questioned you?

18   A.   I don't remember saying that.  But there was revenue, but

19   there were more expenses than revenue.

20        THE COURT:  Mr. Busch, slow down, please.

21        MR. BUSCH:  Yes, sir.

22   Q.   And isn't it true that Eminem and the work of Eminem and

23   F.B.T. was instrumental in the success of Aftermath Records?

24   A.   Well, I -- I don't know how the work was divided up.  I

25   would think a lot of it had to do with Eminem's talent and a lot

1    of it had to do with Dr. Dre's talent.  I -- I'm less

2    knowledgeable about what F.B.T. contributed.  I know what

3    Dr. Dre did and I know what Eminem did.

4    Q.    You know that in 1999 -- the agreement was signed in 1998;

5    isn't that right?  The first agreement?

6    A.    I think that's right.

7    Q.    Do you know in 1999 who won the Grammy for producers of the

8    best rap album of the year?

9    A.    I know Dre won somewhere in that period.  I don't remember

10   what year exactly.

11   Q.    Would it surprise you to learn that Jeff and Mark Bass of

12   F.B.T. won the Grammy that year?

13   A.    Actually, yes, but not that they're untalented.  I just

14   don't recall it.

15   Q.    Okay.

16          Now, you have a form that you used back in 1998 in

17   order to draft recording agreements for your clients; isn't that

18   right?

19   A.    Well, yes, we have -- we have a form -- we have a form

20   recording agreement, that's true.

21   Q.    And isn't it true that as the lawyer who drafted the 1998

22   recording agreement on behalf of Aftermath, you intended to use

23   the words that you chose to express the intent of the parties?

24   A.    Well, step back.  I actually didn't write the agreement.

25   Somebody in my office did.  But we always try to write the

1    agreement of the parties when we write an agreement.

2    Q.    Okay.

3          They wrote it at your direction.  They worked for you.

4    The people in your office took one of your forms and used that

5    in order to craft the Aftermath/F.B.T. agreement; isn't that

6    correct?

7    A.    Yes, that's right.

8    Q.    Okay.

9          And isn't it true that you testified that as the

10   lawyer for Aftermath, and when you were drafting agreements,

11   that you tried to use words to express the intent of the parties

12   in connection with the agreement; isn't that fair to say?

13   A.    Yes.  I think I just said that.

14   Q.    Okay.  Great.

15         Would you please put up the 1998 agreement and go to

16   the definition of "records," please.  Would you please look on

17   the screen.  This is the 1998 agreement, and this is the

18   definition of "record."

19         Do you recognize this definition?

20   A.    Yes, it looks familiar.

21   Q.    Okay.

22         And here it says, "A record means all forms of

23   reproductions, whether embodying sound alone or sound together

24   with visual images manufactured or distributed primarily for

25   home use."

1            Was that a standard definition of "records" that you

2    used at the time?

3    A.    Again, this was 11 years ago but it looks pretty standard.

4    Q.    Okay.

5          And do you know of any other definition of "record"

6    used in the -- that is found in your form agreements -- let me

7    rephrase that question.

8          Do you know whether there is any other definition of

9    "record" other than this one in your -- in the 1998 Aftermath

10   agreement?

11   A.    In the 1998 -- the one with F.B.T.?

12   Q.    Yes, sir.

13   A.    I don't know.  I mean, I don't know.  There shouldn't be

14   more than one definition, but I don't know.

15   Q.    That's standard, that there is one definition of "records"

16   so that when the word "record" is used in the agreement, it

17   means the same thing no matter where it's used; correct?  That's

18   the purpose of a definition?

19   A.    That's correct.

20   Q.    Now, let's take a look at the definition of the word

21   "master" on the same page.

22          And do you recognize this definition of "master"?

23   A.    Yes.

24   Q.    Okay.

25          And "master" means "a recording of sound, without or

1    with visual images, which is used or useful in the recording,

2    production or manufacture of records."

3              That's your definition; correct?

4    A.    Yes.

5    Q.    Okay.

6              And so would that be fair to say, that it's just

7    something that contains a recording of a song as a master as

8    that's defined here?

9    A.    Well, a "master" means a recording of sound, so, yes.

10   Q.    Okay.  Great.

11             All right.  Now, let's go to Paragraph 4 of the

12   agreement, which is the record sold provision that we have

13   already gone over many times.  And go all the way down to

14   "notwithstanding the foregoing."  Right there.  Okay.

15             Do you recognize Paragraph 4 of the 1998 agreement?

16   A.    Yes.

17   Q.    And Paragraph 4 is what Mr. Pomerantz has referred to in

18   this trial as the records sold provision.

19             Do you have that same understanding, it's a records

20   sold provision?

21   A.    I never called it that.

22   Q.    Okay.

23             And this describes how F.B.T. will receive royalties

24   when Aftermath or Interscope sells records; correct?

25   A.    Yes.

1   Q.   Okay.

2        And then below that, we have "notwithstanding the

3   foregoing."

4        And you wrote that; correct?

5   A.   Well, someone in my office wrote it.

6   Q.   On your form; correct?

7   A.   On a form that we use, yes.

8   Q.   Okay.

9   A.   I'm just trying to be precise.

10  Q.   Okay.  That's fine.

11       And "notwithstanding the foregoing" means what -- no

12  matter what was said before, what comes next controls; correct?

13  A.   It means that to the extent that something that comes after

14  is inconsistent with something that came before, then later

15  controls.

16  Q.   Thank you.

17       Let's go to the next page, please.  So I'm going to

18  represent to you that what I am going to show you now is what's

19  coming later.  And if you could pull up the record club

20  provision.  Actually, let's just go to right to the on masters

21  license provision, please.

22  A.   That's kind of cool.

23  Q.   Do you recognize this provision, sir?

24  A.   Yes.

25  Q.   Okay.

1           Now, we looked a second ago at the word "records" as

2   it applied in Paragraph 4 earlier before the "notwithstanding

3   the foregoing."

4           Do you see reference to "records" in this masters

5   license provision as well?

6   A.   Excuse me.  I didn't hear it.

7   Q.   Okay.

8           In Paragraph 4, which is the provision you said a

9   moment ago applies when Aftermath or Interscope is selling

10  records, there is --

11  A.   Well, actually you said that.  I didn't.

12  Q.   And you agreed to it?

13  A.   Okay.  I can't remember that.  But go ahead.

14  Q.   There is -- the word "record" appears in Paragraph 4 when

15  it talks about Aftermath or Interscope selling records; correct?

16  A.   Yes.

17  Q.   Okay.

18          And in Paragraph 4C(v) here, we talk about "on masters

19  licensed by us or our licensees to others for the manufacture

20  and sale of records."

21          Do you see that?

22  A.   Yes.

23  Q.   And do you see where it goes on and says "or for any other

24  uses, your royalty shall be an amount equal to 50 percent of our

25  net receipts from the sale of those records or from those other

1  uses of the masters."

2          Do you see that?

3  A.  Yes.

4  Q.  So "records" is used twice there; correct?

5  A.  Once -- yes.

6  Q.  Now, you don't know of any provision in this agreement that

7  says that "records" as used here is different or has a different

8  meaning than "records" that was used in Paragraph 4 above, do

9  you?

10 A.  No.

11 Q.  Okay.

12          And you never told anybody in connection with the

13 negotiations for this agreement that "records" as used here

14 means something different than what it meant above in Paragraph

15 4, did you?

16 A.  No.

17 Q.  Okay.

18          Now, Mr. Pomerantz has talked about in this case,

19 normal retail channel sales.  He has talked about, in connection

20 with Paragraph 4, normal retail channel sales, and he has said

21 that sales by Wal-Mart or by Best Buy are sales in normal retail

22 channels.

23          Do you agree with that?

24 A.  Do I agree with that statement?  Yes, I do.

25 Q.  Okay.

1      When a master recording is licensed by a -- by

2  Interscope or Universal and it is licensed to someone else who

3  manufactures a record, that record, if sold by Wal-Mart or Best

4  Buy or iTunes, is a normal retail channel sales sale as well;

5  isn't that correct?

6  A.   I'm not following you.  I mean, if -- it could be a normal

7  retail channel sale for the person who sells it.  It wouldn't be

8  a normal retail channel sale for Interscope if they had somebody

9  else doing it.

10      I should step back.  There -- there are situations

11  when records are manufactured by third parties that -- those --

12  and they're sold by the record company.  Those are still those

13  record company's normal retail channel sales.

14  Q.   But if it's manufactured and sold by a third party, then

15  it's a normal retail channel sale by that third party; correct?

16  A.   If it's manufactured and sold by the third party and it's

17  licensed by the record company, then it would be a third party

18  sale.

19  Q.   Thank you.

20      Mr. Paterno, I want to ask you about another provision

21  in this agreement.  Go to the record club provision, please.

22      And this record club provision is above the licensing

23  provision that we just read but it's after the "notwithstanding

24  the foregoing."  And you'll see that it says, "On records sold

25  through a direct mail or mail order distribution method,

1   including, without limitation through record clubs or through

2   any combination of the foregoing, the royalty rate will be

3   50 percent of the net receipts from the sale of those records."

4          Do you see that?

5   A.   Yes.

6   Q.   Okay.

7          Is this provision sometimes found directly within the

8   license provision in recording contracts that you've drafted,

9   rather than being separated out?

10  A.   Sometimes in recording contracts, the -- the provisions are

11  grouped by revenue share, so since this is a 50/50 split of the

12  net receipts and since licensing is a 50/50 split of the net

13  receipts, they sometimes appear together because it's an

14  efficient way to draft.

15  Q.   My question is here you have it separated out between -- in

16  two different provisions.

17          Are there occasions when sometimes it's within the

18  licensing provision itself in that very same paragraph?

19  A.   Again, I just answered that.  Sometimes it's grouped by

20  revenue share.  It's, you know -- it's just a convenient way to

21  draft, so, yes.

22  Q.   And record club sales are sales of albums, the record

23  label's albums; correct?

24  A.   I can't tell you that they don't sell singles.  I don't

25  recall.  But I think they're mostly album sales.

1  Q.    Okay.

2          And the reason why there is a 50/50 split is because

3  in those cases, the record company is not doing the distribution

4  and not doing the manufacturing; isn't that correct?

5  A.    Well, that's a much more detailed question than what you

6  asked.  I mean, historically it wasn't always a 50/50 split.  In

7  the late '80s, early '80s it sort of -- it evolved into that and

8  essentially because of the fact that it was a third party

9  selling the records and it was a -- the third party had all the

10 responsibilities that come with -- basically with ownership,

11 then it became a license 50/50 net split.

12 Q.    Thank you.

13         In going back to 4C(v) for a second, do you know of

14 any provision in this agreement that limits -- that says

15 explicitly that the provision only applies to certain types of

16 licenses?

17 A.    It --

18 Q.    Would you like me to repeat the question?

19 A.    Yes.

20 Q.    Isn't it correct that there's nothing in the 1998 agreement

21 that says that the license provision, 4C(v) only applies to

22 certain types of licenses; isn't that correct?

23 A.    It applies to the licenses that it talks about in 4C(v).  I

24 mean, there are other licenses it doesn't apply to.

25 Q.    It doesn't apply to other licenses that are otherwise

```
 1   covered in the agreement; correct?
 2   A.    Correct.
 3   Q.    Okay.
 4         So if it's not otherwise covered in the agreement and
 5   it's a license, then it's covered by 4C(v); correct?
 6   A.    If it's a license, yes.  And I would have to see the
 7   license and see what it says, but . . .
 8   Q.    And isn't it true that at your deposition, you said
 9   specifically that 4C(v) applies to just what it says?  Where
10   there's a license of the master to others for the manufacture
11   and sale of records or for any other uses, it applies?  Isn't
12   that what you said?
13   A.    Yeah.  Why would it apply to something other than what it
14   says?
15   Q.    Okay.
16         Now, in the 1998 agreement, there is no definition of
17   "net receipts."  Do you know why that is?
18   A.    Because it was a short form.
19   Q.    Do you have other short form agreements where there is no
20   definition of "net receipts" as well or where there are
21   definitions of "net receipts," I should say?
22   A.    I don't know.  I -- there -- it depends on what the other
23   lawyer comments on.  If it was important to the other lawyer,
24   then we would put a definition in, but typically in a short
25   form, that's not something you would define.
```

1    Q.    Okay.

2          Let me go through some of the other agreements, sir,

3    just to talk you through a couple of things, if we could.  Would

4    you pull up Exhibit No. 6.

5          MR. KLAUS:  Do you have a copy of the exhibits that

6    you are showing?

7          MR. BUSCH:  No.  I have them for the witness and for

8    the bench.

9          Would you go to Aftermath 56, 1 through 9.

10   Q.    Do you recognize -- if you can look -- you have a binder as

11   well.  If you would look at Exhibit No. 6, Mr. Paterno, please,

12   in your binder.

13   A.    Okay.  I kind of like the computer.  It's cool.

14   Q.    If you want to see the first page, if you would like to

15   look at it on the computer and just look at the first page, it's

16   there as well.

17   A.    I have it.

18   Q.    Okay.

19          And this was an agreement that was drafted by your

20   office; correct?

21   A.    It certainly looks like it, yes.

22   Q.    And it's for Aftermath Records; correct?

23   A.    Yes.

24   Q.    And it's 1998, the same time period as the period when

25   F.B.T.'s agreement with Aftermath was signed; correct?

1  A.    Yes.

2  Q.    Okay.

3            And there is a definition of "net receipts" here on

4  page Bates stamped 66139?

5  A.    Which page?

6  Q.    It's up on the screen.

7  A.    Oh, okay.

8  Q.    And it says, "Net receipts are revenues received from

9  us from any licensee"--

10  A.    "Received by us."

11  Q.    "Received by us from any licensee or credited to us which

12  are specifically attributable to the masters, less our direct

13  out-of-pocket costs in connection with the licensed use."

14            Do you see that?

15  A.    Yes.

16  Q.    Is that a standard term that you have used in connection

17  with the agreements for Aftermath?

18  A.    I would have to look at some other things.  It doesn't look

19  that odd to me, but, you know, out of context, I can't remember.

20  Q.    Do you recall me asking you at your deposition whether

21  that's a standard provision that you use, standard definition,

22  and you said it was?

23  A.    You're kidding, right?  The deposition was six months -- I

24  don't remember.  But I am happy to say that it is.  It looks

25  pretty normal.

1    Q.    Okay.

2          That's all I have about that particular agreement.

3    A.    Okay.

4    Q.    The next one I want to ask you about, if I could, very

5    briefly, is Exhibit No. 11.  And before you put that on the

6    screen, that one is not pre-admitted into evidence so I would

7    just like to ask you some questions about it.

8          Do you recognize Exhibit No. 11.

9    A.    It looks like one of our contracts.

10   Q.    Okay.

11         And this is a producer agreement; correct?

12   A.    It doesn't really look like a producer agreement, actually.

13   Q.    What type of agreement does it look like?

14   A.    Well, it's got a term, so it looks like it might be some

15   kind of song deal or something.  I don't know.  I would have to

16   read the whole thing.

17         MR. BUSCH:  Your Honor, I would move for introduction

18   of Exhibit No. 11.

19         MR. KLAUS:  No objection, Your Honor.

20         THE COURT:  Admitted.

21         (Plaintiff's Exhibit 11 was received.)

22   BY MR. BUSCH:

23   Q.    Would you please turn to Aftermath 5 -- I'm sorry -- to --

24   would you please put Aftermath 56429 on the screen, please?

25   Thank you.

1          THE COURT:  Mr. Busch, you've got to slow down.

2          MR. BUSCH:  I apologize.

3     Q.   Would you put the definition of "phonograph record" and

4     "record" from this Aftermath agreement on the screen, please?

5     And then also put the definition of "record" that is used in the

6     Aftermath/F.B.T. agreement on the screen next to it?

7          Mr. Paterno, you will see that in the Aftermath

8     agreement from your -- from your firm that is marked as Exhibit

9     No. 11, the definition of "record" means "every form of

10    reproduction, whether now known or unknown, embodying sound

11    alone or sound accompanied by visual images, distributed

12    primarily for home use, school use, jukebox use, and use in

13    means of transportation, including, without limitation, discs of

14    any speed or size, reel-to-reel tapes, cartridges, cassettes or

15    other pre-recorded tapes."

16         Do you see that?

17    A.   Yes.

18    Q.   And right under it on the screen you'll see the definition

19    of "record" from the Aftermath/F.B.T. agreement, and that

20    definition says, "Record means all forms of reproductions,

21    whether embodying sound alone or sound together with visual

22    images, manufactured or distributed primarily for home use."

23         Do you see that?

24    A.   Yes.

25    Q.   Okay.

1        Now, isn't it true that you testified that the broader

2    definition of "record" is better for the record label, and the

3    narrower definition is better for the artist?

4    A.    Typically, yes.

5    Q.    Okay.  You can put that away.

6        Now, Mr. Paterno, is it correct that after the

7    original 1998 recording agreement, that you and your firm

8    drafted on behalf of Aftermath that thereafter Interscope did

9    the primary drafting with respect to the subsequent agreements

10   between Eminem and Aftermath and Interscope?

11   A.    Yes.

12   Q.    Okay.

13       And your role after that was to consult some and to

14   offer some suggestions, but essentially Rand Hoffman from

15   Interscope and his legal team did the drafting of the

16   agreements; would that be fair to say?

17   A.    Right.  They did the day-to-day legal work.  I offered our

18   input and also I was responsible for speaking on behalf of

19   Dr. Dre, who is the other partner, so whatever ultimately got

20   produced, Dr. Dre -- I was the person that spoke to him.

21   Q.    Okay.

22   A.    Or that was -- if you could follow that.

23   Q.    Okay.  I can follow that.  Thank you.

24   A.    Thanks.  Sorry.

25   Q.    And in connection with the -- we've talked about so far in

```
 1   this case that there been several agreements.  There was the
 2   1998 agreement that your firm did.  And then there was what was
 3   called the 2000 novation and then a new agreement in 2003.
 4            Are you familiar with the 2003 agreement?
 5   A.   Generally, yes.
 6   Q.   Okay.
 7            And isn't it true, sir, that you told me that in
 8   connection with the 2003 agreement, you communicated with Rand
 9   Hoffman about that, and that the two of you said that there were
10   things from the 1998 agreement that you weren't happy about, but
11   that you were willing to live with it; isn't that true?
12   A.   Well, not exactly.  I mean, what happened was I asked Rand
13   if he wanted to take the opportunity to clean up some of the
14   provisions of the 1998 short form, because it was done hurriedly
15   and it's a short form, and he said that -- that they had --
16   Interscope had decided to just -- saw what was wrong with what
17   they had, and they felt that it covered the basis adequately.
18            Sorry.  I have had a cough for about a month and a
19   half.
20   Q.   To refresh your recollection, Mr. Paterno, if you'd like, I
21   am going to ask you again, isn't it true that you testified that
22   you and Mr. Hoffman discussed the 2003 agreement and concluded
23   that there were items from the 1998 agreement that you and he
24   were not happy with but you would live with it?
25   A.   Excuse me.
```

```
 1              No, I think it was more that I called them and there
 2   weren't any specific things I talked to him about.  I just said
 3   that we had done a short form and we -- did he want to try to
 4   sort of bring it up to -- to 2003.  And, you know, they decided
 5   not.  There weren't specific problems that I had or any specific
 6   provisions that I brought up to him.  It just was a general
 7   discussion.
 8   Q.   Do you recall me asking you whether the master license
 9   provision was an item that the two of you were unhappy with --
10   unhappy about or thought about changing and you testified you
11   didn't recall?
12   A.   Do I recall that?
13   Q.   Yes.
14   A.   No.  But it certainly sounds like something you could have
15   asked.
16   Q.   Just a couple of final questions, Mr. Paterno.
17              Would you agree that the -- that in connection with
18   digital exploitation of music where there are licenses to
19   iTunes, for example, or agreements with iTunes, that there is
20   reduced cost to the record labels because you don't have to
21   manufacture discs -- because the record label doesn't have to
22   manufacture discs?
23   A.   Yeah.  There -- there is no manufacturing costs.
24   Q.   And there is -- and also no distribution costs, no
25   distribution costs to the record label as well?
```

1    A.    There are some distribution costs.

2    Q.    Didn't you tell me that you don't have to distribute discs

3    to the stores, you don't have to do distribution?

4    A.    No, but there is server costs, there is uploading costs.  I

5    don't know how significant they are but there are costs.

6    Q.    Do you know who bears those costs vis-a-vis iTunes or the

7    record label?

8    A.    Actually, I don't.

9            MR. BUSCH:  I have nothing further.

10           You know what, Your Honor, just one thing before I let

11   him go, if I may.

12           THE COURT:  You may.

13   BY MR. BUSCH:

14   Q.    Just one last thing.  In the '98 and 2003 agreements --

15   could you put up the first page of the '98 agreement, please.

16   And direct your attention to the language about negotiating high

17   end -- second paragraph.  Okay.

18           And you'll see a provision there that says,

19   "Notwithstanding the foregoing," on the first page, "Aftermath

20   agrees to include in the long form agreement and F.B.T. will

21   negotiate in good faith all terms and conditions not contained

22   in this agreement, all of the provisions usually included in

23   high-end recording agreements, including such matters as

24   greatest hits advances, longer periods to audit records, bring

25   lawsuits, etc."

1         Do you see that?

2  A.   Yes.

3  Q.   Isn't it true that you said that the -- the points that are

4  generally negotiated in a high-end recording agreement are

5  things like longer times to audit, consents to licenses, things

6  of that nature?

7  A.   Yes.

8  Q.   And that it's your view that provisions like that are

9  relatively meaningless?

10  A.   No, not relatively meaningless.  Relatively unimportant as

11  compared to the points covered in the short form, which are the

12  material deal points.

13  Q.   Okay.

14        Didn't you tell me that the provision is relatively

15  meaningless because all it relates to is longer times to do

16  audits, bring lawsuits and consents for licenses?

17  A.   I don't recall saying that, but I can tell you that they

18  are less important.  The important points are covered in the

19  deal memo, in the short form.

20  Q.   Thank you.

21        Nothing further now, Your Honor.

22        THE COURT:  Cross-examination.

23                 CROSS-EXAMINATION

24  BY MR. KLAUS:

25  Q.   Good afternoon, Mr. Paterno.  Just ask you a few questions

1   on your background, Mr. Paterno.

2          First of all, what is it that you do for a living?

3   A.   I'm primarily a music lawyer.  I practice law in -- in the

4   area of -- in -- basically in -- my practice is concentrated in

5   things having to do with music and performing artists.

6   Q.   And how long have you been a music lawyer?

7   A.   Sadly, 30 years.  Well, not consecutively.  I had a four

8   year break where I ran a record company, but other than that, I

9   have been a music lawyer since 1978.

10  Q.   And which record company did you run?

11  A.   I ran Hollywood Records -- I started Hollywood Records.

12  It's the adult -- if you consider the Jonas Brothers and the

13  Cheetah Girls adults -- it's the adult label at Disney.  There

14  is the Disney label, which is Winnie the Pooh, and then there is

15  the adult label, which is Cheetah Girls.

16  Q.   And how long did you remain in that position?

17  A.   Four years.

18  Q.   And what did you do after leaving Hollywood Records?

19  A.   Well, I tried to find a job as a -- you know, a real job

20  and was unsuccessful, so I slunked back to being a lawyer.

21  Q.   And that's what you have done since that time?

22  A.   Yeah.  I've been a lawyer since then.

23  Q.   Okay.

24          And you said -- one of the things you said is you

25  represent artists.  Can you tell us some of the artists you have

1   represented over the years?

2   A.    Oh, I have represented Metalic -- Metallica since they

3   started in the '80s.  I have represented Guns N' Roses and most

4   of the Seattle bands.  I currently represent Metallica and

5   Van Halen and Paulina Rubio, Brian Setzer, Dr. Dre, Cypress

6   Hill.  I have a really -- Van Morrison.  Linda Ronstadt.  I got

7   a big client list.  Keyshia Cole.  I just don't remember them

8   all.

9   Q.    One of the people that you mentioned is Dr. Dre.  And how

10  long have you represented Dr. Dre?

11  A.    Since I started my new career again as a lawyer, so it

12  would be like beginning of 1996.

13  Q.    And can you tell us a little bit about who Dr. Dre is?

14  A.    Dr. Dre is -- he's probably the preeminent producer in all

15  of hip hop.  He was responsible for West Coast hip hop.  He is

16  an artist.  He is a producer.  He owns a label.  All West Coast

17  hip hop pretty much originates from Dr. Dre.  Whether it's Ice

18  Cube, Snoop Dog or The Game or any of those people, they are all

19  either produced by, affiliated with or assigned to Dr. Dre's

20  label.

21  Q.    One of the things you mentioned is that Dr. Dre is a music

22  producer.

23         Can you explain what he does as a music producer?

24  A.    He basically -- he -- he lives in the studio.  He goes to

25  the studio every day.  He treats it like a job.  He gets there

```
 1   about 3:00 in the afternoon, works until midnight or later, if
 2   things are going well, and he writes what are called beats.
 3   Beats are the underlying musical bed that rap and hip hop go
 4   over.  So he'll sit in the studio and try to create beats, and
 5   when he comes up with beats he likes, he will bring a rapper in,
 6   Snoop Dog or whoever, to wrap over the beats.  And generally Dre
 7   creates the hook, which is the musical -- usually sung chorus in
 8   hip hop music.  So he is responsible for pretty much all the
 9   musical elements and then he is responsible at the end for
10   what's called mixing, which is where you take the vocals and the
11   music and, you know, put the drums up louder or put the vocals
12   down less and mix it all to what you hear on the radio.
13   Q.    Okay.
14         And you also said that he has a record label.  What is
15   that record label?
16   A.    It's Aftermath Records.
17   Q.    And you represent Aftermath Records?
18   A.    Yes.
19   Q.    And Aftermath Records is co-owned, not just by Dr. Dre but
20   with Interscope; correct?
21   A.    Yes.
22   Q.    And can you explain what the respective division of
23   responsibility is between Dr. Dre and Interscope as far as
24   operating Aftermath?
25   A.    Dr. Dre's kind of responsible for the creative parts.  He
```

1    is responsible for the music, for finding artists and signing

2    them.  He also gets involved in the marketing to the sense

3    that -- in the sense that he is -- he -- he has input on the

4    images and the posters and things like that.

5            The actual work of marketing the records and taking

6    them to radio stations and convincing radio stations to play

7    them and getting them to record stores and getting them

8    manufactured, Dre doesn't do that.  That's done by Interscope.

9    So Interscope sort of does the day-to-day marketing of the

10   record.  Dre makes the records and sort of deals with the image

11   of the artist and signs the artist.  He is on the creative side,

12   they are on the more business side.

13   Q.   And what format does Aftermath sell its records in?

14   A.   Whatever formats people are willing to buy them in.

15   Q.   And I --

16   A.   We would sell then on tin cans if somebody would buy the

17   tin cans.

18   Q.   Take you back, if we could, to Mr. Busch asked you a few

19   questions about the signing of Eminem and F.B.T. in 1998.

20           Do you recall that questioning?

21   A.   Yes.

22   Q.   And I think you said that Dr. Dre wanted Eminem to be

23   signed very quickly; is that right?

24   A.   Yeah, that's right.

25   Q.   Can you explain why that is?

1  A.    Well, there's a number of reasons.   There was -- Dre was

2  afraid that other labels would find out about him, which was

3  pretty normal when Dr. Dre gets interested in an artist,

4  everybody else pays attention.   So he wanted him signed to his

5  label before other people got in and could steal him away.   I

6  mean, he thought he was immensely talented and wanted to make

7  sure he was going to be making records for Aftermath as opposed

8  to Sony or Warner Bros., or something like that.

9  Q.    And did Aftermath sign Eminem directly in 1998?

10 A.    No.   Aftermath -- Eminem was already signed to F.B.T.

11 Productions when Dr. Dre got involved with him, so those rights

12 to his recording services were owned by F.B.T.   Dre then made a

13 deal with F.B.T. to get the services of Eminem which F.B.T. had

14 already locked up.

15 Q.    Do you recall who represented F.B.T. in connection with the

16 negotiation of the 1998 agreement?

17 A.    Yes.   It was Paul Rosenberg

18 Q.    And who is Paul Rosenberg?

19 A.    Paul is -- well, at the time he was Eminem's lawyer.   He is

20 currently Eminem's manager.   He is also -- he manages blink-182

21 and some other artists now.

22 Q.    And at the time of the 1998 agreement, had you met

23 Mr. Rosenberg previously?

24 A.    No, I hadn't.

25 Q.    In the course of dealing with him, did -- over the course

1  of coming up with the 1998 agreement, did you develop any

2  impressions of his abilities as a lawyer?

3  A.    Well, he was at the time I think only a couple of years out

4  of law school.  Keep in mind at the time I was 20 some odd years

5  out of law school.  So I was more experienced than he was but he

6  is a really smart guy and he got a really great deal for his

7  client, so -- you know, I mean I thought Paul was smart and it

8  turns out he was.  He is now a preeminent manager.

9  Q.    Why do you say that he got a good deal for his client?

10  A.    Because the deal on this contract that we've been talking

11  about is, you know -- is $350,000 at a royalty rate of 18 points

12  which is much higher than any new artist was getting at the

13  time.  Significantly higher.

14  Q.    And if I could just ask Mr. Nichols if he would bring up

15  Exhibit 5, which is the 1998 agreement, Page 4.  And if you

16  could highlight, Mr. Nichols, what we have been looking at

17  sometime today, 4A1.

18        Is the 18 percent -- is that the 18 point royalty that

19  you were discussing?

20  A.    Yes, it is.

21  Q.    And what was typical for a new artist at this time in 1998?

22  A.    13, 14, something like that.

23  Q.    And if you could just turn --

24  A.    That was a new artist that people wanted.  I mean, if

25  nobody wanted them, it was less.

1    Q.    If I could just ask you, Mr. Nichols, to turn back to Page

2    3 of this agreement.  And if you could highlight the Paragraph 3

3    A, Advances.

4            And is this the $350,000 advance that you were

5    discussing, Mr. Paterno?

6    A.    Yes.

7    Q.    And that amount was paid to F.B.T. or to Eminem?

8    A.    Well, the contract was with -- was with F.B.T. so it got

9    paid to F.B.T.

10   Q.    And is it your recollection that was a significant amount

11   at the time for a new artist?

12   A.    Yes, especially one signing to Dr. Dre, who should have at

13   least been able to get artists cheaper because he could produce

14   the records and is famous.

15   Q.    To your -- first of all, were you assisted by anyone in

16   your office in connection with the negotiations?

17   A.    Yes.

18   Q.    And who was that?

19   A.    Marne Nieves.

20   Q.    And can you explain what Ms. Nieves' background was as of

21   1998?

22   A.    Well, she was a young lawyer that was an associate in our

23   firm and had been working there probably a year or two years at

24   most, and I can't remember what school she went to, but she was

25   a young lawyer and we had hired her to assist in drafting

1    documents and things like that.

2    Q.    To your recollection, did she have interactions with

3    Mr. Rosenberg in connection with the negotiation of this

4    agreement?

5    A.    Once -- once the initial conversations were done, she had

6    most of the interaction with Paul.

7    Q.    Okay.

8          And do you recall whether Mr. Rosenberg suggested any

9    changes to the drafts of the agreement that you had proposed in

10   1998?

11   A.    Yes.  He suggested numerous changes.

12   Q.    Okay.

13         And if Mr. Nichols could bring up Exhibit 5A,

14   which -- if you could go back to the first page and just zoom in

15   on the "To" and "From".  Can you go down to the CC line?

16         I am showing you, Mr. Paterno, the cover page of what

17   has been pre-admitted as Exhibit 5A.  And first of all, can you

18   identify what this document is?

19   A.    It looks like Paul's markup of one of the drafts of the

20   F.B.T./Aftermath agreement that we had prepared.

21   Q.    And one -- the person who it is being sent to is

22   Mr. Aronson.

23         Can you tell the jury who Mr. Aronson was?

24   A.    Scott was -- I think he was the head of business affairs at

25   the time at Interscope.

1  Q.    And the "cc" was to Ms. Nieves of your office?

2  A.    Yes.

3  Q.    And if you could just forward through a couple of pages,

4  Mr. Nichols.  Just stop on this page, for example, which is the

5  second page of the draft.

6          Can you tell whose handwriting that is?

7  A.    Well, it's Paul's, but I couldn't -- I'm not a handwriting

8  expert, but it's Paul's.

9  Q.    Okay.

10          And is it typical in your experience for there to be

11  markups and exchanges of drafts in the negotiation of recording

12  agreements?

13  A.    Yes.

14  Q.    I would like to ask you, you were asked some questions by

15  Mr. Busch regarding the Paragraph 4A(i), the provision that

16  talks about records sold through normal retail channels.

17          Do you recall that?

18  A.    Yes.

19  Q.    Do you recall any executions between your firm, either you

20  and Ms. Nieves, or anyone on the other side about the meaning of

21  records sold through normal retail channels in 1998?

22  A.    No.

23  Q.    And Mr. Busch also showed you the masters license provision

24  which is Paragraph 4C(v).

25          Do you recall that?

A.    Yes.

Q.    And do you recall any discussions between you on that subject in 1998?

A.    No.

Q.    Okay.

One of the other provisions that Mr. Busch talked to you about was the records club provision.

Do you recall that?

A.    Yes.

Q.    And I think one of the things that you said was that there was a 50/50 split because the record club had all the responsibilities that came with ownership.

Do you recall that?

A.    Yes.

Q.    Can you explain what you meant by the record club having all the responsibilities that came with ownership?

A.    When a -- when a record company like Aftermath or Interscope licenses a record club to distribute an album, the record club is responsible for paying the songwriters or the publishers.  They're responsible for paying the unions.  There's unions that get paid on sales of records.  Those -- those responsibilities are the -- are the record club's; they are no longer the record label.  The record label pays those third parties on sales through normal retail channels to record stores and things like that.  Does that answer your question?

```
 1    Q.    That does answer the question.

 2          I don't have any further questions at this time,

 3    Your Honor.

 4          MR. BUSCH:  I have a few questions on redirect.

 5          THE COURT:  You may.

 6                    REDIRECT EXAMINATION

 7    BY MR. BUSCH:

 8    Q.    Mr. Paterno, just a few questions on redirect, if I could.

 9          Would you please put up on the screen Exhibit No. 7.

10          Exhibit No. 7, Mr. Paterno, is an agreement from your

11    law firm; is that correct?

12    A.    Yes.

13    Q.    Okay.  If you would please now turn to -- please turn to

14    AM 0040, Mike, if you would.

15          And you'll see in this agreement -- this is a 2001

16    agreement; is that correct?

17    A.    Well, it says 2001, so, yeah.

18    Q.    Okay.

19          And it has a similar masters license provision like

20    the one in the '98 Aftermath/F.B.T. agreement; correct?

21    A.    Yes.

22    Q.    Okay.

23          And then if you look down two paragraphs -- if you

24    would highlight Paragraph 7, please.  There is a provision in

25    this agreement, this 2001 agreement, that says, "On records sold
```

1   via telephone, satellite, cable or other direct transmission,

2   including by way of electronic transmission to the customer over

3   wire or through the air, the royalty rate will be the otherwise

4   applicable royalty rate prescribed in Paragraph A1."

5           That -- that provision --

6           THE COURT:  Ask your question.

7   BY MR. BUSCH:

8   Q.   That provision is not contained in the '98 Aftermath

9   agreement; is that correct?

10          MR. KLAUS:  I object, Your Honor.  That exceeds the

11  scope of my cross-examination of the witness.

12          MR. BUSCH:  Your Honor, he asked about the "records

13  sold" provision.

14          THE COURT:  Regardless, are you asking -- if it does,

15  do you want to reopen direct?

16          MR. BUSCH:  Pardon me, sir?

17          THE COURT:  If it does, do you want to reopen direct?

18          MR. BUSCH:  If it does, yes.

19          THE COURT:  All right, you may ask.

20          MR. BUSCH:  Okay, thank you.

21  Q.   That provision is not in the F.B.T./Aftermath provision, is

22  it?  Aftermath agreement, is it?

23  A.   Not that specific provision.  There's something that deals

24  with new medium.

25  Q.   There is something that deals with new medium but there is

1    nothing that says that for records sold via various ways,

2    including electronic transmission, that it will be paid under

3    the record royalty provision, is there?

4    A.    Excuse me?

5    Q.    There is no provision in the Eminem/F.B.T./Aftermath

6    agreement in 1998 that provides what Paragraph 7 does here; is

7    there?

8    A.    That provision is not in the Aftermath/F.B.T. agreement.

9    Q.    And this provision was added by you to your form agreement

10   sometime after 1998; isn't that correct?

11   A.    Well, the 1998 agreement wasn't the form agreement.  The

12   form agreement looked a lot more like this.  That was a short

13   form that was done in order to get the contract done quickly.

14   Q.    Okay.

15         Well, if that's true, sir, turn back to Exhibit No. 6,

16   if you would.

17   A.    Sure.

18   Q.    Exhibit No. 6 is another 1998 Aftermath recording

19   agreement; correct?

20   A.    Yes.

21   Q.    Is this a short form agreement that was done quickly,

22   unlike the 2001 agreement?

23   A.    No.  This -- again, I am looking at it quickly, but looking

24   at it quickly, this looks like the standard, what we called the

25   long form, which was still a short long form but it's -- it's --

1  this is more like the one you just showed me.

2  Q.    Okay.

3         And so if this -- this 1998 agreement does not have

4  the provision that I just showed you from the 2001 agreement,

5  would that lead you to conclude that you added that provision to

6  your form agreement after 1998?

7  A.    Sure.

8  Q.    Okay.  A couple of other questions Mr. Paterno.

9         You mentioned record clubs a moment ago.  You were

10 asked about record clubs by Mr. Klaus.

11 A.    Yes.

12 Q.    You said with record clubs, record clubs are generally

13 responsible for paying the publishers what are called mechanical

14 royalties; is that right?

15 A.    Well, I didn't say it that way, but they're generally

16 responsible for paying publishers mechanical royalties, which

17 does everybody know what those are?  Should I explain what those

18 are?

19 Q.    Fine.  Go ahead.

20 A.    When a -- when a songwriter writes a song and an artist

21 records it, the songwriter is entitled under the U.S. Copyright

22 Act to get what is now today $0.09 a record for each record

23 that's essentially sold with their song on it.  So, for

24 instance, if -- if an artist did -- if an artist, say, Eminem

25 recorded a Beatles song, the Beatles would get $0.09 for each

1  record that was sold with the Eminem recording of it.  That's --

2  that's the -- but you get it for writing the song, not for

3  performing the song.  Eminem would get paid a royalty from the

4  record company for performing the song.  The Beatles would get

5  the royalty for his cover of *Hey, Jude*, for instance.

6        So the mechanical royalties is what's -- is at $0.09 a

7  unit, called a mechanical royalty.  It historically derives from

8  the 1910's when there weren't records, there were piano rolls.

9  So the piano rolls they would pay a mechanical reproduction

10 royalty for each time they made a piano roll that played the

11 song.  So the songwriter gets it, not the person who performs

12 it.

13 Q.   Now, isn't it true, sir, that -- do you know who pays the

14 mechanical royalties that you just described when it comes to

15 limited downloads under the agreements that Universal has with

16 various subscription services like Rhapsody and Napster?

17 A.   No.

18 Q.   Okay.

19        Do you know who pays the mechanical royalties when

20 there is a license by a third party for a compilation agreement?

21 A.   Typically the compiler, the person that licensed the song,

22 pays the mechanical royalties.

23 Q.   Okay.

24        And do you know whether with respect to the

25 Apple/iTunes agreement whether who would pay the mechanical

1    royalties was a point of negotiation between Universal and

2    Apple?

3    A.    I wasn't involved.  I don't know.

4         MR. BUSCH:  Your Honor, I have one other question that

5    I think relates to an order Your Honor made.

6         THE COURT:  All right, then.  At this point in time I

7    am going to --

8         MR. KLAUS:  I'm sorry, Your Honor.  Given that

9    Mr. Busch reopened the direct on that one --

10        THE COURT:  I will let you ask that last question to

11   close it up and then we will have recross.

12        THE WITNESS:  Oh, I'm back.  Okay.  Sorry.

13        MR. BUSCH:  Your Honor, did you --

14        THE COURT:  Are you done except for that last --

15        MR. BUSCH:  Yes, sir.

16        THE COURT:  Then we will have recross.

17                      RECROSS-EXAMINATION

18   BY MR. KLAUS:

19   Q.    Just very briefly, I would like to ask you a question

20   regarding the provision in Exhibit No. 7.  If you could bring

21   that up, Mr. Nichols, that was on the 12th page of the exhibit.

22   And it's Paragraph No. 7.

23        Do you recall Mr. Busch asking you questions about

24   your having -- you or Aftermath having added a paragraph like

25   this sometime after 1998 to its form agreement?

1    A.    Yes.

2    Q.    Why does Aftermath update its or change its form agreement?

3    A.    Well, every record company does.  In fact, when I started,

4    record contracts were six or seven pages.  They're now 70 or 80.

5    Times change.  Things you can't anticipate happen.  You do the

6    best you can as a lawyer to anticipate the future, but you can't

7    ever know exactly what's going to happen.

8         Also sometimes there's decisions by the courts that

9    come out different than what you thought the law was, so you

10   have to fix your form to deal with that.  You know, there -- in

11   my lifetime, there have been four different primary -- formats

12   for records.  There are vinyl when I was a kid and then there

13   was cassettes.  If you want to count eight-tracks, if you were a

14   hillbilly.  There were CD's.  And then there is, you know,

15   digital now.

16        And so you do the best you can to anticipate the

17   changes in the future, but, you know, then the future comes and

18   you have to deal with it.  And so while we think in most cases

19   we have done a good job, you can get more precise.  The more

20   information you have, the better job you can do in reflecting

21   what the parties' agreements are and writing the intent of the

22   parties.

23   Q.    And when you update -- and when you update or make changes

24   to the form, do you make it your practice to go back and add

25   those provisions to existing deals that Aftermath has?

```
 1   A.    No.  No.  Like I said, we try to do the best we can and we
 2   think we have covered most of the stuff, but the better
 3   information you have, the more able you are to reflect the
 4   agreement of the parties.  And, you know, in 1998, there wasn't
 5   iTunes.  In 2002, I think it was starting to come around.  So at
 6   least we now knew what the future was going to look like.  You
 7   didn't know in 1998.
 8              MR. KLAUS:  Those are all the questions I have at this
 9   time.
10              MR. BUSCH:  Your Honor, I would have a question or two
11   based on those questions.
12              THE COURT:  Go ahead.
13                       REDIRECT EXAMINATION
14   BY MR. BUSCH:
15   Q.    And sometimes, Mr. Paterno, isn't it true that you realize
16   that unless you make a change to -- that a provision that you
17   worded or drafted you realize is not something your client would
18   want to have contained in an agreement in the future?
19              Isn't that true, sir, too?
20   A.    I honestly didn't follow that.  What's the question?
21   Q.    My question is isn't it true that you went back and changed
22   the agreement in your form agreement beginning in 2001 because
23   you realized that without the change, if these agreements were
24   licenses between Apple and Universal and iTunes, the license
25   provision would apply by its clear language?
```

1   A.    No.

2   Q.    Not at all?

3   A.    No.  I mean, we didn't -- 2001 I had no idea what an iTunes

4   license -- there was no iTunes, I think.

5   Q.    It's not true, Mr. Paterno, that you went back and changed

6   your form after 1998 because you realized that if the agreements

7   that the record companies had with download companies were

8   licenses, under the clear language of those agreements, they

9   would have to pay under the licensing provision?  That never

10  crossed your mind?

11  A.    No.  Not at all.

12          MR. BUSCH:  Okay.  That's all I have, Your Honor.

13          MR. KLAUS:  I have no further questions at this time.

14          THE COURT:  Okay.

15          Ladies and gentlemen, we are going to at this point

16  close the courtroom.  There is -- just for your information,

17  there is going to be a few times during the course of the trial

18  that we will close the courtroom.  And that's because there is

19  going to be inquiry into confidential information as it relates

20  to third parties.  So to respect that confidentiality, the Court

21  is closing the courtroom.

22          So at this point in time except for the principals --

23          MR. BUSCH:  Your Honor, before we do that, based on

24  his last answer to that question that was raised by Mr. Klaus,

25  there is certain information that I would like to ask the

1    witness about as far as impeachment is concerned.

2              THE COURT:  I thought you were done.

3              MR. BUSCH:  No, sir.  I was -- I wanted to raise that

4    issue.  And so I don't want to overstep my boundaries --

5              THE COURT:  Let's cover that issue and then we'll take

6    a break.

7         (Transcript sealed from Page 58 line 8 to Page 61 Line 5)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5                      (Sealed transcript ended)
 6                           (Jury Out)
 7            THE COURT:  You may step down.  Wait outside, please.
 8                      (Witness leaves courtroom.)
 9            THE COURT:  Are you going to come back to the
10   March 24th letter?
11            MR. BUSCH:  Two things.
12            THE COURT:  All right.  Wait outside.
13            THE WITNESS:  You want me to hang around; right?
14            THE COURT:  Hang around, yes.  Thank you.
15            March 24th letter, is that the --
16            MR. BUSCH:  There's two things, Your Honor.  The --
17   Mr. Paterno not only signed the March 24th letter, but there's
18   also -- and this was not the subject of a Motion in Limine, but
19   I did not want to get into it without Your Honor's -- based on
20   Your Honor's ruling.
21            There were emails that went back and forth that we got
22   from Mr. Paterno that was part of the process when he was going
23   to sign the letter.  And he made a statement in the letter -- in
24   an internal email that was produced to us where he said the
25   record companies aren't going to do anything about this
```

1    basically until someone sues and Don Henley should sue them.

2    That's an internal email that I have here that I can pass up to

3    Your Honor.

4            In my examination of the witness, I simply asked him

5    about amending his form --

6            THE COURT:  Right.

7            MR. BUSCH:  -- and did he amend his form.

8            Mr. Klaus then went into a detailed examination about

9    the reasons he would amend his form, on these different things,

10   and the purposes and whether it had anything to do with this or

11   that.  And I think that the reasons he would amend his form, if

12   he's saying it had nothing to do with a concern about downloads

13   or the licensing provision, opens the door to at least some

14   examination.  And Your Honor can -- Your Honor can limit it, we

15   can do it without showing that it was a 26-lawyer letter.  I can

16   show him --

17           THE COURT:  Can I tell you upfront why I disagree and

18   then I will give you a last shot to address why I disagree

19   instead of simply saying grant, deny, and given there were 14

20   Motions in Limine, that's all you got.

21           But I think it really is a 402 and a 403 argument.

22   There is no evidence that this specific letter relates to any

23   agreement.  So I think ultimately it's 402 and a 403 issue.  I

24   don't think, even with this inquiry, you have tied this -- this

25   letter up to referring to this specific agreement.  So really

1    what I am thinking about is 402 and 403, relevance and then

2    prejudice.

3              MR. BUSCH:  Can I respond to that briefly, Your Honor?

4              THE COURT:  Yes.

5              MR. BUSCH:  His agreements and his testimony is not

6    tied to this specific agreement.  It's not this specific

7    agreement that was amended.  It's all of his other agreements

8    with third parties.  He couldn't get this 2003 agreement amended

9    as it relates to Eminem and F.B.T.  But with respect to those

10   new agreements that came in after 1998, he did amend those,

11   clearly believing that without that amendment, the licensing

12   provision would apply.  He just said a moment ago that that

13   never crossed his mind that the licensing provision would apply

14   in general to any of these agreements, any of them, that he

15   drafted or was involved with.

16             But yet we know that's not true.  And if I'm not

17   allowed to impeach him to show that what he just said on the

18   witness stand 30 seconds ago is not correct, that -- that is

19   direct -- it might be prejudicial but it's only prejudicial

20   because it makes him out to be a liar and it hurts their case,

21   but it's not unfairly prejudicial because it is directly

22   contrary to what he just said, Your Honor, and it's directly

23   relevant to the issues in this case.

24             THE COURT:  All right.  I would stand by the prior

25   ruling under 402 and 403.

```
 1              Wendy, make sure everybody knows the courtroom has
 2    been reopened.
 3                         (Recess taken)
 4                          (Jury Out)
 5              MR. BUSCH:  Your Honor, yeah, we are done with --
 6              THE COURT:  You're excused.
 7              THE WITNESS:  Thank you.
 8              THE COURT:  Mr. Busch?
 9              MR. BUSCH:  Your Honor, Mark Bass is here.  And if we
10    end early today, we are prepared to call him.  Mr. Pomerantz has
11    objected.  He says he doesn't have notice and he's not prepared
12    to examine him.
13              THE COURT:  Why can't we just do direct then?  Let's
14    see where we're at when we get to Mr. Bass, let me know, and if
15    you want to start your direct, let's use the time.
16              MR. BUSCH:  Okay.
17              THE COURT:  All right.  Let's go ahead and bring the
18    jurors out.
19                          (Jury In)
20              THE COURT:  Plaintiff's next witness.
21              MR. BUSCH:  Jimmy Iovine, Your Honor.
22              THE CLERK:  Sir, if you can please stand next to the
23    court reporter and raise your right hand.
24              Jimmy Iovine, Plaintiff's witness, was sworn
25              THE CLERK:  Thank you.  Please take a seat.
```

```
 1              THE COURT:  Mr. Busch, do you have a book for this
 2   witness?
 3              MR. BUSCH:  No.  I have no documents for Mr. Iovine.
 4              THE CLERK:  If you can please state your full name for
 5   the record and spell your last name.
 6              THE WITNESS:  Jimmy Iovine, I-O-V-I-N-E.
 7              THE COURT:  You may inquire.
 8                          DIRECT EXAMINATION
 9   BY MR. BUSCH:
10   Q.   Mr. Iovine, good afternoon.
11   A.   Hi.
12   Q.   What is your position?  Where do you work?
13   A.   I work at Interscope Records.
14   Q.   And what is your position at Interscope Records?
15   A.   I'm the chairman.
16   Q.   How long have you been the chairman of Interscope Records?
17   A.   I believe about seven years.
18   Q.   Okay.
19        And before that, did you work at Interscope Records?
20   A.   Yes, I did.
21   Q.   And in 1998, what was your position?
22   A.   1998, I was the president, I think.
23   Q.   Okay.
24        And Mr. Iovine, you have spent your career in the
25   music business; is that correct?
```

```
 1   A.    Yes, I have.

 2   Q.    Okay.

 3         I want to direct your attention to the signing of

 4   Eminem and F.B.T. in 1998 by Aftermath Records.

 5   A.    Okay.

 6   Q.    Mr. Iovine, is it correct -- let me ask you, how did Eminem

 7   get to your attention?

 8   A.    There was a young man named Dean Geislinger who was

 9   answering phones for us at the time.  He was sort of an intern.

10   And he went to a show and saw him and brought it to my

11   attention.  And at the time I -- I -- I usually take the

12   practice of encouraging young guys and try to teach them along

13   the way.  So I told him what I thought he should do on how to

14   get the tape heard properly and get it in the right hands, and

15   he brought it to me.

16   Q.    And did you meet with Eminem and Mark Bass shortly after

17   that?

18   A.    I remember meeting with Eminem -- I don't remember the

19   exact details of the meeting or anything but I must have met

20   with Eminem and Mark.  I'm not sure if Jeff was there as well.

21   Q.    Okay.

22         Do you recall giving them $25,000 that meeting for

23   them to stay so you could get Eminem signed right away?

24   A.    No, I don't.

25   Q.    Are you saying it didn't happen?
```

A.    No.

Q.    And was -- did you convey to Dr. Dre that Eminem needed to
be signed quickly?

A.    I gave a CD to Dre.  His son was at my house, and he came
to pick him up, and I had a bunch of CDs there and I said, "Dre,
listen to these things."

      And he listened to them and he liked Eminem and he
called me and said, "You know, I'm really interested in this."

Q.    Okay.

      Did you suggest to Eminem that he go to Aftermath
rather than Interscope at the time?

A.    Well, Dre -- when I play something for Dre and if he likes
it, it goes on Aftermath.

Q.    Okay.

      So you didn't suggest -- did you suggest to Mark Bass
or Joel Martin or Eminem that they sign with Aftermath rather
than Interscope?

A.    I don't recall.

Q.    Are you saying that didn't happen?

A.    No.

Q.    Do you know what length of time it was between the time
that the tape was first heard by you and Eminem was ultimately
signed?

A.    No, I don't.

Q.    Was it within a week or two?

```
 1   A.    I have no idea.

 2   Q.    Okay.

 3         Did you put Jeff Bass and Eminem up at the Oakwood

 4   Apartments so that they wouldn't leave town?

 5   A.    I don't remember.

 6   Q.    Okay.

 7         Are you denying that occurred?

 8   A.    No.

 9   Q.    I want to direct your attention now to the time period of

10   2001/2002, that time period, if I could.

11   A.    Okay.

12   Q.    Did you have conversations with Steve Jobs at Apple about

13   licensing Universal's catalog of music to Apple for digital

14   downloads?

15         MR. POMERANTZ:  Objection, Your Honor, to the use of

16   the term of "licensing" here.  There has been a motion on that

17   subject, and I think that Mr. Busch --

18         THE COURT:  Sustained.  Rephrase.

19   BY MR. BUSCH:

20   Q.    Did you have any discussions with Mr. Jobs about entering

21   into an agreement under which Universal or Interscope would

22   allow Apple or grant Apple the right to sell Universal's

23   products?

24   A.    I went to Apple and I -- he showed me iTunes and I thought

25   it was really impressive, and I called Doug Morris, who is the
```

1    chairman of the Universal Music Group that I work for.  I said,

2    "This looks really good.  I think you should look into it."

3    Q.    Did you have any other conversations directly with Steve

4    Jobs where you discussed with him granting them certain rights

5    or providing them with Universal's catalog of music and allowing

6    Apple or iTunes to sell that music pursuant to that agreement?

7    A.    That's not really my responsibility.  My responsibility is

8    more on the creative end and looking at it and saying well,

9    what -- how do we get people interested in this and how do we

10   sort of market it.  It's not really my -- my -- my forte or my

11   job to work out details like that.

12   Q.    Okay.

13         So you didn't have those conversations?

14   A.    I don't remember specifically.  I mean, that wouldn't be

15   the main thing that I do.

16   Q.    Did you ever meet with Steve Jobs?

17   A.    Yes, I did.

18   Q.    How many times?

19   A.    When?

20   Q.    In the 2001/2002 time period before any agreements were

21   reached between --

22   A.    I would say --

23   Q.    -- Universal and Apple?

24   A.    I would say a few times, you know.  He doesn't live here.

25   Q.    I just have a couple of other questions for you,

1  Mr. Iovine.

2  A.   Okay.

3  Q.   Has Eminem been the biggest artist on Interscope since he

4  has been signed to Interscope?

5  A.   I believe so.

6  Q.   And how much in gross sales has Interscope received from

7  sales of music that was created by Eminem and F.B.T.?

8  A.   I don't know the answer to that.

9  Q.   Billion dollars?

10  A.   I -- no.

11  Q.   Not a billion dollars in gross sales?

12  A.   I don't know.  That sounds like a lot of money.

13  Q.   Yeah, it does sound like a lot of money.  Thank you.

14                      CROSS-EXAMINATION

15  BY MR. POMERANTZ:

16  Q.   Good afternoon, Mr. Iovine.

17  A.   Hello.

18  Q.   Mr. Busch established that you are the head of a record

19  label.  I would like to back up a little bit and let the jury

20  get to know you and where you have come from.

21  A.   Okay.

22  Q.   How did you start in the music business?

23  A.   In 1973 -- 1970 I graduated high school and I went to

24  college for a year and a half.  And my dad was a longshoreman,

25  and, you know, I was having trouble finding my way, so I was

1  going to go work with my dad down on the docks, and -- but I

2  loved music.  So I -- I was lucky enough to -- to know someone

3  sort of like five people removed to get me a job cleaning a

4  recording studio, and that's what -- I cleaned and answered the

5  phones, and that's my start.  It was in the Record Plant Studios

6  in New York.

7  Q.    Then who was the first artist that you worked with?

8  A.    Well, what happened was I was answering the phones and

9  making tea -- and I was very good at the tea part.  And so one

10 of the clients there that was working with the main -- it was a

11 very popular studio -- was John Lennon.  And he just took a

12 liking to me.  And what happened was something happened with his

13 other second engineer and he did something wrong and they let

14 him go.  And I used to go in at night before then to practice,

15 you know, on my own, the -- how to, you know, how to set mikes

16 up, microphones, how to work the board and do things like that.

17 And it paid off because when he -- he asked me, I said, "Of

18 course I do," and we went in and we really hit it off.  I was

19 fortunate, he gave me a job as the engineer on his album.

20 Second engineer first.

21 Q.    How long did you work with John Lennon for?

22 A.    Probably '73 to -- probably it was like two years, close to

23 three years.

24 Q.    And what kind of things did you do for John Lennon?

25 A.    I recorded -- I recorded his vocals.  Recorded instruments

1    and music.  I mixed some of the records.  But I was with him

2    every day for three years.

3    Q.    And you said that you stopped working with Mr. Lennon in

4    1975?

5    A.    '75, when he retired for that five-year break.

6    Q.    So then were you out of a job?

7    A.    Well, again, I was out of a job, but not out of -- I always

8    had the sort of answering phone job and second engineering job.

9    And what happened was a guy -- a fellow named Bruce Springsteen

10   was out of money, he was working at a studio and he didn't

11   have -- Sony was about to drop him.  And he came over to the

12   Record Plant and the owner of the studio liked him so he gave

13   him some time and I helped him, you know, work out and we hit it

14   off as well and I became Bruce's engineering.

15   Q.    When you say "Bruce's engineer," what do you do as Bruce's

16   engineer?

17   A.    Well, the band sets up, you sit in between the record

18   producer and the band and you record the music.  You -- you take

19   it -- you take what you believe they sound like and what you

20   hear in the room or heard live and you try to get it as close to

21   that as possible onto a piece of tape.  Now onto a digital

22   format, but in those days, onto a piece of tape.  And you use

23   microphones and all different sort of things to recreate the

24   vibe that they get in the studio.

25   Q.    And what kind of projects did you work on with Bruce

1  Springsteen?

2  A.    *Born to Run* -- an album called *Born to Run* and another

3  album called *Darkness on the Edge of Town*.

4  Q.    And after you worked with Mr. Springsteen, what else did

5  you do -- take us from sort of working with Bruce Springsteen

6  until you get to Interscope Records.

7  A.    After Bruce Springsteen, I decided I wanted to try to be

8  the producer who's, I guess -- the way I always explain a

9  producer is what Quincy Jones does because everybody knows what

10  Quincy Jones does.  And I wanted to become a producer.

11        So I met a few artists.  I met a girl named Patti

12  Smith who was a really great poet and she was with Clive Davis,

13  and I asked her to give me a shot to produce the record, and

14  because of the work I had done with Springsteen and Lennon, they

15  felt that maybe I was capable of doing that and they gave me a

16  shot.

17        And we -- Bruce wrote -- Bruce Springsteen wrote us a

18  great song and it became a hit record.  And from them, from

19  Patty I got Tom Petty & the Heartbreakers, and I did three

20  albums with him.  And then I did three albums with Stevie Nicks

21  from Fleetwood Mac.

22        And after that, I produced two -- an album called

23  *Under Blood Red Sky* and then Simple Minds and the Pretenders and

24  Dire Straits.

25        And then I -- in 1987 I was doing an album called *A*

1    *Very Special Christmas,* which was an album I did -- because my

2    dad died in '85, and I did an album -- I wanted to get all my

3    friends to sing Christmas songs.  And I didn't want to keep the

4    money, so my wife said, "There's a great, great charity that I'm

5    involved in" -- we had just gotten married -- "called Special

6    Olympics."  And I just kind of took a year off from doing my

7    main job and did that.  And it was enormously successful and I

8    think it's raised a hundred million dollars for Special Olympics

9    now.

10           And so after -- but then my son was born in '88 and I

11   decided that -- I was coming home like at 5:00 in the morning

12   every night from producing records.  I said, well, this is not

13   working for me.  So I said maybe -- I said to my wife, "Maybe

14   I'll start a record company," because it seems like it's more

15   normal hours, and it really isn't, but I thought it was.  And I

16   started Interscope with -- Ted had Interscope and then I joined

17   them.  They had a very brief time where they were without me and

18   then I joined them in 1990.

19   Q.   Let me make sure, so that the jury can keep track.  You

20   started Interscope with someone named Ted.  Who is Ted?

21   A.   Ted Field.  He financed Interscope.

22   Q.   And what was your role when Interscope started and what was

23   Mr. Field's role?

24   A.   We were partners.  We -- we never had titles.  We really

25   still don't in a lot of ways.  But we were just running it

1    together, you know.  We just -- we only had six people, five

2    people.

3    Q.    And I'm sorry.  The approximate year when you started

4    Interscope was when?

5    A.    I get confused about it all the time.  I think we put our

6    first record out in 1990, but, you know, I don't really follow

7    that.

8    Q.    All right.

9          So you have been with Interscope from 1990 until --

10   A.    From the beginning, yes.

11   Q.    So that's 19 years now, almost 20 years?

12   A.    Yeah.

13   Q.    Could you -- and what has your basic role been at

14   Interscope from 1990 to the present and what have other people

15   done?

16   A.    Well, I look at my role as setting the tone of what we're

17   trying to accomplish.  You know, I come from a music -- a music

18   background.  I was a record producer, I was a musician.  So I

19   come from what was great about music and how do you express it

20   and try to find artists, and I am very, very attached and

21   interested in record producers because it's my background.  So I

22   always like to have great record producers at Interscope.  Those

23   are the people that -- like Quincy Jones, you know, they do

24   that.

25   Q.    And how many employees does Interscope have today?

1   A.    Today, probably 230, 240.

2   Q.    And what artists have you worked with since you've been at

3   Interscope?  We have heard about some of -- you know, Bruce

4   Springsteen and John Lennon, but who have you worked with in the

5   19 years have you been with Interscope?

6   A.    Gwen Stefani/No Doubt.  Blackstreet with Teddy Riley.  Rock

7   bands, Nine Inch Nails.  U2.  Many, many -- Black Eyed Peas with

8   Will.i.am and Fergie.

9         Do you want me to keep going?

10  Q.    That's fine.  That's fine.

11        Let's turn to Eminem.  Mr. Busch has asked you some

12  questions about how Eminem first came to your attention with the

13  demo tape and the intern.

14  A.    Sure.

15  Q.    What led you to give the demo tape of Eminem to Dr. Dre

16  rather than somebody else?  What about Dr. Dre?

17  A.    Well, Dre, I believe, is the greatest record producer that

18  has ever been in the game.  The most influential record

19  producer.  I've said that on many, many occasions, both

20  privately and publicly.  He is an extraordinarily gifted, gifted

21  person, so he's always my go-to guy.  You know, when

22  something -- I have a question anywhere in the area of hip hop,

23  I always look to him.

24  Q.    All right.

25        Let's turn to F.B.T.  Have you ever spoken to anyone

1    from F.B.T. about this lawsuit?

2    A.    Only once.  Mark called me.

3    Q.    When you say Mark, Mark who?

4    A.    Mark Bass.

5    Q.    And when did Mark Bass call you?

6    A.    You know, I think it was in the last year.  You know, I

7    couldn't say exactly what day or anything like that.

8    Q.    And he called you on the telephone?

9    A.    Yes.

10   Q.    What did Mr. Bass say to you?

11   A.    He sounded upset.  He said, "I want you to know I got

12   nothing to do with this thing.  This is a bunch of nonsense, and

13   it's Joel and, you know, this is not what we want.  We're music

14   people, and this -- this is crazy stuff and I'm going to deal

15   with it."  And I wasn't quite sure what that meant but that was

16   it.

17   Q.    And when he said, "I'm not involved with this thing," did

18   you understand what this thing --

19   A.    Yeah.  He said lawsuit.

20   Q.    And when he told you that he thought the lawsuit was

21   nonsense, what did you say in response?

22   A.    I agreed.

23   Q.    Anything else that you recall saying?

24   A.    I mean, I really didn't say much.  I just said, you know,

25   "God bless you.  Cool," you know.  I know -- I know better than

1    to talk about these things.

2    Q.   When Mr. Bass spoke to you on the phone that day, did he

3    tell you that he thought you owed F.B.T. money?

4    A.   No.

5    Q.   Did he say anything about Interscope paying the wrong way

6    on downloads?

7    A.   Absolutely not.

8    Q.   Have you ever heard from Mr. Bass again?

9    A.   No.

10            MR. POMERANTZ:  No further questions, Your Honor.

11            MR. BUSCH:  One or two questions.

12                    REDIRECT EXAMINATION

13   BY MR. BUSCH:

14   Q.   Mr. Iovine, just a few questions on redirect for you.

15            The first one is, you said that in response to

16   Mr. Bass's supposed comments, that you responded by saying, "I

17   agree"?

18   A.   I don't remember if those were my exact words.

19   Q.   Well, you just told Mr. Pomerantz.  I want to make sure

20   that I understand what you just said.  You just said it under

21   oath and I want to make sure I understand that you said you

22   agree.

23   A.   I think -- yes, I think you're right.  "I agree."  To that

24   effect.

25   Q.   Do you know what the facts are in this lawsuit?

1   A.    I think I understand them.

2   Q.    Do you understand that there's a licensing provision in the

3   contract between F.B.T. and Aftermath Records?

4   A.    I don't know anything about the contract, really.  I -- I

5   have never read the contract.  I don't look at contracts.  It's

6   not what I do.

7   Q.    Do you know what the issues are in this case?

8   A.    Basically.

9   Q.    Do you know what the -- what -- do you believe contracts

10  should be honored?

11  A.    Of course.

12  Q.    Do you believe the language of contracts are important?

13  A.    Of course.

14  Q.    Do you believe that record companies should honor the

15  language of contracts as they're drafted, particularly when they

16  draft them?

17  A.    I'm sorry.  Could you be -- could you --

18  Q.    Do you agree that record -- the record companies should

19  honor the language of their contract that they draft with their

20  artists?

21  A.    Sure.

22        MR. BUSCH:  Okay.  That's all I have.  Thank you,

23  Your Honor.

24        THE COURT:  Mr. Pomerantz?

25        MR. POMERANTZ:  No further questions, Your Honor.

```
 1                THE COURT:  You may step down.  Thank you.

 2                THE WITNESS:  Oh, thanks.  Thank you.

 3                THE COURT:  Plaintiff's next witness.

 4                MR. BUSCH:  Jeff Bass, Your Honor.

 5                THE COURT:  Can I see counsel at sidebar briefly.

 6                     (Sidebar conference commenced.)

 7                THE COURT:  I just lost track of the names of the

 8     witness.  The first thing tomorrow is --

 9                MR. BUSCH:  It depends on how far we get today.

10                THE COURT:  Are you going to finish your direct today?

11                MR. POMERANTZ:  This is Jeff Bass.

12                THE COURT:  Not Mark Bass.  Mark Bass is the other

13     one.

14                MR. POMERANTZ:  We will finish this witness today.

15                THE COURT:  I was confused.  All right.

16                     (Sidebar conference ended.)

17            Jeffrey Irwin Bass, Plaintiff's witness, was sworn

18                THE CLERK:  Please take a seat.  Could you please

19     state your full name and spell your last name.

20                THE WITNESS:  Jeffrey Irwin Bass.  B-A-S-S.

21                          DIRECT EXAMINATION

22     BY MR. BUSCH:

23     Q.    Good afternoon, Mr. Bass.

24     A.    Good afternoon.

25     Q.    Mr. Bass, where do you reside?
```

1    A.    In West Bloomfield, Michigan.

2    Q.    Okay.

3          And do you have a business in West Bloomfield,

4    Michigan?

5    A.    I do.

6    Q.    And what is the name of that business?

7    A.    F.B.T. Productions.

8    Q.    And what is the business of F.B.T. productions?

9    A.    We furnish services to artists, write their music, produce

10   their music and record their music.

11   Q.    And what is your background -- take us through your

12   background, your personal background growing up as a musician

13   and what you have done and who you have performed with?

14   A.    Well, my background is mainly jazz and pop music and R&B

15   music, and got into hip hop music probably 1992/93 era.

16   Q.    Okay.

17         And in 1992 or 1993, what happened to bring you into

18   the hip hop music.

19   A.    Got a phone call from my brother, who had listened to the

20   radio and heard a young gentleman on the radio rapping and had

21   called me up to say that, "You have to hear this guy.  He is an

22   amazing talent."  So he called me up, and we had a little studio

23   in my mother's basement, and we -- we -- he came over there

24   about 4:00 in the morning with his friends, which turned out to

25   be Marshall Mathers.  And that was my real true intro to hip hop

1    music.

2    Q.    Between 1992 and 1995, describe your relationship with

3    Marshall, what occurred in your life and how he was developed.

4    A.    I think for me it -- I was like a big brother.  None of us

5    really had anything to speak of, and we brought him in and

6    recorded all types of music, you know, for his -- you know,

7    we're thinking that maybe someday we can get him a record deal.

8    So we would just bring him in and he would record using our

9    facility, and we just were grooming him and with the hopes that

10   one day we can achieve some success with him.

11   Q.    Okay.

12         And what happened in 1995?

13   A.    When we -- in 1995, we did an album called *Infinite*, and

14   that's basically when we had signed him to an agreement between

15   ourselves and him.

16   Q.    So F.B.T. Productions signed Eminem in 1995?

17   A.    Right, as one of our artists.

18   Q.    Okay.

19         And -- we have heard today quite a bit about the album

20   *Infinite* and it selling 30 copies.  Did --

21   A.    Yeah, approximately 30.  Probably 30, 40 albums.  It was

22   albums and cassettes.

23   Q.    Did you or your brother write any of the music on that

24   album --

25   A.    No.  We were just basically executive producers of that

1  album.  He had some of his friends actually do the tracks for

2  that.  I think there were a lot of samples, the majority of

3  samples on that album.

4  Q.    Okay.

5        And so after the release of *Infinite* in 1995, 30

6  albums are sold, what happens as far as your relationship with

7  Eminem and the development of his career between then and 1997?

8  A.    We began to work -- after that it was basically a flop.  We

9  still had the belief that there was something there, so we

10 started actually writing our own music, forming our own style of

11 hip hop music, and -- where there was live instruments being

12 played, and then we put it together -- we put together an album

13 called the *Slim Shady* EP.  He came up with an alter ego for

14 himself, Slim Shady, who is Eminem, and based the whole album

15 project, the EP project, on that character.  So our music was

16 created and his -- his take on the songs were created because of

17 this character that he -- he came up with, this Slim Shady.

18 Q.    Okay.

19       And so between -- on that *Slim Shady* EP -- first of,

20 all, just explain to the jury what is the difference between an

21 LP and EP.

22 A.    An EP is extended play.  It's like five songs, maybe six

23 songs, just kind of a teaser, where an album has 10, 12 to 16

24 songs on it.  Full length album.

25 Q.    And on the *Slim Shady* EP, how many of those songs did you

1    and your brother Mark write the music on?

2    A.    All of them.

3    Q.    Tell us about that album.  Was it a success?  What

4    happened?

5    A.    It wasn't -- well, in our eyes at that time it was a

6    success.  We probably sold maybe 10,000 copies or so.  But for

7    us that was good.  And it got a little buzz going with him as

8    far as he was doing rap shows where he would battle other MC's

9    around the country.  We would borrow money from my mother, my

10   aunt, wherever we can get money, to get him to these shows.  And

11   so that's -- that's how the buzz kept going --

12   Q.    Okay.

13   A.    -- was by him going state to state, trying to, you know,

14   win in these contests.

15   Q.    Okay.

16          Before we get to how you all got together with

17   Interscope, I want to go back to one or two things.

18   A.    Uh-huh.

19   Q.    Joel Martin is here.  Tell us about F.B.T.'s relationship

20   with Joel Martin and what authority Mr. Martin has to act on

21   behalf of F.B.T.

22   A.    Joel Martin manages our day-to-day business affairs.

23   Q.    Okay.

24          With respect to contracts that are entered into, those

25   types of things, who is involved with that besides your lawyers?

A.     Joel Martin.

Q.     Okay.  All right.

So now take us -- 1997 -- we know that Eminem and Aftermath get together in 1998.  Tell us what happens between '97 and '98 and the things that occurred that got you to Los Angeles to meet with Jimmy Iovine.

A.     On that rap Olympics tour, he -- he made it all the way out to California, and in California, he lost that particular rap battle.  So what happened was there was a young gentleman in the audience at that particular show in California, I believe he was 17 years old, and his name was Evan Bogart.  And he got ahold of that CD that we had, the *Slim Shady* EP, and somehow when we were talking to him, he had said that he can get this CD to Jimmy Iovine at Interscope Records.

We're like, "Okay, how are you going to do that?"  He says, "Well, I'm the mail boy."  He worked in the mail department.  So on a Friday when Jimmy was taking his CDs home to listen to for the weekend because he used -- as far as we learned, he would receive a lot of CDs and he would take them home and study them.

So Evan Bogart somehow slipped our CD in his listening bag and he listened to it over that weekend and freaked out.  I mean, he just fell in love with this kid.  He knew that there was something special about that.  And that led to the meeting with Dr. Dre.

1     Q.    Tell me about -- were you involved in the initial meeting

2     with Jimmy Iovine or was that your brother and Eminem?

3     A.    Yes.  That was my brother and Eminem.  I didn't come out

4     for about two weeks after they initially met.  Their initial

5     meeting, I believe, was in the beginning -- end of January of

6     that year.  And I came out two weeks later after they made

7     their -- their initial meeting.

8     Q.    Okay.

9            And since that time, was there a contract negotiated?

10    A.    Since the -- --

11    Q.    I'm sorry.  Was there an original contract that was then

12    negotiated between --

13    A.    Yes.

14    Q.    And tell us about your representative in connection with

15    that --

16    A.    We needed an attorney, obviously, so we went out there and

17    we -- we had met -- prior to that we met a gentleman who was

18    a -- an attorney out in New York who was a hip hop fanatic.  He

19    loved hip hop.  Eminem actually knew him.  We needed an attorney

20    to negotiate this contract.  So him and Joel back in Michigan on

21    the phone, via phone, because he's not a lawyer, negotiated this

22    original agreement.

23    Q.    Okay.

24            And what was his name?

25    A.    Paul Rosenberg.

1    Q.    Okay.

2          And they had -- Aftermath's attorney was Peter

3    Paterno; is that correct?

4    A.    Yes.

5    Q.    Now, in connection with that agreement, were you involved

6    in negotiations or did you leave that to somebody else?

7    A.    I was never involved in the negotiations of the contract.

8    Q.    Of any contracts?

9    A.    Of any contracts.  I am strictly creative, write the music,

10   play the music, produce the music.

11   Q.    Okay.

12          Let's talk about -- during this trial, Mr. Pomerantz

13   has put up on the screen F.B.T. being a passive income recipient

14   and things of that nature.

15   A.    Right.

16   Q.    I want to talk to you about what you and your brother have

17   done in connection with the albums that have been released by

18   Interscope for F.B.T.

19   A.    Uh-huh.

20   Q.    What was the first album that was released by Interscope or

21   Aftermath?

22   A.    *Slim Shady* LP was the very first project on those labels.

23   Q.    What year was that?

24   A.    I believe '98.

25   Q.    Okay.

1          And what was your role in connection with that album?

2    A.    I wrote and produced 11 songs on that LP and which ended up

3    selling -- we saw it earlier, nine million records, and I won

4    that year for -- an award for rap producer for that album.

5    Q.    A Grammy Award?

6    A.    A Grammy Award, correct.

7    Q.    And that sold nine million?

8    A.    As of today, yes.

9    Q.    And then on the -- what was the next album?

10   A.    *Marshall Mathers* LP.

11   Q.    Okay.

12          And how many albums did that sell?

13   A.    According to today, I heard somewhere around 19 million.

14   Q.    Okay?

15          And tell -- and what year was that?

16   A.    2000.

17   Q.    2000 or 2001?

18   A.    I'm -- I'm not really quite sure what year.

19   Q.    Okay.

20          But my question is how many songs on that album did

21   you write or what was your role?

22   A.    Seven songs on that album I wrote and produced and

23   performed.

24   Q.    And when you say wrote, produced and performed --

25   A.    Saying that, I wrote the -- the music, not the lyrics, the

1  music, the melodies and actually recorded them in the recording

2  studio and arranged the song, and then that's what song ends up

3  on the album.

4  Q.    Okay.

5         Are you familiar with the movie *8 Mile* that starred

6  Eminem?

7  A.    Yes.

8  Q.    And what was the big song on that movie?

9  A.    *Lose Yourself*.

10 Q.    Okay.  And when did you begin writing and recording the

11 music for *Lose Yourself*?

12 A.    I began writing the music to that track about a year, year

13 and a half before the record actually came out.

14 Q.    2000 --

15 A.    2000/2001.

16 Q.    Okay.

17         Did you write that before there even was an idea for a

18 movie?

19 A.    Yes.

20 Q.    Okay.

21         And was the music -- was your part of the music

22 essentially completed prior to the time there was even an idea

23 for the movie?

24 A.    Yes.  Basically the core of the song, which means what you

25 ended up hearing, the guitars, the base, the drums, that was all

1    created in the beginning, 2000/2001.  And when the record came

2    out, those elements were still on.  After Eminem put his lyrics

3    on there sometime late 2001, there was some extra sweetening

4    stuff with keyboards put on there by Louie Rusto and it's

5    exactly the way it is on record today.

6    Q.    And did you win any awards for *Lose Yourself*?

7    A.    Yes.  I won a Grammy for best rap song, and I won an Oscar

8    for best original song in the movie.

9    Q.    Okay.

10          And when you wrote that song *Lose Yourself*, when you

11   wrote the song and the music, were you writing it under your

12   agreement with Aftermath?

13   A.    Yes.

14          MR. BUSCH:  That's all I have.  Thank you.

15          THE COURT:  Cross?

16                        CROSS-EXAMINATION

17   BY MR. KLAUS:

18   Q.    Which agreement with Aftermath were you writing that song

19   under, Mr. Bass?

20   A.    Excuse me?

21   Q.    Mr. Busch just asked you a question about *Lose Yourself* and

22   writing it under an agreement with Aftermath.  Which agreement?

23   A.    I -- I would -- I would -- I think the recording agreement

24   that we had with Aftermath.

25   Q.    Which one?

```
 1    A.    I can't answer that.

 2    Q.    When was that song ready to be delivered under that

 3    recording agreement to Aftermath?

 4          MR. BUSCH:  Objection, Your Honor.  Vague and

 5    ambiguous.

 6          THE COURT:  Overruled.

 7          THE WITNESS:  Repeat the question.

 8    BY MR. KLAUS:

 9    Q.    When was the song ready to be -- when was the song Lose

10    Yourself, the one that won an Academy Award and a Grammy --

11    A.    Uh-huh.

12    Q.    -- when was that song ready to be delivered to Aftermath

13    Records?

14    A.    I believe the end of 2001.

15    Q.    Okay.

16          Is it your testimony the song was complete as of the

17    end of 2001?

18    A.    Correct.

19    Q.    Mr. Busch asked you some questions about the number of

20    songs that you wrote and produced, setting aside the greatest

21    hits album which is the most -- that's called --

22    A.    Curtain Call.

23    Q.    Curtain Call.  Thank you.

24          The album before that was Encore; correct?  How many

25    songs did you write on Encore?
```

1    A.    None.

2    Q.    Let me ask you, sir -- take you back and just ask you a few

3    questions about the 1995 agreement that F.B.T. had.

4            It's correct, isn't it, that Eminem is just one of the

5    artists that you and your brother have signed over the years;

6    isn't that right?

7    A.    That's correct.

8    Q.    And the 1995 agreement, if -- Your Honor, may I hand up a

9    binder for the witness?

10            THE COURT:   You may approach.

11            MR. KLAUS:   Thank you.

12   Q.    I have the exhibit numbers in the binder tabbed on the

13   side, Mr. Bass, and also we have got, as you can see, lots of

14   video in the courtroom to bring things up.

15   A.    Okay.

16   Q.    If I could ask Mr. Nichols to bring up Exhibit 200.  If you

17   could -- if you could just highlight from the top through

18   Paragraph 2.  Paragraph numbered 2.

19            Mr. Bass, this is the exclusive artist agreement that

20   F.B.T. signed with Eminem in 1995; correct?

21   A.    Yes.

22   Q.    And under this agreement, Eminem was to furnish master

23   recordings to F.B.T. so that F.B.T. could manufacture those

24   recordings with a view to exploiting, distributing and marketing

25   those records; correct?

1   A.    Correct.

2   Q.    And what that means in terms of it being exclusive, sir, is

3   that once Eminem had signed that agreement, so long as that

4   agreement remained in effect, he couldn't sign with any other

5   record company; isn't that right?

6   A.    I don't know for sure.

7   Q.    Do you have any reason to doubt that?

8   A.    I know nothing about the contract.

9   Q.    Okay.

10          Was that agreement, so far as you know, still in

11  effect in 1998?

12  A.    I believe so.  I believe it's the same contract.

13  Q.    Is that contract the reason that Aftermath Records entered

14  into an agreement with F.B.T. in 1998 instead of an agreement

15  directly with Eminem?

16  A.    I'm not sure.

17  Q.    And let me just make sure we're clear that in terms of in

18  1995, when you signed Eminem -- in fact, when you signed other

19  artists, it was your intent, F.B.T.'s intent, to be able to

20  distribute and make money off of records that were produced

21  under those agreements; correct?

22  A.    Sure.

23  Q.    That's your business; right?

24  A.    Right.  It was our business, yes.

25  Q.    And in terms of what a record was under this exclusive

1  artist recording agreement or any of your agreements, in fact,

2  records wasn't limited to one configuration, was it?

3  A.   At that time, it was -- it was basically vinyl and

4  cassettes.

5  Q.   But you knew there would be others, didn't you?

6  A.   No, I didn't.

7  Q.   In your own life you had seen changes in configurations of

8  records, hadn't you?

9  A.   At that time?

10 Q.   In 1995.

11 A.   Yeah.  Probably like eight-track like we saw earlier.

12 Q.   And you also saw the CD, didn't you?

13 A.   Yeah.

14 Q.   And you -- did you think you would be able to predict the

15 future to know what the future configurations would be?

16 A.   No.

17 Q.   Was it important to F.B.T. to be able to have the right to

18 distribute recordings in other configurations besides those that

19 existed?

20 A.   No.

21 Q.   It was not important?

22 A.   We didn't think on those terms.

23 Q.   Okay.

24       And if I could just ask you, if you would -- if

25 Mr. Nichols could go to the seventh page of the agreement, to

1   Paragraph 24D.

2            And do you see that this Paragraph 24D defines

3   "Records, phonograph records, recordings, derivatives and sound

4   recordings to mean and include as forms of reproducing and

5   reproduction by which sound may be recorded now known or which

6   hereafter become known, manufactured or sold primarily for home

7   use, jukebox use and/or in means of transportation" and then

8   there a number of "including" words after that.

9            Do you see that?

10  A.    Yes.

11  Q.    Looking at that, the does that refresh your recollection,

12  Mr. Bass, that it was important to F.B.T. in 1995 to be able to

13  distribute its records in any format now known or hereafter

14  created?

15  A.    No.  I really never paid much attention to the agreement.

16  Q.    I would like to ask you, sir -- you said you never paid

17  much attention to the agreement.  You have signed a number of

18  the agreements that are at issue in this case, didn't you?

19  A.    I did.

20  Q.    You signed them on behalf of F.B.T.; correct?

21  A.    I did.

22  Q.    You signed them even though you hadn't read them; right?

23  A.    That's correct.

24  Q.    When you sign agreements on behalf of F.B.T., you expect

25  F.B.T. to abide by the agreement that's reached; correct?

1    A.    Correct.

2    Q.    You expect the other party that F.B.T. reaches agreements

3    with to abide by the agreements it has with F.B.T.; correct?

4    A.    Yes.

5    Q.    I would like to go to the 1998 agreement which is Exhibit

6    No. 5.

7            This is the agreement -- this is the agreement that

8    your company signed with Aftermath Records in 1998; correct?

9    A.    Yes.

10   Q.    And royalties under this agreement were paid directly to

11   F.B.T., were they not, sir?

12   A.    According to the agreement.

13   Q.    And advances under this agreement were paid directly to

14   F.B.T., were they not?

15   A.    Yes, they were.

16   Q.    And over the course of your -- over the course of time

17   following this 1998 agreement, you entered into several

18   subsequent agreements with Aftermath Records and Eminem;

19   correct?

20   A.    Uh-huh.

21   Q.    Is that a "yes," sir?

22   A.    Yes.

23   Q.    And over the course of that -- over the course of that more

24   than -- more than decade now of time, it's a fact, isn't it,

25   that F.B.T. has been paid millions of dollars under these

1   agreements; isn't that correct?

2   A.   That's correct.

3   Q.   And it's correct that under the -- under the 2000

4   agreement, F.B.T., a share of F.B.T.'s royalties are paid to

5   Mr. Martin; isn't that correct?

6   A.   Excuse me.  Rephrase that question.

7   Q.   Of course.

8          There is a 2000 agreement whereby there was a direct

9   relationship created between Eminem and Aftermath; correct?

10  A.   Yes.

11  Q.   And F.B.T. remained what's called in that agreement a

12  passive income participant; correct?

13  A.   Correct.

14  Q.   That means that you -- F.B.T. was no longer required to do

15  anything; correct?

16  A.   If -- if that's what Eminem and our -- and myself had chose

17  to do, which we didn't.

18  Q.   What were you -- following the 2000 agreement, sir, what

19  was F.B.T. contractually required to do in order to earn

20  royalties?

21  A.   I really don't know.

22  Q.   And under that 2000 agreement, was -- a share of the

23  royalties that were payable to F.B.T. were paid to Mr. Martin;

24  correct?

25  A.   Well, they weren't paid to Mr. Martin, no.

1   Q.   Okay.

2         If I could ask you, if you would, to go to Exhibit 9,

3   which is the 2000 novation.  That should be in your book,

4   Mr. Bass.  Exhibit 9.  And if you could turn to Page 10,

5   Paragraph 13.  If I could ask you to highlight the first

6   sentence for me, Mr. Nichols.

7         This 2000 agreement -- this is an agreement you signed

8   on behalf of F.B.T.; correct, Mr. Bass?

9   A.   I'm looking for the signature page.

10   Q.   It's on Page 14, if you want to flip ahead to it.

11   A.   Okay.

12   Q.   You did sign this on behalf of F.B.T.; correct?

13   A.   Yes, I did.

14   Q.   And Paragraph 13 says, does it not, that "F.B.T.

15   irrevocably directs Aftermath to compute, account and pay

16   directly to Joel Martin at the address set forth in Paragraph 11

17   above" -- there's a number that's crossed out and the number

18   25 percent is written in -- "of the monies payable to F.B.T.

19   hereunder."

20         Do you see that?

21   A.   I see that.

22   Q.   Does that your refresh your recollection that from the

23   point of the 2000 agreement forward, 25 percent of the monies

24   payable to F.B.T. under these agreements were payable to

25   Mr. Martin?

1    A.    I see that.

2    Q.    Okay.

3          And is it your belief that Mr. Martin has been paid

4    millions of dollars under these agreements involving Eminem and

5    Aftermath?

6    A.    Yes.

7    Q.    I would like to, if I could, Mr. Bass, ask you just a few

8    questions about Mr. Rosenberg.

9    A.    Okay.

10   Q.    Paul Rosenberg, who represented your company in 1998.

11   A.    Correct.

12   Q.    You have known Mr. Rosenberg for a number of years; isn't

13   that right?

14   A.    Probably about a year before he actually did the

15   negotiations for the original contract.

16   Q.    And during that -- and since that time, you have continued

17   to remain in contact with Mr. Rosenberg, haven't you?

18   A.    I haven't talked to Paul.

19   Q.    Do you know if Mr. Martin has stayed in contact --

20   A.    I think he has.

21   Q.    Do you know if -- did you have any reason not to trust

22   Mr. Rosenberg?

23   A.    No.

24   Q.    Okay.

25          And at the time of the -- and do you have any reason

1    to think he did not provide good services to you in 1998?

2    A.    No.

3    Q.    And it's a fact, isn't it, that in 1998, Mr. Rosenberg

4    wasn't the only lawyer who had provided services for F.B.T. or

5    for Mr. Martin in connection with your music business, was he?

6    A.    No.  I believe we also used Howard Hertz.

7    Q.    And --

8    A.    In Michigan.

9    Q.    I apologize for talking over --

10   A.    In Michigan.

11   Q.    He is -- Mr. Hertz is a lawyer who has an office right

12   outside of Detroit; correct?

13   A.    Correct.

14   Q.    And, in fact, he is still your lawyer; correct?

15   A.    For certain issues.

16   Q.    Okay.

17          And he is not a lawyer that you chose to use in 1998

18   with the agreement for Aftermath?

19   A.    No.

20          MR. KLAUS:  I have no further questions at this time,

21   Your Honor.

22          THE COURT:  Redirect.

23          MR. BUSCH:  Just a couple of questions, Your Honor.

24   Very brief.

25                     REDIRECT EXAMINATION

1    BY MR. BUSCH:

2    Q.    Just a few questions, Mr. Bass.

3          Who do you rely on in connection with various

4    contracts that have been entered into by F.B.T.?

5    A.    I rely on Joel Martin, as well as my attorneys.

6    Q.    Okay.

7          Just because there was some questions asked about your

8    work and how many songs are on a certain album, I just want to

9    ask you a few other questions about that.

10         Could you list the other have artists you worked with

11   besides Eminem?

12   A.    I have worked with 50 Cent, D12, Tony Yayo, George Clinton,

13   T.I.  I have also done works on an artist on ATO Records by the

14   name of Jem.  It's pop music.  I have worked with Quincy Jones

15   on an album for an R&B group called Dreamboy.  Two albums for

16   them, amongst others.  Gospel music and all different types of

17   music.

18   Q.    Okay.

19         The Slim Shady album we've heard so much about from

20   1999, the one that sold nine million that you won a Grammy for?

21   A.    Yes.

22   Q.    How many songs were there total on that album?

23   A.    I -- I want to say 16.

24   Q.    Okay.

25         And how many did you write and produce on that album?

1    A.    Eleven.

2    Q.    How many did Dr. Dr. Dre write and produce on that album?

3    A.    Three.

4          MR. BUSCH:  That's all I have.  Thank you.

5                      RECROSS-EXAMINATION

6    BY MR. KLAUS:

7    Q.    One very brief line of questions for you, Mr. Bass.  The

8    biggest selling song on the *Slim Shady* LP -- I am holding up

9    918A, which is the CD configuration -- the biggest selling song

10   was called *My Name Is;* correct?

11   A.    That's correct.

12   Q.    *My Name Is* was Eminem's break-out song; correct?

13   A.    That's correct.

14   Q.    And you didn't write *My Name Is,* did you?

15   A.    No.  It was a stolen sample.

16   Q.    You didn't produce *My Name Is,* did you?

17   A.    No, I didn't.

18   Q.    And the person who produced it was Dr. Dre, wasn't it?

19   A.    That's correct.

20          MR. KLAUS:  No further questions.

21          MR. BUSCH:  One thing, if I could.

22                      REDIRECT EXAMINATION

23   BY MR. BUSCH:

24   Q.    Who stole the sample?

25   A.    Dr. Dre.

```
1              MR. BUSCH:  Nothing else.

2              THE COURT:  Anything further?

3              MR. KLAUS:  No further questions.

4              THE COURT:  You may step down.  Thank you.

5              MR. BUSCH:  Your Honor, could we have a sidebar for a

6    moment?

7              THE COURT:  Yes.  Give me one second.  Give me one

8    moment.

9              (Sidebar conference commenced.)

10             MR. BUSCH:  It's almost 4:15.  We would prefer to, if

11   we could, start in the morning with Mark.  I don't want to call

12   him and take five minutes, and we will be in the middle of it.

13   I would rather not do that, if it's acceptable.

14             THE COURT:  Are we still -- how long -- how long do

15   you have with Mr. Bass?

16             MR. BUSCH:  Maybe 30 minutes or so.  I would rather

17   get started in the morning.

18             THE COURT:  Let's use the time.

19             (Sidebar conference ended.)

20             THE COURT:  Plaintiff's next witness.

21             MR. BUSCH:  I believe he is downstairs.  He wasn't

22   expecting to come up here.  He will be five minutes.

23             THE COURT:  All right.

24             MR. BUSCH:  Can we have a minute at sidebar?

25             (Sidebar conference commenced.)
```

1          MR. BUSCH:  I don't want to waste the Court's time.

2     They are trying to locate him.  He went downstairs.  I am not

3     sure where he is.  He flew in from Detroit to be here.  He is of

4     clear mind, but I don't know where he is.  So I understand --

5          THE COURT:  Why don't I do this?  I will stay in the

6     courtroom.  We will break for five minutes, and we can handle a

7     couple other matters.

8                    (Sidebar conference ended.)

9          THE COURT:  Ladies and gentlemen, we are just going to

10    break for five minutes.  I am not going to leave the courtroom.

11    It is going to be a short break.  We will bring you in for the

12    last 15 or 20 minutes of testimony.  Remember not to discuss the

13    case with yourselves or anyone else.  Don't form or submit any

14    opinions about the case until it's finally submitted to you.  We

15    will see you in about five minutes.

16                         (Jury Out)

17         THE COURT:  First, with regard to the jurors that we

18    have this morning, again pursuant to the stipulation that we

19    entered into last week, juror Amy or Ms. Vargas had that

20    question whether or not she had the job interview on Monday or

21    Tuesday.  She had the job interview Monday so we are able to

22    keep her.

23         But pursuant to the stipulation, we excused Juror No.

24    9, Eve Lopez.

25         Second, I just want to alert counsel to some very

```
 1   minor scheduling issues.  Tomorrow I am going to have to break a
 2   little early for lunch, but we will make up the time.  I am
 3   going to break at 11:45.
 4          Thursday afternoon -- is that Mr. Bass?
 5          MR. POMERANTZ:  Yes, Your Honor.
 6          THE COURT:  Okay.  Thursday afternoon -- again, we are
 7   going to shorten up the lunch on Thursday afternoon.  We need to
 8   break a little early, probably around 3:45, but we will take a
 9   very short lunch on Thursday.  I am going to need your help
10   Thursday evening though because we are hosting a reception in
11   this courtroom at 5:30 so I am going to ask you to help me with
12   the tables on Thursday afternoon in terms of getting them
13   cleared off so we can host that reception.
14          MR. POMERANTZ:  Are we invited, Your Honor?
15          THE COURT:  Everybody is invited.  But everybody has
16   to come.
17          MR. POMERANTZ:  Your Honor, after the jury leaves
18   today, I think there is a depo designation or two that we need
19   to discuss with your Your Honor so we are ready for tomorrow.
20          THE COURT:  I intended to deal with that as well.
21   Let's bring the jurors back.
22                         (Jury In)
23          THE COURT:  Plaintiff's next witness.
24          MR. BUSCH:  We will call Mark Bass.
25          THE CLERK:  Sir, if you can please stand next to the
```

1    court reporter and raise your right hand.

2            Mark Randy Bass, Plaintiff's witness, was sworn

3            THE CLERK:  Thank you.  Please take a seat.  For the

4    record, sir, can you please state your full name and spell your

5    last name.

6            THE WITNESS:  Mark Randy Bass, B-A-S-S.

7            THE COURT:  You may.

8                            DIRECT EXAMINATION

9    BY MR. BUSCH:

10   Q.    Good afternoon, Mr. Bass.

11   A.    Good afternoon.

12   Q.    Mr. Bass, you and Jeff Bass are brothers?

13   A.    Yes.

14   Q.    And if you could -- and Mr. -- your brother went through

15   some of this before, but I want you to kind of fill in the gap,

16   so to speak.

17            Tell me about how you first met or discovered Eminem.

18   A.    I heard Eminem on the radio doing a little open mike thing

19   that they had on the radio when he was 15 years old.  And I

20   called the radio station and asked if I could speak to him.  I

21   would love to work with him.  And he came to my house at 4:00 in

22   the morning and that was in '95.

23   Q.    Was it '95 or maybe 1992?

24   A.    Well, he was 15 years old.  I'm not sure how old he is now.

25   Q.    And so what did you do between then with him and the time

1   that his record, *Slim Shady*, was -- or the *Infinite* EP was

2   released or *Infinite* LP, I should say?

3   A.   I was like grooming him.  I was raising him to be the

4   artist he is.

5   Q.   And between -- after *Infinite* came out in 1995 -- you know

6   F.B.T. signed Eminem in 1995?

7   A.   Yes.

8   Q.   And who did you rely on in connection with that contract

9   and all other contracts that F.B.T. has entered into?

10  A.   Joel Martin.

11  Q.   And who is Joel?

12  A.   That gentleman right there with the glasses.

13  Q.   Okay.

14       And he's the manager of F.B.T.?

15  A.   Yes.

16  Q.   Okay.

17       Now, between the time that *Infinite* came out and *Slim

18  Shady* two years later, what did you and your brother do in

19  connection with that song or the songs on the album, I should

20  say?

21  A.   We were constantly working on music for him.

22  Q.   Who wrote all the music for the 1997 *Slim Shady* EP?

23  A.   Myself and my brother.

24  Q.   Okay.

25       And at some point in time after the *Slim Shady* EP was

1  released, did you and Eminem go on the road?

2  A.   Yes.  We went to Las Vegas to do a small show that we were

3  able to put together.

4  Q.   And from there where did you go?

5  A.   We decided to come to Los Angeles to try to put some CDs

6  into the stores to sell them.  And I was able to service two

7  stores with some CDs, and we ended up connecting with Jimmy

8  Iovine and Dr. Dre.

9  Q.   Tell me about how you first got noticed by Jimmy Iovine and

10  your meeting with Jimmy Iovine.

11  A.   I remember I was in my hotel room -- we had been sending

12  CDs to Interscope Records, as well as other record companies, to

13  try to get a record deal, and we were in our hotel room and I

14  got a call from a gentleman who said it was Dr. Dre and he

15  really wanted to sit with us.  And I didn't believe it, and I

16  said, "Well, if it's Dr. Dre, please send a car to pick us up."

17  We don't even have a ride to get to the company.  And a

18  limousine came and picked us up and we went to the office.

19  Q.   Did you meet with Dr. Dre or did you meet with Jimmy

20  Iovine?

21  A.   First with Jimmy for about two hours and then Dr. Dre came

22  into the meeting.

23  Q.   Tell me about your meeting with Jimmy Iovine.

24  A.   Jimmy -- we sat down and we looked at each other and we

25  were dressed alike and we kind of hit it off real well at that

1   point.  And I told him exactly what I wanted to do with the kid.

2   The vision that we had was quite different than other

3   traditional rap acts.  And I -- I saw the vision and I told him

4   what my idea was, and he offered me a $25,000 check to not go to

5   any other record companies.  And I told him that, you know,

6   "I'll come back and we can do business if you're really serious

7   about doing business."

8   Q.   Okay.

9        And what was the first -- and then ultimately there

10  was a deal signed?

11  A.   Yes.

12  Q.   And who advised you in connection with the deal whether to

13  sign it and the terms and --

14  A.   Joel Martin.

15  Q.   Okay.

16       And after that, what was the first album that was

17  released on Interscope or Aftermath, I should say?

18  A.   That was the *Slim Shady* LP.

19  Q.   And did you win any award for that?

20  A.   Yes, sir.

21  Q.   What did you win?

22  A.   It was best rap album, I believe it was, for a Grammy for

23  that.

24  Q.   Okay.

25       And since that -- and, Mr. Bass, since that time,

1  there have been other agreements that have been entered into

2  between F.B.T. and Aftermath?

3  A.    Yes.

4  Q.    Okay.

5         And you have relied on Joel Martin and your lawyers in

6  connection with those agreements as well?

7  A.    Yes.  Joel Martin handles all of our agreements.  All

8  myself and my brother are are the music men.

9  Q.    Okay.

10        The last question I have is Mr. Iovine was here

11  earlier and he mentioned that after this law -- sometime after

12  this lawsuit was filed or when this lawsuit was being filed,

13  that you called him on the telephone.

14        Can you tell us about that phone conversation?

15  A.    I called Jimmy and -- to let him know I was coming out to

16  California and I wanted to bring him some other material, some

17  other artists.  And he started talking about the lawsuit and

18  mentioning -- he didn't even know that I owned the company.  He

19  thought that Joel owned -- owned our companies.  And I told him,

20  "The lawsuit is ridiculous, Jimmy.  You know you owe the money.

21  Just pay it.  It's fair.  We love to do it fair."

22  Q.    Okay.

23  A.    And here we are.

24  Q.    Okay.  All right.  Thank you.  I have nothing further.

25            THE COURT:  All right.  We are going to adjourn for

1  the evening.  Remember not to discuss the case among yourselves

2  or with anyone else.  Don't form or express any opinions about

3  the case until it's finally submitted to you, and we will see

4  you tomorrow morning at 9:00.  Thank you.

5                          (Jury Out)

6          THE COURT:  I am going to take a 10-minute break and

7  then we will deal with the other issues.

8                          (Recess taken)

9          THE COURT:  All right.  First, with regard to the

10  deposition of Eddy Cue, I've reviewed defendants' revised

11  objections to plaintiff's offered portions of the deposition of

12  Eddy Cue, and the following are the Court's rulings.

13          Do you have that handy?  Are you ready?

14          MR. BUSCH:  Yes.

15          THE COURT:  It's probably easier if you have the list.

16          MS. LeMOINE:  I don't have the list actually in front

17  of me.

18          MR. BUSCH:  I don't have the list either.

19          MR. POMERANTZ:  Do you have it in writing, Your Honor?

20          THE COURT:  I have my scribblings.

21          MS. LeMOINE:  I can get somebody to get some copies.

22          THE COURT:  Why don't you do that.  It's going to be a

23  lot easier.  It's going to alleviate confusion if you follow

24  along.

25          MR. BUSCH:  Can I raise one other thing or talk about

1   one other thing?

2           THE COURT:  Sure.

3           MR. BUSCH:  At the -- I believe it was on Friday, we

4   requested permission to submit revised jury instructions on the

5   issues that we were talking about.  We have -- we prepared those

6   and we provided them to opposing counsel.  Opposing counsel, not

7   surprisingly, is going to object.  We asked whether they wanted

8   to object in -- so we do it in the form of jury instruction, our

9   statement, their objection?

10          THE COURT:  That would be preferable.

11          MR. BUSCH:  They said they wanted to do it separately.

12          THE COURT:  As long as I -- it's not so bad that I

13   have just this one separate, but as long as it's filed together

14   so that I can -- some way to keep it together because I can tell

15   you this, if I got multiple pleadings and I start looking to

16   settle the instructions, I'm going to get very confused.

17          MR. BUSCH:  We're ready so it's just up to

18   Mr. Pomerantz.

19          MR. POMERANTZ:  Your Honor, I think there's now --

20   they have offered two more instructions, and we will file

21   something in response.  What we can do is we can work with them

22   to put together one set of materials, which is here is all the

23   ones we agree on and here is the disputed ones with one side's

24   position and the other, all put together in a compilation.

25          THE COURT:  Are you talking about the new

1    instructions?  I have that as it relates to prior filings.

2         MR. POMERANTZ:  Okay.  Then we can just do it for this

3    one instruction.

4         THE COURT:  Just for this one because -- I think

5    that's what I have.

6         MR. POMERANTZ:  Well, the way I think the previous

7    ones were submitted is all of them -- there was a batch

8    submitted together in accordance with the Court's deadlines.

9    And some were agreed upon and some were disputed and we gave you

10   in the format that Your Honor asked for, where we had both

11   side's position.  Thereafter, my recollection is there was one

12   more instruction that the plaintiff submitted and we filed a

13   response to it.

14        THE COURT:  Right.  That was separately briefed.

15        MR. POMERANTZ:  And now there's two more and we will

16   file a response.

17        THE COURT:  I think that's probably the easiest way to

18   do it, the way you did the other special that was submitted.  So

19   I basically have the piles.  I have the agreed upon, the

20   plaintiff's disagreed upon and the defendants' disagreed upon so

21   I can start working my way through that.

22        MR. POMERANTZ:  When does Your Honor want to work with

23   us on those -- or talk to us about the jury instructions?

24        THE COURT:  I'm not -- sooner rather than later, and I

25   am just having difficulty getting through everything.

1          It looks like -- I'll tell you the worst case

2    scenario, and I am going to shoot for something better than

3    that, but it looks like we will be finished with testimony

4    Friday, we'll instruct and argue Tuesday morning.  Worst case

5    scenario, I bring them Monday morning and we work it out.

6    That's the worst case scenario.

7          MR. POMERANTZ:  And assuming that's the situation,

8    Your Honor, can we -- just these last instructions, just because

9    of the pace of the trial, there is a lot of witnesses happening

10   very quickly, can we get our response in on Thursday to these

11   two instructions?  Would that be sufficient time for Your Honor?

12         THE COURT:  That's fine.  I have plenty other to work

13   on.

14         MR. POMERANTZ:  And, you know, Richard and I will talk

15   more about the timing here, but it is possible that we will

16   finish early -- early Friday, not late Friday.  We are going

17   pretty fast here.  If that happens, can we still close on

18   Tuesday or do you want to close on Friday?

19         THE COURT:  No.  I think what I want to do -- and I

20   would love to close -- I would love to have this to the jury on

21   Friday, but I think realistically what is going to happen, given

22   where I am at, that we are just going to make a mistake on the

23   instructions.  If we finish early on Friday, we can all use that

24   time to get the final set of instructions ready and then you

25   will have them for the weekend.  Worst care scenario, we don't

1    finish and come back on Monday.  But it looks like probably the

2    safest thing is to use that extra time on Friday to make sure we

3    have been careful with the instructions and then you leave here

4    Friday night and we have a final set that I'm ready to read

5    Tuesday morning at 9:00.

6            MR. POMERANTZ:  Can I ask, Your Honor -- because that

7    makes sense to us and I think it's -- Mr. Busch, I assume that's

8    okay with you, that structure.  If we can then pace this -- and

9    I realize Your Honor has some scheduling issues as well in the

10   next couple of days -- where we can say that even if we finish

11   at 3:00 p.m. on Thursday, we can start a new witness on Friday,

12   let's say.  And I don't know who those witnesses are and where

13   they are going to fall, and I would be willing to discuss it

14   with Mr. Busch and always see if we can reach agreement.  But if

15   we could, as long as we are done at a reasonable time on Friday,

16   is Your Honor okay with that?

17           THE COURT:  That's fine.  I am fine with it to this

18   extent.  I would rather work hard and have that extra time on

19   Friday to finish and make sure we're ready to leave here Friday

20   with -- ready to go on Tuesday.  But, you know, and I think that

21   is actually beneficial to the parties as well to have that final

22   set of instructions when you go home on Friday instead of Monday

23   afternoon when you're getting ready to argue on Tuesday.  But

24   let's play it by ear, and we will see where we are at, and as

25   long as we are going to keep to the time schedule, I will be

1   flexible, but my preference is to see if we can just be ready to

2   go on Tuesday morning with the instructions.  But that will also

3   depend on how quickly I can get through the reading on the

4   instructions and the other things.

5          MR. POMERANTZ:  Sure, sure.  Are we still in stall

6   mode because I can raise one other issue?

7          MS. LeMOINE:  Yes, then.

8          MR. POMERANTZ:  Mr. Busch raised last Friday a binder

9   of contract summaries that he wanted to use.  I think we have

10  actually worked it out with, I think, just one issue remaining,

11  and that is whether the binder, which is demonstrative, goes to

12  the jury in their deliberations.

13          And our position is because of the way it's compiled,

14  while it will be efficient, I think, for the witness to have it

15  and expedite Mr. Busch's questioning of certain witnesses --

16  including I think a witness tomorrow -- we don't think that the

17  summary in that format should be going to the jury, and we don't

18  think the demonstratives are going to the jury.  The jury can

19  have the actual exhibits.  But we wanted to get Your Honor's

20  guidance on that.

21          THE COURT:  I have total discretion, right?  I will

22  look at the demonstratives, I will take a quick review of the

23  law but I think I just have total discretion as to --

24          MR. POMERANTZ:  I think that's right.  Under Federal

25  Rule of Evidence 1006, which I think governs summaries of

```
 1   voluminous documents, the law we found is it goes both ways, and
 2   so Your Honor is correct.
 3            THE COURT:  So let's do this:  Let me take a look at
 4   it and see what we have at the end of the trial.
 5            MR. BUSCH:  And I just want to say just very briefly,
 6   I think, you know, it is a fair summary of the documents and the
 7   provisions and it would allow the jury to see the provisions
 8   rather than have to thumb through thousands and thousands of
 9   pages of documents.
10            THE COURT:  No, I understand.  Let me see how it plays
11   out with the -- what the summary looks like and where we are
12   left at the end of the day and then I will exercise my
13   discretion.
14            MR. POMERANTZ:  One other issue, Your Honor.
15   Plaintiffs want to call as their industry expert Mr. David
16   Berman who you heard about in the opening.  We do not believe
17   he's qualified to offer certain opinions that he is being asked
18   to offer in this case.  I know Your Honor has denied our in
19   limine motion, but we thought that with the opportunity to
20   actually voir dire him in front of Your Honor on some of the
21   scope of his experience, we'd be able to either have him
22   excluded entirely or certainly have his opinions limited, and I
23   wanted to discuss with Your Honor how you would prefer to handle
24   that kind of a situation.
25            THE COURT:  I think, you know -- I think I have a
```

1    pretty good understanding after reading the motions.  If -- are

2    you proposing that you want to voir dire him out of order first?

3    Is that what you are proposing?  Or are you proposing -- I'm not

4    quite sure which way you want to go.

5            MR. POMERANTZ:  Well, I guess one of the questions,

6    Your Honor, is whether we do it in front of the jury or whether

7    Your Honor would take the testimony not in front of the jury and

8    whether --

9            THE COURT:  I don't think it's prejudicial.  I

10   think -- again, I don't want to spend a lot of time on it

11   because I think I have already decided.  I think many of the

12   things that you are talking ultimately will go to weight on

13   cross-examination.  That's really how I see things.  So even if

14   you were somehow successful in getting me to reconsider this

15   motion, which I don't want to encourage going there, but I don't

16   think there is any prejudice at all, even with the direct

17   examination with -- either with a motion to strike before your

18   cross-examination or -- I just don't see the -- necessarily the

19   prejudice in doing it in front of the jury.

20           MR. POMERANTZ:  So, Your Honor, just so I understand,

21   when Mr. Busch asks questions with the jury in the room, I take

22   it, with Mr. Berman to establish his qualifications, do I then

23   stand up after that but before he offers opinions to voir dire

24   him, or do you want me to wait until cross-examination?

25           THE COURT:  You know, you can object whenever you want

1  to object, but I think the better way is -- from my

2  perspective -- again, you can get up and make your objection to

3  the lack of foundation or lack of foundation expertise but

4  again, given my prior rulings, I think the better way, at least

5  from my perspective, is to let him present his expert before

6  cross-examination, make your motion to strike, lack of

7  foundation, expertise.  I mean, you can do it any way -- I am

8  not telling you how to do it.

9        MR. POMERANTZ:  No, no, Your Honor.  I do want to get

10  your guidance because there is many ways I have seen judges do

11  this and I just wanted --

12        THE COURT:  We can -- I don't want to waste the time

13  doing it outside the presence of the jury.  I think I understand

14  the issues well enough.  I'm not -- the only reason I would want

15  to do that is if I was concerned about tremendous prejudice to

16  one side or the other that I would do it outside the presence of

17  the jury.  I don't see Mr. Berman that way.  I see him as -- I

18  see the argument that the defense has made in their Motions in

19  Limine and again in opening statement -- is that my view is that

20  the defendants' points on his lack of expertise really relate to

21  weight and can be addressed on cross-examination and by

22  argument.

23        MR. POMERANTZ:  All right.  Your Honor, I understand

24  that and I guess what I was wondering is I think if I had an

25  opportunity to question him, that Your Honor would see that some

1   of the opinions he's offering, including some of the more

2   important ones, require someone with knowledge of how downloads

3   have actually been handled when contracts have been negotiated

4   in the download era.

5           And when he doesn't have that experience, to have him

6   offer the opinions in front of the jury and then somehow figure

7   out a way to take them back seems prejudicial.  And I am not

8   asking to reconsider it.  What I am asking, though, is if I ask

9   those questions and establish that he doesn't have the

10  experience to offer opinions he has already told to the jury,

11  then it seems difficult to get that back.

12          THE COURT:  I think you are rearguing the motion.  I

13  really do.  I think it goes to weight.

14          MR. POMERANTZ:  All right.

15          THE COURT:  I think you've lined up your

16  cross-examination probably, you have teed it up pretty well, and

17  you are going to argue it fairly effectively.

18          MR. POMERANTZ:  I understand, Your Honor.  I think we

19  are left with just depo designations.

20          MR. BUSCH:  The only other thing that I wanted to ask,

21  Your Honor, is just a matter of procedure.  And I've seen courts

22  do this two ways, and I want to make sure this is acceptable,

23  Your Honor.

24          With respect to expert testimony, the defendants have

25  objected on hearsay grounds to the expert reports.  Some courts

1  that I have been in, the judges have allowed the expert reports

2  to be marked for identification but not to be admitted into

3  evidence, and I wanted to make sure that that was an acceptable

4  procedure.

5           THE COURT:  That's fine.

6           MR. BUSCH:  Okay.

7           THE COURT:  Starting with the defendants' revised

8  objections to plaintiff's offered portions of the deposition of

9  Eddy Cue --

10          MS. LeMOINE:  Excuse me, Your Honor.  I am just

11 letting plaintiff's know because they are looking at me, I have

12 one copy and if you want to trust me to --

13          THE COURT:  Unless you both want to go to the podium.

14          MR. BUSCH:  Why don't you do that?

15          MS. LeMOINE:  I have one copy of the old one.  I think

16 we can use it.

17          THE COURT:  All right.  Starting on Page 1, the only

18 objection on that page is sustained.

19          Page 2, the objection to 65, Lines 21 through 22,

20 sustained.  66, Lines 3 through 6, sustained.  66, Lines 18

21 through 21, sustained.  72, Lines 2 through 3, sustained.  72,

22 Lines 13 through 14, sustained.  73, Lines 1 through 2,

23 sustained.  78, Lines 10 through 14, sustained.  79, Lines 3

24 through 4, sustained.  Lines 81 -- I'm sorry -- Page 81, Lines

25 19 through 24, sustained.  82, 4 through 7, overruled.  85, 4

1    through 11, overruled.

2          Page 3 of the objections, Lines -- Page 93, Lines 18

3    through 22, overruled.  96, Lines 8 through 11, overruled.  96,

4    Line 16 through 97, Line 5, overruled.  99, Line 17 through 19

5    and Line 24, sustained.  Page 101, 4 through 9 and Lines 17

6    through 25, overruled.  Page 103, Lines 7 through 20, overruled.

7    Page 103, Line 25 to Page 104, Line 2, overruled.  Page 104,

8    Line 9 through Page 105, Line 4, overruled.  Page 105, Lines

9    18 -- 8 through 18, overruled.  Page 105, Line 22 through 106,

10   Line 3, sustained.

11         Page 4, Lines -- Page 117, Lines 2 through 9,

12   overruled.  The remaining objections on that page are sustained,

13   excluding the last objection, Page 140, Lines 4, through Page

14   141, Line 4, overruled.

15         Page 5 -- I'm sorry -- Page 5 of the objection, Page

16   152, Lines 5 through 9, sustained.  Page 155, Lines 8 through 11

17   and 16 sustained.  Pages -- Page 181, Lines 8 through 10, 14

18   through 17, 19 through 22, overruled.  Page 197, Line 23, to

19   Page 198, Line 3, sustained.  Page 198, Lines 8 through 15,

20   sustained.  Page 199, Lines 11 through 18, overruled.  Page 199,

21   Line 24 through Page 200, Line 4, overruled.  Page 204, Line 1,

22   through Page 205, Line 6, sustained.

23         Going to Page 6 of the objections, each of the

24   objections on Page 6 are sustained.

25         With regard to further deposition that the Court needs

```
 1   to review, are there any others at this point that I need to

 2   review?

 3          MR. BUSCH:  Yes, Your Honor.  Steve Jobs and Ethan

 4   Gustav.

 5          THE COURT:  Steve Jobs and --

 6          MR. BUSCH:  E-T-H-A-N, Gustav.  G-U-S-T-A-V.

 7          THE COURT:  Okay.  And you're proposing then to have

 8   those for Thursday?

 9          MR. BUSCH:  That would probably be okay.

10          THE COURT:  If I give it in a similar fashion to

11   today?

12          MR. BUSCH:  If that is helpful to Your Honor, to have

13   a little bit of time, that's fine, yes, sir.

14          THE COURT:  Well, I have got to read it.

15          Anything else?

16          MR. KLAUS:  Yes, Your Honor.  May I raise two issues

17   with respect to Mr. Kenswil, who will be testifying tomorrow?

18   Mr. Kenswil was the head of the Elabs unit which was in charge

19   of negotiating the agreements with the third party providers of

20   downloads, streaming, subscription services and the like.

21          There were two issues that came up at the deposition

22   that I would like to raise with Your Honor.  One is that there

23   was a question by Mr. Busch as to whether Mr. Kenswil was

24   present during discussions with other individuals, lawyers of

25   the company, about how the company would pay for subscription
```

1  services or downloads with respect to the -- with respect to

2  the -- the records sold through retail channels or the masters

3  license provision.

4       Mr. Busch was allowed to ask whether there were

5  discussions.  It was established that they were with counsel and

6  he was not -- and there was an instruction not to answer.

7  Although there was discussion by Mr. Busch at that deposition

8  and at the deposition of Mr. Ostroff, who also will testify

9  tomorrow, who was the general counsel about a motion to compel

10  to require the substance of those communications to be

11  addressed, there was never a motion.  So there was a privilege

12  instruction.  And the issue comes up with the issue that we

13  discussed last Friday about coming close to the privilege line.

14  And we don't think that Mr. Busch should be able to ask

15  Mr. Kenswil whether there were discussions on that privileged

16  subject if we're hamstrung in terms of going into what those

17  discussions were.

18       THE COURT:  Is that an issue, Mr. Busch?

19       MR. BUSCH:  Your Honor, we addressed this last Friday.

20       THE COURT:  That is what I am saying.  Is it an issue?

21       MR. BUSCH:  It's an issue only because of this.

22  Subject matter is not privileged.  They allowed him to answer

23  the question about subject matter.  And they -- or whatever

24  question I asked, they allowed them to answer the question about

25  it, without a privilege objection.  There is no reason, having

1    allowed that question to be answered at a deposition, that now

2    they can come into court and say I can't ask whether that

3    subject was discussed.  They've allowed it to be answered, it's

4    been answered.

5            THE COURT:  There's two things.  Just again, so I

6    understand, your -- so you said -- you asked this person did you

7    have discussions about Contract A, B and C?  Yes.  Were your

8    lawyers present?  Yes.  What was said?  Privilege instruction.

9            MR. BUSCH:  Actually it was a little bit broader than

10   that.  I don't have the exact -- this is just coming up.  This

11   was not discussed with me as being brought up before now so I

12   don't know the exact question and answer.  My recollection is

13   that I asked, "Was there a discussion internally at Universal

14   about how to pay for permanent downloads versus conditional

15   downloads?"

16           Answer was allowed to be answered, "Yes."

17           The next question was --

18           THE COURT:  "What was discussed?"

19           MR. BUSCH:  -- "now tell me the substance of that

20   communication."  Privilege.

21           There is no reason that I can't ask this witness when

22   he gets up on the witness stand, "Did you discuss the subject

23   matter of how to pay for conditional downloads versus permanent

24   downloads in 2001."  It's not privileged.  It's subject matter

25   and it was allowed to be answered at the deposition.  So there

1    is no basis to allow me not to ask that question.

2         THE COURT:  What do you mean when you say subject

3    matter, though?  If a question elicits the, quote, general

4    subject matter of what was discussed while a lawyer was present,

5    how is --

6         MR. BUSCH:  Well, whether it's subject matter or

7    substance, my point, Your Honor, is -- let me back up for one

8    second.  Whether it's subject matter or substance, the question

9    and answer was allowed to be obtained at the deposition, period.

10        THE COURT:  Right.

11        MR. BUSCH:  Okay.  So that question that I asked,

12   whether you define it as subject matter or substance, was

13   allowed to be answered, and it's on the record.  It's in the

14   deposition.

15        THE COURT:  Okay.  But maybe -- are you also saying --

16   Mr. -- Mr. Klaus, are you -- are you also saying also 403, that

17   if you can't go into the substance, it makes you sound like you

18   are hiding something here?

19        MR. KLAUS:  That's of course what it was.  And the

20   reason that the question can be answered, Your Honor, is the

21   same reason that the question as to what the subject matter was

22   and who was involved can be put onto a privilege log which is to

23   allow Mr. Busch to test the privilege assertion.  He said

24   repeatedly at these depositions, of both Mr. Ostroff and

25   Mr. Kenswil, "I am going to file a Motion to Compel.  You are

1  going to be back here.  You are going to get sanctioned.  You

2  are going to pay the cost of us coming back."  And he never

3  filed the motion.  So he made his record, and it would be

4  prejudicial --

5         THE COURT:  What is the probative value of just simply

6  asking did you have the discussion with your lawyers present and

7  no one being able to follow up --

8         MR. BUSCH:  It is relevant for a lot of different

9  reasons, Your Honor.

10        THE COURT:  What's the probative value over the

11  prejudice?

12        MR. BUSCH:  Okay.  One of the defendants -- one of the

13  defendants' arguments in this case is that certain topics were

14  not taken into consideration when they revised their forms.  And

15  so at -- at different depositions, I asked the question, "Was

16  this something that was discussed," and the question was allowed

17  to be answered.  It is relevant -- Mr. Paterno sat on that

18  witness stand and said he didn't -- he didn't revise this form

19  with the idea of the license provision in mind at all.

20        And so when I asked about the revision of the forms as

21  it relates to Interscope, there should be -- if -- if I ask a

22  question at deposition and they answered the question about

23  whether this subject was discussed at that time, it is probative

24  to their -- their motive in changing the form in order to avoid

25  the very ramifications that's alleged in this case which is the

1    that the license provision applies.

2         The law is that the changing of a form -- and the law

3    that we cited to the defendants -- the changing of a form can be

4    construed as relevant evidence that you knew that without it --

5         THE COURT:  We talked about that --

6         MR. BUSCH:  Yes.

7         THE COURT:  Conduct versus performance.  We talked

8    about that.

9         MR. BUSCH:  And so the point is that they answered the

10   question at the deposition.  It was in their mind.

11        THE COURT:  Hold on.  I am losing you, though.  So

12   if -- you are going to get that evidence in?

13        MR. BUSCH:  Yes.

14        THE COURT:  All right.  But how is -- how is allowing

15   someone to answer that question any different than providing the

16   basis to a written privilege log when you say -- you see what I

17   am saying?  Isn't that a verbal privilege log?

18        MR. BUSCH:  No, sir.  If you have a written privilege

19   log and you say there's a communication between Lawyer A and

20   Lawyer B, you can craft what the topic is without disclosing the

21   subject matter or the potential substance of the communication.

22   This was much broader than that.  In fact, there are questions

23   and answers in there that actually were not even objected to on

24   privilege grounds, and the subject and the substance was, "Did

25   you guys discuss at the time that you were making these

1    decisions this issue?"  And there was an answer to that.  There
2    was an answer on the record to that and now they have gone back
3    and they realize that that answer is something that maybe they
4    shouldn't have allowed to be answered or didn't want to be
5    answered but it was answered.
6          THE COURT:  I think we have moved on to a different
7    topic, though.  I am confused now.
8          MR. BUSCH:  What do you mean?
9          MR. KLAUS:  Your Honor, I think that's correct.  If I
10   can just say very briefly, again we are talking about two
11   different sets of agreements.  The issue with respect to
12   Mr. Kenswil was were there discussions with groups of lawyers
13   within the company that you were part of about how you would pay
14   these agreements.  Mr. Kenswil is involved in the third party
15   agreements.
16         Mr. Busch has switched gears and is now talking about
17   changes to the Interscope form for paying artists.  That subject
18   was raised at Mr. Ostroff's deposition.  Mr. Ostroff is the
19   general counsel of the company.  He will be here to testify.  At
20   that deposition, the subject matter was phrased so precisely
21   that Mr. Pomerantz said, "I am not even going to let you answer
22   the question on privilege grounds about the subject matter."
23         But with respect to Mr. Kenswil, with respect to was
24   he party to discussions, were there discussions with lawyers
25   present at that time about how there would be an accounting for

1    payments under these third party agreements, that -- the

2    response that was given and the followup was who was involved.

3    Same thing you would have on the privilege log, which is A and

4    B, and then there was the instruction not to answer on the

5    substance of it.

6            That gave Mr. Busch -- that gave Mr. Busch what he

7    needed to decide whether he was going to file a motion to

8    compel.  And for 402/403 purposes, it really would be no

9    different than coming in and holding up a privilege log to the

10   jury.

11           MR. BUSCH:  Your Honor, without seeing the actual

12   questions and answers that they are claiming is privileged here,

13   I don't think that a real -- a real rational --

14           THE COURT:  That was the last thing I was going to ask

15   you to do.  When is he going to testify?  What time?

16           MR. BUSCH:  Well, tomorrow we have the conclusion of

17   Mark Bass and then we have, I believe, Michael Ostroff and Lisa

18   Rogell and then Kenswil, Mr. Kenswil.

19           THE COURT:  Well, get to me first thing in the morning

20   the portions of the depositions you are talking about.  First

21   thing, 8:30.

22           MR. BUSCH:  We will do that, Your Honor.

23           MR. KLAUS:  One other question with respect to

24   Mr. Kenswil.  Be very brief, which is there were a number of

25   questions that Mr. Busch asked that related to what

1    Mr. Kenswil's view of copyright law was and whether or not there

2    were elements of a copyright license in the third party

3    agreements.  They were objected to by Mr. Pomerantz.  We think

4    they should be excluded for the same reason that the prospective

5    expert testimony of Professor Menell was excluded, which is that

6    an inquisition into the meaning of copyright law is not within

7    the relevance of a fact witness and is more prejudicial than

8    probative.

9            THE COURT:  Mr. Busch, on that last issue?

10           MR. BUSCH:  I think, Your Honor, that they are trying

11   to get motions in limine now done that they didn't file.  If I

12   ask a question and they have an objection to it, they should

13   stand up and articulate an objection.  But for me to respond to

14   how I'm going to do my cross --

15           THE COURT:  That's fine.  That's fine.  I am alerted

16   to the objection.  We will deal with it.  But -- all right.

17   Mr. Pomerantz.  Let's wrap it up.

18           MR. POMERANTZ:  Mine are very easy, Your Honor.

19           THE COURT:  These have all been minor.

20           MR. POMERANTZ:  This is really easy and ministerial.

21   I am told that these gentlemen here need to know what you need

22   actually pulled out of the courtroom for the reception.

23           THE COURT:  All I need to do is have clean tables,

24   that's it.

25           MR. POMERANTZ:  Can we leave the wires on the floor?

1            THE COURT:  Yeah, leave the wires.  I just need clean

2    tables and to pack up your briefcases and put them into the ante

3    room.  But I think it was the way that the courtroom was left --

4    just that so I have clean tables.  But you can leave the screens

5    and your -- your equipment, but I just need to have the tables

6    area cleared off.  All right.

7            MR. POMERANTZ:  That's all I had, Your Honor.

8            THE COURT:  All right, thank you.

9            MR. POMERANTZ:  Oh, wait, wait, Mindy has -- Ms.

10   LeMoine has one other thing, I'm sorry.

11           MS. LeMOINE:  One last burning dispute.  What was

12   Your Honor's ruling on 82, Lines 4 through 7?  Mr. Gilford had

13   overruled and I had sustained so --

14           THE COURT:  What page was it on?

15           MS. LeMOINE:  I think it was on Page -- I have a

16   different page, Your Honor.  The page is 82, Lines 4 through 7.

17           THE COURT:  Overruled.

18           MS. LeMOINE:  Thank you.

19           THE COURT:  All right.  Thank you.

20                (Proceedings adjourned at 5:07 p.m.)

21

22

23

24

25

1                          CERTIFICATE

2

3        I hereby certify that pursuant to Section 753, Title 18,
  United States Code, the foregoing is a true and correct
4  transcript of the stenographically reported proceedings held in
  the above-entitled matter and that the transcript page format is
5  in conformance with the regulations of the Judicial Conference
  of the United States.

6  _____          _____
7  Pamela A. Seijas, CSR No. 3593              Date
  Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              I N D E X

2    WITNESSES FOR THE
     PLAINTIFF:          DIRECT      CROSS     REDIRECT    RECROSS
3
      GARY STIFFELMAN                  7          10
4     PETER PATERNO        15         38          49          54
                                                  56
5     JIMMY IOVINE         65         70          78
      JEFFREY IRWIN BASS   80         90         100         102
6                                                102

      MARK RANDY BASS     106
7

8

9

10   WITNESSES FOR THE
     DEFENSE:            DIRECT      CROSS     REDIRECT    RECROSS
11

12

13

14

15

16

17
     PLAINTIFF EXHIBITS:            MARKED           RECEIVED
18
      11                                              32
19

20

21
     DEFENSE EXHIBITS:             MARKED           RECEIVED
22

23

24

25
```

## $

**$0.09** [3] - 52:22, 52:25, 53:6
**$25,000** [2] - 66:22, 109:4
**$350,000** [2] - 44:11, 45:4

## '

**'73** [1] - 71:22
**'75** [1] - 72:5
**'80s** [3] - 28:7, 40:3
**'85** [1] - 74:2
**'88** [1] - 74:10
**'95** [2] - 106:22, 106:23
**'97** [1] - 85:5
**'98** [9] - 8:17, 13:10, 14:3, 37:14, 37:15, 49:20, 50:8, 85:5, 87:24

## 0

**0040** [1] - 49:14
**07-3314-PSG(MANx** [1] - 1:11

## 1

**1** [4] - 30:9, 121:17, 121:22, 122:21
**10** [6] - 12:8, 83:23, 98:4, 121:23, 122:17, 134:3
**10,000** [1] - 84:6
**10-minute** [1] - 111:6
**100** [1] - 134:5
**1006** [1] - 116:25
**101** [1] - 122:5
**102** [2] - 134:6, 134:5
**10250** [1] - 2:13
**103** [2] - 122:6, 122:7
**104** [2] - 122:7
**105** [3] - 122:8, 122:9
**106** [2] - 122:9, 134:6
**11** [13] - 21:3, 32:5, 32:8, 32:18, 32:21, 33:9, 88:2, 98:16, 122:1, 122:3, 122:16, 122:20, 134:18
**1100** [1] - 2:6
**117** [1] - 122:11
**11:45** [1] - 105:3
**12** [1] - 83:23

**12th** [1] - 54:21
**13** [4] - 44:22, 98:5, 98:14, 121:22
**14** [6] - 44:22, 62:19, 98:10, 121:22, 121:23, 122:17
**140** [1] - 122:13
**141** [1] - 122:14
**15** [5] - 104:12, 106:19, 106:24, 122:19, 134:4
**152** [1] - 122:16
**155** [1] - 122:16
**16** [4] - 83:23, 101:23, 122:4, 122:17
**17** [4] - 85:11, 122:4, 122:5, 122:18
**18** [9] - 44:11, 44:18, 121:20, 122:2, 122:9, 122:20, 133:3
**181** [1] - 122:17
**181-I** [1] - 1:24
**19** [6] - 75:11, 76:5, 88:13, 121:25, 122:4, 122:18
**1910's** [1] - 53:8
**197** [1] - 122:18
**1970** [1] - 70:23
**1973** [1] - 70:23
**1975** [1] - 72:4
**1978** [1] - 39:9
**198** [2] - 122:19
**1987** [1] - 73:25
**199** [2] - 122:20
**1990** [4] - 74:18, 75:6, 75:9, 75:14
**1992** [3] - 81:17, 82:2, 106:23
**1992/93** [1] - 81:15
**1993** [1] - 81:17
**1995** [13] - 82:2, 82:12, 82:13, 82:16, 83:5, 92:3, 92:8, 92:20, 93:18, 94:10, 95:12, 107:5, 107:6
**1996** [2] - 15:23, 40:12
**1997** [3] - 83:7, 85:3, 107:22
**1998** [54] - 7:23, 7:25, 12:6, 19:4, 19:16, 19:21, 20:15, 20:17, 21:9, 21:11, 22:15, 28:20, 29:16, 30:24, 34:7, 35:2, 35:10, 35:14, 35:23, 42:19, 43:9, 43:16, 43:22, 44:1, 44:15, 44:21, 45:21, 46:10, 47:21, 48:3, 51:6,

51:10, 51:11, 51:18, 52:3, 52:6, 54:25, 56:4, 56:7, 57:6, 63:10, 65:21, 65:22, 66:4, 85:4, 93:11, 93:14, 96:5, 96:8, 96:17, 99:10, 100:1, 100:3, 100:17
**1999** [3] - 19:4, 19:7, 101:20
**19TH** [1] - 2:14
**1:30** [1] - 3:2

## 2

**2** [8] - 1:19, 92:18, 121:19, 121:21, 121:22, 122:7, 122:11
**20** [4] - 44:4, 75:11, 104:12, 122:6
**200** [2] - 92:16, 122:21
**2000** [11] - 35:3, 88:16, 88:17, 89:14, 97:3, 97:8, 97:18, 97:22, 98:3, 98:7, 98:23
**2000/2001** [2] - 89:15, 90:1
**2001** [12] - 49:15, 49:17, 49:25, 51:22, 52:4, 56:22, 57:3, 88:17, 90:3, 91:14, 91:17, 125:24
**2001/2002** [2] - 68:10, 69:20
**2002** [1] - 56:5
**2003** [11] - 8:5, 12:6, 13:10, 14:4, 35:3, 35:4, 35:8, 35:22, 36:4, 37:14, 63:8
**2004** [1] - 8:6
**2009** [2] - 1:21, 3:1
**204** [1] - 122:21
**205** [1] - 122:22
**21** [2] - 121:19, 121:21
**213** [1] - 1:25, 2:25
**22** [4] - 121:19, 122:3, 122:9, 122:18
**23** [1] - 122:18
**230** [1] - 76:1
**24** [5] - 1:21, 3:1, 121:25, 122:5, 122:21
**240** [1] - 76:1
**24D** [2] - 95:1, 95:2
**24th** [3] - 61:10, 61:15, 61:17
**25** [4] - 98:18, 98:23,

122:6, 122:7
**255** [1] - 1:23
**259-3456** [1] - 2:8
**26-lawyer** [1] - 62:15

## 3

**3** [8] - 45:2, 121:20, 121:21, 121:23, 122:2, 122:10, 122:19
**30** [7] - 39:7, 63:18, 82:20, 82:21, 83:5, 103:16
**310** [1] - 2:16
**315** [1] - 2:5
**32** [1] - 134:18
**355** [1] - 2:22
**3593** [1] - 133:7
**35TH** [1] - 2:23
**37201** [1] - 2:7
**38** [1] - 134:4
**3:00** [2] - 41:1, 115:11
**3:30** [1] - 3:25
**3:45** [1] - 105:8

## 4

**4** [26] - 12:6, 12:8, 12:9, 12:11, 12:19, 22:11, 22:15, 22:17, 24:2, 24:8, 24:14, 25:8, 25:15, 25:20, 44:15, 121:24, 121:25, 122:5, 122:8, 122:11, 122:13, 122:14, 122:21, 132:12, 132:16
**40** [1] - 82:21
**402** [4] - 62:21, 62:23, 63:1, 63:25
**402/403** [1] - 130:8
**403** [5] - 62:21, 62:23, 63:1, 63:25, 126:16
**49** [1] - 134:4
**4:00** [3] - 3:25, 81:24, 106:21
**4:15** [2] - 3:25, 103:10
**4:30** [3] - 3:17, 3:20, 3:21
**4A** [2] - 7:24, 8:17
**4Ai** [1] - 47:15
**4A1** [1] - 44:17
**4C(v** [6] - 9:10, 24:18, 28:13, 28:21, 29:5, 29:9

**4C(v)** [3] - 7:23, 28:23, 47:24

## 5

**5** [11] - 12:8, 12:9, 32:23, 44:15, 58:7, 96:6, 122:4, 122:15, 122:16
**50** [4] - 6:9, 24:24, 27:3, 101:12
**50/50** [6] - 27:11, 27:12, 28:2, 28:6, 28:11, 48:11
**54** [1] - 134:4
**553-3000** [1] - 2:16
**56** [2] - 30:9, 134:4
**56429** [1] - 32:24
**58** [1] - 58:7
**5:00** [1] - 74:11
**5:07** [1] - 132:20
**5:30** [1] - 105:11
**5A** [2] - 46:13, 46:17

## 6

**6** [8] - 30:4, 30:11, 51:15, 51:18, 121:20, 122:22, 122:23, 122:24
**61** [1] - 58:7
**615** [1] - 2:8
**65** [2] - 121:19, 134:5
**66** [2] - 121:20
**66139** [1] - 31:4
**687-0446** [1] - 1:25
**687-3702** [1] - 2:25

## 7

**7** [11] - 49:9, 49:10, 49:24, 51:6, 54:20, 54:22, 121:25, 122:6, 132:12, 132:16, 134:3
**70** [2] - 55:4, 134:5
**72** [2] - 121:21
**73** [1] - 121:22
**753** [1] - 133:3
**78** [2] - 121:23, 134:5
**79** [1] - 121:23

## 8

**8** [7] - 58:7, 89:5, 122:3, 122:9, 122:16, 122:17, 122:19
**80** [2] - 55:4, 134:5

**81** [2] - 121:24
**82** [3] - 121:25,
132:12, 132:16
**85** [1] - 121:25
**8:30** [1] - 130:21

**9**

**9** [8] - 30:9, 98:2,
98:4, 104:24, 122:5,
122:8, 122:11, 122:16
**90** [1] - 134:5
**90012** [1] - 1:24
**90067** [1] - 2:15
**90071-1560** [1] - 2:24
**918A** [1] - 102:9
**93** [1] - 122:2
**96** [2] - 122:3
**97** [1] - 122:4
**99** [1] - 122:4
**9:00** [2] - 111:4,
115:5

**A**

**A1** [1] - 50:4
**abide** [2] - 95:25,
96:3
**abilities** [1] - 44:2
**able** [13] - 5:17,
45:13, 56:3, 93:19,
94:14, 94:17, 95:12,
104:21, 108:3, 108:6,
117:21, 124:14, 127:7
**above-entitled** [1] -
133:4
**Absolutely** [1] - 78:7
**Academy** [1] - 91:10
**acceptable** [3] -
103:13, 120:22, 121:3
**accompanied** [1] -
33:11
**accomplish** [1] -
75:17
**accordance** [1] -
113:8
**According** [2] -
88:13, 96:12
**according** [1] - 3:18
**account** [1] - 98:15
**accounting** [1] -
129:25
**accustomed** [1] -
18:11
**achieve** [1] - 82:10
**Act** [1] - 52:22
**act** [1] - 84:20
**acts** [1] - 109:3

**actual** [3] - 42:5,
116:19, 130:11
**add** [1] - 55:24
**added** [3] - 51:9,
52:5, 54:24
**address** [2] - 62:18,
98:16
**addressed** [4] - 6:17,
119:21, 124:11,
124:19
**adequately** [1] -
35:17
**adjourn** [1] - 110:25
**adjourned** [1] -
132:20
**admitted** [3] - 32:6,
46:17, 121:2
**Admitted** [1] - 32:20
**adult** [3] - 39:12,
39:13, 39:15
**adults** [1] - 39:13
**advance** [3] - 10:17,
10:25, 45:14
**Advances** [1] - 45:3
**advances** [5] -
10:12, 10:13, 10:14,
37:24, 96:13
**advised** [1] - 109:12
**affairs** [2] - 46:24,
84:22
**affiliated** [1] - 40:19
**afraid** [1] - 43:2
**Aftermath** [78] -
1:12, 4:19, 5:14, 5:16,
6:6, 9:14, 9:19, 9:24,
11:10, 11:16, 15:17,
15:22, 16:2, 16:5,
16:8, 16:12, 16:14,
16:17, 16:19, 17:14,
17:20, 17:21, 18:23,
19:22, 20:10, 21:9,
22:24, 24:9, 24:15,
30:9, 30:22, 30:25,
31:17, 32:23, 32:24,
33:4, 33:7, 34:8,
34:10, 37:19, 41:16,
41:17, 41:19, 41:24,
42:13, 43:7, 43:9,
43:10, 48:17, 50:8,
50:22, 51:18, 54:24,
55:2, 55:25, 66:4,
67:10, 67:13, 67:16,
79:3, 85:4, 87:21,
90:12, 90:18, 90:22,
90:24, 91:3, 91:12,
93:13, 96:8, 96:18,
97:9, 98:15, 99:5,
100:18, 109:17, 110:2
**Aftermath's** [1] -
87:2

**Aftermath/F.B.T** [5] -
20:5, 33:6, 33:19,
49:20, 51:8
**afternoon** [16] - 4:4,
7:21, 15:15, 38:25,
41:1, 65:10, 70:16,
80:23, 80:24, 105:4,
105:6, 105:7, 105:12,
106:10, 106:11,
115:23
**Afternoon** [1] - 4:5
**ago** [6] - 21:3, 24:1,
24:9, 52:9, 63:12,
63:18
**agree** [8] - 25:23,
25:24, 36:17, 78:17,
78:22, 78:23, 79:18,
112:23
**agreed** [4] - 24:12,
77:22, 113:9, 113:19
**agreement** [141] -
4:7, 4:25, 7:23, 7:25,
8:17, 9:10, 12:7, 13:3,
13:11, 14:3, 14:4,
16:7, 19:4, 19:5,
19:20, 19:22, 19:24,
20:1, 20:5, 20:12,
20:15, 20:17, 21:10,
21:16, 22:12, 22:15,
25:6, 25:13, 26:21,
28:14, 28:20, 29:1,
29:4, 29:16, 30:19,
30:25, 32:2, 32:11,
32:12, 32:13, 33:4,
33:6, 33:8, 33:19,
34:7, 35:2, 35:3, 35:4,
35:8, 35:10, 35:22,
35:23, 37:15, 37:20,
37:22, 38:4, 43:16,
43:22, 44:1, 44:15,
45:2, 46:4, 46:9,
46:20, 49:10, 49:15,
49:16, 49:20, 49:25,
50:9, 50:22, 51:6,
51:8, 51:9, 51:11,
51:12, 51:19, 51:21,
51:22, 52:3, 52:4,
52:6, 53:20, 53:25,
54:25, 55:2, 56:4,
56:18, 56:22, 62:23,
62:25, 63:6, 63:7,
63:8, 68:21, 69:6,
82:14, 86:22, 87:5,
90:12, 90:18, 90:22,
90:23, 91:3, 92:3,
92:8, 92:19, 92:22,
93:3, 93:4, 93:10,
93:14, 94:1, 94:25,
95:15, 95:17, 95:25,
96:5, 96:7, 96:10,

96:12, 96:13, 96:17,
97:4, 97:8, 97:11,
97:18, 97:22, 98:7,
98:23, 100:18, 115:14
**agreements** [45] -
5:14, 16:1, 16:4,
19:17, 20:10, 21:6,
29:19, 30:2, 31:17,
34:9, 34:16, 35:1,
36:19, 37:14, 37:23,
47:12, 53:15, 55:21,
56:23, 57:6, 57:8,
63:5, 63:7, 63:10,
63:14, 69:20, 93:21,
94:1, 95:18, 95:24,
96:2, 96:3, 96:18,
97:1, 98:24, 99:4,
110:1, 110:6, 110:7,
123:19, 129:11,
129:14, 129:15,
130:1, 131:3
**agrees** [1] - 37:20
**ahead** [5] - 24:13,
52:19, 56:12, 64:17,
98:10
**ahold** [1] - 85:11
**aims** [1] - 18:13
**air** [1] - 50:3
**al** [1] - 1:13
**album** [38] - 19:8,
27:25, 48:18, 71:19,
73:2, 73:3, 73:22,
73:25, 74:1, 74:2,
82:13, 82:19, 82:24,
83:1, 83:3, 83:12,
83:14, 83:23, 83:24,
84:3, 87:20, 88:1,
88:4, 88:9, 88:20,
88:22, 89:3, 91:21,
91:24, 101:8, 101:15,
101:19, 101:22,
101:25, 102:2,
107:19, 109:16,
109:22
**albums** [11] - 11:17,
27:22, 27:23, 73:20,
82:21, 82:22, 83:6,
87:17, 88:12, 101:15
**alert** [1] - 104:25
**alerted** [1] - 131:15
**alike** [1] - 108:25
**alleged** [1] - 127:25
**alleviate** [1] - 111:23
**allow** [6] - 6:12, 6:15,
68:22, 117:7, 126:1,
126:23
**allowed** [13] - 63:17,
121:1, 124:4, 124:22,
124:24, 125:1, 125:3,
125:16, 125:25,

126:9, 126:13,
127:16, 129:4
**allowing** [2] - 69:5,
128:14
**almost** [2] - 75:11,
103:10
**alone** [3] - 20:23,
33:11, 33:21
**alter** [1] - 83:13
**AM** [1] - 49:14
**amazing** [1] - 81:22
**ambiguous** [1] - 91:5
**amend** [4] - 62:7,
62:9, 62:11, 63:10
**amended** [2] - 63:7,
63:8
**amending** [1] - 62:5
**amendment** [1] -
63:11
**amount** [9] - 4:23,
5:10, 10:18, 11:3,
11:19, 12:3, 24:24,
45:7, 45:10
**Amy** [1] - 104:19
**AND** [1] - 2:9
**Angeles** [5] - 1:20,
1:24, 3:1, 85:6, 108:5
**ANGELES** [2] - 2:15,
2:24
**answer** [17] - 9:7,
48:25, 49:1, 57:24,
70:8, 91:1, 124:6,
124:22, 124:24,
125:12, 126:9,
128:15, 129:1, 129:2,
129:3, 129:21, 130:4
**Answer** [1] - 125:16
**answered** [15] -
27:19, 71:4, 125:1,
125:3, 125:4, 125:16,
125:25, 126:13,
126:20, 127:17,
127:22, 128:9, 129:4,
129:5
**answering** [3] - 66:9,
71:8, 72:8
**answers** [2] -
128:23, 130:12
**ante** [1] - 132:2
**anticipate** [3] - 55:5,
55:6, 55:16
**Apartments** [1] -
68:4
**apologize** [2] - 33:2,
100:9
**appear** [1] - 27:13
**APPEARANCES** [1] -
2:1
**Apple** [6] - 6:18,
54:2, 56:24, 68:12,

68:13, 68:22, 68:24, 69:6, 69:23
**Apple/iTunes** [1] - 53:25
**apples** [1] - 6:1
**applicability** [1] - 14:6
**applicable** [1] - 50:4
**applied** [1] - 24:2
**applies** [12] - 8:10, 8:21, 9:1, 9:5, 9:13, 24:9, 28:15, 28:21, 28:23, 29:9, 29:11, 128:1
**apply** [8] - 9:23, 14:9, 28:24, 28:25, 29:13, 56:25, 63:12, 63:13
**approach** [2] - 15:1, 92:10
**approximate** [1] - 75:3
**area** [3] - 39:4, 76:22, 132:6
**argue** [3] - 114:4, 115:23, 120:17
**argument** [4] - 5:10, 62:21, 119:18, 119:22
**arguments** [1] - 127:13
**Aronson** [2] - 46:22, 46:23
**arranged** [1] - 89:2
**articulate** [1] - 131:13
**artist** [25] - 5:15, 10:19, 10:22, 11:20, 11:23, 12:3, 17:10, 34:3, 40:16, 42:11, 43:3, 44:12, 44:21, 44:24, 45:11, 52:20, 52:24, 70:3, 71:7, 92:19, 94:1, 101:13, 107:4
**artists** [19] - 16:1, 17:17, 39:5, 39:25, 42:1, 43:21, 45:13, 73:11, 75:20, 76:2, 79:20, 81:9, 82:17, 92:5, 93:19, 101:10, 110:17, 129:17
**ARY** [1] - 5:13
**aside** [2] - 14:10, 91:20
**assertion** [1] - 126:23
**assigned** [1] - 40:19
**assist** [1] - 45:25
**assisted** [1] - 45:15
**associate** [1] - 45:22

**assume** [2] - 7:5, 115:7
**assuming** [1] - 114:7
**ATO** [1] - 101:13
**attached** [1] - 75:20
**attention** [10] - 10:11, 37:16, 43:4, 46:3, 66:7, 66:11, 68:9, 76:12, 95:15, 95:17
**attorney** [7] - 11:18, 15:17, 15:21, 86:16, 86:18, 86:19, 87:2
**attorneys** [1] - 101:5
**attributable** [1] - 31:12
**audience** [1] - 85:10
**audit** [2] - 37:24, 38:5
**audits** [1] - 38:16
**aunt** [1] - 84:10
**authority** [1] - 84:20
**AVENUE** [1] - 2:22
**avoid** [1] - 127:24
**award** [2] - 88:4, 109:19
**Award** [1] - 88:5, 88:6, 91:10
**awards** [1] - 90:6

**B**

**B-A-S-S** [2] - 80:20, 106:6
**background** [8] - 39:1, 45:20, 75:18, 75:21, 81:11, 81:12, 81:14
**bad** [1] - 112:12
**bag** [1] - 85:22
**balance** [1] - 18:7
**BALLOW** [1] - 2:3
**band** [2] - 72:17, 72:18
**bands** [2] - 40:4, 76:7
**base** [1] - 89:25
**based** [4] - 56:11, 57:23, 61:19, 83:14
**basement** [1] - 81:23
**basic** [1] - 75:13
**basis** [3] - 35:17, 126:1, 128:16
**Bass** [41] - 3:15, 3:17, 19:11, 64:9, 64:14, 66:16, 67:15, 68:3, 77:4, 77:5, 77:10, 78:2, 78:8, 80:4, 80:11, 80:12,

80:17, 80:20, 80:23, 80:25, 90:19, 92:13, 92:19, 95:12, 98:4, 98:8, 99:7, 101:2, 102:7, 103:15, 105:4, 105:24, 106:2, 106:6, 106:10, 106:12, 109:25, 130:17
**BASS** [2] - 134:5, 134:6
**Bass's** [1] - 78:16
**batch** [1] - 113:7
**Bates** [1] - 31:4
**battle** [2] - 84:8, 85:9
**bears** [1] - 37:6
**Beatles** [3] - 52:25, 53:4
**beats** [4] - 41:2, 41:4, 41:5, 41:6
**Beats** [1] - 41:3
**became** [4] - 14:12, 28:11, 72:14, 73:18
**become** [2] - 73:10, 95:6
**bed** [1] - 41:3
**began** [2] - 83:8, 89:12
**begin** [1] - 89:12
**beginning** [5] - 40:12, 56:22, 75:10, 86:5, 90:1
**behalf** [8] - 19:22, 34:8, 34:18, 84:21, 95:20, 95:24, 98:8, 98:12
**belief** [2] - 83:9, 99:3
**below** [1] - 23:2
**bench** [1] - 30:8
**beneficial** [1] - 115:21
**Berman** [3] - 117:16, 118:22, 119:17
**best** [7] - 19:8, 55:6, 55:16, 56:1, 90:7, 90:8, 109:22
**Best** [4] - 8:22, 9:25, 25:21, 26:3
**better** [8] - 34:2, 34:3, 55:20, 56:2, 77:25, 114:2, 119:1, 119:4
**between** [23] - 27:15, 34:10, 41:23, 47:19, 48:2, 54:1, 56:24, 67:21, 69:21, 72:17, 79:3, 82:14, 83:7, 83:19, 83:20, 85:4, 86:12, 97:9, 106:25, 107:5, 107:17, 110:2, 128:19

**Between** [1] - 82:2
**big** [3] - 40:7, 82:4, 89:8
**biggest** [3] - 70:3, 102:8, 102:9
**Billion** [1] - 70:9
**billion** [1] - 70:11
**binder** [6] - 30:10, 30:12, 92:9, 92:12, 116:8, 116:11
**bit** [5] - 40:13, 70:19, 82:19, 123:13, 125:9
**Black** [1] - 76:7
**Blackstreet** [1] - 76:6
**bless** [1] - 77:25
**blink-182** [1] - 43:20
**BLOCK** [1] - 2:12
**Blood** [1] - 73:23
**Bloomfield** [2] - 81:1, 81:3
**board** [3] - 7:24, 8:9, 71:16
**Bogart** [2] - 85:11, 85:21
**book** [3] - 14:24, 65:1, 98:3
**books** [1] - 11:21
**born** [1] - 74:10
**Born** [2] - 73:2
**borrow** [1] - 84:9
**bottom** [2] - 12:10, 12:16
**BOULEVARD** [1] - 2:13
**boundaries** [1] - 58:4
**boy** [1] - 85:16
**break** [12] - 3:22, 39:8, 58:6, 72:5, 102:12, 104:6, 104:10, 104:11, 105:1, 105:3, 105:8, 111:6
**break-out** [1] - 102:12
**Brian** [1] - 40:5
**brief** [4] - 74:17, 100:24, 102:7, 130:24
**briefcases** [1] - 132:2
**briefed** [1] - 113:14
**briefly** [7] - 6:1, 32:5, 54:19, 63:3, 80:5, 117:5, 129:10
**bring** [7] - 7:16, 36:4, 37:24, 38:16, 41:5, 44:14, 46:13, 54:20, 64:17, 81:17, 82:8, 92:14, 92:16,

104:11, 105:21, 110:16, 114:5
**broader** [3] - 34:1, 125:9, 128:22
**Bros** [1] - 43:8
**brother** [12] - 81:19, 82:4, 82:23, 84:1, 86:2, 86:3, 87:16, 92:5, 106:14, 107:18, 107:23, 110:8
**brothers** [1] - 106:12
**Brothers** [1] - 39:12
**brought** [5] - 36:6, 66:10, 66:15, 82:5, 125:11
**Bruce** [7] - 72:9, 72:25, 73:5, 73:7, 73:17, 76:3
**Bruce's** [3] - 72:14, 72:15
**Building** [1] - 1:23
**bunch** [2] - 67:5, 77:12
**burning** [1] - 132:11
**BUSCH** [106] - 2:4, 5:5, 6:13, 6:25, 7:4, 7:9, 7:12, 7:15, 10:7, 10:9, 11:15, 12:4, 13:7, 13:25, 14:14, 14:19, 14:23, 14:25, 15:14, 18:21, 30:7, 32:17, 32:22, 33:2, 37:9, 37:13, 49:4, 49:7, 50:7, 50:12, 50:16, 50:18, 50:20, 54:4, 54:13, 54:15, 56:10, 56:14, 57:12, 57:23, 58:3, 61:11, 61:16, 62:7, 63:3, 63:5, 64:5, 64:9, 64:16, 64:21, 65:3, 65:9, 68:19, 78:11, 78:13, 79:22, 80:4, 80:9, 80:22, 90:14, 91:4, 100:23, 101:1, 102:4, 102:21, 102:23, 103:1, 103:5, 103:10, 103:16, 103:21, 103:24, 104:1, 105:24, 106:9, 111:14, 111:18, 111:25, 112:3, 112:11, 112:17, 117:5, 120:20, 121:6, 121:14, 123:3, 123:6, 123:9, 123:12, 124:19, 124:21, 125:9, 125:19, 126:6, 126:11, 127:8, 127:12, 128:6, 128:9,

128:13, 128:18, 129:8, 130:11, 130:16, 130:22, 131:10
**Busch** [38] - 3:8, 3:10, 4:18, 4:20, 4:25, 5:3, 6:2, 6:24, 18:20, 33:1, 42:18, 47:15, 47:23, 48:6, 54:9, 54:23, 64:8, 65:1, 68:17, 70:18, 76:11, 90:21, 91:19, 115:7, 115:14, 116:8, 118:21, 123:23, 124:4, 124:7, 124:14, 124:18, 126:23, 129:16, 130:6, 130:25, 131:9
**Busch's** [1] - 116:15
**business** [14] - 17:18, 42:12, 46:24, 65:25, 70:22, 81:3, 81:6, 81:8, 84:22, 93:23, 93:24, 100:5, 109:6, 109:7
**buy** [3] - 5:4, 42:14, 42:16
**Buy** [3] - 8:22, 25:21, 26:4
**buzz** [2] - 84:7, 84:11
**BY** [27] - 2:12, 2:19, 7:20, 10:9, 11:15, 12:4, 13:7, 13:25, 15:14, 32:22, 37:13, 38:24, 49:7, 50:7, 54:18, 56:14, 65:9, 68:19, 70:15, 78:13, 80:22, 90:17, 91:8, 101:1, 102:6, 102:23, 106:9

### C

**CA** [2] - 2:15, 2:24
**cable** [1] - 50:1
**CALIFORNIA** [1] - 1:2
**California** [7] - 1:20, 1:24, 3:1, 85:8, 85:10, 110:16
**Candidly** [1] - 13:12
**cans** [2] - 42:16, 42:17
**capable** [1] - 73:15
**capacity** [1] - 11:17
**car** [1] - 108:16
**care** [1] - 114:25
**career** [3] - 40:11, 65:24, 83:7

**careful** [1] - 115:3
**cartridges** [1] - 33:14
**Case** [1] - 1:10
**case** [20] - 4:10, 4:23, 5:2, 5:7, 25:18, 35:1, 63:20, 63:23, 79:7, 95:18, 104:13, 104:14, 111:1, 111:3, 114:1, 114:4, 114:6, 117:18, 127:13, 127:25
**cases** [2] - 28:3, 55:18
**cassette** [1] - 9:2
**cassettes** [4] - 33:14, 55:13, 82:22, 94:4
**catalog** [2] - 68:13, 69:5
**CC** [1] - 46:15
**cc** [1] - 47:1
**CD** [7] - 8:22, 67:4, 85:12, 85:13, 85:21, 94:12, 102:9
**CD's** [1] - 55:14
**CDs** [6] - 67:5, 85:17, 85:19, 108:5, 108:7, 108:12
**Cent** [2] - 6:9, 101:12
**CENTRAL** [1] - 1:2
**certain** [10] - 6:17, 28:15, 28:22, 57:25, 69:4, 100:15, 101:8, 116:15, 117:17, 127:13
**certainly** [4] - 3:12, 30:21, 36:14, 117:22
**CERTIFICATE** [1] - 133:1
**certify** [1] - 133:3
**chairman** [3] - 65:15, 65:16, 69:1
**change** [5] - 15:3, 55:2, 55:5, 56:16, 56:23
**changed** [2] - 56:21, 57:5
**changes** [6] - 46:9, 46:11, 55:17, 55:23, 94:7, 129:17
**changing** [4] - 36:10, 127:24, 128:2, 128:3
**channel** [7] - 25:19, 25:20, 26:4, 26:7, 26:8, 26:13, 26:15
**channels** [6] - 8:9, 25:22, 47:16, 47:21, 48:24, 124:2
**character** [2] - 83:15,

83:17
**charge** [1] - 123:18
**charity** [1] - 74:4
**cheaper** [1] - 45:13
**check** [1] - 109:4
**Cheetah** [2] - 39:13, 39:15
**chorus** [1] - 41:7
**chose** [3] - 19:23, 97:16, 100:17
**Christmas** [2] - 74:1, 74:3
**circumstances** [1] - 16:6
**cited** [1] - 128:3
**City** [1] - 9:25
**claiming** [1] - 130:12
**clean** [4] - 35:13, 131:23, 132:1, 132:4
**cleaned** [1] - 71:4
**cleaning** [1] - 71:3
**clear** [5] - 7:11, 56:25, 57:8, 93:17, 104:4
**cleared** [2] - 105:13, 132:6
**clearly** [2] - 5:11, 63:11
**CLERK** [9] - 15:5, 15:8, 15:10, 64:22, 64:25, 65:4, 80:18, 105:25, 106:3
**client** [5] - 6:3, 40:7, 44:7, 44:9, 56:17
**clients** [2] - 19:17, 71:10
**Clinton** [1] - 101:12
**Clive** [1] - 73:12
**close** [10] - 7:14, 54:11, 57:16, 57:18, 71:22, 72:20, 114:17, 114:18, 114:20, 124:13
**closed** [1] - 6:18
**closing** [1] - 57:21
**club** [10] - 13:14, 23:19, 26:21, 26:22, 27:22, 48:7, 48:11, 48:15, 48:18, 48:19
**club's** [1] - 48:22
**clubs** [5] - 27:1, 52:9, 52:10, 52:12
**co** [2] - 16:17, 41:19
**co-owned** [2] - 16:17, 41:19
**Coast** [2] - 40:15, 40:16
**Code** [1] - 133:3
**Cole** [1] - 40:7
**college** [1] - 70:24

**combination** [1] - 27:2
**coming** [8] - 23:19, 44:1, 74:11, 110:15, 124:13, 125:10, 127:2, 130:9
**commenced** [3] - 80:6, 103:9, 103:25
**comments** [2] - 29:23, 78:16
**communicated** [1] - 35:8
**communication** [3] - 125:20, 128:19, 128:21
**communications** [1] - 124:10
**companies** [8] - 57:7, 61:25, 79:14, 79:18, 108:12, 109:5, 110:19
**company** [22] - 6:7, 11:19, 11:22, 26:12, 26:17, 28:3, 39:8, 39:10, 48:17, 53:4, 55:3, 74:14, 93:5, 96:8, 99:10, 108:17, 110:18, 123:25, 129:13, 129:19
**company's** [1] - 26:13
**compared** [2] - 11:20, 38:11
**comparison** [1] - 6:2
**compel** [2] - 124:9, 130:8
**Compel** [1] - 126:25
**competition** [1] - 17:17
**competitors** [1] - 17:19
**compilation** [3] - 9:25, 53:20, 112:24
**compiled** [1] - 116:13
**compiler** [1] - 53:21
**complete** [1] - 91:16
**completed** [1] - 89:22
**completely** [1] - 6:7
**Compound** [1] - 13:22
**comprised** [4] - 6:8, 6:9
**compute** [1] - 98:15
**computer** [2] - 30:13, 30:15
**concentrated** [1] - 39:4
**concepts** [1] - 14:6

**concern** [1] - 62:12
**concerned** [3] - 17:15, 58:1, 119:15
**concerning** [1] - 16:19
**concerns** [1] - 4:16
**conclude** [1] - 52:5
**concluded** [1] - 35:22
**conclusion** [1] - 130:16
**conditional** [2] - 125:14, 125:23
**conditions** [1] - 37:21
**Conduct** [1] - 128:7
**conference** [6] - 80:6, 80:16, 103:9, 103:19, 103:25, 104:8
**Conference** [1] - 133:5
**confident** [1] - 3:21
**confidential** [3] - 4:23, 6:19, 57:19
**confidentiality** [2] - 6:23, 57:20
**configuration** [1] - 94:2, 102:6
**configurations** [3] - 94:7, 94:15, 94:18
**conformance** [1] - 133:5
**confused** [5] - 14:5, 75:5, 80:15, 112:16, 129:7
**confusion** [1] - 111:23
**connecting** [1] - 108:7
**connection** [23] - 4:16, 16:7, 20:12, 25:12, 25:19, 31:13, 31:16, 34:25, 35:8, 36:17, 43:15, 45:16, 46:3, 86:14, 87:5, 87:17, 88:1, 100:5, 101:3, 107:8, 107:19, 109:12, 110:6
**consecutively** [1] - 39:7
**consents** [2] - 38:5, 38:16
**consider** [1] - 39:12
**consideration** [1] - 127:14
**constantly** [1] - 107:21
**CONSTELLATION** [1] - 2:13
**construed** [1] -

128:4
  **consult** [1] - 34:13
  **consumer** [3] - 8:23, 9:3, 9:6
  **contact** [2] - 99:17, 99:19
  **contained** [3] - 37:21, 50:8, 56:18
  **contains** [1] - 22:7
  **contests** [1] - 84:14
  **context** [3] - 13:3, 14:4, 31:19
  **continued** [1] - 99:16
  **continues** [1] - 13:20
  **contract** [19] - 5:9, 5:21, 44:10, 45:8, 51:13, 79:3, 79:4, 79:5, 79:19, 86:9, 86:11, 86:20, 87:7, 93:8, 93:12, 93:13, 99:15, 107:8, 116:9
  **Contract** [1] - 125:7
  **contracts** [14] - 27:8, 27:10, 32:9, 55:4, 79:5, 79:9, 79:12, 79:15, 84:24, 87:8, 87:9, 101:4, 107:9, 120:3
  **contractually** [1] - 97:19
  **contrary** [1] - 63:22
  **contributed** [1] - 19:2
  **controls** [2] - 23:12, 23:15
  **convenient** [1] - 27:20
  **conversation** [2] - 8:13, 110:14
  **conversations** [6] - 14:1, 14:6, 46:5, 68:12, 69:3, 69:13
  **convey** [1] - 67:2
  **convincing** [1] - 42:6
  **Cool** [1] - 77:25
  **cool** [2] - 23:22, 30:13
  **copies** [3] - 82:20, 84:6, 111:21
  **copy** [3] - 30:5, 121:12, 121:15
  **Copyright** [1] - 52:21
  **copyright** [3] - 131:1, 131:2, 131:6
  **core** [1] - 89:24
  **correct** [80] - 8:23, 9:3, 9:4, 9:6, 9:8, 9:15, 9:21, 9:25, 15:18, 16:12, 16:22, 17:21, 20:6, 21:17,

21:19, 22:3, 22:24, 23:4, 23:6, 23:12, 24:15, 25:4, 26:5, 26:15, 27:23, 28:4, 28:20, 28:22, 29:1, 29:5, 30:20, 30:22, 30:25, 32:11, 34:6, 41:20, 49:11, 49:16, 49:20, 50:9, 51:10, 51:19, 63:18, 65:25, 66:6, 87:3, 88:6, 91:24, 92:4, 92:7, 92:20, 92:25, 93:21, 95:20, 95:23, 95:25, 96:3, 96:8, 96:19, 97:1, 97:2, 97:3, 97:5, 97:9, 97:12, 97:15, 97:24, 98:8, 98:12, 100:12, 100:14, 102:10, 102:11, 102:12, 102:13, 102:19, 117:2, 129:9, 133:3
  **Correct** [8] - 9:22, 29:2, 91:18, 93:1, 96:1, 97:13, 99:11, 100:13
  **cost** [3] - 10:20, 36:20, 127:2
  **costs** [9] - 31:13, 36:23, 36:24, 36:25, 37:1, 37:4, 37:5, 37:6
  **cough** [1] - 35:18
  **counsel** [7] - 80:5, 104:25, 112:6, 124:5, 124:9, 129:19
  **count** [1] - 55:13
  **country** [1] - 84:9
  **couple** [11] - 3:6, 7:22, 30:3, 36:16, 44:3, 47:3, 52:8, 69:25, 100:23, 104:7, 115:10
  **course** [12] - 43:25, 57:17, 71:18, 79:11, 79:13, 96:16, 96:23, 97:7, 126:19
  **COURT** [145] - 1:1, 3:5, 4:2, 4:5, 4:13, 5:3, 5:25, 6:12, 6:24, 7:2, 7:7, 7:10, 7:13, 7:16, 7:18, 10:6, 11:14, 12:1, 13:6, 13:24, 14:18, 14:20, 14:22, 15:1, 15:4, 18:20, 32:20, 33:1, 37:12, 38:22, 49:5, 50:6, 50:14, 50:17, 50:19, 54:6, 54:10, 54:14, 54:16, 56:12,

57:14, 58:2, 58:5, 61:7, 61:9, 61:12, 61:14, 62:6, 62:17, 63:4, 63:24, 64:6, 64:8, 64:13, 64:17, 64:20, 65:1, 65:7, 68:18, 79:24, 80:1, 80:3, 80:5, 80:7, 80:10, 80:12, 80:15, 90:15, 91:6, 92:10, 100:22, 103:2, 103:4, 103:7, 103:14, 103:18, 103:20, 103:23, 104:5, 104:9, 104:17, 105:6, 105:15, 105:20, 105:23, 106:7, 110:25, 111:6, 111:9, 111:15, 111:20, 111:22, 112:2, 112:10, 112:12, 112:25, 113:4, 113:14, 113:17, 113:24, 114:12, 114:19, 115:17, 116:21, 117:3, 117:10, 117:25, 118:9, 118:25, 119:12, 120:12, 120:15, 121:5, 121:7, 121:13, 121:17, 123:5, 123:7, 123:10, 123:14, 124:18, 124:20, 125:5, 125:18, 126:2, 126:10, 126:15, 127:5, 127:10, 128:5, 128:7, 128:11, 128:14, 129:6, 130:14, 130:19, 131:9, 131:15, 131:19, 131:23, 132:1, 132:8, 132:14, 132:17, 132:19
  **Court** [2] - 57:20, 122:25
  **court** [5] - 4:24, 15:5, 64:23, 106:1, 125:2
  **Court's** [3] - 104:1, 111:12, 113:8
  **courtroom** [15] - 4:10, 6:18, 7:11, 7:14, 57:16, 57:18, 57:21, 61:8, 64:1, 92:14, 104:6, 104:10, 105:11, 131:22, 132:3
  **courts** [3] - 55:8, 120:21, 120:25
  **cover** [3] - 46:16, 53:5, 58:5

**covered** [7] - 29:1, 29:4, 29:5, 35:17, 38:11, 38:18, 56:2
  **craft** [2] - 20:5, 128:20
  **crazy** [1] - 77:14
  **create** [1] - 41:4
  **created** [7] - 7:24, 70:7, 83:16, 90:1, 95:14, 97:9
  **creates** [1] - 41:7
  **creative** [4] - 41:25, 42:11, 69:8, 87:9
  **credited** [1] - 31:11
  **cross** [8] - 50:11, 118:13, 118:18, 118:24, 119:6, 119:21, 120:16, 131:14
  **Cross** [2] - 38:22, 90:15
  **CROSS** [6] - 7:19, 38:23, 70:14, 90:16, 134:2, 134:10
  **cross-examination** [7] - 50:11, 118:13, 118:18, 118:24, 119:6, 119:21, 120:16
  **CROSS-EXAMINATION** [4] - 7:19, 38:23, 70:14, 90:16
  **Cross-examination** [1] - 38:22
  **crossed** [3] - 57:10, 63:13, 98:17
  **CSI** [1] - 9:20
  **CSR** [2] - 1:22, 133:7
  **Cube** [1] - 40:18
  **Cue** [3] - 111:10, 111:12, 121:9
  **Curtain** [2] - 91:22, 91:23
  **custom** [1] - 11:25
  **customer** [1] - 50:2
  **CV** [1] - 1:11
  **Cypress** [1] - 40:5

## D

**D12** [1] - 101:12
  **dad** [3] - 70:24, 71:1, 74:2
  **Darkness** [1] - 73:3
  **Date** [1] - 133:7
  **David** [1] - 117:15
  **Davis** [1] - 73:12
  **day-to-day** [3] - 34:17, 42:9, 84:22

**days** [4] - 17:6, 17:12, 72:22, 115:10
  **dba** [1] - 1:12
  **deadlines** [1] - 113:8
  **deal** [24] - 7:3, 16:8, 16:12, 16:23, 17:1, 17:5, 17:9, 32:15, 38:12, 38:19, 43:13, 44:6, 44:9, 44:10, 55:10, 55:18, 77:14, 82:7, 105:20, 108:13, 109:10, 109:12, 117:7, 131:16
  **dealing** [1] - 43:25
  **deals** [5] - 17:12, 42:10, 50:23, 50:25, 55:25
  **Dean** [1] - 66:8
  **decade** [1] - 96:24
  **decide** [1] - 130:7
  **decided** [6] - 35:16, 36:4, 73:7, 74:11, 108:5, 118:11
  **decisions** [2] - 55:8, 129:1
  **defendant** [1] - 5:13
  **DEFENDANT** [1] - 2:18
  **Defendants** [1] - 1:14
  **defendants** [4] - 5:12, 120:24, 127:12, 128:3
  **defendants'** [6] - 5:6, 111:10, 113:20, 119:20, 121:7, 127:13
  **defense** [1] - 119:18
  **DEFENSE** [2] - 134:10, 134:21
  **define** [2] - 29:25, 126:12
  **defined** [1] - 22:8
  **defines** [1] - 95:2
  **definition** [24] - 20:16, 20:18, 20:19, 21:1, 21:5, 21:8, 21:14, 21:15, 21:18, 21:20, 21:22, 22:3, 29:16, 29:20, 29:24, 31:3, 31:21, 33:3, 33:5, 33:9, 33:18, 33:20, 34:2, 34:3
  **definitions** [1] - 29:21
  **deliberations** [1] - 116:12
  **deliver** [1] - 10:19
  **delivered** [2] - 91:2, 91:12
  **delivering** [1] - 10:20

**demo** [2] - 76:13, 76:15
**demonstrative** [1] - 116:11
**demonstratives** [2] - 116:18, 116:22
**denied** [2] - 14:18, 117:18
**deny** [1] - 62:19
**denying** [1] - 68:7
**department** [1] - 85:17
**depo** [2] - 105:18, 120:19
**deposition** [21] - 4:17, 18:2, 18:17, 29:8, 31:20, 31:23, 111:10, 111:11, 121:8, 122:25, 123:21, 124:7, 124:8, 125:1, 125:25, 126:9, 126:14, 127:22, 128:10, 129:18, 129:20
**depositions** [3] - 126:24, 127:15, 130:20
**derivatives** [1] - 95:3
**derives** [1] - 53:7
**describe** [1] - 82:2
**described** [1] - 53:14
**describes** [1] - 22:23
**designation** [1] - 105:18
**designations** [1] - 120:19
**detailed** [2] - 28:5, 62:8
**details** [2] - 66:19, 69:11
**Detroit** [2] - 100:12, 104:3
**develop** [1] - 44:1
**developed** [1] - 82:3
**development** [1] - 83:7
**died** [1] - 74:2
**difference** [1] - 83:20
**different** [19] - 6:7, 17:15, 25:7, 25:14, 27:16, 55:9, 55:11, 62:9, 72:23, 101:16, 109:2, 127:8, 127:15, 128:15, 129:6, 129:11, 130:9, 132:16
**difficult** [1] - 120:11
**difficulty** [1] - 113:25
**digital** [4] - 36:18, 55:15, 68:13, 72:21
**Dire** [1] - 73:24

**dire** [3] - 117:20, 118:2, 118:23
**DIRECT** [6] - 15:13, 65:8, 80:21, 106:8, 134:2, 134:10
**direct** [16] - 10:11, 26:25, 31:12, 37:16, 50:1, 50:15, 50:17, 54:9, 63:19, 64:13, 64:15, 66:3, 68:9, 80:10, 97:8, 118:16
**direction** [1] - 20:3
**directly** [9] - 27:7, 43:9, 63:21, 63:22, 69:3, 93:15, 96:10, 96:13, 98:16
**directs** [1] - 98:15
**disagree** [2] - 62:17, 62:18
**disagreed** [2] - 113:20
**disclosing** [1] - 128:20
**discovered** [1] - 106:17
**discretion** [3] - 116:21, 116:23, 117:13
**discs** [4] - 33:13, 36:21, 36:22, 37:2
**discuss** [7] - 104:12, 105:19, 111:1, 115:13, 117:23, 125:22, 128:25
**discussed** [10] - 14:16, 35:22, 69:4, 124:13, 125:3, 125:11, 125:18, 126:4, 127:16, 127:23
**discussing** [4] - 5:12, 8:7, 44:19, 45:5
**discussion** [6] - 13:9, 13:18, 36:7, 124:7, 125:13, 127:6
**discussions** [11] - 16:18, 48:2, 68:20, 123:24, 124:5, 124:14, 124:17, 125:7, 129:12, 129:24
**Disney** [2] - 39:13, 39:14
**dispute** [1] - 132:11
**disputed** [2] - 112:23, 113:9
**distribute** [5] - 37:2, 48:18, 93:20, 94:18, 95:13
**distributed** [3] - 20:24, 33:11, 33:22
**distributing** [1] -

92:24
**distribution** [6] - 26:25, 28:3, 36:24, 36:25, 37:1, 37:3
**DISTRICT** [2] - 1:1, 1:2
**divided** [1] - 18:24
**division** [1] - 41:22
**docks** [1] - 71:1
**document** [1] - 46:18
**documents** [5] - 46:1, 65:3, 117:1, 117:6, 117:9
**Dog** [2] - 40:18, 41:6
**dollar** [1] - 10:25
**dollars** [8] - 10:13, 10:14, 10:25, 70:9, 70:11, 74:8, 96:25, 99:4
**Don** [1] - 62:1
**done** [23] - 16:23, 17:1, 17:9, 35:14, 36:3, 39:21, 42:8, 46:5, 51:13, 51:21, 54:14, 55:19, 58:2, 64:5, 73:14, 75:15, 81:13, 87:17, 101:13, 115:15, 131:11
**door** [3] - 5:12, 5:22, 62:13
**Doubt** [1] - 76:6
**doubt** [1] - 93:7
**Doug** [1] - 68:25
**down** [14] - 12:9, 12:12, 14:22, 18:20, 22:13, 33:1, 41:12, 46:15, 49:23, 61:7, 71:1, 80:1, 103:4, 108:24
**download** [2] - 57:7, 120:4
**downloads** [13] - 8:10, 14:7, 53:15, 62:12, 68:14, 78:6, 120:2, 123:20, 124:1, 125:14, 125:15, 125:23, 125:24
**downstairs** [2] - 103:21, 104:2
**Dr** [50] - 4:18, 4:19, 5:4, 5:13, 5:14, 5:17, 6:5, 6:8, 6:16, 6:20, 6:23, 16:13, 16:16, 16:18, 16:22, 17:14, 18:11, 18:13, 19:1, 19:3, 34:19, 34:20, 40:5, 40:9, 40:10, 40:17, 40:19, 40:21, 41:19, 41:23, 41:25, 42:22,

43:3, 43:11, 45:12, 67:2, 76:15, 76:16, 85:25, 102:2, 102:18, 102:25, 108:8, 108:14, 108:16, 108:19, 108:21
**draft** [7] - 16:4, 19:17, 27:14, 27:21, 47:5, 79:16, 79:19
**drafted** [8] - 15:25, 19:21, 27:8, 30:19, 34:8, 56:17, 63:15, 79:15
**drafting** [4] - 20:10, 34:9, 34:15, 45:25
**drafts** [3] - 46:9, 46:19, 47:11
**Dre** [54] - 5:4, 5:13, 5:14, 5:17, 6:8, 6:16, 6:20, 16:13, 16:16, 16:18, 16:22, 17:2, 17:14, 18:11, 18:13, 19:3, 19:9, 34:19, 34:20, 40:5, 40:9, 40:10, 40:13, 40:14, 40:17, 40:21, 41:6, 41:19, 41:23, 42:8, 42:10, 42:22, 43:1, 43:3, 43:11, 43:12, 45:12, 67:2, 67:4, 67:5, 67:12, 76:15, 76:16, 76:17, 85:25, 102:2, 102:18, 102:25, 108:8, 108:14, 108:16, 108:19, 108:21
**Dre's** [7] - 4:18, 4:19, 6:5, 6:23, 19:1, 40:19, 41:25
**Dreamboy** [1] - 101:15
**dressed** [1] - 108:25
**drop** [1] - 72:11
**drums** [2] - 41:11, 89:25
**during** [5] - 7:4, 57:17, 87:12, 99:16, 123:24

**E**

**EADES** [1] - 2:20
**ear** [1] - 115:24
**early** [8] - 7:6, 28:7, 64:10, 105:2, 105:8, 114:16, 114:23
**earn** [2] - 10:22, 97:19
**easier** [2] - 111:15, 111:23

**easiest** [1] - 113:17
**East** [1] - 1:23
**easy** [2] - 131:18, 131:20
**Eddy** [3] - 111:10, 111:12, 121:9
**Edge** [1] - 73:3
**effect** [3] - 78:24, 93:4, 93:11
**effectively** [1] - 120:17
**efficient** [2] - 27:14, 116:14
**ego** [1] - 83:13
**eight** [3] - 17:13, 55:13, 94:11
**eight-track** [1] - 94:11
**eight-tracks** [1] - 55:13
**either** [6] - 3:10, 40:19, 47:19, 111:18, 117:21, 118:17
**Elabs** [1] - 123:18
**electronic** [2] - 50:2, 51:2
**elements** [3] - 41:9, 90:2, 131:2
**Eleven** [1] - 102:1
**elicits** [1] - 126:3
**email** [2] - 61:24, 62:2
**emails** [1] - 61:21
**embodying** [3] - 20:23, 33:10, 33:21
**Eminem** [80] - 5:8, 5:11, 5:15, 5:16, 5:20, 5:24, 6:8, 6:9, 8:22, 9:2, 9:5, 9:14, 9:20, 9:24, 10:12, 11:9, 11:11, 11:17, 11:18, 16:19, 16:23, 17:1, 17:3, 17:15, 17:20, 18:22, 19:3, 34:10, 42:19, 42:22, 43:9, 43:10, 43:13, 45:7, 52:24, 53:1, 53:3, 63:9, 66:4, 66:6, 66:16, 66:18, 66:20, 66:23, 67:2, 67:7, 67:10, 67:16, 67:22, 68:3, 70:3, 70:7, 76:11, 76:12, 76:15, 82:16, 83:7, 83:14, 85:3, 86:2, 86:3, 86:19, 89:6, 90:2, 92:4, 92:20, 92:22, 93:3, 93:15, 93:18, 96:18, 97:9, 97:16, 99:4, 101:11, 106:17,

106:18, 107:6, 108:1
**Eminem's** [5] - 5:17, 18:25, 43:19, 43:20, 102:12
**Eminem/F.B.T** [1] - 16:12
**Eminem/F.B.T./ Aftermath** [1] - 51:5
**employees** [1] - 75:25
**Encore** [2] - 91:24, 91:25
**encourage** [1] - 118:15
**encouraging** [1] - 66:12
**end** [13] - 7:13, 12:19, 37:17, 37:23, 38:4, 41:9, 64:10, 69:8, 86:5, 91:14, 91:17, 117:4, 117:12
**ended** [7] - 61:5, 80:16, 88:2, 89:25, 103:19, 104:8, 108:7
**ends** [1] - 89:2
**engineer** [5] - 71:13, 71:19, 71:20, 72:15, 72:16
**engineering** [2] - 72:8, 72:14
**enormously** [1] - 74:7
**entered** [7] - 84:24, 93:13, 96:17, 101:4, 104:19, 107:9, 110:1
**entering** [1] - 68:20
**Entertainment** [1] - 1:13
**entire** [1] - 5:6
**entirely** [1] - 117:22
**entities** [1] - 16:16
**entitled** [2] - 52:21, 133:4
**entity** [2] - 16:16
**EP** [10] - 83:13, 83:15, 83:19, 83:21, 83:22, 83:25, 85:12, 107:1, 107:22, 107:25
**equal** [1] - 24:24
**equipment** [1] - 132:5
**era** [2] - 81:15, 120:4
**especially** [1] - 45:12
**essentially** [4] - 28:8, 34:14, 52:23, 89:22
**establish** [2] - 118:22, 120:9
**established** [2] - 70:18, 124:5

**et** [1] - 1:13
**etc** [1] - 37:25
**Ethan** [1] - 123:3
**ETHAN** [1] - 123:6
**Evan** [2] - 85:11, 85:21
**Eve** [1] - 104:24
**evening** [2] - 105:10, 111:1
**evidence** [8] - 4:22, 5:14, 11:25, 32:6, 62:22, 121:3, 128:4, 128:12
**Evidence** [1] - 116:25
**evolved** [1] - 28:7
**exact** [5] - 16:15, 66:19, 78:18, 125:10, 125:12
**exactly** [7] - 18:6, 19:10, 35:12, 55:7, 77:7, 90:5, 109:1
**EXAMINATION** [16] - 7:19, 10:8, 15:13, 38:23, 49:6, 54:17, 56:13, 65:8, 70:14, 78:12, 80:21, 90:16, 100:25, 102:5, 102:22, 106:8
**examination** [16] - 7:5, 7:6, 12:17, 12:20, 38:22, 50:11, 62:4, 62:8, 62:14, 118:13, 118:17, 118:18, 118:24, 119:6, 119:21, 120:16
**examine** [1] - 64:12
**example** [2] - 36:19, 47:4
**exceeds** [1] - 50:10
**except** [2] - 54:14, 57:22
**exchanges** [1] - 47:11
**excited** [1] - 17:3
**exclude** [1] - 4:13
**excluded** [4] - 6:11, 117:22, 131:4, 131:5
**excluding** [1] - 122:13
**exclusion** [1] - 4:7
**exclusive** [4] - 6:4, 92:19, 93:2, 93:25
**Excuse** [6] - 24:6, 35:25, 51:4, 90:20, 97:6, 121:10
**excuse** [1] - 10:19
**excused** [3] - 4:9, 64:6, 104:23
**executions** [1] -

47:19
**executive** [1] - 82:25
**exercise** [1] - 117:12
**Exhibit** [20] - 12:8, 30:4, 30:11, 32:5, 32:8, 32:18, 32:21, 33:8, 44:15, 46:13, 46:17, 49:9, 49:10, 51:15, 51:18, 54:20, 92:16, 96:5, 98:2, 98:4
**exhibit** [2] - 54:21, 92:12
**EXHIBITS** [2] - 134:17, 134:21
**Exhibits** [1] - 12:8
**exhibits** [2] - 30:5, 116:19
**existed** [1] - 94:19
**existing** [1] - 55:25
**expect** [2] - 95:24, 96:2
**expecting** [2] - 3:16, 103:22
**expedite** [1] - 116:15
**expenses** [4] - 17:23, 18:4, 18:16, 18:19
**experience** [4] - 47:10, 117:21, 120:5, 120:10
**experienced** [1] - 44:5
**expert** [7] - 47:8, 117:15, 119:5, 120:24, 120:25, 121:1, 131:5
**expertise** [3] - 119:3, 119:7, 119:20
**explain** [8] - 40:23, 41:22, 42:25, 45:20, 48:15, 52:17, 73:8, 83:20
**explicitly** [1] - 28:15
**exploitation** [1] - 36:18
**exploiting** [1] - 92:24
**express** [4] - 19:23, 20:11, 75:19, 111:2
**extended** [1] - 83:22
**extent** [2] - 23:13, 115:18
**extra** [3] - 90:3, 115:2, 115:18
**extraordinarily** [1] - 76:20
**Eyed** [1] - 76:7
**eyes** [1] - 84:5

**F**

**F.B.T** [68] - 1:7, 5:7, 5:10, 5:23, 11:9, 11:11, 16:6, 16:7, 17:21, 18:23, 19:2, 19:12, 21:11, 22:23, 37:20, 42:19, 43:10, 43:12, 43:13, 43:15, 45:7, 45:8, 45:9, 63:9, 66:4, 70:7, 76:25, 77:1, 78:3, 79:3, 81:7, 81:8, 82:16, 84:21, 87:13, 87:18, 92:3, 92:20, 92:23, 93:14, 94:17, 95:12, 95:20, 95:24, 95:25, 96:2, 96:3, 96:11, 96:14, 96:25, 97:4, 97:11, 97:14, 97:19, 97:23, 98:8, 98:12, 98:14, 98:18, 98:24, 100:4, 101:4, 107:6, 107:9, 107:14, 110:2
**F.B.T.'s** [4] - 30:25, 84:19, 93:19, 97:4
**F.B.T./Aftermath** [2] - 46:20, 50:21
**facility** [1] - 82:9
**fact** [9] - 28:8, 55:3, 93:18, 94:1, 96:24, 100:3, 100:14, 128:22, 131:7
**facts** [1] - 78:25
**fair** [7] - 16:10, 20:12, 22:6, 34:16, 110:21, 117:6
**fairly** [1] - 120:17
**faith** [1] - 37:21
**fall** [1] - 115:13
**familiar** [4] - 8:2, 20:20, 35:4, 89:5
**famous** [1] - 45:14
**fanatic** [1] - 86:18
**far** [8] - 34:25, 41:23, 58:1, 80:9, 83:6, 84:8, 85:18, 93:10
**fashion** [1] - 123:10
**fast** [1] - 114:17
**faster** [2] - 3:10, 17:9
**FCRR** [1] - 1:22
**February** [2] - 1:21, 3:1
**Federal** [2] - 1:23, 116:24
**fell** [1] - 85:23
**fellow** [1] - 72:9
**felt** [2] - 35:17, 73:15
**Fergie** [1] - 76:8

**few** [14] - 10:7, 10:10, 38:25, 42:18, 49:4, 49:8, 57:17, 69:24, 73:11, 78:14, 92:2, 99:7, 101:2, 101:9
**Field** [1] - 74:21
**Field's** [1] - 74:23
**figure** [1] - 120:6
**file** [5] - 112:20, 113:16, 126:25, 130:7, 131:11
**filed** [5] - 110:12, 112:13, 113:12, 127:3
**filings** [1] - 113:1
**fill** [1] - 106:15
**final** [4] - 36:16, 114:24, 115:4, 115:21
**finally** [2] - 104:14, 111:3
**financed** [1] - 74:21
**financial** [3] - 17:22, 17:24, 18:3
**Fine** [1] - 4:2, 52:19
**fine** [11] - 12:11, 23:10, 76:10, 114:12, 115:17, 121:5, 123:13, 131:15
**finish** [8] - 3:22, 80:10, 80:14, 114:16, 114:23, 115:1, 115:10, 115:19
**finished** [1] - 114:3
**finishes** [1] - 3:17
**FINK** [1] - 2:10
**firm** [7] - 16:4, 33:8, 34:7, 35:2, 45:23, 47:19, 49:11
**First** [6] - 14:1, 39:2, 104:17, 108:21, 111:9, 130:20
**first** [28] - 5:15, 10:11, 11:1, 19:5, 30:14, 30:15, 37:15, 37:19, 45:15, 46:14, 46:17, 67:22, 71:7, 71:20, 75:6, 76:12, 78:15, 80:8, 83:19, 87:20, 87:22, 98:5, 106:17, 108:9, 109:9, 109:16, 118:2, 130:19
**five** [10] - 17:6, 71:3, 72:5, 75:1, 83:22, 103:12, 103:22, 104:6, 104:10, 104:15
**five-year** [1] - 72:5
**fix** [1] - 55:10
**Fleetwood** [1] - 73:21
**flew** [1] - 104:3

**flexible** [1] - 116:1
**flip** [1] - 98:10
**FLOOR** [2] - 2:14, 2:23
**floor** [1] - 131:25
**flop** [1] - 83:8
**flying** [1] - 3:19
**fold** [1] - 17:4
**follow** [7] - 6:14, 34:22, 34:23, 56:20, 75:6, 111:23, 127:7
**following** [4] - 26:6, 96:17, 97:18, 111:12
**follows** [5] - 13:12, 13:13, 13:15, 13:19, 13:20
**followup** [1] - 130:2
**FOR** [4] - 2:3, 2:18, 134:2, 134:10
**foregoing** [17] - 12:13, 12:15, 12:24, 13:3, 13:10, 13:19, 14:2, 14:8, 22:14, 23:3, 23:11, 24:3, 26:24, 27:2, 37:19, 133:3
**foregoing"** [1] - 13:23
**form** [42] - 19:16, 19:19, 21:6, 23:6, 23:7, 29:18, 29:19, 29:25, 33:9, 35:14, 35:15, 36:3, 37:20, 38:11, 38:19, 51:9, 51:11, 51:12, 51:13, 51:21, 51:25, 52:6, 54:25, 55:2, 55:10, 55:24, 56:22, 57:6, 62:5, 62:7, 62:9, 62:11, 104:13, 111:2, 112:8, 127:18, 127:24, 128:2, 128:3, 129:17
**formal** [1] - 4:11
**format** [6] - 42:13, 72:22, 95:13, 113:10, 116:17, 133:4
**formats** [2] - 42:14, 55:11
**formed** [1] - 15:23
**forming** [1] - 83:10
**forms** [7] - 16:1, 20:4, 20:22, 33:20, 95:4, 127:14, 127:20
**forte** [1] - 69:10
**forth** [2] - 61:21, 98:16
**fortunate** [1] - 71:19
**forward** [2] - 47:3, 98:23

**foundation** [4] - 11:13, 119:3, 119:7
**Foundation** [1] - 11:14
**Four** [1] - 39:17
**four** [4] - 12:2, 17:5, 39:7, 55:11
**freaked** [1] - 85:22
**Friday** [19] - 3:23, 85:17, 112:3, 114:4, 114:16, 114:18, 114:21, 114:23, 115:2, 115:4, 115:11, 115:15, 115:19, 115:22, 116:8, 124:13, 124:19
**friends** [3] - 74:3, 81:24, 83:1
**From"** [1] - 46:15
**front** [8] - 7:7, 7:22, 111:16, 117:20, 118:6, 118:7, 118:19, 120:6
**full** [6] - 8:22, 9:1, 15:11, 65:4, 80:19, 106:4
**Full** [1] - 83:24
**funded** [1] - 17:25
**furnish** [2] - 81:9, 92:22
**future** [7] - 55:6, 55:17, 56:6, 56:18, 94:15

**G**

**G-U-S-T-A-V** [1] - 123:6
**Game** [1] - 40:18
**game** [1] - 76:18
**gap** [1] - 106:15
**GARY** [1] - 134:3
**gears** [1] - 129:16
**Geislinger** [1] - 66:8
**general** [6] - 16:3, 36:6, 63:14, 124:9, 126:3, 129:19
**Generally** [2] - 16:9, 35:5
**generally** [6] - 17:9, 17:11, 38:4, 41:6, 52:12, 52:15
**gentleman** [5] - 81:20, 85:9, 86:17, 107:12, 108:14
**gentlemen** [3] - 57:15, 104:9, 131:21
**George** [1] - 101:12
**gifted** [1] - 76:20

**Gilford** [1] - 132:12
**girl** [1] - 73:11
**Girls** [2] - 39:13, 39:15
**given** [4] - 62:19, 114:21, 119:4, 130:2
**Given** [1] - 54:8
**GLASER** [1] - 2:10
**glasses** [1] - 107:12
**GLENN** [1] - 2:19
**go-to** [1] - 76:21
**God** [1] - 77:25
**gold** [1] - 18:12
**Gospel** [1] - 101:16
**governs** [1] - 116:25
**graduated** [1] - 70:23
**Grammy** [8] - 19:7, 19:12, 88:5, 88:6, 90:7, 91:10, 101:20, 109:22
**GRAND** [1] - 2:22
**grant** [2] - 62:19, 68:22
**granted** [1] - 4:14
**granting** [1] - 69:4
**Great** [2] - 20:14, 22:10
**great** [8] - 11:8, 44:6, 73:12, 73:18, 74:4, 75:19, 75:22
**greatest** [3] - 37:24, 76:17, 91:20
**grooming** [2] - 82:9, 107:3
**gross** [3] - 11:16, 70:6, 70:11
**grounds** [3] - 120:25, 128:24, 129:22
**group** [1] - 101:15
**Group** [1] - 69:1
**grouped** [2] - 27:11, 27:19
**groups** [1] - 129:12
**growing** [1] - 81:12
**guess** [3] - 73:8, 118:5, 119:24
**guidance** [2] - 116:20, 119:10
**guitars** [1] - 89:25
**Guns** [1] - 40:3
**Gustav** [2] - 123:4, 123:6
**GUTIERREZ** [1] - 1:4
**guy** [4] - 44:6, 72:9, 76:21, 81:21
**guys** [2] - 66:12, 128:25
**Gwen** [1] - 76:6

**H**

**Halen** [1] - 40:5
**half** [3] - 35:19, 70:24, 89:13
**hamstrung** [1] - 124:16
**hand** [4] - 15:6, 64:23, 92:8, 106:1
**handle** [2] - 15:3, 104:6, 117:23
**handled** [1] - 120:3
**handles** [1] - 110:7
**hands** [1] - 66:14
**handwriting** [2] - 47:6, 47:7
**handy** [1] - 111:13
**hang** [1] - 61:13
**Hang** [1] - 61:14
**happy** [4] - 3:9, 31:24, 35:10, 35:24
**hard** [1] - 115:18
**head** [3] - 46:24, 70:18, 123:18
**hear** [6] - 3:9, 6:21, 24:6, 41:12, 72:20, 81:21
**heard** [12] - 5:5, 66:14, 67:22, 72:20, 76:3, 78:8, 81:20, 82:19, 88:13, 101:19, 106:18, 117:16
**hearing** [1] - 89:25
**hearsay** [1] - 120:25
**Heartbreakers** [1] - 73:19
**held** [1] - 133:4
**Hello** [1] - 70:17
**help** [3] - 8:16, 105:9, 105:11
**helped** [1] - 72:13
**helpful** [1] - 123:12
**Henley** [1] - 62:1
**hereafter** [2] - 95:6, 95:13
**hereby** [1] - 133:3
**hereunder** [1] - 98:19
**Hertz** [2] - 100:6, 100:11
**Hi** [2] - 15:16, 65:11
**hiding** [1] - 126:18
**high** [4] - 37:16, 37:23, 38:4, 70:23
**high-end** [2] - 37:23, 38:4
**higher** [3] - 18:13, 44:12, 44:13
**highlight** [7] - 12:10,

13:14, 44:16, 45:2, 49:24, 92:17, 98:5
**Highlight** [1] - 12:11
**Hill** [1] - 40:6
**hillbilly** [1] - 55:14
**himself** [2] - 6:9, 83:14
**hip** [12] - 40:15, 40:17, 41:3, 41:8, 76:22, 81:15, 81:18, 81:25, 83:11, 86:18, 86:19
**hired** [1] - 45:25
**historically** [2] - 28:6, 53:7
**hit** [4] - 71:18, 72:13, 73:18, 108:25
**hits** [2] - 37:24, 91:21
**Hoffman** [6] - 8:7, 13:9, 14:16, 34:14, 35:9, 35:22
**Hold** [1] - 128:11
**holding** [2] - 102:8, 130:9
**Hollywood** [3] - 39:11, 39:18
**home** [8] - 20:25, 33:12, 33:22, 74:11, 85:17, 85:20, 95:6, 115:22
**honestly** [1] - 56:20
**honor** [2] - 79:14, 79:19
**Honor** [95] - 3:9, 3:24, 4:4, 4:15, 5:5, 6:1, 6:14, 6:15, 6:16, 6:20, 7:1, 7:12, 10:5, 11:12, 11:24, 13:4, 13:22, 14:13, 15:2, 32:17, 32:19, 37:10, 38:21, 49:3, 50:10, 50:12, 54:4, 54:5, 54:8, 54:13, 56:10, 57:12, 57:23, 61:16, 62:3, 62:14, 63:3, 63:22, 64:5, 64:9, 64:21, 68:15, 78:10, 79:23, 79:25, 80:4, 91:4, 92:8, 100:21, 100:23, 103:5, 105:5, 105:14, 105:17, 105:19, 111:19, 112:19, 113:10, 113:22, 114:8, 114:11, 115:6, 115:9, 115:16, 117:2, 117:14, 117:18, 117:20, 117:23, 118:6, 118:7, 118:20,

119:9, 119:23, 119:25, 120:18, 120:21, 120:23, 121:10, 123:3, 123:12, 123:16, 123:22, 124:19, 126:7, 126:20, 127:9, 129:9, 130:11, 130:22, 131:10, 131:18, 132:7, 132:16
**Honor's** [4] - 61:19, 61:20, 116:19, 132:12
**HONORABLE** [1] - 1:4
**honored** [3] - 5:9, 5:22, 79:10
**hook** [1] - 41:7
**hop** [12] - 40:15, 40:17, 41:3, 41:8, 76:22, 81:15, 81:18, 81:25, 83:11, 86:18, 86:19
**hope** [1] - 7:23
**hopefully** [1] - 9:12
**hopes** [1] - 82:9
**host** [1] - 105:13
**hosting** [1] - 105:10
**hotel** [2] - 108:11, 108:13
**hours** [2] - 74:15, 108:21
**house** [2] - 67:4, 106:21
**Howard** [1] - 100:6
**hundred** [1] - 74:8
**hurriedly** [1] - 35:14
**hurts** [1] - 63:20

# I

**I-O-V-I-N-E** [1] - 65:6
**Ice** [1] - 40:17
**idea** [7] - 14:8, 57:3, 68:1, 89:17, 89:22, 109:4, 127:19
**identification** [1] - 121:2
**identify** [1] - 46:18
**illustration** [4] - 9:16, 9:17, 9:18, 9:19
**image** [1] - 42:10
**images** [5] - 20:24, 22:1, 33:11, 33:22, 42:4
**immensely** [1] - 43:6
**impeach** [1] - 63:17
**impeachment** [1] - 58:1
**important** [8] -

29:23, 38:18, 79:12, 94:17, 94:21, 95:12, 120:2
**impressions** [1] - 44:2
**impressive** [1] - 68:25
**Inch** [1] - 76:7
**include** [2] - 37:20, 95:4
**included** [1] - 37:22
**including** [8] - 27:1, 33:13, 37:23, 50:2, 51:2, 95:8, 116:16, 120:1
**income** [2] - 87:13, 97:12
**inconsistent** [2] - 18:5, 23:14
**individuals** [1] - 123:24
**industry** [2] - 17:10, 117:15
**Infinite** [7] - 82:13, 82:20, 83:5, 107:1, 107:2, 107:5, 107:17
**influential** [1] - 76:18
**information** [5] - 55:20, 56:3, 57:16, 57:19, 57:25
**initial** [4] - 46:5, 86:1, 86:4, 86:7
**input** [2] - 34:18, 42:3
**inquire** [2] - 7:18, 65:7
**inquiry** [5] - 6:12, 6:16, 7:13, 57:19, 62:24
**inquisition** [1] - 131:6
**instance** [2] - 52:24, 53:5
**instead** [3] - 62:19, 93:14, 115:22
**instruct** [1] - 114:4
**instructed** [3] - 16:10, 16:22, 17:1
**instruction** [7] - 112:8, 113:3, 113:12, 124:6, 124:12, 125:8, 130:4
**instructions** [13] - 112:4, 112:16, 112:20, 113:1, 113:23, 114:8, 114:11, 114:23, 114:24, 115:3, 115:22, 116:2, 116:4
**instrumental** [1] -

18:23
**instruments** [2] - 71:25, 83:11
**intended** [3] - 4:20, 19:22, 105:20
**intent** [7] - 13:5, 14:17, 19:23, 20:11, 55:21, 93:19
**interaction** [1] - 46:6
**interactions** [1] - 46:2
**interest** [4] - 4:19, 6:3, 6:4, 16:13
**interested** [4] - 43:3, 67:8, 69:9, 75:21
**interests** [2] - 6:5, 6:23
**intern** [2] - 66:9, 76:13
**internal** [2] - 61:24, 62:2
**internally** [1] - 125:13
**Interscope** [55] - 4:19, 11:11, 11:16, 16:13, 16:16, 16:25, 17:14, 17:25, 22:24, 24:9, 24:15, 26:2, 26:8, 34:8, 34:10, 34:15, 35:16, 41:20, 41:23, 42:8, 42:9, 46:25, 48:18, 65:13, 65:14, 65:16, 65:19, 67:11, 67:17, 68:21, 70:3, 70:4, 70:6, 73:6, 74:16, 74:20, 74:21, 74:22, 75:4, 75:9, 75:14, 75:22, 75:25, 76:3, 76:5, 78:5, 84:17, 85:14, 87:18, 87:20, 108:12, 109:17, 127:21, 129:17
**Interscope's** [1] - 11:21
**interview** [2] - 104:20, 104:21
**intro** [1] - 81:25
**introduction** [1] - 32:17
**invited** [2] - 105:14, 105:15
**involved** [13] - 42:2, 43:11, 54:3, 63:15, 74:5, 77:17, 84:25, 86:1, 87:5, 87:7, 126:22, 129:14, 130:2
**involving** [1] - 99:4
**IOVINE** [1] - 134:5
**Iovine** [21] - 3:14,

16:25, 64:21, 64:24, 65:3, 65:6, 65:10, 65:24, 66:6, 70:1, 70:16, 78:14, 85:6, 85:14, 86:2, 108:8, 108:9, 108:10, 108:20, 108:23, 110:10
**irrelevant** [2] - 6:10, 11:25
**irrevocably** [1] - 98:15
**Irwin** [2] - 80:17, 80:20
**IRWIN** [1] - 134:5
**issue** [19] - 4:16, 4:21, 4:22, 11:6, 58:4, 58:5, 62:23, 95:18, 116:6, 116:10, 117:14, 124:12, 124:18, 124:20, 124:21, 129:1, 129:11, 131:9
**issues** [12] - 6:17, 8:6, 63:23, 79:7, 100:15, 105:1, 111:7, 112:5, 115:9, 119:14, 123:16, 123:21
**item** [1] - 36:9
**items** [1] - 35:23
**itself** [1] - 27:18
**iTunes** [10] - 26:4, 36:19, 37:6, 56:5, 56:24, 57:3, 57:4, 68:24, 69:6

# J

**JACOBS** [1] - 2:10
**January** [1] - 86:5
**jazz** [1] - 81:14
**Jeff** [7] - 3:15, 19:11, 66:20, 68:3, 80:4, 80:11, 106:12
**JEFFREY** [1] - 134:5
**Jeffrey** [2] - 80:17, 80:20
**Jem** [1] - 101:14
**Jimmy** [18] - 16:25, 17:2, 64:21, 64:24, 65:6, 85:6, 85:13, 85:17, 86:2, 108:7, 108:9, 108:10, 108:19, 108:21, 108:23, 108:24, 110:15, 110:20
**JIMMY** [1] - 134:5
**job** [15] - 39:19, 40:25, 55:19, 55:20,

69:11, 71:3, 71:19, 72:6, 72:7, 72:8, 74:7, 104:20, 104:21
**Jobs** [6] - 68:12, 68:20, 69:4, 69:16, 123:3, 123:5
**Joel** [15] - 67:16, 77:13, 84:19, 84:20, 84:22, 85:1, 86:20, 98:16, 101:5, 107:10, 107:11, 109:14, 110:5, 110:7, 110:19
**John** [4] - 71:11, 71:21, 71:24, 76:4
**joined** [2] - 74:16, 74:18
**Jonas** [1] - 39:12
**Jones** [2] - 73:9, 73:10, 75:23, 101:14
**Jude** [1] - 53:5
**JUDGE** [1] - 1:4
**judges** [2] - 119:10, 121:1
**Judicial** [1] - 133:5
**jukebox** [2] - 33:12, 95:7
**juror** [1] - 104:19
**Juror** [1] - 104:23
**jurors** [4] - 7:16, 64:18, 104:17, 105:21
**Jury** [3] - 3:4, 7:17, 61:6, 64:4, 64:19, 104:16, 105:22, 111:5
**jury** [26] - 5:21, 6:21, 10:23, 46:23, 70:19, 74:19, 83:20, 105:17, 112:4, 112:8, 113:23, 114:20, 116:12, 116:17, 116:18, 117:7, 118:6, 118:7, 118:19, 118:21, 119:13, 119:17, 120:6, 120:10, 130:10

# K

**keep** [6] - 74:3, 74:19, 76:9, 104:22, 112:14, 115:25
**Keep** [1] - 44:4
**KELLY** [1] - 2:21
**Kenswil** [11] - 123:17, 123:18, 123:23, 124:15, 126:25, 129:12, 129:14, 129:23, 130:18, 130:24
**Kenswil's** [1] - 131:1
**kept** [1] - 84:11

**keyboards** [1] - 90:4
**Keyshia** [1] - 40:7
**kid** [3] - 55:12, 85:23, 109:1
**kidding** [1] - 31:23
**kind** [11] - 23:22, 30:13, 32:15, 41:25, 71:24, 72:25, 74:6, 83:23, 106:15, 108:25, 117:24
**KING** [1] - 2:3
**KLAUS** [24] - 2:21, 4:4, 4:6, 4:15, 6:1, 30:5, 32:19, 38:24, 50:10, 54:8, 54:18, 56:8, 57:13, 90:17, 91:8, 92:11, 100:20, 102:6, 102:20, 103:3, 123:16, 126:19, 129:9, 130:23
**Klaus** [7] - 3:7, 4:3, 15:2, 52:10, 57:24, 62:8, 126:16
**knowledge** [1] - 120:2
**knowledgeable** [1] - 19:2
**known** [5] - 33:10, 95:5, 95:6, 95:13, 99:12
**knows** [2] - 64:1, 73:9

## L

**label** [16] - 17:15, 34:2, 36:21, 36:25, 37:7, 39:13, 39:14, 39:15, 40:16, 40:20, 41:14, 41:15, 43:5, 48:23, 70:19
**label's** [1] - 27:23
**labels** [3] - 36:20, 43:2, 87:22
**Lack** [1] - 11:12
**lack** [4] - 119:3, 119:6, 119:20
**Ladies** [2] - 57:15, 104:9
**language** [8] - 13:19, 14:12, 37:16, 56:25, 57:8, 79:12, 79:15, 79:19
**Las** [1] - 108:2
**last** [25] - 4:20, 12:15, 12:17, 15:11, 37:14, 54:10, 54:14, 57:24, 62:18, 65:5, 77:6, 80:19, 104:12,

104:19, 106:5, 110:10, 114:8, 116:8, 122:13, 124:13, 124:19, 130:14, 131:9, 132:11
**late** [3] - 28:7, 90:3, 114:16
**law** [12] - 39:3, 44:4, 44:5, 49:11, 55:9, 110:11, 116:23, 117:1, 128:2, 131:1, 131:6
**lawsuit** [8] - 77:1, 77:19, 77:20, 78:25, 110:12, 110:17, 110:20
**lawsuits** [2] - 37:25, 38:16
**Lawyer** [2] - 128:19, 128:20
**lawyer** [21] - 19:21, 20:10, 29:23, 39:3, 39:6, 39:9, 39:20, 39:22, 40:11, 43:19, 44:2, 45:22, 45:25, 55:6, 86:21, 100:4, 100:11, 100:14, 100:17, 126:4
**lawyers** [7] - 84:25, 110:5, 123:24, 125:8, 127:6, 129:12, 129:24
**lead** [1] - 52:5
**learn** [1] - 19:11
**learned** [1] - 85:19
**least** [4] - 45:13, 56:6, 62:13, 119:4
**leave** [9] - 14:24, 68:4, 87:6, 104:10, 115:3, 115:19, 131:25, 132:1, 132:4
**leaves** [2] - 61:8, 105:17
**leaving** [1] - 39:18
**led** [2] - 76:15, 85:24
**left** [3] - 117:12, 120:19, 132:3
**legal** [2] - 34:15, 34:17
**legitimate** [1] - 5:1
**LeMoine** [10] - 2:20, 111:16, 111:21, 116:7, 121:10, 121:15, 132:10, 132:11, 132:15, 132:18
**length** [2] - 67:21, 83:24
**lengths** [1] - 11:8
**Lennon** [6] - 71:11, 71:21, 71:24, 72:3,

73:14, 76:4
**less** [5] - 19:1, 31:12, 38:18, 41:12, 44:25
**letter** [8] - 61:10, 61:15, 61:17, 61:23, 62:15, 62:22, 62:25
**letting** [1] - 121:11
**level** [1] - 18:11
**liar** [1] - 63:20
**license** [23] - 8:24, 24:5, 9:7, 9:24, 23:21, 24:5, 27:8, 28:11, 28:21, 29:5, 29:6, 29:7, 29:10, 36:8, 47:23, 49:19, 53:20, 56:24, 57:4, 124:3, 127:19, 128:1, 131:2
**licensed** [8] - 8:8, 9:11, 24:19, 26:1, 26:2, 26:17, 31:13, 53:21
**licensee** [2] - 31:9, 31:11
**licensees** [1] - 24:19
**licenses** [13] - 9:14, 9:19, 28:16, 28:22, 28:23, 28:24, 28:25, 36:18, 38:5, 38:16, 48:18, 56:24, 57:8
**licensing** [10] - 26:22, 27:12, 27:18, 57:9, 62:13, 63:11, 64:13, 68:13, 68:16, 79:2
**life** [2] - 82:3, 94:7
**lifetime** [1] - 55:11
**Limine** [3] - 61:18, 62:20, 119:19
**limine** [2] - 117:19, 131:11
**limit** [1] - 62:14
**limitation** [2] - 27:1, 33:13
**limited** [3] - 53:15, 94:2, 117:22
**limits** [1] - 28:14
**limousine** [1] - 108:18
**Linda** [1] - 40:6
**Line** [18] - 58:7, 122:4, 122:5, 122:7, 122:8, 122:9, 122:10, 122:14, 122:18, 122:19, 122:21, 122:22
**line** [5] - 10:15, 46:15, 58:7, 102:7, 124:13
**lined** [1] - 120:15
**Lines** [26] - 121:19,

121:20, 121:21, 121:22, 121:23, 121:24, 122:2, 122:3, 122:5, 122:6, 122:8, 122:11, 122:13, 122:16, 122:17, 122:19, 122:20, 122:12, 132:16
**Lisa** [1] - 130:17
**list** [5] - 40:7, 101:10, 111:15, 111:16, 111:18
**listen** [2] - 67:6, 85:18
**listened** [3] - 67:7, 81:19, 85:22
**listening** [1] - 85:21
**live** [5] - 35:11, 35:24, 69:24, 72:20, 83:11
**lives** [1] - 40:24
**living** [1] - 39:2
**LLC** [1] - 1:7
**LLP** [2] - 2:11, 2:18
**load** [1] - 7:10
**loaded** [2] - 7:7, 7:8
**locate** [1] - 104:2
**locked** [1] - 43:14
**log** [6] - 126:22, 128:16, 128:17, 128:19, 130:3, 130:9
**longshoreman** [1] - 70:24
**look** [19] - 14:10, 20:16, 21:20, 30:10, 30:11, 30:15, 31:18, 32:12, 32:13, 49:23, 56:6, 69:2, 75:16, 76:23, 79:5, 116:22, 117:3
**looked** [4] - 18:7, 24:1, 51:12, 108:24
**Looking** [1] - 95:11
**looking** [7] - 44:16, 51:23, 69:8, 98:9, 112:15, 121:11
**looks** [13] - 20:20, 21:3, 30:21, 31:24, 32:9, 32:14, 46:19, 51:24, 69:2, 114:1, 114:3, 115:1, 117:11
**Lopez** [1] - 104:24
**Los** [5] - 1:20, 1:24, 3:1, 85:6, 108:5
**LOS** [2] - 2:15, 2:24
**Lose** [6] - 89:9, 89:11, 90:6, 90:10, 90:21, 91:9
**losing** [1] - 128:11
**lost** [2] - 80:7, 85:8

**louder** [1] - 41:11
**Louie** [1] - 90:4
**love** [5] - 85:23, 106:21, 110:21, 114:20
**loved** [2] - 71:2, 86:19
**LP** [8] - 9:6, 83:21, 87:22, 88:2, 88:10, 102:8, 107:2, 109:18
**lucky** [1] - 71:2
**lunch** [4] - 3:22, 105:2, 105:7, 105:9
**lyrics** [2] - 88:25, 90:2

## M

**Mac** [1] - 73:21
**mail** [4] - 26:25, 85:16
**main** [4] - 5:15, 69:15, 71:10, 74:7
**majority** [1] - 83:2
**man** [1] - 66:8
**manager** [3] - 43:20, 44:8, 107:14
**manages** [2] - 43:20, 84:22
**manufacture** [6] - 22:2, 24:19, 29:10, 36:21, 36:22, 92:23
**manufactured** [7] - 20:24, 26:11, 26:14, 26:16, 33:22, 42:8, 95:6
**manufactures** [1] - 26:3
**manufacturing** [2] - 28:4, 36:23
**March** [3] - 61:10, 61:15, 61:17
**MARK** [2] - 2:12, 134:6
**Mark** [18] - 19:11, 64:9, 66:16, 66:20, 67:15, 77:2, 77:3, 77:4, 77:5, 80:12, 84:1, 103:11, 105:24, 106:2, 106:6, 130:17
**marked** [2] - 33:8, 121:2
**MARKED** [2] - 134:17, 134:21
**market** [1] - 69:10
**marketing** [4] - 42:2, 42:5, 42:9, 92:24
**markup** [1] - 46:19
**markups** [1] - 47:11

**Marne** [1] - 45:19
**married** [1] - 74:5
**Marshall** [3] - 81:25, 82:3, 88:10
**Mart** [3] - 9:6, 25:21, 26:3
**Martin** [19] - 67:16, 84:19, 84:20, 84:22, 85:1, 97:5, 97:23, 97:25, 98:16, 98:25, 99:3, 99:19, 100:5, 101:5, 107:10, 109:14, 110:5, 110:7
**master** [9] - 21:21, 21:22, 21:25, 22:7, 22:9, 26:1, 29:10, 36:8, 92:22
**masters** [10] - 8:8, 9:11, 23:20, 24:4, 24:18, 25:1, 31:12, 47:23, 49:19, 124:2
**material** [2] - 38:12, 110:16
**materials** [1] - 112:22
**Mathers** [2] - 81:25, 88:10
**matter** [19] - 4:16, 7:7, 21:17, 23:12, 120:21, 124:22, 124:23, 125:23, 125:24, 126:3, 126:4, 126:6, 126:8, 126:12, 126:21, 128:21, 129:20, 129:22, 133:4
**matters** [2] - 37:23, 104:7
**MC's** [1] - 84:8
**mean** [20] - 10:23, 16:15, 17:24, 18:5, 21:13, 26:6, 28:6, 28:24, 35:12, 43:6, 44:7, 44:24, 57:3, 69:14, 77:24, 85:23, 95:4, 119:7, 126:2, 129:8
**meaning** [3] - 25:8, 47:20, 131:6
**meaningless** [3] - 38:9, 38:10, 38:15
**means** [16] - 11:1, 13:3, 20:22, 21:17, 21:25, 22:9, 23:11, 23:13, 25:14, 33:9, 33:13, 33:20, 89:24, 93:2, 95:7, 97:14
**meant** [3] - 25:14, 48:15, 77:15
**mechanical** [9] - 52:13, 52:16, 53:6,

53:7, 53:9, 53:14, 53:19, 53:22, 53:25
**mechanically** [1] - 7:3
**medium** [2] - 50:24, 50:25
**meet** [5] - 66:16, 69:16, 85:6, 108:19
**meeting** [10] - 66:18, 66:19, 66:22, 85:24, 86:1, 86:5, 86:7, 108:10, 108:22, 108:23
**MELINDA** [1] - 2:20
**melodies** [1] - 89:1
**memo** [1] - 38:19
**men** [1] - 110:8
**Menell** [1] - 131:5
**mentioned** [4] - 40:9, 40:21, 52:9, 110:11
**mentioning** [1] - 110:18
**met** [8] - 43:22, 66:19, 73:11, 86:4, 86:17, 106:17
**Metallic** [1] - 40:2
**Metallica** [2] - 40:2, 40:4
**method** [1] - 26:25
**Miami** [1] - 9:21
**Michael** [1] - 130:17
**Michigan** [5] - 81:1, 81:4, 86:20, 100:8, 100:10
**microphones** [2] - 71:16, 72:23
**middle** [1] - 103:12
**midnight** [1] - 41:1
**might** [3] - 17:15, 32:14, 63:19
**mike** [1] - 106:18
**Mike** [3] - 12:12, 12:14, 49:14
**mikes** [1] - 71:15
**Mile** [1] - 89:5
**million** [7] - 10:25, 11:1, 74:8, 88:3, 88:7, 88:13, 101:20
**millions** [4] - 10:13, 10:14, 96:25, 99:4
**mind** [6] - 44:4, 57:10, 63:13, 104:4, 127:19, 128:10
**Minds** [1] - 73:23
**Mindy** [1] - 132:9
**Mine** [1] - 131:18
**ministerial** [1] - 131:20
**minor** [2] - 105:1, 131:19

**minute** [1] - 103:24
**minutes** [7] - 103:12, 103:16, 103:22, 104:6, 104:10, 104:12, 104:15
**misleading** [1] - 6:11
**mistake** [1] - 114:22
**mix** [1] - 41:12
**mixed** [1] - 72:1
**mixing** [1] - 41:10
**mode** [1] - 116:6
**moment** [5] - 24:9, 52:9, 63:12, 103:6, 103:8
**Monday** [5] - 104:20, 104:21, 114:5, 115:1, 115:22
**money** [21] - 5:7, 5:10, 5:12, 5:18, 5:19, 5:23, 10:18, 11:3, 11:4, 11:9, 11:10, 70:12, 70:13, 72:10, 74:4, 78:3, 84:9, 84:10, 93:20, 110:20
**monies** [2] - 98:18, 98:23
**month** [1] - 35:18
**months** [3] - 17:12, 17:13, 31:23
**morning** [15] - 4:21, 5:6, 15:15, 74:11, 81:24, 103:11, 103:17, 104:18, 106:22, 111:4, 114:4, 114:5, 115:5, 116:2, 130:19
**Morris** [1] - 68:25
**Morrison** [1] - 40:6
**most** [8] - 3:11, 40:3, 45:24, 46:6, 55:18, 56:2, 76:18, 91:21
**mostly** [1] - 27:25
**mother** [1] - 84:9
**mother's** [1] - 81:23
**Motion** [3] - 14:18, 61:18, 126:25
**motion** [11] - 4:13, 68:16, 117:19, 118:15, 118:17, 119:6, 120:12, 124:9, 124:11, 127:3, 130:7
**Motions** [2] - 62:20, 119:18
**motions** [2] - 118:1, 131:11
**motive** [1] - 127:24
**move** [2] - 14:15, 32:17
**moved** [1] - 129:6
**movie** [6] - 9:15,

89:5, 89:8, 89:18, 89:23, 90:8
**moving** [1] - 3:10
**MR** [174] - 3:6, 4:3, 4:4, 4:6, 4:15, 5:5, 6:1, 6:13, 6:14, 6:25, 7:4, 7:9, 7:12, 7:15, 7:20, 10:4, 10:7, 10:9, 11:12, 11:15, 11:24, 12:4, 13:4, 13:7, 13:22, 13:25, 14:13, 14:14, 14:15, 14:19, 14:21, 14:23, 14:25, 15:2, 15:14, 18:21, 30:5, 30:7, 32:17, 32:19, 32:22, 33:2, 37:9, 37:13, 38:24, 49:4, 49:7, 50:7, 50:10, 50:12, 50:16, 50:18, 50:20, 54:4, 54:8, 54:13, 54:15, 54:18, 56:8, 56:10, 56:14, 57:12, 57:13, 57:23, 58:3, 61:11, 61:16, 62:7, 63:3, 63:5, 64:5, 64:9, 64:16, 64:21, 65:3, 65:9, 68:15, 68:19, 70:15, 78:10, 78:11, 78:13, 79:22, 79:25, 80:4, 80:9, 80:11, 80:14, 80:22, 90:14, 90:17, 91:4, 91:8, 92:11, 100:20, 100:23, 101:1, 102:4, 102:6, 102:20, 102:21, 102:23, 103:1, 103:3, 103:5, 103:10, 103:16, 103:21, 103:24, 104:1, 105:5, 105:14, 105:17, 105:24, 106:9, 111:14, 111:18, 111:19, 111:25, 112:3, 112:11, 112:17, 112:19, 113:2, 113:6, 113:15, 113:22, 114:7, 114:14, 115:6, 116:5, 116:8, 116:24, 117:5, 117:14, 118:5, 118:20, 119:9, 119:23, 120:14, 120:18, 120:20, 121:6, 121:14, 123:3, 123:6, 123:9, 123:12, 123:16, 124:19, 124:21, 125:9, 125:19, 126:6, 126:11, 126:19, 127:8, 127:12, 128:6,

128:9, 128:13, 128:18, 129:8, 129:9, 130:11, 130:16, 130:22, 130:23, 131:10, 131:18, 131:20, 131:25, 132:7, 132:9
**MS** [8] - 111:16, 111:21, 116:7, 121:10, 121:15, 132:11, 132:15, 132:18
**multiple** [1] - 112:15
**MUNGER** [1] - 2:18
**Music** [1] - 69:1
**music** [54] - 36:18, 39:3, 39:5, 39:6, 39:9, 40:21, 40:23, 41:8, 41:11, 42:1, 65:25, 68:13, 69:5, 69:6, 70:7, 70:22, 71:2, 72:1, 72:18, 75:17, 75:19, 77:13, 81:9, 81:10, 81:14, 81:15, 81:18, 82:1, 82:6, 82:23, 83:10, 83:11, 83:15, 84:1, 87:9, 87:10, 88:25, 89:1, 89:11, 89:12, 89:21, 90:11, 100:5, 101:14, 101:16, 101:17, 107:21, 107:22, 110:8
**musical** [2] - 41:3, 41:7, 41:9
**musician** [2] - 75:18, 81:12
**must** [1] - 66:19

## N

**N'** [1] - 40:3
**Nails** [1] - 76:7
**name** [12] - 15:11, 65:4, 65:5, 80:19, 81:6, 85:11, 86:24, 101:14, 106:4, 106:5
**Name** [4] - 102:10, 102:12, 102:14, 102:16
**named** [4] - 66:8, 72:9, 73:11, 74:20
**names** [1] - 80:7
**Napster** [1] - 53:16
**narrower** [1] - 34:3
**NASHVILLE** [1] - 2:7
**nature** [2] - 38:6, 87:14
**necessarily** [1] - 118:18

**need** [10] - 8:3, 105:7, 105:9, 105:18, 123:1, 131:21, 131:23, 132:1, 132:5
**needed** [4] - 67:2, 86:16, 86:19, 130:7
**needs** [2] - 6:21, 122:25
**negotiate** [2] - 37:21, 86:20
**negotiated** [5] - 38:4, 86:9, 86:12, 86:21, 120:3
**negotiating** [2] - 37:16, 123:19
**negotiation** [4] - 43:16, 46:3, 47:11, 54:1
**negotiations** [5] - 25:13, 45:16, 87:6, 87:7, 99:15
**Net** [1] - 31:8
**net** [9] - 24:25, 27:3, 27:12, 28:11, 29:17, 29:20, 29:21, 31:3
**never** [11] - 22:21, 25:12, 57:9, 63:13, 74:24, 79:5, 87:7, 95:15, 95:16, 124:11, 127:2
**New** [2] - 71:6, 86:18
**new** [13] - 10:19, 10:20, 35:3, 40:11, 44:12, 44:21, 44:24, 45:11, 50:24, 50:25, 63:10, 112:25, 115:11
**next** [20] - 3:8, 3:13, 3:14, 3:17, 3:19, 15:4, 15:5, 23:12, 23:17, 32:4, 33:6, 64:20, 64:22, 80:3, 88:9, 103:20, 105:23, 105:25, 115:10, 125:17
**Nichols** [9] - 44:14, 44:16, 45:1, 46:13, 47:4, 54:21, 92:16, 94:25, 98:6
**Nicks** [1] - 73:20
**Nieves** [3] - 45:19, 47:1, 47:20
**Nieves'** [1] - 45:20
**night** [4] - 4:20, 71:14, 74:12, 115:4
**Nine** [1] - 76:7
**nine** [3] - 88:3, 88:7, 101:20
**nobody** [1] - 44:25
**None** [2] - 82:4, 92:1
**nonsense** [2] -

**normal** [15] - 8:9, 25:19, 25:20, 25:21, 26:4, 26:6, 26:8, 26:13, 26:15, 31:25, 43:3, 47:16, 47:21, 48:24, 74:15
**nothing** [8] - 5:1, 28:20, 37:9, 51:1, 62:12, 77:12, 93:8, 110:24
**Nothing** [2] - 38:21, 103:1
**notice** [1] - 64:11
**noticed** [1] - 108:9
**Notwithstanding** [1] - 37:19
**notwithstanding** [15] - 12:13, 12:15, 12:23, 13:2, 13:10, 13:18, 13:23, 14:2, 14:7, 14:8, 22:14, 23:2, 23:11, 24:2, 26:23
**novation** [2] - 35:3, 98:3
**number** [8] - 43:1, 91:19, 95:8, 95:17, 98:17, 99:12, 130:24
**numbered** [1] - 92:18
**numbers** [1] - 92:12
**numerous** [1] - 46:11

## O

**Oakwood** [1] - 68:3
**oath** [1] - 78:21
**object** [6] - 7:1, 50:10, 112:7, 112:8, 118:25, 119:1
**objected** [4] - 64:11, 120:25, 128:23, 131:3
**objection** [11] - 32:19, 112:9, 119:2, 121:18, 121:19, 122:13, 122:15, 124:25, 131:12, 131:13, 131:16
**Objection** [6] - 11:12, 11:24, 13:4, 13:22, 68:15, 91:4
**objections** [6] - 111:11, 121:8, 122:2, 122:12, 122:23, 122:24
**obtained** [1] - 126:9
**obviously** [1] - 86:16
**occasions** [2] -

27:17, 76:19
**occurred** [3] - 68:7, 82:3, 85:5
**odd** [2] - 31:19, 44:4
**OF** [2] - 1:2, 1:18
**offer** [6] - 5:3, 34:14, 117:17, 117:18, 120:6, 120:10
**offered** [5] - 34:17, 109:4, 111:11, 112:20, 121:8
**offering** [1] - 120:1
**offers** [1] - 118:23
**office** [9] - 16:7, 19:25, 20:4, 23:5, 30:20, 45:16, 47:1, 100:11, 108:18
**Official** [1] - 1:22, 133:7
**old** [5] - 85:11, 106:19, 106:24, 121:15
**OLSON** [1] - 2:18
**Olympics** [2] - 74:6, 74:8, 85:7
**Once** [2] - 25:5, 46:5
**once** [3] - 46:5, 77:2, 93:3
**One** [11] - 40:9, 40:21, 48:6, 78:11, 102:7, 102:21, 117:14, 123:22, 127:12, 130:23, 132:11
**one** [66] - 3:7, 3:20, 4:7, 4:9, 5:6, 6:15, 8:6, 8:19, 9:16, 9:18, 12:14, 16:11, 17:18, 18:12, 20:4, 21:9, 21:11, 21:14, 21:15, 32:4, 32:6, 32:9, 37:10, 37:14, 39:24, 45:12, 46:19, 46:21, 48:10, 49:20, 52:1, 54:4, 54:9, 71:9, 78:15, 80:13, 82:10, 82:17, 84:17, 90:25, 91:10, 92:4, 94:2, 101:20, 103:7, 111:25, 112:1, 112:13, 112:22, 112:23, 113:3, 113:4, 113:11, 116:6, 116:10, 118:5, 119:16, 121:12, 121:15, 126:7, 127:7, 127:12, 132:10
**ones** [2] - 112:23, 113:7, 120:2
**oOo** [1] - 3:3

**open** [2] - 4:24, 106:18
**opening** [2] - 117:16, 119:19
**opens** [3] - 5:11, 5:22, 62:13
**operating** [1] - 41:24
**opinions** [8] - 104:14, 111:2, 117:17, 117:22, 118:23, 120:1, 120:6, 120:10
**opportunity** [3] - 35:13, 117:19, 119:25
**opposed** [1] - 43:7
**opposing** [1] - 112:6
**Opposing** [1] - 112:6
**oranges** [1] - 6:2
**order** [10] - 6:22, 10:18, 19:17, 20:5, 26:25, 51:13, 54:5, 97:19, 118:2, 127:24
**original** [5] - 34:7, 86:11, 86:22, 90:8, 99:15
**originates** [1] - 40:17
**Oscar** [1] - 90:7
**Ostroff** [3] - 3:19, 124:8, 126:24, 129:18, 130:17
**Ostroff's** [1] - 129:18
**otherwise** [5] - 10:22, 11:5, 28:25, 29:4, 50:3
**ourselves** [1] - 82:15
**out-of-pocket** [1] - 31:13
**outside** [5] - 61:7, 61:12, 100:12, 119:13, 119:16
**overrides** [1] - 14:11
**Overruled** [3] - 12:1, 91:6, 132:17
**overruled** [16] - 121:25, 122:1, 122:3, 122:4, 122:6, 122:7, 122:8, 122:9, 122:12, 122:14, 122:18, 122:20, 122:21, 132:13
**overstep** [1] - 58:4
**owe** [2] - 11:5, 110:20
**owed** [1] - 78:3
**own** [4] - 71:15, 83:10, 94:7
**owned** [9] - 5:13, 5:14, 16:16, 16:17, 41:19, 43:12, 110:18, 110:19

**owner** [1] - 72:12
**ownership** [5] - 6:6, 16:13, 28:10, 48:12, 48:16
**owns** [1] - 40:16

## P

**P-A-T-E-R-N-O** [1] - 15:12
**P.M** [1] - 1:19
**p.m** [3] - 3:2, 115:11, 132:20
**pace** [2] - 114:9, 115:8
**pack** [1] - 132:2
**Page** [39] - 44:15, 45:1, 58:7, 98:4, 98:10, 121:17, 121:19, 121:24, 122:2, 122:5, 122:6, 122:7, 122:8, 122:9, 122:11, 122:13, 122:15, 122:16, 122:17, 122:18, 122:19, 122:20, 122:21, 122:22, 122:23, 122:24, 132:15
**page** [23] - 13:15, 21:21, 23:17, 30:14, 30:15, 31:4, 31:5, 37:15, 37:19, 46:14, 46:16, 47:4, 47:5, 54:21, 94:25, 98:9, 121:18, 122:12, 132:14, 132:16, 133:4
**pages** [3] - 47:3, 55:4, 117:9
**Pages** [1] - 122:17
**paid** [18] - 10:18, 10:21, 11:1, 45:7, 45:9, 48:21, 51:2, 53:3, 71:17, 95:15, 95:16, 96:10, 96:13, 96:25, 97:4, 97:23, 97:25, 99:3
**Pamela** [2] - 1:22, 133:7
**Paragraph** [27] - 12:6, 12:11, 12:19, 22:11, 22:15, 22:17, 24:2, 24:8, 24:14, 24:18, 25:8, 25:14, 25:20, 45:2, 47:15, 47:24, 49:24, 50:4, 51:6, 54:22, 92:18, 95:1, 95:2, 98:5, 98:14, 98:16
**paragraph** [3] -

27:18, 37:17, 54:24
**paragraphs** [1] - 49:23
**Paragraphs** [1] - 12:9
**Pardon** [1] - 50:16
**part** [5] - 10:20, 61:22, 71:9, 89:21, 129:13
**participant** [1] - 97:12
**particular** [3] - 32:2, 85:8, 85:10
**particularly** [2] - 18:1, 79:15
**parties** [10] - 19:23, 20:1, 20:11, 26:11, 48:24, 55:22, 56:4, 57:20, 63:8, 115:21
**parties'** [1] - 55:21
**partner** [1] - 34:19
**partners** [1] - 74:24
**parts** [1] - 41:25
**party** [14] - 4:8, 26:14, 26:15, 26:16, 26:17, 28:8, 28:9, 53:20, 96:2, 123:19, 129:14, 129:24, 130:1, 131:2
**pass** [1] - 62:2
**passive** [2] - 87:13, 97:12
**PATERNO** [1] - 134:4
**Paterno** [28] - 3:13, 7:5, 14:23, 15:7, 15:12, 15:15, 15:17, 15:21, 15:25, 26:20, 30:11, 33:7, 34:6, 35:20, 36:16, 38:25, 39:1, 45:5, 46:16, 49:8, 49:10, 52:8, 56:15, 57:5, 61:17, 61:22, 87:3, 127:17
**Paterno's** [2] - 4:17
**Patti** [1] - 73:11
**Patty** [1] - 73:19
**Paul** [8] - 43:17, 43:18, 43:19, 44:7, 46:6, 86:25, 99:10, 99:18
**Paul's** [3] - 46:19, 47:7, 47:8
**Paulina** [1] - 40:5
**pay** [11] - 10:20, 53:9, 53:25, 57:9, 98:15, 110:21, 123:25, 125:14, 125:23, 127:2, 129:13
**payable** [4] - 97:23,

98:18, 98:24
**paying** [6] - 48:19, 48:20, 52:13, 52:16, 78:5, 129:17
**payments** [1] - 130:1
**pays** [5] - 43:4, 48:23, 53:13, 53:19, 53:22
**Peas** [1] - 76:7
**people** [14] - 5:23, 20:4, 40:9, 40:18, 42:14, 43:5, 44:24, 69:9, 71:3, 75:1, 75:2, 75:14, 75:23, 77:14
**per** [1] - 14:7
**percent** [5] - 24:24, 27:3, 44:18, 98:18, 98:23
**percentage** [1] - 11:22
**perform** [1] - 18:11
**performance** [1] - 128:7
**performed** [3] - 81:13, 88:23, 88:24
**performing** [3] - 39:5, 53:3, 53:4
**performs** [1] - 53:11
**period** [7] - 19:9, 30:24, 68:9, 68:10, 69:20, 126:9
**periods** [1] - 37:24
**permanent** [2] - 125:14, 125:23
**permission** [1] - 112:4
**person** [8] - 26:7, 34:20, 46:21, 53:11, 53:21, 76:21, 102:18, 125:6
**personal** [1] - 81:12
**perspective** [2] - 119:2, 119:5
**Peter** [4] - 14:23, 15:7, 15:12, 87:2
**PETER** [1] - 134:4
**Petty** [1] - 73:19
**Phil** [3] - 7:22, 8:16, 9:11
**PHILIP** [1] - 1:4
**phone** [6] - 72:8, 78:2, 81:19, 86:21, 110:14
**phones** [3] - 66:9, 71:5, 71:8
**phonograph** [2] - 33:3, 95:3
**phrased** [1] - 129:20
**piano** [3] - 53:8, 53:9, 53:10

pick [2] - 67:5, 108:16
**picked** [1] - 108:18
**piece** [2] - 72:21, 72:22
**piggish** [1] - 5:8
**piles** [1] - 113:19
**place** [1] - 17:5
**Plaintiff** [1] - 1:8
**plaintiff** [1] - 113:12
**PLAINTIFF** [3] - 2:3, 134:2, 134:17
**plaintiff's** [4] - 111:11, 113:20, 121:8, 121:11
**Plaintiff's** [12] - 15:4, 15:7, 32:21, 64:20, 64:24, 80:3, 80:17, 103:20, 105:23, 106:2
**plaintiffs** [1] - 5:20
**Plaintiffs** [1] - 117:15
**Plant** [2] - 71:5, 72:12
**play** [5] - 42:6, 67:12, 83:22, 87:10, 115:24
**played** [2] - 53:10, 83:12
**plays** [1] - 117:10
**pleadings** [1] - 112:15
**plenty** [1] - 114:12
**pocket** [1] - 31:13
**podium** [1] - 121:13
**poet** [1] - 73:12
**point** [14] - 6:15, 8:3, 18:1, 44:18, 54:1, 54:6, 57:15, 57:22, 98:23, 107:25, 109:1, 123:1, 126:7, 128:9
**points** [6] - 38:3, 38:11, 38:12, 38:18, 44:11, 119:20
**POMERANTZ** [47] - 2:19, 3:6, 4:3, 6:14, 7:20, 10:4, 11:12, 11:24, 13:4, 13:22, 14:13, 14:15, 14:21, 15:2, 68:15, 70:15, 78:10, 79:25, 80:11, 80:14, 105:5, 105:14, 105:17, 111:19, 112:19, 113:2, 113:6, 113:15, 113:22, 114:7, 114:14, 115:6, 116:5, 116:8, 116:24, 117:14, 118:5, 118:20, 119:9, 119:23, 120:14, 120:18, 131:18, 131:20, 131:25,

132:7, 132:9
**Pomerantz** [15] - 3:5, 10:12, 12:17, 13:20, 14:20, 22:17, 25:18, 64:10, 78:19, 79:24, 87:12, 112:18, 129:21, 131:3, 131:17
**Pooh** [1] - 39:14
**pop** [2] - 81:14, 101:14
**popular** [1] - 71:11
**portion** [4] - 4:18, 6:4, 6:6, 6:19
**portions** [3] - 111:11, 121:8, 130:20
**position** [9] - 3:20, 6:25, 39:16, 65:12, 65:14, 65:21, 112:24, 113:11, 116:13
**possible** [2] - 72:21, 114:15
**posters** [1] - 42:4
**potential** [2] - 4:10, 128:21
**practice** [5] - 39:3, 39:4, 55:24, 66:12, 71:14
**pre** [2] - 32:6, 33:15, 46:17
**pre-admitted** [2] - 32:6, 46:17
**pre-recorded** [1] - 33:15
**precise** [2] - 23:9, 55:19
**precisely** [1] - 129:20
**predict** [1] - 94:14
**preeminent** [2] - 40:14, 44:8
**prefer** [2] - 103:10, 117:23
**preferable** [1] - 112:10
**preference** [1] - 116:1
**prefers** [1] - 7:12
**prejudice** [5] - 63:2, 118:16, 118:19, 119:15, 127:11
**prejudicial** [8] - 6:10, 63:19, 63:21, 118:9, 120:7, 127:4, 131:7
**prepared** [5] - 16:7, 46:20, 64:10, 64:11, 112:5
**prescribed** [1] - 50:4
**presence** [2] - 119:13, 119:16
**present** [7] - 75:14,

119:5, 123:24, 125:8, 126:4, 127:6, 129:25
**president** [1] - 65:22
**PRESIDING** [1] - 1:4
**press** [1] - 6:22
**Pretenders** [1] - 73:23
**pretty** [8] - 21:3, 31:25, 40:17, 41:8, 43:3, 114:17, 118:1, 120:16
**previous** [2] - 13:15, 113:6
**previously** [1] - 43:23
**priced** [2] - 8:22, 9:2
**primarily** [5] - 20:24, 33:12, 33:22, 39:3, 95:6
**primary** [2] - 34:9, 55:11
**principals** [1] - 57:22
**privately** [1] - 76:20
**privilege** [12] - 124:11, 124:13, 124:25, 126:22, 126:23, 128:16, 128:17, 128:18, 128:24, 129:22, 130:3, 130:9
**Privilege** [2] - 125:8, 125:20
**privileged** [4] - 124:15, 124:22, 125:24, 130:12
**privy** [1] - 11:20
**probative** [4] - 127:5, 127:10, 127:23, 131:8
**problems** [4] - 17:22, 17:25, 18:3, 36:5
**procedure** [2] - 120:21, 121:4
**proceeding** [1] - 4:24
**PROCEEDINGS** [1] - 1:18
**Proceedings** [1] - 132:20
**proceedings** [1] - 133:4
**process** [1] - 61:22
**produce** [7] - 45:13, 73:13, 81:9, 87:10, 101:25, 102:2, 102:16
**produced** [10] - 34:20, 40:19, 61:24, 73:22, 88:2, 88:22, 88:24, 91:20, 93:20, 102:18
**producer** [14] -

32:11, 32:12, 40:14,
40:16, 40:22, 40:23,
72:18, 73:8, 73:9,
73:10, 75:18, 76:17,
76:19, 88:4
   **producers** [4] - 19:7,
75:21, 75:22, 82:25
   **producing** [1] -
74:12
   **production** [1] - 22:2
   **productions** [1] -
81:8
   **Productions** [4] -
1:7, 43:11, 81:7,
82:16
   **products** [1] - 68:23
   **Professor** [1] - 131:5
   **profit** [1] - 18:1
   **profitable** [1] - 5:16
   **project** [3] - 83:15,
87:22
   **projects** [1] - 72:25
   **proof** [1] - 5:3
   **properly** [1] - 66:14
   **propose** [1] - 7:2
   **proposed** [1] - 46:9
   **proposing** [4] -
118:2, 118:3, 123:7
   **prospective** [1] -
131:4
   **provide** [1] - 100:1
   **provided** [2] - 100:4,
112:6
   **providers** [1] -
123:19
   **provides** [1] - 51:6
   **providing** [2] - 69:5,
128:15
   **provision** [64] - 8:7,
8:8, 8:15, 8:21, 9:1,
9:5, 9:13, 9:23, 12:19,
12:24, 13:10, 13:19,
22:12, 22:18, 22:20,
23:20, 23:21, 23:23,
24:5, 24:8, 25:6,
26:20, 26:21, 26:22,
26:23, 27:7, 27:8,
27:18, 28:14, 28:15,
28:21, 31:21, 36:9,
37:18, 38:14, 47:15,
47:23, 48:7, 49:19,
49:24, 50:5, 50:8,
50:13, 50:21, 50:23,
51:3, 51:5, 51:8, 51:9,
52:4, 52:5, 54:20,
56:16, 56:25, 57:9,
62:13, 63:12, 63:13,
79:2, 124:3, 127:19,
128:1
   **provisions** [11] -

7:22, 27:10, 27:16,
35:14, 36:6, 37:22,
38:8, 48:6, 55:25,
117:7
   **public** [1] - 6:22
   **publicly** [1] - 76:20
   **publishers** [3] -
48:20, 52:13, 52:16
   **pull** [5] - 8:3, 8:17,
8:18, 23:19, 30:4
   **pulled** [1] - 131:22
   **purpose** [1] - 21:18
   **purposes** [2] - 62:10,
130:8
   **pursuant** [5] - 9:4,
69:6, 104:18, 104:23,
133:3
   **put** [33] - 4:1, 7:22,
9:11, 9:20, 9:24, 12:6,
12:7, 14:10, 18:12,
20:15, 29:24, 32:5,
32:24, 33:3, 33:5,
34:5, 37:15, 41:11,
49:9, 68:3, 75:5,
83:12, 87:13, 90:2,
90:4, 108:3, 108:5,
112:22, 112:24,
126:22, 132:2
   **putting** [1] - 7:22

## Q

   **qualifications** [1] -
118:22
   **qualified** [1] - 117:17
   **questioned** [1] -
18:17
   **questioning** [4] -
6:19, 10:15, 42:20,
116:15
   **questions** [45] -
10:4, 10:7, 10:10,
10:11, 12:18, 14:14,
14:21, 16:3, 32:7,
36:16, 38:25, 42:19,
47:14, 49:2, 49:4,
49:8, 52:8, 54:23,
56:8, 56:11, 57:13,
69:25, 76:12, 78:10,
78:11, 78:14, 79:25,
91:19, 92:3, 99:8,
100:20, 100:23,
101:2, 101:7, 101:9,
102:7, 102:20, 103:3,
118:5, 118:21, 120:9,
128:22, 130:12,
130:25
   **quick** [2] - 17:13,
116:22

**quickly** [15] - 3:13,
3:14, 3:15, 3:24,
16:23, 17:1, 17:4,
42:23, 51:13, 51:21,
51:23, 51:24, 67:3,
114:10, 116:3
   **Quincy** [4] - 73:9,
73:10, 75:23, 101:14
   **quite** [5] - 77:15,
82:19, 88:18, 109:2,
118:4
   **quote** [1] - 126:3

## R

   **R&B** [2] - 81:14,
101:15
   **radio** [8] - 41:12,
42:6, 81:20, 106:18,
106:19, 106:20
   **raise** [11] - 3:7, 4:3,
4:21, 15:6, 58:3,
64:23, 106:1, 111:25,
116:6, 123:16, 123:22
   **raised** [4] - 57:24,
74:8, 116:8, 129:18
   **raising** [1] - 107:3
   **ramifications** [1] -
127:25
   **ran** [2] - 39:8, 39:11
   **Rand** [3] - 34:14,
35:8, 35:12
   **RANDY** [1] - 134:6
   **Randy** [2] - 106:2,
106:6
   **Rap** [1] - 9:25
   **rap** [9] - 19:8, 41:3,
84:8, 85:7, 85:8, 88:4,
90:7, 109:3, 109:22
   **rapper** [1] - 41:5
   **rapping** [1] - 81:20
   **rate** [4] - 27:2, 44:11,
50:3, 50:4
   **rather** [9] - 27:9,
67:11, 67:16, 76:16,
103:13, 103:16,
113:24, 115:18, 117:8
   **rational** [1] - 130:13
   **reach** [4] - 4:25,
115:14
   **reached** [2] - 69:21,
95:25
   **reaches** [1] - 96:2
   **read** [6] - 26:23,
32:16, 79:5, 95:22,
115:4, 123:14
   **reading** [2] - 116:3,
118:1
   **ready** [12] - 91:2,

91:9, 91:12, 105:19,
111:13, 112:17,
114:24, 115:4,
115:19, 115:20,
115:23, 116:1
   **real** [5] - 39:19,
81:25, 108:25, 130:13
   **realistically** [1] -
114:21
   **realize** [4] - 56:15,
56:17, 115:9, 129:3
   **realized** [2] - 56:23,
57:6
   **really** [29] - 32:12,
40:6, 44:6, 62:21,
62:25, 67:8, 68:25,
69:2, 69:7, 69:10,
71:18, 73:12, 74:15,
74:24, 75:6, 77:24,
79:4, 82:5, 88:18,
95:15, 97:21, 108:15,
109:6, 118:13,
119:20, 120:13,
130:8, 131:20
   **rearguing** [1] -
120:12
   **reason** [11] - 28:2,
93:7, 93:13, 99:21,
99:25, 119:14,
124:25, 125:21,
126:20, 126:21, 131:4
   **reasonable** [1] -
115:15
   **reasons** [4] - 43:1,
62:9, 62:11, 127:9
   **receipts** [9] - 24:25,
27:3, 27:12, 27:13,
29:17, 29:20, 29:21,
31:3, 31:8
   **receive** [2] - 22:23,
85:19
   **Received** [2] - 31:10,
31:11
   **RECEIVED** [2] -
134:17, 134:21
   **received** [4] - 10:13,
31:8, 32:21, 70:6
   **reception** [3] -
105:10, 105:13,
131:22
   **Recess** [2] - 64:3,
111:8
   **recipient** [1] - 87:13
   **recognize** [6] -
20:19, 21:22, 22:15,
23:23, 30:10, 32:8
   **recollection** [8] -
17:7, 35:20, 45:10,
46:2, 95:11, 98:22,
113:11, 125:12

   **reconsider** [2] -
118:14, 120:8
   **record** [107] - 6:7,
9:25, 10:19, 10:20,
10:21, 10:22, 10:25,
11:19, 11:22, 13:14,
15:10, 17:10, 17:11,
17:17, 18:12, 20:18,
20:22, 21:5, 21:9,
21:16, 22:12, 23:19,
24:14, 26:3, 26:12,
26:13, 26:17, 26:21,
26:22, 27:1, 27:22,
28:3, 33:3, 33:4, 33:5,
33:9, 33:19, 34:2,
36:20, 36:21, 36:25,
37:7, 39:8, 39:10,
41:14, 41:15, 42:7,
42:10, 48:11, 48:15,
48:17, 48:18, 48:19,
48:22, 48:23, 48:24,
51:3, 52:9, 52:10,
52:12, 52:22, 53:1,
53:4, 55:3, 55:4, 57:7,
61:25, 65:5, 70:18,
72:17, 72:18, 73:13,
73:18, 74:14, 75:6,
75:18, 75:21, 75:22,
76:17, 76:18, 79:14,
79:18, 81:10, 82:7,
82:8, 89:13, 90:1,
90:5, 93:5, 93:25,
104:4, 107:1, 108:12,
108:13, 109:5,
126:13, 127:3, 129:2
   **Record** [3] - 33:20,
71:5, 72:12
   **Recorded** [1] - 71:25
   **recorded** [7] - 33:15,
52:25, 71:25, 82:6,
89:1, 95:5
   **recording** [30] - 6:4,
9:14, 9:20, 9:24,
15:25, 16:1, 16:4,
19:17, 19:20, 19:22,
21:25, 22:1, 22:7,
22:9, 26:1, 27:8,
27:10, 34:7, 37:23,
38:4, 43:12, 47:11,
51:18, 53:1, 71:4,
89:1, 89:10, 90:23,
91:3, 94:1
   **recordings** [5] -
92:23, 92:24, 94:18,
95:3, 95:4
   **Records** [36] - 1:12,
4:19, 6:6, 15:17,
15:22, 16:2, 16:5,
16:8, 16:12, 16:14,
16:17, 16:19, 16:25,

18:23, 30:22, 39:11,
39:18, 41:16, 41:17,
41:19, 65:13, 65:14,
65:16, 65:19, 66:4,
73:6, 79:3, 85:14,
91:13, 93:13, 95:3,
96:8, 96:18, 101:13,
108:12

**records** [58] - 8:9,
11:1, 11:5, 12:19,
13:19, 17:22, 18:3,
18:8, 18:10, 18:16,
20:16, 21:1, 21:15,
22:2, 22:18, 22:19,
22:24, 24:1, 24:4,
24:10, 24:15, 24:20,
24:25, 25:4, 25:7,
25:8, 25:13, 26:11,
26:24, 27:3, 28:9,
29:11, 37:24, 42:5,
42:10, 42:13, 43:7,
45:14, 47:16, 47:21,
48:7, 48:21, 49:25,
50:12, 51:1, 52:21,
53:8, 55:12, 72:1,
74:12, 88:3, 92:25,
93:20, 94:2, 94:8,
95:3, 95:13, 124:2
**recouped** [2] - 10:21,
10:23
**recreate** [1] - 72:23
**recross** [2] - 54:11,
54:16
**RECROSS** [4] -
54:17, 102:5, 134:2,
134:10
**RECROSS-**
**EXAMINATION** [2] -
54:17, 102:5
**Red** [1] - 73:23
**redirect** [3] - 49:4,
49:8, 78:14
**Redirect** [2] - 10:6,
100:22
**REDIRECT** [8] -
10:8, 49:6, 56:13,
78:12, 100:25,
102:22, 134:2, 134:10
**reduced** [1] - 36:20
**reel** [2] - 33:14
**reel-to-reel** [1] -
33:14
**reference** [2] - 13:20,
24:4
**referred** [1] - 22:17
**referring** [1] - 62:25
**reflect** [1] - 56:3
**reflecting** [1] - 55:20
**refresh** [3] - 35:20,
95:11, 98:22

**regard** [3] - 104:17,
111:9, 122:25
**regarding** [2] -
47:15, 54:20
**Regardless** [1] -
50:14
**regulations** [1] -
133:5
**relate** [1] - 119:20
**related** [1] - 130:25
**relates** [7] - 38:15,
54:5, 57:19, 62:22,
63:9, 113:1, 127:21
**relationship** [4] -
82:2, 83:6, 84:19,
97:9
**relative** [1] - 11:19
**Relatively** [1] - 38:10
**relatively** [4] - 7:6,
38:9, 38:10, 38:14
**release** [1] - 83:5
**released** [6] - 4:24,
87:17, 87:20, 107:2,
108:1, 109:17
**relevance** [3] - 5:4,
63:1, 131:7
**relevant** [7] - 4:22,
5:19, 14:12, 63:23,
127:8, 127:17, 128:4
**relied** [1] - 110:5
**rely** [3] - 101:3,
101:5, 107:8
**remain** [2] - 39:16,
99:17
**remained** [2] - 93:4,
97:11
**remaining** [2] -
116:10, 122:12
**Remember** [2] -
104:12, 111:1
**remember** [16] -
17:11, 18:6, 18:18,
19:9, 24:13, 31:19,
31:24, 40:7, 45:24,
66:18, 68:5, 69:14,
78:18, 108:11
**removed** [1] - 71:3
**reopen** [2] - 50:15,
50:17
**reopened** [2] - 54:9,
64:2
**repeat** [1] - 28:18
**Repeat** [1] - 91:7
**repeatedly** [1] -
126:24
**Rephrase** [4] - 13:6,
13:24, 68:18, 97:6
**rephrase** [1] - 21:7
**reported** [1] - 133:4
**Reporter** [2] - 1:22,

133:7
**reporter** [3] - 15:5,
64:23, 106:1
**REPORTER'S** [1] -
1:18
**reports** [2] - 120:25,
121:1
**represent** [2] -
23:18, 39:25, 40:4,
41:17
**representative** [2] -
4:8, 86:14
**represented** [6] -
40:1, 40:2, 40:3,
40:10, 43:15, 99:10
**reproducing** [1] -
95:4
**reproduction** [3] -
33:10, 53:9, 95:5
**reproductions** [2] -
20:23, 33:20
**request** [2] - 4:11,
6:18
**requested** [1] - 112:4
**require** [2] - 120:2,
124:10
**required** [2] - 97:14,
97:19
**reside** [1] - 80:25
**respect** [16] - 6:5,
6:22, 11:5, 34:9,
53:24, 57:20, 63:9,
84:24, 120:24,
123:17, 124:1,
129:11, 129:23,
130:23
**respective** [1] -
41:22
**respond** [2] - 63:3,
131:13
**responded** [1] -
78:16
**response** [7] - 77:21,
78:15, 112:21,
113:13, 113:16,
114:10, 130:2
**responsibilities** [4] -
28:10, 48:12, 48:16,
48:22
**responsibility** [3] -
41:23, 69:7
**responsible** [10] -
34:18, 40:15, 41:8,
41:9, 41:25, 42:1,
48:19, 48:20, 52:13,
52:16
**result** [1] - 5:17
**RESUMED** [1] - 7:19
**retail** [1] - 8:9,
25:19, 25:20, 25:21,

133:7
26:4, 26:7, 26:8,
26:13, 26:15, 47:16,
47:21, 48:24, 124:2
**retailer** [2] - 8:22, 9:2
**retired** [1] - 72:5
**revenue** [8] - 17:23,
18:3, 18:7, 18:15,
18:18, 18:19, 27:11,
27:20
**revenues** [1] - 31:8
**review** [3] - 116:22,
123:1, 123:2
**reviewed** [1] -
111:10
**revise** [1] - 127:18
**revised** [4] - 111:10,
112:4, 121:7, 127:14
**revision** [1] - 127:20
**Rhapsody** [1] -
53:16
**RICHARD** [1] - 2:4
**Richard** [1] - 114:14
**ride** [1] - 108:17
**ridiculous** [1] -
110:20
**rights** [3] - 6:23,
43:11, 69:4
**Riley** [1] - 76:6
**road** [1] - 108:1
**Rock** [1] - 76:6
**Rogell** [2] - 3:18,
130:18
**role** [7] - 34:13,
74:22, 74:23, 75:13,
75:16, 88:1, 88:21
**roll** [1] - 53:10
**rolls** [2] - 53:8, 53:9
**Ronstadt** [1] - 40:6
**Room** [1] - 1:24
**room** [5] - 72:20,
108:11, 108:13,
118:21, 132:3
**Rosenberg** [12] -
43:17, 43:18, 43:23,
46:3, 46:8, 86:25,
99:8, 99:10, 99:12,
99:17, 99:22, 100:3
**Roses** [1] - 40:3
**rovision** [1] - 9:11
**royalties** [13] - 10:22,
22:23, 52:14, 52:16,
53:6, 53:14, 53:19,
53:22, 54:1, 96:10,
97:4, 97:20, 97:23
**royalty** [12] - 10:24,
24:24, 27:2, 44:11,
44:18, 50:3, 50:4,
51:3, 53:3, 53:5, 53:7,
53:10
**Roybal** [1] - 1:23

**Rubio** [1] - 40:5
**Rule** [1] - 116:25
**ruling** [3] - 61:20,
63:25, 132:12
**rulings** [2] - 111:12,
119:4
**Run** [2] - 73:2
**run** [1] - 39:10
**running** [1] - 74:25
**Rusto** [1] - 90:4

**S**

**Sadly** [1] - 39:7
**safest** [1] - 115:2
**sale** [13] - 4:18, 6:5,
6:6, 11:5, 24:20,
24:25, 26:4, 26:7,
26:8, 26:15, 26:18,
27:3, 29:11
**sales** [16] - 11:17,
14:12, 25:19, 25:20,
25:21, 26:4, 26:13,
27:22, 27:25, 48:21,
48:24, 70:6, 70:7,
70:11
**sample** [2] - 102:15,
102:24
**samples** [2] - 83:2,
83:3
**sanctioned** [1] -
127:1
**sat** [2] - 108:24,
127:17
**satellite** [1] - 50:1
**saw** [6] - 35:16,
66:10, 88:3, 94:11,
94:12, 109:3
**scenario** [4] - 114:2,
114:5, 114:6, 114:25
**schedule** [4] - 3:9,
3:11, 3:18, 115:25
**scheduling** [2] -
105:1, 115:9
**school** [5] - 33:12,
44:4, 44:5, 45:24,
70:23
**scope** [2] - 50:11,
117:21
**Scott** [1] - 46:24
**screen** [12] - 8:4, 8:8,
12:7, 20:17, 31:6,
32:6, 32:24, 33:4,
33:6, 33:18, 49:9,
87:13
**screens** [1] - 132:4
**scribblings** [1] -
111:20
**se** [1] - 14:7

**sealed** [1] - 58:7
**Sealed** [1] - 61:5
**seat** [4] - 15:8, 64:25, 80:18, 106:3
**seats** [1] - 15:3
**Seattle** [1] - 40:4
**Second** [2] - 71:20, 104:25
**second** [10] - 4:16, 16:11, 24:1, 28:13, 37:17, 47:5, 71:13, 72:8, 103:7, 126:8
**seconds** [1] - 63:18
**Section** [1] - 133:3
**see** [45] - 7:23, 8:1, 8:11, 9:12, 13:12, 24:4, 24:21, 24:23, 25:2, 26:24, 27:4, 29:6, 29:7, 30:14, 31:14, 33:7, 33:16, 33:18, 33:23, 37:18, 38:1, 49:15, 64:14, 80:5, 92:13, 95:2, 95:9, 98:20, 98:21, 99:1, 104:15, 111:3, 115:14, 115:24, 116:1, 117:4, 117:7, 117:10, 118:13, 118:18, 119:17, 119:18, 119:25, 128:16
**seeing** [1] - 130:11
**Seijas** [2] - 1:22, 133:7
**sell** [7] - 27:24, 42:13, 42:16, 68:22, 69:6, 88:12, 108:6
**selling** [8] - 6:3, 24:9, 24:15, 28:9, 82:20, 88:3, 102:8, 102:9
**sells** [2] - 22:24, 26:7
**send** [1] - 108:16
**sending** [1] - 108:11
**sense** [3] - 42:2, 42:3, 115:7
**sensitive** [2] - 6:16, 6:17
**sent** [1] - 46:21
**sentence** [1] - 98:6
**separate** [1] - 112:13
**separated** [2] - 27:9, 27:15
**separately** [2] - 112:11, 113:14
**serious** [1] - 109:6
**server** [1] - 37:4
**service** [1] - 108:6
**services** [8] - 43:12, 43:13, 53:16, 81:9,

100:1, 100:4, 123:20, 124:1
**Session** [1] - 1:19
**set** [6] - 71:15, 98:16, 112:22, 114:24, 115:4, 115:22
**sets** [2] - 72:17, 129:11
**setting** [1] - 75:16, 91:20
**settle** [1] - 112:16
**Setzer** [1] - 40:5
**Seven** [1] - 88:22
**seven** [2] - 55:4, 65:17
**seventh** [1] - 94:25
**several** [2] - 35:1, 96:17
**Shady** [14] - 83:13, 83:14, 83:17, 83:19, 83:25, 85:12, 87:22, 101:19, 102:8, 107:1, 107:18, 107:22, 107:25, 109:18
**shall** [1] - 24:24
**SHAPIRO** [1] - 2:11
**share** [4] - 27:11, 27:20, 97:4, 97:22
**sheet** [1] - 18:7
**shoot** [1] - 114:2
**short** [13] - 29:18, 29:19, 29:24, 35:14, 35:15, 36:3, 38:11, 38:19, 51:12, 51:21, 51:25, 104:11, 105:9
**shorten** [1] - 105:7
**shortly** [1] - 66:16
**shot** [3] - 62:18, 73:13, 73:16
**show** [10] - 5:15, 9:20, 12:23, 13:13, 23:18, 62:16, 63:17, 66:10, 85:10, 108:2
**showed** [4] - 47:23, 52:1, 52:4, 68:24
**showing** [4] - 11:13, 30:6, 46:16, 62:15
**shown** [1] - 17:25
**shows** [2] - 84:8, 84:10
**side** [5] - 42:11, 42:12, 47:20, 92:13, 119:16
**side's** [2] - 112:23, 113:11
**sidebar** [3] - 80:5, 103:5, 103:24
**Sidebar** [6] - 80:6, 80:16, 103:9, 103:19, 103:25, 104:8

**sides** [1] - 4:8
**sign** [9] - 17:10, 17:18, 43:9, 61:23, 67:16, 93:4, 95:24, 98:12, 109:13
**signature** [1] - 98:9
**signed** [26] - 16:1, 17:20, 19:4, 30:25, 42:23, 43:4, 43:10, 61:17, 66:23, 67:3, 67:23, 70:4, 82:14, 82:16, 92:5, 92:20, 93:3, 93:18, 95:17, 95:20, 95:22, 96:8, 98:7, 107:6, 109:10
**significant** [2] - 37:5, 45:10
**Significantly** [1] - 44:13
**signing** [6] - 16:19, 17:3, 42:1, 42:19, 45:12, 66:3
**signs** [1] - 42:11
**similar** [3] - 6:17, 49:19, 123:10
**Simple** [1] - 73:23
**simply** [3] - 62:4, 62:19, 127:5
**sing** [1] - 74:3
**singles** [1] - 27:24
**sit** [3] - 41:4, 72:17, 108:15
**situation** [2] - 114:7, 117:24
**situations** [1] - 26:10
**six** [5] - 17:13, 31:23, 55:4, 75:1, 83:22
**size** [1] - 33:14
**Sky** [1] - 73:23
**Slim** [14] - 83:13, 83:14, 83:17, 83:19, 83:25, 85:12, 87:22, 101:19, 102:8, 107:1, 107:17, 107:22, 107:25, 109:18
**slipped** [1] - 85:21
**slow** [2] - 18:20, 33:1
**slunked** [1] - 39:20
**small** [1] - 108:2
**smart** [2] - 44:6, 44:7
**Smith** [1] - 73:12
**Snoop** [2] - 40:18, 41:6
**sold** [29] - 8:9, 8:22, 9:2, 9:4, 9:6, 9:7, 12:19, 13:19, 22:12, 22:18, 22:20, 26:3, 26:12, 26:14, 26:16, 26:24, 47:16, 47:21, 49:25, 50:13, 51:1,

52:23, 53:1, 83:6, 84:6, 88:7, 95:6, 101:20, 124:2
**someday** [1] - 82:7
**someone** [9] - 9:15, 9:20, 23:5, 26:2, 62:1, 71:2, 74:20, 120:2, 128:15
**sometime** [5] - 44:17, 51:10, 54:25, 90:3, 110:11
**sometimes** [5] - 27:7, 27:13, 27:17, 55:8, 56:15
**Sometimes** [2] - 27:10, 27:19
**somewhere** [2] - 19:9, 88:13
**son** [2] - 67:4, 74:10
**song** [29] - 22:7, 32:15, 52:20, 52:23, 52:25, 53:2, 53:3, 53:4, 53:11, 53:21, 73:18, 89:2, 89:8, 89:24, 90:7, 90:8, 90:10, 90:11, 90:18, 91:2, 91:9, 91:12, 91:16, 102:8, 102:9, 102:12, 107:19
**songs** [15] - 5:7, 74:3, 83:16, 83:22, 83:23, 83:24, 83:25, 88:2, 88:20, 88:22, 91:20, 91:25, 101:8, 101:22, 107:19
**songwriter** [3] - 52:20, 52:21, 53:11
**songwriters** [1] - 48:19
**Sony** [2] - 43:8, 72:11
**sooner** [2] - 3:23, 113:24
**Sorry** [3] - 34:24, 35:18, 54:12
**sorry** [13] - 10:2, 12:8, 12:12, 14:3, 14:5, 32:23, 54:8, 75:3, 79:17, 86:11, 121:24, 122:15, 132:10
**sort** [10] - 28:7, 36:4, 42:9, 42:10, 66:9, 69:10, 71:3, 72:8, 72:23, 73:5
**sound** [13] - 20:23, 21:25, 22:9, 33:10, 33:11, 33:21, 70:13, 72:19, 95:3, 95:5, 126:17

**sounded** [1] - 77:11
**sounds** [2] - 36:14, 70:12
**SOUTH** [1] - 2:22
**speaking** [1] - 34:18
**special** [2] - 85:24, 113:18
**Special** [3] - 74:1, 74:5, 74:8
**specific** [8] - 36:2, 36:5, 50:23, 62:22, 62:25, 63:6
**specifically** [3] - 29:9, 31:12, 69:14
**speed** [1] - 33:14
**spell** [4] - 15:11, 65:5, 80:19, 106:4
**spend** [1] - 118:10
**spent** [1] - 65:24
**split** [6] - 27:11, 27:12, 28:2, 28:6, 28:11, 48:11
**spoken** [1] - 76:25
**Springsteen** [8] - 72:9, 73:1, 73:4, 73:5, 73:7, 73:14, 73:17, 76:4
**stall** [1] - 116:5
**stamped** [1] - 31:4
**stand** [11] - 3:13, 4:1, 15:5, 63:18, 63:24, 64:22, 105:25, 118:23, 125:22, 127:18, 131:13
**standard** [7] - 21:1, 21:3, 21:15, 31:16, 31:21, 51:24
**starred** [1] - 89:5
**start** [9] - 8:19, 64:15, 70:22, 71:5, 74:14, 103:11, 112:15, 113:21, 115:11
**started** [11] - 39:11, 40:3, 40:11, 55:3, 74:16, 74:20, 74:22, 75:3, 83:10, 103:17, 110:17
**starting** [1] - 56:5
**Starting** [2] - 121:7, 121:17
**state** [6] - 15:10, 65:4, 80:19, 84:13, 106:4
**statement** [4] - 25:24, 61:23, 112:9, 119:19
**States** [1] - 133:3, 133:5
**STATES** [1] - 1:1

**station** [1] - 106:20
**stations** [2] - 42:6
**stay** [2] - 66:23, 104:5
**stayed** [1] - 99:19
**steal** [1] - 43:5
**Stefani/No** [1] - 76:6
**stenographically** [1] - 133:4
**step** [6] - 14:22, 19:24, 26:10, 61:7, 80:1, 103:4
**Steve** [5] - 68:12, 69:3, 69:16, 123:3, 123:5
**Stevie** [1] - 73:20
**Stiffelman** [8] - 3:12, 7:21, 8:1, 8:17, 8:20, 10:10, 13:13, 14:19
**STIFFELMAN** [1] - 134:3
**still** [10] - 26:12, 51:25, 74:25, 83:9, 90:2, 93:10, 100:14, 103:14, 114:17, 116:5
**stipulation** [2] - 104:18, 104:23
**stole** [1] - 102:24
**stolen** [1] - 102:15
**stop** [1] - 47:4
**stopped** [1] - 72:3
**stores** [5] - 37:3, 42:7, 48:24, 108:6, 108:7
**Straits** [1] - 73:24
**streaming** [1] - 123:20
**Street** [1] - 1:23
**STREET** [1] - 2:5
**strictly** [1] - 87:9
**strike** [4] - 14:15, 14:18, 118:17, 119:6
**structure** [1] - 115:8
**studio** [10] - 40:24, 40:25, 41:4, 71:4, 71:11, 72:10, 72:12, 72:24, 81:22, 89:2
**Studios** [1] - 71:5
**study** [1] - 85:20
**stuff** [3] - 56:2, 77:14, 90:4
**style** [1] - 83:10
**subject** [21] - 8:13, 48:3, 61:18, 68:17, 124:16, 124:23, 125:3, 125:22, 125:24, 126:2, 126:4, 126:6, 126:8, 126:12, 126:21, 127:23, 128:21, 128:24,

129:17, 129:20, 129:22
**Subject** [1] - 124:22
**submit** [2] - 104:13, 112:4
**submitted** [6] - 104:14, 111:3, 113:7, 113:8, 113:12, 113:18
**subscription** [3] - 53:16, 123:20, 123:25
**subsequent** [2] - 34:9, 96:18
**substance** [9] - 124:10, 125:19, 126:7, 126:8, 126:12, 126:17, 128:21, 128:24, 130:5
**success** [5] - 5:17, 18:23, 82:10, 84:3, 84:6
**successful** [2] - 74:7, 118:14
**sue** [1] - 62:1
**sues** [1] - 62:1
**sufficient** [1] - 114:11
**suggest** [4] - 5:20, 67:10, 67:15
**suggested** [2] - 46:8, 46:11
**suggestions** [1] - 34:14
**SUITE** [1] - 2:6
**summaries** [2] - 116:9, 116:25
**summary** [3] - 116:17, 117:6, 117:11
**sung** [1] - 41:7
**supposed** [1] - 78:16
**surprise** [1] - 19:11
**surprisingly** [1] - 112:7
**sustained** [21] - 11:14, 121:18, 121:20, 121:21, 121:22, 121:23, 121:24, 121:25, 122:5, 122:10, 122:12, 122:16, 122:17, 122:19, 122:20, 122:22, 122:24, 132:13
**Sustained** [3] - 13:6, 13:24, 68:18
**sweetening** [1] - 90:3
**switched** [1] - 129:16
**sworn** [4] - 15:7, 64:24, 80:17, 106:2

**T**

**T.I** [1] - 101:13
**tabbed** [1] - 92:12
**tables** [5] - 105:12, 131:23, 132:2, 132:4, 132:5
**talent** [3] - 18:25, 19:1, 81:22
**talented** [1] - 43:6
**talks** [3] - 24:15, 28:23, 47:16
**tape** [6] - 66:14, 67:22, 72:21, 72:22, 76:13, 76:15
**tapes** [1] - 33:14, 33:15
**Target** [1] - 9:2
**tea** [2] - 71:9
**teach** [1] - 66:12
**team** [1] - 34:15
**teaser** [1] - 83:23
**Ted** [4] - 74:16, 74:20, 74:21
**Teddy** [1] - 76:6
**teed** [1] - 120:16
**telephone** [3] - 50:1, 77:8, 110:13
**Temple** [1] - 1:23
**ten** [1] - 17:9
**term** [3] - 31:16, 32:14, 68:16
**terms** [9] - 4:6, 37:21, 93:2, 93:17, 93:25, 94:22, 105:12, 109:13, 124:16
**test** [1] - 126:23
**testified** [2] - 20:9, 34:1, 35:21, 36:10
**testify** [2] - 124:8, 129:19, 130:15
**testifying** [1] - 123:17
**testimony** [11] - 4:17, 8:10, 17:5, 17:8, 63:5, 91:16, 104:12, 114:3, 118:7, 120:24, 131:5
**THE** [168] - 1:4, 3:5, 4:2, 4:5, 4:13, 5:3, 5:25, 6:12, 6:24, 7:2, 7:7, 7:10, 7:13, 7:16, 7:18, 10:6, 11:14, 12:1, 12:2, 13:6, 13:24, 14:18, 14:20, 14:22, 14:24, 15:1, 15:4, 15:5, 15:8, 15:9, 15:10, 15:12, 18:20, 32:20, 33:1, 37:12,

38:22, 49:5, 50:6, 50:14, 50:17, 50:19, 54:6, 54:10, 54:12, 54:14, 54:16, 56:12, 57:14, 58:2, 58:5, 61:7, 61:9, 61:12, 61:13, 61:14, 62:6, 62:17, 63:4, 63:24, 64:6, 64:7, 64:8, 64:13, 64:17, 64:20, 64:22, 64:25, 65:1, 65:4, 65:6, 65:7, 68:18, 79:24, 80:1, 80:2, 80:3, 80:5, 80:7, 80:10, 80:12, 80:15, 80:18, 80:20, 90:15, 91:6, 91:7, 92:10, 100:22, 103:2, 103:4, 103:7, 103:14, 103:18, 103:20, 103:23, 104:5, 104:9, 104:17, 105:6, 105:15, 105:20, 105:23, 105:25, 106:3, 106:6, 106:7, 110:25, 111:6, 111:9, 111:15, 111:20, 111:22, 112:2, 112:10, 112:12, 112:25, 113:4, 113:14, 113:17, 113:24, 114:12, 114:19, 115:17, 116:21, 117:3, 117:10, 117:25, 118:9, 118:25, 119:12, 120:12, 120:15, 121:5, 121:7, 121:13, 121:17, 123:5, 123:7, 123:10, 123:14, 124:18, 124:20, 125:5, 125:18, 126:2, 126:10, 126:15, 127:5, 127:10, 128:5, 128:7, 128:11, 128:14, 129:6, 130:14, 130:19, 131:9, 131:15, 131:19, 131:23, 132:1, 132:8, 132:14, 132:17, 132:19, 134:2, 134:10
**themes** [1] - 5:6
**Thereafter** [1] - 113:11
**thereafter** [1] - 34:8
**They've** [1] - 125:3
**thinking** [2] - 63:1, 82:7

**thinks** [2] - 4:25, 6:20
**third** [15] - 26:11, 26:14, 26:15, 26:16, 26:17, 28:8, 28:9, 48:23, 53:20, 57:20, 63:8, 123:19, 129:14, 130:1, 131:2
**Thomas** [2] - 15:7, 15:12
**thousands** [2] - 117:8
**three** [6] - 12:2, 17:12, 71:23, 72:2, 73:19, 73:20
**Three** [1] - 102:3
**throughout** [1] - 5:6
**thumb** [1] - 117:8
**Thursday** [9] - 105:4, 105:6, 105:7, 105:9, 105:10, 105:12, 114:10, 115:11, 123:8
**tied** [2] - 62:24, 63:6
**timing** [2] - 11:6, 114:15
**tin** [2] - 42:16, 42:17
**Title** [1] - 133:3
**titles** [1] - 74:24
**TN** [1] - 2:7
**today** [14] - 3:16, 44:17, 52:22, 64:10, 75:25, 80:9, 80:10, 80:14, 82:19, 88:8, 88:13, 90:5, 105:18, 123:11
**Today** [1] - 76:1
**together** [14] - 20:23, 27:13, 33:21, 75:1, 83:12, 84:16, 85:4, 108:3, 112:13, 112:14, 112:22, 112:24, 113:8
**TOLLES** [1] - 2:18
**Tom** [1] - 73:19
**tomorrow** [7] - 80:8, 105:19, 111:4, 116:16, 123:17, 124:9, 130:16
**Tomorrow** [1] - 105:1
**tone** [1] - 75:16
**tonight** [1] - 3:19
**Tony** [1] - 101:12
**took** [6] - 5:4, 17:5, 17:12, 20:4, 71:11, 74:6
**top** [1] - 92:17
**topic** [2] - 128:20, 129:7
**topics** [1] - 127:13

152

**total** [3] - 101:22, 116:21, 116:23
**tour** [1] - 85:7
**Town** [1] - 73:3
**town** [1] - 68:4
**track** [4] - 74:19, 80:7, 89:12, 94:11
**tracks** [2] - 55:13, 83:1
**traditional** [1] - 109:3
**Transcript** [1] - 58:7
**TRANSCRIPT** [1] - 1:18
**transcript** [3] - 61:5, 133:4, 133:4
**transmission** [3] - 50:1, 50:2, 51:2
**transportation** [2] - 33:13, 95:7
**treats** [1] - 40:25
**tremendous** [1] - 119:15
**trial** [5] - 22:18, 57:17, 87:12, 114:9, 117:4
**TRIAL** [1] - 1:18
**tried** [2] - 20:11, 39:19
**trouble** [1] - 70:25
**true** [23] - 16:25, 18:9, 18:10, 18:15, 18:22, 19:20, 19:21, 20:9, 29:8, 34:1, 35:7, 35:11, 35:21, 38:3, 51:15, 53:13, 56:15, 56:19, 56:21, 57:5, 63:16, 81:25, 133:3
**trust** [2] - 99:21, 121:12
**try** [12] - 5:20, 8:2, 19:25, 36:3, 41:4, 56:1, 66:12, 72:20, 73:7, 75:20, 108:5, 108:13
**trying** [5] - 23:9, 75:17, 84:13, 104:2, 131:10
**Tuesday** [9] - 1:21, 3:1, 104:21, 114:4, 114:18, 115:5, 115:20, 115:23, 116:2
**turn** [9] - 32:23, 44:23, 45:1, 49:13, 51:15, 76:11, 76:25, 98:4
**turned** [1] - 81:24
**turns** [1] - 44:8
**TV** [1] - 9:20
**twice** [1] - 25:4

**Two** [3] - 4:6, 61:11, 101:15
**two** [28] - 4:8, 17:12, 27:16, 35:9, 36:9, 45:23, 49:23, 56:10, 61:16, 67:25, 71:22, 73:22, 78:11, 84:17, 86:4, 86:6, 105:18, 107:18, 108:6, 108:21, 112:20, 113:15, 114:11, 120:22, 123:16, 123:21, 125:5, 129:10
**type** [2] - 32:13
**types** [6] - 14:12, 28:15, 28:22, 82:6, 84:25, 101:16
**typical** [2] - 44:21, 47:10
**Typically** [2] - 34:4, 53:21
**typically** [1] - 29:24

**U**

**U.S** [1] - 52:21
**U2** [1] - 76:7
**ultimately** [5] - 34:19, 62:23, 67:22, 109:9, 118:12
**under** [26] - 9:7, 33:18, 51:2, 52:21, 53:15, 57:8, 57:9, 63:25, 68:21, 78:20, 90:11, 90:19, 90:22, 91:2, 92:22, 93:21, 93:25, 96:10, 96:13, 96:25, 97:3, 97:22, 98:24, 99:4, 130:1
**Under** [2] - 73:23, 116:24
**underlying** [1] - 41:3
**unexpressed** [2] - 13:5, 14:17
**unfairly** [1] - 63:21
**unhappy** [2] - 36:9, 36:10
**unimportant** [1] - 38:10
**UNION** [1] - 2:5
**unions** [2] - 48:20, 48:21
**unit** [2] - 53:7, 123:18
**UNITED** [1] - 1:1
**United** [2] - 133:3, 133:5
**Universal** [9] - 11:10, 26:2, 53:15, 54:1,

56:24, 68:21, 69:1, 69:23, 125:13
**Universal's** [3] - 68:13, 68:22, 69:5
**unknown** [1] - 33:10
**Unless** [1] - 121:13
**unless** [1] - 56:16
**unlike** [1] - 51:22
**unsuccessful** [1] - 39:20
**untalented** [1] - 19:13
**up** [72] - 6:3, 6:14, 7:22, 8:3, 8:17, 8:18, 9:11, 12:6, 12:7, 14:24, 16:11, 18:24, 20:15, 23:19, 30:4, 31:6, 35:13, 36:4, 36:6, 37:15, 41:5, 41:11, 43:14, 44:1, 44:14, 46:13, 49:9, 54:11, 54:21, 62:2, 62:25, 67:5, 68:3, 70:19, 71:16, 72:17, 81:12, 81:21, 81:22, 83:13, 83:17, 87:13, 88:2, 89:2, 89:25, 92:8, 92:14, 92:16, 102:8, 103:22, 105:2, 105:7, 108:7, 108:16, 108:18, 112:17, 118:23, 119:2, 120:15, 120:16, 123:21, 124:12, 125:10, 125:11, 125:22, 126:7, 127:7, 130:9, 131:13, 131:17, 132:2
**update** [3] - 55:2, 55:23
**upfront** [1] - 62:17
**uploading** [1] - 37:4
**upset** [1] - 77:11
**usage** [1] - 11:25
**useful** [1] - 22:1
**uses** [3] - 24:24, 25:1, 29:11

**V**

**Vague** [1] - 91:4
**value** [2] - 127:5, 127:10
**Van** [2] - 40:5, 40:6
**Vargas** [1] - 104:19
**various** [3] - 51:1, 53:16, 101:3
**Vegas** [1] - 108:2
**venture** [1] - 5:16

**verbal** [1] - 128:17
**versus** [3] - 125:14, 125:23, 128:7
**via** [3] - 50:1, 51:1, 86:21
**vibe** [1] - 72:24
**video** [1] - 92:14
**view** [4] - 38:8, 92:24, 119:19, 131:1
**vinyl** [3] - 9:5, 55:12, 94:3
**vis** [4] - 11:22, 37:6
**vis-a-vis** [2] - 11:22, 37:6
**vision** [2] - 109:2, 109:3
**visual** [4] - 20:24, 22:1, 33:11, 33:21
**vocals** [3] - 41:10, 41:11, 71:25
**voir** [3] - 117:20, 118:2, 118:23
**voluminous** [1] - 117:1
**vs** [1] - 1:10

**W**

**Wait** [2] - 61:7, 61:12
**wait** [3] - 118:24, 132:9
**Wal** [3] - 9:6, 25:21, 26:3
**Wal-Mart** [3] - 9:6, 25:21, 26:3
**Warner** [1] - 43:8
**waste** [2] - 104:1, 119:12
**ways** [5] - 51:1, 74:25, 117:1, 119:10, 120:22
**week** [2] - 67:25, 104:19
**weekend** [3] - 85:18, 85:22, 114:25
**weeks** [2] - 86:4, 86:6
**weight** [3] - 118:12, 119:21, 120:13
**WEIL** [1] - 2:10
**Wendy** [1] - 64:1
**West** [4] - 40:15, 40:16, 81:1, 81:3
**whereby** [1] - 97:8
**whole** [4] - 12:10, 12:11, 32:16, 83:14
**wife** [2] - 74:4, 74:13
**Will.i.am** [1] - 76:8
**willing** [3] - 35:11,

42:14, 115:13
**win** [4] - 84:14, 90:6, 109:19, 109:21
**Winnie** [1] - 39:14
**wire** [1] - 50:3
**wires** [2] - 131:25, 132:1
**witness** [35] - 3:8, 3:11, 3:18, 3:19, 3:25, 4:7, 4:9, 4:10, 15:3, 15:4, 15:7, 30:7, 50:11, 58:1, 62:4, 63:18, 64:20, 64:24, 65:2, 80:3, 80:8, 80:14, 80:17, 92:9, 103:20, 105:23, 106:2, 115:11, 116:14, 116:16, 125:21, 125:22, 127:18, 131:7
**WITNESS** [12] - 12:2, 14:24, 15:9, 15:12, 54:12, 61:13, 64:7, 65:6, 80:2, 80:20, 91:7, 106:6
**Witness** [1] - 61:8
**WITNESSES** [2] - 134:2, 134:10
**witnesses** [6] - 3:23, 4:12, 4:13, 114:9, 115:12, 116:15
**won** [8] - 19:7, 19:9, 19:12, 88:3, 90:7, 91:10, 101:20
**wondering** [1] - 119:24
**word** [4] - 21:16, 21:20, 24:1, 24:14
**worded** [1] - 56:17
**words** [6] - 8:2, 14:7, 19:23, 20:11, 78:18, 95:8
**works** [3] - 10:24, 41:1, 101:13
**worst** [2] - 114:1, 114:6
**Worst** [2] - 114:4, 114:25
**wrap** [2] - 41:6, 131:17
**write** [3] - 19:24, 19:25, 20:1, 81:9, 82:23, 84:1, 87:9, 88:21, 89:17, 91:25, 101:25, 102:2, 102:14
**writes** [2] - 41:2, 52:20
**writing** [9] - 53:2, 55:21, 83:10, 89:10, 89:12, 90:11, 90:18,

90:22, 111:19
**written** [3] - 98:18,
128:16, 128:18
**wrote** [13] - 20:3,
23:4, 23:5, 73:17,
88:2, 88:22, 88:24,
88:25, 90:10, 90:11,
91:20, 107:22

## Y

**Yayo** [1] - 101:12
**year** [18] - 19:8,
19:10, 19:12, 39:8,
45:23, 70:24, 72:5,
74:6, 75:3, 77:6, 86:6,
87:23, 88:4, 88:15,
88:18, 89:12, 99:14
**years** [20] - 21:3,
39:7, 39:17, 40:1,
44:3, 44:4, 45:23,
65:17, 71:22, 71:23,
72:2, 75:11, 76:5,
85:11, 92:5, 99:12,
106:19, 106:24,
107:18
**York** [2] - 71:6, 86:18
**young** [6] - 45:22,
45:25, 66:8, 66:12,
81:20, 85:9
**Yourself** [6] - 89:9,
89:11, 90:6, 90:10,
90:21, 91:10
**yourselves** [2] -
104:13, 111:1

## Z

**zoom** [1] - 46:14