1            **UNITED STATES DISTRICT COURT**

2            **CENTRAL DISTRICT OF CALIFORNIA**

3      **HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING**

4   **F.B.T. PRODUCTIONS, LLC,**         )
                                         )

5                                          )
                                         )

6                     **Plaintiffs,**    )
                                         )

7                                          )
                                         )

8        **Vs.**                  )    **No. CV 07-3314-PSG**
                                         )

9                                          )
                                         )

10   **AFTERMATH RECORDS, ET AL.,**       )
                                         )

11                                          )
                                         )

12                   **Defendants.**   )
                                         )

13 _____ )

14

15

16        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17                *JURY TRIAL*

18           *DAY 2, A.M. SESSION*

19         **LOS ANGELES, CALIFORNIA**

20        **TUESDAY, FEBRUARY 24, 2009**

21 _____

22

23          **MIRIAM V. BAIRD, CSR 11893**
       **OFFICIAL U.S. DISTRICT COURT REPORTER**

24       **255 EAST TEMPLE STREET, # 181-K**
      **LOS ANGELES, CALIFORNIA 90012**

25           **(213) 894-2853**
         **MVB11893@aol.com**

```
 1                    A P P E A R A N C E S

 2

 3    IN BEHALF OF THE PLAINTIFF,      RICHARD BUSCH
      F.B.T. PRODUCTIONS:              315 UNION STREET
 4                                     NASHVILLE, TN 37201
                                       - and -
 5                                     GLASER, WEIL, FINK, JACOBS
                                       & SHAPIRO, LLP
 6                                     BY:  MARK L. BLOCK
                                       10250 CONSTELLATION
 7                                     BOULEVARD
                                       NINETEENTH FLOOR
 8                                     LOS ANGELES, CALIFORNIA
                                       90067
 9

10

11

12

13    IN BEHALF OF THE DEFENDANT,      MUNGER, TOLLES & OLSON, LLP
      AFTERMATH RECORDS, ET AL.:       BY:  GLENN D. POMERANTZ
14                                          KELLY KLAUS
                                            MELINDA LEMOINE
15                                     355 SOUTH GRAND AVENUE
                                       THIRTY-FIFTH FLOOR
16                                     LOS ANGELES, CALIFORNIA
                                       90071
17

18

19

20

21

22

23

24

25
```

<div align="center">

**INDEX**

</div>

**WITNESS:**                                              **PAGE:**


**Gary Scott Stiffelman, witness, sworn**              74
DIRECT EXAMINATION                                    74
CROSS-EXAMINATION                                     **90**

* * * * *


**EXHIBITS:**

  None offered

* * * * *

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; MONDAY, JANUARY 26, 2009; 1430 |
| 2 | --- |
| 3 | |
| 4 | THE COURT:  Good morning. |
| 5 | We're still waiting for a couple of jurors, but I |
| 6 | wanted to clarify a couple things on the record with the time |
| 7 | that we have. |
| 8 | First, with regard to Motion in Limine Number 5. |
| 9 | You may be seated. |
| 10 | Motion in Limine Number 5, the order is modified |
| 11 | to reflect that Mr. Martin may testify with regard to |
| 12 | discussions during negotiations with regard to the 2002 -- |
| 13 | I'm sorry.  The 2000 novation as well. |
| 14 | I had a question as it related to the stipulation |
| 15 | for the admission of exhibits, and it related to Page 9 -- |
| 16 | Exhibits 960 to 963.  They are -- those exhibits -- were |
| 17 | those -- lay that on.  Those exhibits are not at the amended |
| 18 | joint exhibit list, and that relates to my second question. |
| 19 | I have a problem with the exhibit list that I have. |
| 20 | As I mentioned during the telephone call, the responses are |
| 21 | cut off; so I can't read the responses. |
| 22 | Is there an amended exhibit list for the Court? |
| 23 | MS. LEMOINE:  We resubmitted that.  We're working |
| 24 | on that right now, Your Honor, getting you one here. |
| 25 | THE COURT:  Okay.  And then are 960 to 963, are |

 1    those add-ons?

 2              MS. LEMOINE:  They were just added, and on the most

 3    recent amended list the parties agreed to add them.

 4              THE COURT:  All right.  And then -- so then the

 5    parties will provide one to the Court and to the clerk?

 6              MS. LEMOINE:  Yes.  It includes everything.

 7              THE COURT:  Anything else to address before all of

 8    the jurors finally arrive?

 9              MR. POMERANTZ:  Yes, Your Honor.  I think we have

10    worked out everything in terms of for openings, and there's

11    no issues to be resolved before openings.  But if we have a

12    minute, there's an issue that I would like to address.

13              We have been talking about the order of witnesses.

14    They have 18 witnesses listed, and they haven't withdrawn any

15    of them as of this time.  A couple of witnesses that we

16    have -- we wanted to get some adjustment of the schedules.

17    It didn't happen.  They didn't drop Mr. Iovine; so he has

18    changed his business trip, and he will be here this afternoon

19    to testify.

20              Mr. Kenswil has changed his business trip, and he

21    will be here tomorrow.  And my understanding in talking to

22    Mr. Busch is that based on the timing of the other witnesses,

23    Mr. Kenswil will get on the stand and off the stand tomorrow

24    as we walk through the witnesses.  So that's fine for

25    Mr. Kenswil because he'll take a redeye tomorrow night to

1     New York.

2          The problem is Ms. Rogell.  She is scheduled to

3     be -- I think she's number five in the lineup.  And as

4     Mr. Busch and I have walked through it, that would mean

5     tomorrow morning.  And Ms. Rogell is flying in tonight from

6     someplace that is snowy, and she's skiing.  I'm not sure

7     exactly where it is.  And she gets in late.  She hopes the

8     weather permits.  And the one thing she has asked is to not

9     testify tomorrow morning.  She'll testify tomorrow afternoon,

10    Thursday, or Friday.

11         And I have asked Mr. Busch to accommodate just

12    Ms. Rogell.  We have worked out the others, and let her

13    testify, instead of testifying fifth, just move up Witnesses

14    6 and 7 let her go in the afternoon tomorrow, and Mr. Busch

15    has declined my request, saying that their precise order of

16    witnesses is very important to them, and they don't want to

17    accommodate even Ms. Rogell's schedule where she gets in

18    late.  We have asked that she just be postponed by a few

19    hours so she cannot testify in the morning, and we would ask

20    Your Honor if you could help us to adjust the schedule just

21    in that one respect.

22         MR. BUSCH:  Your Honor, it did not happen the way

23    Mr. Pomerantz suggested.  We have an order of witnesses, and

24    Mr. Pomerantz asked me to amend to allow Mr. Kenswil at first

25    to go on in the morning.  And what I agreed to do, actually,

 1  was to amend my witness list.  I agreed to move Jeff Bass,

 2  who was scheduled to be fourth, out of the way; and I offered

 3  to eliminate or to move down Rio Caraeff, who is also

 4  scheduled to testify fifth or sixth, before Mr. Kenswil so

 5  that Mr. Kenswil could get on because the first request was

 6  Mr. Kenswil needs to be gone sometime midday.  And after I

 7  had offered that, it turned out that Mr. Kenswil could stay

 8  the whole day on Wednesday and so that really wasn't

 9  necessary.  They wanted -- they no longer wanted me to move

10  Jeff Bass and Rio Caraeff for Mr. Kenswil.

11          Ms. Rogell is a little bit different because

12  Ms. Rogell is testifying about the issues relating to the

13  recording agreements and her negotiations.  And we think it

14  sets up Mr. Kenswil's testimony because it's going from the

15  agreements to the third-party agreements, which we wanted to

16  have the testimony about the agreements, the '98 agreement,

17  negotiations for 2000 and 2003, and different issues related

18  to that prior to putting on Mr. Kenswil's testimony because

19  we think it's logical and makes sense to do it that way.  So

20  for that reason we felt like it was important to get that out

21  of the way before we put on Mr. Kenswil's testimony.

22          We do think that there's a chance that -- we

23  have -- going today, by the way, we have Mr. Stiffelman

24  first, we have Mr. Paterno second, and then we have

25  Mr. Iovine third.  Mr. Bass probably will be tomorrow, which

1    means Ms. Rogell will end up being late morning anyways.  And

2    we won't need to bring Mr. Kenswil in first before Ms. Rogell

3    if it turns out that way.

4         So that's the reason why -- we were willing to

5    accommodate Mr. Kenswil.  We offered to move two witnesses.

6    That wasn't acceptable.  And Ms. Rogell, we think, is

7    important to go in the order that we have her.

8         MR. POMERANTZ:  The reason is that they say they

9    need to explain the agreements before Mr. Kenswil testifies.

10   Mr. Stiffelman, the first witness, is the lawyer involved

11   in the agreements in 2000, 2003, and 2004.  They clearly

12   will be laying out the story of those agreements through

13   Mr. Stiffelman.  Mr. Paterno is the second witness.  He was

14   the primary lawyer for Aftermath in the 1998 agreement.  They

15   clearly will be asking him questions about the '98 agreement.

16        THE COURT:  Mr. Pomerantz, I don't disagree with

17   you.  It's what I said before.  I have limited it to my eight

18   hours.  They have the burden of proof.  Typically these

19   matters aren't even brought to my attention.  I view it as

20   a lack of courtesy and lack of professionalism to not

21   accommodate witnesses, but I'm not going to intervene.

22        And we'll see everybody in a few minutes when all

23   of the jurors are in.

24        MR. POMERANTZ:  Thank you, Your Honor.

25        (Recess from 9:19 a.m. to 9:36 a.m.)

```
 1              THE COURT:  Good morning.

 2              (Open court - jury present.)

 3              THE COURT:  Plaintiffs' opening statement.

 4              MR. BUSCH:  Good morning.

 5              My name is Richard Busch, and I'm representing

 6     the plaintiffs in this case.  The plaintiffs are F.B.T.

 7     Productions, which is a production company owned by Mark and

 8     Jeff Bass.  It stands for Funky Bass Team.  Jeff Bass is

 9     sitting here.

10              And also I'm representing Em2M, LLC, which is owned

11     by Joel Martin, and Joel Martin is also sitting here.  And

12     Mr. Martin handles the business of -- for F.B.T. and for

13     Em2M.

14              Jeff and Mark Bass of F.B.T. are the people who

15     first discovered Eminem in the early 1990's and who composed

16     and played the music on many of Eminem's biggest hits.

17              In fact, Jeff Bass and Eminem won an Oscar for the

18     song "Lose Yourself," which was written by Jeff Bass, and

19     they were also nominated for a Grammy award for best song of

20     the year that same year.  Jeff and Mark Bass also won a

21     Grammy award for best producers for the album Slim Shady in

22     1999.

23              The defendants in this case are Universal Music and

24     two of the record labels that it owns, Interscope Records and

25     Aftermath Records.  Those are entities with which Eminem and
```

 1    F.B.T. have their recording agreements.

 2            We are here today because the defendants in this

 3    case have failed and refused to honor a promise they made to

 4    pay royalties to Eminem and F.B.T. according to the express

 5    terms of the their recording agreements.

 6            Now, one thing that you may be wondering is Eminem

 7    is not a plaintiff in this case.  F.B.T., under their

 8    agreements, have the right to bring a lawsuit in their own

 9    name or in Eminem's name or both, and they've chosen this

10    case to bring this lawsuit just in the name of F.B.T.

11            Now, this is truly a simple case, and there are

12    three things that I'm going to talk to you about now that I

13    want you to keep in mind during the entire case.

14            The first thing is that there are very clear words

15    in the recording contracts at issue in this case.  And those

16    words say, that whenever the defendants license master

17    recordings to another party -- and master recording, it's

18    just a fancy word meaning a recording of music from which

19    copies can be made -- that whenever the defendants license

20    master recordings to a third party for any reason at all in

21    the world -- and that's what the contracts say -- including

22    so that those third parties can manufacture and sell a

23    record, the defendants have to pay the plaintiffs, F.B.T. and

24    Eminem, 50 percent of the net receipts they receive.

25            This language requiring them to pay 50 percent of

```
 1    the net receipts for any license, whenever they license the
 2    master recordings, was written by the defendants.  It was not
 3    written by Eminem.  It was not written by Jeff Bass or Mark
 4    Bass.  It was not written by Joel Martin.  It was written by
 5    the defendants in their recording agreements, and it's as
 6    clear as night and day.  I will show you in this case that
 7    even though you will repeatedly hear the defendants say that
 8    they pay according to their contracts, the defendants are
 9    asking you to ignore the clear language of the recording
10    contracts and essentially rewrite the contracts to say
11    something the defendants wish the contracts say, but they
12    don't.
13           Now, the second thing that I would like you to keep
14    in mind during this case is that the defendants are doing
15    this -- trying to get away with this because they pay artists
16    a lot less when they sell records themselves than when they
17    license master recordings to others to sell.  Now, why do
18    contracts -- record contracts provide for a lesser royalty
19    when the record companies are selling records themselves?
20    Simple.  Because when a record company sells a record
21    themselves, distribute it, manufacture it, they have a lot
22    of costs associated with those sales.
23           For example, the record company must pay for the
24    manufacturing of each one of these CDs or each one of these
25    vinyls.  They have to reproduce this for every sale.  Every
```

1    sale they make thousands, perhaps millions, depending on how

2    many are distributed.  They have to pay for the artwork.

3    They have to create the artwork that goes with each one of

4    these CDs, the booklets that go with each one of these CDs,

5    the liner notes that go with each one of these CDs, the discs

6    and jewel case -- this is a jewel case -- that goes with each

7    one of these CDs, the shrink wrap.  They have to pay for the

8    cost of manufacturing each and every one of these individual

9    items.

10           They also have sales staff across the country whose

11   job it is to sell these CDs and these records to record

12   stores like Best Buy, like Wal-Mart.  They're trying to get

13   them to sell because one thing that you need to keep in

14   mind -- that I asked you to keep in mind during this case is

15   that you and I are not the customers.  No.  It is the

16   retailers who are the customers.

17           So, for example, it is the record companies who are

18   contacting retailers and saying we think this new Eminem is

19   going to be a big hit.  You need to buy 1,000 copies,

20   10,000 copies, 100,000 copies of this.  When the retailers

21   agree to that and say, "Okay.  I'll buy them," the retailers

22   own these CDs.  Title passes to these CDs to them.  They can

23   do with them whatever they want.  They can turn around and

24   throw them away.  They can say, "You buy a television set,

25   and we'll give you every Eminem CD we have in the store for

free." It's theirs. They can do with it what they want.

They can't reproduce it, and I'll get to that in a moment, but they can do whatever they want with this CD that they want when they buy it from a retailer.

On the other hand, when they license a master recording to someone else, they simply give that someone else, the third party like iTunes, for example; or like a third party who might put a song on an album that they manufacture, they give them one copy of the song. They give them either a digital file -- Universal will give them a digital file, or they will give them a tape, and then the third party does the rest. The third party manufactures that. The third party distributes it. The third party does everything else required to get it into the hands of the consumer.

And that is why the -- well, the defendants have no manufacturing costs, no distribution costs at all; whether the song is then sold or downloaded by an end user a thousand times or a million times, they don't have to send a million separate digital files to the licensee. They send one digital file; the licensee does the rest, whether it is in physical form or digital form; and the record label gets the benefit of that. And in those situations when there's a license of the master recording for someone else to sell, the record contract says we're going to split our net receipts

1    50/50.

2           Now, the defendants admit this.  This is nothing

3    that you will hear the defendants not admit.

4           The third thing I'm going to show you is that

5    despite this, the defendants did not want to pay Eminem,

6    F.B.T., or anyone, for that matter, what they promised to

7    pay:  50 percent of what they get for these licenses.

8           Now, we're talking about two things in this case,

9    and I want to make sure that that's clear.  We're talking

10   about permanent downloads, like you -- when you go to iTunes.

11   Permanent downloads.  And we're talking about ring tones,

12   when you have a cell phone and your phone rings and it plays

13   a song for 30 seconds, something like that.  In both of those

14   cases the defendants do the same thing, they provide a

15   digital file, but they don't want it -- they license the

16   digital file, the master recording, but they don't what to

17   pay the 50 percent for that.

18           So what do they do?  I will show you in this case

19   that they try to camouflage their agreements with these

20   mobile companies -- like T-Mobile, Cingular, Sprint,

21   Nextel -- and with the permanent download companies like

22   iTunes and others, try to camouflage those agreements with

23   the hope that they could trick people into believing that

24   they were sell and resell agreements.  And what do I mean

25   by that?  They are trying -- they try to structure these

1    agreements so that it would appear that Universal and the

2    record labels are actually selling the downloads to the

3    digital download companies, who are then supposedly reselling

4    it.  The only reason for this is so that they could claim

5    that they're not licensing the master recordings, but they

6    are selling the digital -- they are selling downloads to

7    iTunes.

8         The problem with that, as I will show you, is that

9    for all practical purposes these agreements are identical to

10   other agreements that is they have that they admit are

11   licensing agreements.  In other words, they send one digital

12   file; they don't get any money for it; Apple and iTunes

13   cannot do with it what they want.  They have restrictions on

14   what they can do.  Universal doesn't get any money unless and

15   until an end user downloads it.  Universal can demand the

16   return of the digital file at any time they want.  They

17   can terminate the agreement.  Apple and the digital download

18   companies, the mobile carriers don't have a lot of the

19   rights, and I'll go into this, that you would have when you

20   sell something to someone.

21        Now, these are the three things that I will show

22   you in the case that I'd like you to keep in mind during the

23   course of the case.

24        Now, let me tell you what else I will show you and

25   fill in the details.

1          The story of Eminem and the Bass brothers begins in

2    1992, when they met each other.  You'll hear this during the

3    case.  Jeff Bass and Mark Bass at the time were struggling

4    musicians and producers.  They had very little.  But they saw

5    in Eminem a great talent.  He was 17 years old at the time.

6    And for the next several years they allowed Eminem to record

7    in their recording studio.

8          In 1995, F.B.T., Jeff and Mark Bass, spent what

9    money they had, borrowed what they didn't, and formed F.B.T.,

10   and they signed Eminem at that time.  Eminem released his

11   first album in 1995 that only sold 30 copies.  It was a big

12   disappointment.  After that, Jeff and Mark Bass began

13   collaborating with Eminem as far as writing the music for the

14   songs.  Now, remember, F.B.T. and Jeff and Mark Bass don't

15   write the lyrics.  They write and compose music.  And you'll

16   hear that during the case.

17         For the next two years they wrote and composed and

18   collaborated with each other, and in 1997 Eminem came out

19   with an L.P. called the *Slim Shady* L.P.  That started getting

20   some buzz.  That started getting some success.  And as a

21   result of that buzz and that success, Eminem and Mark Bass

22   took what money they had and hit the road, and they ended up

23   in Los Angeles, where Eminem started becoming very successful

24   in the underground rap world and came to the attention of

25   Jimmy Iovine, the head of Interscope Records, one of the

1    defendants in this case.

2           And Jimmy Iovine was given a tape of one of

3    Eminem's performances and was blown away, quite frankly, and

4    decided that we needed to sign this kid and we needed to sign

5    him quick, before anyone else could.  So they had Mark Bass

6    and Eminem into Universal and met with Interscope, and

7    they -- Jimmy Iovine actually gave them some money to stay

8    in Los Angeles to make sure the deal got signed.

9           And within -- over the course of a week -- and

10   you'll hear that's ten times faster than is usual in the

11   recording industry, Universal and Interscope had Eminem

12   signed on their -- on their form, on their agreement.  They

13   hired Peter Paterno, who you will also meet, as their lawyer.

14   Peter Paterno is a very well-known lawyer in the record

15   industry, and he was representing Aftermath Records, which

16   was Dr. Dre and Interscope's record label.

17          Dr. Dre had an ownership interest in Aftermath

18   Records.  Interscope was their joint venture partner.  And

19   Jimmy Iovine from Universal gave Eminem and F.B.T. the option

20   of either signing with Interscope or with Aftermath Records.

21   And they suggested that Aftermath, for purposes of

22   appearances, for purposes of buzz, that Aftermath would be a

23   good -- for credibility Aftermath would be a good place for

24   Eminem to sign.

25          Aftermath, at that time, was not a successful

 1    label, and Eminem was essentially the first artist signed

 2    to it.  You'll hear in this case that Eminem's success

 3    skyrocketed Aftermath and increased the value of Aftermath

 4    exponentially.

 5             So in 1998, with about four -- about a week or so

 6    of time, Peter Paterno negotiated this agreement on behalf

 7    of Aftermath.  Eminem and F.B.T. had a lawyer that they knew who

 8    was fresh out of law school.  His name was Paul Rosenberg.

 9    He was essentially a friend of Eminem's and F.B.T.'s, and he

10    was actually also at one time an aspiring rapper by the name

11    of Paul Bunyon.  And he was representing Eminem and F.B.T.

12    Peter Paterno, on behalf of Aftermath -- on Peter Paterno's

13    form -- on Peter Paterno and Aftermath's form, on their

14    recording agreement, the agreement was done in about a week

15    to ten days.

16             THE COURT:  Mr. Busch, I'm sorry to interrupt.

17             Could you slow down just a little bit for me?

18             MR. BUSCH:  Yes, sir.

19             THE COURT:  Thank you.

20             MR. BUSCH:  Now, let me talk to you about the 1998

21    recording agreement that was signed that's at the heart of

22    this case.

23             As I said to you in my opening, when I started,

24    artists get money.  Record companies exploit records or sell

25    records or license records in two ways.  They either sell the

1  records themselves or they license recordings to third

2  parties.

3           So here is the front page of the 1998 recording

4  agreement that was entered into.  You'll see it was from

5  Aftermath Records to Paul Rosenberg, and it talks about the

6  recording agreement.

7           Now, let's go to Paragraph 4 of that agreement, and

8  that is what is called the records sold provision.  And that

9  records sole provision states what the royalties will be when

10  Universal, Aftermath -- when the record label sells a record.

11  And remember what I said:  Selling a record means

12  manufacturing it, having the costs of manufacturing it,

13  having the cost to distribute it, putting it on your

14  platform.  That is the provision that applies when Universal,

15  Aftermath, Interscope is selling records themselves.

16           Now, importantly, and if you go down, you'll see

17  that at the bottom of the records sold provision it says,

18  "Notwithstanding the foregoing."  And what I'll show you is

19  in this case that "notwithstanding the foregoing" means what

20  comes next controls over what came before.  So what comes

21  next is going to control as far as how we're going to pay

22  royalties.

23           So what comes next after "notwithstanding the

24  foregoing"?  After the "notwithstanding the foregoing" we

25  have two paragraphs that I want to draw your attention to.

1    The first is a record club provision.  I remember record

2    clubs.  And what record clubs are is there are record clubs

3    that will sell record label's products.  They'll do the

4    distribution.  You'll get something in the mail that says if

5    you buy two CDs or three CDs at a lower price now, then we'll

6    send you CDs in the future, and you'll buy them at full

7    price.

8          And here you'll see that it says that on records

9    sold through a direct mail or mail order distribution method,

10   including record clubs, we're going to split the net receipts

11   50/50.  Why?  It's Universal's product, it's Universal's

12   album, but Universal is not doing the distribution.  They've

13   licensed it to someone else to do the distribution and the

14   costs of manufacturing, and so they're splitting the receipts

15   50/50, just like any other license.

16         Sometimes you'll see -- and I'll show you this in

17   this case.  Sometimes you'll see the record club provision in

18   a separate paragraph, like you do here.  Other times it's

19   right in the licensing paragraph that I'll show you.  Why?

20   Because it's a license.  It's treated the same way.  There's

21   a split of 50/50 because the record label has no costs.

22   They're not doing the distribution.  They're not doing the

23   manufacturing.

24         Now, let me show the next paragraph that is the

25   heart of this case.  Paragraph 4(c)(v) of the 1998 agreement

```
 1    says, "On masters license by us or our N.R.S. licensees," and
 2    I'll show you that the defendants will say that the N.R.S. is
 3    not important -- on our -- "by our licensees to others" -- so
 4    it's a license by us or our licensees to others, "for their
 5    manufacture and sale of records or for any other uses" --
 6    anything -- "your royalty shall be an amount equal to
 7    50 percent of our net receipts from the sale of those records
 8    or from those other uses of the masters."
 9            Okay.  I will show you in this case that there's
10    absolutely no restriction on the types of licenses this
11    applies to.  By its pure language it applies to any license
12    of any kind, whether the third party is manufacturing and
13    selling records or using those masters for any purpose.  And
14    remember, I said a moment ago all a master is is a recording
15    of a song from which a copy can be made.  That's all it is.
16            So keep this in mind.  This is the key language in
17    the case, and I want you to focus on it if you would.
18            If you would go to the definition of "master,"
19    please.
20            So it's a license of a master.  That's in the same
21    contract.  There's the definition of master.  And as I said,
22    all it means is a recording of sound, with or without visual
23    images, which is used or useful in the recording, production,
24    or manufacture of records.  That's all it is.  And whenever
25    the defendants license masters to other for any use in the
```

1   world, the 50 percent net receipts provision applies.

2           Now, not only am I going to tell you this -- not

3   only have I told you this, but I'm also going to bring in --

4   in this case you're going to meet David Berman.  Who is David

5   Berman?  David Berman spent his entire career in the music

6   business.  He was the president of Capitol Records, which was

7   one of the major record labels which had the Beatles, Frank

8   Sinatra, Selena.  He was also the general counsel, the head

9   legal person at Geffen Records, which is now part of

10  Universal itself.

11          He will be here and tell you the same thing.  He

12  will be here and tell you that the records sold provision,

13  which is when Universal, when Interscope is selling records,

14  was structured with the fact that the record company would

15  be doing the distributing and manufacturing themselves.  He

16  will tell you that the license provision that I just told you

17  has always applied to every license of a master recording

18  ever.

19          That's what it is meant to do.  It applies to every

20  license, and it applies to these types of licenses in this

21  case.  He will be here.  He will tell you the same thing.

22          In fact, in this case the defendants have what they

23  call an expert witness.  And the person they have is who they

24  call their expert witness is a person by the name of

25  Jeff Harleston.  I will show you that their expert witness,

1    Jeffrey Harleston, is just another employee of the

2    defendants.  He works for -- he works for and with many of

3    the same witnesses on behalf of Universal that you'll meet in

4    this case.

5          I will show you that when I asked him questions at

6    what is called a deposition, which is when I asked questions

7    before the trial to see what somebody is going to say, that

8    he couldn't think of any license that would -- any license at

9    all before downloads -- before permanent downloads that he

10   would say would not be covered by the licensing provision.

11         I will also show you that although he'll come in

12   here -- at least he did at his deposition and say that these

13   agreements are not license agreements, I will show you that

14   prior to the time he knew he was going to be an expert

15   witness in this case that he said publicly that these

16   agreements are license agreements.

17         Now, in 1998 illegal downloads were all of the

18   rage, and it was a big problem for the music industry.

19   Napster, Peer to Peer, those types of things were a big

20   problem.  And Universal at that time created a division

21   called eLabs.  And what eLabs was designed to do was to try

22   to figure out how to deal with these illegal downloads and to

23   try to structure something on their own to have their own

24   system for perhaps purchasing downloads.  So they tried to

25   establish their own digital download structure.

1          There was a company called Blue Matter that you'll

2     hear about that was a complete failure.  There was a joint

3     venture between it and Sony called Press Play, failure.  Just

4     recently they tried another joint venture called Total Music,

5     and it just closed.  Failure.

6          This record company, whose business it is, they'll

7     tell you, to sell music, had been absolutely unable to create

8     their own platform, their own way to sell digital downloads.

9     They haven't been able to build the infrastructure.  They

10    haven't been able to distribute or manufacture downloads

11    themselves.  They haven't been able to do it.

12         Now, if they could do it -- and this is important.

13    If they could do it, if they were able to successfully be

14    able to build their own platform, their own distribution

15    method, their own -- their own way to sell these downloads

16    themselves to the consumer, then perhaps they would have an

17    argument that the records sold provision applies.

18         The problem is, that they haven't been able to.

19    They can't.  They have to depend on the people at Apple,

20    iTunes, and others to sell the downloads pursuant to licenses

21    when they license their master recordings, and the license

22    provision, as a result, clearly applies, as I will show you

23    in this case.

24         They haven't been able to do it.  They've had to

25    license their recordings as a result.

1          Now we get to the big problem of the defendants,

2    which I'll show in this case.  By 2002, Apple and Universal

3    were in negotiations for Universal to license their

4    recordings to Apple so Apple could sell downloads.  While

5    Universal could not do it themselves, they knew that the

6    people at Apple were brilliant; that Apple had created a

7    superior platform for reproducing, manufacturing, and

8    distributing digital music, and that iTunes had the chance to

9    be big.  These people are not stupid people.  They are not.

10   And they knew what they had to do.  They knew they had a big

11   problem.

12         They knew they didn't want to pay artists

13   50 percent of what their receipts were for this license,

14   which they knew had the possibility of being very big.

15         So what did they do?  The top people at Universal

16   met, all the way up to the CEO, Doug Morris; the COO, Zach

17   Horowitz; the general counsel, Michael Ostroff, who will be

18   here to testify in this case; and the lawyers for all of the

19   labels.  And they talked about what to do.

20         I will show you that they were fully aware of

21   the licensing provision in the recording contracts of the

22   artists.  Fully aware of it.  I will show you that that

23   subject was discussed in connection with what I'm going to

24   tell you happened.  And they knew that the licenses that they

25   were going to be entering into fit all too nicely within the

1    licensing provision of the artists's contracts.

2            So what did they do?  They did several things,

3    which I will show you were designed to possibly cheat artists

4    out of their proper royalties.

5            The first thing that they did -- I'll tell you the

6    two things and then I'll fill in the details.

7            The first thing they did was they tried to make

8    these digital download agreements look like a sale/resale

9    agreement rather than a license agreement.  That's the first

10   thing they did.

11           The second thing they did, which I will show you

12   also, was they tried -- they invented a new royalty not found

13   in the artist agreements to try and make it appear that they

14   were being generous by giving the artists something more than

15   they would have gotten if records were sold directly by them.

16           But they also, at the same time, directed their

17   people to amend existing contracts and to negotiate new

18   provisions and new contracts to make it -- to say that the

19   record royalty provision applied and not the licensing

20   provision so that when the artist got wind of the fact that

21   they were actually being duped, that Universal was not being

22   generous, their contracts would have been amended or they

23   would have negotiated an amendment to their contract to say

24   that permanent downloads would be paid as record royalties.

25           Unfortunately, as I'll show you in this case, they

1    tried but were unable to get that concession from Eminem and

2    F.B.T.

3            So now let me fill in the details about what they

4    did.

5            When they negotiated their permanent down- --

6    remember, I said there were two things.  There's permanent

7    download agreements and there is master tone agreements.

8            And with the permanent download agreements and the

9    master tone agreements, what they did was they tried to

10   structure those agreements as if they were selling downloads

11   to the third parties rather than licensing.

12           I'm going to show you that that is a total fiction

13   for many reasons.  It's a fiction for one reason because

14   they're not selling these third parties anything.  The third

15   parties don't get title to the files that are provided to it.

16   They don't get to keep them when the term ends.  And,

17   remember, I told you when the records -- when the record

18   companies actually do sell something to retailers, the

19   retailers have it.  The record companies can't say back to

20   them, "Give it back to us."  They have it.  With these

21   licensing agreements, as I'll show you, everything they give

22   them by the terms of the agreement, ownership remains with

23   Universal, with the record companies.  It's a fiction.  It's

24   a fiction because Universal can terminate the agreement and

25   demand destruction of everything it provided to the download

1  and master tone companies.  When they sell physical product,
2  they can't do that.

3           It's a fiction because the agreements say
4  specifically that ownership and title remains with Universal.
5  When they sell physical product, that's not the case.  It's
6  a fiction because when you get this album, this *Infinite*
7  album, if you had bought one of the 30 copies -- I'm sorry.
8  This *Infinite* album, if you had bought one of the 30 copies
9  back in 1995, you can go on eBay and sell it.

10          Guess what?  This download, by the terms of the
11 agreements, you can't resell it.  It's not yours to resell.
12 The terms of the agreements between Universal and the record
13 labels say there's no resale.  This entire structure they set
14 up is a complete fiction.

15          One other thing, as I'll show you in this case.  At
16 the time -- let me back up for one second.

17          The other thing they point to and they say, well --
18 that shows it's a sale is that they structured these
19 agreements to say we're selling the downloads to Apple for
20 a wholesale price of 70 cents or 70 percent of what Apple is
21 selling it for, and then Apple is selling it at a retail
22 price.  So, you see, it's a wholesale/retail structure, just
23 like we do in the physical world where we sell our CDs or
24 records at a lower price and then the retailers mark it up
25 for a retail price.  Again, I will show you that's a fiction

1    for several reasons.

2         One, it's a fiction because, unlike the physical

3    world, Apple doesn't -- Universal doesn't get a penny until

4    an end user downloads it.  If an end user never downloads a

5    song, Universal gets nothing.  They don't owe them anything.

6    The retailers owes the money once they buy the CD, whether

7    you or I ever go in the store and buy it ourselves.

8         The other reason it's a fiction, as I will show you

9    in this case, at the same time that Universal made this

10   decision to treat these permanent downloads and master tone

11   agreements as sale/resale agreements there was another form

12   of digital exploitation -- fancy word -- that was happening.

13   And those are subscription agreements.  You've probably heard

14   of those.

15        With subscriptions agreements, if you pay Rhapsody

16   or you pay the Napster -- the new Napster 9.95 or 12.95 a

17   month, you can download as many songs as you want.  You can

18   put them on your iPod, just like with a permanent download,

19   but Universal treats those as licenses.  Why?  Because even

20   Universal couldn't come up with a justification to say if

21   it's just a license and you don't have it forever that it's

22   a sale.

23        But I'm going to show you that with respect to some

24   of the things that they treat as licenses, ring-back tones

25   for one, that they have at the same wholesale/retail pricing

```
 1    that they do -- and remember, with ring-back tones -- back up

 2    for one second.

 3            A ring-back tone, just so that you know, is -- a

 4    master tone is when your phone rings; you hear it; it's a --

 5    it rings.  A ring-back tone is if I call you and I'm waiting

 6    for you to pick up, I hear music.

 7            Those with ring-back tones, they're not sold

 8    permanently.  You get them for 12 months.  And Universal

 9    treats those as licenses, but yet they -- they have the

10    same -- and I'll show you these agreements.  In many of the

11    agreements they have the same wholesale/retail pricing that

12    they do when they say they're selling.  I'll show you this

13    entire thing is a sham, and it's just a way to try to get

14    away with not paying the artist 50 percent of what they're

15    owed.

16            One last thing on this issue.  There are several

17    agreements for these master tones and ring tones that were

18    not drafted by Universal.  They were drafted -- the mobile

19    carriers insisted on drafting these agreements themselves.

20    And in those agreements, unlike the ones Universal drafted,

21    I will show you that they say they are license agreements

22    because Universal wasn't able to draft them and try to

23    camouflage them as something different.

24            I will also show you that in at least one draft of

25    one of those, their attorney who was negotiating these
```

1  agreements crossed out the word "license" and replaced it

2  with something else, thinking nobody would ever see the draft

3  so that they could say it wasn't a license.

4        I will also show you, with respect to master tones

5  and ring tones, that even their own head of eLabs, even

6  though they treat these as sales, has testified in this case

7  and will testify that there are many facts that would support

8  a conclusion that they're not sales; that they don't fall

9  under the records sold provision.  Their own witness will

10  come in here and will tell you that.

11        Now, I've told you there were two things that I was

12  going to show you.  And the second thing that I'm going to

13  show you with respect to this is the decision was made in

14  2002 to change their form agreement -- Universal's form

15  agreement and to try to renegotiate the agreements with

16  artists so that the contracts would say that for permanent

17  downloads -- for permanent downloads they would be paid under

18  the records sold provision.

19        I'm going to show you that in this case two of

20  their witnesses, who you will meet, Lisa Rogell and Rand

21  Hoffman, were deposed in this case.  They didn't -- at the

22  time, they did not know or they forgot about a memo that was

23  authored -- that was written by the general counsel of

24  Universal that said that all agreements that were done in the

25  future should be changed to have this records sold -- that

1  digital downloads would be treated as records sold.

2          After -- and so in 2003 I will show you that Eminem

3  and F.B.T. and the defendants entered into a new agreement.

4  That new agreement does not have that provision in it.  It

5  maintains the licensing provision.  They tried to get that

6  provision added to the 2003 -- the new 2003 agreement but

7  were unable to do so.

8          When I questioned their witnesses about that, they

9  said the reason it was not in there was -- the new provision

10  was not included was because it was not an agreement started

11  from scratch, and that was what they tried to explain as the

12  reason it was not included.  And that they said that the new

13  policy at Universal was to only include that new provision

14  when there was a new -- when there was a new contract from

15  scratch.

16          I will show you in this case that that testimony

17  was wrong, that Universal wanted that new provision in every

18  new agreement so that it would be carved out of the licensing

19  provision, and I will show you that they tried unsuccessfully

20  to get it and that in 2003 the new agreement has the same

21  language that was in the '98 agreement.

22          Could you put that up on the board, please.

23          2003 agreement:  "On masters license by us or our

24  licensees to others for the manufacture and sale of records

25  or for any other uses, your royalty shall be an amount equal

1    to 50 percent of our net receipts from the sale of those

2    records or from those other uses of the masters."

3            In 2003, when this new agreement was entered into,

4    this same provision -- unmodified, not restricted at all --

5    was included, even though with other record contracts at that

6    time I will show you, the defendants were adding language to

7    say that digital downloads would be treated as records sold.

8    They tried to get it into this new agreement.  They knew that

9    they had to have it or the licensing provision applied.  And

10   they couldn't and they didn't.  And I will show you that that

11   means that the licensing provision as they know applies to

12   permanent downloads and master tones.

13           Now, the 2003 agreement was negotiated between

14   Eminem's lawyer, Gary Stiffelman, who you'll meet in this

15   case; and Rand Hoffman, who is Interscope's chief legal

16   person.

17           And soon after the agreement was entered into,

18   Gary Stiffelman sent Rand Hoffman the following e-mail:

19           October 26, 2003, "I told Paul I would ask you

20   to send me a breakdown of how the 99 cents Apple makes is

21   divvied up."

22           On October 27th, 2003, Rand Hoffman responded

23   by saying, "We are selling tracks to Apple at a current

24   wholesale price of 70 cents.  Apple resells for whatever

25   they want, currently 99 cents."  Okay?

1     Rand Hoffman responded by putting forth this

2  wholesale/resale, which I will show you is nonsense in this

3  case.  Gary Stiffelman then shortly thereafter responded with

4  another e-mail.

5     This is November 12th, 2003, and it's to Rand

6  Hoffman from Gary Stiffelman.  And you'll see it says, "For

7  the record, and to avoid any implication that we stood by in

8  silence, we do not in any way agree that a download via a

9  third party, like Verizon or iTunes, is anything but a

10  license for which our clients should be paid 50 percent."

11     He goes on to say that "Doing so, if it were a sale

12  or record, flies in the face of both the contract and

13  precedent because it's akin to granting a third-party record

14  company the right to reproduce a master on a soundtrack

15  album.  You have no direct costs or expenses, other than

16  mechanicals" -- and I'll get to that in a moment.  And he

17  goes on to say that "The licensing provision should apply."

18     That's precisely what is happening.  With iTunes,

19  with the master tone providers, it's nothing different than

20  licensing to a third party to do the distribution and

21  manufacturing.

22     With record clubs, as I said a moment ago, it's

23  Universal's albums, but because a third party is doing the

24  distributing pursuant to a license and they have the costs

25  and the manufacturing costs, the license provision applies.

1            Now, soon after this, in 2005, Gary Cohen, who is

2       an accountant, was hired to do an audit on behalf of Eminem

3       and F.B.T.  And for purposes of this case he was able to come

4       up with -- or he found two deficiencies.  One, that as

5       between Eminem and F.B.T., that there is supposed to be a

6       certain allocation of costs between those parties and that

7       Universal had overcharged F.B.T. for about $159,000.  That's

8       another claim in this case.  And I will show you that

9       Universal in this case admits that they owe that money,

10      although they haven't paid it.

11           The second thing that he found was that Universal

12      was not paying under the licensing provision for downloads,

13      and he included that in his report.  It took the defendants

14      about a year, but they got back to the -- back to that audit

15      in 1997 and they said, one, essentially admitting that they

16      owed the $159,000; they haven't paid that.  But, two, denying

17      the claim on the digital downloads for the reasons that we

18      have talked about; that supposedly it's a sale and a resale

19      and that's the reason why we are now here.

20           Now, in this case, I've told you what we're going

21      to show you.  We're going to show you that the licensing

22      provision applies to all licenses of any kind by its

23      expressed terms; that they drafted the agreement and that

24      that is what it applies to.

25           What are they going to tell you?

1          First, they're going to tell you that -- or they're

2     going to bring up words like "ancillary."  And they're going

3     to point to a provision in a -- an amendment to the '98

4     agreement where the word "ancillary" applies.  It's called

5     the 2000 Novation.  It's a -- it's a -- it basically

6     shows it's a -- it's just an amendment to the 1998 agreement.

7     And you'll see that the word "ancillary" applies.

8          They're going to say a-ha.  That word "ancillary"

9     in the 1998 agreement -- and then it is also carried forward

10    in the 2003 agreement, that that word "ancillary" means that

11    the licensing provision only applies to what they call

12    ancillary uses.  And they're going to try to tell you that

13    ancillary use is when they license the master for someone

14    else's product.

15         Well, I'm going to show you in this case that not

16    only are they wrong, but it's just the opposite.  I'm going

17    to show you in this case that the ancillary word was added

18    in the 2000 amendment to the '98 agreement and the 2003

19    agreement to make sure that F.B.T. shared in all costs --

20    shared all revenue of any kind in the world; that Joel Martin

21    will be here, and he'll tell you he was concerned that

22    Universal would try and get away with not paying money for

23    all kinds of different things, like when they got money from

24    lawsuits if somebody illegally downloaded one of Eminem's

25    songs.  He wanted to make sure he was covered for anything

 1    and everything and that that word was added.

 2           I will bring in Gary Stiffelman, who will tell you

 3    the same exact thing; that that's why it's added.

 4           And I'll bring in Lisa Rogell, Universal's own

 5    person who negotiated that, and she won't be able to tell you

 6    anything different.

 7           I'm also going to -- what else are they going to

 8    say?

 9           They're also going to point in the 2000 -- in

10    another amendment to the 2003 agreement, they're going to

11    point to some language where permanent downloads appears and

12    how sales of albums by way of permanent downloads are going

13    to be treated for what is called escalation.  I'm going to

14    show you in this case that, again, it's just the opposite.

15    I'm going to show you that not only does it not mean what

16    they say it means or what they are going to try and suggest

17    that it means, but that it means just the opposite; that it

18    has no application whatsoever to royalties or how Eminem or

19    F.B.T. should be paid for downloads.

20           Not only am I going to bring -- not only am I going

21    to tell you that; I'm going to bring in Gary Stiffelman, who

22    negotiated the 2004 amendment, and he's going to tell you the

23    same thing.

24           I'm also going to bring in their own witness --

25    their own person who negotiated, I'm going to call him as

1    a witness, Rand Hoffman, and he's going to be forced to tell

2    you the same thing.

3         I'm also going to show you their form contracts and

4    show you the difference between language to show you the same

5    thing.

6         And, by the way, going back to the ancillary for a

7    moment.  I'm also going to show you -- when they try and say

8    that that "ancillary" word is somehow important, I'm going to

9    show you that the -- it's not defined anywhere; and,

10   furthermore, the only place that it has a definition in

11   another contract doesn't mean anything like they're going to

12   suggest to you it means in this case.

13        Now, what else are they going to say?

14        They're going to say that "Lose Yourself," one of

15   the biggest songs of Eminem, does not -- that F.B.T. and

16   Eminem don't have -- or F.B.T. does not have any rights to

17   royalties from digital downloads for "Lose Yourself."  I'm

18   going to show you the opposite once again.  I'm going to show

19   you that Jeff Bass, who wrote "Lose Yourself," recorded it

20   for the Aftermath agreement, and I'm going to show you that

21   the agreement that they point to that F.B.T. did not sign or

22   was not a party to, does not in any way affect their rights

23   to royalties for "Lose Yourself."

24        What else are they going to say?

25        They're going to say even if the plaintiffs are

```
1     right, even if we're right, we get certain deductions from
2     the damages that they're claiming.  They're going to say we
3     get to deduct all kinds of things.
4          Well, I'm going to show you in this case is that,
5     one, that net receipts -- the term "net receipts," which
6     they're going to point to, is not defined anywhere in the
7     contract.  Their contract is not defined.  I'm going to show
8     you that the only -- that with respect to licensing income
9     for conditional downloads for any licensing income, I'll show
10    you royalty statements to show there are no deductions that
11    they take or that are taken from licensing income.
12         And I'm also going to show you that traditionally,
13    for purposes of licensing income, the only costs that are
14    ever deducted are direct costs, and in this case the only
15    direct costs they have are publishing royalties, but
16    generally speaking artists do not bear the costs of
17    publishing royalties.  I'm going to show you that the amount
18    that Gary Cohen, the expert in this case, came up with as
19    damages is the appropriate amount of damages.
20         You know, in the end, the defendants are going to
21    throw confusing words at you like "ancillary" and "core."
22    They're going to tell you that the licensing provision only
23    applies to certain licenses because they're going to realize
24    this whole sale/resale thing isn't going to fly; so they're
25    going to say, well, even if it doesn't fly, the licensing
```

1    provision only applies to certain licenses.

2            I will show you that those -- and they will not be

3    able to show you any differently -- that the licensing

4    provisions have no limitations to them.  They say clearly --

5    the recording contracts say clearly that notwithstanding the

6    records sold provision, it applies to any and all uses of

7    master recording licenses to others.

8            The defendants will say a record is a record is a

9    record.  They're going to try and confuse you by saying the

10   record that you bought, the CD that you bought, the vinyl

11   that you bought is the same now as what you're getting on

12   iTunes.  It's the same thing.  It's just the latest way that

13   record companies are selling records.  That's what they'll

14   tell you.

15           What I'm going to show you is it's irrelevant.

16   What I'm going to show you is that the key question is not

17   that a record is a record is a record.  I'm going to show you

18   the question is who is doing the distribution?  Who is doing

19   the manufacturing?  Is it pursuant to a license?  Because

20   under the terms of agreement and under the practice of the

21   industry, whenever there's a license, whenever there's a

22   third party doing the distribution and manufacturing, the

23   licensing provision applies.

24           And I'm also going to show you that with respect to

25   these downloads -- remember, they -- I'm going to tell you

1    that they're going to show you that -- or they're going to

2    say to you that the digital download is just the latest way

3    of selling records; so, therefore, you should find the record

4    provision applies.

5         When you get a conditional download that they treat

6    as a license, you get the same exact thing.  You get the same

7    exact music.  You get the same exact artwork.  But for

8    subscriptions, they treat those as licenses and pay under the

9    licensing provision.  For permanent downloads they don't.

10   There's no distinction.  I'll show you don't look at the

11   final product; you look at whether it's being done pursuant

12   to a license or not.

13        They say a record is a record is a record.  My job

14   in this case will be to keep you focused on this.

15        "On masters licensed by us or on licensees to

16   others for the manufacture and sale of records or for any

17   other uses, your royalty shall be an amount equal to

18   50 percent of our net receipts from the sale of those

19   records or from those other uses of the masters."

20        It's irrelevant, I'll show you, whether it's a

21   record, a record, or a record; the issue is is it being

22   licensed by them to a third party.  If it is, the licensing

23   provision applies.

24        Thank you.

25        THE COURT:  Defense's opening.

```
 1           MR. POMERANTZ:  Your Honor, I need about one minute
 2   to set up.  And it will go for a little less than an hour,
 3   and I'm happy to do it or to take a break, whichever
 4   Your Honor --
 5           THE COURT:  Let's -- we're going to take a short
 6   break of ten minutes.
 7           Remember not to discuss the case among yourselves
 8   or with anyone else.  Don't form or express any opinions
 9   about the case until it is finally submitted to you.
10           We'll see you in ten minutes.
11           THE CLERK:  All rise.
12           (Brief recess taken from 10:26 a.m. to 10:41 p.m.)
13           THE COURT:  Mr. Pomerantz.
14           MR. POMERANTZ:  Good morning.
15           In 1996, F.B.T. was a record production company.
16   And it was the company that was responsible for helping
17   Eminem with his career.  Now, we know today Eminem is a
18   musical superstar, but that wasn't true in 1996.  In 1996
19   he was unknown.
20           And F.B.T. had the responsibility for his records.
21   F.B.T. was responsible for how to produce them, for how to
22   market them, and for how to sell them.  And in 1995, F.B.T.
23   and Eminem produced Eminem's first record, and it was called
24   *Infinite*.  And here's what happened.  The record flopped.
25   You heard from F.B.T.'s counsel it sold 30 copies, just
```

30 copies; that's it.  F.B.T. did not make Eminem into a superstar.  But Eminem did become a superstar.  And he became a superstar because of his own energies and his own talents.  And he became a superstar because he was helped by two successful record companies, Aftermath Records and Interscope Records.

And F.B.T., the company of Mark Bass and Jeff Bass, well, they became rich.  And now F.B.T. is here asking you to give them even more money.  And to get that money, what they've said is that we've got a tale.  It's a tale about tricks and it's about camouflage and about fictions.  And they said there's -- it's a simple case and there's only one way to read the contract and that way gives them more money.

But there's some things you didn't hear from F.B.T.'s lawyer.  You didn't hear about words in the contracts that he didn't show you, words that don't say what F.B.T. is saying here today.

In fact, the words that are actually in the contract say exactly the opposite of what F.B.T. is telling you.  What the words in the contract actually say is that if a record is sold in any format -- in any format through a retailer to a consumer, then F.B.T. gets the same royalty rate.  And that royalty rate isn't 50 percent of net receipts.  It's 18 to 23 percent.  That's what the words of the contract actually say.

```
1              You see, when Aftermath and F.B.T. entered into

2     their deal in 1998, it was a rather straightforward

3     agreement.  Eminem is the artist, and he would record music.

4     Aftermath would produce the records, market them, and get

5     them sold.  And Aftermath would pay royalties to F.B.T. for

6     each record that was sold.  And in particular, if a record

7     was sold through a normal retail channel, then F.B.T. got 18

8     to 23 percent.  That was the deal.

9              For royalty rate purposes, the contracts do not

10    care what particular format the record was in.  It doesn't

11    care if the music was put onto a vinyl disc or put onto a

12    cassette tape or a compact disc or a digital download or some

13    future technology that none of us here in the courtroom could

14    imagine.

15             As long as it's the same artist and same music,

16    it's the same record, and it's the same royalty rate.  Now,

17    you don't have to just take my word for it.  We can look at

18    the contract to see what they said.  Let me show you the

19    provision that Mr. Busch only briefly showed you.

20             I hope this board is visible to all of you.

21             This is what the contracts say.  They say "records

22    sold."  Mr. Busch pointed you to the words "records sold."

23    And they say if there's a sale of a record through a normal

24    retail channel, then F.B.T. gets 18 percent.  Those are the

25    words in the contracts.  That's what it actually says.
```

1          And there are other words in the contract as well

2     that Mr. Busch didn't show you.  There are words in the

3     contract that tell you that a record isn't just the formats

4     that existed in 1998, when the contract was signed.  It

5     wasn't just vinyl discs and cassette tapes and compact discs.

6     There are other words in that contract.

7          Let me put that up on the screen for you.

8          Here are some of the other words in the contract

9     that Mr. Busch didn't show you.  These words come right out

10    of the 1998 agreement.

11         "Aftermath has the right to exploit the Eminem

12    masters in any and all forms of media now known and

13    hereinafter developed."

14         A record is all forms of reproduction.  And new

15    medium records, that is, a certain class of records, well,

16    those include transmissions directly into the home.  That's

17    what the contract says.  It's clear from the words of the

18    contract that records include any format, even those that

19    didn't exist in 1998.  Those -- that had yet to be created.

20    A format like a digital download.  A digital download is a

21    format that was hereinafter developed.  A digital download is

22    a form of reproduction.  This is a transmission directly into

23    the home.

24         And most -- and the parties here understood, as we

25    all have to understand in today's world, that technology will

1    change.  And the parties said, "We know technology will

2    change, but we don't want our deal to change.  The deal stays

3    the same.  If it's the same artist, if it's the same music,

4    then it's the same record, and the royalty rate is the same."

5         And here's what the contracts do not say.  They

6    don't say, "Records sold through normal retail channels

7    except for digital downloads."  They don't say, "Records sold

8    through normal retail channels except if technology changes."

9    They don't say that "If technology changes, well, so does the

10   deal."  That's not what the contract says.

11        So ladies and gentlemen, here is why we're in court

12   here today.  It's because F.B.T. has sued Aftermath for

13   things that the contract doesn't say because F.B.T. hopes

14   that you're going to ignore what the contract says, what a

15   record really is, and what it means to sell a record through

16   a normal retail channel.  They're hoping that you will let

17   them rewrite the contract today, the contract that they

18   signed.

19        My name is Glenn Pomerantz, and with me at counsel

20   table is Mindy LeMoine and Kelly Klaus.  And we have the

21   privilege of representing Aftermath Records, Interscope

22   Records, and the Universal Music Group in this lawsuit.

23        Also assisting us will be Phil Nichols, who will be

24   helping us present the evidence.

25        And together we're going to prove three things to

1   you.  First, we are going to demonstrate under these

2   contracts that a record is a record.  That is what this case

3   is about.  And we will show you that if Eminem's music is put

4   on a vinyl disc like this, or on a cassette tape or on a CD,

5   or if the Eminem music is put onto a download, it's still a

6   record.  It's a record under the contracts.

7        All of these different technologies are just

8   different ways of getting Eminem's recordings to you, the

9   consumer.  And because the contracts treat them all the same

10   way, the royalty rate is the same, and it doesn't matter

11   whether the recording is put onto a vinyl disc, a cassette

12   tape, a compact disc, or a digital download.  So that's the

13   first thing we will prove to you; that a record is a record.

14        The second thing that we'll demonstrate to you is

15   that if a record is sold to a consumer through a store, even

16   if that store is on the Internet instead of on a street

17   corner, that's a record sold through a normal retail channel.

18   There's a reason why companies like Apple and *Amazon.com* are

19   so successful today.  That's because of millions and millions

20   of people now have downloads on their computers and on their

21   iPods.  It's because millions and millions of people now buy

22   their records in the download format.  It's a very normal way

23   today to buy music.

24        The third thing that we'll demonstrate to you is

25   that the provision that F.B.T. wants you to focus you on, the

 1    so-called masters license provision, well, it does not apply
 2    to a situation where the record company is selling its own
 3    records through a retailer such as permanent downloads.
 4    We'll show you that just because -- let's put -- let's put
 5    the masters license provision on the screen.  This is the
 6    provision that F.B.T.'s lawyer asked you to look at.
 7           We'll show you that just because this provision
 8    says the word "license," it doesn't mean that a download is
 9    not a record.  It doesn't mean that iTunes or *Amazon.com* are
10    not normal retail channels.  And it doesn't mean that
11    downloads aren't sold through those kind of retailers.
12           What F.B.T. wants you to believe is that the word
13    "license" changes all of this and that somehow the concept of
14    the licensing makes all of this irrelevant.  Well, it
15    doesn't.  That wasn't the deal.  "License" is not a magic
16    word.  And the contract doesn't just say "license."  It says
17    "masters license."  And it says "masters license" in a
18    particular sentence in a particular contract.
19           And F.B.T. doesn't want you to look at what the
20    parties really meant by masters license in this contract.
21    They don't want you to look behind the curtain.  But that's
22    your job.  You're supposed to look behind the curtain.  And
23    when you look behind the curtain, when you hear the witnesses
24    and look at documents, here's what you're going to learn:
25    That this masters license provision over here, it's always

1   been applied to a situation where the record company let

2   someone else use an Eminem recording in their product.

3          Let me give you an example.

4          When Warner Brothers was making the movie "Cradle

5   to the Grave" and they wanted to set the tone of a particular

6   scene and they thought an Eminem recording would be the right

7   background music in that movie, they came to Aftermath and

8   asked permission to use one Eminem recording in one small

9   piece of their product, their movie.  And they paid a fee for

10  it, and that's a master's license, and F.B.T. gets 50 percent

11  of the net receipts.

12         Or when another record company comes to Aftermath,

13  and they say, "We're putting together a compilation record,

14  15 to 20 of the best rap hits of 2000, and we want to put one

15  Eminem recording on that," the Eminem recording is a small

16  piece of someone else's product, the other record company's

17  compilation record.  That's a masters license, putting an

18  Eminem recording in someone else's product.

19         It doesn't apply when what is being sold is an

20  Eminem record itself, an Eminem record being sold through a

21  retailer through a consumer.  In any format -- vinyl,

22  cassette, CD, download -- that's a sale of a record through a

23  retailer.

24         Both sides of this case are going to tell you that

25  there's a provision in the 1998 contract, the first contract

1    between F.B.T. and Aftermath, that already covers downloads.

2    They're going to say that, sure.  You could add more language

3    to the contract, but you don't need to because there's a

4    sentence -- there's a provision in the contract that already

5    applies.  We just disagree on which provision applies.

6    F.B.T. is going to tell you it's that one, and we're going

7    to prove to you that it's this one.

8         And the evidence in this case is going to explain

9    to you that it basically comes down to this:  Is an Eminem

10   record itself being sold through a retailer to a consumer?

11   If that is what is going on, then it's a sale of a record

12   through a normal retail channel and F.B.T. gets 18 percent.

13   This percentage changes, Eminem gets more successful, goes

14   from 18 to 22 and 23 percent.  But that's the percentage that

15   applies.

16        But if, instead, someone else is using an Eminem

17   recording in their product, then it's a master's license, and

18   F.B.T. gets 50 percent of net receipts.

19        So as you watch the evidence, listen to the

20   witnesses, one of the first questions you're going to have

21   to ask yourself is what is a record?  I've shown you some

22   contract provisions that tell you what a record is.  And it

23   talks about not just current formats of records but future

24   formats of records.  But you don't need to rely just on the

25   words of the contract.  Rely on your own experience.  Rely on

1    common sense.

2            When I started buying records back in the '60s and

3    '70s, a record looked like this.  It was a vinyl disc.  I

4    picked Stevie Wonder because it was a popular artist back in

5    the '70s and still is today.  And this is Steve Wonder's

6    album *Talking Book*.  It's a vinyl L.P.  And there's cover art

7    on an album that helps the consumer identify who the artist

8    is and what the album is.  Sometimes that cover art becomes

9    just as popular as the music itself.

10           And the artist here in my example, Stevie Wonder,

11   goes into the studio, and he records music.  And it's up the

12   record company to take that music and use technology and put

13   it onto a disc, here a vinyl disc.  When I was buying records

14   in the '60s and '70s, there were small record stores all

15   around the city, and you would go there to buy your records.

16   In the mid '70s, a new configuration came out, the

17   eight-track cartridge.  Thankfully, it was short lived.  Same

18   artist as on the vinyl disc.  Here I'm using Stevie Wonder as

19   an example.  It's the same music as on the vinyl L.P., same

20   track in the same order.  Typically it would have the same

21   cover art.  It's the same record.  The record company would

22   use different technology, and instead of putting the

23   recording onto a vinyl L.P. they put it onto an eight-track

24   cartridge.  It's different technology, but it's the same

25   product.

1     Later in the '70s another configuration came out,

2 and that was the cassette tape.  And it was popular in the

3 late '70s and well into the '80s and '90s.  It was smaller

4 and easier to use than the eight-track cartridge, but it was

5 still the same artist with the same music and the same cover

6 art.  It's still the same record, just different technology

7 used to put it onto a cassette tape instead of an eight-track

8 cartridge.

9     Now, my daughter Amy started buying music in the

10 '90s.  I don't think she ever bought a vinyl LP or a cassette

11 tape.  She bought the next format of a record, the compact

12 disc, and it looked like this.  It's still the same artist,

13 the same music with the same tracks in the same order.  It's

14 still the same artwork.  It's the same record.  Technology

15 changed and they were able to put music now onto compact

16 discs, but it's still the same record.  And my daughter

17 didn't go to the local small record shops that aren't around

18 anymore.  She would go to big stores like Best Buy or maybe

19 go online and go to *Amazon.com* and have the CD mailed

20 directly to our home.

21     I also have a son named Danny who is 19 years old

22 and a student at Boston College.  He didn't start buying

23 music until about five years ago, and he bought a totally new

24 format of music.  He bought the digital download, but he is

25 still buying the same artist and the same music.  If you buy

1    an album from iTunes, you get the same songs in the same

2    order as if you bought the CD.  Or you could buy individual

3    tracks off of the album, just like back in the '60s we could

4    buy 45 R.P.M. records, just a single song.  And you can do

5    that now on iTunes.  But it's still the same artist, the same

6    music, the same artwork.  When you go to iTunes, for any of

7    you who have used it, you know that there -- the album covers

8    come onto the computer screen.  It comes onto your iPod

9    screen.  It's the same artwork.  It's the same record; it's

10   just in a different format.

11        My son doesn't go to Best Buy or Tower.  He can

12   just go onto his computer, and he visits a store on the

13   Internet, iTunes.  And he buys his records today from iTunes.

14        And, of course, we all know in the world we live in

15   that technology is not going to stop.  There's going to be

16   another format of music.  We don't know what it's going to

17   be, but it will become -- it will come.

18        And the parties knew that.  That's why they defined

19   records the way they did.  They knew technology would change.

20   And that is why when you see the contract define records as

21   all forms of reproduction, all means all.  A record is a

22   record.  If it's the same artist and the same music, it's the

23   same record, and it's a record under the contract.

24        Now, the story of F.B.T. and Eminem, as you heard

25   from Mr. Busch, begins in the mid '90s.  And at that time

 1    Eminem was not known around the world.  He was an unknown

 2    artist living in Detroit.  His name was Marshall Mathers,

 3    Eminem.  And like other musicians, he wanted to become a

 4    star.  He had a certain style of music.  Some call it

 5    hip-hop; some call it rap.  And as he was getting his start

 6    he met two brothers, Mark Bass and Jeff Bass.  Mark Bass and

 7    Jeff Bass owned record companies.  One of them was F.B.T.

 8    Productions.

 9            F.B.T. Productions and the other companies owned

10    by Mr. Bass, Mark Bass and Jeff Bass, do a lot of the same

11    things that Aftermath Records does or Interscope Records

12    does.  They were essentially record companies.  And like

13    record companies, one of the things they had to do was get

14    a contract signed by their artist, and that is what they did

15    with Eminem.  In 1995, F.B.T. signed Eminem to a contract.

16    Mr. Busch didn't show you that contract.

17            Let me show that you contract.  Put that on the

18    screen.  And let's get the top of it.  There you go.

19            What this contract is is an exclusive artist

20    recording agreement.  Now, remember, this is 1995,

21    three years before Aftermath entered the picture.  Exclusive

22    artist recording agreement.  What that means is Eminem is

23    exclusive to F.B.T.

24            What does that mean?  That means that Eminem cannot

25    record music for anybody but F.B.T. unless F.B.T. permits him

1     to do so.  He was exclusive to F.B.T.

2          And what the contract says is that Eminem, the

3     artist, is going to furnish master recordings to F.B.T., the

4     company, and then F.B.T.'s job was to exploit, distribute,

5     and market records containing Eminem's music.  And as I

6     mentioned, F.B.T., one of the Bass companies, released

7     Eminem's first record, *Infinite*, in 1995.  And you heard what

8     happened:  It flopped.  30 records were sold.

9          Now, after that dismal start Eminem did not give

10    up.  He kept performing at clubs in Detroit and elsewhere and

11    trying to make it.  In 1997, he performed at an event called

12    the Rap Olympics, and there were people in the audience that

13    day who changed his life.  Those were not employees of F.B.T.

14    they were employees of a different record company, and they

15    liked what they heard, and they asked Eminem for a demo tape.

16    And they brought it to Los Angeles, and it landed on the desk

17    of Andre Young.

18          Let me tell you a little bit about Andre Young.

19    He's a legendary hip-hop producer, and professionally he goes

20    by the name Dr. Dre.  He's from Los Angeles.  He grew up just

21    a few miles from this courthouse.  And he's a successful

22    hip-hop artist himself.  He won some Grammy awards for

23    recordings back in the '90s.  And Dr. Dre isn't just an

24    artist; he's a producer, and he decided he wanted to form

25    his own record company to help other hip-hop artists become

1    stars, to create their music.  And so he formed a record

2    company called Aftermath Records.  And in 1998, Dr. Dre saw

3    talent, saw promise in Eminem.

4         Now, let me tell you a little bit about Aftermath

5    Records.  Let's look at a chart.  It's Dr. Dre up on the

6    left.  Dr. Dre owned 50 percent of Aftermath records back in

7    1998.  He owned 50 percent, and the other 50 percent was

8    owned by Universal Music Group and Interscope Records.

9         Now, you've probably heard of Universal Studios,

10   off the Hollywood freeway.  Universal Studios and Universal

11   Music Group are part of the same company -- or they were back

12   in 1998.  Today the Universal Music Group is comprised of a

13   number of record labels that sign artists and then help those

14   artists to create and sell their records.

15        One of the labels that Universal owns is Interscope

16   Records.  Other labels that it owns include Motown; Def Jam;

17   and Univision's two labels, Fonovisa and Disa.

18        And basically the way that Aftermath works is that

19   Dr. Dre runs the label creatively.  He decides which artists

20   they're going to sign, and then he works with those artists

21   to help them create the best music possible.

22        And Interscope and Universal support Dr. Dre and

23   Aftermath in a variety of ways.  Let me give you a few

24   examples.

25        When Aftermath releases a record, someone has got

1    to take it to radio stations across the station and introduce

2    them to the new music.  There's a staff at Interscope that

3    does that.  They go across the country, and they take a new

4    record to radio stations and encourage them to play it.

5    There's a totally different staff at Interscope and Universal

6    that take a new record and they go to retailers, and they try

7    to encourage retailers to promote that record in their store.

8    They go to physical retailers like Best Buy or Target and

9    they say, "Put this new record at the end of the aisle so

10   consumers can see it," or "Put this poster up on the wall."

11        And they go to online retailers and they say,

12   "Promote this new record on your Website.  Feature it on your

13   home page, encourage people to listen to it on your

14   Websites."

15        They -- Interscope and Aftermath also provide

16   various administrative services, and they distribute and sell

17   Aftermath's records through retailers to consumers.

18        And so in 1998, Eminem and Dr. Dre and Universal

19   and Interscope and F.B.T. began a relationship and that

20   relationship has turned out to be very successful for all of

21   them.

22        Let me walk you through a few of the highlights of

23   that relationship.  I'm going to use a timeline.  All right.

24   Now, seeing how far away you are and how small this type is,

25   I hope you can all see it.  I'll try to lead you through it.

1          Right over here is the 1995 agreement.  That's the

2   one between F.B.T. and Eminem.  Aftermath had nothing to do

3   with it.  It was an exclusive deal.

4          Here in 1998 is the first agreement between F.B.T.

5   and Aftermath.  Let me pause for a second on that agreement.

6   It's between F.B.T. and Aftermath, not Eminem.  Why isn't

7   Eminem a party to the 1998 agreement?  Well, remember the '95

8   agreement where Eminem was exclusive to F.B.T.?  So Eminem

9   wasn't permitted to have a direct deal with Aftermath.

10  Instead, F.B.T. would furnish Eminem's services to Aftermath.

11  And when Aftermath sold an Eminem record, they would pay the

12  royal -- all of the royalties to F.B.T., and then F.B.T.

13  would share a portion of those with Eminem.

14          This deal in 1998, it set the terms of the

15  relationship that governs from 1998 to this very day.  It has

16  the records sold through normal retail channels provision.

17  That never changes.  It has the masters license provision,

18  never changes.  It has the definition of records, of current

19  and future technologies.  All of that is in the '98

20  agreement, and they never change.

21          Now, the parties did sign some additional

22  agreements in 2000, 2003, and 2004.  And they changed the

23  deal some.  One of the things they did was they gave Eminem a

24  lot more money and that's because he was becoming more and

25  more successful.  And those agreements also increased the

 1    royalty rate from 18 to 20 to 22 percent that got paid to

 2    F.B.T. and to Eminem.

 3             But the core of the deal didn't change.  Records

 4    sold through normal retail channels, never changed.

 5             Let's spend a little more time on that provision.

 6    I'm going to put that back up.

 7             Records sold through normal retail channels.

 8    We've already talked about what a record is and how the

 9    configurations and formats evolved over time.

10             So let's talk about normal retail channels.  What

11    is a normal retail channel?  Well, let's look at a chart.

12    What a normal retail channel is is what common sense tells

13    you it is.  It is basically a sale of a record through a

14    retailer to a consumer.  Aftermath produces an Eminem record,

15    sells it through a retailer -- here I've used Tower Records

16    as an example -- to a consumer.  And when the consumer buys

17    the record, it's a sale of a record through a normal retail

18    channel.  And when that occurs, F.B.T. gets 18 up to

19    23 percent.  And it doesn't matter if that record is in vinyl

20    or if it is cassette or it is CD.  It doesn't say that here.

21    It just has to be a record.  As long as it's a record and

22    it's sold through a normal retail channel, it's 18 to

23    23 percent.

24             Now, if we change Tower to Best Buy or if we change

25    Best Buy to Target or if we change Target to Wal-Mart, it

1    doesn't matter.  Best Buy, Target, Wal-Mart, they all sell

2    records.  It's one of the things they do.  And for royalty

3    purposes it doesn't make any difference.  It doesn't make any

4    difference which format of record is sold or which retailer

5    it is sold through.  If it's a sale of an Eminem record

6    through a retailer to a consumer, it's 18 to 23 percent, not

7    50 percent of net receipts.

8           Now, that's equally true, even if the format -- I'm

9    sorry.

10          That's equally true even if the store doesn't exist

11   on a street corner but, rather, exists on your computer

12   because it's still a retail store where you go to buy

13   records.  It just happens to be on the Internet.  Wal-Mart

14   has an online store called *Walmart.com*.

15          For royalty purposes it doesn't matter whether you

16   buy the Eminem CD through Wal-Mart or you buy the Eminem

17   download through *Walmart.com*.  As long as it's a record and

18   it's sold through a normal retail channel, the artist gets 18

19   to 23 percent.  That was the agreement that the parties

20   signed.

21          And if we change *Walmart.com* to iTunes, it's still

22   the same result.  It's the same royalty rate, 18 percent.

23   That was the deal because iTunes is also a normal retail

24   channel.

25          This case is going to ask you to just look at the

1    real world and use your common sense.

2           It was recently announced that iTunes sells more

3    records than anybody else in the United States.  iTunes sells

4    more records than Wal-Mart does.  Buying records as downloads

5    is a normal thing today.  It's a very normal way to buy

6    music.  And what the documents in this case and the testimony

7    of the witnesses and common sense are all going to tell you

8    is that when Aftermath sells an Eminem download through

9    iTunes, it's a sale of a record through a normal retail

10   channel just as much as when they sell an Eminem CD through

11   Wal-Mart.

12           Now, F.B.T. is here telling you that a different

13   provision of the contract applies to downloads, the masters

14   license provision.

15           Phil, if we could put that one back up on the

16   screen.

17           And F.B.T. says it's very simple.  A master has

18   been licensed.  It's for any other use; and, therefore,

19   F.B.T. gets more money.  Well, the evidence is going to show

20   that F.B.T. is wrong for several reasons.

21           First, if the records sold provision applies, then

22   the masters license provision does not apply.  And you don't

23   have to just take my word for that.  You heard Mr. Busch

24   mention Mr. David Berman, the person who has been in the

25   industry for many, many years.  Well, Mr. Berman is going to

```
 1    tell you the same thing.  He's going to tell you that a
 2    transaction is either a record sold or a masters license, and
 3    he couldn't think of anything else.  It's one or the other,
 4    not both.
 5            And as I just went through and explained to you,
 6    a download is a record sold through a normal retail channel;
 7    so if this one applies, then you know that one doesn't.  But
 8    that's not the only reason.
 9            There's another reason why the masters license
10    provision doesn't apply, and that's because it actually
11    applies to something that is very different than a download.
12    It applies to a secondary use of Eminem's music to what I'll
13    call a non core use of Eminem's music.  It applies when
14    Aftermath permits someone else to use an Eminem recording in
15    their product, in someone else's product, and gets paid a fee
16    for letting them use the Eminem recording.  That fee, that
17    net receipt, is what gets split 50/50.  It does not apply --
18    the masters license provision does not apply when Aftermath
19    is selling its own Eminem record through a retailer to a
20    consumer.
21            For a record company and an artist there's a core
22    product that they do.  They create.  It's a record.  Let's
23    look at these core products.  These are the core products of
24    a record company.  That's what an artist and a record company
25    make.  They make records, recorded music, records of the
```

1    artist's music.  There's a reason why a record company is

2    called a record company:  Because they make records.

3            The masters license provision applies to non core

4    products.  What do I mean by a non core product?

5            Well, let me show you.  What I mean by a non core

6    product is when Aftermath lets a movie studio use an Eminem

7    recording to set the tone of a scene.  As I told you, when

8    they let Warner Brothers use an Eminem recording in the movie

9    "Cradle to the Grave," Warner Brothers wanted to use the

10   Eminem recording in a very small piece of the movie.  The

11   Eminem recording is a small piece of Warner Brothers' movie.

12   It's in someone else's product.  And when Warner Brothers

13   paid Aftermath for that use, that's a masters license, and

14   Aftermath turned around and paid F.B.T. 50 percent of the net

15   receipts.

16           And that's exactly what Aftermath did when an

17   Eminem recording was used by Universal in "Alpha Dog" and

18   by Fox in "When Freddy Got Fingered."

19           And when an Eminem recording was used by Paramount

20   in the television -- in an episode of the television show

21   "CSI Miami," those are all masters licensed.  They're using

22   an Eminem recording in someone else's product.

23           And the same is true for a compilation record.

24   What are compilation records?  Well, back when I was buying

25   records, they usually were made by a company called KTel,

1    *Greatest Hits of the '70s*, *Greatest Love Songs*.

2            Now other companies besides KTel make compilation

3    records.  Here's an example.  This one is called Best of Rap

4    City.  This is a compilation record.  It has 17 different

5    recordings on it by 17 different artists, one of whom is

6    Eminem.  Different music than an Eminem record.  It has

7    different cover art than any of the Eminem records.  This is

8    cover art that is created specifically for this compilation

9    record.

10            And this compilation record isn't put out by

11    Aftermath.  It doesn't say Aftermath back here.  It's not an

12    Aftermath record.  It says Virgin.  This is a record put out

13    by Virgin.  It's someone else's product.  It's Virgin's

14    record.  And what is going on here is an Eminem recording is

15    being used in someone else's product.

16            When Aftermath gets paid money to let someone else,

17    some third party, use the Eminem recording in their product,

18    that is when the masters license provision kicks in.  That's

19    when they get paid 50 percent of net receipts.

20            Now, let's go back to this masters license

21    provision, and let's study some of the words here.  You see

22    in the first clause where "Masters license to others for

23    their manufacture and sale of records."  Let's stop right

24    there.  "To others for their manufacture and sale of

25    records."  That's a compilation record.  To Virgin for Virgin

1    to manufacture and sell its own compilation record.  That's

2    what that refers to.

3              And what about the next clause:  "Or for any other

4    uses."  Well, that covers movies, television shows,

5    television commercials.  You might say, well, why didn't they

6    just say for movies or television shows instead of for any

7    other uses?  Well, the answer is simple.  Because third

8    parties may think of other ways to use an Eminem recording in

9    their product.  And we don't have to guess.  This was written

10   in 1998, but we know what has happened since then.

11             For example, video games.  There is a very popular

12   video game called Guitar Hero.  It's put out by Activision.

13   If Activision wants to use a recording in its video game,

14   that would be a master's license because you're taking a

15   recording and making it a small piece of someone else's

16   product.  You're incorporating an Eminem recording in someone

17   else's product.  That's not what a download is.

18             It is not Eminem's music in someone else's product,

19   and that's why it is not covered by the masters license

20   provision.  A download is the core product, a record company.

21   It's a record with the artist's music, just like an Eminem CD

22   or an Eminem cassette or an Eminem vinyl record.  And that's

23   why a download is covered by the records sold through the

24   normal retail channel provision and that's why F.B.T.

25   properly gets paid 18 to 23 percent.  That's the deal that

1    F.B.T. signed.

2          Now, F.B.T.'s counsel mentioned something about

3    conditional downloads, if you remember that, or subscription

4    services.  Remember that?  And what F.B.T.'s counsel said is

5    a conditional download is exactly the same thing as a

6    permanent download, only we treat one as a masters license

7    and the other as a record sold.  He says it's a sham for us

8    to do that.  Again, watch the evidence and use your common

9    sense.

10          Let me give you an example.  If I held up two

11   copies of the same DVD "Cradle to the Grave," you'd probably

12   say they're the same thing.  But if I told you I bought this

13   one at Best Buy and I rented this one from Netflix, you'd

14   know there is something different.  You'd know that I own

15   this one and I can keep it forever.  And you know that I have

16   to give this one back unless I have -- unless I pay a fee for

17   some additional days.  That is the difference between a

18   permanent download and a conditional download.  If you buy a

19   permanent download from iTunes, you get to keep it forever.

20   It's on your computer.  It's on your iPod.  You keep it.  But

21   if you get a conditional download from Rhapsody or another

22   subscription service, it goes away unless you pay another fee

23   for an additional 30 days.  It's Netflix.  You're renting it.

24          And there's another difference with a subscription

25   service.  You can't go to a subscription service like

1   Rhapsody and say, "I just want to buy a conditional

2   download."  You can't do that, a conditional download.  You

3   have to first subscribe to the entire subscription, and you

4   get all of the music of the subscription of Rhapsody's

5   subscription service.  And the Eminem recordings are just a

6   small piece of that service.  It's just like a compilation

7   record.  The Eminem recordings are a small piece of someone

8   else's product here, someone else's subscription service.

9           Now, Mr. Busch also spent some time talking to you

10  about a different set of contracts; not these contracts, but

11  the contracts that Universal has with retailers who sell

12  downloads and retailers who sell master tones, retailers like

13  Apple or Sprint.

14          He didn't tell you some very basic things about

15  those contracts.  He didn't tell you, for example, that none

16  of those contracts use the term masters license.  That's the

17  term that he's relying on in the recording agreement.  None

18  of those contracts with iTunes or Sprint or any of them say

19  masters license.  None of them say anything about 50 percent

20  of net receipts or royalties or Eminem or F.B.T.  What he

21  told you about those contracts is that we didn't describe

22  them as a license because it was a trick.  I think he used

23  the word "camouflage."  He said it was a fiction.

24          There's nothing here to camouflage.  There's no

25  trick.  It's either a record that is being sold through a

1    retailer to a consumer or it's using an Eminem recording in

2    someone else's product.  There's nothing to hide.  No words

3    are going to change that, whether you use the word "license"

4    or something else.

5           Just look at what's going on.  Is it a sale of a

6    record through a retailer to a consumer or are you letting

7    someone else use an Eminem recording in their product?

8    Nothing is camouflaged.

9           But F.B.T. tells you, "We have a different way of

10   looking at those contracts with iTunes and with Sprint."  And

11   they said they're going to try to convince you it's a license

12   by bringing in Mr. Berman, a person who has been in the

13   industry for many years.  F.B.T.'s counsel didn't tell you,

14   but they're paying him $500 an hour to come in here and tell

15   you what F.B.T. wants you to hear.

16          And Mr. Berman's job is to tell you that he knows

17   the formula for what makes something a license.  And he's

18   going to tell you what it is.

19          Well, let me tell you something about Mr. Berman

20   that F.B.T.'s counsel didn't tell you.  He retired in 2001.

21   iTunes opened in 2003, two years later.  Downloads were not

22   a commercial reality in any real sense until there was

23   iTunes.

24          Mr. Berman has never negotiated or drafted a

25   contract in the download era.  Never.  But F.B.T.'s

1    $500-an-hour expert is still going to come in here, and he's

2    going to tell you that he has the magic formula for what

3    makes something a license.  And he is going to give you some

4    factors, some indicia of a license.  You heard some of them

5    from F.B.T.'s counsel this morning.  Does title pass?  Are

6    there restrictions on that usage?  Things like that.

7         Here's what you didn't hear.  You didn't hear that

8    any of those factors are in the contract.  They're not.  You

9    won't see the word title.  You won't see that there are

10   restrictions on usage and that somehow matters as to whether

11   it's a record sold or a masters license.  They're not in the

12   contract.  What is in the contract is records sold through

13   normal retail channels and a definition that tells you it is

14   current and future technologies.

15        And let me give you just one example of how F.B.T.

16   is manipulating its definition of a license.  According to

17   Mr. Berman, because Universal restricts what Apple can do

18   with that digital file, that makes it a license.  But then

19   when Apple turns around and restricts what the consumer can

20   do with a digital file, Mr. Berman tells you that is not a

21   license.  He says that's a restricted sale.  One is a license

22   and one is a sale, even though they both involve restrictions

23   on usage.

24        Why?  Well, that's because it helps F.B.T. in this

25   case to call one a license and the other a sale.  But the

```
 1    words in the contract don't mean what F.B.T. wants it to mean
 2    at a particular point in time.  The words in the contract had
 3    a real meaning to the parties when they signed the agreement
 4    in 1998.  And they both signed the agreement.  And you're
 5    going to be asked to consider what did the parties really
 6    mean when they said records sold through normal retail
 7    channels?  And what did they really mean when they said
 8    masters license?
 9            So the bottom line of this case is really pretty
10    simple.  Some things have changed and some things have never
11    changed.  Let me start with the things that have never
12    changed.
13            Remember when I told you a short while ago that we
14    were going to prove three things?  Well, those three things
15    have never changed.
16            First, the deal does not care whether the record
17    is on a vinyl disc, a cassette tape, a compact disc, or a
18    download.  And that was true back in 1998 and it's true
19    today.  They are all records under the deal.
20            Second, the concept of a sale through a normal
21    retail channel has never changed.  That was the deal in '98,
22    and that remains the deal today.  And it doesn't matter if
23    that sale of a record occurred through Best Buy or if that
24    sale occurred through Wal-Mart or if that sale occurred
25    through iTunes.  Those are all sales of records through a
```

1    normal retailer, and the royalty is 18 to 23 percent, not

2    50 percent of net receipts.

3              And, third, the masters license provision hasn't

4    changed.  It hasn't changed since 1998.  The only time that

5    the masters license provision has been applied under this

6    contract is when an Eminem recording is used in someone

7    else's product.  That's when the masters license provision

8    applies, when it's used in a movie or T.V. show or a

9    compilation record.

10             And that's not what a download is.  A download

11   is a core product of the record company.  It's a record

12   containing the artist's music, and it's sold through a normal

13   retail channel.

14             Now, that's what didn't change since 1998.

15             Let's talk about what did change since 1998.  Let

16   me get the timeline.  Yeah.  Okay.  It's kind of hard to see.

17   I hope you can see.

18             The first album up at the top -- I have the albums.

19   The first album released by Aftermath, the first Eminem

20   album, is called the *Slim Shady* L.P.  That was a success.

21   283,000 records were sold just in the first week.  As of

22   today, 9 million records of *Slim Shady* have been sold, and

23   F.B.T. was paid millions of dollars in royalties for the sale

24   of *Slim Shady* records.

25             The second album, the *Marshall Mathers* L.P. that

1    came out in 2000, it was an even bigger hit:  1.7 million

2    records in the first week, 19 million records worldwide to

3    this date, and F.B.T. got millions and millions of more

4    dollars in royalties for those sales.

5           Now, let's pause at 2000.  There's an agreement in

6    2000 that Mr. Busch referred to called a 2000 Novation.  It's

7    a modification of the deal.  Let's look at the first page of

8    that agreement.

9           This agreement changed the structure of the

10   relationship among the parties.  Remember I told you under

11   90 -- in 1998 that Aftermath did a deal with F.B.T. and then

12   F.B.T. had its own exclusive deal with Eminem?  Well, in 2000

13   they changed that.  Eminem was now a bigger star, and Eminem

14   wanted a direct relationship with Aftermath.

15          And so they changed the deal so that Eminem was

16   now -- had a direct contract with Aftermath, with F.B.T.

17   They were both parties to the agreement.  And now Eminem

18   would furnish his own services to Aftermath, and Aftermath

19   would pay royalties directly to Eminem.

20          So when that change occurred, what happened to

21   F.B.T.?

22          Well, F.B.T. became a passive income recipient.

23   What does that mean?  That means F.B.T. still gets paid

24   money.  They still get paid royalties.  They split them with

25   Eminem.  And under the deal in 2000, Eminem would now get 60

1   percent of the royalties, approximately 60 percent, and

2   F.B.T. would get approximately 40 percent.  That was what the

3   2000 Novation did.

4           Now let's go back to the timeline.  The third album

5   was called *The Eminem Show*; the fourth, *Encore*; and the

6   fifth, a greatest hits album called *Curtain Call*.  They were

7   all big successes, and F.B.T. got paid millions of dollars of

8   royalties for each and every one of those albums.

9           So the story of the last ten years is clear.

10  Eminem was becoming a bigger and bigger star, and F.B.T. was

11  becoming rich as a passive income participant.  F.B.T. was

12  making millions of dollars because Jeff Bass and Mark Bass

13  met Eminem when he was unknown and signed him to an exclusive

14  deal, and they've hung on as Eminem has become a superstar.

15          But this deal doesn't last forever.  There's only

16  three albums left.  And F.B.T.'s share of the royalties has

17  gone from 44 percent to 40 percent to 36 percent.  And so

18  F.B.T. comes to you now and asks you to give them more money.

19  More money than the contract says they should get.  More

20  money than they signed on to in '98.  And that's what this

21  trial is all about.

22          At the end of this trial I'll get a chance to come

23  back and talk to you again.  And at that time I'm going to

24  ask you to tell F.B.T. no.  That a record is a record and a

25  deal is a deal.

```
 1              Thank you very much.
 2              THE COURT:  Plaintiffs' first witness?
 3         Gary Scott Stiffelman, witness, sworn
 4              THE CLERK:  For the record, sir, please state your
 5    full name and spell your last name.
 6              THE WITNESS:  Gary Scott Stiffelman,
 7    S-T-I-F-F-E-L-M-A-N.
 8              THE COURT:  You may inquire.
 9                    DIRECT EXAMINATION
10    BY MR. BUSCH:
11    Q.   Good morning, Mr. Stiffelman.
12              Mr. Stiffelman, what is your occupation?
13    A.   I'm an attorney.
14    Q.   Where are you practicing?
15    A.   At a firm in which I'm a partner named Ziffren and
16    Brittenham.
17    Q.   And do you have a specific focus?
18    A.   Music.
19    Q.   Okay.  And how long have you been practicing music law?
20    A.   It will be 30 years in September.
21    Q.   And is your practice devoted to negotiating agreements
22    or being involved in lawsuits where you are representing a
23    party generally?
24    A.   I don't do litigation.  I'm a negotiator, deal maker.
25    Q.   Okay.  And how many recording agreements have you
```

1    negotiated in your career?

2    A.    My God, hundreds.

3    Q.    Okay.  And are you familiar with terms generally found

4    in recording agreements as a result of that experience?

5    A.    Yes, I am.

6    Q.    Okay.  Now I want to direct your attention now to the

7    parties involved in this case and the agreements involved in

8    this case.

9            Did there come a time when you began representing

10   Marshall Mathers, who is known as Eminem?

11   A.    Yes.

12   Q.    And do you represent him today?

13   A.    Yes.

14   Q.    Okay.  And how did you come to represent him?

15   A.    An introduction was made through some mutual

16   acquaintances of his management.

17   Q.    Okay.  And when did you begin -- what was the first

18   project you did where you were representing Eminem?

19   A.    I think the very first project was a home video from a

20   live concert.

21   Q.    What year was that?

22   A.    Probably 2000, something in that -- maybe '99 or 2000.

23   Q.    Okay.  And were you familiar at that time with the

24   company F.B.T. Productions?

25   A.    Yes.

1    Q.    And how did you get to know F.B.T. Productions?

2    A.    I was informed of their involvement and read of their

3    involvement with the various contracts to which my client was

4    a party that involved them.

5    Q.    Okay.  And did there come a time when you were involved

6    in what was called the 2000 Novation?

7    A.    Yes.

8    Q.    And what was the 2000 Novation?

9    A.    Before that time, Marshall was signed to F.B.T., and

10   F.B.T. supplied his services, in turn, to Interscope.  What

11   happened in 2000 was it was mutually agreed that Marshall's

12   relationship would be direct -- would become direct with

13   Interscope and that F.B.T. would be compensated by Interscope

14   directly so that the -- so to speak the middle man was

15   removed so that Marshall could deal directly with the record

16   label.

17   Q.    And were you aware at that time of the original 1998

18   recording agreement between F.B.T. and Aftermath and

19   Interscope Records?

20   A.    Yes.  I became aware of it.

21   Q.    Okay.  And so would it be fair to say that the 2000

22   Novation was an amendment of the '98 recording agreement?

23   A.    It's a way to describe it, yes.

24   Q.    Okay.  Let me go forward now, if I could.  I'm going to

25   come back to the 2000 Novation and a couple of the provisions

```
 1    in that agreement in a moment.  But before I do -- well, let
 2    me back up for one second.
 3            In connection with the 2000 Novation, was there any
 4    discussion whatsoever about limiting the masters license
 5    provision in the '98 agreement?
 6    A.    Limiting it?
 7    Q.    Yes.
 8    A.    No.
 9    Q.    Okay.  Let's go forward to the 2003 agreement, if I
10    could, and we'll come back to the 2000 Novation in a moment.
11            Following the 2000 Novation, were you involved with
12    negotiations for a new recording agreement between and among
13    Aftermath, Interscope, and Eminem?
14    A.    Yes.
15    Q.    Okay.  And who did you represent in those negotiations?
16    A.    Marshall.
17    Q.    Okay.  Let me show you what's been premarked into
18    evidence as Exhibit Number 10.
19            Is this the final 2003 recording agreement, the
20    first page of it?
21    A.    It seems to be.
22    Q.    Okay.  And why was this new agreement entered into?
23    A.    To improve the terms on which Marshall was compensated.
24    Q.    Okay.  And you'll see at page -- that F.B.T. and Joel
25    Martin also signed the agreement.
```

1          Do you know why they signed the agreement?

2    A.    Yes.

3    Q.    Why did they sign the agreement as well?

4    A.    To define their participation on an ongoing basis at the

5    same time as Marshall's was being redefined.

6    Q.    Okay.  Now, in connection with your negotiations of this

7    2003 agreement, who at Interscope Records did you negotiate

8    with?

9    A.    Principally I believe it was Rand Hoffman.

10   Q.    Okay.  Now, looking at Exhibit Number 10, I want to

11   direct your attention to what appears to be the same

12   licensing provision as that found in the original '98

13   recording agreement.

14         Could you look at that, please, Paragraph 5CV.

15   A.    Do you want me to look here?

16   Q.    Either place.  It's Exhibit 10.

17         During your negotiations with Interscope or

18   Aftermath with Mr. Hoffman, did Mr. Hoffman ask you to agree

19   to a provision in the new agreement, in the 2003 agreement,

20   under which downloads offered by third parties like iTunes

21   would be accounted as record sales?

22         MR. POMERANTZ:  Objection, Your Honor.  It's

23   leading.

24         THE COURT:  Overruled.

25         THE WITNESS:  It was discussed.

```
 1   BY MR. BUSCH:
 2   Q.   Okay.  And did he ask you to put that provision in?
 3   A.   It was discussed.
 4   Q.   Okay.
 5   A.   I wasn't putting provisions in.  They were doing the
 6   drafting.
 7   Q.   Okay.  Well, did you would agree to put a specific
 8   provision in the agreement saying that permanent downloads
 9   would be paid as record sales?
10   A.   It was suggested.
11   Q.   Okay.  And did you agree?
12   A.   No.
13   Q.   Why did you disagree, or why did you refuse to do?
14   A.   I didn't think it was consistent with what the contract
15   provided, and I saw no reason to agree to something that was
16   inferior to what already existed.  The point of the amendment
17   was to improve Marshall's participation.
18   Q.   Okay.  And did you -- was it your belief that the
19   license provision in the agreement covered the permanent
20   downloads?
21              MR. POMERANTZ:  Objection, Your Honor.  Unexpressed
22   intent.  Irrelevant.
23              THE COURT:  Sustained.
24              Rephrase.
25              ///
```

```
 1    BY MR. BUSCH:

 2    Q.   Okay.  Did you express to Mr. Hoffman why you refused to

 3    accept his proposal?

 4    A.   Yes.

 5    Q.   And What did you say?

 6    A.   I believed that the contract that existed, the original

 7    contract that existed and the 2000 Novation agreement

 8    provided for better compensation than Rand was proposing we

 9    accept.

10    Q.   Did you express to him specifically that the paragraph

11    in the licensing provision applied to permanent downloads?

12              MR. POMERANTZ:  Objection, Your Honor.  He's

13    leading the witness.

14              THE COURT:  Sustained.

15    BY MR. BUSCH:

16    Q.   Okay.  Did you or did you not express to him whether

17    the -- your view of whether the licensing provision applied?

18              MR. POMERANTZ:  That's leading, Your Honor.

19              THE COURT:  Sustained.

20    BY MR. BUSCH:

21    Q.   What was the discussion specifically then,

22    Mr. Stiffelman, in response to the proposal about putting

23    the -- a provision in for downloads as record sales that you

24    had with Mr. Hoffman?

25    A.   Rand was well aware of my view, and it was repeated at
```

```
 1   the time that I believed that this language covered downloads
 2   and that the record company was supposed to be splitting the
 3   money 50/50.
 4   Q.   Okay.  And so as far as you know, did any provision make
 5   its way into the 2003 agreement that Mr. Hoffman proposed?
 6   A.   On this subject?
 7   Q.   Yes.
 8   A.   No.  I was scrupulous to make sure it didn't.
 9   Q.   Okay.  Now, following the signing of the 2003 agreement,
10   did you ever follow up with any e-mails of which you are
11   aware concerning this subject matter of how the record label
12   would pay for -- or how the record label was paying for
13   permanent downloads?
14   A.   After this was signed?
15   Q.   Yes.
16   A.   There may have been communications.  I don't recall
17   exactly.
18   Q.   Let me see if I can refresh your recollection.
19   A.   Sure.
20        MR. BUSCH:  Would you put up Exhibit 19.
21   BY MR. BUSCH:
22   Q.   Let me show you what was marked as Exhibit 19,
23   premarked.
24        MR. BUSCH:  And if you would highlight the bottom
25   e-mail -- if you would.
```

```
 1   BY MR. BUSCH:

 2   Q.   You'll see here, Mr. Stiffelman -- is this an e-mail

 3   that you sent to Mr. Hoffman?

 4   A.   At the bottom, and at the top is his response.

 5   Q.   Okay.  And so would you put up -- did you respond to

 6   this -- to his response to your e-mail?

 7   A.   I don't recall.

 8   Q.   Let me see if I can refresh your recollection on that as

 9   well.

10   A.   All right.

11   Q.   Let me -- let me back up for one second, if I could.

12          Do you recall having any conversation with

13   Mr. Hoffman upon receiving that e-mail, other than a

14   potential e-mail response?

15   A.   I don't think between the day I sent the request and the

16   day he responded we had any conversation, no.

17   Q.   Okay.

18          MR. BUSCH:  Now go ahead and put up Exhibit 128.

19   BY MR. BUSCH:

20   Q.   Is this -- let me show you what's been marked --

21   premarked and introduced into evidence as Exhibit Number 128.

22          You say there, "For the record, and to avoid any

23   implication that we stood by in silence, we do not in any way

24   agree that a download via a third party like Verizon or

25   iTunes is anything but a license for which our client should
```

 1    be paid 50 percent."

 2              And then you go on to talk about the fact that

 3    treating it as a sale flies in the face of both contract and

 4    precedent.  And you say that it's akin to granting a

 5    third-party record company the right to reproduce a master on

 6    a soundtrack album.

 7              Did you have any further conversation with

 8    Mr. Hoffman about this e-mail after you sent it?

 9    A.   We probably discussed the subject matter numerous times.

10    I don't recall a conversation that was particularly prompted

11    by that e-mail.

12    Q.   Okay.  And was your position, as articulated in your

13    e-mail, based upon your 30 years of experience in the music

14    industry?

15              MR. POMERANTZ:  Objection, Your Honor.  He's not

16    being offered as a custom and usage expert.

17              THE COURT:  Sustained.

18              Rephrase.

19    BY MR. BUSCH:

20    Q.   Okay.  What was the basis of the position that you set

21    forth in your e-mail?

22    A.   It was the language of the contract and how it had been

23    applied in other circumstances that were licenses and my view

24    that this was a license, like all those other circumstances,

25    and that this was the appropriate treatment.

1    Q.   You mentioned in the second paragraph, quote, "You have

2    no costs or expenses."

3              Do you see that?

4    A.   Direct costs.

5    Q.   Direct costs or expenses.

6              Why was that relevant to what you were saying?  Why

7    did you say that?

8    A.   I had been trying for years, and this was just one piece

9    along the way, to explain why my feeling is that the right

10   thing for the companies to do is to split this money.  And

11   one of the reasons is they don't have to press the records,

12   they don't have to press packaging, they don't take returns,

13   they don't build inventory, and, therefore, the appropriate

14   treatment is to share the money equally.

15   Q.   Okay.  After -- we can move on from this.

16             After this 2003 agreement, was there a 2004

17   amendment, an amendment to this 2003 agreement?

18   A.   There may have been.  I believe there was, yes.

19   Q.   Okay.

20             MR. BUSCH:  Can you put Exhibit 17 up.

21   BY MR. BUSCH:

22   Q.   Looking at Exhibit Number 17, is that the 2004

23   amendment?

24   A.   It seems to be.

25   Q.   Okay.  And did you negotiate it?

 1    A.    Yes.

 2    Q.    On behalf of whom?

 3    A.    Marshall Mathers.

 4    Q.    And who negotiated it with you on behalf of Interscope?

 5    A.    Rand Hoffman.

 6    Q.    Okay.

 7    A.    There may have been other lawyers involved.  Rand was

 8    one point.

 9    Q.    I see.

10          MR. BUSCH:  If you could go to the signature page,

11    please.  The signature page.

12    BY MR. BUSCH:

13    Q.    I see it is signed by Rand Hoffman on behalf of

14    Aftermath Records and Marshall Mathers.  And there's -- it's

15    also signed by F.B.T. and Joel Martin.

16          Do you know why F.B.T. and Joel Martin also signed

17    it?

18    A.    They -- we always kept F.B.T. involved in these

19    transactions; so there was no concern that we were going

20    behind their backs, in any way cutting them out of their fair

21    participation.

22    Q.    Okay.  Now, if we can go back, there's one provision I

23    want to ask you about in this agreement.  And it's in

24    Paragraph 2, and I've highlighted it.

25          And it says, "Sales of albums by way of permanent

 1    download shall be treated as U.S. and R.C. net sales for the

 2    purposes of escalations, provided the sales price concerned

 3    falls within a top line sales price category applicable to

 4    such method of sale."

 5            Can you tell me how that provision made its way

 6    into the 2004 amendment?

 7    A.   Well, it's not that simple, but I can tell you -- I can

 8    give you some sense of it.

 9            Royalties on sales of CDs, tapes, whatever format,

10    generally speaking will start lower.  And if the record is

11    successful, they'll achieve higher and higher royalty

12    participations.  There are a whole bunch of categories that

13    the record labels don't count in determining when you're

14    going to hit that escalation point.

15            The lawyer's job representing the artist is always

16    trying to get as many things to count so you can get to that

17    escalated tier as soon as possible.  So my view was that to

18    the extent that we can get there faster by including some of

19    the downloads and determining whether you reached that

20    threshold would be beneficial for the artist.

21    Q.   Did Mr. Hoffman attempt through those negotiations to

22    craft the language so that downloads would count as record

23    sales for royalty purposes and not just for escalations?

24            MR. POMERANTZ:  Objection, Your Honor.  Leading

25    again.

```
 1              THE COURT:  Sustained.

 2              Rephrase.

 3   BY MR. BUSCH:

 4   Q.   Okay.  Was there a discussion between you and

 5   Mr. Hoffman in connection with this provision about counting

 6   downloads for royalty purposes as sales rather than just for

 7   escalations?

 8              MR. POMERANTZ:  Same objection, Your Honor.  It's

 9   still leading.

10              THE COURT:  Sustained.

11   BY MR. BUSCH:

12   Q.   What was the discussion between you and Mr. Hoffman

13   concerning this provision as it related to royalties versus

14   escalations?

15   A.   My recollection is that he was, at first, resisting

16   counting anything other than the CD sales, the normal retail

17   channels towards the escalation, and we went back and forth

18   on whether any of these downloads could count towards

19   achieving the escalated royalty levels.  I don't think,

20   frankly, there was any discussion at this point about whether

21   we were going to change the royalty on those downloads

22   because he knew I was intransigent on the point.

23   Q.   Well, did you -- what is an escalation?  Let me back up

24   and ask a better question than that.

25              Was there a discussion about whether individual
```

1    track downloads would count one way or the other?

2    A.    My attempt was to provide that since the download format

3    provided for singles, as well as albums, that there would be

4    some metric by which a certain number of downloads of singles

5    would also count toward determining when the escalating

6    royalties would take place.  It was not successful.

7    Q.    Mr. Hoffman denied that?

8    A.    Correct.

9    Q.    Okay.  Let's go back to the 2000 Novation.

10         Do you recall any discussions about -- well, do you

11   recall discussions between Joel Martin, Lisa Rogell, and

12   yourself concerning the 2000 Novation?

13   A.    Hundreds.

14   Q.    Okay.  Who is Lisa Rogell?

15   A.    She is a lawyer at Interscope.

16   Q.    And was she the primary person that was involved in

17   those negotiations for Interscope?

18   A.    I think it was Rand, but I think that he had appointed

19   Lisa to do the heavy lifting on their behalf.

20   Q.    I'm showing you here a draft that has been premarked

21   into evidence as Exhibit 9-K. It's Paragraph 6 of the 2000

22   Novation.

23         Do you see a reference to ancillary -- the word

24   "ancillary uses" anywhere here?

25   A.    I don't see those words.

```
 1    Q.   Okay.

 2              MR. BUSCH:  And now if you can put up Exhibit 879,

 3    At paragraph 6, please.  And would you highlight that,

 4    please.

 5    BY MR. BUSCH:

 6    Q.   And you'll see that in this draft there is a

 7    reference -- it's a later draft to the same paragraph where

 8    ancillary use is applied or stated.

 9              Do you see that?

10    A.   Yes.

11    Q.   Okay.  Do you recall any conversations between Joel

12    Martin and Lisa Rogell and yourself concerning how that word

13    or words got into the 2000 Novation?

14    A.   Yes.

15    Q.   Can you explain to the jury how that phrase got into the

16    2000 Novation?

17    A.   Yeah.

18              Joel was concerned that there would be no way by

19    which these master recordings could be exploited for which

20    F.B.T. was not to be compensated.  So we came up with that

21    language.  It's just sort of a catchall for everything that

22    we hadn't already thought up.

23    Q.   Okay.  Do you know who came up with the word

24    "ancillary," whether it was Lisa Rogell from Interscope's

25    side or any -- or you or Joel?
```

1          Do you remember who, among the three of you, came

2    up with that phrase?

3    A.    I don't.

4    Q.    Okay.  Do you recall any discussion whatsoever about the

5    use of the word "ancillary" in connection with the 2000

6    agreement or the 2003 agreement, other than what you just

7    described?

8    A.    No.  It was just a catchall.

9              MR. BUSCH:  That's all I have.

10             Thank you.

11             THE COURT:  Cross-examination?

12             MR. POMERANTZ:  Your Honor, my cross-examination

13   won't be long.  It will probably be longer than two or three

14   minutes.  And it's Your Honor's --

15             THE COURT:  Let's go ahead and continue.

16             MR. POMERANTZ:  All right.  No problem.

17             Thank you.

18                        **CROSS-EXAMINATION**

19   BY MR. POMERANTZ:

20   Q.    Mr. Stiffelman, I think it's still good morning; so good

21   morning.

22   A.    Good morning.

23   Q.    You started representing Eminem back in 2000; correct?

24   A.    Roughly, maybe.  '99, 2000.

25   Q.    And you know that the first agreement between Aftermath

1   and F.B.T. was in 1998; right?

2   A.   That's correct.

3   Q.   You didn't negotiate that agreement; right?

4   A.   Correct.

5   Q.   You had nothing to do with that agreement?

6   A.   Correct.

7   Q.   You didn't create any of the terms or negotiate them;

8   right?

9   A.   Correct.

10  Q.   And you didn't write any of the words that are in the

11  1998 agreement; right?

12  A.   Probably.

13  Q.   You started representing Eminem in 2000; correct?

14  A.   Or '99.

15  Q.   And you represented him in connection with the 2000

16  Novation that Mr. Busch was just going over with you;

17  correct?

18  A.   That's correct.

19  Q.   And the 2003 agreement?

20  A.   That's correct.

21  Q.   And the 2004 amendment; correct?

22  A.   Correct.

23  Q.   Okay.  I want to look at what didn't change and what did

24  change after you got involved with Eminem in 2000.  So let's

25  look at some of the definitions from the 1998 agreements.

```
 1              These are -- I'm going to put up on the screen
 2      three definitions that I extracted right from the 1998
 3      agreement.  The first one comes from Paragraph 8 of the 1998
 4      agreement, and it says that "Aftermath can exploit all
 5      masters in any and all forms of media now known and
 6      hereinafter developed."
 7              That language never changed in the 2000 Novation
 8      that you worked on; correct?
 9      A.   I don't recall, but I'll take your word for it.
10      Q.   And the same thing with the definition of "record."
11              That doesn't change in the 2000 Novation?
12      A.   Again, I have to take your word for it.  I don't have it
13      in front of me.
14      Q.   I take it you don't have any recollection of changing
15      those provisions?
16      A.   It's nine years ago.
17      Q.   And the definition of new medium, the one that says,
18      "New medium records includes records transmissions directly
19      into the home," that didn't change; correct?
20      A.   Again, I just have to take your word for it.
21      Q.   Okay.  And none of these provisions changed in 2000,
22      2003, or 2004; correct?
23      A.   Again, I would have -- I mean, I could go back and look
24      at those agreements see whether the language was kept intact.
25      I don't remember.
```

```
 1   Q.   The agreements -- I can certainly hand the agreements to
 2   you, but if you have any reason to think they might have
 3   changed I'm happy to hand the agreements up to you.
 4   A.   No reason to think one way or the other.
 5   Q.   All right.  So now let's look at the royalty provision
 6   that deals with records sold through normal retail channels.
 7   That was in Paragraph 4(a)(i) of the 1998 agreements.
 8        MR. POMERANTZ:  And, Phil, if you could pull that
 9   one up and then pull up 4(a)(i) so that Mr. Stiffelman and
10   the jury can see them.
11   BY MR. POMERANTZ:
12   Q.   All right.  And this is the records sold through the
13   normal retail channel provision from the '98 agreement.
14        And, again, this is another one of the provisions
15   that you did not -- you were not involved in negotiating
16   these words; right?
17   A.   That's correct.
18   Q.   And in 2000 and in 2004 some of the numbers in this
19   agreement changed; that is, the royalty rates changed;
20   correct?
21   A.   That's correct.
22   Q.   And in 2000 it went to 20 percent, and then in 2004 it
23   went to 22 percent for the first threshold; correct?
24   A.   That sounds right.
25   Q.   But the words in this provision stayed the same from '98
```

 1    to 2000 to 2003 to 2004 to the present; correct?

 2    A.   I'll take your word for it.

 3    Q.   And the words "records sold" and the words "through

 4    normal retail channels," they've never changed; right?

 5    A.   I'll take your word for it.  I have no reason to doubt

 6    you.  I think that's right.

 7    Q.   Well, let's look at the masters license provision that

 8    Mr. Busch showed you.

 9          MR. POMERANTZ:  Phil, if you could pull up 4(c)(v)

10    from the '98 agreement.  It's the bottom paragraph there.

11    Right above that.  There you go.

12          Thank you.

13    BY MR. POMERANTZ:

14    Q.   All right.  This is the provision dealing with the

15    masters license that was in the '98 agreement; right?

16    A.   Yes.

17    Q.   And you didn't negotiate this provision; correct?

18    A.   That's correct.

19    Q.   And this provision never changed, other than they got

20    rid of the three letters "N.R.S."

21          Correct?

22    A.   I would have to look at the language, but I'll assume

23    it's correct.

24    Q.   So the deal still is as it was written in '98, other

25    than the letters N.R.S.; correct?

```
 1    A.    Yes.  I assume that's correct.  I would have to look at

 2    the 2000 and 2003 and 2004 documents to confirm it, but I'll

 3    say -- I'll assume that it's correct.

 4    Q.    All right.  So now that's what didn't change.  Let's

 5    talk about what did change after '98 and after you got

 6    involved in 2000.

 7          You're aware that when Eminem signed with Aftermath

 8    in 1998, Eminem was not a superstar at that time; right?

 9    A.    That's correct.

10    Q.    He had not yet released a single successful record;

11    correct?

12    A.    I'm not sure that's correct.  I'm not sure that's

13    correct.

14    Q.    Were you aware --

15    A.    I think there may have been a record distributed locally

16    that had some heat, but he was no -- he was not an

17    international superstar.

18    Q.    Did you ever hear of the record Infinite that F.B.T. put

19    out by Eminem back in '95?

20    A.    I believe so, yeah.

21    Q.    Do you know how many records that sold?

22    A.    I don't.

23    Q.    Did anyone ever tell you that that one sold 30 records?

24    A.    No.

25    Q.    Now, by the time you started representing Eminem in
```

1    2000, he was already working with Aftermath and Dr. Dre and

2    had already put out a successful album; correct?

3    A.    That's correct.

4    Q.    And that album was *Slim Shady*.

5         MR. POMERANTZ:  Can you put the timeline up, Phil,

6    just to help me and Mr. Stiffelman out.

7    BY MR. POMERANTZ:

8    Q.    This is a timeline, Mr. Stiffelman, that we have created

9    that shows when each of the agreements were signed and when

10   each of the albums were released, just to help you and me

11   through this.

12   A.    Thank you.

13   Q.    So before you started working with Mr. Mathers he had

14   already released the *Slim Shady* L.P.; correct?

15   A.    That's right.

16   Q.    And that was an Aftermath record; correct?

17   A.    That's correct.

18   Q.    And that *Slim Shady* record sold millions of units;

19   correct?

20   A.    I believe that's correct.

21   Q.    In a variety of configurations, vinyl, cassette, CD;

22   correct?

23   A.    Yes.

24   Q.    And then these other four albums that followed -- the

25   *Marshall Mathers* L.P., *The Eminem Show*, *Encore*, and the

1   greatest hits record *Curtain Call*, they were also successful

2   records; correct?

3   A.   Very much so.

4   Q.   And so one of the things that changed after the '98

5   agreement was that Eminem became successful; correct?

6   A.   Yes.

7   Q.   And the money that Eminem received also changed after

8   1998; correct?

9   A.   Yes.

10  Q.   And when you worked with Eminem on the 2000 Novation,

11  the first change of the agreement, he got a big advance as

12  part of that deal; correct?

13  A.   That's right.

14  Q.   Something in the neighborhood of 11 to $14 million;

15  right?

16  A.   That sounds right.

17  Q.   And then in 2003, when another agreement was signed,

18  Eminem got another advance; correct?

19  A.   That's correct.

20  Q.   He got another $7.5 million; correct?

21  A.   Yes.

22  Q.   And then in 2004, just a year later when an amendment

23  was signed, Eminem got another advance; correct?

24  A.   That's how it works.

25  Q.   And that was $15 million; correct?

```
 1   A.    I believe that's right.

 2   Q.    And then before Curtain Call was released, the greatest

 3   hits, there was another advance, around $9 million; right?

 4   A.    I believe that's right.

 5   Q.    And over this period of time, as we've talked about, the

 6   royalty rate also went up as Eminem got more successful;

 7   correct?

 8   A.    I don't know between every album it went up, but yes.

 9   It was renegotiated along the way.   That's how this business

10   works.

11   Q.    And it went from 18 to 20 to 22 percent, as we

12   discussed; right?

13   A.    Right.

14         Which he shares with F.B.T., with the record

15   producers, and so on; correct.

16   Q.    He doesn't get all but a share of it.

17         So one thing that changed since 1998 is Eminem

18   became more successful, and another thing is there was more

19   money for Eminem and a higher royalty rate; right?

20   A.    Everybody was making more money.

21   Q.    Okay.   Let's look at how all of this was affecting

22   F.B.T.

23         They were also making more money, weren't they?

24   A.    If you sell records, you are going to make more money.

25   Q.    Now, when you started representing Eminem in 1999 or
```

1    2000, you understood that Eminem had already signed an

2    exclusive deal with F.B.T.; right?

3    A.   Correct.

4    Q.   And that meant that Eminem was lopped into F.B.T. and

5    could not sign a deal to record music for another record

6    company; right?

7    A.   Correct.

8    Q.   And so the way the deal worked before you got involved

9    was that Aftermath would pay all of the royalties to F.B.T.,

10   and then F.B.T. would turn around and pay some portion of

11   that to Mr. Mathers; correct?

12   A.   I'm not sure whether they had already worked out some

13   arrangement where -- where Aftermath would pay Marshall his

14   share directly or not.  I don't -- I don't receive the

15   accounting statements.  I don't know whether the checks were

16   coming from Aftermath directly or from F.B.T.

17   Q.   And one of the things that you got involved in changing,

18   the 2000 Novation, was that Mr. Mathers would have a direct

19   relationship with Aftermath --

20   A.   That's correct.

21   Q.   -- correct?

22        MR. POMERANTZ:  Phil, could you put up the first

23   page of the 2000 Novation?

24   BY MR. POMERANTZ:

25   Q.   This is, again, Exhibit 9 that Mr. Busch showed to you,

```
 1    and this is the first page.
 2              MR. POMERANTZ:  And if you could highlight the
 3    second whereas clause, just bring the whole clause up.  And
 4    then up at the top, Phil, if you would highlight the words --
 5    the end of the fifth line, "Direct relationship with
 6    Aftermath."
 7              Do you see that?
 8    BY MR. POMERANTZ:
 9    Q.   So that's the -- that was one of the things you worked
10    on on behalf of Mr. Mathers to get into this agreement;
11    correct?
12    A.   That's right.
13    Q.   And that meant that F.B.T. would no longer be furnishing
14    Eminem's services to Aftermath; correct?
15    A.   That's correct.
16    Q.   And, instead, Mr. Mathers would be furnishing his own
17    services to Aftermath; correct?
18    A.   I believe it was made personal -- it may have been a
19    company that he owned or personal.  Probably personal.
20    Q.   And then Aftermath would pay royalties directly to
21    Eminem; correct?
22    A.   Correct.
23    Q.   And every six months a check would be sent to Eminem
24    for the royalties he was entitled to under the agreement;
25    correct?
```

```
1    A.    Correct.

2    Q.    But even though Eminem had a direct relationship with

3    Aftermath, F.B.T. wasn't out of the picture; right?

4    A.    Right.  They were receiving an override.

5    Q.    They would get a share of the royalties?

6    A.    Well, it was no longer a share of his royalties.  It was

7    their own royalties.

8    Q.    Right.

9          But of the total royalties due under the contract,

10   a share would go to Eminem and a share would go to F.B.T.;

11   correct?  If you don't like the word "share," I can say a

12   portion.  A portion of the --

13   A.    But some royalties went to F.B.T.  Some royalties went

14   to Marshall.  Some royalties went to the record producers.

15   The royalty -- everybody got a little royalty.  Some song

16   writers got a participation, depending, but --

17   Q.    Right.

18         Let's focus on F.B.T.  Let's see what the agreement

19   says about F.B.T.

20         MR. POMERANTZ:  Phil, another line down.  Could you

21   highlight "F.B.T. shall remain" and through the word

22   "participant."

23   BY MR. POMERANTZ:

24   Q.    What the parties did in this agreement is they described

25   F.B.T. as a passive income participant; correct?
```

1    A.    Yes.

2    Q.    That's the words that the parties all agreed to; right?

3    A.    That's what the contract provides.

4    Q.    And that was okay from your perspective as the lawyer

5    representing Eminem; correct?  That you thought that was an

6    apt description?

7    A.    Yes.  They no longer had to furnish the services.  They

8    would receive the money regardless.

9    Q.    And that was the money F.B.T. agreed to when they signed

10   onto this contract; correct?

11   A.    Yes.

12   Q.    And that was the language Aftermath agreed to; right?

13   A.    Yes.

14   Q.    And being a passive income participant meant that F.B.T.

15   was still going to get paid some royalties; correct?

16   A.    Correct.

17   Q.    And do you remember what share -- what portion of the

18   total royalties they were going to get on the first two

19   albums?

20   A.    On the albums that had previously been recorded?

21   Q.    Correct.

22   A.    I don't remember.

23   Q.    Well, let's -- let me see if I can refresh your memory.

24         MR. POMERANTZ:  Phil, can you go to Page 4 of this

25   same exhibit.  And let's pull up the portion that's going to

```
 1   go to F.B.T.  Uh-oh.  It's tough for me.  Okay.  Pull that
 2   up.
 3           Thank you.
 4   BY MR. POMERANTZ:
 5   Q.  And you see in this particular portion that Phil has
 6   brought up that it says eight-eighteenths and ten-eighteenths
 7   for F.B.T. -- I'm sorry.  Eight-eighteenths of the royalty.
 8           MR. POMERANTZ:  Phil, we need more than that.  I
 9   want it to be from eight-eighteenths and ten-eighteenths.
10   BY MR. POMERANTZ:
11   Q.  It says that eight-eighteenths of the royalty will go to
12   F.B.T. and ten-eighteenths will go to the artist.
13           Do you see that?
14   A.  Yes.
15   Q.  Does that refresh your recollection of how much of the
16   royalty will go to F.B.T. on these two albums?
17   A.  Yeah.  After deducting whatever had to be paid to a
18   producer and other third-party participants.
19   Q.  All right.  And the artist here that it is referring to
20   is Eminem; correct?
21   A.  Correct.  Marshall.
22   Q.  And so eight-eighteenths, if I have my math correct,
23   that's about 44 percent; right?
24   A.  I don't have a calculator.
25   Q.  Eight-eighteenths, four-ninths --
```

1    A.    Sounds right.

2    Q.    -- 44 percent; is that right?

3          And ten-eighteenths would mean that the remainder

4    of the royalty would go to Eminem; correct?

5    A.    After the third parties are taken off the top.

6    Q.    All right.  And then for the rest of the L.P.s -- under

7    this deal Eminem is obligated to deliver seven albums;

8    correct?

9    A.    Sounds right.

10   Q.    And this is talking about what the split would be

11   between Eminem and F.B.T. on the first two.

12         Do you remember what the split was on albums three

13   through seven?

14   A.    I don't remember.

15   Q.    Okay.

16         MR. POMERANTZ:  Let's go to Page 7, Phil.  And pull

17   up that top.

18   BY MR. POMERANTZ:

19   Q.    All right.  And this one, if you look at the part that

20   Phil has highlighted, it says that eight-twentieths are going

21   to go to F.B.T. and twelve-twentieths are going to go to the

22   artist.

23         Do you see that?

24   A.    Yes.

25   Q.    So does that refresh your memory as to how much F.B.T.

1    and Eminem were going to get of the royalty?

2    A.    Yes.

3    Q.    And eight-twentieths going to F.B.T., that's 40 percent;

4    right?

5    A.    Yes.

6    Q.    And twelve-twentieths, 60 percent is to go to Eminem?

7    A.    Correct.

8    Q.    And so as a passive income participant, F.B.T. was going

9    to get 40 percent of the royalties; right?

10   A.    40 percent of a higher total number of royalties, so....

11   Q.    So 20 percent versus the 18 percent?

12   A.    Correct.  Right.

13          The net result is they would receive the same

14   amount for each CD sold.

15   Q.    All right.

16          MR. POMERANTZ:  So I want to go to the 2003

17   agreement.  Phil, you can take this down now.

18   BY MR. POMERANTZ:

19   Q.    And that was the one where you remembered talking and

20   negotiating the deal with Mr. Rand Hoffman.

21          Do you remember that?

22   A.    Yes.

23   Q.    And Mr. Hoffman was speaking for Aftermath and

24   Interscope; correct?

25   A.    That's right.

1    Q.    And you were speaking for Mr. Mathers; correct?

2    A.    Yes.

3    Q.    And if you remember in 2003, you already had the 1998

4    agreement in place; correct?

5    A.    But it had been superseded by the novation, but yes.

6    Q.    It had been modified?

7    A.    Right.

8    Q.    You didn't have to look at both of those to see what the

9    total deal was?

10   A.    Yes.

11   Q.    And then you got to 2003; right?

12         And what you and Mr. Hoffman decided to do in 2003

13   was to basically take the 1998 agreement and modify it based

14   upon whatever changes the two of you agreed to; correct?

15   A.    Yes.

16   Q.    And you didn't start from scratch; correct?  You doesn't

17   say, "Let's rip up the agreement and start all over again."

18         Right?

19   A.    That's correct.

20   Q.    You took the '98 agreement and you talked about the

21   terms that you could agree to change and then you changed

22   them; right?

23   A.    Yes.

24   Q.    And those terms included financial terms where Eminem

25   would get more money; correct?

1    A.    The changes?

2    Q.    Yes.

3    A.    Yes.

4    Q.    And if the parties couldn't agree on a particular

5    change, then it wouldn't make its way into the 2003

6    agreement; correct?

7    A.    That's right.

8    Q.    And in your experience, when you have a preexisting

9    agreement and now the parties want to enter into a new

10   agreement or a modification of that, it's typical that you

11   don't just start from scratch but, rather, you start with

12   the preexisting agreement; right?

13   A.    There are two schools of thought.  Some companies want

14   to start from scratch so that it is more likely to survive

15   other legal challenges by being truly a new agreement.  In

16   this case it wasn't applied.

17   Q.    And you and Mr. Hoffman both agreed on the approach?

18   A.    That's right.

19   Q.    All right.  Now, you mentioned a conversation or

20   conversations that you had with Mr. Hoffman during the course

21   of the negotiations of the 2003 agreement regarding royalties

22   on downloads; correct?

23   A.    There were ongoing conversations on that subject that I

24   was having with all of the labels.  I don't remember specific

25   ones apropos of the 2003 amendment.

1    Q.    All right.  And your position was that a download

2    involved the license of a master; correct?

3    A.    Under certain circumstances.  A download by iTunes is a

4    download by a third party, yes.

5    Q.    And Mr. Hoffman disagreed with you; correct?

6    A.    He disagreed.

7    Q.    And he said that he thought that a download was a record

8    sold through a normal retail channel; correct?

9    A.    I don't remember him saying it per se, but that was --

10   the position that they were taking was that the royalty

11   applied to a CD would apply to a download.

12   Q.    And that's in most contracts a record sold through a

13   normal retail channel; right?

14   A.    Not necessarily because there's a lot of records sold

15   for which a royalty applies that aren't sold through normal

16   retail channels.

17   Q.    Right.

18         But what Mr. Hoffman said is if an Eminem CD had

19   a certain royalty rate, then an Eminem download would have

20   the same royalty rate as the CD; correct?

21   A.    More or less.

22   Q.    And the same thing with an Eminem cassette or vinyl.

23         The same rate that applied to an Eminem casette or

24   a vinyl or a CD, Mr. Hoffman said that applied to an Eminem

25   download as well?

1    A.    Well, it's more complicated than that because the rate

2    that applies to a CD isn't the same as applies to a tape

3    isn't the same as applies to an eight-track isn't the same as

4    applies -- there are different rates because there are

5    different packaging deductions and other deductions in each

6    of those separate categories.

7    Q.    But I'm not talking about the deductions, just the rate

8    itself.

9    A.    The rate?

10   Q.    Just the rate --

11   A.    Yes.

12   Q.    -- the 18 percent rate that was in the '98 agreement, or

13   as it got changed over time, that rate applies to an Eminem

14   compact disc or vinyl or cassette sold through a normal

15   retail channel; correct?

16   A.    That was their position.

17   Q.    And they thought the download should be -- should apply

18   the same royalty rate; correct?

19   A.    That was their position; correct.

20   Q.    And Mr. Hoffman, at the end of the day, didn't persuade

21   you of his position; correct?

22   A.    Correct.

23   Q.    And you didn't persuade Mr. Hoffman of his position;

24   correct?

25   A.    We agreed to disagree.

1    Q.    You agreed to disagree.

2              Did you ever send any specific language to

3    Mr. Hoffman in 2003 or 2004 that said -- that you wanted put

4    into the agreement that said "Downloads shall be treated as

5    masters license"?

6    A.    I -- there was no point in saying the language.  He

7    knew -- we each knew what the other wanted to change, the

8    language.  If we agreed to the concept, we would have easily

9    agreed to the language.

10   Q.    And if -- if that language wasn't -- that kind of

11   language wasn't added to the agreement, you still thought

12   that the masters license provision would apply; correct?

13   A.    In this case it was my position very, very vociferously

14   articulated that the existing language applied to iTunes and

15   other downloads, yes.

16   Q.    And Mr. Hoffman had the same position vociferously, but

17   just the opposite side of the table; correct?

18   A.    Yes.

19   Q.    And he said to you that --

20              THE COURT:  I'm sorry.

21              Mr. Pomerantz, let's go ahead and break for the

22   lunch hour.  We're going to break until 1:30.

23              Remember not to discuss the case among yourselves

24   or with anyone else.  Do not form or express any opinions

25   about the case until it has been finally submitted to you.

UNITED STATES DISTRICT COURT

```
1              We'll see you at 1:30.

2              THE CLERK:  All rise.

3              (A.m. session concluded at 12:20 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```