1             UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4       THE HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

5

6

7    F.B.T. Productions, LLC,              )

8                     Plaintiff,           )

9                                          )

10   vs.                                   )    Case No.

11                                         )    CV 07-3314-PSG(MANx)

12   Aftermath Records (dba Aftermath      )

13   Entertainment), et al.,               )

14                     Defendants.         )

15   _____       )

16

17

18        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

19                Day 3 (P.M. Session)

20               Los Angeles, California

21            Wednesday, February 25, 2009

22   Pamela A. Seijas, CSR, FCRR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

```
1   APPEARANCES:

2

3     FOR PLAINTIFF:        KING & BALLOW

4                           BY:  RICHARD BUSCH

5                                MARC GUILFORD

6                           315 UNION STREET

7                           SUITE 1100

8                           NASHVILLE, TN  37201

9                           (615) 259-3456

10

11

12

13   FOR DEFENDANT:         MUNGER, TOLLES & OLSON, LLP

14                          BY:  GLENN D. POMERANTZ

15                               MELINDA EADES LeMOINE

16                               KELLY M. KLAUS

17                          355 SOUTH GRAND AVENUE

18                          35TH FLOOR

19                          LOS ANGELES, CA  90071-1560

20                          (213) 687-3702

21

22

23

24

25
```

```
1              Los Angeles, California, Wednesday, February 25, 2009

2                                1:57 p.m.

3                                  -oOo-

4                               (Jury Out)

5         THE COURT:  First, let me apologize for the delay.  My

6    apologies.

7              Second, with regard to what was discussed at sidebar,

8    Mr. Busch, I already ruled on that Motion in Limine No. 4.  And

9    then we had some discussion about the letter with regard to the

10   examination of Mr. Paterno, but I think it was not appropriate

11   to make the inquiry -- again, to make the inquiry with regard to

12   the letter that you made on that examination and then there was

13   an objection.  I don't think there was any harm ultimately in

14   terms of the case, but I don't think it was appropriate to make

15   that inquiry.

16        MR. BUSCH:  And I understand, Your Honor.  May I just

17   have 10 seconds in my defense?

18        THE COURT:  You may.

19        MR. BUSCH:  Okay.  Maybe 20 seconds.

20        In my examination of Mr. Ostroff, he said that artists

21   had complained, and when --

22        THE COURT:  Say that again.

23        MR. BUSCH:  He said that artists had complained -- I'm

24   sorry -- artist representatives had complained about the

25   treatment.
```

```
 1              And when Mr. Klaus got up, I was focused on the
 2     agreement itself.  Mr. Klaus then asked Mr. Ostroff specifically
 3     about "Well, what else do you have to look at besides the
 4     agreement?"  And he was saying custom and practice.  And he
 5     opened the door to custom and practice, and my view of it was
 6     that tying the two together -- I wasn't referencing the
 7     letter -- but just that having opened the door to that and with
 8     the issue of artists complaining being testified by Mr. Ostroff,
 9     I felt like without reference to the letter it was fair game to
10     just say was Mr. Paterno one of the artist representatives who
11     was complaining.  So --
12              THE COURT:  But the only complaint is referenced in
13     the letter.
14              MR. BUSCH:  I don't know that.  He may have said he
15     may have had a separate conversation.  We don't know, because I
16     haven't been able to explore that.  It could have been a
17     separate conversation.  It could have been anything.  In any
18     event, I'm sorry, Your Honor.  It won't happen again.
19              THE COURT:  It won't happen again, and there will be
20     other consequences if it happens again.
21              MR. BUSCH:  Okay.  Thank you.
22              THE COURT:  All right.
23              MR. KLAUS:  Your Honor, may I be heard?  It's not
24     directly on that issue, but since we had another sidebar to
25     discuss the privilege issue that came up with respect to
```

 1    Mr. Ostroff where we submitted something and you said Mr. Busch

 2    couldn't get into privileged conversations, I think when

 3    Mr. Kenswil is on in just a few moments, we will be facing

 4    exactly the same issue.

 5            THE COURT:  Is Mr. Kenswil -- is he next?

 6            MR. BUSCH:  He's after Ms. Rogell.

 7            THE COURT:  I have read the transcripts provided and I

 8    don't have my notes in front of me, but I think I recall

 9    correctly, there really shouldn't -- the Court's ruling is that

10    there should not be any inquiry of what I perceive as a fact

11    witness with regard to his legal opinions regarding copyright.

12            MR. BUSCH:  I understand.

13            MR. KLAUS:  That's one, Your Honor.

14            And then there is also with respect to -- there was

15    also a privilege issue with respect to Mr. Kenswil.

16            THE COURT:  I think Mr. Busch has already represented

17    he wasn't going to get into that.

18            MR. BUSCH:  I will not.

19            THE COURT:  All right.  Let's go ahead and bring the

20    jurors out.

21                        (Jury In)

22            THE COURT:  You may resume.

23            MR. BUSCH:  Thank you.

24                  DIRECT EXAMINATION RESUMED

25    BY MR. BUSCH:

1  Q.   Good afternoon, Ms. Rogell.

2  A.   Good afternoon, Mr. Busch.

3  Q.   I just have a few additional questions for you.  We talked

4  about before the break a 2003 -- the 2003 agreement between

5  Eminem and Aftermath.

6           Do you recall testifying briefly about that?

7  A.   Yeah.  Yes.  Yes.

8  Q.   Okay.

9           All right.  Would you please put Exhibit No. 10 on the

10  screen for the jury and for Ms. Rogell.

11           And you can look on the screen, if you like, or you

12  can look on the notebook, whichever you prefer.  This is the

13  July 2nd, 2003, agreement between Marshall Mathers and Aftermath

14  Records; is that correct?

15  A.   Yes.

16  Q.   Okay.

17           Now I want to direct your attention to the bottom of

18  the first page, and it says, "This agreement shall not

19  constitute or be deemed a modification or an extension of the

20  prior agreements, as this agreement is a new and separate one

21  for your services and shall have the same full force and effect

22  of a new and separate agreement supported by new consideration,

23  executed as of the date hereof."

24           So is it correct, ma'am, that the 2003

25  Eminem/Aftermath agreement was a new artist agreement?

```
1    A.    Yes.

2    Q.    Okay.

3          Now, isn't it your -- isn't it correct, ma'am, that

4    you were instructed by Interscope and Aftermath that when you do

5    a new artist deal, you were to include in that language -- or

6    propose to include in the contract the language we looked at

7    before the break about permanent downloads being treated as

8    record sales?

9    A.    What I was to do is if I was doing a new agreement for a

10   new artist, use the new form.  And that language was in that

11   form.

12   Q.    Okay.

13         And who told you that it was restricted to a new deal

14   by a new artist?

15   A.    It wasn't restriction.  That was just how it was.  If

16   you're signing a new artist, here is the form we use as of a

17   certain date.

18   Q.    Okay.

19         Let me see if I can refresh your recollection about

20   some testimony.

21         Could you please play Ms. Rogell's testimony from Page

22   125, Line 20, through Page 126, Line 7?

23         THE COURT:  I'm sorry.  One moment.

24         I'm sorry, Mr. Busch.  For what purpose is the

25   deposition going to be played?
```

```
1              MR. BUSCH:  Both for impeachment and to refresh her

2     recollection, Your Honor.

3              MS. LeMOINE:  If I could ask if he's going to play

4     that portion, we would ask for a larger portion to be played.

5              THE COURT:  One moment.

6              And your request?

7              MS. LeMOINE:  Could you -- what was the request?  To

8     what section?

9              THE COURT:  Page 125, Line 20, through Page 126, Line

10    7.

11             MR. BUSCH:  I'm sorry.  It was -- yes, that's correct,

12    Your Honor.

13             MS. LeMOINE:  That's fine, Your Honor.

14             THE COURT:  You may.

15             (Whereupon, the testimony was played for the jury

16              as follows:

17             "Q.  Was there a discussion when you were

18             directed in -- sometime in March or prior to

19             March of 2003 to insert the language for

20             downloads that we've gone over into artist

21             agreements?  Was there a specific direction

22             only to put it in new artist agreements and

23             not to put it in new agreements with artists

24             that you had previous agreements with?

25             "A. It wasn't an instruction to insert this
```

```
 1                language into new agreements.  It was, as of
 2                this date, this is the new form.  When you do
 3                a new artist deal, you use it.  Period.")
 4   BY MR. BUSCH:
 5   Q.   So, Ms. Rogell, your instruction -- so I understand, your
 6   instruction by your superiors was whenever you do a new artist
 7   deal, you were to use the form language about permanent
 8   downloads -- licenses for permanent downloads being treated as
 9   record sales; correct?
10   A.   I'm supposed to use whatever language is in the new form.
11   Q.   Okay.
12                And were you also instructed -- so I take it then by
13   your answer that you were not instructed by your superiors, by
14   Mr. Ostroff or Ms. -- Mr. Hoffman, that if there was an -- a
15   renegotiation or an amendment, you were to propose that language
16   in the new form?
17   A.   I don't recall if I was instructed that way.
18   Q.   Okay.
19                And in connection with the Eminem/Aftermath deal, that
20   was a new agreement, was it not?
21   A.   This is a new agreement.
22                MR. BUSCH:  Okay.  Thank you.  Nothing further.
23                THE COURT:  Cross?
24                          CROSS-EXAMINATION
25   BY MS. LeMOINE:
```

Q.    Good afternoon, Ms. Rogell.

A.    Hello.

Q.    Mr. Busch was going through the 2003 agreement with you.
Just one more thing on that point.

        Did the parties reach agreement on the scope of the
changes they wanted to make in the 2003 agreement?

A.    Yeah.

Q.    And what did -- what was the scope --

A.    Just to take the old agreement, put in anything new that we
needed to just get it done, and get the deal done fast.

Q.    So do you recall any discussion with Mr. Hoffman or
Mr. Stiffelman for Eminem regarding permanent downloads or
mastertones in the context of that --

A.    No.

        MS. LeMOINE:  All right.  That's all I have.  Thank
you.

        THE COURT:  Anything further?

        MR. BUSCH:  Nothing further.

        THE COURT:  You may step down.  Thank you.

        THE WITNESS:  Thank you.

        THE COURT:  Plaintiff's next witness?

        MR. BUSCH:  Larry Kenswil.

        Your Honor, I would like to perhaps use this easel
during my examination of Mr. Kenswil, and would it be possible
to put it here so the jurors could see it a little bit better?

```
 1              THE COURT:  Yes.
 2              MR. BUSCH:  And then my second question is can I have
 3    permission to scoot a few feet over when I'm questioning and
 4    using the easel?
 5              THE COURT:  Just with regard to the examination using
 6    the easel, you may.
 7              MR. BUSCH:  Thank you.
 8              THE CLERK:  Sir, if you can please stand next to the
 9    court reporter and raise your right hand.
10         Lawrence Kenswil, Plaintiff's witness, was sworn
11              THE CLERK:  Thank you.  Please take a seat.  For the
12    record, sir, can you please state your full name and spell your
13    last name.
14              THE WITNESS:  Lawrence Kenswil, K-E-N-S-W-I-L.
15              THE COURT:  You may.
16              MR. BUSCH:  We are going to wait one moment,
17    Your Honor, while we get opposing counsel their binders.
18                        DIRECT EXAMINATION
19    BY MR. BUSCH:
20    Q.   All right.  Now that we have done that, would you,
21    Mr. Kenswil -- I take it you were -- we met once before when I
22    conducted a deposition of you; is that correct?
23    A.   Right.
24    Q.   And, Mr. Kenswil, you were the head of Universal's Elabs
25    division; is that correct?
```

1   A.    For a time period, yes.

2   Q.    And you have spent many years in the music business; is

3   that right?

4   A.    That's correct.

5   Q.    And you started heading up Universal's Elabs division in

6   what year?

7   A.    About 1997.

8   Q.    Okay.

9         And you were the head of Universal's Elabs division

10  between 1997 and what date?

11  A.    Toward the beginning of 2007.

12  Q.    Okay.

13        And at the beginning of 2007, you took on a new

14  position at Universal; is that correct?

15  A.    That's correct.

16  Q.    And what position was that?

17  A.    I was executive vice-president of business strategy.

18  Q.    Okay.

19        How long did you hold that position?

20  A.    About two years.

21  Q.    Until when?

22  A.    The end of last year.

23  Q.    The end of 2008?

24  A.    Yes.

25  Q.    And are you still with Universal today?

1    A.    No.

2    Q.    Okay.

3          You're an attorney; is that correct?

4    A.    That's correct.

5    Q.    In connection with your work -- and, by the way, before we

6    move on, for the last two years, have you heard of a -- back up

7    one second.

8          Have you heard of a project called Total Music?

9    A.    Yes.

10   Q.    And Total Music was an attempt by Universal to sell music

11   over the Internet; is that correct?

12   A.    In a very, very broad sense, yes.

13   Q.    It was described as being a competitor to iTunes; isn't

14   that right?

15   A.    Not in my mind, no.

16   Q.    No.  What I'm asking you is you know there have been

17   descriptions of it in newspaper articles and otherwise as being

18   a potential competitor to iTunes.  You are aware of that, are

19   you not?

20   A.    I don't recall that, no.

21   Q.    You don't recall ever seeing that?

22   A.    No.

23   Q.    Okay.

24          And it was digital music; right?

25   A.    Yes.

1    Q.    And the process was that Universal would sell different

2    types of MP3 players, and the music itself would be allowed to

3    be downloaded by consumers; is that correct?

4    A.    In any meeting that I was in, I never heard of anyone

5    intending for Universal to sell any MP3 players.

6    Q.    Okay.

7          What was -- well, let me ask you, what was Total Music

8    then?

9    A.    Total Music was a joint venture formed by Sony Music and

10   Universal Music, intended to do different things at different

11   points of its strategic development.

12         What it ended up building and never really launching

13   was a system to support advertiser-supported music on demand

14   streams on the Internet.  So it would not be selling anything.

15   It would be a system for essentially giving away music to people

16   who wanted to hear it and for ads to be sold to help pay for it.

17   Q.    Were there conditional downloads as a part of that service?

18   A.    Not the one I just described, no.

19   Q.    Was there another part of Total Music that was envisioned

20   to have a conditional download component to it?

21   A.    I'm sure if you looked at the two years of different

22   strategy decks prepared for what Total Music might be, someone

23   might have put conditional downloads in there, but it was never,

24   in my mind, any kind of major part of the initiative.

25   Q.    And this was going to be a platform that was being built as

1   a joint venture between Universal and Sony Music; is that right?

2   A.    That's correct.

3   Q.    And it failed, it never launched; is that right?

4   A.    It never got to fail.  It never launched.

5   Q.    And the plug has been pulled on it; right?

6   A.    That's correct.

7   Q.    Okay.

8         Now, this was not Universal's first foray into

9   selling -- trying to build their own platform to sell permanent

10  downloads themselves, is it?  Or to sell any type of downloads

11  themselves, I should say?

12  A.    Well, I'm not sure what you mean by the word "platform."

13  Q.    To sell directly without entering into agreements with

14  companies like Apple or Yahoo where they would be manufacturing

15  the downloads themselves and selling them to the public.

16        This was not the first foray Universal had into that

17  arena, was it?

18  A.    Well, certainly Universal has had several forays into the

19  download business.  I don't know of anywhere -- there was no

20  plan noted to include third parties in the process.

21  Q.    What was the first foray into Universal's attempt to sell

22  digital downloads themselves?

23  A.    By "themselves," you mean the Universal product?

24  Q.    Yes.

25  A.    The first one to launch where downloads were actually sold

1   was probably called Blue Matter.

2   Q.   Blue Matter.

3        And that was -- that was a Universal-owned business?

4   A.   The Blue Matter part of it was a Universal-owned trademark

5   so, yes.

6   Q.   And that was back in 1998; is that right?

7   A.   It was later.

8   Q.   '99?

9   A.   '99/2000.

10  Q.   How long did that last?

11  A.   Probably two years.

12  Q.   Okay.

13       And that no longer exists; correct?

14  A.   That's correct.

15  Q.   Okay.

16       You were either involved or you -- you were either

17  involved negotiating or overseeing agreements between Universal

18  and various third party digital download companies during the

19  course of your career with Elabs; correct?

20  A.   Correct.

21  Q.   And you are familiar with the terms in those agreements as

22  a result; correct?

23  A.   Generally, yes.

24  Q.   Okay.

25       And you're involved with the procedures that occur in

1  getting Universal recordings to the download companies, whether

2  they be conditional download companies or permanent download

3  companies, as part of those agreements; correct?

4  A.    To the extent the procedures were in place when I was

5  there, yes.

6  Q.    Okay.

7         And you were there through 1990?

8  A.    I was there through last year.

9  Q.    And so the procedures with respect to getting the Universal

10  master recordings to the digital download companies, whether

11  they be for permanent or conditional downloads, were consistent

12  during the term of your career between 2003 and 2008?

13  A.    No.

14  Q.    How were they inconsistent?

15  A.    Well, the systems when we started weren't built.  So when

16  we first entered into the digital businesses, to get our music

17  online required ad hoc exercises, basically,

18  business-by-business, so that if we had a deal with a certain

19  type of online business and they needed to get the music

20  delivered to them on CD, we would deliver them a CD.

21         If they wanted music -- if they already had CDs, then

22  they would ask us permission to rip those CDs and we would give

23  them that permission.  Basically it was whatever was most

24  efficient to get the music up in a quick amount of time for the

25  business being launched.

1    Q.    Isn't it true, sir -- and I don't know what year you are

2    talking about.  Are you talking 2000, 2001?  What year are you

3    talking about there?

4    A.    There were probably -- we built a system for digitally

5    delivering music during the decade, but it took a long time

6    before most, and I don't know if even now all of our digital

7    retailers and other digital partners had systems to ingest it

8    that way.  So we had to accommodate them.

9    Q.    I want -- isn't it true, sir, that since 2003 you have

10   provided an asset and metadata guide -- a digital asset and

11   metadata guide to the digital download companies, whether they

12   be permanent download companies or conditional download

13   companies, setting forth the procedure for getting the music on

14   their system?

15   A.    That wasn't my department, I'm afraid.  I'm not too

16   familiar with that.  I know we had a digital asset management

17   system that was able to transmit bits to them electronically.

18   I'm sure there was some instructions on how to use it.  If by

19   that you mean the guide, I assume there was one.

20   Q.    Okay.

21         Let me back up for one second, sir, and let me just

22   ask you a few questions that -- I want to make sure that we're

23   on the same page here.

24         Isn't it true, sir, that with respect to both the

25   permanent download and the conditional download agreements,

1    Universal supplies a digital file -- two digital files, one

2    digital file with a master recording on it and another digital

3    file with metadata on it, to the download companies; isn't that

4    correct?

5    A.    Broadly that is one way it can be done, yes.

6    Q.    Okay.

7          Do you know of any download agreement for permanent or

8    conditional downloads between the time of the Apple agreement in

9    2002 and the time that you left where it was done differently?

10   A.    I'm not aware one way or the other.

11   Q.    Isn't it true that you have testified that in connection

12   with the digital download agreements, that Universal has no

13   manufacturing costs in connect -- connected with that?

14   A.    Generally that's true, but it depends on -- I mean, it has

15   costs.  If you don't call them manufacturing costs, you have to

16   call them something else, but the way the term has been used

17   traditionally, manufacturing costs means a physical cost --

18   pressing a physical good, and that has gone away.

19   Q.    Universal creates digital files and supplies them to the

20   digital download companies.  That's traditionally the way it

21   occurs; isn't that right?

22   A.    That is one way it occurs.

23   Q.    And you can't think of any way, as you sit here, in any of

24   the agreements that you negotiated or that was entered into by

25   Universal at the time of the Apple agreement in 2003 and the

1  time that you left where it was different; isn't that correct?

2  A.    No.  I said there were some -- there were some partners who

3  wanted to receive CDs for quite a length of time.

4  Q.    Name them.

5  A.    I believe Music Net was receiving CDs for quite a while.  I

6  don't know when they stopped or if they stopped.

7  Q.    Anything else besides Music Net?

8  A.    I'm not aware of one way or the other.

9  Q.    Okay.

10         So that's the only one you can identify here today; is

11  that right?  Where it's not the supplying of one digital file

12  per song to the digital download companies?  The only one you

13  can think of is Music Net; is that right?

14  A.    Well, you said one digital file.  I don't know that it's

15  just one file.  I think we sometimes supply several files.

16         THE COURT:  Hold on.  Mr. Busch, slow down, please.

17         MR. BUSCH:  Okay.

18  Q.    Stand corrected.  You supply -- the primary way of doing

19  it, just so we're very clear, is that Universal supplies a

20  digital file with the sound recording on it and a separate

21  digital file with various information to the digital download

22  companies, whether they be conditional or whether they be

23  permanent download companies?  That is the primary way it is

24  done; correct?

25  A.    Yes.

1   Q.   Okay.

2          And once those -- and with respect to that digital

3   file, isn't it correct that the digital download companies,

4   whether they be permanent download companies or conditional

5   download companies, are responsible for paying for the digital

6   file they receive?

7   A.   That's a matter of contract.  We certainly ask them to pay

8   a service charge for that.  I don't know that we always manage

9   to collect it.

10  Q.   It's in your agreements many times; isn't that correct?

11  A.   Well, we propose it.

12  Q.   And so the agreements will speak for themselves whether

13  that is something that is in the agreements or not; is that

14  right?

15  A.   That's correct.

16  Q.   Okay.

17          And isn't it correct that Apple -- let's take Apple,

18  for example.  Apple does not obtain ownership of the digital

19  files it receives; isn't that correct?

20  A.   Well, ownership is a -- is a word when you are dealing with

21  copyright which can be -- which we have to define.  They

22  certainly don't retain any -- have any ownership in any

23  copyrighting.  Are you asking whether they own the bits we sent

24  them, the 1's and 0's?

25  Q.   Yeah.  What I am asking is isn't it true that the

1    digital file -- that the information in the digital files that

2    is sent to Apple by the terms of your deals remain the ownership

3    of Universal?

4    A.    Well, the copyright in them remain the ownership.  I don't

5    know what effect an ownership declaration on the 1's and 0's

6    would have one way or the other.  They certainly can't make any

7    copyright usage of them without Universal.

8    Q.    That's not my question, sir.  My question is the digital

9    files itself, the metadata and the digital files, isn't it true

10    that you testified that that remains the ownership of Universal

11    and Apple does not obtain ownership of it?

12    A.    I don't remember what I testified on that.

13    Q.    Okay.

14           Open up your binder and I want to direct you to Page

15    59.

16    A.    I'm sorry.  I have three binders.

17    Q.    Okay.  Can you pull up Page 59?

18           THE COURT:  Hold on.  Before you do that, I want to

19    know for what purpose.

20           MR. BUSCH:  For impeachment, Your Honor.

21           THE COURT:  Page 59, line what?

22           MR. BUSCH:  Line 23.

23           THE COURT:  To?

24           MR. BUSCH:  Through Line 25, and Page 60, Line 1

25    through 6.

```
 1              THE COURT:  One moment.

 2              MR. BUSCH:  And also to refresh his recollection.

 3              THE COURT:  One moment.

 4              MR. KLAUS:  Your Honor, we have the objection that's

 5   noted there as well.  We would ask for a ruling on it.

 6              THE COURT:  Overruled.  You may play.

 7              MR. BUSCH:  Page 59, Line 23, through Page 60, Line 6.

 8              (Whereupon, the deposition was played for the jury

 9              as follows:

10              "Q. Okay.  What are -- are there -- obviously

11              this is a contract that contains multiple

12              terms.  Does Apple obtain ownership of the

13              digital file that it receives from Universal?

14              "A. My answer would be no.")

15   BY MR. BUSCH:

16   Q.   So when you were deposed in this case, you didn't go on a

17   speech about copyright and different things of that nature.

18   Your answer was no; is that right?

19              THE COURT:  Mr. Busch, that's argumentative.

20   BY MR. BUSCH:

21   Q.   Okay.

22              Does that refresh your recollection that your

23   testimony when you were under oath in a deposition was that no,

24   Apple does not receive ownership of the digital file it receives

25   from Universal?
```

A.    Yes.  I just saw it and I see what I said, yes.

Q.    Okay.

So were you telling the truth then?

A.    I don't think it's a matter of whether I'm telling the truth then or if it's inconsistent with what I just said.

Q.    Well, the jury will make that conclusion.  What I am asking you is were you telling the truth then?

A.    Yes.

Q.    Okay.

Now, once Apple or the digital download companies get the file -- by the way, let me back up one second.

Isn't it true, sir, that there is no additional cost to Universal once it supplies a digital file which the download companies may themselves be responsible for paying for, service fee -- isn't it true that your testimony is that there is no additional cost to Universal, whether that song is then downloaded one time or a million times?

A.    Well, that's not accurate.  So if I said that, that's wrong.

MR. BUSCH:  Okay, Your Honor.  I would like to read -- I would like to play his testimony.  Let me just get it here. Page 67, Line 23, through Page 68, Line 9.

THE COURT:  Any objection?

MR. KLAUS:  No objection, Your Honor.

THE COURT:  You may.

```
 1                    (Whereupon, the deposition was played for the jury
 2       as follows:
 3                    "Q. Okay.  Now, with respect to that
 4                    particular file, once it is with Apple, once
 5                    it is with Apple, and say it's there for a
 6                    year and it's downloaded a million times, is
 7                    there any cost to Universal with respect to
 8                    that particular digital file after the
 9                    original digital file is provided to Apple?
10                    "A. Probably not, although from time to time
11                    we reservice files.  But assuming that didn't
12                    happen, then there is no marginal cost to
13                    Universal, an increased cost due to it being
14                    downloaded several times.")
15       BY MR. BUSCH:
16       Q.    So does that refresh your recollection that you testified,
17       sir, that assuming that there was no re-servicing of a file,
18       there would be no additional cost to Universal whether a
19       download is downloaded one time or a million times?
20       A.    It reflects -- it refreshes my recollection, but it's not
21       complete.
22       Q.    Okay.
23                    When you answered the question, you didn't say you
24       needed to add anything, did you?
25       A.    No.  I obviously forgot about something.
```

1   Q.   And I guess you now want to explain what you forgot about

2   when you were under oath and you answered my question the first

3   time; right?

4               MR. KLAUS:  Objection.  Argumentative, Your Honor.

5               THE COURT:  Sustained.

6   BY MR. BUSCH:

7   Q.   If you do, go ahead.

8               MR. KLAUS:  Objection.  Same objection, Your Honor.

9               THE COURT:  Overruled.  You may.

10              THE WITNESS:  If I want to explain, I may?

11  BY MR. BUSCH:

12  Q.   If you want to explain why your answer was not complete

13  when you gave it the first time when I asked you the question --

14  let me back up for one second.  Was your answer wrong when you

15  gave it?

16  A.   It was too narrow.

17  Q.   Okay.

18              And now you want to broaden that answer that you gave

19  the first time?

20  A.   What I'm going to say is not controversial.

21  Q.   Go ahead.

22  A.   Whenever a copy of a record is sold, the record company has

23  to make at least two royalty payments; one is to the artist and

24  one is to the songwriter.  And every time another file is sold,

25  a download is sold, a CD is sold, those payments are made.

1           So obviously I wasn't thinking in terms of those

2    royalties, and I left that out.

3    Q.    Okay.

4           So what you're saying is that there are mechanical

5    royalties that have to be paid and that's the cost that you

6    were -- that you did not answer the first time; correct?

7    A.    And artist royalties.

8    Q.    Okay.

9           Now is your answer complete?

10   A.    Yes.

11   Q.    Okay.

12          Now, Mr. Kenswil, you're also familiar with the way

13   music is sold in the physical world; correct?

14   A.    Yes.

15   Q.    And in the physical world, Universal has costs for

16   manufacturing each record, each individual record, correct, when

17   it's selling records?

18   A.    Yes.

19   Q.    It has costs for creating each individual jewel case if

20   it's a CD; correct?

21   A.    Yes.

22   Q.    It has costs to manufacture each separate CD; correct?

23   A.    Yes.

24   Q.    It has costs to print the label copy and any liner notes or

25   lyrics that are included with each individual CD; correct?

A.    Yes.

Q.    Okay.

          And Universal, when it is -- when it is selling those
records, bears all those costs of manufacturing; correct?

A.    Generally, yes.

Q.    Okay.

          And when Universal is selling physical records,
Universal always sells its physical records through its own --
own distributor.  It used to be called UMVD; correct?

A.    Well, no.

Q.    That's not correct, that when Universal sells physical
records, it sells them through its own distributor, Universal
Music and Video Distribution Company?

A.    Well, first of all, I have to ask you, are you talking
about just this country?

Q.    I'm talking about the United States.

A.    Okay.  Generally that's true, if it's not a hundred percent
true.

Q.    Okay.

          And Universal, when it's selling physical records,
bears the cost of distribution; correct?

A.    Well, I think you have to define which costs you mean
because when you say costs of distribution, it's a very broad --

Q.    Shipping the cost to retailers.

A.    It bears the cost of shipping to a depot where the

```
 1   retailers receive it, yes.
 2   Q.   And it bears the cost of a sales staff that is designed to
 3   sell -- make sales of individual CDs to individual retailers,
 4   get them to buy as many individual CDs as possible; correct?
 5   A.   That's correct.
 6   Q.   Okay.
 7            And isn't it correct, sir, that in the physical -- in
 8   the physical world when Universal sells its physical product,
 9   it's selling it to a retailer like a Best Buy or a Wal-Mart;
10   isn't that correct?  Generally speaking.
11   A.   It can sell it to a retailer directly or it could sell it
12   to a wholesaler who then resells to a retailer.  Either way.
13   Q.   Okay.
14            Either way it's selling to a retailer; correct?
15   A.   No.  Sometimes it sells to a wholesaler who does not
16   retail.
17   Q.   Okay.
18            Either a retailer or a wholesaler, a business of some
19   kind that does that business; correct?
20   A.   Yes.
21   Q.   Okay.
22            And isn't it correct that when the product, the CD,
23   the record, the vinyl, whatever it is, is sold to the retailer,
24   subject to what are called reserves returns, the royalty is
25   credited to the artist at that point in time?
```

A.    Well, you have left out some steps.

Q.    Okay.

A.    I don't think that's true.

Q.    Okay.

Well, could -- I would like to impeach the witness

with his testimony again, Page 66, Line 4 through 12.  It's

actually 66, Line 9 through 12, Your Honor.  I think 4 through 8

is not necessary.  Well, to give it the full flavor, yes, 4

through 12, Your Honor.

THE COURT:  Line 4 starts with an answer, though.

MR. BUSCH:  I'm sorry.  9 through -- let me see.  Then

it's my mistake.  It goes back to 65, Line 24, and then

continuing on to 66, Line 12.

THE COURT:  You may.

MR. BUSCH:  Thank you.

(Whereupon, the deposition was played for the jury

as follows:

"Q. Okay.  With respect to physical product,

do you know whether it is the sale to the

retailer that is subject to the royalty to

the artist or the sale to the end user?  Or

the consumer?

"A. It's a CD that's the -- in either case,

when the product is put into normal retail

channels, subject to reserves for returns in

```
 1                  ** typical cases, that's when the royalty

 2                  is -- is credited to the artist.

 3                  "Q. So when it's sold to the retailer subject

 4                  to anticipated returns is when it is credited

 5                  to the artist; is that fair to say?

 6                  "A. That's correct.")

 7   BY MR. BUSCH:

 8   Q.   Were you telling the truth there, Mr. Kenswil?

 9   A.   It's not technically accurate.

10   Q.   So you were lying or mistaken?

11   A.   I was not lying.  I was being -- I was being far too

12   general.

13   Q.   Okay.

14        So when you said that the royalty is credited to the

15   artist when the sale is made to the retailer subject to

16   anticipated returns, when you said that that was the case, were

17   you -- when you said that was the case, were you right, wrong or

18   mistaken?

19   A.   I was -- it -- stated like that is misleading.  It's

20   neither right nor wrong.  It's misleading.  It needs

21   clarification.

22   Q.   Why didn't you tell me that it sought clarification and was

23   misleading when I asked you the question when you were under

24   oath in your deposition?

25   A.   Well, I'm sure if it had been read back to me at that
```

1    point, I would have thought about it and I would have.

2    Q.    If you want to clarify it, be my guest.

3    A.    Sure.  Artists are credited with royalties twice a year,

4    essentially.  They're not credited sales by sales.  Their

5    accounts are credited every six months when all the sales that

6    happen during that six months are added up and there is one

7    credit.  So to say it's credited, as I said there when it

8    happens, is not accurate.  It would lead artists to wonder why

9    they get paid six months later.  And that's why it's misleading.

10   Q.    Well, I didn't say paid; I said credited.

11   A.    That's right.  That's not credited.  Paid -- they're paid

12   three months after that.  They're are credited at the end of the

13   accounting period.  So -- and it's -- and it's a long, complex

14   accounting reasons, but that is when they're credited.  It's the

15   last day of the accounting period for all the sales in that

16   accounting period.

17   Q.    Did you get the opportunity to read your deposition and

18   make any corrections prior to coming to trial here today?

19   A.    Yes.

20   Q.    Did you make a correction to that?

21   A.    I don't know.  Probably not.

22   Q.    Okay.

23          So with respect to physical sales, once the retailer

24   purchases the CD or vinyl or record, whatever it is, they own

25   it, they can do with it what they want; correct?

A. I'm sorry. I -- could you repeat the question? I lost it.
Q. Okay.
Once the retailer purchases the physical CD from Universal, they can do with it what they want -- throw it away, sell it, do with it what they want; correct?
A. Subject to copyright law, yes.
Q. Okay.
And when you say subject to copyright law, you mean they cannot reproduce it; correct? They cannot make their own copies of it; correct?
A. Well, they can't do anything with it subject to an exclusive right under copyright law that hasn't been granted to them.
Q. Okay.
Now, with respect to Apple and the digital downloads, in fact Apple does make reproductions of a digital file that is supplied to it by Universal; isn't that correct?
A. That's correct.
Q. You've granted them that right to do that; correct?
A. That's correct.
Q. Okay.
You have licensed them that right to do that; isn't that correct?
MR. KLAUS: Objection, Your Honor. Calls for a legal conclusion.

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  I'm sorry?

 3    BY MR. BUSCH:

 4    Q.    The objection was overruled.

 5    A.    Okay.  The right to do that is a copyright license.

 6    Q.    Now, with respect to the Apple agreement, we talked about

 7    this a moment ago, and it's your general understanding that in

 8    general these digital download companies, whether permanent or

 9    conditional, get a digital file with the master recording on it

10    and another digital file with various metadata on it; correct?

11    A.    That's correct.

12    Q.    Okay.

13          And the digital download companies, whether they be

14    conditional or permanent, then, in your words, digitally

15    manufacture that -- those two files into what is the download;

16    correct?

17    A.    It's a layman's term, they probably wouldn't use it, but

18    essentially, yes.

19    Q.    Okay.

20          And it's your testimony, is it not, sir, that the

21    creation of what is quote, unquote, the download does not occur

22    until someone actually -- an end user actually downloads --

23    requests a download for a song; isn't that correct?

24    A.    That's correct.

25    Q.    Okay.
```

1          And it's also your testimony, is it not, that Apple

2    only has to pay Universal any money if and when an end user

3    downloads a song?

4    A.    Well, they only have to pay for that reproduction when the

5    download uses -- I mean, forgetting about the other payments we

6    talked about.

7    Q.    The service charge.

8    A.    Right.  That's correct.

9    Q.    And you know that in this case, it is Universal's position

10   that Universal is selling a download to Apple and Apple is

11   reselling it?  You understand that?

12   A.    Yes.

13   Q.    Okay.

14          How can Universal sell an -- a download to Apple if

15   Universal is providing Apple a digital file with a master

16   recording on it and a separate digital file with metadata and

17   information that only becomes a download when Apple manufactures

18   it into it?

19   A.    Well, Universal has separately authorized Apple to do what

20   you are calling manufacturing but in actuality is called -- I

21   don't know what it's called, but it's not called manufacturing.

22   But it -- the creation of the ultimate downloaded file is being

23   done by Apple because Universal has essentially outsourced it to

24   them to do that.

25   Q.    They farmed it out; right?

1    A.    Well, they -- they've granted, as I said before, a

2    copyright license to Apple for that process.

3    Q.    What they did was that they licensed Apple the right to

4    reproduce the digital files that it provided them and

5    manufacture or create a download that Apple then sells to an end

6    user?  That's what occurs; right?

7    A.    I think the two steps you said are just the same thing.

8    Q.    Okay.

9          Now, we talked about this a little bit in your

10   deposition, but -- and we talked about what a retailer can do

11   with physical product that it actually buys.  And let's just

12   talk about that for a moment.

13         If a retailer buys -- let's say Best Buy buys Eminem

14   CDs and it has them in stock.  Best Buy can say, "Come into Best

15   Buy and buy a TV and we'll give you every Eminem CD we have in

16   the store."  They could do that; right?

17   A.    Yes.

18   Q.    Okay.

19         On the other hand, let's take Apple, for example.

20   You've placed -- Universal's placed restrictions on Apple with

21   what it can do as far as bundling things that it -- songs that

22   it has provided to Apple -- that Universal has provided to

23   Apple, have they not?

24   A.    Yes, they have.

25   Q.    Okay.

1          So Apple can say, "Buy an iPod and get 20 free songs,"

2   but what they can't do is say, "Buy an iPod and get 20 Eminem

3   songs;" correct?

4   A.   That's correct.

5   Q.   Okay.

6          And we talked about this before, also at your

7   deposition.  If Universal sends Apple a take-down notice and

8   says, "You can't sell any more of Eminem's album *Slim Shady* for

9   some reason," Apple has to honor that; correct?

10  A.   Yeah.  I suppose there could be a situation where if

11  Universal did that, Apple could claim it didn't have the right

12  to do it but there are situations where it has the right to do

13  that, yes.

14  Q.   Okay.

15         And Apple could not go out, if Universal did that, and

16  buy the *Slim Shady* LP on CDs and then start selling it on

17  iTunes?  They can't do that, can they?

18  A.   Selling them as a download on iTunes?

19  Q.   Yes.

20  A.   That's correct.  They couldn't do that.

21  Q.   Now, you know that for permanent downloads -- I'm sorry --

22  for conditional downloads and streams, that Universal does pay

23  50 percent of its net receipts under the licensing provisions of

24  artists' contracts for those limited downloads and streams?

25  You're aware of that?

1    A.    I'm aware of that under some artist contracts that's how

2    it's paid, yes.

3    Q.    Are you aware of exceptions to that?

4    A.    Yes.

5    Q.    Do you know if Eminem is paid that way and F.B.T.?

6    A.    I don't know.

7    Q.    So would it be fair to say that you have to look at the

8    terms of the contract in order to determine whether the

9    licensing provision applies?

10   A.    I'd say before paying any artist, you have to look at the

11   terms of the contract to see what's payable.

12   Q.    With respect to the conditional downloads that are paid, as

13   you said a moment ago, in some cases and for Eminem and F.B.T.,

14   50 percent of net receipts, do you know whether the asset and

15   metadata guide that is sent to those digital download companies

16   is the same as it is with respect to the permanent download

17   companies?  In other words, the processes are the same?

18   A.    Are you asking whether the metadata guide is the same or

19   the metadata is --

20   Q.    The metadata guide.

21   A.    I don't know.

22   Q.    Okay.

23         And is it correct that with conditional downloads and

24   permanent downloads, the metadata is the same?

25   A.    Some of it is, the name of the artist, the title, the

1  running time, things like that.  The -- to the extent that the

2  metadata has copy control type information, it would be

3  different.

4  Q.   Okay.

5        Anything else different besides copy control?

6  A.   I don't know.

7  Q.   Do you know whether there is any difference between the

8  asset and metadata guide that is attached to Universal's

9  agreements with permanent download companies versus the asset

10  and metadata guide that is part of agreements with conditional

11  download companies?

12  A.   Well, I've never read them so I don't know.

13  Q.   Okay.

14        Isn't it true that if you get a conditional download

15  on -- you put it on an iPod or an MP3 player, the artwork, cover

16  artwork, is the same as with the permanent download?

17  A.   Conditional download won't play on an iPod.

18  Q.   It won't?  Are you sure of that?

19  A.   Yes.

20  Q.   Will it play on an MP3 player?

21  A.   It will play on an MP3 player that has the correct

22  technology on it.

23  Q.   Okay.

24        So it will play on MP3 players?

25  A.   Some.

1    Q.    Okay.

2          Are you certain that an iPod that has a condition --

3    that won't -- you can't have a conditional download on it?  Are

4    you positive?

5    A.    Yes.

6    Q.    Okay.

7          Let's just take the MP3 player that you acknowledge

8    you can have a conditional download on.  Is the artwork that you

9    get the same as with a permanent download?

10   A.    Well, they both display the cover art, and the cover art is

11   the cover art.

12   Q.    Okay.

13         And the song is the same?

14   A.    The song is the same.

15   Q.    Okay.

16         What I would like to do, Mr. Kenswil, is you have a

17   binder in front of you.  And I believe it says "Summary Charts"

18   on them.

19   A.    Yes.

20   Q.    What I'd like to do is have you go through --

21         MR. KLAUS:  Your Honor, does Mr. Busch have another

22   copy for me or is it identical to the --

23         THE COURT:  Mr. Klaus, I'm sorry.  I didn't hear you.

24         MR. KLAUS:  I'm sorry, Your Honor.  I was asking if

25   Mr. Busch had a copy for me.  He provided one last week and I

1   just wanted his confirmation that it was the identical binder.

2           THE COURT:  Mr. Busch, have you provided the copy of

3   the summary charts that you're examining the witness on?

4           MR. BUSCH:  Yes.  And, yes, it is identical.

5           THE COURT:  All right.  Thank you.

6   BY MR. BUSCH:

7   Q.   And what I have done, if you look at these summary

8   charts -- let's start with 1A.

9           What I have done, Mr. Kenswil, is because we have so

10  many agreements that Universal has produced to us, what I have

11  done is I have put on -- I have cut out the terms that appear

12  that are consistent in various of the agreements, whether they

13  be mobile agreements, whether they be permanent download

14  agreements, or whether they be conditional download agreements,

15  and I would like to just identify by exhibit number and by the

16  title of the agreement on the charts that you have in front of

17  you.

18          Do you see that?

19  A.   Yes.

20  Q.   Okay.

21          Now, starting with the first -- the first in order, we

22  have mobile agreements.  And would you agree that Universal's

23  right to conduct an audit of the mobile carriers who are selling

24  mastertones is a standard term in your mobile agreements?

25  A.   Yes, it is.

1    Q.    And that's true whether it's a -- and if you look at --

2    behind B and you look behind C, you'll see that there are

3    similar audit right terms for conditional downloads,

4    subscription services that are not mobile and for permanent

5    downloads.

6             Do you see that?

7    A.    Yes.

8    Q.    And the right of Universal to conduct an audit for

9    permanent downloads or for any of these services is standard in

10   all of the agreements; correct?

11   A.    Well, I can't testify that they're identical.

12   Q.    Similar?

13   A.    Similar.

14   Q.    Okay.

15   A.    Yes.

16   Q.    What is -- and why does Universal want an audit right

17   for -- when it is providing its music to these download

18   companies, whether they be for conditional or permanent

19   downloads?

20   A.    To confirm the information sent by those companies back to

21   Universal was accurate.

22   Q.    Financial information; right?

23   A.    Any information.

24   Q.    Including financial; right?

25   A.    Including financial, yes.

 1          MR. VANDELL:  Excuse me, Your Honor.  I represent

 2     Apple, and it looks like we are now getting into some of the

 3     agreements that are covered by that --

 4          THE COURT:  All right.  Let's just take our afternoon

 5     break and let's take a look at this.  We are going to take a

 6     15-minute break.  Remember not to discuss the case among

 7     yourselves or with anyone else.  Don't form or express any

 8     opinions about the case until it's finally submitted to you.  We

 9     will see you in 15 minutes.

10                         (Jury Out)

11          THE COURT:  You may step down.  Thank you.

12          And, Counsel, would you step forward and for the

13     record state your appearance, please.

14          MR. VANDELL:  My name is Colin Vandell, Latham &

15     Watkins, and I represent Apple.

16          THE COURT:  Thank you.

17          Mr. Busch, I didn't -- I didn't notice what -- which

18     one you had on the screen, but I am assuming that some of the

19     compilations include Apple compilations.

20          MR. BUSCH:  Yes.  I didn't know that every provision

21     of the Apple agreement was subject to this.  We are not going to

22     take a position.  But, yes, sir, in answer to your question --

23          THE COURT:  Did we display one yet?  Because all we've

24     talked about so far was audit.

25          MR. BUSCH:  One of the provisions on that sheet is an

1    Apple audit, but it doesn't have any financial.  It just says --

2    it just says they can audit the records.  That's all.

3              THE COURT:  So it's my understanding, though, that the

4    previous protective orders and the request of Apple was that

5    there -- the third party contracts are confidential; is that

6    correct?

7              MR. VANDELL:  That is correct, Your Honor.  And one of

8    those that was listed on the order was No. 326, which I saw was

9    up there.

10             THE COURT:  All right.  With regard to the examination

11   of the summary charts, the courtroom will be closed.

12             Any objection to closing the courtroom except as it

13   relates to principals and persons affiliated with the law firms

14   that are, I'm sure, governed by the protective orders?

15             MR. KLAUS:  No objection, Your Honor.

16             THE COURT:  I want this to be as streamlined as

17   possible, though, because I want to do this in a way that closes

18   the courtroom for the least amount of time.  Is there any way we

19   can, without destroying your -- what you want to do, that --

20   because I think you are just going to go through -- Apple is

21   going to appear on each --

22             MR. BUSCH:  No, no.  Right.  I'm going to try --

23   believe me, Your Honor, I have eight hours to try my case, I'm

24   well aware of that, and I'm trying to move through this thing

25   very quickly.

```
 1              THE COURT:  Now I'm just wondering how am I going to
 2    do it in a way -- I want to do this in a way that closes the
 3    courtroom for the least amount of time.  So basically the only
 4    time that we are going to get into confidential information is
 5    when there is an examination of the summary charts; is that
 6    correct?
 7              MR. BUSCH:  I believe that is correct.
 8              THE COURT:  Okay.  So with regard to the examination
 9    as it relates to summary charts, I will close the courtroom.
10              Mr. Klaus, do you have a question?
11              MR. KLAUS:  I, at this point, don't, and I don't know
12    whether I will on cross-examination need to go into these
13    charts.  It's not my intention to do so.
14              THE COURT:  All right.  So after you are done with
15    your direct exam, if you in good faith --
16              MR. BUSCH:  I just thought of something.  I just
17    thought of something.
18              THE COURT:  Sure.
19              MR. BUSCH:  If we play the Eddy Cue deposition after
20    this, which I think we are going to do, that might -- I don't
21    know what --
22              MR. VANDELL:  Well, I believe the courtroom is closed
23    for the entirety of the Cue deposition.
24              THE COURT:  So just let me -- let me know when you are
25    done with the examination of the summary charts.  We will reopen
```

the courtroom. Then we will close it again when we get to Mr. Cue.

MR. BUSCH: Okay.

THE COURT: All right. Thank you.

(Recess taken)

(Jury Out)

THE COURT: All right. Before we bring the jurors out, the courtroom is now being closed except for principals and persons associated with the law firms that are governed under the protective orders.

And then also at this point I am not necessarily going to seal the transcript unless there is examination as it relates to Apple. If it's just being shown and not being inquired upon, I am not going to seal the transcript or be more discreet as to how we seal the transcript.

MR. KLAUS: Your Honor, can I raise a timing question here? We have had one of the witnesses who was supposed to be next on Mr. Busch's list. He has been here since 10:30 this morning, Rio Caraeff. I would ask, number one, if Mr. Busch has a time estimate for how much time he has left and whether he thinks he's going -- we're going to have the opportunity to put Mr. Caraeff on. Our view is that he should finish Mr. Kenswil today, and we should -- he should put Mr. Caraeff on today or Mr. Caraeff should be excused as a witness.

THE COURT: Anyway, how long -- I'm not going --

```
 1   why -- what argument do you have to excuse the witness if we
 2   just didn't get to him?
 3           MR. KLAUS:  Because the next thing -- because the next
 4   thing that Mr. Busch has said he wants to do is to play the Eddy
 5   Cue video deposition transcript.  And there is no reason that
 6   Mr. Caraeff should have to wait for him to play a video
 7   deposition transcript of someone that can --
 8           THE COURT:  But you are not asking him to be excused
 9   for the trial?  You're saying --
10           MR. KLAUS:  We, frankly, think -- we think he is a
11   witness who Mr. Busch has told us he has something like 10 or
12   15 minutes of questions for, and if he is not going to ask him
13   by the end of the day, then we think he should be excused.
14           THE COURT:  Mr. Busch, how much longer do you have
15   with Mr. Kenswil?
16           MR. BUSCH:  It depends on his answers, of course,
17   Your Honor.  But it's 3:30 now.  I would expect that I'll be
18   done with him before 4:00, I think.
19           THE COURT:  And how much time do you think you have,
20   Mr. Klaus?
21           MR. KLAUS:  I think probably 20 minutes -- 20 to
22   30 minutes.
23           THE COURT:  Do you have any objection to taking this
24   witness out of order and finishing him today and then doing Cue
25   first thing or --
```

1    MR. BUSCH:  I have made the mistake once before of

2    getting you upset with me over this and I --

3    THE COURT:  Look, I don't want -- I feel strongly

4    about professional courtesy and the treatment of witnesses.

5    But, again, I respect that it's your case.  You have the burden

6    of proof.  Frankly, in these things, I don't think it makes -- I

7    mean, if it's a murder case, you don't put the coroner on first.

8    But, I mean -- that's a big deal.  But with these things it's

9    not necessarily -- but you're the judge of that.  I'm not the

10   judge of that.

11   MR. BUSCH:  Your Honor, just 10 seconds ago

12   Mr. Pomerantz and I have been talking about this, and I was

13   telling him that given time issues, I was considering what to do

14   here.  We had talked about the fact that I was going to put Cue

15   on first earlier.  He didn't have an objection to that.  But

16   then now as we have got later in the day because of this timing

17   issue, it's become an issue.

18   Look, I prefer to put Cue on first just because it

19   flows from what Mr. Kenswil is saying to the procedures at

20   Apple.  It makes sense to do it that way.  But I am prepared to

21   do the witness -- Mr. Caraeff is not going to be that lengthy

22   so --

23   THE COURT:  We will do Caraeff at the end of the day

24   and then we will adjourn after we are finished with Mr. Caraeff.

25   MR. KLAUS:  Thank you, Your Honor.

1          The other thing is I can't see the easel from where I

2    am sitting.  I don't know if it's possible to turn it around or

3    how to position it.

4          THE COURT:  Have you examined what is written on the

5    easel?

6          MR. BUSCH:  Just examine what is on the easel.

7          THE COURT:  All right.

8          MR. KLAUS:  Very well, Your Honor.  Thank you.

9          THE COURT:  Let's go ahead and bring the jurors out.

10                        (Jury Out)

11                    (Courtroom closed)

12          THE COURT:  Ladies and gentlemen, it happened

13    yesterday where I cleared the courtroom of spectators because we

14    were addressing a portion that is subject to a court order in

15    terms of privacy, protection of third party persons.  So again

16    we've cleared the courtroom of spectators because the

17    contractual matters that are being discussed are governed under

18    a Court's protective order.

19          You may.

20    BY MR. BUSCH:

21    Q.   Mr. Kenswil, let's keep on moving, if we can.  And before

22    the break, what I was doing is going through various agreements

23    with you to show you terms that are consistent, whether the

24    agreements are conditional download subscription agreements, for

25    which you pay 50 percent under some artist contracts, or whether

1   they are permanent download agreements.  I would like to

2   continue with that process now.

3   A.   Okay.

4   Q.   Okay.

5        Before the break -- I just want to make one -- ask you

6   a couple of questions before we do.  Is it correct that with

7   subscription services, there are different tiers of

8   subscriptions, and that if you pay a certain price, you are

9   allowed to use -- have a conditional download on an MP3 portable

10  player?

11  A.   Different subscription services have different offers to

12  the consumer.  And they all try different things to attract

13  consumers and they are trying to find something that will

14  attract as many consumers as possible so they try different

15  things.

16        Now, when you say play on an MP3 player, the problem

17  is the term "MP3 player" is a generic term.  It's like Kleenex,

18  it's a generic term that people use for playing the things that

19  aren't MP3 players or things that aren't MP3s.

20  Q.   It's a portable device?

21  A.   Yeah.  Subscription services generally now in order to be

22  in business need to allow those conditional downloads to be

23  playable on a portable device, yes, but they only work on

24  specific portable devices is the problem.

25  Q.   But if you have that portable device, you get the same

1   cover artwork from the album and the same songs; correct?

2   A.    If the subscription service is delivering it, you get it,

3   yes.

4   Q.    Now, starting with what is behind Tab 1 which is audit

5   rights, and for both conditional download services and for

6   permanent download services, you -- Universal has audit rights;

7   is that correct?

8   A.    Yes.

9   Q.    Okay.

10            And they have audit rights why?  Why does Universal

11  want audit rights?

12  A.    I think I -- we went over this.  In order to confirm that

13  the information delivered by the third party is accurate.

14  Q.    And that's financial information; correct?

15  A.    Among other things, yes.

16  Q.    And under both conditional and permanent download

17  agreements, Universal gets paid over a period of time based upon

18  the number of downloads that occur; correct?

19  A.    I'm sorry.  Both --

20  Q.    Under both conditional and permanent downloads, Universal

21  has a recurring benefit of being paid quarterly or semiannually,

22  based upon the number of downloads that occur during that period

23  by an end user; correct?

24  A.    That's not correct.

25  Q.    What's not correct about it.

1    A.    Subscription services divide money based on the number of

2    times a song is played, not downloaded.

3    Q.    Well, in any event, it is because of the number of plays or

4    downloads, every so often Universal receives payment by those

5    download companies; correct?

6    A.    No.  Download companies, they only get paid on downloads.

7    Subscription services, they get paid according to the number of

8    plays.

9    Q.    I think that is what I just said.  We may be talking over

10   each other.

11          My only point here is that every so often, based on

12   either the plays or the downloads, Universal receives money?

13   A.    Yes.

14   Q.    Okay.

15          And it's quarterly or semiannually, depending on the

16   terms of the agreement; correct?

17   A.    Or even monthly.

18   Q.    Okay.

19          And Universal wants the opportunity to inspect the

20   financial books of those companies to make sure they're being

21   paid appropriately; correct?

22   A.    Books and other things, yes.

23   Q.    Okay.

24          Go to Tab 2, if you would, sir.  Behind Tab 2.

25   A.    Right.

1    Q.    Put content delivery on the screen, if you would.  And if

2    you would put the non-mobile subscriptions, get to the permanent

3    downloads.

4            Do you recognize the content delivery page that is

5    identified on the screen for both the subscription and the

6    permanent downloads contracts?

7    A.    I have to admit it's nothing I ever focused on

8    particularly.  It looks vaguely familiar.

9    Q.    Okay.

10           And for both the conditional download and the

11   permanent download, if you would just focus on one of each at

12   the top, please.

13           Blow it up so the jury can see it.  The first line.

14   You need to go back to the first sentence.  Okay.

15           You'll see that in both cases, both for permanent

16   downloads and for conditional downloads, it -- this provision of

17   the agreement references providing the information to

18   Universal's licensees; is that correct?

19   A.    Taking your word that that's where they're from, yes.

20   Q.    Okay.

21           And the licensees in this case is a reference to the

22   digital download companies, both the permanent and the

23   conditional download companies; is that correct?

24   A.    Well, I don't know what these refer to.  They refer to

25   whoever the contracting parties are in those agreements.  I

1    don't know which agreements they're from.

2    Q.    They are in front of you right there, sir.  They are

3    cutouts.  You can look in the book as well.

4    A.    You will have to show me where they came from in the book.

5    Q.    If you look behind Tab 2 --

6    A.    Yeah.

7    Q.    -- content delivery?  You will see the title of the

8    agreement above it?

9    A.    I just don't know which two these are.

10         Oh, they are Broadband Instruments and Sprint

11   Spectrum?

12   Q.    Yes, sir.

13   A.    I don't know what Broadband Instruments is.

14   Q.    You will see there -- look at the cutouts.  You will see

15   that Universal is referencing providing its content to its

16   licensees.  Look in the book.  Don't worry about what is on the

17   screen --

18   A.    Oh, okay.

19   Q.    -- for both permanent downloads and conditional downloads;

20   correct?

21   A.    I'm looking for the Broadband Instruments.  I'm sorry.  I

22   don't see where that comes from.

23   Q.    You don't see where it comes from?

24   A.    Yeah.  Broadband Instruments.  I can't find it.

25   Q.    2B1.

1    A.    2B1.  Okay.  Okay.  So Broadband Instruments is a

2    conditional download agreement, I assume.

3    Q.    That one is?

4    A.    Yeah.

5          And Sprint Spectrum.

6    Q.    Sir, all I want you -- and I don't want to belabor this.

7    Just look at the document that is titled Permanent Downloads,

8    and look at the reference to licensees and tell me whether the

9    licensees being referenced are the licensees who are contracting

10   with Universal to be able to provide permanent downloads to end

11   users.

12   A.    I assume so, from -- I mean, these are cutouts.  I assume

13   they're accurate.

14   Q.    Okay.  Fine.

15         Go to Tab 3, if you would, please.  Would it be fair

16   to say that the content management fee provisions that are up on

17   the screen whereby Apple and others pay for the file service fee

18   for the file it receives, is standard in the agreements for both

19   conditional and permanent downloads?

20   A.    You asked me specifically about the Apple one, right?

21   Q.    What I'm asking you is if this is a standard term in the

22   various -- in the agreements that you understand have been

23   entered into between Universal and the download companies,

24   whether permanent or conditional?

25   A.    It looks standard to me.

1   Q.    Okay.  Great.

2              If you would now move to the fourth tab, if you would.

3   And you will see that in the fourth tab for both conditional and

4   permanent downloads, you will see language that says that "The

5   download company will be responsible for all encoding, hosting,

6   serving, and providing clearinghouse and other functions

7   necessary for the operation of the service."

8              And you'll see similar language in the permanent

9   download page.

10             Is that a standard provision in both the conditional

11  and permanent download contracts?

12  A.    I believe so.

13  Q.    Turn behind Tab 5, if you would, please.  You will see that

14  behind Tab 5, for both conditional and permanent downloads, we

15  have requirements that end users agree that the master

16  recordings are being provided to the download companies subject

17  to the download companies requiring certain end user agreements,

18  agreements with the consumer.

19             Do you see that?

20  A.    I'm sorry.  Tab 4?

21  Q.    It's behind Tab 5, sir.

22  A.    Tab 5.

23  Q.    End user agreements.

24  A.    Okay.  Right.  The end user agreement would be different

25  but the requirement that they be one would be similar.

1   Q.   Okay.

2       Tab 6 has grants of rights, the rights to reproduce

3  and do different things that is being afforded to the permanent

4  download and conditional download providers.

5       Is that standard in the various download agreements,

6  grant of rights?

7   A.   Well, a grant of rights is standard.  Whether they're

8  identical, I don't know.

9   Q.   But there is a grant of rights provision, generally

10  speaking, in both the conditional and permanent download

11  agreements, where Universal is stating what the grant of rights

12  the download company has is; correct?

13   A.   Yes.

14   Q.   Okay.

15       Go to 7, if you would.  And 7 states that the

16  property, the intellectual property being provided or the

17  property being provided remains the property of Universal;

18  correct?

19   A.   The copyright ownership, yes.

20   Q.   Okay.

21       And this is Tab 7.  This refers to copyright ownership

22  and it refers to the fact that all the intellectual property

23  being provided to both the conditional and the permanent

24  download provider remains the property of Universal; correct?

25   A.   Right.  It's referring to the underlying copyright

1  ownership, yes.

2  Q.    That's correct.  This one is.

3        And that's standard in both the subscription and the

4  permanent download agreements; correct?

5  A.    Yes.

6  Q.    Go to Tab 8.  And in Tab 8, you will see for both the

7  conditional subscription services and the permanent download

8  contracts, that there is a provision that says that essentially

9  "Any and all rights not expressly granted hereunder are reserved

10 by Universal."

11       Is that standard in both sets of agreements?

12 A.    It's standard in any contract I have ever seen.

13 Q.    Is it standard --

14 A.    Yes.

15 Q.    -- in these agreements?

16 A.    Yes.

17 Q.    And with respect to Apple, if you look at Apple's

18 agreement, Exhibit 73, which is on 8C001, this is the Apple

19 permanent download agreement --

20 A.    Yes.

21 Q.    It says, "No further licensing or obligation," and it says,

22 "Except for the rights granted by Universal to Apple, no further

23 rights are granted to Apple in or under the agreement, either by

24 implication or estoppel."

25       Do you see that?

1    A.    Yes.

2    Q.    Is that language that is generally used in the permanent

3    download and conditional download agreements?

4    A.    I assume so.  I don't know for sure.

5    Q.    You believe it is; correct?

6    A.    Yes.

7    Q.    Tab 9, please.  Tab 9 for both the conditional download

8    agreements and -- if you look at Tab 9 and you look at the

9    permanent downloads and you'll see that the end user is defined

10   as someone who has no right to resale.  Do you see that?  Or

11   resell the product it receives?

12   A.    Among other things, yes.

13   Q.    Okay.

14         And that's standard that both for conditional

15   downloads and permanent downloads, someone who purchases a

16   permanent download has no right to resell it; correct?

17   A.    Are you asking me a legal question?

18   Q.    I'm asking you whether that provision is included in the

19   permanent download agreements generally.

20   A.    Yes.

21   Q.    Okay.

22         Now, for payment terms -- for permanent downloads, the

23   payment terms are generally a percentage of the retail price or

24   a floor amount; correct?

25   A.    The payment from, for instance, Apple to Universal?

1   Q.   Right.

2   A.   That's correct.

3   Q.   Okay.

4        And one of the reasons that Universal believes that

5   the -- or the pricing structure that was created for permanent

6   downloads was a wholesale/retail price structure; correct?

7   A.   Yes.

8   Q.   Okay.

9        And one of the things you have pointed me to in this

10  case about why this transaction is a sale is the fact that

11  Universal sells supposedly the downloads to Apple at wholesale

12  but then resells them at retail; correct?

13  A.   Yes.

14  Q.   Okay.

15       Isn't it true that in various agreements that relate

16  to things that you treat as licenses, that Universal has that

17  same wholesale resale price structure?

18  A.   Well, what is treated as -- I don't know what you mean by

19  treated as licenses.

20  Q.   Have you heard of ringback tones?

21  A.   Yes.

22  Q.   Okay.

23       What are ringback tones?

24  A.   Ringback tones is something -- if someone calls you on the

25  cell phone, it's what they hear when the phone is ringing, and

1   you can personalize that.

2   Q.   And ringback tones is something the end user only has for

3   12 months at a time; correct?

4   A.   I'm not aware of that.

5   Q.   You're not aware one way or the other?

6   A.   That's correct.

7   Q.   Do you know whether for ringback tones Universal pays -- or

8   for ringback tones, do you know whether Universal pays under the

9   licensing provision of artist contracts for revenue received

10  from ringback tones?

11  A.   It would depend on what the artist contract says.

12  Q.   If it is an artist contract like the one in this case where

13  the artist is entitled to 50 percent of net receipts for

14  licensing of the masters, do you know whether under those

15  circumstances for ringback tones Universal pays 50 percent of

16  net receipts?

17  A.   Are you asking me how I would pay under the artist contract

18  in this case?

19  Q.   No, sir.  I'm asking you whether -- do you know whether

20  Universal pays 50 percent of net receipts under the licensing

21  provision for ringback tones?  Do you know?

22  A.   In general?

23  Q.   Yes.

24  A.   In -- before you asked me if it was under a contract like

25  in this case, so I --

1    Q.    Let's take Eminem and this case.  Do you know whether

2    Eminem receives 50 percent of net receipts for ringback tones

3    under the licensing provision?

4    A.    I -- I don't recall either way.

5    Q.    Okay.

6          Now, if the end user only gets temporary use of a

7    ringback tone, 12 months, then based on your understanding of

8    how Universal has paid, you understand that Universal would pay

9    under the licensing provision of artist's contracts for that;

10   correct?

11   A.    I don't think that's the one dispositive fact.

12   Q.    It's not?

13   A.    I don't know whether it is.  I -- I wouldn't want to sit

14   here and say that's the only factor that goes into that

15   decision.

16   Q.    Okay.

17         Well, it's not a sale of a record, is it, if the

18   person only gets it for 12 months or on a temporary basis;

19   right?

20   A.    Right.  Certainly the person isn't buying a record, that's

21   correct.

22   Q.    And let's just assume that Universal pays under the

23   licensing provision for ringback tones.  Because the -- the end

24   user does not get the ringback tone permanently.

25         Do you know why there be a wholesale/retail price

1   structure for that if it's not a sale?

2   A.   Well, I guess you could call it whatever you want in the

3   contracts.  I don't know that that --

4   Q.   That's precisely my point.  Thank you.

5        Let's go on to the next one in line here, which is

6   reproduction fee.  Isn't it correct that for permanent downloads

7   and conditional download contracts, there is a general provision

8   that says that the fees paid herein are for each compliant

9   reproduction?

10  A.   I'm sorry.  I'm not familiar with this clause.  I'm not

11  sure what this is for.

12  Q.   Okay.  If you don't know, that's fine.

13       Let's go to Paragraph 12 of -- Paragraph 12 -- I meant

14  Tab 12.  And isn't it correct, sir, that in the permanent

15  download agreements -- go to the permanent download provisions.

16  You will see that a standard provision says -- pull up 335.

17       That there is a standard provision that says that,

18  "Notwithstanding anything to the contrary contained in this

19  agreement, Universal shall retain all rights, title and interest

20  in and to any Universal content, EG, Universal sound recordings,

21  or metadata, including any artwork delivered hereunder."

22       Do you see that?

23  A.   It sounds redundant to the other clause that says that,

24  yeah.

25  Q.   It's a standard clause that is in the agreements, is it

1    not?

2    A.    Yes, it is.

3    Q.    13 -- behind Paragraph 13 you will see take-down rights;

4    that Universal has the right to demand that the sound recordings

5    provided by it be taken down upon its request?

6         Do you see that?

7    A.    Yes.

8    Q.    That's a standard in all permanent download and

9    subscription agreements; is that correct?

10   A.    I'm not sure.  This one may be negotiated from time to

11   time.  It's a different -- I mean, there is a take-down right.

12   I'm not sure how similar they are from agreement to agreement.

13   Q.    But whether it be a number of days or what the obligation

14   is, there is a negotiation over what take-down rights and

15   obligations there are under these permanent download agreements;

16   correct?

17   A.    That's correct.

18   Q.    And then we have termination rights.  The right to

19   terminate the agreement.  And that's behind Tab 15 -- 14.  I'm

20   sorry.

21        And looking at one, "Universal shall have the right by

22   written notice to Apple to terminate this agreement prior to the

23   end of the term under any of the following conditions."

24        Do you see that?

25   A.    Yes.

1    Q.    That's something that is standard in the agreements, that

2    there is a right to terminate under certain conditions; correct?

3    A.    Right.  The conditions may vary from agreement to

4    agreement, though.

5    Q.    And we talked about Paragraph 15 -- or Form 15 we talked

6    about a moment ago; that there is a percentage of retail as it

7    applies for permanent downloads.

8          Do you recall me asking those questions?

9    A.    Yes.

10   Q.    Okay.

11         Now I want to talk to you specifically for a moment

12   about mastertones and ringtones.

13   A.    Okay.

14   Q.    Do you recall me at the deposition asking you whether there

15   were facts that would support a conclusion that mastertones and

16   ringtones, even though sold by a mobile carrier to an end user,

17   was not a sale of record under the sale of record provision of

18   the recording contracts?  Do you recall that?

19   A.    What I recall is discussing whether it was a normal retail

20   channel sale.

21   Q.    Okay.

22         And you said that there were several facts that you

23   believe would support a conclusion that it was not a normal

24   retail channel sale.

25         Do you recall that?

```
1   A.    I recall saying reasonable people could differ on the

2   issue.

3   Q.    Okay.

4         And you are -- and then you -- I asked you what facts

5   would support the conclusion that mastertone and ringtones were

6   not normal retail channel sales.

7         Do you recall that?

8   A.    Facts or factors, yes.

9   Q.    Okay.

10        And you said that it's only 30 seconds of the song?

11  That is one factor?

12  A.    I might have.  I don't remember that.

13  Q.    Okay.  Let me see if I can refresh your recollection.

14  A.    Sure.

15        MR. BUSCH:  Give me one second, Your Honor.  I

16  apologize.

17        THE COURT:  You may.

18        MR. BUSCH:  315, Your Honor, Line 19, through 316,

19  Line 9.  Actually, Your Honor, to get the full questions and

20  answers, I would like to go back to Page 314 and have the jury

21  listen to Mr. Kenswil's answers.  314, Line 10 through 17, and

22  then it goes to Page 315, Line 19, through Page 316, Line 9.

23        MR. KLAUS:  Your Honor --

24        THE COURT:  One moment.

25        Mr. Klaus?
```

```
 1              MR. KLAUS:  We would object to that.  The question
 2    that Mr. Busch presented was whether it was -- whether
 3    30 seconds was the factor.  And he is now proposing to play a
 4    much longer portion of the deposition.
 5              THE COURT:  The objection is sustained.
 6              MR. BUSCH:  Okay.  Let me ask the question a different
 7    way then.
 8    Q.   Do you recall me asking you whether -- what factors there
 9    were that would support a conclusion that mastertones or
10    ringtones was not a USNRC net sale?
11    A.   I remember you asking me that, yes.
12    Q.   Do you recall the factors that you identified that you
13    believed could support a conclusion that they were not -- that a
14    mastertone or ringtone was not a USNRC net sale?
15    A.   Well, I came up with them off the top of my head at the
16    time, and I don't remember exactly what I said, no.
17              MR. BUSCH:  Now, Your Honor, I would ask to have the
18    ability to refresh his recollection with the pages and lines
19    that I just identified.
20              THE COURT:  Mr. Klaus?
21              MR. KLAUS:  We think Mr. Busch should just be able to
22    ask the question right now --
23              THE COURT:  He just said he doesn't recall.
24              You may read only as to 315, Line 19, through 316,
25    Line 9.
```

```
 1              MR. BUSCH:  Line 9, okay.
 2              (Whereupon, the deposition was played for the jury
 3              as follows:
 4              "Q. You just said that reasonable people
 5              could differ on that.  I want to know what
 6              facts would support a finding that it would
 7              not be USNRC, in your view.
 8              "A. It's not the full song.  It isn't been a
 9              traditional -- people using it in a
10              non-traditional way, as opposed to a download
11              which people use in the same way they use
12              anything they bought physically in the past.
13              They use it to listen to the song.  In
14              ringtone they're using it -- as an ancillary
15              to the phone.  So I think you could argue
16              that in the custom and practice of the
17              business of what normal retail channels
18              meant, it's not what people intended by it.
19              I think that would be an argument.")
20  BY MR. BUSCH:
21  Q.    Does that refresh your recollection about what you said?
22  A.    Yes.
23  Q.    Okay.
24              And do you still believe those are facts that would
25  support that view?
```

1   A.    Well, they're factors.  I don't know if they're facts.

2   Q.    And if I showed you -- well, never mind.  Thank you very

3   much, Mr. Kenswil.  Nothing further at this time.

4             THE COURT:  Mr. Klaus, are you going to examine on

5   anything with regard to the summary?

6             MR. KLAUS:  I will examine with respect to the summary

7   factors.  I don't at this point expect to be bringing the charts

8   back up.

9             THE COURT:  Let's go ahead and reopen the courtroom.

10                  (Courtroom reopened)

11            THE COURT:  Can I have counsel at sidebar briefly,

12  without court reporter.

13      (Sidebar conference commenced without the court reporter)

14            THE COURT:  Ladies and gentlemen in the audience,

15  typically courtrooms in the courtrooms are prohibited --

16  computers are prohibited in the courtroom, absent a court order,

17  and in this case there has been no court order allowing audience

18  members to use the computer.  So with regard to audience

19  members, you need to turn off your computers.

20            You may.

21                  CROSS-EXAMINATION

22  BY MR. KLAUS:

23  Q.    Mr. Kenswil, good afternoon.

24  A.    Good afternoon.

25  Q.    One of the things Mr. Busch was asking about was with

1  respect to your statement that reasonable people could differ

2  regarding whether mastertones were normal retail channel sales.

3              Do you recall those questions?

4  A.   Yes.

5  Q.   Mr. Busch asked you for the factors that you thought could

6  be reasonably considered on one side as to whether they were

7  not.

8              Are there factors that you would think a reasonable

9  person could consider that would make a mastertone sale a normal

10 retail channel sale?

11 A.   There are some I could come up with.  I am sure there are

12 some that others could come up with.

13 Q.   What would be the ones that you could come up with?

14 A.   Well, they are -- people are buying the permanent right.

15 They are buying the copy of the song.  Even though it's not the

16 whole song, they are buying it permanently.  They will have it

17 forever.  They can listen to it whenever they want.  And they

18 are playing it on the same device that they can play their music

19 on.

20             It's -- it's -- they could set it to ring or they

21 could set it not to ring.  They could also set a download to

22 ring or not to ring.

23             So there's really -- when you come down to the

24 difference, it's how it's being marketed more than anything

25 else.  It's not part of an overall service where you get a whole

1   bunch of them for a set price.  You're buying them one at a

2   time.  Those are some of the reasons.

3   Q.   Okay.

4        And let me ask you -- I'm going to come over to this

5   chart that Mr. Busch had with all of the these various

6   provisions that he had put up on the screen with respect to

7   conditional and permanent download services.

8        Do you recall being asked about these items,

9   Mr. Kenswil?

10  A.   Yes.

11  Q.   These are -- you testified there were similarities in some

12  of the terms of these transactions.

13       Are you familiar with differences between conditional

14  and permanent downloads?

15  A.   Yes.

16  Q.   What differences are you familiar with between conditional

17  and permanent downloads?

18  A.   Well, a conditional download is being delivered as part of

19  an overall service that someone pays an overall charge for,

20  usually for a certain amount of time.  When they stop paying,

21  the music stops playing.  They don't own anything except the

22  right to listen to the music while they're subscribing.  You

23  don't own it any more than you own the TV program you watch on

24  cable TV.

25       The -- the -- therefore, the -- what's being -- the

1    rights that are being granted all up and down the chain are very

2    different and the amounts being paid are very different.  It's a

3    very different business transaction as a result.

4    Q.    Okay.

5          And with respect to the permanent download, what is it

6    that the end user gets with the permanent download?

7    A.    They get ownership of the file, which they can play

8    forever.

9    Q.    And with respect to, for example, the fact that Universal

10   has provisions in its agreements with third parties that say

11   that Universal's intellectual property and the content remain

12   Universal's, does that change anything about what the end user

13   has with a permanent download?

14   A.    No.

15   Q.    Does the fact that Universal has a reservation of its

16   intellectual property right in permanent downloads change the

17   fact that the end user has the song permanently?

18   A.    No.

19   Q.    Does the fact that Universal has either a term of length or

20   termination rights change the fact that the end user has that

21   download permanently?

22   A.    No.  The termination right does not affect the end user at

23   all.

24   Q.    Does the fact that Universal has what Mr. Busch has labeled

25   here take-down rights affect the end user in the permanent

1    downloads and their ability to use their work?

2    A.    No.   Once they have bought it, they keep it.

3    Q.    Also Mr. Busch asked you some questions about the means by

4    which Apple delivers a permanent download to an end user.

5          Do you recall those questions, sir?

6    A.    Yes.

7    Q.    Let me just ask you, Mr. Kenswil, you were at Universal for

8    how long?

9    A.    Twenty-five years.

10   Q.    And are you familiar, based on your experience, with the

11   way that Universal manufactures its physical CDs?

12   A.    Yes, I am.

13   Q.    And I think Mr. Busch had asked you a question about

14   whether that manufacturing was done by a company called UMVD.

15          Do you recall that?

16   A.    I remember recalling asking about distribution.  I don't

17   recall if he asked manufacturing.

18   Q.    Let me ask you in terms of manufacturing, who does the

19   manufacturing for Universal of its CDs?

20   A.    In this country?

21   Q.    In the --

22   A.    In the United States?

23   Q.    In the United States.

24   A.    Third party CD manufacturing plants.

25   Q.    And can you just describe in general what your knowledge is

1    of what the process is by which they make CDs?

2    A.    Sure.    Universal sends the plant a file one way or another,

3    either physically or electronically.    It then uses that file --

4    copies that file to -- to -- to -- to what they call parts,

5    which is basically different components used to manufacture a

6    CD.    Those parts are used to literally stamp out CD by CD,

7    making copies.    They then ship those copies to the depot.

8    Q.    Is it -- and I think you testified that it was your

9    understanding that Apple, in the case of iTunes, needed to have

10    what you called a copyright license in order to reproduce the

11    digital file that had Universal's music on it; correct?

12    A.    That's correct.

13    Q.    Is it your understanding that the physical manufacturer

14    also has to have what you called a copyright license?

15    A.    They certainly do.

16    Q.    And why is that your understanding, sir?

17            MR. BUSCH:    Objection.    This all calls for legal

18    conclusions which the defendant has objected to.

19            THE COURT:    Sustained.

20            MR. KLAUS:    Your Honor, I believe that Mr. Busch

21    asked -- I objected and Mr. Busch's question opened the door.

22            THE COURT:    Give me a second.

23            Overruled.

24            THE WITNESS:    I mean, the right to make copies of a

25    sound recording is a right under copyright, and in order to do

1    that you need a license on the copyright to make that copy, and

2    Universal grants that license to the manufacturing plant so they

3    can do that.

4    BY MR. KLAUS:

5    Q.    And let me just ask you, Mr. Kenswil, a few questions about

6    your general background and your background in Elabs, which I

7    don't think Mr. Busch covered at length.

8               First of all, can you tell me, you were at Universal

9    for 25 years?

10   A.    That's right.

11   Q.    What position did you start out in?

12   A.    I was a junior lawyer.

13   Q.    In which department?

14   A.    At MCA records, which was basically the whole record

15   company at that point.

16   Q.    And what did you do as a junior business lawyer there?

17   A.    I was given deal points, which are the major contractual

18   points, and I drafted contracts and negotiated -- this is for

19   artist services mainly.  And then negotiated them with artists's

20   lawyers.

21   Q.    And how long did you do that?

22   A.    I did -- that's called business and legal affairs.  I did

23   that for about 15 years.

24   Q.    Then what did you do after doing business and legal

25   affairs?

1   A.   Well, I became -- I -- over those 15 years, I was promoted

2   and then became head of the department.  After a few years of

3   that, as digital distribution started becoming a topic for the

4   record company to deal with, I formed the division at Universal

5   to deal with it.  And that was eventually called Elabs.  And I

6   ran Elabs for ten years after that.

7   Q.   And what was the purpose of Elabs?  What was its objective?

8   A.   The objective was to get us into the digital distribution

9   business, get us into selling our downloads to people and

10  getting our music out into as many places as possible, on the

11  Internet and elsewhere, to amass as much knowledge in this

12  technical field as possible, and to negotiate whatever

13  agreements were necessary in order to affect all of this.

14  Q.   And why did Universal want its content to be available

15  online?

16  A.   Because it thought that would be a great way to sell it.

17  Q.   And did you find that there were potential opportunities in

18  the online distribution area?

19  A.   Everyone recognized from the beginning there were huge

20  opportunities in online distribution as well as huge threats.

21  Q.   And can you describe what some of those opportunities were?

22  A.   Well, the opportunity was -- is that it was an amazingly

23  growing medium and that it was rapidly getting into every

24  household, and the speed of transmission to everyone's household

25  was growing rapidly.  This would essentially allow a record

1   store to be on everyone's computer.  And rather than having to

2   go to a record store and find the music, the music could be

3   brought directly to you to buy.

4           The stores then would not be limited by the amount of

5   music they could carry.  They would have unlimited shelf space.

6   They would never run out of the hits, and they could stock every

7   piece of music ever recorded.  So the opportunity was

8   tremendous.

9   Q.   And what did you see as threats in that environment?

10  A.   Well, the threats was that music was very easy to copy and

11  that other people would do the same thing without getting

12  permission, which is what has happened.

13  Q.   And Mr. Busch asked you some questions about Universal

14  going it alone or trying to start its own individual service for

15  downloads.

16          Do you recall that line of questioning?

17  A.   Yes.

18  Q.   And did you -- did you find that to be a feasible option?

19  A.   No.

20  Q.   Why not?

21  A.   Well, it -- it ignores the fact that people, when they go

22  shopping for music, want everything to be in one place.  The

23  most Universal could offer was its own music.  They don't want

24  one artist's music.  They don't want certainly one label's

25  music.  They don't even know what music is on any given label,

1  for the most part.  What they want is all the music in one

2  place.  So that means you need aggregators.  So the best way to

3  do that is to find who is aggregating the most people and get

4  them to the sell the music.

5  Q.   And who were some of the online aggregators that Universal

6  did business with in some of the earliest years of digital

7  distribution?

8  A.   Well, early on there were -- there were music services,

9  music technology, that sold music, essentially called Liquid

10  Audio.  So it was a player on your computer, and it would

11  connect you to a download store, and you could download music.

12  That was a very early version of those downloads, and we were

13  selling downloads through Liquid Audio before Apple.

14        There were others as well that -- that just weren't

15  able to compete, and there has been others since Apple such as

16  Amazon and Best Buy and Buy.com and Wal-Mart, all selling

17  downloads that we sell to them.

18  Q.   Okay.

19        And what -- just briefly, what other types of services

20  has Universal tried to disseminate its content online through?

21  A.   The main -- putting aside phones and ringtones and things

22  like that, the other main type of music service was radically

23  different.  It's what you have heard referred to as subscription

24  services.  It's essentially an access service where rather than

25  paying for a CD, you pay for access to everything.  And then you

1  can decide what you want to listen to.

2        We have had very, very high hopes for these services

3  because essentially for the price of a CD a month, you can

4  listen to everything.  So far they have had limited success.

5  Q.   Are they still in existence?

6  A.   Yes.

7        MR. KLAUS:  Your Honor, I believe those are all the

8  questions that I have of Mr. Kenswil at this time.

9        THE COURT:  Thank you.

10        Mr. Busch?

11        MR. BUSCH:  I just have a couple of questions.

12                    REDIRECT EXAMINATION

13  BY MR. BUSCH:

14  Q.   Mr. Kenswil, just a couple of questions, and it's been a

15  long day.

16        When you were talking earlier when Mr. Klaus was

17  asking you questions, he was asking you questions about what an

18  end user gets when the end user gets a conditional download or a

19  permanent download, whether they have it permanently or not.

20        Do you recall that testimony?

21        THE COURT:  I'm sorry.  I'm sorry.  Wendy -- is the

22  person -- are you using a computer?

23        UNIDENTIFIED WOMAN:  No.  It's not on.

24        THE COURT:  All right.  Thank you.

25  BY MR. BUSCH:

1    Q.    Do you recall, Mr. Klaus was asking you questions about

2    what an end user gets, whether the end user gets the download

3    permanently and whether these restrictions that I went over

4    affects the end user's right to permanently have the download.

5              Do you recall that?

6    A.    Yes.

7    Q.    You're aware that Universal enters into licensing

8    agreements with third parties where the third party manufactures

9    and sells records that contain Universal's sound recordings on

10   them; correct?

11   A.    That's correct.

12   Q.    And in those cases, you're aware that Universal pays under

13   the licensing provision, the 50/50 licensing provision, because

14   the third party's manufacturing and selling of various albums or

15   product is done pursuant to a license.

16              You're aware of that; correct?

17   A.    I don't agree the way you stated it.

18   Q.    You -- put up 5(c)(v), if you would.  4(c)(v) and 5(c)(v)

19   of the '98 and 2000 agreement.  And the "notwithstanding the

20   foregoing" and the record club.  And that.  Okay.  Perfect.

21              Mr. Kenswil, when you were answering questions

22   before -- and I am going to direct your attention to the

23   licensing provision where it says, "On masters license by us or

24   our NRS licensees to others for their manufacture and sale of

25   records or for any other uses, your royalty shall be an amount

```
1    equal to 50 percent of our net receipts from the sale of those
2    records or from those other uses of the masters."
3            Do you see that provision?
4    A.   Yes, I do.
5    Q.   Okay.
6            And when you were talking about the fact that an end
7    user has a download permanently, you were referring to the fact
8    that their -- the end user is essentially purchasing a record;
9    correct?
10   A.   Yes.
11   Q.   Okay.
12           So in this scenario of 5(c)(v) that we're looking at
13   here, what you're focusing on is the fact that an end user has
14   purchased the record and has it permanently, but there are other
15   occasions or there are occasions in the physical world where
16   that is too true, too, where an end user purchases a record, has
17   it permanently and yet it's pursuant to a license; is that
18   correct?
19           MR. KLAUS:  Objection, Your Honor.  Vague and
20   ambiguous.
21           THE COURT:  Overruled.
22           THE WITNESS:  Yes.  There are master use licenses that
23   are for a record to be sold by the licensee to the public, yes.
24   BY MR. BUSCH:
25   Q.   Okay.
```

1          And in those cases, the end user has those records

2    permanently; correct?

3    A.    Yes.

4    Q.    The consumer has those permanently and can do with them

5    what they want; correct?

6    A.    Subject to law, yes.

7    Q.    Okay.

8          And with record clubs, record clubs are agreements

9    where Universal licenses to a record club the right to

10   manufacture and distribute Universal albums; isn't that correct?

11   A.    You have it in present tense.  I don't know if they still

12   exist, but that's been correct in the past, yes.

13   Q.    Okay.

14         And when a consumer purchases a record from a record

15   club, they have that record permanently; correct?

16   A.    I'm sorry.  Did you say Universal records?

17   Q.    No.  I said when a consumer purchases --

18   A.    I'm sorry.  I'm sorry.  I was going back to the last

19   question because I -- did you say Universal -- they sell

20   Universal records?

21   Q.    They sell an album that is a Universal album?

22   A.    Well, they sell an album containing Universal-owned

23   copyrights.  It's their album to sell.  They're selling their

24   records.

25   Q.    The record club album that's being sold on occasion is

1    Universal product, is it not?

2    A.    No, it's not Universal product.

3    Q.    Never?

4    A.    It is not -- by definition, it is record club product, not

5    Universal product.

6    Q.    It has the same songs on the album that would be on the

7    album if Universal was selling the product; correct?

8    A.    Yes.  As I said, it contains Universal copyrights, yes.

9    Q.    Okay.

10            So if we have the *Slim Shady* LP with eleven songs and

11    a record club were to be selling it, those eleven songs would be

12    on the record club's product; correct?

13    A.    Probably, yes.

14    Q.    And just like with a permanent download, Universal -- the

15    end user, the consumer who purchases that album has it

16    permanently; correct?

17    A.    That's correct.

18    Q.    And just like with a permanent -- I'm sorry.  And in those

19    cases, Universal splits its net receipts with the artis 50/50;

20    correct?

21    A.    If the contract says so, yes.

22    Q.    Okay.

23            And in those cases, it's the record club who's doing

24    the distribution and manufacturing has those costs, not

25    Universal; correct?

1    A.    Yes.

2    Q.    And when you talked about in connection with -- in

3    connection with the questionings by Mr. Klaus, when you talked

4    about the fact that a -- that presently Universal has a third

5    party manufacturer who manufactures CDs.

6              Do you recall that?

7    A.    Yes.

8    Q.    And do you recall your testimony about the manufacturer

9    having a copyright license?

10             Do you recall that?

11   A.    Yes.

12   Q.    Okay.

13             First of all, Universal, until very recently, had

14   their own manufacturing plant; correct?

15   A.    I don't know how recently.

16   Q.    Last five years or so; isn't that correct?

17   A.    It may be more than five but not much more.

18   Q.    Okay.

19             So up until the last five years or so, Universal had

20   their own manufacturing plant; right?

21   A.    No.  Because for a while before that it didn't have any, so

22   there was a period where it had its own.

23   Q.    Okay.

24             And when the manufacturer makes a CD, it's Universal

25   that's selling that CD that is manufactured; isn't that right?

1    Universal's distribution company is the one that is selling the

2    CD; correct?

3    A.    It sells the CD to the retailer, correct.

4    Q.    The distribution company that's owned by Universal;

5    correct?

6    A.    That's correct.

7    Q.    And Universal has the cost -- even if a third party is

8    doing the manufacturing, Universal has the cost for that

9    manufacturing; is that right?

10   A.    Well, it pays the manufacturer a fee for manufacturing.

11   Q.    Okay.  That's all I have.  Thank you.

12            THE COURT:  Anything further?

13            MR. KLAUS:  One very brief question.

14                    RECROSS-EXAMINATION

15   BY MR. KLAUS:

16   Q.    I want to make sure I was clear on understanding your

17   answers, Mr. Kenswil.

18            Mr. Nichols, could you bring up Exhibit 5,

19   Paragraph C5?  4C5.

20            Mr. Busch asked you questions about third parties

21   getting licenses to manufacture and sell records.  Do you recall

22   that?

23   A.    Yes.

24   Q.    The records that you were talking about there, are those

25   compilation records?

1           MR. BUSCH:  Objection, Your Honor.  His understanding

2    or intent is irrelevant.  It's subjective intent.

3           THE COURT:  Overruled.

4           MR. KLAUS:  Thank you, Your Honor.

5    Q.   Are those compilation records?

6    A.   Generally, yes.

7    Q.   Are compilation records Universal's records?

8    A.   No.

9    Q.   Whose records are they?

10   A.   They are the records of the company that is selling the

11   compilation records.

12          MR. KLAUS:  No further questions, Your Honor.

13          MR. BUSCH:  Okay.  I have a couple based on that,

14   Your Honor.

15                     REDIRECT EXAMINATION

16   BY MR. BUSCH:

17   Q.   The masters that were provided to the compilation company

18   that you just identified remained the ownership of Universal;

19   correct?

20   A.   The copyright and the masters do, yes.

21   Q.   Okay.

22          And just like with these provisions in the permanent

23   download agreements, isn't it true that in the licenses for

24   compilation agreements, many of the same terms and provisions

25   can be found?

```
 1   A.     I haven't seen a compilation license form in many years, so
 2   I am probably not the person to ask.
 3           MR. BUSCH:  Thank you, Your Honor.
 4           THE COURT:  Anything further?
 5           MR. KLAUS:  Nothing further.
 6           THE COURT:  You may step down.  Thank you.
 7           Next witness.
 8           MR. BUSCH:  We are going to keep going, Your Honor?
 9   We will call Rio Caraeff.
10           THE CLERK:  If you can please stand next to the Court
11   reporter and raise your right hand.
12               Rio Caraeff, Plaintiff's witness, was sworn
13           THE CLERK:  Thank you.  Please take a seat.
14           For the record, sir, can you please state your full
15   name and spell your last name.
16           THE WITNESS:  My name is Rio Caraeff.  My last name is
17   spelled C-A-R-A-E-F-F.
18           THE CLERK:  Thank you.
19           THE COURT:  You may approach.  You may proceed.
20                        DIRECT EXAMINATION
21   BY MR. BUSCH:
22   Q.   Good afternoon, Mr. Caraeff.  I just have a few questions
23   for you.  You were the head of -- you were at one time the head
24   of Universal's mobile division; is that correct?
25   A.     Yes.
```

1  Q.    What years were you the head of Universal's mobile

2  division?

3  A.    From January 2005 through approximately March of 2007.

4  Q.    Okay.

5        And you are familiar in that capacity with the

6  procedures relating to mastertones and ringback tones, are you

7  not?

8  A.    Yes.

9  Q.    And you're familiar with the fact that with ringback tones,

10 they are not purchased by an end user on a permanent basis;

11 correct?

12 A.    I am familiar that the end user is buying ringback tones

13 from the wireless operator for a particular use for a period of

14 time.

15 Q.    Okay.

16       And that's for 6 to 12 months; is that correct?

17 A.    That's correct.

18 Q.    Okay.

19       And do you know whether that is treated as a license

20 by Universal under the licensing provisions of artist contracts?

21 A.    I don't.

22 Q.    But with respect to ringback tones, the end user does not

23 get that ringback tone permanently; correct?

24 A.    That's correct.

25       MR. BUSCH:  Okay.  I have nothing further for this

1  witness.

2          MR. KLAUS:  We have no questions.

3          THE COURT:  All right.  You may step down.  Thank you.

4          Ladies and gentlemen, we are going to adjourn for the

5  day.  We will resume again tomorrow at 9:00.  Again, remember

6  not to discuss the case with anyone else.  Don't form or express

7  any opinions about the case until it's finally submitted to you,

8  and we will see you tomorrow at 9:00.  Good night.

9                          (Jury Out)

10          THE COURT:  We will take a ten minute break.  I did

11  keep the booklet with the summary charts for discussion later.

12  Before I forget -- and I apologize for not mentioning it when I

13  noticed yesterday -- there was one exhibit, and to the extent

14  that these things are public record, that did include

15  Mr. Martin's social security number and Mr. Mather's social

16  security number so -- and I apologize, I can't go back and

17  remember when I noticed it, but be careful with regard to --

18  especially your client's confidential information, as you showed

19  them to the public.  In any event, I just wanted to mention that

20  before I forgot.  I will see you in about ten minutes.

21          MR. BUSCH:  Your Honor, can I speak to my client?  Is

22  there any way to do something about that?

23          THE COURT:  Certainly, you can redact it.  I just

24  don't remember -- I think it was one of the agreements that had

25  their signature lines and underneath their signature lines it

1  had their social security number so -- and I am certain there

2  can be a stipulation and we can redact that information.

3          MR. BUSCH:  Yes, that would be great if we can do

4  that.  Thank you, Your Honor.

5                      (Recess taken)

6          THE COURT:  All right.  First, Mr. Busch, when we went

7  to sidebar without the reporter, we had a discussion off the

8  record about first about the use of the computer by an audience

9  member, and also you wanted to address a separate issue as it

10  related to a particular juror.

11          You may.

12          MR. BUSCH:  To be fair, Your Honor, I don't -- I don't

13  want to say it was my request.  Mr. Pomerantz brought this to my

14  attention, and I think we jointly just thought there was a

15  potential thing.

16          THE COURT:  I think there is.  I mean, I agree that

17  there is -- you know, we give -- I give them that instruction

18  before each break and at the end of each day.  If counsel are

19  concerned about it enough -- I mean, the only other alternative

20  that we can do is first thing in the morning make inquiry of the

21  both of them to make sure that they have not engaged in any

22  discussions about the case.  That's the only other thing we can

23  do and I am not sure that we want to go there yet.

24          MR. BUSCH:  I don't know that we want to do that and I

25  think that runs the risk of having her be alienated towards one

1    side or the other and I don't want to take that risk --

2         MR. POMERANTZ:  We don't request that either,

3    Your Honor.  I think it was just a matter of -- I was making

4    Mr. Busch aware of it, and I am not sure there is anything to

5    do.  I just wanted Your Honor to be aware of it as well.

6         THE COURT:  All right.  So the juror that I suspect

7    that we're talking about is juror Melissa Juarez who is sitting

8    in what used to be Chair 8.

9         Okay.  Anything else to address before I address the

10   depositions of Mr. Jobs and Mr. Gustav?

11        MR. POMERANTZ:  Yes, Your Honor.  A few things.  To

12   the extent that either one of us create, in effect, a

13   demonstrative by using butcher paper or something, our request

14   would be that that be preserved so that -- it's been now shown

15   to the jury, and if the other side wants to use it either with

16   another witness, in closing argument or whatever, we would ask

17   that it be preserved.  So Mr. Busch has now created this butcher

18   paper --

19        THE COURT:  We might see it again in closing.  I -- I

20   think it should be preserved.

21        MR. BUSCH:  If that's --

22        THE COURT:  That's probably the best --

23        MR. BUSCH:  I have done many trials and usually when

24   they are done, they are turned down and they're done away with.

25        THE COURT:  Well, certainly, we can go anywhere from

 1 | ultimately there may be a request to mark it as an exhibit,
 2 | admitted, in which we would argue about it.  Let's preserve it
 3 | until the end of the trial, and go from there.
 4 |          MR. BUSCH:  Okay.
 5 |          MR. POMERANTZ:  Your Honor, I don't want to sound like
 6 | I'm making the same complaint over and over again, but
 7 | Your Honor, it wasn't fair to Mr. Caraeff to have him here from
 8 | morning to night and then have him asked two questions, both of
 9 | which were already answered by Mr. Kenswil, and then excuse him.
10 |          I don't -- I know Your Honor has left it that we are
11 | supposed to be professionally courteous to each other, but at
12 | some point it's unfair to people who have a life to -- and a
13 | business and a job, and I apologized to Mr. Caraeff when he left
14 | because we are all part of this Court system, and I just think
15 | that was unfair.
16 |          MR. BUSCH:  Your Honor, the number of questions aren't
17 | the importance; it is what you obtain.  And to us, which will
18 | become crystal clear, we think that the issue that we obtained
19 | from Mr. Caraeff, the testimony that the jury heard was
20 | important, and I was trying to get some information like that
21 | from Mr. Kenswil, but Mr. Kenswil was waffling on ringback tones
22 | and what his knowledge of ringback tones was.  And I wanted it
23 | very clear on the record that ringback tones were temporary and
24 | not permanent -- for reasons that I can discuss now or I can
25 | advise later -- but I didn't know what I was going to get from

```
 1    Mr. Kenswil.  I got what I got.  Mr. -- and the bottom line
 2    basically is Mr. Caraeff only had to stay for five more minutes
 3    after I finished with Mr. Kenswil anyways.
 4                THE COURT:  Just one moment.
 5                MR. BUSCH:  And I didn't tell him -- okay.
 6                THE COURT:  Mr. Busch, you said something?
 7                MR. BUSCH:  I was going to say I did not mention to
 8    Mr. Caraeff to be here at 9:00 this morning.  We had a list of
 9    witnesses and he was taken in the order in which he was on the
10    list.
11                THE COURT:  Again, I don't want to spend a lot of time
12    on this, but it seemed to me -- I had to go back and look at the
13    readback, because I didn't take any notes regarding
14    Mr. Caraeff's, testimony because it seemed to me we had already
15    heard about ringtones not being permanent and the price.  But --
16                MR. BUSCH:  Ringback tones.  But that was in the last
17    couple minutes of Mr. Kenswil so we are talking about a five
18    minute different here.  Mr. Caraeff was taken in the order.
19                THE COURT:  Fine.  Okay, let's move on.
20                MR. POMERANTZ:  Your Honor, one of the things that
21    would be appreciated -- and I don't want to require Your Honor
22    to do math right here on the record -- but we would like the
23    amount of time.
24                THE COURT:  I'll do it.
25                MR. POMERANTZ:  And the schedule for tomorrow, Your
```

1    Honor, I know Your Honor has said that I think tomorrow is the

2    day when we have to end at 3:45, if I recall correctly.

3              How is the rest -- is the rest of the day going to be

4    adjusted in some way?

5              THE COURT:  We are going to take a shorter lunch.  We

6    will take a 45-minute lunch.

7              MR. POMERANTZ:  From about 12:00 to 12:45?

8              THE COURT:  Roughly.  We will see where we are at.

9    Probably closer to 12:30 to 1:15, that type of --

10             MR. POMERANTZ:  Thank you, Your Honor.  That's all I

11   had.

12             THE COURT:  Anything else?

13             Okay.  Counsel, do you have your sheets on Mr. Gustaf?

14   All right.

15             First, Ethan Gustav, Page 9 of the designation.  Page

16   21, Lines 4 through 25, overruled.

17             Page 22, Lines 1 through 25, overruled.

18             Page 23, lines 1 through 25, overruled.

19             Page 48, Lines 1 through 4 and 8 through 19,

20   sustained.

21             Page 49, Lines 4 through 11 and 22 through 25,

22   sustained.

23             Page 53, Lines 3 through 6 and Lines 12 through 25,

24   overruled.

25             Page 56, Lines 21 through 25, overruled.

1          Page 57, Lines 9 through 13, 15 through 18 and 25,

2    overruled.

3          Page 10 of the designation, testimony at Page 60,

4    Lines 15 through 22, overruled.

5          Page 75, Lines 12 through 14, sustained.

6          Page 76, Lines 17 through 25, overruled.

7          Page 80, Lines 10 through 25, sustained.

8          Page 81, Lines 1 through 17, sustained.

9          Page 82, Lines 8 through 14, sustained.

10          Page 83, Lines 1 through 5 and 24 through 25,

11    overruled.

12          Page 89, Lines 8 through 13 and 21 through 22,

13    overruled.

14          Page 90, Lines 2 through 5 and 13 through 17,

15    overruled.

16          Page 93, Lines 16 through 25, sustained.

17          Page 97, Lines 5 through 17 and 22 through 24,

18    overruled.

19          Page 102, Lines 1 through 21, sustained.

20          Page 104, Lines 1 through 2 and 5 through 6,

21    sustained.

22          Page 105, Lines 1 through 21 and line 25, sustained.

23          Page 106, Lines 3 through 25, sustained.

24          Page 119, Lines 1 through 4 and 9 through 13,

25    sustained.

1          Page 148, Lines 9 through 18 and 25, sustained.

2          Page 149, Lines 1 through 25, sustained.

3          Page 153, Lines 9 through 21, overruled.

4          One moment.

5          Page 168, Lines 4 through 5, 9 through 17 and 24

6     through 25, overruled.

7          Page 169, Lines 1 through 2 and 8 through 25,

8     sustained.

9          Page 170, Lines 21 through 25, sustained.

10          The remaining objections on Page 12 are sustained.

11          Moving on to Page 13, Page -- the two objections on

12     Page 13 are sustained.

13          Moving on to Mr. Jobs:  Page 16 of the designation,

14     Line 7 through 17 -- I'm sorry -- Page 7, Line 17, through Page

15     8, Line 5 of the deposition, overruled.

16          Page 11, Line 17, through Page 12, Line 10, sustained.

17          Page 13, Line 9, through Page 14, Line 7, overruled.

18          Page 14, Lines 9 through 12, sustained.

19          Page 14, Line 19, through Page 15, Line 11, overruled.

20          Page 15, Lines 13 through 15, overruled.

21          Page 15, Line 21, through Page 16, Line 3, overruled.

22          Page 19, Line 11 through 14 and Line 16, sustained.

23          Page 20, Lines 22 through 24, overruled.

24          Page 21, Lines 1 through 3, 7 through 8 and 10,

25     overruled.

```
 1              Page 23, Lines 3 through 13, overruled.

 2              Page 23, Line 18, through Page 24, Line 15, overruled.

 3              Page 24, Lines 17 through 20, overruled.  Page 24,

 4   Lines 22 through 25, Line -- Page 24, Line 22, through Page 25,

 5   Line 1, overruled.

 6              Page 25, Line 3, and then Line 7 through 8, 10 through

 7   12 and 20 through 22, overruled.

 8              Page 25, Line 25, through Page 26, Line 5, sustained.

 9              Page 26, Line 7, 9 through 10, 12 through 13, 15

10   through 17, 19 through 20, 22 through 24, overruled.

11              Page 27, Lines 2 through 3, 6 through 7, 9 through 12

12   and 15, sustained.

13              Page 42, Lines 12 through 22, overruled.

14              Page 45, Lines 14 through 17, overruled.

15              Page 45, Line 20, through Page 46, Line 4, overruled.

16              Page 54, Lines 22 through 24, sustained.

17              Page 55, Lines 1 through 4, 6 through 8, 11 through

18   13, 19 through 20, 23 through 24, sustained.

19              Page 56, Lines 2 through 3, 5 through 6, 8 through 10,

20   13 through 14, 16 through 17, overruled.

21              Page 56, Line 20, through Page 57, Line 7, overruled.

22              Page 57, Lines 11, 14, 16, through 21, sustained.

23   Page 57, Line 24, through Page 58, Line 2, sustained.

24              Page 65, Line 4, sustained.

25              Page 68, Lines 3 through 10, 12 through 13, 15 through
```

```
 1  17, 20 through 25, overruled.

 2            Page 69, Lines 13 through 14 sustained.

 3            Page 70, Lines 10 through 13, 17 through 21,

 4  overruled.  Page 70, Line 23, to Page 71, Line 1, overruled.

 5            Page 71, Lines 6 through 9, 12, 14 through 17

 6  overruled.

 7            Page 96, Lines 4 through 20, 23 through 25, overruled.

 8            Page 97, Line 25, through Page 98, Line 10, overruled.

 9            Page 98, Line 16, through Page 99, Line 8, overruled.

10            Page 99, Lines 11 through 16, overruled.

11            Page 102, Lines 13 through 21, sustained.

12            Page 103, Lines 5 through 18, sustained.  Page 103,

13  Line 23, through Page 104, Line 12, sustained.

14            Page 104, Line 15 through -- and Lines 17 through 21,

15  sustained.

16            Any questions?

17            MR. BUSCH:  No, Your Honor, no questions.  Yet.  All

18  right.

19            THE COURT:  Any other depositions that I need to look

20  at tonight?

21            MR. BUSCH:  No, sir.  I think that's it.

22            THE COURT:  All right.  From the defense, any

23  depositions to look at?

24            MR. POMERANTZ:  No.

25            THE COURT:  Okay, anything else to address before
```

1  tomorrow at 9:00.

2          MR. BUSCH:  Can I speak to Mr. Pomerantz about one

3  thing?  I don't know that we have a problem, but if we can do

4  this.

5                  (Counsel confer off the record)

6          MR. BUSCH:  There was one issue that I did address

7  with Mr. Pomerantz.  He is going to speak to his team and let me

8  know tomorrow and if it's an issue, we'll raise it with the

9  Court tomorrow morning.

10          THE COURT:  All right.  Give me one moment.

11          All right.  Total time used from this point,

12  plaintiffs have used 4 hours and 56 minutes.  Defense has used

13  2 hours and 11 minutes.

14          Anything else?

15          MR. BUSCH:  Your Honor, I don't know if this is the

16  time.  I might be asking for an extra hour or so, depending on

17  how things go tomorrow.

18          THE COURT:  All right.  Make the request at the end of

19  the day.  Good night.

20

21                  (Proceedings adjourned at 5:15 p.m.

22

23

24

25

CERTIFICATE

     I hereby certify that pursuant to Section 753, Title 18,
United States Code, the foregoing is a true and correct
transcript of the stenographically reported proceedings held in
the above-entitled matter and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.


_____        _____
Pamela A. Seijas, CSR No. 3593                    Date
(Official Reporter)

1                        I N D E X

2    WITNESSES FOR THE
     PLAINTIFF:        DIRECT      CROSS      REDIRECT     RECROSS
3
      LISA ROGELL        5           9
4     LAWRENCE KENSWIL   11          69          78           84
                                                 85
5     RIO CARAEFF        87

6

7

8

9
     WITNESSES FOR THE
10   DEFENSE:           DIRECT      CROSS      REDIRECT     RECROSS

11

12

13

14

15

16

17   PLAINTIFF EXHIBITS:         MARKED            RECEIVED

18

19

20

21   DEFENSE EXHIBITS:           MARKED            RECEIVED

22

23

24

25

**'**

**'98** [1] - 80:19
**'99** [1] - 16:8
**'99/2000** [1] - 16:9

**0**

**0's** [2] - 21:24, 22:5
**07-3314-PSG(MANx** [1] - 1:11

**1**

**1** [17] - 22:24, 51:4, 94:17, 94:18, 94:19, 95:8, 95:10, 95:19, 95:20, 95:22, 95:24, 96:2, 96:7, 96:24, 97:5, 97:17, 98:4
**1's** [2] - 21:24, 22:5
**10** [15] - 3:17, 6:9, 47:11, 48:11, 66:21, 95:3, 95:7, 96:16, 96:24, 97:6, 97:9, 97:19, 97:25, 98:3, 98:8
**102** [2] - 95:19, 98:11
**103** [2] - 98:12
**104** [3] - 95:20, 98:13, 98:14
**105** [1] - 95:22
**106** [1] - 95:23
**10:30** [1] - 46:18
**11** [9] - 94:21, 96:16, 96:19, 96:22, 97:17, 97:22, 98:10, 99:13, 101:4
**1100** [1] - 2:7
**119** [1] - 95:24
**12** [23] - 30:6, 30:7, 30:9, 30:13, 61:3, 62:7, 62:18, 63:13, 63:14, 88:16, 94:23, 95:5, 96:10, 96:16, 96:18, 97:7, 97:9, 97:11, 97:13, 97:25, 98:5, 98:13
**125** [2] - 7:22, 8:9
**126** [2] - 7:22, 8:9
**12:00** [1] - 94:7
**12:30** [1] - 94:9
**12:45** [1] - 94:7
**13** [18] - 64:3, 95:1, 95:12, 95:14, 95:24, 96:11, 96:12, 96:17, 96:20, 97:1, 97:9, 97:18, 97:20, 97:25,

98:2, 98:3, 98:11
**14** [12] - 64:19, 95:5, 95:9, 96:17, 96:18, 96:19, 96:22, 97:14, 97:20, 97:22, 98:2, 98:5
**148** [1] - 96:1
**149** [1] - 96:2
**15** [18] - 43:9, 47:12, 64:19, 65:5, 75:23, 76:1, 95:1, 95:4, 96:19, 96:20, 96:21, 97:2, 97:9, 97:12, 97:25, 98:14
**15-minute** [1] - 43:6
**153** [1] - 96:3
**16** [8] - 95:16, 96:13, 96:21, 96:22, 97:20, 97:22, 98:9, 98:10
**168** [1] - 96:5
**169** [1] - 96:7
**17** [17] - 66:21, 95:6, 95:8, 95:14, 95:17, 96:5, 96:14, 96:16, 97:3, 97:10, 97:14, 97:20, 98:1, 98:3, 98:5, 98:14
**170** [1] - 96:9
**18** [5] - 95:1, 96:1, 97:2, 98:12, 100:4
**181-l** [1] - 1:24
**19** [8] - 66:18, 66:22, 67:24, 94:19, 96:19, 96:22, 97:10, 97:18
**1990** [1] - 17:7
**1997** [2] - 12:7, 12:10
**1998** [1] - 16:6
**1:15** [1] - 94:9
**1:57** [1] - 3:2
**1A** [1] - 41:8

**2**

**2** [10] - 52:24, 54:5, 95:14, 95:20, 96:7, 97:11, 97:19, 97:23, 99:13
**20** [16] - 3:19, 7:22, 8:9, 37:1, 37:2, 47:21, 96:23, 97:3, 97:7, 97:10, 97:15, 97:18, 97:21, 98:1, 98:7
**2000** [2] - 18:2, 80:19
**2001** [1] - 18:2
**2002** [1] - 19:9
**2003** [10] - 6:4, 6:13, 6:24, 8:19, 10:3, 10:6, 17:12, 18:9, 19:25
**2005** [1] - 88:3

**2007** [3] - 12:11, 12:13, 88:3
**2008** [2] - 12:23, 17:12
**2009** [1] - 1:21, 3:1
**21** [13] - 94:16, 94:25, 95:12, 95:19, 95:22, 96:3, 96:9, 96:21, 96:24, 97:22, 98:3, 98:11, 98:14
**213** [2] - 1:25, 2:20
**22** [12] - 94:17, 94:21, 95:4, 95:12, 95:17, 96:23, 97:4, 97:7, 97:10, 97:13, 97:16
**23** [10] - 22:22, 23:7, 24:22, 94:18, 97:1, 97:2, 97:18, 98:4, 98:7, 98:13
**24** [13] - 30:12, 95:10, 95:17, 96:5, 96:23, 97:2, 97:4, 97:4, 97:10, 97:16, 97:18, 97:23
**25** [30] - 1:21, 3:1, 22:24, 75:9, 94:16, 94:17, 94:18, 94:21, 94:23, 94:25, 95:1, 95:6, 95:7, 95:10, 95:16, 95:22, 95:23, 96:1, 96:2, 96:6, 96:7, 96:9, 97:4, 97:6, 97:8, 98:1, 98:7, 98:8
**255** [1] - 1:23
**259-3456** [1] - 2:9
**26** [2] - 97:8, 97:9
**27** [1] - 97:17
**2B1** [2] - 54:25, 55:1
**2nd** [1] - 6:13

**3**

**3** [11] - 1:19, 55:15, 94:23, 95:23, 96:21, 96:24, 97:1, 97:6, 97:11, 97:19, 97:25
**30** [3] - 47:22, 66:10, 67:3
**314** [2] - 66:20, 66:21
**315** [4] - 2:6, 66:18, 66:22, 67:24
**316** [3] - 66:18, 66:22, 67:24
**326** [1] - 44:8
**335** [1] - 63:16
**355** [1] - 2:17
**3593** [1] - 100:9
**35TH** [1] - 2:18

**37201** [1] - 2:8
**3:30** [1] - 47:17
**3:45** [1] - 94:2

**4**

**4** [16] - 3:8, 30:6, 30:7, 30:8, 30:10, 56:20, 94:16, 94:19, 94:21, 95:24, 96:5, 97:15, 97:17, 97:24, 98:7, 99:12
**4(c)(v** [1] - 80:18
**42** [1] - 97:13
**45** [2] - 97:14, 97:15
**45-minute** [1] - 94:6
**46** [1] - 97:15
**48** [1] - 94:19
**49** [1] - 94:21
**4:00** [1] - 47:18
**4C5** [1] - 85:19

**5**

**5** [15] - 56:13, 56:14, 56:21, 56:22, 85:18, 95:10, 95:14, 95:17, 95:20, 96:5, 96:15, 97:8, 97:19, 98:12, 101:3
**5(c)(v** [3] - 80:18, 81:12
**50** [8] - 37:23, 38:14, 49:25, 61:13, 61:15, 61:20, 62:2, 81:1
**50/50** [2] - 80:13, 83:19
**53** [1] - 94:23
**54** [1] - 97:16
**55** [1] - 97:17
**56** [4] - 94:25, 97:19, 97:21, 99:12
**57** [4] - 95:1, 97:21, 97:22, 97:23
**58** [1] - 97:23
**59** [4] - 22:15, 22:17, 22:21, 23:7
**5:15** [1] - 99:21

**6**

**6** [10] - 22:25, 23:7, 57:2, 88:16, 94:23, 95:20, 97:11, 97:17, 97:19, 98:5
**60** [3] - 22:24, 23:7, 95:3
**615** [1] - 2:9

**65** [2] - 30:12, 97:24
**66** [3] - 30:6, 30:7, 30:13
**67** [1] - 24:22
**68** [2] - 24:22, 97:25
**687-0446** [1] - 1:25
**687-3702** [1] - 2:20
**69** [2] - 98:2, 101:4

**7**

**7** [13] - 7:22, 8:10, 57:15, 57:21, 96:14, 96:17, 96:24, 97:6, 97:9, 97:11, 97:21
**70** [2] - 98:3, 98:4
**71** [2] - 98:4, 98:5
**73** [1] - 58:18
**75** [1] - 95:5
**753** [1] - 100:4
**76** [1] - 95:6
**78** [1] - 101:4

**8**

**8** [14] - 30:7, 58:6, 91:8, 94:19, 95:9, 95:12, 96:7, 96:15, 96:24, 97:6, 97:17, 97:19, 98:9
**80** [1] - 95:7
**81** [1] - 95:8
**82** [1] - 95:9
**83** [1] - 95:10
**84** [1] - 101:4
**85** [1] - 101:4
**87** [1] - 101:5
**89** [1] - 95:12
**8C001** [1] - 58:18

**9**

**9** [22] - 24:22, 30:7, 30:11, 59:7, 59:8, 66:19, 66:22, 67:25, 68:1, 94:15, 95:1, 95:24, 96:1, 96:3, 96:5, 96:17, 96:18, 97:9, 97:11, 98:5, 101:3
**90** [1] - 95:14
**90012** [1] - 1:24
**90071-1560** [1] - 2:19
**93** [1] - 95:16
**96** [1] - 98:7
**97** [2] - 95:17, 98:8
**98** [2] - 98:8, 98:9
**99** [2] - 98:9, 98:10

**9:00** [4] - 89:5, 89:8, 93:8, 99:1

**A**

**ability** [2] - 67:18, 73:1
**able** [5] - 4:16, 18:17, 55:10, 67:21, 78:15
**above-entitled** [1] - 100:5
**absent** [1] - 69:16
**access** [2] - 78:24, 78:25
**accommodate** [1] - 18:8
**according** [1] - 52:7
**accounting** [4] - 32:13, 32:14, 32:15, 32:16
**accounts** [1] - 32:5
**accurate** [6] - 24:18, 31:9, 32:8, 42:21, 51:13, 55:13
**acknowledge** [1] - 40:7
**actuality** [1] - 35:20
**ad** [1] - 17:17
**add** [1] - 25:24
**added** [1] - 32:6
**additional** [4] - 6:3, 24:12, 24:16, 25:18
**address** [5] - 90:9, 91:9, 98:25, 99:6
**addressing** [1] - 49:14
**adjourn** [2] - 48:24, 89:4
**adjourned** [1] - 99:21
**adjusted** [1] - 94:4
**admit** [1] - 53:7
**admitted** [1] - 92:2
**ads** [1] - 14:16
**advertiser** [1] - 14:13
**advertiser-supported** [1] - 14:13
**advise** [1] - 92:25
**affairs** [2] - 75:22, 75:25
**affect** [3] - 72:22, 72:25, 76:13
**affects** [1] - 80:4
**affiliated** [1] - 44:13
**afforded** [1] - 57:3
**afraid** [1] - 18:15
**Aftermath** [5] - 1:12, 6:5, 6:13, 7:4
**afternoon** [7] - 6:1,

6:2, 10:1, 43:4, 69:23, 69:24, 87:22
**aggregating** [1] - 78:3
**aggregators** [2] - 78:2, 78:5
**ago** [4] - 34:7, 38:13, 48:11, 65:6
**agree** [4] - 41:22, 56:15, 80:17, 90:16
**agreement** [38] - 4:2, 4:4, 6:4, 6:13, 6:18, 6:20, 6:22, 6:25, 7:9, 9:20, 9:21, 10:3, 10:5, 10:6, 10:9, 19:7, 19:8, 19:25, 34:6, 41:16, 43:21, 52:16, 53:17, 54:8, 55:2, 56:24, 58:18, 58:19, 58:23, 63:19, 64:12, 64:19, 64:22, 65:3, 65:4, 80:19
**agreements** [60] - 6:20, 8:21, 8:22, 8:23, 8:24, 9:1, 15:13, 16:17, 16:21, 17:3, 18:25, 19:12, 19:24, 21:10, 21:12, 21:13, 39:9, 39:10, 41:10, 41:12, 41:13, 41:14, 41:22, 41:24, 42:10, 43:3, 49:22, 49:24, 50:1, 51:17, 53:25, 54:1, 55:18, 55:22, 56:17, 56:18, 56:23, 57:5, 57:11, 58:4, 58:11, 58:15, 59:3, 59:8, 59:19, 60:15, 63:15, 63:25, 64:9, 64:15, 65:1, 72:10, 76:13, 80:8, 82:8, 86:23, 86:24, 89:24
**ahead** [5] - 5:19, 26:7, 26:21, 49:9, 69:9
**al** [1] - 1:13
**album** [10] - 37:8, 51:1, 82:21, 82:22, 82:23, 82:25, 83:6, 83:7, 83:15
**albums** [2] - 80:14, 82:10
**alienated** [1] - 90:25
**allow** [2] - 50:22, 76:25
**allowed** [2] - 14:2, 50:9
**allowing** [1] - 69:17
**alone** [1] - 77:14
**alternative** [1] -

90:19
**amass** [1] - 76:11
**amazingly** [1] - 76:22
**Amazon** [1] - 78:16
**ambiguous** [1] - 81:20
**amendment** [1] - 9:15
**amount** [8] - 17:24, 44:18, 45:3, 59:24, 71:20, 77:4, 80:25, 93:23
**amounts** [1] - 72:2
**ancillary** [1] - 68:14
**ANGELES** [1] - 2:19
**Angeles** [3] - 1:20, 1:24, 3:1
**answer** [10] - 9:13, 23:14, 23:18, 26:12, 26:14, 26:18, 27:6, 27:9, 30:10, 43:22
**answered** [3] - 25:23, 26:2, 92:9
**answering** [1] - 80:21
**answers** [4] - 47:16, 66:20, 66:21, 85:17
**anticipated** [2] - 31:4, 31:16
**Anyway** [1] - 46:25
**anyways** [1] - 93:3
**apologies** [1] - 3:6
**apologize** [4] - 3:5, 66:16, 89:12, 89:16
**apologized** [1] - 92:13
**appear** [2] - 41:11, 44:21
**appearance** [1] - 43:13
**APPEARANCES** [1] - 2:1
**Apple** [59] - 15:14, 19:8, 19:25, 21:17, 21:18, 22:2, 22:11, 23:12, 23:24, 24:10, 25:4, 25:5, 25:9, 33:15, 33:16, 34:6, 35:1, 35:10, 35:14, 35:15, 35:17, 35:19, 35:23, 36:2, 36:3, 36:5, 36:19, 36:20, 36:22, 36:23, 37:1, 37:7, 37:9, 37:11, 37:15, 43:2, 43:15, 43:19, 43:21, 44:1, 44:8, 44:20, 46:13, 48:20, 55:17, 55:20, 58:17, 58:18, 58:22,

58:23, 59:25, 60:11, 64:22, 73:4, 74:9, 78:13, 78:15
**Apple's** [1] - 58:17
**applies** [2] - 38:9, 65:7
**appreciated** [1] - 93:21
**approach** [1] - 87:19
**appropriate** [2] - 3:10, 3:14
**appropriately** [1] - 52:21
**area** [1] - 76:18
**arena** [1] - 15:17
**argue** [2] - 68:15, 92:2
**argument** [3] - 47:1, 68:19, 91:16
**argumentative** [1] - 23:19
**Argumentative** [1] - 26:4
**art** [3] - 40:10, 40:11
**articles** [1] - 13:17
**artis** [1] - 83:19
**artist** [29] - 3:24, 4:10, 6:25, 7:5, 7:10, 7:14, 7:16, 8:20, 8:22, 9:3, 9:6, 26:23, 27:7, 29:25, 30:21, 31:2, 31:5, 31:15, 38:1, 38:10, 38:25, 49:25, 61:9, 61:11, 61:12, 61:13, 61:17, 75:19, 88:20
**artist's** [2] - 62:9, 77:24
**artists** [5] - 3:20, 3:23, 4:8, 8:23, 32:8
**Artists** [1] - 32:3
**artists'** [1] - 37:24
**artists's** [1] - 75:19
**artwork** [5] - 39:15, 39:16, 40:8, 51:1, 63:21
**aside** [1] - 78:21
**asset** [6] - 18:10, 18:16, 38:14, 39:8, 39:9
**associated** [1] - 46:9
**assume** [6] - 18:19, 55:2, 55:12, 59:4, 62:22
**assuming** [3] - 25:11, 25:17, 43:18
**attached** [1] - 39:8
**attempt** [2] - 13:10, 15:21
**attention** [3] - 6:17,

80:22, 90:14
**attorney** [1] - 13:3
**attract** [2] - 50:12, 50:14
**audience** [4] - 69:14, 69:17, 69:18, 90:8
**Audio** [2] - 78:10, 78:13
**audit** [11] - 41:23, 42:3, 42:8, 42:16, 43:24, 44:1, 44:2, 51:4, 51:6, 51:10, 51:11
**authorized** [1] - 35:19
**available** [1] - 76:14
**AVENUE** [1] - 2:17
**aware** [14] - 13:18, 19:10, 20:8, 37:25, 38:1, 38:3, 44:24, 61:4, 61:5, 80:7, 80:12, 80:16, 91:4, 91:5

**B**

**background** [2] - 75:6
**BALLOW** [1] - 2:3
**based** [7] - 51:17, 51:22, 52:1, 52:11, 62:7, 73:10, 86:13
**basis** [2] - 62:18, 88:10
**bears** [1] - 28:4, 28:21, 28:25, 29:2
**became** [2] - 76:1, 76:2
**become** [2] - 48:17, 92:18
**becomes** [1] - 35:17
**becoming** [1] - 76:3
**beginning** [3] - 12:11, 12:13, 76:19
**Behind** [1] - 52:24
**behind** [9] - 42:2, 51:4, 54:5, 56:13, 56:14, 56:21, 64:3, 64:19
**belabor** [1] - 55:6
**believes** [1] - 60:4
**benefit** [1] - 51:21
**Best** [5] - 29:9, 36:13, 36:14, 78:16
**best** [2] - 78:2, 91:22
**better** [1] - 10:25
**between** [11] - 6:4, 6:13, 12:10, 15:1, 16:17, 17:12, 19:8,

39:7, 55:23, 71:13, 71:16
**big** [1] - 48:8
**binder** [3] - 22:14, 40:17, 41:1
**binders** [2] - 11:17, 22:16
**bit** [2] - 10:25, 36:9
**bits** [2] - 18:17, 21:23
**Blow** [1] - 53:13
**Blue** [3] - 16:1, 16:2, 16:4
**book** [3] - 54:3, 54:4, 54:16
**booklet** [1] - 89:11
**books** [1] - 52:20
**Books** [1] - 52:22
**bottom** [2] - 6:17, 93:1
**bought** [2] - 68:12, 73:2
**break** [8] - 6:4, 7:7, 43:5, 43:6, 49:22, 50:5, 89:10, 90:18
**brief** [1] - 85:13
**briefly** [3] - 6:6, 69:11, 78:19
**bring** [4] - 5:19, 46:7, 49:9, 85:18
**bringing** [1] - 69:7
**broad** [2] - 13:12, 28:23
**Broadband** [5] - 54:10, 54:13, 54:21, 54:24, 55:1
**broaden** [1] - 26:18
**Broadly** [1] - 19:5
**brought** [2] - 77:3, 90:13
**build** [1] - 15:9
**building** [1] - 14:12
**Building** [1] - 1:23
**built** [3] - 14:25, 17:15, 18:4
**bunch** [1] - 71:1
**bundling** [1] - 36:21
**burden** [1] - 48:5
**BUSCH** [85] - 2:4, 3:16, 3:19, 3:23, 4:14, 4:21, 5:6, 5:12, 5:18, 5:23, 5:25, 8:1, 8:11, 9:4, 9:22, 10:18, 10:22, 11:2, 11:7, 11:16, 11:19, 20:17, 22:20, 22:22, 22:24, 23:2, 23:7, 23:15, 23:20, 24:20, 25:15, 26:6, 26:11, 30:11, 30:15, 31:7, 34:3,

41:4, 41:6, 43:20, 43:25, 44:22, 45:7, 45:16, 45:19, 46:3, 47:16, 48:1, 48:11, 49:6, 49:20, 66:15, 66:18, 67:6, 67:17, 68:1, 68:20, 74:17, 79:11, 79:13, 79:25, 81:24, 86:1, 86:13, 86:16, 87:3, 87:8, 87:21, 88:25, 89:21, 90:3, 90:12, 90:24, 91:21, 91:23, 92:4, 92:16, 93:5, 93:7, 93:16, 98:17, 98:21, 99:2, 99:6, 99:15
**Busch** [33] - 3:8, 5:1, 5:16, 6:2, 7:24, 10:3, 20:16, 23:19, 40:21, 40:25, 41:2, 43:17, 46:19, 47:4, 47:11, 47:14, 67:2, 67:21, 69:25, 70:5, 71:5, 72:24, 73:3, 73:13, 74:20, 75:7, 77:13, 79:10, 85:20, 90:6, 91:4, 91:17, 93:6
**Busch's** [2] - 46:18, 74:21
**business** [19] - 12:2, 12:17, 15:19, 16:3, 17:18, 17:19, 17:25, 29:18, 29:19, 50:22, 68:17, 72:3, 75:16, 75:22, 75:24, 76:9, 78:6, 92:13
**business-by-business** [1] - 17:18
**businesses** [1] - 17:16
**butcher** [2] - 91:13, 91:17
**buy** [4] - 29:4, 36:15, 37:16, 77:3
**Buy** [7] - 29:9, 36:13, 36:14, 36:15, 37:1, 37:2, 78:16
**Buy.com** [1] - 78:16
**buying** [6] - 62:20, 70:14, 70:15, 70:16, 71:1, 88:12
**buys** [3] - 36:11, 36:13
**BY** [24] - 2:4, 2:14, 5:25, 9:4, 9:25, 11:19, 23:15, 23:20, 25:15, 26:6, 26:11, 31:7, 34:3, 41:6, 49:20, 68:20, 69:22, 75:4, 79:13, 79:25, 81:24,

85:15, 86:16, 87:21

---

**C**

---

**C-A-R-A-E-F-F** [1] - 87:17
**C5** [1] - 85:19
**CA** [1] - 2:19
**cable** [1] - 71:24
**CALIFORNIA** [1] - 1:2
**California** [3] - 1:20, 1:24, 3:1
**cannot** [2] - 33:9
**capacity** [1] - 88:5
**CARAEFF** [1] - 101:5
**Caraeff** [18] - 46:19, 46:22, 46:23, 46:24, 47:6, 48:21, 48:23, 48:24, 87:9, 87:12, 87:16, 87:22, 92:7, 92:13, 92:19, 93:2, 93:8, 93:18
**Caraeff's** [1] - 93:14
**career** [2] - 16:19, 17:12
**careful** [1] - 89:17
**carrier** [1] - 65:16
**carriers** [1] - 41:23
**carry** [1] - 77:5
**Case** [1] - 1:10
**case** [23] - 3:14, 23:16, 27:19, 30:23, 31:16, 31:17, 35:9, 43:6, 43:8, 44:23, 48:5, 48:7, 53:21, 60:10, 61:12, 61:18, 61:25, 62:1, 69:17, 74:9, 89:6, 89:7, 90:22
**cases** [7] - 31:1, 38:13, 53:15, 80:12, 82:1, 83:19, 83:23
**CD** [21] - 17:20, 26:25, 27:20, 27:22, 27:25, 29:22, 30:23, 32:24, 33:3, 36:15, 73:24, 74:6, 78:25, 79:3, 84:24, 84:25, 85:2, 85:3
**CDs** [12] - 17:21, 17:22, 20:3, 20:5, 29:3, 29:4, 36:14, 37:16, 73:11, 73:19, 74:1, 84:5
**cell** [1] - 60:25
**CENTRAL** [1] - 1:2
**certain** [8] - 7:17, 17:18, 40:2, 50:8,

56:17, 65:2, 71:20, 90:1
**certainly** [7] - 15:18, 21:7, 21:22, 22:6, 74:15, 77:24, 91:25
**Certainly** [2] - 62:20, 89:23
**CERTIFICATE** [1] - 100:1
**certify** [1] - 100:4
**chain** [1] - 72:1
**Chair** [1] - 91:8
**change** [3] - 72:12, 72:16, 72:20
**changes** [1] - 10:6
**channel** [5] - 65:20, 65:24, 66:6, 70:2, 70:10
**channels** [2] - 30:25, 68:17
**charge** [3] - 21:8, 35:7, 71:19
**chart** [1] - 71:5
**Charts** [1] - 40:17
**charts** [10] - 41:3, 41:8, 41:16, 44:11, 45:5, 45:9, 45:13, 45:25, 69:7, 89:11
**circumstances** [1] - 61:15
**claim** [1] - 37:11
**clarification** [2] - 31:21, 31:22
**clarify** [1] - 32:2
**clause** [3] - 63:10, 63:23, 63:25
**clear** [4] - 20:19, 85:16, 92:18, 92:23
**cleared** [2] - 49:13, 49:16
**clearinghouse** [1] - 56:6
**CLERK** [5] - 11:8, 11:11, 87:10, 87:13, 87:18
**client** [1] - 89:21
**client's** [1] - 89:18
**close** [2] - 45:9, 46:1
**closed** [4] - 44:11, 45:22, 46:8, 49:11
**closer** [1] - 94:9
**closes** [2] - 44:17, 45:2
**closing** [3] - 44:12, 91:16, 91:19
**club** [7] - 80:20, 82:9, 82:15, 82:25, 83:4, 83:11, 83:23
**club's** [1] - 83:12
**clubs** [2] - 82:8

**Code** [1] - 100:4
**Colin** [1] - 43:14
**collect** [1] - 21:9
**coming** [1] - 32:18
**commenced** [1] - 69:13
**companies** [35] - 15:14, 16:18, 17:1, 17:2, 17:3, 17:10, 18:11, 18:12, 18:13, 19:3, 19:20, 20:12, 20:22, 20:23, 21:3, 21:4, 21:5, 24:10, 24:14, 34:8, 34:13, 38:15, 38:17, 39:9, 39:11, 42:18, 42:20, 52:5, 52:6, 52:20, 53:22, 53:23, 55:23, 56:16, 56:17
**company** [10] - 26:22, 56:5, 57:12, 73:14, 75:15, 76:4, 85:1, 85:4, 86:10, 86:17
**Company** [1] - 28:13
**compete** [1] - 78:15
**competitor** [2] - 13:13, 13:18
**compilation** [7] - 85:25, 86:5, 86:7, 86:11, 86:17, 86:24, 87:1
**compilations** [2] - 43:19
**complained** [3] - 3:21, 3:23, 3:24
**complaining** [2] - 4:8, 4:11
**complaint** [2] - 4:12, 92:6
**complete** [3] - 25:21, 26:12, 27:9
**complex** [1] - 32:13
**compliant** [1] - 63:8
**component** [1] - 14:20
**components** [1] - 74:5
**computer** [5] - 69:18, 77:1, 78:10, 79:22, 90:8
**computers** [2] - 69:16, 69:19
**concerned** [1] - 90:19
**conclusion** [7] - 24:6, 33:25, 65:15, 65:23, 66:5, 67:9, 67:13
**conclusions** [1] -

74:18
**condition** [1] - 40:2
**conditional** [51] -
14:17, 14:20, 14:23,
17:2, 17:11, 18:12,
18:25, 19:8, 20:22,
21:4, 34:9, 34:14,
37:22, 38:12, 38:23,
39:10, 39:14, 40:3,
40:8, 41:14, 42:3,
42:18, 49:24, 50:9,
50:22, 51:5, 51:16,
51:20, 53:10, 53:16,
53:23, 54:19, 55:2,
55:19, 55:24, 56:3,
56:10, 56:14, 57:4,
57:10, 57:23, 58:7,
59:3, 59:7, 59:14,
63:7, 71:7, 71:13,
71:16, 71:18, 79:18
**Conditional** [1] -
39:17
**conditions** [3] -
64:23, 65:2, 65:3
**conduct** [2] - 41:23,
42:8
**conducted** [1] -
11:22
**confer** [1] - 99:5
**conference** [1] -
69:13
**Conference** [1] -
100:6
**confidential** [3] -
44:5, 45:4, 89:18
**confirm** [2] - 42:20,
51:12
**confirmation** [1] -
41:1
**conformance** [1] -
100:6
**connect** [2] - 19:13,
78:11
**connected** [1] -
19:13
**connection** [5] -
9:19, 13:5, 19:11,
84:2, 84:3
**consequences** [1] -
4:20
**consider** [1] - 70:9
**consideration** [1] -
6:22
**considered** [1] - 70:6
**considering** [1] -
48:13
**consistent** [3] -
17:11, 41:12, 49:23
**constitute** [1] - 6:19
**consumer** [7] -

30:22, 50:12, 56:18,
82:4, 82:14, 82:17,
83:15
**consumers** [3] -
14:3, 50:13, 50:14
**contain** [1] - 80:9
**contained** [1] - 63:18
**containing** [1] -
82:22
**contains** [2] - 23:11,
83:8
**content** [9] - 53:1,
53:4, 54:7, 54:15,
55:16, 63:20, 72:11,
76:14, 78:20
**context** [1] - 10:13
**continue** [1] - 50:2
**continuing** [1] -
30:13
**contract** [11] - 7:6,
21:7, 23:11, 38:8,
38:11, 58:12, 61:11,
61:12, 61:17, 61:24,
83:21
**contracting** [2] -
53:25, 55:9
**contracts** [14] -
37:24, 38:1, 44:5,
49:25, 53:6, 56:11,
58:8, 61:9, 62:9, 63:3,
63:7, 65:18, 75:18,
88:20
**contractual** [2] -
49:17, 75:17
**contrary** [1] - 63:18
**control** [2] - 39:2,
39:5
**controversial** [1] -
26:20
**conversation** [2] -
4:15, 4:17
**conversations** [1] -
5:2
**copies** [5] - 33:10,
74:4, 74:7, 74:24
**copy** [10] - 26:22,
27:24, 39:2, 39:5,
40:22, 40:25, 41:2,
70:15, 75:1, 77:10
**copyright** [19] - 5:11,
21:21, 22:4, 22:7,
23:17, 33:6, 33:8,
33:12, 34:5, 36:2,
57:19, 57:21, 57:25,
74:10, 74:14, 74:25,
75:1, 84:9, 86:20
**copyrighting** [1] -
21:23
**copyrights** [2] -
82:23, 83:8

**coroner** [1] - 48:7
**correct** [140] - 6:14,
6:24, 7:3, 8:11, 9:9,
11:22, 11:25, 12:4,
12:14, 12:15, 13:3,
13:4, 13:11, 14:3,
15:2, 15:6, 16:13,
16:14, 16:19, 16:22,
17:3, 19:4, 20:1,
20:24, 21:3, 21:10,
21:15, 21:17, 21:19,
27:6, 27:13, 27:16,
27:20, 27:22, 27:25,
28:4, 28:9, 28:11,
28:21, 29:4, 29:5,
29:7, 29:10, 29:14,
29:19, 29:22, 31:6,
32:25, 33:5, 33:9,
33:10, 33:17, 33:18,
33:19, 33:20, 33:23,
34:10, 34:11, 34:16,
34:23, 34:24, 35:8,
37:3, 37:4, 37:9,
37:20, 38:23, 39:21,
42:10, 44:6, 44:7,
45:6, 45:7, 50:6, 51:1,
51:7, 51:14, 51:18,
51:23, 51:24, 51:25,
52:5, 52:16, 52:21,
53:18, 53:23, 54:20,
57:12, 57:18, 57:24,
58:2, 58:4, 59:5,
59:16, 59:24, 60:2,
60:6, 60:12, 61:3,
61:6, 62:10, 62:21,
63:6, 63:14, 64:9,
64:16, 64:17, 65:2,
74:11, 74:12, 80:10,
80:11, 80:16, 81:9,
81:18, 82:2, 82:5,
82:10, 82:12, 82:15,
83:7, 83:12, 83:16,
83:17, 83:20, 83:25,
84:14, 84:16, 85:2,
85:3, 85:5, 85:6,
86:19, 87:24, 88:11,
88:16, 88:17, 88:23,
88:24, 100:4
**Correct** [1] - 16:20
**corrected** [1] - 20:18
**correction** [1] -
32:20
**corrections** [1] -
32:18
**correctly** [2] - 5:9,
94:2
**cost** [14] - 19:17,
24:12, 24:16, 25:7,
25:12, 25:13, 25:18,
27:5, 28:21, 28:24,

28:25, 29:2, 85:7,
85:8
**costs** [12] - 19:13,
19:15, 19:17, 27:15,
27:19, 27:22, 27:24,
28:4, 28:22, 28:23,
83:24
**counsel** [2] - 11:17,
69:11, 90:18
**Counsel** [3] - 43:12,
94:13, 99:5
**country** [2] - 28:15,
73:20
**couple** [5] - 50:6,
79:11, 79:14, 86:13,
93:17
**course** [2] - 16:19,
47:16
**COURT** [108] - 1:1,
3:5, 3:18, 3:22, 4:12,
4:19, 4:22, 5:5, 5:7,
5:16, 5:19, 5:22, 7:23,
8:5, 8:9, 8:14, 9:23,
10:17, 10:19, 10:21,
11:1, 11:5, 11:15,
20:16, 22:18, 22:21,
22:23, 23:1, 23:3,
23:6, 23:19, 24:23,
24:25, 26:5, 26:9,
30:10, 30:14, 34:1,
40:23, 41:2, 41:5,
43:4, 43:11, 43:16,
43:23, 44:3, 44:10,
44:16, 45:1, 45:8,
45:14, 45:18, 45:24,
46:4, 46:7, 46:25,
47:8, 47:14, 47:19,
47:23, 48:3, 48:23,
49:4, 49:7, 49:9,
49:12, 66:17, 66:24,
67:5, 67:20, 67:23,
69:4, 69:9, 69:11,
69:14, 74:19, 74:22,
79:9, 79:21, 79:24,
81:21, 85:12, 86:3,
87:4, 87:6, 87:19,
89:3, 89:10, 89:23,
90:6, 90:16, 91:6,
91:19, 91:22, 91:25,
93:4, 93:6, 93:11,
93:19, 93:24, 94:5,
94:8, 94:12, 98:19,
98:22, 98:25, 99:10,
99:18
**Court** [3] - 87:10,
92:14, 99:9
**court** [6] - 11:9,
49:14, 69:12, 69:13,
69:16, 69:17
**Court's** [2] - 5:9,

49:18
**courteous** [1] -
92:11
**courtesy** [1] - 48:4
**Courtroom** [2] -
49:11, 69:10
**courtroom** [12] -
44:11, 44:12, 44:18,
45:3, 45:9, 45:22,
46:1, 46:8, 49:13,
49:16, 69:9, 69:16
**courtrooms** [2] -
69:15
**cover** [5] - 39:15,
40:10, 40:11, 51:1
**covered** [2] - 43:3,
75:7
**create** [2] - 36:5,
91:12
**created** [2] - 60:5,
91:17
**creates** [1] - 19:19
**creating** [1] - 27:19
**creation** [2] - 34:21,
35:22
**credit** [1] - 32:7
**credited** [12] - 29:25,
31:2, 31:4, 31:14,
32:3, 32:4, 32:5, 32:7,
32:10, 32:11, 32:12,
32:14
**CROSS** [4] - 9:24,
69:21, 101:2, 101:10
**Cross** [1] - 9:23
**cross** [1] - 45:12
**CROSS-
EXAMINATION** [2] -
9:24, 69:21
**cross-examination**
[1] - 45:12
**crystal** [1] - 92:18
**CSR** [2] - 1:22, 100:9
**Cue** [7] - 45:19,
45:23, 46:2, 47:5,
47:24, 48:14, 48:18
**custom** [2] - 4:4, 4:5,
68:16
**cut** [1] - 41:11
**cutouts** [3] - 54:3,
54:14, 55:12
**CV** [1] - 1:11

---

# D

**date** [4] - 6:23, 7:17,
9:2, 12:10
**Date** [1] - 100:9
**days** [1] - 64:13
**dba** [1] - 1:12

**deal** [11] - 7:5, 7:13, 9:3, 9:7, 9:19, 10:10, 17:18, 48:8, 75:17, 76:4, 76:5
**dealing** [1] - 21:20
**deals** [1] - 22:2
**decade** [1] - 18:5
**decide** [1] - 79:1
**decision** [1] - 62:15
**decks** [1] - 14:22
**declaration** [1] - 22:5
**deemed** [1] - 6:19
**DEFENDANT** [1] - 2:13
**defendant** [1] - 74:18
**Defendants** [1] - 1:14
**defense** [2] - 3:17, 98:22
**DEFENSE** [2] - 101:10, 101:21
**Defense** [1] - 99:12
**define** [2] - 21:21, 28:22
**defined** [1] - 59:9
**definition** [1] - 83:4
**delay** [1] - 3:5
**deliver** [1] - 17:20
**delivered** [4] - 17:20, 51:13, 63:21, 71:18
**delivering** [2] - 18:5, 51:2
**delivers** [1] - 73:4
**delivery** [3] - 53:1, 53:4, 54:7
**demand** [2] - 14:13, 64:4
**demonstrative** [1] - 91:13
**department** [3] - 18:15, 75:13, 76:2
**deposed** [1] - 23:16
**deposition** [18] - 7:25, 11:22, 23:8, 23:23, 25:1, 30:16, 31:24, 32:17, 36:10, 37:7, 45:19, 45:23, 47:5, 47:7, 65:14, 67:4, 68:2, 96:15
**depositions** [3] - 91:10, 98:19, 98:23
**depot** [2] - 28:25, 74:7
**describe** [2] - 73:25, 76:21
**described** [2] - 13:13, 14:18
**descriptions** [1] - 13:17
**designation** [3] -

94:15, 95:3, 96:13
**designed** [1] - 29:2
**destroying** [1] - 44:19
**determine** [1] - 38:8
**development** [1] - 14:11
**device** [4] - 50:20, 50:23, 50:25, 70:18
**devices** [1] - 50:24
**differ** [3] - 66:1, 68:5, 70:1
**difference** [2] - 39:7, 70:24
**differences** [2] - 71:13, 71:16
**Different** [1] - 50:11
**different** [22] - 14:1, 14:10, 14:21, 20:1, 23:17, 39:3, 39:5, 50:7, 50:11, 50:12, 50:14, 56:24, 57:3, 64:11, 67:6, 72:2, 72:3, 74:5, 78:23, 93:18
**differently** [1] - 19:9
**digital** [52] - 13:24, 15:22, 16:18, 17:10, 17:16, 18:6, 18:7, 18:10, 18:11, 18:16, 19:1, 19:2, 19:12, 19:19, 19:20, 20:11, 20:12, 20:14, 20:20, 20:21, 21:2, 21:3, 21:5, 21:18, 22:1, 22:8, 22:9, 23:13, 23:24, 24:10, 24:13, 25:8, 25:9, 33:15, 33:16, 34:8, 34:9, 34:10, 34:13, 35:15, 35:16, 36:4, 38:15, 53:22, 74:11, 76:3, 76:8, 78:6
**digitally** [2] - 18:4, 34:14
**DIRECT** [5] - 5:24, 11:18, 87:20, 101:2, 101:10
**direct** [4] - 6:17, 22:14, 45:15, 80:22
**directed** [1] - 8:18
**direction** [1] - 8:21
**directly** [4] - 4:24, 15:13, 29:11, 77:3
**discreet** [1] - 46:14
**discuss** [4] - 4:25, 43:6, 89:6, 92:24
**discussed** [2] - 3:7, 49:17
**discussing** [1] -

65:19
**discussion** [5] - 3:9, 8:17, 10:11, 89:11, 90:7
**discussions** [1] - 90:22
**display** [2] - 40:10, 43:23
**dispositive** [1] - 62:11
**disseminate** [1] - 78:20
**distribute** [1] - 82:10
**Distribution** [1] - 28:13
**distribution** [11] - 28:21, 28:23, 73:16, 76:3, 76:8, 76:18, 76:20, 78:7, 83:24, 85:1, 85:4
**distributor** [2] - 28:9, 28:12
**DISTRICT** [2] - 1:1, 1:2
**divide** [1] - 52:1
**division** [6] - 11:25, 12:5, 12:9, 76:4, 87:24, 88:2
**document** [1] - 55:7
**done** [18] - 10:10, 11:20, 19:5, 19:9, 20:24, 35:23, 41:7, 41:9, 41:11, 45:14, 45:25, 47:18, 73:14, 80:15, 91:23, 91:24
**door** [3] - 4:5, 4:7, 74:21
**down** [14] - 10:19, 20:16, 37:7, 43:11, 64:3, 64:5, 64:11, 64:14, 70:23, 72:1, 72:25, 87:6, 89:3, 91:24
**download** [105] - 14:20, 15:19, 16:18, 17:1, 17:2, 17:10, 18:11, 18:12, 18:25, 19:3, 19:7, 19:12, 19:20, 20:12, 20:21, 20:23, 21:3, 21:4, 21:5, 24:10, 24:13, 25:19, 26:25, 34:8, 34:13, 34:15, 34:21, 34:23, 35:5, 35:10, 35:14, 35:17, 36:5, 37:18, 38:15, 38:16, 39:9, 39:11, 39:14, 40:3, 40:7, 40:3, 40:8, 40:9, 41:13, 41:14, 42:17, 49:24,

50:1, 50:9, 51:5, 51:6, 51:16, 52:5, 53:10, 53:11, 53:22, 53:23, 55:2, 55:23, 56:5, 56:9, 56:11, 56:16, 56:17, 57:4, 57:5, 57:10, 57:12, 57:24, 58:4, 58:7, 58:19, 59:3, 59:7, 59:16, 59:19, 63:7, 63:15, 64:8, 64:15, 68:10, 70:21, 71:7, 71:18, 72:5, 72:6, 72:13, 72:21, 73:4, 78:11, 79:18, 79:19, 80:2, 80:4, 81:7, 83:14, 86:23
**Download** [1] - 52:6
**downloaded** [7] - 14:3, 24:17, 25:6, 25:14, 25:19, 35:22, 52:2
**Downloads** [1] - 55:7
**downloads** [6] - 7:7, 8:20, 9:8, 10:12, 14:17, 14:23, 15:10, 15:15, 15:22, 15:25, 17:11, 19:8, 33:15, 34:22, 35:3, 37:21, 37:22, 37:24, 38:12, 38:23, 38:24, 42:3, 42:5, 42:9, 42:19, 50:22, 51:18, 51:20, 51:22, 52:4, 52:6, 52:12, 53:3, 53:6, 53:16, 54:19, 55:10, 55:19, 56:4, 56:14, 59:9, 59:15, 59:22, 60:6, 60:11, 63:6, 65:7, 71:14, 71:17, 72:16, 73:1, 76:9, 77:15, 78:12, 78:13, 78:17
**drafted** [1] - 75:18
**due** [1] - 25:13
**during** [6] - 10:24, 16:18, 17:12, 18:5, 32:6, 51:22

**E**

**EADES** [1] - 2:15
**earliest** [1] - 78:6
**early** [2] - 78:8, 78:12
**easel** [6] - 10:23, 11:4, 11:6, 49:1, 49:5, 49:6
**East** [1] - 1:23
**easy** [1] - 77:10
**Eddy** [2] - 45:19,

47:4
**effect** [3] - 6:21, 22:5, 91:12
**efficient** [1] - 17:24
**EG** [1] - 63:20
**eight** [1] - 44:23
**Either** [3] - 29:12, 29:14, 29:18
**either** [11] - 16:16, 30:23, 52:12, 58:23, 62:4, 72:19, 74:3, 91:2, 91:12, 91:15
**Elabs** [8] - 11:24, 12:5, 12:9, 16:19, 75:6, 76:5, 76:6, 76:7
**electronically** [2] - 18:17, 74:3
**eleven** [1] - 83:10, 83:11
**elsewhere** [1] - 76:11
**Eminem** [9] - 6:5, 10:12, 36:13, 36:15, 37:2, 38:5, 38:13, 62:1, 62:2
**Eminem's** [1] - 37:8
**Eminem/Aftermath** [2] - 6:25, 9:19
**encoding** [1] - 56:5
**end** [45] - 12:22, 12:23, 30:21, 32:12, 34:22, 35:2, 36:5, 47:13, 48:23, 51:23, 55:10, 56:15, 56:17, 56:24, 59:9, 61:2, 62:6, 62:23, 64:23, 65:16, 72:6, 72:12, 72:17, 72:20, 72:22, 72:25, 73:4, 79:18, 80:2, 80:4, 81:6, 81:8, 81:13, 81:16, 82:1, 83:15, 88:10, 88:12, 88:22, 90:18, 92:3, 94:2, 99:18
**End** [1] - 56:23
**ended** [1] - 14:12
**engaged** [1] - 90:21
**entered** [3] - 17:16, 19:24, 55:23
**entering** [1] - 15:13
**enters** [1] - 80:7
**Entertainment** [1] - 1:13
**entirety** [1] - 45:23
**entitled** [2] - 61:13, 100:5
**environment** [1] - 77:9
**envisioned** [1] - 14:19

**equal** [1] - 81:1
**especially** [1] - 89:18
**essentially** [10] -
14:15, 32:4, 34:18,
35:23, 58:8, 76:25,
78:9, 78:24, 79:3,
81:8
  **estimate** [1] - 46:20
**estoppel** [1] - 58:24
**et** [1] - 1:13
**Ethan** [1] - 94:15
**event** [3] - 4:18,
52:3, 89:19
**eventually** [1] - 76:5
**exactly** [2] - 5:4,
67:16
**exam** [1] - 45:15
**examination** [11] -
3:10, 3:12, 3:20,
10:24, 11:5, 44:10,
45:5, 45:8, 45:12,
45:25, 46:12
  **EXAMINATION** [8] -
5:24, 9:24, 11:18,
69:21, 79:12, 85:14,
86:15, 87:20
  **examine** [3] - 49:6,
69:4, 69:6
**examined** [1] - 49:4
**examining** [1] - 41:3
**example** [3] - 21:18,
36:19, 72:9
  **Except** [1] - 58:22
**except** [3] - 44:12,
46:8, 71:21
**exceptions** [1] - 38:3
**exclusive** [1] - 33:12
**excuse** [2] - 47:1,
92:9
  **Excuse** [1] - 43:1
**excused** [3] - 46:24,
47:8, 47:13
**executed** [1] - 6:23
**executive** [1] - 12:17
**exercises** [1] - 17:17
**exhibit** [3] - 41:15,
89:13, 92:1
  **Exhibit** [3] - 6:9,
58:18, 85:18
**EXHIBITS** [2] -
101:17, 101:21
**exist** [1] - 82:12
**existence** [1] - 79:5
**exists** [1] - 16:13
**expect** [2] - 47:17,
69:7
  **experience** [1] -
73:10
**explain** [3] - 26:1,
26:10, 26:12

**explore** [1] - 4:16
**express** [2] - 43:7,
89:6
**expressly** [1] - 58:9
**extension** [1] - 6:19
**extent** [4] - 17:4,
39:1, 89:13, 91:12
**extra** [1] - 99:16

## F

**F.B.T** [3] - 1:7, 38:5,
38:13
**facing** [1] - 5:3
**fact** [18] - 5:10,
33:16, 48:14, 57:22,
60:10, 62:11, 72:9,
72:15, 72:17, 72:19,
72:20, 72:24, 77:21,
81:6, 81:7, 81:13,
84:4, 88:9
**factor** [3] - 62:14,
66:11, 67:3
**factors** [7] - 66:8,
67:8, 67:12, 69:1,
69:7, 70:5, 70:8
**facts** [6] - 65:15,
65:22, 66:4, 68:6,
68:24, 69:1
  **Facts** [1] - 66:8
**fail** [1] - 15:4
**failed** [1] - 15:3
**fair** [6] - 4:9, 31:5,
38:7, 55:15, 90:12,
92:7
  **faith** [1] - 45:15
**familiar** [11] - 16:21,
18:16, 27:12, 53:8,
63:10, 71:13, 71:16,
73:10, 88:5, 88:9,
88:12
  **far** [4] - 31:11, 36:21,
43:24, 79:4
**farmed** [1] - 35:25
**fast** [1] - 10:10
**FCRR** [1] - 1:22
**feasible** [1] - 77:18
**February** [2] - 1:21,
3:1
  **Federal** [1] - 1:23
**fee** [5] - 24:15, 55:16,
55:17, 63:6, 85:10
**fees** [1] - 63:8
**feet** [1] - 11:3
**felt** [1] - 4:9
**few** [8] - 5:3, 6:3,
11:3, 18:22, 75:5,
76:2, 87:22, 91:11
**field** [1] - 76:12

**file** [33] - 19:1, 19:2,
19:3, 20:11, 20:14,
20:15, 20:20, 20:21,
21:3, 21:6, 22:1,
23:13, 23:24, 24:11,
24:13, 25:4, 25:8,
25:9, 25:17, 26:24,
33:16, 34:9, 34:10,
35:15, 35:16, 35:22,
55:17, 55:18, 72:7,
74:2, 74:3, 74:4,
74:11
**files** [10] - 19:1,
19:19, 20:15, 21:19,
22:1, 22:9, 25:11,
34:15, 36:4
**finally** [2] - 43:8,
89:7
  **Financial** [1] - 42:22
**financial** [5] - 42:24,
42:25, 44:1, 51:14,
52:20
  **Fine** [2] - 55:14,
93:19
  **fine** [2] - 8:13, 63:12
**finish** [1] - 46:22
**finished** [2] - 48:24,
93:3
**finishing** [1] - 47:24
**firms** [2] - 44:13,
46:9
  **First** [5] - 3:5, 75:8,
84:13, 90:6, 94:15
**first** [21] - 6:18, 15:8,
15:16, 15:21, 15:25,
17:16, 26:2, 26:13,
26:19, 27:6, 28:14,
41:21, 47:25, 48:7,
48:15, 48:18, 53:13,
53:14, 90:8, 90:20
**five** [6] - 73:9, 84:16,
84:17, 84:19, 93:2,
93:17
**flavor** [1] - 30:8
**floor** [1] - 59:24
**FLOOR** [1] - 2:18
**flows** [1] - 48:19
**focus** [1] - 53:11
**focused** [2] - 4:1,
53:7
**focusing** [1] - 81:13
**following** [1] - 64:23
**follows** [5] - 8:16,
23:9, 25:2, 30:17,
68:3
  **FOR** [4] - 2:3, 2:13,
101:2, 101:9
**foray** [3] - 15:8,
15:16, 15:21
**forays** [1] - 15:18

**force** [1] - 6:21
**foregoing** [2] -
80:20, 100:4
**forever** [2] - 70:17,
72:8
**forget** [1] - 89:12
**forgetting** [1] - 35:5
**forgot** [3] - 25:25,
26:1, 89:20
  **Form** [1] - 65:5
**form** [10] - 7:10,
7:11, 7:16, 9:2, 9:7,
9:10, 9:16, 43:7, 87:1,
89:6
  **format** [1] - 100:5
**formed** [2] - 14:9,
76:4
  **forth** [1] - 18:13
**forward** [1] - 43:12
**fourth** [2] - 56:2,
56:3
  **frankly** [1] - 47:10
**Frankly** [1] - 48:6
**free** [1] - 37:1
**front** [4] - 5:8, 40:17,
41:16, 54:2
**full** [6] - 6:21, 11:12,
30:8, 66:19, 68:8,
87:14
  **functions** [1] - 56:6

## G

**game** [1] - 4:9
**general** [7] - 31:12,
34:7, 34:8, 61:22,
63:7, 73:25, 75:6
  **Generally** [6] -
16:23, 19:14, 28:5,
28:17, 29:10, 86:6
**generally** [5] - 50:21,
57:9, 59:2, 59:19,
59:23
  **generic** [2] - 50:17,
50:18
**gentlemen** [3] -
49:12, 69:14, 89:4
**given** [3] - 48:13,
75:17, 77:25
**GLENN** [1] - 2:14
**governed** [3] - 44:14,
46:9, 49:17
**GRAND** [1] - 2:17
**grant** [4] - 57:6, 57:7,
57:9, 57:11
**granted** [7] - 33:12,
33:19, 36:1, 58:9,
58:22, 58:23, 72:1
  **grants** [2] - 57:2,

75:2
  **great** [2] - 76:16,
90:3
  **Great** [1] - 56:1
**growing** [2] - 76:23,
76:25
**guess** [2] - 26:1,
63:2
  **guest** [1] - 32:2
**guide** [8] - 18:10,
18:11, 18:19, 38:15,
38:18, 38:20, 39:8,
39:10
  **GUILFORD** [1] - 2:5
**Gustaf** [1] - 94:13
**Gustav** [2] - 91:10,
94:15
  **GUTIERREZ** [1] - 1:4

## H

**hand** [3] - 11:9,
36:19, 87:11
**harm** [1] - 3:13
**head** [7] - 11:24,
12:9, 67:15, 76:2,
87:23, 88:1
**heading** [1] - 12:5
**hear** [3] - 14:16,
40:23, 60:25
**heard** [8] - 4:23,
13:6, 13:8, 14:4,
60:20, 78:23, 92:19,
93:15
**held** [1] - 100:5
**Hello** [1] - 10:2
**help** [1] - 14:16
**hereby** [1] - 100:4
**herein** [1] - 63:8
**hereof** [1] - 6:23
**hereunder** [2] - 58:9,
63:21
  **high** [1] - 79:2
**hits** [1] - 77:6
**hoc** [1] - 17:17
**Hoffman** [2] - 9:14,
10:11
  **Hold** [2] - 20:16,
22:18
  **hold** [1] - 12:19
**honor** [1] - 37:9
**Honor** [60] - 3:16,
4:18, 4:23, 5:13, 8:2,
8:12, 8:13, 10:23,
11:17, 22:20, 23:4,
24:20, 24:24, 26:4,
26:8, 30:7, 30:9,
33:24, 40:21, 40:24,
43:1, 44:7, 44:15,

44:23, 46:16, 47:17, 48:11, 48:25, 49:8, 66:15, 66:18, 66:19, 66:23, 67:17, 74:20, 79:7, 81:19, 86:1, 86:4, 86:12, 86:14, 87:3, 87:8, 89:21, 90:4, 90:12, 91:3, 91:5, 91:11, 92:5, 92:7, 92:10, 92:16, 93:20, 93:21, 94:1, 94:10, 98:17, 99:15

**HONORABLE** [1] - 1:4

**hopes** [1] - 79:2

**hosting** [1] - 56:5

**hour** [1] - 99:16

**hours** [3] - 44:23, 99:12, 99:13

**household** [2] - 76:24

**huge** [2] - 76:19, 76:20

**hundred** [1] - 28:17

# I

**identical** [5] - 40:22, 41:1, 41:4, 42:11, 57:8

**identified** [4] - 53:5, 67:12, 67:19, 86:18

**identify** [2] - 20:10, 41:15

**ignores** [1] - 77:21

**impeach** [1] - 30:5

**impeachment** [2] - 8:1, 22:20

**implication** [1] - 58:24

**importance** [1] - 92:17

**important** [1] - 92:20

**include** [5] - 7:5, 7:6, 15:20, 43:19, 89:14

**included** [2] - 27:25, 59:18

**including** [1] - 63:21

**Including** [2] - 42:24, 42:25

**inconsistent** [2] - 17:14, 24:5

**increased** [1] - 25:13

**individual** [7] - 27:16, 27:19, 27:25, 29:3, 29:4, 77:14

**information** [14] - 20:21, 22:1, 35:17, 39:2, 42:20, 42:22,

42:23, 45:4, 51:13, 51:14, 53:17, 89:18, 90:2, 92:20

**ingest** [1] - 18:7

**initiative** [1] - 14:24

**inquired** [1] - 46:13

**inquiry** [5] - 3:11, 3:15, 5:10, 90:20

**insert** [2] - 8:19, 8:25

**inspect** [1] - 52:19

**instance** [1] - 59:25

**instructed** [4] - 7:4, 9:12, 9:13, 9:17

**instruction** [4] - 8:25, 9:5, 9:6, 90:17

**instructions** [1] - 18:18

**Instruments** [5] - 54:10, 54:13, 54:21, 54:24, 55:1

**intellectual** [4] - 57:16, 57:22, 72:11, 72:16

**intended** [2] - 14:10, 68:18

**intending** [1] - 14:5

**intent** [2] - 86:2

**intention** [1] - 45:13

**interest** [1] - 63:19

**Internet** [3] - 13:11, 14:14, 76:11

**Interscope** [1] - 7:4

**involved** [3] - 16:16, 16:17, 16:25

**iPod** [5] - 37:1, 37:2, 39:15, 39:17, 40:2

**irrelevant** [1] - 86:2

**issue** [12] - 4:8, 4:24, 4:25, 5:4, 5:15, 48:17, 66:2, 90:9, 92:18, 99:6, 99:8

**issues** [1] - 48:13

**items** [1] - 71:8

**itself** [3] - 4:2, 14:2, 22:9

**iTunes** [5] - 13:13, 13:18, 37:17, 37:18, 74:9

# J

**January** [1] - 88:3

**jewel** [1] - 27:19

**job** [1] - 92:13

**Jobs** [2] - 91:10, 96:13

**joint** [2] - 14:9, 15:1

**jointly** [1] - 90:14

**Juarez** [1] - 91:7

**JUDGE** [1] - 1:4

**judge** [2] - 48:9, 48:10

**Judicial** [1] - 100:6

**July** [1] - 6:13

**junior** [2] - 75:12, 75:16

**juror** [3] - 90:10, 91:6, 91:7

**jurors** [4] - 5:20, 10:25, 46:7, 49:9

**Jury** [6] - 3:4, 5:21, 43:10, 46:6, 49:10, 89:9

**jury** [11] - 6:10, 8:15, 23:8, 24:6, 25:1, 30:16, 53:13, 66:20, 68:2, 91:15, 92:19

# K

**K-E-N-S-W-I-L** [1] - 11:14

**keep** [4] - 49:21, 73:2, 87:8, 89:11

**KELLY** [1] - 2:16

**KENSWIL** [1] - 101:4

**Kenswil** [32] - 5:3, 5:5, 5:15, 10:22, 10:24, 11:10, 11:14, 11:21, 11:24, 27:12, 31:8, 40:16, 41:9, 46:22, 47:15, 48:19, 49:21, 69:3, 69:23, 71:9, 73:7, 75:5, 79:8, 79:14, 80:21, 85:17, 92:9, 92:21, 93:1, 93:3, 93:17

**Kenswil's** [1] - 66:21

**kind** [2] - 14:24, 29:19

**KING** [1] - 2:3

**KLAUS** [33] - 2:16, 4:23, 5:13, 23:4, 24:24, 26:4, 26:8, 33:24, 40:21, 40:24, 44:15, 45:11, 46:16, 47:3, 47:10, 47:21, 48:25, 49:8, 66:23, 67:1, 67:21, 69:6, 69:22, 74:20, 75:4, 79:7, 81:19, 85:13, 85:15, 86:4, 86:12, 87:5, 89:2

**Klaus** [11] - 4:1, 4:2, 40:23, 45:10, 47:20, 66:25, 67:20, 69:4, 79:16, 80:1, 84:3

**Kleenex** [1] - 50:17

**knowledge** [3] - 73:25, 76:11, 92:22

# L

**label** [2] - 27:24, 77:25

**label's** [1] - 77:24

**labeled** [1] - 72:24

**Ladies** [3] - 49:12, 69:14, 89:4

**language** [11] - 7:5, 7:6, 7:10, 8:19, 9:1, 9:7, 9:10, 9:15, 56:4, 56:8, 59:2

**larger** [1] - 8:4

**Larry** [1] - 10:22

**Last** [1] - 84:16

**last** [12] - 11:13, 12:22, 13:6, 16:10, 17:8, 32:15, 40:25, 82:18, 84:19, 87:15, 87:16, 93:16

**Latham** [1] - 43:14

**launch** [1] - 15:25

**launched** [3] - 15:3, 15:4, 17:25

**launching** [1] - 14:12

**law** [6] - 33:6, 33:8, 33:12, 44:13, 46:9, 82:6

**Lawrence** [2] - 11:10, 11:14

**LAWRENCE** [1] - 101:4

**lawyer** [2] - 75:12, 75:16

**lawyers** [1] - 75:20

**layman's** [1] - 34:17

**lead** [1] - 32:8

**least** [3] - 26:23, 44:18, 45:3

**left** [7] - 19:9, 20:1, 27:2, 30:1, 46:20, 92:10, 92:13

**legal** [6] - 5:11, 33:24, 59:17, 74:17, 75:22, 75:24

**LeMOINE** [6] - 2:15, 8:3, 8:7, 8:13, 9:25, 10:15

**length** [3] - 20:3, 72:19, 75:7

**lengthy** [1] - 48:21

**letter** [5] - 3:9, 3:12, 4:7, 4:9, 4:13

**license** [12] - 34:5, 36:2, 74:10, 74:14, 75:1, 75:2, 80:15,

80:23, 81:17, 84:9, 87:1, 88:19

**licensed** [2] - 33:22, 36:3

**licensee** [1] - 81:23

**licensees** [7] - 53:18, 53:21, 54:16, 55:8, 55:9, 80:24

**licenses** [7] - 9:8, 60:16, 60:19, 81:22, 82:9, 85:21, 86:23

**licensing** [14] - 37:23, 38:9, 58:21, 61:9, 61:14, 61:20, 62:3, 62:9, 62:23, 80:7, 80:13, 80:23, 88:20

**life** [1] - 92:12

**Limine** [1] - 3:8

**limited** [3] - 37:24, 77:4, 79:4

**line** [6] - 22:21, 53:13, 63:5, 77:16, 93:1, 95:22

**Line** [63] - 7:22, 8:9, 22:22, 22:24, 23:7, 24:22, 30:6, 30:7, 30:10, 30:12, 30:13, 66:18, 66:19, 66:21, 66:22, 67:24, 67:25, 68:1, 96:14, 96:15, 96:16, 96:17, 96:19, 96:21, 96:22, 97:2, 97:4, 97:5, 97:6, 97:8, 97:9, 97:15, 97:21, 97:23, 97:24, 98:4, 98:8, 98:9, 98:13, 98:14

**liner** [1] - 27:24

**Lines** [53] - 94:16, 94:17, 94:19, 94:21, 94:23, 94:25, 95:1, 95:4, 95:5, 95:6, 95:7, 95:8, 95:9, 95:10, 95:12, 95:14, 95:16, 95:17, 95:19, 95:20, 95:22, 95:23, 95:24, 96:1, 96:2, 96:3, 96:5, 96:7, 96:9, 96:18, 96:20, 96:23, 96:24, 97:1, 97:3, 97:4, 97:11, 97:13, 97:14, 97:16, 97:17, 97:19, 97:22, 97:25, 98:2, 98:3, 98:5, 98:7, 98:10, 98:11, 98:12, 98:14

**lines** [4] - 67:18, 89:25, 94:18

**Liquid** [2] - 78:9,

78:13
  **LISA** [1] - 101:3
  **list** [3] - 46:18, 93:8, 93:10
  **listed** [1] - 44:8
  **listen** [6] - 66:21, 68:13, 70:17, 71:22, 79:1, 79:4
  **literally** [1] - 74:6
  **LLC** [1] - 1:7
  **LLP** [1] - 2:13
  **look** [20] - 4:3, 6:11, 6:12, 38:7, 38:10, 41:7, 42:1, 42:2, 43:5, 54:3, 54:5, 54:14, 55:7, 55:8, 58:17, 59:8, 93:12, 98:19, 98:23
  **Look** [3] - 48:3, 48:18, 54:16
  **looked** [2] - 7:6, 14:21
  **looking** [3] - 54:21, 64:21, 81:12
  **looks** [3] - 43:2, 53:8, 55:25
  **LOS** [1] - 2:19
  **Los** [3] - 1:20, 1:24, 3:1
  **lost** [1] - 33:1
  **LP** [2] - 37:16, 83:10
  **lunch** [2] - 94:5, 94:6
  **lying** [2] - 31:10, 31:11
  **lyrics** [1] - 27:25

## M

  **ma'am** [2] - 6:24, 7:3
  **main** [2] - 78:21, 78:22
  **major** [2] - 14:24, 75:17
  **manage** [1] - 21:8
  **management** [2] - 18:16, 55:16
  **manufacture** [7] - 27:22, 34:15, 36:5, 74:5, 80:24, 82:10, 85:21
  **manufactured** [1] - 84:25
  **manufacturer** [5] - 74:13, 84:5, 84:8, 84:24, 85:10
  **manufactures** [4] - 35:17, 73:11, 80:8, 84:5
  **manufacturing** [21] -

15:14, 19:13, 19:15, 19:17, 27:16, 28:4, 35:20, 35:21, 73:14, 73:17, 73:18, 73:19, 73:24, 75:2, 80:14, 83:24, 84:14, 84:20, 85:8, 85:9, 85:10
  **MARC** [1] - 2:5
  **March** [3] - 8:18, 8:19, 88:3
  **marginal** [1] - 25:12
  **mark** [1] - 92:1
  **MARKED** [2] - 101:17, 101:21
  **marketed** [1] - 70:24
  **Marshall** [1] - 6:13
  **Mart** [2] - 29:9, 78:16
  **Martin's** [1] - 89:15
  **master** [6] - 17:10, 19:2, 34:9, 35:15, 56:15, 81:22
  **masters** [5] - 61:14, 80:23, 81:2, 86:17, 86:20
  **mastertone** [3] - 66:5, 67:14, 70:9
  **mastertones** [7] - 10:13, 41:24, 65:12, 65:15, 67:9, 70:2, 88:6
  **math** [1] - 93:22
  **Mather's** [1] - 89:15
  **Mathers** [1] - 6:13
  **Matter** [3] - 16:1, 16:2, 16:4
  **matter** [4] - 21:7, 24:4, 91:3, 100:5
  **matters** [1] - 49:17
  **MCA** [1] - 75:14
  **mean** [15] - 15:12, 15:23, 18:19, 19:14, 28:22, 33:8, 35:5, 48:7, 48:8, 55:12, 60:18, 64:11, 74:24, 90:16, 90:19
  **means** [3] - 19:17, 73:3, 78:2
  **meant** [2] - 63:13, 68:18
  **mechanical** [1] - 27:4
  **medium** [1] - 76:23
  **meeting** [1] - 14:4
  **MELINDA** [1] - 2:15
  **Melissa** [1] - 91:7
  **member** [1] - 90:9
  **members** [2] - 69:18, 69:19
  **mention** [2] - 89:19, 93:7

  **mentioning** [1] - 89:12
  **met** [1] - 11:21
  **metadata** [15] - 18:10, 18:11, 19:3, 22:9, 34:10, 35:16, 38:15, 38:18, 38:19, 38:20, 38:24, 39:2, 39:8, 39:10, 63:21
  **might** [6] - 14:22, 14:23, 45:20, 66:12, 91:19, 99:16
  **million** [3] - 24:17, 25:6, 25:19
  **mind** [3] - 13:15, 14:24, 69:2
  **minute** [2] - 89:10, 93:18
  **minutes** [9] - 43:9, 47:12, 47:21, 47:22, 89:20, 93:2, 93:17, 99:12, 99:13
  **misleading** [4] - 31:19, 31:20, 31:23, 32:9
  **mistake** [2] - 30:12, 48:1
  **mistaken** [2] - 31:10, 31:18
  **mobile** [9] - 41:13, 41:22, 41:23, 41:24, 42:4, 53:2, 65:16, 87:24, 88:1
  **modification** [1] - 6:19
  **moment** [14] - 7:23, 8:5, 11:16, 23:1, 23:3, 34:7, 36:12, 38:13, 65:6, 65:11, 66:24, 93:4, 96:4, 99:10
  **moments** [1] - 5:3
  **money** [3] - 35:2, 52:1, 52:12
  **month** [1] - 79:3
  **monthly** [1] - 52:17
  **months** [8] - 32:5, 32:6, 32:9, 32:12, 61:3, 62:7, 62:18, 88:16
  **morning** [5] - 46:19, 90:20, 92:8, 93:8, 99:9
  **most** [5] - 17:23, 18:6, 77:23, 78:1, 78:3
  **Motion** [1] - 3:8
  **move** [4] - 13:6, 44:24, 56:2, 93:19
  **moving** [1] - 49:21
  **Moving** [2] - 96:11,

96:13
  **MP3** [11] - 14:2, 14:5, 39:15, 39:20, 39:21, 39:24, 40:7, 50:9, 50:16, 50:17, 50:19
  **MP3s** [1] - 50:19
  **MR** [128] - 3:16, 3:19, 3:23, 4:14, 4:21, 4:23, 5:6, 5:12, 5:13, 5:18, 5:23, 5:25, 8:1, 8:11, 9:4, 9:22, 10:18, 10:22, 11:2, 11:7, 11:16, 11:19, 20:17, 22:20, 22:22, 22:24, 23:2, 23:4, 23:7, 23:15, 23:20, 24:20, 24:24, 25:15, 26:4, 26:6, 26:8, 26:11, 30:11, 30:15, 31:7, 33:24, 34:3, 40:21, 40:24, 41:4, 41:6, 43:1, 43:14, 43:20, 43:25, 44:7, 44:15, 44:22, 45:7, 45:11, 45:16, 45:19, 45:22, 46:3, 46:16, 47:3, 47:10, 47:16, 47:21, 48:1, 48:11, 48:25, 49:6, 49:8, 49:20, 66:15, 66:18, 66:23, 67:1, 67:6, 67:17, 67:21, 68:1, 68:20, 69:6, 69:22, 74:17, 74:20, 75:4, 79:7, 79:11, 79:13, 79:25, 81:19, 81:24, 85:13, 85:15, 86:1, 86:4, 86:12, 86:13, 86:16, 87:3, 87:5, 87:8, 87:21, 88:25, 89:2, 89:21, 90:3, 90:12, 90:24, 91:2, 91:11, 91:21, 91:23, 92:4, 92:5, 92:16, 93:5, 93:7, 93:16, 93:20, 93:25, 94:7, 94:10, 98:17, 98:21, 98:24, 99:2, 99:6, 99:15
  **MS** [5] - 8:3, 8:7, 8:13, 9:25, 10:15
  **multiple** [1] - 23:11
  **MUNGER** [1] - 2:13
  **murder** [1] - 48:7
  **music** [36] - 12:2, 13:10, 13:24, 14:2, 14:13, 14:15, 17:16, 17:19, 17:21, 17:24, 18:5, 18:13, 27:13, 42:17, 70:18, 71:21, 71:22, 74:11, 76:10,

77:2, 77:5, 77:7, 77:10, 77:22, 77:23, 77:24, 77:25, 78:1, 78:4, 78:8, 78:9, 78:11, 78:22
  **Music** [13] - 13:8, 13:10, 14:7, 14:9, 14:10, 14:19, 14:22, 15:1, 20:5, 20:7, 20:13, 28:13

## N

  **Name** [1] - 20:4
  **name** [8] - 11:12, 11:13, 38:25, 43:14, 87:15, 87:16
  **narrow** [1] - 26:16
  **NASHVILLE** [1] - 2:8
  **nature** [1] - 23:17
  **necessarily** [2] - 46:11, 48:9
  **necessary** [3] - 30:8, 56:7, 76:13
  **need** [7] - 45:12, 50:22, 53:14, 69:19, 75:1, 78:2, 98:19
  **needed** [4] - 10:10, 17:19, 25:24, 74:9
  **needs** [1] - 31:20
  **negotiate** [1] - 76:12
  **negotiated** [4] - 19:24, 64:10, 75:18, 75:19
  **negotiating** [1] - 16:17
  **negotiation** [1] - 64:14
  **Net** [3] - 20:5, 20:7, 20:13
  **net** [10] - 37:23, 38:14, 61:13, 61:16, 61:20, 62:2, 67:10, 67:14, 81:1, 83:19
  **Never** [1] - 83:3
  **never** [9] - 14:4, 14:12, 14:23, 15:3, 15:4, 39:12, 69:2, 77:6
  **new** [23] - 6:20, 6:22, 6:25, 7:5, 7:9, 7:10, 7:13, 7:14, 7:16, 8:22, 8:23, 9:1, 9:2, 9:3, 9:6, 9:10, 9:16, 9:20, 9:21, 10:9, 12:13
  **newspaper** [1] - 13:17
  **Next** [1] - 87:7
  **next** [8] - 5:5, 10:21,

11:8, 46:18, 47:3, 63:5, 87:10
**Nichols** [1] - 85:18
**night** [3] - 89:8, 92:8, 99:19
**non** [2] - 53:2, 68:10
**non-mobile** [1] - 53:2
**non-traditional** [1] - 68:10
**normal** [7] - 30:24, 65:19, 65:23, 66:6, 68:17, 70:2, 70:9
**notebook** [1] - 6:12
**noted** [2] - 15:20, 23:5
**notes** [3] - 5:8, 27:24, 93:13
**Nothing** [4] - 9:22, 10:18, 69:3, 87:5
**nothing** [2] - 53:7, 88:25
**notice** [3] - 37:7, 43:17, 64:22
**noticed** [2] - 89:13, 89:17
**notwithstanding** [1] - 80:19
**Notwithstanding** [1] - 63:18
**NRS** [1] - 80:24
**number** [12] - 41:15, 46:19, 51:18, 51:22, 52:1, 52:3, 52:7, 64:13, 89:15, 89:16, 90:1, 92:16

**O**

**oath** [3] - 23:23, 26:2, 31:24
**object** [1] - 67:1
**objected** [2] - 74:18, 74:21
**objection** [11] - 3:13, 23:4, 24:23, 24:24, 26:8, 34:4, 44:12, 44:15, 47:23, 48:15, 67:5
**Objection** [6] - 26:4, 26:8, 33:24, 74:17, 81:19, 86:1
**objections** [2] - 96:10, 96:11
**objective** [2] - 76:7, 76:8
**obligation** [2] - 58:21, 64:13
**obligations** [1] -

64:15
**obtain** [4] - 21:18, 22:11, 23:12, 92:17
**obtained** [1] - 92:18
**obviously** [3] - 23:10, 25:25, 27:1
**occasion** [1] - 82:25
**occasions** [2] - 81:15
**occur** [4] - 16:25, 34:21, 51:18, 51:22
**occurs** [3] - 19:21, 19:22, 36:6
**OF** [2] - 1:2, 1:18
**offer** [1] - 77:23
**offers** [1] - 50:11
**Official** [2] - 1:22, 100:9
**often** [2] - 52:4, 52:11
**old** [1] - 10:9
**OLSON** [1] - 2:13
**Once** [2] - 33:3, 73:2
**once** [8] - 11:21, 21:2, 24:10, 24:13, 25:4, 32:23, 48:1
**One** [9] - 7:23, 8:5, 23:1, 23:3, 43:25, 66:24, 69:25, 85:13, 96:4
**one** [68] - 4:10, 5:13, 6:20, 10:4, 11:16, 13:7, 14:18, 15:25, 18:19, 18:21, 19:1, 19:5, 19:10, 19:22, 20:8, 20:10, 20:11, 20:12, 20:14, 20:15, 22:6, 24:11, 24:17, 25:19, 26:14, 26:23, 26:24, 32:6, 40:25, 43:18, 43:23, 44:7, 46:17, 46:19, 50:5, 53:11, 55:3, 55:20, 56:25, 58:2, 60:4, 60:9, 61:5, 61:12, 62:11, 63:5, 64:10, 64:21, 66:11, 66:15, 70:6, 71:1, 74:2, 77:22, 77:24, 78:1, 85:1, 87:23, 89:13, 89:24, 90:25, 91:12, 93:4, 93:20, 99:2, 99:6, 99:10
**ones** [1] - 70:13
**online** [1] - 17:17, 17:19, 76:15, 76:18, 76:20, 78:5, 78:20
**oOo** [1] - 3:3
**Open** [1] - 22:14
**opened** [3] - 4:5, 4:7,

74:21
**operation** [1] - 56:7
**operator** [1] - 88:13
**opinions** [3] - 5:11, 43:8, 89:7
**opportunities** [3] - 76:17, 76:20, 76:21
**opportunity** [5] - 32:17, 46:21, 52:19, 76:22, 77:7
**opposed** [1] - 68:10
**opposing** [1] - 11:17
**option** [1] - 77:18
**order** [15] - 38:8, 41:21, 44:8, 47:24, 49:14, 49:18, 50:21, 51:12, 69:16, 69:17, 74:10, 74:25, 76:13, 93:9, 93:18
**orders** [3] - 44:4, 44:14, 46:10
**original** [1] - 25:9
**Ostroff** [5] - 3:20, 4:2, 4:8, 5:1, 9:14
**otherwise** [1] - 13:17
**outsourced** [1] - 35:23
**overall** [3] - 70:25, 71:19
**Overruled** [6] - 23:6, 26:9, 34:1, 74:23, 81:21, 86:3
**overruled** [41] - 34:4, 94:16, 94:17, 94:18, 94:24, 94:25, 95:2, 95:4, 95:6, 95:11, 95:13, 95:15, 95:18, 96:3, 96:6, 96:15, 96:17, 96:19, 96:20, 96:21, 96:23, 96:25, 97:1, 97:2, 97:3, 97:5, 97:7, 97:10, 97:13, 97:14, 97:15, 97:20, 97:21, 98:1, 98:4, 98:6, 98:7, 98:8, 98:9, 98:10, 98:11, 98:12, 98:13, 98:14
**overseeing** [1] - 16:17
**own** [15] - 15:9, 21:23, 28:8, 28:9, 28:12, 32:24, 33:9, 71:21, 71:23, 77:14, 77:23, 84:14, 84:20, 84:22
**owned** [4] - 16:3, 16:4, 82:22, 85:4
**ownership** [15] - 21:18, 21:20, 21:22, 22:2, 22:4, 22:5, 22:10, 22:11, 23:12,

23:24, 57:19, 57:21, 58:1, 72:7, 86:18

**P**

**P.M** [1] - 1:19
**p.m** [2] - 3:2, 99:21
**Page** [110] - 7:21, 7:22, 8:9, 22:14, 22:17, 22:21, 22:24, 23:7, 24:22, 30:6, 66:20, 66:22, 94:15, 94:17, 94:18, 94:19, 94:21, 94:23, 94:25, 95:1, 95:3, 95:5, 95:6, 95:7, 95:8, 95:9, 95:10, 95:12, 95:14, 95:16, 95:17, 95:19, 95:20, 95:22, 95:23, 95:24, 96:1, 96:2, 96:3, 96:5, 96:7, 96:9, 96:10, 96:11, 96:12, 96:13, 96:14, 96:16, 96:17, 96:18, 96:19, 96:20, 96:21, 96:22, 96:23, 96:24, 97:1, 97:2, 97:3, 97:4, 97:6, 97:8, 97:9, 97:11, 97:13, 97:14, 97:15, 97:16, 97:17, 97:19, 97:21, 97:22, 97:23, 97:24, 97:25, 98:2, 98:3, 98:4, 98:5, 98:7, 98:8, 98:9, 98:10, 98:11, 98:12, 98:13, 98:14
**page** [5] - 6:18, 18:23, 53:4, 56:9, 100:5
**pages** [1] - 67:18
**Paid** [1] - 32:11
**paid** [15] - 27:5, 32:9, 32:10, 32:11, 38:2, 38:5, 38:12, 51:17, 51:21, 52:6, 52:7, 52:21, 62:8, 63:8, 72:2
**Pamela** [1] - 1:22, 100:9
**paper** [2] - 91:13, 91:18
**Paragraph** [5] - 63:13, 64:3, 65:5, 85:19
**part** [10] - 14:17, 14:19, 14:24, 16:4, 17:3, 39:10, 70:25, 71:18, 78:1, 92:14
**particular** [4] - 25:4, 25:8, 88:13, 90:10

**particularly** [1] - 53:8
**parties** [6] - 10:5, 15:20, 53:25, 72:10, 80:8, 85:20
**partners** [2] - 18:7, 20:2
**parts** [2] - 74:4, 74:6
**party** [8] - 16:18, 44:5, 49:15, 51:13, 73:24, 80:8, 84:5, 85:7
**party's** [1] - 80:14
**past** [2] - 68:12, 82:12
**Paterno** [2] - 3:10, 4:10
**pay** [11] - 14:16, 21:7, 35:2, 35:4, 37:22, 49:25, 50:8, 55:17, 61:17, 62:8, 78:25
**payable** [1] - 38:11
**paying** [5] - 21:5, 24:14, 38:10, 71:20, 78:25
**payment** [4] - 52:4, 59:22, 59:23, 59:25
**payments** [5] - 26:23, 26:25, 35:5
**pays** [8] - 61:7, 61:8, 61:15, 61:20, 62:22, 71:19, 80:12, 85:10
**people** [14] - 14:15, 50:18, 66:1, 68:4, 68:9, 68:11, 68:18, 70:1, 70:14, 76:9, 77:11, 77:21, 78:3, 92:12
**per** [1] - 20:12
**perceive** [1] - 5:10
**percent** [9] - 28:17, 37:23, 38:14, 49:25, 61:13, 61:15, 61:20, 62:2, 81:1
**percentage** [2] - 59:23, 65:6
**Perfect** [1] - 80:20
**perhaps** [1] - 10:23
**Period** [1] - 9:3
**period** [8] - 12:1, 32:13, 32:15, 32:16, 51:17, 51:22, 84:22, 88:13
**Permanent** [1] - 55:7
**permanent** [77] - 7:7, 9:7, 9:8, 10:12, 15:9, 17:2, 17:11, 18:12, 18:25, 19:7, 20:23, 21:4, 34:8, 34:14,

37:21, 38:16, 38:24, 39:9, 39:16, 40:9, 41:13, 42:4, 42:9, 42:18, 50:1, 51:6, 51:16, 51:20, 53:2, 53:6, 53:11, 53:15, 53:22, 54:19, 55:10, 55:19, 55:24, 56:4, 56:8, 56:11, 56:14, 57:3, 57:10, 57:23, 58:4, 58:7, 58:19, 59:2, 59:9, 59:15, 59:16, 59:19, 59:22, 60:5, 63:6, 63:14, 63:15, 64:8, 64:15, 65:7, 70:14, 71:7, 71:14, 71:17, 72:5, 72:6, 72:13, 72:16, 72:25, 73:4, 79:19, 83:14, 83:18, 86:22, 88:10, 92:24, 93:15
**permanently** [15] - 62:24, 70:16, 72:17, 72:21, 79:19, 80:3, 80:4, 81:7, 81:14, 81:17, 82:2, 82:4, 82:15, 83:16, 88:23
**permission** [4] - 11:3, 17:22, 17:23, 77:12
**person** [5] - 62:18, 62:20, 70:9, 79:22, 87:2
**personalize** [1] - 61:1
**persons** [3] - 44:13, 46:9, 49:15
**PHILIP** [1] - 1:4
**phone** [3] - 60:25, 68:15
**phones** [1] - 78:21
**physical** [18] - 19:17, 19:18, 27:13, 27:15, 28:7, 28:8, 28:11, 28:20, 29:7, 29:8, 30:18, 32:23, 33:3, 36:11, 73:11, 74:13, 81:15
**physically** [2] - 68:12, 74:3
**piece** [1] - 77:7
**place** [3] - 17:4, 77:22, 78:2
**placed** [2] - 36:20
**places** [1] - 76:10
**Plaintiff** [1] - 1:8
**PLAINTIFF** [3] - 2:3, 101:2, 101:17
**Plaintiff's** [3] - 10:21, 11:10, 87:12

**plaintiffs** [1] - 99:12
**plan** [1] - 15:20
**plant** [4] - 74:2, 75:2, 84:14, 84:20
**plants** [1] - 73:24
**platform** [3] - 14:25, 15:9, 15:12
**play** [15] - 7:21, 8:3, 23:6, 24:21, 39:17, 39:20, 39:21, 39:24, 45:19, 47:4, 47:6, 50:16, 67:3, 70:18, 72:7
**playable** [1] - 50:23
**played** [8] - 7:25, 8:4, 8:15, 23:8, 25:1, 30:16, 52:2, 68:2
**player** [8] - 39:15, 39:20, 39:21, 40:7, 50:10, 50:16, 50:17, 78:10
**players** [4] - 14:2, 14:5, 39:24, 50:19
**playing** [3] - 50:18, 70:18, 71:21
**plays** [3] - 52:3, 52:8, 52:12
**plug** [1] - 15:5
**point** [11] - 10:4, 29:25, 32:1, 45:11, 46:11, 52:11, 63:4, 69:7, 75:15, 92:12, 99:11
**pointed** [1] - 60:9
**points** [3] - 14:11, 75:17, 75:18
**POMERANTZ** [9] - 2:14, 91:2, 91:11, 92:5, 93:20, 93:25, 94:7, 94:10, 98:24
**Pomerantz** [4] - 48:12, 90:13, 99:2, 99:7
**portable** [5] - 50:9, 50:20, 50:23, 50:24, 50:25
**portion** [4] - 8:4, 49:14, 67:4
**position** [7] - 12:14, 12:16, 12:19, 35:9, 43:22, 49:3, 75:11
**positive** [1] - 40:4
**possible** [7] - 10:24, 29:4, 44:17, 49:2, 50:14, 76:10, 76:12
**potential** [2] - 13:18, 76:17, 90:15
**practice** [3] - 4:4, 4:5, 68:16
**precisely** [1] - 63:4

**prefer** [2] - 6:12, 48:18
**prepared** [1] - 14:22, 48:20
**present** [1] - 82:11
**presented** [1] - 67:2
**presently** [1] - 84:4
**preserve** [1] - 92:2
**preserved** [3] - 91:14, 91:17, 91:20
**president** [1] - 12:17
**PRESIDING** [1] - 1:4
**pressing** [1] - 19:18
**previous** [2] - 8:24, 44:4
**price** [8] - 50:8, 59:23, 60:6, 60:17, 62:25, 71:1, 79:3, 93:15
**pricing** [1] - 60:5
**primary** [2] - 20:18, 20:23
**principals** [2] - 44:13, 46:8
**print** [1] - 27:24
**privacy** [1] - 49:15
**privilege** [2] - 4:25, 5:15
**privileged** [1] - 5:2
**problem** [3] - 50:16, 50:24, 99:3
**procedure** [1] - 18:13
**procedures** [5] - 16:25, 17:4, 17:9, 48:19, 88:6
**proceed** [1] - 87:19
**Proceedings** [1] - 99:21
**PROCEEDINGS** [1] - 1:18
**proceedings** [1] - 100:5
**process** [5] - 14:1, 15:20, 36:2, 50:2, 74:1
**processes** [1] - 38:17
**produced** [1] - 41:10
**product** [14] - 15:23, 29:8, 29:22, 30:18, 30:24, 36:11, 59:11, 80:15, 83:1, 83:2, 83:4, 83:5, 83:7, 83:12
**Productions** [1] - 1:7
**professional** [1] - 48:4
**professionally** [1] - 92:11

**program** [1] - 71:23
**prohibited** [2] - 69:15, 69:16
**project** [1] - 13:8
**promoted** [1] - 76:1
**proof** [1] - 48:6
**property** [8] - 57:16, 57:17, 57:22, 57:24, 72:11, 72:16
**propose** [3] - 7:6, 9:15, 21:11
**proposing** [1] - 67:3
**protection** [1] - 49:15
**protective** [4] - 44:4, 44:14, 46:10, 49:18
**provide** [1] - 55:10
**provided** [14] - 5:7, 18:10, 25:9, 36:4, 36:22, 40:25, 41:2, 56:16, 57:16, 57:17, 57:23, 64:5, 86:17
**provider** [1] - 57:24
**providers** [1] - 57:4
**providing** [5] - 35:15, 42:17, 53:17, 54:15, 56:6
**provision** [20] - 38:9, 43:20, 53:16, 56:10, 57:9, 58:8, 59:18, 61:9, 61:21, 62:3, 62:9, 62:23, 63:7, 63:16, 63:17, 65:17, 80:13, 80:23, 81:3
**provisions** [9] - 37:23, 43:25, 55:16, 63:15, 71:6, 72:10, 86:22, 86:24, 88:20
**public** [4] - 15:15, 81:23, 89:14, 89:19
**pull** [2] - 22:17, 63:16
**pulled** [1] - 15:5
**purchased** [2] - 81:14, 88:10
**purchases** [7] - 32:24, 33:3, 59:15, 81:16, 82:14, 82:17, 83:15
**purchasing** [1] - 81:8
**purpose** [3] - 7:24, 22:19, 76:7
**pursuant** [3] - 80:15, 81:17, 100:4
**put** [17] - 6:9, 8:22, 8:23, 10:9, 10:25, 14:23, 30:24, 39:15, 41:11, 46:21, 46:23, 48:7, 48:14, 48:18,

53:2, 71:6, 80:18
**Put** [1] - 53:1
**putting** [1] - 78:21

## Q

**quarterly** [2] - 51:21, 52:15
**questioning** [2] - 11:3, 77:16
**questionings** [1] - 84:3
**questions** [26] - 6:3, 18:22, 47:12, 50:6, 65:8, 66:19, 70:3, 73:3, 73:5, 75:5, 77:13, 79:8, 79:11, 79:14, 79:17, 80:1, 80:21, 85:20, 86:12, 87:22, 89:2, 92:8, 92:16, 98:16, 98:17
**quick** [1] - 17:24
**quickly** [1] - 44:25
**quite** [2] - 20:3, 20:5
**quote** [1] - 34:21

## R

**radically** [1] - 78:22
**raise** [4] - 11:9, 46:16, 87:11, 99:8
**ran** [1] - 76:6
**rapidly** [2] - 76:23, 76:25
**rather** [2] - 77:1, 78:24
**re** [1] - 25:17
**re-servicing** [1] - 25:17
**reach** [1] - 10:5
**read** [6] - 5:7, 24:20, 31:25, 32:17, 39:12, 67:24
**readback** [1] - 93:13
**really** [5] - 5:9, 14:12, 70:23
**reason** [2] - 37:9, 47:5
**reasonable** [4] - 66:1, 68:4, 70:1, 70:8
**reasonably** [1] - 70:6
**reasons** [4] - 32:14, 60:4, 71:2, 92:24
**recalling** [1] - 73:16
**receipts** [8] - 37:23, 38:14, 61:13, 61:16, 61:20, 62:2, 81:1, 83:19
**receive** [4] - 20:3,

112

21:6, 23:24, 29:1
**RECEIVED** [2] -
101:17, 101:21
**received** [1] - 61:9
**receives** [8] - 21:19,
23:13, 23:24, 52:4,
52:12, 55:18, 59:11,
62:2
**receiving** [1] - 20:5
**recently** [2] - 84:13,
84:15
**Recess** [2] - 46:5,
90:5
**recognize** [1] - 53:4
**recognized** [1] -
76:19
**recollection** [9] -
7:19, 8:2, 23:2, 23:22,
25:16, 25:20, 66:13,
67:18, 68:21
**record** [40] - 7:8, 9:9,
11:12, 26:22, 27:16,
29:23, 32:24, 43:13,
62:17, 62:20, 65:17,
75:14, 76:4, 76:25,
77:2, 80:20, 81:8,
81:14, 81:16, 81:23,
82:8, 82:9, 82:14,
82:15, 82:25, 83:4,
83:11, 83:12, 83:23,
87:14, 89:14, 90:8,
92:23, 93:22, 99:5
**recorded** [1] - 77:7
**recording** [6] - 19:2,
20:20, 34:9, 35:16,
65:18, 74:25
**recordings** [6] -
17:1, 17:10, 56:16,
63:20, 64:4, 80:9
**Records** [2] - 1:12,
6:14
**records** [24] - 27:17,
28:4, 28:7, 28:8,
28:12, 28:20, 44:2,
75:14, 80:9, 80:25,
81:2, 82:1, 82:16,
82:20, 82:24, 85:21,
85:24, 85:25, 86:5,
86:7, 86:9, 86:10,
86:11
**RECROSS** [3] -
85:14, 101:2, 101:10
**RECROSS-**
**EXAMINATION** [1] -
85:14
**recurring** [1] - 51:21
**redact** [2] - 89:23,
90:2
**REDIRECT** [4] -
79:12, 86:15, 101:2,

101:10
**redundant** [1] -
63:23
**refer** [2] - 53:24
**reference** [3] - 4:9,
53:21, 55:8
**referenced** [2] -
4:12, 55:9
**references** [1] -
53:17
**referencing** [2] - 4:6,
54:15
**referred** [1] - 78:23
**referring** [2] - 57:25,
81:7
**refers** [2] - 57:21,
57:22
**reflects** [1] - 25:20
**refresh** [8] - 7:19,
8:1, 23:2, 23:22,
25:16, 66:13, 67:18,
68:21
**refreshes** [1] - 25:20
**regard** [10] - 3:7, 3:9,
3:11, 5:11, 11:5,
44:10, 45:8, 69:5,
69:18, 89:17
**regarding** [4] - 5:11,
10:12, 70:2, 93:13
**regulations** [1] -
100:6
**relate** [1] - 60:15
**related** [1] - 90:10
**relates** [3] - 44:13,
45:9, 46:12
**relating** [1] - 88:6
**remain** [3] - 22:2,
22:4, 72:11
**remained** [1] - 86:18
**remaining** [1] - 96:10
**remains** [3] - 22:10,
57:17, 57:24
**Remember** [1] - 43:6
**remember** [8] -
22:12, 66:12, 67:11,
67:16, 73:16, 89:5,
89:17, 89:24
**renegotiation** [1] -
9:15
**reopen** [2] - 45:25,
69:9
**reopened** [1] - 69:10
**repeat** [1] - 33:1
**reported** [1] - 100:5
**Reporter** [2] - 1:22,
100:9
**reporter** [5] - 11:9,
69:12, 69:13, 87:11,
90:7
**REPORTER'S** [1] -

1:18
**represent** [2] - 43:1,
43:15
**representatives** [2] -
3:24, 4:10
**represented** [1] -
5:16
**reproduce** [4] - 33:9,
36:4, 57:2, 74:10
**reproduction** [3] -
35:4, 63:6, 63:9
**reproductions** [1] -
33:16
**request** [9] - 8:6, 8:7,
44:4, 64:5, 90:13,
91:2, 91:13, 92:1,
99:18
**requests** [1] - 34:23
**require** [1] - 93:21
**required** [1] - 17:17
**requirement** [1] -
56:25
**requirements** [1] -
56:15
**requiring** [1] - 56:17
**resale** [2] - 59:10,
60:17
**resell** [2] - 59:11,
59:16
**reselling** [1] - 35:11
**resells** [2] - 29:12,
60:12
**reservation** [1] -
72:15
**reserved** [1] - 58:9
**reserves** [2] - 29:24,
30:25
**reservice** [1] - 25:11
**respect** [2] - 4:25,
5:14, 5:15, 17:9,
18:24, 21:2, 25:3,
25:7, 30:18, 32:23,
33:15, 34:6, 38:12,
38:16, 48:5, 58:17,
69:6, 70:1, 71:6, 72:5,
72:9, 88:22
**responsible** [3] -
21:5, 24:14, 56:5
**rest** [2] - 94:3
**restricted** [1] - 7:13
**restriction** [1] - 7:15
**restrictions** [2] -
36:20, 80:3
**result** [2] - 16:22,
72:3
**resume** [2] - 5:22,
89:5
**RESUMED** [1] - 5:24
**retail** [11] - 29:16,
30:24, 59:23, 60:12,

65:6, 65:19, 65:24,
66:6, 68:17, 70:2,
70:10
**retailer** [14] - 29:9,
29:11, 29:12, 29:14,
29:18, 29:23, 30:20,
31:3, 31:15, 32:23,
33:3, 36:10, 36:13,
85:3
**retailers** [4] - 18:7,
28:24, 29:1, 29:3
**retain** [2] - 21:22,
63:19
**returns** [4] - 29:24,
30:25, 31:4, 31:16
**revenue** [1] - 61:9
**RICHARD** [1] - 2:4
**rights** [20] - 51:5,
51:6, 51:10, 51:11,
57:2, 57:6, 57:7, 57:9,
57:11, 58:9, 58:22,
58:23, 63:19, 64:3,
64:14, 64:18, 72:1,
72:20, 72:25
**ring** [4] - 70:20,
70:21, 70:22
**ringback** [20] -
60:20, 60:23, 61:2,
61:7, 61:8, 61:10,
61:15, 61:21, 62:2,
62:7, 62:23, 62:24,
88:6, 88:9, 88:12,
88:22, 88:23, 92:21,
92:22, 92:23
**Ringback** [2] - 60:24,
93:16
**ringing** [1] - 60:25
**ringtone** [2] - 67:14,
68:14
**ringtones** [6] -
65:12, 65:16, 66:5,
67:10, 78:21, 93:15
**RIO** [1] - 101:5
**Rio** [4] - 46:19, 87:9,
87:12, 87:16
**rip** [1] - 17:22
**risk** [2] - 90:25, 91:1
**Rogell** [5] - 5:6, 6:1,
6:10, 9:5, 10:1
**ROGELL** [1] - 101:3
**Rogell's** [1] - 7:21
**Room** [1] - 1:24
**Roughly** [1] - 94:8
**royalties** [4] - 27:2,
27:5, 27:7, 32:3
**royalty** [6] - 26:23,
29:24, 30:20, 31:1,
31:14, 80:25
**Roybal** [1] - 1:23
**ruled** [1] - 3:8

**ruling** [2] - 5:9, 23:5
**run** [1] - 77:6
**running** [1] - 39:1
**runs** [1] - 90:25

**S**

**sale** [16] - 30:19,
30:21, 31:15, 60:10,
62:17, 63:1, 65:17,
65:20, 65:24, 67:10,
67:14, 70:9, 70:10,
80:24, 81:1
**sales** [11] - 7:8, 9:9,
29:2, 29:3, 32:4, 32:5,
32:15, 32:23, 66:6,
70:2
**saw** [2] - 24:1, 44:8
**scenario** [1] - 81:12
**schedule** [1] - 93:25
**scoot** [1] - 11:3
**scope** [2] - 10:5,
10:8
**screen** [8] - 6:10,
6:11, 43:18, 53:1,
53:5, 54:17, 55:17,
71:6
**seal** [3] - 46:12,
46:14, 46:15
**seat** [2] - 11:11,
87:13
**Second** [1] - 3:7
**second** [7] - 11:2,
13:7, 18:21, 24:11,
26:14, 66:15, 74:22
**seconds** [5] - 3:17,
3:19, 48:11, 66:10,
67:3
**section** [1] - 8:8
**Section** [1] - 100:4
**security** [3] - 89:15,
89:16, 90:1
**see** [38] - 7:19,
10:25, 24:1, 30:11,
38:11, 41:18, 42:2,
42:6, 43:9, 49:1,
53:13, 53:15, 54:7,
54:14, 54:22, 54:23,
56:3, 56:4, 56:8,
56:13, 56:19, 58:6,
58:25, 59:9, 59:10,
63:16, 63:22, 64:3,
64:6, 64:24, 66:13,
77:9, 81:3, 89:8,
89:20, 91:19, 94:8
**seeing** [1] - 13:21
**Seijas** [1] - 1:22,
100:9
**sell** [21] - 13:10,

14:1, 14:5, 15:9, 15:10, 15:13, 15:21, 29:3, 29:11, 33:5, 35:14, 37:8, 76:16, 78:4, 78:17, 82:19, 82:21, 82:22, 82:23, 85:21

**Selling** [1] - 37:18

**selling** [22] - 14:14, 15:9, 15:15, 27:11, 28:3, 28:7, 28:20, 29:9, 29:14, 35:10, 37:16, 41:23, 76:9, 78:13, 78:16, 80:14, 82:23, 83:7, 83:11, 84:25, 85:1, 86:10

**sells** [9] - 28:8, 28:11, 28:12, 29:8, 29:15, 36:5, 60:11, 80:9, 85:3

**semiannually** [2] - 51:21, 52:15

**sends** [2] - 37:7, 74:2

**sense** [2] - 13:12, 48:20

**sent** [4] - 21:23, 22:2, 38:15, 42:20

**sentence** [1] - 53:14

**separate** [8] - 4:15, 4:17, 6:20, 6:22, 20:20, 27:22, 35:16, 90:9

**separately** [1] - 35:19

**service** [12] - 14:17, 21:8, 24:14, 35:7, 51:2, 55:17, 56:7, 70:25, 71:19, 77:14, 78:22, 78:24

**services** [17] - 6:21, 42:4, 42:9, 50:7, 50:11, 50:21, 51:5, 51:6, 52:1, 52:7, 58:7, 71:7, 75:19, 78:8, 78:19, 78:24, 79:2

**servicing** [1] - 25:17

**serving** [1] - 56:6

**Session** [1] - 1:19

**set** [4] - 70:20, 70:21, 71:1

**sets** [1] - 58:11

**setting** [1] - 18:13

**several** [4] - 15:18, 20:15, 25:14, 65:22

**Shady** [3] - 37:8, 37:16, 83:10

**shall** [5] - 6:18, 63:21, 63:19, 64:21, 80:25

**sheet** [1] - 43:25

**sheets** [1] - 94:13

**shelf** [1] - 77:5

**ship** [1] - 74:7

**Shipping** [1] - 28:24

**shipping** [1] - 28:25

**shopping** [1] - 77:22

**shorter** [1] - 94:5

**show** [2] - 49:23, 54:4

**showed** [2] - 69:2, 89:18

**shown** [2] - 46:13, 91:14

**side** [3] - 70:6, 91:1, 91:15

**Sidebar** [1] - 69:13

**sidebar** [4] - 3:7, 4:24, 69:11, 90:7

**signature** [2] - 89:25

**signing** [1] - 7:16

**similar** [4] - 42:3, 56:8, 56:25, 64:12

**Similar** [2] - 42:12, 42:13

**similarities** [1] - 71:11

**sit** [2] - 19:23, 62:13

**sitting** [2] - 49:2, 91:7

**situation** [1] - 37:10

**situations** [1] - 37:12

**six** [3] - 32:5, 32:6, 32:9

**Slim** [3] - 37:8, 37:16, 83:10

**slow** [1] - 20:16

**social** [3] - 89:15, 90:1

**sold** [13] - 14:16, 15:25, 26:22, 26:24, 26:25, 27:13, 29:23, 31:3, 65:16, 78:9, 81:23, 82:25

**someone** [7] - 14:22, 34:22, 47:7, 59:10, 59:15, 60:24, 71:19

**sometime** [1] - 8:18

**sometimes** [1] - 20:15

**Sometimes** [1] - 29:15

**song** [13] - 20:12, 24:16, 34:23, 35:3, 40:13, 40:14, 52:2, 66:10, 68:8, 68:13, 70:15, 70:16, 72:17

**songs** [7] - 36:21, 37:1, 37:3, 51:1, 83:6, 83:10, 83:11

**songwriter** [1] -

26:24

**Sony** [2] - 14:9, 15:1

**sorry** [24] - 3:24, 4:18, 7:23, 7:24, 8:11, 22:16, 30:11, 33:1, 34:2, 37:21, 40:23, 40:24, 51:19, 54:21, 56:20, 63:10, 64:20, 79:21, 82:16, 82:18, 83:18, 96:14

**sought** [1] - 31:22

**sound** [6] - 20:20, 63:20, 64:4, 74:25, 80:9, 92:5

**sounds** [1] - 63:23

**SOUTH** [1] - 2:17

**space** [1] - 77:5

**speaking** [2] - 29:10, 57:10

**specific** [2] - 8:21, 50:24

**specifically** [3] - 4:2, 55:20, 65:11

**spectators** [2] - 49:13, 49:16

**Spectrum** [2] - 54:11, 55:5

**speech** [1] - 23:17

**speed** [1] - 76:24

**spell** [2] - 11:12, 87:15

**spelled** [1] - 87:17

**spend** [1] - 93:11

**spent** [1] - 12:2

**splits** [1] - 83:19

**Sprint** [2] - 54:10, 55:5

**staff** [1] - 29:2

**stamp** [1] - 74:6

**Stand** [1] - 20:18

**stand** [2] - 11:8, 87:10

**standard** [18] - 41:24, 42:9, 55:18, 55:21, 55:25, 56:10, 57:5, 57:7, 58:3, 58:11, 58:12, 58:13, 59:14, 63:16, 63:17, 63:25, 64:8, 65:1

**start** [4] - 37:16, 41:8, 75:11, 77:14

**started** [3] - 12:5, 17:15, 76:3

**starting** [2] - 41:21, 51:4

**starts** [1] - 30:10

**state** [3] - 11:12, 43:13, 87:14

**statement** [1] - 70:1

**states** [1] - 57:15

**STATES** [1] - 1:1

**States** [5] - 28:16, 73:22, 73:23, 100:4, 100:6

**stating** [1] - 57:11

**stay** [1] - 93:2

**stenographically** [1] - 100:5

**step** [5] - 10:19, 43:11, 43:12, 87:6, 89:3

**steps** [2] - 30:1, 36:7

**Stiffelman** [1] - 10:12

**still** [4] - 12:25, 68:24, 79:5, 82:11

**stipulation** [1] - 90:2

**stock** [2] - 36:14, 77:6

**stop** [1] - 71:20

**stopped** [1] - 20:6

**stops** [1] - 71:21

**store** [4] - 36:16, 77:1, 77:2, 78:11

**stores** [1] - 77:4

**strategic** [1] - 14:11

**strategy** [2] - 12:17, 14:22

**streamlined** [1] - 44:16

**streams** [3] - 14:14, 37:22, 37:24

**STREET** [1] - 2:6

**Street** [1] - 1:23

**strongly** [1] - 48:3

**structure** [4] - 60:5, 60:6, 60:17, 63:1

**Subject** [2] - 33:6, 82:6

**subject** [10] - 29:24, 30:20, 30:25, 31:3, 31:15, 33:8, 33:11, 43:21, 49:14, 56:16

**subjective** [1] - 86:2

**submitted** [3] - 5:1, 43:8, 89:7

**subscribing** [1] - 71:22

**subscription** [10] - 42:4, 49:24, 50:7, 50:11, 51:2, 53:5, 58:3, 58:7, 64:9, 78:23

**Subscription** [3] - 50:21, 52:1, 52:7

**subscriptions** [2] - 50:8, 53:2

**success** [1] - 79:4

**SUITE** [1] - 2:7

**summary** [9] - 41:3,

41:7, 44:11, 45:5, 45:9, 45:25, 69:5, 69:6, 89:11

**Summary** [1] - 40:17

**superiors** [2] - 9:6, 9:13

**supplied** [1] - 33:17

**supplies** [4] - 19:1, 19:19, 20:19, 24:13

**supply** [2] - 20:15, 20:18

**supplying** [1] - 20:11

**support** [8] - 14:13, 65:15, 65:23, 66:5, 67:9, 67:13, 68:6, 68:25

**supported** [2] - 6:22, 14:13

**suppose** [1] - 37:10

**supposed** [3] - 9:10, 46:17, 92:11

**supposedly** [1] - 60:11

**suspect** [1] - 91:6

**Sustained** [2] - 26:5, 74:19

**sustained** [34] - 67:5, 94:20, 94:22, 95:5, 95:7, 95:8, 95:9, 95:16, 95:19, 95:21, 95:22, 95:23, 95:25, 96:1, 96:2, 96:8, 96:9, 96:10, 96:12, 96:16, 96:18, 96:22, 97:8, 97:12, 97:16, 97:18, 97:22, 97:23, 97:24, 98:2, 98:11, 98:12, 98:13, 98:15

**sworn** [2] - 11:10, 87:12

**system** [6] - 14:13, 14:15, 18:4, 18:14, 18:17, 92:14

**systems** [2] - 17:15, 18:7

## T

**Tab** [19] - 51:4, 52:24, 54:5, 55:15, 56:13, 56:14, 56:20, 56:21, 56:22, 57:2, 57:21, 58:6, 59:7, 59:8, 63:14, 64:19

**tab** [2] - 56:2, 56:3

**take-down** [5] - 37:7, 64:3, 64:11, 64:14, 72:25

**team** [1] - 99:7

**technical** [1] - 76:12
**technically** [1] - 31:9
**technology** [2] - 39:22, 78:9
**Temple** [1] - 1:23
**temporary** [3] - 62:6, 62:18, 92:23
**ten** [3] - 76:6, 89:10, 89:20
**tense** [1] - 82:11
**term** [10] - 17:12, 19:16, 34:17, 41:24, 50:17, 50:18, 55:21, 64:23, 72:19
**terminate** [3] - 64:19, 64:22, 65:2
**termination** [3] - 64:18, 72:20, 72:22
**terms** [17] - 3:14, 16:21, 22:2, 23:12, 27:1, 38:8, 38:11, 41:11, 42:3, 49:15, 49:23, 52:16, 59:22, 59:23, 71:12, 73:18, 86:24
**testified** [7] - 4:8, 19:11, 22:10, 22:12, 25:16, 71:11, 74:8
**testify** - 42:11
**testifying** [1] - 6:6
**testimony** [14] - 7:20, 7:21, 8:15, 23:23, 24:15, 24:21, 30:6, 34:20, 35:1, 79:20, 84:8, 92:19, 93:14, 95:3
**THE** [122] - 1:4, 3:5, 3:18, 3:22, 4:12, 4:19, 4:22, 5:5, 5:7, 5:16, 5:19, 5:22, 7:23, 8:5, 8:9, 8:14, 9:23, 10:17, 10:19, 10:20, 10:21, 11:1, 11:5, 11:8, 11:11, 11:14, 11:15, 20:16, 22:18, 22:21, 22:23, 23:1, 23:3, 23:6, 23:19, 24:23, 24:25, 26:5, 26:9, 26:10, 30:10, 30:14, 34:1, 34:2, 40:23, 41:2, 41:5, 43:4, 43:11, 43:16, 43:23, 44:3, 44:10, 44:16, 45:1, 45:8, 45:14, 45:18, 45:24, 46:4, 46:7, 46:25, 47:8, 47:14, 47:19, 47:23, 48:3, 48:23, 49:4, 49:7, 49:9, 49:12, 66:17, 66:24, 67:5,

67:20, 67:23, 69:4, 69:9, 69:11, 69:14, 74:19, 74:22, 74:24, 79:9, 79:21, 79:24, 81:21, 81:22, 85:12, 86:3, 87:4, 87:6, 87:10, 87:13, 87:16, 87:18, 87:19, 89:3, 89:10, 89:23, 90:6, 90:16, 91:6, 91:19, 91:22, 91:25, 93:4, 93:6, 93:11, 93:19, 93:24, 94:5, 94:8, 94:12, 98:19, 98:22, 98:25, 99:10, 99:18, 101:2, 101:9
**themselves** [7] - 15:10, 15:11, 15:15, 15:22, 15:23, 21:12, 24:14
**therefore** [1] - 71:25
**they've** [1] - 36:1
**thinking** [1] - 27:1
**thinks** [1] - 46:21
**third** [12] - 15:20, 16:18, 44:5, 49:15, 51:13, 72:10, 80:8, 80:14, 84:4, 85:7, 85:20
**Third** [1] - 73:24
**threats** [3] - 76:20, 77:9, 77:10
**three** [2] - 22:16, 32:12
**throw** [1] - 33:4
**tiers** [1] - 50:7
**timing** [2] - 46:16, 48:16
**Title** [1] - 100:4
**title** [4] - 38:25, 44:16, 54:7, 63:19
**titled** [1] - 55:7
**TN** [1] - 2:8
**today** [6] - 12:25, 20:10, 32:18, 46:23, 47:24
**together** [1] - 4:6
**TOLLES** [1] - 2:13
**tomorrow** [8] - 89:5, 89:8, 93:25, 94:1, 99:1, 99:8, 99:9, 99:17
**tone** [3] - 62:7, 62:24, 88:23
**tones** [10] - 60:20, 60:23, 60:24, 61:2, 61:7, 61:8, 61:10, 61:15, 61:21, 62:2, 62:23, 88:6, 88:9, 88:12, 88:22, 92:21,

92:22, 92:23, 93:16
**tonight** [1] - 98:20
**took** [2] - 12:13, 18:5
**top** [2] - 53:12, 67:15
**topic** [1] - 76:3
**Total** [7] - 13:8, 13:10, 14:7, 14:9, 14:19, 14:22, 99:11
**Toward** [1] - 12:11
**towards** [1] - 90:25
**trademark** [1] - 16:4
**traditional** [2] - 68:9, 68:10
**traditionally** [2] - 19:17, 19:20
**transaction** [2] - 60:10, 72:3
**transactions** [1] - 71:12
**TRANSCRIPT** [1] - 1:18
**transcript** [7] - 46:12, 46:14, 46:15, 47:5, 47:7, 100:5, 100:5
**transcripts** [1] - 5:7
**transmission** [1] - 76:24
**transmit** [1] - 18:17
**treat** [1] - 60:16
**treated** [5] - 7:7, 9:8, 60:18, 60:19, 88:19
**treatment** [2] - 3:25, 48:4
**tremendous** [1] - 77:8
**trial** [3] - 32:18, 47:9, 92:3
**TRIAL** [1] - 1:18
**trials** [1] - 91:23
**tried** [1] - 78:20
**true** [18] - 18:1, 18:9, 18:24, 19:11, 19:14, 21:25, 22:9, 24:12, 24:15, 28:17, 28:18, 30:3, 39:14, 42:1, 60:15, 81:16, 86:23, 100:4
**truth** [4] - 24:3, 24:5, 24:7, 31:8
**try** [4] - 44:22, 44:23, 50:12, 50:14
**trying** [5] - 15:9, 44:24, 50:13, 77:14, 92:20
**Turn** [1] - 56:13
**turn** [2] - 49:2, 69:19
**turned** [1] - 91:24
**TV** [3] - 36:15, 71:23, 71:24

**Twenty** [1] - 73:9
**Twenty-five** [1] - 73:9
**twice** [1] - 32:3
**two** [12] - 4:6, 12:20, 13:6, 14:21, 16:11, 19:1, 26:23, 34:15, 36:7, 54:9, 92:8, 96:11
**tying** [1] - 4:6
**type** [5] - 15:10, 17:19, 39:2, 78:22, 94:9
**types** [2] - 14:2, 78:19
**typical** [1] - 31:1
**typically** [1] - 69:15

# U

**ultimate** [1] - 35:22
**ultimately** [2] - 3:13, 92:1
**UMVD** [2] - 28:9, 73:14
**Under** [1] - 51:20
**under** [26] - 23:23, 26:2, 31:23, 33:12, 37:23, 38:1, 46:9, 49:17, 49:25, 51:16, 58:23, 61:8, 61:14, 61:17, 61:20, 61:24, 62:3, 62:9, 62:22, 64:15, 64:23, 65:2, 65:17, 74:25, 80:12, 88:20
**underlying** [1] - 57:25
**underneath** [1] - 89:25
**unfair** [2] - 92:12, 92:15
**UNIDENTIFIED** [1] - 79:23
**UNION** [1] - 2:6
**United** [5] - 28:16, 73:22, 73:23, 100:4, 100:6
**UNITED** [1] - 1:1
**Universal** [128] - 12:14, 12:25, 13:10, 14:1, 14:5, 14:10, 15:1, 15:16, 15:18, 15:23, 16:3, 16:4, 16:17, 17:1, 17:9, 19:1, 19:12, 19:19, 19:25, 20:19, 22:3, 22:7, 22:10, 23:13, 23:25, 24:13, 24:16,

25:7, 25:13, 25:18, 27:15, 28:3, 28:7, 28:8, 28:11, 28:12, 28:20, 29:8, 33:4, 33:17, 35:2, 35:10, 35:14, 35:15, 35:19, 35:23, 36:22, 37:7, 37:11, 37:15, 37:22, 41:10, 42:8, 42:16, 42:21, 51:6, 51:10, 51:17, 51:20, 52:4, 52:12, 52:19, 54:15, 55:10, 55:23, 57:11, 57:17, 57:24, 58:10, 58:22, 59:25, 60:4, 60:11, 60:16, 61:7, 61:8, 61:15, 61:20, 62:8, 62:22, 63:19, 63:20, 64:4, 64:21, 72:9, 72:15, 72:19, 72:24, 73:7, 73:11, 73:19, 74:2, 75:2, 75:8, 76:4, 76:14, 77:13, 77:23, 78:5, 78:20, 80:7, 80:12, 82:9, 82:10, 82:16, 82:19, 82:20, 82:21, 82:22, 83:1, 83:2, 83:5, 83:7, 83:8, 83:14, 83:19, 83:25, 84:4, 84:13, 84:19, 84:24, 85:4, 85:7, 85:8, 86:18, 88:20
**Universal's** [18] - 11:24, 12:5, 12:9, 15:8, 15:21, 35:9, 36:20, 39:8, 41:22, 53:18, 72:11, 72:12, 74:11, 80:9, 85:1, 86:7, 87:24, 88:1
**Universal-owned** [3] - 16:3, 16:4, 82:22
**unless** [1] - 46:12
**unlimited** [1] - 77:5
**unquote** [1] - 34:21
**up** [26] - 4:1, 4:25, 12:5, 13:6, 14:12, 17:24, 18:21, 22:14, 22:17, 24:11, 26:14, 32:6, 44:9, 53:13, 55:16, 63:16, 67:15, 69:8, 70:11, 70:12, 70:13, 71:6, 72:1, 80:18, 84:19, 85:18
**upset** [1] - 48:2
**usage** [1] - 22:7
**user** [33] - 30:21, 34:22, 35:2, 36:6, 51:23, 56:17, 56:23, 56:24, 59:9, 61:2,

62:6, 62:24, 65:16,
72:6, 72:12, 72:17,
72:20, 72:22, 72:25,
73:4, 79:18, 80:2,
81:7, 81:8, 81:13,
81:16, 82:1, 83:15,
88:10, 88:12, 88:22
  **user's** [1] - 80:4
  **users** [2] - 55:11,
56:15
  **uses** [4] - 35:5, 74:3,
80:25, 81:2
  **USNRC** [3] - 67:10,
67:14, 68:7

## V

  **Vague** [1] - 81:19
  **vaguely** [1] - 53:8
  **VANDELL** [4] - 43:1,
43:14, 44:7, 45:22
  **Vandell** [1] - 43:14
  **various** [10] - 16:18,
20:21, 34:10, 41:12,
49:22, 55:22, 57:5,
60:15, 71:5, 80:14
  **vary** [1] - 65:3
  **venture** [2] - 14:9,
15:1
  **version** [1] - 78:12
  **versus** [1] - 39:9
  **vice** [1] - 12:17
  **vice-president** [1] -
12:17
  **video** [2] - 47:5, 47:6
  **Video** [1] - 28:13
  **view** [4] - 4:5, 46:22,
68:7, 68:25
  **vinyl** [2] - 29:23,
32:24
  **vs** [1] - 1:10

## W

  **waffling** [1] - 92:21
  **wait** [2] - 11:16, 47:6
  **Wal** [2] - 29:9, 78:16
  **Wal-Mart** [2] - 29:9,
78:16
  **wants** [3] - 47:4,
52:19, 91:15
  **watch** [1] - 71:23
  **Watkins** [1] - 43:15
  **Wednesday** [2] -
1:21, 3:1
  **week** [1] - 40:25
  **Wendy** [1] - 79:21
  **whereby** [1] - 55:17

  **whichever** [1] - 6:12
  **whole** [3] - 70:16,
70:25, 75:14
  **wholesale** [2] -
60:11, 60:17
  **wholesale/retail** [2] -
60:6, 62:25
  **wholesaler** [3] -
29:12, 29:15, 29:18
  **wireless** [1] - 88:13
  **WITNESS** [7] -
10:20, 11:14, 26:10,
34:2, 74:24, 81:22,
87:16
  **witness** [14] - 5:11,
10:21, 11:10, 30:5,
41:3, 46:24, 47:1,
47:11, 47:24, 48:21,
87:7, 87:12, 89:1,
91:16
  **WITNESSES** [2] -
101:2, 101:9
  **witnesses** [3] -
46:17, 48:4, 93:9
  **WOMAN** [1] - 79:23
  **wonder** [1] - 32:8
  **wondering** [1] - 45:1
  **word** [3] - 15:12,
21:20, 53:19
  **words** [2] - 34:14,
38:17
  **world** [4] - 27:13,
27:15, 29:8, 81:15
  **worry** [1] - 54:16
  **written** [2] - 49:4,
64:22

## Y

  **Yahoo** [1] - 15:14
  **year** [7] - 12:6, 12:22,
17:8, 18:1, 18:2, 25:6,
32:3
  **years** [16] - 12:2,
12:20, 13:6, 14:21,
16:11, 73:9, 75:9,
75:23, 76:1, 76:2,
76:6, 78:6, 84:16,
84:19, 87:1, 88:1
  **yesterday** [2] -
49:13, 89:13
  **yourselves** [1] - 43:7