1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4      THE HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

5

6

7  F.B.T. Productions, LLC,              )

8                    Plaintiff,          )

9                                        )

10 vs.                                   )   Case No.

11                                       )   CV 07-3314-PSG(MANx)

12 Aftermath Records (dba Aftermath      )

13 Entertainment), et al.,               )

14                    Defendants.        )

15 _____       )

16

17

18          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

19                  Day 4 (P.M. Session)

20                  Los Angeles, California

21              Thursday, February 26, 2009

22 Pamela A. Seijas, CSR, FCRR
   Official Reporter
23 Roybal Federal Building
   255 East Temple Street
24 Room 181-I
   Los Angeles, California  90012
25 (213) 687-046

```
1   APPEARANCES:

2

3     FOR PLAINTIFF:          KING & BALLOW

4                             RICHARD BUSCH

5                             315 UNION STREET

6                             SUITE 1100

7                             NASHVILLE, TN  37201

8                             (615) 259-3456

9                                 - AND -

10                            GLASER, WEIL, FINK, JACOBS &

11                            SHAPIRO, LLP

12                            BY:  MARK L. BLOCK

13                            10250 CONSTELLATION BOULEVARD

14                            19TH FLOOR

15                            LOS ANGELES, CA  90067

16                            (310) 553-3000

17  FOR DEFENDANT:            MUNGER, TOLLES & OLSON, LLP

18  BY:                       GLENN D. POMERANTZ

19                            MELINDA EADES LeMOINE

20                            KELLY M. KLAUS

21                            355 SOUTH GRAND AVENUE

22                            35TH FLOOR

23                            LOS ANGELES, CA  90071-1560

24                            (213) 687-3702

25
```

1    Los Angeles, California, Thursday, February 26, 2009

2    1:17 p.m.

3    -oOo-

4    (Jury Out)

5    MR. BUSCH:  Yes.  I believe there were two things that

6    we were going to address before the -- the exhibits that we

7    wanted to have introduced so that I may question Mr. Weinberg

8    about them, and then the second was a time issue.  There are

9    other exhibits that I will want to introduce, but these are just

10   ones that we need for Mr. Weinberg today.

11   THE COURT:  All right.

12   MR. BUSCH:  So the ones that we would want to

13   introduce are 109, 110, 111, 112, 113, 114, 115, 116, 118, 119,

14   120, 121, 122, 123, and 124.

15   THE COURT:  And in reading the exhibit list,

16   Mr. Busch, you think they are relevant to show how the

17   agreements were modified and why they were modified?

18   MR. BUSCH:  Yes, sir.

19   THE COURT:  And why isn't that relevant?

20   MR. POMERANTZ:  No objection.

21   MR. KLAUS:  No objection.

22   THE COURT:  All right.  So I have read the stuff at

23   least.  109 through 124 are admitted -- I'm sorry, not -- I

24   shouldn't say it that way, no.  109, 110, 111, 112, 113, 114,

25   115, 116, 118, 119, 120, 121, 122, 123 and 124 are admitted.

```
 1        (Plaintiff's Exhibits 109-116 and 118-124 were received.)

 2              THE COURT:  Next with regard to the timing issue.

 3              MR. BUSCH:  Your Honor, again, we had -- based upon

 4   what occurred this morning, we were potentially going to

 5   eliminate Scott Levine, which he is eliminated, and we wanted to

 6   play the deposition of Ethan Gustav.  He is the T-Mobile

 7   representative.  It's about 15 minutes.  I want to just -- the

 8   question is how much time would I like to request?

 9              THE COURT:  Right.

10              MR. BUSCH:  I would like to request 90 minutes.

11              THE COURT:  In addition --

12              MR. BUSCH:  In addition -- and I don't plan on using

13   it necessarily, but what I want -- but what I'm concerned about

14   is just I don't know where Mr. Pomerantz is going to go with

15   Harleston and then I don't know what Your Honor's final ruling

16   will be on the two people that were not disclosed as witnesses

17   in the witness list in this case.  So that's one of the reasons.

18   I was going to request 90 minutes just to be protective and

19   hopefully not use it or not use all of it.

20              MR. POMERANTZ:  Your Honor, if I may be heard?

21              THE COURT:  Yes.

22              MR. POMERANTZ:  I think there's three points that we

23   need to consider here.

24              First, before this trial started, you said that you

25   thought this case was a very simple case.  We agreed and
```

1    Mr. Busch disagreed.  I think in the first three minutes of his

2    opening he then came around and agreed with you and me, and he's

3    right, this is about as simple a case as gets into federal court

4    as there is.  It's not only just a breach of contract case but

5    it doesn't have multiple breaches.  It's one core breach with

6    maybe a couple of subsidiary issues.

7         Your Honor gave us clear instructions that we had

8    eight hours, each of us, to put on our story, our cases, our

9    witnesses.  Mr. Busch has chosen to spend a lot of time arguing

10   with Mr. Ostroff, going over with Mr. Hoffman what he has

11   already gone over with other witnesses, and then having

12   Mr. Kenswil go through a lot of agreements that said over and

13   over and over again the same things, what the documents actually

14   said.

15        Second, there was a lot of witnesses called here that

16   were totally unnecessary.  There was cumulative witnesses.

17   Mr. Bass and Mr. Bass and Mr. Martin essentially told the story

18   of F.B.T.  They didn't need all three.  They made that choice.

19   Indeed, we were going to call Mr. Mark Bass.  It would have been

20   more on our nickel than theirs, and they chose to put Mr. Mark

21   Bass on themselves.

22        And then there was some irrelevant witnesses.

23   Mr. Iovine was asked basically -- I think the whole point of it

24   was to say "We were excited about Eminem and we wanted to sign

25   him quickly."  Exactly what Mr. Paterno said, the very witness

1  before Mr. Iovine.

2          And so -- and then there was Ms. Rogell who basically

3  said the same thing as Mr. Hoffman.  Mr. Paterno was saying the

4  same thing.  And I guess I come down to this, Your Honor.  I

5  think it's only fair to hold them to the parameters Your Honor

6  set up.  We understood what Your Honor was saying.  We have

7  carefully thought through what matters in this case, and we have

8  saved time for the witnesses that really mattered here that

9  would take some time, the two experts, and Mr. Martin, who I am

10  doing right now.

11          And we made a judgment call.  We chose not to ask a

12  lot of questions of these early witnesses because we didn't

13  think they had a lot of things that were really relevant at the

14  end of the day to say.  So we played by the rules.  We didn't

15  ask questions of these witnesses.  We saved our time for these

16  witnesses at the end.

17          Mr. Busch is saying, "Well, I want to ask all these

18  questions at the beginning of the trial for witness after

19  witness after witness and now please give me 90 more minutes

20  because I used it up with these early witnesses," and I don't

21  think that's fair.  We played by the rules.  We have time left

22  for the witnesses that follow.  And he's basically saying, "Give

23  me time early, give me time middle and give me time late," and I

24  don't think that's fair.

25          THE COURT:  I think you have, Mr. Pomerantz, laid out

1  my thinking exactly with regard to the testimony.  With regard

2  to Mr. Kenswil, I think given what I wrote in the Summary

3  Judgment Motion, I thought that was appropriate and necessary

4  and I think appropriately -- the time was appropriately spent on

5  Mr. Kenswil.  I agree with you a hundred percent on everyone

6  else.  Kenswil went almost two hours for the -- on the

7  plaintiff's side.

8        I am not going to grant the 90-minute request, but I

9  will grant additional time of the flat two hours from this point

10 on.

11        MR. BUSCH:  Which is -- is that about 45 minutes?

12 What is my time, Your Honor?

13        THE COURT:  You are at 111, so I am giving you

14 49 minutes.

15        MR. BUSCH:  All right.

16        THE COURT:  All right.  So you have two hours.  That's

17 it.

18        MR. BUSCH:  Okay.  Thank you, Your Honor.  Can I

19 consult with my client?  I need to discuss whether we should

20 call Ethan Gustav or not based upon Your Honor's ruling.

21        THE COURT:  All right.

22          (Mr. Busch confers off the record)

23        MR. BUSCH:  Your Honor, if it's acceptable, what we

24 would like to do is there are just a few things that we think

25 Gustav is very important for.  So we're not going to finish

1  today obviously so what we might do is go back this evening, cut

2  it down to probably three minutes or four, minutes based upon

3  Your Honor's rulings of what is admissible, and then we play it

4  before our case closes rather than play it today.

5         THE COURT:  Okay.  So we have today -- we are

6  finishing Martin, and then --

7         MR. BUSCH:  Martin and then Ping Hu.  And there's an

8  issue with Ping Hu I want to just raise very briefly.  And then

9  Weinberg -- I'm sorry, it's finish Martin, David Weinberg, Ping

10  Hu, and then David Berman.

11         THE COURT:  All right.  And then what is the issue

12  with Ping Hu?

13         MR. BUSCH:  The issue with Ping Hu -- I don't know if

14  Mr. Pomerantz intends to do this or not, but Ping Hu was not

15  listed as a witness either.  And we did a 30(b)(6) notice on the

16  secondary $159,000 claim, and Ping Hu was brought in as the

17  30(b)(6) representative on that specific claim, and his

18  testimony is going to be five minutes, and it's going to be

19  related to that 159.

20         In a conversation I had with Mr. Pomerantz, he told me

21  that if Your Honor ruled that Ciongoli and Steve Berman were not

22  allowed to testify because they were not disclosed as witnesses,

23  he would try and elicit information from Ping Hu perhaps that he

24  would have elicited from those witnesses, and we would -- we

25  would absolutely object to that.  He also was not listed as a

```
 1   witness, Ping Hu.  It was only on the 30(b)(6) for the $159,000
 2   claim, and he should not be allowed to back-door this issue by
 3   trying to elicit something from Ping Hu that he was never
 4   identified as a witness.
 5            MR. POMERANTZ:  That wasn't the complete statement,
 6   Your Honor.  What I actually said to Mr. Busch was that it
 7   depends on what happens with Gary Cohen.  I am not going to ask
 8   Ping Hu any of the questions he is concerned about today.  He is
 9   going to ask questions about this $159,000 claim and Ms. LeMoine
10   will put him into his place.  And that will be fine.  That's all
11   we're going to do.
12            The question is what happens when Mr. Cohen, their
13   damages expert, testifies.  We are hopeful that by the time
14   Mr. Klaus finishes his cross-examination of Mr. Cohen, we don't
15   need Mr. Ciongoli, we don't need Mr. Hu, we don't need anybody
16   to follow up.  We won't know for certain until we finish that,
17   but it will be an issue that will come up as a rebuttal question
18   or an impeachment question, and we'll deal with it after --
19            THE COURT:  All you're asking is not to excuse Hu.
20   You are not going to ask him anything on those points at this
21   point?  You are just asking me not to excuse Hu subject to
22   recall --
23            MR. POMERANTZ:  Exactly.
24            THE COURT:  -- depending on what happens?
25            All right.  That's fine.
```

1        Anything else?

2            MR. POMERANTZ:  I believe that's it.

3            MR. BUSCH:  I believe that's all, Your Honor.

4                    (Jury In)

5            THE COURT:  Mr. Martin.  Good afternoon.

6            Mr. Pomerantz, you may resume your cross-examination.

7            MR. POMERANTZ:  Thank you, Your Honor.

8                    CROSS-EXAMINATION RESUMED

9    BY MR. POMERANTZ:

10   Q.   Good afternoon, Mr. Martin.

11   A.   Good afternoon.

12   Q.   Before we broke for lunch, you had mentioned, I think, in

13   one of the questions that I asked you something about record

14   clubs, and I said that we would come back to that, and I would

15   like to do that now.  Okay?

16   A.   Yes.

17   Q.   Mr. Nichols, if you can put up on the screen Pages 4 and 5

18   from the '98 agreement here, the agreement between F.B.T. and

19   Aftermath, and if you can move that to one side and also bring

20   up the other page, Page 5, so we can have both provisions up on

21   the page at the same time.  Do have you them both on the screen?

22   All right.  Let's take the records sold provision, 4A, and put

23   that up on the top.  Highlight that and put that up on the top.

24   Move that up there.  And then if we can get -- can you get to

25   the next provision underneath that there?  If you can set that

1  up so we have those three provisions so it's easy for everybody

2  to read.  Thank you.

3          All right.  So there is three different provisions

4  that Mr. Nichols has pulled up from this agreement, the royalty

5  provision.

6          Do you see that?

7  A.    Yes.

8  Q.    First, before we get to the actual provisions, can you just

9  explain what a record club is?

10 A.    It's a way of buying records through a -- some organization

11 or service where you have to just maybe acknowledge, you know,

12 that you're joining or that you're -- it doesn't cost you any

13 money, I don't believe, but that you're going to be a customer

14 and buy records through the record club, sometimes at a better

15 rate than you would normally get through a retail store, for

16 example.

17 Q.    Columbia House would be an example of a record club?

18 A.    Yes, it would.

19 Q.    And the way record clubs typically worked was that if you

20 signed up with a record club, you would get a certain number of

21 records either free or for a very small price, pennies or a

22 dollar, and in exchange, the record club member would make a

23 commitment; correct?

24 A.    Well, they didn't all work like that.  Actually what

25 happened that I can recall is that they would offer records to

1  you, and if you didn't return them and didn't want them, you

2  could send them back and you didn't have to buy anything.

3  Q.   So every month the record club would send you a record or

4  two, and if you remembered to send it back, then you wouldn't

5  get charged, but if you decided you wanted it or if you just

6  forgot to send it back, then you would have to pay for it;

7  correct?

8  A.   Something like that.

9  Q.   And you were at Mr. Berman's deposition; right?

10 A.   I don't remember.  I was at one deposition.

11 Q.   And do you remember him discussing record clubs during that

12 deposition?

13 A.   No, I don't.  I don't have the recollection.

14 Q.   All right.

15       So now let's go look at royalty provisions and the way

16 the royalty provisions deal with record clubs.  Now, you said

17 that record clubs were paid under the master license provision;

18 correct?

19 A.   The artist was paid under the master license provision for

20 record clubs.

21 Q.   F.B.T. was paid under the masters -- isn't that what you

22 said?

23 A.   Yes.

24 Q.   That's not true; right?

25 A.   I'm not sure what you mean.

1    Q.    Well, if you look on the agreement -- on the provisions

2    here, you see that in the middle Mr. Nichols has put up 4(c)(v),

3    the provision that we have looked at many times during this

4    trial, the masters license provision.

5          Do you see that?

6    A.    Yes.

7    Q.    That is not the provision in this contract that covers

8    record club sales, is it?

9    A.    Well, that's one of two provisions that covers licensing,

10   so if the question was is it covered under a licensing

11   provision, that's what I meant to say.  Sometimes record club

12   royalties are just lumped in to the licensing provision.  As a

13   matter of fact, quite a few agreements that I'm familiar with,

14   it's just in one licensing provision.  This for some reason just

15   says another form of licensing will be record club.  So that's

16   what I meant.

17   Q.    And so you're saying that what this says in the record club

18   provision is that another form of licensing will be record

19   clubs?

20         Is that what it says?

21   A.    It says that it's -- again, as it relates to records

22   through a record club, there is a 50 percent provision.

23   Q.    Okay.

24         So the first provision, the one we've been looking at

25   earlier in this case, the one that says records sold through

1    normal retail channels, that's the one at the top; right?

2    A.    Yes.

3    Q.    And so that's for sales through normal retail channels;

4    correct?

5    A.    Well, not necessarily.  It's for sales manufactured and not

6    licensed through normal retail channels.  You can license a

7    record and have it go through a normal retail channel.  That

8    doesn't mean you can't license a record and have it sold through

9    a normal retail channel.

10   Q.    Okay.

11         I want to, at least for right now, focus on the words

12   of the contract.  This contract says that "Records sold through

13   normal retail channels will be covered by section 41A;" correct?

14   A.    It also says, "Notwithstanding the foregoing, if it's a

15   license sale, then this provision applies."

16   Q.    And "this one" meaning 4(c)(v)?

17   A.    This one meaning the licensing provision.

18   Q.    All right.

19         If we look at the one that expressly addresses record

20   clubs, you see the term "record clubs" in quotes and the

21   parenthetical on the bottom provision?

22         Do you see that?

23   A.    Yeah.

24   Q.    Okay.

25         That's a separate provision from the records sold

1    through normal retail channels and it's a separate provision

2    from the masters license provision; correct?

3    A.    Okay.

4    Q.    And it says that if a record is sold through a direct mail

5    or mail order distribution method, including record clubs, then

6    you get paid the royalty rate that's specified in that

7    provision; correct?

8    A.    Yes.

9    Q.    And so it's not a record sold through a normal retail

10   channel, it's a record sold through a record club; correct?

11   A.    It's a licensing provision that deals with record clubs.

12   It's a 50 percent royalty on a licensed product.  Record clubs

13   are licenses.

14   Q.    And under this contract, there is a separate provision that

15   deals with record clubs; correct?

16   A.    I'm looking at it, yes.

17   Q.    All right.

18         And record clubs are a special form of the way music

19   is sold in this country; correct?

20   A.    What do you mean by "special form"?

21   Q.    It has its own unique attributes to it.  People have to

22   sign up.  They have to make a commitment.  Something gets mailed

23   to them every single month.

24         That's different than going to a retail store or to

25   iTunes; correct?

A.    You have to sign up for iTunes.  You have to sign and

accept the terms and conditions on iTunes before you can buy

anything.  There is an agreement that you have to accept, it's

called the end user license agreement, and in order to obtain

product through iTunes, unless you sign up, you don't get to buy

it.

Q.    Does iTunes send its customers a record every single month

that they have to pay for if they don't remember to send it back

to iTunes?

A.    Well, they give you free records.  There will be like a

record of the week or you could get free downloads and there is

various promotions.  It might not be that they send you anything

because there is nothing to send.  They don't send anything that

physically has to be returned.

Q.    I'm sorry.  I -- I probably wasn't clear.

       If you are a customer of iTunes, does iTunes send you

a record every single month that you have to pay for unless you

remember to send it back to them?

A.    I don't believe so.  Not a record, no.

Q.    And when you become a customer at iTunes, do you

automatically get four or five free records or records in

exchange for paying a penny or a nickel or a dollar?

A.    When you sign up with the iTunes service, it -- it enables

you, under the terms and conditions of their license, to buy

whatever you want.  You don't have to return anything.  But in

1  order to buy or listen to anything, you have to pay money and

2  it's a purchase.

3  Q.   And so a record that is sold through a record club is not

4  treated under this agreement as a record sold through a normal

5  retail channel; correct?

6  A.   It's paid under a licensing provision.

7  Q.   Well, it's not paid under the masters license provision

8  that we have been talking about in this trial; correct?

9  A.   Well, it's paid under a licensing provision.  There is two

10 licensing provisions.  Either it fits into the definition of

11 record club or it fits into the definition of general licensing.

12 Q.   The record club payments in this case, under this contract,

13 are paid under Paragraph 4C1, not 4C5; correct?

14 A.   Okay.

15         MR. POMERANTZ:  I have no further questions.

16         THE COURT:  Redirect?

17         MR. BUSCH:  I just have a couple of questions,

18 Your Honor.

19                REDIRECT EXAMINATION

20 BY MR. BUSCH:

21 Q.   Mr. Martin, I just want to address -- do you have that blue

22 pen and red pen, the markers?

23         Mr. Martin, just a couple of questions.

24         First question is, under your contract with

25 Universal/Aftermath, how often do you have the right to audit

1    Universal to complain about how they're accounting to you?

2    A.    Every three years.

3    Q.    Okay.

4          And how -- since 1998, how many audits have you done?

5    A.    This would be the second one.

6    Q.    Okay.

7          What was the first one?

8    A.    It covered a three-year period from 1999 to 2002, I

9    believe.

10   Q.    Was it December 31, 2001?

11   A.    I think so, yes.

12   Q.    And then so when was the next time after -- let me back up

13   for one second.

14         In that first audit that was done, was there any

15   permanent download revenue at all?

16   A.    I don't believe so, no.

17   Q.    And so when was the next time you were able to actually

18   have your accountant do an audit of Universal?

19   A.    Well, any time within a three-year period after that audit,

20   so I think we probably engaged Gary in 2000 -- maybe it's 2006.

21   Q.    Okay.

22   A.    And it would have covered the period -- a three-year period

23   prior to that.

24   Q.    Okay.  That's all I have on that.

25         On your -- by the way, who gets your accounting

1  statements?  Who do the accounting statements go to?

2  A.    They go to Sarah Catlett.

3  Q.    What does she do with them?

4  A.    She forwards them to Gary Cohen.

5  Q.    Mr. Pomerantz had this chart which says "Record and

6  Compilation Record."

7          Do you see that?

8  A.    Yes.

9  Q.    And he asked you some questions about compilation records.

10         Do you recall that?

11  A.    Yes.

12  Q.    And do you recall that you said some compilations were paid

13  as licenses and some were not?

14  A.    Yes.

15  Q.    And what did you mean by that?

16  A.    Well, not all compilations are paid by license.

17  Q.    If Universal takes an Eminem -- two Eminem masters and

18  Universal creates a compilation album and Universal releases it,

19  how are you accounted for that?

20  A.    Under the records sold provision.

21  Q.    Okay.

22         So if we scratch out "record" here and we write in

23  "Compilation sold, manufactured, distributed by Universal," and

24  then we have "Compilation record distributed, sold,

25  manufactured, distributed third party."  Okay?  My handwriting

1   is not so great.  We have -- and they had the same records --

2   the same tracks on them, we'd have the same artist; right?

3   Right?

4   A.    Yes.

5   Q.    We'd have the same music; right?

6   A.    Yes.

7   Q.    We'd have the same art; right?

8   A.    Yes.

9   Q.    We'd have different record companies; right?  Because one

10  would be -- one would be by a third party and one would be

11  released by Universal; correct?

12  A.    Yes.

13  Q.    And then we would have the same -- different royalty rates

14  for the two; correct?

15  A.    Yes.

16  Q.    And would that be because where it was released by

17  Universal, it was being sold by Universal?

18  A.    Of course.  It wasn't being licensed by Universal.

19  Q.    And for the compilation by the third party, that would be

20  under the license; right?

21  A.    That's correct.

22          MR. BUSCH:  That's all I have.

23          THE COURT:  Recross?

24                      RECROSS-EXAMINATION

25  BY MR. POMERANTZ:

1    Q.    First I would just like to thank Mr. Busch for correcting

2    my spelling.  Wow.  That was pretty sad.

3             So I just want to clarify something --

4    A.    That's not the only thing he corrected.

5    Q.    Thank you.  Thank you.  Good point.

6             So this one over here -- let's see.  Okay.  He was --

7    Mr. Busch was talking about a compilation record that Universal

8    puts out and a compilation record that someone else like Virgin

9    puts out; correct?

10   A.    Yes.

11   Q.    So the one over here that Mr. Busch created, that's

12   Universal's record; correct?

13   A.    Or that they distribute and manufacture.

14   Q.    All right.

15            And this one over here, the one that I was working on,

16   that one there is someone else's product; correct?

17   A.    If it's licensed to somebody else, it's someone else's

18   product, yes.

19   Q.    That is an Eminem recording in someone else's product;

20   correct?

21   A.    Could be, yes.

22   Q.    Well, that's what it is.  This is Virgin's record and

23   Aftermath is letting Virgin use one Eminem recording in Virgin's

24   compilation record; correct?

25   A.    They're licensing one track for use, that's correct.

1   Q.   But in the one over here where Mr. Busch just sort of

2   started crossing out, that is not someone else's record;

3   correct?

4   A.   I'm not sure.  It could be the same exact thing.  It could

5   have seven -- it could be, for example, now 13.  It's someone

6   else's record to the extent that there's 10 other artists on it,

7   but if Universal distributes it, then it's paid under the normal

8   retail channel.  So is it someone else's record?  It just

9   contains an Eminem track with other artists.

10  Q.   Let me make sure we get it right here.  What Mr. Busch

11  wrote was "Compilation sold, manufactured, distributed by

12  Universal;" correct?

13  A.   Okay.

14  Q.   That's Universal's record.  This one is someone else's

15  record; correct?

16  A.   It's Universal manufacturing and distributing product,

17  that's right.

18              MR. POMERANTZ:  I have no further questions.

19              THE COURT:  Anything further?

20              MR. BUSCH:  Just one.

21                     REDIRECT EXAMINATION

22  BY MR. BUSCH:

23  Q.   Put up 4(c)(v), if you would.

24              Is there anything in 4(c)(v) in the master licensing

25  provision in this agreement whatsoever that restricts the

1  language of that agreement to only applying to quote, unquote,

2  someone else's product if the masters are being licensed by

3  Universal?

4  A.    No.

5          MR. BUSCH:  All right.  That's all I have.

6                    RECROSS-EXAMINATION

7  BY MR. POMERANTZ:

8  Q.    There is a provision in this contract that covers

9  compilation records that Universal itself puts out, isn't there?

10 A.    I don't know.  I would have to see it.

11 Q.    Well, it's not the masters license provision that Mr. Busch

12 just referred to, is it?

13 A.    I -- I have to see it.  I'm not sure what you're referring

14 to.

15 Q.    Let's pull up the 2003 agreement.  And, Phil, I think we

16 are also going to need to go to the next page so we can get the

17 remainder of this provision in there.

18          Take a moment to read this provision, Mr. Martin.

19          Do you have this one in mind?

20 A.    I don't have it in mind.  I'm reading it, but it looks like

21 it has to do with prorations of masters if they're compiled on

22 the same record with other artists.

23 Q.    So if you take the compilation record that Mr. Busch

24 described on this piece of paper that he marked up, a

25 compilation record that Universal puts together where they take

1    an Eminem recording and they take some recordings, let's say, of

2    some other Universal artists and they put it on a compilation

3    record and Universal itself is putting it out, F.B.T. doesn't

4    get paid under the masters license provision of 4(c)(v);

5    correct?

6    A.    Are you saying do we get -- do we get paid under the

7    licensing provision?  I don't believe we get 50 percent of

8    receipts, no.  I think that we're -- we're paid on the basis of

9    records sold but it's prorated.  If we only have one -- it

10   doesn't have to be a compilation record.  It could be a

11   soundtrack record that contains other artists, but if Universal

12   is basically manufacturing and taking the responsibility of all

13   the costs, then we would get paid under the records sold

14   provision.

15   Q.    And that's because it's Universal's record rather than

16   someone else's compilation record?

17   A.    It's because they take care of all the costs and expenses

18   and distribution and all the things that are typically

19   associated with the manufacturing of records, as we understand

20   it in this agreement.

21             MR. POMERANTZ:  No further questions, Your Honor.

22             MR. BUSCH:  All done.

23             THE COURT:  You may step down.  Thank you.

24             Plaintiff's next witness.

25             MR. BUSCH:  It's David Weinberg.

```
 1              THE CLERK:  Stand next to the court reporter, please.
 2              David Weinberg, Plaintiff's witness, was sworn
 3              THE CLERK:  Thank you.  Please take a seat.
 4              For the record, sir, can you please state your full
 5   name and spell your last name.
 6              THE WITNESS:  Sure.  My name is David Weinberg,
 7   spelled W-E-I-N-B-E-R-G.
 8              THE COURT:  You may.
 9                        DIRECT EXAMINATION
10   BY MR. BUSCH:
11   Q.   Good afternoon, Mr. Weinberg.
12   A.   Good afternoon, Mr. Busch.
13   Q.   We have met on a couple of occasions; correct?
14   A.   Yes.
15   Q.   I have gone over a lot of the agreements with Mr. Kenswil,
16   so I'm not going to belabor those and go back over them with
17   you.  But I do just want to hit a couple of points with you, if
18   I could.  Okay?
19   A.   Sure.
20   Q.   Okay.  Great.
21              Very quickly, you joined Universal in around 2001; is
22   that correct?
23   A.   I believe that's correct, yes.
24   Q.   And you worked for Mr. Kenswil in the Elabs department; is
25   that correct?
```

A.     Mr. Kenswil ran the Elabs department, that's correct.

Q.     And you were involved with negotiating various agreements with various third party digital download and mastertone -- or phone companies that offered mastertones; is that correct?

A.     Yes, that's correct.

Q.     Okay.

       And between 2001 when you joined and today, have you been involved one way or another in the different agreements that have been entered into between Universal and third parties?

A.     What --

Q.     Digital download or mastertone agreements, as far as either negotiating or being involved as far as your department in negotiating those agreements?

A.     Yes, I have been.

Q.     Okay.

A.     And, yes, my department was involved in those.

Q.     You understand when I am mentioning third parties, I mean companies that are not affiliated with Universal; correct?

A.     Yes, I understand what you mean.

Q.     Okay.

       Now, I just want to very briefly discuss with you a couple of specific agreements, and the first agreement -- first, would you put that metadata, the first page of the metadata guide.

       I want to show you a document that has been attached

1    to several of the agreements that we have received from your

2    counsel in this case.

3            Do you recognize this document?

4    A.   I recognize the cover page, yes, I do.

5    Q.   It's part of 326.

6            And this is an asset and metadata recipient guide; is

7    that correct?

8    A.   That's correct.

9    Q.   This goes to both companies that are offering permanent

10   downloads and subscription services offering conditional

11   downloads; correct?

12   A.   Yes.  This document goes to any company that gets any of

13   our music product.

14   Q.   Okay.

15           If you look at the middle of the section, you'll see

16   it says "Asset and metadata delivery standards for digital

17   licensees of Universal Music Group."

18           Do you see that?

19   A.   I do see that.

20   Q.   Did you craft that language?

21   A.   No, not at all.

22   Q.   Okay.

23           Somebody at Universal did, though?

24   A.   I -- I -- I would imagine so.  I would have to check the

25   files, but I would think so.

1    Q.    Okay.  All right.  You can put that document away.

2          And are you familiar with the fact that with respect

3    to both permanent downloads and conditional downloads, that

4    there are two files sent to the permanent download and

5    conditional download companies, one containing a recording and

6    one containing information?

7    A.    Yes.  That's a general way of describing the two content

8    feeds.  There is also information contained in the file itself.

9    Q.    Okay.

10         In the file that contains the information; correct?

11   A.    No.  That's not what I meant.  The information is in the --

12   in the audio recording as well.

13   Q.    Okay.

14         Do you know that Mr. Cue, whose videotaped testimony

15   was played today, testified that they get a -- one file that

16   just has the sound recording in it and one file that has

17   information in it.

18         Is he mistaken?

19   A.    I -- I don't think so.  That's not what I was saying.

20   Q.    Okay.

21         Let's very quickly look at -- you and I have talked

22   about on occasion three or four different mobile agreements that

23   you said were on forms, not Universal forms.

24         Do you recall talking about those?

25   A.    I -- I remember talking about some of them.  I don't

1   remember how many we talked about.

2   Q.    Okay.

3         And one of them was an agreement with Sprint, which is

4   a phone company.  And one was with -- do you recall that?

5   A.    I do recall that.

6   Q.    And one was with T-Mobile.

7         Do you recall that?

8   A.    I -- I believe I do, yes.  I have a vague recollection of

9   that.

10  Q.    And one was with Cingular and you recall that?

11  A.    I -- I don't recall the specific conversation about that,

12  but if we had it, I'm sure we did.

13  Q.    Okay.

14        Now, can you put up Exhibit No. 76 on the screen.  And

15  Section 6.1, please.  First of all, the first page, if you

16  would.  And highlight the top.

17        And you'll see that this agreement is with Sprint and

18  it's dated 2003 and it identifies Sprint as Sprint and UMG

19  recordings as service provider.

20        Do you see that?

21  A.    I do see that, yes.

22  Q.    Okay.

23        And do you recall telling me that with respect to this

24  agreement and the several other mobile agreements that we just

25  talked about, that I mentioned to you that the mobile carriers

1   insisted that they be on their forms and not Universal forms?

2           Do you recall that?

3   A.    Yes, I do remember that.

4   Q.    And if you could go to Paragraph 6.1, please.  And you'll

5   see there is a title "Grant of licenses and rights."

6           Do you see that?

7   A.    I do.

8   Q.    And you will see it says, "License grant:  Service provider

9   grants Sprint and Sprint affiliates a non-exclusive,

10  non-transferable, with no right to sublicense, except as

11  provided in this agreement, license in the territory to

12  reproduce, display, perform, distribute and transmit the service

13  provider services."

14          Do you see that?

15  A.    I do see that.

16  Q.    Okay.

17          And do you recall me asking you whether that means

18  that Universal was licensing to Sprint its product?  Do you

19  recall me asking you that question?

20  A.    I do.  And I also remember telling you that I didn't think

21  that that was the essence of the business model here.

22  Q.    Right.  Exactly.

23          And, in fact, when I asked you that and you said

24  that -- and you did say that.  When I asked you that and you

25  said that, you pointed me to -- you said you have to read the

```
 1   entire agreement, including that talks -- the section that talks
 2   about the fact that we sell it at a wholesale price and we
 3   receive a retail price back.
 4           Do you recall saying that?
 5   A.   Not quite.  I'm -- we -- we sell it at a wholesale price
 6   and we get a wholesale price back.  You just said we get a
 7   retail price back --
 8   Q.   Oh, I'm sorry.  You're right.
 9           What I meant was you sell it to -- your position was
10   you have to look at the wholesale -- the price structuring;
11   right?  That's what you told me?
12   A.   I'm sorry?  In what context now?
13   Q.   Okay.
14           In the context of denying or saying that this was not
15   a license and you had to look at the business transaction, isn't
16   it true that you pointed me or you said that you have to look at
17   the entire agreement, including the section that covers
18   wholesale fees and references to the purchase of mastertones
19   under this agreement?
20   A.   I -- yes, I do remember that conversation.
21   Q.   Okay.
22           And that's your position; correct?  That was accurate?
23   A.   Yes.  Yes, it is.
24   Q.   Okay.
25           Now, are you familiar with ringback tones?
```

1    A.    Sure.

2    Q.    Okay.

3         And ringback tones -- do you understand, unlike a

4    mastertone or a ring tone, a ringback tone is something that you

5    hear -- the person calling hears rather than the person who is

6    being called; correct?

7    A.    Yes.  That's the difference in the product, and there is

8    also a difference in the business model.

9    Q.    Okay.

10        And with ringback tones, the person who gets them

11   licenses them for a period of 12 months; isn't that correct?

12   A.    It's not always 12 months but I think -- I think what you

13   might mean is you get to keep it for a limited period of time

14   but you don't get to own it like a record, like a mastertone.

15   Q.    Okay.

16        And do you know that ringback tones, when they are

17   credited to the artist, are paid as a license under the

18   licensing provision of artist contracts?

19   A.    Yeah.  I'm generally familiar with that.

20   Q.    And isn't it true that with ringback tone agreements, they

21   have the same wholesale retail price structure as the permanent

22   downloads and mastertones?

23   A.    I'm not sure what you mean by that.  If you mean that we

24   get paid when somebody gets access to a ringback tone, then,

25   yes, we get paid something for that.  But I otherwise don't

 1  understand your question.

 2  Q.   My question is simply this:  Isn't it true that the price

 3  structure identified in the agreement says that Universal is

 4  selling at a wholesale price the masters for purposes of

 5  ringback tones?

 6  A.   I'm still not sure if I understand your question.  But if

 7  you mean wholesale price meaning what we get, yes, that's --

 8  wholesale price just means what Universal gets when the user

 9  gets access for a limited period for that ringback tone.

10  Q.   I just want to make sure we're on the same page.  So very

11  briefly let's pull up Exhibit 330, Aftermath -- the Bates stamp

12  is 3414, Page 120.

13  A.   Should I be opening this up --

14          THE COURT:  Wait for Mr. Busch to ask a question.

15  BY MR. BUSCH:

16  Q.   Just very briefly, is this a standard term that is

17  contained in your ringback tone agreements as it relates to the

18  price structuring?

19  A.   I'm not sure I understand the question -- are you asking

20  about the price itself or I don't understand the --

21  Q.   What I am asking is with respect to ringback tones, is it

22  correct that there is reference to a wholesale price in your

23  ringback tone agreements when it comes to payment terms?  Is

24  that a standard provision?

25  A.   I would have -- is it -- is it standard to use the word

1  "wholesale price" here?  "Wholesale price" again, as I just

2  said, means the amount that we get paid.

3  Q.    Okay.

4        So you're not saying that you -- it has nothing to do

5  with selling it to the mobile carrier for a wholesale price; is

6  that your testimony?

7  A.    Again, it depends on the business model, and I think you

8  yourself just said that the business model here was that you

9  would have access for a limited period of time -- you said

10  12 months; I said in many cases they're six months -- whereas a

11  mastertone is something that you get to keep, like a record.

12  Q.    In either case -- my only question is -- and I don't want

13  to belabor this.  My only question is there is a concept of

14  getting paid on a wholesale price when it comes to ringback

15  tones in your agreements; correct?

16  A.    Yes.  It's here in this agreement, that's right.

17  Q.    And so we just have to look at the other agreements to see

18  if that same concept is contained in those as well?

19  A.    I said that we might not always use the same concept in the

20  other agreements.  Here I believe that what this means is the

21  amount that we get paid.  If you're -- again, what agreement is

22  this from?  Just remind me what's on the cover page?  Which

23  partner is this with?

24  Q.    You can put the first page up, if you like.   Alltel

25  communications.

1    A.    I can't remember the specifics, but we had a form.  What

2    happened in chronology, Mr. Busch --

3            MR. BUSCH:  Your Honor, I move to strike.  All I asked

4    him was a very simple question.

5            THE COURT:  Ask your next question.  Motion to strike

6    granted.

7    BY MR. BUSCH:

8    Q.    Okay.

9            Mr. Weinberg, all I'm asking is a very simple

10   question.  In connection with ringback tones, is the concept of

11   a wholesale price contained in your ringback tone agreements or

12   are you saying it's some, maybe, not all?  Is that your answer?

13   A.    Well, in this case it is.  I'm not sure about the others.

14   I would have to look at them.  But here it means the price that

15   we were paid.

16   Q.    Okay.

17           Let's -- I want to direct your attention now to the

18   T-Mobile agreement.  Do you recall negotiating the T-Mobile

19   agreement?

20   A.    Vaguely.  I remember -- I remember being involved in it.  I

21   don't know if I remember all the specifics today.

22   Q.    Do you recall the fact that the T-Mobile agreement, like

23   the Cingular and Sprint and Nextel agreement, was on their form?

24   A.    Yes, that I do remember.

25   Q.    And do you recall telling me that if these documents were

```
 1    on Universal's forms, the Sprint agreement, the Cingular
 2    agreement, these various mobile agreements, the language used
 3    would be quite different than the language used in the form
 4    agreements that the mobile carriers insisted upon?
 5    A.    I'm sorry.  Can you repeat the question?
 6    Q.    Do you remember telling me that if you -- if these
 7    agreements were on Universal's forms instead of on the forms of
 8    these mobile carriers who insisted that their forms be used,
 9    that the language would be quite different?  Do you recall
10    telling me that?
11    A.    I remember telling you that the language used would be
12    specific to our product.
13    Q.    Okay.
14          Did you also tell me that the terms and the conditions
15    as far as use of the terms license would be different?
16    A.    I don't remember the specifics of what I said but if you
17    say that I said that and that was in the transcript, then I'm
18    sure that I said it.
19    Q.    All right.
20          Now, with respect to the T-Mobile agreement, they did
21    allow you to make a few changes to the agreement.  Do you recall
22    that?
23    A.    I don't recall the specifics, but I would have to look at
24    the file to see what happened.
25    Q.    Would you put up 112 on the screen, please.  And this is --
```

```
 1    if you could focus on the -- yeah.
 2            This is an email that you sent to the people at
 3    T-Mobile and others containing your edits to the draft T-Mobile
 4    agreement; is that right?
 5    A.    I see that -- give me a chance to read it, please.
 6    Q.    Okay.
 7    A.    Yes, I see it.
 8    Q.    So this does contain your edits?
 9    A.    Again, I would have to look at the draft, but the cover
10    email that you're showing me seems to indicate that there were
11    edits, yes.
12    Q.    Okay.
13            Could you please now go to Page 4.   You need to -- if
14    could enlarge that or somehow make it so the jury can read it
15    very clearly.
16            So is it correct that -- we're looking at -- Paragraph
17    4, that says, "Licenses and other intellectual property rights."
18            Do you see that?
19    A.    I see the title section, that's right.
20    Q.    Okay.
21            And what we're looking at is what's called a red line
22    or underline.  So what we are seeing is that the words that are
23    underlined shows the change that you made, and what you deleted
24    is in the right-hand margin; is that correct?
25    A.    It -- it looks like it if this is accurate, sure.
```

1   Q.    Okay.

2         So this, just so that we're clear -- this document,

3   when you received it, said, "UMG hereby grants to T-Mobile a

4   non-exclusive limited royalty-free, except as set forth in any

5   schedule attached hereto, license during the term."

6         That's what it said when you got it; correct?

7   A.    I would imagine so, yes.

8   Q.    And you replaced the word "license" with the word "right";

9   is that correct?

10  A.    Again, we -- we were trying to make, I think, this

11  provision fit the business model we were working on, T-Mobile's

12  form.

13        MR. BUSCH:   Okay.   I move to strike, Your Honor, as

14  non-responsive to my question.

15        THE COURT:   Motion to strike granted.

16  BY MR. BUSCH:

17  Q.    I want you to answer my question, please.

18  A.    Sure.

19  Q.    Is it correct that you struck out the word "license" and

20  inserted the word "right" in its place?

21  A.    Again, if this is my draft, then I'm sure that -- that that

22  was the case.

23  Q.    Okay.

24        And then that wasn't the only place where you did

25  that.   Moving down it says "right" -- it originally said

1    "license,"  you changed it to "right" -- during the term to, 1,

2    use, reproduce and distribute the Hi-Fi tones to subscribers and

3    sublicense the foregoing rights to third party providers to

4    distribute the UMG content to subscribers via T-Mobile's

5    telecommunications network on behalf of T-Mobile."

6         I'm sorry.  You know what?  I made a mistake.

7         The first deletion of "license" is where the word

8    "authorization" appears; is that correct?  So it originally

9    said, "Ring tone distribution license," and you changed

10   "license" -- highlight the first "license," Mike, please -- you

11   changed "authorization" -- "license" to "authorization".  That's

12   the first change you made; correct?

13   A.   In this section, that appears to be the first change that

14   was made.

15   Q.   Okay.

16        And then the second time you struck out the word

17   "license" was to replace it with the word "right"; is that

18   correct?

19   A.   It -- it looks like that's the second change in this

20   paragraph, that's right.

21   Q.   Okay.

22        One last question.  iTunes, do you know what

23   percentage of the market iTunes controls for permanent

24   downloads?

25   A.   I can't tell you the exact number, but it's the majority of

1    the market.  More than the majority of the market.

2    Q.    Say that again.

3    A.    More than the majority of the market.

4    Q.    Eighty percent?

5    A.    Again, I can't tell you the exact number, but it's more

6    than the majority.

7          MR. BUSCH:  All right.  Thank you very much.  Nothing

8    further.

9          THE COURT:  Mr. Klaus?

10                        CROSS-EXAMINATION

11   BY MR. KLAUS:

12   Q.    Good afternoon.

13         I'm going to ask Mr. Nichols here to bring up in

14   Exhibit 112 -- you may have that in the big giant binder that

15   you were handed -- Exhibit 112.  This is the red line draft that

16   you sent back to T-Mobile that Mr. Busch was questioning you

17   about just a moment ago.  I am going to ask Mr. Nichols if he

18   will skip ahead to the fifth page of the exhibit, which is the

19   page that Mr. Busch was talking to you about.

20   A.    I see that, yes.

21   Q.    And so -- if I could ask Mr. Nichols, if you could just

22   pull out all of -- all of Section 4.  Okay.

23         Okay, Mr. Weinberg.  I just want -- Mr. Busch had you

24   focused on one sentence in one paragraph in this section with

25   respect to the word "license."

1          That was in Paragraph 4A; was it not?

2     A.    Yes.  I see that, that's right.

3     Q.    What was -- and is it your understanding on the basis of

4     red lining that when you don't see changes, that means that

5     reflects a draft that you received from T-Mobile?

6     A.    That's probably correct, unless there wa a mistake, yes.

7     That's right.

8     Q.    And the title of the -- I'm not going to be able to use

9     this.  The title of Paragraph 4 is?  --

10    A.    Do you want me to read that?

11    Q.    Would you, please.

12    A.    The title of the whole section was "Licenses and Other

13    Intellectual Property Rights."

14    Q.    Would you just highlight that for me?  Thank you.

15          And do you see that in Paragraph 4A, which had the

16    same sentence that Mr. Busch was asking you about, do you see

17    that there is a reference to, in little two, to the word

18    "sublicense"?  Do you see that?

19    A.    I do see that.

20    Q.    Okay.

21          And then what's the title of Section B?

22    A.    Section B is Audio Clip License.

23    Q.    Okay.  And if you could just highlight that for me,

24    Mr. Nichols.

25          And then can you just read the full sentence of the

1    first part of Section 4B, Mr. Weinberg?

2    A.    Sure.    "UMG hereby grants to T-Mobile a non-exclusive,

3    limited, royalty-free license, during the term, to distribute

4    the audio clips, via streaming, to subscribers, solely in

5    connection with the promotion of the sale of hi-fi tones on

6    T-Mobile websites and handsets, unless otherwise approved in

7    writing by UMG."

8    Q.    Okay.    And, Mr. Nichols, if you could just highlight the

9    word "license" there as well up in the -- yeah.

10           And what's the title of Section C, Mr. Weinberg?

11   A.    Section C is Promotion and Support License.

12   Q.    And what does that sentence state -- what does the

13   provision state?

14   A.    Would you like me to read it?

15   Q.    Yes, please.

16   A.    Sure.    "C:  Promotion and Support License.    UMG grants to

17   T-Mobile a non-exclusive, royalty-free license during the term,

18   (one), modify any images included in the UMG content to add a

19   preview watermark, and, (two), in use, reproduction and publicly

20   display the UMG content, little X, for the demonstration and

21   promotion in connection with the sale of Hi-Fi tones."    And then

22   there's a bracketed section and "Y:  In connection with

23   providing support to subscribers," and then there is a note

24   there, "What does this mean, question mark."

25   Q.    Okay.    And then Section D.

1   A.    Sure.  Again would you like me to read it?

2   Q.    The section heading is just called?

3   A.    It's titled "Trademark License."

4   Q.    Okay.

5         And the grant?  If you could just read the beginning

6   part of the grant?

7   A.    Sure.  "UMG grants to T-Mobile a non-exclusive,

8   royalty-free license during the term, to use, reproduce,

9   distribute and display the trademarks specified in Exhibit B or

10  an applicable schedule as part or in connection with," etc.,

11  etc.  Do you want me to keep going?

12  Q.    No.  I think that's enough.

13        First of all, do you remember this red line draft that

14  you sent back to T-Mobile?

15  A.    I -- I don't remember the specifics.  I -- I see it and --

16  I -- I believe in its accuracy, but I don't remember the

17  specifics.

18  Q.    Do you have any idea why -- Mr. Busch focused you on this

19  change, changing the word "license" to "authorization" and

20  changing "license" to "right."

21        Do you remember that question?

22  A.    I remember the question, yes.

23  Q.    Do you know why you made that change?

24  A.    I draft and review, since this one I think -- I don't

25  remember the date but I know it was several years ago --

1    hundreds and hundreds of agreements.  But looking at it today, I
2    would say that it's very simple.  The first Subparagraph A was
3    an authorization to T-Mobile to resell our mastertones as
4    mastertone record product, and the use of the word "license" was
5    not an accurate description of the business model.
6    Q.    Why not?
7    A.    Because we were giving T-Mobile the authorization to resell
8    product which is different from the other license provisions
9    that follow in the same section where they had different -- they
10   were covering different uses of different types of content.
11   Q.    Just briefly, how are they different, sir?
12   A.    Well, as an example, so in A, again, what we were
13   authorizing T-Mobile to do was to resell a mastertone product to
14   a consumer where the consumer would get to keep the mastertone,
15   they would get to own it; whereas, for example in Paragraph B,
16   the audio clip license, that's what we call a preview clip, so
17   when you open up your handset and you see, let's say, a Beyonce
18   song, you get to listen it for a few seconds to see if you like
19   it -- that's a preview clip -- before you buy it, pay the money
20   and then permanently own it.  And so that's a limited audio clip
21   license, which is B is a limited use license, and that is why it
22   was covered in a separate paragraph with a separate, you know,
23   description.
24   Q.    Let me just ask you the question, Mr. Weinberg, were you
25   trying to camouflage the word "license" in Section 4 of this

1  agreement?

2  A.    I'm not sure if I understand the question, but if you --

3  Section A is -- is -- we were authorizing T-Mobile to resell.

4  That's the correct and accurate description of the business

5  model.  And then B and C and D, the trademark license, those

6  provisions referred to licenses.

7  Q.    Okay.

8        Let me ask you, sir, and you can take that -- just so

9  we're clear on this, because we didn't look at some other pages

10  of the exhibit, if you could pull this page back, the changing

11  those uses of the word "license" there in Paragraph 4A -- and if

12  you have got Exhibit 112 in front of you, sir, if you could look

13  at it -- were those the only changes that you suggested to

14  T-Mobile in connection with the agreement they sent to you?

15  A.    In connection with the whole agreement now?

16  Q.    So just, if you could, flip to, for example, Page 5 of the

17  agreement.

18  A.    There -- there are a few other changes here.

19  Q.    You can just hold on.  I have asked Mr. Nichols to bring it

20  up so that we can --

21  A.    Sure.

22  Q.    Are the underlined changes, are those your changes,

23  Mr. Weinberg?

24  A.    They -- they appear to be, yes.

25  Q.    Okay.

1          And if you flip through the next several pages, are

2    there underlined changes there as well?

3    A.    I see that.

4    Q.    Let me ask you briefly, Mr. Weinberg, to just -- describe a

5    little bit about who you are and what it is you do.  First of

6    all, what is your position?

7    A.    Probably mean my position at Universal?

8    Q.    At Universal, yes.

9    A.    I am a senior vice-president, business and legal affairs in

10   Elabs at Universal Music Group.  That's the digital distribution

11   and strategy group of Universal Music.

12   Q.    What is your -- how did you come to work at Universal as

13   a -- as an attorney in the Elabs group?

14   A.    Career history?  So briefly I graduated from law school at

15   the University of Texas.  I grew up in Texas.  Austin is a big

16   music city.  I was always fascinated by music.

17          I went to work in New York for a corporate firm called

18   Milbank Tweed.  I worked there for a number of years in the

19   corporate department doing drafting and deal -- business deals.

20   I then had an opportunity to go work at a firm in New York

21   called Grubman & Dorsky.  They do and did represent, when I went

22   to work there -- work with the music business, artists, record

23   companies, producers, engineers, mixers, all sorts of aspects of

24   the music business, and I worked there for a number of years,

25   and then I had an opportunity to move out to L.A. and join

1  Universal Music Group and specifically Elabs.  Again, the group

2  that is responsible for all things digital at Universal.

3  Q.    And when did you join Elabs?

4  A.    I -- it was -- right at the beginning when I first came to

5  Universal, and I think, if Mr. Busch was correct, it was about

6  2001.

7  Q.    Okay.

8          And what was Elabs doing in the year of 2001 around

9  the time that you joined?

10  A.    We were doing lots of things, and specifically we were

11  trying to find -- we -- we were moving from being a company that

12  was primarily in the business of just selling compact discs,

13  physical product, to the digital area where we would make our

14  product available online.  For example, through online retail

15  stores, through other third parties, we called distribution

16  parties.  And I was part of a group that was looking to move us

17  from being a physical -- primarily physical media company, a

18  traditional record company, into the future to be part of the

19  online world, which is we know where consumers have moved to

20  access music.

21  Q.    And what -- what type of work specifically did you,

22  Mr. Weinberg, do in Elabs when you started there?

23  A.    Sure.  I was part of the business and legal affairs group,

24  and that meant primarily that I negotiated and drafted

25  agreements for, again, for the Elabs group at UMG, Universal

1    Music.

2    Q.    And since joining in 2001 up through the present,

3    Mr. Weinberg, can you estimate the number of agreements that you

4    have worked on over that time?

5    A.    Sure.  So hundreds and hundreds.  Last year alone, we did

6    well over 300 deals with different Internet and online and

7    mobile companies, and if the business grew steadily from year to

8    year since 2001, it would be in the hundreds.  I can't tell you

9    how many, but tons.

10    Q.    Okay.

11          And do you have any role at Universal Music Group in

12    negotiating artist recording agreements?

13    A.    No, not at all.

14    Q.    Do you have any role at all at Universal Music Group in

15    artist relations?

16    A.    No, I don't.

17    Q.    With respect to your role in negotiating agreements, just a

18    couple of questions.  We've heard a lot of reference in this

19    case to the -- to what is called form agreements.

20          Do you know what a form agreement is?

21    A.    Sure.  It's -- as it's generally used, it means a basic

22    form that has a bunch of basic provisions that apply to most

23    basic deals and use -- you use that as sort of a standard

24    background form and then you always have to change the specific

25    provisions to reflect the particular deal.  But, yes, I think

1    that's what you're asking about.

2    Q.    Okay.

3          And does Elabs have forms that it uses for its

4    agreements?

5    A.    We do.

6    Q.    Okay.  And we saw this with T-Mobile, and Mr. Busch

7    referenced it with respect to Sprint.

8          Are there third party partners who you work with who

9    have their own forms?

10   A.    Sure.  Big companies typically have their own forms for

11   their own purposes.

12   Q.    Okay.

13         And how exactly is -- how does the form or forms --

14   how are they developed at a place like Elabs?

15   A.    We would look at other agreements that we've used in the

16   past for similar deals.  In the case of our digital distribution

17   business, especially in the case of downloads, where we were

18   selling product, we looked to our physical business where we

19   were selling physical CDs for certain key business terms that we

20   wanted to include in our download form, and -- and that was one

21   of the agreements that we looked at.  I'm sure that there are

22   others as well, but that's the main one, for example, that comes

23   to mind as to how a particular form developed.

24   Q.    Why did you look at the form you had looked at for CDs?

25   A.    We -- we looked at that form because it's the same business

1    model.  At one point in time we were selling CDs to customers

2    and then in the online age, we were selling downloads to

3    customers and end users.  It's the same business model.

4    Q.    Okay.  Just a couple of questions on a couple of points

5    that have come up in this case.  Mr. Weinberg, first of all,

6    some questions have come up with respect to Apple and the iTunes

7    store.

8              You are familiar with the iTunes store, I take it?

9    A.    I am.  And a fan.

10   Q.    And you are one of the attorneys at Universal who

11   negotiated the original iTunes agreement; is that right?

12   A.    I did.

13   Q.    Does -- let me ask you this:  Does iTunes -- does Apple --

14   does iTunes do marketing and promotion of Universal's records

15   that are sold in the iTunes store?

16   A.    Sometimes.  They -- they're an online record store, so they

17   merchandise and market certain of our product that -- certain of

18   our records that we have available for sale in their store.

19   Q.    And can you give examples of how they might do that.

20   A.    Sure.  When you open up the iTunes store on your computer,

21   the first page that pops up might show certain highlights,

22   things that are new to the store or things that the staff, the

23   iTunes staff, has chosen as favorites.  Or there are other ways

24   of highlighting a particular record, and it's like putting a

25   poster in a front window of a Tower or Virgin Records store.

1    Q.    Are you familiar with the type of marketing efforts that

2    Universal Music Group expends for its own records?

3    A.    Sure.

4    Q.    And are the marketing efforts that iTunes does for records

5    sold in the record store comparable to the marketing efforts, as

6    you understand them, that Universal makes for its records?

7    A.    It's -- it's -- no.  Apple is just focused -- or iTunes is

8    just focused on what's available for sale in the iTunes store;

9    whereas, Universal is focused on marketing everything that the

10   artist puts out everywhere.  So it could be in other stores, in

11   physical stores, mastertones, other kinds of product that we put

12   out.  It goes -- it goes far beyond what iTunes does in their

13   particular specific storefront.

14   Q.    There was an exchange yesterday -- you weren't here -- with

15   Mr. Kenswil.

16         First of all, you used to work for Mr. Kenswil; right?

17   A.    I didn't work directly for him.  He was head of Elabs for a

18   period, yes.

19   Q.    But you have known him for a number of years?

20   A.    I have.

21   Q.    There was testimony yesterday about whether or not it could

22   reasonably be considered that a mastertone is something that is

23   sold through normal retail channels.

24         And I just want to ask you, do you believe that

25   mastertones are sold through normal retail channels?  The

1  mastertone sales are record sales through normal retail

2  channels?

3  A.    Sure.  We have sold hundreds of millions of mastertones,

4  and, in fact, we all have little framed pictures on our -- in

5  our offices showing how many hundreds of -- I can't remember the

6  exact number, but it's millions and millions of mastertones.

7  That's normal retail -- retail channel to me.

8  Q.    And they have been a popular product from the perspective

9  of Universal Music Group?

10  A.    Hugely popular product.

11  Q.    And there was also -- there has been some discussion about

12  restrictions in the iTunes agreement on the ability -- or the

13  resale ability of end users, people who buy downloads from the

14  iTunes record store.

15        Let me first ask you this, Mr. Weinberg:  Are you

16  familiar with provisions in the iTunes agreement with Universal

17  Music Group that restrict whether or not content that is sold

18  through the iTunes store can be resold by the -- by those who

19  buy that content?

20  A.    Sure.  I -- I think in -- iTunes and other agreements like

21  it are what we at Universal or in the Internet business call

22  B-to-C businesses.  That means business-to-consumer businesses.

23  So we authorize Apple to sell our downloads to consumers.  We're

24  not authorizing Apple to sell our downloads to other online

25  record stores to open other online record stores.  That would be

1    a B-to-B model, and that's not what we were doing.

2    Q.    What was the concern with the B-to-B model?

3    A.    Well, we wanted to have the -- a direct relationship with

4    the -- with the store and be able to decide which stores we

5    wanted to sell to.  Just like, again, we were mimicking the

6    physical world where we get to decide what record stores to sell

7    to, who is a good credit risk, who is going to keep our product

8    secure, who is going to market in the way that we want, and

9    otherwise -- I mean the reason is not just to keep our content

10   secure but also give consumers a good -- a good value

11   proposition and make sure that we were creating a quality

12   marketplace, just like in the physical world.

13   Q.    And if I could ask Mr. Nichols if you could bring up,

14   please, Exhibit No. 74.  If you could highlight just the very

15   introductory paragraph, Mr. Nichols.

16         Mr. Weinberg, does this appear to you, what's on the

17   screen, to be the original agreement between Universal Music

18   Group and Apple Computer Inc.?

19   A.    Yes.  That's what it appears to be.

20   Q.    Is this an agreement that you had involvement in

21   negotiating and drafting?

22   A.    Yes.  I was involved in that agreement along with several

23   other people.

24   Q.    If I could ask you to go to the tenth page of the exhibit,

25   please, Mr. Nichols.  And if I could ask --

```
 1                    THE COURT:  Could we have a sidebar.
 2                        (Sidebar conference commenced.)
 3                    THE COURT:  Mr. Klaus, does this relate to the portion
 4      of the order that I signed with regard to closing the courtroom.
 5      I wasn't -- didn't think you were going to inquire about the
 6      Apple agreement.
 7                    MR. KLAUS:  Your Honor, thank you so much for
 8      reminding me.  I don't believe there is any problem with people
 9      seeing this.  But if I could --
10                    MR. BUSCH:  I don't understand.  These are the same
11      provisions that they wanted the courthouse closed for yesterday.
12                    MR. KLAUS:  I think it was Apple.
13                    THE COURT:  Apple is here.  That's what they asked
14      for.
15                    MR. KLAUS:  That's fine with me.
16                    MR. BUSCH:  It seems prejudicial that you close the
17      courtroom for me but not for him.  It's the same provision.
18                    MR. KLAUS:  Can I just say something?  I have no
19      problem with it.
20                    THE COURT:  I just wasn't anticipating this
21                        (Sidebar conference ended.)
22                    THE COURT:  Ladies and gentlemen, as I explained
23      before, there are certain portions of contracts that the Court
24      has protected third parties, and on this issue at this point we
25      are going to close the courtroom with regard to this inquiry and
```

1    we will reopen it once that inquiry is done.

2    (Courtroom closed and transcript sealed from Page 55 Line 4 to

3    Page 56 Line 7)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8                    (Courtroom reopened)
 9                  REDIRECT EXAMINATION
10   BY MR. BUSCH:
11   Q.   I just have a couple of questions on redirect,
12   Mr. Weinberg.
13         You scratched out the word "license" in the Section A
14   that we've talked about, and in his cross-examination of you,
15   Mr. Weinberg, Mr. Klaus pointed to several places where you
16   didn't scratch out the word "license."
17         Do you remember that?
18   A.   I do remember that.
19   Q.   Okay.
20         Mr. Klaus didn't point this out, I don't believe, but
21   isn't it correct that before every word of the word "license"
22   that you didn't strike out, it says "royalty free?"
23   A.   I see the places that you're highlighting.  Yes, that's
24   right.
25   Q.   So if it's a royalty-free license, that means Universal's
```

1  not going to get any money for those licenses; correct?  Royalty

2  free?

3  A.    In those -- in those -- in those two cases that I -- that

4  you have pointed out there, it means Universal, but it doesn't

5  necessarily mean the artist or writer might not get some money.

6  Q.    Well, it says "royalty free."  So just -- I don't want to

7  argue with you about that but the places where you struck out

8  "license" --

9  A.    In those two places.

10  Q.    -- did not have "royalty free," and the places where you

11  did strike out "license" -- I'm sorry -- where you did not

12  strike out "license," those were for royalty free licenses;

13  correct?

14  A.    In these two places in this section, B and C, these are two

15  instances where Universal would not get paid or monies for these

16  uses, that's correct.

17  Q.    Okay.

18          And it's not just two, it's -- for B, audio clip

19  license, it's "UMG hereby grants to T-Mobile a non-exclusive

20  limited royalty-free license."

21          That's one; right?  That's right?  That's one?

22  A.    That's one.

23  Q.    Then in C, "UMG hereby grants to T-Mobile a non-exclusive

24  royalty-free license."

25          That's another; right?

1    A.    I see that.

2    Q.    And then in D, "UMG grants to T-Mobile a non-exclusive

3    royalty-free license."

4          You didn't strike those out?

5    A.    That's right.

6          MR. BUSCH:  Okay.  That's all I have.

7          MR. KLAUS:  Could you leave that up so we can expedite

8    this and save all of us some time?  Thank you.

9                        RECROSS-EXAMINATION

10   BY MR. KLAUS:

11   Q.    There is another place where Mr. Busch didn't point out

12   that there'S the word "royalty free."  Is that not correct,

13   Mr. Weinberg?  And I direct your attention to Paragraph A, "UMG

14   grants to T-Mobile a non-exclusive limited" -- what does that

15   say?

16   A.    It's blocked on my screen.  I'm sorry.

17   Q.    Do you see that?

18   A.    I do.

19   Q.    You didn't strike out the word "royalty free" there, did

20   you?

21   A.    No.

22   Q.    And if there was no underlining or strike-through, does

23   that mean that "royalty free" was in the draft that T-Mobile

24   sent to you?

25   A.    Probably.

1  Q.    Do you have any reason to think it wasn't?

2  A.    No.

3          MR. KLAUS:  I have nothing further, Your Honor.  Thank

4  you.

5          MR. BUSCH:  Just one quick thing.

6                    REDIRECT EXAMINATION

7  BY MR. BUSCH:

8  Q.    What Mr. Klaus was pointing to, "UMG hereby grants to

9  T-Mobile a non-exclusive limited royalty free right," where you

10  struck out the word "license," there is a parenthetical there,

11  right?  "Except as set forth in any schedule attached hereto"?

12  A.    I see that, yes.

13  Q.    The schedule that is attached to this agreement is a

14  schedule that will discuss how Universal will be paid by the

15  mobile carrier for mastertones; isn't that right?

16  A.    I would have to look at the schedule.

17  Q.    If there is -- I'll be happy to have you look at it.  It's

18  Aftermath 13677, Page 14.

19          Well, if we go to the -- if we go to the final

20  agreement, which is Exhibit 78, we can just do that, the

21  exhibits have the payment terms; correct?

22  A.    I don't recall the specifics but if that -- if it's in

23  there, then I'm sure it is.

24  Q.    I'm just going to represent to you that this is an

25  agreement attached to the T-Mobile agreement; okay?

```
 1   A.    Sure.

 2   Q.    This is the payment terms that would be attached as an

 3   exhibit; right?

 4   A.    Sure.

 5              MR. BUSCH:  That's all I have.

 6              MR. KLAUS:  No further questions, Your Honor.

 7              THE COURT:  You may step down.  Thank you.

 8              Plaintiff's next witness?

 9              MR. BUSCH:  Ping Hu.

10              THE COURT:  Pardon me?

11              MR. BUSCH:  Ping Hu.

12                 Ping Hu, Plaintiff's witness, was sworn

13              THE CLERK:  Please take a seat.  For the record, can

14   you please state your full name and spell your last name.

15              THE WITNESS:  Ping Hu.  Last name is H-U.

16                        DIRECT EXAMINATION

17   BY MR. BUSCH:

18   Q.    Mr. Hu, we have met once before at deposition; is that

19   correct?

20   A.    That's correct.

21   Q.    Where do you work?

22   A.    I work at Universal Music Group.

23   Q.    What is your position?

24   A.    Vice-president of royalty audits.

25   Q.    And you're here today on not the digital download part of
```

1    this case, but on a separate claim.

2            You understand that; correct?

3    A.    Yes, I do.

4    Q.    And the claim you're here on is a claim that Universal

5    over-allocated certain costs to F.B.T. that was part of an

6    audit -- that was discovered in an audit that F.B.T. did of

7    Universal.

8            You're aware of that?

9    A.    Yes, I am.

10   Q.    Okay.

11           Now, do I understand it correctly, Mr. Hu, that you

12   were not involved directly in responding to the audit of

13   Mr. Cohen that was part of a February 10th, 2006, letter; is

14   that correct?

15   A.    That's correct.

16   Q.    Okay.

17           Someone else prepared the response to the audit but

18   you have knowledge of it; is that correct?

19   A.    That's correct.

20   Q.    And you weren't involved specifically in investigating the

21   claims that were made in the audit; correct?

22   A.    Correct.

23   Q.    Okay.

24           And -- but you have reviewed Mr. Cohen's audit letter;

25   is that correct?

```
 1   A.    Yes.

 2          MR. BUSCH:  Your Honor, we would move for introduction

 3   of Exhibit No. 207.  It's Gary Cohen's audit letter, audit

 4   report of February 10, 2006.

 5          THE COURT:  Any objection?

 6          MS. LeMOINE:  No objection, Your Honor.

 7          THE COURT:  207 is admitted.

 8          (Plaintiff's Exhibit 207 was received.)

 9   BY MR. BUSCH:

10   Q.    And, Mr. Hu, if you -- you don't need to pull it up --

11   Mr. Hu, if you look at Exhibit No. -- you can put up the first

12   page, please.

13          Do you recognize Exhibit No. 207 to be the audit

14   letter of -- audit report of Gary Cohen that you reviewed?

15   A.    Yes, that's correct.

16   Q.    Okay.

17          And it's dated February 10, 2006; correct?

18   A.    Correct.

19   Q.    And you're aware that in this report, Mr. Cohen made

20   certain claims on behalf of F.B.T. and Eminem, and one of them

21   was that -- was this over-allocation of costs issue; correct?

22   A.    Correct.

23   Q.    And this is dated February 10, 2006.  If you could turn in

24   your binder to Exhibit No. 209, please.  And if you'd put 209 on

25   the board, please.
```

```
 1              You'll notice that Universal's response is dated
 2   May 8, 2007?
 3   A.   Yes, it is.
 4   Q.   Do you know why it took Universal over a year to respond to
 5   Mr. Cohen's audit report?
 6   A.   No, I don't.
 7   Q.   This audit report, this response is signed by a Stephanie
 8   Polansky; is that correct?
 9   A.   Yes.
10   Q.   And you were not cc'd on this.  Do you know why?
11   A.   Yes.  This was before I took over the department.
12   Q.   When did you take over the department?
13   A.   In July of 2007.
14   Q.   So you were not involved in this in any way, shape or form;
15   correct?
16   A.   Correct.
17   Q.   But you were put forward as Universal's corporate
18   representative on this issue; is that correct?
19   A.   Yes.
20   Q.   Now, I deposed you; do you recall that?
21   A.   Yes.
22   Q.   Do you recall me asking you questions about the amount of
23   money that Universal admits or admitted in this letter that it
24   owed?
25              Do you recall that.
```

1    A.    I remember you asking the questions, yes.

2    Q.    Do you recall telling me that Universal was admitting that

3    it owed approximately $159,000 to F.B.T. in connection with your

4    deposition testimony?

5    A.    No.  I don't believe I said that.

6              MS. LeMOINE:  Objection, Your Honor.  It misstates his

7    testimony.

8              THE COURT:  Overruled.

9              THE WITNESS:  I believe I acknowledged that F.B.T. was

10   overcharged in the amount of $159,000 and Eminem was

11   undercharged in the same amount.

12   BY MR. BUSCH:

13   Q.    Okay.

14             And subject to any -- I asked you if there was any

15   kind of counterclaims or anything like that that Universal was

16   putting forth against it, and you testified that you were

17   unaware of the specifics of any such counterclaim; is that

18   correct?

19   A.    No, that's not correct.  At the time there was one

20   counterclaim that was quantified and it was netted out in the

21   159,000 that we discussed.

22   Q.    Right.

23             So there was a counterclaim that was being raised but

24   that's what brought the amount owed down to $159,000 to F.B.T.

25   for the over-allocation; is that correct?

```
1   A.    Correct.  That's correct.
2            MR. BUSCH:  All right.  I have nothing further,
3   Your Honor.
4                      CROSS-EXAMINATION
5   BY MS. LeMOINE:
6   Q.    Good afternoon, Mr. Hu.
7   A.    Good afternoon.
8   Q.    If I understand the claim here, it's that F.B.T. was
9   overcharged for certain recoupable costs; is that right?
10  A.    That's correct.
11  Q.    And if F.B.T. was overcharged, was someone else
12  undercharged ?
13  A.    Yes, Eminem was undercharged.
14  Q.    So to pay F.B.T. the amount overcharged, you would take it
15  from Eminem who was undercharged; is that right?
16  A.    That's correct.
17  Q.    Do you know whether Eminem agrees that he was undercharged?
18  A.    No, I don't know that.
19  Q.    Do you know whether anyone has asked Eminem if he agrees --
20  A.    Yes.  I believe F.B.T. has contacted Eminem's
21  representative and was -- that issue was raised.
22  Q.    Have you heard from Eminem or his representatives whether
23  he approves of reallocating this overcharge in this way?
24            MR. BUSCH:  Objection.  Hearsay, Your Honor.
25            THE COURT:  Sustained.
```

```
 1   BY MS. LeMOINE:
 2   Q.   Have you heard from Eminem's representatives that he
 3   approves of this reallocation?
 4              MR. BUSCH:  Objection.  Hearsay.
 5              THE COURT:  Sustained.
 6   BY MS. LeMOINE:
 7   Q.   Who did the audit for F.B.T.?
 8   A.   Gary Cohen.
 9   Q.   Who did the audit for Eminem?
10   A.   Gary Cohen.
11   Q.   Has Mr. Cohen ever told you that Eminem approves of the
12   claim?
13              MR. BUSCH:  Objection.  Hearsay.
14              THE COURT:  Sustained.
15   BY MS. LeMOINE:
16   Q.   So --
17              THE COURT:  I'm sorry.  With regard to Mr. Cohen,
18   exception.
19              MS. LeMOINE:  I believe Mr. Cohen would be a party
20   admission, Your Honor.
21              THE COURT:  Overruled.
22   BY MS. LeMOINE:
23   Q.   So did Mr. Cohen ever tell you that Eminem approved of this
24   allocation claim?
25   A.   No, he did not.
```

1              MS. LeMOINE:  Thank you very much.  That's all I have.

2              MR. BUSCH:  Nothing further, Your Honor.

3              THE COURT:  You may step down.  Thank you.

4              MR. BUSCH:  Your Honor, may I have a sidebar for

5    one minute, please?

6                   (Sidebar conference not reported)

7              THE COURT:  We are going to take a five-minute break.

8    I am not going to leave the courtroom, and we will resume in

9    five minutes.  Remember not to discuss the case with yourself or

10   anyone else until it's finally submitted to you.  We'll see you

11   in five minutes.

12                          (Jury Out)

13                         (Recess taken)

14                          (Jury In)

15             THE COURT:  Plaintiff's next witness.

16             MR. BUSCH:  Yes, sir.  We will call David Berman.

17        David Marshall Berman, Plaintiff's witness, was sworn

18             THE CLERK:  Please take a seat.

19             For the record, can you please state your full name

20   and spell your last name.

21             THE WITNESS:  David Marshall Berman.  B-E-R-M-A-N.

22             THE COURT:  You may.

23                       DIRECT EXAMINATION

24   BY MR. BUSCH:

25   Q.   Good afternoon, Mr. Berman.

1    A.    Good afternoon, Mr. Busch.

2    Q.    Mr. Berman, you are -- you have been retained by the

3    plaintiffs as an expert witness in this case; is that correct?

4    A.    That's correct.

5    Q.    And what are you being paid for your time?

6    A.    $500 an hour.

7    Q.    And, Mr. Berman, would you please describe your educational

8    background.

9    A.    I have a Bachelor's of Business Administration from the

10   University of Michigan and a law degree from Harvard Law School

11   where I graduated in 1969.

12   Q.    Okay.

13         And take me through, if you would, your experience in

14   the music business from 1969.

15   A.    Immediately upon graduation from law school, I joined the

16   law firm of Mitchell, Silberberg & Knupp in Los Angeles where I

17   specialized in -- where I worked in the music department.  The

18   firm at that time represented many record companies, publishing

19   companies, artists, producers, managers.  We represented A&M

20   Records and Island Records, two companies which are now part of

21   the Universal Music Group.  We represented The Doors and The

22   Beach Boys and The Temptations.  And in the course of my time at

23   the law firm, I, of course, as a music attorney, had to have a

24   basic knowledge of copyright law and contract law.  But as

25   important as that was, equally important -- in some cases more

1    important -- was a knowledge of the record or the music

2    business, because you can't be a transaction lawyer, you can't

3    make deals and draft contracts without knowing the -- the

4    essence of the business that you're dealing with.

5          So over the course of my time there, by talking issues

6    with clients, by talking to senior attorneys, you learn the

7    business, you learn distribution, you learn marketing, you learn

8    promotion, you learn royalty accountings.  And sometimes by

9    trial and error.  You will draft an agreement and hand it to a

10   senior lawyer who will look at it and throw it back in your face

11   and say this makes no bleeping sense, which I think was a little

12   harsh, but that's the sink-or-swim technique of learning.  But

13   you do learn.  And what you really learn is the music business.

14         Now, in -- I started with the firm in '69.  In early

15   in April of '76 I went to Warner Bros. Records where I was the

16   vice-president and later senior vice-president of business

17   affairs.  In that context, not only did I continue to learn, I

18   learned about the record business from the inside of a company.

19   All that time both at the law firm and at Warner Bros., I -- I

20   was involved with negotiating and drafting recording contracts

21   and -- and licensing agreements and record club licenses and

22   sound track compilations and other compilations.  Licensing is a

23   major part of the whole business.  It always has been.

24         I was at Warners for approximately 11 years.

25         In early '87 I went to Capitol, initially as the

1  president of Capitol Industries, Inc., which was the North

2  American holding company of EMI.  I was responsible for human

3  resources, legal, finance, distribution, music publishing,

4  Canada, international, and I had dotted line responsibility to

5  the then three EMI-owned labels.

6          Shortly thereafter, though, I moved to Capitol Records

7  itself as the president of Capitol Records, and in that

8  capacity, ran a record company.

9  Q.   Let me stop you right there, if I could.  You have gone

10 pretty quickly over 20 years.

11         I understand you were in private practice for a while

12 and then you went to Warner; is that correct?

13 A.   Yes.

14 Q.   Where you were the head of the legal department?

15 A.   Legal and business affairs department, yes.

16 Q.   And then after a while there, you went to Capitol Records

17 where you started out in the legal department; is that right?

18 A.   No, not at all.  No.  I started out in a corporate

19 position, president of Capitol Industries, Inc.  It was a

20 corporate position above the labels.  It wasn't an operating

21 function.

22 Q.   Okay.  Stop right there.

23         And then you became president of Capitol Records; is

24 that right?

25 A.   That's correct.

1  Q.    And is Capitol Records considered a major -- one of the

2  major record companies?

3  A.    Sure.  As was Warner -- as is Warners.

4  Q.    And who were some of the artists that were on Capitol at

5  that time?

6  A.    Well, while I was there, I mean -- The Beatles.  But I did

7  not sign The Beatles.  While I was there, we signed Bonnie

8  Raitt, we signed MC Hammer, we signed Garth Brooks, we signed

9  the Beastie Boys.

10 Q.    Okay.

11        Who were some of the other artists that were just on

12 Capitol at that time?

13 A.    Queen, Paul McCartney, The Beatles catalog, The Beach Boys

14 catalog.  In fact, we still had The Beach Boys for a while

15 there.

16 Q.    Okay.  Now, let me stop you right there.

17        During your time that you have described so far, did

18 you gain an understanding of the custom and usage of licensing

19 provisions in recording contracts?

20 A.    Absolutely.

21 Q.    And did you gain an understanding of the nature and purpose

22 of licensing provisions in recording contracts?

23 A.    Of course.

24 Q.    Okay.

25        And did you, during your time, negotiate licensing

1    agreements and become familiar with types of terms normally

2    found in licensing agreements?

3    A.    Of course.

4    Q.    Okay.  Okay.

5          As president of Capitol Records, what were your duties

6    and responsibilities?

7    A.    My responsibilities were to run a record company.  So every

8    department head reported to me.  I had all the functions that a

9    chief executive officer of the label has.

10   Q.    And were you involved in negotiations of the artists

11   agreements that you identified being signed during your time at

12   Capitol?

13   A.    I certainly was with -- with -- with Bonnie Raitt, with MC

14   Hammer, with Beastie Boys, I very much was, yes.

15   Q.    You left Capitol records in October of 1989; is that

16   correct?

17   A.    That's correct.

18   Q.    What did you do then?  What were your next couple of

19   positions then?

20   A.    I -- for about a year, most of 1990, I went back to the law

21   firm as a partner.  I was a partner at the law firm when I left.

22   And again in the music department.

23         And then in early 1991, I went to Geffen Records.  We

24   didn't have titles per se, but my contract referred to me as a

25   senior executive in charge of business affairs and

1    administration, and sometime after that I did take on the title

2    of general counsel in addition.

3    Q.    The head legal position?

4    A.    The head legal position, yes.

5    Q.    And Geffen Records, is that owned by Universal?

6    A.    It was owned by -- well, it became Universal when Seagrams

7    bought them.  Yes.  At the time that I -- Geffen Records was

8    sold to MCA, now Universal in 1990.

9    Q.    Okay.

10          And did you negotiate artist agreements during that

11   time?

12   A.    Absolutely.

13   Q.    And --

14   A.    And licensing agreements and record club agreements and

15   soundtrack album licenses in and out, etc.

16   Q.    Okay.

17          And what type -- give me some examples of some of the

18   names of the artists that you signed agreements with at that

19   time.

20   A.    Counting Crows, The Roots, Riza from Wu Tang Clan.  We had

21   Nirvana, of course.  We did an Eagles album, Don Henley.

22   Guns N' Roses, which was already there but we did renegotiate.

23   Q.    And I take it you continued, as part of those negotiations,

24   to continue negotiating licensing provisions and contracts?

25   A.    Yes.

1    Q.    And did you continue to have an understanding of the

2    licensing provision as far as its application to a sale versus

3    when a license occurred?

4    A.    Yes.

5    Q.    Okay.

6          Were new medium or new technology provisions being

7    inserted into contracts around this time?

8    A.    Yes, I believe they were.

9    Q.    Okay.

10         And did you gain a familiarity with the nature and

11   purpose of these provisions?  In other words, why they were

12   included?

13   A.    Well, essentially --

14   Q.    Just yes or no right now.

15   A.    Yes.

16   Q.    Okay.

17         Why did you leave Geffen?

18   A.    I was offered the position of president of the Buena Vista

19   Music Group, which is the recorded music and music publishing

20   arm of the Walt Disney Company, and it seemed like a good idea

21   at the time.

22   Q.    And what were your duties and responsibilities in

23   connection with that job?

24   A.    We had responsibilities over four record labels and two

25   music publishing companies.

1  Q.    Okay.

2        Did that involve negotiating recording agreements?

3  A.    Yes.  Although -- well, yes, I was definitely involved in

4  negotiating recording agreements.

5  Q.    How long did you stay at Disney?

6  A.    I left in, I believe it was, April of 2001.

7  Q.    And throughout your 32 years of working in the record

8  business, did you become familiar with all facets of the record

9  business?

10 A.    Yes, I did.

11 Q.    Including the processes for selling records as opposed to

12 licensing records?

13 A.    Absolutely.

14 Q.    Okay.

15       And you negotiated and agreed to numerous distribution

16 agreements for the sale of records and -- versus the licensing

17 of records?

18 A.    Yes.

19 Q.    Okay.

20       Now, in 2000 --

21       Let me stop right there, Your Honor.  I would like to

22 tender Mr. Berman as an expert.

23       MR. POMERANTZ:  I will reserve my questions for

24 cross-examination, Your Honor.

25       THE COURT:  Thank you.  You may proceed.

1    MR. BUSCH:  Okay.  Thank you.

2  Q.   Now, you left Disney in 2001; is that correct?

3  A.   That's correct.

4  Q.   And what have you been doing since 2001?

5  A.   Well, when I left, it was my intention to retire, but I --

6  beginning in, I believe it was early '02, I had become fairly

7  active in expert witnessing.  I have continued to follow the

8  music industry.  I have a number of friends still in it and both

9  of my children work for record companies.  And I have recently

10  taken a position as the -- as a member of the board of directors

11  and the CEO of a very small startup entertainment firm.

12  Q.   Let me just ask you some general questions so the jury can

13  get an understanding of how this all works.

14    When a record company sells a record, who is the

15  record company generally selling to?

16  A.   Well, they're essentially, for the most part, selling to a

17  retail account, to a Best Buy.  We keep using examples of Tower

18  Records.  Unfortunately, we are not selling to Tower Records any

19  more, but to a retail account.

20  Q.   What does the record company do historically to turn a

21  master into a record or CD and then sell it to the retailer?

22  A.   The do a number of things.  First they manufacture or cause

23  to be manufactured the record, the CD, the vinyl, the cassette,

24  whatever it may be.  They create the artwork and they fabricate

25  the artwork for the CD booklet, which will contain pictures,

1  additional pictures, credits, very frequently lyrics, the album

2  cover if it's in vinyl; the J card and the jewel box for the

3  cassettes.  So they have all those art and manufacturing

4  responsibilities.  They then cause themselves, through others,

5  the record to be distributed.  And --

6  Q.  Can I stop you right there?

7  A.  Yes.

8  Q.  When we're talking about the manufacture of a record -- I

9  will take this one, for example, the Eminem -- is it correct

10  that the record label has the responsibility for the costs

11  involved with copying and manufacturing each individual unit?

12      MR. POMERANTZ:  Your Honor, he is leading the witness.

13  I object.

14      THE COURT:  Overruled.  Go ahead.

15      THE WITNESS:  Yes, the entire costs of producing the

16  CD, the jewel case, the booklet, any stickers, those costs are

17  all costs that are borne by the record company.

18  BY MR. BUSCH:

19  Q.  They have to be -- when it's a physical product being sold

20  by the record company, the record company is responsible for

21  reproducing or recreating each one of these -- as many units as

22  they produce; correct?

23  A.  The more the better.

24  Q.  Okay.

25      And they have the costs associated with all of that?

1    A.    Of course.

2    Q.    All right.  If you would continue now.  I think you were --

3    you had talked about the reprinting of all the information that

4    is contained within the package when they sell physical product.

5    You were going on to --

6    A.    I was going on to distribution.

7    Q.    Okay.

8          What about -- before you do, what about warehousing

9    costs?

10   A.    Well, to me that's part of the distribution issue.

11   Q.    All right.  Go ahead, then.

12   A.    The next function chronologically is the distribution

13   function.  The records are manufactured.  They are now sent to

14   the various distribution centers where they are warehoused.  The

15   distribution function entails having salespeople, both

16   regionally and nationally, call on retail accounts to solicit

17   orders.  They are responsible for the shipment of those orders

18   to the retail accounts.  They have responsibilities of inventory

19   management because a record isn't necessarily a hit everywhere

20   simultaneously.  If it breaks out of Atlanta, you may want to

21   make sure that your Atlanta branch, if you have one, is well

22   stocked and has a lot of records in the area, but you may not

23   want the West Coast branch to be that stocked because it hasn't

24   broken there and may not.  So inventory management is a major

25   issue.

1          Once you do get the records in the store, the function
2     of the distribution department doesn't end there.  You then have
3     some very serious in-store promotional activities that are part
4     of the distribution and sales function.  When you see, as I
5     think was alluded to a little while ago, posters in the window
6     of a retail store, the store didn't pay for that.  The record
7     company paid for that poster.  Not only did the record pay for
8     that poster, more than likely the record company paid the store
9     for the right to put the poster in the window in the first
10    place.
11         When you see the stand-ups of, you know, an artist,
12    Rod Stewart, big stand-up front and center in the store, the
13    record company paid for that stand-up.  When you see a big stack
14    of records, which we see less and less of, maybe up front and by
15    the -- you know, the -- the counter, there was a price that the
16    record company paid to the retail account called P&P, price and
17    positioning, to get that record highly visible, up front, in
18    quantity and sold for a lower price.  So those are -- I think
19    I -- most of the functions of the label up to that point.
20    Q.    Okay.
21         And would it be fair to say that historically were
22    these costs and processes that you just described taken into
23    consideration in the constructing of the records sold royalty
24    provisions in recording contracts?
25    A.    Well, sure.  I mean the economics of the business are

1  obviously taken into account -- account in determining the

2  splitting of the income, let's say, between the artist and the

3  label.

4  Q.   Okay.

5       Now, you know one of these issues -- one of the issues

6  in this case is whether Universal is licensing masters or

7  whether there is a sale.  You understand that is one of the

8  issues; correct?

9  A.   In my opinion that's the issue.

10  Q.   Okay.

11       Now, what -- when a record retailer buys a record from

12  a record company, what do they get?

13  A.   They get the ownership of this record.  They get title to

14  this record.  And that essentially means that they can do almost

15  anything they want with this record.  They paid hypothetically

16  $10 for this record.  To the label.  That's all the label is

17  going to see on this record.  The record company -- the

18  retailer, they can then sell it to anybody they want to for any

19  price they want to.  They can give it away.  They can destroy

20  it.  They can do anything with it other than copy it.  They

21  cannot make another copy of it.  That's the essential nature of

22  the sale.

23  Q.   Okay.

24       When do record companies book the sale of records?

25  A.   When the record is sold to the retail account.

Q.    Okay.

When is the royalty earned by the artist?

A.    At the same time.  The royalty is earned or accrued to the
artist's account at the time the record is sold to the account.
It matters not one iota whether that record is -- is ever sold.
Now, there is -- the royalty is subject to a reserve and a
return.  If the retail account returns the record, then the
royalty is uncredited to the artist's account.  But so long as
it's not returned, if it's burned, if it's destroyed, if it's
stolen, the artist gets -- earns his royalty.

Q.    Are there penalties with respect to returns that are built
in?

A.    In -- not in a legal sense because they're valid penalties.
Most distribution companies, I believe it was in the '80s, set
up a procedure whereby records historically had been 100 percent
returnable, and although the labels didn't particularly change
that function, what they did say was if you return more than --
and I believe initially it was 20 percent, I think it was
subsequently went down to 18 percent, but keep the math simple,
let's pretend it was 20 percent.  If you return more than
20 percent of your records and I sold you every record for $10,
I am not going to give you $10 for every record you return, I am
going to give you less because you are returning too many.  If
you return less than 20 percent of the records, I am going to
give you a little more than what you paid.  So there was an

1    incentive to buy properly, not overbuy, because you could return

2    it, and a disincentive to return too many records.

3    Q.    Okay.

4              Mr. Paterno, Peter Paterno, testified in this case.

5              Do you know that?

6    A.    Yes, I'm aware of that.

7    Q.    And Mr. Paterno testified that the master licensing

8    provision in the record contract that's in issue here applies to

9    everything it says it applies to.

10   A.    I couldn't agree with Peter more.

11   Q.    Okay.

12             And what is the nature and purpose of the licensing

13   provision?

14   A.    Well, it's essentially a catch-all provision which covers

15   any sale of the record that was done by a license from the label

16   to a third party.  A license of the master to a third party that

17   isn't otherwise provided for in the agreement.  If there is a

18   specific other provision, the licensing provision might not

19   apply, but if there is no other specific provision and if the

20   record was sold pursuant to a license, then the master license

21   provision applies.

22   Q.    As far as the licensing provision is concerned, would you

23   please explain the economics behind the licensing provision as

24   opposed to the records sold provision.

25   A.    Well, essentially there are very -- in general, there are

1    very little costs incurred with respect to a specific

2    transaction that is licensed.  It -- if you take a record club

3    license, the -- all of those costs that I mentioned that take

4    place when a record company distributes a piece of physical

5    product itself into a retail account, none of those costs --

6    very few of those costs apply in the case where the record

7    company licenses it.  Because, in the case of a license, the

8    label isn't paying for the cost of manufacture.  They're not

9    paying for the cost of the artwork.  They're not paying for the

10   cost of the distribution.  They don't have any of those costs.

11   And so it's become commonplace in licensing provisions, which

12   don't otherwise -- which aren't otherwise provided, that the

13   income therefrom, the net income is split 50/50 with the artist.

14   Q.    Okay.

15           And with respect to the actual song, so that we're

16   clear, when a song, master recording or group of master

17   recordings is supplied to a third party pursuant to a license,

18   what does typically the record company provide to that third

19   party?

20   A.    Well, they provide -- I'm hesitating with the use of the

21   word "song" which I don't agree with.  The record company

22   provides a master or a copy of a master to the licensee from

23   which the licensee duplicates in some fashion, manufactures,

24   replicates, whatever word you want to use, the record and sells

25   the record.  So the essential difference between the retail

1    establishment is the one thing they can't do is make a copy of

2    it.  The one thing that the licensee must do is make copies.

3    Q.   Okay.

4         Under the custom and practice with respect to this

5    provision, unless there's something otherwise provided for in

6    the agreement, are there any limitations historically to the

7    type of licenses that the master license provision applies to?

8    A.   No.  If it's a license, if there is no other provision for

9    it, it's covered by the master licensing provision.

10   Q.   Okay.

11        Do you recall being questioned by Mr. Pomerantz in

12   this case?

13   A.   Yes, I do.

14   Q.   Mr. Pomerantz was asking you some questions about what he

15   called ancillary uses of master recordings and application of

16   this master licensing provision in that regard.

17        Do you recall that?

18   A.   Yes.

19   Q.   Okay.  I want to ask you some questions about that topic.

20        In your -- and he also has brought up compilations and

21   he has put things on the board.  You've been sitting in today;

22   right?

23   A.   Got here around 10:30.

24   Q.   You saw his little chart about compilation versus record?

25   You saw that; right?

1  A.    Before you destroyed it, yes.

2  Q.    Okay.

3        What has been the sole issue historically in

4  determining whether the master licensing provision has applied?

5  A.    Whether the transaction was pursuant to a license.

6  Q.    Now -- and historically when a license is involved, can you

7  tell the jury on whose distribution platform the record has been

8  sold?

9  A.    The licensees platform.  They perform -- they have the

10  laboring oar.

11  Q.    Okay.

12        And you reviewed some of the different digital

13  download agreements that are at issue in this case; the Apple

14  agreement,  for example; correct.

15  A.    Yes.

16  Q.    Okay.

17        And have you gained an understanding of those

18  agreements by reviewing those agreements?

19  A.    Yes.

20  Q.    Okay?

21        And can you tell the jury, do those agreements have

22  terms that are generally found in licensing agreements from your

23  experience?

24  A.    Those agreements, in my opinion, contain all of the indicia

25  of a license, and none of the indicia of a sale.

Q.    Okay.

         And historically, what have been the types of rights
and limitations granted within a typical license under a master
license provision?

A.    Well, as opposed to the sale to the retail account, the
licensee is -- obtains a copy of the master or a digital file.
They do not own that master.  They cannot sell that master.
They cannot, without the authorization permission of the label,
destroy that master.  The price that they pay the licensor, the
label, for the copy -- excuse me -- they do have the right --
the essence of the deal is they have the right to make copies of
that master and sell those copies.

         And the price that they pay the label for that right
is in some manner or shape contingent on the price that they get
from the -- their customer.  So that unlike this which the --
the record company got $10 for, regardless of how much Best Buy
sold it for, in the typical license and certainly with the
download providers, the price that Universal or any of the
labels gets varies depending upon the price at which the
download provider sells the download or the licensee sells the
record.

Q.    Okay.  And you may have just answered this.  I'm sorry.

         Would it be fair to say or is it correct or not that
historically in a license, the record company generally receives
a percentage of the price that the licensee sells the record

1  for?

2  A.    That's what I just said.

3  Q.    Okay.

4        Have you read some of the download and mastertone

5  agreements where there is a reference to a wholesale price?

6  A.    Yes, I have.

7  Q.    Does that impact your conclusions at all?

8  A.    Not a bit.

9  Q.    Why?

10 A.    Well, they talk of a wholesale price.  But unlike -- you

11 know, again my example of the $10, which is a real wholesale

12 price, that's the price that the label is going to get for this

13 CD, regardless of how much Best Buy sells it for.

14        In the case of the downloads, whether it's the

15 mastertones or the Apple, that quote wholesale price -- take the

16 typical in the iTunes agreement -- $0.70 is that wholesale

17 price.  It doesn't stop there.  It's $0.70 or 70 percent of what

18 Apple sells the download for, whichever is greater.  So what

19 Universal -- that's essentially the same with all the labels.

20 What the labels get from the download provider -- from Apple,

21 let's use that, it's the biggest example -- very much depends

22 upon the price that Apple sells it for.

23 Q.    And if Apple never sells what they have received --

24 A.    Then the label gets nothing.

25 Q.    Okay.  Okay.

```
 1              You also sat in, I believe, when defendants' expert,
 2    Jeffrey Harleston, was deposed in this case; is that right?
 3    A.    That's correct.
 4    Q.    And you're aware that one of the things Mr. Harleston said
 5    is that what the download companies are receiving are records
 6    and not master recordings.  Do you recall that?
 7              MR. POMERANTZ:  Objection, Your Honor.  It's an
 8    improper question.  It's hearsay at this point.
 9              THE COURT:  Overruled.
10              MR. BUSCH:  Thank you.
11              THE WITNESS:  I recall that.
12    BY MR. BUSCH:
13    Q.    Okay.
14              And do you agree with that?
15    A.    No, I don't.
16    Q.    Why is that?
17    A.    A master, in simplest terms, is the thing from which a
18    record is produced.  What the download providers receive from
19    the label is a digital file.  They don't sell the digital file.
20    They use the digital file.  It is duplicated, the music on it is
21    duplicated in some form, and what is sold is a download.  So
22    from the digital file, i.e., a master, a download is created and
23    transferred and sold to the end user.
24    Q.    And are you familiar with the testimony about the fact that
25    two files are received that are combined by the download
```

```
 1   companies?

 2   A.   That is my understanding.

 3   Q.   Okay.

 4        Now, in a similar vein you understand that another

 5   position of Universal has been that the licensing provision does

 6   not apply to the downloads because the download companies are

 7   selling what Universal calls its core products, it's albums?

 8        Are you aware of that position they have taken?

 9   A.   I have heard that.

10   Q.   Okay.

11        Does that position hold water, based upon your custom

12   and experience?

13   A.   You remind me of My Cousin Vinny.

14   Q.   Okay, I shouldn't have said hold water.

15   A.   If I had a New York accent, I would do a Marisa Tomei.

16   Q.   I have a better suit on than he did.

17   A.   No, it doesn't hold water.  Whoops.

18   Q.   We have to get going because I have a limited amount of

19   time, Mr. Berman, so no time for jokes.

20   A.   Repeat the question.

21   Q.   Okay.

22        Does this idea that the master provision does not

23   apply because Apple is selling what Universal calls its core

24   products, is that -- based on your knowledge, does that have any

25   merit?
```

```
 1   A.    No, it doesn't have merit for a number of reasons.  First

 2   of all, the licensing provision has no limitation that says when

 3   we license our masters for non-core product uses.  It says

 4   nothing of the kind.  It says when we license our product for

 5   record use or any other purpose without such a limitation.

 6         Secondly, they do license -- if they call their core

 7   product, the CDs, the cassettes, the singles, they do license

 8   them.  Nobody denies that a record club is a license.  And what

 9   is licensed, what is given to Columbia House to reproduce and to

10   sell, is the same, quote, core product as they describe it as

11   they themselves are selling.  So that distinction is just

12   meaningless to me.

13   Q.    Okay.

14         Now, another thing that Mr. Harleston said is that

15   when you brought up the record club issue, he said that the

16   record club was, quote, unquote, a hybrid and like a conditional

17   download somehow.

18         Based upon your knowledge of what is happening with

19   respect to a record club, does that make any sense?

20   A.    First of all, I don't care if it's a hybrid.  I'll get to

21   the fact that I disagree.  It's a license and that's the issue

22   that matters.  It's what matters here.  If the transaction in

23   question is a license, it's covered by the licensing provisions.

24   If it's not a license, it's not covered by the licensing

25   provisions.  The hybrid, I don't buy.  I mean, it's the same,
```

1    quote, core product.  There -- it's a different manner that the

2    consumer has of purchasing it.  I agree that a record club

3    historically isn't considered a normal retail channel, but none

4    of those issues matter.

5    Q.    And in fact, in this agreement, in the 2004 agreement --

6    could you put, I'm sorry, '98 agreement?  Could you pull up

7    4(c)(v) for me, please?

8              There is a provision that says, "Notwithstanding the

9    foregoing" underneath the record -- what Mr. Pomerantz has

10   referred to as the normal retail channel record sale provision.

11   And then there is a "notwithstanding the foregoing."

12             What does "notwithstanding the foregoing" mean?

13   A.    It essentially means that what follows takes precedence

14   over or trumps what came before.

15   Q.    Okay.

16             And going to the licensing provision, it says "On

17   masters licensed by us or NRS licensees to others for their

18   manufacture and sale of records or for any other uses" -- let's

19   stop there.

20             When there is a license, if the third party is then

21   selling it in what Mr. Pomerantz has referred to as normal

22   retail channels, does 4(c)(v) still apply?

23   A.    Absolutely.

24   Q.    Okay.

25             A few final questions, Mr. Berman.  We spoke earlier

1    about the fact that you have experience with the nature and

2    purpose of new medium clauses and the custom and practice of

3    their application; correct?

4    A.    Yes.

5    Q.    Okay.

6          And is it fair to say that new medium clauses

7    generally provide that a record label will pay a lower amount of

8    what they ordinarily would pay -- would have had to pay if the

9    method of sale was not a new medium?

10   A.    Yeah.  Well, that's true, yes.

11   Q.    And what has been the custom and practice of its

12   application?

13   A.    Well, the rationale and the custom and practice and origin

14   of such a provision is that with the introduction of some new

15   configuration, new technology, new method of distribution, as

16   occurred when CDs first came into creation, the expenses that a

17   label are going to have to incur to either manufacture the new

18   configuration or to set up alternative forms of distribution or

19   a new platform are going to be more expensive and, therefore, in

20   an effort to offset those higher costs of either distribution,

21   manufacture or both or whatever, they -- the attempt is made,

22   and usually successfully, to reduce what is paid to the artist.

23   Q.    Okay.

24         So if Universal was selling the downloads themselves

25   and got a royalty for a sale of a download as opposed to

1    licensing it to a third party where they don't have the cost of

2    distribution and manufacturing that you just described, could

3    they potentially take that new medium deduction?

4    A.    If they were manufacturing and selling it themselves, A,

5    the licensing provisions wouldn't apply; and, B, that's the

6    perfect example if it's a new technology and a new platform,

7    higher expenses, where a new medium provision would be

8    applicable.

9    Q.    Okay.

10          And with respect to licenses and the term "net

11   receipts," is it fair to say that that has -- custom and

12   practice has been that that only applies to direct costs related

13   to the specific license?

14   A.    Essentially, that is true.  You do not, in determining net

15   receipts from a specific license, deduct overhead costs or

16   general costs of any kind.  You deduct the specific direct costs

17   incurred as a part and parcel of that specific transaction.

18   Q.    Okay.

19          And you're familiar with escalations, are you not?

20   A.    Yes, I am.

21   Q.    And what is an escalation?

22   A.    An escalation is an increase in the royalty rate payable to

23   an artist or -- payable to an artist, keep it simple -- upon the

24   achievement of a certain sales level.  I may get a 12 percent

25   royalty on the first million units and a 14 percent royalty on

1  the next million units and a 15 percent royalty after that.

2  That's an escalation.

3  Q.    Okay.

4        We have had testimony about a 2004 amendment.

5  Mr. Hoffman was here earlier today and Mr. Stiffelman was here

6  and they talked about a 2004 amendment at issue in this case.

7  And Mr. Hoffman said earlier today that it applied to sales of

8  albums but we got into a bit of a disagreement about whether the

9  escalation part meant that it applied to sales of albums for

10  purposes of royalties.

11        Are the two things interconnected?  As far as what is

12  paid to the -- whether the license provision applies to sales of

13  albums?

14  A.    No.  No, the license provision dictates the split of income

15  50/50.  The escalation provision you're referring to in the '04

16  amendment or agreement simply states that for purposes of

17  determining the escalation, a download of an entire album

18  applies.  So if you have to get to a million units before the

19  escalation on the normal retail sales takes place, a download of

20  an entire album counts for that purpose.  It doesn't anything to

21  do with the royalty on the download itself.

22        MR. BUSCH:  Okay.  All right.  That's all I have,

23  Your Honor.

24        THE COURT:  Ladies and gentlemen, we are going to

25  break early today, and we will resume again at 9:00 tomorrow.

1    Remember not to discuss the case among yourselves or with anyone

2    else.  Don't form or express any opinions about the case until

3    it's finally submitted to you and we will see you tomorrow at

4    9:00.  Thank you.

5                          (Jury Out)

6              THE COURT:  With regard to tomorrow's agenda,

7    cross-examination of Mr. Berman and then what is next?

8              MR. BUSCH:  And then we will call our economic expert,

9    Gary Cohen, and I think that we'll decide whether we are going

10   to do Gustav or not.  Maybe not at this point.  If we do, it's

11   15 minutes, but I may not.  And then we will rest our case.

12             MR. POMERANTZ:  And then after that, Your Honor, we

13   will call Mr. Harleston as our custom and practice expert and

14   then I'm not sure if there is anything beyond that or not.

15             THE COURT:  All right.

16             MR. POMERANTZ:  There is one issue, Your Honor.  We --

17   there is one issue that we need to discuss with Your Honor

18   before Mr. Harleston testifies relating to whether certain lines

19   of questioning and exhibits are admissible and we can do it -- I

20   don't think we need any briefing on it but I would like to raise

21   it with Your Honor sometime before he testifies.  We can do it

22   before we start tomorrow --

23             THE COURT:  Let's do it tomorrow at 8:30 so we are

24   ready to go.

25             MR. BUSCH:  And one more thing.  Your Honor had

1    ordered the defendants to give us their objections or whatever

2    to the jury instructions that we sent them on Monday and I still

3    don't have them.

4         THE COURT:  I thought today was the day we will get

5    them.

6         MR. POMERANTZ:  We will file today and send it to

7    them.

8         MR. BUSCH:  I just wanted to make sure that -- I

9    didn't want to violate -- I didn't know when Your Honor wanted

10   them.

11        THE COURT:  Well, here's the other reality that

12   relates to the jury instructions, given what -- the other things

13   I am doing as well.  The reality is I am not going to work on

14   the jury instructions until this weekend.

15        MR. BUSCH:  So we are not going to have our Friday

16   conference?

17        THE COURT:  No.  What I want to do is Monday at 9:00

18   I'll give you my rulings or tentative rulings, whatever they

19   are, on the jury instructions and then we can settle them during

20   the course of the day.  My first matter on Monday is not until

21   10:00 but then we are going to be working between criminal cases

22   and civil cases in the afternoon to get it done.  But

23   realistically, I just can't put the time that -- into it that

24   they deserve until the weekend.

25        MR. BUSCH:  Okay.  And the other thing, Your Honor, is

1  I had mentioned we have some exhibits to move in before

2  Mr. Cohen testifies, so if we get here at 8:30 tomorrow, perhaps

3  we can handle that also.

4          THE COURT:  Okay, that's right.

5          One of the things I didn't see in the packet of

6  materials that I'm going through -- if they have, I just can't

7  find them -- proposed special verdicts.  Has anybody submitted

8  proposed special verdicts?

9          MR. BUSCH:  I believe the defendants' position was the

10 general verdict form should be done here, just general do you

11 find that they breached the contract.

12         MR. POMERANTZ:  That is our position, Your Honor.

13         THE COURT:  Okay.  And --

14         MR. BUSCH:  Let me speak to my clients and I will let

15 Your Honor know tomorrow morning at 8:30.

16         THE COURT:  That's fine.  I want to be ready first

17 thing Tuesday with instructions and verdict forms.

18         MR. POMERANTZ:  One other -- just if we can, maybe

19 right after court, know which exhibits he wants to proffer

20 tomorrow morning, that would be --

21         THE COURT:  That would make things --

22         MR. BUSCH:  I will send them a list tonight.

23         MS. LeMOINE:  Let's go over it before we go.

24         MR. BUSCH:  I have a list here.  You can have them.

25         THE COURT:  Last, again it relates to any decisions

1    you are going to make, essentially where we are at now,

2    Mr. Busch is the plaintiff has used 8 hours and the defense is

3    at 3 hours and 55 minutes.  So there's 49 minutes left.

4              MR. BUSCH:  So I am probably not going to use Gustav

5    because I am going to run through Cohen -- Mr. Cohen in 15 or

6    20 minutes and save the rest for my cross-examination of

7    Harleston.

8              THE COURT:  All right.  We will see you tomorrow at

9    8:30.

10              (Proceedings adjourned at 3:51 p.m.)

11                        CERTIFICATE

12

13      I hereby certify that pursuant to Section 753, Title 18,
     United States Code, the foregoing is a true and correct
14    transcript of the stenographically reported proceedings held in
     the above-entitled matter and that the transcript page format is
15    in conformance with the regulations of the Judicial Conference
     of the United States.

16

17

     _____          _____
18    Pamela A. Seijas, CSR No. 3593                    Date
     Official Reporter
19

20

21

22

23

24

25

I N D E X

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOEL MARTIN | | 10 | 17, 22 | 20,22 |
| DAVID WEINBERG | 25 | 40 | 56, 59 | 58 |
| PING HU | 60 | 65 | | |
| DAVID MARSHALL BERMAN | 67 | | | |

| WITNESSES FOR THE DEFENSE: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

| PLAINTIFF EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| 109-116, 118-124 | | 4 |
| 207 | | 62 |

| DEFENSE EXHIBITS: | MARKED | RECEIVED |
|---|---|---|

**$**

**$0.70** [2] - 87:16, 87:17
**$10** [5] - 80:16, 81:21, 81:22, 86:16, 87:11
**$159,000** [6] - 8:16, 9:1, 9:9, 64:3, 64:10, 64:24
**$500** [1] - 68:6

**'**

**'02** [1] - 76:6
**'04** [1] - 94:15
**'69** [1] - 69:14
**'76** [1] - 69:15
**'80s** [1] - 81:14
**'87** [1] - 69:25
**'98** [2] - 10:18, 91:6

**0**

**07-3314-PSG(MANx** [1] - 1:11

**1**

**1** [1] - 39:1
**10** [5] - 22:6, 62:4, 62:17, 62:23, 99:3
**100** [1] - 81:15
**10250** [1] - 2:13
**109** [3] - 3:13, 3:23, 3:24
**109-116** [2] - 4:1, 99:19
**10:00** [1] - 96:21
**10:30** [1] - 84:23
**10th** [1] - 61:13
**11** [1] - 69:24
**110** [2] - 3:13, 3:24
**1100** [1] - 2:6
**111** [3] - 3:13, 3:24, 7:13
**112** [6] - 3:13, 3:24, 36:25, 40:14, 40:15, 45:12
**113** [2] - 3:13, 3:24
**114** [2] - 3:13, 3:24
**115** [2] - 3:13, 3:25
**116** [2] - 3:13, 3:25
**118** [2] - 3:13, 3:25
**118-124** [2] - 4:1, 99:19
**119** [2] - 3:13, 3:25

**12** [4] - 32:11, 32:12, 34:10, 93:24
**120** [3] - 3:14, 3:25, 33:12
**121** [2] - 3:14, 3:25
**122** [2] - 3:14, 3:25
**123** [2] - 3:14, 3:25
**124** [3] - 3:14, 3:23, 3:25
**13** [1] - 22:5
**13677** [1] - 59:18
**14** [2] - 59:18, 93:25
**15** [4] - 4:7, 94:1, 95:11, 98:5
**159** [1] - 8:19
**159,000** [1] - 64:21
**17** [1] - 99:3
**18** [2] - 81:19, 98:13
**181-I** [1] - 1:24
**1969** [2] - 68:11, 68:14
**1989** [1] - 72:15
**1990** [2] - 72:20, 73:8
**1991** [1] - 72:23
**1998** [1] - 18:4
**1999** [1] - 18:8
**19TH** [1] - 2:14
**1:17** [1] - 3:2

**2**

**20** [6] - 70:10, 81:18, 81:20, 81:21, 81:24, 98:6
**20,22** [1] - 99:3
**2000** [2] - 18:20, 75:20
**2001** [10] - 18:10, 25:21, 26:7, 47:6, 47:8, 48:2, 48:8, 75:6, 76:2, 76:4
**2002** [1] - 18:8
**2003** [2] - 23:15, 29:18
**2004** [3] - 91:5, 94:4, 94:6
**2006** [5] - 18:20, 61:13, 62:4, 62:17, 62:23
**2007** [2] - 63:2, 63:13
**2009** [2] - 1:21, 3:1
**207** [5] - 62:3, 62:7, 62:8, 62:13, 99:20
**209** [2] - 62:24
**213** [2] - 1:25, 2:24
**22** [1] - 99:3
**25** [1] - 99:4
**255** [1] - 1:23
**259-3456** [1] - 2:8

**26** [2] - 1:21, 3:1

**3**

**3** [1] - 98:3
**30(b)(6** [3] - 8:15, 8:17, 9:1
**300** [1] - 48:6
**31** [1] - 18:10
**310** [1] - 2:16
**315** [1] - 2:5
**32** [1] - 75:7
**326** [1] - 27:5
**330** [1] - 33:11
**3414** [1] - 33:12
**355** [1] - 2:21
**3593** [1] - 98:13
**35TH** [1] - 2:22
**37201** [1] - 2:7
**3:51** [1] - 98:10

**4**

**4** [9] - 1:19, 10:17, 37:13, 37:17, 40:22, 41:9, 44:25, 55:2, 99:19
**4(c)(v** [7] - 13:2, 14:16, 22:23, 22:24, 24:4, 91:7, 91:22
**40** [1] - 99:4
**41A** [1] - 14:13
**45** [1] - 7:11
**49** [2] - 7:14, 98:3
**4A** [4] - 10:22, 41:1, 41:15, 45:11
**4B** [1] - 42:1
**4C1** [1] - 17:13
**4C5** [1] - 17:13

**5**

**5** [3] - 10:17, 10:20, 45:16
**50** [3] - 13:22, 15:12, 24:7
**50/50** [2] - 83:13, 94:15
**55** [2] - 55:2, 98:3
**553-3000** [1] - 2:16
**56** [2] - 55:3, 99:4
**58** [1] - 99:4
**59** [1] - 99:4

**6**

**6.1** [2] - 29:15, 30:4

**60** [1] - 99:5
**615** [1] - 2:8
**62** [1] - 99:20
**65** [1] - 99:5
**67** [1] - 99:6
**687-046** [1] - 1:25
**687-3702** [1] - 2:24

**7**

**7** [1] - 55:3
**70** [1] - 87:17
**74** [1] - 53:14
**753** [1] - 98:13
**76** [1] - 29:14
**78** [1] - 59:20

**8**

**8** [1] - 63:2, 98:2
**8:30** [1] - 95:23, 97:2, 97:15, 98:9

**9**

**90** [3] - 4:10, 4:18, 6:19
**90-minute** [1] - 7:8
**90012** [1] - 1:24
**90067** [1] - 2:15
**90071-1560** [1] - 2:23
**9:00** [3] - 94:25, 95:4, 96:17

**A**

**A&M** [1] - 68:19
**ability** [2] - 52:12, 52:13
**able** [3] - 18:17, 41:8, 53:4
**above-entitled** [1] - 98:14
**absolutely** [1] - 8:25
**Absolutely** [4] - 71:20, 73:12, 75:13, 91:23
**accent** [1] - 89:15
**accept** [2] - 16:2, 16:3
**acceptable** [1] - 7:23
**access** [4] - 32:24, 33:9, 34:9, 47:20
**account** [12] - 76:17, 76:19, 79:16, 80:1, 80:25, 81:4, 81:7, 81:8, 83:5, 86:5

**accountant** [1] - 18:18
**accounted** [1] - 19:19
**accounting** [3] - 18:1, 18:25, 19:1
**accountings** [1] - 69:8
**accounts** [2] - 78:16, 78:18
**accrued** [1] - 81:3
**accuracy** [1] - 43:16
**accurate** [4] - 31:22, 37:25, 44:5, 45:4
**achievement** [1] - 93:24
**acknowledge** [1] - 11:11
**acknowledged** [1] - 64:9
**active** [1] - 76:7
**activities** [1] - 79:3
**actual** [2] - 11:8, 83:15
**add** [1] - 42:18
**addition** [3] - 4:11, 4:12, 73:2
**additional** [2] - 7:9, 77:1
**address** [2] - 3:6, 17:21
**addresses** [1] - 14:19
**adjourned** [1] - 98:10
**administration** [1] - 73:1
**Administration** [1] - 68:9
**admissible** [2] - 8:3, 95:19
**admission** [1] - 66:20
**admits** [1] - 63:23
**admitted** [4] - 3:23, 3:25, 62:7, 63:23
**admitting** [1] - 64:2
**affairs** [5] - 46:9, 47:23, 69:17, 70:15, 72:25
**affiliated** [1] - 26:18
**affiliates** [1] - 30:9
**Aftermath** [6] - 1:12, 10:19, 21:23, 33:11, 59:18
**afternoon** [11] - 10:5, 10:10, 10:11, 25:11, 25:12, 40:12, 65:6, 65:7, 67:25, 68:1, 96:22

**age** [1] - 50:2
**agenda** [1] - 95:6
**ago** [3] - 40:17, 43:25, 79:5
**agree** [5] - 7:5, 82:10, 83:21, 88:14, 91:2
**agreed** [3] - 4:25, 5:2, 75:15
**agreement** [56] - 10:18, 11:4, 13:1, 16:3, 16:4, 17:4, 22:25, 23:1, 23:15, 24:20, 26:22, 29:3, 29:17, 29:24, 30:11, 31:1, 31:17, 31:19, 33:3, 34:16, 34:21, 35:18, 35:19, 35:22, 35:23, 36:1, 36:2, 36:20, 36:21, 37:4, 45:1, 45:14, 45:15, 45:17, 48:20, 50:11, 52:12, 52:16, 53:17, 53:20, 53:22, 54:6, 59:13, 59:20, 59:25, 69:9, 82:17, 84:6, 85:14, 87:16, 91:5, 91:6, 94:16
**agreements** [50] - 3:17, 5:12, 13:13, 25:15, 26:2, 26:8, 26:11, 26:13, 26:22, 27:1, 28:22, 29:24, 32:20, 33:17, 33:23, 34:15, 34:17, 34:20, 35:11, 36:2, 36:4, 36:7, 44:1, 47:25, 48:3, 48:12, 48:17, 48:19, 49:4, 49:15, 49:21, 52:20, 69:21, 72:1, 72:2, 72:11, 73:10, 73:14, 73:18, 75:2, 75:4, 75:16, 85:13, 85:18, 85:21, 85:22, 85:24, 87:5
**agrees** [2] - 65:17, 65:19
**ahead** [3] - 40:18, 77:14, 78:11
**al** [1] - 1:13
**album** [6] - 19:18, 73:15, 73:21, 77:1, 94:17, 94:20
**albums** [4] - 89:7, 94:8, 94:9, 94:13
**allocated** [1] - 61:5
**allocation** [3] - 62:21, 64:25, 66:24
**allow** [1] - 36:21
**allowed** [2] - 8:22,

9:2
**Alltel** [1] - 34:24
**alluded** [1] - 79:5
**almost** [2] - 7:6, 80:14
**alone** [1] - 48:5
**alternative** [1] - 92:18
**amendment** [3] - 94:4, 94:6, 94:16
**American** [1] - 70:2
**amount** [9] - 34:2, 34:21, 63:22, 64:10, 64:11, 64:24, 65:14, 89:18, 92:7
**ancillary** [1] - 84:15
**AND** [1] - 2:9
**Angeles** [4] - 1:20, 1:24, 3:1, 68:16
**ANGELES** [2] - 2:15, 2:23
**answer** [2] - 35:12, 38:17
**answered** [1] - 86:22
**anticipating** [1] - 54:20
**appear** [2] - 45:24, 53:16
**APPEARANCES** [1] - 2:1
**Apple** [16] - 50:6, 50:13, 51:7, 52:23, 52:24, 53:18, 54:6, 54:12, 54:13, 85:13, 87:15, 87:18, 87:20, 87:22, 87:23, 89:23
**applicable** [2] - 43:10, 93:8
**application** [4] - 74:2, 84:15, 92:3, 92:12
**applied** [3] - 85:4, 94:7, 94:9
**applies** [8] - 14:15, 82:8, 82:9, 82:21, 84:7, 93:12, 94:12, 94:18
**apply** [7] - 48:22, 82:19, 83:6, 89:6, 89:23, 91:22, 93:5
**applying** [1] - 23:1
**appropriate** [1] - 7:3
**appropriately** [2] - 7:4
**approved** [2] - 42:6, 66:23
**approves** [3] - 65:23, 66:3, 66:11
**April** [2] - 69:15, 75:6
**area** [2] - 47:13,

78:22
**argue** [1] - 57:7
**arguing** [1] - 5:9
**arm** [1] - 74:20
**art** [2] - 20:7, 77:3
**artist** [17] - 12:19, 20:2, 32:17, 32:18, 48:12, 48:15, 51:10, 57:5, 73:10, 79:11, 80:2, 81:2, 81:10, 83:13, 92:22, 93:23
**artist's** [2] - 81:4, 81:8
**artists** [11] - 22:6, 22:9, 23:22, 24:2, 24:11, 46:22, 68:19, 71:4, 71:11, 72:10, 73:18
**artwork** [3] - 76:24, 76:25, 83:9
**aspects** [1] - 46:23
**asset** [1] - 27:6
**Asset** [1] - 27:16
**associated** [2] - 24:19, 77:25
**Atlanta** [2] - 78:20, 78:21
**attached** [6] - 26:25, 38:5, 59:11, 59:13, 59:25, 60:2
**attempt** [1] - 92:21
**attention** [2] - 35:17, 58:13
**attorney** [2] - 46:13, 68:23
**attorneys** [2] - 50:10, 69:6
**attributes** [1] - 15:21
**audio** [5] - 28:12, 42:4, 44:16, 44:20, 57:18
**Audio** [1] - 41:22
**audit** [18] - 17:25, 18:14, 18:18, 18:19, 61:6, 61:12, 61:17, 61:21, 61:24, 62:3, 62:13, 62:14, 63:5, 63:7, 66:7, 66:9
**audits** [2] - 18:4, 60:24
**Austin** [1] - 46:15
**authorization** [6] - 39:8, 39:11, 43:19, 44:3, 44:7, 86:8
**authorization"** [1] - 39:11
**authorize** [1] - 52:23
**authorizing** [3] - 44:13, 45:3, 52:24
**automatically** [1] -

16:21
**available** [3] - 47:14, 50:18, 51:8
**AVENUE** [1] - 2:21
**aware** [5] - 61:8, 62:19, 82:6, 88:4, 89:8

## B

**B-E-R-M-A-N** [1] - 67:21
**B-to-B** [2] - 53:1, 53:2
**B-to-C** [1] - 52:22
**Bachelor's** [1] - 68:9
**back-door** [1] - 9:2
**background** [2] - 48:24, 68:8
**BALLOW** [1] - 2:3
**based** [5] - 4:3, 7:20, 8:2, 89:11, 89:24
**Based** [1] - 90:18
**basic** [4] - 48:21, 48:22, 48:23, 68:24
**basis** [2] - 24:8, 41:3
**Bass** [4] - 5:17, 5:19, 5:21
**Bates** [1] - 33:11
**Beach** [3] - 68:22, 71:13, 71:14
**Beastie** [2] - 71:9, 72:14
**Beatles** [3] - 71:6, 71:7, 71:13
**became** [2] - 70:23, 73:6
**become** [5] - 16:20, 72:1, 75:8, 76:6, 83:11
**beginning** [4] - 6:18, 43:5, 47:4, 76:6
**behalf** [2] - 39:5, 62:20
**behind** [1] - 82:23
**belabor** [2] - 25:16, 34:13
**BERMAN** [1] - 99:7
**Berman** [12] - 8:10, 8:21, 67:16, 67:17, 67:21, 67:25, 68:2, 68:7, 75:22, 89:19, 91:25, 95:7
**Berman's** [1] - 12:9
**Best** [3] - 76:17, 86:16, 87:13
**better** [3] - 11:14, 77:23, 89:16
**between** [7] - 10:18,

26:7, 26:9, 53:17, 80:2, 83:25, 96:21
**Beyonce** [1] - 44:17
**beyond** [2] - 51:12, 95:14
**Big** [1] - 49:10
**big** [4] - 40:14, 46:15, 79:12, 79:13
**biggest** [1] - 87:21
**binder** [2] - 40:14, 62:24
**bit** [3] - 46:5, 87:8, 94:8
**bleeping** [1] - 69:11
**BLOCK** [1] - 2:12
**blocked** [1] - 58:16
**blue** [1] - 17:21
**board** [3] - 62:25, 76:10, 84:21
**Bonnie** [2] - 71:7, 72:13
**book** [1] - 80:24
**booklet** [2] - 76:25, 77:16
**borne** [1] - 77:17
**bottom** [1] - 14:21
**bought** [1] - 73:7
**BOULEVARD** [1] - 2:13
**box** [1] - 77:2
**Boys** [5] - 68:22, 71:9, 71:13, 71:14, 72:14
**bracketed** [1] - 42:22
**branch** [2] - 78:21, 78:23
**breach** [2] - 5:4, 5:5
**breached** [1] - 97:11
**breaches** [1] - 5:5
**break** [2] - 67:7, 94:25
**breaks** [1] - 78:20
**briefing** [1] - 95:20
**briefly** [7] - 8:8, 26:21, 33:11, 33:16, 44:11, 46:4, 46:14
**bring** [4] - 10:19, 40:13, 45:19, 53:13
**broke** [1] - 10:12
**broken** [1] - 78:24
**Brooks** [1] - 71:8
**Bros** [2] - 69:15, 69:19
**brought** [4] - 8:16, 64:24, 84:20, 90:15
**Buena** [1] - 74:18
**Building** [1] - 1:23
**built** [1] - 81:11
**bunch** [1] - 48:22

burned [1] - 81:9
Busch [26] - 3:16,
5:1, 5:9, 6:17, 7:22,
9:6, 21:1, 21:7, 21:11,
22:1, 22:10, 23:11,
23:23, 25:12, 33:14,
35:2, 40:16, 40:19,
40:23, 41:16, 43:18,
47:5, 49:6, 58:11,
68:1, 98:2
BUSCH [65] - 2:4,
3:5, 3:12, 3:18, 4:3,
4:10, 4:12, 7:11, 7:15,
7:18, 7:23, 8:7, 8:13,
10:3, 17:17, 17:20,
20:22, 22:20, 22:22,
23:5, 24:22, 24:25,
25:10, 33:15, 35:3,
35:7, 38:13, 38:16,
40:7, 54:10, 54:16,
56:10, 58:6, 59:5,
59:7, 60:5, 60:9,
60:11, 60:17, 62:2,
62:9, 64:12, 65:2,
65:24, 66:4, 66:13,
67:2, 67:4, 67:16,
67:24, 76:1, 77:18,
88:10, 88:12, 94:22,
95:8, 95:25, 96:8,
96:15, 96:25, 97:9,
97:14, 97:22, 97:24,
98:4
Business [1] - 68:9
business [35] -
30:21, 31:15, 32:8,
34:7, 34:8, 38:11,
44:5, 45:4, 46:9,
46:19, 46:22, 46:24,
47:12, 47:23, 48:7,
49:17, 49:18, 49:19,
49:25, 50:3, 52:21,
52:22, 68:14, 69:2,
69:4, 69:7, 69:13,
69:16, 69:18, 69:23,
70:15, 72:25, 75:8,
75:9, 79:25
business-to-
consumer [1] - 52:22
businesses [2] -
52:22
Buy [3] - 76:17,
86:16, 87:13
buy [11] - 11:14,
12:2, 16:2, 16:5,
16:24, 17:1, 44:19,
52:13, 52:19, 82:1,
90:25
buying [1] - 11:10
buys [1] - 80:11
BY [26] - 2:12, 2:18,

10:9, 17:20, 20:25,
22:22, 23:7, 25:10,
33:15, 35:7, 38:16,
40:11, 56:10, 58:10,
59:7, 60:17, 62:9,
64:12, 65:5, 66:1,
66:6, 66:15, 66:22,
67:24, 77:18, 88:12

C

CA [2] - 2:15, 2:23
CALIFORNIA [1] -
1:2
California [3] - 1:20,
1:24, 3:1
camouflage [1] -
44:25
Canada [1] - 70:4
cannot [3] - 80:21,
86:7, 86:8
capacity [1] - 70:8
Capitol [13] - 69:25,
70:1, 70:6, 70:7,
70:16, 70:19, 70:23,
71:1, 71:4, 71:12,
72:5, 72:12, 72:15
card [1] - 77:2
care [2] - 24:17,
90:20
Career [1] - 46:14
carefully [1] - 6:7
carrier [2] - 34:5,
59:15
carriers [3] - 29:25,
36:4, 36:8
Case [1] - 1:10
case [33] - 4:17,
4:25, 5:3, 5:4, 6:7,
8:4, 13:25, 17:12,
27:2, 34:12, 35:13,
38:22, 48:19, 49:16,
49:17, 50:5, 61:1,
67:9, 68:3, 77:16,
80:6, 82:4, 83:6, 83:7,
84:12, 85:13, 87:14,
88:2, 94:6, 95:1, 95:2,
95:11
cases [6] - 5:8,
34:10, 57:3, 68:25,
96:21, 96:22
cassette [1] - 76:23
cassettes [2] - 77:3,
90:7
catalog [2] - 71:13,
71:14
catch [1] - 82:14
catch-all [1] - 82:14
Catlett [1] - 19:2

cc'd [1] - 63:10
CD [5] - 76:21, 76:23,
76:25, 77:16, 87:13
CDs [5] - 49:19,
49:24, 50:1, 90:7,
92:16
center [1] - 79:12
centers [1] - 78:14
CENTRAL [1] - 1:2
CEO [1] - 76:11
certain [12] - 9:16,
11:20, 49:19, 50:17,
50:21, 54:23, 61:5,
62:20, 65:9, 93:24,
95:18
certainly [2] - 72:13,
86:17
CERTIFICATE [1] -
98:11
certify [1] - 98:13
chance [1] - 37:5
change [8] - 37:23,
39:12, 39:13, 39:19,
43:19, 43:23, 48:24,
81:16
changed [3] - 39:1,
39:9, 39:11
changes [7] - 36:21,
41:4, 45:13, 45:18,
45:22, 46:2
changing [3] - 43:19,
43:20, 45:10
channel [8] - 14:7,
14:9, 15:10, 17:5,
22:8, 52:7, 91:3,
91:10
channels [9] - 14:1,
14:3, 14:6, 14:13,
15:1, 51:23, 51:25,
52:2, 91:22
charge [1] - 72:25
charged [1] - 12:5
chart [2] - 19:5,
84:24
check [1] - 27:24
chief [1] - 72:9
children [1] - 76:9
choice [1] - 5:18
chose [2] - 5:20,
6:11
chosen [2] - 5:9,
50:23
chronologically [1] -
78:12
chronology [1] -
35:2
Cingular [3] - 29:10,
35:23, 36:1
Ciongoli [2] - 8:21,
9:15

city [1] - 46:16
civil [1] - 96:22
claim [10] - 8:16,
8:17, 9:2, 9:9, 61:1,
61:4, 65:8, 66:12,
66:24
claims [2] - 61:21,
62:20
Clan [1] - 73:20
clarify [1] - 21:3
clauses [2] - 92:2,
92:6
clear [5] - 5:7, 16:15,
38:2, 45:9, 83:16
clearly [1] - 37:15
CLERK [4] - 25:1,
25:3, 60:13, 67:18
client [1] - 7:19
clients [2] - 69:6,
97:14
Clip [1] - 41:22
clip [5] - 44:16,
44:19, 44:20, 57:18
clips [1] - 42:4
close [2] - 54:16,
54:25
closed [2] - 54:11,
55:2
closes [1] - 8:4
closing [1] - 54:4
club [23] - 11:9,
11:14, 11:17, 11:20,
11:22, 12:3, 13:8,
13:11, 13:15, 13:17,
13:22, 15:10, 17:3,
17:11, 17:12, 69:21,
73:14, 83:2, 90:8,
90:15, 90:16, 90:19,
91:2
clubs [14] - 10:14,
11:19, 12:11, 12:16,
12:17, 12:20, 13:19,
14:20, 15:5, 15:11,
15:12, 15:15, 15:18
Coast [1] - 78:23
Code [1] - 98:13
Cohen [17] - 9:7,
9:12, 9:14, 19:4,
61:13, 62:14, 62:19,
66:8, 66:10, 66:11,
66:17, 66:19, 66:23,
95:9, 97:2, 98:5
Cohen's [3] - 61:24,
62:3, 63:5
Columbia [2] -
11:17, 90:9
combined [1] - 88:25
commenced [1] -
54:2
commitment [2] -

11:23, 15:22
commonplace [1] -
83:11
communications [1]
- 34:25
compact [1] - 47:12
companies [19] -
20:9, 26:4, 26:18,
27:9, 28:5, 46:23,
48:7, 49:10, 68:18,
68:19, 68:20, 71:2,
74:25, 76:9, 80:24,
81:14, 88:5, 89:1,
89:6
Company [1] - 74:20
company [27] -
27:12, 29:4, 47:11,
47:17, 47:18, 69:18,
70:2, 70:8, 72:7,
76:14, 76:15, 76:20,
77:17, 77:20, 79:7,
79:8, 79:13, 79:16,
80:12, 80:17, 83:4,
83:7, 83:18, 83:21,
86:16, 86:24
comparable [1] -
51:5
Compilation [4] -
19:6, 19:23, 19:24,
22:11
compilation [13] -
19:9, 19:18, 20:19,
21:7, 21:8, 21:24,
23:9, 23:23, 23:25,
24:2, 24:10, 24:16,
84:24
compilations [5] -
19:12, 19:16, 69:22,
84:20
compiled [1] - 23:21
complain [1] - 18:1
complete [1] - 9:5
Computer [1] - 53:18
computer [1] - 50:20
concept [4] - 34:13,
34:18, 34:19, 35:10
concern [1] - 53:2
concerned [3] - 4:13,
9:8, 82:22
conclusions [1] -
87:7
conditional [4] -
27:10, 28:3, 28:5,
90:16
conditions [3] - 16:2,
16:24, 36:14
Conference [1] -
98:15
conference [4] -
54:2, 54:21, 67:6,

96:16
**confers** [1] - 7:22
**configuration** [2] - 92:15, 92:18
**conformance** [1] - 98:15
**connection** [9] - 35:10, 42:5, 42:21, 42:22, 43:10, 45:14, 45:15, 64:3, 74:23
**consider** [1] - 4:23
**consideration** [1] - 79:23
**considered** [3] - 51:22, 71:1, 91:3
**CONSTELLATION** [1] - 2:13
**constructing** [1] - 79:23
**consult** [1] - 7:19
**consumer** [4] - 44:14, 52:22, 91:2
**consumers** [3] - 47:19, 52:23, 53:10
**contacted** [1] - 65:20
**contain** [2] - 37:8, 76:25, 85:24
**contained** [5] - 28:8, 33:17, 34:18, 35:11, 78:4
**containing** [3] - 28:5, 28:6, 37:3
**contains** [2] - 22:9, 24:11, 28:10
**content** [8] - 28:7, 39:4, 42:18, 42:20, 44:10, 52:17, 52:19, 53:9
**context** [3] - 31:12, 31:14, 69:17
**contingent** [1] - 86:14
**continue** [4] - 69:17, 73:24, 74:1, 78:2
**continued** [2] - 73:23, 76:7
**contract** [12] - 5:4, 13:7, 14:12, 15:14, 17:12, 17:24, 23:8, 68:24, 72:24, 82:8, 97:11
**contracts** [9] - 32:18, 54:23, 69:3, 69:20, 71:19, 71:22, 73:24, 74:7, 79:24
**controls** [1] - 39:23
**conversation** [3] - 8:20, 29:11, 31:20
**copies** [3] - 84:2, 86:11, 86:12

**copy** [6] - 80:20, 80:21, 83:22, 84:1, 86:6, 86:10
**copying** [1] - 77:11
**copyright** [1] - 68:24
**core** [7] - 5:5, 89:7, 89:23, 90:3, 90:6, 90:10, 91:1
**corporate** [5] - 46:17, 46:19, 63:17, 70:18, 70:20
**correct** [98] - 11:23, 12:7, 12:18, 14:4, 14:13, 15:2, 15:7, 15:10, 15:15, 15:19, 15:25, 17:5, 17:8, 17:13, 20:11, 20:14, 20:21, 21:9, 21:12, 21:16, 21:20, 21:24, 21:25, 22:3, 22:12, 22:15, 24:5, 25:13, 25:22, 25:23, 25:25, 26:1, 26:4, 26:5, 26:18, 27:7, 27:8, 27:11, 28:10, 31:22, 32:6, 32:11, 33:22, 34:15, 37:16, 37:24, 38:6, 38:9, 38:19, 39:8, 39:12, 39:18, 41:6, 45:4, 47:5, 56:21, 57:1, 57:13, 57:16, 58:12, 59:21, 60:19, 60:20, 61:2, 61:14, 61:15, 61:18, 61:19, 61:21, 61:25, 62:15, 62:17, 62:21, 63:8, 63:15, 63:18, 64:18, 64:19, 64:25, 65:1, 65:10, 65:16, 68:3, 68:4, 70:12, 70:25, 72:16, 72:17, 76:2, 76:3, 77:9, 77:22, 80:8, 85:14, 86:23, 88:3, 92:3, 98:13
**court** [3] - 5:3, 25:1, 97:19
**courthouse** [1] - 54:11
**Courtroom** [2] - 55:2, 56:8
**courtroom** [4] - 54:4, 54:17, 54:25, 67:8
**Cousin** [1] - 89:13
**cover** [4] - 27:4, 34:22, 37:9, 77:2
**covered** [8] - 13:10, 14:13, 18:8, 18:22, 44:22, 84:9, 90:23, 90:24
**covering** [1] - 44:10
**covers** [5] - 13:7, 13:9, 23:8, 31:17, 82:14

83:10, 92:20, 93:12, 93:15, 93:16
**counsel** [2] - 27:2, 73:2
**counter** [1] - 79:15
**counterclaim** [3] - 64:17, 64:20, 64:23
**counterclaims** [1] - 64:15
**Counting** [1] - 73:20
**country** [1] - 15:19
**counts** [1] - 94:20
**couple** [1] - 5:6, 17:17, 17:23, 25:13, 25:17, 26:22, 48:18, 50:4, 56:11, 72:18
**course** [9] - 20:18, 68:22, 68:23, 69:5, 71:23, 72:3, 73:21, 78:1, 96:20
**Court** [1] - 54:23
**COURT** [62] - 1:1, 3:11, 3:15, 3:19, 3:22, 4:2, 4:9, 4:11, 4:21, 6:25, 7:13, 7:16, 7:21, 8:5, 8:11, 9:19, 9:24, 10:5, 17:16, 20:23, 22:19, 24:23, 25:8, 33:14, 35:5, 38:15, 40:9, 54:1, 54:3, 54:13, 54:20, 54:22, 60:7, 60:10, 62:5, 62:7, 64:8, 65:25, 66:5, 66:14, 66:17, 66:21, 67:3, 67:7, 67:15, 67:22, 75:25, 77:14, 88:9, 94:24, 95:6, 95:15, 95:23, 96:4, 96:11, 96:17, 97:4, 97:13, 97:16, 97:21, 97:25, 98:8

**craft** [1] - 27:20
**create** [1] - 76:24
**created** [2] - 21:11, 88:22
**creates** [1] - 19:18
**creating** [1] - 53:11
**creation** [1] - 92:16
**credit** [1] - 53:7
**credited** [1] - 32:17
**credits** [1] - 77:1
**criminal** [1] - 96:21
**cross** [6] - 9:14, 10:6, 56:14, 75:24, 95:7, 98:6
**CROSS** [5] - 10:8, 40:10, 65:4, 99:2, 99:11
**cross-examination** [6] - 9:14, 10:6, 56:14, 75:24, 95:7, 98:6
**CROSS-EXAMINATION** [3] - 10:8, 40:10, 65:4
**crossing** [1] - 22:2
**Crows** [1] - 73:20
**CSR** [2] - 1:22, 98:18
**Cue** [1] - 28:14
**cumulative** [1] - 5:16
**custom** [8] - 71:18, 84:4, 89:11, 92:2, 92:11, 92:13, 93:11, 95:13
**customer** [4] - 11:13, 16:16, 16:20, 86:15
**customers** [3] - 16:7, 50:1, 50:3
**cut** [1] - 8:1
**CV** [1] - 1:11

# D

**damages** [1] - 9:13
**date** [1] - 43:25
**Date** [1] - 98:18
**dated** [4] - 29:18, 62:17, 62:23, 63:1
**David** [8] - 8:9, 8:10, 24:25, 25:2, 25:6, 67:16, 67:17, 67:21
**DAVID** [2] - 99:4, 99:6
**dba** [1] - 1:12
**deal** [5] - 9:18, 12:16, 46:19, 48:25, 86:13
**dealing** [1] - 69:4
**deals** [7] - 15:11, 15:15, 46:19, 48:6, 48:23, 49:16, 69:3
**December** [1] -

18:10
**decide** [3] - 53:4, 53:6, 95:9
**decided** [1] - 12:5
**decisions** [1] - 97:25
**deduct** [2] - 93:15, 93:16
**deduction** [1] - 93:3
**DEFENDANT** [1] - 2:17
**Defendants** [1] - 1:14
**defendants** [1] - 96:1
**defendants'** [2] - 88:1, 97:9
**DEFENSE** [2] - 99:11, 99:22
**defense** [1] - 98:2
**definitely** [1] - 75:3
**definition** [2] - 17:10, 17:11
**degree** [1] - 68:10
**deleted** [1] - 37:23
**deletion** [1] - 39:7
**delivery** [1] - 27:16
**demonstration** [1] - 42:20
**denies** [1] - 90:8
**denying** [1] - 31:14
**department** [14] - 25:24, 26:1, 26:12, 26:16, 46:19, 63:11, 63:12, 68:17, 70:14, 70:15, 70:17, 72:8, 72:22, 79:2
**deposed** [2] - 63:20, 88:2
**deposition** [6] - 4:6, 12:9, 12:10, 12:12, 60:18, 64:4
**describe** [3] - 46:4, 68:7, 90:10
**described** [4] - 23:24, 71:17, 79:22, 93:2
**describing** [1] - 28:7
**description** [3] - 44:5, 44:23, 45:4
**deserve** [1] - 96:24
**destroy** [2] - 80:19, 86:9
**destroyed** [2] - 81:9, 85:1
**determining** [4] - 80:1, 85:4, 93:14, 94:17
**developed** [2] - 49:14, 49:23
**dictates** [1] - 94:14
**difference** [3] - 32:7,

32:8, 83:25
**different** [17] - 11:3,
15:24, 20:9, 20:13,
26:8, 28:22, 36:3,
36:9, 36:15, 44:8,
44:9, 44:10, 44:11,
48:6, 85:12, 91:1
**digital** [13] - 26:3,
27:16, 46:10, 47:2,
47:13, 49:16, 60:25,
85:12, 86:6, 88:19,
88:20, 88:22
**Digital** [1] - 26:11
**direct** [6] - 15:4,
35:17, 53:3, 58:13,
93:12, 93:16
**DIRECT** [5] - 25:9,
60:16, 67:23, 99:2,
99:11
**directly** [2] - 51:17,
61:12
**directors** [1] - 76:10
**disagree** [1] - 90:21
**disagreed** [1] - 5:1
**disagreement** [1] -
94:8
**disclosed** [2] - 4:16,
8:22
**discovered** [1] - 61:6
**discs** [1] - 47:12
**discuss** [6] - 7:19,
26:21, 59:14, 67:9,
95:1, 95:17
**discussed** [1] -
64:21
**discussing** [1] -
12:11
**discussion** [1] -
52:11
**disincentive** [1] -
82:2
**Disney** [3] - 74:20,
75:5, 76:2
**display** [3] - 30:12,
42:20, 43:9
**distinction** [1] -
90:11
**distribute** [6] -
21:13, 30:12, 39:2,
39:4, 42:3, 43:9
**distributed** [5] -
19:23, 19:24, 19:25,
22:11, 77:5
**distributes** [2] -
22:7, 83:4
**distributing** [1] -
22:16
**distribution** [23] -
15:5, 24:18, 39:9,
46:10, 47:15, 49:16,

69:7, 70:3, 75:15,
78:6, 78:10, 78:12,
78:14, 78:15, 79:2,
79:4, 81:14, 83:10,
85:7, 92:15, 92:18,
92:20, 93:2
**DISTRICT** [2] - 1:1,
1:2
**document** [5] -
26:25, 27:3, 27:12,
28:1, 38:2
**documents** [2] -
5:13, 35:25
**dollar** [2] - 11:22,
16:22
**Don** [1] - 73:21
**done** [7] - 18:4,
18:14, 24:22, 55:1,
82:15, 96:22, 97:10
**door** [1] - 9:2
**Doors** [1] - 68:21
**Dorsky** [1] - 46:21
**dotted** [1] - 70:4
**down** [8] - 6:4, 8:2,
24:23, 38:25, 60:7,
64:24, 67:3, 81:19
**download** [25] -
18:15, 26:3, 26:11,
28:4, 28:5, 49:20,
60:25, 85:13, 86:18,
86:20, 87:4, 87:18,
87:20, 88:5, 88:18,
88:21, 88:22, 88:25,
89:6, 90:17, 92:25,
94:17, 94:19, 94:21
**downloads** [15] -
16:11, 27:10, 27:11,
28:3, 32:22, 39:24,
49:17, 50:2, 52:13,
52:23, 52:24, 87:14,
89:6, 92:24
**draft** [10] - 37:3,
37:9, 38:21, 40:15,
41:5, 43:13, 43:24,
58:23, 69:3, 69:9
**drafted** [1] - 47:24
**drafting** [3] - 46:19,
53:21, 69:20
**duplicated** [2] -
88:20, 88:21
**duplicates** [1] -
83:23
**during** [11] - 12:11,
13:3, 38:5, 39:1, 42:3,
42:17, 43:8, 71:25,
72:11, 73:10, 96:19
**During** [1] - 71:17
**duties** [2] - 72:5,
74:22

# E

**EADES** [1] - 2:19
**Eagles** [1] - 73:21
**early** [8] - 6:12, 6:20,
6:23, 69:14, 69:25,
72:23, 76:6, 94:25
**earned** [2] - 81:2,
81:3
**earns** [1] - 81:10
**East** [1] - 1:23
**easy** [1] - 11:1
**economic** [1] - 95:8
**economics** [2] -
79:25, 82:23
**edits** [3] - 37:3, 37:8,
37:11
**educational** [1] -
68:7
**effort** [1] - 92:20
**efforts** [3] - 51:1,
51:4, 51:5
**eight** [1] - 5:8
**Eighty** [1] - 40:4
**Either** [1] - 17:10
**either** [6] - 8:15,
11:21, 26:11, 34:12,
92:17, 92:20
**Elabs** [12] - 25:24,
26:1, 46:10, 46:13,
47:1, 47:3, 47:8,
47:22, 47:25, 49:3,
49:14, 51:17
**elicit** [2] - 8:23, 9:3
**elicited** [1] - 8:24
**eliminate** [1] - 4:5
**eliminated** [1] - 4:5
**email** [2] - 37:2,
37:10
**EMI** [2] - 70:2, 70:5
**EMI-owned** [1] - 70:5
**Eminem** [18] - 5:24,
19:17, 21:19, 21:23,
22:9, 24:1, 62:20,
64:10, 65:13, 65:15,
65:17, 65:19, 65:22,
66:9, 66:11, 66:23,
77:9
**Eminem's** [2] -
65:20, 66:2
**enables** [1] - 16:23
**end** [7] - 6:14, 6:16,
16:4, 50:3, 52:13,
79:2, 88:23
**ended** [1] - 54:21
**engaged** [1] - 18:20
**engineers** [1] - 46:23
**enlarge** [1] - 37:14
**entails** [1] - 78:15

**entered** [1] - 26:9
**entertainment** [1] -
76:11
**Entertainment** [1] -
1:13
**entire** [5] - 31:1,
31:17, 77:15, 94:17,
94:20
**entitled** [1] - 98:14
**equally** [1] - 68:25
**error** [1] - 69:9
**escalation** [7] -
93:21, 93:22, 94:2,
94:9, 94:15, 94:17,
94:19
**escalations** [1] -
93:19
**especially** [1] - 49:17
**essence** [3] - 30:21,
69:4, 86:11
**essential** [2] - 80:21,
83:25
**essentially** [9] -
5:17, 74:13, 76:16,
80:14, 82:14, 82:25,
87:19, 91:13, 98:1
**Essentially** [1] -
93:14
**establishment** [1] -
84:1
**estimate** [1] - 48:3
**et** [1] - 1:13
**etc** [3] - 43:10, 43:11,
73:15
**Ethan** [2] - 4:6, 7:20
**evening** [1] - 8:1
**everywhere** [2] -
51:10, 78:19
**exact** [4] - 22:4,
39:25, 40:5, 52:6
**Exactly** [5] - 5:25,
9:23, 30:22
**exactly** [2] - 7:1,
49:13
**examination** [6] -
9:14, 10:6, 56:14,
75:24, 95:7, 98:6
**EXAMINATION** [13] -
10:8, 17:19, 20:24,
22:21, 23:6, 25:9,
40:10, 56:9, 58:9,
59:6, 60:16, 65:4,
67:23
**example** [13] - 11:16,
11:17, 22:5, 44:12,
44:15, 45:16, 47:14,
49:22, 77:9, 85:14,
87:11, 87:21, 93:6
**examples** [3] -
50:19, 73:17, 76:17

**Except** [1] - 59:11
**except** [2] - 30:10,
38:4
**exception** [1] - 66:18
**exchange** [3] -
11:22, 16:22, 51:14
**excited** [1] - 5:24
**exclusive** [10] - 30:9,
38:4, 42:2, 42:17,
43:7, 57:19, 57:23,
58:2, 58:14, 59:9
**excuse** [3] - 9:19,
9:21, 86:10
**executive** [2] - 72:9,
72:25
**exhibit** [5] - 3:15,
40:18, 45:10, 53:24,
60:3
**Exhibit** [13] - 29:14,
33:11, 40:14, 40:15,
43:9, 45:12, 53:14,
59:20, 62:3, 62:8,
62:11, 62:13, 62:24
**Exhibits** [1] - 4:1
**EXHIBITS** [2] -
99:18, 99:22
**exhibits** [4] - 3:6,
3:9, 59:21, 95:19,
97:1, 97:19
**expedite** [1] - 58:7
**expends** [1] - 51:2
**expenses** [3] -
24:17, 92:16, 93:7
**expensive** [1] -
92:19
**experience** [4] -
68:13, 85:23, 89:12,
92:1
**expert** [9] - 9:13,
68:3, 75:22, 76:7,
88:1, 95:8, 95:13
**experts** [1] - 6:9
**explain** [2] - 11:9,
82:23
**explained** [1] - 54:22
**express** [1] - 95:2
**expressly** [1] - 14:19
**extent** [1] - 22:6

# F

**F.B.T** [16] - 1:7, 5:18,
10:18, 12:21, 24:3,
61:5, 61:6, 62:20,
64:3, 64:9, 64:24,
65:8, 65:11, 65:14,
65:20, 66:7
**fabricate** [1] - 76:24
**face** [1] - 69:10

**facets** [1] - 75:8
**fact** [11] - 13:13, 28:2, 30:23, 31:2, 35:22, 52:4, 71:14, 88:24, 90:21, 91:5, 92:1
**fair** [7] - 6:5, 6:21, 6:24, 79:21, 86:23, 92:6, 93:11
**fairly** [1] - 76:6
**familiar** [11] - 13:13, 28:2, 31:25, 32:19, 50:8, 51:1, 52:16, 72:1, 75:8, 88:24, 93:19
**familiarity** [1] - 74:10
**fan** [1] - 50:9
**far** [8] - 26:11, 26:12, 36:15, 51:12, 71:17, 74:2, 82:22, 94:11
**fascinated** [1] - 46:16
**fashion** [1] - 83:23
**favorites** [1] - 50:23
**FCRR** [1] - 1:22
**February** [6] - 1:21, 3:1, 61:13, 62:4, 62:17, 62:23
**federal** [1] - 5:3
**Federal** [1] - 1:23
**feeds** [1] - 28:8
**fees** [1] - 31:18
**few** [7] - 7:24, 13:13, 36:21, 44:18, 45:18, 83:6, 91:25
**fi** [1] - 42:5
**Fi** [2] - 39:2, 42:21
**fifth** [1] - 40:18
**file** [11] - 28:8, 28:10, 28:15, 28:16, 36:24, 86:6, 88:19, 88:20, 88:22, 96:6
**files** [3] - 27:25, 28:4, 88:25
**final** [3] - 4:15, 59:19, 91:25
**finally** [2] - 67:10, 95:3
**finance** [1] - 70:3
**fine** [4] - 9:10, 9:25, 54:15, 97:16
**finish** [3] - 7:25, 8:9, 9:16
**finishes** [1] - 9:14
**finishing** [1] - 8:6
**FINK** [1] - 2:10
**firm** [10] - 46:17, 46:20, 68:16, 68:18, 68:23, 69:14, 69:19, 72:21, 76:11

**First** [11] - 4:24, 11:8, 17:24, 21:1, 29:15, 43:13, 46:5, 51:16, 76:22, 90:1, 90:20
**first** [25] - 5:1, 13:24, 18:7, 18:14, 26:22, 26:23, 29:15, 34:24, 39:7, 39:10, 39:12, 39:13, 42:1, 44:2, 47:4, 50:5, 50:21, 52:15, 62:11, 79:9, 92:16, 93:25, 96:20, 97:16
**fit** [1] - 38:11
**fits** [2] - 17:10, 17:11
**five** [5] - 8:18, 16:21, 67:7, 67:9, 67:11
**five-minute** [1] - 67:7
**flat** [1] - 7:9
**flip** [2] - 45:16, 46:1
**FLOOR** [2] - 2:14, 2:22
**focus** [2] - 14:11, 37:1
**focused** [5] - 40:24, 43:18, 51:7, 51:8, 51:9
**follow** [4] - 6:22, 9:16, 44:9, 76:7
**follows** [1] - 91:13
**FOR** [4] - 2:3, 2:17, 99:2, 99:11
**foregoing** [6] - 14:14, 39:3, 91:9, 91:11, 91:12, 98:13
**forgot** [1] - 12:6
**form** [21] - 13:15, 13:18, 15:18, 15:20, 35:1, 35:23, 36:3, 38:12, 48:19, 48:20, 48:22, 48:24, 49:13, 49:20, 49:23, 49:24, 49:25, 63:14, 88:21, 95:2, 97:10
**format** [1] - 98:14
**forms** [14] - 28:23, 30:1, 36:1, 36:7, 36:8, 49:3, 49:9, 49:10, 49:13, 92:18, 97:17
**forth** [3] - 38:4, 59:11, 64:16
**forward** [1] - 63:17
**forwards** [1] - 19:4
**four** [4] - 8:2, 16:21, 28:22, 74:24
**framed** [1] - 52:4
**free** [21] - 11:21, 16:10, 16:11, 16:21, 38:4, 42:3, 42:17,

43:8, 56:22, 56:25, 57:2, 57:6, 57:10, 57:12, 57:20, 57:24, 58:3, 58:12, 58:19, 58:23, 59:9
**frequently** [1] - 77:1
**Friday** [1] - 96:15
**friends** [1] - 76:8
**front** [5] - 45:12, 50:25, 79:12, 79:14, 79:17
**full** [4] - 25:4, 41:25, 60:14, 67:19
**function** [7] - 70:21, 78:12, 78:13, 78:15, 79:1, 79:4, 81:17
**functions** [2] - 72:8, 79:19
**future** [1] - 47:18

## G

**gain** [3] - 71:18, 71:21, 74:10
**gained** [1] - 85:17
**Garth** [1] - 71:8
**Gary** [8] - 9:7, 18:20, 19:4, 62:3, 62:14, 66:8, 66:10, 95:9
**Geffen** [4] - 72:23, 73:5, 73:7, 74:17
**general** [8] - 17:11, 28:7, 73:2, 76:12, 82:25, 93:16, 97:10
**generally** [6] - 32:19, 48:21, 76:15, 85:22, 86:24, 92:7
**gentlemen** [2] - 54:22, 94:24
**giant** [1] - 40:14
**given** [3] - 7:2, 90:9, 96:12
**GLASER** [1] - 2:10
**GLENN** [1] - 2:18
**graduated** [2] - 46:14, 68:11
**graduation** [1] - 68:15
**GRAND** [1] - 2:21
**grant** [5] - 7:8, 7:9, 30:8, 43:5, 43:6
**Grant** [1] - 30:5
**granted** [3] - 35:6, 38:15, 86:3
**grants** [10] - 30:9, 38:3, 42:2, 42:16, 43:7, 57:19, 57:23, 58:2, 58:14, 59:8
**Great** [1] - 25:20

**great** [1] - 20:1
**greater** [1] - 87:18
**grew** [2] - 46:15, 48:7
**Group** [12] - 27:17, 46:10, 47:1, 48:11, 48:14, 51:2, 52:9, 52:17, 53:18, 60:22, 68:21, 74:19
**group** [7] - 46:11, 46:13, 47:1, 47:16, 47:23, 47:25, 83:16
**Grubman** [1] - 46:21
**guess** [1] - 6:4
**guide** [2] - 26:24, 27:6
**Guns** [1] - 73:22
**Gustav** [5] - 4:6, 7:20, 7:25, 95:10, 98:4
**GUTIERREZ** [1] - 1:4

## H

**H-U** [1] - 60:15
**Hammer** [2] - 71:8, 72:14
**hand** [2] - 37:24, 69:9
**handed** [1] - 40:15
**handle** [1] - 97:3
**handset** [1] - 44:17
**handsets** [1] - 42:6
**handwriting** [1] - 19:25
**happy** [1] - 59:17
**Harleston** [7] - 4:15, 88:2, 88:4, 90:14, 95:13, 95:18, 98:7
**harsh** [1] - 69:12
**Harvard** [1] - 68:10
**head** [5] - 51:17, 70:14, 72:8, 73:3, 73:4
**heading** [1] - 43:2
**hear** [1] - 32:5
**heard** [5] - 4:20, 48:18, 65:22, 66:2, 89:9
**hears** [1] - 32:5
**hearsay** [1] - 88:8
**Hearsay** [3] - 65:24, 66:4, 66:13
**held** [1] - 98:14
**Henley** [1] - 73:21
**hereby** [6] - 38:3, 42:2, 57:19, 57:23, 59:8, 98:13
**hereto** [2] - 38:5,

59:11
**hesitating** [1] - 83:20
**Hi** [2] - 39:2, 42:21
**hi** [1] - 42:5
**Hi-Fi** [2] - 39:2, 42:21
**hi-fi** [1] - 42:5
**higher** [2] - 92:20, 93:7
**highlight** [6] - 29:16, 39:10, 41:14, 41:23, 42:8, 53:14
**Highlight** [1] - 10:23
**highlighting** [2] - 50:24, 56:23
**highlights** [1] - 50:21
**highly** [1] - 79:17
**historically** [9] - 76:20, 79:21, 81:15, 84:6, 85:3, 85:6, 86:2, 86:24, 91:3
**history** [1] - 46:14
**hit** [2] - 25:17, 78:19
**Hoffman** [4] - 5:10, 6:3, 94:5, 94:7
**hold** [5] - 6:5, 45:19, 89:11, 89:14, 89:17
**holding** [1] - 70:2
**Honor** [42] - 4:3, 4:20, 5:7, 6:4, 6:5, 6:6, 7:12, 7:18, 7:23, 8:21, 9:6, 10:3, 10:7, 17:18, 24:21, 35:3, 38:13, 54:7, 59:3, 60:6, 62:2, 62:6, 64:6, 65:3, 65:24, 66:20, 67:2, 67:4, 75:21, 75:24, 77:12, 88:7, 94:23, 95:12, 95:16, 95:17, 95:21, 95:25, 96:9, 96:25, 97:12, 97:15
**Honor's** [3] - 4:15, 7:20, 8:3
**HONORABLE** [1] - 1:4
**hopeful** [1] - 9:13
**hopefully** [1] - 4:19
**hour** [1] - 68:6
**hours** [6] - 5:8, 7:6, 7:9, 7:16, 98:2, 98:3
**House** [2] - 11:17, 90:9
**Hu** [23] - 8:7, 8:8, 8:10, 8:12, 8:13, 8:14, 8:16, 8:23, 9:1, 9:3, 9:8, 9:15, 9:19, 9:21, 60:9, 60:11, 60:12, 60:15, 60:18, 61:11, 62:10, 62:11, 65:6
**HU** [1] - 99:5

**Hugely** [1] - 52:10
**human** [1] - 70:2
**hundred** [1] - 7:5
**hundreds** [2] - 44:1, 48:5, 48:8, 52:3, 52:5
**hybrid** [3] - 90:16, 90:20, 90:25
**hypothetically** [1] - 80:15

**I**

**i.e** [1] - 88:22
**idea** [3] - 43:18, 74:20, 89:22
**identified** [3] - 9:4, 33:3, 72:11
**identifies** [1] - 29:18
**images** [1] - 42:18
**imagine** [2] - 27:24, 38:7
**Immediately** [1] - 68:15
**impact** [1] - 87:7
**impeachment** [1] - 9:18
**important** [4] - 7:25, 68:25, 69:1
**improper** [1] - 88:8
**in-store** [1] - 79:3
**Inc** [3] - 53:18, 70:1, 70:19
**incentive** [1] - 82:1
**include** [1] - 49:20
**included** [2] - 42:18, 74:12
**Including** [1] - 75:11
**including** [3] - 15:5, 31:1, 31:17
**income** [4] - 80:2, 83:13, 94:14
**increase** [1] - 93:22
**incur** [1] - 92:17
**incurred** [2] - 83:1, 93:17
**Indeed** [1] - 5:19
**indicate** [1] - 37:10
**indicia** [2] - 85:24, 85:25
**individual** [1] - 77:11
**Industries** [2] - 70:1, 70:19
**industry** [1] - 76:8
**information** [7] - 8:23, 28:6, 28:8, 28:10, 28:11, 28:17, 78:3
**inquire** [1] - 54:5
**inquiry** [1] - 54:25,

55:1
**inserted** [2] - 38:20, 74:7
**inside** [1] - 69:18
**insisted** [3] - 30:1, 36:4, 36:8
**instances** [1] - 57:15
**instead** [1] - 36:7
**instructions** [6] - 5:7, 96:2, 96:12, 96:14, 96:19, 97:17
**Intellectual** [1] - 41:13
**intellectual** [1] - 37:17
**intends** [1] - 8:14
**intention** [1] - 76:5
**interconnected** [1] - 94:11
**international** [1] - 70:4
**Internet** [2] - 48:6, 52:21
**introduce** [2] - 3:9, 3:13
**introduced** [1] - 3:7
**introduction** [2] - 62:2, 92:17
**introductory** [1] - 53:15
**inventory** [2] - 78:18, 78:24
**investigating** [1] - 61:20
**involve** [1] - 75:2
**involved** [14] - 26:2, 26:8, 26:12, 26:16, 35:20, 53:22, 61:12, 61:20, 63:14, 69:20, 72:10, 75:3, 77:11, 85:6
**involvement** [1] - 53:20
**iota** [1] - 81:5
**Iovine** [2] - 5:23, 6:1
**irrelevant** [1] - 5:22
**Island** [1] - 68:20
**issue** [22] - 3:8, 4:2, 8:8, 8:11, 8:13, 9:2, 9:17, 54:24, 62:21, 63:18, 65:21, 78:10, 78:25, 80:9, 82:8, 85:3, 85:13, 90:15, 90:21, 94:6, 95:16, 95:17
**issues** [6] - 5:6, 69:5, 80:5, 80:8, 91:4
**itself** [7] - 23:9, 24:3, 28:8, 33:20, 70:7, 83:5, 94:21

**iTunes** [30] - 15:25, 16:1, 16:2, 16:5, 16:7, 16:9, 16:16, 16:20, 16:23, 39:22, 39:23, 50:6, 50:8, 50:11, 50:13, 50:14, 50:15, 50:20, 50:23, 51:4, 51:7, 51:8, 51:12, 52:12, 52:14, 52:16, 52:18, 52:20, 87:16

**J**

**JACOBS** [1] - 2:10
**Jeffrey** [1] - 88:2
**jewel** [2] - 77:2, 77:16
**job** [1] - 74:23
**JOEL** [1] - 99:3
**join** [2] - 46:25, 47:3
**joined** [4] - 25:21, 26:7, 47:9, 68:15
**joining** [2] - 11:12, 48:2
**jokes** [1] - 89:19
**JUDGE** [1] - 1:4
**judgment** [1] - 6:11
**Judgment** [1] - 7:3
**Judicial** [1] - 98:15
**July** [1] - 63:13
**Jury** [5] - 3:4, 10:4, 67:12, 67:14, 95:5
**jury** [8] - 37:14, 76:12, 85:7, 85:21, 96:2, 96:12, 96:14, 96:19

**K**

**keep** [9] - 32:13, 34:11, 43:11, 44:14, 53:7, 53:9, 76:17, 81:19, 93:23
**KELLY** [1] - 2:20
**Kenswil** [9] - 5:12, 7:2, 7:5, 7:6, 25:15, 25:24, 26:1, 51:15, 51:16
**key** [1] - 49:19
**kind** [1] - 64:15, 90:4, 93:16
**kinds** [1] - 51:11
**KING** [1] - 2:3
**KLAUS** [11] - 2:20, 3:21, 40:11, 54:7, 54:12, 54:15, 54:18, 58:7, 58:10, 59:3, 60:6
**Klaus** [6] - 9:14,

40:9, 54:3, 56:15, 56:20, 59:8
**knowing** [1] - 69:3
**knowledge** [5] - 61:18, 68:24, 69:1, 89:24, 90:18
**known** [1] - 51:19
**Knupp** [1] - 68:16

**L**

**L.A** [1] - 46:25
**label** [16] - 72:9, 77:10, 79:19, 80:3, 80:16, 82:15, 83:8, 86:8, 86:10, 86:13, 87:12, 87:24, 88:19, 92:7, 92:17
**labels** [7] - 70:5, 70:20, 74:24, 81:16, 86:19, 87:19, 87:20
**laboring** [1] - 85:10
**Ladies** [2] - 54:22, 94:24
**laid** [1] - 6:25
**language** [6] - 23:1, 27:20, 36:2, 36:3, 36:9, 36:11
**last** [4] - 25:5, 39:22, 60:14, 67:20
**Last** [3] - 48:5, 60:15, 97:25
**late** [1] - 6:23
**law** [10] - 46:14, 68:10, 68:15, 68:16, 68:23, 68:24, 69:19, 72:20, 72:21
**Law** [1] - 68:10
**lawyer** [2] - 69:2, 69:10
**leading** [1] - 77:12
**learn** [5] - 69:6, 69:7, 69:8, 69:13, 69:17
**learned** [1] - 69:18
**learning** [1] - 69:12
**least** [2] - 3:23, 14:11
**leave** [3] - 58:7, 67:8, 74:17
**left** [7] - 6:21, 72:15, 72:21, 75:6, 76:2, 76:5, 98:3
**Legal** [1] - 70:15
**legal** [8] - 46:9, 47:23, 70:3, 70:14, 70:17, 73:3, 73:4, 81:13
**LeMoine** [12] - 2:19, 9:9, 62:6, 64:6, 65:5, 66:1, 66:6, 66:15,

66:19, 66:22, 67:1, 97:23
**less** [4] - 79:14, 81:23, 81:24
**letter** [5] - 61:13, 61:24, 62:3, 62:14, 63:23
**letting** [1] - 21:23
**level** [1] - 93:24
**Levine** [1] - 4:5
**License** [5] - 30:8, 41:22, 42:11, 42:16, 43:3
**license** [85] - 12:17, 12:19, 13:4, 14:6, 14:8, 14:15, 15:2, 16:4, 16:24, 17:7, 19:16, 20:20, 23:11, 24:4, 30:11, 31:15, 32:17, 36:15, 38:5, 38:8, 38:19, 39:1, 39:7, 39:9, 39:10, 39:11, 39:17, 40:25, 42:3, 42:9, 42:17, 44:4, 44:8, 44:16, 44:21, 44:25, 45:5, 45:11, 56:13, 56:16, 56:21, 56:25, 57:8, 57:11, 57:12, 57:19, 57:20, 57:24, 58:3, 59:10, 74:3, 82:15, 82:16, 82:20, 83:3, 83:7, 83:17, 84:7, 84:8, 85:5, 85:6, 85:25, 86:3, 86:4, 86:17, 86:24, 90:3, 90:4, 90:6, 90:7, 90:8, 90:21, 90:23, 90:24, 91:20, 93:13, 93:15, 94:12, 94:14
**licensed** [8] - 14:6, 15:12, 20:18, 21:17, 23:2, 83:2, 90:9, 91:17
**licensee** [6] - 83:22, 83:23, 84:2, 86:6, 86:20, 86:25
**licensees** [3] - 27:17, 85:9, 91:17
**licenses** [12] - 15:13, 19:13, 30:5, 32:11, 45:6, 57:1, 57:12, 69:21, 73:15, 83:7, 84:7, 93:10
**Licenses** [2] - 37:17, 41:12
**Licensing** [1] - 69:22
**licensing** [45] - 13:9, 13:10, 13:12, 13:14,

13:15, 13:18, 14:17, 15:11, 17:6, 17:9, 17:10, 17:11, 21:25, 22:24, 24:7, 30:18, 32:18, 69:21, 71:18, 71:22, 71:25, 72:2, 73:14, 73:24, 74:2, 75:12, 75:16, 80:6, 82:7, 82:12, 82:18, 82:22, 82:23, 83:11, 84:9, 84:16, 85:4, 85:22, 89:5, 90:2, 90:23, 90:24, 91:16, 93:1, 93:5

**licensor** [1] - 86:9

**likely** [1] - 79:8

**limitation** [2] - 90:2, 90:5

**limitations** [2] - 84:6, 86:3

**limited** [11] - 32:13, 33:9, 34:9, 38:4, 42:3, 44:20, 44:21, 57:20, 58:14, 59:9, 89:18

**line** [4] - 37:21, 40:15, 43:13, 70:4

**Line** [2] - 55:2, 55:3

**lines** [1] - 95:18

**lining** [1] - 41:4

**list** [4] - 3:15, 4:17, 97:22, 97:24

**listed** [2] - 8:15, 8:25

**listen** [2] - 17:1, 44:18

**LLC** [1] - 1:7

**LLP** [2] - 2:11, 2:17

**look** [20] - 12:15, 13:1, 14:19, 27:15, 28:21, 31:10, 31:15, 31:16, 34:17, 35:14, 36:23, 37:9, 45:9, 45:12, 49:15, 49:24, 59:16, 59:17, 62:11, 69:10

**looked** [5] - 13:3, 49:18, 49:21, 49:24, 49:25

**looking** [6] - 13:24, 15:16, 37:16, 37:21, 44:1, 47:16

**looks** [3] - 23:20, 37:25, 39:19

**Los** [4] - 1:20, 1:24, 3:1, 68:16

**LOS** [2] - 2:15, 2:23

**lower** [2] - 79:18, 92:7

**lumped** [1] - 13:12

**lunch** [1] - 10:12

**lyrics** [1] - 77:1

**M**

**mail** [2] - 15:4, 15:5

**mailed** [1] - 15:22

**main** [1] - 49:22

**major** [4] - 69:23, 71:1, 71:2, 78:24

**majority** [4] - 39:25, 40:1, 40:3, 40:6

**management** [2] - 78:19, 78:24

**managers** [1] - 68:19

**manner** [2] - 86:14, 91:1

**manufacture** [7] - 21:13, 76:22, 77:8, 83:8, 91:18, 92:17, 92:21

**manufactured** [6] - 14:5, 19:23, 19:25, 22:11, 76:23, 78:13

**manufactures** [1] - 83:23

**manufacturing** [7] - 22:16, 24:12, 24:19, 77:3, 77:11, 93:2, 93:4

**margin** [1] - 37:24

**Marisa** [1] - 89:15

**MARK** [1] - 2:12

**mark** [1] - 42:24

**Mark** [2] - 5:19, 5:20

**MARKED** [2] - 99:18, 99:22

**marked** [1] - 23:24

**markers** [1] - 17:22

**market** [6] - 39:23, 40:1, 40:3, 50:17, 53:8

**marketing** [6] - 50:14, 51:1, 51:4, 51:5, 51:9, 69:7

**marketplace** [1] - 53:12

**Marshall** [2] - 67:17, 67:21

**MARSHALL** [1] - 99:6

**MARTIN** [1] - 99:3

**Martin** [10] - 5:17, 6:9, 8:6, 8:7, 8:9, 10:5, 10:10, 17:21, 17:23, 23:18

**master** [26] - 12:17, 12:19, 22:24, 76:21, 82:7, 82:16, 82:20, 83:16, 83:22, 84:7, 84:9, 84:15, 84:16, 85:4, 86:3, 86:6, 86:7,

**masters** [13] - 12:21, 13:4, 15:2, 17:7, 19:17, 23:2, 23:11, 23:21, 24:4, 33:4, 80:6, 90:3, 91:17

**mastertone** [1] - 26:3, 26:11, 32:4, 32:14, 34:11, 44:4, 44:13, 44:14, 51:22, 52:1, 87:4

**mastertones** [10] - 26:4, 31:18, 32:22, 44:3, 51:11, 51:25, 52:3, 52:6, 59:15, 87:15

**materials** [1] - 97:6

**math** [1] - 81:19

**matter** [4] - 13:13, 91:4, 96:20, 98:14

**mattered** [1] - 6:8

**matters** [4] - 6:7, 81:5, 90:22

**MC** [2] - 71:8, 72:13

**MCA** [1] - 71:8

**McCartney** [1] - 71:13

**mean** [19] - 12:25, 14:8, 15:20, 19:15, 26:17, 26:19, 32:13, 32:23, 33:7, 42:24, 46:7, 53:9, 57:5, 58:23, 71:6, 79:25, 90:25, 91:12

**meaning** [3] - 14:16, 14:17, 33:7

**meaningless** [1] - 90:12

**means** [12] - 30:17, 33:8, 34:2, 34:20, 35:14, 41:4, 48:21, 52:22, 56:25, 57:4, 80:14, 91:13

**meant** [6] - 13:11, 13:16, 28:11, 31:9, 47:24, 94:9

**media** [1] - 47:17

**medium** [6] - 74:6, 92:2, 92:6, 92:9, 93:3, 93:7

**MELINDA** [1] - 2:19

**member** [2] - 11:22, 76:10

**mentioned** [4] - 10:12, 29:25, 83:3, 97:1

**mentioning** [1] - 26:17

**merchandise** [1] -

86:9, 86:12, 88:6, 88:17, 88:22, 89:22

**merit** [2] - 89:25, 90:1

**met** [2] - 25:13, 60:18

**metadata** [4] - 26:23, 27:6, 27:16

**method** [3] - 15:5, 92:9, 92:15

**Michigan** [1] - 68:10

**middle** [3] - 6:23, 13:2, 27:15

**might** [8] - 8:1, 16:12, 32:13, 34:19, 50:19, 50:21, 57:5, 82:18

**Mike** [1] - 39:10

**Milbank** [1] - 46:18

**million** [3] - 93:25, 94:1, 94:18

**millions** [3] - 52:3, 52:6

**mimicking** [1] - 53:5

**mind** [3] - 23:19, 23:20, 49:23

**minute** [2] - 67:5, 67:7

**minutes** [16] - 4:7, 4:10, 4:18, 5:1, 6:19, 7:11, 7:14, 8:2, 8:18, 67:9, 67:11, 95:11, 98:3, 98:6

**misstates** [1] - 64:6

**mistake** [2] - 39:6, 41:6

**mistaken** [1] - 28:18

**Mitchell** [1] - 68:16

**mixers** [1] - 46:23

**Mobile** [30] - 4:6, 29:6, 35:18, 35:22, 36:20, 37:3, 38:3, 39:5, 40:16, 41:5, 42:2, 42:6, 42:17, 43:7, 43:14, 44:3, 44:7, 44:13, 45:3, 45:14, 49:6, 57:19, 57:23, 58:2, 58:14, 58:23, 59:9, 59:25

**mobile** [9] - 28:22, 29:24, 29:25, 34:5, 36:2, 36:4, 36:8, 48:7, 59:15

**Mobile's** [2] - 38:11, 39:4

**model** [11] - 30:21, 32:8, 34:7, 34:8, 38:11, 44:5, 45:5, 50:1, 50:3, 53:1, 53:2

**modified** [2] - 3:17

**modify** [1] - 42:18

**moment** [2] - 23:18, 40:17

**Monday** [3] - 96:2, 96:17, 96:20

**money** [6] - 11:13, 17:1, 44:19, 57:1, 57:5, 63:23

**monies** [1] - 57:15

**month** [4] - 12:3, 15:23, 16:7, 16:17

**months** [4] - 32:11, 32:12, 34:10

**morning** [4] - 4:4, 97:15, 97:20

**most** [4] - 48:22, 72:20, 76:16, 79:19

**Most** [1] - 81:14

**Motion** [7] - 7:3, 35:5, 38:15

**move** [7] - 10:19, 35:3, 38:13, 46:25, 47:16, 62:2, 97:1

**Move** [1] - 10:24

**moved** [2] - 47:19, 70:6

**moving** [1] - 47:11

**Moving** [1] - 38:25

**MR** [95] - 3:5, 3:12, 3:18, 3:20, 3:21, 4:3, 4:10, 4:12, 4:20, 4:22, 7:11, 7:15, 7:18, 7:23, 8:7, 8:13, 9:5, 9:23, 10:2, 10:3, 10:7, 10:9, 17:15, 17:17, 17:20, 20:22, 20:25, 22:18, 22:20, 22:22, 23:5, 23:7, 24:21, 24:22, 24:25, 25:10, 33:15, 35:3, 35:7, 38:13, 38:16, 40:7, 40:11, 54:7, 54:10, 54:12, 54:15, 54:16, 54:18, 56:10, 58:6, 58:7, 58:10, 59:3, 59:5, 59:7, 60:5, 60:6, 60:9, 60:11, 60:17, 62:2, 62:9, 64:12, 65:2, 65:24, 66:4, 66:13, 67:2, 67:4, 67:16, 67:24, 75:23, 76:1, 77:12, 77:18, 88:7, 88:10, 88:12, 94:22, 95:8, 95:12, 95:16, 95:25, 96:6, 96:8, 96:15, 96:25, 97:9, 97:12, 97:14, 97:18, 97:22, 97:24, 98:4

**MS** [10] - 62:6, 64:6, 65:5, 66:1, 66:6, 66:15, 66:19, 66:22,

67:1, 97:23
**multiple** [1] - 5:5
**MUNGER** [1] - 2:17
**Music** [14] - 27:17,
46:10, 46:11, 47:1,
48:1, 48:11, 48:14,
51:2, 52:9, 52:17,
53:17, 60:22, 68:21,
74:19
**music** [20] - 15:18,
20:5, 27:13, 46:16,
46:22, 46:24, 47:20,
68:14, 68:17, 68:23,
69:1, 69:13, 70:3,
72:22, 74:19, 74:25,
76:8, 88:20
**must** [1] - 84:2

## N

**N'** [1] - 73:22
**name** [8] - 25:5,
25:6, 60:14, 60:15,
67:19, 67:20
**names** [1] - 73:18
**NASHVILLE** [1] - 2:7
**nationally** [1] - 78:16
**nature** [5] - 71:21,
74:10, 80:21, 82:12,
92:1
**necessarily** [4] -
4:13, 14:5, 57:5,
78:19
**necessary** [1] - 7:3
**need** [12] - 3:10,
4:23, 5:18, 7:19, 9:15,
23:16, 37:13, 62:10,
95:17, 95:20
**negotiate** [2] - 71:25,
73:10
**negotiated** [3] -
47:24, 50:11, 75:15
**negotiating** [11] -
26:2, 26:12, 26:13,
35:18, 48:12, 48:17,
53:21, 69:20, 73:24,
75:2, 75:4
**negotiations** [2] -
72:10, 73:23
**net** [3] - 83:13,
93:10, 93:14
**netted** [1] - 64:20
**network** [1] - 39:5
**never** [2] - 9:3, 87:23
**New** [3] - 46:17,
46:20, 89:15
**new** [15] - 50:22,
74:6, 92:2, 92:6, 92:9,
92:14, 92:15, 92:17,

92:19, 93:3, 93:6,
93:7
**next** [14] - 10:25,
18:12, 18:17, 23:16,
24:24, 25:1, 35:5,
46:1, 60:8, 67:15,
72:18, 78:12, 94:1,
95:7
**Next** [1] - 4:2
**Nextel** [1] - 35:23
**Nichols** [12] - 10:17,
11:4, 13:2, 40:13,
40:17, 40:21, 41:24,
42:8, 45:19, 53:13,
53:15, 53:25
**nickel** [2] - 5:20,
16:22
**Nirvana** [1] - 73:21
**Nobody** [1] - 90:8
**non** [3] - 30:9,
30:10, 38:4, 38:14,
42:2, 42:17, 43:7,
57:19, 57:23, 58:2,
58:14, 59:9, 90:3
**non-core** [1] - 90:3
**non-exclusive** [10] -
30:9, 38:4, 42:2,
42:17, 43:7, 57:19,
57:23, 58:2, 58:14,
59:9
**non-responsive** [1] -
38:14
**non-transferable** [1]
- 30:10
**none** [3] - 83:5,
85:25, 91:3
**normal** [18] - 14:1,
14:3, 14:6, 14:7, 14:9,
14:13, 15:1, 15:9,
17:4, 22:7, 51:23,
51:25, 52:1, 52:7,
91:3, 91:10, 91:21,
94:19
**normally** [2] - 11:15,
72:1
**North** [1] - 70:1
**note** [1] - 42:23
**Nothing** [2] - 40:7,
67:2
**nothing** [6] - 16:13,
34:4, 59:3, 65:2,
87:24, 90:4
**notice** [2] - 8:15,
63:1
**Notwithstanding** [2]
- 14:14, 91:8
**notwithstanding** [2]
- 91:11, 91:12
**NRS** [1] - 91:17
**number** [11] - 11:20,

39:25, 40:5, 46:18,
46:24, 48:3, 51:19,
52:6, 76:8, 76:22,
90:1
**numerous** [1] -
75:15

## O

**oar** [1] - 85:10
**object** [2] - 8:25,
77:13
**Objection** [5] - 64:6,
65:24, 66:4, 66:13,
88:7
**objection** [4] - 3:20,
3:21, 62:5, 62:6
**objections** [1] - 96:1
**obtain** [1] - 16:4
**obtains** [1] - 86:6
**obviously** [2] - 8:1,
80:1
**occasion** [1] - 28:22
**occasions** [1] -
25:13
**occurred** [3] - 4:4,
74:3, 92:16
**October** [1] - 72:15
**OF** [2] - 1:2, 1:18
**offer** [1] - 11:25
**offered** [2] - 26:4,
74:18
**offering** [2] - 27:9,
27:10
**officer** [1] - 72:9
**offices** [1] - 52:5
**Official** [1] - 1:22,
98:18
**offset** [1] - 92:20
**often** [1] - 17:25
**OLSON** [1] - 2:17
**once** [2] - 55:1,
60:18
**Once** [1] - 79:1
**One** [3] - 39:22, 97:5,
97:18
**one** [69] - 4:17, 5:5,
10:13, 10:19, 12:10,
13:9, 13:14, 13:25,
13:25, 14:1, 14:16,
14:17, 14:19, 18:5,
18:7, 18:13, 20:9,
20:10, 21:6, 21:11,
21:15, 21:16, 21:23,
21:25, 22:1, 22:14,
22:20, 23:19, 24:9,
26:8, 28:5, 28:6,
28:15, 28:16, 29:3,
29:4, 29:6, 29:10,

40:24, 42:18, 43:24,
49:20, 49:22, 50:1,
50:10, 57:21, 57:22,
59:5, 62:20, 64:19,
67:5, 71:1, 77:9,
77:21, 78:21, 80:5,
80:7, 81:5, 84:1, 84:2,
88:4, 95:16, 95:17,
95:25
**ones** [2] - 3:10, 3:12
**online** [8] - 47:14,
47:19, 48:6, 50:2,
50:16, 52:24, 52:25
**oOo** [1] - 3:3
**open** [3] - 44:17,
50:20, 52:25
**opening** [2] - 5:2,
33:13
**operating** [1] - 70:20
**opinion** [2] - 80:9,
85:24
**opinions** [1] - 95:2
**opportunity** [2] -
46:20, 46:25
**opposed** [4] - 75:11,
82:24, 86:5, 92:25
**order** [4] - 15:5, 16:4,
17:1, 54:4
**ordered** [1] - 96:1
**orders** [2] - 78:17
**ordinarily** [1] - 92:8
**organization** [1] -
11:10
**origin** [1] - 92:13
**original** [2] - 50:11,
53:17
**originally** [2] - 38:25,
39:8
**Ostroff** [1] - 5:10
**otherwise** [7] -
32:25, 42:6, 53:9,
82:17, 83:12, 84:5
**over-allocated** [1] -
61:5
**over-allocation** [2] -
62:21, 64:25
**overbuy** [1] - 82:1
**overcharge** [1] -
65:23
**overcharged** [4] -
64:10, 65:9, 65:11,
65:14
**overhead** [1] - 93:15
**Overruled** [4] - 64:8,
66:21, 77:14, 88:9
**owed** [1] - 63:24,
64:3, 64:24
**own** [9] - 15:21,
32:14, 44:15, 44:20,
49:9, 49:10, 49:11,

51:2, 86:7
**owned** [3] - 70:5,
73:5, 73:6
**ownership** [1] -
80:13

## P

**P&P** [1] - 79:16
**p.m** [2] - 3:2, 98:10
**P.M** [1] - 1:19
**package** [1] - 78:4
**packet** [1] - 97:5
**page** [16] - 10:20,
10:21, 23:16, 26:23,
27:4, 29:15, 33:10,
34:22, 34:24, 40:18,
40:19, 45:10, 50:21,
53:24, 62:12, 98:14
**Page** [7] - 10:20,
33:12, 37:13, 45:16,
55:2, 55:3, 59:18
**pages** [2] - 45:9,
46:1
**Pages** [1] - 10:17
**paid** [33] - 12:17,
12:19, 12:21, 15:6,
17:6, 17:7, 17:9,
17:13, 19:12, 19:16,
22:7, 24:4, 24:6, 24:8,
24:13, 32:17, 32:24,
32:25, 34:2, 34:14,
34:21, 35:15, 57:15,
59:14, 68:5, 79:7,
79:8, 79:13, 79:16,
80:15, 81:25, 92:22,
94:12
**Pamela** [2] - 1:22,
98:18
**paper** [1] - 23:24
**Paragraph** [9] -
17:13, 30:4, 37:16,
41:1, 41:9, 41:15,
44:15, 45:11, 58:13
**paragraph** [4] -
39:20, 40:24, 44:22,
53:15
**parameters** [1] - 6:5
**parcel** [1] - 93:17
**Pardon** [1] - 60:10
**parenthetical** [2] -
14:21, 59:10
**part** [18] - 27:5, 42:1,
43:6, 43:10, 47:16,
47:18, 47:23, 60:25,
61:5, 61:13, 68:20,
69:23, 73:23, 76:16,
78:10, 79:3, 93:17,
94:9

**particular** [4] - 48:25, 49:23, 50:24, 51:13
**particularly** [1] - 81:16
**parties** [5] - 26:9, 26:17, 47:15, 47:16, 54:24
**partner** [3] - 34:23, 72:21
**partners** [1] - 49:8
**party** [13] - 19:25, 20:10, 20:19, 26:3, 39:3, 49:8, 66:19, 82:16, 83:17, 83:19, 91:20, 93:1
**past** [1] - 49:16
**Paterno** [5] - 5:25, 6:3, 82:4, 82:7
**Paul** [1] - 71:13
**pay** [13] - 12:6, 16:8, 16:17, 17:1, 44:19, 65:14, 79:6, 79:7, 86:9, 86:13, 92:7, 92:8
**payable** [2] - 93:22, 93:23
**paying** [4] - 16:22, 83:8, 83:9
**payment** [3] - 33:23, 59:21, 60:2
**payments** [1] - 17:12
**pen** [2] - 17:22
**penalties** [2] - 81:11, 81:13
**pennies** [1] - 11:21
**penny** [1] - 16:22
**people** [5] - 4:16, 37:2, 52:13, 53:23, 54:8
**People** [1] - 15:21
**per** [1] - 72:24
**percent** [15] - 7:5, 13:22, 15:12, 24:7, 40:4, 81:15, 81:18, 81:19, 81:20, 81:21, 81:24, 87:17, 93:24, 93:25, 94:1
**percentage** [2] - 39:23, 86:25
**perfect** [1] - 93:6
**perform** [2] - 30:12, 85:9
**perhaps** [2] - 8:23, 97:2
**period** [9] - 18:8, 18:19, 18:22, 32:11, 32:13, 33:9, 34:9, 51:18
**permanent** [6] -

18:15, 27:9, 28:3, 28:4, 32:21, 39:23
**permanently** [1] - 44:20
**permission** [1] - 86:8
**person** [3] - 32:5, 32:10
**perspective** [1] - 52:8
**Peter** [2] - 82:4, 82:10
**Phil** [1] - 23:15
**PHILIP** [1] - 1:4
**phone** [2] - 26:4, 29:4
**physical** [11] - 47:13, 47:17, 49:18, 49:19, 51:11, 53:6, 53:12, 77:19, 78:4, 83:4
**physically** [1] - 16:14
**pictures** [3] - 52:4, 76:25, 77:1
**piece** [2] - 23:24, 83:4
**PING** [1] - 99:5
**Ping** [15] - 8:7, 8:8, 8:9, 8:12, 8:13, 8:14, 8:16, 8:23, 9:1, 9:3, 9:8, 60:9, 60:11, 60:12, 60:15
**place** [8] - 9:10, 38:20, 38:24, 49:14, 58:11, 79:10, 83:4, 94:19
**places** [6] - 56:15, 56:23, 57:7, 57:9, 57:10, 57:14
**Plaintiff** [1] - 1:8
**plaintiff** [1] - 98:2
**PLAINTIFF** [3] - 2:3, 99:2, 99:18
**plaintiff's** [1] - 7:7
**Plaintiff's** [6] - 4:1, 24:24, 25:2, 60:8, 60:12, 62:8, 67:15, 67:17
**plaintiffs** [1] - 68:3
**plan** [1] - 4:12
**platform** [4] - 85:7, 85:9, 92:19, 93:6
**play** [3] - 4:6, 8:3, 8:4
**played** [2] - 6:14, 6:21, 28:15
**point** [11] - 5:23, 7:9, 9:21, 21:5, 50:1, 54:24, 56:20, 58:11, 79:19, 88:8, 95:10
**pointed** [4] - 30:25, 31:16, 56:15, 57:4
**pointing** [1] - 59:8

**points** [4] - 4:22, 9:20, 25:17, 50:4
**Polansky** [1] - 63:8
**POMERANTZ** [22] - 2:18, 3:20, 4:20, 4:22, 9:5, 9:23, 10:2, 10:7, 10:9, 17:15, 20:25, 22:18, 23:7, 24:21, 75:23, 77:12, 88:7, 95:12, 95:16, 96:6, 97:12, 97:18
**Pomerantz** [10] - 4:14, 6:25, 8:14, 8:20, 10:6, 19:5, 84:11, 84:14, 91:9, 91:21
**pops** [1] - 50:21
**popular** [2] - 52:8, 52:10
**portion** [1] - 54:3
**portions** [1] - 54:23
**position** [16] - 31:9, 31:22, 46:6, 46:7, 60:23, 70:19, 70:20, 73:3, 73:4, 74:18, 76:10, 89:5, 89:8, 89:11, 97:9, 97:12
**positioning** [1] - 79:17
**positions** [1] - 72:19
**poster** [4] - 50:25, 79:7, 79:8, 79:9
**posters** [1] - 79:5
**potentially** [2] - 4:4, 93:3
**practice** [7] - 70:11, 84:4, 92:2, 92:11, 92:13, 93:12, 95:13
**precedence** [1] - 91:13
**prejudicial** [1] - 54:16
**prepared** [1] - 61:17
**present** [1] - 48:2
**president** [10] - 46:9, 60:24, 69:16, 70:1, 70:7, 70:19, 70:23, 72:5, 74:18
**PRESIDING** [1] - 1:4
**pretend** [1] - 81:20
**pretty** [2] - 21:2, 70:10
**preview** [3] - 42:19, 44:16, 44:19
**price** [38] - 11:21, 31:2, 31:3, 31:5, 31:6, 31:7, 31:10, 32:21, 33:2, 33:4, 33:7, 33:8, 33:20, 33:22, 34:1, 34:5, 34:14, 35:11, 35:14, 79:15,

79:16, 79:18, 80:19, 86:9, 86:13, 86:14, 86:18, 86:19, 86:25, 87:5, 87:10, 87:12, 87:15, 87:17, 87:22
**primarily** [2] - 47:12, 47:17, 47:24
**private** [1] - 70:11
**problem** [2] - 54:8, 54:19
**procedure** [1] - 81:15
**proceed** [1] - 75:25
**Proceedings** [1] - 98:10
**PROCEEDINGS** [1] - 1:18
**proceedings** [1] - 98:14
**processes** [2] - 75:11, 79:22
**produce** [1] - 77:22
**produced** [1] - 88:18
**producers** [2] - 46:23, 68:19
**producing** [1] - 77:15
**product** [30] - 15:12, 16:5, 21:16, 21:18, 21:19, 22:16, 23:2, 27:13, 30:18, 32:7, 36:12, 44:4, 44:8, 44:13, 47:13, 47:14, 49:18, 50:17, 51:11, 52:8, 52:10, 53:7, 77:19, 78:4, 83:5, 90:3, 90:4, 90:7, 90:10, 91:1
**Productions** [1] - 1:7
**products** [2] - 89:7, 89:24
**proffer** [1] - 97:19
**promotion** [4] - 42:5, 42:21, 50:14, 69:8
**Promotion** [2] - 42:11, 42:16
**promotional** [1] - 79:3
**promotions** [1] - 16:12
**properly** [1] - 82:1
**Property** [1] - 41:13
**property** [1] - 37:17
**proposed** [2] - 97:7, 97:8
**proposition** [1] - 53:11
**prorated** [1] - 24:9
**prorations** [1] - 23:21

**protected** [1] - 54:24
**protective** [1] - 4:18
**provide** [3] - 83:18, 83:20, 92:7
**provided** [4] - 30:11, 82:17, 83:12, 84:5
**provider** [5] - 29:19, 30:8, 30:13, 86:20, 87:20
**providers** [3] - 39:3, 86:18, 88:18
**provides** [1] - 83:22
**providing** [1] - 42:23
**provision** [69] - 10:22, 10:25, 11:5, 12:17, 12:19, 13:3, 13:4, 13:7, 13:11, 13:12, 13:14, 13:18, 13:22, 13:24, 14:15, 14:17, 14:21, 14:25, 15:1, 15:2, 15:7, 15:11, 15:14, 17:6, 17:7, 17:9, 19:20, 22:25, 23:8, 23:11, 23:17, 23:18, 24:4, 24:7, 24:14, 32:18, 33:24, 38:11, 42:13, 54:17, 74:2, 82:8, 82:13, 82:14, 82:18, 82:19, 82:21, 82:22, 82:23, 82:24, 84:5, 84:7, 84:8, 84:9, 84:16, 85:4, 86:4, 89:5, 89:22, 90:2, 91:8, 91:10, 91:16, 92:14, 93:7, 94:12, 94:14, 94:15
**provisions** [25] - 10:20, 11:1, 11:3, 11:8, 12:15, 12:16, 13:1, 13:9, 17:10, 44:8, 45:6, 48:22, 48:25, 52:16, 54:11, 71:19, 71:22, 73:24, 74:6, 74:11, 79:24, 83:11, 90:23, 90:25, 93:5
**publicly** [1] - 42:19
**publishing** [4] - 68:18, 70:3, 74:19, 74:25
**pull** [6] - 23:15, 33:11, 40:22, 45:10, 62:10, 91:6
**pulled** [1] - 11:4
**purchase** [2] - 17:2, 31:18
**purchasing** [1] - 91:2
**purpose** [6] - 71:21,

74:11, 82:12, 90:5, 92:2, 94:20
**purposes** [4] - 33:4, 49:11, 94:10, 94:16
**pursuant** [4] - 82:20, 83:17, 85:5, 98:13
**put** [21] - 5:8, 5:20, 9:10, 10:17, 10:22, 10:23, 13:2, 24:2, 26:23, 28:1, 29:14, 34:24, 36:25, 51:11, 62:11, 62:24, 63:17, 79:9, 84:21, 91:6, 96:23
**Put** [1] - 22:23
**puts** [5] - 21:8, 21:9, 23:9, 23:25, 51:10
**putting** [3] - 24:3, 50:24, 64:16

**Q**

**quality** [1] - 53:11
**quantified** [1] - 64:20
**quantity** [1] - 79:18
**Queen** [1] - 71:13
**questioned** [1] - 84:11
**questioning** [2] - 40:16, 95:19
**questions** [24] - 6:12, 6:15, 6:18, 9:8, 9:9, 10:13, 17:15, 17:17, 17:23, 19:9, 22:18, 24:21, 48:18, 50:4, 50:6, 56:11, 60:6, 63:22, 64:1, 75:23, 76:12, 84:14, 84:19, 91:25
**quick** [1] - 59:5
**quickly** [4] - 5:25, 25:21, 28:21, 70:10
**quite** [4] - 13:13, 31:5, 36:3, 36:9
**quote** [5] - 23:1, 87:15, 90:10, 90:16, 91:1
**quotes** [1] - 14:20

**R**

**raise** [2] - 8:8, 95:20
**raised** [2] - 64:23, 65:21
**Raitt** [2] - 71:8, 72:13
**ran** [2] - 26:1, 70:8
**rate** [3] - 11:15, 15:6, 93:22
**rates** [1] - 20:13

**rather** [3] - 8:4, 24:15, 32:5
**rationale** [1] - 92:13
**read** [12] - 3:22, 11:2, 23:18, 30:25, 37:5, 37:14, 41:10, 41:25, 42:14, 43:1, 43:5, 87:4
**reading** [2] - 3:15, 23:20
**ready** [2] - 95:24, 97:16
**real** [1] - 87:11
**realistically** [1] - 96:23
**reality** [2] - 96:11, 96:13
**reallocating** [1] - 65:23
**reallocation** [1] - 66:3
**really** [5] - 6:8, 6:13, 69:13
**reason** [3] - 13:14, 53:9, 59:1
**reasonably** [1] - 51:22
**reasons** [2] - 4:17, 90:1
**rebuttal** [1] - 9:17
**receipts** [3] - 24:8, 93:11, 93:15
**receive** [1] - 31:3, 88:18
**received** [7] - 4:1, 27:1, 38:3, 41:5, 62:8, 87:23, 88:25
**RECEIVED** [2] - 99:18, 99:22
**receives** [1] - 86:24
**receiving** [1] - 88:5
**recently** [1] - 76:9
**Recess** [1] - 67:13
**recipient** [1] - 27:6
**recognize** [3] - 27:3, 27:4, 62:13
**recollection** [2] - 12:13, 29:8
**record** [151] - 7:22, 10:13, 11:9, 11:14, 11:17, 11:19, 11:20, 11:22, 12:3, 12:11, 12:16, 12:17, 12:20, 13:8, 13:11, 13:15, 13:17, 13:18, 13:22, 14:7, 14:8, 14:19, 14:20, 15:4, 15:5, 15:9, 15:10, 15:11, 15:15, 15:18, 16:7, 16:11, 16:17, 16:19,

17:3, 17:4, 17:11, 17:12, 19:22, 19:24, 20:9, 21:7, 21:8, 21:12, 21:22, 21:24, 22:2, 22:6, 22:8, 22:14, 22:15, 23:22, 23:23, 23:25, 24:3, 24:10, 24:11, 24:15, 24:16, 25:4, 32:14, 34:11, 44:4, 46:22, 47:18, 50:16, 50:24, 51:5, 52:1, 52:14, 52:25, 53:6, 60:13, 67:19, 68:18, 69:1, 69:18, 69:21, 70:8, 71:2, 72:7, 73:14, 74:24, 75:7, 75:8, 76:9, 76:14, 76:15, 76:20, 76:21, 76:23, 77:5, 77:8, 77:10, 77:17, 77:20, 78:19, 79:6, 79:7, 79:8, 79:13, 79:16, 79:17, 80:11, 80:12, 80:13, 80:14, 80:15, 80:16, 80:17, 80:24, 80:25, 81:4, 81:5, 81:7, 81:21, 81:22, 82:8, 82:15, 82:20, 83:2, 83:4, 83:6, 83:18, 83:21, 83:24, 83:25, 84:24, 85:7, 86:16, 86:21, 86:24, 86:25, 88:18, 90:5, 90:8, 90:15, 90:16, 90:19, 91:2, 91:9, 91:10, 92:7
**Record** [2] - 15:12, 19:5, 19:6
**recorded** [1] - 74:19
**recording** [14] - 21:19, 21:23, 24:1, 28:5, 28:12, 28:16, 48:12, 69:20, 71:19, 71:22, 75:2, 75:4, 79:24, 83:16
**recordings** [5] - 24:1, 29:19, 83:17, 84:15, 88:6
**records** [41] - 10:22, 11:10, 11:14, 11:21, 11:25, 13:21, 13:25, 14:25, 16:10, 16:21, 19:9, 19:20, 20:1, 23:9, 24:9, 24:13, 24:19, 50:14, 50:18, 51:2, 51:4, 51:6, 72:15, 75:11, 75:12, 75:16, 75:17, 78:13, 78:22, 79:1, 79:14,

79:23, 80:24, 81:15, 81:21, 81:24, 82:2, 82:24, 88:5, 91:18
**Records** [17] - 1:12, 14:12, 50:25, 68:20, 69:15, 70:6, 70:7, 70:16, 70:23, 71:1, 72:5, 72:23, 73:5, 73:7, 76:18
**recoupable** [1] - 65:9
**recreating** [1] - 77:21
**Recross** [1] - 20:23
**RECROSS** [5] - 20:24, 23:6, 58:9, 99:2, 99:11
**RECROSS-EXAMINATION** [3] - 20:24, 23:6, 58:9
**red** [5] - 17:22, 37:21, 40:15, 41:4, 43:13
**redirect** [1] - 56:11
**Redirect** [1] - 17:16
**REDIRECT** [6] - 17:19, 22:21, 56:9, 59:6, 99:2, 99:11
**reduce** [1] - 92:22
**reference** [4] - 33:22, 41:17, 48:18, 87:5
**referenced** [1] - 49:7
**references** [1] - 31:18
**referred** [5] - 23:12, 45:6, 72:24, 91:10, 91:21
**referring** [2] - 23:13, 94:15
**reflect** [1] - 48:25
**reflects** [1] - 41:5
**regard** [5] - 4:2, 7:1, 54:4, 54:25, 66:17, 84:16, 95:6
**regardless** [2] - 86:16, 87:13
**regionally** [1] - 78:16
**regulations** [1] - 98:15
**relate** [1] - 54:3
**related** [2] - 8:19, 93:12
**relates** [4] - 13:21, 33:17, 96:12, 97:25
**relating** [1] - 95:18
**relations** [1] - 48:15
**relationship** [1] - 53:3
**released** [2] - 20:11, 20:16
**releases** [1] - 19:18

**relevant** [3] - 3:16, 3:19, 6:13
**remainder** [1] - 23:17
**remember** [27] - 12:10, 12:11, 16:8, 16:18, 28:25, 29:1, 30:3, 30:20, 31:20, 35:1, 35:20, 35:21, 35:24, 36:6, 36:11, 36:16, 43:13, 43:15, 43:16, 43:21, 43:22, 43:25, 52:5, 56:17, 56:18, 64:1
**Remember** [2] - 67:9, 95:1
**remembered** [1] - 12:4
**remind** [2] - 34:22, 89:13
**reminding** [1] - 54:8
**renegotiate** [1] - 73:22
**reopen** [1] - 55:1
**reopened** [1] - 56:8
**Repeat** [1] - 89:20
**repeat** [1] - 36:5
**replace** [1] - 39:17
**replaced** [1] - 38:8
**replicates** [1] - 83:24
**report** [5] - 62:4, 62:14, 62:19, 63:5, 63:7
**reported** [3] - 67:6, 72:8, 98:14
**Reporter** [2] - 1:22, 98:18
**reporter** [1] - 25:1
**REPORTER'S** [1] - 1:18
**represent** [2] - 46:21, 59:24
**representative** [4] - 4:7, 8:17, 63:18, 65:21
**representatives** [2] - 65:22, 66:2
**represented** [3] - 68:18, 68:19, 68:21
**reprinting** [1] - 78:3
**reproduce** [4] - 30:12, 39:2, 43:8, 90:9
**reproducing** [1] - 77:21
**reproduction** [1] - 42:19
**request** [4] - 4:8, 4:10, 4:18, 7:8
**resale** [1] - 52:13

**resell** [4] - 44:3, 44:7, 44:13, 45:3
**reserve** [2] - 75:23, 81:6
**resold** [1] - 52:18
**resources** [1] - 70:3
**respect** [14] - 28:2, 29:23, 33:21, 36:20, 40:25, 48:17, 49:7, 50:6, 81:11, 83:1, 83:15, 84:4, 90:19, 93:10
**respond** [1] - 63:4
**responding** [1] - 61:12
**response** [3] - 61:17, 63:1, 63:7
**responsibilities** [6] - 72:6, 72:7, 74:22, 74:24, 77:4, 78:18
**responsibility** [3] - 24:12, 70:4, 77:10
**responsible** [4] - 47:2, 70:2, 77:20, 78:17
**responsive** [1] - 38:14
**rest** [2] - 95:11, 98:6
**restrict** [1] - 52:17
**restrictions** [1] - 52:12
**restricts** [1] - 22:25
**resume** [3] - 10:6, 67:8, 94:25
**RESUMED** [1] - 10:8
**retail** [36] - 11:15, 14:1, 14:3, 14:6, 14:7, 14:9, 14:13, 15:1, 15:9, 15:24, 17:5, 22:8, 31:3, 31:7, 32:21, 47:14, 51:23, 51:25, 52:1, 52:7, 76:17, 76:19, 78:16, 78:18, 79:6, 79:16, 80:25, 81:7, 83:5, 83:25, 86:5, 91:3, 91:10, 91:22, 94:19
**retailer** [3] - 76:21, 80:11, 80:18
**retained** [1] - 68:2
**retire** [1] - 76:5
**return** [9] - 12:1, 16:25, 81:7, 81:17, 81:20, 81:22, 81:24, 82:1, 82:2
**returnable** [1] - 81:16
**returned** [2] - 16:14, 81:9
**returning** [1] - 81:23

**returns** [2] - 81:7, 81:11
**revenue** [1] - 18:15
**review** [1] - 43:24
**reviewed** [3] - 61:24, 62:14, 85:12
**reviewing** [1] - 85:18
**RICHARD** [1] - 2:4
**right-hand** [1] - 37:24
**rights** [4] - 30:5, 37:17, 39:3, 86:2
**Rights** [1] - 41:13
**Ring** [1] - 39:9
**ring** [1] - 32:4
**ringback** [1] - 31:25, 32:3, 32:4, 32:10, 32:16, 32:20, 32:24, 33:5, 33:9, 33:17, 33:21, 33:23, 34:14, 35:10, 35:11
**risk** [1] - 53:7
**Riza** [1] - 73:20
**Rod** [1] - 79:12
**Rogell** [1] - 6:2
**role** [3] - 48:11, 48:14, 48:17
**Room** [1] - 1:24
**Roots** [1] - 73:20
**Roses** [1] - 73:22
**royalties** [2] - 13:12, 94:10
**royalty** [36] - 11:4, 12:15, 12:16, 15:6, 15:12, 20:13, 38:4, 42:3, 42:17, 43:8, 56:22, 56:25, 57:6, 57:10, 57:12, 57:20, 57:24, 58:3, 58:12, 58:19, 58:23, 59:9, 60:24, 69:8, 79:23, 81:2, 81:3, 81:6, 81:8, 81:10, 92:25, 93:22, 93:25, 94:1, 94:21
**Royalty** [1] - 57:1
**royalty-free** [8] - 38:4, 42:3, 42:17, 43:8, 56:25, 57:20, 57:24, 58:3
**Roybal** [1] - 1:23
**ruled** [1] - 8:21
**rules** [2] - 6:14, 6:21
**ruling** [2] - 4:15, 7:20
**rulings** [2] - 8:3, 96:18
**run** [2] - 72:7, 98:5

**S**

**sad** [1] - 21:2
**sale** [17] - 14:15, 42:5, 42:21, 50:18, 51:8, 74:2, 75:16, 80:7, 80:22, 80:24, 82:15, 85:25, 86:5, 91:10, 91:18, 92:9, 92:25
**sales** [11] - 13:8, 14:3, 14:5, 52:1, 79:4, 93:24, 94:7, 94:9, 94:12, 94:19
**salespeople** [1] - 78:15
**Sarah** [1] - 19:2
**sat** [1] - 88:1
**save** [2] - 58:8, 98:6
**saved** [2] - 6:8, 6:15
**saw** [3] - 49:6, 84:24, 84:25
**schedule** [6] - 38:5, 43:10, 59:11, 59:13, 59:14, 59:16
**School** [1] - 68:10
**school** [2] - 46:14, 68:15
**Scott** [1] - 4:5
**scratch** [2] - 19:22, 56:16
**scratched** [1] - 56:13
**screen** [6] - 10:17, 10:21, 29:14, 36:25, 53:17, 58:16
**se** [1] - 72:24
**Seagrams** [1] - 73:6
**sealed** [1] - 55:2
**seat** [3] - 25:3, 60:13, 67:18
**Second** [2] - 5:15
**second** [5] - 3:8, 18:5, 18:13, 39:16, 39:19
**secondary** [1] - 8:16
**Secondly** [1] - 90:6
**seconds** [1] - 44:18
**section** [12] - 14:13, 27:15, 31:1, 31:17, 37:19, 39:13, 40:24, 41:12, 42:22, 43:2, 44:9, 57:14
**Section** [12] - 29:15, 40:22, 41:21, 41:22, 42:1, 42:10, 42:11, 42:25, 44:25, 45:3, 56:13, 98:13
**secure** [2] - 53:8, 53:10

**see** [50] - 11:6, 13:2, 13:5, 14:20, 14:22, 19:7, 21:6, 23:10, 23:13, 27:15, 27:18, 27:19, 29:17, 29:20, 29:21, 30:5, 30:6, 30:8, 30:14, 30:15, 34:17, 36:24, 37:5, 37:7, 37:18, 37:19, 40:20, 41:2, 41:4, 41:15, 41:16, 41:18, 41:19, 43:15, 44:17, 44:18, 46:3, 56:23, 58:1, 58:17, 59:12, 67:10, 79:4, 79:11, 79:13, 79:14, 80:17, 95:3, 97:5, 98:8
**seeing** [2] - 37:22, 54:9
**Seijas** [1] - 1:22, 98:18
**sell** [14] - 31:2, 31:5, 31:9, 52:23, 52:24, 53:5, 53:6, 76:21, 78:4, 80:18, 86:7, 86:12, 88:19, 90:10
**selling** [17] - 33:4, 34:5, 47:12, 49:18, 49:19, 50:1, 50:2, 75:11, 76:15, 76:16, 76:18, 89:7, 89:23, 90:11, 91:21, 92:24, 93:4
**sells** [9] - 76:14, 83:24, 86:20, 86:25, 87:13, 87:18, 87:22, 87:23
**send** [13] - 12:2, 12:3, 12:4, 12:6, 16:7, 16:8, 16:12, 16:13, 16:16, 16:18, 96:6, 97:22
**senior** [5] - 46:9, 69:6, 69:10, 69:16, 72:25
**sense** [3] - 69:11, 81:13, 90:19
**sent** [8] - 28:4, 37:2, 40:16, 43:14, 45:14, 58:24, 78:13, 96:2
**sentence** [4] - 40:24, 41:16, 41:25, 42:12
**separate** [6] - 14:25, 15:1, 15:14, 44:22, 61:1
**serious** [1] - 79:3
**Service** [1] - 30:8
**service** [4] - 11:11, 16:23, 29:19, 30:12
**services** [2] - 27:10,

30:13
**Session** [1] - 1:19
**set** [6] - 6:6, 10:25, 38:4, 59:11, 81:14, 92:18
**settle** [1] - 96:19
**seven** [1] - 22:5
**several** [6] - 27:1, 29:24, 43:25, 46:1, 53:22, 56:15
**shape** [2] - 63:14, 86:14
**SHAPIRO** [1] - 2:11
**shipment** [1] - 78:17
**Shortly** [1] - 70:6
**show** [3] - 3:16, 26:25, 50:21
**showing** [2] - 37:10, 52:5
**shows** [1] - 37:23
**side** [2] - 7:7, 10:19
**sidebar** [1] - 54:1, 67:4
**Sidebar** [3] - 54:2, 54:21, 67:6
**sign** [7] - 5:24, 15:22, 16:1, 16:5, 16:23, 71:7
**signed** [9] - 11:20, 54:4, 63:7, 71:7, 71:8, 72:11, 73:18
**Silberberg** [1] - 68:16
**similar** [2] - 49:16, 89:4
**simple** [7] - 4:25, 5:3, 35:4, 35:9, 44:2, 81:19, 93:23
**simplest** [1] - 88:17
**simply** [2] - 33:2, 94:16
**simultaneously** [1] - 78:20
**single** [3] - 15:23, 16:7, 16:17
**singles** [1] - 90:7
**sink** [1] - 69:12
**sink-or-swim** [1] - 69:12
**sitting** [1] - 84:21
**six** [1] - 34:10
**skip** [1] - 40:18
**small** [2] - 11:21, 76:11
**sold** [38] - 10:22, 13:25, 14:8, 14:12, 14:25, 15:4, 15:9, 15:10, 15:19, 17:3, 17:4, 19:20, 19:23, 19:24, 20:17, 22:11,

24:9, 24:13, 50:15, 51:5, 51:23, 51:25, 52:3, 52:17, 73:8, 77:19, 79:18, 79:23, 80:25, 81:4, 81:5, 81:21, 82:20, 82:24, 85:8, 86:17, 88:21, 88:23
**sole** [1] - 85:3
**solely** [1] - 42:4
**solicit** [1] - 78:16
**Someone** [1] - 61:17
**someone** [11] - 21:8, 21:16, 21:17, 21:19, 22:2, 22:5, 22:8, 22:14, 23:2, 24:16, 65:11
**sometime** [2] - 73:1, 95:21
**sometimes** [2] - 11:14, 69:8
**Sometimes** [2] - 13:11, 50:16
**song** [4] - 44:18, 83:15, 83:16, 83:21
**sorry** [12] - 3:23, 8:9, 16:15, 31:8, 31:12, 36:5, 39:6, 57:11, 58:16, 66:17, 86:22, 91:6
**sort** [2] - 22:1, 48:23
**sorts** [1] - 46:23
**sound** [2] - 28:16, 69:22
**soundtrack** [2] - 24:11, 73:15
**SOUTH** [1] - 2:21
**special** [4] - 15:18, 15:20, 97:7, 97:8
**specialized** [1] - 68:17
**specific** [13] - 8:17, 26:22, 29:11, 36:12, 48:24, 51:13, 82:18, 82:19, 83:1, 93:13, 93:15, 93:16, 93:17
**specifically** [4] - 47:1, 47:10, 47:21, 61:20
**specifics** [8] - 35:1, 35:21, 36:16, 36:23, 43:15, 43:17, 59:22, 64:17
**specified** [2] - 15:6, 43:9
**spell** [3] - 25:5, 60:14, 67:20
**spelled** [1] - 25:7
**spelling** [1] - 21:2
**spend** [1] - 5:9

**spent** [1] - 7:4
**split** [2] - 83:13, 94:14
**splitting** [1] - 80:2
**Sprint** [10] - 29:3, 29:17, 29:18, 30:9, 30:18, 35:23, 36:1, 49:7
**stack** [1] - 79:13
**staff** [2] - 50:22, 50:23
**stamp** [1] - 33:11
**Stand** [1] - 25:1
**stand** [3] - 79:11, 79:12, 79:13
**stand-up** [2] - 79:12, 79:13
**stand-ups** [1] - 79:11
**standard** [4] - 33:16, 33:24, 33:25, 48:23
**standards** [1] - 27:16
**start** [1] - 95:22
**started** [6] - 4:24, 22:2, 47:22, 69:14, 70:17, 70:18
**startup** [1] - 76:11
**state** [5] - 25:4, 42:12, 42:13, 60:14, 67:19
**statement** [1] - 9:5
**statements** [2] - 19:1
**States** [2] - 98:13, 98:15
**STATES** [1] - 1:1
**states** [1] - 94:16
**stay** [1] - 75:5
**steadily** [1] - 48:7
**stenographically** [1] - 98:14
**step** [3] - 24:23, 60:7, 67:3
**Stephanie** [1] - 63:7
**Steve** [1] - 8:21
**Stewart** [1] - 79:12
**stickers** [1] - 77:16
**Stiffelman** [1] - 94:5
**still** [5] - 33:6, 71:14, 76:8, 91:22, 96:2
**stocked** [2] - 78:22, 78:23
**stolen** [1] - 81:10
**stop** [6] - 70:9, 71:16, 75:21, 77:6, 87:17, 91:19
**Stop** [1] - 70:22
**store** [21] - 11:15, 15:24, 50:7, 50:8, 50:15, 50:16, 50:18, 50:20, 50:22, 50:25, 51:5, 51:8, 52:14,

52:18, 53:4, 79:1, 79:3, 79:6, 79:8, 79:12
**storefront** [1] - 51:13
**stores** [7] - 47:15, 51:10, 51:11, 52:25, 53:4, 53:6
**story** [2] - 5:8, 5:17
**strategy** [1] - 46:11
**streaming** [1] - 42:4
**STREET** [1] - 2:5
**Street** [1] - 1:23
**strike** [10] - 35:3, 35:5, 38:13, 38:15, 56:22, 57:11, 57:12, 58:4, 58:19, 58:22
**strike-through** [1] - 58:22
**struck** [4] - 38:19, 39:16, 57:7, 59:10
**structure** [2] - 32:21, 33:3
**structuring** [2] - 31:10, 33:18
**stuff** [1] - 3:22
**subject** [3] - 9:21, 64:14, 81:6
**sublicense** [3] - 30:10, 39:3, 41:18
**submitted** [3] - 67:10, 95:3, 97:7
**Subparagraph** [1] - 44:2
**subscribers** [4] - 39:2, 39:4, 42:4, 42:23
**subscription** [1] - 27:10
**subsequently** [1] - 81:19
**subsidiary** [1] - 5:6
**successfully** [1] - 92:22
**suggested** [1] - 45:13
**suit** [1] - 89:16
**SUITE** [1] - 2:6
**Summary** [1] - 7:2
**supplied** [1] - 83:17
**Support** [2] - 42:11, 42:16
**support** [1] - 42:23
**Sustained** [3] - 65:25, 66:5, 66:14
**swim** [1] - 69:12
**sworn** [3] - 25:2, 60:12, 67:17

| | |

**T**

**T-Mobile** [30] - 4:6, 29:6, 35:18, 35:22, 36:20, 37:3, 38:3, 39:5, 40:16, 41:5, 42:2, 42:6, 42:17, 43:7, 43:14, 44:3, 44:7, 44:13, 45:3, 45:14, 49:6, 57:19, 57:23, 58:2, 58:14, 58:23, 59:9, 59:25
**T-Mobile's** [2] - 38:11, 39:4
**talks** [2] - 31:1
**Tang** [1] - 73:20
**technique** [1] - 69:12
**technology** [3] - 74:6, 92:15, 93:6
**telecommunications** [1] - 39:5
**Temple** [1] - 1:23
**Temptations** [1] - 68:22
**tender** [1] - 75:22
**tentative** [1] - 96:18
**tenth** [1] - 53:24
**term** [8] - 14:20, 33:16, 38:5, 39:1, 42:3, 42:17, 43:8, 93:10
**terms** [11] - 16:2, 16:24, 33:23, 36:14, 36:15, 49:19, 59:21, 60:2, 72:1, 85:22, 88:17
**territory** [1] - 30:11
**testified** [4] - 28:15, 64:16, 82:4, 82:7
**testifies** [4] - 9:13, 95:18, 95:21, 97:2
**testify** [1] - 8:22
**testimony** [9] - 7:1, 8:18, 28:14, 34:6, 51:21, 64:4, 64:7, 88:24, 94:4
**Texas** [2] - 46:15
**THE** [74] - 1:4, 3:11, 3:15, 3:19, 3:22, 4:2, 4:9, 4:11, 4:21, 6:25, 7:13, 7:16, 7:21, 8:5, 8:11, 9:19, 9:24, 10:5, 17:16, 20:23, 22:19, 24:23, 25:1, 25:3, 25:6, 25:8, 33:14, 35:5, 38:15, 40:9, 54:1, 54:3, 54:13, 54:20, 54:22, 60:7, 60:10, 60:13, 60:15,

62:5, 62:7, 64:8, 64:9, 65:25, 66:5, 66:14, 66:17, 66:21, 67:3, 67:7, 67:15, 67:18, 67:21, 67:22, 75:25, 77:14, 77:15, 88:9, 88:11, 94:24, 95:6, 95:15, 95:23, 96:4, 96:11, 96:17, 97:4, 97:13, 97:16, 97:21, 97:25, 98:8, 99:2, 99:11
**theirs** [1] - 5:20
**themselves** [5] - 5:21, 77:4, 90:11, 92:24, 93:4
**thereafter** [1] - 70:6
**therefore** [1] - 92:19
**therefrom** [1] - 83:13
**thinking** [1] - 7:1
**third** [16] - 19:25, 20:10, 20:19, 26:3, 26:9, 26:17, 39:3, 47:15, 49:8, 54:24, 82:16, 83:17, 83:18, 91:20, 93:1
**three** [12] - 4:22, 5:1, 5:18, 8:2, 11:1, 11:3, 18:2, 18:8, 18:19, 18:22, 28:22, 70:5
**three-year** [3] - 18:8, 18:19, 18:22
**throughout** [1] - 75:7
**throw** [1] - 69:10
**Thursday** [2] - 1:21, 3:1
**timing** [1] - 4:2
**title** [9] - 30:5, 37:19, 41:8, 41:9, 41:12, 41:21, 42:10, 73:1, 80:13
**Title** [1] - 98:13
**titled** [1] - 43:3
**titles** [1] - 72:24
**TN** [1] - 2:7
**today** [16] - 3:10, 8:1, 8:4, 8:5, 9:8, 26:7, 28:15, 35:21, 44:1, 60:25, 84:21, 94:5, 94:7, 94:25, 96:4, 96:6
**together** [1] - 23:25
**TOLLES** [1] - 2:17
**Tomei** [1] - 89:15
**tomorrow** [8] - 94:25, 95:3, 95:22, 95:23, 97:2, 97:15, 97:20, 98:8
**tomorrow's** [1] - 95:6

**tone** [9] - 32:4, 32:20, 32:24, 33:9, 33:17, 33:23, 35:11, 39:9

**tones** [11] - 31:25, 32:3, 32:10, 32:16, 33:5, 33:21, 34:15, 35:10, 39:2, 42:5, 42:21

**tonight** [1] - 97:22

**tons** [1] - 48:9

**took** [2] - 63:4, 63:11

**top** [4] - 10:23, 14:1, 29:16

**topic** [1] - 84:19

**totally** [1] - 5:16

**Tower** [3] - 50:25, 76:17, 76:18

**track** [3] - 21:25, 22:9, 69:22

**tracks** [1] - 20:2

**Trademark** [1] - 43:3

**trademark** [1] - 45:5

**trademarks** [1] - 43:9

**traditional** [1] - 47:18

**transaction** [6] - 31:15, 69:2, 83:2, 85:5, 90:22, 93:17

**TRANSCRIPT** [1] - 1:18

**transcript** [4] - 36:17, 55:2, 98:14, 98:14

**transferable** [1] - 30:10

**transferred** [1] - 88:23

**transmit** [1] - 30:12

**treated** [1] - 17:4

**TRIAL** [1] - 1:18

**trial** [5] - 4:24, 6:18, 13:4, 17:8, 69:9

**true** [7] - 12:24, 31:16, 32:20, 33:2, 92:10, 93:14, 98:13

**trumps** [1] - 91:14

**try** [1] - 8:23

**trying** [4] - 9:3, 38:10, 44:25, 47:11

**Tuesday** [1] - 97:17

**turn** [2] - 62:23, 76:20

**Tweed** [1] - 46:18

**two** [24] - 3:5, 4:16, 6:9, 7:6, 7:9, 7:16, 12:4, 13:9, 17:9, 19:17, 20:14, 28:4, 28:7, 41:17, 42:19, 57:3, 57:9, 57:14,

57:18, 68:20, 74:24, 88:25, 94:11

**type** [4] - 47:21, 51:1, 73:17, 84:7

**types** [3] - 44:10, 72:1, 86:2

**typical** [3] - 86:3, 86:17, 87:16

**typically** [4] - 11:19, 24:18, 49:10, 83:18

**U**

**UMG** [15] - 29:18, 38:3, 39:4, 42:2, 42:7, 42:16, 42:18, 42:20, 43:7, 47:25, 57:19, 57:23, 58:2, 58:13, 59:8

**unaware** [1] - 64:17

**uncredited** [1] - 81:8

**Under** [21] - 12:17, 12:19, 12:21, 13:10, 15:14, 16:24, 17:4, 17:6, 17:7, 17:9, 17:12, 17:13, 17:24, 20:20, 22:7, 24:4, 24:6, 24:13, 31:19, 32:17, 86:3

**undercharged** [5] - 64:11, 65:12, 65:13, 65:15, 65:17

**underline** [1] - 37:22

**underlined** [3] - 37:23, 45:22, 46:2

**underlining** [1] - 58:22

**underneath** [2] - 10:25, 91:9

**understood** [1] - 6:6

**Unfortunately** [1] - 76:18

**UNION** [1] - 2:5

**unique** [1] - 15:21

**unit** [1] - 77:11

**UNITED** [1] - 1:1

**United** [2] - 98:13, 98:15

**units** [4] - 77:21, 93:25, 94:1, 94:18

**Universal** [70] - 18:1, 18:18, 19:17, 19:18, 19:23, 20:11, 20:17, 20:18, 21:7, 22:7, 22:12, 22:16, 23:3, 23:9, 23:25, 24:2, 24:3, 24:11, 25:21,

26:9, 26:18, 27:17, 27:23, 28:23, 30:1, 30:18, 33:3, 33:8, 46:7, 46:8, 46:10, 46:11, 46:12, 47:1, 47:2, 47:5, 47:25, 48:11, 48:14, 50:10, 51:2, 51:6, 51:9, 52:9, 52:16, 52:21, 53:17, 57:4, 57:15, 59:14, 60:22, 61:4, 61:7, 63:4, 63:23, 64:2, 64:15, 68:21, 73:5, 73:6, 73:8, 80:6, 86:18, 87:19, 89:5, 89:7, 89:23, 92:24

**Universal's** [9] - 21:12, 22:14, 24:15, 36:1, 36:7, 50:14, 56:25, 63:1, 63:17

**Universal/
Aftermath** [1] - 17:25

**University** [2] - 46:15, 68:10

**unless** [5] - 16:5, 16:17, 41:6, 42:6, 84:5

**unlike** [2] - 32:3, 86:15, 87:10

**unnecessary** [1] - 5:16

**unquote** [2] - 23:1, 90:16

**up** [51] - 6:6, 6:20, 9:16, 9:17, 10:17, 10:20, 10:23, 10:24, 11:1, 11:4, 11:20, 13:2, 15:22, 16:1, 16:5, 16:23, 18:12, 22:23, 23:15, 23:24, 29:14, 33:11, 33:13, 34:24, 36:25, 40:13, 42:9, 44:17, 45:20, 46:15, 48:2, 50:5, 50:6, 50:20, 50:21, 53:13, 58:7, 62:10, 62:11, 79:12, 79:13, 79:14, 79:17, 79:19, 81:15, 84:20, 90:15, 91:6, 92:18

**ups** [1] - 79:11

**usage** [1] - 71:18

**user** [3] - 16:4, 33:8, 88:23

**users** [2] - 50:3, 52:13

**uses** [4] - 44:10, 45:11, 49:3, 57:16, 84:15, 90:3, 91:18

**V**

**vague** [1] - 29:8

**Vaguely** [1] - 35:20

**valid** [1] - 81:13

**value** [1] - 53:10

**varies** [1] - 86:19

**various** [5] - 16:12, 26:2, 26:3, 36:2, 78:14

**vein** [1] - 89:4

**verdict** [2] - 97:10, 97:17

**verdicts** [2] - 97:7, 97:8

**versus** [3] - 74:2, 75:16, 84:24

**via** [2] - 39:4, 42:4

**vice** [3] - 46:9, 69:16

**Vice** [1] - 60:24

**vice-president** [2] - 46:9, 69:16

**Vice-president** [1] - 60:24

**videotaped** [1] - 28:14

**Vinny** [1] - 89:13

**vinyl** [2] - 76:23, 77:2

**violate** [1] - 96:9

**Virgin** [3] - 21:8, 21:23, 50:25

**Virgin's** [2] - 21:22, 21:23

**visible** [1] - 79:17

**Vista** [1] - 74:18

**vs** [1] - 1:10

**W**

**W-E-I-N-B-E-R-G** [1] - 25:7

**Wait** [1] - 33:14

**Walt** [1] - 74:20

**wants** [1] - 97:19

**warehoused** [1] - 78:14

**warehousing** [1] - 78:8

**Warner** [4] - 69:15, 69:19, 70:12, 71:3

**Warners** [2] - 69:24, 71:3

**water** [3] - 89:11, 89:14, 89:17

**watermark** [1] - 42:19

**ways** [1] - 50:23

**websites** [1] - 42:6

**week** [1] - 16:11

**weekend** [2] - 96:14, 96:24

**WEIL** [1] - 2:10

**WEINBERG** [1] - 99:4

**Weinberg** [23] - 3:7, 3:10, 8:9, 24:25, 25:2, 25:6, 25:11, 35:9, 40:23, 42:1, 42:10, 44:24, 45:23, 46:4, 47:22, 48:3, 50:5, 52:15, 53:16, 56:12, 56:15, 58:13

**West** [1] - 78:23

**whatsoever** [1] - 22:25

**whereas** [3] - 34:10, 44:15, 51:9

**whereby** [1] - 81:15

**whichever** [1] - 87:18

**whole** [4] - 5:23, 41:12, 45:15, 69:23

**Wholesale** [1] - 34:1

**wholesale** [19] - 31:2, 31:5, 31:6, 31:10, 31:18, 32:21, 33:4, 33:7, 33:8, 33:22, 34:1, 34:5, 34:14, 35:11, 87:5, 87:10, 87:11, 87:15, 87:16

**Whoops** [1] - 89:17

**window** [3] - 50:25, 79:5, 79:9

**WITNESS** [6] - 25:6, 60:15, 64:9, 67:21, 77:15, 88:11

**witness** [16] - 4:17, 5:25, 6:18, 6:19, 8:15, 9:1, 9:4, 24:24, 25:2, 60:8, 60:12, 67:15, 67:17, 68:3, 77:12

**WITNESSES** [2] - 99:2, 99:11

**witnesses** [14] - 4:16, 5:9, 5:11, 5:15, 5:16, 5:22, 6:8, 6:12, 6:15, 6:16, 6:20, 6:22, 8:22, 8:24

**witnessing** [1] - 76:7

**word** [24] - 33:25, 38:8, 38:19, 38:20, 39:7, 39:16, 39:17, 40:25, 41:17, 42:9, 43:19, 44:4, 44:25, 45:11, 56:13, 56:16, 56:21, 58:12, 58:19, 59:10, 83:21, 83:24

**words** [3] - 14:11, 37:22, 74:11
**works** [1] - 76:13
**world** [3] - 47:19, 53:6, 53:12
**Wow** [1] - 21:2
**write** [1] - 19:22
**writer** [1] - 57:5
**writing** [1] - 42:7
**wrote** [2] - 7:2, 22:11
**Wu** [1] - 73:20

## Y

**year** [9] - 18:8, 18:19, 18:22, 47:8, 48:5, 48:7, 48:8, 63:4, 72:20
**years** [8] - 18:2, 43:25, 46:18, 46:24, 51:19, 69:24, 70:10, 75:7
**yesterday** [3] - 51:14, 51:21, 54:11
**York** [3] - 46:17, 46:20, 89:15
**yourself** [2] - 34:8, 67:9
**yourselves** [1] - 95:1