1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4   F.B.T. PRODUCTIONS, LLC,          )
                                      )
5                                     )
                                      )
6                    Plaintiffs,      )
                                      )
7                                     )
                                      )
8          Vs.                        )   No. CV 07-3314-PSG
                                      )
9                                     )
                                      )
10  AFTERMATH RECORDS, ET AL.,        )
                                      )
11                                    )
                                      )
12                   Defendants.      )
                                      )
13  _____    )

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  *JURY TRIAL*

18             *DAY 3, A.M. SESSION*

19            LOS ANGELES, CALIFORNIA

20         WEDNESDAY, FEBRUARY 25, 2009

21  _____

22

23           MIRIAM V. BAIRD, CSR 11893
         OFFICIAL U.S. DISTRICT COURT REPORTER
24          255 EAST TEMPLE STREET, # 181-K
           LOS ANGELES, CALIFORNIA 90012
25                (213) 894-2853
               MVB11893@aol.com

1                    **A P P E A R A N C E S**

2

3   **IN BEHALF OF THE PLAINTIFF,**         RICHARD BUSCH
    **F.B.T. PRODUCTIONS:**                 315 UNION STREET
4                                            NASHVILLE, TN 37201
                                             - and -
5                                            GLASER, WEIL, FINK, JACOBS
                                             & SHAPIRO, LLP
6                                            BY:  MARK L. BLOCK
                                             10250 CONSTELLATION
7                                            BOULEVARD
                                             NINETEENTH FLOOR
8                                            LOS ANGELES, CALIFORNIA
                                             90067
9

10

11

12

13  **IN BEHALF OF THE DEFENDANT,**         MUNGER, TOLLES & OLSON, LLP
    **AFTERMATH RECORDS, ET AL.:**          BY:  GLENN D. POMERANTZ
14                                                 KELLY KLAUS
                                                   MELINDA LEMOINE
15                                           355 SOUTH GRAND AVENUE
                                             THIRTY-FIFTH FLOOR
16                                           LOS ANGELES, CALIFORNIA
                                             90071
17

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT

1                                    INDEX

2   WITNESS:                                                PAGE:

3
     Mark Bass, witness, previously sworn                      4
4    REDIRECT EXAMINATION                                     12
     Michael Ostroff, witness, sworn                          13
5    DIRECT EXAMINATION                                       13
     CROSS-EXAMINATION                                        **60**
6    REDIRECT EXAMINATION                                     73
     Lisa Rogell, witness, sworn                              81
7    DIRECT EXAMINATION                                       81

8                             * * * * *

9
    EXHIBITS:
10
     None Offered
11
                              * * * * *
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   LOS ANGELES, CALIFORNIA; WEDNESDAY, FEBRUARY 25, 2009; 0900

 2                          ---

 3             THE COURT:  Good morning.

 4             (Open court - jury present)

 5             Mr. Bass, would you take the witness stand.

 6          Mark Bass, witness, previously sworn

 7             MR. KLAUS:  Your Honor, I have a binder of exhibits

 8   before I approach.

 9   BY MR. KLAUS:

10   Q.   Good morning, Mr. Bass.

11   A.   Good morning.

12   Q.   You're a co-owner of the plaintiff F.B.T., aren't you?

13   A.   Yes, sir.

14   Q.   And you and your brother are the only two owners of

15   F.B.T.

16             Isn't that a fact?

17   A.   Yes.

18   Q.   And it's a fact, isn't it, that at the time that F.B.T.

19   filed this lawsuit that we're here for today, you didn't know

20   that it had been filed, did you?

21   A.   I didn't know the day it was filed.

22   Q.   When did you find out that it was filed?

23   A.   I'm not sure of that.

24   Q.   Okay.  And does that mean that when F.B.T. filed this

25   lawsuit, you didn't know the claims that F.B.T. was making in
```

1    this case?

2    A.    No.    That's not true.

3    Q.    Did you know that F.B.T. was claiming it should be paid

4    more for the sale of Eminem records in the form of permanent

5    downloads than F.B.T. gets paid for Eminem's records when

6    they're sold as compact discs?

7            MR. BUSCH:    Objection.    Mischaracterizes

8    allegations, Your Honor.

9            THE COURT:    Overruled.

10           THE WITNESS:    Can you repeat that, please?

11   BY MR. KLAUS:

12   Q.    Sure.

13           Did you know when this lawsuit was filed that

14   F.B.T. was claiming that it should get paid more for Eminem

15   records when they're sold as permanent downloads than when

16   those same records are sold as compact discs?

17   A.    I was aware there was a difference in the two.

18   Q.    What were you aware of in the difference between the

19   two?

20   A.    Well, the cost of making a CD and selling it with the

21   packaging costs and all of the costs incurred in making the

22   CD, there's a difference in download.    There's no packaging

23   in downloads; so there's -- those deductions should not be

24   made.

25   Q.    Okay.    Do you know where in the contract it says that?

```
1    A.   Pardon me?

2    Q.   Do you know where in the contract it says that?

3    A.   No.  I don't deal with contracts.

4    Q.   Okay.  Do you know what the difference is between an

5    Eminem record that is sold as a com- -- in the form of a

6    compact disc and an Eminem record that is sold in the form

7    of a permanent download?

8    A.   No, I do not.

9    Q.   Okay.  Does the permanent download that someone gets on

10   iTunes, does that have the same Eminem music that you would

11   get on a compact disc if you bought it in the store?

12   A.   Yes.

13   Q.   Is it the same artist, Eminem, who is singing on both

14   the compact disc and the permanent download?

15   A.   Yes, sir.

16   Q.   Does the person who gets the download over iTunes get

17   the same cover artwork that the person gets when they buy a

18   CD?

19   A.   They do not.

20   Q.   They don't.

21        Do they get any artwork at all?

22   A.   I imagine you can probably download the artwork.  I've

23   never seen it.

24   Q.   Do you know one way or another whether you get the same

25   artwork when you download an Eminem record on iTunes?
```

```
 1    A.   No, I don't.

 2    Q.   Is a permanent download a record, Mr. Bass?

 3    A.   A record is a vinyl; so it's not a record.

 4    Q.   Is that the only form -- is a compact disc a record?

 5    A.   No.  It's a compact disc.

 6    Q.   Is there a difference under your contract whether

 7    some- -- under your contract in this case?

 8    A.   I'm not sure.

 9    Q.   Okay.

10              THE COURT:  Mr. Klaus --

11              MR. KLAUS:  Yes.

12              THE COURT:  Could you slow down, please.

13              MR. KLAUS:  Of course.

14              THE COURT:  Thank you.

15    BY MR. KLAUS:

16    Q.   Let me ask you, Mr. Bass, do you know if permanent

17    downloads are sold through normal retail channels?

18    A.   No, I do not.

19    Q.   Do you know if iTunes is a normal retail channel?

20    A.   It's a computer company.  It's a site, a Website.

21    Q.   Do you know if it's a normal retail channel under your

22    contract?

23    A.   No.  I do not know that.

24    Q.   Yesterday afternoon, Mr. Bass, Mr. Busch asked you some

25    questions about a telephone conversation that you said you
```

UNITED STATES DISTRICT COURT

1    had had with Mr. Iovine.

2              Do you remember that?

3    A.   Yes.

4    Q.   And it's your testimony that you were the one that

5    called Mr. Iovine; correct?

6    A.   I called Jimmy.

7    Q.   He didn't call you; correct?

8    A.   Right.

9    Q.   And you called him because you were coming to

10   Los Angeles and you wanted to get together to do some work?

11   A.   Yeah.  I wanted to bring him some new projects I was

12   working on.

13   Q.   Okay.  And it's also your testimony that you referred to

14   the lawsuit having been filed as being ridiculous because if

15   Mr. Iovine owed you money, he should pay you money?

16   A.   The fight was ridiculous.  The -- to drag something out

17   for as long as it has, the argument about it -- the fight

18   about the money is not the purpose of what me and my brother

19   are in this for.  We like to do the music, and so it's gotten

20   in the way of our doing our creative process of making this

21   music.

22   Q.   Did you tell Mr. Iovine that he owed you money during

23   that conversation?

24   A.   No.  We didn't talk -- we didn't -- that wasn't brought

25   up like that.

```
 1   Q.   And let me just ask you a couple questions about your
 2   work with Eminem, Mr. Bass.
 3   A.   Okay.
 4   Q.   You said yesterday that you first met Mr. Mathers in
 5   1992; correct?
 6   A.   Well, I said '95, but it was -- it was earlier.
 7   Q.   Okay.  It was -- it was around --
 8   A.   He was 15 years old.
 9   Q.   Okay.  And is it your testimony that for several years
10   you groomed Eminem to be the artist that he is today?
11   A.   Yes, sir.
12   Q.   Okay.  Were you -- does 1992 sound about the right time
13   that you met him?
14   A.   I'll go for that.
15   Q.   Okay.  And were you grooming him in 19- --
16   A.   Since he was 15 years old.
17   Q.   Were you grooming him in 1993 to be the artist he is
18   today?
19   A.   I've worked with Eminem for a very long time -- every
20   day, all day -- for many years.
21   Q.   And were you grooming him to be the artist he is
22   today --
23   A.   Absolutely.
24   Q.   -- in 1994?
25   A.   Absolutely.
```

1    Q.    Were you grooming him to be the artist he was -- is

2    today in 1995?

3    A.    Absolutely.

4    Q.    After grooming Eminem to be the artist he is today for

5    several years, your record company put out an Eminem album;

6    correct?

7    A.    Yes.

8    Q.    That was called *Infinite*?

9    A.    Yes, sir.

10   Q.    And that was a flop, wasn't it?

11   A.    It didn't sell many units.

12   Q.    Okay.  And given -- let me ask you this, Mr. Bass.

13         Given that you had spent several years of your life

14   grooming Eminem to be the artist he is today, why wasn't

15   *Infinite* a success?

16   A.    Music wasn't -- the music and the public weren't ready

17   for such a phenomenal artist at that time.  It was brand new,

18   and it was -- it was -- it took some time to get him there.

19   Q.    Was he a -- did you continue to groom Eminem through

20   1996?

21   A.    All the way through -- yes.

22   Q.    Did you continue to groom him through 1997?

23   A.    Through 2000 something.  This is -- it's an ongoing

24   process.  It's not something that you can just let go.  It's

25   like a plant.  You have to water it, and it grows.

```
 1   Q.   Did Eminem's talent have anything to do with helping him
 2   make --
 3   A.   Absolutely.
 4   Q.   -- make him the artist that he is today?
 5   A.   Yes, sir.
 6   Q.   Did his song-writing abilities help him to make the
 7   artist --
 8   A.   Absolutely.
 9   Q.   Did Dr. Dre help Eminem to become the artist he is
10   today?
11   A.   Sure, he did.
12   Q.   Did Jimmy Iovine help Eminem to become the artist that
13   he is today?
14   A.   Yes, he did.
15   Q.   Did the people at Aftermath Records help Eminem
16   to become the artist that he is today?
17   A.   No, they did not.
18   Q.   Did they help to promote his music?
19   A.   No, they did not.
20   Q.   In what way did the people at Aftermath Records not
21   promote Eminem's music, sir?
22   A.   Well, I believe the people at Interscope were promoting
23   the record.
24   Q.   Did the people at Inter- -- with that clarification.
25        Did -- the people at Interscope, were they
```

1    responsible for helping to make Eminem the artist that he is

2    today?

3    A.   Yes.  We did it as a team.

4    Q.   Is it your view, Mr. Bass, that Eminem wouldn't be on

5    the Aftermath or Interscope label or the label of any other

6    record company today if it wasn't for you?

7    A.   Yes, sir.

8    Q.   Is it your view that you contributed Eminem to the

9    world?

10   A.   Absolutely.

11        MR. KLAUS:  Okay.  I have no further questions at

12   this time.

13        THE COURT:  Okay.  Thank you.

14        Redirect.

15                    **REDIRECT EXAMINATION**

16   BY MR. BUSCH:

17   Q.   Just a couple of questions, Mr. Bass.

18        My first question is who do you rely on for

19   purposes of making business decisions on behalf of F.B.T.?

20   A.   Joel Martin.

21   Q.   Okay.  And have you ever read any of the contracts that

22   are at issue in this case?

23   A.   No, I have not.

24   Q.   Okay.  On the 1995 *Infinite* album, was there any music

25   that you or your brother played, or was it just samples?

1    A.    No.  We played.

2    Q.    Okay.  And how many songs did you play on that album?

3    A.    I think there's 11 songs on that record.

4    Q.    I'm talking about -- I'm not talking about the

5    *Slim Shady*.  I'm talking about the first *Infinite.*

6    A.    Oh.  Well, I don't know exactly how many songs are on

7    there.

8          MR. BUSCH:  Okay.  All right.  That's all I have.

9          THE COURT:  Anything further?

10         MR. KLAUS:  No further questions, Your Honor.

11         THE COURT:  You may step down.

12         Thank you.

13         THE WITNESS:  Thank you.

14         THE COURT:  Plaintiffs' next witness.

15         MR. BUSCH:  Michael Ostroff.

16                **Michael Ostroff, witness, sworn**

17         THE CLERK:  Please state your full name and spell

18    your last name for the record.

19         THE WITNESS:  Michael Ostroff, O-S-T-R-O-F-F.

20         THE COURT:  You may.

21                      **DIRECT EXAMINATION**

22    BY MR. BUSCH:

23    Q.    Good morning, Mr. Ostroff.

24    A.    Good morning.

25    Q.    Mr. Ostroff, when we started this case, I told the jury

1   that it would be my job to focus them on the issues in the

2   case.  And I just want to ask you a few preliminary

3   questions --

4            THE COURT:  Ask the questions, please.

5   BY MR. BUSCH:

6   Q.   Okay.  Mr. Ostroff, it's true that it's important to you

7   that Universal pay according to the terms of its contracts

8   with its artists; is that correct?

9   A.   Yes.

10  Q.   Okay.  Pay according to the language of the contract of

11  the artist; right?

12  A.   Yes.

13  Q.   Okay.  During Mr. Pomerantz's opening statement in this

14  case, he said that -- well, he talked about how much money

15  Joel Martin --

16            THE COURT:  Mr. Busch, you're arguing.  Ask a

17  question.

18  BY MR. BUSCH:

19  Q.   Is the amount of money that Joel Martin or F.B.T. has

20  made under their contracts with Aftermath important if

21  Aftermath owed them more money because they're not honoring

22  their contracts?

23  A.   I'm not sure I understand the question.

24  Q.   Is the amount of money that F.B.T. or Joel Martin has

25  been paid by Aftermath important or relevant if Aftermath is

1    not honoring its contract by paying what is actually owed, in

2    other words, owed them more money?

3    A.    Aftermath should be paying what is due under the

4    contract.

5    Q.    Okay.  Yesterday Mr. Iovine testified that he had worked

6    with Bruce Springsteen and some other artists in his career.

7           Is that relevant, in your mind, to whether

8    Aftermath is honoring its contracts with Joel Martin, F.B.T.,

9    and Eminem?

10          THE COURT:  Mr. Busch, that is not relevant.  You

11   didn't object when the question was asked.  Don't ask this

12   question for a legal ruling on relevance.

13   BY MR. BUSCH:

14   Q.    Okay.  Mr. Ostroff, in your career there have been

15   different ways that records have been developed.

16          There's a vinyl record; right?

17   A.    Yes.

18   Q.    And we heard yesterday that there were eight-track

19   tapes.

20          You're aware of that; right?

21   A.    Yes.

22   Q.    And you're aware that there are CDs?

23   A.    I'm aware of that, yes.

24   Q.    Okay.  And you're aware that there are digital

25   downloads?

1    A.    Yes.

2    Q.    And sometimes digital downloads are provided on a

3    conditional basis and sometimes permanent; correct?

4    A.    Yes.

5    Q.    Okay.  And record companies receive revenue from their

6    exploitation of their master recordings when they sell

7    vinyls; right?

8    A.    Yes.

9    Q.    When they sell, manufacture, and distribute vinyl

10   records; right?

11   A.    Yes.

12   Q.    When they sell, manufacture, and distribute cassettes;

13   right?

14   A.    Yes.

15   Q.    When they sell, manufacture, and distribute CDs; right?

16   A.    Yes.  I mean, they make the money in all these cases

17   when they sell them, not -- they don't make it when they

18   manufacture them.

19   Q.    Part of selling in connection with the record label is

20   manufacturing and distributing; correct?

21   A.    Well, selling is selling, I think distributing more than

22   manufacturing, but selling is -- is if you sell the product.

23   Q.    And when -- traditionally when Universal sells product,

24   they have their own distribution company that distributes

25   that product; correct?

1    A.    Traditionally, Universal, yes.  That's true for

2    Universal.

3    Q.    Okay.  And Interscope is part of Universal; correct?

4    A.    Now it is.

5    Q.    Okay.  And, in fact, just until recently Universal had

6    its own manufacturing plants that it owned; correct?

7    A.    Yes.

8    Q.    Okay.  And when Universal sells physical product, it is

9    responsible for the cost of the manufacturing of each one of

10   the CDs or vinyls that is sold; correct?

11   A.    Yes.

12   Q.    Okay.  And when Universal is selling products such as

13   vinyl and cassettes, CDs, eight-track tapes, they are

14   responsible for the costs of distributing and manufacturing

15   those products; correct?

16   A.    Distributing them to retailers, yes.

17   Q.    Okay.  And they also are responsible for the cost of

18   manufacturing; correct?

19   A.    Yes.

20   Q.    Okay.  Now, that's one way Universal gets money from

21   eight-tracks, CDs, cassettes, and vinyls.  There's another

22   way, too.

23          And there's -- the other way is when they license

24   product to third parties who do the manufacturing,

25   distributing, and selling; correct?

1    A.    Yes.  I mean, it's -- there are some cases of that.

2    Q.    Okay.  And so in this case, Mr. Ostroff -- well, let me

3    back up for one second.

4              So you're aware of record clubs; correct?

5    A.    Yes.

6    Q.    Okay.  And in record club situations, Universal licenses

7    to a record club the right to distribute Universal albums,

8    for example; correct?

9    A.    Our deals with the record clubs give them the right

10    to -- to distribute the albums, yes.

11    Q.    And they have the cost of those -- of that distribution;

12    correct?

13    A.    Yes.

14    Q.    Okay.  And in those cases, Mr. Ostroff, in fact,

15    Universal splits its receipts with its artists on a 50/50

16    basis; isn't that correct?

17    A.    Typically, yes.

18    Q.    Okay.  And, in addition, we have licensing provisions

19    where if a Universal -- if Universal licenses master

20    recordings to a third party who manufacture vinyl, CDs, or

21    cassettes, then Universal also splits their net receipts with

22    their -- with those -- with their artists on a 50/50 basis in

23    those cases, too; is that right?

24    A.    I think that's right in some, but not all cases.

25    Q.    Okay.  So the issue -- and you understand this case?

1    You are aware of the facts in this case?  You're aware of the

2    issues; correct?

3    A.    Yes.

4    Q.    You're the general counsel of the company; correct?

5    A.    Yes.

6    Q.    And when Universal licenses vinyls -- or licenses to a

7    third party the right to sell vinyls, cassettes, CDs, those

8    are sometimes sold in record stores; correct?

9    A.    Yes.

10   Q.    By the licensee; correct?

11   A.    Well, yes.  Usually it's -- I mean, record club records

12   are not sold in record stores, but if we license a master

13   that may be compiled or combined with other masters, say for

14   a sound track album, then yes.  That is sold in record

15   stores.

16   Q.    So if there's a license -- listen to my question now.

17          If there's a license of a master recording,

18   Universal master recording to a third party who manufactures

19   and sells a record containing those masters, those are sold

20   in Wal-Mart; correct?  The record is sold in Wal-Mart?

21   A.    In the -- if we use a soundtrack album, for example,

22   yes.

23   Q.    And it's sold in Best Buy; correct?

24   A.    It may be, sure.

25   Q.    And the licensee is selling in what would be called

1  normal retail channels; correct?

2  A.   Yes.

3  Q.   Okay.  And in this case, Mr. Ostroff, you understand

4  that the issue is whether Universal is, itself, selling

5  downloads and master tones or whether they are licensing

6  those masters for iTunes or other digital download companies

7  or mobile carriers to sell downloads or master tones; is that

8  correct?

9  A.   Yes.

10  Q.   Okay.  Now, let's talk about that for a minute.

11       How long have you been with Universal?

12  A.   Since 1984.

13  Q.   And you're familiar with Universal's efforts to create

14  their own digital download service; isn't that right?

15  A.   Somewhat familiar, yes.

16  Q.   Okay.  And you -- it would be fair to say that

17  Universal's efforts in that regard have been a failure.

18  A.   It certainly hasn't been the success that iTunes has

19  been, but we've had, I think, you know -- I think we've had

20  a number of situations where we've been involved in different

21  download services.

22  Q.   All right.  Well, let's focus on that for a moment.

23       When I questioned you at your deposition, we talked

24  about something called Blue Matter.

25       Are you familiar with that?

1    A.   Yes.

2    Q.   And that was back in 1998; is that right?

3    A.   I don't recall the specific time.

4    Q.   Okay.  It was a homegrown download project of Universal;

5    correct?

6    A.   Yes.

7    Q.   And it lasted about a year; correct?

8    A.   The -- the times -- I mean the -- that length of time

9    sounds right.  I'd say I'm not sure about 1998.  I would have

10   thought it was sometime later, but --

11   Q.   It was a failure; correct?

12   A.   It was not successful, no.

13   Q.   Okay.  And then Universal had another foray into their

14   attempt to sell downloads themselves where they had a joint

15   venture with Sony where they were co-owners of a company

16   called Press Play.  Is that right?

17   A.   Yes.

18   Q.   And Universal no longer has an ownership interest in

19   Press Play; isn't that right?

20   A.   I think we still have an interest in its successor, but

21   you and I disagreed about that before.  And I'm not certain

22   of the current status.

23   Q.   Okay.  And just recently there is a -- there was an

24   effort called Total Music; is that right?

25   A.   Well, there was an effort called Total Music, yes.

1    Q.   And Total Music was supposed to be -- or was publicized

2    as a competitor with iTunes; isn't that right?

3    A.   Total -- I mean, a competitor of iTunes -- Total Music

4    was another -- it never launched, but it was going to be

5    another effort by us to get music to consumers in a different

6    way.

7    Q.   And that's -- and Universal owned that, correct, with

8    Sony?

9    A.   Yes.

10   Q.   And it folded before it ever launched; isn't that right?

11   A.   Yes.

12   Q.   Okay.  So having failed to develop your own digital

13   download service, Mr. Ostroff, Universal has entered into

14   agreements with third parties like iTunes, where Universal

15   will provide those digital download companies with a copy of

16   a master recording and allow them to create a download from

17   that; isn't that correct?

18   A.   As we sell to physical retailers who then sell the

19   product, we -- we sell to online retailers who also sell the

20   products to consumers.

21        MR. BUSCH:  Okay.  I move to strike.

22   BY MR. BUSCH:

23   Q.   And I would ask you to answer my question, Mr. Ostroff.

24        THE COURT:  And your motion to strike is denied.

25        ///

```
 1    BY MR. BUSCH:

 2    Q.   Mr. Ostroff, listen to my question.

 3              Do you provide --

 4              THE COURT:  I denied the motion to strike.  Don't

 5    say, "Listen to my question."

 6    BY MR. BUSCH:

 7    Q.   Mr. Ostroff, do you provide a digital file with a master

 8    recording to iTunes?

 9    A.   A digital file of a master recording, yes.

10    Q.   Okay.  And does iTunes or any digital download company

11    under your agreements with them get ownership of that digital

12    file?  Does title or any ownership of that go to those

13    digital download companies, or is it reserved to Universal?

14              MR. KLAUS:  Objection, Your Honor.  Calls for a

15    legal conclusion.

16              THE COURT:  Overruled.

17              THE WITNESS:  I'm not certain of the concept of

18    title in the digital world; so I don't know -- I don't know

19    what the answer to the question is.  But when it is sold to

20    the consumer, the ultimate consumer, they own the copy of the

21    recording.

22    BY MR. BUSCH:

23    Q.   That's not my question.

24              My question is do you know -- under the terms of

25    your agreements with the digital download companies and with
```

1    the cellular phone companies, who you provide a copy of the

2    master recording to, do you know whether, under the terms of

3    those agreements, right, title, and interest to what you

4    provide them stays with Universal or goes to those companies?

5    A.    I said I don't know.

6    Q.    Okay.  Would it surprise you to learn that the

7    agreements say that all right, title, and interest to those

8    master recordings and the digital files and everything

9    provided stays with Universal?

10   A.    No.

11   Q.    Do you know whether when Universal sells, manufactures,

12   and distributes physical product, whether the retailer

13   obtains title, ownership of what they purchase at the time

14   they purchase it?

15   A.    I believe they obtain title -- title to the copy -- or

16   the copies that they've purchased.

17   Q.    Okay.  Now, Mr. Ostroff, I want to fast-forward a little

18   bit to the 2001-2002 time period.

19          And at that time -- at the time that the

20   negotiations for the agreements between Universal and the

21   digital download companies were beginning, did you have any

22   conversations with anyone at Universal about the structuring

23   of those agreements, wholesale, retail --

24          THE COURT:  Let's have a sidebar.

25          (Sidebar discussion.)

1              THE COURT:  The discussion we had yesterday -- I've

2     read the transcript.  You're not to make an inquiry that has

3     anything to do with attorney-client privilege.

4              MR. KLAUS:  I think he just did.

5              THE COURT:  That's right.

6              MR. KLAUS:  I think he just did.

7              MR. BUSCH:  You're ruling about it now?

8              THE COURT:  Correct.

9              MR. BUSCH:  I only did -- we provided you with an

10    Exhibit 777, which is a memorandum that Mr. Ostroff drafted

11    that's been provided that wasn't protected by attorney-client

12    privilege where he discusses their decision to pay on the

13    licensing provision 50/50 for conditional downloads and

14    streams.  He discusses how they're going to pay for downloads

15    by doing these different -- by creating a royalty structure

16    that is not found in the agreement.  So they have allowed

17    that.  They have the memo in the case.

18              Our theory of this situation is that the defendants

19    understood the licensing provision took that into

20    consideration --

21              THE COURT:  Say that again.

22              MR. BUSCH:  That the defendants created this

23    structure because they understood the licensing provision.

24    They created the structure to avoid that.  If by allowing

25    them to get their story out of lifting the royalty and doing

1    different things when these digital download agreements were

2    entered into, but not at least letting me ask the question

3    whether you had a discussion about the licensing provision at

4    the same time you made this decision period, doesn't allow me

5    to make my argument that this was all a charade in order to

6    avoid the licensing provision in the agreement.

7              THE COURT:  I think ultimately the conversations

8    are privileged.

9              Thank you.

10             (Sidebar discussion concluded.)

11   BY MR. BUSCH:

12   Q.  Mr. Ostroff, could you look at Exhibit Number 5,

13   Paragraph 4(c)(v).

14             I want to go back to something we were speaking

15   about a minute ago.

16   A.  Is this in the book?

17             THE COURT:  It's in the book.  It's on the screen.

18   BY MR. BUSCH:

19   Q.  It's on the screen.  You can look at it on the screen.

20             Have you reviewed the recording contract at issue

21   in this case, Mr. Ostroff?

22   A.  Yes.

23   Q.  Okay.  And you're familiar with the two provisions in

24   the agreements?

25   A.  The two --

```
1    Q.   The two record royalty provisions and the licensing

2    provision?

3    A.   Yes.

4    Q.   Okay.  And you know that after the provision that talks

5    about Universal or Interscope, Aftermath selling records it

6    says "notwithstanding the foregoing."

7              Do you see that?

8    A.   Yes.

9    Q.   And you understand that "notwithstanding the foregoing"

10   means that whatever comes next is -- to the extent there's

11   a conflict, controls over what came before?

12   A.   Yes.

13   Q.   Okay.  And after that "notwithstanding the foregoing"

14   provision, you see the master license provision?

15   A.   Yes.

16   Q.   Okay.  You know a second ago I asked you questions about

17   whether Universal/Interscope supplies the master to iTunes.

18             Do you recall that?

19   A.   I'm sorry.  Whether Interscope or -- provides a master?

20   Yes.

21   Q.   Okay.  And you see this licensing provision, and you see

22   there's no limitations on -- in this licensing provision to

23   what licenses it applies to.

24             Do you see that?

25   A.   Yes.
```

1    Q.    Okay.  So we spoke about a moment ago that -- or you

2    said in your deposition to me that downloads are records;

3    correct?

4    A.    Yes.

5    Q.    Okay.  And your view is that downloads are records, just

6    like a CD is a record; right?

7    A.    Yes.

8    Q.    Just like a vinyl is a record; right?

9    A.    Yes.

10   Q.    Just like a cassette is a record; right?

11   A.    Yes.

12   Q.    Yesterday I think Mr. Paterno said that hillbillies once

13   bought eight-track tapes.  I don't know what that means, but

14   that's what he said.

15         And eight-track tapes are a record too; right?

16   A.    I bought eight-track tapes.

17   Q.    Well, you will have to talk to Mr. Paterno about that.

18         Those are records too; correct?

19   A.    Yes.

20   Q.    Okay.  And it's your view then that just like

21   eight-track tapes, just like casettes, just like records,

22   digital downloads are vinyl -- I mean are records; correct?

23   A.    Yes.

24   Q.    Okay.  Now, Mr. Ostroff, Universal pays under the

25   licensing provision for conditional downloads and streams;

1    correct?

2    A.    Yes.

3    Q.    Okay.  And, Mr. Ostroff, when deciding whether or -- and

4    let's just back up for one second.  When you look at this

5    licensing provision, where it says, "On masters licensed by

6    us or are licensees to others for their manufacture and sale

7    of records" --

8                Do you see that, or for any other uses?

9    A.    Yes.

10   Q.    Do you see that language?

11               Okay.  Do you know what iTunes does with the master

12   recording it receives from Universal?

13   A.    What they do technically?  No.

14   Q.    Okay.  Do you know whether they get one master --

15   whether they get a -- one file or two files or three files?

16   A.    I don't know.

17   Q.    Okay.  Would it surprise you to learn that they get two

18   or three different files from Universal?

19   A.    No.

20   Q.    One that has the master recording on it?

21               It wouldn't surprise you to learn that; correct?

22   A.    No.

23   Q.    Okay.  And one or two that has the various information

24   on it, what's called "metadata"?

25   A.    No.  I know they get that information.  Whether they're

 1    separate files, I don't know.

 2    Q.   Okay.  And do you know whether the file that is

 3    provided -- the master recording that is provided to iTunes,

 4    that is provided to the mobile carriers or the other

 5    permanent downloads companies are -- is that the company that

 6    is ultimately downloaded by an end user, or does Apple

 7    combine those files into one to create the download?

 8    A.   I don't know.

 9    Q.   Okay.  Would it surprise you to learn that Apple does,

10    in fact, combine those files into a different file that is

11    then the download?

12    A.   No.

13    Q.   Okay.  So if we look at this -- the language of this

14    licensing provision, where it says on masters that

15    "Notwithstanding the foregoing, notwithstanding the prior

16    records sold provision, on masters licensed by us or are

17    licensees to others for their manufacture and sale of records

18    or any other uses, your royalty shall be an amount equal to

19    50 percent of our net receipts from the sale of those records

20    or from those other uses of the masters."

21            You would agree then, sir, that the issue in this

22    case is not whether a record is a record is a record, but

23    rather whether there is a license by Universal of a master

24    recording to Apple for the manufacture and sale of records or

25    for any other uses.

```
 1              You would agree with that; correct?

 2              MR. KLAUS:  Objection, Your Honor.  It's just

 3    argumentative.

 4              THE COURT:  Rephrase.

 5    BY MR. BUSCH:

 6    Q.   Okay.  You would agree, Mr. Ostroff, that given the

 7    language of this licensing provision, given the

 8    "notwithstanding the foregoing" -- and given the

 9    "notwithstanding the foregoing" language, that the inquiry in

10    this case depends on whether Universal is licensing the

11    master recordings to iTunes and others or whether they are

12    selling those master recordings to iTunes or others?

13              MR. KLAUS:  Objection, Your Honor.  It's still

14    argumentative.

15              THE COURT:  Sustained.

16              Rephrase.

17    BY MR. BUSCH:

18    Q.   Let me ask the question this way then.

19              Would you agree, sir -- would it be -- isn't it

20    true, sir, that the licensing provision controls over the

21    records sold provision in the event of a conflict, according

22    to this contract?

23    A.   I think that oversimplifies it.  I don't think it's --

24    I don't think that's the case.

25    Q.   You see the "notwithstanding the foregoing."
```

```
 1              Right?
 2    A.    Yes.
 3    Q.    And you just said a moment ago, "notwithstanding the
 4    foregoing" means that whatever comes next controls over what
 5    comes before in the event of a conflict; right?
 6    A.    In the event of a conflict, yes.
 7    Q.    Okay.  And do you know of any other definition of
 8    records -- or do you know of the definition of records in
 9    this contract that is different than -- when it is in the
10    licensing provision than when it is in the records sold
11    provision, do you know whether it's a different definition?
12    A.    I'm not sure.
13              MR. BUSCH:  Okay.  Could you go to the records
14    definition, please.
15    BY MR. BUSCH:
16    Q.    I'll represent to you that this is the definition of
17    records in the -- in the contract, and it says, "Record means
18    all forms of reproductions, whether embodying sound alone or
19    sound together with visual images manufactured or distributed
20    primarily for home use."
21              Do you see that?
22    A.    Yes.
23    Q.    Okay.  And it's your view that downloads, just like
24    records, just -- just like vinyls, just like CDs, just like
25    cassettes fall within that definition; correct?
```

```
1   A.   Yes.
2   Q.   Okay.  Now, do you know if there's another definition of
3   record in this contract when record is used in the master
4   licensing provision than when it is used in the provision
5   that applies when Universal is selling and manufacturing and
6   distributing records?
7   A.   I don't.
8   Q.   Okay.  Assuming that that is the only definition of
9   record in this contract, going back to Paragraph 4CV, would
10  it be fair to say that you understand that the issue in this
11  case becomes whether Universal is licensing master recordings
12  for iTunes to create those records or whether they're selling
13  those records to iTunes?
14          MR. KLAUS:  Objection, Your Honor.  It's still
15  argumentative.
16          THE COURT:  Sustained.
17          Rephrase.
18  BY MR. BUSCH:
19  Q.   Do you know whether Universal -- well, let me ask the
20  question this way then.
21          Do you know whether Universal reserves rights when
22  it provides the digital files to iTunes?
23  A.   I mean, generally we reserve rights.  It's not a -- it's
24  not a grant of ownership in the master recording and in the
25  copyright; so -- and certainly in that sense, at least, we're
```

```
 1   reserving rights.
 2   Q.   Do you know if you grant the right to reproduce the
 3   digital file to iTunes?
 4   A.   I don't know.
 5   Q.   Do you know whether you are reserving the right to
 6   demand that iTunes not sell anything once you give them
 7   notice to stop selling downloads?
 8   A.   I would expect that we would reserve that right.
 9   Q.   Okay.  Now, when you provide -- when you sell a physical
10   album to Best Buy, for example, they have the right to sell
11   that, and you can't tell them not to sell it; isn't that
12   correct?
13   A.   Correct.
14   Q.   Okay.  Mr. Ostroff, so we're very clear here, when I met
15   with you at your deposition and asked you why Universal does
16   not pay for permanent downloads under the masters license
17   provision, it's your testimony that the reason why is because
18   it's a sale by Universal to iTunes; correct?
19   A.   Yes.
20   Q.   Okay.  And you didn't say, when I questioned you, that
21   there was some reason that if it was a license, if it truly
22   was a license, the master license provision would not apply,
23   did you?
24   A.   I don't recall.
25   Q.   And there's nothing in that language that you saw, that
```

1    I just showed you a moment ago, that would justify not paying

2    for -- under the licensing provision for permanent downloads

3    if, in fact, it is a license, is there?

4              MR. KLAUS:  Objection.  Argumentative, Your Honor.

5              THE COURT:  Overruled.

6              THE WITNESS:  I think you have to look at the

7    entirety of the contract and determine where the download

8    sales fit within the language of the contract.

9    BY MR. BUSCH:

10   Q.   Listen to my question.

11             There is nothing in the licensing provision that

12   I just showed you, that we just went over, that would justify

13   not paying under that provision for download sales by iTunes

14   if Universal is licensing the masters to iTunes; isn't that

15   correct?  Look at the provision if you like.

16             MR. BUSCH:  Put the provision back on.

17             THE WITNESS:  I don't think so.

18   BY MR. BUSCH:

19   Q.   You don't think there's anything in that language that

20   would justify not paying it under that provision if, in fact,

21   it's a license of the master; correct?

22   A.   That provision read, you know, separated from anything

23   else in the contract.

24   Q.   Would apply -- seems to apply; correct?

25             MR. KLAUS:  Objection, Your Honor.  I think that

1    mischaracterizes his testimony.

2              THE COURT:  Overruled.

3    BY MR. BUSCH:

4    Q.   Isn't that what you just said, sir?

5    A.   That -- I mean, you would have to look at what the

6    arrangement was with Apple and/or other retailers and the

7    consumer and that provision, but you can't read that

8    provision alone.

9    Q.   Okay.  I want you to answer my -- I believe you answered

10   a moment ago.  I want to hear -- I want the jury to hear your

11   answer, sir.

12             It's your testimony that -- with that

13   "notwithstanding the foregoing" language and reading that

14   licensing provision, that if, in fact, Universal is licensing

15   a master to iTunes, if, in fact, that is the case, then

16   there's nothing in that provision that would -- that would

17   show that it would not apply -- that that transaction would

18   not -- that provision would not apply; isn't that correct?

19             MR. KLAUS:  Objection, Your Honor.  It's

20   argumentative.  It mischaracterizes his testimony.

21             THE COURT:  Overruled.

22             THE WITNESS:  If the only thing that Universal was

23   doing was licensing, and it was a pure license for

24   manufacture or sale, then that seems to be the case.

25             MR. BUSCH:  Thank you.

1  BY MR. BUSCH:

2  Q.   Now, are you familiar with -- are you familiar with any

3  language in this contract -- we showed -- I showed you the

4  "notwithstanding the foregoing" a moment ago; right?

5  A.   Yes.

6  Q.   You saw that.

7       We have gone over that several times now?

8  A.   Yes.

9  Q.   Do you know of any language in that contract -- from

10  this contract that we just looked at, any language that

11  restricts the application of that licensing provision to only

12  certain licenses?

13  A.   I'm not sufficiently familiar with the contract, but

14  I don't know of that limiting language.

15  Q.   Okay.  Now, I want to go to a different topic, if I

16  could, and I want to talk to you about the time period of

17  2002 or so.

18       Okay?

19  A.   Okay.

20  Q.   And in 2002 a decision was made -- do you know that 2002

21  was the time period in which some of these -- Apple started

22  negotiating with Universal for Universal to enter into

23  agreements to supply music to Apple?

24  A.   I'll take your word for it.

25  Q.   Okay.  And right around that time a decision was made at

1    Universal to pay downloads -- conditional downloads and

2    streams at 50 percent of net receipts; correct?

3    A.    Yes.

4    Q.    Okay.  And it's your testimony, is it not, that --

5         MR. BUSCH:  Could you put up the masters license

6    provision again, please.

7    BY MR. BUSCH:

8    Q.    It's your testimony, is it not, that the licensing --

9    that licensing provision applies to conditional downloads;

10   correct?  That's what you said --

11   A.    Well, I don't know if that licensing provision applies,

12   but we're paying on 50 percent of net receipts for

13   conditional downloads.

14   Q.    You're paying Eminem and F.B.T. under this contract --

15   or under the 2003 contract of the same language 50 percent of

16   net receipts; is that right?

17   A.    Yes.  That's correct.

18   Q.    And it's your testimony that you're doing so because

19   conditional downloads and streams is another use of the

20   master or another use as referenced in this provision;

21   correct?  Any other use.

22   A.    I think so.

23   Q.    Okay.  Now, with respect to conditional downloads versus

24   permanent downloads, I want to focus on that for a minute.

25         A moment ago you said that the issue is whether

 1    Universal's arrangement with iTunes, the agreement with

 2    iTunes, that would have to be looked at to determine whether

 3    Universal is actually licensing masters to Uni- -- to iTunes

 4    or whether it's a sale; correct?

 5    A.    Yes.  Along with, you know, what is actually going on.

 6    Q.    Okay.  What is actually going on -- okay.

 7              Do you know what the agreements say and what is

 8    actually going on with respect to permanent download

 9    agreements and processes where you're not paying 50 percent

10    and conditional download agreements with third parties where

11    you are paying 50 percent?  Do you know what the agreements

12    say and what the processes are?

13    A.    Well --

14              MR. KLAUS:  Objection, Your Honor.  Compound.

15              THE COURT:  Overruled.

16              THE WITNESS:  I'm not familiar with all of the

17    language of the agreements, but the process is in the

18    permanent download case, ultimately the consumer ends up with

19    ownership of the copy of the recording and basically has the

20    right to -- to listen to it, use it, you know, pretty much as

21    they want, as distinct from the conditional download where

22    there's conditional, also called limited download, where

23    there's much more limited uses.

24    Q.    Okay.  You're focusing on the second half, which is sale

25    of records or for any other uses.  What I want you to --

```
 1   first of all, let me back up to something you just said.
 2           Do you know whether a -- somebody who gets a
 3   download, a permanent download, can resell it under the terms
 4   of the agreement?
 5   A.   Under the -- I don't believe they can resell it under
 6   the terms of -- the Apple terms of sale.
 7   Q.   What about any of the other agreements?
 8   A.   I'm not sure.
 9   Q.   Okay.  And when I buy an album from a record store, I
10   can go on eBay and resell it; right?
11   A.   Yes.
12   Q.   Okay.  Now, you were focusing on, in your answer, the
13   second part of the master license provision, sale of records
14   or for any other uses, and your view is that a conditional
15   download is for any other use and iTunes is selling a record;
16   correct?
17   A.   Yes.
18   Q.   Okay.  What I want to focus you on is the first part of
19   that agreement -- of the language of the contract, what
20   really matters here on masters licensed by us.  And what I
21   want you to -- my question was designed to ask you this.
22           THE COURT:  Mr. Busch, you're arguing.
23           MR. BUSCH:  Yes, sir.
24           THE COURT:  State your question.
25           ///
```

```
 1    BY MR. BUSCH:

 2    Q.   Focusing on the licensing language in the first part of

 3    this provision, do you know if the terms, procedures,

 4    provisions of the conditional download agreements that

 5    Universal has with the conditional download providers and the

 6    terms, conditions, and procedures that it has with permanent

 7    download providers are virtually the same?

 8    A.   I don't know.

 9    Q.   Do you know whether in each case Universal supplies the

10    download provider with a copy of the master recording?

11    A.   I believe typically we do in each case.

12    Q.   Okay.  Do you know whether in each case you provide them

13    a separate file with metadata and various information?

14    A.   I don't know.

15    Q.   Do you know whether in both cases the digital download

16    and the conditional download providers combine those two into

17    one to make them available on their service to end users?

18    A.   I don't know.

19    Q.   Do you know whether in both cases, both for permanent

20    downloads and conditional downloads, Universal retains all

21    right, title, and interest in everything they provided?

22    A.   Well, I'm sure we retain right, title, and interest into

23    the master recording, and specifically -- or especially the

24    copyright.

25    Q.   Well, that's not my question.
```

```
 1              Do you know whether under the terms of those
 2   agreements Universal retains right, title, and interest in
 3   everything it provides -- the metadata, the digital file,
 4   everything -- in both cases?
 5   A.   I don't know.
 6   Q.   Would it surprise you to learn that they do?
 7   A.   No.
 8   Q.   Do you know whether in both cases Universal reserves the
 9   right to demand that the download companies take the songs
10   off the service at any time in both Universal -- in both
11   permanent downloads and conditional downloads?
12   A.   Did you ask if that would surprise me?
13   Q.   Yes.
14   A.   No.  That wouldn't surprise me.
15   Q.   Do you believe that's the case?
16   A.   Yes.
17   Q.   And just so that we're clear, when Universal sells an
18   album, a vinyl, a CD, a cassette to Best Buy or Wal-Mart,
19   once Best Buy or Wal-Mart get that CD, they have the right to
20   do with it what they want; correct?
21   A.   Yes.
22   Q.   They can destroy it if they want; right?
23   A.   Yes.
24   Q.   They can throw it in the garbage if they want; right?
25   A.   Yes.
```

```
 1    Q.    They can sell it if they want; right?
 2    A.    Yes.
 3    Q.    Universal can't say, "Hey, we sold that to you.  Now
 4    give it back to us."
 5          Right?
 6    A.    No.  We can stop selling them in the future.
 7    Q.    But the CDs they have, they have the right to do with
 8    them what they want, and Universal can't tell them what to
 9    do?
10    A.    That's the --
11          THE REPORTER:  Your Honor, can Mr. Busch please
12    slow down.
13          THE COURT:  Please slow down, Mr. Busch.
14          MR. BUSCH:  I will try.
15          THE COURT:  All right.  Thank you.
16          THE WITNESS:  Basically that's true, yes.
17    BY MR. BUSCH:
18    Q.    All right.  All right.  Let's go to 2002.  And as we
19    talked about --
20          You can take that off.
21          In 2002, Universal made the decision to pay for
22    conditional downloads and streams 50 percent under the master
23    licensing provision; correct?
24    A.    Yes.
25    Q.    Okay.  And Universal, at that same time -- the same time
```

1    it was crafting these agreements, made the decision to pay

2    for permanent downloads under a royalty -- a royalty

3    structure not found in the recording agreements; isn't that

4    right?

5    A.   Yes.

6    Q.   You created a new royalty structure to pay for permanent

7    downloads; correct?

8    A.   Yes.

9    Q.   Okay.  And what you did was you -- and this is rather

10   technical, I guess, but you uplifted -- you pay for -- how do

11   you pay for -- when Universal sells a record, what is the

12   artist royalty based upon?  Is it based upon the wholesale or

13   retail price?

14   A.   Well, it's -- you know, it can be a complicated and

15   arcane subject.  And there are a number of factors that go

16   into the royalty calculation.  When we began to sell -- when

17   we began to sell permanent downloads, we simplified the

18   calculation and removed some of the deductions.

19   Q.   Okay.  You uplifted the wholesale price to 130 percent

20   of wholesale?

21   A.   Yes.  And that's what we do with CDs also.

22   Q.   And you said you weren't going to take packaging

23   deductions; is that right?

24   A.   Yes.  Where -- whereas we take the container charges or

25   packaging deductions for CDs, we -- we decided we would not

1    do that for downloads, even if or even though our contracts

2    may have given us that right.

3    Q.   Are there packaging costs that Universal has with

4    downloads?

5    A.   Not physical packaging costs.

6    Q.   Okay.  Do you know whether any costs to send the

7    information or the digital file over to the digital download

8    companies are passed on to the digital download companies

9    that they have to pay for the files they receive?

10   A.   I don't know.

11   Q.   Now, isn't it true that the reason that you did these

12   things, you didn't take -- oh, there's one other thing.

13        There's a -- sometimes a new medium clause in

14   record contracts that say that for new mediums your royalty

15   will be 25 percent less than the otherwise applicable royalty

16   rate; correct?

17   A.   Yes.

18   Q.   Okay.  Isn't it correct that the purpose of that

19   provision is that if Universal has costs associated with

20   developing their own new mediums that that is the reason that

21   provision is in contracts?

22   A.   Well, it's not so much developing our own new medium or

23   media; it's that there are costs involved typically when a

24   new medium is introduced.  So it's -- that provision is to

25   allow us to if not recover the cost, at least to reduce our

1    other costs when we introduce new media.

2    Q.    And that contemplates that Universal will be selling

3    that new medium product; correct?

4    A.    No.  I think it just contemplates that there will be --

5    that it applies to new media.

6    Q.    It doesn't -- the reason that Universal is allowed to

7    take that -- pay a less royalty has nothing to do with the

8    fact that Universal will be having costs in the development

9    of new media products that it will be selling?

10            Is that what you're saying?

11   A.    I don't think so.  I don't think that's what I'm saying.

12   Q.    Okay.  And in connection with both -- permanent

13   downloads, you sent out a memo saying that you wouldn't take

14   new media deductions; correct?

15   A.    Yes.

16   Q.    Okay.  Now, with respect to conditional downloads and

17   streams that you pay 50 percent of net receipts for, do you

18   know whether you take new medium deductions for those?

19   A.    We do not.

20   Q.    Now, isn't it true that the reason that you did -- that

21   you created this royalty structure that is not found in the

22   royalty -- in the agreements is because you were concerned

23   that artists would claim that you were actually licensing the

24   master recording to the digital download companies and would

25   say that you should be paying 50 percent of net receipts?

1    A.    No.

2    Q.    And that --

3    A.    And when you say that we created this new structure,

4    what we did was we -- we agreed that we would pay the artists

5    more favorably than the contracts provided, so....

6    Q.    More favorably under the records sold provision, not

7    more favorably if you were paying that as a license; isn't

8    that correct?

9    A.    The -- yes.  Yes, because it's records sold.

10   Q.    So for -- so let us just get this straight so everyone

11   understands.

12         When you just said that you decided to pay under

13   the records royalty provision and -- because it's a records

14   sold in your view, and that you were paying more --

15   graciously more than what the artist would otherwise receive

16   under that provision, you were not saying that if the

17   licensing provision were to apply that the artist would still

18   be getting more money under your -- under your structure, are

19   you?

20         MR. KLAUS:  Objection, Your Honor.  Argumentative.

21         THE COURT:  Sustained.

22         Rephrase.

23   BY MR. BUSCH:

24   Q.    Okay.  Do you know whether if the licensing provision

25   applied the artist would be getting more money than under

```
 1   what you created, if they were getting 50 percent of net
 2   receipts?
 3   A.   The focus was on -- for the sale element.
 4   Q.   Okay.  Listen to my question.
 5        Do you know whether if the licensing provision
 6   applied, the artist would be getting more money than under
 7   the structure that you created under the records sold
 8   provision?
 9   A.   Is the question -- would an artist get more money under
10   the licensing provision than under the records sold
11   provision?
12   Q.   Yes, sir.
13   A.   I think it depends on the royalty, but in most cases
14   there would be more money in the licensing provision.
15   Q.   And you're saying that -- that the thought never crossed
16   your mind or anyone at Universal's mind at all, ever, that --
17   when you created this that you were trying to appease the
18   artist so they wouldn't claim that the licensing provision
19   applied and you should be paying under the licensing
20   provision?
21        Never crossed your mind.  Is that your testimony
22   today?
23   A.   That -- we thought it would appease the artist so they
24   wouldn't raise the issue?
25   Q.   That never crossed your mind?
```

1    A.    I don't know if it crossed my mind in that way.

2    Q.    In what way did it cross your mind?

3    A.    There were -- as there are in this case, there were

4    artist representatives who argued that the license provisions

5    applied.

6    Q.    So it crossed your mind when you did this that perhaps

7    by doing what you were doing, it would satisfy them not to

8    raise the issue; isn't that correct?

9    A.    I don't know if it crossed my mind.  The -- the point

10   was that we wanted artist support when we launched the

11   download business, and we thought this would be an aid in --

12   in getting artist support.

13   Q.    Uh-huh.

14          Now, at the same time you made this change and you

15   created this structure out of thin air, you also directed

16   your people to go back and renegotiate artist contracts, if

17   they could, to put in a specific provision saying that if

18   Universal licenses permanent downloads, it would be paid

19   under this structure that you created; isn't that correct?

20          MR. KLAUS:  Objection, Your Honor.  Argumentative.

21          THE COURT:  Sustained.

22          Rephrase.

23   BY MR. BUSCH:

24   Q.    Isn't it correct that you also, at this same time,

25   directed the lawyers at the various labels to try to amend

1    existing contracts with artists to incorporate this royalty

2    structure, period?

3    A.    No.

4    Q.    You did not do that?

5    A.    I did not direct them to try to amend.  I believe I said

6    that they could offer it.

7    Q.    They should offer it -- could offer it or should offer

8    it?

9    A.    Should.

10   Q.    Okay.  That's not a direction by you?

11   A.    Well -- but an offer is not a direction to amend.

12   Q.    Okay.  Let's get -- just so that we're -- we're on the

13   same page here.

14           MR. BUSCH:  Can we get Exhibit 77 up on the board,

15   please -- 777.  Just that one sentence.

16   BY MR. BUSCH:

17   Q.    This is a memo that you put together; is that correct?

18   A.    Yes.

19   Q.    September 17th, 2002?

20   A.    Yes.

21   Q.    Okay.  And this memo is a memo that relates to what

22   we've been talking about for the past few minutes, both the

23   new royalty structure and about amending artist contracts;

24   correct?

25   A.    Yes.

```
1    Q.   Okay.  I'm going to direct your attention to the very
2    end of the document.
3              Okay.  So you say:
4                  "Also, effectively [sic] immediately, our new
5                  royalty -- new recording agreements should reflect
6                  this royalty treatment.  You should make the
7                  appropriate changes to your form agreement, as well
8                  as any agreements that are currently in draft.  You
9                  should also offer to amend any existing recording
10                 contract, even if the term has expired, to provide
11                 for this calculation of online royalties.  Even if
12                 the contract is not amended, we will instruct
13                 royalties to pay the artist at the higher rate."
14             That was your memo; correct?
15   A.   Yes.
16   Q.   And that was your instruction; correct?
17   A.   Yes.
18   Q.   You never instructed your lawyers that this new policy
19   in the amending of the contract only applies to artist
20   contracts that were being drafted from scratch, did you?
21   A.   I'm not sure I understand the question.
22   Q.   Okay.  Let me see if I can help you then.
23             Your direction was "Offer to amend existing
24   recording agreements in order to specifically contain this
25   royalty structure."
```

```
1              Correct?
2    A.   Yes.  Yes.
3    Q.   Okay.  And it was "Change your form immediately to
4    incorporate this in agreements in draft and for new
5    agreements."
6              Correct?
7    A.   Yes.
8    Q.   You never advised anyone separately that this new policy
9    or what they were to do in negotiating with artists only
10   apply -- this new policy, only apply to artist agreements
11   being started from scratch, did you?
12   A.   Well, the -- the -- you should make the change to your
13   form agreements, as well as any agreements that are currently
14   in draft, that's the -- that's the from-scratch part.  I
15   think the offer to amend existing contract is for contracts
16   that are already in existence.
17   Q.   Okay.  So what you were instructing your people to do
18   was to offer -- recording agreements in mid term, they should
19   contact the artist's representatives and offer an amendment;
20   correct?
21   A.   Yes.  I don't think the -- the -- the instruction was
22   not call everybody who, you know, we have contracts with and
23   offer to make this amendment; it was more, you know, if
24   you're talking with them and, you know, if they ask, you can
25   offer to make the amendment.
```

```
 1    Q.    Okay.  So do you know who Rand Hoffman is?

 2    A.    Yes.

 3    Q.    Who is Rand Hoffman?

 4    A.    He's head of business affairs for Interscope, Geffen,

 5    and A&M Records.

 6    Q.    Okay.  If Mr. Hoffman testified that he never raised

 7    this issue with Eminem because your instruction was in

 8    2000 -- let me rephrase the question.

 9          If Mr. Hoffman testified that when a new agreement

10    was being entered into with Eminem in 2003 that he did not

11    raise the issue of changing this royalty structure because

12    your instruction was only to do so when starting an agreement

13    from scratch, that would be false; right?

14          MR. KLAUS:  Objection, Your Honor.  Argumentative.

15    That mischaracterizes the testimony.

16          THE COURT:  Sustained.  Argumentative.

17    BY MR. BUSCH:

18    Q.    You would have expected that in connection with the

19    2000 -- with the new agreement with Eminem that Rand Hoffman

20    would have raised this issue with Eminem's representatives;

21    isn't that correct?

22    A.    I would have expected that, but under the -- you should

23    offer to amend.

24    Q.    Okay.  Now, can we -- yeah.

25          I'm going to show you now the new form Interscope
```

1    agreement that was created as a result of your direction.

2    It's Exhibit 13 in the binder.  If you would look on the

3    monitor, it's coming up right now.  I want to direct --

4           First of all, Mr. Ostroff, do you recognize this as

5    the new form Interscope agreement that was created after your

6    direction?

7    A.    I don't know the new form that was created after my

8    direction.

9    Q.    Did you consult with people in drafting the new form?

10   A.    I don't recall.

11          MR. KLAUS:  Objection, Your Honor.

12   Attorney-client --

13          THE COURT:  Sustained.

14          MR. KLAUS:  -- privilege.

15          THE COURT:  Sustained.

16   BY MR. BUSCH:

17   Q.    Do you know who came up with the language?

18   A.    No.

19   Q.    Okay.  But you don't dispute that this is Interscope's

20   new form based upon your direction, do you?

21   A.    I have no knowledge.  I don't dispute it.

22   Q.    Okay.  Assuming this is the new draft form that

23   Interscope used, I want to direct your attention to the first

24   line, where it says, "If company sells or licenses to any

25   third party the right to sell the permanent downloads or

```
 1    record -- records hereunder."
 2              Do you see that?
 3    A.   Yes.
 4    Q.   Do you know why there's a reference to licenses?
 5    A.   No.
 6    Q.   Okay.  What agreements were being referenced in that new
 7    form agreement where it says "if company sells or licenses"?
 8    Were they referring to iTunes agreement with respect to
 9    licenses?  Do you know?
10              MR. KLAUS:  Objection, Your Honor.  It lacks
11    foundation.
12              THE COURT:  Sustained.
13    BY MR. BUSCH:
14    Q.   You don't know what agreements are being referenced;
15    right?
16              MR. KLAUS:  Same objection, Your Honor.
17              THE COURT:  Sustained.
18    BY MR. BUSCH:
19    Q.   Okay.  We talked about the fact that you were directing
20    that a new royalty be put for permanent downloads.
21              Did you also direct that a provision be inserted
22    into the Interscope new form agreement that would cut
23    permanent downloads out of the licensing provision, like this
24    paragraph we're looking at here?
25              MR. KLAUS:  Objection, Your Honor.  Argumentative.
```

```
 1              THE COURT:  Sustained.
 2    BY MR. BUSCH:
 3    Q.    Did you instruct that a specific paragraph should be put
 4    in this agreement, in the new form Interscope agreement
 5    addressing the issue of licensing for permanent downloads?
 6    A.    I don't remember doing that, no.
 7    Q.    Okay.  Do you know why this paragraph was created?
 8    A.    You know, part of its genesis may have been my memo, but
 9    I'm not sure of the timing of this -- of this form.
10    Q.    Isn't it correct the reason this paragraph was created
11    was because Interscope understood that without it digital
12    downloads would be covered under the master licensing
13    provision?
14              MR. KLAUS:  Objection, Your Honor.  Lacks
15    foundation.
16              THE COURT:  Sustained.  Sustained.  Foundation.
17    BY MR. BUSCH:
18    Q.    Do you know whether that was the reason?
19    A.    I don't.
20    Q.    The paragraph above that one, if you could take a look
21    at that one, please.
22              This is another -- this is a master licensing
23    provision as it is contained in Interscope's new form
24    agreement; isn't that correct?
25    A.    Again, if you say so.  I don't know.
```

1    Q.    Okay.

2    A.    I'm not familiar.

3    Q.    And record club sales by third parties are contained

4    within that paragraph; is that correct?

5          MR. KLAUS:  Objection, Your Honor.  The document

6    speaks for itself, and it lacks foundation.

7          THE COURT:  Foundation.

8    BY MR. BUSCH:

9    Q.    Okay.  Do you see where there's a reference to record

10   clubs here?

11   A.    Yes.

12   Q.    Okay.  And under this provision for record club sales by

13   third parties where Universal licenses it, the Universal

14   licenses album to those third parties, you'll see -- do you

15   see where it says 50 percent of net receipts will be paid?

16   A.    Yes.

17   Q.    Okay.  And isn't it true, sir, that prior to the

18   creation of the new draft -- the new form Interscope

19   agreement your testimony is that before that time

20   Interscope's form agreements probably did not conclude any

21   specific limitation on the master licensing provision as it

22   applied to permanent downloads?

23   A.    I'm sorry.  I don't understand the question.

24   Q.    Do you recall testifying that prior to the change of

25   this form agreement that we're looking at right now, that

```
 1   your understanding is that there was no reference to or

 2   carveout of permanent downloads from the master licensing

 3   provision?

 4   A.   I don't know that there's a carveout here.

 5   Q.   Do you see where it says, "License is" --

 6             MR. BUSCH:  Or go back to -- go back to the

 7   paragraph, please.

 8   BY MR. BUSCH:

 9   Q.   "If company sells or licenses to any third party the

10   right to sell permanent downloads" --

11             You see that language; right?

12   A.   Yes.

13   Q.   Okay.  Isn't it correct that your testimony is that

14   language like that was not in Interscope's form agreement

15   prior to your memo?

16   A.   I don't know that.

17   Q.   Did you tell me in your deposition that that's probably

18   correct?

19   A.   I may have.  There was language about electronic

20   transmissions in -- I believe in the prior form contract,

21   which, you know, may cover that.

22   Q.   Electronic transmissions, but not the way they be paid;

23   correct?

24   A.   No.  I think there was language about how they would be

25   paid.
```

```
 1   Q.   Are you certain of that?

 2   A.   No.

 3   Q.   My question to you is isn't it true that -- and I can

 4   show you your testimony if you would like -- that prior to

 5   this form agreement your understanding is that language like

 6   this in Interscope's form agreement did not exist?

 7            MR. KLAUS:  Objection, Your Honor.  It's been asked

 8   and answered.

 9            THE COURT:  Overruled.

10            THE WITNESS:  I don't know.

11   BY MR. BUSCH:

12   Q.   Let me just -- let me just ask you a couple of last

13   questions if I could.

14            MR. BUSCH:  Go back to paragraph -- Exhibit 5.

15            Actually, that's all I have.

16            THE COURT:  Let's go ahead and take the morning

17   break at this time.  We'll resume again in about 15 minutes.

18            Remember not to discuss the case among yourselves

19   or with anyone else.  Do not form or express any opinions

20   about the case until it has finally been submitted to you.

21            We'll see you in about 15 minutes.

22            THE CLERK:  All rise.

23            (Recess from 10:38 a.m. to 11:00 a.m.)

24            THE COURT:  Mr. Klaus, you may.

25            (Open court - jury present.)
```

```
1                        CROSS-EXAMINATION

2     BY MR. KLAUS:

3     Q.   I would like to --

4              MR. KLAUS:  I'm going to ask Mr. Nichols to bring

5     up Exhibit 777 and Page 2 of the same document.  It's maybe

6     in your binder.  It will be on your screen shortly.

7     BY MR. KLAUS:

8     Q.   Do you recall Mr. Busch asked you some questions about

9     the royalty structure that was contained in this memorandum

10    dated September 17th, 2002?

11    A.   Yes.

12             MR. KLAUS:  And I'm going to ask Mr. Nichols if he

13    could highlight the two paragraphs that start "Streams and

14    conditional downloads and permanent downloads."

15    BY MR. KLAUS:

16    Q.   Do you see --

17             MR. KLAUS:  Not this.  Just these.

18    BY MR. KLAUS:

19    Q.   And the language that has been highlighted there, is

20    that the royalty structure that -- that you were discussing

21    with Mr. Busch?

22    A.   Yes.  For the -- yes.  For the streams and conditional

23    downloads and permanent downloads, yes.

24    Q.   Okay.  And when you were talking about permanent

25    downloads, I just want everyone to understand what the
```

1    royalty structure was that was -- that you were discussing.

2            Where it says, "We will take no container

3    charge" -- do you see that on number one?

4    A.    Yes.

5    Q.    Does -- is a container charge a reference to a term that

6    is found in existing royalty provisions?

7    A.    In -- yes.  In record royal provisions generally there's

8    a container charge provision.

9    Q.    Okay.  And if I could ask you, Mr. Ostroff, in

10   Exhibit 5, which we have looked at quite a bit, this is the

11   1998 F.B.T. Aftermath agreement.

12            MR. KLAUS:  If you could bring up Page 6 of the

13   same.  If you could bring up Paragraph Number little 3 right

14   there.

15   BY MR. KLAUS:

16   Q.    And, Mr. Ostroff, is this Paragraph E(iii) from the 1998

17   agreement, is this an example of a container charge provision

18   in an existing artist agreement?

19   A.    Yes.

20   Q.    And can you briefly explain what the nature of this

21   deduction is.

22   A.    The nature of this deduction is -- I think, as I

23   testified earlier, it's one of the elements used in

24   determining royalties for -- to pay an artist under an artist

25   contract.  And these deductions of varying percentages for

1  different -- different formats, those deductions are made

2  when determining the royalty payable to the artist.

3  Q.   And is it correct that -- under this agreement that the

4  container deduction that is for records in the form of

5  digital records, including, without limitation, compact discs

6  and for all records in any other form now known or hereafter

7  devised would otherwise be 25 percent?

8  A.   Yes.

9          MR. KLAUS:  And if I could ask Mr. Nichols to bring

10  back up Exhibit 777, which we were looking at, which is the

11  memo that you wrote.  And, again, going back to this royalty

12  structure for permanent downloads that is described in this

13  memorandum, Page 2.  If you could bring up the permanent

14  download paragraph again.

15  BY MR. KLAUS:

16  Q.   Number two says, "We will take no new technology

17  deduction."

18          Do you see that?

19  A.   Yes.

20  Q.   Is the new technology deduction also a deduction that is

21  found in standard terms in artist recording agreements?

22  A.   Yes.

23          MR. KLAUS:  And if I could ask Mr. Nichols to go

24  back to Exhibit 5, Page 7.  And if you could just highlight

25  the top paragraph there.  Not that.

```
 1    BY MR. KLAUS:

 2    Q.    And this says that "The royalty payable to you for new

 3    mediums will be 75 percent of the otherwise applicable

 4    royalty rate."

 5           Do you see that, Mr. Ostroff?

 6    A.    Yes.

 7    Q.    Is that an example of the type of new technology

 8    deduction that you were referencing in your September 17th,

 9    2002, memorandum?

10    A.    Yes.

11    Q.    Okay.  And if I could ask you -- let me pause on the

12    subject of the new medium deduction for just one moment.

13           Mr. Busch asked you some questions about the

14    purpose of the new medium deduction.

15           Do you recall that?

16    A.    Yes.

17    Q.    And do you recall that the -- one of the -- I think one

18    of the things that you said was that the new medium deduction

19    existed because of costs incurred in -- in moving to new

20    technologies; is that right?

21    A.    Yes.

22    Q.    Did Universal Music Group incur costs in the move to

23    digital distribution?

24    A.    Yes.

25    Q.    And did it incur those costs even for distribution that
```

1  wasn't done by Universal itself through its own download

2  services?

3  A.   Yes.

4  Q.   Can you -- and what were those costs?

5  A.   Well, there were the costs of converting our master

6  recordings into files that the online retailers could sell.

7  There were the actual hard costs of doing that.  There were

8  a lot of infrastructure costs as we moved to the -- the

9  digital business where we had to put together a whole new

10  team that would be, you know, both doing the -- sort of the

11  physical work and then also in developing the new business

12  models.  There were -- it's -- it's been very expensive to --

13  you know, to enter into this new business.

14  Q.   And can you give -- do you have an estimate of what the

15  amount of those costs in dollars were to Universal?

16        MR. BUSCH:  Objection, Your Honor.  We requested

17  that information, and discovery was not provided.

18        MR. KLAUS:  I don't think that -- I don't think

19  that's correct, Your Honor.

20        THE COURT:  Overruled.

21        THE WITNESS:  In the many millions.  I don't have

22  the number.

23        MR. KLAUS:  Okay.  And if I could ask Mr. Nichols

24  to go back to Exhibit 777 and to bring up the downloads

25  provision again.

```
 1   BY MR. KLAUS:
 2   Q.   And, again, moving to point number three, where it says,
 3   "The current plan is not to give away free goods to help
 4   entice sales.  We and our artists will be paid on all tracks
 5   sold," do you see that?
 6   A.   Yes.
 7   Q.   What is that a reference to?
 8   A.   Artists contracts typically have provisions that
 9   recognize that when records are sold in the physical world,
10   often there are free goods records that are given away with
11   records that are sold.  And the -- the royalty provisions of
12   the artist's contract say that royalties are not payable on
13   the free goods.
14   Q.   And if I could just ask you to turn back to Exhibit
15   Number 5.  This is the F.B.T. Aftermath 1998 agreement.
16         In Paragraph E on page -- starting on Page 6, do
17   you see in this section here, Mr. Ostroff, in example, called
18   the free goods deduction?
19   A.   I don't see Paragraph E on Page 6.
20   Q.   Page 5.  My apologies.
21   A.   Yes.
22   Q.   And is that the paragraph small number two on Page 6 or
23   small number one on Page 5?
24   A.   Yes.
25         MR. KLAUS:  If you could just highlight those, the
```

1    top two paragraphs there.

2    BY MR. KLAUS:

3    Q.   Your -- and then just to go back to Exhibit 777,

4    Mr. Ostroff.  This is your September 2002 memorandum.

5          MR. KLAUS:  Could we go back to that.  Bring up the

6    permanent downloads provision again.

7    BY MR. KLAUS:

8    Q.   I'd like to direct you on -- to number four, where it

9    says, "Whether the track was sold on an individual basis or

10   as part of an album, we will pay the album royalty rate

11   rather than the lower singles royalty rate."

12          What was that a reference to, Mr. Ostroff?

13   A.   Artist contract royalty provisions typically provide for

14   different royalty rates for singles versus albums, and the

15   singles are typically lower than the -- the royalty rate for

16   singles is typically lower than the royalty rate for albums.

17          MR. KLAUS:  And going back to Exhibit Number 5,

18   Page Number 4.  If I could ask you to highlight, Mr. Nichols,

19   4-A -- all of Section 4-A.

20   BY MR. KLAUS:

21   Q.   And in the paragraph that is numbered 4-A little i,

22   appears to be a typographical error, the second little i, is

23   the 12 percent for records other than LPs the single rate

24   under this agreement?

25   A.   Yes.

```
1    Q.   And was your memo saying that it should instead being
2    calculated at the album royalty rate of 18 percent?
3    A.   Yes.
4    Q.   Okay.  And is it the case that even if Univ- -- under
5    your memo, even if Universal was entitled to take all of the
6    deductions that we've described, that you were instructing
7    the people at the various labels not to take those
8    deductions?
9    A.   Yes.
10   Q.   Mr. Busch asked you some questions about the last -- the
11   second-to-the-last paragraph of your September memorandum,
12   Exhibit 777, and the next-to-the-last paragraph that starts,
13   "Also effective immediately."
14          And if I could just ask you, Mr. Ostroff, why did
15   you say that "Effective immediately, our new recording
16   agreements should reflect this royalty treatment"?
17   A.   I believe that since we were -- since we were committing
18   to change our royalties in specific ways that would benefit
19   artists, we had to change the agreements because if we
20   didn't, an artist or their representative would say, "What do
21   you mean you're taking away the container charges?  It's
22   still in your agreement."  So we needed to change the
23   agreements basically to show our commitment.
24          MR. KLAUS:  Okay.  And if I could ask you then, go
25   back to the second page of this document, Mr. Nichols.
```

```
1   BY MR. KLAUS:

2   Q.   And just to bring up -- we've been focusing on the --

3   the eliminated deductions for permanent downloads.  I'd like

4   to focus on --

5            MR. KLAUS:  Could you bring up -- highlight those

6   paragraphs, please.

7   BY MR. KLAUS:

8   Q.   We also talked about the fact the you were paying the

9   50 percent of net receipts for streams and conditional

10  downloads.

11           Do you see that?

12  A.   Yes.

13  Q.   And I'd just like to take you back in time, Mr. Ostroff.

14           At the time of this memorandum in September of

15  2002, do you know if the iTunes service had launched yet?

16  A.   I don't.

17  Q.   Do you know if there were any revenues that Universal

18  was receiving from the iTunes service as of September of

19  2002?

20  A.   I don't.

21  Q.   Did you know at the -- did you know at the time what the

22  prospects of success or the prospects of Universal's revenues

23  might be for streams or conditional downloads?

24  A.   I did not know what the prospects of success would be.

25  Q.   Did you -- did you think that they -- did you have
```

1   reason to believe that they might be high?

2   A.    Yes.

3   Q.    What was the reason -- what was your reason for that?

4   A.    Well, at the time I thought that subscription services

5   would prove to be popular with -- with music consumers.

6   Q.    Why did you think that?

7   A.    The notion of being able to get all of the music for a

8   low monthly fee I thought would be appealing to consumers.

9   Q.    Do you still think that has the prospect for being an

10  appealing consumer offering?

11  A.    I think it has the prospect for being an appealing

12  consumer offering.  I'm less optimistic that it's actually

13  going to succeed.

14  Q.    And did you -- did you -- were you less optimistic that

15  it would succeed at the time of this memorandum in September

16  of 2002?

17  A.    I think I still harbored strong hopes at that time.

18  Q.    Okay.  I'd like to then just direct your attention back

19  to the masters license provision, which is Paragraph 4(c) (5)

20  on Page 5 of the 1998 agreement.

21         And do you recall that Mr. Busch asked you a number

22  of questions regarding this provision in the agreement?

23  A.    Yes.

24  Q.    And one of the things that I wrote down that you said,

25  Mr. Ostroff, was that -- I think you said you couldn't read

1    this provision in isolation.

2    A.    Yes.

3    Q.    Is that your view?

4    A.    Yes.

5    Q.    What do you mean, you can't read this provision in

6    isolation?

7    A.    That you have to look at all of the provisions of the

8    contract.  You have to look at the understanding of the

9    parties.  You have to look at sort of custom and practice in

10   the industry, and to just isolate one -- you have to look at,

11   you know, obviously the other -- you know, the other

12   agreements, the download agreements.  And to just -- to just

13   isolate this one provision doesn't give the answer.

14   Q.    Okay.  Mr. Busch also asked you a series of questions

15   about what happens when Universal manufactures or has

16   manufactured for it compact discs.

17          Do you recall that testimony, that questioning?

18   A.    Yes.

19   Q.    And I think one of the things that you said was that

20   Universal has somebody else manufacture their compact disc

21   for them?

22   A.    We do.

23   Q.    Okay.  And when that somebody else manufactures compact

24   discs for you, what is it that you provide to that

25   manufacturer so that they can do that?

1    A.    Copies of the master recordings.

2    Q.    Okay.  And does Universal in that situation retain

3    ownership of the underlying master recordings?

4    A.    We retain ownership of the -- the copyright and the

5    master recording.  I'm not sure if we send them tapes or

6    digital files, and I'm not sure about the ownership of the --

7    the physical media that -- if it is physical media that is

8    sent to them.  But we retain ownership of the copyrights.

9    Q.    Does Universal always retain the ownership of the

10   copyrights of its work in the manufacturing and distribution

11   process?

12   A.    Yes.

13   Q.    And was that true before the compact disc?  When -- when

14   you made eight-track cassettes, did you retain ownership of

15   the copyrights and the works?

16   A.    Yes.

17   Q.    And if the copies of the eight-track cassettes that you

18   may have bought or the cassette tapes or the vinyl albums, if

19   copies of those items were sold to consumers, did Universal

20   still retain ownership of the copyright in the underlying

21   work?

22   A.    Yes.

23   Q.    Mr. Busch also asked you some questions about

24   reservations of rights and ability to recall material posted

25   to the iTunes service.

1              Do you recall that questioning, Mr. Ostroff?

2    A.   Yes.

3    Q.   And just so we're clear, if somebody at Time A downloads

4    a song from iTunes, and Universal thereafter removes that

5    song from the iTunes service, does the person who has the

6    permanent download have to give that back?

7    A.   No.

8    Q.   And, finally, Mr. Busch asked you some questions

9    regarding the cost that Universal incurs in the manufacture,

10   distribution, and sale of physical CDs.

11             Is it the case, Mr. Ostroff, that manufacturing and

12   distribution costs are the only costs that Universal incurs

13   in selling its music in CD format?

14   A.   No.

15   Q.   What other types of costs does Universal incur when it

16   sells its products in CD format?

17   A.   Well, there is the cost of making the recording.  The --

18   the recording cost, advances to the artist, advances to

19   producers, and then also costs involved in marketing the

20   records.

21   Q.   And does Universal also pay what are called "mechanical

22   royalties" to the songwriters that are owed on those -- on

23   those records --

24   A.   Yes.

25   Q.   -- when it makes its own CDs?

```
 1    A.    Yes.
 2    Q.    And are these same other costs of production, marketing,
 3    promotion, mechanical royalties also incurred by Universal
 4    when it distributes its music in the form of downloads?
 5    A.    Yes.
 6           MR. KLAUS:  I have no further questions at this
 7    time, Your Honor.
 8           THE COURT:  Redirect.
 9                    REDIRECT EXAMINATION
10    BY MR. BUSCH:
11    Q.    I'm going to start with the last thing that Mr. Klaus
12    just asked you.  When Universal licenses a master recording
13    to a third party, do you know whether it deducts -- when it
14    pays artists, the amount that it gets back, do you know
15    whether it deducts any marketing or other costs that you just
16    identified, the recording costs, from the amount they pay on
17    that license?
18    A.    I think it depends.
19    Q.    When they license a master recording to a third party to
20    release on their own album, isn't it true that there are no
21    deductions for marketing or other -- marketing or other costs
22    that it deducts when it pays the artists the 50 percent?
23    Isn't that correct?
24    A.    If we -- if we license a master for a compilation album
25    is your example?
```

1    Q.    Yes.

2    A.    Correct.  We do not typically deduct anything else.

3    Q.    And that is because the only deductions that are done to

4    licenses typically are direct costs relating to the license

5    itself; isn't that correct?

6    A.    Yes.

7    Q.    Okay.  Now, I want to talk to you about something else

8    you said.  Mr. Klaus was asking you about CDs and

9    manufacturing of CDs and the fact that you give a digital

10   file to your manufacturer.

11            Do you recall that testimony?

12   A.    Yes.

13   Q.    Okay.  Universal, just so that we're clear --

14   A.    I think I said we give a tape or a file.  I wasn't sure

15   whether it was a digital file or what the format was.

16   Q.    Just to be very clear so everyone understands, when

17   Universal is manufacturing the CDs itself or through a third

18   party like you just identified, Universal bears the cost of

19   that manufacturing process; correct?

20   A.    Yes.

21   Q.    And you said a second ago that Universal -- in response

22   to questioning by Mr. Klaus, you said that Universal retains

23   the ownership in the copyright to the underlying composition

24   or sound recording; right?

25   A.    Not the composition; the sound recording.

1    Q.    The sound recording.

2            Okay.  And that is the same thing with respect to

3    digital downloads.

4            Universal retains the copyright of the sound

5    recording; correct?

6    A.    Yes.

7    Q.    Okay.  But once Universal provides or sells that CD to

8    the retailer, the retailer has ownership of the CD itself;

9    correct?

10   A.    Yes.

11   Q.    Okay.  When Universal supplies the digital file with the

12   master recording on it to Apple, Apple, on the other hand,

13   does not have ownership of that digital file; correct?

14   A.    I don't know because I'm not sure what -- it's sort of

15   like your title question.  I don't know what ownership of the

16   digital file means.  I mean, the zeroes and ones are probably

17   on their servers.

18   Q.    Do you know what your -- well, first of all, during my

19   direct examination of you, you said you understood that in

20   the physical world title does pass to the retailer.

21           Do you recall testifying to that?

22   A.    Yes.

23   Q.    Now, do you know what the provisions of the agreements

24   say as far as who has ownership of all of the information

25   supplied by Universal to Apple or the digital download

```
1    providers in digital file?  Do you know what -- in digital

2    form.

3              Do you know what it says?

4    A.   No.

5    Q.   Okay.  You also said in your examination by Mr. Klaus

6    that in 2002 you didn't know whether iTunes had launched yet

7    or how much revenue was received yet by iTunes.

8              Do you recall that testimony?

9    A.   Yes.

10   Q.   You understood that Universal and iTunes, however, at

11   the time of your memo were in negotiations for an agreement,

12   did you not?

13   A.   I don't know.  It doesn't surprise me, but I don't

14   remember the timeline.

15   Q.   You don't recall whether in -- at that time, in 2002,

16   Universal and iTunes were in negotiations for an agreement?

17             Is that your testimony?

18   A.   I don't recall specifically.  It makes sense, but I

19   don't recall specifically.

20   Q.   Okay.  You also said that the reason that you directed

21   your staff to amend contracts was because if you took

22   packaging -- if you did not take packaging deductions that

23   you could have taken from artists that artists'

24   representatives would say, "Hey, wait a second.  Why are you

25   giving me more money than what I'm entitled to?"  So it
```

1    needed to be put into the contract.

2           Is that your testimony?

3    A.    No.  No.

4           MR. KLAUS:  Objection.  It's argumentative,

5    Your Honor.

6           THE COURT:  Sustained.

7           Rephrase.

8    BY MR. BUSCH:

9    Q.    That's not what you said on direct examination?

10   A.    No.  What I said was that if we had made a statement

11   that we were going to -- not going to take container charges,

12   and then we were to put container charges in a recording

13   agreement, that would look like we weren't -- that we didn't

14   mean what we said.  So I wanted to be -- I wanted our

15   contracts to be clear that we were making this change.

16   Q.    And we began this examination today by you saying that

17   you pay according to the terms of your contracts; right?

18   A.    Yes.

19   Q.    And that's important to pay according to the terms of

20   the contract; right?

21   A.    Yes.

22   Q.    And with conditional downloads and streams, you're

23   paying according to the terms of contract; right?

24   A.    Yes.

25   Q.    But for permanent downloads you decided not to pay for

1    under the terms of the contract; right?

2            Is that your testimony?

3    A.   My testimony is we paid more than what was required.

4    Q.   Of course, it's also your testimony that if you paid

5    under the licensing provision the artist would be getting

6    more.

7    A.   The artist would be getting different.  In I think many

8    cases it would be more.

9    Q.   Okay.  And -- okay.  You also mentioned that -- at the

10   time of your memo that there were artists' representatives

11   that were complaining about the treatment of digital

12   downloads as not being paid under the licensing provision.

13           Do you recall your testimony there?

14           MR. KLAUS:  Objection, Your Honor.  That exceeds

15   the scope of my cross.

16           THE COURT:  Overruled.

17   BY MR. BUSCH:

18   Q.   Go ahead.

19   A.   I don't know if I said they were complaining at that

20   time, but there -- there was -- I know there was an issue and

21   artists' representatives -- some artist representatives.

22   Q.   Was Mr. Paterno one of those artists' representatives?

23   A.   I don't know.

24           MR. KLAUS:  Objection, Your Honor.

25           THE COURT:  Sustained.

BY MR. BUSCH:

Q.   Mr. Ostroff, Mr. Klaus asked you some questions about
the processes in connection with CDs and some hypotheticals,
I think, about your opinion on different views.  I want to
ask you some questions as well.

     If someone buys an Eminem CD from Best Buy or
Amazon and puts it on their computer hard drive and makes a
hundred copies of it and takes those CDs down to Melrose
Avenue -- Melrose Boulevard and sets up a kiosk and starts
selling those CDs for $5, is that person violating
Universal's rights?

     MR. KLAUS:  Objection, Your Honor.  Calls for a
legal conclusion and exceeds the scope of my cross.

     THE COURT:  Sustained.

BY MR. BUSCH:

Q.   You have an understanding, do you not, that a person who
buys a CD cannot reproduce that CD; isn't that correct?

A.   Well, our company does not object if they make a
reproduction for themselves, if they rip it to their -- their
hard drive.

Q.   My question is a little bit different.

     There's -- the person who buys the CD can't take
that CD, make a reproduction of it, and -- hold on a second.

     That person can't take that CD, make a hundred
copies of it, and go on the street and sell it; isn't that

```
1    right?
2              MR. KLAUS:  Objection, Your Honor.  Calls for a
3    legal conclusion.  Also relevance.
4              THE COURT:  Sustained.
5    BY MR. BUSCH:
6    Q.   Okay.  You talked about, in Mr. Klaus' examination of
7    you, the many millions of dollars that Universal had invested
8    to set up the digital business.
9              Do you recall testifying to that?
10   A.   Yes.
11   Q.   Okay.  Would it be fair to say that that many millions
12   of dollars was set up -- was paid to set up Universal's own
13   digital download businesses that have ultimately failed?
14   A.   I wasn't -- you know, I wasn't including those in --
15   in when I was calculating what it was; but as I said, I don't
16   have a hard figure for that.
17   Q.   And just so that we're very clear, with respect to the
18   digital files that are provided by Universal to the digital
19   download companies -- and by -- those files are paid for by
20   the download companies; isn't that correct?
21   A.   I don't know.
22             MR. BUSCH:  That's all I have.
23             THE COURT:  Anything further?
24             MR. KLAUS:  Nothing further, Your Honor.
25             THE COURT:  You may step down.
```

```
1              Thank you.

2              MR. KLAUS:  Your Honor, may we have a brief

3    conference at sidebar with you?

4              THE COURT:  Brief.

5              (Sidebar discussion.)

6              MR. KLAUS:  That was outrageous what Mr. Busch just

7    did.  He's going to continue to try to do it with every

8    witness that comes in here.  He specifically said before

9    doing something like that to impeach or say that someone had

10   opened the door he said he would ask permission.  You've

11   overruled his attempts to do it repeatedly.  He just tried to

12   do it.  I would like an instruction that Mr. Busch not try to

13   do that again.  It's outrageous.

14             THE COURT:  I made a note to myself.  I'll deal

15   with it outside the presence of the jury.

16             MR. KLAUS:  Thank you very much.

17             (Sidebar discussion concluded.)

18             THE COURT:  Plaintiffs' next witness?

19             MR. BUSCH:  Lisa Rogell.

20                    Lisa Rogell, witness, sworn

21             THE CLERK:  For the record, ma'am, please state

22   your full name and spell your last name.

23             THE WITNESS:  Lisa Rogell, R-O-G-E-L-L.

24             THE COURT:  You may inquire.

25                         DIRECT EXAMINATION
```

1    BY MR. BUSCH:

2    Q.   Ms. Rogell, good morning.

3    A.   Good morning.

4    Q.   Where do you work?

5    A.   I'm not working right now.

6    Q.   Your last job?

7    A.   Interscope Records.

8    Q.   Okay.  What years did you work for Interscope Records?

9    A.   '97 to 2005.

10   Q.   Okay.  And after 2005, did you continue to work on a

11   part-time basis?

12   A.   Yes.

13   Q.   Okay.  And when did you stop working there on a

14   part-time basis?

15   A.   August 2008; right.

16   Q.   2008?

17   A.   Yeah.

18   Q.   Okay.  And what -- are you an attorney?

19   A.   Yes.

20   Q.   And what department at Interscope did you work in?

21   A.   Business and legal affairs.

22   Q.   And who was your boss at the time?

23   A.   Rand Hoffman.

24   Q.   What -- what years were Mr. Hoffman your boss?

25   A.   I think '99 he came in.  It was Scott Aronson before

1    that.

2    Q.    Okay.

3    A.    I'm not sure.

4    Q.    All right.  You were -- in 1998, you were aware that

5    Interscope and Aftermath and F.B.T. entered into a recording

6    agreement, are you not?

7    A.    Yes.

8    Q.    And you had some involvement with that; correct?

9    A.    Yes.

10   Q.    Okay.  That agreement was primarily drafted by

11   Peter Paterno's office; is that right?

12   A.    Yes.

13   Q.    And your role at Interscope was to offer suggestions; is

14   that correct?

15   A.    Yes.

16   Q.    Okay.  And as you sit here today, you don't have a

17   recollection of the changes to the agreement from the first

18   draft to the last, things like that, do you?

19   A.    No.

20   Q.    Okay.  And there were no discussions of which you were

21   aware -- that you can recall now about the licensing

22   provision in that agreement; is that correct?

23   A.    Correct.

24   Q.    Okay.  I want to now take you up, if I could, to the

25   2000 Novation.

1              Are you aware of a document called the

2    2000 Novation?

3    A.    Yes.

4    Q.    And did you work on the 2000 Novation?

5    A.    Yes.

6    Q.    And What was your role in connection with the

7    2000 Novation?

8    A.    Can you tell me where it is so I can remember?

9    Q.    I believe it is Exhibit Number 9.

10   A.    I drafted it.

11   Q.    Okay.  And in connection with drafting the 2000

12   Novation, did you work with Gary Stiffelman and Joel Martin?

13   A.    In 2000 -- I believe so.

14   Q.    Okay.  Did you have conversations with Mr. Martin in

15   connection with the 2000 Novation?

16   A.    Probably.

17   Q.    Okay.

18   A.    I don't know.

19   Q.    Do you recall your conversation or changes to the

20   2000 Novation, as you sit here now?

21   A.    No.

22   Q.    Okay.  Do you know who Joel Martin is?

23   A.    Yes.

24   Q.    And how long have you known Mr. Martin?

25   A.    Probably since '98, or whenever we started with F.B.T.

```
 1    Q.   And did you have a good business relationship with

 2    Mr. Martin?

 3    A.   Uh-huh.

 4    Q.   Okay.

 5              THE COURT:  Is that a "yes"?

 6              THE WITNESS:  Yes.

 7    BY MR. BUSCH:

 8    Q.   And you considered him honest in your dealings with him?

 9    A.   I don't know.

10    Q.   Is that a "yes"? "no"? "maybe"?

11    A.   Maybe.  I don't know.  I never thought about it.

12    Q.   Okay.  Now, looking at the 2000 Novation, and I want to

13    look at Exhibit 9-K in your binder.  And I would like you to

14    turn to Paragraph 6-E, if we could.

15    A.   In 9-K there is no 6-E.

16    Q.   Paragraph 6.

17    A.   Yeah.

18              MR. BUSCH:  Can you put it up on the board, please.

19    BY MR. BUSCH:

20    Q.   And could you look at -- just get it in front of you.

21    Look at it, if you would.

22              Also look at Paragraph 7, if you would.

23    A.   Uh-huh.

24    Q.   And then what I'd like you to do if you would,

25    Ms. Rogell, is look at Exhibit Number 880.
```

```
 1                MR. BUSCH:  Could you bring 880 up next to it.

 2                THE WITNESS:  That's the same paragraph in there.

 3       BY MR. BUSCH:

 4       Q.   Well, look at the first page of Exhibit 880 first.

 5       A.   It's a letter.

 6       Q.   From you to Joel and Gary.

 7                Do you see that?

 8       A.   Uh-huh.

 9       Q.   And it says:

10                "Dear Joel and Gary, Enclosed please find

11                redlined Pages 4 and 7 of the above-referenced

12                agreement marked to reflect the changes made

13                thereto pursuant to Joel's comments to the last

14                draft."

15                Do you see that?

16       A.   Uh-huh.

17       Q.   Okay.  I'm sure it being --

18                THE COURT:  I'm sorry?

19                THE WITNESS:  Yes.

20                THE COURT:  Thank you.

21       BY MR. BUSCH:

22       Q.   I'm sure it being many years since that conversation,

23       you don't have a recollection of what Joel's comments were?

24       A.   No.

25       Q.   Okay.  If you look at the draft, however, that is
```

1    attached to it -- and I want you to specifically look at

2    Paragraph 6, and there is an underline.

3             And it says:

4                 "Furthermore, it is agreed that the foregoing

5             fractions of the applicable royalty rate shall also

6             be applied to any advances or fees payable to

7             artists in connection with any ancillary uses of

8             each master recording."

9             Do you see that?

10   A.   Yes.

11   Q.   Okay.  Do you have recollection of -- of the

12   conversation that led to that change being made?

13   A.   No.

14   Q.   Okay.  Mr. Stiffelman testified that Joel was concerned

15   that there be certain uses of the master for which F.B.T.

16   would not be paid, and he requested broad language to be used

17   to make sure F.B.T. was being paid for everything.

18             Does that sound -- does that refresh your

19   recollection about the conversation that led to this being

20   added?

21   A.   No.

22   Q.   Okay.  So you don't have any recollection of any

23   discussion -- or you don't have a recollection of how this

24   got in; is that correct?

25   A.   No.

1   Q.   Okay.  And if you go back and look at Exhibit

2   Number 879, if you would.

3   A.   Uh-huh.

4   Q.   You'll see this is a letter from Gary Stiffelman to you,

5   the first page.

6   A.   Uh-huh.

7   Q.   And if you'll look -- turn to Paragraph 6-E -- I'm

8   sorry.  7-E.  I apologize.

9   A.   Uh-huh.

10  Q.   And you'll see once again there's an underline

11  reflecting a change which says:

12              "In connection with LPs 3 through 7 and each

13          master recording recorded in connection therewith,

14          whether embodied thereon or not, i.e., the

15          following shall also be applicable to ancillary

16          uses of those master recordings."

17          Do you see that?

18  A.   Yes.

19  Q.   Is your testimony the same with respect to this edition

20  as it was before, that you have no recollection of how this

21  made its way into the agreement?

22  A.   Correct.

23  Q.   Okay.  And you don't recall what the conversations were

24  between yourself, Mr. Stiffelman, and Mr. Martin concerning

25  this; correct?

1  A.   Correct.

2  Q.   Okay.  And if I showed you any other changes along these

3  same lines, your answer would be the same?

4  A.   Correct.

5  Q.   Okay.  All right.  Now, I'd like to take you up --

6         You can put that document away or those documents

7  away.

8         And I'd like to take you up to the 2003 time

9  period, Ms. Rogell.

10        And in 2003, were you involved in negotiating a new

11  agreement between Eminem and Interscope Records?

12  A.   Yes.

13  Q.   Okay.  And what was your role in connection with that?

14  A.   I don't know if it was Interscope or Aftermath.

15  Q.   With Interscope or Aftermath, whichever it was with.

16  A.   The same.  You know, drafting.

17  Q.   And who did you report to in connection with that?

18  A.   Rand Hoffman.

19  Q.   Okay.  Now, in connection with that agreement, is it

20  your testimony, Ms. Rogell, that you did not suggest any

21  changes to -- well, let me back up for one second.

22        Were you aware in 2002 of an instruction by

23  Mr. Ostroff to make certain changes to recording agreements?

24  A.   No.

25  Q.   Neither Mr. Hoffman, Rand Hoffman, your boss, nor

1    Mr. Ostroff told you about any instruction to make changes

2    to form recording agreements at Interscope?

3    A.    I didn't change the form.

4    Q.    What's that?

5    A.    I wasn't changing the form.

6    Q.    That's not my question.

7    A.    No.

8    Q.    My question was were you aware of any instruction by

9    Mr. Ostroff or Mr. Hoffman in connection with your

10   negotiations of the 2003 agreement concerning changing

11   language in amended recording agreements to include specific

12   language about permanent downloads?

13   A.    I don't recall.

14   Q.    Okay.  And you testified at a deposition in this case

15   that language concerning -- that -- I showed you a new form

16   Interscope agreement.

17         Do you recall that at your deposition?

18   A.    Yeah.

19   Q.    And do you recall me showing you new form Interscope

20   agreement that had a specific provision about paying

21   records -- permanent downloads as record royalties -- record

22   sales?

23   A.    Yes.

24   Q.    Okay.  And do you recall your testimony that the reason

25   why that was not included in the Eminem agreement was because

1    your understanding was that the information contained in that

2    draft agreement only was to be included in new recording

3    agreements?

4    A.    Yeah.  There was a new form with new language.

5    Q.    And your explanation at your deposition for not

6    suggesting that it be included in the new Eminem's agreement

7    to Eminem's counsel was because your understanding was that

8    it only was supposed to be included in new recording

9    agreements, and this was not a new recording agreement;

10   correct?

11   A.    I'm not sure where that question went, but yeah.  I

12   think.

13   Q.    Okay.  Let me -- I want to make sure you understand my

14   question.

15              THE COURT:  Hold on.  I need to break.

16              MR. BUSCH:  Okay.

17              THE COURT:  And then you can resume again at 1:15.

18   I need to break a little earlier today, and then we're going

19   to come back at 1:15.  So we'll break from 11:45 to 1:15.

20              Again, remember not to discuss the case among

21   yourselves or with anyone else.  Do not form or express any

22   opinions about the case.

23              And we will see you at 1:15.

24              THE CLERK:  All rise.

25              (Whereupon the a.m. session was concluded.)