1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4   F.B.T. PRODUCTIONS, LLC,           )
                                       )
5                                      )
                                       )
6                     Plaintiffs,      )
                                       )
7                                      )
                                       )
8         Vs.                          )   No. CV 07-3314-PSG
                                       )
9                                      )
                                       )
10  AFTERMATH RECORDS, ET AL.,         )
                                       )
11                                     )
                                       )
12                    Defendants.      )
    ―――――――――――――――――――――――――――――――     )
13                                     )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                    *JURY TRIAL*

18               *DAY 4, A.M. SESSION*

19             LOS ANGELES, CALIFORNIA

20          THURSDAY, FEBRUARY 26, 2009

21  ―――――――――――――――――――――――――――――――――――――――――――――

22

23             MIRIAM V. BAIRD, CSR 11893
         OFFICIAL U.S. DISTRICT COURT REPORTER
24          255 EAST TEMPLE STREET, # 181-K
            LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2853
                 MVB11893@aol.com

1                    **A P P E A R A N C E S**

2


3   **IN BEHALF OF THE PLAINTIFF,**     RICHARD BUSCH
    **F.B.T. PRODUCTIONS:**             315 UNION STREET
4                                       NASHVILLE, TN 37201
                                        - and -
5                                       GLASER, WEIL, FINK, JACOBS
                                        & SHAPIRO, LLP
6                                       BY:  MARK L. BLOCK
                                        10250 CONSTELLATION
7                                       BOULEVARD
                                        NINETEENTH FLOOR
8                                       LOS ANGELES, CALIFORNIA
                                        90067
9

10

11

12


13  **IN BEHALF OF THE DEFENDANT,**    MUNGER, TOLLES & OLSON, LLP
    **AFTERMATH RECORDS, ET AL.:**     BY:  GLENN D. POMERANTZ
14                                           KELLY KLAUS
                                             MELINDA LEMOINE
15                                      355 SOUTH GRAND AVENUE
                                        THIRTY-FIFTH FLOOR
16                                      LOS ANGELES, CALIFORNIA
                                        90071
17

18

19

20

21

22

23

24

25

1                              <u>INDEX</u>

2     <u>WITNESS:</u>                                              <u>PAGE:</u>

3
      <u>Eddy Cue, witness introduced by videotaped</u>          8
4     <u>deposition</u>
      <u>Rand Hoffman, witness, sworn</u>                        8
5     DIRECT EXAMINATION                                        8
      CROSS-EXAMINATION                                        55
6     FURTHER DIRECT EXAMINATION                               58
      <u>Joel Martin, witness, sworn</u>                        61
7     DIRECT EXAMINATION                                       61
      CROSS-EXAMINATION                                       **72**

8                                   * * * * *

9

10    <u>EXHIBITS:</u>

11    Exhibit 874 received                                     59

12                                   * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6

 7    LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 26, 2009; 0900

 8                              ---

 9         THE COURT:  Good morning.  A couple of things.

10    Today we're going to be playing video depositions; correct?

11         MR. BUSCH:  Sure.

12         THE COURT:  I wanted to clarify with the parties

13    if the parties wanted the reporter to report the video

14    deposition.  And the reason I point that out is if the court

15    reporter reports it, it may be different than the original

16    transcript because we're dealing with people, and they hear

17    things differently.  So we can either have the reporter

18    report it or have the reporter not report it, and the parties

19    can present by stipulation what the testimony is that was

20    presented.

21         MR. BUSCH:  The latter is fine, Your Honor.

22         THE COURT:  All right.  So it --

23         MR. POMERANTZ:  We agree.

24         THE COURT:  Okay.  The reporter won't report it.

25    You'll submit the transcripts that were played to the jurors,
```

1    and you'll mark them somehow and make them part of the

2    record.

3              Okay.  Anything else?

4              MR. BUSCH:  The only thing is, Your Honor, we have

5    exhibits that there is no foundational objection to them.

6    We'd like to move some exhibits into evidence.

7              THE COURT:  Just give me one moment.

8              MR. BUSCH:  There are other -- they have objections

9    under 402 or different objections, but we -- we would like to

10   move some exhibits in evidence.

11             THE COURT:  All right.  Go ahead.

12             MR. BUSCH:  Okay.  We'd like to move into evidence

13   Exhibit Number -- excuse me, Your Honor -- 61, Exhibit

14   Number --

15             THE COURT:  Hold on a second.

16             So are these now exhibits that are not being

17   objected or -- what is the objection, if there is?

18             MR. POMERANTZ:  Your Honor, this is the first I've

19   heard of this; so I don't know.  I guess what I would ask is

20   that Mr. Busch list ones that he wants, and then unless

21   there's some reason why we have to deal with it today, I'd

22   like to have overnight to look at it, and then we can address

23   it, if necessary, tomorrow morning.

24             THE COURT:  Is it something you want to publish

25   today?

1          MR. BUSCH:  Well, that's the thing is that if we

2     get to it.  I'm not sure how far we're going to get today,

3     and if we get -- like, for example, there are exhibits

4     that -- there are some going to be published today -- or

5     potentially be published today.  And if we get to Gary Cohen,

6     who is our economic expert, and then Joel Martin, who will be

7     testifying today, there may be some exhibit entries in the

8     accounting statements, the royalty statements, that would

9     be --

10          THE COURT:  Well, let's do this.

11          Are there any exhibits that you want to publish

12     this morning that have not been admitted?

13          MR. BUSCH:  Yes, Your Honor.

14          THE COURT:  Okay.  Which ones are those?

15          MR. BUSCH:  Those would be the ones that relate

16     to the deposition of Ethan Gustav, and I'll be publishing

17     both in that sense, and then also in connection with

18     Mr. Weinberg's testimony.  And those would be Exhibit Numbers

19     109, 110, 111, 112, 113, 114, 115, 116, 118, 119, 120, 121,

20     122, 123, and 124.

21          MR. POMERANTZ:  Your Honor, as to those exhibits,

22     he had said -- Mr. Busch said they would be relevant and used

23     in the video deposition of Mr. Gustav the and deposition of

24     Mr. Weinberg.  As we discussed the schedule this morning,

25     we'll start with Mr. Cue's deposition, which will go --

 1  a video deposition.  It will go for about 30 minutes, I think

 2  is what we anticipated.  Then there's Mr. Hoffman live, and

 3  then there's Mr. Martin live.  If we can take a break at

 4  least by the end of Mr. Martin, and maybe before depending

 5  on how long Mr. Hoffman goes, at least then we can look at

 6  these exhibits during a break and then come back and deal

 7  with them.

 8          THE COURT:  That's fine.  I just want you

 9  to make -- once we start, I want it to flow.

10          So are there any object -- I mean, before we get to

11  that break, are there any exhibits that we can deal with that

12  we have to deal with now?

13          MR. POMERANTZ:  I don't -- if it's only relating to

14  Mr. Gustav and Mr. Weinberg, I think the answer is no.

15          THE COURT:  Okay.  Are there any that -- are there

16  any that you're going to need before the first break?  And

17  then we can just deal with this over the break.  I just want

18  to get started.

19          MR. BUSCH:  I don't believe so, Your Honor.

20          THE COURT:  Okay.  So we'll deal with this during

21  the break.  And then --

22          Let's get started.

23          Let's bring the jurors out.

24          Mr. Busch, you're starting with Mr. Cue.

25          The courtroom is ordered closed during the

```
 1    deposition of Mr. Cue.
 2              (Open court - jury present.)
 3              THE COURT:  Good morning.
 4              Plaintiffs' next witness.
 5              MR. BUSCH:  We will call Eddy Cue by deposition,
 6    Your Honor.
 7              THE COURT:  You may.
 8        Eddy Cue, witness introduced by videotaped deposition
 9              (Whereupon, the videotaped deposition of Eddy Cue
10              was played and not reported subject to
11              stipulation.)
12              MR. BUSCH:  That's all we have, Your Honor.
13              THE COURT:  Okay.  Plaintiffs' next witness.
14              MR. BUSCH:  Rand Hoffman, Your Honor.
15              THE COURT:  The courtroom is ordered reopened.
16                    Rand Hoffman, witness, sworn
17              THE CLERK:  For the record, sir, please state your
18    full name and spell your last name.
19              THE WITNESS:  Rand Hoffman, H-O-F-F-M-A-N.
20              THE COURT:  You may inquire.
21                        DIRECT EXAMINATION
22    BY MR. BUSCH:
23    Q.   Good morning, Mr. Hoffman.
24              Mr. Hoffman, what is your position?
25    A.   I'm head of business and legal affairs for
```

1   Interscope/Geffen/A&M Records.

2   Q.   Okay.  So you're an attorney?

3   A.   I am.

4   Q.   Okay.  And how long have you been employed in that

5   position?

6   A.   Since the beginning of 1999.

7   Q.   Okay.  So you were not involved in the 1998 recording

8   agreement between Aftermath Records and F.B.T. and Eminem; is

9   that correct?

10  A.   No.  I didn't work there then.

11  Q.   Okay.  Mr. Hoffman, do you have an understanding of

12  Interscope's relationship with Aftermath?

13  A.   Yes.  I believe I do.

14  Q.   And does Interscope currently own Aftermath?

15  A.   Interscope owns a share of Aftermath, not the whole

16  thing.

17  Q.   What percentage?

18  A.   The way it is set up for different artist agreements and

19  different masters different shares are owned.  Some of it is

20  50/50.  Some of it is 75/25.  Some of it is 100/0.

21  Q.   100 for Interscope?

22  A.   For some masters, yes.

23  Q.   Okay.  And in connection with the Eminem masters?

24  A.   Some of them are owned 75/25, and I think some of them

25  are now owned 100/0.

```
1    Q.   By Interscope?

2    A.   Yes.

3    Q.   Okay.  The song "Lose Yourself," do you know what the

4    percentage of Interscope is on it?  "Lose Yourself."

5    A.   I'm not 100 percent certain, but I don't think "Lose

6    Yourself" came in through Aftermath because I believe it was

7    part of the Eight Mile soundtrack, which is not an Aftermath

8    record.

9    Q.   My question to you is do you know what Interscope owns

10   of "Lose Yourself"?  And we'll get to that in a second.

11   A.   No.  I'm sorry.  I'm sorry.

12   Q.   What does Interscope own of "Lose Yourself"?

13   A.   I believe we own 50 percent.

14   Q.   Isn't it true that you have an agreement with a company

15   called Shady Records that as between you and Shady,

16   Interscope owns 100 percent of "Lose Yourself"?

17   A.   I'm sorry.  We're getting tangled in like Shady and

18   what kind of Shady there is.  I believe that Shady, the

19   relationship, co-owns it 50/50.

20   Q.   What I'm asking you is -- first of all, let me ask you

21   this.

22            Does Interscope own a portion of an entity called

23   Shady Records?

24   A.   Yes.

25   Q.   Okay.  And what portion of Shady Records does Interscope
```

1   own?

2   A.   Of Shady Records, the business, we own 50 percent.

3   Q.   Okay.  And what I want to ask you, sir, is do you have

4   an agreement with Shady Records that Eminem masters that

5   appear on a Shady Records release would be owned by

6   Interscope as opposed to Shady?  Do you have that agreement

7   with Shady Records?

8   A.   I don't recall exactly what the agreement says.  I

9   remember there's an agreement, and -- but I don't recall

10  exactly how the -- there's an entity called Shady Records,

11  Inc., and then there's Shady Records, the business.  Those

12  are two different things.  Shady Records, Inc., I don't think

13  owns the masters, but the Shady Records business I think

14  co-owns it, I believe.  I'm not -- I would have to look back

15  at it.

16  Q.   And Interscope owns 50 percent of Shady; is that

17  correct?

18  A.   Yes.

19  Q.   Okay.  Now, under -- you're familiar with the terms of

20  the 1998 recording agreement between Aftermath and F.B.T.; is

21  that correct?

22  A.   Yes.  I believe I am.

23  Q.   Okay.  And Interscope Records is the distributor for

24  Aftermath per that agreement; correct?

25  A.   Yes.  Interscope.  We also have -- you know, we

1    distribute through U.M.G.D.  But as between Interscope and

2    Aftermath, yes.  Interscope.

3    Q.    Okay.  So the jury can understand this, I just want to

4    make this very clear.

5            You and -- Interscope is a division -- what's

6    called an unincorporated division of Universal; is that

7    correct?

8    A.    Yes.  Universal Music Group is a collection of

9    businesses under different brands.  Interscope is one of

10   those.  Motown is one of those.  Music Publishing Division

11   is one of those, yes.

12   Q.    I want you to please answer my question.

13           Interscope is an unincorporated division of U.M.G.

14   recordings; isn't that correct?

15   A.    Yes.

16   Q.    Okay.  And Aftermath is owned by Interscope, you said

17   for some masters 100 percent, for some 75 percent, and for

18   some 50 percent as it related to Eminem; correct?

19   A.    I think you said two different things.  Aftermath is not

20   owned by Interscope.  Some of the masters that come out on

21   records that say Interscope, now some of those masters are

22   owned by Interscope and some of them aren't, yes.

23   Q.    Okay.  Let's back up for one second because I want to

24   make sure this is clear.

25   A.    Yes.

1    Q.    Interscope owns Aftermath; isn't that correct?

2    A.    No.

3    Q.    What portion of Aftermath does Interscope own?

4    A.    It depends on the recording.  We have a relationship

5    that says we will co-own various artists and various masters

6    in varying percentages.

7    Q.    So as of -- does U.M.G. have an ownership in Aftermath?

8    A.    Well, I don't want to be overly technical, but as we

9    just said, since Interscope is an unincorporated division

10   of U.M.G., I guess, technically, yes, as a legal matter.

11   Q.    Okay.  And isn't it true that in 2002 or 2003 -- and

12   I want to understand this transaction -- that Interscope

13   purchased part of Dr. Dre's interest in Aftermath?

14   A.    No.  Not in 2002-2003.

15   Q.    What year?

16   A.    There have been a couple of transactions.  There was

17   a transaction in 2000 in which Interscope purchased some

18   masters that Aftermath owned -- or a portion.  I'm sorry.

19   A portion of some masters.  And then there was another

20   transaction in 2005 involving a purchase of some masters.

21   Q.    And Eminem masters were part of that purchase?

22   A.    Which one?

23   Q.    Either.

24   A.    In 2000, yes.  That's my recollection.  And in 2005,

25   yes.

| | |
|---|---|
| 1 | Q.   Okay.  So as it relates to the Eminem masters recorded |
| 2 | under the Aftermath agreements -- the 1998 Aftermath |
| 3 | agreements and the 2003 Aftermath agreements and the 2000 |
| 4 | Novation, which we've also talked about -- are there any |
| 5 | masters recorded under those agreements that Interscope does |
| 6 | not have an ownership interest as of now? |
| 7 | A.   No.  I don't believe so. |
| 8 | Q.   And as you said a moment ago Interscope owns 50 percent |
| 9 | of Shady; is that correct? |
| 10 | A.   Yes.  Shady as the business.  Not Shady Records, Inc., |
| 11 | but Shady, the business. |
| 12 | Q.   And you mentioned a moment ago, the *Eight Mile* -- the |
| 13 | Eminem soundtrack that was for the *Eight Mile* movie. |
| 14 | You mentioned that a moment ago; correct? |
| 15 | A.   Yes, I did. |
| 16 | Q.   Okay.  And the masters that were recorded under that |
| 17 | agreement, in your view, is owned 50 percent Shady and |
| 18 | 50 percent Interscope? |
| 19 | A.   In my view, yes, because that's how the profits are |
| 20 | shared. |
| 21 | Q.   And you don't recall now whether there's an agreement |
| 22 | between Interscope and Shady that says that any masters |
| 23 | recorded or produced by Eminem as between Shady and |
| 24 | Interscope would be technically owned by Interscope and |
| 25 | not Shady? |

1              You don't recall that?

2    A.    I'm not trying to be argumentative.  Don't hear it this

3    way, but we're getting confused -- I'm getting confused

4    between Shady Records, Inc., which we don't own, and Shady

5    the business.  In my head, when I think of ownership I'm

6    basically thinking how the money is split and not who

7    technic- -- whether -- what -- what Shady entity or

8    Interscope entity technically owns it.  And the business is

9    a 50/50 split of the profits; so that's how I think of it.

10   Q.    What I'm asking you is a different question.  My

11   question is not the 50/50 split of income.

12              What I'm asking you is -- Interscope has an

13   agreement with Shady Records or Shady, Inc., whichever one.

14              And what I'm asking you is as between Interscope

15   and either Shady Records or Shady, Inc., do you know whether

16   there's an agreement that says despite the fact that we might

17   split revenue 50/50, Interscope is the owner of the masters?

18   A.    No.  As I -- no.  I don't recall exactly what it says.

19   Q.    Okay.  Okay.  A moment ago I asked you -- you began at

20   Interscope in 1999; is that correct?

21   A.    Yes.

22   Q.    But you'd been in the music business for many years

23   before then; correct?

24   A.    Yes.  Since 1981.  I started at C.B.S. Records.

25   Q.    Okay.  So you've been a lawyer involved in the record

1    business since 1981; is that right?

2    A.    Yes.

3    Q.    Okay.  And it's your testimony in this case, is it not,

4    that with respect to provisions in recording agreements, that

5    the lawyers for the record companies purposely draft

6    provisions broadly, is it not?

7    A.    I haven't testified yet, but if you're asking me do I

8    believe that, do I believe that we purposely draft them

9    broadly, that's such a broad question.  Some things we draft

10   narrowly; sometimes some things we draft broadly.

11   Q.    Okay.  You have testified before.

12         I met you, and you testified in a deposition where

13   I questioned you; isn't that right?

14   A.    Oh, definitely, we had a deposition.

15   Q.    Okay.  So you realized you were under oath, and you

16   testified at that deposition; correct?

17   A.    Of course.

18   Q.    Okay.  And isn't it correct that you said at that

19   deposition that the master license provision of recording

20   agreements is purposely drafted broadly?

21   A.    I don't remember that specific thing.  It's possible.

22   You know, it's not something I wouldn't say; so I'm not

23   disagreeing with you.  I don't remember.

24   Q.    You don't disagree with that statement?

25   A.    That the master license provision in the Eminem

1    agreement, is that what you said, was drafted broadly?

2    Q.    What I asked you do you agree with the statement that

3    the master license provision in recording agreements are

4    purposely drafted broadly by the record companies, yes or no?

5           Do you agree with that statement?

6    A.    Yeah.  I think that's true.

7    Q.    Okay.  And it's also your testimony, Mr. Hoffman, that

8    by 1998 record companies knew that digital downloads would be

9    a form of exploitation; correct?

10   A.    Yes.

11   Q.    Mr. Hoffman, I'd like to speak to you for a moment about

12   the 2000 Novation, which we've talked about in this case.

13   That was an agreement where F.B.T. and -- well, let me back

14   up one second.

15          That was an agreement where the agreement was

16   amended -- the '98 agreement was amended so that Eminem and

17   Aftermath had a direct relationship; correct?

18   A.    Yes.  That's true.

19   Q.    Okay.  Were you involved in those negotiations or were

20   those done primarily by Lisa Rogell?

21   A.    I was involved.

22   Q.    Okay.  Do you have any recollection of conversations

23   concerning that agreement?

24   A.    Yes, I do.

25   Q.    Okay.  And can you tell me what recollection you have

1    about conversations with respect to that agreement?

2    A.    Eminem came from nowhere, and that first album was a

3    fabulous success.  It was very exciting for all of us.  And

4    as is customary in the record business, when someone has

5    success you wind up renegotiating.  Even though you have a

6    contract, you wind up with more than they would otherwise be

7    entitled to.  So that was the background.

8            And then Eminem and F.B.T. came in together and

9    said that they had agreed between them that they would --

10   that F.B.T. would become a passive royalty participant and

11   that we would have a direct agreement with Eminem and that we

12   could negotiate with the Eminem part of that, giving him more

13   money.  So we did an agreement that was consistent with that

14   we agreed to pay a large advance, all or most of which went

15   to Eminem as opposed to F.B.T., we agreed to set up the

16   royalty as two separate streams.

17   Q.    You keep talking about giving Eminem money, which was --

18   and then you used the word "advance."

19           Aren't advances recoupable by the record company?

20   A.    Yes.  But they don't usually recoup.

21   Q.    What about with Eminem, have you recouped?

22   A.    No.

23   Q.    Not all of it?

24   A.    No.

25   Q.    Did you recoup the advances from 1998?

1    A.    No.

2    Q.    Not any of it?

3    A.    Oh, wait a minute.  From 1998, yes.  He had a new artist

4    deal in 1998, and then he had a wonderful platinum album.

5    We've never recouped since, as far as I can recall.

6    Q.    100 percent?

7    A.    100 percent what?

8    Q.    How much of the money that you've advanced Eminem have

9    you recouped from the 2000 Novation?

10   A.    Advances that you give at different times are all put in

11   one pot, and royalties from different times are all together.

12   We've never been in a recoup position with Eminem since 2000,

13   I believe.

14   Q.    Okay.  But you don't know exactly what that amount would

15   be of unrecouped advances?

16   A.    I know how unrecouped he is now.

17   Q.    Well, I'm talking about in 2000.

18   A.    Yeah.  He's unrecouped 6 and a half million, something

19   like that.

20   Q.    And does that include advances you've given since then?

21   A.    Oh, yes.

22   Q.    From 2000, do you know if that money was recouped?

23   A.    You don't recoup in order.  It doesn't work that way.

24   Q.    Do you know -- do you know if Universal has made that --

25   what has Universal made on Eminem albums?

```
 1   A.   I don't have that number at my fingertips.

 2   Q.   10 million?  50 million?  100 million?

 3   A.   I can't speculate.  But, you know, of course, a lot of

 4   money.

 5   Q.   How much?

 6   A.   I don't have a number --

 7   Q.   Well, you just said you were unrecouped.  So I want to

 8   know what Universal has made on Eminem.

 9   A.   And I understand what you're asking --

10        MR. POMERANTZ:  Your Honor --

11        THE COURT:  Hold on.

12        Mr. Busch, slow down.

13        MR. BUSCH:  Okay.

14        THE WITNESS:  I understand what you're saying.

15   I don't know how much we've made.

16   BY MR. BUSCH:

17   Q.   Is it more than $50 million?

18   A.   I don't know how much we have made.  I don't want to

19   hazard -- I'm not going to hazard -- I would prefer not to

20   hazard a guess.

21   Q.   What I want to know from you, Mr. Hoffman --

22        THE COURT:  Mr. Busch, you're going to make a

23   request at the end of the day, and you're going to lose that

24   request.

25        MR. BUSCH:  Okay.
```

```
 1   BY MR. BUSCH:
 2   Q.   You can't say whether it's one million or $100 million
 3   or anything in between?
 4            THE COURT:   That's been asked and answered.
 5   BY MR. BUSCH:
 6   Q.   I want to talk to you now about -- is there any specific
 7   conversations you remember about the 2000 Novation, beyond
 8   what you just said?
 9   A.   Beyond what I just said?  Not that come to mind right
10   now.
11   Q.   Do you have a recollection of any word changes that were
12   made during the drafts of the 2000 Novation?
13   A.   Well, I remember we changed words.  I would have to look
14   back at the existing ones.  But I -- we turned that 1998
15   agreement, which was with F.B.T., into the agreement that
16   you -- that has F.B.T. and Eminem as separate royalty
17   participants.  Of course we had to change words.
18   Q.   Did you have any conversations with Joel Martin during
19   the negotiations for the 2000 Novation?
20   A.   I would guess so, but I don't have a particular
21   conversation that I can remember.
22   Q.   What about with Gary Stiffelman?
23   A.   Yes.
24   Q.   Do you have any specific conversations you remember with
25   Gary Stiffelman about the 2000 Novation?
```

```
 1    A.    Well, the conversations that I was referring to in which
 2    we agreed to the basic structure, in which we agreed to the
 3    basic advances and royalty rates.
 4    Q.    Okay.  I want to go now to the 2003 time period, 2002,
 5    2003.
 6          And in 2002, isn't it true that Michael Ostroff
 7    issued a memo regarding how Universal would pay for permanent
 8    downloads?
 9    A.    Yes.
10    Q.    Okay.  And that instruction in 2002 was that Universal
11    should -- in addition to changing the royalty structure
12    should go -- should request of artist representatives who
13    have existing contracts to amend those contracts to put that
14    specific royalty provision in those contracts; isn't that
15    correct?
16    A.    No.  Not requests.  We were asked -- told we should
17    offer to do it because it was an improvement.  We were going
18    to pay it that way anyway, and we were told for our -- we
19    were trying to build up a coalition with our artists to stop
20    piracy and support downloads that people would pay for.  So
21    we were instructed to offer to them that we could write down
22    this more favorable way of paying with no container
23    deduction, no new medium reduction.  We could offer -- we
24    were going to do that, whether it was written or not.  So if
25    anybody wanted to have it in writing that was a benefit to
```

1    them.  So we were instructed to offer that.

2    Q.   You were instructed -- just so that we're clear on

3    the record.  You were instructed to offer to artist

4    representatives to amend existing contracts to include a

5    provision about how permanent downloads would be accounted;

6    correct?

7    A.   Yes.

8    Q.   Okay.  And in this case when you were deposed, do you

9    recall me pointing out to you that the 2003 Eminem agreement

10   did not contain such a provision?

11        Do you recall?

12   A.   Oh, definitely.  I know it doesn't contain that.

13   Q.   And wasn't it your testimony under oath at that time

14   that the reason that it did not contain the amended royalty

15   provision was because your instruction was to only include

16   that provision in agreements you were drafting from scratch?

17   A.   I don't know.  Gary Stiffelman and I agreed that we

18   weren't going to make changes that weren't necessary in the

19   2003 --

20   Q.   You have to listen to my question.

21   A.   I'm sorry?

22   Q.   Wasn't it your testimony under oath -- and, by the way,

23   isn't it correct at the time that you didn't know that I had

24   the Ostroff memo that detailed the suggestion?

25        MR. POMERANTZ:  Objection, Your Honor.  It's

1  argumentative and it also misstates facts as part of the

2  discovery in this case, and Your Honor has already ruled as

3  to that.

4          MR. BUSCH:  That's mischaracterized.  That's

5  absolutely untrue.

6          MR. POMERANTZ:  Your Honor, we had a -- we had a

7  motion on this part of the trial.

8          THE COURT:  Sidebar.

9          (Sidebar discussion.)

10          MR. BUSCH:  It's one thing for me not to say they

11  didn't produce it.  That was the motion.  It's another thing

12  for me not to be able to say to him, "You didn't know I had

13  it at the time."  That's two different things.  The motion

14  was I'm not supposed to say they didn't produce it.  I'm not

15  going to say they didn't produce it.  To impeach this witness

16  to show he's lying because he didn't understand I had a

17  document that now he knows I have so he can change his

18  testimony, that's pure impeachment.  That's different.

19          THE COURT:  Mr. Pomerantz?

20          MR. POMERANTZ:  In the motion that we briefed

21  before trial we laid out the fact that their discovery

22  request and our objection to that request did not call for

23  this document by asking the question the way it's framed.

24  He's suggesting that there is something surreptitious going

25  on here.  The witness knows that there is discovery in this

1  case.  He doesn't know what documents are produced or not

2  produced.  He's not involved in that process.  He's trying to

3  get an implication here that something was hidden or that the

4  witness knows what was produced and what was not produced in

5  the case.  That would be improper because it would require us

6  to go to the discovery process.

7            MR. BUSCH:  I can ask him, you were not presented

8  at your deposition with that memo; correct?

9            THE COURT:  That's a different question.

10           MR. BUSCH:  The question I just asked is the same

11  thing.  I am not asking what document is produced.

12           THE COURT:  I think that question just asked is the

13  proper question.

14           MR. BUSCH:  I'll ask that question.

15           THE COURT:  I think the proper question -- and you

16  didn't know I had it.  You didn't know when I had it or not?

17  That's --

18           MR. BUSCH:  As to his state of mind.

19           THE COURT:  You may ask that question.

20           MR. BUSCH:  Thank you.

21           (End of sidebar discussion.)

22  BY MR. BUSCH:

23  Q.   Mr. Hoffman, at your deposition I did not present you

24  with the Ostroff memorandum detailing the change in policy;

25  isn't that correct?

```
 1   A.    I don't think so.  I don't recall, but I don't think so.
 2   Q.    Okay.  And I didn't question you about it at your
 3   deposition; correct?
 4   A.    Yes.
 5   Q.    Okay.  You didn't know whether I had it or not; isn't
 6   that correct?
 7   A.    I don't remember.
 8   Q.    Okay.  And your testimony under oath at your deposition
 9   was that the reason that the Eminem agreement was not amended
10   to include a provision saying that licenses for permanent
11   downloads would be paid at the record royal rate was because
12   you said that the instruction by Mr. Ostroff was to only
13   include that in agreements drafted from scratch; isn't that
14   correct?
15   A.    I think we talked about it at the deposition that we
16   were putting it in new agreements drafted from scratch.  I
17   think so.
18         MR. BUSCH:  Your Honor, I'd like to play his
19   deposition testimony for impeachment.
20         MR. POMERANTZ:  Well, Your Honor, can we have the
21   cite?
22         THE COURT:  First, page and line.
23         MR. BUSCH:  Okay.  146, Line 4 through Line 16.
24         MR. POMERANTZ:  Two things, Your Honor.  First,
25   I don't believe the answer is inconsistent.
```

```
 1            THE COURT:  It is not inconsistent.  You may not
 2   read.
 3            MR. BUSCH:  Your Honor, may I be heard on this?
 4            THE COURT:  No.
 5   BY MR. BUSCH:
 6   Q.  Isn't your testimony, Mr. Hoffman, that a decision was
 7   made that when you were drafting from scratch this is what
 8   you would do?
 9            MR. POMERANTZ:  Objection, Your Honor.  He just
10   asked -- that question was answered.
11            THE COURT:  Sustained.
12   BY MR. BUSCH:
13   Q.  Was your understanding that the agreement, the change
14   in the agreement was only to be included when drafting an
15   agreement from scratch?
16            MR. POMERANTZ:  Same thing, Your Honor.
17            THE COURT:  Asked and answered.
18            MR. BUSCH:  Your Honor --
19            THE COURT:  No.  Next question.  Don't argue.
20   BY MR. BUSCH:
21   Q.  Mr. Hoffman, was it the policy of Universal that in all
22   new artist agreements the record royalty provision was to be
23   included concerning digital downloads?
24   A.  We changed our form, if that's what you mean, yes.  When
25   we would issue our new form we had new language.
```

1    Q.    And isn't it true that Mr. Stiffelman, during -- or

2    isn't it true that during the negotiations for the 2003

3    agreement you actually did ask Mr. Stiffelman to include the

4    record royalty provision in the new form, in the new Eminem

5    contract?

6    A.    No, I did not.  It was unnecessary.  We had -- Gary and

7    I agreed that we would only change the existing agreement for

8    the specific money points that we discussed and wouldn't make

9    other changes just to clarify things.  So no, we never

10   discussed it.

11   Q.    So if Mr. Stiffelman said that you did, that would not

12   be true?

13   A.    Correct.  I believe -- I love Gary, but I think he's

14   misremembering if that's what he said.

15   Q.    Let me just get something straight, though.

16         You had an order from Mr. Ostroff -- is Mr. Ostroff

17   your boss?

18   A.    I have a dotted line to Michael.  I report up through

19   the Interscope structure, but I have the dotted line to

20   Michael because he's the most senior business person at

21   Universal.

22   Q.    Okay.  So you had an instruction from Mr. Ostroff to

23   amend agreements to include the -- a provision that says that

24   when Universal licenses downloads that it will be paid under

25   a record royalty provision as amended.

1          You had that instruction from Mr. Ostroff; correct?

2          MR. POMERANTZ:  Your Honor, we're retreading the

3    same grounds.

4          THE COURT:  Asked and answered.

5    BY MR. BUSCH:

6    Q.   That provision -- that instruction that you received

7    from Mr. Ostroff was not followed up -- it was not included

8    in the final 2003 Eminem contract; is that correct?

9          MR. POMERANTZ:  Same objection, Your Honor.

10         THE COURT:  Sustained.

11   BY MR. BUSCH:

12   Q.   The two -- at -- the master license provision of the

13   2003 agreement was unchanged.

14         Is that fair to say?

15   A.   Unchanged from what?

16   Q.   The '98 agreement.

17   A.   Yes.

18         MR. BUSCH:  Okay.  Can you pull up Exhibit

19   Number 13.

20         THE WITNESS:  Is that something that's in this book

21   that I should have here?  Excuse me.

22         THE COURT:  You'll be presented in a moment.

23   BY MR. BUSCH:

24   Q.   Yes.  Exhibit 13.  It's in that book.

25         If you would please turn to 24 of the exhibit,

 1    I should say.

 2    A.    Yes.

 3    Q.    And do you recognize this agreement and this part of

 4    the agreement as the form agreement that was changed by

 5    Interscope in 2003?

 6    A.    I believe so, yes.

 7    Q.    Okay.  And it's your testimony, is it not, that at the

 8    section that is C(1)(i) --

 9              MR. BUSCH:  If you could bold that.

10    BY MR. BUSCH:

11    Q.    It's your testimony, is it not, that that provision was

12    added in order to avoid claims that licenses for digital

13    downloads should be paid under the master lining provision?

14    A.    That that's why we added it?

15    Q.    That's one reason.

16    A.    It's one reason.  We basically added it because we were

17    paying more favorably than we had to, and we wanted to make

18    that clear.

19    Q.    Okay.  You were paying more favorably if the downloads

20    were paid as record sales.

21              If you had to pay 50 percent of your receipts, it

22    would not be more favorably; correct?

23    A.    But we didn't have to pay 50 percent of our receipts.

24    We didn't think of it that way.

25    Q.    You -- Mr. Hoffman, you just said a moment ago that one

1    of the reasons that that provision was added was a concern

2    that an artist would claim that the digital download

3    agreements were licenses and would want to be paid 50 percent

4    of receipts.  That was one reason.  You just said that.

5    A.    Of course.  Clarity is always, you know, to our

6    advantage -- You know, to everybody's advantage, not our

7    advantage.  Clarity is better.

8    Q.    Okay.  And in connection with -- so with respect to this

9    provision then, when you say that you were paying more

10   favorably, just to make it very clear, it's more favorable if

11   the -- if the digital download licenses fall under the record

12   royalty provision; it's not more favorable to Universal if

13   Universal has to pay net receipts under the master licensing

14   provision; is that correct?

15   A.    Right.  Because everybody we know we were paying it as

16   a record.  This was getting rid of the container deduction,

17   getting rid of the new medium deduction.

18   Q.    Okay.  Mr. Hoffman, following -- by the way,

19   following -- and this change was made in early 2003 to the

20   Interscope agreement; isn't that correct?

21   A.    I'm not certain, but I think so.

22   Q.    Okay.  And so the Eminem agreement -- the new Eminem

23   agreement was June of 2003; correct?

24   A.    Yeah, I think so.

25   Q.    Okay.  So the Interscope form, just to be clear, was

```
 1    amended prior to the Eminem agreement; correct?
 2    A.    I think so, yes.
 3    Q.    Okay.  And after the Eminem agreement was entered into,
 4    did you receive an e-mail from Gary Stiffelman about
 5    permanent downloads and how Universal was paying for them
 6    for Apple, for example?
 7    A.    Yes.
 8    Q.    Okay.  And it's your testimony under oath that you made
 9    it clear to Gary Stiffelman -- well, that this issue --
10               Let me back up one second.
11               Let me just show you Exhibit Number 19.  If you
12    could turn to Exhibit Number 19 in your binder, please.
13    A.    Yes.  I have it.
14    Q.    Okay.
15               MR. BUSCH:  Could you put that up on the screen,
16    please.
17    BY MR. BUSCH:
18    Q.    So on October 26th, of 2003, Mr. Stiffelman sent you an
19    e-mail saying that Paul --
20               Do you know who Paul is?
21    A.    Paul Rosenberg.
22    Q.    Asked for a breakdown how the 99 cents Apple makes is
23    divvied up, and you responded with the following e-mail; is
24    that correct?
25    A.    Yes.
```

1    Q.    Okay.  And you said we are selling the tracks to Apple

2    at a current wholesale of 70 cents, and then Apple resells

3    them; correct?

4    A.    Yes.

5    Q.    Okay.  And then you went on in the e-mail to explain the

6    no container deduction and so forth; correct?

7    A.    Exactly.

8    Q.    Okay.  Now, if you would turn in your binder to Exhibit

9    Number 128.

10          Did you receive this e-mail from Mr. Stiffelman?

11   A.    I did.

12   Q.    Okay.  And he says:

13              "To avoid any implication that we stood by in

14          silence, we don't agree that a download via a third

15          party like Verizon or iTunes is anything but a

16          license for which our client should be paid

17          50 percent."

18          And he goes on to discuss the basis for his

19   opinion.

20          Do you see that?

21   A.    I see what the -- I see the e-mail, yes.

22   Q.    Okay.  Did you respond to this e-mail?

23   A.    No, I did not.  We just agreed to disagree.  There was

24   no need.

25   Q.    Okay.  So you didn't respond to this e-mail -- and by

```
 1    the way, you didn't respond and say, "Well, even if the -- if
 2    it's not a sale or resale," we don't believe the licensing
 3    provision applies anyway?
 4          You didn't respond and say that, did you?
 5    A.   Gary knew that.  Gary knew what I felt.
 6    Q.   I want you to answer my question.
 7    A.   Did I --
 8    Q.   You did not respond to this e-mail; correct?
 9    A.   I definitely didn't write back.  Did I talk to him about
10    it?  I might have.  He knew the situation.  He was just
11    trying to preserve rights.
12    Q.   Go to Exhibit Number 777, please.
13          This is the Ostroff memorandum, is it not?
14    A.   Yes.
15    Q.   And I want to direct your attention to the second page
16    of it, the last -- I'm sorry.  The last page of it.  It's the
17    third page, that paragraph.
18          MR. BUSCH:  And could you bring that up, please.
19    BY MR. BUSCH:
20    Q.   Where it says, "Also effective immediately, our newer
21    recording agreements should reflect this royalty treatment."
22          And do you know what Mr. Ostroff meant when he said
23    our new recording agreements should reflect this royalty
24    treatment?
25          MR. POMERANTZ:  I have two objections, Your Honor.
```

```
 1   It calls for speculation as to what Mr. Ostroff meant.  Also

 2   this is the same ground that we went over before.

 3              THE COURT:  Sustained.

 4              Rephrase.

 5   BY MR. BUSCH:

 6   Q.   Does this paragraph accurately reflect Mr. Ostroff's

 7   instruction to you?

 8   A.   I don't know how to answer that.  It says what it says.

 9   Q.   Did it -- my question is did Mr. Ostroff ever give you

10   any instructions contrary to what is in this memorandum

11   concerning Eminem's June 2003 agreement, for example?

12   A.   We certainly never discussed this memo in the context of

13   the Eminem 2003 agreement.  Michael Ostroff and I did not

14   discuss this memo in the context of Eminem's 2003 agreement.

15   Q.   Did Mr. Ostroff tell you that with respect to Eminem's

16   agreement you didn't need to follow his instructions?

17   A.   No.  He didn't need to.  This is not the kind of thing

18   where I -- I have a certain amount of discretion and

19   authority.  And Gary and I agreed we weren't going to make

20   changes in the 2003 agreement that weren't of things that we

21   had specifically discussed.  We were trying to get it done

22   quickly so that Em could get his check.

23   Q.   Okay.  All right.  I want to talk to you a little bit --

24   I want to go back to Exhibit Number 13, if we could.

25   A.   Page 24, again?
```

```
 1    Q.    Yes.
 2    A.    Yes, sir.
 3    Q.    And if you go back and look at Page 20 -- if you would
 4    please -- you'll see that the section, Section 9, is entitled
 5    "Royalties."
 6          Is that correct?
 7    A.    Yes.
 8    Q.    And I want to go now to Page 24, the same paragraph I
 9    was asking you about.  And I want to direct your attention to
10    the -- the sentence that begins, "Sales of albums," at the
11    very bottom of that paragraph.
12    A.    Yes.
13    Q.    Last sentence.
14    A.    Yes.
15          MR. BUSCH:  Would you highlight that, please.
16    BY MR. BUSCH:
17    Q.    And you'll see it says sales of albums by way of
18    permanent download shall be treated as U.S.N.R.C. net sales
19    for the purpose of Article 9 hereof.
20          Do you see that?
21    A.    Yes.
22    Q.    And Article 9 hereof was royalties; correct?
23    A.    Yes.  I think where we use U.S.N.R.C. is in 9.01, when
24    we talk about the escalations.
25    Q.    What I'm asking you is for purposes of Article 9 hereof.
```

```
 1              Do you see that?
 2    A.    I do.
 3    Q.    Okay.  And it doesn't say for Section 9.01, escalations.
 4    It says, "For purposes of Article 9 hereof."
 5              Do you see that?
 6    A.    I do.
 7    Q.    Okay.
 8    A.    And I think that means the escalations because that's
 9    where we use it.  But yes, I see it.
10    Q.    Okay.  Now, I want to direct your attention to the 2004
11    amendment.
12              There was a 2004 amendment that you and
13    Mr. Stiffelman negotiated; correct?
14    A.    Yes.
15    Q.    Okay.  And What are escalations?
16    A.    Escalations -- we negotiate a royalty rate that we're
17    willing to pay an artist per unit sold.  And an escalation
18    would be a clause that typically would say if you sell a
19    certain number of units, say a million units, then on units
20    above a million we'll pay you a higher royalty rate.
21    Q.    Okay.  And Mr. Stiffelman wanted sales of full albums to
22    be treated as net sales for purposes of escalations; is that
23    right?
24    A.    I'm sorry.  I got tangled in the question.
25              Could you ask it again.
```

1    Q.   Mr. Stiffelman wanted sales of albums, full albums, by

2    permanent downloads to be treated as net sales -- U.S.N.R.C.

3    sales for purposes of escalations; correct?

4    A.   Yes.  He wanted them to count.  If we sold a download as

5    an album, he wanted it to count towards the number where we

6    escalated, which is something that we would do anyway.

7    Q.   Okay.  And that was his question; right?

8    A.   Yes, he did.  He asked that we make that clear.  I think

9    he probably understood that we were doing that anyway, but

10   he's a good lawyer; so he believes in clarity.

11   Q.   And he asked that 14 individual track downloads count as

12   an album and you said no; is that correct?

13   A.   I don't remember if it was 14, but yeah.  He asked

14   that -- if some number of individual track downloads we would

15   group them and count those also as if it was a download.  And

16   yes, I said no.

17   Q.   Okay.  And so this provision that we're talking about

18   here only applies to sales of full albums, not to the

19   individual track downloads; is that correct?

20   A.   I think so, but I'd like to get it in front of me.

21        Which number is that?

22   Q.   Okay.

23   A.   Okay.  Just to be sure, why don't you ask the question

24   again so there's no confusion.

25   Q.   For purposes of your agreement with Mr. Stiffelman on

1    this issue, Mr. Stiffelman requested only that sales of --

2    well, he requested that sales of albums be treated as

3    permanent downloads for purposes of escalations, and you

4    agreed; correct?

5    A.    Yes.

6    Q.    And he also asked that individual track downloads, if

7    they added up to 12 or 14, be treated as an album, and you

8    said no.

9    A.    Correct.

10   Q.    Okay.  And if you put up that provision.

11            MR. BUSCH:  And put up Page 24 of Exhibit

12   Number 13.  Same sentence.

13   BY MR. BUSCH:

14   Q.    You drafted both paragraphs; is that correct?

15   A.    No.  I didn't actually draft either of them.  I oversaw

16   the process, but I didn't draft either of them.

17   Q.    And the language in your form agreement as it relates to

18   this 2004 amendment is identical with the exception of that

19   in the form agreement it says for purposes of Article 9

20   hereof, and in the amendment it says for purposes of

21   escalations; correct?

22   A.    Yeah.  But it's the same thing because in -- there was

23   no Article 9 in the amendment; so we couldn't refer to that.

24   And the only place that it comes up in Article 9 is in

25   escalations.  So Lisa was really drafting the same thing.

```
 1   Q.   Mr. Hoffman, I want you to answer my question, please.
 2              MR. POMERANTZ:  Your Honor, I would request that he
 3   not interrupt the witness.
 4              THE COURT:  Mr. Busch, simply make a motion to
 5   strike if you think --
 6              MR. BUSCH:  Okay.
 7              THE COURT:  -- the answer is nonresponsive.
 8              MR. BUSCH:  Fine.
 9              THE COURT:  All right.
10   BY MR. BUSCH:
11   Q.   Mr. Hoffman, I want you to please focus on my question.
12              THE COURT:  You just ignored what I told you.  All
13   right?
14              Ask your question.
15   BY MR. BUSCH:
16   Q.   Isn't it correct that the difference between what is in
17   the form document at Interscope and what is in the 2004
18   amendment is a change up for the purposes of Article 9 hereof
19   versus for the purposes of escalations?
20              Isn't that correct, that's the language difference?
21   A.   That's the language difference for the reason I
22   explained.
23   Q.   Okay.  And Article 9 of the 2003 -- 2003 form agreement
24   is entitled royalties, is it not?
25   A.   It is.
```

```
 1   Q.   Okay.  And in 2004, if you wanted to make the claim or

 2   if there was -- back up for one second.

 3          Isn't it correct that there was nothing that

 4   prevented you from saying that this was to be -- the sales

 5   of albums would be treated as U.S.N.R. net sales for the

 6   purposes of royalties, if that was the understanding of the

 7   parties?  You could have said that; correct?

 8   A.   Could've said anything.  Unnecessary.

 9   Q.   Okay.  The words we choose as lawyers is important, is

10   it not?

11   A.   It is.

12   Q.   Okay.  Now, if the parties had agreed -- well, that's

13   fine.

14          Mr. Hoffman, I'd like to talk to you about --

15          MR. BUSCH:  You can take that down.

16   BY MR. BUSCH:

17   Q.   I'd like to talk to you about a couple of other things

18   before we finish up.

19          Could you turn, if you would, to Exhibit Number 911

20   in your binder.

21   A.   I have it.

22   Q.   And if you would go to the signature page on Exhibit

23   Number 911 --

24   A.   Yes.

25   Q.   -- you'll see that you're signing this agreement on
```

 1    behalf of both Shady Records, Inc., and Aftermath Records.
 2    A.    Yes.
 3    Q.    Why are -- why do you sign agreements -- what authority
 4    do you have to sign agreements on behalf of both Shady
 5    Records, Inc., and Aftermath Records?
 6    A.    The signing of the actual document is ministerial.  We
 7    do internal approval memos, and if I -- I did a memo
 8    outlining the basic terms of the deal, and I got Paul
 9    Rosenberg, I think, to sign for Shady; and either
10    Peter Paterno or Dr. Dre to sign for Aftermath.  Once they
11    had signed the memo, the actual agreement, I have the
12    authority to sign.
13    Q.    So I'm not sure I understood what you said.
14          Do you hold a position with Aftermath Records?
15    A.    No.
16    Q.    Do you hold a position with Shady Records, Inc.?
17    A.    No.
18    Q.    Okay.  But as the senior legal officer for Interscope
19    Records, based upon your -- the ownership interest of
20    Interscope and Shady Records, Inc., and the ownership it has
21    in the Aftermath Records, are you authorized to sign on
22    behalf of Shady and Aftermath?
23    A.    I'm authorized to sign because that's the custom and
24    practice and understanding that I have with the owners of the
25    other parts of Aftermath and Shady; that as long as they've

1  signed the approval memo with the basic business terms, I can

2  sign the agreement that embodies them.

3  Q.  Okay.  Mr. Hoffman, you're aware that in this case

4  Universal has raised an issue that the song "Lose Yourself"

5  was not recorded under the agreements that are at issue here,

6  the '98 recording agreement as amended in 2000 and the 2003

7  agreement.

8        You're aware of that; correct?

9  A.  I am.

10 Q.  Do you know which film company distributed the movie

11 *Eight Mile*?

12 A.  Universal Pictures.

13 Q.  Okay.  Do you know whether Universal's record

14 distribution company, U.M.G.D., distributed Eminem's

15 *Eight Mile* album?

16 A.  Universal records distribution company, U.M.G.D., did

17 distribute the *Eight Mile* soundtrack album.

18 Q.  Okay.  And if I understand it correct, it's the position

19 of Universal that Eminem's recording of "Lose Yourself" was

20 recorded under an agreement with Shady Records and that Shady

21 Records owns the Eminem "Lose Yourself" recording; is that

22 correct?

23 A.  You asked me what Universal's position is.  I know that

24 Universal -- I haven't read all of the pleadings.  I know

25 that Universal's position is that "Lose Yourself" was not

1    recorded pursuant to the 2000 or 2003 agreements.

2    Q.    Or the '98 agreement?

3    A.    Or the '98 agreement.

4    Q.    Okay.  Do you have an understanding of what that is

5    based upon?

6    A.    The soundtrack agreement and the soundtrack and the

7    soundtrack economics did not run through Aftermath.

8    Q.    Could you explain that a little better, please, for the

9    jury.

10   A.    Eminem was signed to Aftermath; so -- and Aftermath is a

11   relationship between us and Dr. Dre.  So every time an Eminem

12   record sells, as it was originally set up, Aftermath makes

13   money if it's profitable and so Interscope and Dr. Dre make

14   money.  When Eminem wanted to do the soundtrack album for

15   *Eight Mile*, he wanted it not to be through Aftermath, where

16   he just got a royalty; he wanted it to be on Shady Records,

17   the label we have with Eminem so that not only would he get

18   a royalty, but he gets some of the profits.  Dr. Dre agreed

19   to that.  Dr. Dre agreed that instead of putting the

20   soundtrack album through Aftermath, where Dre would get a

21   share, we could put it through Shady, where Em would get a

22   share.

23   Q.    Okay.  And it's true that Shady Records has an agreement

24   with Interscope relating to the recordings for *Eight Mile*;

25   correct?

1    A.    Yeah.  I believe so.

2    Q.    Okay.

3    A.    We could look at this, but yeah.

4    Q.    And F.B.T. was not a party to this soundtrack agreement

5    that you're referencing; correct?

6    A.    I haven't looked at it in ages, but I don't recall that.

7    We can look at it now.  I'm not --

8    Q.    Okay.

9    A.    I'm not trying to dispute that.

10   Q.    Okay.  And under the agreement between Interscope and

11   Shady that we just talked about, Interscope actually owns the

12   master recordings that appear on that -- on the album, the

13   Eminem *Eight Mile* soundtrack, not Shady; right?

14   A.    Well, I think you asked me this before.  I don't

15   remember about ownership.  And then we've got to be clear,

16   are we talking about Shady, the entity that Eminem owns; or

17   Shady, the partnership that we have with Eminem.  Those are

18   two different Shadys.

19   Q.    Well, let's look at -- let me see if I can refresh your

20   memory, or you can explain this for me, please.  Let's look

21   at the document that's in your binder that is Exhibit

22   Number 884.

23   A.    Yes.  I have it in front of me.

24   Q.    That's an agreement dated January 1, 2002, between

25   Interscope Records and Shady Records; correct?

 1  A.    Between Interscope and Shady Records, Inc.  Again,

 2  there's two different Shadys.

 3  Q.    Doesn't this describe -- doesn't this agreement describe

 4  who owns the master recordings as between Shady Records,

 5  Inc., and Interscope?

 6  A.    I haven't looked at this agreement in 15 years.

 7  Q.    Okay.  Well, let me ask the question this way.

 8          If this agreement shows that Interscope records, as

 9  between it and Shady Records, Inc., owns the master

10  recordings, is it correct that Interscope would own the

11  master recordings that is contained in the *Eight Mile* movie?

12          MR. POMERANTZ:  Objection, Your Honor.  It's lack

13  of foundation.  I would request that he put the provision in

14  front of the witness to see if it refreshes his recollection.

15  Right now he's just arguing with the witness.

16          THE COURT:  One moment.

17          Overruled.  Overruled.

18  BY MR. BUSCH:

19  Q.    Go ahead, Mr. Hoffman.

20  A.    I'm sorry.  Now, I don't remember the question.

21  Q.    Okay.  Mr. Hoffman, the question was if this agreement

22  says that as between Shady Records, Inc., and Interscope

23  Records, Interscope Records owns the master recordings that

24  is produced by Eminem, would it be fair to say that

25  Interscope and not Shady Records owns the master recordings

1    that appeared in the movie "Lose Yourself" [sic]?

2    A.    Again, if you're talking about Shady Records, Inc.,

3    which is an entity that Eminem owns by himself, if it says

4    that as between that entity and Interscope that Interscope

5    owns it, then Interscope owns it unless there's some other

6    document that superseded that, which I don't have any

7    recollection of that.

8    Q.    Okay.  Thank you.  That's all I wanted to know.

9          All right.  Now, isn't it true that Eminem's

10   recording of "Lose Yourself" also appeared on Eminem's

11   greatest hits albums, which does fall under the 2003

12   agreement in this case?

13   A.    Eminem's "Lose Yourself" is on the hits album; that's

14   true.

15         And your other question was that does that fall

16   under the 2003 agreement?  Well, yes and no.  We prorated the

17   royalties.

18   Q.    There's a specific provision in the 2003 agreement

19   dealing with greatest hits albums so that it falls under the

20   2003 agreement; correct?  The terms of the 2003 agreement.

21   A.    Yes.

22   Q.    Okay.  And isn't it true that the amendment to the 2003

23   agreement addressing Eminem's greatest hits albums refers to

24   certain recordings owned by third parties, and "Lose

25   Yourself" is not identified on that greatest hits amendment?

 1    A.    I haven't looked at that document in years.

 2    Q.    Okay.

 3    A.    So we --

 4    Q.    Let me see if I can refresh your recollection.

 5    A.    Sure.

 6    Q.    It's Exhibit Number 18.

 7          And this is a letter from Aftermath Records care of

 8    Interscope Records; correct?

 9    A.    Yes.  It's a letter agreement, yes.

10    Q.    And with Marshall Mathers, III?

11    A.    Yes.

12    Q.    Okay.  And it says that --

13          MR. BUSCH:  Could you go to the "notwithstanding

14    anything to the contrary" in the middle of the paragraph,

15    please.  "Notwithstanding the contrary."  All the way to the

16    end of that sentence, please.  Right there.  That's fine.

17    BY MR. BUSCH:

18    Q.    Do you see where it says, "Notwithstanding anything to

19    the contrary contained herein, the parties acknowledge and

20    agree that the masters 'Renegade,' 'Stand,' and 'Dead Wrong'

21    are owned by third parties and licensed to Aftermath for

22    inclusion on the hits album and will be subject to the terms,

23    conditions, and restrictions contained in the applicable

24    third-party agreements"?

25          Do you see that?

1    A.   Yes, I do.

2    Q.   Okay.  And if you go to the Schedule A, where those

3    songs that are going to appear on the greatest hits album are

4    identified, "Lose Yourself" is identified on Schedule A?

5         Do you see that?

6    A.   I do.  Number 6.

7    Q.   Okay.  So "Lose Yourself" is not identified on

8    Schedule A as something that is a -- something that is owned

9    by a third party; correct?

10   A.   Correct.

11   Q.   Okay.  Now, I want to go back to --

12        You can put that document away.

13        I want to go to the soundtrack agreement that you

14   were mentioning earlier.

15   A.   Which number was that?

16        MR. BUSCH:  What number is the soundtrack?

17   BY MR. BUSCH:

18   Q.   It is Exhibit Number 912.

19   A.   Yes.  I have it.

20   Q.   And this is an agreement between Marshall Mathers and

21   Shady Records, Inc.; is that correct?

22   A.   Yes.

23   Q.   Okay.  And in this agreement the first paragraph says,

24   that this agreement -- I'm sorry.

25        Paragraph one says, "You will record and agree --

1  you will record and deliver at least two masters as defined

2  in the Eminem recording agreement, *Eight Mile* masters."

3          Do you see that?

4  A.   Yes.

5  Q.   And the Eminem recording agreement that is the 1998

6  agreement -- or the Eminem recording agreement is the 1998

7  agreement as amended in 2000; correct?

8  A.   Correct.

9  Q.   Okay.  And under the 1998 recording agreement as amended

10 in 2000, Eminem -- all of the masters that were recorded by

11 Eminem were covered by those agreements; correct?

12 A.   Say that again.

13 Q.   Under the 1998 recording agreement, Eminem was to record

14 and deliver through F.B.T. master recordings to Aftermath;

15 correct?

16 A.   Correct.

17 Q.   And Eminem as far as -- in 2000 became an exclusive

18 recording artist for Aftermath; correct?

19 A.   Yes.  His masters were exclusively for Interscope unless

20 Interscope would agree otherwise.

21 Q.   Okay.  So Eminem could not have recorded "Lose Yourself"

22 and delivered it to Sony or to Warner Brothers; correct?

23 A.   Not without our permission, but --

24 Q.   Okay.

25 A.   -- you know, that happens.

```
 1   Q.   And it says, "You will record and deliver at least two
 2   masters as defined in the Eminem recording agreement."
 3            Was Interscope part of this agreement?
 4   A.   Do you mean were we involved in it?
 5   Q.   Yes.
 6   A.   Did we draft it?  Yes.
 7   Q.   Did you have any discussions with anybody in connection
 8   with what this language, "You will record and deliver at
 9   least two masters," meant?
10   A.   No.  Not that I recall.
11   Q.   Do you know whether the song "Lose Yourself" was
12   recorded prior to May 23rd, 2002?
13   A.   I don't know.
14   Q.   There were two records that were on the *Eight Mile* -- or
15   in the *Eight Mile* movie, "Rabbit Run" and "Eight Mile" that
16   were new masters, were there not?
17   A.   I think so.  I'd have to go back and look at the track
18   listings.  It's been a while, but that sounds right.
19   Q.   Okay.  And so the basis for your claim -- as you
20   understand it, Universal's claim that it does not have to --
21   that it's Aftermath, not -- I'm sorry.
22            The basis of Universal's claim in this case that
23   "Lose Yourself" is not part of the '98 or 2003 agreement is
24   this soundtrack agreement and this language about "You will
25   record and deliver at least two masters to Shady Records,
```

 1 | Inc."
 2 |         Is that correct?
 3 | A.   I don't know what all of the bases for our claim is, but
 4 | they were not delivered to Aftermath.  You know, this
 5 | document -- I can't remember if there are other documents.
 6 | Q.   And you don't know whether "Lose Yourself" was one of
 7 | the two masters -- I'm sorry.  You don't know that "Lose
 8 | Yourself" was an *Eight Mile* master as defined by this
 9 | agreement, do you?
10 | A.   Of course it was.  The things that hadn't been on other
11 | records -- that he wound up doing more than two.  It was a
12 | requirement of two.  But what this is supposed to say is that
13 | it says, "At least masters that haven't been on your records
14 | that you deliver for inclusion in the movie and on the
15 | soundtrack are the *Eight Mile* masters."
16 | Q.   Okay.  Hold on.  Let's look at the language.
17 |         "You will record and deliver at least two masters."
18 |         Do you know whether -- you don't know whether
19 | Eminem's recording of "Lose Yourself" was recorded prior to
20 | the date of this agreement, do you?
21 | A.   No.  I don't know.  But it doesn't matter.  Artists have
22 | tracks in partial development all of the time.  You know,
23 | when they get -- they get delivered -- whether they started
24 | it at one point or started another point, you know, he
25 | delivered for the movie and the soundtrack a bunch -- you

```
 1    know, at least three, that I recall, tracks.
 2    Q.   Okay.  Just so that we're clear -- and one last
 3    question.
 4            So it's your testimony that if this recording "Lose
 5    Yourself" was recorded pursuant to the Aftermath agreements
 6    that Interscope and Shady Records could enter into an
 7    agreement without F.B.T.'s approval, taking it out from
 8    under --
 9    A.   I didn't say that.
10    Q.   -- the F.B.T. -- the recording agreements of Eminem.
11    A.   I'm sorry.  I didn't say that.
12            MR. BUSCH:  That's all I have.
13            Thank you, Your Honor.
14            THE COURT:  Ladies and gentlemen, we're going to
15    take our morning break for about 15 minutes.
16            Remember not to discuss the case among yourselves
17    or with anyone else.  Do not form or express any opinions
18    about the case until it has been submitted to you.
19            And we'll see you in 15 minutes.
20            THE CLERK:  All rise.
21            (Open court - jury not present.)
22            THE COURT:  Mr. Busch, could you clarify for
23    me because yesterday afternoon you indicated that there was
24    some potential that you were going to ask the Court for an
25    hour of time.  Mr. Hoffman has been examined for about an
```

```
 1   hour.

 2            Can you highlight for me what new material

 3   Mr. Hoffman has testified to other than the "Lose Yourself"?

 4   And haven't we been with Ms. Rogell and Mr. Stiffelman for

 5   just about everything Mr. Hoffman talked about today?

 6            MR. BUSCH:  Mr. Hoffman?  No, Your Honor, because

 7   it was Mr. Hoffman who had direct conversations with

 8   Mr. Stiffelman about the 2004 amendment.

 9            THE COURT:  Right.

10            And that took about 30 seconds.

11            MR. BUSCH:  About the 2003 agreement as well.

12            THE COURT:  Right.

13            MR. BUSCH:  About the Ostroff memorandum.  He was

14   the one that was in charge of those agreements.

15            THE COURT:  How long -- how long did that testimony

16   take?  About five minutes, maybe?  Because he didn't remember

17   specific conversations, he remembered general conversations.

18   Wasn't that about five minutes?

19            MR. BUSCH:  I don't know, Your Honor, but he was

20   arguing a lot of the time with me.  I thought -- and he was

21   going on and giving speeches that were not directly

22   responsive to my question.

23            THE COURT:  You need to consider your case because

24   as it stands now you're not getting additional time, and

25   you're at about six and half hours.
```

UNITED STATES DISTRICT COURT

```
1              MR. BUSCH:  Okay.

2              (Recess from 11:00 a.m. to 11:13 a.m.)

3              (Open court - jury present.)

4              THE COURT:  Cross-examination.

5                      CROSS-EXAMINATION

6    BY MR. POMERANTZ:

7    Q.   Mr. Hoffman, F.B.T.'s counsel spent a few moments on

8    your employment background.  I just would like to briefly

9    follow up.

10             Where did you go to college?

11   A.   I went to Columbia College in New York City.

12   Q.   And what year did you graduate?

13   A.   1975.

14   Q.   And then you went to law school?

15   A.   And then I went to Harvard Law School.

16   Q.   And what year did you graduate from Harvard?

17   A.   1978.

18   Q.   And what was your first job after law school?

19   A.   I clerked for the state court -- state trial court of

20   Massachusetts for about a year.

21   Q.   And then you said that your first job in the music

22   industry was with C.B.S. Records; correct?

23   A.   Correct.

24   Q.   And then you joined -- and that was in 1981.

25   A.   I went there in 1981, worked at C.B.S. for about six,
```

1    seven years, both in the record division and in the music

2    publishing division.

3    Q.   And what did you do after C.B.S. Records?

4    A.   I went to B.M.G. Music for a couple years.  That was

5    the label that had had RCA and Arista.  And then I went to

6    Polygram Records.  And I was at Polygram from 1989 until

7    Polygram was purchased by Universal in 1998.  And then in

8    1999, Universal asked me to go to with the

9    Interscope/Geffen/A&M division out in Los Angeles.

10   Q.   And while you were at CBS Records and B.M.G. and

11   Polygram, did you have any responsibilities for recording

12   agreements?

13   A.   Yes, I did.  I started as a lawyer drafting recording

14   agreements, and I gradually moved up the ladder to having

15   more responsibility, supervising other lawyers, negotiating

16   bigger and bigger deals over time.

17   Q.   And after you joined Interscope in 1999, did you

18   continue to have responsibilities for recording agreements?

19   A.   Yes.  Definitely.

20   Q.   Over the years from 1981 to today, over a 28-year

21   period, approximately how many different recording agreements

22   have you worked on?

23   A.   Hundreds and hundreds.

24   Q.   Can you give us examples of some of the artists whose

25   recording agreements you've worked on.

A.    Over the years Santana, Cyndi Lauper, a little bit on

Michael Jackson's stuff; more currently Black Eyed Peas,

No Doubt, Dr. Dre, Sting, Sheryl Crow.  I could go on and on.

Q.    We've all heard of those names.

         So when you're sitting across the table negotiating

a recording agreement, is it the artist who is actually

sitting across the table from you?

A.    Not usually.  There's a few.  Will-I-Am of the Black

Eyed Peas actually can talk about business some.  Jon Bon

Jovi could talk about business some.  But that's really,

really rare.  Normally I'm talking to lawyers or managers

representing those artists.

Q.    Now, you mentioned that Interscope is now a part of the

Universal Music Group; correct?

A.    Yes.

Q.    And you mentioned, I think, Motown is another label that

is owned by Universal; correct?

A.    Yes.

Q.    Are there other labels besides Interscope and Motown

that are owned by Universal?

A.    Yes.  Universal tries -- has labels in all different

genres.  There's Fonovisa in the Latin area.  There's Decca

and Deutchagramaphone in the classical area.  There's Mercury

Nashville for country music.  There are other pop labels,

like Def Jam and Mercury and Motown.

1   Q.   And besides record labels, are there any other kinds of

2   companies that are part of the Universal Music Group?

3   A.   Yeah.  Universal Music Group has -- there's a music

4   publishing deposition called U.M.P., and then there's the

5   distribution, U.M.G.D.

6   Q.   And just in some very basic terms, what does a record

7   distribution company do?

8   A.   They're responsible -- they're the primary interface

9   between the labels and the retailers.  They get the music

10  into the -- into the stores, and they promote it into the

11  stores.  Like the CDs, they'll get them into Best Buy or

12  Target and, you know, get us displayed in the front.  And,

13  you know, for digital they'll get our stuff into the iTunes

14  store and try to get our stuff on the front page of iTunes so

15  you'll see our stuff rather than some other record company

16  stuff.

17       MR. POMERANTZ:  Your Honor, I have no further

18  questions of Mr. Hoffman.

19       THE COURT:  Redirect?

20       MR. BUSCH:  Your Honor, I have one question for

21  Mr. Hoffman.  And I would ask for -- to be able to reopen my

22  direct just for one question.

23       THE COURT:  You may.

24       MR. BUSCH:  Okay.

25                 **FURTHER DIRECT EXAMINATION**

```
1   BY MR. BUSCH:

2   Q.   Mr. Hoffman, would you please go to Exhibit Number 874

3   in the soundtrack binder.

4   A.   Yes, I have it.

5   Q.   Okay.  Are these two letters that you sent to

6   Joel Martin?

7   A.   I must have.  That's my signature.  I don't recall them,

8   but they must be.

9             MR. BUSCH:  Okay.  Your Honor, we move for

10   introduction of Exhibit Number 874.

11             MR. POMERANTZ:  Your Honor, my binder actually

12   doesn't have 874.  It has a tab but it doesn't have the

13   document.

14             May I just look at it for one second?

15             THE COURT:  You may.

16             MR. POMERANTZ:  No objection, Your Honor.

17             THE COURT:  874 admitted.

18             (Exhibit 874 received.)

19             MR. BUSCH:  That's all we have, Your Honor.

20             THE COURT:  Mr. Pomerantz, anything else?

21             MR. POMERANTZ:  No, Your Honor.

22             THE COURT:  You may step down.  Thank you.

23             You may step down.

24             Plaintiff's next witness.

25             MR. BUSCH:  David Weinberg, Your Honor.  But before
```

 1    we do, I have a couple of exhibits that I need to have

 2    introduced.

 3           THE COURT:  Can I have a sidebar with the reporter.

 4           (Sidebar discussion.)

 5           MR. BUSCH:  Can I say something very quickly,

 6    Your Honor.  During the last session -- this is an emotional

 7    case for me.  I'm doing my best.  I certainly don't want to

 8    upset the Court.  So to the extent I did, I apologize.  I

 9    need to say -- I don't know if Your Honor is upset at me.

10           THE COURT:  I'm not upset.  When I make a ruling,

11    trust me, I go back and I move on to the next witness.

12           MR. BUSCH:  Based upon what Your Honor said, I am

13    eliminating two witnesses, Steve Jobs, Ethan Gustav.  If

14    Your Honor is seriously not going to give me a little bit

15    more time, I'm very concerned -- I'm going to move through

16    these very quickly.

17           THE COURT:  I was concerned because I thought with

18    Mr. Hoffman you basically covered the bases with -- you

19    correctly pointed out Mr. Stiffelman.  Those conversations

20    were brief, but then you wanted to tangle up with

21    Mr. Hoffman.

22           MR. BUSCH:  I didn't want to.  I get caught up in

23    the moment.

24           THE COURT:  All right.

25           MR. POMERANTZ:  We were told that Mr. Martin was

1    the next witness.  They didn't say Joel Weinberg was.

2    Mr. Klaus is the one who is doing Mr. Weinberg's.  He's the

3    attorney prepared to discuss each of those, not me.  He's

4    handling that witness.

5              MR. BUSCH:  I could call Mr. Martin.  I'd rather --

6              THE COURT:  Let's go with Mr. Martin.

7              (End of sidebar discussion.)

8                   **Joel Martin, witness, sworn**

9              THE CLERK:  For the record, can you state your full

10    name and spell your last name.

11             THE WITNESS:  Joel Martin, M-A-R-T-I-N.

12                        **DIRECT EXAMINATION**

13    BY MR. BUSCH:

14    Q.   Mr. Martin, good morning.

15    A.   Good morning.

16    Q.   Mr. Martin, Jeff Bass and Mark Bass have already

17    testified.

18             Just tell the jury a little bit about yourself,

19    where you're from, and how you got into the music business,

20    please.

21    A.   I'm from Detroit, Michigan.  I basically got into the

22    music business as an intern when I was 17 years old.  I was

23    in high school and there was a work study program and you

24    could take the afternoon off and work in a recording studio

25    or whatever it was that you were interested in, and I worked

 1    in a recording studio for my last year of high school.

 2    Q.    Okay.  And how did you meet Jeff and Mark Bass?

 3    A.    Well, Mark Bass and I met when he was ten years old.  I

 4    was 18 years old, and Mark Bass was my camper.  I was a

 5    counselor at a camp, and he was one of my kids.

 6    Q.    Okay.  And what hap- -- as far as your involvement with

 7    their music, can you explain how you got involved with them

 8    musically?

 9    A.    Well, initially when he was ten years old he was a

10    drummer in the camp band, so to speak, and I was the

11    coordinator.  So I guess we go back -- it goes to 40 years as

12    it relates to Mark.  I hadn't seen Mark for probably ten

13    years after camp, and we ran into each other at a concert.

14    And at that time his brother, Jeff, had just been signed to

15    Quincy Jones's record label with a group called Dream Boy.

16    And Jeff was a musician, and Mark was actually working with

17    him and working on that project at the time.

18    Q.    And what year was this?

19    A.    I think this would've been 1985.

20    Q.    Okay.  And from there, just tell us what happened as far

21    as your involvement with Eminem and the development of

22    Eminem's initial agreements that are at issue in this case.

23    A.    Well, Mark especially started working with me at my

24    studio kind of as the same thing, an intern and/or producing

25    projects that he would bring into the studio, and we had this

1    relationship for years before we formally entered into any

2    kind of a business relationship.  I think in 1991 or '92, at

3    my studio Mark kept telling me about this kid that was just

4    an unbelievable rapper and, you know, how he had met him;

5    that he heard him on a radio show and that he was white.

6         So I just didn't understand that.  There were no

7    white rappers at the time that amounted to anything.  There

8    was the whole Vanilla Ice thing, and no credibility with the

9    white rapper.

10        So Mark continued to work with him in his own

11   little basement studio, but at that time he hadn't come into

12   my recording studio yet.  And, to be honest with you, I think

13   it was almost two, two and a half years before Marshall

14   actually ended up coming into our studios to do some demos.

15   That would have been at or around the time he was working

16   on the *Infinite* record, which was the first album.

17   Q.   Okay.  And we've all heard about the two different

18   albums, *Infinite* and *Slim Shady*.

19        Do you have knowledge of the creation of those

20   albums and the involvement of the Bass brothers in those

21   albums?

22   A.   I think that Mark and Jeff probably worked as just

23   executive producers on the first record.  They weren't

24   writing music with him.  I mean, they were doing other

25   projects.  Jeff was working for Westbound Records at the

| | |
|---|---|
| 1 | time.  Mark was mixing gospel records.  There were a lot of |
| 2 | things happening with them in addition to Eminem, but Eminem |
| 3 | was recording basically in their basement with his other |
| 4 | musicians, so to speak. |
| 5 | Q.    And then for the *Infinite* album -- I'm sorry.  For the |
| 6 | *Slim Shady* E.P., what was the involvement of Bass brothers in |
| 7 | that, if you know? |
| 8 |           MR. POMERANTZ:  Your Honor, I've been letting this |
| 9 | go for some time, but Mr. Martin seems to be telling |
| 10 | Mr. Bass's stories as opposed to his own firsthand |
| 11 | recollection of his involvement.  I would object on lack of |
| 12 | foundation and hearsay to the extent he's testifying to what |
| 13 | the Bass brothers told him. |
| 14 |           THE COURT:  Overruled. |
| 15 | BY MR. BUSCH: |
| 16 | Q.    Were you part of this whole process, Mr. Martin? |
| 17 | A.    From the time -- from *Infinite*, yes, I was. |
| 18 | Q.    Okay.  So go ahead, tell us what occurred with respect |
| 19 | to the *Slim Shady* E.P. and the -- |
| 20 | A.    Well, actually, before that what happened was we decided |
| 21 | to form F.B.T. Productions.  And Marshall was actually not |
| 22 | the first artist that the Bass brothers signed; he was the |
| 23 | second artist.  But *Infinite*, the first record, was recorded |
| 24 | pretty much by Marshall, had a lot of samples of different |
| 25 | records that were contained; that it wasn't music being put |

```
 1   together from scratch.

 2           So they released the record as the first F.B.T.

 3   release in 1995, and at that time, we signed Marshall to a

 4   recording agreement.  They gave us the rights to basically

 5   release and produce records officially.

 6   Q.   Okay.  And then between then and -- we've heard that

 7   Infinite wasn't a big hit.  And then in 1997 we heard about

 8   Slim Shady being released.

 9           Tell us about the involvement that you had with the

10   facts leading up to the signing of F.B.T. and Eminem with

11   Interscope.

12           MR. POMERANTZ:  Objection to the form of the

13   question, Your Honor.  He's putting a lot of testimony into

14   the question instead of just asking the next question.

15           THE COURT:  Overruled.

16           THE WITNESS:  Well, Infinite wasn't a hit, no.  It

17   sold 30 records.  We pressed up 500 records.  And it was

18   pretty much a disaster.  You know, we had faith that Marshall

19   was talented, but again, from my standpoint, he was a white

20   rapper.  It was a business that was mostly urban, and white

21   rappers really weren't accepted.

22           But in any event, they went back to the studio, and

23   this time with Mark and Jeff writing the music.  And what

24   they did was they wrote the music together with Marshall.

25   Marshall doesn't write music, he writes lyrics, and they came
```

1   up with a record that had real music as opposed to samples

2   and borrowing records, for example.  So the *Slim Shady* E.P.

3   was the next record that F.B.T. released.

4           And it started getting noticed, for whatever

5   reason, at the time.  This was 1997.  And at the time for us

6   to sell 10,000 records was actually pretty amazing because,

7   you know, 10,000 records you were actually making money.

8   You couldn't make money at a record company selling

9   10,000 records, but the way we were doing it, we actually

10  made $1,000, $5,000 selling 10,000 records.

11          But more importantly, it got us to the point that

12  in the underground rap world Eminem was being taken

13  seriously.

14  Q.   And so how -- tell me about the signing of the 1998

15  agreement, what your involvement was leading up to the

16  facts -- leading up to the signing of the '98 agreement

17  that we've heard about.

18  A.   Mark and Marshall went on the road, and they performed

19  these battles, so to speak.  They were rap battles.  I think

20  they first went to Las Vegas.  They ended up in Los Angeles,

21  and Marshall actually lost at the rap battle contest in

22  Los Angeles.  But there was somebody, a guy named Evan

23  Bogart, that was an intern at the record company, at

24  Interscope, and apparently loved Marshall, knew about the

25  *Slim Shady* E.P., and got it to Jimmy Iovine.

```
1    Q.   Okay.  Now, we've heard a lot about the '98 agreement,

2    2000 agreement, 2003.  We've heard about all of these

3    different agreements.  And Mr. Pomerantz has questioned

4    Mr. Bass about his involvement in records that went -- that

5    had been released after '98.

6              Can you tell us about F.B.T.'s involvement with

7    Eminem from '98 into, you know, this century?

8    A.   Well, F.B.T. and our studios have pretty made -- pretty

9    much made every single Eminem record as it related to the

10   studios that it was recorded at, Mark and Jeff have certainly

11   been involved in most of the records from, I'd say, 1995

12   especially until 2003.  The recording studios that we have

13   have continued to produce every single Eminem record.  Our

14   video studios continue to produce and work with Marshall on a

15   daily basis for close to ten years.  And Jeff Bass's

16   involvement, in particular, has been ongoing.  We also -- for

17   F.B.T. we have other producers that we work with that work

18   under F.B.T.

19             Marshall's recording engineer is a guy by the name

20   of Louie Rusto, who actually writes with Jeff and writes some

21   of the other music for Marshall; so it's on going.

22   Q.   Because Mr. Pomerantz has mentioned several times

23   this -- used the word that F.B.T. is a passive participant,

24   as if F.B.T. is not doing anything.

25             Is F.B.T. working with Eminem?
```

1          MR. POMERANTZ:  Objection, Your Honor.  It's

2    leading.

3          THE COURT:  Overruled.

4          THE WITNESS:  Well, I think the word "passive

5    participant" is a little bit confusing.  It means that we're

6    passive with respect to Marshall's direct relationship at

7    Interscope, that we don't have any decision making as to who

8    makes his records, but that has nothing to do with the fact

9    that we continue to make his records, every single one of

10   them, up until recently.

11   BY MR. BUSCH:

12   Q.   Okay.  Now, Eminem is not a plaintiff in this case.

13   Everyone knows that.

14          What rights does F.B.T. have in that regard to --

15   with respect to bringing lawsuits that involve Eminem as to

16   recordings?

17   A.   We have all rights.  We have the right on Marshal's

18   behalf to go after issues like this.  This is what

19   contractual rights we were given from the very beginning.

20   Marshall doesn't have to be here today in order for us to

21   fight for these issues.

22   Q.   Okay.  I want to direct your attention now to just a

23   couple of minor things, and then we'll -- and I'm going to

24   let Mr. Pomerantz question you.

25          You have had a couple of audits done on behalf of

1    F.B.T. and Eminem; is that correct?

2    A.    Yes.

3    Q.    And who was the person who was hired to do those audits?

4    A.    Eminem, or Marshall, and F.B.T. jointly hire Gary Cohen,

5    who is an auditor in New York, whose job it is basically to

6    audit record companies.

7    Q.    Okay.  And there are two claims in this case.  We

8    haven't talked at all about one of them that much, but

9    there's a claim in this case for the allocations where --

10          Are you familiar with that claim?

11   A.    Yes.

12   Q.    Did you know anything about an overallocation of costs

13   prior to the time you received Gary Cohen's audit report?

14   A.    No.

15   Q.    Okay.  And Gary Cohen did an audit report.

16          Do you remember what the date was that he finished

17   that report?

18   A.    The first one or the second one?

19   Q.    The second one.

20   A.    I think 2006 or 2007.  I'm not sure.

21   Q.    Okay.  Do you recall how long it took Universal to get

22   back to you in connection with that audit report, the -- what

23   Mr. Cohen's findings were?

24   A.    Well, well over a year.

25   Q.    And was that the audit report that contained issues

1    related to those in this lawsuit?

2    A.    Yes.

3    Q.    Okay.  One last question.  I forgot about one thing.

4           I questioned Ms. Rogell about some conversations

5    with respect to the 2000 Novation, which was the agreement

6    where F.B.T. and Interscope had the direct relationship.

7           Do you recall that?

8    A.    Yes.

9    Q.    Okay.  With respect to that, did you have any

10   conversations with Ms. Rogell concerning concerns you had

11   with respect to the 2000 Novation?

12   A.    Yes.

13   Q.    Okay.

14   A.    From time to time, yes.

15   Q.    Do you recall any specific conversations now about that?

16   A.    Well, as it relates to this case, I recall, of course,

17   the conversation about ancillary uses and the word

18   "ancillary."  And it wasn't contained in this agreement.

19   And, basically, we -- and after conversations with

20   Gary Stiffelman -- wanted to make sure that we were

21   protected; so we had a clause that said any ancillary uses

22   not already covered in the recording agreement would be

23   treated in a way that we still received a percentage of

24   those uses.

25   Q.    Okay.  Did you express exactly what your concern was?

A.    Yes.

Q.    Okay.  And What did you express to Ms. Rogell your
concern was?

A.    Well, the concern was that, you know, there could've
been loopholes in the contract, and we wanted to make sure
that there was language in there that covered it.  And she
came back with language, and it was okay to Gary, it was okay
to me and my attorney, so....

Q.    Okay.  And what exactly did you express to her your
concern was?

A.    Well, the concern was that the language, again, made --
made sure that under any circumstances for uses not
contemplated in the agreement we would just receive a
percentage.

            MR. BUSCH:  Okay.  All right.  Thank you.

            That's all I have.

            THE COURT:  Cross-examination?

            MR. POMERANTZ:  Your Honor, I have some of the
actual recordings, some of the actual records that I want
to hand up.  I don't know if we have enough copies for both
Mr. Martin and Your Honor and Mr. Busch.  I think Mr. Busch
may have his own copies already.

            THE COURT:  That's fine.

            MR. POMERANTZ:  Is that okay?

            THE COURT:  That's fine.

 1          MR. POMERANTZ:  For the *Best of Rap City* CD, I do

 2    have one for Your Honor.

 3                        **CROSS-EXAMINATION**

 4    BY MR. POMERANTZ:

 5    Q.   Good morning, Mr. Martin.

 6    A.   Good morning, Glenn.

 7    Q.   You graduated high school back in the '70s; right?

 8    A.   1975.

 9    Q.   And back then there were a lot of small record shops

10    around town; right?

11    A.   Yes.

12    Q.   You had them in Detroit?

13    A.   Yes.

14    Q.   We had them in Los Angeles; correct?

15    A.   Yes.

16    Q.   And there were some bigger record stores around then

17    too, stores like Tower Records; right?

18    A.   Yes.

19    Q.   And then other retailers arose that started to sell

20    records; correct?

21    A.   Yes.

22    Q.   Virgin Mega Stores, for example; right?

23    A.   Yes.

24    Q.   Best Buy and Circuit City started selling records, as

25    well as electronics equipment; correct?

```
1    A.    Yes.

2    Q.    And those kinds of record stores sold records in the

3    vinyl format; correct?

4    A.    Yes.

5    Q.    And casettes; correct?

6    A.    Yes.

7    Q.    And compact discs when they came out; correct?

8    A.    Yes.

9    Q.    And then in the 1990's, online retailers like Amazon.com

10   emerged; correct?

11   A.    Yes.

12   Q.    And a consumer could go online and go to the Amazon.com

13   store; correct?

14   A.    Yes.

15   Q.    And if you wanted to get a compact disc from Amazon.com,

16   you could, with the click of a button on your computer, order

17   a compact disc from Amazon.com; correct?

18   A.    Yes.

19   Q.    And then Amazon would mail the compact disc to you;

20   correct?

21   A.    Yes.

22   Q.    And you didn't even have to leave your home to go to a

23   store to buy a record; correct?

24   A.    Yes.

25   Q.    And you have bought things from Amazon.com, haven't you?
```

```
 1   A.   Yes.

 2   Q.   And you know a lot of people who have done that;

 3   correct?

 4   A.   Many.

 5   Q.   It's a pretty normal thing to do?

 6   A.   Yes.

 7   Q.   And then when downloads became available, other online

 8   retailers emerged; correct?

 9   A.   Yes.

10   Q.   And many of the same records that you could buy in the

11   compact disc format you could now buy in the download format;

12   correct?

13   A.   Yes.

14   Q.   You could go to iTunes and buy the same record; correct?

15   A.   Yes.

16   Q.   And iTunes today is the biggest retailer of downloads of

17   records; correct?

18   A.   They're a big retailer of music; that's correct.

19   Q.   They're probably the biggest retailer of downloads;

20   correct?

21   A.   I'm not sure, but I'm sure they're very big.

22   Q.   And other stores -- *Amazon.com* started selling downloads

23   of records as well as compact discs; correct?

24   A.   That's correct.

25   Q.   And Wal-Mart opened an online store.
```

1          You could buy records from *Walmart.com;* correct?

2   A.    That's correct.

3   Q.    Downloaded records; correct?

4   A.    That's correct.

5   Q.    And you own an iPod, don't you?

6   A.    Yes, I do.

7   Q.    And you can listen to your downloaded records on your

8   iPod; correct?

9   A.    Yes, I can.

10  Q.    And a lot of people do that today, don't they?

11  A.    Yes, they do.

12  Q.    And they listen to it on their computers as well.

13  A.    Yes, they do.

14  Q.    And lots and lots of people today buy their records in

15  the form of digital downloads; correct?

16  A.    They obtain their music in the form of digital

17  downloads; that's correct.

18  Q.    That's a pretty normal thing to do in today's world; is

19  that correct?

20  A.    To obtain the music in digital downloads, yes.

21  Q.    And iTunes is a normal place for people to go to to get

22  those downloads; correct?

23  A.    Is an outlet for people to obtain music.

24  Q.    All right.  So I've put in front of you the three

25  different formats of the same record, which is the *Marshall*

 1    *Mathers* L.P.  I think there's a rubber band around it.  Maybe

 2    you can take off the rubber band.

 3              MR. POMERANTZ:  And I'd like to use -- try to use

 4    this Elmo here.  Thank you.

 5              Can I practice to make sure I have it right?

 6              THE COURT:  You may.

 7    BY MR. POMERANTZ:

 8    Q.   All right.  Would you pick up the compact disc of the

 9    *Marshall Mathers* L.P.

10              Do you have that in front of you?

11    A.   Yes.

12    Q.   All right.  And let me pick up my copy here.  This has

13    been marked already as Exhibit 919-A.

14              All right.  Who is the artist who is featured on

15    this record?

16    A.   Eminem.

17    Q.   And if we look at the cassette version of it, who is the

18    artist featured on this one?

19    A.   Eminem.

20    Q.   And if we looked at the vinyl?

21    A.   Eminem.

22    Q.   So there's the same artist featured on each -- each one

23    of these various configurations of the record; correct?

24    A.   Of course.

25    Q.   Let me just make a little chart here to help us keep

```
 1   track.  We'll put the same artist.  There we go.
 2            All right.  Could you turn to the back of the
 3   compact disc.
 4            And you'll see that there's a list of tracks;
 5   correct?
 6   A.   Yes.
 7   Q.   And the first one looks like it's just a public service
 8   announcement; correct?
 9   A.   Yes.
10   Q.   And what's the title of the second track?
11   A.   It says "You."
12   Q.   Okay.  And if you look over on the cassette, what does
13   it say?
14   A.   "You."
15   Q.   And if you looked over on the -- on the L.P.?
16   A.   It would say "You."
17   Q.   All right.  And then on the third track, what is the
18   title of that one?
19   A.   It says "Stan."
20   Q.   That's on the CD you're looking at; right?
21   A.   That's right.
22   Q.   And on the cassette?
23   A.   I'm sure it says "Stan."
24   Q.   And on the L.P.?
25   A.   Same thing.
```

```
1    Q.   All right.  And if we went through all -- I think it's
2    18 tracks.  If we went through each track, it would be
3    exactly the same track in exactly the same order; correct?
4    A.   On the album, yes.
5    Q.   All right.  So let's just put down here same music on
6    all three.
7              Now, if you look at the cover of the compact disc,
8    it looks like there's a picture of Eminem sitting down in
9    front of a house; correct?
10   A.   Yes.
11   Q.   And that's the same cover that's on the cassette;
12   correct?
13   A.   Yes.
14   Q.   And the same cover that is on the L.P.; correct?
15   A.   Yes.
16   Q.   So it's fair to say that there's the same cover art?
17   A.   Yes.
18   Q.   All right.  Let's put that one down, too.
19             And if you look at the back of the compact disc,
20   and if you look near the bottom, Mr. Martin, and you'll see
21   there's a little logo that has the capital "A" and then the
22   word "Aftermath" underneath it.
23             Do you see that?
24   A.   Yes.
25   Q.   What does that indicate?
```

```
 1   A.   It indicates that it's an Aftermath record.

 2   Q.   All right.  And if you look at the cassette and you look

 3   at the -- at the bottom of the cassette on the back, that

 4   also says it's an Aftermath record; correct?

 5   A.   Yes.

 6   Q.   And the L.P. says the same thing; correct?

 7   A.   Yes.

 8   Q.   So it's the same -- it's the same record company;

 9   correct?

10   A.   Yes.  One of four record companies.

11   Q.   All right.  And the royalty rate that Aftermath paid to

12   F.B.T. for this Marshall Mathers L.P. -- I'm sorry.  CD, when

13   it sold through a retailer like Wal-Mart or Best Buy to a

14   consumer, that royalty rate was determined by the records

15   sold through normal retail channel provision; correct?

16   A.   Unless it was licensed to the retailers.

17   Q.   All right.  So typically when these CDs, when a consumer

18   goes to Wal-Mart and buys it, that would be a normal record

19   sold through the retail channel?

20   A.   If it's a physical copy of the record and it's not

21   licensed, yes, it would.

22   Q.   All right.  And back when this record came out, the

23   Marshall Mathers L.P., the royalty rate was either 18 or

24   20 percent; correct?

25   A.   Yes.
```

1    Q.   And that's the same even if the consumer bought a

2    cassette of the *Marshall Mathers* L.P. rather than the CD;

3    correct?

4    A.   There might be different packaging deductions.  It might

5    not be exactly the same, but it's under the records sold

6    provision.

7    Q.   And, actually, the rate is the same.

8         The deduction may be different; correct?

9    A.   Yes.

10   Q.   So if this one was 18 to 20 percent as the royalty rate,

11   then so was this one; correct?

12   A.   Yes.

13   Q.   All right.  And same thing with the vinyl.

14        If this was sold through a retailer to a consumer,

15   this would also have the 18 to 20 percent royalty rate;

16   correct?

17   A.   Yes.  The physical property, yes.

18   Q.   All right.  So let's put the same royalty rate.

19        If I changed this from the *Marshall Mathers* L.P. --

20   which I think is number two; right? -- and I instead did it

21   with the same exercise, if I did it with *Slim Shady* and went

22   through vinyl, the cassette, and the CD, you'd have exactly

23   the same answers; correct?

24   A.   Yes, I would.

25   Q.   And you'd have the same answers if I went through the

1     *Eminem Show*; correct?

2     A.    Yes.

3     Q.    And *Encore*?

4     A.    Yes.

5     Q.    And the *Curtain Call*?

6     A.    Yes.

7     Q.    Let's switch and look at the *Best of Rap City*

8     compilation record.  Okay?  So let's create a new column over

9     here.  We'll call it compilation records.

10         Now, could you look at the tracks on the back of

11     this compilation record?  And you see 17 different tracks.

12         Do you see that?

13     A.    Yes.

14     Q.    And that means that there's 17 different recordings on

15     this particular record; correct?

16     A.    Yes.

17     Q.    And the Eminem recording is, I think, Recording

18     Number 8; correct?

19     A.    Yes.

20     Q.    It says, "My name is," by Eminem; right?

21     A.    Yes.

22     Q.    So Eminem's recording is just one of 17 tracks on this

23     recording -- on this record; correct?

24     A.    Yes.

25     Q.    And so it's not just Eminem as the featured artist;

1    correct?

2    A.    That's correct.

3    Q.    It's a bunch of different artists; correct?

4    A.    That's correct.

5    Q.    And if you compared these 17 tracks to any of the Eminem

6    albums that Aftermath has put out -- the *Marshall Mathers*

7    *L.P.*, the *Slim Shady* L.P. *Curtain Call*, *Encore*, or the *Eminem*

8    *Show* -- this music is different; isn't it?

9    A.    On the compilation?

10   Q.    Yes.

11   A.    In the sense that it only contains one Eminem recording.

12   Q.    Right.

13          So the 17 tracks on the compilation record are

14   different than the tracks that are on all of these albums

15   with just one exception; correct?

16   A.    Okay.

17   Q.    So there's different music on the compilation record

18   except for that one track.

19   A.    Okay.

20   Q.    Now, if you look at the cover art on this compilation

21   record, it doesn't look anything like the cover art on any of

22   the Eminem records; correct?

23   A.    No.

24   Q.    It's totally different?

25   A.    Yes.

1    Q.    It's artwork cover art that was created for this

2    particular record; correct?

3    A.    I believe so.

4    Q.    Different art.

5          Now, we looked at *Marshall Mathers* L.P., this one

6    over here.

7          We saw that it said Aftermath Records on the back;

8    correct?

9    A.    Yes.

10   Q.    And it said that on the back of the CD, the cassette,

11   and the vinyl disc; correct?

12   A.    Yes.

13   Q.    But if you look at the compilation record, and if you

14   look at the back over in the right-hand corner --

15   A.    Yes.

16   Q.    -- it says Virgin; correct?

17   A.    Yes.

18   Q.    And that means that Virgin is the company that is

19   putting out this record; correct?

20   A.    I believe so.

21   Q.    That's a different company than the company that has put

22   out all of the Eminem records; correct?

23   A.    Yes.

24   Q.    And when Aftermath paid royalties to F.B.T. for this

25   compilation record, it paid under the masters license

1    provision; correct?

2    A.    I believe so.

3    Q.    Which is not the same provision it paid for the sale of

4    the compact disc of the *Marshall Mathers* L.P.; is that

5    correct?

6    A.    Not necessarily true.

7    Q.    For the record that was sold through Wal-Mart to the

8    consumer, those were paid as records sold.

9          Isn't that what you just said a short while ago?

10   A.    That record also appears as licensed by record clubs.

11   There was a licensed version of the same exact thing that

12   you're holding up exactly, and it was a license to the record

13   clubs.

14   Q.    We'll --

15   A.    We received 50 percent based on the licensing provision.

16   Q.    We'll come back to record clubs.

17   A.    Okay.

18   Q.    We've been discussing Wal-Mart, Best Buy, Tower, all of

19   those kinds of retailers that any consumer can go to.

20   A.    Okay.

21   Q.    If the record was -- if this CD was sold -- this Eminem

22   CD was sold to any one of those retailers, you just said that

23   that should be a royalty under the records sold provision;

24   right?

25   A.    If it was not licensed; that's correct.

```
 1   Q.   Okay.  And that's the 18 to 20 percent; correct?

 2   A.   That's correct.

 3   Q.   Okay.  And this one, the compilation record, that would

 4   be paid 50 percent of net receipts under the masters license

 5   provision; correct?

 6   A.   Possibly, yes.

 7   Q.   Should be; right?

 8   A.   Well, possibly because sometimes they would determine

 9   that there's another royalty.  But generally speaking, it

10   should be under the licensing provision.

11   Q.   Well, are you aware of anything that would lead you to

12   believe that Aftermath paid F.B.T. royalties on the Best of

13   Rap City CD in any way other than 50 percent of net receipts

14   under the masters license provision?

15   A.   Not on that particular CD.  There were many

16   compilations.

17   Q.   Now let's talk about the download.

18        Let's assume that this Marshall Mathers L.P. was

19   purchased from iTunes, and let's assume that the customer who

20   went to iTunes wanted to buy the entire album, not just a

21   track from the album.  All right?

22        MR. POMERANTZ:  Let's put a picture on the screen.

23   I think I need to switch this from the Elmo; correct?

24        Thank you.  I appreciate that.

25   BY MR. POMERANTZ:
```

1    Q.   This is an iPod, and I think you can probably see it on

2    your screen.  It has the Eminem album, the *Marshall Mathers*

3    *L.P.*, bought from iTunes.

4            Do you see that?

5    A.   Yes.

6    Q.   And so when the customer who buys the album from iTunes

7    gets the album, it's the same artist as the *Marshall Mathers*

8    *L.P.*; correct?

9    A.   It's the same music.

10   Q.   I'll get to the music in a second.  I want to make sure

11   it's the same artist.

12   A.   Well, of course if it's the same music, it would be the

13   same artist.

14   Q.   Okay.  So we have the same artist.  You say it's the

15   same music.

16           It's the same tracks that you would get if you

17   bought the CD; correct?

18   A.   The same tracks, the same music, yes.

19   Q.   So it would have "You" and then "Stan" and then "Paul"

20   and then "Who knew."

21           Correct?

22   A.   Yes.

23   Q.   All 18 of the tracks?

24   A.   Yes.

25   Q.   And if you look at the cover art that you can see on

 1   your iPod, it's the same cover art that you can see on the

 2   compact disc; correct?

 3   A.   Well, it's different.  I mean, they've mocked it up to

 4   make a different configuration of it.  Obviously someone has

 5   taken it.  It's not the same cover, but they've got the

 6   covers probably going side by side and back and forth.  So

 7   I -- it's a rendition of the cover.

 8   Q.   Right.

 9   A.   It's not exactly the same.

10   Q.   If you look at it -- and I have to take off my glasses.

11   I hope you can see it Mr. Martin.

12        But it looks to me like it's Marshall Mathers

13   sitting on at the steps of a house; correct?

14   A.   The art that is in the middle of the page; that's

15   correct.

16   Q.   All right.  So it's the same as the art that you're

17   seeing on this compact disc; correct?

18   A.   Relatively speaking.

19   Q.   And the same that you see on the cassette?

20   A.   Relatively speaking, yeah.

21   Q.   And the same as you see on the vinyl?

22   A.   Yes.

23   Q.   And the record company that is involved in selling the

24   album through iTunes is Aftermath; correct?

25   A.   Involved in selling to iTunes?

1    Q.   Let's -- I'll put away the word "sale" just for right

2    now.  I understand your concerns about that word.  Let me do

3    it differently.

4            Aftermath is the record company that puts out the

5    Eminem album *Marshall Mathers* L.P.; correct?

6    A.   Well, there's three other record companies.  You just

7    keep referring to Aftermath, but there's Aftermath, there's

8    Interscope, and there's our label.

9    Q.   All right.  And those are the same ones that put out the

10   compact disc; correct?

11   A.   That's correct.

12   Q.   And the cassette?

13   A.   Correct.

14   Q.   And the L.P.?

15   A.   Correct.

16   Q.   And the downloaded album; correct?

17   A.   Correct.

18   Q.   All right.  So let's go back to the Elmo, if we can.

19   Elmo is not a Sesame Street name.  It's just the name of this

20   device.

21          So if we look at this, what you just told me,

22   Mr. Martin, is that the download album of the *Marshall*

23   *Mathers* L.P. has the same artist, the same music, the same

24   art, and the same record company as the *Marshall Mathers*

25   compact disc, cassette tape, and L.P.; correct?

1    A.    Yes.

2    Q.    Now, I take it it's your position that even though it's

3    the same artist and the same music and the same art and the

4    same record company, you take the position that it's not the

5    same royalty rate; correct?

6    A.    That's correct.

7    Q.    All right.

8          MR. BUSCH:  Can I ask you not to -- I'd like you to

9    save that, if you would, please.

10   BY MR. POMERANTZ:

11   Q.    Mr. Martin, by the time that F.B.T. signed the agreement

12   with Aftermath back in 1998, how many years had you been in

13   the music business?

14   A.    I've been in the music business since 1974.

15   Q.    And when did you first start buying records yourself?

16   A.    When I was ten years old I remember buying a record, a

17   45.

18   Q.    So I'll call that, since you and I are roughly the same

19   age, close to the '70s.

20          How is that?  Fair?

21   A.    1968.

22   Q.    All right.  And you're aware that back then you were

23   probably buying most of your records in the vinyl form;

24   correct?

25   A.    Yes.

```
 1    Q.   And you would buy vinyl L.P.s; correct?

 2    A.   Yes.

 3    Q.   And back then they also sold singles that were 45 rpms;

 4    correct?

 5    A.   Yes.

 6    Q.   One song on Side A and a different song on Side B;

 7    correct?

 8    A.   Yes.

 9    Q.   And you bought some of those too?

10    A.   Yeah.

11    Q.   And then you recall in the '70s different configurations

12    came out in which you could buy a record on a tape; correct?

13    A.   Yes.

14    Q.   First it was the eight-track tape; correct?

15    A.   Yes.

16    Q.   I won't ask you if you bought those.

17              And then there was the cassette tape; right?

18    A.   Yes.

19    Q.   And you bought some of those?

20    A.   Yes.

21    Q.   And then sometime in the '80s and, well, certainly into

22    the '90s, a different format of music came out and you could

23    buy your records now on a compact disc; correct?

24    A.   Yes.

25    Q.   You bought some of those?
```

1    A.    Yes.

2    Q.    And so by 1998, when you were involved in the

3    F.B.T./Aftermath agreement, you knew that the technology for

4    delivering music to the consumers had changed over the years;

5    correct?

6    A.    Yes.

7    Q.    And you knew that technology for delivering music was

8    likely to continue to change as we went forward; correct?

9    A.    Yes.

10   Q.    You knew there would be undoubtedly new ways to deliver

11   music to consumers.

12   A.    Yes.

13   Q.    And you knew that when you signed the 1998 agreement;

14   correct?

15   A.    Absolutely.

16   Q.    And you knew that when the -- that agreement was signed,

17   the agreement itself contemplated that there would be new

18   technologies of music; correct?

19   A.    Yes.

20          MR. POMERANTZ:  Mr. Nichols, could you put up

21   the 1998 agreement.  It's Exhibit 5.  And let's put up

22   Paragraph 8, please.  If you could pull that up so we

23   could see a little better, please.

24   BY MR. POMERANTZ:

25   Q.    Mr. Martin, when the agreement was signed in 1998, you

1   knew this Paragraph 8 was in the agreement; correct?

2   A.   Yes.

3   Q.   And you knew there was a provision in there that gave

4   Aftermath the right to exploit Eminem masters in any and all

5   forms of media now known and hereinafter developed; correct?

6   A.   Yes.

7   Q.   All right.  And you also knew that this agreement had a

8   definition of record in it; correct?

9   A.   I would assume so.

10  Q.   All right.

11          MR. POMERANTZ:  Let's turn to Page 13, please.  And

12  if you could bring up the definition of record, which is in

13  Paragraph E.

14  BY MR. POMERANTZ:

15  Q.   And so when this agreement was signed in 1998, you knew

16  that it contained this definition of records; correct?

17  A.   Yes.

18  Q.   And you knew that the parties had agreed that a record

19  includes all forms of reproduction; correct?

20  A.   Well, this definition says all forms of reproductions

21  that are manufactured or distributed primarily for home use.

22  I'm not sure if it contemplated anything other than home use,

23  but that's the definition here, which would mean not

24  necessarily for any other purposes other than primarily for

25  use in the home.

```
 1    Q.    All right.  Well, we'll get to home use in a minute --
 2    A.    Okay.
 3    Q.    -- Mr. Martin.
 4          Now, you knew that this definition did not specify
 5    a particular configuration of music; correct?
 6    A.    No.  It did not.
 7    Q.    It did not specify a particular type of record.
 8    A.    That's correct.
 9    Q.    It didn't mention compact discs.
10    A.    No.
11    Q.    Or vinyl.
12    A.    No.
13    Q.    Or cassettes; right?
14    A.    Correct.
15    Q.    It said all forms of reproduction.
16    A.    Correct.
17    Q.    And you also knew that there was another definition on
18    this very same page that talked about something called new
19    medium records; correct?
20    A.    Yes.
21    Q.    Let's look at that provision.
22          You knew that the definition in this contract said
23    that a new medium record included transmissions directly into
24    the home; correct?
25    A.    Yes.
```

1    Q.    And it said that "New medium records meant recorded

2    music that was not in general commercial distribution in the

3    United States as of January 1, 1997."

4            Do you see that?

5    A.    Well, it says any software medium that was not in

6    general before 1997.  That's what it is referring to, the

7    actual software medium.

8    Q.    All right.  And downloads were not in general commercial

9    distribution back in 1998 -- or 1997; correct?

10   A.    The medium was, which was the Internet.  That's the

11   medium.

12   Q.    And you think that is what this is referring to?

13   A.    Yes.

14   Q.    And you understand that the Internet involves the

15   transmission of data; correct?

16   A.    It could, sure.

17   Q.    Well, is that how you would define the Internet as

18   involving the transmission of data?

19   A.    That's one of the functions, yes.

20   Q.    And if you have a computer in your home, then that data

21   is transmitted directly into your home; correct?

22   A.    Well, I think that the provision could certainly apply

23   to satellite radio, anything that is transmitted directly

24   into the home.  I'm not sure it limits it to anything as it

25   relates to download or a computer, but, you know, the idea

1    was there are subscription services, there's Sirius Radio,

2    there's XM Radio.  There's a lot of things that can be

3    transmitted directly into the home.

4    Q.   I probably wasn't clear.  I'm sorry.  I was focusing on

5    the Internet for a second right now.

6           Did the -- if there was a computer in your home,

7    that means that data is transmitted directly into your home

8    through the Internet; correct?  Assuming you have an Internet

9    connection.

10   A.   Potentially, yes.

11   Q.   And if that data that is transmitted directly into your

12   home happens to be a download of a musical recording, then

13   that -- then that download is transmitted directly into your

14   home; correct?

15   A.   The data is transmitted into your home or onto your

16   computer.

17          MR. POMERANTZ:  All right.  Let's go back up to

18   that definition of record, Mr. Nichols, and let's look at

19   home use language that Mr. Martin is referring to.

20   BY MR. POMERANTZ:

21   Q.   Have you ever used an eight-track cartridge in your car?

22   A.   Well, I had an eight-track player, but it didn't happen

23   to be in my car.  But I know people have done that.

24   Q.   A lot of people had that back in the '70's; right?

25   A.   I guess so.

1    Q.    Have you ever used a cassette tape in your car?

2    A.    I'm sure I have.

3    Q.    You probably know a lot of people who have done that;

4    correct?

5    A.    I'm sure I have.

6    Q.    For many years many, many, many cars came equipped with

7    cassette players built right into the car; correct?

8    A.    Yes.

9    Q.    And have you ever -- do you know of something called a

10   Walkman?

11   A.    Yes.

12   Q.    And you could use a cassette tape in certain versions of

13   the Walkman; correct?

14   A.    Yes.

15   Q.    Heard of a boom box?

16   A.    Yes.

17   Q.    That's something you can take to the beach with you;

18   correct?

19   A.    That's correct.

20   Q.    And you could put the cassette into the boom box and

21   listen to the music at the beach; correct?

22   A.    If I wanted to bring a cassette to the beach, yes.  I

23   could do that.

24   Q.    And just because people used cassettes, outside of the

25   home, and even if they primarily used it in their car, for

```
 1    example, that didn't mean that a cassette wasn't treated as a
 2    record under this deal by both F.B.T. and Aftermath; correct?
 3    A.    The point is -- is -- are these things, were they
 4    designed primarily for home use?  I don't know anybody that
 5    had a CD collection or a cassette collection or an
 6    eight-track collection in their car.  They might have taken
 7    something from the house and, yes, they used it outside of
 8    the home, but that wasn't the primary use.
 9    Q.    Well, you were at Mr. Berman's deposition in this case,
10    weren't you?
11    A.    One of them.
12    Q.    Okay.  And in that deposition, you remember I was asking
13    Mr. Berman questions about cassettes?
14    A.    I don't remember.
15    Q.    Mr. Berman is someone who your company has hired and
16    paid money to as an expert in this case; correct?
17    A.    Yes.
18    Q.    And he testified in his deposition that at some point in
19    time cassettes were primarily used in cars and not homes;
20    correct?
21    A.    I don't know.  If that's what he testified to, that's
22    correct.  That's what he testified to.
23    Q.    But you know that from the very first time that
24    Aftermath ever paid royalties to F.B.T. for sales of
25    cassettes through normal retail channels, you were paid under
```

```
 1    the records sold provision; correct?

 2    A.    Unless they were licensed, we were paid under the

 3    records sold provision.

 4    Q.    So they were treated as records; correct?

 5    A.    Absolutely.

 6    Q.    And that's because what home use means in this

 7    provision, and the way both parties understood it, is it

 8    means personal use; correct?

 9    A.    I don't know that.  I mean, if you're asking me am

10    I disputing that it's a record, of course not.  It's a

11    record.

12    Q.    Mr. Busch, asked you a few questions about the 2000

13    Novation.

14               Do you recall that?

15    A.    Yes.

16    Q.    And in particular, he asked you about some discussions

17    you had with representatives of Interscope.

18               Do you remember that?

19    A.    Yes.

20    Q.    And during the negotiations of that 2000 Novation, you

21    had conversations with Ms. Rogell; correct?

22    A.    Yes.

23    Q.    And Mr. Hoffman, too?

24    A.    Yes.

25    Q.    And you talked to them about changing the 1998 contract
```

1  so that Eminem would have a direct relationship with

2  Aftermath; correct?

3  A.   That was one of the things, yes.

4  Q.   But during that conversation in 2000 and those

5  negotiations, you never talked to Mr. Hoffman or Ms. Rogell

6  about anything related to downloads; correct?

7  A.   That's correct.

8  Q.   Or master tones; correct?

9  A.   That's correct.

10 Q.   Or how royalties should be paid on downloads or master

11 tones; correct?

12 A.   I didn't have those conversations, no.

13 Q.   And you said you did have a conversation with Ms. Rogell

14 about the use of the term "ancillary use" in the 2000

15 Novation; correct?

16 A.   I didn't say anything about the term "ancillary use."

17 I didn't even -- that wasn't something I came up with.  We

18 just approached them and said, "Look, please put a provision

19 in that covers any uses that aren't contemplated by the

20 agreement."

21 Q.   Did you -- in those conversations, did you ask

22 Ms. Rogell to expand the scope of the masters license

23 provision?

24 A.   No.

25 Q.   Did you ask Ms. Rogell to contract the scope of the

1    masters license provision?

2    A.    No.

3    Q.    There was no discussion about expanding or contracting

4    the scope of the masters license provision; correct?

5    A.    No.

6    Q.    That's correct?

7    A.    That's correct.

8    Q.    Do you know if it costs more to manufacture a compact

9    disc of an Eminem record than it does to manufacture a

10   cassettes tape of an Eminem record?

11   A.    It used to.

12   Q.    And today?

13   A.    I'm not sure.  I don't really know what the cost

14   breakdown is.

15   Q.    Do you know if it costs more or less to manufacture a

16   compact disc versus a vinyl disc?

17   A.    I think vinyl now is more expensive.

18           MR. POMERANTZ:  Phil, could you put up

19   Paragraph 4-AI of the 1998 agreement, Exhibit 5.  And if you

20   would -- no.  I'm sorry.  Exhibit 5, Paragraph 4-A.  I'm

21   sorry.

22   BY MR. POMERANTZ:

23   Q.    This is the records sold provision; correct?

24   A.    Yes.

25   Q.    And it pertains to records that are sold through normal

1    retail channels; correct?

2    A.    Yes.

3    Q.    And if a record is covered by this provision, then at

4    least in 1998 you get paid 18 percent royalty rate; correct?

5    A.    Yes; that's correct.

6    Q.    Whether it was a vinyl L.P. or a compact disc; correct?

7    A.    That's correct.

8    Q.    So even though it cost more money to manufacture the

9    vinyl disc than it cost to manufacture the compact disc, the

10   rate was the same; correct?

11   A.    If it was covered under this provision.

12   Q.    There's nothing in this provision that says that the

13   rate changes depending upon how much it costs to manufacture

14   the record; correct?

15   A.    I don't see that.

16   Q.    So if it costs a lot of money to manufacture this vinyl

17   disc and just pennies to manufacture this compact disc, the

18   royalty rate is still the same; correct?

19   A.    I believe so.

20   Q.    Now, Interscope and Universal built some technology so

21   that they could send digital files to online retailers, like

22   iTunes and Amazon and Microsoft; correct?

23   A.    I don't think they built anything.

24   Q.    Do you know?

25   A.    My opinion is -- is that that technology has been used

1  by everybody.  I don't believe they built anything.

2  Q.   Do you know if Universal spent millions of dollars

3  building technology so that they were able to transmit their

4  recordings to iTunes, Amazon, Microsoft, and others?

5  A.   I believe they spent millions of dollars building their

6  own platform to sell downloads themselves.  I do not believe

7  they spent millions of dollars to just turn the files into

8  digital, for example, to send to the download companies.

9  Q.   You don't know how much money they spent to build the

10  technology that was needed, not to build Blue Matter or some

11  of the other things that Mr. Busch was mentioning, but to

12  build the technology that is necessary today to send

13  recordings to iTunes.

14       Do you know how much they spent?

15  A.   What technology are you referring to?

16  Q.   The technology that a record company needs, a record

17  company like Universal, in order to make sure that the

18  recording is transformed into something that can work with

19  iTunes.

20  A.   I'm a recording engineer.  I'm not familiar with

21  anything other than the process to turn a sound recording

22  into a digital file, other than what we do.  And I don't see

23  a cost associated with it beyond a very fundamental cost.

24  I'm not sure what you're referring to.

25  Q.   All right.  Let me discuss master tones just for a

 1    moment.

 2           F.B.T.'s position in this case is that Aftermath is

 3    not paying royalties correctly for downloads; right?

 4    A.    Correct.

 5    Q.    And also for master tones.

 6    A.    Correct.

 7    Q.    But a master tone is just a form of a download; correct?

 8    A.    A master tone is a download.

 9    Q.    Well, let's go back to downloads then.

10           It's F.B.T.'s contention in this case that

11    Aftermath -- I'm sorry.  Let me start over again.

12           It's F.B.T.'s contention in this case that it was

13    unaware that Aftermath was paying royalties on downloads

14    under the incorrect provision until 2006; correct?

15    A.    Well, until the report, we had no idea specifically what

16    the download rate was.  It wasn't reported back to me.  I

17    don't review those statements.  I review the publishing

18    statements, but the artist royalty statements go both to

19    Marshall and then they go to Gary Cohen, and whatever we get,

20    we get.

21    Q.    But your position is that you were unaware of how

22    Universal was paying on downloads until 2006; correct?

23    A.    I was sure in 2006 how they were paying.

24    Q.    Well, but isn't it F.B.T.'s contention in this case that

25    it was unaware until 2006 of how Universal was paying F.B.T.

```
 1     for downloads?

 2           MR. BUSCH:  Objection, Your Honor.  Argumentative,

 3     and asked and answered.

 4           THE COURT:  Overruled.

 5           THE WITNESS:  There's a variety of downloads.

 6     There's conditional downloads.  There's permanent downloads.

 7     We didn't parse ourselves.  The accounting statements that

 8     was probably done over a two- or three-year period, as

 9     typically audits are done, and in 2006 we knew for sure how

10     they were paying.

11           MR. POMERANTZ:  Your Honor, I would like to refresh

12     his memory by showing him a pleading that was filed in this

13     case called a memo of contentions.  I was not there, and I --

14     before I put it on the screen I want to get Your Honor's

15     permission.

16           THE COURT:  First show it to Mr. Busch, and then --

17           MR. POMERANTZ:  I only have it on the screen.  We

18     do have it.  I'm sorry.  I do have it.  I have it, Your

19     Honor.

20           THE COURT:  Is there any foundation as to this

21     witness to this document?

22           MR. BUSCH:  I would object on this as to the

23     previous in limine motions.

24           THE COURT:  Mr. Pomerantz, is there any foundation

25     as to Mr. Martin knowing what is on the pleading?
```

 1          MR. POMERANTZ:  This is a formal document filed by

 2   F.B.T. in this lawsuit.

 3          THE COURT:  Is it verified?

 4          MR. POMERANTZ:  No.

 5          THE COURT:  All right.  You may not inquire.

 6          MR. POMERANTZ:  Thank you, Your Honor.

 7   BY MR. POMERANTZ:

 8   Q.   You know Gary Stiffelman; correct?

 9   A.   Yes.

10   Q.   He's Eminem's lawyer?

11   A.   Yes.

12   Q.   And you heard him testify in this case?

13   A.   Yes.

14   Q.   He said he was aware of how Universal was paying on

15   downloads back in 2003; correct?

16   A.   Yes.

17   Q.   And he said he knew that Universal was paying for

18   downloads under the records sold through normal retail

19   channels provision; correct?

20   A.   Yes.

21   Q.   But your contention is that F.B.T. was unaware that

22   Universal was paying under that provision until 19- -- until

23   2006; correct?

24   A.   That's correct.

25   Q.   Now, Aftermath sends royalty statements to F.B.T. every

1    six months; correct?

2    A.    That's correct.

3    Q.    And those royalty statements reflect how Universal is

4    paying on each record that it reports on; correct?

5    A.    Each record, each configuration?

6    Q.    Yes.

7    A.    Sometimes, yes.

8    Q.    And the royalty statements that F.B.T. has been

9    receiving since 2002 shows that the downloads were being paid

10   as records sold through normal retail channels; correct?

11   A.    That's not correct.

12   Q.    You're certain?

13   A.    Yes, I am.

14   Q.    All right.  Let's look at the 2002 royalty statement,

15   which I think is in the binder that I gave to you.  The

16   bigger of the two binders.  If you go to Exhibit 613.

17          No.  Let's go to 907 first; that's the earlier in

18   time.  It's the next one in your binder.  It's just the next

19   tab.

20          MR. POMERANTZ:  And Mr. Nichols, if you could bring

21   up --

22          THE WITNESS:  613?

23   BY MR. POMERANTZ:

24   Q.    I'm sorry.  Go to the next one, Mr. Martin.  It's 907.

25   A.    Okay.

```
 1   Q.   All right.  And let's go to Page 2 -- the second page of

 2   this document, which has the summary schedule.

 3            Do you see that?  It actually says Page 1 in the

 4   upper right-hand corner, but it's the second page of the

 5   document.

 6            Do you have that?

 7   A.   Does it say Page 1?

 8   Q.   It says Page 1 in the upper right-hand corner.

 9            Do you see that?

10   A.   Yes.

11   Q.   All right.  And this is a royal statement; correct?

12   A.   It's part of a royalty statement.

13   Q.   Yes.

14            MR. POMERANTZ:  And I should say, Your Honor, for

15   the record, that these are very voluminous exhibits, reports.

16   What I've included is everything except the foreign detail,

17   which is very voluminous, which they are the sales in foreign

18   territories.  The actual entire royalty statement is an

19   exhibit, but for convenience so that Mr. Martin wasn't

20   weighed down, I stopped after all of domestic sales, the

21   sales and licenses in the United States.

22   BY MR. POMERANTZ:

23   Q.   All right.  Mr. Martin?

24   A.   Okay.

25            MR. POMERANTZ:  So, Mr. Nichols, if you could bring
```

1    up the summary schedule at the bottom.  A little lower than

2    that.  Right there.

3    BY MR. POMERANTZ:

4    Q.   All right.  So you see in the summary schedule -- this

5    is the royalty report for the period ending June 30, 2002.

6            Do you see that up at the top?

7    A.   Yes.

8    Q.   All right.  And that means that this is covering sales

9    of Eminem records from January 1 of 2002 through June 30 of

10   2002; correct?

11   A.   Yes.

12   Q.   All right.  So -- and this summary schedule at the

13   bottom has three line items.  The first one is domestic.

14           Do you see that?

15   A.   Yes.

16   Q.   And the second one is license.

17           Do you see that?

18   A.   Yes.

19   Q.   And the third one is foreign.

20           Do you see that?

21   A.   Yes.

22   Q.   And so it shows here that on this schedule that

23   F.B.T. -- and this is the report that is going to F.B.T.;

24   correct?  This is an F.B.T. royalty statement?

25   A.   I think so.

```
 1    Q.   All right.  And it shows that for domestic sales it
 2    looks like it's about $2.4 million.
 3              Do you see that?
 4    A.   Yes.
 5    Q.   Okay.  And then for licenses it says it's -- looks to me
 6    like 200 -- either 30 or 50.
 7              Do you see that?
 8    A.   Yes.
 9    Q.   All right.  And then it has foreign sales of -- looks
10    like a little over 220- -- 227,000?
11    A.   Yes.
12    Q.   All right.  And then behind this comes all of the detail
13    that support those numbers; correct?
14    A.   Yes.
15    Q.   And the domestics is referring to the sales of records
16    in the United States; correct?
17    A.   I think so, yes.
18    Q.   And the license is referring to what the contract is
19    referring to as masters license; correct?
20    A.   Yes.
21    Q.   All right.  And so if you turn to the next page, where
22    it says "domestic," and let's just look at the first couple
23    of items there.
24              This is the sale of records; correct?
25              MR. BUSCH:  Objection.  Vague and ambiguous.  Sale
```

1    of records by whom?

2              MR. POMERANTZ:  I think he's already said that the

3    domestic heading stands for the sale of records.

4              THE COURT:  Overruled.  Overruled.

5    BY MR. POMERANTZ:

6    Q.   Okay.  Let's look at the -- let's look at the first

7    entries here.

8              Do you see the first entry is for a recording that

9    it looks like it is B and then a few asterisks?

10   A.   Uh-huh.

11   Q.   And then it says, I think, "please."

12             Do you see that?

13   A.   Yes.

14   Q.   All right.  And then if you go to the next words --

15             MR. POMERANTZ:  Phil, can you highlight the next

16   words right over to the right of that?  Right there.

17   Highlight that.

18   BY MR. POMERANTZ:

19   Q.   What does that say?

20   A.   It looks like it says "burns."

21   Q.   Burns.

22             And you know what a burn is, don't you?

23   A.   What is a burn?

24   Q.   Well, you understand that back in the 2002 time period,

25   people often referred to permanent downloads as burns?

1    A.    I don't believe so.

2    Q.    That's not a word you -- you're familiar with?

3    A.    A burn is a permanent download?  I think I'm not even

4    sure that they were doing permanent downloads back then.

5    Q.    Well, let's look at the next royalty statement because

6    that might help to clarify things.

7    A.    Well, we're going to a different royalty statement?

8    Q.    The next period, the second half of 2002 --

9    A.    Okay.

10   Q.    -- just to make sure that we're clear.  That's

11   Exhibit 613.  And, again, on the -- on the second page

12   there's a summary chart at the bottom.

13         MR. POMERANTZ:  If you could highlight that, Phil.

14   Bring that up.

15   BY MR. POMERANTZ:

16   Q.    And you see here now it has the first same item,

17   domestic U.M.G.

18         Do you see that?

19   A.    Uh-huh.  Yes.

20   Q.    And U.M.G. stand for Universal Music Group?

21   A.    Yes.

22   Q.    All right.  And the next one says club, and that's at

23   the record club you were referring to.

24         Do you remember that?

25   A.    I'm sorry.  What page are you on?

```
 1   Q.   I'm on the second page of -- it's Page 1 up at the top
 2   right-hand corner.  It's actually the second page of the
 3   document itself.
 4   A.   Page 1 on the top.
 5   Q.   Do you see that on the upper right-hand corner, Page 1?
 6   A.   Is it on the screen?
 7   Q.   Yeah.
 8        MR. POMERANTZ:  Why don't we put -- Phil, why don't
 9   you come back and pull up the whole document.
10        THE WITNESS:  I must be on the wrong --
11   BY MR. POMERANTZ:
12   Q.   613 is what I'm looking for, Mr. Martin.
13   A.   Okay.
14   Q.   And on the second page of that document, the first -- it
15   says Page 1 on that upper right-hand corner?
16   A.   Yes.
17   Q.   All right.  And you see that in the middle of the top of
18   the page it says that this is the artist's royalty statement
19   for the period ending 12/31/02.
20        Do you see that?
21   A.   Yes.
22   Q.   And so that is for the sales of Eminem records from
23   July 1, 2002, through December 31, 2002; correct?
24   A.   Yes.
25   Q.   All right.  And so then the summary chart at the bottom
```

1    there divides up the earnings into four categories.  The

2    first one was domestic U.M.G.

3              Do you see that?

4    A.   Yes.

5    Q.   And the second is club.

6    A.   Yep.

7    Q.   The third is third party.

8    A.   Yes.

9    Q.   And the fourth is foreign.

10   A.   Yes.

11   Q.   Do you see that?

12   A.   Yes.

13   Q.   All right.  So now let's look at the domestic U.M.G.

14   And we just only need to go back two pages, to the page that

15   begins Page 3 up at the top.

16   A.   Yes.

17             MR. POMERANTZ:  Okay.  And you'll -- Phil, if

18   you'll bring up the same recording that is listed first, and

19   then -- and just highlight that plus the -- yeah.  Right

20   there.  That is perfect.

21             All right.  Then highlight the name of the

22   recording and then the configuration.  All right.

23   BY MR. POMERANTZ:

24   Q.   So you see now there's the same recording, which is B

25   and then a bunch of asterisks.

1             Do you see that?

2    A.    Yes.

3    Q.    And now instead of describing it as burns, the royalty

4    statements now begin to describe them as permanent downloads;

5    correct?

6    A.    Yes.

7    Q.    And this is the domestic U.M.G. section; correct?

8    A.    That's where this is.

9    Q.    Not in the license section; correct?

10   A.    You did not -- they did not put it in the license

11   section.

12   Q.    All right.

13   A.    That's correct.

14   Q.    And so you received royalty statements in 2002 that told

15   you that permanent downloads were being accounted to as a

16   sale of a record.

17   A.    And I said that was incorrect.

18   Q.    All right.  And you received royalty statements in 2003

19   that showed how -- how downloads were --

20   A.    Well, let's talk about 2002 because you know that for an

21   accounting period that ends at the end of 2002, it's nine

22   months or ten months before we actually get a statement; so

23   it wouldn't have been until the very end of 2003 that we

24   actually received anything that said anything about permanent

25   downloads.

1    Q.   Are you sure that it takes nine months to get royalty

2    statements?

3    A.   100 percent.  As it relates to accounting periods;

4    that's correct.

5    Q.   And you don't believe that you received royalty

6    statements 90 days after the end of the accounting periods?

7    A.   In some cases that's true.  We will get them, depending

8    upon how we get into the agreements and whether or not we saw

9    them six months later or nine months.  There could be a total

10   of $10 in income for permanent downloads here.  We didn't go

11   into the agreement to just focus on $10 worth of income on a

12   $2 million statement.  Like I said, we became -- it was clear

13   to us when the audit was done that you weren't paying on the

14   basis of the licensing provision for downloads.

15   Q.   So are you now saying that you were aware, at least

16   sometime in 2003, that Universal was paying F.B.T. for

17   downloads under the records sold provision?

18   A.   I'm not saying I was aware of it.  You asked me whether

19   or not it was in the statements.  I don't go over these

20   statements like that.

21   Q.   And you received two royalty statements from Universal

22   in 2003; correct?

23   A.   That's correct.

24   Q.   And two of them in 2004; correct?

25   A.   That's correct.

1    Q.    And two more in 2005; correct?

2    A.    Correct.

3          Now, when you say I received them, we received

4    checks.  These royalty statements are, in some cases,

5    thousands of pages long.  I don't go through these agreements

6    and take a look at specific line entries as it relates to a

7    permanent download.

8          THE COURT:  Mr. Pomerantz, let's take the lunch

9    break.

10          MR. POMERANTZ:  Thank you, Your Honor.

11          THE COURT:  All right.  Ladies and gentlemen, we're

12    going to break for one hour to 1:30.

13          Remember not to discuss the case among yourselves

14    or with anyone else.  Don't form or express any opinions

15    about the case until it is finally submitted to you.

16          We'll see you at 1:30.

17          THE CLERK:  All rise.

18          (Open court - jury not present.)

19          THE COURT:  You may step down.

20          I'd like to start at 1:20 with the discussion on

21    the exhibits.  We're ready to go.

22          MR. POMERANTZ:  Your Honor, I think we have had a

23    discussion today in terms of timing, where we are in the

24    case.  I think we've agreed that we will go through -- finish

25    Mr. Martin, which shouldn't take very long.  Then we have

1   Mr. Weinberg, and then we have Mr. Berman, their expert.

2   That will leave only, I believe, two witnesses left.

3             Oh, I'm sorry.  Ping Hu, Mr. Hu, who will also go

4   today.

5             MR. BUSCH:  Can I say one thing before -- just real

6   quick?

7             Based upon Your Honor's comments after the last

8   break, obviously I was concerned about time and so I wanted

9   to play Ethan Gustav's deposition.  It's literally

10  20 minutes.  But if I've got an hour and a half or less time

11  left, I don't want to eat that time up with that.

12            THE COURT:  How much time -- you have Mr. Berman,

13  who is you -- is --

14            MR. BUSCH:  This is what I have.  I'll go right

15  through it, Your Honor.

16            THE COURT:  All right.

17            MR. BUSCH:  I have David Weinberg.  I'm going to

18  get him on and off in 20 minutes or so.

19            THE COURT:  Okay.

20            MR. BUSCH:  Then I've got Ping Hu; that's on the

21  $159,000 claim, literally probably five minutes.

22            THE COURT:  Okay.

23            MR. BUSCH:  And then I've got -- what else do we

24  have?  Okay.  Gustav's deposition is about 20 minutes.  It's

25  exactly 15 minutes.

1          And then I've got my two experts, David Berman and

2     Gary Cohen.  And I'm thinking -- 30 minutes or so for each of

3     those is what I'm thinking approximately, Your Honor.  And

4     then I've got to reserve time to cross-examine their expert,

5     Mr. Harleston.

6          And then the last thing is I don't know what

7     Your Honor's rulings are.  I hope that Your Honor is going to

8     stick with your ruling on Ciongoli and Steve Berman, the

9     late-disclosed witnesses, and not allow them to testify, but

10    that's also hanging out there.

11          THE COURT:  How long do you -- your -- okay.

12          Go ahead.

13          MR. POMERANTZ:  I guess what -- the point I was

14    going to make is I think we both feel comfortable that if we

15    finish through Mr. Berman today -- Mr. David Berman, their

16    expert, then that would leave tomorrow two witnesses,

17    Mr. Gary Cohen and Mr. Jeff Harleston.

18          Whether there's any witnesses beyond that depends

19    on Your Honor's ruling on these two witnesses, each of whom

20    would be very short if we -- if Your Honor would let us do

21    it, and the possibility that Mr. Busch may want to call

22    a short rebuttal witness that he and I have discussed.

23          So that -- and what I was hoping to do today, and

24    I think Mr. Busch joins me in this request, at least based on

25    our discussions, is that we hope we can get through Mr. David

1    Berman today and that if we do, it may run us up right up to

2    4:30.

3              THE COURT:  Remember, we're breaking early.

4              MR. POMERANTZ:  Oh, that's true.

5              So we're not going to get to Mr. Gary Cohen today.

6    So even if we finished at 3:15, which I don't think we would,

7    but if we did, we would like to break so we can start

8    Mr. Cohen fresh tomorrow morning.

9              THE COURT:  That's fine.  That's fine.

10             The only other issue is that no matter what,

11   Mr. Busch, you need more time.  You have an hour and

12   11 minutes.  So no matter what, you need to -- you're going

13   to have to request more time.  So based on what -- even the

14   pared down version is an hour and a half without

15   cross-examination.  Think about the exact requests that

16   you're going to make.  You have an hour and 11 minutes.  Even

17   pared down, you have an hour and a half without cross.  So

18   think about what your request is.

19             MR. BUSCH:  Okay.  And then we'll speak about it?

20             THE COURT:  At 1:20.

21             MR. BUSCH:  Okay, Your Honor.

22             (Whereupon the a.m. session was concluded)

23

24

25

**$**

**$1,000** [1] - 66:19
**$10** [2] - 115:10, 115:11
**$100** [1] - 21:2
**$159,000** [1] - 117:21
**$5,000** [1] - 66:10
**$50** [1] - 20:17

**'**

**'70s** [3] - 72:7, 89:19, 90:11
**'80s** [1] - 90:21
**'90s** [1] - 90:22
**'92** [1] - 63:2
**'98** [10] - 17:16, 29:16, 43:6, 44:2, 44:3, 51:23, 66:16, 67:1, 67:5, 67:7
**'Dead** [1] - 48:20
**'Renegade** [1] - 48:20
**'Stand** [1] - 48:20

**0**

**07-3314-PSG** [1] - 1:8
**0900** [1] - 4:7

**1**

**1** [11] - 45:24, 94:3, 107:3, 107:7, 107:8, 108:9, 112:1, 112:4, 112:5, 112:15, 112:23
**10** [1] - 20:2
**10,000** [4] - 66:6, 66:7, 66:9, 66:10
**100** [8] - 9:21, 10:5, 10:16, 12:17, 19:6, 19:7, 20:2, 115:3
**100/0** [2] - 9:20, 9:25
**10250** [1] - 2:6
**109** [1] - 6:19
**11** [2] - 119:12, 119:16
**110** [1] - 6:19
**111** [1] - 6:19
**112** [1] - 6:19
**113** [1] - 6:19
**114** [1] - 6:19
**115** [1] - 6:19
**116** [1] - 6:19
**118** [1] - 6:19
**11893** [1] - 1:23
**119** [1] - 6:19
**11:00** [1] - 55:2
**11:13** [1] - 55:2

**12** [1] - 39:7
**12/31/02** [1] - 112:19
**120** [1] - 6:19
**121** [1] - 6:19
**122** [1] - 6:20
**123** [1] - 6:20
**124** [1] - 6:20
**128** [1] - 33:9
**13** [5] - 29:19, 29:24, 35:24, 39:12, 92:11
**14** [3] - 38:11, 38:13, 39:7
**146** [1] - 26:23
**15** [4] - 46:6, 53:15, 53:19, 117:25
**16** [1] - 26:23
**17** [6] - 61:22, 81:11, 81:14, 81:22, 82:5, 82:13
**18** [9] - 48:6, 62:4, 78:2, 79:23, 80:10, 80:15, 85:1, 86:23, 101:4
**181-K** [1] - 1:24
**19** [3] - 32:11, 32:12, 105:22
**1968** [1] - 89:21
**1974** [1] - 89:14
**1975** [2] - 55:13, 72:8
**1978** [1] - 55:17
**1981** [5] - 15:24, 16:1, 15:24, 55:25, 56:20
**1985** [1] - 62:19
**1989** [1] - 56:6
**1990's** [1] - 73:9
**1991** [1] - 63:2
**1995** [2] - 65:3, 67:11
**1997** [5] - 65:7, 66:5, 94:3, 94:6, 94:9
**1998** [24] - 9:7, 11:20, 14:2, 17:8, 18:25, 19:3, 19:4, 21:14, 50:5, 50:6, 50:9, 50:13, 56:7, 66:14, 89:12, 91:2, 91:13, 91:21, 91:25, 92:15, 94:9, 98:25, 100:19, 101:4
**1999** [4] - 9:6, 15:20, 56:8, 56:17
**1:20** [2] - 116:20, 119:20
**1:30** [2] - 116:12, 116:16

**2**

**2** [2] - 107:1, 115:12
**2.4** [1] - 109:2

**20** [8] - 36:3, 79:24, 80:10, 80:15, 85:1, 117:10, 117:18, 117:24
**200** [1] - 109:6
**2000** [24] - 13:17, 13:24, 14:3, 17:12, 19:9, 19:12, 19:17, 19:22, 21:7, 21:12, 21:19, 21:25, 43:6, 44:1, 50:7, 50:10, 50:17, 67:2, 70:5, 70:11, 98:12, 98:20, 99:4, 99:14
**2002** [18] - 13:11, 22:4, 22:6, 22:10, 45:24, 51:12, 106:9, 106:14, 108:5, 108:9, 108:10, 110:24, 111:8, 112:23, 114:14, 114:20, 114:21
**2002-2003** [1] - 13:14
**2003** [36] - 13:11, 14:3, 22:4, 22:5, 23:9, 23:19, 28:2, 29:8, 29:13, 30:5, 31:19, 31:23, 32:18, 35:11, 35:13, 35:14, 35:20, 40:23, 43:6, 44:1, 47:11, 47:16, 47:18, 47:20, 47:22, 51:23, 54:11, 67:2, 67:12, 105:15, 114:18, 114:23, 115:16, 115:22
**2004** [7] - 37:10, 37:12, 39:18, 40:17, 41:1, 54:8, 115:24
**2005** [3] - 13:20, 13:24, 116:1
**2006** [7] - 69:20, 103:14, 103:22, 103:23, 103:25, 104:9, 105:23
**2007** [1] - 69:20
**2009** [2] - 1:20, 4:7
**213** [1] - 1:25
**220** [1] - 109:10
**227,000** [1] - 109:10
**23rd** [1] - 51:12
**24** [4] - 29:25, 35:25, 36:8, 39:11
**255** [1] - 1:24
**26** [2] - 1:20, 4:7
**26th** [1] - 32:18
**28-year** [1] - 56:20

**3**

**3** [1] - 113:15
**30** [7] - 7:1, 54:10, 65:17, 108:5, 108:9, 109:6, 118:2
**31** [1] - 112:23
**315** [1] - 2:3
**355** [1] - 2:15
**37201** [1] - 2:4
**3:15** [1] - 119:6

**4**

**4** [2] - 1:18, 26:23
**4-A** [1] - 100:20
**4-AI** [1] - 100:19
**40** [1] - 62:11
**402** [1] - 5:9
**45** [2] - 89:17, 90:3
**4:30** [1] - 119:2

**5**

**5** [3] - 91:21, 100:19, 100:20
**50** [16] - 10:13, 11:2, 11:16, 12:18, 14:8, 14:17, 14:18, 20:2, 30:21, 30:23, 31:3, 33:17, 84:15, 85:4, 85:13, 109:6
**50/50** [5] - 9:20, 10:19, 15:9, 15:11, 15:17
**500** [1] - 65:17
**55** [1] - 3:5
**58** [1] - 3:6
**59** [1] - 3:11

**6**

**6** [2] - 19:18, 49:6
**61** [3] - 3:6, 3:7, 5:13
**613** [4] - 106:16, 106:22, 111:11, 112:12

**7**

**70** [1] - 33:2
**70's** [1] - 95:24
**72** [1] - 3:7
**75** [1] - 12:17
**75/25** [2] - 9:20, 9:24
**777** [1] - 34:12

**8**

**8** [6] - 3:3, 3:4, 3:5, 81:18, 91:22, 92:1

**874** [6] - 3:11, 59:2, 59:10, 59:12, 59:17, 59:18
**884** [1] - 45:22
**894-2853** [1] - 1:25

**9**

**9** [10] - 36:4, 36:19, 36:22, 36:25, 37:4, 39:19, 39:23, 39:24, 40:18, 40:23
**9.01** [2] - 36:23, 37:3
**90** [1] - 115:6
**90012** [1] - 1:24
**90067** [1] - 2:8
**90071** [2] - 2:16
**907** [2] - 106:17, 106:24
**911** [2] - 41:19, 41:23
**912** [1] - 49:18
**919-A** [1] - 76:13
**99** [1] - 32:22

**A**

**a.m** [3] - 55:2, 119:22
**A.M** [1] - 1:18
**able** [3] - 24:12, 58:21, 102:3
**Absolutely** [2] - 91:15, 98:5
**absolutely** [1] - 24:5
**accepted** [1] - 65:21
**accounted** [2] - 23:5, 114:15
**accounting** [6] - 6:8, 104:7, 114:21, 115:3, 115:6
**accurately** [1] - 35:6
**acknowledge** [1] - 48:19
**actual** [6] - 42:6, 42:11, 71:19, 94:7, 107:18
**added** [5] - 30:12, 30:14, 30:16, 31:1, 39:7
**addition** [2] - 22:11, 64:2
**additional** [1] - 54:24
**address** [1] - 5:22
**addressing** [1] - 47:23
**admitted** [2] - 6:12, 59:17
**advance** [2] - 18:14, 18:18
**advanced** [1] - 19:8
**advances** [5] -

18:19, 18:25, 19:15, 19:20, 22:3
**Advances** [1] - 19:10
**advantage** [3] - 31:6, 31:7
**affairs** [1] - 8:25
**AFTERMATH** [2] - 1:10, 2:13
**Aftermath** [61] - 9:8, 9:12, 9:14, 9:15, 10:6, 10:7, 11:20, 11:24, 12:2, 12:16, 12:19, 13:1, 13:3, 13:7, 13:13, 13:18, 14:2, 14:3, 17:17, 42:1, 42:5, 42:10, 42:14, 42:21, 42:22, 42:25, 44:7, 44:10, 44:12, 44:15, 44:20, 48:7, 48:21, 50:14, 50:18, 51:21, 52:4, 53:5, 78:22, 79:1, 79:4, 79:11, 82:6, 83:7, 83:24, 85:12, 87:24, 88:4, 88:7, 89:12, 92:4, 97:2, 97:24, 99:2, 103:2, 103:11, 103:13, 105:25
**afternoon** [2] - 53:23, 61:24
**age** [1] - 89:19
**ages** [1] - 45:6
**ago** [6] - 14:8, 14:12, 14:14, 15:19, 30:25, 84:9
**agree** [7] - 4:23, 17:2, 17:5, 33:14, 48:20, 49:25, 50:20
**agreed** [15] - 18:9, 18:14, 18:15, 22:2, 23:17, 28:7, 33:23, 35:19, 39:4, 41:12, 44:18, 44:19, 92:18, 116:24
**agreement** [115] - 9:8, 10:14, 11:4, 11:6, 11:8, 11:9, 11:20, 11:24, 14:17, 14:21, 15:13, 15:16, 17:1, 17:13, 17:15, 17:16, 17:23, 18:1, 18:11, 18:13, 21:15, 23:9, 26:9, 27:13, 27:14, 27:15, 28:3, 28:7, 29:13, 29:16, 30:3, 30:4, 31:20, 31:22, 31:23, 32:1, 32:3, 35:11, 35:13, 35:14, 35:16, 35:20, 38:25, 39:17, 39:19, 40:23,

41:25, 42:11, 43:2, 43:6, 43:7, 43:20, 44:2, 44:3, 44:6, 44:23, 45:4, 45:10, 45:24, 46:3, 46:6, 46:8, 46:21, 47:12, 47:16, 47:18, 47:20, 47:23, 48:9, 49:13, 49:20, 49:23, 49:24, 50:2, 50:5, 50:6, 50:7, 50:9, 50:13, 51:2, 51:3, 51:23, 51:24, 52:9, 52:20, 53:7, 54:11, 57:6, 65:4, 66:15, 66:16, 67:1, 67:2, 70:5, 70:18, 70:22, 71:13, 89:11, 91:3, 91:13, 91:16, 91:17, 91:21, 91:25, 92:1, 92:7, 92:15, 99:20, 100:19, 115:11
**agreements** [34] - 9:18, 14:2, 14:3, 14:5, 16:4, 16:20, 17:3, 23:16, 26:13, 26:16, 27:22, 28:23, 31:3, 34:21, 34:23, 42:3, 42:4, 43:5, 44:1, 48:24, 50:11, 53:5, 53:10, 54:14, 56:12, 56:14, 56:18, 56:21, 56:25, 62:22, 67:3, 115:8, 116:5
**ahead** [4] - 5:11, 46:19, 64:18, 118:12
**AL** [2] - 1:10, 2:13
**album** [25] - 18:2, 19:4, 38:5, 38:12, 39:7, 43:15, 43:17, 44:14, 44:20, 45:12, 47:13, 48:22, 49:3, 63:16, 64:5, 78:4, 85:20, 85:21, 86:2, 86:6, 86:7, 87:24, 88:5, 88:16, 88:22
**albums** [17] - 19:25, 36:10, 36:17, 37:21, 38:1, 38:18, 39:2, 41:5, 47:11, 47:19, 47:23, 63:18, 63:20, 63:21, 82:6, 82:14
**allocations** [1] - 69:9
**allow** [1] - 118:9
**almost** [1] - 63:13
**amazing** [1] - 66:6
**Amazon** [3] - 73:19, 101:22, 102:4
**Amazon.com** [6] - 73:9, 73:12, 73:15, 73:17, 73:25, 74:22

**ambiguous** [1] - 109:25
**amend** [3] - 22:13, 23:4, 28:23
**amended** [9] - 17:16, 23:14, 26:9, 28:25, 32:1, 43:6, 50:7, 50:9
**amendment** [9] - 37:11, 37:12, 39:18, 39:20, 39:23, 40:18, 47:22, 47:25, 54:8
**amount** [2] - 19:14, 35:18
**amounted** [1] - 63:7
**ancillary** [5] - 70:17, 70:18, 70:21, 99:14, 99:16
**ANGELES** [5] - 1:19, 1:24, 2:8, 2:16, 4:7
**Angeles** [4] - 56:9, 66:20, 66:22, 72:14
**announcement** [1] - 77:8
**answer** [7] - 7:14, 12:12, 26:25, 34:6, 35:8, 40:1, 40:7
**answered** [5] - 21:4, 27:10, 27:17, 29:4, 104:3
**answers** [2] - 80:23, 80:25
**anticipated** [1] - 7:2
**anyway** [4] - 22:18, 34:3, 38:6, 38:9
**apologize** [1] - 60:8
**appear** [3] - 11:5, 45:12, 49:3
**appeared** [2] - 47:1, 47:10
**Apple** [4] - 32:6, 32:22, 33:1, 33:2
**applicable** [1] - 48:23
**applies** [2] - 34:3, 38:18
**apply** [1] - 94:22
**appreciate** [1] - 85:24
**approached** [1] - 99:18
**approval** [3] - 42:7, 43:1, 53:7
**area** [2] - 57:22, 57:23
**argue** [1] - 27:19
**arguing** [2] - 46:15, 54:20
**Argumentative** [1] - 104:2
**argumentative** [2] -

15:2, 24:1
**Arista** [1] - 56:5
**arose** [1] - 72:19
**art** [11] - 78:16, 82:20, 82:21, 83:1, 83:4, 86:25, 87:1, 87:14, 87:16, 88:24, 89:3
**Article** [9] - 36:19, 36:22, 36:25, 37:4, 39:19, 39:23, 39:24, 40:18, 40:23
**artist** [23] - 9:18, 19:3, 22:12, 23:3, 27:22, 31:2, 37:17, 50:18, 57:6, 64:22, 64:23, 76:14, 76:18, 76:22, 77:1, 81:25, 86:7, 86:11, 86:13, 86:14, 88:23, 89:3, 103:18
**artist's** [1] - 112:18
**Artists** [1] - 52:21
**artists** [5] - 13:5, 22:19, 56:24, 57:12, 82:3
**artwork** [1] - 83:1
**associated** [1] - 102:23
**assume** [3] - 85:18, 85:19, 92:9
**Assuming** [1] - 95:8
**asterisks** [2] - 110:9, 113:25
**attention** [4] - 34:15, 36:9, 37:10, 68:22
**attorney** [3] - 9:2, 61:3, 71:8
**audit** [6] - 69:6, 69:13, 69:15, 69:22, 69:25, 115:13
**auditor** [1] - 69:5
**audits** [3] - 68:25, 69:3, 104:9
**authority** [3] - 35:19, 42:3, 42:12
**authorized** [2] - 42:21, 42:23
**available** [1] - 74:7
**AVENUE** [1] - 2:15
**avoid** [2] - 30:12, 33:13
**aware** [7] - 43:3, 43:8, 85:11, 89:22, 105:14, 115:15, 115:18

**B**

**B.M.G** [2] - 56:4,

56:10
**background** [2] - 18:7, 55:8
**BAIRD** [1] - 1:23
**band** [3] - 62:10, 76:1, 76:2
**Based** [2] - 60:12, 117:7
**based** [5] - 42:19, 44:5, 84:15, 118:24, 119:13
**basement** [2] - 63:11, 64:3
**bases** [2] - 52:3, 60:18
**basic** [5] - 22:2, 22:3, 42:8, 43:1, 58:6
**basis** [5] - 33:18, 51:19, 51:22, 67:15, 115:14
**Bass** [10] - 61:16, 62:2, 62:3, 62:4, 63:20, 64:6, 64:13, 64:22, 67:4
**Bass's** [2] - 64:10, 67:15
**battle** [1] - 66:21
**battles** [2] - 66:19
**beach** [3] - 96:17, 96:21, 96:22
**became** [3] - 50:17, 74:7, 115:12
**become** [1] - 18:10
**began** [1] - 15:19
**begin** [1] - 114:4
**beginning** [2] - 9:6, 68:19
**begins** [2] - 36:10, 113:15
**BEHALF** [2] - 2:3, 2:13
**behalf** [5] - 42:1, 42:4, 42:22, 68:18, 68:25
**behind** [1] - 109:12
**believes** [1] - 38:10
**benefit** [1] - 22:25
**Berman** [9] - 97:13, 97:15, 117:1, 117:12, 118:1, 118:8, 118:15, 119:1
**Berman's** [1] - 97:9
**Best** [7] - 58:11, 72:1, 72:24, 79:13, 81:7, 84:18, 85:12
**best** [1] - 60:7
**better** [3] - 31:7, 44:8, 91:23
**between** [21] - 9:8, 10:15, 11:20, 12:1,

14:22, 14:23, 15:4, 15:14, 18:9, 21:3, 40:16, 44:11, 45:10, 45:24, 46:4, 46:9, 46:22, 47:4, 49:20, 58:9, 65:6
**Between** [1] - 46:1
**beyond** [3] - 21:7, 102:23, 118:18
**Beyond** [1] - 21:9
**big** [3] - 65:7, 74:18, 74:21
**bigger** [4] - 56:16, 72:16, 106:16
**biggest** [2] - 74:16, 74:19
**binder** [8] - 32:12, 33:8, 41:20, 45:21, 59:3, 59:11, 106:15, 106:18
**binders** [1] - 106:16
**bit** [5] - 35:23, 57:1, 60:14, 61:18, 68:5
**Black** [2] - 57:2, 57:8
**BLOCK** [1] - 2:6
**Blue** [1] - 102:10
**Bogart** [1] - 66:23
**bold** [1] - 30:9
**Bon** [1] - 57:9
**book** [2] - 29:20, 29:24
**boom** [2] - 96:15, 96:20
**borrowing** [1] - 66:2
**boss** [1] - 28:17
**bottom** [7] - 36:11, 78:20, 79:3, 108:1, 108:13, 111:12, 112:25
**bought** [8] - 73:25, 80:1, 86:3, 86:17, 90:9, 90:16, 90:19, 90:25
**BOULEVARD** [1] - 2:7
**box** [2] - 96:15, 96:20
**Boy** [1] - 62:15
**brands** [1] - 12:9
**break** [11] - 7:3, 7:6, 7:11, 7:16, 7:17, 7:21, 53:15, 116:9, 116:12, 117:8, 119:7
**breakdown** [2] - 32:22, 100:14
**breaking** [1] - 119:3
**brief** [1] - 60:20
**briefed** [1] - 24:20
**briefly** [1] - 55:8
**Bring** [1] - 111:14

**bring** [8] - 7:23, 34:18, 62:25, 92:12, 96:22, 106:20, 107:25, 113:18
**bringing** [1] - 68:15
**broad** [1] - 16:9
**broadly** [6] - 16:6, 16:9, 16:10, 16:20, 17:1, 17:4
**brother** [1] - 62:14
**brothers** [1] - 63:20, 64:6, 64:13, 64:22
**Brothers** [1] - 50:22
**build** [4] - 22:19, 102:9, 102:10, 102:12
**building** [2] - 102:3, 102:5
**built** [4] - 96:7, 101:20, 101:23, 102:1
**bunch** [3] - 52:25, 82:3, 113:25
**burn** [3] - 110:22, 110:23, 111:3
**burns** [3] - 110:20, 110:25, 114:3
**Burns** [1] - 110:21
**BUSCH** [91] - 2:3, 4:11, 4:21, 5:4, 5:8, 5:12, 6:1, 6:13, 6:15, 7:19, 8:5, 8:12, 8:14, 8:22, 20:13, 20:16, 20:25, 21:1, 21:5, 24:4, 24:10, 25:7, 25:10, 25:14, 25:18, 25:20, 25:22, 26:18, 26:23, 27:3, 27:5, 27:12, 27:18, 27:20, 29:5, 29:11, 29:18, 29:23, 30:9, 30:10, 32:15, 32:17, 34:18, 34:19, 35:5, 36:15, 36:16, 39:11, 39:13, 40:6, 40:8, 40:10, 40:15, 41:15, 41:16, 46:18, 48:13, 48:17, 49:16, 49:17, 53:12, 54:6, 54:11, 54:13, 54:19, 55:1, 58:20, 58:24, 59:1, 59:9, 59:19, 59:25, 60:5, 60:12, 60:22, 61:5, 61:13, 64:15, 68:11, 71:15, 89:8, 104:2, 104:22, 109:25, 117:5, 117:14, 117:17, 117:20, 117:23, 119:19, 119:21
**Busch** [15] - 5:20, 6:22, 7:24, 20:12,

20:22, 40:4, 53:22, 71:21, 98:12, 102:11, 104:16, 118:21, 118:24, 119:11
**business** [21] - 8:25, 11:2, 11:11, 11:13, 14:10, 14:11, 15:5, 15:8, 15:22, 16:1, 18:4, 28:20, 43:1, 57:9, 57:10, 61:19, 61:22, 63:2, 65:20, 89:13, 89:14
**businesses** [1] - 12:9
**button** [1] - 73:16
**Buy** [1] - 58:11, 72:24, 79:13, 84:18
**buy** [10] - 73:23, 74:10, 74:11, 74:14, 75:1, 75:14, 85:20, 90:1, 90:12, 90:23
**buying** [3] - 89:15, 89:16, 89:23
**buys** [2] - 79:18, 86:6
**BY** [47] - 2:6, 2:13, 8:22, 20:16, 21:1, 21:5, 25:22, 27:5, 27:12, 27:20, 29:5, 29:11, 29:23, 30:10, 32:17, 34:19, 35:5, 36:16, 39:13, 40:10, 40:15, 41:16, 46:18, 48:17, 49:17, 55:6, 59:1, 61:13, 64:15, 68:11, 72:4, 76:7, 85:25, 89:10, 91:24, 92:14, 95:20, 100:22, 105:7, 106:23, 107:22, 108:3, 110:5, 110:18, 111:15, 112:11, 113:23

## C

**C(1)(i** [1] - 30:8
**C.B.S** [4] - 15:24, 55:22, 55:25, 56:3
**CALIFORNIA** [6] - 1:2, 1:19, 1:24, 2:8, 2:16, 4:7
**camp** [3] - 62:5, 62:10, 62:13
**camper** [1] - 62:4
**capital** [1] - 78:21
**car** [6] - 95:21, 95:23, 96:1, 96:7, 96:25, 97:6
**care** [1] - 48:7
**cars** [2] - 96:6, 97:19

**cartridge** [1] - 95:21
**case** [29] - 16:3, 17:12, 23:8, 24:2, 25:1, 25:5, 43:3, 47:12, 51:22, 53:16, 53:18, 54:23, 60:7, 62:22, 68:12, 69:7, 69:9, 70:16, 97:9, 97:16, 103:2, 103:10, 103:12, 103:24, 104:13, 105:12, 116:13, 116:15, 116:24
**cases** [2] - 115:7, 116:4
**cassettes** [1] - 73:5
**cassette** [20] - 76:17, 77:12, 77:22, 78:11, 79:2, 79:3, 80:2, 80:22, 83:10, 87:19, 88:12, 88:25, 90:17, 96:1, 96:7, 96:12, 96:20, 96:22, 97:1, 97:5
**cassettes** [6] - 93:13, 96:24, 97:13, 97:19, 97:25, 100:10
**categories** [1] - 113:1
**caught** [1] - 60:22
**CBS** [1] - 56:10
**CD** [12] - 72:1, 77:20, 79:12, 80:2, 80:22, 83:10, 84:21, 84:22, 85:13, 85:15, 86:17, 97:5
**CDs** [2] - 58:11, 79:17
**CENTRAL** [1] - 1:2
**cents** [2] - 32:22, 33:2
**century** [1] - 67:7
**certain** [7] - 10:5, 31:21, 35:18, 37:19, 47:24, 96:12, 106:12
**certainly** [5] - 35:12, 60:7, 67:10, 90:21, 94:22
**change** [8] - 21:17, 24:17, 25:24, 27:13, 28:7, 31:19, 40:18, 91:8
**changed** [5] - 21:13, 27:24, 30:4, 80:19, 91:4
**changes** [5] - 21:11, 23:18, 28:9, 35:20, 101:13
**changing** [2] - 22:11, 98:25

**channel** [2] - 79:15, 79:19
**channels** [4] - 97:25, 101:1, 105:19, 106:10
**charge** [1] - 54:14
**chart** [3] - 76:25, 111:12, 112:25
**check** [1] - 35:22
**checks** [1] - 116:4
**choose** [1] - 41:9
**Ciongoli** [1] - 118:8
**Circuit** [1] - 72:24
**circumstances** [1] - 71:12
**cite** [1] - 26:21
**City** [5] - 55:11, 72:1, 72:24, 81:7, 85:13
**claim** [9] - 31:2, 41:1, 51:19, 51:20, 51:22, 52:3, 69:9, 69:10, 117:21
**claims** [2] - 30:12, 69:7
**clarify** [4] - 4:12, 28:9, 53:22, 111:6
**clarity** [1] - 38:10
**Clarity** [2] - 31:5, 31:7
**classical** [1] - 57:23
**clause** [2] - 37:18, 70:21
**clear** [13] - 12:4, 12:24, 23:2, 30:18, 31:10, 31:25, 32:9, 38:8, 45:15, 53:2, 95:4, 111:10, 115:12
**CLERK** [4] - 8:17, 53:20, 61:9, 116:17
**clerked** [1] - 55:19
**click** [1] - 73:16
**client** [1] - 33:16
**close** [2] - 67:15, 89:19
**closed** [1] - 7:25
**club** [3] - 111:22, 111:23, 113:5
**clubs** [2] - 84:10, 84:13, 84:16
**co** [3] - 10:19, 11:14, 13:5
**co-own** [1] - 13:5
**co-owns** [2] - 10:19, 11:14
**coalition** [1] - 22:19
**Cohen** [8] - 6:5, 69:4, 69:15, 103:19, 118:2, 118:17, 119:5, 119:8
**Cohen's** [2] - 69:13, 69:23
**collection** [4] - 12:8,

97:5, 97:6
**college** [1] - 55:10
**College** [1] - 55:11
**Columbia** [1] - 55:11
**column** [1] - 81:8
**comfortable** [1] -
118:14
**coming** [1] - 63:14
**comments** [1] -
117:7
**commercial** [2] -
94:2, 94:8
**compact** [22] - 73:7,
73:15, 73:17, 73:19,
74:11, 74:23, 76:8,
77:3, 78:7, 78:19,
84:4, 87:2, 87:17,
88:10, 88:25, 90:23,
93:9, 100:8, 100:16,
101:6, 101:9, 101:17
**companies** [8] -
16:5, 17:4, 17:8, 58:2,
69:6, 79:10, 88:6,
102:8
**company** [20] -
10:14, 18:19, 43:10,
43:14, 43:16, 58:7,
58:15, 66:8, 66:23,
79:8, 83:18, 83:21,
87:23, 88:4, 88:24,
89:4, 97:15, 102:16,
102:17
**compared** [1] - 82:5
**compilation** [10] -
81:8, 81:9, 81:11,
82:9, 82:13, 82:17,
82:20, 83:13, 83:25,
85:3
**compilations** [1] -
85:16
**computer** [5] -
73:16, 94:20, 94:25,
95:6, 95:16
**computers** [1] -
75:12
**concern** [6] - 31:1,
70:25, 71:3, 71:4,
71:10, 71:11
**concerned** [3] -
60:15, 60:17, 117:8
**concerning** [4] -
17:23, 27:23, 35:11,
70:10
**concerns** [2] - 70:10,
88:2
**concert** [1] - 62:13
**concluded** [1] -
119:22
**conditional** [1] -
104:6

**conditions** [1] -
48:23
**configuration** [4] -
87:4, 93:5, 106:5,
113:22
**configurations** [2] -
76:23, 90:11
**confused** [2] - 15:3
**confusing** [1] - 68:5
**confusion** [1] - 38:24
**connection** [6] -
6:17, 9:23, 31:8, 51:7,
69:22, 95:9
**consider** [1] - 54:23
**consistent** [1] -
18:13
**CONSTELLATION**
[1] - 2:6
**consumer** [7] -
73:12, 79:14, 79:17,
80:1, 80:14, 84:8,
84:19
**consumers** [2] -
91:4, 91:11
**contain** [3] - 23:10,
23:12, 23:14
**contained** [7] -
46:11, 48:19, 48:23,
64:25, 69:25, 70:18,
92:16
**container** [3] - 22:22,
31:16, 33:6
**contains** [1] - 82:11
**contemplated** [4] -
71:13, 91:17, 92:22,
99:19
**contention** [4] -
103:10, 103:12,
103:24, 105:21
**contentions** [1] -
104:13
**contest** [1] - 66:21
**context** [2] - 35:12,
35:14
**continue** [4] - 56:18,
67:14, 68:9, 91:8
**continued** [2] -
63:10, 67:13
**contract** [8] - 18:6,
28:5, 29:8, 71:5,
93:22, 98:25, 99:25,
109:18
**contracting** [1] -
100:3
**contracts** [4] - 22:13,
22:14, 23:4
**contractual** [1] -
68:19
**contrary** [4] - 35:10,
48:14, 48:15, 48:19

**convenience** [1] -
107:19
**conversation** [4] -
21:21, 70:17, 99:4,
99:13
**conversations** [17] -
17:22, 18:1, 21:7,
21:18, 21:24, 22:1,
54:7, 54:17, 60:19,
70:4, 70:10, 70:15,
70:19, 98:21, 99:12,
99:21
**coordinator** [1] -
62:11
**copies** [2] - 71:20,
71:22
**copy** [1] - 76:12,
79:20
**corner** [6] - 83:14,
107:4, 107:8, 112:2,
112:5, 112:15
**Correct** [15] - 28:13,
39:9, 49:10, 50:8,
50:16, 55:23, 86:21,
88:13, 88:15, 88:17,
93:14, 93:16, 103:4,
103:6, 116:2
**correct** [243] - 4:10,
9:9, 11:17, 11:21,
11:24, 12:7, 12:14,
12:18, 13:1, 14:9,
14:14, 15:20, 15:23,
16:16, 16:18, 17:9,
17:17, 22:15, 23:6,
23:23, 25:8, 25:25,
26:3, 26:6, 26:14,
29:1, 29:8, 30:22,
31:14, 31:20, 31:23,
32:1, 32:24, 33:3,
33:6, 34:8, 36:6,
36:22, 37:13, 38:3,
38:12, 38:19, 39:4,
39:14, 39:21, 40:16,
40:20, 41:3, 41:7,
43:8, 43:18, 43:22,
44:25, 45:5, 45:25,
46:10, 47:20, 48:8,
49:9, 49:21, 50:7,
50:11, 50:15, 50:18,
50:22, 52:2, 55:22,
57:14, 57:17, 69:1,
72:14, 72:20, 72:25,
73:3, 73:5, 73:7,
73:10, 73:13, 73:17,
73:20, 73:23, 74:3,
74:8, 74:12, 74:14,
74:17, 74:18, 74:20,
74:23, 74:24, 75:1,
75:2, 75:3, 75:4, 75:8,
75:15, 75:17, 75:19,

75:22, 76:23, 77:5,
77:8, 78:3, 78:9,
78:12, 78:14, 79:4,
79:6, 79:9, 79:15,
79:24, 80:3, 80:8,
80:11, 80:16, 80:23,
81:1, 81:15, 81:18,
81:23, 82:1, 82:2,
82:3, 82:4, 82:15,
82:22, 83:2, 83:8,
83:11, 83:16, 83:19,
83:22, 84:1, 84:5,
84:25, 85:1, 85:2,
85:5, 85:23, 86:8,
86:17, 87:2, 87:13,
87:15, 87:17, 87:24,
88:5, 88:10, 88:11,
88:16, 88:25, 89:5,
89:6, 89:24, 90:1,
90:4, 90:7, 90:12,
90:14, 90:23, 91:5,
91:8, 91:14, 91:18,
92:1, 92:5, 92:8,
92:16, 92:19, 93:5,
93:8, 93:19, 93:24,
94:9, 94:15, 94:21,
95:8, 95:14, 96:4,
96:7, 96:13, 96:18,
96:19, 96:21, 97:2,
97:16, 97:20, 97:22,
98:1, 98:4, 98:8,
98:21, 99:2, 99:6,
99:7, 99:8, 99:9,
99:11, 99:15, 100:4,
100:6, 100:7, 100:23,
101:1, 101:4, 101:5,
101:6, 101:7, 101:10,
101:14, 101:18,
101:22, 103:7,
103:14, 103:22,
105:8, 105:15,
105:19, 105:23,
105:24, 106:1, 106:2,
106:4, 106:10,
106:11, 107:11,
108:10, 108:24,
109:13, 109:16,
109:19, 109:24,
112:23, 114:5, 114:7,
114:9, 114:13, 115:4,
115:22, 115:23,
115:24, 115:25, 116:1
**correctly** [2] - 60:19,
103:3
**cost** [5] - 100:13,
101:8, 101:9, 102:23
**costs** [5] - 69:12,
100:8, 100:15,
101:13, 101:16
**Could've** [1] - 41:8

**could've** [1] - 71:4
**counsel** [1] - 55:7
**counselor** [1] - 62:5
**count** [4] - 38:4,
38:5, 38:11, 38:15
**country** [1] - 57:24
**couple** [8] - 4:9,
13:16, 41:17, 56:4,
60:1, 68:23, 68:25,
109:22
**course** [9] - 16:17,
20:3, 21:17, 31:5,
52:10, 70:16, 76:24,
86:12, 98:10
**COURT** [87] - 1:1,
1:23, 4:9, 4:12, 4:22,
4:24, 5:7, 5:11, 5:15,
5:24, 6:10, 6:14, 7:8,
7:15, 7:20, 8:3, 8:7,
8:13, 8:15, 8:20,
20:11, 20:22, 21:4,
24:8, 24:19, 25:9,
25:12, 25:15, 25:19,
26:22, 27:1, 27:4,
27:11, 27:17, 27:19,
29:4, 29:10, 29:22,
35:3, 40:4, 40:7, 40:9,
40:12, 46:16, 53:14,
53:22, 54:9, 54:12,
54:15, 54:23, 55:4,
58:19, 58:23, 59:15,
59:17, 59:20, 59:22,
60:3, 60:10, 60:17,
60:24, 61:6, 64:14,
65:15, 68:3, 71:17,
71:23, 71:25, 76:6,
104:4, 104:16,
104:20, 104:24,
105:3, 105:5, 110:4,
116:8, 116:11,
116:19, 117:12,
117:16, 117:19,
117:22, 118:11,
119:3, 119:9, 119:20
**court** [7] - 4:14, 8:2,
53:21, 55:3, 55:19,
116:18
**Court** [2] - 53:24,
60:8
**courtroom** [2] - 7:25,
8:15
**cover** [11] - 78:7,
78:11, 78:14, 78:16,
82:20, 82:21, 83:1,
86:25, 87:1, 87:5,
87:7
**covered** [6] - 50:11,
60:18, 70:22, 71:6,
101:3, 101:11
**covering** [1] - 108:8

covers [2] - 87:6, 99:19
create [1] - 81:8
created [1] - 83:1
creation [1] - 63:19
credibility [1] - 63:8
Cross [2] - 55:4, 71:17
CROSS [4] - 3:5, 3:7, 55:5, 72:3
cross - 118:4, 119:15, 119:17
cross-examination [1] - 119:15
Cross-examination [2] - 55:4, 71:17
CROSS-EXAMINATION [4] - 3:5, 3:7, 55:5, 72:3
cross-examine [1] - 118:4
Crow [1] - 57:3
CSR [1] - 1:23
Cue [6] - 3:3, 7:24, 8:1, 8:5, 8:8, 8:9
Cue's [1] - 6:25
current [1] - 33:2
Curtain [2] - 81:5, 82:7
custom [1] - 42:23
customary [1] - 18:4
customer [2] - 85:19, 86:6
CV [1] - 1:8
Cyndi [1] - 57:1

**D**

daily [1] - 67:15
data [6] - 94:15, 94:18, 94:20, 95:7, 95:11, 95:15
date [2] - 52:20, 69:16
dated [1] - 45:24
David [5] - 59:25, 117:17, 118:1, 118:15, 118:25
DAY [1] - 1:18
days [1] - 115:6
deal [9] - 5:21, 7:6, 7:11, 7:12, 7:17, 7:20, 19:4, 42:8, 97:2
dealing [2] - 4:16, 47:19
deals [1] - 56:16
Decca [1] - 57:22
December [1] - 112:23
decided [1] - 64:20

decision [2] - 27:6, 68:7
deduction [5] - 22:23, 31:16, 31:17, 33:6, 80:8
deductions [1] - 80:4
Def [1] - 57:25
DEFENDANT [1] - 2:13
Defendants [1] - 1:12
define [1] - 94:17
defined [3] - 50:1, 51:2, 52:8
definitely [3] - 16:14, 23:12, 34:9
Definitely [1] - 56:19
definition [9] - 92:8, 92:12, 92:16, 92:20, 92:23, 93:4, 93:17, 93:22, 95:18
deliver [8] - 50:1, 50:14, 51:1, 51:8, 51:25, 52:14, 52:17, 91:10
delivered [4] - 50:22, 52:4, 52:23, 52:25
delivering [2] - 91:4, 91:7
demos [1] - 63:14
deposed [1] - 23:8
deposition [27] - 3:4, 4:14, 6:16, 6:23, 6:25, 7:1, 8:1, 8:5, 8:8, 8:9, 16:12, 16:14, 16:16, 16:19, 25:8, 25:23, 26:3, 26:8, 26:15, 26:19, 58:4, 97:9, 97:12, 97:18, 117:9, 117:24
depositions [1] - 4:10
describe [3] - 46:3, 114:4
describing [1] - 114:3
designed [1] - 97:4
despite [1] - 15:16
detail [2] - 107:16, 109:12
detailed [1] - 23:24
detailing [1] - 25:24
determine [1] - 85:8
determined [1] - 79:14
Detroit [2] - 61:21, 72:12
Deutchagramaphone [1] - 57:23
developed [1] - 92:5

development [2] - 52:22, 62:21
device [1] - 88:20
difference [3] - 40:16, 40:20, 40:21
Different [1] - 83:4
different [38] - 4:15, 5:9, 9:18, 9:19, 11:12, 12:9, 12:19, 15:10, 19:10, 19:11, 24:13, 24:18, 25:9, 45:18, 46:2, 56:21, 57:21, 63:17, 64:24, 67:3, 75:25, 80:4, 80:8, 81:11, 81:14, 82:3, 82:8, 82:14, 82:17, 82:24, 83:21, 87:3, 87:4, 90:6, 90:11, 90:22, 111:7
differently [2] - 4:17, 88:3
digital [12] - 17:8, 27:23, 30:12, 31:2, 31:11, 58:13, 75:15, 75:16, 75:20, 101:21, 102:8, 102:22
DIRECT [6] - 3:5, 3:6, 3:7, 8:21, 58:25, 61:12
direct [11] - 17:17, 18:11, 34:15, 36:9, 37:10, 54:7, 58:22, 68:6, 68:22, 70:6, 99:1
directly [8] - 54:21, 93:23, 94:21, 94:23, 95:3, 95:7, 95:11, 95:13
disagree [2] - 16:24, 33:23
disagreeing [1] - 16:23
disaster [1] - 65:18
disc [23] - 73:15, 73:17, 73:19, 74:11, 76:8, 77:3, 78:7, 78:19, 83:11, 84:4, 87:2, 87:17, 88:10, 88:25, 90:23, 100:9, 100:16, 101:6, 101:9, 101:17
disclosed [1] - 118:9
discovery [4] - 24:2, 24:21, 24:25, 25:6
discretion [1] - 35:18
discs [3] - 73:7, 74:23, 93:9
discuss [2] - 33:18, 35:14, 53:16, 61:3, 102:25, 116:13

discussed [6] - 6:24, 28:8, 28:10, 35:12, 35:21, 118:22
discussing [1] - 84:18
discussion [7] - 24:9, 25:21, 60:4, 61:7, 100:3, 116:20, 116:23
discussions [3] - 51:7, 98:16, 118:25
displayed [1] - 58:12
dispute [1] - 45:9
disputing [1] - 98:10
distribute [2] - 12:1, 43:17
distributed [3] - 43:10, 43:14, 92:21
distribution [6] - 43:14, 43:16, 58:5, 58:7, 94:2, 94:9
distributor [1] - 11:23
DISTRICT [3] - 1:1, 1:2, 1:23
divides [1] - 113:1
division [7] - 12:5, 12:6, 12:13, 13:9, 56:1, 56:2, 56:9
Division [1] - 12:10
divvied [1] - 32:23
document [18] - 24:17, 24:23, 25:11, 40:17, 42:6, 45:21, 47:6, 48:1, 49:12, 52:5, 59:13, 104:21, 105:1, 107:2, 107:5, 112:3, 112:9, 112:14
documents [2] - 25:1, 52:5
dollars [3] - 102:2, 102:5, 102:7
domestic [9] - 107:20, 108:13, 109:1, 109:22, 110:3, 111:17, 113:2, 113:13, 114:7
domestics [1] - 109:15
done [9] - 17:20, 35:21, 68:25, 74:2, 95:23, 96:3, 104:8, 104:9, 115:13
dotted [2] - 28:18, 28:19
Doubt [1] - 57:3
down [12] - 20:12, 22:21, 41:15, 59:22, 59:23, 78:5, 78:8, 78:18, 107:20,

116:19, 119:14, 119:17
download [18] - 31:2, 31:11, 33:14, 36:18, 38:4, 38:15, 74:11, 85:17, 88:22, 94:25, 95:12, 95:13, 102:8, 103:7, 103:8, 103:16, 111:3, 116:7
Downloaded [1] - 75:3
downloaded [2] - 75:7, 88:16
downloads [48] - 17:8, 22:8, 22:20, 23:5, 26:11, 27:23, 28:24, 30:13, 30:19, 32:5, 38:2, 38:11, 38:14, 38:19, 39:3, 39:6, 74:7, 74:16, 74:19, 74:22, 75:15, 75:17, 75:20, 75:22, 94:8, 99:6, 99:10, 102:6, 103:3, 103:9, 103:13, 103:22, 104:1, 104:5, 104:6, 105:15, 105:18, 106:9, 110:25, 111:4, 114:4, 114:15, 114:19, 114:25, 115:10, 115:14, 115:17
Dr [7] - 13:13, 42:10, 44:11, 44:13, 44:18, 44:19, 57:3
draft [7] - 16:5, 16:8, 16:9, 16:10, 39:15, 39:16, 51:6
drafted [6] - 16:20, 17:1, 17:4, 26:13, 26:16, 39:14
drafting [5] - 23:16, 27:7, 27:14, 39:25, 56:13
drafts [1] - 21:12
Dre [7] - 42:10, 44:11, 44:13, 44:18, 44:19, 44:20, 57:3
Dre's [1] - 13:13
Dream [1] - 62:15
drummer [1] - 62:10
during [9] - 7:6, 7:20, 7:25, 21:12, 21:18, 28:1, 28:2, 98:20, 99:4
During [1] - 60:6

**E**

e-mail [9] - 32:4,

32:19, 32:23, 33:5,
33:10, 33:21, 33:22,
33:25, 34:8
  **E.P** [4] - 64:6, 64:19,
66:2, 66:25
  **early** [2] - 31:19,
119:3
  **earnings** [1] - 113:1
  **EAST** [1] - 1:24
  **eat** [1] - 117:11
  **economic** [1] - 6:6
  **economics** [1] - 44:7
  **Eddy** [4] - 3:3, 8:5,
8:8, 8:9
  **effective** [1] - 34:20
  **eight** [4] - 90:14,
95:21, 95:22, 97:6
  **Eight** [16] - 10:7,
14:12, 14:13, 43:11,
43:15, 43:17, 44:15,
44:24, 45:13, 46:11,
50:2, 51:14, 51:15,
52:8, 52:15
  **eight-track** [4] -
90:14, 95:21, 95:22,
97:6
  **either** [7] - 4:17,
15:15, 39:15, 39:16,
42:9, 79:23, 109:6
  **Either** [1] - 13:23
  **electronics** [1] -
72:25
  **eliminating** [1] -
60:13
  **Elmo** [4] - 76:4,
85:23, 88:18, 88:19
  **Em** [2] - 35:22, 44:21
  **embodies** [1] - 43:2
  **emerged** [2] - 73:10,
74:8
  **Eminem** [86] - 9:8,
9:23, 11:4, 12:18,
13:21, 14:1, 14:13,
14:23, 16:25, 17:16,
18:2, 18:8, 18:11,
18:12, 18:15, 18:17,
18:21, 19:8, 19:12,
19:25, 20:8, 21:16,
23:9, 26:9, 28:4, 29:8,
31:22, 32:1, 32:3,
35:13, 43:21, 44:10,
44:11, 44:14, 44:17,
45:13, 45:16, 45:17,
46:24, 47:3, 50:2,
50:5, 50:6, 50:10,
50:11, 50:13, 50:17,
50:21, 51:2, 53:10,
62:21, 64:2, 65:10,
66:12, 67:7, 67:9,
67:13, 67:25, 68:12,

68:15, 69:1, 69:4,
76:16, 76:19, 76:21,
78:8, 81:1, 81:17,
81:20, 81:25, 82:5,
82:7, 82:11, 82:22,
83:22, 84:21, 86:2,
88:5, 92:4, 99:1,
100:9, 100:10, 108:9,
112:22
  **Eminem's** [13] -
35:11, 35:14, 35:15,
43:14, 43:19, 47:9,
47:10, 47:13, 47:23,
52:19, 62:22, 81:22,
105:10
  **emotional** [1] - 60:6
  **employed** [1] - 9:4
  **employment** [1] -
55:8
  **Encore** [2] - 81:3,
82:7
  **end** [6] - 7:4, 20:23,
48:16, 114:21,
114:23, 115:6
  **End** [2] - 25:21, 61:7
  **ended** [2] - 63:14,
66:20
  **ending** [2] - 108:5,
112:19
  **ends** [1] - 114:21
  **engineer** [2] - 67:19,
102:20
  **enter** [1] - 53:6
  **entered** [2] - 32:3,
63:1
  **entire** [2] - 85:20,
107:18
  **entitled** [3] - 18:7,
36:4, 40:24
  **entity** [7] - 10:22,
11:10, 15:7, 15:8,
45:16, 47:3, 47:4
  **entries** [3] - 6:7,
110:7, 116:6
  **entry** [1] - 110:8
  **equipment** [1] -
72:25
  **equipped** [1] - 96:6
  **escalated** [1] - 38:6
  **escalation** [1] -
37:17
  **escalations** [10] -
36:24, 37:3, 37:8,
37:15, 37:22, 38:3,
39:3, 39:21, 39:25,
40:19
  **Escalations** [1] -
37:16
  **especially** [2] -
62:23, 67:12

**ET** [2] - 1:10, 2:13
  **Ethan** [3] - 6:16,
60:13, 117:9
  **Evan** [1] - 66:22
  **event** [1] - 65:22
  **evidence** [3] - 5:6,
5:10, 5:12
  **exact** [2] - 84:11,
119:15
  **Exactly** [1] - 33:7
  **exactly** [3] - 11:8,
11:10, 15:18, 19:14,
70:25, 71:9, 78:3,
80:5, 80:22, 84:12,
87:9, 117:25
  **EXAMINATION** [10] -
3:5, 3:5, 3:6, 3:7, 3:7,
8:21, 55:5, 58:25,
61:12, 72:3
  **examination** [3] -
55:4, 71:17, 119:15
  **examine** [1] - 118:4
  **examined** [1] - 53:25
  **example** [7] - 6:3,
32:6, 35:11, 66:2,
72:22, 97:1, 102:8
  **examples** [1] - 56:24
  **except** [2] - 82:18,
107:16
  **exception** [2] -
39:18, 82:15
  **exciting** [1] - 18:3
  **exclusive** [1] - 50:17
  **exclusively** [1] -
50:19
  **Excuse** [1] - 29:21
  **excuse** [1] - 5:13
  **executive** [1] - 63:23
  **exercise** [1] - 80:21
  **exhibit** [3] - 6:7,
29:25, 107:19
  **Exhibit** [26] - 3:11,
5:13, 6:18, 29:18,
29:24, 32:11, 32:12,
33:8, 34:12, 35:24,
39:11, 41:19, 41:22,
45:21, 48:6, 49:18,
59:2, 59:10, 59:18,
76:13, 91:21, 100:19,
100:20, 106:16,
111:11
  **exhibits** [12] - 5:5,
5:6, 5:10, 5:16, 6:3,
6:11, 6:21, 7:6, 7:11,
60:1, 107:15, 116:21
  **EXHIBITS** [1] - 3:10
  **existing** [4] - 21:14,
22:13, 23:4, 28:7
  **expand** [1] - 99:22
  **expanding** [1] -

100:3
  **expensive** [1] -
100:17
  **expert** [5] - 6:6,
97:16, 117:1, 118:4,
118:16
  **experts** [1] - 118:1
  **explain** [4] - 33:5,
44:8, 45:20, 62:7
  **explained** [1] - 40:22
  **exploit** [1] - 92:4
  **exploitation** [1] -
17:9
  **express** [5] - 53:17,
70:25, 71:2, 71:9,
116:14
  **extent** [2] - 60:8,
64:12
  **Eyed** [2] - 57:2, 57:9

**F**

**F.B.T** [42] - 1:4, 2:3,
9:8, 11:20, 17:13,
18:8, 18:10, 18:15,
21:15, 21:16, 45:4,
50:14, 53:10, 64:21,
65:2, 65:10, 66:3,
67:8, 67:17, 67:18,
67:23, 67:24, 67:25,
68:14, 69:1, 69:4,
70:6, 79:12, 83:24,
85:12, 89:11, 97:2,
97:24, 103:25, 105:2,
105:21, 105:25,
106:8, 108:23,
108:24, 115:16
  **F.B.T.'s** [5] - 53:7,
55:7, 67:6, 103:2,
103:10, 103:12,
103:24
  **F.B.T./Aftermath** [1]
- 91:3
  **fabulous** [1] - 18:3
  **fact** [3] - 15:16,
24:21, 68:8
  **facts** [3] - 24:1,
65:10, 66:16
  **Fair** [1] - 89:20
  **fair** [3] - 29:14,
46:24, 78:16
  **faith** [1] - 47:19
  **fall** [3] - 31:11, 47:11,
47:15
  **falls** [1] - 47:19
  **familiar** [4] - 11:19,
69:10, 102:20, 111:2
  **far** [5] - 6:2, 19:5,
50:17, 62:6, 62:20
  **favorable** [3] - 22:22,

31:10, 31:12
  **favorably** [4] - 30:17,
30:19, 30:22, 31:10
  **featured** [4] - 76:14,
76:18, 76:22, 81:25
  **FEBRUARY** [2] -
1:20, 4:7
  **felt** [1] - 34:5
  **few** [4] - 55:7, 57:8,
98:12, 110:9
  **FIFTH** [1] - 2:15
  **fight** [1] - 68:21
  **file** [1] - 102:22
  **filed** [2] - 104:12,
105:1
  **files** [2] - 101:21,
102:7
  **film** [1] - 43:10
  **final** [1] - 29:8
  **finally** [1] - 116:15
  **findings** [1] - 69:23
  **fine** [8] - 4:21, 7:8,
41:13, 48:16, 71:23,
71:25, 119:9
  **Fine** [1] - 40:8
  **fingertips** [1] - 20:1
  **finish** [3] - 41:18,
116:24, 118:15
  **finished** [2] - 69:16,
119:6
  **FINK** [1] - 2:5
  **First** [4] - 26:22,
26:24, 90:14, 104:16
  **first** [26] - 5:18, 7:16,
10:20, 18:2, 49:23,
55:18, 55:21, 63:16,
63:23, 64:22, 64:23,
65:2, 66:20, 69:18,
77:7, 89:15, 97:23,
106:17, 108:13,
109:22, 110:6, 110:8,
111:16, 112:14,
113:2, 113:18
  **firsthand** [1] - 64:10
  **five** [3] - 54:16,
54:18, 117:21
  **FLOOR** [2] - 2:7,
2:15
  **flow** [1] - 7:9
  **focus** [2] - 40:11,
115:11
  **focusing** [1] - 95:4
  **follow** [2] - 35:16,
55:9
  **followed** [1] - 29:7
  **following** [3] - 31:18,
31:19, 32:23
  **Fonovisa** [1] - 57:22
  **foreign** [5] - 107:16,
107:17, 108:19,

109:9, 113:9
**forgot** [1] - 70:3
**form** [18] - 17:9,
27:24, 27:25, 28:4,
30:4, 31:25, 39:17,
39:19, 40:17, 40:23,
53:17, 64:21, 65:12,
75:15, 75:16, 89:23,
103:7, 116:14
**formal** [1] - 105:1
**formally** [1] - 63:1
**format** [4] - 73:3,
74:11, 90:22
**formats** [1] - 75:25
**forms** [4] - 92:5,
92:19, 92:20, 93:15
**forth** [2] - 33:6, 87:6
**forward** [1] - 91:8
**foundation** [4] -
46:13, 64:12, 104:20,
104:24
**foundational** [1] -
5:5
**four** [2] - 79:10,
113:1
**fourth** [1] - 113:9
**framed** [1] - 24:23
**fresh** [1] - 119:8
**front** [8] - 38:20,
45:23, 46:14, 58:12,
58:14, 75:24, 76:10,
78:9
**full** [5] - 8:18, 37:21,
38:1, 38:18, 61:9
**functions** [1] - 94:19
**fundamental** [1] -
102:23
**FURTHER** [2] - 3:6,
58:25

### G

**Gary** [21] - 6:5,
21:22, 21:25, 23:17,
28:6, 28:13, 32:4,
32:9, 34:5, 35:19,
69:4, 69:13, 69:15,
70:20, 71:7, 103:19,
105:8, 118:2, 118:17,
119:5
**general** [4] - 54:17,
94:2, 94:6, 94:8
**generally** [1] - 85:9
**genres** [1] - 57:22
**gentlemen** [2] -
53:14, 116:11
**given** [2] - 19:20,
68:19
**GLASER** [1] - 2:5
**glasses** [1] - 87:10

**Glenn** [1] - 72:6
**GLENN** [1] - 2:13
**gospel** [1] - 64:1
**gradually** [1] - 56:14
**graduate** [2] - 55:12,
55:16
**graduated** [1] - 72:7
**GRAND** [1] - 2:15
**greatest** [5] - 47:11,
47:19, 47:23, 47:25,
49:3
**ground** [1] - 35:2
**grounds** [1] - 29:3
**group** [2] - 38:15,
62:15
**Group** [5] - 12:8,
57:14, 58:2, 58:3,
111:20
**guess** [7] - 5:19,
13:10, 20:20, 21:20,
62:11, 95:25, 118:13
**Gustav** [4] - 6:16,
6:23, 7:14, 60:13
**Gustav's** [2] - 117:9,
117:24
**GUTIERREZ** [1] - 1:3
**guy** [2] - 66:22,
67:19

### H

**H-O-F-F-M-A-N** [1] -
8:19
**half** [7] - 19:18,
54:25, 63:13, 111:8,
117:10, 119:14,
119:17
**hand** [7] - 71:20,
83:14, 107:4, 107:8,
112:2, 112:5, 112:15
**handling** [1] - 61:4
**hanging** [1] - 118:10
**hap** [1] - 62:6
**Harleston** [2] -
118:5, 118:17
**Harvard** [2] - 55:15,
55:16
**hazard** [3] - 20:19,
20:20
**head** [2] - 8:25, 15:5
**heading** [1] - 110:3
**hear** [2] - 4:16, 15:2
**Heard** [1] - 96:15
**heard** [5] - 5:19,
27:3, 57:4, 63:5,
63:17, 65:6, 65:7,
66:17, 67:1, 67:2,
105:12
**hearsay** [1] - 64:12
**help** [2] - 76:25,

111:6
**herein** [1] - 48:19
**hereinafter** [1] - 92:5
**hereof** [6] - 36:19,
36:22, 36:25, 37:4,
39:20, 40:18
**hidden** [1] - 25:3
**high** [3] - 61:23,
62:1, 72:7
**higher** [1] - 37:20
**Highlight** [1] -
110:17
**highlight** [6] - 36:15,
54:2, 110:15, 111:13,
113:19, 113:21
**himself** [1] - 47:3
**hire** [1] - 69:4
**hired** [2] - 69:3,
97:15
**hit** [2] - 65:7, 65:16
**hits** [7] - 47:11,
47:13, 47:19, 47:23,
47:25, 48:22, 49:3
**Hoffman** [36] - 3:4,
7:2, 7:5, 8:14, 8:16,
8:19, 8:23, 8:24, 9:11,
17:7, 17:11, 20:21,
25:23, 27:6, 27:21,
30:25, 31:18, 40:1,
40:11, 41:14, 43:3,
46:19, 46:21, 53:25,
54:3, 54:5, 54:6, 54:7,
55:7, 58:18, 58:21,
59:2, 60:18, 60:21,
98:23, 99:5
**Hold** [3] - 5:15,
20:11, 52:16
**hold** [2] - 42:14,
42:16
**holding** [1] - 84:12
**home** [20] - 73:22,
92:21, 92:22, 92:25,
93:1, 93:24, 94:20,
94:21, 94:24, 95:3,
95:6, 95:7, 95:12,
95:14, 95:15, 95:19,
96:25, 97:4, 97:8,
98:6
**homes** [1] - 97:19
**honest** [1] - 63:12
**Honor** [59] - 4:21,
5:4, 5:13, 5:18, 6:13,
6:21, 7:19, 8:6, 8:12,
8:14, 20:10, 23:25,
24:2, 24:6, 26:18,
26:20, 26:24, 27:3,
27:9, 27:16, 27:18,
29:2, 29:9, 34:25,
40:2, 46:12, 53:13,
54:6, 54:19, 58:17,

58:20, 59:9, 59:11,
59:16, 59:19, 59:21,
59:25, 60:6, 60:9,
60:12, 60:14, 64:8,
65:13, 68:1, 71:18,
71:21, 72:2, 104:2,
104:11, 104:19,
105:6, 107:14,
116:10, 116:22,
117:15, 118:3, 118:7,
118:20, 119:21
**Honor's** [4] - 104:14,
117:7, 118:7, 118:19
**HONORABLE** [1] -
1:3
**hope** [3] - 87:11,
118:7, 118:25
**hoping** [1] - 118:23
**hour** [8] - 53:25,
54:1, 116:12, 117:10,
119:11, 119:14,
119:16, 119:17
**hours** [1] - 54:25
**house** [3] - 78:9,
87:13, 97:7
**Hu** [3] - 117:3,
117:20
**Hundreds** [1] - 56:23
**hundreds** [1] - 56:23

### I

**Ice** [1] - 63:8
**idea** [2] - 94:25,
103:15
**identical** [1] - 39:18
**identified** [4] - 47:25,
49:4, 49:7
**ignored** [1] - 40:12
**III** [1] - 48:10
**immediately** [1] -
34:20
**impeach** [1] - 24:15
**impeachment** [2] -
24:18, 26:19
**implication** [2] -
25:3, 33:13
**important** [1] - 41:9
**importantly** [1] -
66:11
**improper** [1] - 25:5
**improvement** [1] -
22:17
**IN** [2] - 2:3, 2:13
**Inc** [17] - 11:11,
11:12, 14:10, 15:4,
15:13, 15:15, 42:1,
42:5, 42:16, 42:20,
46:1, 46:5, 46:9,
46:22, 47:2, 49:21,

52:1
**include** [7] - 19:20,
23:4, 23:15, 26:10,
26:13, 28:3, 28:23
**included** [5] - 27:14,
27:23, 29:7, 93:23,
107:16
**includes** [1] - 92:19
**inclusion** [2] - 48:22,
52:14
**income** [3] - 15:11,
115:10, 115:11
**inconsistent** [2] -
26:25, 27:1
**incorrect** [2] -
103:14, 114:17
**INDEX** [1] - 3:1
**indicate** [1] - 78:25
**indicated** [1] - 53:23
**indicates** [1] - 79:1
**individual** [4] -
38:11, 38:14, 38:19,
39:6
**industry** [1] - 55:22
**Infinite** [7] - 63:16,
63:18, 64:5, 64:17,
64:23, 65:7, 65:16
**initial** [1] - 62:22
**inquire** [2] - 8:20,
105:5
**instead** [4] - 44:19,
65:14, 80:20, 114:3
**instructed** [4] -
22:21, 23:1, 23:2,
23:3
**instruction** [7] -
22:10, 23:15, 26:12,
28:22, 29:1, 29:6,
35:7
**instructions** [2] -
35:10, 35:16
**interest** [3] - 13:13,
14:6, 42:19
**interested** [1] - 61:25
**interface** [1] - 58:8
**intern** [3] - 61:22,
62:24, 66:23
**internal** [1] - 42:7
**Internet** [6] - 94:10,
94:14, 94:17, 95:5,
95:8
**interrupt** [1] - 40:3
**Interscope** [76] -
9:14, 9:15, 9:21, 10:1,
10:4, 10:9, 10:12,
10:16, 10:22, 10:25,
11:6, 11:16, 11:23,
11:25, 12:1, 12:2,
12:5, 12:9, 12:13,
12:16, 12:20, 12:21,

12:22, 13:1, 13:3, 13:9, 13:12, 13:17, 14:5, 14:8, 14:18, 14:22, 14:24, 15:8, 15:12, 15:14, 15:17, 15:20, 28:19, 30:5, 31:20, 31:25, 40:17, 42:18, 42:20, 44:13, 44:24, 45:10, 45:11, 45:25, 46:1, 46:5, 46:8, 46:10, 46:22, 46:23, 46:25, 47:4, 47:5, 48:8, 50:19, 50:20, 51:3, 53:6, 56:17, 57:13, 57:19, 65:11, 66:24, 68:7, 70:6, 88:8, 98:17, 101:20
**Interscope's** [1] - 9:12
**Interscope/Geffen/ A&M** [2] - 9:1, 56:9
**introduced** [3] - 3:3, 8:8, 60:2
**introduction** [1] - 59:10
**involve** [1] - 68:15
**involved** [10] - 9:7, 15:25, 17:19, 17:21, 25:2, 51:4, 62:7, 67:11, 87:23, 91:2
**Involved** [1] - 87:25
**involvement** [10] - 62:6, 62:21, 63:20, 64:6, 64:11, 65:9, 66:15, 67:4, 67:6, 67:16
**involves** [1] - 94:14
**involving** [2] - 13:20, 94:18
**Iovine** [1] - 66:25
**iPod** [4] - 75:5, 75:8, 86:1, 87:1
**issue** [7] - 27:25, 32:9, 39:1, 43:4, 43:5, 62:22, 119:10
**issued** [1] - 22:7
**issues** [3] - 68:18, 68:21, 69:25
**item** [1] - 111:16
**items** [2] - 108:13, 109:23
**itself** [2] - 91:17, 112:3
**iTunes** [16] - 33:15, 58:13, 58:14, 74:14, 74:16, 75:21, 85:19, 85:20, 86:3, 86:6, 87:24, 87:25, 101:22, 102:4, 102:13, 102:19

## J

**Jackson's** [1] - 57:2
**JACOBS** [1] - 2:5
**Jam** [1] - 57:25
**January** [3] - 45:24, 94:3, 108:9
**Jeff** [11] - 61:16, 62:2, 62:14, 62:16, 63:22, 63:25, 65:23, 67:10, 67:15, 67:20, 118:17
**Jimmy** [1] - 66:25
**job** [3] - 55:18, 55:21, 69:5
**Jobs** [1] - 60:13
**Joel** [7] - 3:6, 6:6, 21:18, 59:6, 61:1, 61:8, 61:11
**joined** [2] - 55:24, 56:17
**joins** [1] - 118:24
**jointly** [1] - 69:4
**Jon** [1] - 57:9
**Jones's** [1] - 62:15
**Jovi** [1] - 57:10
**JUDGE** [1] - 1:3
**July** [1] - 112:23
**June** [4] - 31:23, 35:11, 108:5, 108:9
**jurors** [2] - 4:25, 7:23
**JURY** [1] - 1:17
**jury** [7] - 8:2, 12:3, 44:9, 53:21, 55:3, 61:18, 116:18

## K

**keep** [3] - 18:17, 76:25, 88:7
**KELLY** [1] - 2:14
**kept** [1] - 63:3
**kid** [1] - 63:3
**kids** [1] - 62:5
**kind** [4] - 10:18, 35:17, 62:24, 63:2
**kinds** [3] - 58:1, 73:2, 84:19
**KLAUS** [1] - 2:14
**Klaus** [1] - 61:2
**knowing** [1] - 104:25
**knowledge** [1] - 63:19
**known** [1] - 92:5
**knows** [4] - 24:17, 24:25, 25:4, 68:13

## L

**L.P** [22] - 76:1, 76:9,

77:15, 77:24, 78:14, 79:6, 79:12, 79:23, 80:2, 80:19, 82:7, 83:5, 84:4, 85:18, 86:3, 86:8, 88:5, 88:14, 88:23, 88:25, 101:6
**L.P.s** [1] - 90:1
**label** [5] - 44:17, 56:5, 57:16, 62:15, 88:8
**labels** [5] - 57:19, 57:21, 57:24, 58:1, 58:9
**lack** [2] - 46:12, 64:11
**ladder** [1] - 56:14
**Ladies** [2] - 53:14, 116:11
**laid** [1] - 24:21
**language** [11] - 27:25, 39:17, 40:20, 40:21, 51:8, 51:24, 52:16, 71:6, 71:7, 71:11, 95:19
**large** [1] - 18:14
**Las** [1] - 66:20
**Last** [1] - 36:13
**last** [10] - 8:18, 34:16, 53:2, 60:6, 61:10, 62:1, 70:3, 117:7, 118:6
**late** [1] - 118:9
**late-disclosed** [1] - 118:9
**Latin** [1] - 57:22
**latter** [1] - 4:21
**Lauper** [1] - 57:1
**law** [2] - 55:14, 55:18
**Law** [1] - 55:15
**lawsuit** [2] - 70:1, 105:2
**lawsuits** [1] - 68:15
**lawyer** [4] - 15:25, 38:10, 56:13, 105:10
**lawyers** [4] - 16:5, 41:9, 56:15, 57:11
**lead** [1] - 85:11
**leading** [4] - 65:10, 66:15, 66:16, 68:2
**least** [12] - 7:4, 7:5, 50:1, 51:1, 51:9, 51:25, 52:13, 52:17, 53:1, 101:4, 115:15, 118:24
**leave** [3] - 73:22, 117:2, 118:16
**left** [2] - 117:2, 117:11
**legal** [3] - 8:25,

13:10, 42:18
**LEMOINE** [1] - 2:14
**less** [2] - 100:15, 117:10
**letter** [2] - 48:7, 48:9
**letters** [1] - 59:5
**letting** [1] - 64:8
**license** [17] - 16:19, 16:25, 17:3, 29:12, 33:16, 83:25, 84:12, 85:4, 85:14, 99:22, 100:1, 100:4, 108:16, 109:18, 109:19, 114:9, 114:10
**licensed** [7] - 48:21, 79:16, 79:21, 84:10, 84:11, 84:25, 98:2
**licenses** [7] - 26:10, 28:24, 30:12, 31:3, 31:11, 107:21, 109:5
**licensing** [5] - 31:13, 34:2, 84:15, 85:10, 115:14
**likely** [1] - 91:8
**limine** [1] - 104:23
**limits** [1] - 94:24
**line** [5] - 26:22, 28:18, 28:19, 108:13, 116:6
**Line** [2] - 26:23
**lining** [1] - 30:13
**Lisa** [2] - 17:20, 39:25
**list** [2] - 5:20, 77:4
**listed** [1] - 113:18
**listen** [4] - 23:20, 75:7, 75:12, 96:21
**listings** [1] - 51:18
**literally** [2] - 117:9, 117:21
**live** [2] - 7:2, 7:3
**LLC** [1] - 1:4
**LLP** [2] - 2:5, 2:13
**logo** [1] - 78:21
**Look** [1] - 99:18
**look** [37] - 5:22, 7:5, 11:14, 21:13, 36:3, 45:3, 45:7, 45:19, 45:20, 51:17, 52:16, 59:14, 76:17, 77:12, 78:7, 78:19, 78:20, 79:2, 81:7, 81:10, 82:20, 82:21, 83:13, 83:14, 86:25, 87:10, 88:21, 93:21, 95:18, 106:14, 109:22, 110:6, 111:5, 113:13, 116:6
**looked** [6] - 45:6, 46:6, 48:1, 76:20,

77:15, 83:5
**looking** [2] - 77:20, 112:12
**looks** [8] - 77:7, 78:8, 87:12, 109:2, 109:5, 109:9, 110:9, 110:20
**loopholes** [1] - 71:5
**LOS** [5] - 1:19, 1:24, 2:8, 2:16, 4:7
**Los** [4] - 56:9, 66:20, 66:22, 72:14
**lose** [1] - 20:23
**Lose** [24] - 10:3, 10:4, 10:5, 10:10, 10:12, 10:16, 43:4, 43:19, 43:21, 43:25, 47:1, 47:10, 47:13, 47:24, 49:4, 49:7, 50:21, 51:11, 51:23, 52:6, 52:7, 52:19, 53:4, 54:3
**lost** [1] - 66:21
**Louie** [1] - 67:20
**love** [1] - 28:13
**loved** [1] - 66:24
**lower** [1] - 108:1
**lunch** [1] - 116:8
**lying** [1] - 24:16
**lyrics** [1] - 65:25

## M

**M-A-R-T-I-N** [1] - 61:11
**mail** [10] - 32:4, 32:19, 32:23, 33:5, 33:10, 33:21, 33:22, 33:25, 34:8, 73:19
**managers** [1] - 57:11
**manufacture** [8] - 100:8, 100:9, 100:15, 101:8, 101:9, 101:13, 101:16, 101:17
**manufactured** [1] - 92:21
**mark** [1] - 5:1
**MARK** [1] - 2:6
**Mark** [15] - 61:16, 62:2, 62:3, 62:4, 62:12, 62:16, 62:23, 63:3, 63:10, 63:22, 64:1, 65:23, 66:18, 67:10
**marked** [1] - 76:13
**Marshal's** [1] - 68:17
**Marshall** [33] - 48:10, 49:20, 63:13, 64:21, 64:24, 65:3, 65:18, 65:24, 65:25, 66:18,

66:21, 66:24, 67:14, 67:21, 68:20, 69:4, 75:25, 76:9, 79:12, 79:23, 80:2, 80:19, 82:6, 83:5, 84:4, 85:18, 86:2, 86:7, 87:12, 88:5, 88:22, 88:24, 103:19
**Marshall's** [2] - 67:19, 68:6
**Mart** [5] - 74:25, 79:13, 79:18, 84:7, 84:18
**Martin** [30] - 3:6, 6:6, 7:3, 7:4, 21:18, 59:6, 60:25, 61:5, 61:6, 61:8, 61:11, 61:14, 61:16, 64:9, 64:16, 71:21, 72:5, 78:20, 87:11, 88:22, 89:11, 91:25, 93:3, 95:19, 104:25, 106:24, 107:19, 107:23, 112:12, 116:25
**Massachusetts** [1] - 55:20
**master** [20] - 16:19, 16:25, 17:3, 29:12, 30:13, 31:13, 45:12, 46:4, 46:9, 46:11, 46:23, 46:25, 50:14, 52:8, 99:8, 99:10, 102:25, 103:5, 103:7, 103:8
**masters** [39] - 9:19, 9:22, 9:23, 11:4, 11:13, 12:17, 12:20, 12:21, 13:5, 13:18, 13:19, 13:20, 13:21, 14:1, 14:5, 14:16, 14:22, 15:17, 48:20, 50:1, 50:2, 50:10, 50:19, 51:2, 51:9, 51:16, 51:25, 52:7, 52:13, 52:15, 52:17, 83:25, 85:4, 85:14, 92:4, 99:22, 100:1, 100:4, 109:19
**material** [1] - 54:2
**Mathers** [18] - 48:10, 49:20, 76:1, 76:9, 79:12, 79:23, 80:2, 80:19, 82:6, 83:5, 84:4, 85:18, 86:2, 86:7, 87:12, 88:5, 88:23, 88:24
**Matter** [1] - 102:10
**matter** [4] - 13:10, 52:21, 119:10, 119:12
**mean** [8] - 7:10,

27:24, 51:4, 63:24, 87:3, 92:23, 97:1, 98:9
**means** [8] - 37:8, 68:5, 81:14, 83:18, 95:7, 98:6, 98:8, 108:8
**meant** [4] - 34:22, 35:1, 51:9, 94:1
**media** [1] - 92:5
**medium** [9] - 22:23, 31:17, 93:19, 93:23, 94:1, 94:5, 94:7, 94:10, 94:11
**meet** [1] - 62:2
**Mega** [1] - 72:22
**MELINDA** [1] - 2:14
**memo** [9] - 22:7, 23:24, 25:8, 35:12, 35:14, 42:7, 42:11, 43:1, 104:13
**memorandum** [4] - 25:24, 34:13, 35:10, 54:13
**memory** [2] - 45:20, 104:12
**memos** [1] - 42:7
**mention** [1] - 93:9
**mentioned** [5] - 14:12, 14:14, 57:13, 57:16, 67:22
**mentioning** [2] - 49:14, 102:11
**Mercury** [2] - 57:23, 57:25
**met** [3] - 16:12, 62:3, 63:4
**Michael** [5] - 22:6, 28:18, 28:20, 35:13, 57:2
**Michigan** [1] - 61:21
**Microsoft** [2] - 101:22, 102:4
**middle** [3] - 48:14, 87:14, 112:17
**might** [6] - 15:16, 34:10, 80:4, 97:6, 111:6
**Mile** [16] - 10:7, 14:12, 14:13, 43:11, 43:15, 43:17, 44:15, 44:24, 45:13, 46:11, 50:2, 51:14, 51:15, 52:8, 52:15
**million** [11] - 19:18, 20:2, 20:17, 21:2, 37:19, 37:20, 109:2, 115:12
**millions** [3] - 102:2, 102:5, 102:7

**mind** [2] - 21:9, 25:18
**ministerial** [1] - 42:6
**minor** [1] - 68:23
**minute** [2] - 19:3, 93:1
**minutes** [13] - 7:1, 53:15, 53:19, 54:16, 54:18, 117:10, 117:18, 117:21, 117:24, 117:25, 118:2, 119:12, 119:16
**MIRIAM** [1] - 1:23
**mischaracterized** [1] - 24:4
**misremembering** [1] - 28:14
**misstates** [1] - 24:1
**mixing** [1] - 64:1
**mocked** [1] - 87:3
**moment** [11] - 5:7, 14:8, 14:12, 14:14, 15:19, 17:11, 29:22, 30:25, 46:16, 60:23, 103:1
**moments** [1] - 55:7
**money** [15] - 15:6, 18:13, 18:17, 19:8, 19:22, 20:4, 28:8, 44:13, 44:14, 66:7, 66:8, 97:16, 101:8, 101:16, 102:9
**months** [6] - 106:1, 114:22, 115:1, 115:9
**morning** [12] - 4:9, 5:23, 6:12, 6:24, 8:3, 8:23, 53:15, 61:14, 61:15, 72:5, 72:6, 119:8
**most** [4] - 18:14, 28:20, 67:11, 89:23
**mostly** [1] - 65:20
**motion** [5] - 24:7, 24:11, 24:13, 24:20, 40:4
**motions** [1] - 104:23
**Motown** [4] - 12:10, 57:16, 57:19, 57:25
**move** [6] - 5:6, 5:10, 5:12, 59:9, 60:11, 60:15
**moved** [1] - 56:14
**movie** [7] - 14:13, 43:10, 46:11, 47:1, 51:15, 52:14, 52:25
**MR** [159] - 4:11, 4:21, 4:23, 5:4, 5:8, 5:12, 5:18, 6:1, 6:13, 6:15, 6:21, 7:13, 7:19, 8:5, 8:12, 8:14, 8:22,

20:10, 20:13, 20:16, 20:25, 21:1, 21:5, 23:25, 24:4, 24:6, 24:10, 24:20, 25:7, 25:10, 25:14, 25:18, 25:20, 25:22, 26:18, 26:20, 26:23, 26:24, 27:3, 27:5, 27:9, 27:12, 27:16, 27:18, 27:20, 29:2, 29:5, 29:9, 29:11, 29:18, 29:23, 30:9, 30:10, 32:15, 32:17, 34:18, 34:19, 34:25, 35:5, 36:15, 36:16, 39:11, 39:13, 40:2, 40:6, 40:8, 40:10, 40:15, 41:15, 41:16, 46:12, 46:18, 48:13, 48:17, 49:16, 49:17, 53:12, 54:6, 54:11, 54:13, 54:19, 55:1, 55:6, 58:17, 58:20, 58:24, 59:1, 59:9, 59:11, 59:16, 59:19, 59:21, 59:25, 60:5, 60:12, 60:22, 60:25, 61:5, 61:13, 64:8, 64:15, 65:12, 68:1, 68:11, 71:15, 71:18, 71:24, 72:1, 72:4, 76:3, 76:7, 85:22, 85:25, 89:8, 89:10, 91:20, 91:24, 92:11, 92:14, 95:17, 95:20, 100:18, 100:22, 104:2, 104:11, 104:17, 104:22, 105:1, 105:4, 105:6, 105:7, 106:20, 106:23, 107:14, 107:22, 107:25, 108:3, 109:25, 110:2, 110:5, 110:15, 110:18, 111:13, 111:15, 112:8, 112:11, 113:17, 113:23, 116:10, 116:22, 117:5, 117:14, 117:17, 117:20, 117:23, 118:13, 119:4, 119:19, 119:21
**MUNGER** [1] - 2:13
**Music** [7] - 12:8, 12:10, 56:4, 57:14, 58:2, 58:3, 111:20
**music** [40] - 15:22, 55:21, 56:1, 57:24, 58:3, 58:9, 61:19, 61:22, 62:7, 63:24, 64:25, 65:23, 65:24,

65:25, 66:1, 67:21, 74:18, 75:16, 75:20, 75:23, 78:5, 82:8, 82:17, 86:9, 86:10, 86:12, 86:15, 86:18, 88:23, 89:3, 89:13, 89:14, 90:22, 91:4, 91:7, 91:11, 91:18, 93:5, 94:2, 96:21
**musical** [1] - 95:12
**musically** [1] - 62:8
**musician** [1] - 62:16
**musicians** [1] - 64:4
**must** [5] - 59:7, 59:8, 112:10
**MVB11893@aol.com** [1] - 1:25

**N**

**name** [9] - 8:18, 61:10, 67:19, 81:20, 88:19, 113:21
**named** [1] - 66:22
**names** [1] - 57:4
**narrowly** [1] - 16:10
**Nashville** [1] - 57:24
**NASHVILLE** [1] - 2:4
**near** [1] - 78:20
**necessarily** [2] - 84:6, 92:24
**necessary** [3] - 5:23, 23:18, 102:12
**need** [11] - 7:16, 33:24, 35:16, 35:17, 54:23, 60:1, 60:9, 85:23, 113:14, 119:11, 119:12
**needed** [1] - 102:10
**needs** [1] - 102:16
**negotiate** [2] - 18:12, 37:16
**negotiated** [1] - 37:13
**negotiating** [2] - 56:15, 57:5
**negotiations** [5] - 17:19, 21:19, 28:2, 98:20, 99:5
**net** [7] - 31:13, 36:18, 37:22, 38:2, 41:5, 85:4, 85:13
**never** [5] - 19:5, 19:12, 28:9, 35:12, 99:5
**New** [3] - 55:11, 69:5, 94:1
**new** [18] - 19:3, 22:23, 26:16, 27:22, 27:25, 28:4, 31:17,

31:22, 34:23, 51:16, 54:2, 81:8, 91:10, 91:17, 93:18, 93:23
**newer** [1] - 34:20
**Next** [1] - 27:19
**next** [16] - 8:4, 8:13, 59:24, 60:11, 61:1, 65:14, 66:3, 106:18, 106:24, 109:21, 110:14, 110:15, 111:5, 111:8, 111:22
**Nichols** [4] - 91:20, 95:18, 106:20, 107:25
**nine** [3] - 114:21, 115:1, 115:9
**NINETEENTH** [1] - 2:7
**nonresponsive** [1] - 40:7
**normal** [9] - 74:5, 75:18, 75:21, 79:15, 79:18, 97:25, 100:25, 105:18, 106:10
**Normally** [1] - 57:11
**nothing** [3] - 41:3, 68:8, 101:12
**noticed** [1] - 66:4
**notwithstanding** [1] - 48:13
**Notwithstanding** [2] - 48:15, 48:18
**Novation** [12] - 14:4, 17:12, 19:9, 21:7, 21:12, 21:19, 21:25, 70:5, 70:11, 98:13, 98:20, 99:15
**nowhere** [1] - 18:2
**Number** [18] - 5:13, 5:14, 29:19, 32:11, 32:12, 33:9, 34:12, 35:24, 39:12, 41:19, 41:23, 45:22, 48:6, 49:6, 49:18, 59:2, 59:10, 81:18
**number** [9] - 20:1, 20:6, 37:19, 38:5, 38:14, 38:21, 49:15, 49:16, 80:20
**numbers** [1] - 109:13
**Numbers** [1] - 6:18

## O

**oath** [5] - 16:15, 23:13, 23:22, 26:8, 32:8
**object** [3] - 7:10, 64:11, 104:22
**objected** [1] - 5:17
**Objection** [7] -

23:25, 27:9, 46:12, 65:12, 68:1, 104:2, 109:25
**objection** [5] - 5:5, 5:17, 24:22, 29:9, 59:16
**objections** [3] - 5:8, 5:9, 34:25
**obtain** [3] - 75:16, 75:20, 75:23
**obviously** [1] - 117:8
**Obviously** [1] - 87:4
**occurred** [1] - 64:18
**October** [1] - 32:18
**OF** [4] - 1:2, 1:16, 2:3, 2:13
**offer** [5] - 22:17, 22:21, 22:23, 23:1, 23:3
**officer** [1] - 42:18
**OFFICIAL** [1] - 1:23
**officially** [1] - 65:5
**often** [1] - 110:25
**old** [5] - 61:22, 62:3, 62:4, 62:9, 89:16
**OLSON** [1] - 2:13
**Once** [1] - 42:10
**once** [1] - 7:9
**One** [5] - 46:16, 70:3, 79:10, 90:6, 97:11
**one** [59] - 5:7, 12:9, 12:10, 12:11, 12:23, 13:22, 15:13, 17:14, 19:11, 21:2, 24:10, 30:15, 30:16, 30:25, 31:4, 32:10, 41:2, 49:25, 52:6, 52:24, 53:2, 54:14, 58:20, 58:22, 59:14, 61:2, 62:5, 68:9, 69:8, 69:18, 69:19, 70:3, 72:2, 76:18, 76:22, 77:7, 77:18, 78:18, 80:10, 80:11, 81:22, 82:11, 82:15, 82:18, 83:5, 84:22, 85:3, 94:19, 99:3, 106:18, 106:24, 108:13, 108:16, 108:19, 111:22, 113:2, 116:12, 117:5
**ones** [5] - 5:20, 6:14, 6:15, 21:14, 88:9
**ongoing** [1] - 67:16
**online** [5] - 73:9, 73:12, 74:7, 74:25, 101:21
**Open** [4] - 8:2, 53:21, 55:3, 116:18
**opened** [1] - 74:25

**opinion** [2] - 33:19, 101:25
**opinions** [2] - 53:17, 116:14
**opposed** [4] - 11:6, 18:15, 64:10, 66:1
**order** [7] - 19:23, 28:16, 30:12, 68:20, 73:16, 78:3, 102:17
**ordered** [2] - 7:25, 8:15
**original** [1] - 4:15
**originally** [1] - 44:12
**Ostroff** [16] - 22:6, 23:24, 25:24, 26:12, 28:16, 28:22, 29:1, 29:7, 34:13, 34:22, 35:1, 35:9, 35:13, 35:15, 54:13
**Ostroff's** [1] - 35:6
**otherwise** [2] - 18:6, 50:20
**ourselves** [1] - 104:7
**outlet** [1] - 75:23
**outlining** [1] - 42:8
**outside** [2] - 96:24, 97:7
**overallocation** [1] - 69:12
**overly** [1] - 13:8
**overnight** [1] - 5:22
**Overruled** [8] - 46:17, 64:14, 65:15, 68:3, 104:4, 110:4
**oversaw** [1] - 39:15
**own** [15] - 9:14, 10:12, 10:13, 10:22, 11:1, 11:2, 13:3, 13:5, 15:4, 46:10, 63:10, 64:10, 71:22, 75:5, 102:6
**owned** [15] - 9:19, 9:24, 9:25, 11:5, 12:16, 12:20, 12:22, 13:18, 14:17, 14:24, 47:24, 48:21, 49:8, 57:17, 57:20
**owner** [1] - 15:17
**owners** [1] - 42:24
**ownership** [6] - 13:7, 14:6, 15:5, 42:19, 42:20, 45:15
**owns** [20] - 9:15, 10:9, 10:16, 10:19, 11:13, 11:14, 11:16, 13:1, 14:8, 15:8, 43:21, 45:11, 45:16, 46:4, 46:9, 46:23, 46:25, 47:3, 47:5

## P

**packaging** [1] - 80:4
**page** [18] - 26:22, 34:15, 34:16, 34:17, 41:22, 58:14, 87:14, 93:18, 107:1, 107:4, 109:21, 111:11, 111:25, 112:1, 112:2, 112:14, 112:18, 113:14
**PAGE** [1] - 3:2
**Page** [20] - 35:25, 36:3, 36:8, 39:11, 92:11, 107:1, 107:3, 107:7, 107:8, 112:1, 112:4, 112:5, 112:15, 113:15
**pages** [2] - 113:14, 116:5
**paid** [20] - 26:11, 28:24, 30:13, 30:20, 31:3, 33:16, 79:11, 83:24, 83:25, 84:3, 84:8, 85:4, 85:12, 97:16, 97:24, 97:25, 98:2, 99:10, 101:4, 106:9
**paragraph** [6] - 34:17, 35:6, 36:8, 36:11, 48:14, 49:23
**Paragraph** [6] - 49:25, 91:22, 92:1, 92:13, 100:19, 100:20
**paragraphs** [1] - 39:14
**pared** [2] - 119:14, 119:17
**parse** [1] - 104:7
**part** [14] - 5:1, 10:7, 13:13, 13:21, 18:12, 24:1, 24:7, 30:3, 51:3, 51:23, 57:13, 58:2, 64:16, 107:12
**partial** [1] - 52:22
**participant** [3] - 18:10, 67:23, 68:5
**participants** [1] - 21:17
**particular** [8] - 21:20, 67:16, 81:15, 83:2, 85:15, 93:5, 93:7, 98:16
**parties** [10] - 4:12, 4:13, 4:18, 41:7, 41:12, 47:24, 48:19, 48:21, 92:18, 98:7
**partnership** [1] - 45:17
**parts** [1] - 42:25

**party** [5] - 33:15, 45:4, 48:24, 49:9, 113:7
**passive** [4] - 18:10, 67:23, 68:4, 68:6
**Paterno** [1] - 42:10
**Paul** [5] - 32:19, 32:20, 32:21, 42:8, 86:19
**pay** [9] - 18:14, 22:7, 22:18, 22:20, 30:21, 30:23, 31:13, 37:17, 37:20
**paying** [18] - 22:22, 30:17, 30:19, 31:9, 31:15, 32:5, 103:3, 103:13, 103:22, 103:23, 103:25, 104:10, 105:14, 105:17, 105:22, 106:4, 115:13, 115:16
**Peas** [2] - 57:2, 57:9
**pennies** [1] - 101:17
**people** [12] - 4:16, 22:20, 74:2, 75:10, 75:14, 75:21, 75:23, 95:23, 95:24, 96:3, 96:24, 110:25
**per** [2] - 11:24, 37:17
**percent** [26] - 10:5, 10:13, 10:16, 11:2, 11:16, 12:17, 12:18, 14:8, 14:17, 14:18, 19:6, 19:7, 30:21, 30:23, 31:3, 33:17, 79:24, 80:10, 80:15, 84:15, 85:1, 85:4, 85:13, 101:4, 115:3
**percentage** [4] - 9:17, 10:4, 70:23, 71:14
**percentages** [1] - 13:6
**perfect** [1] - 113:20
**performed** [1] - 66:18
**period** [8] - 22:4, 56:21, 104:8, 108:5, 110:24, 111:8, 112:19, 114:21
**periods** [2] - 115:3, 115:6
**permanent** [16] - 22:7, 23:5, 26:10, 32:5, 36:18, 38:2, 39:3, 104:6, 110:25, 111:3, 111:4, 114:4, 114:15, 114:24, 115:10, 116:7
**permission** [2] -

50:23, 104:15
**person** [2] - 28:20, 69:3
**personal** [1] - 98:8
**pertains** [1] - 100:25
**Peter** [1] - 42:10
**Phil** [5] - 100:18, 110:15, 111:13, 112:8, 113:17
**PHILIP** [1] - 1:3
**physical** [2] - 79:20, 80:17
**pick** [2] - 76:8, 76:12
**picture** [2] - 78:8, 85:22
**Pictures** [1] - 43:12
**Ping** [2] - 117:3, 117:20
**piracy** [1] - 22:20
**place** [2] - 39:24, 75:21
**PLAINTIFF** [1] - 2:3
**plaintiff** [1] - 68:12
**Plaintiff's** [1] - 59:24
**Plaintiffs** [1] - 1:6
**Plaintiffs'** [2] - 8:4, 8:13
**platform** [1] - 102:6
**platinum** [1] - 19:4
**play** [2] - 26:18, 117:9
**played** [2] - 4:25, 8:10
**player** [1] - 95:22
**players** [1] - 96:7
**playing** [1] - 4:10
**pleading** [2] - 104:12, 104:25
**pleadings** [1] - 43:24
**plus** [1] - 113:19
**point** [7] - 4:14, 52:24, 66:11, 97:3, 97:18, 118:13
**pointed** [1] - 60:19
**pointing** [1] - 23:9
**points** [1] - 28:8
**policy** [2] - 25:24, 27:21
**Polygram** [4] - 56:6, 56:7, 56:11
**Pomerantz** [7] - 24:19, 59:20, 67:3, 67:22, 68:24, 104:24, 116:8
**POMERANTZ** [70] - 2:13, 4:23, 5:18, 6:21, 7:13, 20:10, 23:25, 24:6, 24:20, 26:20, 26:24, 27:9, 27:16, 29:2, 29:9, 34:25,

40:2, 46:12, 55:6, 58:17, 59:11, 59:16, 59:21, 60:25, 64:8, 65:12, 68:1, 71:18, 71:24, 72:1, 72:4, 76:3, 76:7, 85:22, 85:25, 89:10, 91:20, 91:24, 92:11, 92:14, 95:17, 95:20, 100:18, 100:22, 104:11, 104:17, 105:1, 105:4, 105:6, 105:7, 106:20, 106:23, 107:14, 107:22, 107:25, 108:3, 110:2, 110:5, 110:15, 110:18, 111:13, 111:15, 112:8, 112:11, 113:17, 113:23, 116:10, 116:22, 118:13, 119:4
**pop** [1] - 57:24
**portion** [5] - 10:22, 10:25, 13:3, 13:18, 13:19
**position** [12] - 8:24, 9:5, 19:12, 42:14, 42:16, 43:18, 43:23, 43:25, 89:2, 89:4, 103:2, 103:21
**possibility** [1] - 118:21
**possible** [1] - 16:21
**Possibly** [1] - 85:6
**possibly** [1] - 85:8
**pot** [1] - 19:11
**potential** [1] - 53:24
**Potentially** [1] - 95:10
**potentially** [1] - 6:5
**practice** [2] - 42:24, 76:5
**prefer** [1] - 20:19
**prepared** [1] - 61:3
**present** [6] - 4:19, 8:2, 25:23, 53:21, 55:3, 116:18
**presented** [3] - 4:20, 25:7, 29:22
**preserve** [1] - 34:11
**PRESIDING** [1] - 1:3
**pressed** [1] - 65:17
**pretty** [7] - 64:24, 65:18, 66:6, 67:8, 74:5, 75:18
**prevented** [1] - 41:4
**previous** [1] - 104:23
**primarily** [6] - 17:20, 92:21, 92:24, 96:25, 97:4, 97:19

**primary** [1] - 58:8, 97:8
**PROCEEDINGS** [1] - 1:16
**process** [5] - 25:2, 25:6, 39:16, 64:16, 102:21
**produce** [6] - 24:11, 24:14, 24:15, 65:5, 67:13, 67:14
**produced** [7] - 14:23, 25:1, 25:2, 25:4, 25:11, 46:24
**producers** [2] - 63:23, 67:17
**producing** [1] - 62:24
**PRODUCTIONS** [2] - 1:4, 2:3
**Productions** [1] - 64:21
**profitable** [1] - 44:13
**profits** [3] - 14:19, 15:9, 44:18
**program** [1] - 61:23
**project** [1] - 62:17
**projects** [2] - 62:25, 63:25
**promote** [1] - 58:10
**proper** [2] - 25:13, 25:15
**property** [1] - 80:17
**prorated** [1] - 47:16
**protected** [1] - 70:21
**provision** [54] - 16:19, 16:25, 17:3, 22:14, 23:5, 23:10, 23:15, 23:16, 26:10, 27:22, 28:4, 28:23, 28:25, 29:6, 29:12, 30:11, 30:13, 31:1, 31:9, 31:12, 31:14, 34:3, 38:17, 39:10, 46:13, 47:18, 79:15, 80:6, 84:1, 84:3, 84:15, 84:23, 85:5, 85:10, 85:14, 92:3, 93:21, 94:22, 98:1, 98:3, 98:7, 99:18, 99:23, 100:1, 100:4, 100:23, 101:3, 101:11, 101:12, 103:14, 105:19, 105:22, 115:14, 115:17
**provisions** [2] - 16:4, 16:6
**public** [1] - 77:7
**publish** [2] - 5:24, 6:11

**published** [2] - 6:4, 6:5
**Publishing** [1] - 12:10
**publishing** [4] - 6:16, 56:2, 58:4, 103:17
**pull** [3] - 29:18, 91:22, 112:9
**purchase** [2] - 13:20, 13:21
**purchased** [4] - 13:13, 13:17, 56:7, 85:19
**pure** [1] - 24:18
**purpose** [1] - 36:19
**purposely** [4] - 16:5, 16:8, 16:20, 17:4
**purposes** [12] - 36:25, 37:4, 37:22, 38:3, 38:25, 39:3, 39:19, 39:20, 40:18, 40:19, 41:6, 92:24
**pursuant** [2] - 44:1, 53:5
**put** [27] - 19:10, 22:13, 32:15, 39:10, 39:11, 44:21, 46:13, 49:12, 64:25, 75:24, 77:1, 78:5, 78:18, 80:18, 82:6, 83:21, 85:22, 88:1, 88:9, 91:20, 91:21, 96:20, 99:18, 100:18, 104:14, 112:8, 114:10
**puts** [1] - 88:4
**putting** [4] - 26:16, 44:19, 65:13, 83:19

**Q**

**questioned** [3] - 16:13, 67:3, 70:4
**questions** [3] - 58:18, 97:13, 98:12
**quick** [1] - 117:6
**quickly** [3] - 35:22, 60:5, 60:16
**Quincy** [1] - 62:15

**R**

**Rabbit** [1] - 51:15
**radio** [2] - 63:5, 94:23
**Radio** [2] - 95:1, 95:2
**raised** [1] - 43:4
**ran** [1] - 62:13
**Rand** [4] - 3:4, 8:14, 8:16, 8:19
**rap** [3] - 66:12,

66:19, 66:21
**Rap** [3] - 72:1, 81:7, 85:13
**rapper** [3] - 63:4, 63:9, 65:20
**rappers** [2] - 63:7, 65:21
**rare** [1] - 57:11
**rate** [16] - 26:11, 37:16, 37:20, 79:11, 79:14, 79:23, 80:7, 80:10, 80:15, 80:18, 89:5, 101:4, 101:10, 101:13, 101:18, 103:16
**rates** [1] - 22:3
**rather** [3] - 58:15, 61:5, 80:2
**RCA** [1] - 56:5
**read** [2] - 27:2, 43:24
**ready** [1] - 116:21
**real** [2] - 66:1, 117:5
**realized** [1] - 16:15
**really** [5] - 39:25, 57:10, 57:11, 65:21, 100:13
**reason** [9] - 4:14, 5:21, 23:14, 26:9, 30:15, 30:16, 31:4, 40:21, 66:5
**reasons** [1] - 31:1
**rebuttal** [1] - 118:22
**receipts** [6] - 30:21, 30:23, 31:4, 31:13, 85:4, 85:13
**receive** [2] - 32:4, 33:10, 71:13
**received** [13] - 3:11, 29:6, 59:18, 69:13, 70:23, 84:15, 114:14, 114:18, 114:24, 115:5, 115:21, 116:3
**receiving** [1] - 106:9
**recently** [1] - 68:10
**Recess** [1] - 55:2
**recognize** [1] - 30:3
**recollection** [8] - 13:24, 17:22, 17:25, 21:11, 46:14, 47:7, 48:4, 64:11
**record** [103] - 5:2, 8:17, 10:8, 15:25, 16:5, 17:4, 17:8, 18:4, 18:19, 23:3, 26:11, 27:22, 28:4, 28:25, 30:20, 31:11, 31:16, 43:13, 44:12, 49:25, 50:1, 50:13, 51:1, 51:8, 51:25, 52:17, 56:1, 58:1, 58:6,

58:15, 61:9, 62:15, 63:16, 63:23, 64:23, 65:2, 66:1, 66:3, 66:8, 66:23, 67:9, 67:13, 69:6, 72:9, 72:16, 73:2, 73:23, 74:14, 75:25, 76:15, 76:23, 79:1, 79:4, 79:8, 79:10, 79:18, 79:20, 79:22, 81:8, 81:11, 81:15, 81:23, 82:13, 82:17, 82:21, 83:2, 83:13, 83:19, 83:25, 84:7, 84:10, 84:12, 84:16, 84:21, 85:3, 87:23, 88:4, 88:6, 88:24, 89:4, 89:16, 90:12, 92:8, 92:12, 92:18, 93:7, 93:23, 95:18, 97:2, 98:10, 98:11, 100:9, 100:10, 101:3, 101:14, 102:16, 106:4, 106:5, 107:15, 111:23, 114:16

**recorded** [15] - 14:1, 14:5, 14:16, 14:23, 43:5, 43:20, 44:1, 50:10, 50:21, 51:12, 52:19, 53:5, 64:23, 67:10, 94:1

**recording** [48] - 9:7, 11:20, 13:4, 16:4, 16:19, 17:3, 34:21, 34:23, 43:6, 43:19, 43:21, 47:10, 50:2, 50:5, 50:6, 50:9, 50:13, 50:18, 51:2, 52:19, 53:4, 53:10, 56:11, 56:13, 56:18, 56:21, 56:25, 57:6, 61:24, 62:1, 63:12, 64:3, 65:4, 67:12, 67:19, 70:22, 81:17, 81:22, 81:23, 82:11, 95:12, 102:18, 102:20, 102:21, 110:8, 113:18, 113:22, 113:24

**Recording** [1] - 81:17

**recordings** [15] - 12:14, 44:24, 45:12, 46:4, 46:10, 46:11, 46:23, 46:25, 47:24, 50:14, 68:16, 71:19, 81:14, 102:4, 102:13

**RECORDS** [2] - 1:10, 2:13

**Records** [54] - 9:1,

9:8, 10:15, 10:23, 10:25, 11:2, 11:4, 11:5, 11:7, 11:10, 11:11, 11:12, 11:13, 11:23, 14:10, 15:4, 15:13, 15:15, 15:24, 42:1, 42:5, 42:14, 42:16, 42:19, 42:20, 42:21, 43:20, 43:21, 44:16, 44:23, 45:25, 46:1, 46:4, 46:9, 46:22, 46:23, 46:25, 47:2, 48:7, 48:8, 49:21, 51:25, 53:6, 55:22, 56:3, 56:6, 56:10, 63:25, 72:17, 83:7

**records** [58] - 12:21, 43:16, 46:8, 51:14, 52:11, 52:13, 64:1, 64:25, 65:5, 65:17, 66:2, 66:6, 66:7, 66:9, 66:10, 67:4, 67:11, 68:8, 68:9, 71:19, 72:20, 72:24, 73:2, 74:10, 74:17, 74:23, 75:1, 75:3, 75:7, 75:14, 79:14, 80:5, 81:9, 82:22, 83:22, 84:8, 84:23, 89:15, 89:23, 90:23, 92:16, 93:19, 94:1, 98:1, 98:3, 98:4, 100:23, 100:25, 105:18, 106:10, 108:9, 109:15, 109:24, 110:1, 110:3, 112:22, 115:17

**recoup** [4] - 18:20, 18:25, 19:12, 19:23

**recoupable** [1] - 18:19

**recouped** [4] - 18:21, 19:5, 19:9, 19:22

**Redirect** [1] - 58:19

**reduction** [1] - 22:23

**refer** [1] - 39:23

**referencing** [1] - 45:5

**referred** [1] - 110:25

**referring** [11] - 22:1, 88:7, 94:6, 94:12, 95:19, 102:15, 102:24, 109:15, 109:18, 109:19, 111:23

**refers** [1] - 47:23

**reflect** [4] - 34:21, 34:23, 35:6, 106:3

**refresh** [3] - 45:19,

48:4, 104:11

**refreshes** [1] - 46:14

**regard** [1] - 68:14

**regarding** [1] - 22:7

**relate** [1] - 6:15

**related** [4] - 12:18, 67:9, 70:1, 99:6

**relates** [7] - 14:1, 39:17, 62:12, 70:16, 94:25, 115:3, 116:6

**relating** [1] - 7:13, 44:24

**relationship** [10] - 9:12, 10:19, 13:4, 17:17, 44:11, 63:1, 63:2, 68:6, 70:6, 99:1

**Relatively** [2] - 87:18, 87:20

**release** [3] - 11:5, 65:3, 65:5

**released** [4] - 65:2, 65:8, 66:3, 67:5

**relevant** [1] - 6:22

**Remember** [3] - 53:16, 116:13, 119:3

**remember** [19] - 11:9, 16:21, 16:23, 21:7, 21:13, 21:21, 21:24, 26:7, 38:13, 45:15, 46:20, 52:5, 54:16, 69:16, 89:16, 97:12, 97:14, 98:18, 111:24

**remembered** [1] - 54:17

**rendition** [1] - 87:7

**renegotiating** [1] - 18:5

**reopen** [1] - 58:21

**reopened** [1] - 8:15

**Rephrase** [1] - 35:4

**report** [13] - 4:13, 4:18, 4:24, 28:18, 69:13, 69:15, 69:17, 69:22, 69:25, 103:15, 108:5, 108:23

**reported** [2] - 8:10, 103:16

**REPORTER** [1] - 1:23

**reporter** [6] - 4:13, 4:15, 4:17, 4:18, 4:24, 60:3

**REPORTER'S** [1] - 1:16

**reports** [3] - 4:15, 106:4, 107:15

**representatives** [3] - 22:12, 23:4, 98:17

**representing** [1] -

57:12

**reproduction** [2] - 92:19, 93:15

**reproductions** [1] - 92:20

**request** [10] - 20:23, 20:24, 22:12, 24:22, 40:2, 46:13, 118:24, 119:13, 119:18

**requested** [2] - 39:1, 39:2

**requests** [2] - 22:16, 119:15

**require** [1] - 25:5

**requirement** [1] - 52:12

**resale** [1] - 34:2

**resells** [1] - 33:2

**reserve** [1] - 118:4

**respect** [10] - 16:4, 18:1, 31:8, 35:15, 64:18, 68:6, 68:15, 70:5, 70:9, 70:11

**respond** [5] - 33:22, 33:25, 34:1, 34:4, 34:8

**responded** [1] - 32:23

**responsibilities** [2] - 56:11, 56:18

**responsibility** [1] - 56:15

**responsible** [1] - 58:8

**responsive** [1] - 54:22

**restrictions** [1] - 48:23

**retail** [6] - 79:15, 79:19, 97:25, 101:1, 105:18, 106:10

**retailer** [5] - 74:16, 74:18, 74:19, 79:13, 80:14

**retailers** [8] - 58:9, 72:19, 73:9, 74:8, 79:16, 84:19, 84:22, 101:21

**retreading** [1] - 29:2

**revenue** [1] - 15:17

**review** [2] - 103:17

**RICHARD** [1] - 2:3

**rid** [2] - 31:16, 31:17

**right-hand** [6] - 83:14, 107:4, 107:8, 112:2, 112:5, 112:19

**rights** [5] - 34:11, 65:4, 68:14, 68:17, 68:19

**rise** [2] - 53:20,

116:17

**road** [1] - 66:18

**Rogell** [10] - 17:20, 54:4, 70:4, 70:10, 71:2, 98:21, 99:5, 99:13, 99:22, 99:25

**Rosenberg** [2] - 32:21, 42:9

**roughly** [1] - 89:18

**royal** [2] - 26:11, 107:11

**royalties** [11] - 19:11, 36:22, 40:24, 41:6, 47:17, 83:24, 85:12, 97:24, 99:10, 103:3, 103:13

**Royalties** [1] - 36:5

**royalty** [48] - 6:8, 18:10, 18:16, 21:16, 22:3, 22:11, 22:14, 23:14, 27:22, 28:4, 28:25, 31:12, 34:21, 34:23, 37:16, 37:20, 44:16, 44:18, 79:11, 79:14, 79:23, 80:10, 80:15, 80:18, 84:23, 85:9, 89:5, 101:4, 101:18, 103:18, 105:25, 106:3, 106:8, 106:14, 107:12, 107:18, 108:5, 108:24, 111:5, 111:7, 112:18, 114:3, 114:14, 114:18, 115:1, 115:5, 115:21, 116:4

**rpms** [1] - 90:3

**rubber** [2] - 76:1, 76:2

**ruled** [1] - 24:2

**ruling** [3] - 60:10, 118:8, 118:19

**rulings** [1] - 118:7

**run** [2] - 44:7, 119:1

**Run** [1] - 51:15

**Rusto** [1] - 67:20

**S**

**sale** [6] - 34:2, 84:3, 88:1, 109:24, 110:3, 114:16

**Sale** [1] - 109:25

**sales** [22] - 30:20, 36:17, 36:18, 37:21, 37:22, 38:1, 38:2, 38:3, 38:18, 39:1, 39:2, 41:4, 41:5, 97:24, 107:17, 107:20, 107:21,

108:8, 109:1, 109:9, 109:15, 112:22
**Sales** [1] - 36:10
**samples** [2] - 64:24, 66:1
**Santana** [1] - 57:1
**satellite** [1] - 94:23
**save** [1] - 89:9
**saw** [2] - 83:7, 115:8
**Schedule** [3] - 49:2, 49:4, 49:8
**schedule** [6] - 6:24, 107:2, 108:1, 108:4, 108:12, 108:22
**school** [5] - 55:14, 55:18, 61:23, 62:1, 72:7
**School** [1] - 55:15
**scope** [3] - 99:22, 99:25, 100:4
**scratch** [6] - 23:16, 26:13, 26:16, 27:7, 27:15, 65:1
**screen** [6] - 32:15, 85:22, 86:2, 104:14, 104:17, 112:6
**second** [23] - 5:15, 10:10, 12:23, 17:14, 32:10, 34:15, 41:2, 59:14, 64:23, 69:18, 69:19, 77:10, 86:10, 95:5, 107:1, 107:4, 108:16, 111:8, 111:11, 112:1, 112:2, 112:14, 113:5
**seconds** [1] - 54:10
**section** [5] - 30:8, 36:4, 114:7, 114:9, 114:11
**Section** [2] - 36:4, 37:3
**see** [56] - 33:20, 33:21, 36:4, 36:17, 36:20, 37:1, 37:5, 37:9, 41:25, 45:19, 46:14, 48:4, 48:18, 48:25, 49:5, 50:3, 53:19, 58:15, 77:4, 78:20, 78:23, 81:11, 81:12, 86:1, 86:4, 86:25, 87:1, 87:11, 87:19, 87:21, 91:23, 94:4, 101:15, 102:22, 107:3, 107:9, 108:4, 108:6, 108:14, 108:17, 108:20, 109:3, 109:7, 110:8, 110:12, 111:16, 111:18, 112:5, 112:17, 112:20,

113:3, 113:11, 113:24, 114:1, 116:16
**seeing** [1] - 87:17
**sell** [4] - 37:18, 66:6, 72:19, 102:6
**selling** [7] - 33:1, 66:8, 66:10, 72:24, 74:22, 87:23, 87:25
**sells** [1] - 44:12
**send** [3] - 101:21, 102:8, 102:12
**sends** [1] - 105:25
**senior** [2] - 28:20, 42:18
**sense** [2] - 6:17, 82:11
**sent** [2] - 32:18, 59:5
**sentence** [4] - 36:10, 36:13, 39:12, 48:16
**separate** [2] - 18:16, 21:16
**seriously** [2] - 60:14, 66:13
**service** [1] - 77:7
**services** [1] - 95:1
**Sesame** [1] - 88:19
**SESSION** [1] - 1:18
**session** [2] - 60:6, 119:22
**set** [3] - 9:18, 18:15, 44:12
**seven** [1] - 56:1
**several** [1] - 67:22
**Shady** [66] - 10:15, 10:17, 10:18, 10:23, 10:25, 11:2, 11:4, 11:5, 11:6, 11:7, 11:10, 11:11, 11:12, 11:13, 11:16, 14:9, 14:10, 14:11, 14:17, 14:22, 14:23, 14:25, 15:4, 15:7, 15:13, 15:15, 42:1, 42:4, 42:9, 42:16, 42:20, 42:22, 42:25, 43:20, 44:16, 44:21, 44:23, 45:11, 45:13, 45:16, 45:17, 45:25, 46:1, 46:4, 46:9, 46:22, 46:25, 47:2, 49:21, 51:25, 53:6, 63:18, 64:6, 64:19, 65:8, 66:2, 66:25, 80:21, 82:7
**Shadys** [2] - 45:18, 46:2
**shall** [1] - 36:18
**SHAPIRO** [1] - 2:5
**share** [3] - 9:15, 44:21, 44:22

**shared** [1] - 14:20
**shares** [1] - 9:19
**Sheryl** [1] - 57:3
**shops** [1] - 72:9
**short** [3] - 84:9, 118:20, 118:22
**show** [4] - 24:16, 32:11, 63:5, 104:16
**Show** [2] - 81:1, 82:8
**showed** [1] - 114:19
**showing** [1] - 104:12
**shows** [4] - 46:8, 106:9, 108:22, 109:1
**sic** [1] - 47:1
**side** [2] - 87:6
**Side** [2] - 90:6
**Sidebar** [2] - 24:8, 24:9, 60:4
**sidebar** [3] - 25:21, 60:3, 61:7
**sign** [8] - 42:3, 42:4, 42:9, 42:10, 42:12, 42:21, 42:23, 43:2
**signature** [2] - 41:22, 59:7
**signed** [11] - 42:11, 43:1, 44:10, 62:14, 64:22, 65:3, 89:11, 91:13, 91:16, 91:25, 92:15
**signing** [5] - 41:25, 42:6, 65:10, 66:14, 66:16
**silence** [1] - 33:14
**simply** [1] - 40:4
**single** [3] - 67:9, 67:13, 68:9
**singles** [1] - 90:3
**Sirius** [1] - 95:1
**sitting** [4] - 57:5, 57:7, 78:8, 87:13
**situation** [1] - 34:10
**six** [4] - 54:25, 55:25, 106:1, 115:9
**Slim** [8] - 63:18, 64:6, 64:19, 65:8, 66:2, 66:25, 80:21, 82:7
**slow** [1] - 20:12
**small** [1] - 72:9
**so...** [1] - 71:8
**software** [2] - 94:5, 94:7
**sold** [22] - 37:17, 38:4, 65:17, 73:2, 79:13, 79:15, 79:19, 80:5, 80:14, 84:7, 84:16, 84:17, 84:22, 84:23, 90:3, 98:1, 98:3, 100:23, 100:25,

105:18, 106:10, 115:17
**someone** [3] - 18:4, 87:4, 97:15
**sometime** [2] - 90:21, 115:16
**Sometimes** [1] - 106:7
**sometimes** [2] - 16:10, 85:8
**song** [5] - 10:3, 43:4, 51:11, 90:6
**songs** [1] - 49:3
**Sony** [1] - 50:22
**sorry** [22] - 10:11, 10:17, 13:18, 23:21, 34:16, 37:24, 46:20, 49:24, 51:21, 52:7, 53:11, 64:5, 79:12, 95:4, 100:20, 100:21, 103:11, 104:18, 106:24, 111:25, 117:3
**sound** [1] - 102:21
**sounds** [1] - 51:18
**soundtrack** [16] - 10:7, 14:13, 43:17, 44:6, 44:7, 44:14, 44:20, 45:4, 45:13, 49:13, 49:16, 51:24, 52:15, 52:25, 59:3
**SOUTH** [1] - 2:15
**speaking** [3] - 85:9, 87:18, 87:20
**specific** [9] - 16:21, 21:6, 21:24, 22:14, 28:8, 47:18, 54:17, 70:15, 116:6
**specifically** [2] - 35:21, 103:15
**specify** [2] - 93:4, 93:7
**speculate** [1] - 20:3
**speculation** [1] - 35:1
**speeches** [1] - 54:21
**spell** [2] - 8:18, 61:10
**spent** [6] - 55:7, 102:2, 102:5, 102:7, 102:9, 102:14
**split** [4] - 15:6, 15:9, 15:11, 15:17
**Stan** [3] - 77:19, 77:23, 86:19
**stand** [1] - 111:20
**standpoint** [1] - 65:19
**stands** [1] - 54:24, 110:3
**start** [6] - 6:25, 7:9, 89:15, 103:11,

116:20, 119:7
**started** [11] - 7:18, 7:22, 15:24, 52:23, 52:24, 56:13, 62:23, 66:4, 72:19, 72:24, 74:22
**starting** [1] - 7:24
**state** [5] - 8:17, 25:18, 55:19, 61:9
**statement** [13] - 16:24, 17:2, 17:5, 106:14, 107:11, 107:12, 107:18, 108:24, 111:5, 111:7, 112:18, 114:22, 115:12
**statements** [18] - 6:8, 103:17, 103:18, 104:7, 105:25, 106:3, 106:8, 114:4, 114:14, 114:18, 115:2, 115:6, 115:19, 115:20, 115:21, 116:4
**STATES** [1] - 1:1
**States** [3] - 94:3, 107:21, 109:16
**step** [3] - 59:22, 59:23, 116:19
**steps** [1] - 87:13
**Steve** [2] - 60:13, 118:8
**stick** [1] - 118:8
**Stiffelman** [20] - 21:22, 21:25, 23:17, 28:1, 28:3, 28:11, 32:4, 32:9, 32:18, 33:10, 37:13, 37:21, 38:1, 38:25, 39:1, 54:4, 54:8, 60:19, 70:20, 105:8
**still** [2] - 70:23, 101:18
**Sting** [1] - 57:3
**stipulation** [2] - 4:19, 8:11
**stood** [1] - 33:13
**stop** [1] - 22:19
**stopped** [1] - 107:20
**store** [4] - 58:14, 73:13, 73:23, 74:25
**Stores** [1] - 72:22
**stores** [6] - 58:10, 58:11, 72:16, 72:17, 73:2, 74:22
**stories** [1] - 64:10
**straight** [1] - 28:15
**streams** [1] - 18:16
**Street** [1] - 88:19
**STREET** [2] - 1:24, 2:3

**strike** [1] - 40:5
**structure** [3] - 22:2, 22:11, 28:19
**studio** [8] - 61:24, 62:1, 62:24, 62:25, 63:3, 63:11, 63:12, 65:22
**studios** [5] - 63:14, 67:8, 67:10, 67:12, 67:14
**study** [1] - 61:23
**stuff** [5] - 57:2, 58:13, 58:14, 58:15, 58:16
**subject** [2] - 8:10, 48:22
**submit** [1] - 4:25
**submitted** [2] - 53:18, 116:15
**subscription** [1] - 95:1
**success** [2] - 18:3, 18:5
**suggesting** [1] - 24:24
**suggestion** [1] - 23:24
**summary** [6] - 107:2, 108:1, 108:4, 108:12, 111:12, 112:25
**superseded** [1] - 47:6
**supervising** [1] - 56:15
**support** [2] - 22:20, 109:13
**supposed** [2] - 24:14, 52:12
**surreptitious** [1] - 24:24
**Sustained** [3] - 27:11, 29:10, 35:3
**switch** [2] - 81:7, 85:23
**sworn** [4] - 3:4, 3:6, 8:16, 61:8

# T

**tab** [2] - 59:12, 106:19
**table** [2] - 57:5, 57:7
**talented** [1] - 65:19
**tangle** [1] - 60:20
**tangled** [2] - 10:17, 37:24
**tape** [7] - 88:25, 90:12, 90:14, 90:17, 96:1, 96:12, 100:10
**Target** [1] - 58:12

**technic** [1] - 15:7
**technical** [1] - 13:8
**technically** [3] - 13:10, 14:24, 15:8
**technologies** [1] - 91:18
**technology** [9] - 91:3, 91:7, 101:20, 101:25, 102:3, 102:10, 102:12, 102:15, 102:16
**TEMPLE** [1] - 1:24
**ten** [6] - 62:3, 62:9, 62:12, 67:15, 89:16, 114:22
**term** [2] - 99:14, 99:16
**terms** [7] - 11:19, 42:8, 43:1, 47:20, 48:22, 58:6, 116:23
**territories** [1] - 107:18
**testified** [9] - 16:7, 16:11, 16:12, 16:16, 54:3, 61:17, 97:18, 97:21, 97:22
**testify** [2] - 105:12, 118:9
**testifying** [2] - 6:7, 64:12
**testimony** [16] - 4:19, 6:18, 16:3, 17:7, 23:13, 23:22, 24:18, 26:8, 26:19, 27:6, 30:7, 30:11, 32:8, 53:4, 54:15, 65:13
**THE** [100] - 2:3, 2:13, 4:9, 4:12, 4:22, 4:24, 5:7, 5:11, 5:15, 5:24, 6:10, 6:14, 7:8, 7:15, 7:20, 8:3, 8:7, 8:13, 8:15, 8:17, 8:19, 8:20, 20:11, 20:14, 20:22, 21:4, 24:8, 24:19, 25:9, 25:12, 25:15, 25:19, 26:22, 27:1, 27:4, 27:11, 27:17, 27:19, 29:4, 29:10, 29:20, 29:22, 35:3, 40:4, 40:7, 40:9, 40:12, 46:16, 53:14, 53:20, 53:22, 54:9, 54:12, 54:15, 54:23, 55:4, 58:19, 58:23, 59:15, 59:17, 59:20, 59:22, 60:3, 60:10, 60:17, 60:24, 61:6, 61:9, 61:11, 64:14, 65:15, 65:16, 68:3, 68:4, 71:17, 71:23,

71:25, 76:6, 104:4, 104:5, 104:16, 104:20, 104:24, 105:3, 105:5, 106:22, 110:4, 112:10, 116:8, 116:11, 116:17, 116:19, 117:12, 117:16, 117:19, 117:22, 118:11, 119:3, 119:9, 119:20
**themselves** [1] - 102:6
**they've** [3] - 42:25, 87:3, 87:5
**thinking** [3] - 15:6, 118:2, 118:3
**third** [10] - 33:14, 34:17, 47:24, 48:21, 48:24, 49:9, 77:17, 108:19, 113:7
**third-party** [1] - 48:24
**THIRTY** [1] - 2:15
**THIRTY-FIFTH** [1] - 2:15
**thousands** [1] - 116:5
**three** [6] - 53:1, 75:24, 78:6, 88:6, 104:8, 108:13
**three-year** [1] - 104:8
**THURSDAY** [2] - 1:20, 4:7
**timing** [1] - 116:23
**title** [2] - 77:10, 77:18
**TN** [1] - 2:4
**Today** [1] - 4:10
**today** [20] - 5:21, 5:25, 6:2, 6:4, 6:5, 6:7, 54:5, 56:20, 68:20, 74:16, 75:10, 75:14, 100:12, 102:12, 116:23, 117:4, 118:15, 118:23, 119:1, 119:5
**today's** [1] - 75:18
**together** [4] - 18:8, 19:11, 65:1, 65:24
**TOLLES** [1] - 2:13
**tomorrow** [3] - 5:23, 118:16, 119:8
**tone** [2] - 103:7, 103:8
**tones** [4] - 99:8, 99:11, 102:25, 103:5
**took** [2] - 54:10, 69:21
**top** [5] - 108:6, 112:1, 112:4, 112:17,

113:15
**total** [1] - 115:9
**totally** [1] - 82:24
**towards** [1] - 38:5
**Tower** [2] - 72:17, 84:18
**town** [1] - 72:10
**track** [16] - 38:11, 38:14, 38:19, 39:6, 51:17, 77:1, 77:10, 77:17, 78:2, 78:3, 82:18, 85:21, 90:14, 95:21, 95:22, 97:6
**tracks** [14] - 33:1, 52:22, 53:1, 77:4, 78:2, 81:10, 81:11, 81:22, 82:5, 82:13, 82:14, 86:16, 86:18, 86:23
**transaction** [3] - 13:12, 13:17, 13:20
**transactions** [1] - 13:16
**TRANSCRIPT** [1] - 1:16
**transcript** [1] - 4:16
**transcripts** [1] - 4:25
**transformed** [1] - 102:18
**transmission** [2] - 94:15, 94:18
**transmissions** [1] - 93:23
**transmit** [1] - 102:3
**transmitted** [7] - 94:21, 94:23, 95:3, 95:7, 95:11, 95:13, 95:15
**treated** [9] - 36:18, 37:22, 38:2, 39:2, 39:7, 41:5, 70:23, 97:1, 98:4
**treatment** [2] - 34:21, 34:24
**trial** [3] - 24:7, 24:21, 55:19
**TRIAL** [1] - 1:17
**tries** [1] - 57:21
**true** [15] - 10:14, 13:11, 17:6, 17:18, 22:6, 28:1, 28:2, 28:12, 44:23, 47:9, 47:14, 47:22, 84:6, 115:7, 119:4
**trust** [1] - 60:11
**try** [2] - 58:14, 76:3
**trying** [6] - 15:2, 22:19, 25:2, 34:11, 35:21, 45:9
**turn** [9] - 29:25,

32:12, 33:8, 41:19, 77:2, 92:11, 102:7, 102:21, 109:21
**turned** [1] - 21:14
**two** [34] - 11:12, 12:19, 18:16, 24:13, 29:12, 34:25, 45:18, 46:2, 50:1, 51:1, 51:9, 51:14, 51:25, 52:7, 52:11, 52:12, 52:17, 59:5, 60:13, 63:13, 63:17, 69:7, 80:20, 104:8, 106:16, 113:14, 115:21, 115:24, 116:1, 117:2, 118:1, 118:16, 118:19
**Two** [1] - 26:24
**type** [1] - 93:7
**typically** [3] - 37:18, 79:17, 104:9

# U

**U.M.G** [8] - 12:13, 13:7, 13:10, 111:17, 111:20, 113:2, 113:13, 114:7
**U.M.G.D** [4] - 12:1, 43:14, 43:16, 58:5
**U.M.P** [1] - 58:4
**U.S** [1] - 1:23
**U.S.N.R** [1] - 41:5
**U.S.N.R.C** [3] - 36:18, 36:23, 38:2
**unaware** [4] - 103:13, 103:21, 103:25, 105:21
**unbelievable** [1] - 63:4
**unchanged** [1] - 29:13
**Unchanged** [1] - 29:15
**under** [39] - 5:9, 11:19, 12:9, 14:2, 14:5, 14:16, 16:15, 23:13, 23:22, 26:8, 28:24, 30:13, 31:11, 31:13, 32:8, 43:5, 43:20, 45:10, 47:11, 47:16, 47:19, 50:9, 53:8, 67:18, 71:12, 80:5, 83:25, 84:23, 85:4, 85:10, 85:14, 97:2, 97:25, 98:2, 101:11, 103:14, 105:18, 105:22, 115:17
**Under** [1] - 50:13
**underground** [1] -

66:12
  **underneath** [1] - 78:22
  **understood** [3] - 38:9, 42:13, 98:7
  **undoubtedly** [1] - 91:10
  **unincorporated** [3] - 12:6, 12:13, 13:9
  **UNION** [1] - 2:3
  **unit** [1] - 37:17
  **United** [3] - 94:3, 107:21, 109:16
  **UNITED** [1] - 1:1
  **units** [3] - 37:19
  **Universal** [39] - 12:6, 12:8, 19:24, 19:25, 20:8, 22:7, 22:10, 27:21, 28:21, 28:24, 31:12, 31:13, 32:5, 43:4, 43:12, 43:16, 43:19, 43:24, 56:7, 56:8, 57:14, 57:17, 57:20, 57:21, 58:2, 58:3, 69:21, 101:20, 102:2, 102:17, 103:22, 103:25, 105:14, 105:17, 105:22, 106:3, 111:20, 115:16, 115:21
  **Universal's** [5] - 43:13, 43:23, 43:25, 51:20, 51:22
  **Unless** [2] - 79:16, 98:2
  **unless** [3] - 5:20, 47:5, 50:19
  **Unnecessary** [1] - 41:8
  **unnecessary** [1] - 28:6
  **unrecouped** [4] - 19:15, 19:16, 19:18, 20:7
  **untrue** [1] - 24:5
  **up** [59] - 9:18, 12:23, 17:14, 18:5, 18:6, 18:15, 22:19, 28:18, 29:7, 29:18, 32:10, 32:15, 32:23, 34:18, 39:7, 39:10, 39:11, 39:24, 40:18, 41:2, 41:18, 44:12, 52:11, 55:9, 56:14, 60:20, 60:22, 63:14, 65:10, 65:17, 66:1, 66:15, 66:16, 66:20, 68:10, 71:20, 76:8, 76:12, 84:12, 87:3, 91:20,

91:21, 91:22, 92:12, 95:17, 99:17, 100:18, 106:21, 108:1, 108:6, 111:14, 112:1, 112:9, 113:1, 113:15, 113:18, 117:11, 119:1
  **upper** [4] - 107:4, 107:8, 112:5, 112:15
  **upset** [3] - 60:8, 60:9, 60:10
  **urban** [1] - 65:20
  **uses** [5] - 70:17, 70:21, 70:24, 71:12, 99:19

## V

  **Vague** [1] - 109:25
  **Vanilla** [1] - 63:8
  **variety** [1] - 104:5
  **various** [3] - 13:5, 76:23
  **varying** [1] - 13:6
  **Vegas** [1] - 66:20
  **verified** [1] - 105:3
  **Verizon** [1] - 33:15
  **version** [3] - 76:17, 84:11, 119:14
  **versions** [1] - 96:12
  **versus** [2] - 40:19, 100:16
  **via** [1] - 33:14
  **video** [5] - 4:10, 4:13, 6:23, 7:1, 67:14
  **videotaped** [3] - 3:3, 8:8, 8:9
  **view** [2] - 14:17, 14:19
  **vinyl** [14] - 73:3, 76:20, 80:13, 80:22, 83:11, 87:21, 89:23, 90:1, 93:11, 100:16, 100:17, 101:6, 101:9, 101:16
  **Virgin** [3] - 72:22, 83:16, 83:18
  **voluminous** [2] - 107:15, 107:17
  **Vs** [1] - 1:8

## W

  **wait** [1] - 19:3
  **Wal** [5] - 74:25, 79:13, 79:18, 84:7, 84:18
  **Wal-Mart** [5] - 74:25, 79:13, 79:18, 84:7, 84:18
  **Walkman** [2] - 96:10,

96:13
  **Walmart.com** [1] - 75:1
  **wants** [1] - 5:20
  **Warner** [1] - 50:22
  **ways** [1] - 91:10
  **weighed** [1] - 107:20
  **WEIL** [1] - 2:5
  **Weinberg** [6] - 6:24, 7:14, 59:25, 61:1, 117:1, 117:17
  **Weinberg's** [2] - 6:18, 61:2
  **Westbound** [1] - 63:25
  **whichever** [1] - 15:13
  **white** [5] - 63:5, 63:7, 63:9, 65:19, 65:20
  **whole** [4] - 9:15, 63:8, 64:16, 112:9
  **wholesale** [1] - 33:2
  **Will-I-Am** [1] - 57:8
  **willing** [1] - 37:17
  **wind** [2] - 18:5, 18:6
  **WITNESS** [10] - 3:2, 8:19, 20:14, 29:20, 61:11, 65:16, 68:4, 104:5, 106:22, 112:10
  **witness** [20] - 3:3, 3:4, 3:6, 8:4, 8:8, 8:13, 8:16, 24:15, 24:25, 25:4, 40:3, 46:14, 46:15, 59:24, 60:11, 61:1, 61:4, 61:8, 104:21, 118:22
  **witnesses** [6] - 60:13, 117:2, 118:9, 118:16, 118:18, 118:19
  **wonderful** [1] - 19:4
  **word** [9] - 18:18, 21:11, 67:23, 68:4, 70:17, 78:22, 88:1, 88:2, 111:2
  **words** [5] - 21:13, 21:17, 41:9, 110:14, 110:16
  **world** [2] - 66:12, 75:18
  **worth** [1] - 115:11
  **would've** [1] - 62:19
  **wound** [1] - 52:11
  **write** [3] - 22:21, 34:9, 65:25
  **writes** [3] - 65:25, 67:20
  **writing** [3] - 22:25, 63:24, 65:23
  **written** [1] - 22:24

**Wrong'** [1] - 48:20
**wrote** [1] - 65:24

## X

**XM** [1] - 95:2

## Y

**year** [8] - 13:15, 55:12, 55:16, 55:20, 62:1, 62:18, 69:24, 104:8
  **years** [20] - 15:22, 46:6, 48:1, 56:1, 56:4, 56:20, 57:1, 61:22, 62:3, 62:4, 62:9, 62:11, 62:13, 63:1, 63:13, 67:15, 89:12, 89:16, 91:4, 96:6
  **yesterday** [1] - 53:23
  **York** [2] - 55:11, 69:5
  **yourself** [2] - 61:18, 89:15
  **Yourself** [24] - 10:3, 10:4, 10:6, 10:10, 10:12, 10:16, 43:4, 43:19, 43:21, 43:25, 47:1, 47:10, 47:13, 47:25, 49:4, 49:7, 50:21, 51:11, 51:23, 52:6, 52:8, 52:19, 53:5, 54:3
  **yourselves** [2] - 53:16, 116:13