1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                        ---

4      THE HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

5

6

7    F.B.T. Productions, LLC,            )

8                   Plaintiff,           )

9                                        )

10   vs.                                 )   Case No.

11                                       )   CV 07-3314-PSG(MANx)

12   Aftermath Records (dba Aftermath    )

13   Entertainment), et al.,             )

14                   Defendants.         )

15   _____    )

16

17

18         REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

19                 Day 5, A.M. Session

20               Los Angeles, California

21             Wednesday, March 4, 2009

22   Pamela A. Seijas, CSR, FCRR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

```
 1  APPEARANCES:

 2

 3    FOR PLAINTIFF:         KING & BALLOW

 4                          BY:  RICHARD BUSCH

 5                               MARK GUILFORD

 6                          315 UNION STREET

 7                          SUITE 1100

 8                          NASHVILLE, TN  37201

 9                          (615) 259-3456

10

11

12  FOR DEFENDANT:          MUNGER, TOLLES & OLSON, LLP

13                          BY:  GLENN D. POMERANTZ

14                               MELINDA EADES LeMOINE

15                               KELLY M. KLAUS

16                          355 SOUTH GRAND AVENUE

17                          35TH FLOOR

18                          LOS ANGELES, CA  90071-1560

19                          (213) 687-3702

20

21

22

23

24

25
```

1    Los Angeles, California, Wednesday, March 4, 2009

2    9:14 a.m.

3    -oOo-

4    (Jury Out)

5    THE COURT:  Good morning.  Juror No. 4 in Seat No. 4

6    has just arrived.  Juror No. 6 left a message on the Court's

7    voicemail last night and this morning basically indicating that

8    she had an event at work and she was required to be there and

9    she wasn't coming in.

10    So the CRD called her back and said she better get

11    here or else the marshal was going to bring her here, and I

12    guess she got quite emotional about it.  But in any event, she

13    is coming in.

14    My recommendation would be to -- once she gets here, I

15    will admonish her and then proceed without her, excuse her.

16    Mr. Busch, Mr. Pomerantz, if you have strong feelings

17    about it, we will wait for her and make her stay.

18    MR. POMERANTZ:  Do you know how long she will be?

19    THE COURT:  She lives in West L.A. so she -- she's on

20    her way now.

21    MR. POMERANTZ:  Can we have a moment to discuss this

22    with our clients?

23    THE COURT:  Let me have a sidebar as well with you.

24    (Sidebar conference commenced without the reporter)

25    (Recess taken)

1           MR. BUSCH:  Your Honor, could we have a sidebar with

2    Your Honor on this issue?

3           THE COURT:  Are you requesting off the record?

4           MR. BUSCH:  Yes.  Off the record.

5           THE COURT:  Off the record.

6           (Sidebar conference commenced without the reporter)

7                    (Recess taken)

8      (Chambers proceeding commenced; interview of Juror No. 6)

9           THE COURT:  We're -- we wanted to follow up with your

10   phone call and discuss your situation.  Tell me what's going on

11   at work and --

12          THE JUROR:  Okay.  So -- sorry.  Basically I am a PR

13   marketing person at a fashion company, and for the past few

14   months, I have been coordinating this event with 200 of the top

15   industry people in the city that are potential clients that are

16   all coming in.  It's on Thursday.  And I wanted to, you know, do

17   the right thing and come to jury duty and, like, get that all

18   squared away.  And I thought it was going to be over on Tuesday

19   so I thought it would fit perfectly into the schedule.

20   Basically the owner of the company has told me that if I don't

21   go to the event on Thursday, which I pretty much knew this

22   because it is such a big deal for the company and like lots of

23   money has been put into it and time and energy which also in the

24   case, obviously, all of the same stuff.  Like, I can be here

25   today, but tomorrow it's -- I mean, if I get fired, I won't be

```
 1    able to pay rent, and, like, it's just kind of -- I'm sorry.

 2              THE COURT:  That's okay.  Take your time.

 3              THE JUROR:  It's been kind of a tough morning because

 4    I wasn't sure what to do.  I didn't think it was going to come

 5    down to this.

 6              THE COURT:  Are you an employee of the company or an

 7    independent contractor?

 8              THE JUROR:  I am probably more so set up like an

 9    independent contractor.  Like, I didn't sign paperwork or

10    anything like that.  I have a contract with them.  So, yeah, I

11    guess a contractor.

12              THE COURT:  And you provide --

13              THE JUROR:  Well, I work for them.  I am an employee,

14    I guess, in the sense of like that -- the paperwork, is that

15    what you are asking?

16              THE COURT:  I am trying to figure out if you are an

17    employee.

18              THE JUROR:  I am an employee.

19              THE COURT:  Your employer said he will fire you if

20    you're not there on Thursday?

21              THE JUROR:  She said that I will be no longer needed

22    with them.  Like, I have to go on Thursday.  That's the --

23    that's the bottom line.  Because it is a huge event that we are

24    putting on and it cannot go off without me being there.

25              THE COURT:  And she knows you are in jury duty?
```

```
 1           THE JUROR:  Yes.  But I told her when I got called to
 2   jury duty that my last day would be Tuesday.  So -- I mean, I'm
 3   not sure.  This is the first jury I have ever served on.  So I
 4   don't really know how it works as far as like if it can just
 5   keep getting extended or whatnot, but I had the date in mind and
 6   that's what I told her.  And so obviously like today is one
 7   thing, but tomorrow is -- we can't move the 200 people that are
 8   coming, over 200 people.
 9           THE COURT:  The reason -- the other reason I called
10   you in, just to also explain -- you mentioned this is the first
11   time you are on jury duty.  Essentially when we talked about it
12   at the beginning, we can't get started unless everybody is here.
13   And typically when I asked the jurors to come the next day,
14   that's the equivalent of a formal order, and so one of the
15   things -- and, again, I don't want to pick on you or cause you
16   any more angst than you are already feeling, but I think most
17   judges and I feel the same way, that our orders need to be
18   complied with and somebody can't call the night before and say,
19   "I am not coming in."  Because that's a direct violation of what
20   the Court has ordered you to do.  It's bigger than me -- and I
21   use the word "the Court" -- it's not about me; it's about the
22   Court.
23           THE JUROR:  I know.  I apologize.  I definitely
24   realize that, and I thought about just coming in and showing up
25   this morning anyway, and I wasn't sure what to do because I left
```

 1   four messages and I didn't hear anything back, so I should have

 2   just probably shown up and talked to you about it when I got

 3   here.

 4              THE COURT:  When did you leave the first message?

 5              THE JUROR:  I left them on -- all yesterday, but the

 6   first one was, you know, sometime probably around noon or

 7   something.  I don't know the exact time.  I left two -- I left

 8   one on each of the voicemails in the afternoon, and then also

 9   when I got home.

10              THE COURT:  Before 5:00?

11              THE JUROR:  Yes.  Absolutely.  Maybe around 1:00 or

12   something like that.  And then the other two were when I got

13   home from work last night because I hadn't heard anything back.

14              THE COURT:  All right.

15              THE JUROR:  Did you not get the first ones?

16              THE COURT:  That's what I am going to figure out.  I

17   did not learn of it until this morning.

18              THE JUROR:  Okay.

19          (The Court and counsel confer off the record outside

20              the hearing of the juror)

21              THE COURT:  I'm going to excuse you from this case.

22   Do you have anything in the jury room?

23              THE JUROR:  Just my notebook.  The one that the Court

24   provided is in there.  In the jury room?

25              THE COURT:  In the jury room itself.

```
 1              THE JUROR:  Yes.

 2              THE COURT:  You have your personal belongings in

 3   there?

 4              THE JUROR:  Yes.

 5              THE COURT:  When you go in, I want you not to discuss

 6   this with any of the other jurors.  Just take your things, and

 7   you will be excused from this particular case.

 8              THE JUROR:  Okay.  Thank you very much.

 9              THE COURT:  You're welcome.

10                    (Juror No. 6 left chambers)

11              THE COURT:  We had a couple of off the record

12   discussions with regard to plaintiff's position and defenses'

13   position relating to this juror.

14              Mr. Busch, would you like to make your record?

15              MR. BUSCH:  Yes.  We object to the allowance of this

16   juror to be excused from the jury.  There -- we have -- the

17   plaintiffs have been prepared each day to go to trial, and this

18   juror has not expressed any inability to consider this case in a

19   fair and impartial manner, and we believe we're being prejudiced

20   by the recusal of this juror from the case.

21              THE COURT:  All right.  Anything you want to say?

22              MR. POMERANTZ:  We believe it's within the Court's

23   discretion to excuse the juror, and based on what the juror told

24   us here in chambers, I believe it will be a proper exercise of

25   discretion.
```

1        THE COURT:  In exercising my discretion, there were

2   two things.  One, the initial schedule that we gave to the

3   jurors with regard to how this trial would proceed, and then

4   Friday due to the -- due to my illness, we were not able to

5   continue on Friday.  And then again based on my decision not to

6   have court on Tuesday, based on the unavailability of the

7   defense witness, we didn't have court on Tuesday.  Given the

8   change in schedule and the juror's situation, the Court

9   exercised its discretion to excuse the juror.

10       MR. POMERANTZ:  May I say one other thing?

11       THE COURT:  Yes.

12       MR. POMERANTZ:  I think we would all agree that it's

13  inappropriate to contact this juror while this case is still in

14  progress and before the jury has resolved the case.  I will

15  instruct everybody on our side of the case to make sure that

16  does not happen and I would just ask that Mr. Busch do likewise.

17       THE COURT:  Mr. Busch?

18       MR. BUSCH:  We would have no intention of doing that.

19       THE COURT:  Right.  Okay.  So no one is to have

20  contact with any juror until the proceedings have been

21  concluded.  Thank you.

22            (Proceedings held in open court)

23                      (Jury In)

24       THE COURT:  Good morning.  Mr. Berman, if you would

25  take the stand, please.  Mr. Berman, you are reminded that you

1    are still under oath.  Mr. Pomerantz, you may cross-examine.

2                         CROSS-EXAMINATION

3    BY MR. POMERANTZ:

4    Q.    Good morning, Mr. Berman.

5    A.    Good morning.

6    Q.    You would agree with me that in order to offer a reliable

7    opinion, you have to have relevant experience; right?

8    A.    Yes, I do.  I agree with you.

9    Q.    And this is a case about royalties for digital downloads;

10   right?

11   A.    In part, yes.

12   Q.    And you've offered opinions about what royalties F.B.T.

13   should be receiving for digital downloads; correct?

14   A.    Yes.

15   Q.    And in your over 30 years of experience in the music

16   business, you have done a lot of things; right?

17   A.    Yes.

18   Q.    And there's certain things you haven't done; right?

19   A.    Correct.

20   Q.    You haven't worked in the music business, for example,

21   since downloads became a popular form of music; right?

22   A.    Well, to the extent that I've -- I don't -- I believe I'm

23   still working in the music business, so I don't know how to

24   answer that.

25   Q.    Well, you retired in 2001; right?

A.    I intended to retire.  Currently I'm involved in

seven cases as an expert witnesses, four of which are active,

three of which are inactive.  As I stated earlier, I've recently

taken on a position as a director and CEO of a startup

entertainment company so I don't consider myself retired.

Q.    Have you ever testified under oath that you retired in

2001?

A.    I may well have because it was my intention to do so.

Q.    And iTunes opened in 2003; correct?

A.    That's my understanding.

Q.    And downloads became popular after iTunes opened; correct?

A.    Well, the -- their popularity certainly has increased since

iTunes came into being.

Q.    And so while you worked for record companies which was

from -- or law firms -- which was from 1969, I think you said,

until 2001 -- that's the period; correct?

A.    That's correct.

Q.    During that entire time period, you never sat across the

table from a -- across the table from an artist representative

and negotiated royalty rates specifically for downloads, did

you?

A.    No.  I negotiated royalty rates for all kinds of things,

and quite apropos of this case, I'm totally familiar with the

practices regarding licensing.

Q.    We'll get to that, Mr. Berman.  Stay with me.

1          You don't recall ever negotiating a recording

2    agreement that expressly mentioned permanent downloads, did you?

3    A.    I don't recall, no.

4    Q.    And you don't recall ever drafting a recording agreement

5    which expressly mentioned permanent downloads; right?

6    A.    I don't recall.

7    Q.    Every single recording agreement that you negotiated and

8    drafted, you did before the iTunes store opened; correct?

9    A.    That's correct.

10   Q.    Before iPods were being sold?

11   A.    Yes.   That's correct.

12   Q.    Before millions and millions of people were buying records

13   in the form of downloads; correct?

14   A.    Well, people were buying records in the form of downloads

15   as early as '01.   Just not very much.

16   Q.    In fact, you never discussed downloads with any

17   representative of an artist during any contract negotiations

18   before you retired from the music business in 2001; right?

19   A.    That's probably not true.   Certainly Napster came into

20   being in 1999.   The issue of downloads and the problems that the

21   industry was confronted with, the ability to access music on --

22   on the Internet, was an issue that was widely discussed.

23   Q.    Do you recall being deposed in this case?

24   A.    Yes.

25   Q.    You sat in a conference room with me; correct?

1    A.    I'm sorry?

2    Q.    You sat in a conference room with me; correct?

3    A.    That's correct.

4    Q.    And a court reporter issued an oath; correct?

5    A.    That's correct.

6    Q.    And you swore to tell the truth in that deposition;

7    correct?

8    A.    Yes, I did

9    Q.    And I asked you questions; right?

10    A.    Yes.

11    Q.    And you answered them; right?

12    A.    Yes.

13    Q.    And one of the questions I asked you was whether you can

14    think of a single negotiation that you were part of relating to

15    an artist's agreement in which you or the artist representative

16    brought up how to pay royalties on permanent downloads?

17    A.    That's not exactly the question you just asked me.  I

18    thought the question was -- and I may have misheard you -- I

19    thought the question you just asked me was did I ever discuss it

20    with -- an attorney representing an artist.  And the issue of

21    downloads was something that I'm sure was -- must have been

22    discussed because it was an issue of concern to the record

23    industry in general.

24    Q.    Well, let me then reask the question.  Okay?

25          Can you think of a single negotiation that you were

1  part of relating to an artist's agreement in which you or the

2  artist representative brought up how to pay royalties on

3  permanent downloads?

4  A.    I don't recall.

5  Q.    Now, we know that many recording agreements have been

6  negotiated and drafted since 2003; correct?

7  A.    Of course.

8  Q.    And you didn't negotiate or draft any of those; right?

9  A.    That's correct.

10  Q.    And so with respect to those agreements, those that were

11  entered into after iTunes opened, you don't know how common

12  royalty provisions in those contracts have been applied to

13  downloads, do you?

14  A.    That's not exactly true.  I am generally aware of the

15  practices.  I do keep active in the business, A, out of interest

16  and, B, out of the fact that I continue to be an expert witness

17  in music industry related cases.  Both of my children work for

18  record companies.  As part of the process of forming the

19  opinions that I have in this case, as you well know, I spoke to

20  a number of people active in the business to find out what the

21  practices and policies of the record companies with respect

22  to -- I'm going too fast, I know -- with respect to downloads

23  was.  So it's not fair to say that I have no knowledge.

24  Q.    Let's -- let's go to your expert witnessing for a second

25  just to make sure it's clear to the jury what you have and you

1   have not done.

2        In all of the times when you've been hired for your

3   paid testimony, you've never testified about royalties for

4   downloads, have you?

5   A.   I don't -- I don't believe so.

6   Q.   You've never been -- come into a court and had a judge say

7   you're qualified as an expert on royalties for downloads?

8   That's never happened; right?

9   A.   I have been qualified as an expert on the issue of

10  licensing and royalties in connection with a recording

11  agreement.  Not on downloads.

12  Q.   I'm sorry.  I am sure my question wasn't precise.  Let me

13  try it again.

14        You have never been qualified as an expert by any

15  court on the issue of what royalties should be paid for

16  downloads; right?

17  A.   I have never been involved in a case that specifically

18  related to what royalties should be paid on a download --

19  Q.   Now --

20  A.   -- before this one.

21  Q.   -- you also mentioned in your testimony last Thursday when

22  Mr. Busch was asking you questions -- you mentioned that you had

23  read the agreement between Universal and iTunes; remember that?

24  A.   The Apple agreement, yes.

25  Q.   And you said that -- I think that you also had read some

1  other agreements between Universal and retailers who sell

2  downloads or mastertones; right?

3  A.   Yes.  I have reviewed many of the download agreements that

4  Universal has entered into.

5  Q.   And you did that after you were hired as a paid witness in

6  this case; correct?

7  A.   That's correct.

8  Q.   Before that time, you had never read one of those

9  agreements; right?

10  A.   Well, I -- no, I probably didn't read the end user

11  agreement that I signed when I signed up for iTunes or Rhapsody,

12  so, no, I didn't.

13  Q.   And you've never been involved in negotiating or drafting

14  an agreement between any record company and Apple or iTunes;

15  right?

16  A.   That's correct.

17  Q.   Or between any record company and any retailer who sells

18  downloads; right?

19  A.   I believe that's correct.

20  Q.   All right.

21       Now, you understand that F.B.T.'s position in this

22  case is that royalties on downloads, on permanent downloads,

23  should be paid under the masters license provision in this case;

24  right?

25  A.   Yes.

1    Q.    And that's what you said to Mr. Busch when he asked you

2    questions last Thursday; right?  That was your testimony?

3    A.    That's correct.

4    Q.    That's your opinion in this case?

5    A.    Yes.

6    Q.    And that's what F.B.T. is paying you to do; right?

7    A.    They're paying me to express my opinions.  They're -- I'm

8    not changing my opinions based on their payment.

9    Q.    Well, you're getting paid for your testimony; correct?

10   A.    As are you.  Yes, I am.

11   Q.    I'm not testifying here, Mr. Berman; I am only asking

12   questions.

13            And part of your testimony that you're getting paid

14   for is what you said last Thursday; right?

15   A.    That's correct.

16   Q.    And part of what you're getting paid for is what you're

17   saying here this morning; correct?

18   A.    That's correct.

19   Q.    And you get paid $500 an hour for your testimony; right?

20   A.    Yes.

21   Q.    And so if you testified last Thursday and today for a

22   couple of hours, F.B.T. is going to pay you a thousand dollars;

23   right?

24   A.    I hope so.

25   Q.    And you've also prepared some reports in this case; right?

1    A.    Correct.

2    Q.    And F.B.T. has paid you money for those reports; right?

3    A.    Correct.

4    Q.    They have paid you in excess of $15,000 for those reports;

5    right?

6    A.    I believe that's correct.

7    Q.    And as you said, this kind of paid-for testimony is what

8    you have been doing since you retired in 2001; right?

9    A.    Yes.  You paid me for testimony also in this case.

10   Q.    You call it expert witnessing; right?

11   A.    Yes.

12   Q.    And what expert witnessing means is that people involved in

13   lawsuits hire you so that you will say something in the case

14   that will help them try to win the case; right?

15   A.    Well, that -- you're putting a pejorative on it that I

16   think is totally inappropriate.  I have been asked to be an

17   expert witness in many cases that I have turned down because my

18   opinions did not -- they were in conflict with what the lawyers

19   wanted me to say.  I have turned down Universal when they have

20   asked me to be an expert witness because I didn't feel I could

21   testify to what they wanted me to testify to.

22   Q.    Mr. Berman, you've testified as an expert witness more than

23   20 times; right?

24   A.    That's correct.

25   Q.    And in every one of those cases you said what your

1  client -- what was helpful to your client in that case; right?

2  A.   Because if what my opinion is is not helpful to the client,

3  I refuse to be hired.

4  Q.   And in all -- in the more than 20 times that you've been an

5  expert witness, just to be clear, you have never testified about

6  what royalties should be paid on downloads; right?

7           MR. BUSCH:  Objection.  Asked and answered multiple

8  times, Your Honor.

9           THE COURT:  Overruled.

10           THE WITNESS:  Correct.

11  BY MR. POMERANTZ:

12  Q.   Now, when Mr. Busch questioned you last Thursday, you

13  mentioned that you had been an expert in a number of other

14  lawsuits; right?

15  A.   I don't recall.  I -- I certainly have been so I don't

16  recall Mr. Busch asking me that.

17  Q.   And I don't recall you saying that there was a case in

18  New York where a federal judge refused to let you testify in

19  that case.

20           That happened; right?

21  A.   Yes, it did.

22  Q.   And the judge in that case said that you weren't qualified

23  to offer the opinion that you were planning on offering in that

24  case; right?

25  A.   That's what she said.

1  Q.   And in that case, what you were planning on offering is an

2  opinion about how to value a small record label; right?

3  A.   Yes.

4  Q.   And you were planning on listing a bunch of factors that

5  you thought were relevant in how to value a small record label;

6  right?

7  A.   I believe that's correct.

8  Q.   Just like here you listed a bunch of factors that you think

9  are relevant in deciding whether something is a license or not;

10  right?

11  A.   That's correct.

12  Q.   But the New York judge said that you did not explain how

13  you valued these factors; right?

14  A.   I don't -- the judge was Miriam Cedarbaum.  I was not --

15  she determined that I was not qualified.  I don't recall all of

16  the details of her opinion.

17  Q.   Maybe I can refresh your memory.

18          Your Honor, may I approach?

19          THE COURT:  You may.

20  BY MR. POMERANTZ:

21  Q.   Mr. Berman, you are a lawyer; right?

22  A.   I am an inactive member of the California Bar.

23  Q.   What does inactive mean?

24  A.   My -- my Bar dues are very cheap.  I am not authorized to

25  practice law.

1    Q.    How long has it been since you have been authorized to

2    practice law?

3    A.    I became an inactive member, I believe, in the beginning of

4    2002.

5    Q.    So for the last seven years, you haven't been authorized to

6    practice law?

7    A.    That's correct.

8    Q.    You can't represent any client on a legal matter?

9    A.    That's correct.

10   Q.    Including a record company?

11   A.    That's correct.

12   Q.    Or an artist?

13   A.    That's correct.

14   Q.    Or a production company?

15   A.    That's also correct.

16   Q.    All right.

17            But you do know how to read court decisions, don't

18   you?

19   A.    I have in the past, yes.

20   Q.    That's one of the things that lawyers do; right?

21   A.    I never really practiced law all that much.  I was a music

22   executive.  I was never a litigator, which is what a real lawyer

23   does.

24   Q.    All right.

25            Well, this is the decision by Judge Cedarbaum that

```
1    you were referring to, and if you would turn to the page which
2    is second to the end and has "576" up in the upper left-hand
3    corner, you will see a section that has a heading that says,
4    "Admissibility of David Berman's Proposed Testimony."
5              Do you see that?
6    A.    Yes.
7    Q.    All right.
8              And if you look down a little bit farther down there,
9    the second paragraph, you see that Judge Cedarbaum said, "He
10   does not explain how he valued these factors."
11             Do you see that?
12   A.    No, but --
13   Q.    It's in the last paragraph of the -- on the page.  End of
14   the first sentence.
15   A.    Correct.  Yes.
16   Q.    And that's what she said; right?
17   A.    Yes.
18   Q.    She said you do not assess the relative value of those
19   factors; right?
20   A.    Yes.
21   Q.    And she said that instead of relying on some discernable
22   methodology, you just relied on your instinct; right?
23   A.    Well, that's what she said.  I think she was wrong, but,
24   yes, that's what she said.
25   Q.    And she said that your instinct just isn't subject to any
```

1    standards.  Isn't that what she said?

2    A.    I don't recall.  She probably did.

3    Q.    You can see it.  It's just the next sentence down in the

4    opinion, if you have any questions about it.

5    A.    I stopped here.  I am sure she said that.

6    Q.    All right.

7          And so she said that you weren't qualified as an

8    expert witness; right?

9    A.    To value a record company, even though in the course of my

10   career I had not only valued them, I had bought and sold them,

11   but, yes, she came to that opinion.

12   Q.    Now, let me switch subjects.  You remember Mr. Busch asked

13   you some questions about costs that record companies incur?

14   A.    Yes.

15   Q.    And you talked about manufacturing and distribution costs?

16   A.    Yes.

17   Q.    But there's a lot more costs that record companies incur to

18   try to make a new record a success other than just manufacturing

19   and distribution costs; right?

20   A.    Very definitely.

21   Q.    For example, record companies often incur a lot of costs to

22   try to market a new record; right?

23   A.    That -- correct.

24   Q.    Can you give us some examples of the kind of costs that a

25   record company incurs when they're trying to market a new record

1  like a new Eminem record?

2  A.    Advertising.  A lot of the costs that I already alluded to

3  in my testimony last Thursday with respect to in store but

4  they -- with an artist the stature of Eminem there may well be

5  TV advertising, there might be making -- with an artist of the

6  stature of Eminem, even though MTV isn't playing many videos,

7  they would probably make a video.

8             Independent promotion used to be a significant cost.

9  That's the cost of hiring outsiders to try to get the record

10  played on radio.  It's less important today than it historically

11  has been.

12            They may or may not hire an independent publicist, but

13  even if they don't, there will be expenses incurred by the

14  publicity department inside the company.  I don't doubt that

15  there are a lot of costs incurred.

16  Q.    Let me just go over a few of the costs.  You mentioned

17  these independent promoters.  There is also a promotion staff

18  that the record company itself employs?

19  A.    Very definitely, yes.  In the case of Interscope, yes.

20  Q.    And what do those people do?

21  A.    The promotion department's main task is to get the record

22  played on radio, simply put.

23  Q.    And so a company like Interscope would have a lot of people

24  whose job it is to go to radio stations all across the country

25  and try to persuade them that this particular new record is

1    worthy of their airplay; correct?

2    A.    That's correct.

3    Q.    Now, you also mentioned -- let me go back to the

4    manufacturing costs that you referenced last Thursday.

5         That's another cost that a record company incurs;

6    correct?

7    A.    Absolutely.

8    Q.    And that's a cost that either the record company incurs

9    because it does the manufacturing itself or it pays someone else

10   to do because they hire a third party to do the manufacturing;

11   right?

12   A.    That's correct.

13   Q.    And you know for the last several years that Universal has

14   hired a third party to manufacture its compact discs; right?

15   A.    That's typically what the majors are now doing.

16   Q.    And you know that there is a cost to manufacture vinyl or

17   cassette or CD?  All of them have costs; right?

18   A.    Yes.

19   Q.    Not necessarily the same costs but costs?

20   A.    Correct.

21   Q.    And then -- let's talk about distribution for a second, and

22   you talked about -- I think you referred to it as in-store

23   promotion.

24   A.    Yes.

25   Q.    All right.

1          And that involves a staff of people who go to

2    retailers across the country and try to encourage them to

3    promote a new record in their store; correct?

4    A.   Well, the staff -- yes.  Okay.  More or less, yes.

5    Q.   And they try to persuade the retailer to put this

6    particular new record at the end of the aisle instead of some

7    other new record; correct?

8    A.   Well, they pay for that.

9    Q.   Oh, do they?  Let me ask you this:  Do you know if

10   Universal has paid for that kind of placement in a store since

11   2002?

12   A.   I -- it's called P&P, price and positioning, and I assume

13   it still goes on.  You're right, I don't know for a fact.

14   Q.   Have you ever heard of a program that Universal started in

15   2002 called its jumpstart program?

16   A.   No.

17   Q.   Now, in addition to the staff trying to get

18   end-of-the-aisle airplay -- I'm sorry -- end-of-the-aisle

19   placement, they might also ask the retailer to try to put a

20   poster on the wall of this particular new Eminem release rather

21   than some other record company's new release; right?

22   A.   Yes, that's correct.

23   Q.   And they might say that when you play music in the store

24   while the consumer is there looking, play our new record rather

25   than somebody else's; right?

A.    Yes.

Q.    And that's the job of the sales staff of the distribution company; right?

A.    That's part of the function.

Q.    And so this sales staff will go to Best Buy or Target or any other store that's out there trying to sell records; right?

A.    Yes.

Q.    And the sales staff also goes to iTunes and Amazon and tries to get them to promote the new record; right?

A.    I don't know if it's the same sales staff.  I'm sure they do contact the digital downloaders and try to get their records displayed on the website.  I know Apple does not accept any advertising.  So all they can do is try to persuade.  They can't buy it.

Q.    And you don't know one way or the other whether Universal has the same sales staff contact iTunes that contacts Best Buy?

A.    I don't know.

Q.    And you don't know if Universal has the same person contact Amazon and say, "Promote the Eminem CD" at the same time that they ask Amazon to promote the Eminem download?

A.    I don't know.  It doesn't matter.  It's irrelevant for this case, but you're right, I don't know.

Q.    And all of these kinds of costs that the record company incurs to try to make a new record a success is just trying to sell a record that the consumers will end up liking; right?

1   A.    Well, to sell a record is the end game.  Presumably the

2   consumer isn't going to buy it if he doesn't like it, but the

3   selling of the record is the end game.

4   Q.    And is it fair to say that when a record company puts out a

5   record by a new artist, most of them lose money?

6   A.    Yes.

7   Q.    Fair to say that no more than three in ten records that are

8   released by a new artist make any money at all?

9   A.    That's probably true.

10  Q.    So the record company loses money on seven out of ten new

11  records by new artists; right?

12  A.    Probably true.

13  Q.    And that happens because it still remains hard to predict

14  exactly what music by what new artist the consumer is going to

15  like?

16  A.    That's correct.

17  Q.    Now, F.B.T. released an Eminem record in 1996 before F.B.T.

18  signed its deal with Aftermath in '98; right?

19  A.    That's my understanding.

20  Q.    Do you remember hearing that that record was called

21  *Infinite*?

22  A.    I don't remember that.  I'm aware that there was a record

23  released by F.B.T. before the Interscope deal.

24  Q.    And that record was a flop; right?

25  A.    That's my understanding.

```
1   Q.    I think you called it a stiff; right?

2   A.    I may well have.

3   Q.    And then after Infinite flopped, F.B.T. signed its deal

4   with Dr. Dre and Aftermath; right?

5   A.    That's my understanding.

6   Q.    And everybody was hopeful that when Eminem combined his

7   talents with Dr. Dre and Aftermath and Interscope and Universal,

8   that his next record would be a success; right?

9   A.    You're always hopeful that the record you release is going

10  to be a success.

11  Q.    But no one knows for sure?

12  A.    That's correct.

13  Q.    Now, that next record turned out to be the Slim Shady LP;

14  right?

15  A.    I believe that's correct.

16  Q.    And that record turned out to be one of those three out of

17  ten new releases by new artists that was successful; right?

18  A.    It certainly was.

19  Q.    All right.  Let's change subjects.  Let's talk about

20  technology.

21         You're not here as a computer technology expert;

22  right?

23  A.    Absolutely not.

24  Q.    And you don't know all of the precise technical details

25  that are part of the download process; right?
```

A.    That's correct.

Q.    You don't know the precise technical details of how a
recording goes from Universal through iTunes to the consumer;
right?

A.    I don't know the technical details of how the digital file
goes from Universal -- the digital files go from Universal to
Apple and from iTunes to the consumer, that's correct.

Q.    But you do know that the record company has to do something
as part of that chain; right?

A.    Yes.

Q.    And you do know that iTunes has to do something as part of
that chain?

A.    Yes.  I know the record company has to send a digital file
to iTunes, and I know that iTunes sells a download to the
consumer.

Q.    And you know that the consumer has to do something as part
of that chain; right?

A.    That's correct.

Q.    So Universal as the record company, iTunes as the store and
the consumer all have to do something to make that process work;
right?

A.    That's correct.

Q.    You don't know all of the money that Universal had to spend
to create the infrastructure that it needed to do its part of
that chain, do you?

1    A.    No.  I'm advised that it's -- it's not a significant amount

2    but no, I don't know.

3    Q.    Well, do you know if it's in the millions of dollars?

4    A.    I don't know but I'm sure if it is, you will advise the

5    jury of that.

6    Q.    Do you know if it's in the tens of millions of dollars?

7    A.    I don't know, but, again, I'm sure you will advise the jury

8    if that's the case.

9    Q.    Now, you do know there are certain costs that a record

10   company incurs to manufacture a compact disc; right?

11   A.    Yes.

12   Q.    And a cassette and a vinyl LP; right?

13   A.    Yes.

14   Q.    Do you know which one of those costs more to manufacture,

15   which configuration?

16   A.    Today?  I would think vinyl probably costs the most today.

17   Q.    Do you know how much more it costs to manufacture a vinyl

18   disc than a cassette or compact disc?

19   A.    I don't know what it costs to make a vinyl disc today --

20   and when you say -- I'm thinking of a package as a whole, so in

21   my mind, I'm including the CD booklet, I'm including an album

22   cover, I am including a J card for the cassette, etc.  But to

23   answer the specific question, I don't know the specific dollar

24   amounts.

25   Q.    But it's fair to say that one configuration definitely

1   costs more than the other to manufacture?

2   A.   I believe that's true, yes.

3   Q.   And you would put vinyl as probably more expensive than a

4   compact disc?

5   A.   I think that's probably true.  Depending on how elaborate

6   and ornate your cover is or your CD booklet is.

7   Q.   All right.

8          Let's go to the provision in the 1998 agreement that

9   deals with records sold through normal retail channels.  And,

10  Mr. Nichols, if could put that on the screen, it's 4(a)(i).

11         And, Mr. Berman, I should also let you know there are

12  some binders in front of you that have exhibits in them, and

13  every document that I will refer to here is also in that binder

14  so if you ever need to look at the document itself, feel free

15  and just let me know.  All right.

16         You have seen this provision before; correct?

17  A.   Yes, I have.

18  Q.   And this applies to the sale of compact disks through

19  normal retail channels; right?

20  A.   Among other things, yes.

21  Q.   And applies to the sale of cassettes through normal retail

22  channels?

23  A.   Well, it -- it applies to some -- if you're going to say

24  that iTunes is a normal retail channel -- which you're free to

25  say -- I don't know whether it is or isn't -- I'm certainly

1   going to tell that you that this provision does not cover that

2   sale.

3   Q.   Okay.  You're way ahead of me.  So just -- just -- let's

4   take it a question at a time.

5   A.   Okay.

6   Q.   All I asked you was whether a -- a compact disc sold

7   through a normal retail channel is covered by this provision.

8   A.   I believe it is.

9   Q.   And a cassette sold through a normal retail channel is

10  covered by this provision?

11  A.   If it's sold by Universal, it is.  Universal can license

12  the compact disc to a third party, in which event it's not

13  covered by this.  And yet it's sold through a normal retail

14  channel.

15  Q.   So let me restate the question.

16          If Universal sells a compact disc through a normal

17  retail channel, that would be covered by this provision; right?

18  A.   Well, they actually sell it to a retail channel.

19  Q.   We will get to -- I'm just looking at the words of the

20  contract, Mr. Berman.  It says "through," doesn't it?

21  A.   But words can be deceptive and words can be ambiguous and

22  words can be wrong.  The fact is -- not the words, but the

23  absolute fact is Universal sells their CDs to the retailer.

24  Q.   We'll get to that.  We'll get to that.

25          Compact discs are covered by this provision; right?

1    A.    Yes.

2    Q.    Cassettes are; right?

3    A.    If -- if they're sold to retail by Universal, that's

4    correct.

5    Q.    And vinyl is covered by this provision?

6    A.    I agree.

7    Q.    And if they're covered by this provision, every one of them

8    gets paid the same royalty rate of 18 percent; right?

9    A.    Well, the royalty rate isn't what counts.  It's the royalty

10   that counts, and the royalty differs, based on the

11   configuration.

12   Q.    Well, let me restate my question, Mr. Berman.

13        The same royalty rate, 18 percent, applies if the

14   vinyl, the cassette or the compact disc is sold under this

15   provision; right?

16   A.    The same royalty rate applies.  There are different

17   packaging deductions and the like.  So the amount received is

18   not the same on each configuration.

19   Q.    But the 18 percent figure that we see in this provision,

20   that applies to the compact disc, the cassette and the vinyl

21   record; right?

22   A.    It -- is this the '98 agreement?

23   Q.    Yes, it is.

24   A.    Well, no, because on compact discs they get paid 90 percent

25   of 18 percent.  That's the rate.

1   Q.   That's the rate or that's the number of units they get paid

2   on?

3   A.   Well, it's the same difference.  It's the same difference.

4   Q.   All right.

5            If -- let's put compact discs to one side because I

6   don't want to confuse the issue.  Let's just take cassette and

7   vinyl.

8            Both covered by 18 percent; right?

9   A.   Different packaging deductions, but yes.

10  Q.   The packaging deductions are something different than the

11  royalty rate; correct?

12  A.   They're all -- they're all part of getting to the amount of

13  money the artist receives for each unit sold.  They're all part

14  of the royalty accounting process.

15  Q.   Let me restate my question.

16           The packaging deduction is something different than

17  the royalty rate?

18  A.   It's part of the royalty process.

19  Q.   Yes.  But it's different than the royalty rate; correct?

20  A.   It impacts the royalty rate.

21  Q.   Well, this particular paragraph sets the rate; correct?

22  A.   Yes.

23  Q.   And some other paragraph deals with deductions; correct?

24  A.   Yes.

25  Q.   All right.  So let's stay with the rate because that's the

1   paragraph we're focusing on right now.

2          If a cassette costs less to manufacture than a vinyl

3   record but it's still sold by Universal through a normal retail

4   channel, is the cassette still paid at the 18 percent rate?

5   A.   Yeah, but the list price of the cassette is going to be

6   different and less than the list price of the CD.

7   Q.   So what you're saying, Mr. Berman, is the price will take

8   care of the difference in manufacturing costs; right?

9   A.   Well, the price that the retailer sells it for is

10  irrelevant for purposes of this royalty calculation.

11  Q.   No.  But you just referred to price, and what you were

12  saying, Mr. Berman, was that if it costs less to manufacture a

13  cassette than a vinyl, then you would expect that the suggested

14  retail list price of a cassette may be less because the costs

15  are less; correct?

16  A.   That might happen.

17  Q.   But the 18 percent royalty rate is going to be the royalty

18  rate, regardless of the manufacturing costs; correct?

19  A.   Yeah.  Yeah.  That doesn't change.  The wholesale price

20  could change.

21  Q.   And if technology advances and it allows a record company

22  to reduce its manufacturing costs, the royalty rate is still

23  18 percent?

24  A.   Yep.

25  Q.   And so if it's a record sold through a normal retail

1    channel by Universal, it's going to be an 18 percent royalty

2    rate; correct?

3    A.    On the record sold to the retail channel by Universal, it's

4    an 18 percent royalty, subject to the escalations with increased

5    sales, etc.

6    Q.    You can take that down.  Thanks, Mr. Nichols.

7         Mr. Berman, you would agree that in offering the

8    opinions you're offering in this case, you need some relevant

9    information; correct?

10   A.    Yes.

11   Q.    And in your position, you would like to have all of the

12   relevant information; correct?

13   A.    That's correct.

14   Q.    You would agree that more information is better than less

15   information?

16   A.    Yes, I would.

17   Q.    And as I mentioned earlier, you prepared two reports in

18   this case; correct?

19   A.    Yes.

20   Q.    And those reports set forth the opinions that you were

21   going to offer at this trial; right?

22   A.    I believe so.

23   Q.    And in each of your two reports, you listed the specific

24   documents that you were basing your conclusions on; right?

25   A.    I believe that's correct.

1    Q.    All right.  I want you to look at that list of documents.

2    I have them in your binder.  Your two reports I think are

3    Exhibits 280 and 862.  If you could kind of just look at the

4    first page of each of those because that's where you list the

5    documents that you based your opinions on.

6    A.    Right.  I have got it.

7    Q.    All right.

8              So you've got 280 and 862?

9    A.    Yep.

10   Q.    All right.

11             Now, each of the documents that you listed on the

12   first page of these reports were documents that you received

13   from F.B.T.; correct?

14   A.    From counsel.

15   Q.    From Mr. Busch or one of his colleagues; correct?

16   A.    That's correct.

17   Q.    And you never asked Mr. Busch to send you any particular

18   documents; correct?

19   A.    I don't recall.

20   Q.    Okay.

21             You just assumed that they would provide to you

22   whatever documents would be relevant to you reaching whatever

23   opinions you would have in this case; correct?

24   A.    Yeah.  But there may -- I may have specifically asked for

25   the Complaint and some other documents.  I really don't recall

1    specifically.

2    Q.   Well, what I want to look at actually are documents that

3    you did not list in these reports.

4    A.   Okay.

5    Q.   Documents that you did not base any of your opinions on.

6             Can we do that for a moment?

7    A.   Sure.

8    Q.   All right.  So if you look at the two lists -- let me put

9    up on the screen, if I could, the 2000 -- what has been refereed

10   to as the 2000 novation.  Mr. Nichols, if you could put that up

11   there.  This is the first page and I have highlighted the second

12   paragraph which is one of the paragraphs we have gone over

13   earlier in this trial, Mr. Berman.

14            This agreement is not one of the agreements that you

15   listed in either of your reports; correct?

16   A.   That's correct.

17   Q.   This agreement was not provided to you before you reached

18   your opinions; right?

19   A.   I -- I'm not sure that's true.  I have seen this document.

20   I don't recall the first time I saw it.  I don't know whether it

21   was before my first or second report, before my first or second

22   deposition.  I don't recall when.

23   Q.   Well, you remember at your first deposition, you hadn't

24   given me the documents that you had been provided with; remember

25   that?

1    A.    My recollection -- that's correct.  I was advised that

2    counsel would take care of that.

3    Q.    All right.

4             And so then you went back to your home or office and

5    you gathered all of the documents that you had been provided in

6    connection with your first report; correct?

7    A.    Yes.

8    Q.    Okay.

9             And then you brought them and gave them to Mr. Busch

10   who gave them to me; correct?

11   A.    That's correct.

12   Q.    And then I showed you that collection of documents at your

13   second deposition; correct?

14   A.    Yes.

15   Q.    And we put them in binders; remember that?

16   A.    Well, they were in binders already.  When -- you didn't put

17   them -- I -- they were put in binders when they were delivered

18   to me.

19   Q.    All right.

20             And I received them in binders?

21   A.    That's correct.

22   Q.    And then I showed them to you at your second deposition;

23   correct?

24   A.    That's correct.

25   Q.    And you told me at that second deposition that those were

1  all of the documents that you had been provided before you

2  issued your first report in this case; correct?

3  A.    They were all the documents I had been provided.  I don't

4  recall -- what I said was I had seen this document before.

5  I'm -- I didn't say it was provided to me before.

6  Q.    Oh, okay.

7              But it's not one of the documents that you based any

8  of your opinions on; right?

9  A.    Apparently not, or I would have mentioned it.

10  Q.    And it's not mentioned in your report; correct?

11  A.    No, it's not.

12  Q.    All right.  Let me put up another document that is not

13  listed in your report.  Mr. Nichols, could you put up the 2004

14  amendment, please?  And this is the 2004 amendment, Mr. Berman,

15  and I've highlighted Paragraph 2(a) here which again is a

16  provision that we have discussed with other witnesses in this

17  trial.

18              This is another document that was not listed as one of

19  the documents that you based your opinions on; correct?

20  A.    That's correct.

21  Q.    And you didn't list it in your first report or in your

22  second report; correct?

23  A.    Right.  Yes.

24  Q.    And so this agreement was not -- a copy of this agreement

25  was not provided to you before you reached your opinions in this

1  matter; correct?

2  A.   Again, I have seen this document.  I don't recall when I

3  saw it.  I could well have seen it -- I was aware of the issue

4  and I could well have seen it before either of the two reports.

5  I don't recall when I first saw it.

6  Q.   A copy of this amendment was not in the binder that you

7  gave me; right?

8  A.   I didn't say it was provided to me.  I said I saw it.  No,

9  it was not.

10  Q.   And you did not list this amendment as one of the documents

11  that you were basing your opinion on; right?

12  A.   That's correct.

13  Q.   And you now understand that this is the only agreement

14  amongst the four between F.B.T. and Aftermath that expressly

15  mentions permanent downloads?

16  A.   It's the only one that I've seen, yes.  I don't claim to

17  have seen every document or agreement between Aftermath and

18  F.B.T.

19  Q.   All right.  All right.  Mr. Nichols, you can pull this one

20  down.  Would you do me a favor, Mr. Nichols, and put back up

21  4(a) from the 1998 agreement.  This is again the provision

22  dealing with records sold through normal retail channels.

23          Do you have that provision there, Mr. Berman?

24  A.   Right here, yes.

25  Q.   All right.

1          Now, the -- do you see up on the -- in that little

2   sentence in the middle here it has the term "Records Sold"?

3   See that?

4   A.    You mean on full price records sold in the United States?

5   Q.    Right.

6   A.    Yes.

7   Q.    And "records sold," a term like that, that's pretty common

8   language in a recording agreement; correct?

9   A.    Yes.

10  Q.    And it generally refers to the sale of a record; right?

11  A.    I would think so.

12  Q.    And that could be a sale of a record in the vinyl format;

13  correct?

14  A.    It could.

15  Q.    Or the cassette format?

16  A.    It -- yeah.  I mean, you have to read more to -- yes, it

17  could.

18  Q.    Or the compact disc format; right?

19  A.    Yes.

20  Q.    And you've heard of the term "digital sales"; correct?

21  A.    Yes.

22  Q.    And a digital sale is a sale of a digital download;

23  correct?

24  A.    Generally speaking.

25  Q.    And digital sales like physical sales are just the sale of

1    a record; correct?

2    A.    Not necessarily.

3    Q.    It's just a different method of purchasing a record, isn't

4    it?

5    A.    Not necessarily.

6    Q.    Have you ever said that?

7    A.    In general, I agree that a download is considered, in

8    general, to be a record.  Whether a download is a record for

9    purposes of the '98 and '03 agreement is in debate -- is

10   debatable.  In order for a record to be -- a download to be a

11   record under this agreement, you have to interpret the word

12   "home" in the definition of record to mean personal as opposed

13   to commercial.

14            Now, you could well do that.  For my purposes in this

15   case I didn't care because the provision that is applicable

16   talks about masters license for records or any other uses.  So

17   if a download is a record, it fell under the licensing provision

18   that talked about masters license for record purposes.  If a

19   download is not a record under this agreement because "home"

20   doesn't mean personal, then it falls under the other provision

21   of "or any other use."  So it doesn't matter to me.

22   Q.    Mr. Berman, we'll get to all the issues you want to get to,

23   including the issue of home use where you have no opinion.  My

24   question was much simpler.

25            My question was simply digital sales, like physical

```
1  sales, are just sales of records; right?
2  A.   Well, I don't -- I don't like the use of the word "just"
3  because there are differences, but I agree, in general, maybe
4  under this agreement, maybe not, it's the sale of a record.
5  Q.   Have you ever testified under oath that a digital sale is a
6  sale of a record?
7  A.   In general I -- I -- I'll testify to it right now.   In
8  general, yes.
9  Q.   Have you ever testified under oath that a digital sale is
10 just a different method of purchasing a record?
11 A.   I don't know but -- I don't have a problem with that
12 statement.
13          MR. POMERANTZ:  Your Honor, may I approach the
14 witness to refresh his recollection of what he has said
15 previously under oath?
16          THE COURT:  You may.
17 BY MR. POMERANTZ:
18 Q.   Mr. Berman, I have handed you the transcript of a
19 deposition in a different case.
20          Do you see that?
21 A.   This happens to be the case that Judge Cedarbaum said I
22 wasn't qualified to be an expert for.
23 Q.   But you were deposed in that case; correct?
24 A.   Yeah.  But I guess I wasn't an expert.
25 Q.   But you did answer questions under --
```

1    A.    I was deposed and I answered questions under oath.

2    Q.    And this is the case of 24/7 Records against Sony.

3          Do you see that?

4    A.    Yes.

5    Q.    And you were testifying on behalf of 24/7; correct?

6    A.    Yes.

7    Q.    And this deposition took place on November 13, 2006;

8    correct?

9    A.    Apparently so.

10   Q.    All right.

11         Could you turn to Page 65 of this transcript.

12         Your Honor, with permission, I would like to put that

13   testimony up on the board.

14         THE COURT:  Page and line?

15         MR. POMERANTZ:  It's going to be Page 65 of this

16   transcript, Lines 12 through 16.

17         THE COURT:  You may.

18         MR. POMERANTZ:  Would you please put that up on the

19   screen.

20   Q.    Mr. Berman, this is a question and an answer -- I'm sorry.

21   This is an answer that you gave under oath in the 24/7 lawsuit;

22   correct?

23   A.    Yes.

24   Q.    You said that, "Digital sales is a growing source of

25   revenue, but again it is a different method of purchasing a

1    record to me.  It's still the sale of a record."

2          Correct?

3    A.    I don't have any problem with that.  I think that's true.

4    Q.    Now in this lawsuit, in the 24/7 lawsuit, the issue of

5    royalties being paid on digital downloads wasn't the issue;

6    correct?

7    A.    Not at all.

8    Q.    So this was being stated because it was just the honest

9    truth; right?

10   A.    Everything I say is the honest truth.

11   Q.    Now, would you agree with me, Mr. Berman, that a consumer

12   is essentially purchasing a record from iTunes?

13   A.    In general I agree with that.  Don't hold me to that with

14   respect to the specific agreements in this case because it

15   doesn't matter to me.

16   Q.    And you would agree with me that it's just -- purchasing a

17   record from iTunes is just like a consumer purchasing a record

18   from Tower?

19   A.    No, I wouldn't.  It's a different process.  The "just" I

20   disagree with.

21   Q.    Could -- I would like to show, Your Honor, to Mr. Berman a

22   deposition in this case, 192/15 through 17.

23          THE COURT:  Is that Volume 1?

24          MR. POMERANTZ:  Yes, Your Honor.  And 192/21 through

25   193/7.

```
 1              MR. BUSCH:  Could you repeat that, please?
 2              MR. POMERANTZ:  192/15 to 17, and then 192, Line 21,
 3    through 193/7.
 4              MR. BUSCH:  For what purpose, Your Honor?
 5              THE COURT:  That's my question.  For what purpose?
 6              MR. POMERANTZ:  I don't think it's consistent with
 7    what he just said.  I would be happy to ask a few more questions
 8    to see if it remains consistent.
 9              THE COURT:  At this point I don't think it's
10    inconsistent.
11              MR. POMERANTZ:  Let me follow up.
12    Q.   Mr. Berman, is it your view that when a consumer buys a
13    download from iTunes, that's similar in nature to when they
14    bought a CD from Tower Records?
15    A.   Similar in nature?  Yeah, it's -- you're buying a record.
16    The process is different, but, yeah.  The configuration that you
17    receive it is different.
18    Q.   Okay.  Well, let's look at the kind of retailers that
19    normally sell records.  Let's start with Tower Records.
20    Mr. Nichols, if you could put that up on the screen.
21              This is a chart that the jury saw during the opening
22    statements, Mr. Berman.
23    A.   Unfortunately, Tower no longer sells records.
24    Q.   And Virgin Megastores as of very soon --
25    A.   They are closing the remaining six today.  Very sad.
```

1    Q.    But normal retail channels still includes those stores that

2    remain open for business that sell only records; correct?

3    A.    Well, even Tower didn't sell only records, but, yes.  It's

4    the "only" that isn't applicable.

5    Q.    Stores that were primarily record stores?

6    A.    Sure.

7    Q.    And those record stores like Tower or Wherehouse or some of

8    the others we have, Strawberries --

9    A.    All gone.

10    Q.    -- some of the others we had here in Los Angeles --

11    A.    All gone.

12    Q.    -- they sold different configurations of records; correct?

13    A.    Yes.

14    Q.    You could go buy a vinyl or cassette or CD when it came

15    out; correct?

16    A.    Yes.

17    Q.    And then retailers began to evolve so that other kinds of

18    stores began to sell records; correct?

19    A.    Well, the -- if you are referring to Best Buy and --

20    whatchamacallit --

21    Q.    Circuit City?

22    A.    Thank you.  Circuit City.

23    Q.    And so those were electronic stores who then also started

24    selling records; correct?

25    A.    Correct.

1  Q.    And then mass merchants like Wal-Mart or Target or KMart,

2  they also started selling records; correct?

3  A.    The mass merchants, to the best of my recollection, always

4  sold records.  They were racked.  They may not have bought them

5  themselves.  They may have farmed out that space on the floor to

6  a rack job or to keep the inventory, but they always sold

7  records.

8  Q.    And whether it was a mass merchant like Wal-Mart or an

9  electronic store like Best Buy or a record store like Tower,

10  they were all normal retail channels; correct?

11  A.    In general, yes.  If you want to put that specifically in

12  the context of a recording agreement -- a specific agreement,

13  then you have to look at the whole agreement, but in general I

14  have no problem with that.

15  Q.    And sometimes a Christian book store could be a normal

16  retail channel; right?

17  A.    For Gospel music, it certainly is.

18  Q.    And that's because it's a retailer that is selling records;

19  correct?

20  A.    Normal retail channel is generally historically referred to

21  a brick and mortar store that sells records.  All the things

22  you've mentioned so far are brick and mortar stores that sell

23  records.

24  Q.    So let's go to something that is not a brick and mortar

25  store, Mr. Berman.  Let's start with Amazon.com.

1              That became a popular online retailer in the 1990's;

2    correct?

3    A.    Yes.

4    Q.    It's not what you refer to as a brick and mortar store;

5    correct?

6    A.    No, it's not.

7    Q.    You can just go on to your computer, click a few buttons

8    and a CD could be mailed to you; correct?

9    A.    That's my understanding.

10   Q.    And Amazon.com has sold a lot of CDs?

11   A.    I believe they did.

12   Q.    And Amazon.com now sells downloads of records; correct?

13   A.    Yes, they do.

14   Q.    You're not here telling the jury that Amazon.com is not a

15   normal retail channel, are you?

16   A.    I don't care if it is or not.

17   Q.    You're not offering that opinion here, are you?

18   A.    I am not saying it isn't or isn't.  I don't care.

19   Q.    You don't have an opinion on that; right?

20   A.    Not in the context of this case.  It doesn't matter to me.

21   Q.    So you're not here saying that normal retail channel is

22   limited to brick and mortar stores, are you?

23   A.    For purposes of this case, it doesn't matter.

24   Q.    And you're not saying that the way people in the music

25   industry commonly understand the term "normal retail channel" is

1  limited to just a physical store; right?

2  A.   I don't -- again, historically that phrase came into use in

3  recording agreements and clearly referred to brick and mortar.

4  The intent was to refer to brick and mortar -- normal retail

5  channels, Tower, etc. -- as opposed to, let's say, a record club

6  which is generally not considered to be a normal retail channel.

7  Even though you're buying a full record, the same record as you

8  bought through Tower, you are going to get through the record

9  club.  So that's the origin of the language.  I'm not sure that

10 the non-brick and mortar today, the Amazon.com or the iTunes, is

11 or is not a normal retail channel.  Once again, I don't care for

12 purposes of this agreement.

13 Q.   Could you put up the iTunes slide, please, Mr. Nichols.

14      Mr. Berman, you are not here saying to this jury that

15 iTunes is not a normal retail channel, are you?

16 A.   I'm not saying that.  I'm not saying it is or it isn't.

17 Q.   And, in fact, since iTunes opened in 2003, you have never

18 negotiated or drafted a recording agreement that had the words

19 "normal retail channel" in it?

20 A.   I haven't negotiated or drafted a recording agreement

21 since -- what year did you use?

22 Q.   I said 2003.

23 A.   Well, certainly not, no.

24 Q.   Has F.B.T., to your knowledge, ever objected to Universal

25 or Interscope that Amazon.com is not a normal retail channel?

1    A.    I have no idea.

2    Q.    Does that have any relevance to any opinion you're offering

3    in this case?

4    A.    No.

5    Q.    Are you aware if Mr. Martin or his auditor or any

6    representative of F.B.T. has ever said to Universal or

7    Interscope that Amazon.com is not a normal retail channel?

8    A.    With respect to physical product or downloads?

9    Q.    Any product.

10    A.    Well, I can intuit that they objected -- well, they

11    objected to the method of payment by downloads from Amazon.com

12    as part of the audit.

13    Q.    But Amazon.com is not a physical retailer; correct?

14    A.    Amazon.com sells physical product and downloads.  You

15    can -- we just went through the whole process how you click and

16    they mail you a CD.

17    Q.    Right.  When I said "physical retailer" I didn't mean

18    physical product.  We all know that this is a physical product.

19          What I am saying is Amazon.com is not a physical

20    retailer in the sense that it doesn't have a store --

21    A.    It's not brick and mortar.

22    Q.    All right.

23          But even though it's not brick and mortar, you don't

24    have an opinion as to whether or not it constitutes a normal

25    retail channel; right?

```
1   A.    I don't care for purposes of this case.
2   Q.    All right.
3              Let's go to the two royalty provisions that are most
4   at issue in this case:  The provision dealing with records sold
5   through normal retail channels and the masters license
6   provision.  Could you put both of them up on the screen,
7   Mr. Nichols.
8              So you see the one on top, Mr. Berman, is the one
9   that deals with records being sold through normal retail
10  channels?  Do you see that?
11  A.    Yes.
12  Q.    And the one on the bottom is the one that pertains to
13  masters being licensed.  Do you see that?
14  A.    Yes.
15  Q.    And both of these are in the 1998 agreement.  You know
16  that?
17  A.    I know that.
18  Q.    And basically the same language is again used in the 2003
19  agreement.  You know that?
20  A.    I know that.
21  Q.    All right.
22             Now, you cannot think of a single transaction that is
23  both a record sold through a normal retail channel and a masters
24  license; correct?
25  A.    What?  I just -- I mentioned them.  When Universal licenses
```

1    a master for a soundtrack album, that album is sold often to a

2    normal retail channel.

3              MR. POMERANTZ:  Your Honor, I would like to play the

4    following sworn testimony from the deposition:  263/9 through

5    11, 22 through 24.  264/2 through 4 and 8 through 11.

6              MR. BUSCH:  Your Honor, if he is --

7              THE COURT:  Let me just read.

8              MR. BUSCH:  Okay, I'm sorry.

9              THE COURT:  Mr. Busch?

10             MR. BUSCH:  If he is going to read -- I'm not sure

11   what the purpose of the reading is, but if he is going to read

12   it, then for purposes of completeness he should also play 264/14

13   through 18 -- 13 through 18.

14             THE COURT:  Mr. Pomerantz, you may play the sections

15   identified.

16             MR. POMERANTZ:  I'm sorry?

17             THE COURT:  You may.

18             MR. POMERANTZ:  Play the sections that I asked for?

19             (Whereupon, the video was played for the jury

20              as follows:

21             "Q. Can a transaction be both of a sale of a

22              record under Paragraph 4(a) of the 1998 agreement

23              and a master licensed under Paragraph 4(c)(5)?

24             "A. If you gave me an example, I might be able to

25              say yes or no.  I can't think of one.

1          "Q. Can you think of any situation where you

2             believe that Paragraph 4(c)(v) would trump

3             Pragraph 4(a)?

4          "A. Yeah.  They left out D -- only applies to

5             license.  4(a)(i), I cannot think of a license

6             that would be covered by that clause, so I

7             think they're inconsistent.")

8    BY MR. POMERANTZ:

9    Q.    Mr. Berman, it's your view --

10   A.    That's not the issue we were just discussing, not at all.

11   Q.    Mr. Berman, it's your view that if a transaction is covered

12   by 4(a), that it's not covered by 4(c)(v); right?

13   A.    No.  First, if a transaction is covered by the license,

14   then it's not covered by 4(a).  Because what you don't have here

15   is the phrase before the (v) which says, "Notwithstanding the

16   foregoing."  So 4(v), should there be any conflict, should there

17   be a situation that it could be considered in both (a) and (v),

18   (v) trumps it.  (v) comes after "Notwithstanding the foregoing."

19   Q.    But you just said in your deposition you couldn't think of

20   a single situation where both 4(a) and 4 --

21   A.    I was --

22   Q.    -- 4(c) applies.

23          THE COURT:  Look.  We have a reporter.  So go ahead

24   and finish your question and then --

25   BY MR. POMERANTZ:

1    Q.    You just said in your deposition that you couldn't think of

2    a single situation where 4(a) and 4(c)(v) applied; right?

3    A.    They both don't apply.  What you just asked me earlier is a

4    transaction that was a license that was also sold through normal

5    retail channels, and I told you that.  That doesn't mean that

6    the royalty on that license is paid pursuant to 4(a)(i).  It's

7    not.  The royalty on that license is paid pursuant to 4(a)(v),

8    or whatever the hell those letters are now.  Excuse me, I

9    apologize.

10         The royalty is paid through (v), but the transaction

11   is a license transaction that is sold through a normal retail

12   channel.

13   Q.    Well, let's go to that "Notwithstanding the foregoing"

14   language that you just referred to, Mr. Berman.

15         Mr. Nichols, if you could pull up that language and

16   then what follows below it.  Thank you.

17         All right.  So again, Mr. Berman, this is the

18   "Notwithstanding the foregoing" language that begins Clause C.

19   Do you see that?

20   A.    Yes.

21   Q.    And then there's a whole bunch of paragraphs that follow

22   it.  Do you see that?

23   A.    I lost my reading glasses.

24   Q.    Why don't you just look -- do you want to look at the

25   binder?  It's Exhibit 5.  That might be easier for you.

1  A.    Okay.

2  Q.    And you were just mentioning the "Notwithstanding the

3  foregoing" language; correct?

4  A.    Yes.

5  Q.    And you were saying that means that whatever comes above it

6  doesn't matter if something below it also applies; right?

7  A.    What comes below it trumps it, that's correct.

8  Q.    All right.

9        Now, you notice that in a number of the provisions

10 below that "Notwithstanding the foregoing", it has the phrase of

11 "the otherwise applicable royalty rate."

12       Do you see that?

13 A.    Yes.

14 Q.    And that's in there because some other royalty rate might

15 apply; right?

16 A.    Some other royalty rate doesn't apply because it says on

17 mid price records it will be two-thirds.  So the -- so the

18 otherwise applicable 18 percent, let's say, doesn't apply; the

19 two-thirds applies.  The one-half applies.

20 Q.    All right.

21       What that's saying is that if the 18 percent royalty

22 rate that was in section 4(a) would apply, this is saying forget

23 that because there is an other -- because we want this rate

24 under this heading "Notwithstanding the foregoing" to apply.

25 That's what that means; right?

1    A.    Yes.

2    Q.    All right.

3          And that language is in Paragraph 4(c)(i) in that

4    Paragraph B; correct?  You can see it.  I have it highlighted on

5    the screen.  It makes it a little easier for you.  Do you see

6    that right there?

7    A.    Start again.  Because --

8    Q.    Sure.

9          Do you see the language the otherwise applicable

10   royalty rate, that is in 4(c)(i)(b) -- 4(c)(i)(b)?  Do you see

11   that?

12   A.    It's in a whole bunch of places.

13   Q.    Right.  Well, it's in (i), double (i), triple (iii) and

14   (i)(v); right?

15   A.    Yes.

16   Q.    But it's not in 4(c)(v), is it?

17   A.    Right.

18   Q.    And that's because if 4(c)(v) applies, if it's a masters

19   license, then it's not a record that Aftermath is selling

20   through a normal retail channel?

21   A.    It's not a record that Aftermath is selling, period.

22   Q.    Right.  Exactly.

23          So either 4(a) is going to apply or 4(c)(v).  There

24   is no trumping going on at all, is there?

25   A.    Well, if there were something that you're trying to put in

1 both, the license provision applies.  If it's pursuant to a

2 license, the license provision is going to apply.  If it's not

3 pursuant to a license, something else is going to apply.

4 Q.   All right.  You can take that down now, Mr. Nichols.  Thank

5 you.

6         All right.  Now you -- I think you have already said

7 that you don't have an opinion as to whether iTunes is a normal

8 retail channel so let me ask you to assume that iTunes is a

9 normal retail channel, okay?

10 A.   Okay.

11 Q.   When iTunes sells an Eminem download to an iTunes customer,

12 that's a sale through a normal retail channel under the 1998

13 agreement, isn't it?

14 A.   No.

15 Q.   Okay.  Let me show you what you said under oath in your

16 deposition.

17         Your Honor, I would like to play the following:

18 237/22 through 238/2 and then we go to 239/11 through 21 for the

19 answer.

20         THE COURT:  One moment.

21         You may.

22         MR. POMERANTZ:  Would you please play that?

23         (Whereupon, the video was played for the jury

24          as follows:

25         " Q. Assume for the purposes of this question

1           that iTunes is a normal retail channel as
2           that term is used in the 1998 agreement.
3           Okay?  When iTunes sells an Eminem download
4           to an iTunes customer, is that a sale through
5           a normal retail channel as that term is used in
6           the 1998 agreement?
7           "A. Well, you've hit the nub of the difference
8           between the Best Buy and the iTunes because the
9           transaction between Universal and Best Buy, the
10          sale takes place to Best Buy.  The transaction
11          between Universal and iTunes, the sale does not
12          take place until iTunes sells it to the consumer.
13          So, yes, that is a sale through -- if you
14          hypothetically assume that iTunes is a normal
15          retail channel, then that's a sale through a
16          normal retail channel.  It is not a sale to a.
17          normal retail channel.")
18          MR. BUSCH:  Your Honor, later in the deposition,
19  Mr. Berman clarified that specific answer.
20          MR. POMERANTZ:  Your Honor, I do intend to get to
21  that clarification as well.
22          THE COURT:  All right.
23          MR. POMERANTZ:  And if I don't, Mr. Busch can bring
24  it up but I intend to get to it.
25          THE COURT:  Mr. Busch, you will remind us.

1          MR. BUSCH:  Yes, sir.

2          MR. POMERANTZ:  Could you put that answer on the

3   screen again, Mr. Nichols?  And highlight the very end.  Then

4   that's a sale through a normal retail channel.  It's not a sale

5   to -- right.  All the way to the end.  Thank you very much.

6   Q.   That's the testimony you gave at your deposition; correct?

7   A.   The -- the answer I just gave before this, my focus was on

8   the royalty provisions.  This -- you can say that that iTunes

9   transaction is a sale through a normal retail channel, but it

10  doesn't change what royalty applies.  So for purposes of the '98

11  agreement, that doesn't mean it goes under the royalty language

12  that talks about sales through a normal retail channel.  That's

13  what I was referring to when I just answered.

14  Q.   All right.

15          But your testimony is that it's a sale through a

16  normal retail channel but not a sales to?  At least that's what

17  you said at this moment --

18  A.   Well, I agree with that, that it's not -- first of all --

19  yes, Universal sells nothing to iTunes.  They -- they transfer a

20  digital file.  And then iTunes sells a download to the consumer.

21  Q.   Okay.  I want to keep this answer, but I also want to look

22  at Section 5(a)(i) of the -- of the agreement so let me --

23  actually, you know what, let's use 4(a)(i) and just put it right

24  underneath his answer, if you can do that.  Can you do that,

25  Mr. Nichols?  Put the royalty provision underneath there?  Now,

```
 1   let's go back -- let's go back and put it back to the prior
 2   slot.  I will put this up.
 3            I hope this is something you can see from there,
 4   Mr. Berman.
 5   A.    Not a prayer.
 6   Q.    You can't see that?
 7   A.    No.
 8   Q.    Look at Exhibit 10 and Paragraph 5(a)(i) in your binder.
 9   It's the same thing.
10   A.    Right.
11   Q.    All right.  Now, Paragraph 5(a)(i) uses the words "sales
12   through a normal retail channel"; correct?
13   A.    Yes.
14   Q.    And "through" doesn't mean the same thing as "to," does it?
15   A.    It -- this is all a smokescreen.  For royalty purposes --
16   which is what this clause is, it's a royalty clause -- the sale
17   at the royalty is paid -- is earned when the sale takes place to
18   the retail channel.  If you are claiming that Universal doesn't
19   pay a royalty or credit an artist with a royalty until the
20   record is sold through the retail channel, i.e., until the
21   retail channel sells it to a consumer, then you're wrong and you
22   know you're wrong because that's not what happens.
23   Q.    Mr. Berman, my question was much simpler.  "Through"
24   doesn't mean the same thing as "to," does it?
25   A.    The only logical way to interpret this clause is to say
```

1  that the word "through" in this clause means "to."  The same way

2  you want "home" to mean "personal."

3  Q.   So you would agree that the word "through" and the word

4  "to" mean something different and the parties misspoke when

5  they -- when they used the word "through" in the agreement?

6  A.   This in many respects -- although interestingly not the

7  licensing provision -- is not a well-drafted agreement.  And if

8  they use language that says royalties are paid on sales through

9  a retail channel and if by that they mean that the royalties

10  would not be paid until the retailer sold the record to the

11  customer, they're wrong.  And they know they're wrong and you

12  know they're wrong because that's not how they pay royalties.

13  Q.   Mr. Berman, since you were a young lawyer in the record

14  business, contracts have said, "Records sold through normal

15  retail channels," haven't they?

16  A.   But that's -- but that's -- I don't know.  I'm not saying

17  I've never seen it, but I know that's not how royalties are

18  accounted.  So you have to read that as saying "through" means

19  "to."

20  Q.   But do you recall that after you gave this answer in your

21  deposition which says that the sales to -- through iTunes is a

22  sale through a normal retail channel but it's not a sale to a

23  normal retail channel -- after you gave that testimony, do you

24  recall ten minutes or so later that Mr. Busch requested a break

25  in the deposition?

1    A.    No, I don't recall.  I'm sure it happened, but I don't
2    recall.
3    Q.    And do you recall that you and Mr. Busch then took a
4    15-minute break?
5    A.    I don't recall.
6    Q.    And Mr. Busch during that break wanted to talk to you about
7    an answer that you had given, didn't he?
8    A.    I don't recall.
9    Q.    Well, do you recall him telling you that he wanted to know
10    why you used the word "through" in that answer?
11    A.    Well, I think I would have used the word because that's
12    what -- the hypothetical you were asking me.  I wasn't referring
13    to a royalty provision here.  I mean, I was not using that
14    language and thereby placing the transaction into a royalty
15    provision.  I was just stating a fact that the iTunes
16    transaction is not a sale by Universal to iTunes but it is a
17    sale by iTunes to the end user.
18    Q.    I want to talk about what you and Mr. Busch discussed in
19    the break in the deposition.
20    A.    Well, I don't recall.
21    Q.    Okay.  Well, why don't you look at Page 248, 249 of your
22    deposition transcript and see if that can refresh your
23    recollection.
24    A.    Where is that?
25    Q.    The deposition transcript should probably be -- I think the

1  first volume, which is what this is in, is in the back part of

2  that first binder.  It's probably the very last document there,

3  Mr. Berman.  Is there a deposition transcript?

4  A.    There's a deposition transcript.

5  Q.    All right.  And so turn to Page 248 and look down at Line

6  22 and just start reading from there and see if that refreshes

7  your memory about what you and Mr. Busch discussed during a

8  break.

9            MR. BUSCH:  I would like the witness to be directed

10  to Page 248, beginning at Line 4, please, instead of Line 22.

11            THE COURT:  I didn't hear you.

12            MR. BUSCH:  I said I would ask the witness be

13  directed to Page 248, Line 4, instead of beginning at 248, Line

14  22.

15            THE COURT:  I thought he was reading both pages in

16  total.

17            MR. POMERANTZ:  248 and 249 is fine, Your Honor, I

18  really just wanted to --

19            THE COURT:  He is reading 248 in total and 249 to

20  refresh his recollection.

21            MR. POMERANTZ:  Correct, Your Honor.

22            THE COURT:  All right.

23            I'm sorry, Mr. Berman, did you hear that?

24            THE WITNESS:  I wasn't listening.

25            THE COURT:  You were asked to read 248 in its total

1    and 249 in its total to refresh your recollection.

2              (Whereupon, the witness reads the deposition)

3              THE WITNESS:  Do you want me to read all of 49?

4              THE COURT:  Yes.

5              MR. POMERANTZ:  As far as you want.  I think if you

6    read through the middle of the page or -- you will probably be

7    fine, but I just want to see if that refreshes your memory of

8    what you and Mr. Busch discussed during that break in the

9    deposition.

10             THE WITNESS:  Well --

11             MR. BUSCH:  There's no question pending --

12             THE WITNESS:  This is exactly what I just said.

13             THE COURT:  All we're asking is does this refresh

14   your recollection as to what you discussed with Mr. Busch?

15             THE WITNESS:  Not really.  I mean, I'm -- I'm sure

16   it's accurate.

17             MR. POMERANTZ:  Your Honor, then I would request that

18   we -- I would like to put up on the -- actually, I guess -- do

19   you have -- I would like to put up on the screen so the jury can

20   see 248/22 through 249/16.

21             MR. BUSCH:  Your Honor, Mr. Pomerantz said that he

22   would play the entire clarification at the appropriate time, and

23   I believe this is it, and I believe it begins at 248, Line 4.

24             MR. POMERANTZ:  Your Honor, I want to come back to

25   that part.  I will go to exactly that Line 4.  Right now the

1    question that is pending is what did they discuss.

2        THE COURT:  Go ahead and play the portion with regard

3    to what they discussed.

4        MR. POMERANTZ:  All right.  So starting on 22.  Let's

5    do the first page first and then the second page.

6        (Whereupon, the video was played for the jury

7         as follows:

8         "Q. During that break did you discuss the subject

9          of what you just said with Mr. Busch?

10        "A. Mr. Busch asked me did I mean 'through,' and

11         in asking me that question, I said well, not if

12         'through' puts the transaction into the royalty

13         provisions of 4(a).  What I was trying to do, as

14         I explained to Mr. Busch, was distinguish between

15         who was making the sale and that it wasn't Universal,

16         it was iTunes.  And I wasn't trying -- I wasn't

17         focusing on the word 'through' in 4(a).  'By' is

18         a more appropriate word.  Mr. Busch did not suggest

19         or implicate or tell me to use that word.  I came up

20         with that.

21        "Q. What did Mr. Busch say to you?

22        "A. I just told you.  He questioned what I meant

23         by -- did I mean 'through' and it occurred to me

24         when he asked me that question why he would he

25         concerned with that if to the extent that the use

1          of the word would in some sense push the

2          transaction into 4(a).")

3   BY MR. POMERANTZ:

4   Q.    So after that break in the deposition, you then came back

5   and said that you wanted to take back your answer; correct?

6   A.    No.  I wanted to clarify, as I literally a minute ago just

7   explained, the transaction might be deemed to be a sale -- the

8   iTunes transaction that we're hypothetically talking about might

9   be deemed to be, if you deem iTunes to be a normal retail

10  channel, it might be a sale through a normal retail channel in

11  general.  But what I wanted to clarify, and what I already

12  clarified before you brought this whole thing up, was by that I

13  don't mean it fits under 4(a) for royalty purposes.  It doesn't.

14  And that's what I was clarifying here and that's what I was

15  clarifying in my deposition.

16  Q.    What you said was that you must have misspoke when you said

17  that a sale through iTunes is a sale through a normal retail

18  channel; correct?

19  A.    I -- I'd like to read what I said just before that.

20          THE COURT:  I think it's probably now an appropriate

21  time to show the jurors this clarification.

22          MR. POMERANTZ:  That's fine.  I was going to do that

23  right now, Your Honor.

24          THE COURT:  Which is what the witness wants to read,

25  so they will see it.

```
1              MR. POMERANTZ:  Exactly.  So rather than have him
2    read it, just put it up on the screen?
3              THE COURT:  Just show it.  Yes.
4              MR. POMERANTZ:  248/4 through 18.  Right?
5              MR. BUSCH:  Yes.  Through 18.
6              MR. POMERANTZ:  Can you play it or do you --
7              MR. BUSCH:  I would like it to be played just like
8    the other was played.
9              MR. POMERANTZ:  Okay.  Go ahead.
10             Your Honor, we are going to quickly clip it.  I think
11   it will take a minute to clip those pages.  Lines 4 through 18.
12   Sorry, Your Honor.
13             (Whereupon, the video was played for the jury
14              as follows:
15             "A. Mr. Pomerantz, I would like to clarify some --
16              the answer or answers that I gave just before
17              the break.  In the hypothetical where we assumed
18              that iTunes was a normal retail channel, when I
19              acknowledge that a sale by iTunes to the consumer
20              was a sale through a normal retail channel, I really
21              misspoke in the sense that I was trying to
22              distinguish when the sale took place and that it
23              was not a sale to iTunes by Universal, but it was
24              a sale by iTunes to the consumer.  To the extent
25              that through -- the use of the word 'through' somehow
```

1                    pushed that transaction into Paragraph 4(a) of

2                    the '98 agreement, I disagree.  So my answer should

3                    be yes, that would be a sale by iTunes, a normal

4                    retail channel.")

5    BY MR. POMERANTZ:

6    Q.    So you said misspoke when you said that the sale was

7    through a normal retail channel; correct?

8    A.    This is all such a smokescreen.  If the sale is pursuant to

9    a license between Universal and iTunes, it matters not one iota

10   whether it was a sale -- download sale was by iTunes through

11   iTunes, by iTunes or anything else.  If it's a license -- if the

12   transaction is pursuant to a license, then the royalty provision

13   that is applicable is the licensing provision of the '98 and '03

14   agreements.  I don't care if -- if iTunes is or is not a retail

15   channel, I don't care if the download is sold by or through.

16   Q.    Mr. Berman, words of a contract matter, don't they?

17   A.    They can be deceptive also.

18   Q.    Words of a contract matter to the parties who sign the

19   contract, don't they?

20   A.    I could enter into a contract with you where I say, "I

21   hereby sell you the right to manufacture and sell records

22   embodying my master recording."  I said "sell" but that doesn't

23   mean that transaction isn't a license.  You know that's a

24   license.

25   Q.    F.B.T. signed a contract in 1998 that had the word "sales

1    through normal retail channels" right in it; correct?

2    A.    Yes.    But if the transaction is pursuant to a license, that

3    provision isn't applicable.    The licensing provision is

4    applicable.    So the nub of it, the real crux, is what's the

5    relationship between Universal and the digital download

6    providers.

7    Q.    And F.B.T. signed another contract in 2003 that also said

8    "sales through normal retail channels," didn't --

9    A.    But that provision doesn't apply to a license sale to a

10    third party.

11    Q.    But it does say "sales through normal retail channels,"

12    doesn't it?

13    A.    It says it.

14    Q.    And the parties meant what --

15    A.    It says --

16             THE COURT:    Hold on, hold on, hold on.

17    Mr. Pomerantz, Mr. Berman, please slow down.

18    BY MR. POMERANTZ:

19    Q.    And the parties meant what they said when they wrote and

20    signed the agreement, didn't they?

21    A.    Did Universal mean home or did they mean personal?

22    Q.    Oh, we'll go to that, Mr. Berman, because you don't have an

23    opinion on that, do you?

24    A.    I don't -- it's not relevant in this case.

25    Q.    The reason why you changed your answer after the break and

1  discussion with Mr. Busch was because you didn't want this

2  transaction pushed into Paragraph 4(a); right?

3  A.    It couldn't be pushed into 4(a).  It couldn't be.  I didn't

4  want to imply that by using the word "through" somehow you were

5  pushing it into 4(a).  By the way, I'll use the word "through."

6  It still doesn't push it into 4(a).

7  Q.    Now, the little dialogue that we just reviewed in the

8  deposition transcript, that's not the only time that counsel for

9  F.B.T. suggested certain words that you should use or not use;

10  right?

11           MR. BUSCH:  Objection, Your Honor.

12           THE WITNESS:  Umm --

13           THE COURT:  Hold on.

14           MR. BUSCH:  Mischaracterizes the record completely.

15           THE COURT:  Mr. Pomerantz, you need to be specific.

16  BY MR. POMERANTZ:

17  Q.    At -- was there any other time when Mr. Busch suggested

18  that you use certain words or not use other words when you were

19  testifying under oath?

20  A.    I don't recall.

21  Q.    Well, do you recall that in another break in the

22  deposition, he reminded you that you should use the word

23  "license" more?

24  A.    I actually don't recall that.

25  Q.    Do you recall him saying that he wanted you to use the word

1  "license" to describe the transaction between Universal and

2  Apple?

3  A.    Well, if he did, he certainly was correct.  I don't

4  remember it.

5  Q.    Maybe this will help.  Do you remember that he said, "Stop

6  using the word 'distribute' to describe the relationship between

7  Universal and Apple and try to use the word 'license' more"?

8  A.    I don't recall.

9  Q.    Well, let me see if I can refresh your recollection.  Can

10  we -- Your Honor, I would like to show 135/17 through 136/12.

11              THE COURT:  You may.

12              (Whereupon, the video was played for the jury

13               as follows:

14              "Q. Mr. Berman, before we just recommenced, you

15              and Mr. Busch spoke about something outside the

16              room.  What did you guys speak about?

17              "A. He reminded me that -- he suggested that don't

18              refer to Apple as a -- what did he say?  You know,

19              I don't remember what the hell he said.  Something

20              about making sure you describe the transaction as

21              a license from Universal to Apple and Apple then

22              has the right to reproduce and sell to the ultimate

23              consumer the download.

24              "Q. Anything else?

25              "A. Not that I can recall.

1          "Q. Did he tell you not to refer to Apple

2          as something?

3          "A. Something about the use of the word

4          'distribution'.

5          "Q. What did he say?

6          "A. I don't remember.

7          "Q. That conversation was about two minutes ago?

8          "A. About two minutes ago.")

9    BY MR. POMERANTZ:

10   Q.    Mr. Berman, when you wrote the reports in this case, the

11   ones that you looked at earlier in the binder, Mr. Busch also

12   suggested that you change some of the words that you had used in

13   your drafts of those reports; correct?

14   A.    There was some changes, yes.

15   Q.    You sent your drafts to Mr. Busch for his review and then

16   he gave you comments back; correct?

17   A.    That's my recollection, yes.

18   Q.    And you talked to him about what words he wanted changed in

19   the drafts; correct?

20   A.    In some instances.

21   Q.    And then after Mr. Busch made some recommendations, you

22   changed some of the wording of the draft -- of the reports;

23   correct?

24   A.    Yes.  Mostly for clarification.

25   Q.    Well, one example was that in your report at one point you

```
 1  had described a download as a record.
 2              Do you remember that?
 3  A.   No, I don't.
 4  Q.   And do you recall that Mr. Busch asked you to change the
 5  word "record" to something else?
 6  A.   I don't recall.
 7  Q.   He didn't want you to describe a download as a record; do
 8  you remember that?
 9  A.   No, I really don't remember that.
10  Q.   Because he might want to argue that maybe a download is not
11  a record.
12              Do you remember that?
13  A.   Well, it may or may not be in this case, but it doesn't
14  matter.
15  Q.   Do you remember that he asked you to change the word
16  "record" to "end user"?
17  A.   I really don't remember that.
18  Q.   Let's -- let me show you the deposition testimony.  It's on
19  Page 332 -- before you show it, I have to refer it to the Court.
20              332, Your Honor, 23, through 333/10.  Your Honor, I
21  guess we only have that one available right now in text which is
22  how I would propose to offer it as opposed to the video --
23              THE COURT:  Could you give me the page and line
24  again, please?
25              MR. POMERANTZ:  Sure, 332 /23 through 333/10.
```

```
 1              THE COURT:  You may.

 2              MR. POMERANTZ:  Put that up on the screen, the words.

 3   Q.   Mr. Berman, take a moment to read these records.  I will

 4   read them out loud.

 5              "Q. And you changed the word 'record' to 'end user.'

 6              Do you see that?

 7              "A. Yes.

 8              "Q. Why did you make that change?

 9              "A. Well, because it, under the agreement, it

10              is possible that the download does not fit within

11              the definition of record.  I didn't say it didn't,

12              but it's possible it doesn't, and that -- therefore,

13              the use of the word 'record' will be incorrect --

14              could be incorrect.

15              "Q. Is that a change that Mr. Busch requested that

16              you make?

17              "A. Probably."

18        You have no reason to believe that that wasn't your

19   testimony during the deposition, do you?

20   A.   Absolutely not.

21   Q.   All right.

22              Let's look at this definition of "record" that we

23   have been referring to.  Let's look at the one from the 1998

24   agreement.  Mr. Nichols, if you could put up that definition

25   onto the screen.
```

1          Mr. Berman, you have seen this definition of "record"

2  from the agreement before; correct?

3  A.    Yes, I have.

4  Q.    All right.

5          And I will give you a moment to get it in front of

6  you.

7  A.    Well, you can go ahead.

8  Q.    Now, in the first part of this definition, it says that

9  "Records means all forms of reproductions."

10          Do you see that?

11  A.    Yes.

12  Q.    What do you understand the word "all" to mean in that

13  sentence?

14  A.    "All forms of reproductions."  I can't define it better

15  than what it just says.

16  Q.    "All" means all?

17  A.    Well, "all" means all subject to the rest of the clause,

18  rest of the sentence.

19  Q.    Which we'll get to in a second --

20  A.    But "all" doesn't mean all, because there are limitations

21  after the word "all" which limit the use of the word "all."

22  Q.    Right.

23          But this definition doesn't specify a particular

24  configuration of a record, does it?

25  A.    No.

1    Q.    It doesn't say compact discs?

2    A.    No.

3    Q.    Or cassettes?

4    A.    No.

5    Q.    And it's common for record companies to define a record in

6    a recording contract in a way that doesn't limit it to specific

7    configurations that then exist; correct?

8    A.    Absolutely correct.

9    Q.    Because a record company wants to make sure that the

10   agreement covers configurations of records that are created in

11   the future; correct?

12   A.    They want to make sure they have acquired the rights to

13   manufacture and distribute those things that aren't even known

14   at the time, that's correct.

15   Q.    And so if a new way of delivering a record is created, they

16   want to make sure they have the rights to that; correct?

17   A.    Or a new configuration.

18   Q.    And one of those new ways of delivering a record to a

19   consumer, since this agreement was signed in 1998, is the

20   digital download; right?

21   A.    That's correct.

22   Q.    And that became a common configuration of records after

23   this agreement was signed; right?

24   A.    I -- that's accurate.

25   Q.    Now, let's look at the definition of "new medium records"

```
 1   which is also on the same page.  Mr. Nichols, if you could maybe
 2   get them on the same screen.
 3            Do you see that definition, Mr. Berman?
 4   A.   I see it.
 5   Q.   All right.
 6            And "new medium records" is just a subset of records
 7   under this agreement; correct?
 8   A.   Well, I -- I can't make hide nor -- I can't understand this
 9   Provision H.  It makes no sense to me.
10   Q.   Well, let's focus on some words that I think will make
11   sense to you.
12            Do you see the words "transmission directly into the
13   home"?
14   A.   Yes.
15   Q.   Okay.
16            You would agree with me that a digital download is a
17   transmission directly into the home; correct?
18   A.   I think that's fair.
19   Q.   All right.
20            So now let's look back at this definition, the last
21   part of the definition of "records," the one that says
22   "manufactured or distributed primarily for home use."
23            Do you see that?
24   A.   Yes.
25   Q.   You don't have an opinion as to whether a download fits
```

1  within that definition, do you?

2  A.   The argument can be made that since the download -- and you

3  can even go farther and make the argument that even compact

4  discs are today not primarily for home use but are portable --

5  that this definition of "record" does not encompass a digital

6  download.

7  Q.   Mr. Berman --

8  A.   It doesn't matter to me for purposes of this agreement

9  because of the language of the licensing provision.  But that's

10  an argument that can be made.  And it's -- it's not an argument

11  that I have to take sides on.

12  Q.   Mr. Berman, my question was not what argument could be

13  made.  My question was what's your opinion.  So let me state it

14  over again.

15  A.   I don't have to have an opinion on that issue in this case.

16  I have already acknowledged that in general -- and I'll say it

17  again -- a download is perceived in the industry to be a record.

18  Whether it is in this case or not is not for me to say.

19  Q.   Let's talk about cassettes for a moment in the context of

20  this definition.

21  A.   Yeah.  That's a problem, too, since the Walkman.

22  Q.   You would -- it's your view that at some point in time

23  cassettes were manufactured or distributed primarily for use in

24  a Walkman or use in a car; correct?

25  A.   Eventually that's what happened.

1    Q.    But you're also aware that Universal continued to pay

2    royalties to F.B.T. as -- on cassettes as a sale of a record;

3    correct?

4    A.    Oh, sure.  Universal's position, I'm sure, is that if

5    there's any ambiguity, that "home" must in the context of this

6    agreement mean personal as opposed to commercial.  So, sure,

7    they pay a royalty.

8    Q.    And you don't know of any -- strike that.

9          You're not aware of F.B.T. ever complaining that a

10   cassette is not a record under this definition, are you?

11   A.    Not aware of it, no.

12   Q.    Even though in your view records were manufactured or

13   distributed primarily for use in cars or Walkmans; correct?

14   A.    Cassettes were, you mean?

15   Q.    Yes.

16   A.    At a given point in time, that's what happened.

17   Q.    And F.B.T. and Universal both accepted that records still

18   were records under this definition; right?

19   A.    I don't know.

20   Q.    Well, that's because they were still being used for

21   personal use and not commercial use; right?

22   A.    I don't know the reasons.  And again it's not relevant for

23   my opinion.

24   Q.    Let's put 4(a)(i) back on the screen.  That's the records

25   sold provision.

1          Mr. Berman, you understand that you're here to offer

2    opinions about words and terms in recording agreements; correct?

3    A.    In part.

4    Q.    And what's customary about those terms; right?

5    A.    In part.

6    Q.    And what people in the industry customarily understand

7    certain terms and recording agreements to mean; correct?

8    A.    In part, yes.

9    Q.    But you have no opinion about whether a download is a

10   record under this provision, do you?

11   A.    I need not come to a conclusion on that.  It's irrelevant

12   for the purposes of my opinion and whether or not the

13   transaction between Universal and the download providers is a

14   license or not.  If it's a license, it's covered by the

15   licensing provision, whether the download is a record or not a

16   record so it doesn't matter.

17   Q.    So is the answer is no, you don't --

18   A.    I don't know what the hell -- I don't know what the

19   question was.

20   Q.    You don't have an opinion about whether a download is a

21   record under this agreement?

22          MR. BUSCH:  Your Honor, this question has literally

23   been asked ten times and answered ten times by this witness.

24          THE COURT:  Overruled.

25          THE WITNESS:  I need not come to an opinion.

1  Therefore, I have not come to an opinion.

2  BY MR. POMERANTZ:

3  Q.   And the same with whether iTunes is a normal retail

4  channel; correct?

5  A.   It's irrelevant to me.  You know, that one -- I'm -- I'm --

6  definitely don't know whether to consider that a normal retail

7  channel.

8  Q.   Those are opinions that F.B.T. has not asked you to offer

9  in this case; right?

10  A.   They are opinions that were unnecessary to come to.  It

11  didn't matter.  They don't matter.

12  Q.   All right.  Let's switch subjects.  You can pull this off

13  the screen.

14        Your Honor, do you want me to keep going?

15        THE COURT:  Yes, please.

16  BY MR. POMERANTZ:

17  Q.   You're aware that Aftermath and Eminem and F.B.T. entered

18  into another agreement in 2003?  Do you remember that?

19  A.   Yes.

20  Q.   That's Exhibit 10 in your binder there.

21  A.   Okay.

22  Q.   Now, that was -- at that point in time, Eminem was already

23  a superstar; correct?

24  A.   Yes.

25  Q.   And you understand that he was represented by Mr. Gary

1    Stiffelman during that deal negotiation; correct?

2    A.    Yes.

3    Q.    And you know Mr. Stiffelman, don't you?

4    A.    Yes, I do.

5    Q.    And he is an experienced music lawyer?

6    A.    Yes, he is.

7    Q.    And is it fair to say that Eminem had bargaining strength

8    when that 2003 agreement was negotiated and entered into?

9    A.    He certainly had more in '03 than he did in '98.  That's

10   for sure.

11   Q.    Would you describe Mr. Mathers' position in 2003 as one of

12   bargaining strength?

13   A.    Bargaining power, bargaining strength, bargaining position,

14   I don't -- the terms are interchangeable for me.

15   Q.    But you would apply those terms to Mr. Mathers' position in

16   2003; correct?

17   A.    Yeah.  Everything is relative, but, yes, I would.

18   Q.    And notwithstanding --

19   A.    But -- excuse me -- all of the factors have to be taken

20   into consideration.  The fact that he was a huge selling artist

21   gives him power, strength, position; however, it wasn't like he

22   had one album left under his contract and he was free.  That

23   would really give him power.  So he couldn't leave Universal.

24   He owed them a number of records under the existing agreement.

25   Q.    But your position is that he had bargaining strength.  You

1    have said that; correct?

2    A.    It's relative, but, yes, he did.  Of course he did.

3    Q.    And notwithstanding that strength, all the parties agreed

4    to leave the wording of the masters license provision just the

5    way it was in 1998; correct?

6    A.    It is my understanding that testimony has been given that

7    Universal attempted to get clarification that the digital

8    downloads would be covered by a specific royalty provision and

9    that they lost that negotiation and they lost that point.

10   Q.    Were you -- I'm sorry.  I didn't mean to interrupt.  Go

11   ahead and finish.

12   A.    And hence the licensing language remained.  They attempted

13   it and didn't succeed.

14   Q.    Were you here during Mr. Hoffman's testimony?

15   A.    In part.

16   Q.    Not all of it?

17   A.    Not all of it.

18   Q.    Were you here during Mr. Stiffelman's testimony?

19   A.    No.  But I'm advised that's what happened.

20   Q.    You're aware that notwithstanding Mr. Mathers' bargaining

21   strength, the wording of the "records sold through normal retail

22   channel" provision stayed the same.  The numbers changed.  He

23   got a higher rate, but the wording stayed the same; correct?

24   A.    Sure.

25   Q.    All right.  I want to refer back to Paragraph 4(a)(i) over

1    here, Mr. Berman, so you may need to get that back in front of

2    you.  That's Exhibit 10, Paragraph 4(a)(i).

3    A.    Got it.

4    Q.    Got it?  This is the 2003 agreement?

5    A.    Yes.  Yes.

6    Q.    You see that that agreement uses -- or that provision uses

7    the term -- the acronym USNRC?

8    A.    Yes.

9    Q.    And that stands for United States Normal Retail Channel?

10   A.    Yes.

11   Q.    All right.

12         And it's your testimony that even though that says

13   "sales through normal retail channels," that what the parties

14   really meant was "sales to normal retail channelsz"; right?

15   A.    Well, little clarification.  It's a royalty provision.  It

16   states what the artist is going to get.  When Universal sells a

17   record to a retail -- a normal -- to a retailer, that is the

18   moment in time -- that is the relevant transaction which

19   generates the royalty to the artist.  Whether the retail account

20   never sells the record, whether it's destroyed, whether it's

21   stolen, doesn't matter for the royalty purposes.  So, therefore,

22   the relevance in this paragraph for royalty purposes is the

23   relevant transaction is a sale to the retail account.

24         You can say that the record is ultimately sold through

25   the account.  You can say that.  But that's not what's relevant

1    for royalty purposes.

2    Q.    For royalty purposes, as you read that provision, "sales

3    through normal retail channels" really means "sales to normal

4    retail channels"; right?

5    A.    That's when the royalty is earned by the artist, and you

6    know that's how they account to the artist.

7    Q.    I don't know that, but let's go ahead and put up the 2004

8    amendment so we can compare it.  This is the 2004 amendment.

9    It's one of the ones that wasn't listed in your report as what

10   you based your opinion on but you said you have some familiarity

11   with it.

12              Do you remember that?

13   A.    I have seen it.  I can't read it here.

14   Q.    We will bring it up.  Mr. Nichols, can you bring up the

15   first paragraph and Paragraph 2(a) and maybe that --

16   A.    Is it in here?

17   Q.    It is.  It's Exhibit 17, I believe.

18   A.    Okay.

19   Q.    Now, this is the 2004 amendment.  So it was signed a year

20   after this 2003 agreement; okay?

21   A.    Yes.

22   Q.    Do you see that in Paragraph 2(a) in that last sentence or

23   actually in both sentences, it uses the same acronym, USNRC?

24   A.    Yes.

25   Q.    And you see up in the first paragraph that I have

1  highlighted here, it says, "Unless specifically provided to the

2  contrary herein, all terms defined in the agreement will have

3  the same meaning herein."

4           Do you see that?

5  A.   Yes.

6  Q.   So that means that there's a term in the 2003 agreement, it

7  means the same thing in this 2004 amendment; correct?

8  A.   That's correct.

9  Q.   All right.

10          And you see that both 5(a)(i) in the 2003 agreement

11  and 2(a) in the 2004 amendment use the term USNRC?

12  A.   Yes.

13  Q.   Now, you just said that over here in the 2003 agreement,

14  when the term USNRC is used, it's really referring to "sales to

15  normal retail channels"; right?

16  A.   For royalty purposes that's when the royalty is earned.

17  Q.   All right.  But when you looked at Paragraph 2(a) where it

18  uses USNRC, you don't say that means "sales to retailers," do

19  you?

20  A.   Of course I do.  The royalty is earned.  This is amending

21  the royalty provision.  It's changing 5(a)(i).  It's changing

22  the royalty rate.  It talks about sales through -- the language

23  says, "Net sales through normal retail channels" but

24  nevertheless the royalty is, in fact, earned when the sale is to

25  the retail channel.  I haven't changed it at all.

1    Q.    Do you contend that USNRC means something different in the

2    '04 amendment than it does in the '03 contract?

3    A.    No.

4            MR. POMERANTZ:  Your Honor, I would like to play to

5    the jury depo testimony starting at 327, Line 4 through 8.  And

6    then 13 through 15.

7            MR. BUSCH:  Again, Your Honor, we have -- for

8    completeness, either in my redirect or Mr. Pomerantz, I think

9    the bottom of Page 326 should be read as well.

10            THE COURT:  Line?

11            MR. BUSCH:  326, Line 13 through 25, and then going

12    over to Page 327, Line 1 through 8.  Actually 326, beginning at

13    Line 5.  I apologize, Your Honor.  I am looking back at the

14    transcript.  And the discussion, to put it in context, begins at

15    Page 325, Line 5.

16            MR. POMERANTZ:  Your Honor, my question was very

17    simple, which is whether the two different agreements -- whether

18    the term "USNRC" means the same thing or something different.

19    That was my question I put to Mr. Berman and that is really all

20    I intend to use with this excerpt.

21            THE COURT:  One moment.

22            MR. BUSCH:  Just in response to what Mr. Pomerantz

23    said, in order to put his answer in context, I think you have to

24    read back to the beginning of the line of questioning.

25            THE COURT:  Mr. Pomerantz, you may.

```
 1              (Whereupon, the video was played for the jury
 2               as follows:
 3              "Q. Does USNRC in this Exhibit 17, Paragraph 2(a),
 4              mean something different than USNRC means in
 5              Paragraph 4(a) or 5(a) of the '98 or 2003 agreement?
 6              "A. Yes.  The concept is totally different and I
 7              don't want to repeat it again.  I have said it three
 8              times.")
 9              THE WITNESS:  We are talking about two totally
10    different things.  I was, at least.
11    BY MR. POMERANTZ:
12    Q.    There's a problem for F.B.T. if this -- could you put the
13    2004 amendment back up there, please, Mr. Nichols.  And those
14    two paragraphs.
15              Mr. Berman, there is a problem for F.B.T. in this case
16    if USNRC in this particular amendment meant a "sale to a normal
17    retail channel"; right?
18    A.    No, there is no problem.  And what I was referring to in
19    the deposition as opposed to what I just answered when I said
20    USNRC means the same in both, I was referring to the earlier
21    portion of USNRC and they do mean the same.
22              What I was focusing on in the deposition and what I
23    will focus on now is the last part of Paragraph 2(a) which says,
24    "Sales of albums by way of permanent download shall be treated
25    as USNRC net sales for the purposes of escalations."  That's the
```

1   narrow, narrow provision that this means.  It doesn't mean that

2   the sale is a USNRC.  It doesn't change the royalty payable on

3   the download.  It only means to get to an escalation, if you got

4   to sell a million records, if somebody downloads the entire

5   album, that counts as one more toward getting you to a million

6   records.

7   Q.   Mr. Berman, F.B.T.'s position in this case is that

8   permanent downloads are not sold to retailers; correct?

9   A.   Permanent -- are not sold -- by whom to whom?  I don't -- I

10  really don't understand the question.

11  Q.   Permanent downloads are not sold by Universal or Interscope

12  or Aftermath.  By a record company to retailers; correct?

13  A.   To retailers -- to iTunes?

14  Q.   To normal retail channels.

15  A.   No.  They don't -- as a general rule, they are not

16  selling -- they're not selling downloads, period.  Well, they --

17  they could on the run, and they tried.  But they are not selling

18  to the digital download providers.

19  Q.   So F.B.T. doesn't want you to say that USNRC means a sale

20  of a permanent download to a retailer; right?

21  A.   Whew, you've lost me.

22  Q.   You said in the 2003 agreement that "sales through a normal

23  retail channel" really means "sales to a normal retail

24  channel" --

25  A.   For royalty purposes, yes.

```
 1   Q.    Well, this is a royalty provision, isn't it?

 2   A.    This is a royalty -- this is an escalation provision.

 3   Well, it's two things.  What part of the paragraph are you

 4   talking about now?

 5   Q.    I am pointing over here to 5(a)(i) and it says how royalty

 6   are to be paid.

 7   A.    5(a)(i)?  I thought we were on 2(a).

 8             THE COURT:  I'm sorry.  Again, slow down.

 9             THE WITNESS:  I thought we were on 2(a.)

10   BY MR. POMERANTZ:

11   Q.    I am pointing over here.

12   A.    You got 2(a) up here.  You don't have 4(a)(i) up here.

13   Q.    Look over here --

14   A.    I can't see that far.

15   Q.    Open up your book to Exhibit 10, Paragraph 5(a)(i).

16   A.    Got it.

17   Q.    And this is a royalty provision; correct?

18   A.    Yes, it is.

19   Q.    And it says, "If a record is sold through a normal retail

20   channel," then in this -- in 2003, the royalty rate is

21   20 percent; correct?

22   A.    It's sold by Universal.

23   Q.    Yes.

24             And that's a royalty provision; correct?

25   A.    Yes.
```

1    Q.    And even though it says "sales through normal retail

2    channels," your position is that as a royalty matter, it really

3    means "sales to a normal retail channel"?

4    A.    Correct.

5    Q.    But permanent downloads, according to F.B.T., are not sold

6    to normal retail channels; right?

7    A.    Permanent downloads are pursuant to a large number of

8    licensing agreements between Universal and the download

9    providers, that's correct.

10   Q.    So --

11   A.    So -- so Universal is not selling a download to any of

12   those digital providers.

13   Q.    So you did not want USNRC to be something that was a

14   permanent download sale to a retailer; right?

15   A.    Total smokescreen.  Irrelevant.  It can be a USNRC, it

16   can't be.  The only issue that is relevant is the transaction

17   pursuant to a license.  Then I don't care about normal retail

18   channels, core product, ancillary, any of that.  If it's

19   pursuant to a license, it's covered by the licensing provision.

20   Q.    Let's look at some other language in this 2004 amendment.

21         Do you see at the end of the -- of the paragraph it

22   has -- it says "method of sale"?

23   A.    I'm sorry.  Are we on the 2(a)?

24   Q.    2004.  Yes.  2(a) on the 2004 amendment, the sentence that

25   deals with permanent downloads.

1              Do you see that?  It's Exhibit 17.

2    A.   I got 17.  Now, where are we?

3    Q.   2(a).

4    A.   Yeah.

5    Q.   Last sentence.

6    A.   "For the purposes of escalations"?

7    Q.   Yes.  Do you see the end of that line where it says "method

8    of sale"?

9    A.   "Provided that the sales price concern falls within the top

10   line sales price" -- yes, I see that.

11   Q.   "Method of sales" refers to permanent downloads, doesn't

12   it?

13   A.   You know, this is very interesting.  This language, it

14   seems to me, all it was was they copied the language in their

15   form agreement relating to escalations and they stuck it in,

16   even though it doesn't really make a lot of sense, because it

17   talks about the "sales price concern falls within the top line

18   series."

19            Well, as of this date and until very, very, very

20   recently, there was only one top line for iTunes.  It's -- with

21   some limited exceptions.  It's $9.99 for a full album.  There

22   isn't a top line, a mid price or a budget on downloads.  So

23   it -- it -- I think it was just sloppy drafting.

24   Q.   Now, Mr. Berman, back to my question.  "Method of sales"

25   refers to permanent downloads; correct?

A.    I believe it does.

Q.    And this sentence does not say anything about a method of license, does it?

A.    No.  This has nothing to do -- this sentence has to do with the escalation.  This sentence has to do with how many units of an album do we have to sell in order to get a higher royalty rate.  And, by the way, however many that is, if you sell an entire album via digital download, that will count towards getting you to that higher royalty rate on the physical product, not on the download.

Q.    Mr. Berman, if we could just stick with my question, please.

      Method of -- this contract does not -- this sentence does not say anything about a method of license; correct?  That doesn't appear?  Those words don't appear, does it?  Do they?

A.    No.

Q.    All right.

      And you see right before that it refers to a "top line sales price category"?  Do you see that?  Do you see that term?

A.    That's --

Q.    "Top line" -- do you see those words?

A.    Yes.

Q.    And it says that there is a top line sales price category applicable to such method of sale.

A.    Which there really isn't.

Q.    And you understand that since "method of sale" refers in this sentence to permanent downloads, that there is a top line sales price category for permanent downloads; right?

A.    But there isn't.

Q.    You mean, the parties didn't mean what they said?

A.    It was sloppy drafting.  It -- there aren't, until very recently when it's been announced -- I don't know that it's been done yet -- there aren't tiered pricing on downloads.  Apple has one price in general and it's $9.99 for a full album.  It may be more if you have multiple, multiple tracks and there is a lot of mechanicals, but basically for all intents and purposes, it's $9.99.

      So they are all top line or there is no top -- top line is in contra-distinction to budget or mid price.  Well, if there is no budget or mid price being sold online, then what's the point?

Q.    But what the parties who wrote and signed this contract said was that permanent downloads have a sales price; correct?

A.    Well, I -- what they wrote -- permanent downloads have a sales price, I'll agree with that.

Q.    And the top line sales price category referred to here is a price that Universal provides to the retailer; correct?

A.    Not on the downloads.  The downloads -- they sell it at any price they want -- well, the -- they -- I don't know where

1    you're going.  You've got me confused, I'll tell you that.

2    Q.   Well, if you just answer my questions and not try to get to

3    where you think I'm going, we'll get done a lot faster.

4            Top line sales price category is a price -- for any

5    configuration, is a price that Universal provides to the

6    retailer; correct?

7    A.   Well, if we're talking about the physical world, no, they

8    sell to the retailer at a given price and historically they have

9    created a suggested list price, but the retailer then sells it

10   for any price they choose.

11   Q.   Sure.

12           But when this is referring to a top line sales price

13   category, it's either referring to the suggested price that

14   Universal provides to the retailer or to the actual wholesale

15   price that Universal is providing to the retailer; correct?

16   A.   I guess so.

17   Q.   So it's a price that Universal charges the retailer for

18   sales of its records; correct?

19   A.   In the physical world, that's correct.

20   Q.   And that's the term they used here --

21           THE COURT:  We need to break.

22           MR. POMERANTZ:  All right.  Thank you, Your Honor.

23           THE COURT:  We are going to take a one hour lunch

24   break.  We will resume again at 1:30.  Remember not to discuss

25   the case with yourselves or anyone else.  Don't form or express

1    any opinions about the case until it's finally submitted to you.

2    We will see you in an hour.

3                              (Jury Out)

4              THE COURT:  Mr. Pomerantz, how much longer do you

5    think you have on cross?

6              MR. POMERANTZ:  I knew that was the question.  I

7    would say 20 to 30 minutes, Your Honor.

8              THE COURT:  We will see you at 1:30.

9                         (Lunch Recess Taken)

10             (A.M. proceedings adjourned at 12:30 p.m.)

11                            CERTIFICATE

12

13        I hereby certify that pursuant to Section 753, Title 18,
     United States Code, the foregoing is a true and correct
14   transcript of the stenographically reported proceedings held in
     the above-entitled matter and that the transcript page format is
15   in conformance with the regulations of the Judicial Conference
     of the United States.

16

17

     _____          _____
18   Pamela A. Seijas, CSR No. 3593                  Date
     Official Reporter
19

20

21

22

23

24

25

1                           I N D E X

2   WITNESSES FOR THE
    PLAINTIFF:          DIRECT      CROSS     REDIRECT    RECROSS
3
      DAVID MARSHALL                  9
4     BERMAN

5

6

7

8

9
    WITNESSES FOR THE
10  DEFENSE:            DIRECT      CROSS     REDIRECT    RECROSS

11

12

13

14

15

16

17  PLAINTIFF EXHIBITS:          MARKED          RECEIVED

18

19

20

21  DEFENSE EXHIBITS:            MARKED          RECEIVED

22

23

24

25