1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4   F.B.T. PRODUCTIONS, LLC,          )
                                      )
5                                     )
                                      )
6                      Plaintiffs,    )
                                      )
7                                     )
                                      )
8          Vs.                        )   No. CV 07-3314-PSG
                                      )
9                                     )
                                      )
10  AFTERMATH RECORDS, ET AL.,        )
                                      )
11                                    )
                                      )
12                     Defendant.     )
                                      )
13  _____  )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               LOS ANGELES, CALIFORNIA

18               TUESDAY, MARCH 3, 2009

19  _____

20

21               MIRIAM V. BAIRD, CSR 11893
            OFFICIAL U.S. DISTRICT COURT REPORTER
22            255 EAST TEMPLE STREET, # 181-K
              LOS ANGELES, CALIFORNIA 90012
23                  (213) 894-2853
                  MVB11893@aol.com
24

25

1                     **A P P E A R A N C E S**

2


3    **IN BEHALF OF THE PLAINTIFF,**    RICHARD BUSCH
     **F.B.T. PRODUCTIONS:**            - and -
4                                       Mark Guilford
                                        315 UNION STREET
5                                       NASHVILLE, TN 37201

6


7


8


9


     **IN BEHALF OF THE DEFENDANT,**    MUNGER, TOLLES & OLSON, LLP
10   **AFTERMATH RECORDS, ET AL.:**     BY:  GLENN D. POMERANTZ
                                              KELLY KLAUS
11                                            MELINDA LEMOINE
                                        355 SOUTH GRAND AVENUE
12                                      THIRTY-FIFTH FLOOR
                                        LOS ANGELES, CALIFORNIA
13                                      90071

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   LOS ANGELES, CALIFORNIA; MONDAY, MARCH 2, 2009; 0900

 2                              ---

 3

 4          THE CLERK:  CV 07-3314-PSG.  F.B.T. Productions,

 5   LLC, versus Aftermath Records, et al.

 6          MR. BUSCH:  Richard Busch and Mark Guilford for the

 7   plaintiffs, Your Honor.

 8          Good afternoon.

 9          THE COURT:  Good afternoon.

10          MR. POMERANTZ:  Glenn Pomerantz, Mindy LeMoine, and

11   Kelly Klaus on behalf of the defendants.

12          THE COURT:  I -- first I wanted to discuss

13   Exhibit 129 and the examination of Jeff Harleston.  I've read

14   the two-page exhibit.

15          And, Mr. Pomerantz, I wanted to discuss your view

16   with regard to this -- the examination, using this document

17   to examine your expert or defendants' expert Harleston.

18   I went back and looked at Motion in Limine Number 6, and what

19   I was persuaded about in granting Motion in Limine Number 6

20   was when the various third parties or persons associated with

21   the defendants used the phraseology of license, they were

22   unconnected to the recording agreements used in this case.

23          The thing that I think is different with

24   Mr. Harleston, at least at first blush to me, is although,

25   again, he is unconnected with the -- with the negotiations,
```

1    he's the expert that is going to talk about custom and usage.

2    So if he's going to talk about custom and usage, why can't he

3    be examined about statements he'd made about custom and usage

4    in the industry?

5         MR. POMERANTZ:  Your Honor, I think that the

6    reasons expressed in Motion in Limine 6 are even more

7    important and apply even more so when you're bringing in an

8    expert to testify about customs and practice specifically

9    related to recording agreements.  The basis of Motion in

10   Limine 6 was that when someone unconnected to the recording

11   agreements at issue here, or recording agreements generally,

12   use the term license in a different context, that that is,

13   number one, irrelevant; and, number two, it's prejudicial and

14   confusing because we would have to go in and explain why it's

15   different in a way that could seriously mislead the jury and

16   create confusion.

17        Here, the Senate testimony concerns statutory rates

18   that are set for Internet radio broadcasters.  It's a

19   statutory scheme that is completely divorced from recording

20   agreements.

21        And what Mr. Harleston was addressing -- what the

22   Senate hearing was all about was how should Congress go about

23   setting statutory rates for Internet radio broadcasters.  In

24   that context he used the term license to mean permission.

25        If now Mr. Harleston takes the stand, he is

1   specifically being asked to testify about customs and

2   practices relating to recording agreements.  It's

3   precisely -- if the plaintiffs are permitted to put the word

4   "license," when he uses it in the context of testimony

5   relating to statutory rate proceeding -- and if they are able

6   to put the word license in front of them totally divorced

7   from the context of recording agreements, it's not -- it's

8   not just that it's not about these particular recording

9   agreements; it's not about recording agreements at all.  It's

10  not about royalties.  It's not about masters license

11  provisions.  There's no connection between what he is saying

12  there and the issues that he's going to be testifying here

13  today.

14          It doesn't impeach him.  It just confuses the jury

15  that they're going to -- the plaintiffs will try to infer

16  that he's using license in a similar context when we know

17  the context of that testimony, and it had nothing to do

18  with recording agreements or royalty provisions and, in

19  particular, a masters license provision, like the type that

20  he'll be testifying about here today.

21          So I think what's going on here is this is nothing

22  more than trying to get an unfair sound bite to put the word

23  "license" in front of the jury when we all know it's in a

24  different context, and they're unfairly trying to transfer

25  that to the context in which Mr. Harleston will be

1    testifying.  And I think when you do that in particular with

2    someone who is specifically being designated to talk about

3    custom and practices for recording agreements, that's when

4    it's particularly confusing and prejudicial in our view.

5              THE COURT:  You know, I agree with you generally.

6    The purpose of the testimony -- I'm looking for the specific

7    references to iTunes and the -- in the two-page testimony.

8    Just give me a moment to see if I have a question.

9              MR. BUSCH:  It's on the second page, Your Honor.

10             THE COURT:  Pardon?

11             MR. BUSCH:  It's on the second page.

12             THE COURT:  Which full paragraph?

13             MR. BUSCH:  It is the first full paragraph -- first

14   paragraph on the second page.

15             THE COURT:  Give me a moment.  Thank you.

16             Mr. Pomerantz, why -- again, I understand the --

17   why Mr. Harleston was there, what he was addressing with

18   regard to radio.  But why, when he branches out -- and we

19   look at that first paragraph on Page 2 of Exhibit 129, why

20   isn't -- again, why isn't that directly on point with what

21   he's going to be testifying in this particular case?  Or at

22   least could be questioned about and then offer his

23   explanation or whatever it may be why it's different.

24             And I know I'm sensitive to the fact that I don't

25   want one of the points that you made in your motion in limine

```
 1    to this sort of side trial about copyright license, copyright
 2    law.  I'm sensitive about that -- that specific paragraph.
 3    I'm not sure it's not fair game.
 4            MR. POMERANTZ:  Well, that's not the paragraph.
 5    The paragraph begins over here, on the bottom of the first
 6    page.  And what that paragraph does, as does the whole thing,
 7    is he's connecting -- the question that's put to the
 8    Senate -- the Senators at this hearing, which is how should
 9    Senators go about thinking about how to set rates for
10    Internet radio and for broad -- and for Internet radio
11    broadcasters, and all he is saying here is that we have
12    different prices where we do a lot of different things, and
13    you shouldn't assume on the radio side that it should all be
14    the same price.
15            THE COURT:  But he's also explaining to the Senate
16    how business has evolved, isn't he?
17            MR. POMERANTZ:  He is, but what he's not doing is
18    in any way thinking or talking about the royalty distinction
19    between a sale and a license.  That is not the context here
20    at all.  There's nothing that connects that.
21            So the mere fact that he uses license in the
22    generic sense of permission to use our music, and he uses it
23    in ways that are not at all connected to a royalty provision,
24    and the question in this case, which is is it a sale of a
25    record under one royalty provision or is the license of a
```

 1    master in another, it's totally divorced from that question,

 2    which is what his testimony will be focused on.

 3              It won't be focused on the use of license in

 4    broader and different context, which is exactly what we were

 5    arguing in Motion in Limine Number 6.  It's designed to take

 6    the word license in a totally unrelated context and say,

 7    "A-ha, they must mean the same thing as what we're talking

 8    about here," and that would mean that I would have to

 9    question Mr. Harleston about what in the heck were the

10    Senators reviewing here?  You know, what was the real issue?

11    Did it have anything to do with the sale of a record or the

12    license of a master for royalty purposes?  And I would have

13    to go all the way through that and keep my fingers crossed

14    that the jurors aren't confused and misled because of the

15    word license here.

16              I think it's very much the same prejudice, and I

17    think even more so when you put it to someone who is being

18    designated as an expert on terms in recording agreements.

19              THE COURT:  Mr. Busch?

20              MR. BUSCH:  Just to put this into context, Your

21    Honor, Mr. Harleston is a senior executive at Interscope and

22    was copied on the Ostroff memo in 2002 in connection with the

23    new royalty system that was in place for digital downloads.

24              Mr. Weinberg, in his testimony before this Court

25    the other day, said that he scratched out the word "license"

1    not because of any royalty relating to the recording

2    agreements but because it didn't accurately describe the

3    transaction.  And Mr. Weinberg said that he took out the word

4    "license" for that reason.

5           Mr. Harleston -- Mr. Harleston, in connection with

6    his testimony in this case, was -- was designated to respond

7    to Mr. Berman as an expert, and he testified affirmatively

8    that the Apple iTunes Universal agreement was not a license,

9    period.  His view is it's a sale/resale, and it's not a

10   license.  That opinion that he has articulated in connection

11   with his opinion testimony in this case that this is a -- not

12   a license.  It is not a licensing arrangement.  It is the

13   directly at issue in this case.

14          He specifically contradicts that in his Senate

15   testimony.  He specifically contradicts the fact that these

16   are licenses and it's completely different to what he

17   testified to in his deposition.  And when I presented him

18   with this Senate testimony in his deposition, he was asked

19   specifically whether -- what he was talking about, if he

20   didn't mean that it was a license agreement, and he couldn't

21   come up with a reason.  He didn't say anything related to,

22   "Well, I was talking about this."

23          I asked him specifically, and I can show you the

24   pages, what he meant if he didn't mean that the iTunes

25   Universal agreement was a license.

1        And so he is talking in his testimony here that

2   these agreements are licenses.  He doesn't say sale/resale.

3   The defendants in this case have put up the defense that this

4   is a sale/resale -- separate and apart from the recording

5   agreements, sale/resale.

6        Having done that specifically for Mr. Weinberg,

7   having done that for Mr. Kenswil, this man, who is a senior

8   executive and reports to Mr. Ostroff and worked with these

9   people, this is a flat-out admission.  He's saying these are

10  license agreements.  It directly contradictions what their

11  fact witnesses have said.  He's being designated as an

12  expert, offering opinion testimony on that point.

13       And the jury can make the determination upon

14  examination by Mr. Pomerantz whether it is fair to suggest

15  that he really didn't mean what he said here, but, rather, he

16  was only using that word in the vernacular somehow in

17  connection with Internet radio.

18       This is what you call a smoking gun.  It's not

19  prejudicial.  It's fair.  The issue is in play.  And he's

20  their expert.  And he's not just fact testimony.  It's

21  opinion testimony he's offering on this point, and we would

22  ask that it be allowed.

23       THE COURT:  Anything else, Mr. Pomerantz?

24       MR. POMERANTZ:  I fear when you give me the last

25  word that I'm a little behind.  Your Honor, he -- one thing

1   that Mr. Busch said --

2        THE COURT:  Well, let me just say.  I'm giving you

3   the last shot -- I think -- as it relates to expert

4   testimony, I think it is fair game.  And he's -- he's going

5   to have to explain his testimony, at least from the

6   plaintiffs' perspective, is different than his trial

7   testimony.

8        MR. POMERANTZ:  Your Honor, I think it's -- and

9   I guess I would ask Your Honor to consider that the point of

10  being an expert I think cuts exactly the opposite direction.

11  It's one thing for Mr. Iovine, who was another one of the

12  people who -- who had made a statement about license

13  generically.  And, Your Honor, that was covered by the

14  ruling.

15       THE COURT:  Right.

16       MR. POMERANTZ:  Mr. Iovine had -- had nothing to do

17  with -- with recording agreements and terms.  Mr. Harleston

18  -- he had nothing to do with this particular recording

19  agreement.  He is coming in here to try and explain to the

20  jury what -- how words in recording agreements are

21  customarily understood.

22       And if they take -- the one thing that Mr. Busch

23  didn't say was that Internet radio had anything to do with an

24  issue in this case because it doesn't.  It is completely

25  irrelevant.

1          So when Mr. Harleston uses the word license, he's

2    not giving any thought to royalty provisions or anything like

3    that, and he's not trying to use license in any sense other

4    than the sense of a discussion about Internet radio.

5          THE COURT:  Why shouldn't the jurors hear that

6    explanation?

7          MR. POMERANTZ:  The jurors could, but we all know

8    what is going on.  Mr. Busch wants to put this document in

9    front of the jury and say that's what this contract means.

10   He's admitting what this contract means.  That's what

11   Mr. Busch just said.  And no matter how hard I try, there is

12   a great risk that the jury is going to look at this and be

13   confused and say, "Well, wait a second.  What does that have

14   to do with royalty agreements and the issues we've been asked

15   to consider?"

16         And that's what 403 is all about.  When that risk

17   is greater than the probative value, it should be excluded.

18   And there's no probative value to Mr. -- to Mr. Harleston

19   using the term "license" in an Internet radio proceeding.

20         THE COURT:  But when he testifies about custom and

21   usage, he's going to take the contrary view to Mr. Berman.

22   He's going to say this is just like Wal-Mart.  It's like

23   Target, *Amazon.com*, Best Buy.  And so, therefore, if you look

24   at the way the business has been run in the past and the way

25   it's run now and for the immediate future, this is really

1  like your opening statement:  A record is a record is a

2  record.

3          And I'm not -- I'm not persuaded yet as to why

4  he -- why he cannot be confronted with this document to say,

5  look.  At least in this portion of your testimony you didn't

6  view it as a record is a record is a record.  You didn't view

7  it in the same way that you would view Wal-Mart, Best Buy;

8  and then he offers an explanation, whatever it may be.  I'm

9  not --

10          MR. POMERANTZ:  And, Your Honor, I guess all I can

11  say is nothing in this testimony, even under these words,

12  deal with a record is a record is a record or a sale through

13  a retailer.  Those are concepts that are in royalty

14  agreements --

15          THE COURT:  Right.

16          MR. POMERANTZ:  -- regardless.

17          THE COURT:  But that's what he's going to say in

18  this case, isn't he?  The custom and practice, that's going

19  to be the theme, or that's the theme of your case, and that's

20  what I'm anticipating he's going to talk about to buttress

21  the theme.

22          MR. POMERANTZ:  Most definitely.

23          And I guess what I'm saying is that that theme,

24  those two pieces, that a record is a record and that it is

25  sold through normal retailers, that has nothing to do with

```
 1    anything said in this provision; so -- in this paragraph.

 2            And so what Mr. Busch is trying to do is to mislead

 3    the jury and confuse the jury by extracting the word

 4    "license" here to suggest that that somehow has some bearing

 5    on royalty provisions, which it doesn't pertain to.

 6            THE COURT:  I would allow the examination of 129 as

 7    it relates to expert Harleston.

 8            Have the -- is there anything else?  Have the jury

 9    instructions --

10            MR. BUSCH:  I have one thing, Your Honor.

11            THE COURT:  All right.

12            MR. BUSCH:  Your Honor, in ruling on the jury

13    instructions yesterday --

14            THE COURT:  Yes.

15            MR. BUSCH:  -- Your Honor ruled that the adhesion

16    jury instruction could be given and if -- but at same time

17    Your Honor ruled that Instruction Number 34 was not going to

18    be given.

19            THE COURT:  Give me a moment.

20            MR. BUSCH:  Yes, sir.

21            THE COURT:  Refresh my memory, where is adhesion?

22            MR. BUSCH:  What number is adhesion, Mark?

23            MR. GUILFORD:  34-A, Your Honor.

24            THE COURT:  34-A.

25            MR. BUSCH:  34-A is adhesion.
```

```
 1              THE COURT:  I'm with you.

 2              All right.  34-A is adhesion.  Okay.

 3              MR. BUSCH:  34-A discusses what a contract adhesion

 4   is, but it doesn't give a jury any explanation about what to

 5   do in the event that it finds a contract of adhesion.  It's

 6   completely silent on that.  So it doesn't make sense unless

 7   you also give 34, which, Your Honor -- and I think, you know,

 8   what happened was Your Honor was undecided about 34-A until

 9   we had argument.  And so 34, I think, has to be given if 34-A

10   is given because of the fact that without it, it's

11   meaningless.

12              THE COURT:  Give me a moment.

13              Do you have a copy -- does anyone have a copy of

14   CACI?  I don't have a copy of CACI with me.

15              MR. KLAUS:  I do.

16              THE COURT:  Mr. Busch, my memory is refreshed.

17   When I looked back at it, I didn't look at the argument.  But

18   when you look at the use instruction, how can I give it at

19   this stage as opposed to if they're deadlocked, then I give

20   34.

21              MR. BUSCH:  The -- as I understand and as I've read

22   the CACI, it's in the commentary.  It's not binding.

23              THE COURT:  I agree.

24              MR. BUSCH:  It's just a suggestion.

25              THE COURT:  Right.
```

1              MR. BUSCH:  And having agreed to give the contract

2    of adhesion, it strikes me that the jury is going to get this

3    contract of adhesion instruction and say, okay.  What if we

4    find that there's nothing that instructs them, what happens?

5    And since it's just a suggestion, it is not binding, we would

6    think that 34 needs to be given at the time.

7              I also -- I think it's pretty much Black letter

8    law, Your Honor, that the contracts are to be construed

9    against the drafter in the case of an ambiguity.  But as to

10   the point without 34, 34-A doesn't give the jury any

11   guidance.

12             THE COURT:  Mr. Klaus, what's the impact of 34 by

13   itself?  34-A?  I mean, Mr. Busch has it right.  When I

14   looked at 34, I relied on -- really relied on the use note

15   and thought it was inappropriate to give.  In my mind my

16   preliminary analysis was to not give contract of adhesion

17   because I didn't feel the evidence supported it.

18             And as I listened to argument, I thought I was

19   really acting as the -- when I listened to the argument, I

20   felt like I was beginning to act like the jury in weighing

21   the evidence.  And I thought, well, okay.  There's --

22   there's -- as I said, it was weak, but I thought there was

23   enough to let the jury look at contract of adhesion.

24             So now that I've done that, what does the jury do

25   with it?

1    MR. KLAUS:  Well, I think that that -- that

2    highlights why the contract of adhesion point -- or contract

3    of adhesion instruction shouldn't be given at all.

4    THE COURT:  Well, that's -- I felt I asked

5    Mr. Busch, why are you trying -- I think I'm trying to --

6    you're trying to persuade me to take back 34 -- 34-A.

7    MR. KLAUS:  Well, the direction for use, which is

8    in the commentary, does -- specifically says it should only

9    be given in the case of a deadlocked jury because the Black

10   letter law is not what Mr. Busch said, which is that

11   ambiguities are construed against the drafter.  The Black

12   letter law is that once you've gone through every other canon

13   of construction that helps you in interpreting the contract,

14   then and only then do you construe the ambiguity against the

15   party that caused it to exist.

16   What's more, the second paragraph of their proposed

17   instruction, which is the one that says this has particular

18   force in the case of a contract of adhesion, that's not found

19   in the model instruction either.  That's found in the

20   commentary note.  And if you look at the commentary note, the

21   commentary note is citing a decision of the Court of Appeal

22   in the *Baby against Bank of America* case.  That case

23   involved -- it -- it referred to the contract of adhesion as

24   a principle of contract construction in a very generic

25   paragraph, stating rules of contract construction.

1          But ultimately what the Court said was that a bill

2     stuffer, something that -- something that the company

3     literally put into utility customer's bills and said, "We are

4     changing the terms of your contract," was not enforceable.

5     That's the classic way of a contract of adhesion.

6          There's nothing in there that says we're going to

7     construe ambiguities against it.  What it says is that the --

8     the agreements don't suggest that the ADR provision, which

9     was part of the bill stuffer, was one of the things that the

10    parties reasonably contracted to.

11         That's what -- that's what contract of adhesion

12    principles, where they come into play in terms of -- in terms

13    of agreements is deciding whether something is enforceable,

14    whether you have a provision that is oppressive or

15    prejudicial or broad.

16         Remember, in this case what they're trying to do is

17    taking a provision and saying, we like this provision.  We

18    want it to be construed as broadly as it possibly can.

19    They're not trying to get out from underneath enforcement of

20    anything.

21         So I think when you combine the fact that the

22    directions for use say you give it only in the case of a

23    deadlocked jury, and when you combine it with the fact that

24    the only authority that they've got as support for the

25    proposition that the rule has particular force -- that the

1    jury should be instructed that the rule has particular force

2    in the case of contracts of adhesion is an off-point case

3    suggests, at a minimum, that 34 and 34-A, we should reserve

4    argument on it up until the point where the jury comes back

5    and says it's deadlocked.

6              THE COURT:  Mr. Busch, can you -- because you have

7    to be careful what you ask for.

8              But what I was thinking -- go ahead and go back to

9    the lectern.

10             MR. BUSCH:  Yes, sir.

11             THE COURT:  When I was thinking about your

12   argument, you're right.  I changed my mind on 34-A on the fly

13   after hearing your argument, and now what do I -- when you

14   make that point, now what do we do with it, given the use

15   note and the fact that I seem to be -- I am being persuaded

16   that, well, we don't really get to that point until we have

17   a deadlocked jury, and then they deal with contract adhesion

18   and which way you could persuasively argue to push them in

19   your direction after that point.

20             MR. BUSCH:  Right.

21             What I would say, Your Honor, is that the

22   Rule 34 -- the Instruction 34 that we asked to be given

23   specifically says in determining the meaning of a term of

24   the contract you must first consider all of the other

25   instructions that I've given you, and if after considering

1    these instructions you still cannot agree on the meaning of

2    the term, then you should interpret the contract term against

3    the party that drafted the term.

4         So in the instruction itself it gives the jury

5    exactly the instruction which we are asking and which

6    Your Honor is concerned about, which is that they're only to

7    consider the contract of adhesion and this point if they,

8    when they're sitting back there, can't reach an agreement as

9    it relates to the entire -- to the verdict.

10         So what I would suggest, Your Honor, is that,

11    again, there's no rule that says you cannot give this at the

12    time and that the jury has to come back and give you a note

13    that says we're deadlocked before you can give it.  There's

14    nothing that says that.

15         So my question -- my point would be this:  If we're

16    going to give the contract of adhesion, which I believe we

17    should, I think what is in 34 explains to the jury you're

18    only to consider these two things if you guys cannot reach

19    a decision.  And then this is what -- what you do.  You

20    construe it against the drafter.  And if it is a contract

21    of adhesion, it's of particular force.

22         So I think 34 fits right into that point.

23         THE COURT:  But if we wait for that note from the

24    jury, then we've assured ourselves that they've reached that

25    point rather than letting them play with two instructions

1  that may not apply.

2          MR. BUSCH:  I understand what Your Honor is saying.

3  I think that -- as I said, I don't see that there is any law

4  that states it has to be given at that time.  And I do

5  think -- you know, I do file and raise this to have

6  Your Honor reconsider the adhesion instruction.

7          THE COURT:  I think it's appropriate that we pull

8  34 and 34-A and wait until we have -- wait until we get that

9  note.

10         MR. BUSCH:  Okay.

11         THE COURT:  All right.

12         MR. POMERANTZ:  Your Honor, just a few small issues

13 unless Your Honor has other issues.

14         THE COURT:  Has there been an exchange of the

15 version of the instructions?

16         MR. BUSCH:  We gave them an instruction.  I think

17 they considered a special verdict form.  They've given us

18 back one as well.  I think generally it looks okay.

19         THE COURT:  Okay.

20         MR. BUSCH:  I did want to speak to Mr. Pomerantz

21 about it, if we could, and just let Your Honor know.

22         THE COURT:  All right.  Just give me -- if you can,

23 then -- there's not one more change to be made, and so if you

24 can give the next final set tomorrow.

25         MR. POMERANTZ:  There's two different things.  I'm

```
 1   sorry.  There's two different things.
 2              On the jury instructions, I think we're done.
 3              THE COURT:  Well --
 4              MR. POMERANTZ:  We'll put out -- I think there's
 5   one other issue.
 6              THE COURT:  Pull 34-A, and then we have to
 7   renumber.  And then also I think there were a couple of
 8   instructions that we'll wait and see.
 9              MR. POMERANTZ:  Right.
10              One of them has to wait until we make our motion
11   for judgment as a matter of law.  But yes, we're just about
12   ready and we've already exchanged and I think we're just
13   about there.
14              THE COURT:  I just want to make sure that we're
15   ready to go when -- when the time comes.
16              MR. POMERANTZ:  We will be.
17              THE COURT:  Okay.
18              MR. POMERANTZ:  On the -- what Mr. Busch was
19   speaking to, and that's one of the issues I wanted to raise,
20   is on the verdict form, we have exchanged them.  They're very
21   close, and we'll work it out tonight and be able to bring it
22   back to you tomorrow.
23              THE COURT:  Okay.
24              MR. POMERANTZ:  We would request, Your Honor, just
25   to know how much time we have left, if Your Honor -- I don't
```

```
 1    know if you have that tallied up.

 2              THE COURT:  Plaintiff has used eight hours exactly.

 3              Defense has used 3 hours 55 minutes.

 4              MR. POMERANTZ:  3:55?

 5              THE COURT:  Correct.

 6              MR. POMERANTZ:  All right.  And then a couple

 7    issues have come up regarding the closings that I just wanted

 8    to raise with Your Honor.  Or, actually, one concerns still

 9    some testimony for tomorrow.

10              We -- I am trying to avoid an issue in front of the

11    jury tomorrow.  We have had on our exhibit list since the

12    beginning certain pages from the iTunes and Amazon Websites

13    that help the jury to understand exactly how they work.  And

14    we sort of marched them through a handful of pages.  We put

15    it on our exhibit list at the very beginning.  We've given

16    the pages to Mr. Busch in January and then a narrower set in

17    February.

18              I believe their remaining objections are 402, 403,

19    and 901, and I'd like to resolve those now because I think

20    it's important to have the jury see iTunes and see Amazon so

21    they can see exactly how it works, particularly for those

22    jurors who have never used them before.

23              And I don't know if Mr. Busch continues to object

24    to our using those, but I can't imagine that this jury can't

25    see iTunes and can't see Amazon.
```

```
 1              THE COURT:  Mr. Busch.

 2              MR. BUSCH:  Your Honor, our point on that is the

 3    issue in this case is whether the agreement between Universal

 4    and these download companies are licenses or not, and what

 5    the home page of iTunes looks like --

 6              THE COURT:  Doesn't it relate to custom and usage?

 7    Again, that theme the expert is going to talk about, that

 8    this is like the one they had on the Web -- Wal-Mart -- this

 9    is the Wal-Mart --

10              MR. BUSCH:  If that's Your Honor's inclination, I'm

11    not going to fight it hard.

12              THE COURT:  All right.  They can be inquired about.

13              MR. POMERANTZ:  That's how we plan on using it,

14    Your Honor.

15              THE COURT:  All right.

16              MR. POMERANTZ:  On demonstratives, we had agreed --

17    the demonstratives we will use in closing, we had agreed and

18    Your Honor had ordered that any new demonstratives -- I

19    assume any old demonstratives that we have already created

20    and exchanged don't need to be forever exchanged.

21              THE COURT:  Right.

22              MR. POMERANTZ:  For new demonstratives, we are

23    under an order to exchange by noon tomorrow.

24              And there's one issue where we disagree as to what

25    that means.  I think we have agreed that if all you're doing
```

```
1   is extracting words from an admitted exhibit, like 4-A and 4
2   C.V., that's not really a demonstrative that needs to be
3   exchanged.  We're just going to do that as we've done it
4   throughout the trial.
5              THE COURT:  Right.
6              And, again, in good faith.  I mean, they are
7   certainly words.  If I can see a situation where someone
8   could add things to the word to make them prejudicial, and
9   that -- you know.
10             MR. POMERANTZ:  Yes.  That's exactly where --
11             THE COURT:  Colors and fireworks or whatever else.
12             MR. POMERANTZ:  Exactly.
13             This is the line that Mr. Busch and I draw in the
14   pretrial exchange, which was if it was just the words --
15   nothing more, no colors, no added words --
16             THE COURT:  Fireworks.
17             MR. POMERANTZ:  Okay.  So we are going to -- the
18   thing where we disagree is on extracting witness testimony,
19   we think that if what you want to do is extract witness
20   testimony and put it up on the screen, you should exchange
21   that.  And there's a difference between that and an exhibit.
22             An exhibit, as with my cases, this has come down to
23   about ten exhibits that matter, and we all know backwards.
24             THE COURT:  Yes.
25             MR. POMERANTZ:  And we all know exactly the context
```

1    in which words are used.

2         But here, if they're going to suddenly put a

3    witness testimony up on the screen and we don't have notice

4    that they're going to do that and in a way where it's then --

5    maybe it's misleading because it ignores other testimony, at

6    least if you have that kind of notice you can either object

7    to the -- to the way it's being used because it's misleading

8    in the way they've extracted that testimony, or at least it

9    allows you to get prepared to respond to it during the

10   closings.

11        So we would request that the exchange of -- of

12   demonstratives include anything where you're extracting

13   witness testimony that was given during trial.

14        THE COURT:  How is it -- I'm sympathetic, but how

15   is it any different, let's say, with all -- before we had all

16   these electronics someone getting up and saying, okay.  Your

17   memory is what governs.  If I say something wrong, you know,

18   it's your memory that governs the -- what their witnesses

19   said.  And do you remember Joe said -- Joe/John said that the

20   light was green?  And, well, how is this any different than

21   the other person would get up there, you go -- "You were

22   lying."

23        And the other person would get up and says, "No,

24   you rely on your memory, the light was red."  He said the

25   light was red.  Well, how is that any different, other than

 1   now we have the technology that makes it more snazzy and

 2   probably more accurate?

 3              MR. POMERANTZ:  I'm not sure I 100 percent

 4   understand what Your Honor is --

 5              THE COURT:  Let me try -- typically, before at the

 6   least electronics, the lawyer would get up and in summarizing

 7   would start maybe with a general statement, okay.  I'm trying

 8   to give this to you as straight as I can.  If I misstate

 9   somebody's testimony, I really don't mean to do that, but

10   what you remember is what governs.

11              And then the lawyer proceeds to say, and don't you

12   remember Witness Smith said A, B, and C?

13              MR. POMERANTZ:  Now, I understand.

14              THE COURT:  And then the other side gets up and

15   says, no, no.  The witness said A and B.  You know, go back

16   and talk among yourselves.

17              MR. POMERANTZ:  I understand.

18              THE COURT:  In this specific case he would say,

19   what Mr. Busch didn't show you was the next three questions,

20   where he said A, B, and C.

21              MR. POMERANTZ:  Here's the difference.

22              Your Honor's example is not a demonstrative.

23   Demonstratives have added power.  That's why we have special

24   rules that govern demonstratives.  And so when they put words

25   on a screen -- and it is -- I'm assuming, quite frankly, it

1    will be a quote from -- from a transcript.  And it will say,

2    this is what Witness X said.

3            We, on the fly, would have to be scrambling

4    through, and because of that added force of putting it up on

5    the screen and making it a demonstrative, and in the eyes of

6    the jury it takes -- it has more power than if Mr. Busch just

7    said, remember when Mr. X said this, we would think those

8    should be exchanged.  And it goes both ways.  We'll similarly

9    make the exchange.

10            THE COURT:  Mr. Busch.

11            MR. BUSCH:  I guess I could just give Mr. Pomerantz

12    a copy of my closing statement, if he wants it, but I would

13    rather not do that.

14            I think what we would -- what we have planned to do

15    is quote directly from the transcript.  And that is fair game

16    for both sides.  I don't see why putting up the transcript,

17    the official transcript and what it says needs to be

18    exchanged before closing arguments.  I don't think that that

19    is what is intended.  We're willing not to have them give us

20    their -- what they intend to rely on in the testimony and put

21    it up, and I don't see any reason that we should be required

22    to do that.

23            THE COURT:  All right.  The Court would not require

24    that exchange.

25            All right.  Anything else?

```
 1              MR. POMERANTZ:  Did you say will not?
 2              THE COURT:  Will not.
 3              MR. POMERANTZ:  Yes, Your Honor.
 4         I think Mr. Busch and I are in agreement on this.
 5    We just want to go over the schedule for tomorrow.
 6              MR. BUSCH:  I have a few other substantive matters
 7    before we do that.
 8              THE COURT:  I thought this was going to be
 9    30 minutes.
10              MR. BUSCH:  I know.  I just want to let Your Honor
11    know what we're -- what we have in mind, so....
12              THE COURT:  Go ahead and finish, Mr. Pomerantz.
13              MR. BUSCH:  Yeah.  These are things that I have
14    raised before.
15              THE COURT:  Okay.
16              MR. BUSCH:  Okay.
17              MR. POMERANTZ:  In terms of the schedule for
18    tomorrow, I think we have agreed we will finish Mr. Berman;
19    that's our first order of business.  And then we will turn to
20    Mr. Cohen, who is their damages expert.
21              THE COURT:  Right.
22              MR. POMERANTZ:  When that is done, then the
23    plaintiffs will rest.  And we would like to have an op- --
24              MR. BUSCH:  Gustav.  Gustav.
25              MR. POMERANTZ:  Oh, I'm sorry.  They want to play
```

 1    a short video of Mr. Gustav; so that witness will also be --

 2    will fit in there someplace.

 3              They will then rest.

 4              We would like to have the opportunity to make an

 5    oral motion for -- for judgment as a matter of law.

 6              MR. BUSCH:  We will as well, Your Honor.

 7              MR. POMERANTZ:  And then --

 8              THE COURT:  Mr. Pomerantz, it's hard enough, and

 9    you're making life even more difficult for the reporter.

10              MR. POMERANTZ:  I apologize.

11              THE COURT:  I'll give you time.  I always have.

12              MR. POMERANTZ:  Okay.  Thank you, sir.

13              THE COURT:  Not enough time, but --

14              MR. POMERANTZ:  Okay.  And then we will turn to

15    Mr. Harleston, and he is likely to be our only witness that

16    we would call in our case.  That, our best guesstimate, will

17    take us into early afternoon, mid afternoon potentially.  And

18    so then what is remaining, as I understand it from your court

19    reporter, is that you tend to charge the jury first and then

20    closing.

21              THE COURT:  I preinstruct.

22              MR. POMERANTZ:  And so we would -- we are -- we are

23    indifferent as to whether the jury is charged tomorrow

24    afternoon and then we close on Thursday morning, or whether

25    you wait and charge the jury Thursday morning and let us

```
 1   close Thursday morning.  Either way is fine with us, but I
 2   think both of us would request that we not close tomorrow
 3   afternoon, but that we finish all of the testimony and then
 4   Your Honor could decide whether to charge tomorrow afternoon
 5   or --
 6           THE COURT:  I'd rather -- my preference is I'll
 7   preinstruct tomorrow, and then you can start openings fresh.
 8   Because I -- after the instruction anyway, most of the time
 9   the plaintiffs go first.  Sometimes I wonder if it's fair
10   after 45 minutes of -- or 40 minutes of instruction.
11           So they'll be fresh in the morning.  Counsel are
12   also going to remind them of certain instructions that they
13   want to focus on; so -- and then I'll have them in writing,
14   but my preference is to instruct tomorrow if we have the
15   time.
16           MR. POMERANTZ:  That's fine, Your Honor.
17           THE COURT:  Fine.
18           MR. BUSCH:  Your Honor, the first thing on the time
19   that is left.  Your Honor said we were at eight hours.  I
20   think Your Honor had given me -- we had --
21           THE COURT:  8:49.
22           MR. BUSCH:  So I have 49 minutes left?
23           THE COURT:  Correct.
24           MR. BUSCH:  Okay.  This might sound ridiculous, but
25   during the testimony of Eddy Cue I think we were charged for
```

1    all of it, and two minutes and 30 seconds were --

2            THE COURT:  I meant to ask about that because

3    there's apportionment.

4            MR. BUSCH:  Yes.

5            THE COURT:  There's -- is that the only --

6            MR. BUSCH:  For Cue.  And then for Gustav there is,

7    like, eight minutes, and so a couple of minutes there also.

8            THE COURT:  I'll give you 52.

9            MR. BUSCH:  Okay.  All right.  So a couple of

10   things that I have raised before, Your Honor.

11           One is there was one interrogatory.  We moved to

12   compel some information in discovery, and one of it was their

13   costs related to digital downloads.  And that matter was

14   resolved by the defendants agreeing to supply us with an

15   interrogatory answering the question.  And so they did a

16   Supplemental Interrogatory Number 26.

17           THE COURT:  Okay.

18           MR. BUSCH:  And they answered the interrogatory,

19   and it was part of the Court's resolution of the motion to

20   compel.  And so we would -- we believe that that should be

21   allowed into evidence since it was not part of the regular

22   interrogatory process.  It was specifically as part of a

23   judicial resolution of the motion.

24           THE COURT:  Are you -- I'm sorry.

25           MR. BUSCH:  I'm proposing to introduce into

```
1    evidence their answer in evidence to Interrogatory 26.

2              THE COURT:  Without objection?

3              MR. BUSCH:  Without the objection, just the answer.

4              THE COURT:  Okay.  I don't see a problem with that.

5    It's just the answer.

6              MR. BUSCH:  Okay.

7              THE COURT:  Is there a problem with that,

8    Mr. Pomerantz?

9              MR. POMERANTZ:  Your Honor, I understand from

10   Mr. LeMoine that without the objection, you don't understand

11   how we've explained and narrowed our --

12             THE COURT:  I thought that was in your favor; so if

13   you want the objection in, that's --

14             MR. POMERANTZ:  I don't know because I didn't know

15   he was raising this today; and so I guess what I'd like to do

16   is -- again, if -- I don't mean to delay things, but if we

17   could just look at it and --

18             THE COURT:  If it's a problem, let me know.

19             MR. POMERANTZ:  -- and then we can raise it

20   tomorrow if we need to.

21             THE COURT:  Okay.

22             MR. BUSCH:  That's fine.

23             The other thing, Your Honor -- and I mentioned this

24   yesterday when we were together.  We had several document

25   requests that asked the defendants to produce any contracts,
```

1    agreements, correspondence, communications with Eminem or

2    agreements that bear on or relate to these -- this lawsuit.

3    They did not produce agreements that relate to this

4    *Eight Mile* soundtrack issue.  Never produced anything.

5          And there was one agreement that we just obtained

6    yesterday from our economic expert, Mr. Cohen.  They

7    subpoenaed documents from him he had in his file.  He

8    produced.  Then the copy service produced them directly to

9    them, and we, for some reason, didn't get copies of these

10   documents.  Mr. Cohen brought it, and it's a -- there's no

11   dispute about the authenticity of it or anything.  They

12   should have produced it in discovery.  It's one document, and

13   we would like it added to the exhibit list.

14         We're told by -- I'm told by Mr. Pomerantz he's

15   going to object to it on lateness grounds, but it is what it

16   is, and they should have produced it, and we would ask that

17   it be allowed to be added to the exhibit list.

18         MR. POMERANTZ:  Your Honor, I don't know if it was

19   responsive or not responsive to document requests, but that's

20   really beside the point because it was produced in this case

21   by their auditor back in May of last year.  So it's been part

22   of the record in this case in the document production from

23   the get-go.  And it's been in the possession of their auditor

24   since even before May, since he's the one who audited our

25   books and records and was given a copy of this agreement.

UNITED STATES DISTRICT COURT

1              So it's not a surprise to them.  We have an exhibit

2    list.  We have an amended exhibit list.  We've gone through

3    it.  At this point after so many witnesses have been called

4    and gone, I think it's unfair to add another exhibit.

5              THE COURT:  All right.  We're not going to amend

6    the exhibit list this late.

7              Anything else?

8              MR. BUSCH:  If Your Honor is done for the day,

9    that's fine.

10             THE COURT:  No.  I want to make sure we're ready to

11   go.

12             MR. BUSCH:  Okay.  So there's just -- you know, at

13   the end of our case we're going to be asking for various

14   documents from the exhibit list to be introduced.

15             THE COURT:  Okay.  What I want you to do is this.

16             Well, haven't you moved in exhibits -- all of the

17   exhibits you want to move in except for the ones you are

18   going to maybe cover tomorrow?

19             MR. BUSCH:  No, sir.  There are -- like, for

20   example, we had mentioned testimony by their CFO, Clive

21   Ellis, that we had submitted to Your Honor for review and we

22   have discussed.  There are royalty statements that need to be

23   introduced.  It's not that many.

24             THE COURT:  Why don't we just handle them like any

25   other as we've been going?

```
 1              MR. BUSCH:  Sure.

 2              They may have objections to some, and I don't want

 3   to take up the Court's time or the jury's time while Your

 4   Honor weighs those objections.

 5              MR. POMERANTZ:  Your Honor, I'm aware of some of

 6   the documents that Mr. Busch is referring to, and we do

 7   object on different grounds.  And we can -- I don't know when

 8   Your Honor wants to address them.

 9              MR. BUSCH:  We can be here tomorrow morning early

10   if Your Honor would like.

11              THE COURT:  I was hoping -- what are we talking

12   about?

13              MR. POMERANTZ:  And, Your Honor, if we're in a rush

14   to get out, we also, I think, will have time at the end of

15   the day tomorrow as well, you know, because we're probably

16   not going to --

17              MR. BUSCH:  Okay.  That's fine, Your Honor.

18              THE COURT:  All right.  Let's wrap up all of the

19   exhibits.

20              Also what I want to do is work with Ms. Hernandez

21   so that we're ready to go and have the exhibits ready to send

22   back --

23              MR. BUSCH:  Okay.

24              THE COURT:  -- to the jury room.  So we can handle

25   that at the end of the day when counsel reviews to make sure
```

 1  that we're all on the same page; that the exhibits we've

 2  admitted are, in fact, the ones that counsel believes should

 3  have been admitted.  And then at the end of the day we have

 4  all of the exhibits ready to go so when the jurors start

 5  deliberating, they get the documents as soon as possible.

 6          MR. BUSCH:  And then just the last thing -- it is

 7  just a matter of housekeeping.

 8          Your Honor ruled yesterday that the binder of the

 9  cutouts will be added to the exhibit list and be allowed to

10  go to the jury.

11          Does Your Honor have an extra binder?  Do we need

12  to bring an extra binder?

13          THE COURT:  I have a bench copy; so there should be

14  one -- an extra court copy that would go back to the jury

15  room, and I believe it needs to be numbered.

16          MR. BUSCH:  Okay.  We'll do that.

17          THE COURT:  Last, with regard to the jury

18  instructions, with regard to that use of the interrogatory,

19  we need to now add Joint Number 18.

20          MR. POMERANTZ:  Your Honor, we may dispute it, but

21  if we don't dispute it --

22          THE COURT:  All right.  But, anyway, you said

23  yesterday it wasn't applicable, so....

24          MR. POMERANTZ:  I guess that one would have to be

25  resolved before you charge the jury.

```
 1                THE COURT:  Right.
 2                MR. POMERANTZ:  So we'll see if can work that one
 3     out.
 4                THE COURT:  Okay.  All right.  We'll see you
 5     tomorrow at 9:00 o'clock.
 6                MR. POMERANTZ:  Thank you, Your Honor.
 7                (Proceedings concluded at 4:30 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```