1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

4   F.B.T. PRODUCTIONS, LLC,            )
                                        )
5                                       )
                                        )
6                    Plaintiffs,        )
                                        )
7                                       )
                                        )
8          Vs.                          )   No. CV 07-3314-PSG
                                        )
9                                       )
                                        )
10  AFTERMATH RECORDS, ET AL.,          )
                                        )
11                                      )
                                        )
12                   Defendants.        )
    _____ )
13                                      )

14

15

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  *JURY TRIAL*

18              *DAY 5 P.M. SESSION*

19            LOS ANGELES, CALIFORNIA

20           WEDNESDAY, MARCH 4, 2009

21   _____

22

23            MIRIAM V. BAIRD, CSR 11893
         OFFICIAL U.S. DISTRICT COURT REPORTER
24          255 EAST TEMPLE STREET, # 181-K
           LOS ANGELES, CALIFORNIA 90012
25                 (213) 894-2853
               MVB11893@aol.com

1                          **A P P E A R A N C E S**

2


3     **IN BEHALF OF THE PLAINTIFF,**      RICHARD BUSCH
      **F.B.T. PRODUCTIONS:**              - and -
4                                          Mark Guilford
                                           315 UNION STREET
5                                          NASHVILLE, TN 37201

6


7


8


9

      **IN BEHALF OF THE DEFENDANT,**      MUNGER, TOLLES & OLSON, LLP
10    **AFTERMATH RECORDS, ET AL.:**       BY:  GLENN D. POMERANTZ
                                                KELLY KLAUS
11                                              MELINDA LEMOINE
                                           355 SOUTH GRAND AVENUE
12                                         THIRTY-FIFTH FLOOR
                                           LOS ANGELES, CALIFORNIA
13                                         90071

14

15

16

17

18

19

20

21

22

23

24

25

1                              <u>INDEX</u>

2    <u>**WITNESS:**</u>                                        <u>**PAGE:**</u>

3

     **CROSS-EXAMINATION RESUMED**                              4
4    **REDIRECT EXAMINATION**                                  21
     <u>**Gary William Cohen, witness, sworn**</u>             23
5    **DIRECT EXAMINATION**                                    24
     **CROSS-EXAMINATION**                                     **38**
6    **REDIRECT EXAMINATION**                                  84
     <u>**Ethan Gustav, Witness testimony by videotaped**</u>  86
7    <u>**deposition,**</u>
     <u>**Jeffrey Harleston, witness, sworn**</u>              86
8    **DIRECT EXAMINATION**                                    **87**
     **CROSS-EXAMINATION**                                     128

9
                                  * * * * *
10

11   <u>**EXHIBITS:**</u>

12   Exhibit 929 received                                     109
     Exhibit 129 received                                     120
13   Exhibits 123-A and B received                            164

14                                * * * * *

15

16

17

18

19

20

21

22

23

24

25

```
1        LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 4, 2009; 1330

2                              ---

3

4            (Open court - jury present.)

5            THE COURT:  Good afternoon.

6            Mr. Pomerantz, you may resume.

7            MR. POMERANTZ:  Thank you, Your Honor.

8                   CROSS-EXAMINATION RESUMED

9    BY MR. POMERANTZ:

10   Q.   Good afternoon, Mr. Berman.

11   A.   Good afternoon, Mr. Pomerantz.

12   Q.   Mr. Berman, retailers have certain rights to return

13   records; correct?

14   A.   That's correct.

15   Q.   Could you explain how that return right works?

16   A.   Historically, and today, they have the right to return

17   all of the records they purchase; however, there's a break

18   point whereby if they return more than a certain percentage,

19   they're essentially penalized.  They don't get back all of

20   the money they spent.  If they return less than a certain

21   percentage, they actually get back a little bit more than

22   they sent in an effort to reduce the amount of returns.

23   Q.   And if they're in that middle zone, then they get back

24   what they paid?

25   A.   That's correct.
```

1    Q.   And if a retailer returns an Eminem CD back to

2    Universal, then F.B.T. and Eminem don't get paid a royalty on

3    that CD; right?

4    A.   It's reversed.  Yes, that's correct.

5    Q.   And so that wouldn't be a sale through a normal retail

6    channel or a sale to a normal retail channel; right?

7    A.   At the end of the day it wouldn't; that's correct.

8    Q.   All right.  And so F.B.T. and Eminem, like artists

9    generally, only get paid if the record is not returned;

10   correct?

11   A.   That's a little bit broad, but generally speaking that's

12   correct.

13   Q.   And if a retailer is unable to sell a record for

14   whatever reason, no one wants to buy it, then the retailer

15   typically would return that record; correct?

16   A.   Typically that's correct.

17   Q.   It would make no economic sense for the retailer to keep

18   a record it knew it couldn't sell; correct?

19   A.   If it knew it couldn't sell it, that's correct.

20   Q.   And so either at the end of the day the records are

21   going to be sold to consumers because somebody bought it, or

22   the retailer is going to return it and get its money back;

23   correct?

24   A.   No.  Records are stolen frequently, in which event the

25   artist gets paid; the record company gets paid.  Records can

1   be destroyed.  So it doesn't have to be that way.  It's not
2   as simple as sell or return.
3   Q.   All right.  But if you put aside whatever that small
4   quantity that might be stolen or destroyed, basically records
5   are either sold to consumers or they are returned to the
6   record company; correct?
7   A.   Well, stolen is not a small thing; so I don't want to
8   exclude stolen.
9   Q.   I didn't.
10  A.   Okay.  Well, you said put it aside.  I thought you were
11  excluding it.
12  Q.   But otherwise then you would agree with me?
13  A.   Yes, I would.
14  Q.   Let's turn to record clubs.
15           You've heard of things called record clubs;
16  correct?
17  A.   Of course.
18  Q.   Could you explain to the jury how a record club
19  basically works?
20  A.   Yes.
21           Historically when you join a record club, you pay a
22  nominal amount, let's say a dollar, in return for which they
23  send you four albums of your choice.  And then every month
24  there is a selection of the month, and they will send you
25  that album unless you tell them otherwise that you don't want

1   it or unless you get it and you return it, which you have the

2   right to do, or you choose another selection.  You don't have

3   to choose their selection for that month.  You are generally

4   required under the terms of the agreement to purchase --

5   because you get those four albums for practically nothing

6   when you signed, you are generally required to purchase a set

7   number of albums over the course of a year.  My recollection

8   is normally it was four, and that's essentially how it works.

9   And for those albums you pay essentially the full retail

10  price.

11  Q.   And so record clubs are only for members of the record

12  club; correct?

13  A.   Yes.

14  Q.   And if you forget to tell the record club I don't want

15  the selection of the month or you don't send back the

16  selection that you received, then you're obligated to pay for

17  that selection; correct?

18  A.   Yes.

19  Q.   And the record club member, when he or she signs up,

20  commits to buy a certain number of records?

21  A.   I believe I just said that, yes.

22  Q.   And so the record club transaction is a very different

23  transaction than if a consumer wants to walk into Best Buy

24  and just buy an Eminem CD; correct?

25  A.   I guess it's broader in scope, but at the end of the

1    day, assuming that you bought the Eminem album through the

2    record club, you wound up owning the same record.

3    Q.    Yes.  But you've made a totally different commitment.

4         The record club member has committed to buy a

5    certain number of records over the course of the year;

6    correct?

7    A.    That's correct.

8    Q.    And the record club member is taking on the obligation

9    to try to remember to say, no.  I don't want that record if

10   it gets sent to them each month; correct?

11   A.    That's correct.

12   Q.    And the person who walks into Best Buy takes on none of

13   those risk or obligations; right?

14   A.    Risk -- I don't know about risk, but yeah.  That's

15   correct.

16   Q.    All right.  Now, sales through record clubs are not

17   covered by the masters license provision in the 1998 or 2003

18   agreements; correct?

19   A.    They aren't in these agreements.  They frequently are.

20   In the Universal 2003 form agreement they're covered by that

21   provision, but not in these agreements.  You're right.

22   Q.    All right.  And, in fact, there are three different

23   provisions in this contract:  One for masters license, one

24   for record clubs, and one for records sold through normal

25   retail channels; correct?

1  A.   Well, there are those three and others.

2  Q.   All right.  Let's put those three up on the screen, if

3  we could.

4       So I pulled these from the 1998 agreement.  There's

5  exactly the same provisions in the 2003 agreement.

6       These are the three provisions that we were just

7  talking about; correct?

8  A.   Right.

9  Q.   And the one on the top, the one that says 4(a), that's

10 the provision that applies when Universal sells an Eminem

11 record through a normal retail channel; correct?

12 A.   To a normal retail channel; that's correct.

13 Q.   Right.

14      And then the one on the bottom is the one that

15 applies when masters are being licensed; correct?

16 A.   That's correct.

17 Q.   And that's where you get the 50 percent of net receipts;

18 correct?

19 A.   That's correct.

20 Q.   And the one in the middle, which we haven't spent a lot

21 of time on in this trial, that is the one that says that

22 records sold through a direct mail or mail order distribution

23 method, including without limitation through record clubs.

24      And then it provides a royalty rate for that;

25 correct?

1    A.    Yes.

2    Q.    All right.  And that's a provision that applies to

3    record clubs; correct?

4    A.    It specifically applies to record clubs; correct.

5    Q.    All right.  And so what that provision says is that if a

6    record is sold through a record club, here's what we'll pay

7    you; correct?

8    A.    That's correct.

9    Q.    And you notice in the 4(a), the first one, it says,

10    "Records sold through normal retail channels."

11            Do you see that?

12    A.    Yes.

13    Q.    And in the second one it says, "Records sold through,"

14    among other things, "record clubs."

15            Correct?

16    A.    Yes.

17    Q.    So it's fair to say that a record club is not a normal

18    retail channel; correct?

19    A.    I believe I testified that historically it generally was

20    not considered to be that.

21    Q.    All right.  And the masters license provision is a

22    different provision here; correct?

23    A.    It's a different provision, yes.

24    Q.    Record clubs are not covered by the masters license

25    provision; right?

```
1    A.    Not in this agreement.  They are in many agreements.

2    Q.    And record clubs are a special situation where somebody

3    has to sign up and make a certain long-term commitment;

4    correct?

5    A.    And I believe we just said that.

6    Q.    You're not going in and buying a record, an Eminem

7    record or any other record, through a normal retailer; right?

8    A.    You lost me.  Try me again, please.

9    Q.    When you go and you buy a record -- when a member buys a

10   record from a record club, you're not buying it from a normal

11   retailer; correct?

12   A.    No.  You're buying it from the record club.

13   Q.    All right.

14   A.    And if you do -- do not consider the record club to be

15   a normal -- I said it was not a normal retail channel.  I

16   don't -- I haven't thought about whether they're a normal

17   retailer or not.

18   Q.    And that's fair.  I meant normal retail channel.

19          We're in agreement on that; correct?

20   A.    Yes.

21   Q.    All right.  Let's put this down, and let's go to a

22   different subject.

23          You've heard --

24          MR. POMERANTZ:  Actually, why don't we put just the

25   masters license provision up.  Just the 4-C, please.
```

```
 1              Thank you.
 2    BY MR. POMERANTZ:
 3    Q.    And we're focusing here on the language of this
 4    particular provision, Mr. Berman, where it says "masters
 5    license," and then it has the rest of the sentence.
 6              Do you see that?
 7    A.    Yes.
 8    Q.    All right.  You've heard of something called the
 9    copyright laws; right?
10    A.    Yes.
11    Q.    You're not an expert in copyright law; right?
12    A.    I don't consider myself to be an expert in copyright
13    law, no.
14    Q.    But you've heard of something called a copyright
15    license?
16    A.    Of course, yes.
17    Q.    And you're not saying that masters license in this
18    sentence here means the same thing as a copyright license,
19    are you?
20    A.    Well, that -- that gets a little fuzzy.  They are not
21    selling the copyright.  The copyright is -- certainly to the
22    master recording, to the sound recording is certainly owned,
23    in this instance, by Universal or Aftermath, and is retained.
24    But they are, in a sense, granting a copyright license in
25    that the licensee has the right to manufacture the records
```

1  embodying the master.  If they weren't licensed for that,

2  they would be a copyright infringer because you couldn't make

3  a copy unless you were granted the license.  So in that

4  sense, it is a copyright license.

5  Q.   Mr. Berman, you're not offering the opinion that masters

6  license in this sentence means the same thing as a copyright

7  license, are you?

8  A.   They're -- they're not identical, but you do have to

9  have a license to copy, absent which you're an infringer.  So

10  yes, there is a copyright license as a part of this.

11  Q.   Mr. Berman, you don't even know what the definition of

12  a license is under the copyright law, do you?

13  A.   I'm not positive what the definition is under copyright

14  law.  I know what a license is.

15  Q.   You don't know what the definition of license is under

16  the copyright law?

17  A.   That's correct.

18  Q.   And when you were negotiating recording agreements, you

19  never researched the definition of a license under the

20  copyright laws; correct?

21  A.   I never -- I don't believe I ever researched the

22  definition of license under the Copyright Act.

23  Q.   You never did that in your 30 years of working on

24  recording agreements, did you?

25  A.   Not that I recall.

1    Q.   And you don't recall ever writing a licensing provision

2    in a recording agreement in which you said that copyright

3    licenses will be governed by this particular royalty

4    provision, did you?

5    A.   I wouldn't have used that language, no.

6    Q.   One of the things that you say makes something into a

7    license under -- let me restate that.

8         One of the factors that you pointed to previously

9    that you think is relevant to whether a license is involved

10   is whether there was a restriction on how the recording can

11   be used.

12        Do you remember saying that?

13   A.   Not exactly.

14   Q.   Let me see if I can refresh your memory.

15   A.   All right.

16   Q.   You -- didn't you say that one of the reasons why you

17   think the Universal-Apple agreement is subject to the

18   royalties here that F.B.T. is claiming is because Universal

19   prohibits Apple from taking certain actions or doing certain

20   things with the digital file?

21   A.   No.  If you mean D.R.M., no.  No.  That's not what makes

22   it a license.  I disagree.

23   Q.   Well, let me -- okay.  Could you look at your report,

24   Exhibit 220, Paragraph 4.  I think it is Exhibit 280.

25   A.   I'm sorry.  What exhibit?

```
1   Q.    Exhibit 280 --
2   A.    280.
3   Q.    -- Paragraph 4.
4            And if you look at Paragraph 4, at the bottom where
5   there's a bunch of numbered points -- do you see that at the
6   bottom of Paragraph 4?
7   A.    Yes.
8   Q.    And do you see Number 4?
9            Does that refresh your memory that one of the
10  points that you are making about the Universal-Apple
11  relationship is that Apple is prohibited from taking certain
12  actions or doing certain things with the digital files?
13  A.    Yes.  I do see that.  I think I was probably referring
14  to that -- enhancing the idea that Apple doesn't own the
15  digital file; that the ownership of the digital file remains
16  with Universal.
17  Q.    But what you pointed to there -- again, I'm just using
18  your words, Mr. Berman -- is that Apple is prohibited from
19  taking certain actions or doing certain things with the
20  digital file.
21            Those are your words; right?
22  A.    Yes.  They can't get -- they can't -- as opposed to if
23  they were buying the digital files, as opposed to if they
24  owned the digital file and had the right to sell it to
25  anybody or do the things that the owner of a physical CD --
```

1   do the things that Tower Records had the right to do.  That's

2   the distinction.

3   Q.   But you know that when Apple sells a download to an

4   iTunes customer, there are also restrictions on what the

5   customer can do with the digital file; correct?

6   A.   There are.

7   Q.   And -- but your position is that that transaction where

8   iTunes restricts what the customer can do with it, those

9   restrictions don't make it a license; correct?

10  A.   That's absolutely correct.

11  Q.   And you call it a restrictive sale?

12  A.   Well, in my deposition -- I'll try to be slow.

13           In my deposition I came up with that phrase off the

14  top of my head.  I think it's a good one.  I don't think it's

15  a matter of law.  But the two restrictions I was referring

16  to, one, purely technological that Apple inserts which

17  precludes the consumers ability to play that download on a

18  portable device other than an iPod.  That didn't make the

19  transaction not a sale.  The owner of the digital file owns

20  it in perpetuity.  Apple has no right to demand it back.  It

21  is a restriction that Apple imposes.

22           The other restrictions are really restrictions that

23  are consistent with the Copyright Act that preclude the

24  ability to copy the digital file or limit the ability to copy

25  it.  And those are -- is applicable to any sale.  You are not

```
 1    allowed to copy -- as I said, when a store buys the CD, they
 2    can do almost anything they want with it except copy it.
 3    Q.   It's --
 4    A.   That restriction doesn't matter.
 5    Q.   I'm sorry.  I didn't mean to interrupt you.
 6    A.   It's okay.
 7    Q.   So it's fair to say that because Universal restricts
 8    what Apple can do with the digital file, that, in your view,
 9    is an indicia of a license; but when Apple turns around and
10    restricts what the consumer can do with the digital file,
11    that is a sale?
12    A.   Well, you're focusing on one area, and it's not the one
13    indicia that made it a sale or made it a license.  It's all
14    of the things I listed.  So you have to go through everything
15    I listed and not just pick out one because, in and of itself,
16    that -- that's not sufficient.
17    Q.   All right.  That's the point I wanted to get across.  In
18    and of itself that's not sufficient.
19          MR. POMERANTZ:  Mr. Nichols, could you put back on
20    4(a) and 4(c)(v) back up on the screen, please.
21    BY MR. POMERANTZ:
22    Q.   All right.  So we're back to the two royalty provisions
23    that we've been discussing, the records sold through normal
24    retail channel provision and the masters license provision.
25          Do you have that?
```

1    A.    Yes.

2    Q.    All right.  If a consumer goes to *Amazon.com* to buy a

3    CD, let's say, of the *Marshall Mathers* L.P.

4    A.    Okay.

5    Q.    That would be a sale through a normal retail channel;

6    right?

7    A.    Are you hypothesizing that *Amazon.com* is a normal retail

8    channel?

9    Q.    I'm hypothesizing it because it's -- because you're not

10   willing to give an opinion on it; so yes.

11            Why don't you assume, for the sake of this

12   discussion, that *Amazon.com* is a normal retail channel.

13   Okay?

14   A.    Okay.

15   Q.    And you're not aware that F.B.T. has ever objected to

16   Amazon being a normal retail channel.

17   A.    Again, if the relationship between Apple -- excuse me.

18   Between Universal and the download providers is a license,

19   that whole issue of to/through doesn't matter to me a bit.

20   Q.    So if -- if a consumer goes to *Amazon.com* and buys a CD

21   of the *Marshall Mathers* L.P., that's covered by 4(a);

22   correct?

23   A.    Because Universal sold that CD to Amazon.

24   Q.    All right.  Now, suppose the same consumer decided

25   instead of buying the *Marshall Mathers* L.P. in the CD format,

```
 1   they decided that they wanted to buy this same record in the

 2   download format, and they went to Amazon.com.

 3            Okay?

 4   A.    Yeah.

 5   Q.    If that consumer bought the Marshall Mathers L.P.

 6   download from Amazon.com, your position is that that is now

 7   covered by 4(c)(v); correct?

 8   A.    Absolutely correct.

 9   Q.    Even though the consumer is getting exactly the same

10   record?

11   A.    No.

12   Q.    They're not getting the same record?

13   A.    No.  They're not getting that jewel case.  They're not

14   getting the entire CD booklet.  They're paying a different

15   price.  They have it in a different format.  So no, it's not

16   exactly the same.

17   Q.    And when they --

18   A.    The music is the same.

19   Q.    And if the consumer offered -- I'm sorry.

20            If the consumer bought the L.P. through Amazon.com,

21   they're not getting the jewel case either, are they?

22   A.    No.  They're getting the album cover, the liner notes,

23   the insert.  They're all different.

24   Q.    But they're all the same record?

25   A.    The same music.
```

1    Q.    Same artist?

2    A.    Same artist.

3    Q.    Same cover art?

4    A.    You don't -- no.  The cover art on the album is not

5    exactly the same, sizewise, et cetera, as on the C.D.

6    Q.    I'm sorry.  You're saying that the cover art on these

7    two records are not the same --

8    A.    Well, you -- they may well be on the ones you're holding

9    up because it has to be on -- in every case.

10   Q.    Are you aware of whether the cover art on any Eminem

11   record is different on the vinyl L.P. than on the CD?

12   A.    I'm not the Eminem -- I'm not enough of an Eminem maven

13   to know that.

14   Q.    And when you buy the download through *Amazon.com,* you

15   get the same cover art if you bought the *Marshall Mathers*

16   L.P.; correct?

17   A.    You may, but you don't get the CD booklet.  You don't

18   get the additional pictures.  You don't get the liner notes.

19   You don't get the credits.

20   Q.    Do you know that for sure?

21   A.    Yeah.  You don't get the CD booklet.

22   Q.    So your position is that when the Eminem CD is bought

23   through *Amazon.com,* 4(a) applies, but when the Eminem

24   download album is bought through Amazon, 4(c)(v) applies;

25   correct?

```
 1    A.    Absolutely.

 2              MR. POMERANTZ:  I have no further questions.

 3              THE COURT:  Redirect.

 4                    REDIRECT EXAMINATION

 5    BY MR. BUSCH:

 6    Q.    Mr. Berman, I just have one or two questions for you.

 7              Mr. Berman, for the past several hours we've

 8    listened to Mr. Pomerantz ask you questions about to and

 9    through.

10              Do you recall that?

11    A.    Absolutely.  Yes, I do.

12    Q.    And you heard Mr. Berman ask you questions about --

13    A.    Mr. Pomerantz.

14    Q.    Mr. Pomerantz.  I'm sorry.

15              -- Mr. Pomerantz ask you questions about normal

16    retail channels?  You've heard that?

17    A.    Yes.

18    Q.    And you've heard Mr. Pomerantz ask you questions about

19    whether you and I spoke during a deposition.

20              Do you recall that?

21    A.    Yes.

22    Q.    Okay.

23              MR. BUSCH:  Could you put 4(c)(v) on the screen.

24    BY MR. BUSCH:

25    Q.    Mr. Pomerantz, did not ask you or did not show you in
```

```
 1    connection with the last slide the "notwithstanding the
 2    foregoing."
 3              Do you see that?
 4    A.   Yes.
 5    Q.   Okay.  And you'll see 4(c)(v), which is the crux of the
 6    case.
 7              Do you see that?
 8    A.   Yes.
 9    Q.   Why does it apply when Universal licenses master
10    recordings to Apple and the other digital download companies?
11    Why does 4(c)(v) apply?
12    A.   Because it clearly states that on masters licensed by
13    Universal for manufacture, sale of records, or any other
14    uses, your royalty shall be 50 percent of our net receipts.
15    This clearly covers a license by Universal of the master.
16    Q.   And what does "notwithstanding the foregoing" --
17    A.   It means that anything that preceded this is not going
18    to take precedence over this.  This trumps what come -- came
19    before it.
20              MR. BUSCH:  Nothing further.
21              THE COURT:  Mr. Pomerantz?
22              MR. POMERANTZ:  No further questions, Your Honor.
23              THE COURT:  You may step down.
24              Thank you.
25              MR. POMERANTZ:  Your Honor, may we approach sidebar
```

```
1    for a moment?
2              (Sidebar conference.)
3              MR. POMERANTZ:  Your Honor, I would like to make a
4    motion to strike the entirety of Mr. Berman's testimony.
5    He didn't testify to custom and practice in the industry with
6    respect to how people understood words in a recording
7    agreement.  Instead, what he testified was that the
8    transaction between Universal and Apple is a license.  That
9    is a legal question that Mr. -- Professor Monel is not
10   allowed to testify to, he is not an expert on.  I think the
11   entirety of the testimony is based on the legal conclusion
12   that a certain transaction is a license rather than custom
13   and practice testimony that would be admissible in a contract
14   interpretation test.
15             MR. BUSCH:  Mr. --
16             THE COURT:  The motion is denied.
17             (Sidebar conference concluded.)
18             THE COURT:  Plaintiffs' next witness.
19             MR. BUSCH:  Gary Cohen.
20             **Gary William Cohen, witness, sworn**
21             THE CLERK:  For the record, sir, could you please
22   state your full name and spell your last name.
23             THE WITNESS:  Gary William Cohen, C-o-h-e-n.
24             THE COURT:  You may approach.
25             MR. BUSCH:  Thank you, Your Honor.
```

1                          **DIRECT EXAMINATION**

2    BY MR. BUSCH:

3    Q.    Mr. Cohen, what are you here for today?

4    A.    I'm here to render an opinion about what the damages --

5    how much F.B.T. would be owed if it is determined that

6    permanent downloads and mobile master tones are master

7    licenses.

8    Q.    Where do you work?

9    A.    I work in New Jersey.  I have my own office.  I work for

10   myself, Gary Cohen Corporation.

11   Q.    And what is your occupation?

12   A.    I'm an accountant in the entertainment industry.  I

13   primarily conduct royalty audits for recording artists and

14   songwriters.

15   Q.    So you're a certified public accountant; is that right?

16   A.    Yes.

17   Q.    Okay.  Very briefly take us through your educational

18   background so the jury can understand your qualifications.

19   A.    I went to Yale University and received a bachelor of

20   science in accounting from New York University in 1983.  In

21   1985 I was certified in the state of New York as a C.P.A.

22   Q.    Okay.  And since you've been a certified public

23   accountant, just briefly explain your training to be able

24   to do record business audits.

25   A.    I worked for a while for Coopers & Lybrand, and then I

1    went to the entertainment accounting firm of Joseph Rascoff &

2    Company, where I worked in the royalty audit department.  I

3    eventually became a partner in the royalty audit division of

4    that firm, and after ten years of working there I started my

5    own firm and have been running my own firm for about

6    15 years.

7    Q.   Okay.  And how many royalty audits have you done?

8    A.   In excess of 500.

9    Q.   Can you give just some of the names of artists who have

10   retained you to do royalty -- artists on their behalf,

11   including Universal artists?

12   A.   I have worked for the Beatles; for the Rolling Stones;

13   for Carlos Santana; for Black Eyed Peas; for Fergie; for the

14   Beach Boys; for Tom Petty; for Bing Crosby, Doris Day, and

15   many, many others.

16   Q.   Okay.  And are some of those Universal artists?

17   A.   Yes, they are.

18   Q.   Okay.  In doing those royalty audits, what type of

19   analysis are you generally asked to do?

20   A.   I'm asked to determine whether the royalty statements

21   that are periodically rendered to an artist are, in fact,

22   accurate.

23   Q.   Okay.  And through your auditing work and conversations

24   with Universal employees in their royalty department as part

25   of your work, have you gained familiarity and expertise in

1    reading and understanding Universal's artist royalty

2    statements?

3    A.    Yes.

4    Q.    Okay.  And have you been qualified and testified as an

5    expert in other cases and have been accepted as an expert on

6    damages in royalty disputes between artists and record

7    labels?

8    A.    Yes.  Three other times.  Once in Federal Court in

9    New York for the Sugar Hill Records versus Sanctuary Records,

10   once in New York State Court for Dennis Coles with Wu-Tang

11   Music Publishing, and once in Santa Monica for Bing Crosby

12   and his estate with M.C.A. Records or Universal.

13           MR. BUSCH:  Your Honor, we tender Mr. Cohen as an

14   expert on damages.

15           THE COURT:  You may proceed.

16           MR. BUSCH:  Thank you.

17   BY MR. BUSCH:

18   Q.    Mr. Cohen, when did you first begin doing any work for

19   Eminem or F.B.T.?

20   A.    Sometime in 2002 I was asked to do a royalty audit which

21   covered the period 1999 through December 31, 2001.

22   Q.    Okay.  We've heard about F.B.T., one of the plaintiffs

23   in this case.  There's another plaintiff, Em2M?

24           Are you familiar with Em2M?

25   A.    Yes.  Em2M is Joel Martin's company, and by assignment,

1    F.B.T. assigned 25 percent of its interest to Em2M, and a

2    letter of direction, I believe, went to Interscope or

3    Universal noting that assignment.

4    Q.    So Em2M's rights are derivative of F.B.T.'s?

5    A.    That's correct.

6    Q.    Okay.  Now, you mentioned that you have been engaged by

7    Eminem and F.B.T. to do an audit.

8          Did you find in that audit that F.B.T. and Eminem

9    were underpaid?

10   A.    The 2001 audit?

11   Q.    Yes.

12   A.    Yes, they were.

13   Q.    Okay.  And do you recall generally when you submitted

14   your findings?

15   A.    Sometime in the middle of 2002.

16   Q.    And was there a resolution of the matter?

17   A.    Yes.  A couple of years later the matter was resolved.

18   Q.    What year was that?

19   A.    2004.

20   Q.    Okay.  And for that audit, was there any revenue on the

21   royalty statements relating to digital downloads or master

22   tones?

23   A.    No.

24   Q.    Okay.  After this first audit, were you asked to do a

25   second audit on behalf of Eminem and F.B.T.?

1    A.    Yes.  I did a second audit that covered the period

2    January of 2002 through June 30th of 2005.  I was asked to do

3    that audit sometime in the latter half of 2005.

4    Q.    And do you recall whether you were given any

5    instructions or parameters in connection with that audit?

6    A.    No.

7    Q.    Okay.  What did you review in connection with that

8    audit?

9    A.    I reviewed the internal sales reports of Interscope or

10   Universal.  I reviewed foreign sales reports.  I reviewed

11   invoices underlying costs.  I reviewed statements from third

12   parties that paid Universal.

13   Q.    Okay.  And Mr. Cohen, for purposes of this case, you

14   understand there are two issues that were addressed in your

15   audit that is involved in this case; correct?

16   A.    That's correct.

17   Q.    Okay.  And you understand the first of those or one of

18   those issues relates to an over allocation of costs to

19   F.B.T.?

20   A.    Yes.  F.B.T. was charged too many costs against their

21   royalties.

22   Q.    Okay.  And you understand there's a second issue, which

23   is the digital download issue that we've been discussing?

24   A.    Yes.

25   Q.    Okay.  Now, let's start with the first of the two.

```
1                 In your audit, what did you find in connection with
2      the over allocation of costs?
3      A.    That F.B.T. was overcharged, and Eminem was undercharged
4      by approximately $160,000.
5      Q.    And this was a report that you had issued on behalf of
6      both F.B.T. and Eminem; correct?
7      A.    That's correct.
8      Q.    Okay.  Do you have any reason to believe that Eminem
9      disagrees with your conclusion in that regard?
10     A.    No.
11     Q.    Okay.  And when did you issue your audit report with
12     your findings?
13     A.    In February of 2006.
14     Q.    And when did Universal respond to that audit letter?
15     A.    Over a year later, in May of 2007.
16     Q.    Okay.  And do you have an understanding of whether
17     Universal disputed the over allocation of cost issue in their
18     response?
19     A.    They accepted it in their response.
20     Q.    Okay.  Now, you know that the issue on the digital
21     downloads is one that Universal did dispute; correct?
22     A.    That's correct.
23     Q.    Okay.  Oh, by the way, prior to the issuance of your
24     report on the over allocation of cost issue, did F.B.T. have
25     any way to know about the over allocation of cost to it?
```

```
 1   A.    I gave them a draft of my report in January, about a

 2   month before I issued the report.  That's the first time

 3   I would think that they would know about that issue.

 4   Q.    Okay.  All right.  Now, let's turn to your work as an

 5   expert in this case and the damages in this case that you

 6   found.

 7   A.    Uh-huh.

 8   Q.    When were you engaged to be an expert for F.B.T. in this

 9   case?

10   A.    May of 2008.

11   Q.    Okay.  In order -- in order to prepare your report, what

12   did you do?

13   A.    I was given by Universal a report called a revenue

14   report, which detailed revenue from some time at the

15   beginning of 2004 through December 11th, 2008.  I used that

16   report as the basis for my calculations, and I also referred

17   to royalty statements that had been rendered to both F.B.T.

18   and Eminem to discern the relative royalty rates that they

19   were paid.

20   Q.    Okay.  In connection with your analysis along the lines

21   that you just said, what master recordings of Eminem and

22   F.B.T. did you consider as part of your damage calculation?

23   A.    I considered all of the masters that were included in

24   the revenue report, which included masters from the *Slim

25   Shady* L.P.; the *Marshall Mathers* L.P.; the *Eminem Show;*
```

1    *Encore; Curtain Call;* the *Eight Mile* soundtrack; and the

2    Eminem *Reup* album.

3    Q.    Okay.  Now, you understand that in this case Universal,

4    on damages, is questioning whether damages for the *Eight Mile*

5    sound track and for the *Reup* album should be included in your

6    damage calculation.

7           You understand that; correct?

8    A.    Yes.

9    Q.    Okay.  Do you have an opinion about whether those should

10   be included?

11   A.    Yes.  I believe they should be included.

12   Q.    Why is that?

13   A.    I believe F.B.T. has been paid -- underpaid on all

14   digital downloads, and F.B.T. has a right to all -- to an

15   interest in all master recordings recorded by Eminem, whether

16   they be on an album that is completely Eminem or any other

17   recording.  He is an exclusive recording artist of Interscope

18   and Aftermath, so....

19   Q.    You understand that in the 2000 Novation there's a

20   reference to side projects.

21           Do you understand that?

22   A.    Yes.

23   Q.    Does whether the *Eight Mile* soundtrack or the *Reup* album

24   constitutes side projects have any bearing on your analysis?

25   A.    No.

1    Q.    All right.  Now, let's go on to the actual calculation.

2            How did you determine the amount of damages owed by

3    Interscope and Aftermath to F.B.T.?

4    A.    Generally speaking, I took the revenue report that was

5    supplied to me by Universal and -- which listed the revenue

6    for digital downloads and master tones, and I divided it in

7    half.  And I said this is the total of what the artist -- the

8    artist being in this case both Eminem and F.B.T. because they

9    share an interest.  This is what they're owed.  I then had to

10    determine F.B.T.'s share of that piece of the pie and -- by

11    looking at relative royalty rates of Eminem and F.B.T. on

12    each particular master, and that gave me how much F.B.T.

13    should have been paid.

14    Q.    And how -- what was your basis of knowing the percentage

15    that F.B.T. was owed versus Eminem?

16    A.    As I said before, I referred to the royalty statements

17    for that.

18    Q.    Okay.  Now, what did you do after determining the amount

19    of overall revenue F.B.T. should have received?

20    A.    I deducted what they actually have received.  I made a

21    calculation based on the same revenue reports.

22    Q.    Okay.  I'd like to put up on the screen a demonstrative

23    that we have put together to help you walk the jury through

24    what your analysis was.

25    A.    On the left-hand column under the title "Royalty

1   statement," this is how Universal paid F.B.T. on a master

2   that would've been on the *Eminem Show*.  You can see that

3   Item A is the instructed retail price, which is 30 percent

4   above -- 130 percent of B, which is the wholesale price; the

5   wholesale price being what Universal receives from, let's

6   say, iTunes for a digital download.  I then note, as per the

7   contracts, that Eminem's retail rate is 12 percent on this

8   album and F.B.T.'s straight 8 percent.  So F shows the total

9   of D and E, or 20 percent; and G says the total penny royalty

10  paid by Universal to both Eminem and F.B.T. to the artist is

11  18.2 cents.

12          Now, as you see from E and F above, F.B.T. is

13  entitled to 40 percent of the overall royalty, G; in which

14  case -- I shouldn't say entitled -- but they received 7.28

15  cents per digital download that -- for a master originally

16  contained on the *Eminem Show* album.

17          My calculation or recalculation takes the wholesale

18  price, B; 70 cents, divides it in half, K; and then applies

19  the same 40 percent F.B.T. entitlement to the 35 percent.

20  And this shows that in L F.B.T. is entitled to 14 cents per

21  digital download, roughly double what they had been paid.

22  Q.   Okay.  Now, Mr. Cohen, does the amount that you found

23  that F.B.T. should be owed for these digital downloads and

24  masters tones, does that include Eminem's share?

25  A.   No.

1    Q.    Okay.  And have you prepared another demonstrative to

2    aid the jury in understanding the bottom-line figures that

3    you found F.B.T. was owed based upon your calculation?

4    A.    Yes.

5    Q.    Okay.

6    A.    This shows -- the first line shows how much F.B.T. would

7    be paid if master tones and permanent downloads were paid at

8    50 percent of net receipts.  From that is deducted the amount

9    that was actually paid to F.B.T. using the same revenue base.

10            I then further divided this -- subtracting the top

11   one from the bottom one leaves you at $1.474 million.  Of

12   that, about a million is in permanent downloads and about

13   400,000 is in master tones.  And it should be noted that this

14   calculation is probably conservative because the revenue

15   report supplied to me is not clear about when its start date

16   is in 2004, and it only goes through December 11th, 2008.

17   We're now three months later.

18   Q.    Okay.  So your bottom line damage calculation is that

19   F.B.T. is owed $1,474,270; is that correct?

20   A.    Yes.  Through the date specified here.

21   Q.    Okay.  And what did you mean when you said that the

22   summary that you relied on only began sometime in 2004; you

23   don't know when?

24   A.    Right.

25            There was a note that was provided with this

1   revenue report saying that Universal could not easily

2   generate a report that covered all of 2004 or 2003, but they

3   didn't specify what the start date was.

4   Q.   In 2004?

5   A.   In 2004.

6   Q.   Okay.

7   A.   So I'm not quite sure when it starts, but I do know that

8   it ends December 11th, 2008.

9   Q.   Okay.  What was -- of the amount of damages that you

10  found there, what was the amount related to sales of full

11  albums?

12  A.   About $260,000.

13  Q.   Okay.  Now, you know that Universal -- you know there's

14  a clause in the recording agreements that say that on masters

15  license, F.B.T. will receive 50 percent of net receipts;

16  correct?

17  A.   That's correct.

18  Q.   And you understand that in this case Universal has paid

19  to publishers a certain amount of money, what is called

20  mechanical royalties.

21         You're aware of that also?

22  A.   Yes.

23  Q.   Okay.  Do you have a position on whether mechanical

24  royalties should or should not be deducted from the net --

25  from the 1.474 number you found?

```
 1    A.    I have an opinion.  I don't think they should be
 2    deducted.  Typically mechanicals are not deducted from net
 3    receipts in paying artists, and artist do not bear mechanical
 4    royalties.
 5          Further, Universal did not deduct any publishing
 6    royalty or mechanical royalty from conditional downloads or
 7    streams, which are -- which are paid as licenses.  And,
 8    finally, there's no definition of net receipts in the
 9    agreement; so it's really a moot point --
10    Q.    Okay.
11    A.    -- whether they should be deducted or not.
12    Q.    They -- have you done a calculation of what the amount
13    of mechanical royalties Universal has paid is?
14    A.    Yes.  It's about $360,000.
15    Q.    Okay.  Now, one other thing.  We talked about a moment
16    ago the fact that Universal has claimed in this case that two
17    albums -- two albums, the *Eight Mile* soundtrack and *Reup*,
18    should not be within the damage calculation.
19          Are you aware of that?
20    A.    Yes, I am.
21    Q.    Okay.  And what amount of revenue relates to the
22    *Eight Mile* -- from your damage calculation would you subtract
23    if you excluded the *Eight Mile* soundtrack and *Reup*?
24    A.    Revenue or --
25    Q.    The damage -- from the damage.
```

1    A.    Damages would be reduced by about $290,000.

2    Q.    Okay.  But if that was reduced, would you have to add

3    back in mechanicals that Universal has been credited?

4    A.    Right.

5          Instead of $360,000 in mechanicals deducted, you

6    deduct about 295,000 in mechanicals.

7    Q.    Okay.

8    A.    That would not be the -- the composition -- or the

9    master "Lose Yourself" appears also on the *Curtain Call*

10   album.  And if you added back the amount of damages that

11   relate to "Lose Yourself" as it appears on the *Curtain Call*

12   album, then you'd add back $120,000 in damages, and you'd be

13   at about 1.3 million.

14   Q.    Okay.  So would it be fair to say, Mr. Cohen, that based

15   upon your analysis and what deductions you do or do not allow

16   to Universal that the damages to the plaintiffs in this case

17   is somewhere between nearly a million dollars -- 900,000 to a

18   million on the low end and 1.5 on the high end?

19   A.    Maybe even more than 1.5, depending on the periods that

20   were not included in the revenue reports that I saw.

21   Q.    Okay.

22          MR. BUSCH:  Your Honor, that's all I have.

23          THE COURT:  Cross-examination?

24          MR. BUSCH:  Your Honor, I would like to move the --

25   Mr. Cohen's expert reports into -- for identification

```
 1    purposes as newly added exhibits.
 2              THE COURT:  Let's do it over the break.  We'll
 3    identify them and add them to the list.
 4              MR. BUSCH:  Okay.
 5              THE COURT:  All right.
 6              MR. KLAUS:  Your Honor, may I approach?
 7              THE COURT:  You may.
 8                        CROSS-EXAMINATION
 9    BY MR. KLAUS:
10    Q.   Good afternoon, sir.
11              Mr. Cohen, I'd like to bring back up first the
12    chart that you were going over with Mr. Busch that had the
13    various letters and numbers going through the computation of
14    the error factor in your analysis.
15    A.   Right.
16    Q.   Do you remember that?
17    A.   I'm looking at it, yes.
18    Q.   This is part of your damages calculation methodology in
19    this case; right?
20    A.   It's an example.
21    Q.   And this is an example of how, in your methodology, you
22    try to explain the -- what you call the error factor
23    component; right?
24    A.   Right.
25              It shows how much F.B.T. was paid on one unit, one
```

1    download from the *Eminem Show* and how much I thought they

2    should be paid and what the approximate ratio is.

3    Q.   And your damages analysis on the permanent downloads

4    claim, Mr. Cohen, that's predicated on the assumption that

5    F.B.T. is correct that the masters license provision applies

6    to download revenue; isn't that right?

7    A.   Yes.

8    Q.   And so if that assumption isn't right, then this

9    analysis really never comes into play, does it?

10   A.   Well, that's why we're here.

11   Q.   Okay.

12          MR. KLAUS:   Now, you can take that down,

13   Mr. Nichols.

14   BY MR. KLAUS:

15   Q.   A few questions on your background, Mr. Cohen.

16          You're an accountant; correct?

17   A.   Yes.

18   Q.   You're a certified public accountant; correct?

19   A.   Yes.

20   Q.   And what you do for a living is royalty audits; correct?

21   A.   Primarily.

22   Q.   And you do audits like the kind you did for F.B.T. in

23   this case; correct?

24   A.   Yes.

25   Q.   And when you're doing audits, royalty audits, you think

1    of yourself as an advocate for your client, don't you?

2    A.    Typically.

3    Q.    And that means that you advocate, in the course of the

4    audit, the position of the person who hires you; right?

5    A.    I try to find the best result for them.

6    Q.    And the best result -- when it's the party that is

7    receiving royalties, the best result is getting more money as

8    a result of the audit; isn't that right?

9    A.    Yes.

10   Q.    And it's an important part of your job, advocating for

11   your client and trying to get the best result and the most

12   money for them, to figure out what their deal is with the

13   record company, isn't it?

14   A.    Yeah.  I have to have an understanding of the recording

15   deals.

16   Q.    And you need to know what that deal is because that deal

17   tells you what your client is entitled to get paid; isn't

18   that right?

19   A.    Yes.

20   Q.    And let me turn to, if I may, your work on the audit in

21   this case, which you discussed briefly with Mr. Busch.

22           I think you said you finished your report and gave

23   it to your clients sometime in around January of 2006; is

24   that right?

25   A.    I showed them a draft of my report then.

```
 1   Q.   And the final report was issued in early February of

 2   2006; correct?

 3   A.   Correct.

 4   Q.   And in the course of that audit work, Mr. Cohen, one

 5   issue that you decided to look at is whether the masters

 6   license provision applies to download revenue; isn't that

 7   right?

 8   A.   Yes.

 9   Q.   Now, Eminem didn't ask you to look at that issue, did

10   he?

11   A.   No.  I've never spoken to Eminem.

12   Q.   You did speak to his representatives, Mr. Sedelmeyer and

13   Mr. Stiffelman, in connection with the audit; correct?

14   A.   I don't believe I spoke to Mr. Stiffelman about it, but

15   I did speak to Mr. Sedelmeyer briefly.

16   Q.   And Mr. Sedelmeyer never asked you to look into the

17   issue whether the masters license provision applies to

18   download revenue, did he?

19   A.   No.  I pointed out the issue to him.

20   Q.   Okay.  And no one from F.B.T. asked you to look at the

21   issue of whether the masters license provision applied to

22   download revenue, did they?

23   A.   No.

24   Q.   Mr. Martin didn't ask you to do that, did he?

25   A.   He's -- no.
```

```
 1   Q.   Okay.  None of those people told you they thought they

 2   were being underpaid by Aftermath on revenue from downloads,

 3   did they?

 4   A.   Before or after I issued my report?

 5   Q.   Before you issued your report, sir.

 6   A.   They agreed with my position when I showed them the

 7   draft in January.

 8   Q.   But you were the first person on the F.B.T. side to

 9   raise this issue; right?

10   A.   On both sides.

11   Q.   And you raised that issue while you were representing

12   and advocating for your clients; correct?

13   A.   Yes.

14   Q.   And you raised the issue because you thought that it

15   would be something that had a significant amount of money at

16   stake for your clients; isn't that right?

17   A.   It turned out that it did have a significant amount of

18   money for my client.

19        MR. KLAUS:  And if Mr. Nichols could bring up --

20   and this is in Volume I.

21   BY MR. KLAUS:

22   Q.   I've given you two binders, and one of them has --

23   Volume I has your deposition transcripts and some exhibits,

24   and you'll find that in there as well.

25   A.   Is that the fat one or the thin one?
```

```
 1   Q.   The bigger one is Volume I.

 2   A.   Okay.

 3   Q.   And I'm going to ask to you look at Exhibit 211,

 4   Mr. Cohen.

 5   A.   There it is; right.

 6   Q.   And if we could look at the first paragraph of this

 7   e-mail.

 8        This is an e-mail that you sent to Mr. Sedelmeyer

 9   in November of 2005; correct?

10   A.   Yes.

11   Q.   And you wrote to him -- one of the subjects you wrote to

12   him was regarding digital downloads; correct?

13   A.   Yes.

14   Q.   And you said that it's your opinion that digital

15   download sales should be treated as third-party sales, and

16   royalties should be accrued at 50 percent of what you called

17   Interscope's receipts.

18        Do you see that?

19   A.   Yes.

20   Q.   And you said that was a significant dollar amount;

21   correct?

22   A.   Yes.

23        MR. KLAUS:  You can take that down.

24   BY MR. KLAUS:

25   Q.   In the course of doing your audit you decided, did you
```

1    not, Mr. Cohen, that what we've been looking at and calling

2    the sale of records through normal retail channels provision,

3    Paragraph 4(a), did not apply to permanent downloads revenue;

4    correct?

5    A.    Could you repeat that.

6    Q.    You determined that the sale of records provision,

7    Paragraph 4(a) of the agreement, did not apply to permanent

8    downloads revenue; correct?

9    A.    Yes.

10    Q.    And you also decided that what we've been calling the

11    masters license provision, Paragraph 4-C Roman v, did apply

12    to permanent downloads revenue; correct?

13    A.    Yes.

14    Q.    And you reached that conclusion because you thought that

15    is what the party's agreement called for; correct?

16    A.    Yes.

17    Q.    And it was important in coming to that conclusion for

18    you to know what the parties specifically had agreed to

19    regarding this issue; correct?

20    A.    Agreed to with -- which parties?

21    Q.    The parties to the contracts.

22    A.    Okay.

23    Q.    It was important to you to know what they had agreed to;

24    correct?

25    A.    Yes.

1   Q.   And in the course -- in the course of your

2   investigation, you looked at some of the same agreements

3   that we've been looking at in this case to date.

4           You looked at the 1998 agreement?

5   A.   Yes.

6   Q.   You looked at the 2000 Novation?

7   A.   Yes.

8   Q.   You looked at the 2003 agreement?

9   A.   Yes.

10  Q.   Did you look at the 2004 amendment?

11  A.   I believe I did.

12  Q.   And in looking at these agreements and in the course of

13  investigating this issue, you never talked to anyone about

14  the negotiation of any of those agreements, did you?

15  A.   I believe I asked Mr. Sedelmeyer if he had an opinion

16  about that.  It says, "Please advise."

17  Q.   Did you ask him about the negotiations of those

18  agreements?

19  A.   That's an implicit -- I did not ask that specific

20  question, and I was making an inquiry as to what his opinion

21  would be.

22  Q.   And isn't it a fact, sir, that in reaching your

23  conclusion you never talked to anyone about what the

24  provisions -- the records sold provision or the masters

25  license provision in those agreements meant?

1    A.    I made an inquiry as to whether Mr. Sedelmeyer, who was

2    Eminem's attorney at the time, thought that these should be

3    paid as master licenses or the way they had been paid, which

4    is described in the first sentence of my note to him.

5    Q.    Now, you were deposed in this case?

6    A.    Twice.

7    Q.    You were deposed twice by Mr. Pomerantz?

8    A.    Yes.

9    Q.    You were deposed once in, I believe, about the middle of

10   May last year?

11   A.    Yes.

12   Q.    And that was in New York; correct?

13   A.    Yes.

14   Q.    And at that deposition Mr. Pomerantz asked you, did he

15   not, did you ever talk to anyone about what any term in the

16   March 9, 1998, agreement means?

17   A.    I don't recall.

18         MR. KLAUS:  Your Honor, I'd ask permission to play

19   from day one of Mr. Cohen's deposition.

20         MR. BUSCH:  For what purpose, Your Honor?

21         THE COURT:  Hold on.

22         MR. BUSCH:  I'm sorry.

23         MR. KLAUS:  Page 85, Line 24 through Page 86,

24   Line 9.

25         MR. BUSCH:  For what purpose, Your Honor?

```
1              THE COURT:  I was looking at the wrong date.

2              Mr. Klaus, impeachment?

3              MR. KLAUS:  For impeachment, Your Honor.

4              THE COURT:  You may.

5              (Whereupon, the videotaped deposition was played in

6              open court.)

7                  "QUESTION:  Did you ever talk to anyone about

8              what any term in the March 9, 1998, agreement

9              means?

10                 "ANSWER:  I don't recall.

11                 "QUESTION:  You don't recall doing so?

12                 "ANSWER:  No.

13                 "QUESTION:  Did you ever talk to anyone about

14             what any term in the July 2, 2003, agreement means?

15                 "ANSWER:  I don't recall.

16                 "QUESTION:  You don't recall doing so?

17                 "ANSWER:  No."

18  BY MR. KLAUS:

19  Q.  And in the course of looking into this issue, Mr. Cohen,

20  you didn't look at any documents, other than the recording

21  agreements themselves; isn't that right?

22  A.  In looking at which issue?

23  Q.  The issue of whether the masters license provision

24  applied to permanent download revenue.

25  A.  I looked at the recording agreements, and as noted here,
```

1    I made an inquiry of Mr. Sedelmeyer.

2    Q.   But other than the e-mail to Mr. Sedelmeyer, setting

3    that e-mail aside, you didn't look at any other documents,

4    other than at the recording agreements, in investigating this

5    issue in your audit, did you?

6    A.   Not that I recall.

7    Q.   You didn't look at any drafts of the agreements, did

8    you?

9    A.   Not that I recall.

10   Q.   You didn't look at any written communications between

11   the parties to the agreement, did you?

12   A.   Not that I recall.

13   Q.   And you -- and in investigating this issue in the course

14   of your audit, Mr. Cohen, you didn't look at the agreement

15   between Universal and Apple, did you?

16   A.   No.

17   Q.   You didn't look at the agreement between Universal and

18   any provider of permanent downloads, did you?

19   A.   No.   Universal refused to provide those to me.

20   Q.   You didn't look to see if there was any language in an

21   agreement between Universal and a third-party download

22   provider that would tell you the transaction was a master or

23   a license or the sale of a record, did you?

24   A.   Right.   Universal refused to provide them to me.

25   Q.   Well, sir, you -- it's true you can't think of any

1  specific language or any type of provision in such an

2  agreement that would help you answer the question whether the

3  sale of a download should be accounted for under the masters

4  license provision or the sale of records provision, can you?

5  A.   I can't make a conclusion if I don't see the agreement.

6          MR. KLAUS:  Your Honor, I would request the

7  opportunity to play day one of Mr. Cohen's deposition

8  Page 103, Line 7 through Page 104, Line 5.

9          MR. BUSCH:  I have the same question:  For what

10  purpose, Your Honor?

11          THE COURT:  If it's for impeachment, I don't think

12  it's impeachment.

13          MR. KLAUS:  Well, let me try it -- let me ask a few

14  more questions, Your Honor.

15          THE COURT:  All right.

16  BY MR. KLAUS:

17  Q.   Mr. Cohen, what would you look for in an agreement

18  between Universal and iTunes to determine whether the

19  transaction should be accounted for as a sale or a license?

20  A.   That's speculation.  I can't answer that.

21  Q.   You can't identify any specific language that you would

22  look for, can you?

23  A.   I would have to see the agreement.

24  Q.   And you can't identify any type of provision that you

25  would be looking for in order to make the determination

1   whether it's a sale or a license, can you?

2   A.   I'm not an attorney per se.  I do read a lot of

3   agreements.  I would look for the nature of the agreement and

4   make the determination at that point in time, not just

5   whether the word "license" is or is not there.  But if the

6   word "license" is there or the transaction appears to be a

7   license, then I would perhaps make that determination.

8            MR. KLAUS:  Your Honor, at this point I would ask

9   permission to play Page 103, 7, to 104, 5, as inconsistent

10  with Mr. Cohen's testimony.

11           THE COURT:  That request is denied.

12           MR. KLAUS:  Okay.

13  BY MR. KLAUS:

14  Q.   Now, you know that there are economic issues involved in

15  recording agreements; correct?

16  A.   In most contracts, yes.

17  Q.   And you have heard, for example, Mr. Berman offer his

18  testimony about what he believes to be the economic

19  justifications behind the masters license provision; correct?

20  A.   I didn't sit through his whole testimony.

21  Q.   Are you familiar with his testimony regarding what he

22  considers to be the economic justifications for the masters

23  license provision?

24  A.   No.

25           Could you refresh me?

1    Q.   Are you familiar with the fact that he said that the

2    masters license provision, in substance he said, is in the

3    agreement because in those cases the record company doesn't

4    pay manufacturing or distribution costs?

5    A.   I would agree that a download and a mobile master tone

6    is probably a license, not because they don't pay, but

7    because they don't manufacture; they don't distribute; they

8    don't hold inventory.  So I would agree that these are

9    licenses and not sales by Universal.

10   Q.   Now, do you believe -- do you know whether there is an

11   economic justification that Aftermath has for treating

12   digital download income as sale of a record as opposed to

13   a masters license?

14   A.   Sure.  They pay lower royalties to the artist.

15   Q.   That's what you believe the economic justification is?

16   A.   I don't know.  I can't speak for them.  That's what is

17   apparent to me.  I don't know what their economic

18   justification is.

19          MR. KLAUS:  Your Honor, I would request the

20   opportunity to play Mr. Cohen's deposition, Page 129, Line 22

21   through Page 130, Line 17.

22          THE COURT:  You may.

23          (Whereupon, the videotaped deposition was played in

24          open court.)

25              "QUESTION:  Do you believe there's an economic

1          justification for paying digital downloads as a

2          license of a master rather than a sale of a record?

3               "ANSWER:  No.

4               "QUESTION:  Do you believe there's an economic

5          justification for paying royalties on a digital

6          download as a sale of a record rather than a

7          license of a master?

8               "ANSWER:  I don't know.

9               "QUESTION:  Did you ever give consideration to

10         whether either of those two results was

11         economically justified?

12              "ANSWER:  No.

13              "QUESTION:  Why not?

14              "ANSWER:  Because I didn't.

15              "QUESTION:  Any other reason?

16              "ANSWER:  Because I didn't."

17    BY MR. KLAUS:

18    Q.   Now, Mr. Cohen, you've been F.B.T.'s auditor under the

19    agreements with Aftermath for several years; correct?

20    A.   Yes.

21    Q.   And do you know how much F.B.T. has been paid -- and by

22    F.B.T. I mean both Em2M and F.B.T. have been paid under

23    royal- -- have been in royalties under these agreements?

24    A.   Since when?

25    Q.   Since 2001.

1    A.    No.

2    Q.    Do you know that they've been paid in excess of

3    $20 million of royalties under these agreements?

4    A.    It's possible.  If you say so.

5    Q.    And if you were to go about trying to figure out how

6    much F.B.T. has been paid in royalties during this particular

7    period, would you look at royalty statements that F.B.T.

8    receives from Aftermath on a periodic basis?

9    A.    Yes.

10   Q.    And I've put in -- Binder 2 in front of you, sir.

11          Do you have that?

12   A.    I'm looking at it.

13   Q.    Okay.  And I -- the royalty statements -- the royalty

14   report --

15   A.    My Binder 2 appears to be fairly empty.

16          What tab are you looking at?

17   Q.    Why don't you wait for my question, Mr. Cohen --

18   A.    Sorry.

19   Q.    -- and then I think I can try to clarify that.

20   A.    I was panicking.

21   Q.    Mr. Cohen, the royalty statements that -- that Aftermath

22   sends to F.B.T., they're fairly voluminous documents, aren't

23   they?

24   A.    Yes.

25   Q.    Okay.  And -- and what I've done here is not to give you

1    the complete royalty statements which have been admitted into

2    evidence in this case, but which would require a number of

3    notebooks to be brought up to the podium, but simply the

4    summary sheets that are included with the royalty statements.

5    So, for example, I could direct your attention to Number 500,

6    which is the first royalty statement in your binder.

7              This is for the period ending June 30, 2002.

8    A.    Yes.

9    Q.    Do you see that?

10   A.    I do.

11   Q.    And does the excerpt -- the couple of pages that I've

12   given you here, does this appear to be the type of summary

13   sheet that Aftermath sends to F.B.T. in connection with the

14   royalty statements?

15   A.    Yes.  This one is for the period ending June 30th, 2002.

16   Q.    And the second page of that document --

17              MR. KLAUS:  And I'll ask Mr. Nichols if he could

18   bring it up, Exhibit 500, Number 2.

19   BY MR. KLAUS:

20   Q.    -- at the bottom it lists what is called a payee amount

21   due?

22   A.    Yes.

23   Q.    Do you see that?

24   A.    I do.

25   Q.    And the amount there is a little over $512,000 for that

```
 1    period?
 2    A.   Correct.
 3    Q.   And that indicates the amount of royalties that was paid
 4    to F.B.T. under the agreement during the period covered by
 5    the statement; correct?
 6    A.   This appears -- the amount paid to -- it appears to be
 7    one quarter of the amount of royalties earned.  So it might
 8    be just Em2M's share.
 9    Q.   Right.
10         And I've got others for F.B.T. that are in this
11    binder as well.
12    A.   Right.
13         The total amount of royalties on this statement for
14    F.B.T. and Em2M are 2.6 million.
15    Q.   And you would get that by -- and you would -- you would
16    determine that by combining the total -- total payable to the
17    payee on one statement with the payee amount due on the
18    F.B.T. statement; correct?
19    A.   I just looked at the third column from the left, which
20    gives you the total.
21    Q.   Okay.  And if you were -- it's correct, is it not,
22    that if you were to put all of the amounts that were payable
23    under -- under the royalty summaries together into a table,
24    you could add them up and determine the amount of royalties;
25    correct?
```

1    A.   Yes.

2    Q.   Okay.  And I've done that -- as you'll see, I'm not

3    going to publish this.  But if I could just ask you to take

4    a look at the sheet that I've put together in the front.

5         Do you see that?

6    A.   Yes.

7    Q.   Okay.  And do you see that the -- it's got summarized

8    the amounts of royalties paid under a number of statements

9    over a period going back through June of 2002?

10   A.   Yes.

11   Q.   And do you see that the total amount is $21,125,406?

12   A.   Yes.  This appears to cover January '01 through June

13   of '07.

14   Q.   And do you have any reason to disagree with the total

15   amount of royalties stated there?

16   A.   I have no reason to agree or disagree.

17   Q.   Okay.  If I could turn, if I may, sir, to the -- the

18   claim involving the over -- what you called the overcharge of

19   costs to F.B.T.; correct?

20        You understand -- you understand that's the second

21   cause of action in the case?

22   A.   Yes.

23   Q.   Okay.  And the dollar amount that's at stake there is

24   approximately a little over $159,000.

25        Is that what you understand?

```
 1    A.    Yes.

 2    Q.    159,332, to be precise?

 3    A.    Yes.

 4    Q.    Just so we're clear about what has happened --

 5          MR. KLAUS:  Your Honor, may I move to the -- to the

 6    chart?

 7          THE COURT:  You may.

 8    BY MR. KLAUS:

 9    Q.    And you'll tell me if you have a hard time seeing

10    something?

11    A.    I'm good right now.

12    Q.    Okay.  There are two royalty accounts for these purposes

13    that you looked at; correct?

14          There's Eminem's royalty account; correct?

15    A.    Yes.

16    Q.    And there's also F.B.T.'s royalty account; correct?

17    A.    Well, we'll assume here that that includes Em2M.

18    Q.    Includes Em2M --

19    A.    Okay.

20    Q.    -- for purposes of this claim?

21          THE COURT:  I'm sorry.  Mr. Klaus, can you

22    keep your voice -- you're not at the mike anymore; so can you

23    keep your voice up for me?

24          MR. KLAUS:  Yes.  Of course.

25          ///
```

1    BY MR. KLAUS:

2    Q.    And it's correct, is it not, Mr. Cohen, that as a result

3    of what you called the overcharge of costs to F.B.T.

4    Aftermath has paid $159,332 to Eminem; correct?

5    A.    They probably credited it against his -- their account.

6    Whether it was actually paid or not at that particular time I

7    can't say, sitting here.

8    Q.    But that's money that has gone -- effectively gone from

9    Aftermath to Eminem; correct?

10   A.    Well, there was a cost -- there were costs incurred, and

11   they were charged to either Eminem or F.B.T.  They were split

12   at a ratio.  And if they were -- a certain amount was charged

13   to F.B.T., and that amount that was charged to F.B.T. should

14   have been charged to Eminem.

15   Q.    And that resulted in Aftermath crediting this money to

16   Eminem's account instead of, as you say, crediting it to the

17   same dollar-for-dollar amount to F.B.T.'s account; correct?

18   A.    Well, at that point in time Eminem may have been

19   unrecouped.  So it may have been a further charge to their

20   account with no cash consequence.  But since F.B.T. was

21   recouped, it did have a cash consequence at F.B.T.

22   Q.    And you don't -- your testimony is you don't know one

23   way or another whether there was a cash consequence to

24   Aftermath?

25   A.    Not sitting here.  I'd have to go back and look, but

1    since Eminem has been unrecouped for quite some time because

2    of the very large advances Universal has given it, it's quite

3    possible that at this point in time that Eminem was

4    unrecouped.  I can't say with certainty.

5    Q.    But there was a credit that was made to his account in

6    the amount of 159 --

7    A.    There was less charges charged against his royalty

8    account.

9    Q.    And you -- what you're saying should have been done is

10   that Aftermath -- first of all, you didn't say in your

11   report, did you -- your audit report that Aftermath should

12   reverse or take away the charges to Eminem, did you?

13   A.    Yes, I did.

14   Q.    Did you say that in your report?

15   A.    If you look at the summary pages, you'll see a negative

16   against Eminem and a positive for F.B.T.  I netted the

17   transaction.

18   Q.    Did you say in words in your report that Aftermath

19   should reverse the charge -- the $159,332 credit?

20   A.    May I look at my report?

21   Q.    Yes, you may.  It's Exhibit 207.

22   A.    Okay.  That's in the first book?

23   Q.    That's in the first book, sir.

24   A.    Okay.  207.

25            If you look at the summary sheet for Items 17 and

1    18, which are offset by other items not included in the

2    report, you'll see there's a charge against artist and a

3    credit for F.B.T., the artist in this case, meaning Eminem.

4    That's on G.C.C. 13685.  Then if you look at Items 17 and 18,

5    the text of the report, there is no dollar value given to the

6    claims because they're netting as between F.B.T. and Eminem.

7    So in essence, without saying it in words, I've said it in

8    numbers that this is an offsetting transaction as between the

9    artist and F.B.T.

10   Q.   You did not say anywhere in the -- in the report, did

11   you, sir -- you did not say you should reverse the credit

12   from Eminem to Aftermath, did you?

13   A.   I just showed you that I did.  And the cover sheet

14   summarizing the claims that I showed that there's to be a

15   charge to artist and a credit, if you look at G.C.C. 13685,

16   it's quite clear.

17   Q.   Did you say anywhere in your report that Eminem agreed

18   with your conclusion on this issue?

19   A.   I didn't ask Eminem whether they agreed or not.  They

20   saw a draft of my report, and they made no comments to the

21   contrary.

22   Q.   Did you ask them specifically whether they agreed with

23   your conclusions on this issue?

24   A.   They have very competent representation, and they looked

25   at my report.  I did not ask them specifically about this

1    particular --

2    Q.    Have you asked them since the date of he your report

3    whether they agree with your conclusion on this issue?

4    A.    No.

5    Q.    And have you told Universal or Aftermath that Eminem

6    agrees with you on this issue?

7    A.    I don't recall.

8    Q.    Turn, if I may, sir, to -- go back to the question of

9    the masters license provision and download revenue, sir --

10   A.    Can I make a comment that I was engaged to be an

11   economic expert given the supposition that this is a master

12   license, and my comments in my audit report preceded by many

13   years and was subsequent to this action being filed.  Once

14   the action was filed, I was engaged as an expert to do the

15   calculation, and that is when F.B.T. took the position that

16   they felt that permanent downloads and mobile master tones

17   were, in fact, master licenses, and they asked me to do that

18   calculation, not to parse the language.

19   Q.    I --

20   A.    I'll try to help you here.

21   Q.    I appreciate that, Mr. Cohen.  You jumped ahead of my

22   question because I actually was going to ask you about your

23   damages calculation.

24   A.    Great.

25              MR. KLAUS:  If I could as Mr. Nichols, if you

1    would, to please bring up the masters license provision,

2    which we've looked at several times in this case.

3    BY MR. KLAUS:

4    Q.   Now, what the provision says with respect to the royalty

5    calculation is that if the masters license provision applies,

6    your royalty shall be an amount equal to 50 percent of our

7    net receipts from the sale of those records or from those

8    other uses of the masters; correct?

9    A.   Correct.

10   Q.   Now, you took us through some of the methodology that

11   you used to calculate damages on the masters license claim.

12        And you said, did you not, sir, that the first step

13   in your methodology was to take the total amount of all

14   revenue that Aftermath received from permanent downloads and

15   master tone providers?

16   A.   Yes.  Related to Eminem recorded masters.

17   Q.   And the second step in your methodology was to divide

18   that total number in half; correct?  50 percent/50 percent?

19   A.   Correct.

20   Q.   And then your damages calculation methodology proceeded

21   on to several other steps; correct?

22   A.   Yes.

23   Q.   And just to be clear, in this methodology you didn't

24   deduct anything from Aftermath's receipts in order to -- to

25   determine what was 50 percent of net receipts under this

 1    agreement, did you?

 2    A.    That's correct.

 3    Q.    Your testimony is that net receipts means Aftermath's

 4    total receipts; correct?

 5    A.    I didn't see a definition for net receipts in the

 6    agreement; so I'd made no deductions.

 7    Q.    Now, there is a definition of net receipts in one of the

 8    agreements between Aftermath and Eminem and F.B.T., is there

 9    not?

10    A.    I don't recall.

11    Q.    If I could ask you, sir, to turn to Page 10 of -- I'm

12    sorry.  Page 7 of Exhibit 10 in your binder.

13    A.    This is binder --

14    Q.    This is the Binder Number 1.

15          MR. KLAUS:  Mr. Nichols, if you could bring up the

16    2003 agreement, which is Exhibit 10 at Page 7.  And if you

17    could pull out, Mr. Nichols, Paragraph G, little one.

18          THE WITNESS:  This is a paragraph for video income.

19    BY MR. KLAUS:

20    Q.    It is the paragraph for video income; that's correct,

21    sir.

22          But do you see in the middle of the paragraph, what

23    it says is:

24              "Notwithstanding anything to the contrary

25              contained herein with respect to videos as used in

1           the previous sentence, net receipts shall mean

2           gross receipts solely attributable to videos

3           hereunder."

4           And then it says, "Less."

5           Do you see that?

6    A.   Yes.

7    Q.   That means deductions; correct?

8    A.   Less means less, yes.

9    Q.   And one of the categories is:

10              "Any and all direct costs and/or third-party

11          payment in connection with the creation

12          manufacture, exploitation, or use of said videos."

13          Do you see that?

14   A.   Right.

15   Q.   And is it your understanding, Mr. Cohen, that what is

16   taken out to determine net receipts, at least in this

17   provision -- at least in this provision, would include

18   mechanical royalties of the type that you were discussing

19   with Mr. Busch?

20   A.   I'd have to think about it, but I'm not sure.

21          Because it doesn't say mechanical royalties, does

22   it?

23   Q.   Is a mechanical royalty in your experience of doing

24   audits, Mr. -- Mr. Cohen -- is that a direct cost in

25   connection with creating, manufacturing, and exploiting works

1    that contains --

2    A.    Who pays for mechanical royalties subject to some

3    negotiation between the licensee and the licensor, and it

4    doesn't say specifically mechanical royalties.  And we're

5    talking about a hypothetical of videos.  The claims are about

6    permanent downloads and mobile master tones and not videos.

7    Q.    It's understood, but the issue that you were looking at

8    was net receipts under the agreement; correct?

9    A.    No.  I was looking at net receipts in relation to my

10    calculations, not in relation to a video calculation.

11    Q.    But your calculations were based on net receipts as

12    it -- as it is used in this agreement; correct?

13    A.    But you can't take one part of the agreement and stuff

14    it into another provision and say it applies.

15    Q.    Can you ignore it?  And -- well, first of all, let me --

16    let me back --

17    A.    I absolutely did ignore it.

18    Q.    Let me ask you for -- let me ask -- let me just make

19    sure we're clear on this.

20            Did you believe it was your job in coming up with

21    a damages calculation methodology, Mr. Cohen, to try to

22    understand what the parties understood and agreed to by the

23    term "net receipts"?

24    A.    I'm not clear about what you're asking me.

25    Q.    Did you -- did you think that part of your job was to

1    understand what net receipts meant in the agreement?

2    A.    I understood what my client's position was, which is

3    that there should be no deductions.  And so I took no

4    deductions.

5    Q.    So because it was your client's position that there

6    should be no deductions, that's the reason that you took no

7    deductions?

8    A.    No.  I also agreed with that position because there's no

9    definition of net receipts.  Artists typically do not bear

10   mechanical royalties.  When you pay -- when Universal pays

11   50 percent of net receipts on conditional downloads and on

12   streaming, they take no mechanical royalty deductions.  I

13   don't know why they should apply it to my calculations at

14   this particular time.  That was my position.

15   Q.    Let me just be very clear about your testimony.

16         Did you -- in the -- in the course of doing your

17   work, Mr. Cohen -- your damages calculation here, did you

18   ever ask Mr. Martin whether any amounts should be deducted

19   from gross receipts that were received by Aftermath in

20   connection with permanent downloads in order to determine net

21   receipts?

22   A.    Did I speak to Mr. Martin --

23   Q.    Did you ask --

24   A.    -- or his representatives?

25   Q.    First, did you ask Mr. Martin that question?

```
1    A.    I may have.  I don't recall.

2    Q.    Did you ask anyone whether any amount should be deducted

3    from the gross receipts received for permanent downloads in

4    order to determine net receipts?

5    A.    For my expert report?

6    Q.    Correct.

7    A.    Yes, of course.  I talked to Mr. Martin's counsel.

8              MR. KLAUS:  Your Honor, I would request permission

9    to play Mr. Cohen's deposition, Day 2, Page 80, Line 7

10   through Line 23.

11             THE COURT:  You may.

12             "QUESTION:  Did you ever ask Mr. Martin

13             whether any amounts should be deducted from the

14             gross receipts received in connection with

15             permanent downloads in order to determine the net

16             receipts?"

17             "ANSWER:  No.

18             "QUESTION:  Did you ever ask anyone whether

19             any amounts should be re- -- deducted from the

20             gross receipts received for permanent downloads in

21             order to determine net receipts?

22             "ANSWER:  In preparing this report, you're

23             asking me?

24             "QUESTION:  Yes.

25             "ANSWER:  In this context; right?
```

```
 1                    "QUESTION:  Yes.

 2                    "ANSWER:  No."

 3     BY MR. KLAUS:

 4     Q.   That was your testimony at your deposition, wasn't it,

 5     Mr. Cohen?

 6     A.   Yes.  That was in relation to the first export -- expert

 7     report that was submitted in November that was subsequently

 8     amended in January of 2009.  And between those times I had

 9     conversations with counsel.

10     Q.   But your basic -- your view that you shouldn't deduct

11     any amounts from Aftermath's total receipts in order to

12     determine net receipts -- that was your view when you did

13     your first report, wasn't it?

14     A.   Yes.

15     Q.   And it remained your view when you did your second

16     report; correct?

17     A.   Not only was it my view, but it was the basis of the

18     complaint.  I did read the complaint.

19     Q.   Sir, you -- I'd like to talk to you a little bit more

20     about net receipts.

21          First of all, were you here when Mr. Busch asked

22     Mr. Berman what the custom and usage of the term "net

23     receipts" is --

24     A.   No.

25     Q.   -- in recording agreements?
```

1  A.   No.  I must have stepped outside.

2  Q.   Okay.  Do you know that Mr. Berman said that in

3  determining net receipts you deduct the specific direct

4  costs that are incurred as part and parcel of a specific

5  transaction?

6  A.   I don't know what he said.  I wasn't here.

7  Q.   I will represent to you -- ask you, first of all, if you

8  can assume that's what he said.

9  A.   Sure.  I'll take your word.

10  Q.   Do you agree or disagree with his -- with his -- with

11  his view of the custom and usage of net receipts?

12  A.   I can't speak to custom and usage.  I don't have as much

13  experience in negotiating recording contracts as Mr. Berman

14  does.  I've seen definitions of net receipts where costs are

15  deducted or their net of costs, but what those costs are are

16  often specified, such as they are in that video clause you

17  showed me.

18  Q.   So you don't have a view one way or another on

19  whether -- if there --

20  A.   I have a view as part of my expert report.

21  Q.   Mr. Cohen, I'm sorry.  I need to finish my question.

22  A.   Sorry.

23  Q.   That's okay.

24       You don't have a view one way or another as to

25  whether or not in determining net receipts you deduct the

1    specific -- where you have a net receipts clause you deduct

2    the specific direct cost incurred as part and parcel of a

3    transaction?

4    A.    It depends on the costs and it depends on the definition

5    of net receipts.

6    Q.    Now, when you did your second report --

7    A.    Yes.

8    Q.    -- you calculated the amount of damages that would have

9    to be deducted if mechanical royalties were taken into

10   account at -- you said $360,692?

11   A.    Approximately 360,000, yes.

12   Q.    Okay.  And -- just make sure I understand your testimony

13   on -- backing up for just one moment -- on why you don't

14   think -- why you don't think that it's appropriate to deduct

15   mechanical royalties in determining net receipts, I think you

16   said it's typically the case in license situations that --

17   where master recordings are licensed to third parties the

18   artist does not directly bear the cost of mechanical royalty

19   payments.

20          That's your view, isn't it?

21   A.    Yes.

22   Q.    And when you're saying what is typically the case, what

23   you're talking about are synchronization licenses; correct?

24   A.    I'm also talking about third-party compilations.  And as

25   we discussed, I'm also talking about conditional downloads

1    and I'm also talking about streaming.

2    Q.    Okay.  Let's hold off on conditional downloads and

3    stream.  But let's talk about compilations and let's talk

4    synchronization licenses for just -- for just a moment.

5              First of all, just -- just so we're clear,

6    Mr. Cohen -- and we can get -- we'll get to conditional

7    streams and -- and conditional downloads, I assure you.

8    A.    I'll be here.

9    Q.    The -- when you're talking about a synchronization

10   license, Mr. Cohen, what you're talking about in that typical

11   license situation is where a third party takes the song,

12   takes the recording, and incorporates it into its own work --

13   a television program, a movie, or a commercial; correct?

14   A.    Correct.

15   Q.    And the compilation album situation that you're talking

16   about is where the third party takes one track that may be

17   on the record company's album and incorporates it into a

18   different album; correct?

19   A.    It releases an album on a -- in this case a

20   non-Universal label.  The license is tracked from all

21   sorts of different companies --

22   Q.    Now --

23   A.    -- and releases it through, supposedly, normal retail

24   channels or otherwise.

25   Q.    Now, in those situations, sir, with these typical

1    license situations, the record company that is doing the

2    licensing doesn't bear the cost of mechanical royalties

3    typically, does it?

4    A.    Correct.

5    Q.    Typically in those license situations it's the

6    licensee -- it's the third party that actually bears the

7    cost of the mechanicals; correct?

8    A.    It's by negotiation.  I've seen both.

9    Q.    It's -- do -- do you have an understanding as to what

10   the general rule is and what's the exception?

11   A.    I agree it's typical, but I've seen both.

12   Q.    Okay.  So in those cases where the licensee -- the

13   synchronization licensee or the compilation album licensee is

14   paying the mechanicals there's no mechanical royalty for the

15   record company to deduct in coming up with net receipts, is

16   there?

17   A.    It's been -- first of all, there is no mechanical

18   royalty for synchronization uses.  It's a completely

19   different type of publisher royalty.

20   Q.    But in the case of a compilation --

21   A.    If a compilation album -- if it's been paid by the

22   licensee, then there's nothing more for the record company,

23   who is doing the licensor, to deduct.  Yes.

24   Q.    And in the case of -- in the case of conditional

25   downloads and streams, you understand that it's the party

1    that is -- the party that is providing the conditional

2    download service or the stream that is paying the mechanical

3    royalty for the use of the work; correct?

4    A.    I'm not sure.

5    Q.    You have no way of knowing one way or the other?

6    A.    I just hap- -- don't happen to know how that transaction

7    works.

8    Q.    But in the case of iTunes and other download providers,

9    it's Aftermath that is bearing that royalty cost, is it not?

10   A.    Right.

11          They're bearing the cost because -- I'm guessing

12   that the record company -- that iTunes did not want to bear

13   the burden and did not have the royalty system in which to

14   make those payments.  So Aftermath as a consideration might

15   be doing it for iTunes.

16   Q.    You're just guessing that, sir?

17   A.    Absolutely.  I didn't see the agreements.

18   Q.    Okay.  And is it -- it's correct, is it not, that when a

19   record is sold under the sale of records provision, 4(a) of

20   the agreements, the record company typically pays for the

21   mechanical royalty?

22   A.    Sure.

23   Q.    Now, sir, just to be clear, in coming up with your

24   damages calculation in this case you followed what you

25   referred to as a damages calculate the -- calculation

```
1    methodology; correct?

2    A.    If it says somewhere in my report that's my methodology,

3    that's the term I used, then I did.

4    Q.    Okay.  And that's what you do when you're an expert

5    trying to calculate damages, sir; you follow a methodology?

6    A.    I do a calculation, yeah.

7    Q.    An important part of that calculation is having a

8    methodology to follow; correct?

9    A.    Sure.  You have to do certain mathematical calculations.

10   Q.    You have served as -- as I believe you said to Mr. Busch

11   you've been retained to testify as an expert in prior cases

12   on -- on damages issues?

13   A.    Yes.

14   Q.    Has any Judge, sir, ever found any methodology that

15   you've employed in the course of your work to be unreliable?

16   A.    Not that I recall.

17   Q.    Are you familiar, sir, with a case called *Robinson*

18   *Against Sanctuary Record Groups, Limited*?

19   A.    *Robinson*?  That would be the *Sugar Hill*.

20   Q.    That was the *Sugar Hill* case; correct?

21   A.    Yes.

22   Q.    And are you -- are you familiar with the fact that

23   there was an opinion issued in the case finding the damages

24   methodology and analysis that you followed to be unreliable?

25   A.    I don't recall.
```

```
 1    Q.   Okay.  If I can --

 2              MR. KLAUS:  May I approach, Your Honor?

 3              THE COURT:  You may.

 4    BY MR. KLAUS:

 5    Q.   Mr. Cohen, I've handed you an opinion of the

 6    United States District Court for the Southern District

 7    of New York in the Robinson Against Sanctuary case dated

 8    March 25th, 2008.

 9    A.   Yes.

10    Q.   And -- first of all, if you would like to take a moment

11    to -- to just thumb through this.

12              Have you ever seen this opinion before?

13    A.   No.

14    Q.   If I can direct your attention, sir, to Page 6 of the

15    document that I've handed you.  And if I can ask you to look

16    in the second column at the bottom of the carryover

17    paragraph.

18    A.   Uh-huh.

19    Q.   Do you see where the Court is writing:

20                   "In order to prove their damages, plaintiffs

21              relied on the testimony and opinion of their expert

22              and only witness, Gary Cohen, a royalty auditor."

23              Do you see that?

24    A.   Yes.

25    Q.   That's you, isn't it, sir?
```

1    A.    It is.

2    Q.    And you're familiar with the work that you've done --

3    that you did in this case?

4    A.    I don't recall exactly what I did, but I know I did work

5    on that case.

6    Q.    Okay.  And if you would look at Page 9 of the opinion,

7    sir.

8          Do you see that there's a section that starts off,

9    "Cohen's reliability"?

10   A.    Yes.

11   Q.    And the first -- the first paragraph opens, "For the

12   reasons that follow, the Court finds that Cohen's opinion and

13   testimony are insufficiently reliable to support a reasonable

14   damages calculation."

15         Do you see that?

16   A.    Yes.

17   Q.    And do you see that in the -- if you go to the second

18   column, the first full paragraph there starts off by saying:

19             "Even if plain- -- nevertheless, even if

20         plaintiffs' lists were reliable and plaintiffs have

21         full ownership interest in the exploited

22         recordings, there is no basis upon which this Court

23         can reasonably conclude that Cohen's methodology is

24         reliable."

25         Do you see that?

1  A.   Yes.

2  Q.   It says that:

3            "Cohen's estimate is built upon one flawed

4        assumption after another."

5            Do you see that?

6  A.   Yes.

7  Q.   And it's your testimony -- is it your testimony,

8  Mr. Cohen, that the first time that you've become aware of

9  this opinion is sitting on the witness stand in this case?

10 A.   I said I didn't recall.

11           Now that my memory has been refreshed, I did not

12 see this opinion.  It was a very different type of case.  The

13 client in that case did not supply me with accurate or usable

14 background information.  They had no books and records and

15 wanted me to build a claim based on that.  So I did the best

16 I could with the information provided to me.

17           Here in this case, I'm using information that

18 Universal provided to me, which I'm sure they've certified as

19 being accurate.  And so what I was basing my calculation on

20 is numbers that were given to me.  Very different situations.

21 Q.   Did you know about this decision when Mr. Pomerantz

22 deposed you in May of 2008, sir?

23 A.   I don't recall my -- my conversation with him about that

24 deposition.

25           MR. KLAUS:  I'd ask the Court's permission to

```
 1    refresh his recollection to play day one, Page 65, Lines 12

 2    through 14.

 3               THE WITNESS:  Again, here we're talking --

 4               THE COURT:  Hold on -- hold on one second.

 5               You may.

 6               MR. KLAUS:  Your Honor, may I play?

 7               THE COURT:  You may.

 8               MR. KLAUS:  Day 1, 65, Lines 12 through 14.

 9                    "QUESTION:  Has any judge ever found any

10               methodology that you've employed to be unreliable?

11                    "ANSWER:  Not that I recall."

12    BY MR. KLAUS:

13    Q.    Now, the date of that deposition was May 15th, correct?

14    A.    Correct.

15    Q.    The date of this decision was March 25th; correct?

16    A.    I guess.  I've never seen this decision before.

17    Q.    The decision was released approximately 50 days before

18    Mr. Pomerantz deposed you?

19    A.    I understand that, but I've said I've never seen this

20    decision before.  I gave testimony and that was the end of

21    my involvement.  The attorneys involved never showed me this

22    decision.

23    Q.    The attorneys told you about the decision when it came

24    out, didn't they?

25    A.    I don't recall.
```

1   Q.   The attorneys -- first of all, the attorney in that case

2   was a gentleman named Mr. Cinque?

3   A.   Cinque.

4   Q.   Mr. Cinque.

5        And you've worked as an expert witness for

6   Mr. Cinque on occasions prior to the *Robinson Against*

7   *Sanctuary* case?

8   A.   I know I did something subsequent, not prior.

9   Q.   Okay.  Were you depose -- did -- is it not a fact, sir,

10  that Mr. Cinque had defended a deposition where you were an

11  expert witness in a case just two months before your May 2008

12  deposition with Mr. Pomerantz?

13  A.   In the same case?

14  Q.   In a different case, Mr. Cinque had defended your

15  deposition as an ex -- as his expert witness -- his client's

16  expert witness --

17  A.   Which case was this?

18  Q.   -- in another case; correct?

19  A.   I just have -- I don't remember which case it was or the

20  timing.

21       MR. KLAUS:  If I could ask Your Honor's permission

22  to publish day one, Page 5 of Mr. Cohen's deposition, Lines 3

23  through 23 to refresh the witness's recollection.

24       THE COURT:  You may.

25       MR. KLAUS:  We'll just bring up the --

 1                    "QUESTION:  Mr. Pomerantz asked you what the

 2            most recent deposition was that you experienced;

 3            correct?

 4                    "ANSWER:  At the top of the page?

 5                    "QUESTION:  Yes.

 6                    "ANSWER:  Yes."

 7            THE COURT:  Mr. Klaus, just go ahead and read.

 8            MR. KLAUS:  Okay.

 9    BY MR. KLAUS:

10    Q.   And your answer was that it was -- either the name I'm

11    going to botch -- but it was Yngwie Mahmsteen?  Is that how

12    you pronounce it, sir?

13    A.   Yngwie Mahmsteen.

14    Q.   Yngwie Mahmsteen.

15            And Mr. Pomerantz asked you to repeat it just as

16    you've -- as -- as I've done with you.

17            And he asked you when was this most recent

18    deposition, and you said it was two months ago?

19    A.   Yes.

20    Q.   Do you see that he asked you what the subject matter of

21    your testimony was?  And you said --

22            THE COURT:  Mr. Klaus, just go ahead and read them

23    verbatim.

24            MR. KLAUS:  Okay.

25                    "QUESTION:  When was the most recent

```
 1              deposition?
 2                   "ANSWER:  That was about two months ago.
 3                   "QUESTION:  Which matter was that?
 4                   "ANSWER:  The Yngwie Mahmsteen matter?
 5                   "QUESTION:  What was the subject matter of
 6              your testimony?
 7                   "ANSWER:  Accounting malpractice.  I was an
 8              expert witness as to damages.
 9                   "Did the issues in --
10                   "QUESTION:  Did the issue concern anything
11              related to the music business?
12                   "ANSWER:  Yngwie Mahmsteen is a musician, and
13              David Berman is a business management firm.
14                   "QUESTION:  Who were the lawyers representing
15              the side that you were on?
16                   "ANSWER:  Jim Cinque of Cinque and Cinque."
17    BY MR. KLAUS:
18    Q.   Do you see that?
19    A.   I do.
20    Q.   And looking at that, does that refresh your recollection
21    that you had been in a deposition with Mr. Cinque as recently
22    as two months before the date that Mr. Pomerantz deposed you
23    and asked you if a Judge had ever found your methodology to
24    be unreliable?
25    A.   I'm sorry.  That's two questions.
```

 1   Q.   Does it refresh your recollection looking at this that

 2   you had been in a deposition two months earlier with the same

 3   Mr. Cinque?

 4   A.   Yes.  I was in a deposition two months earlier with

 5   Mr. Cinque, but that's a different case than the decision you

 6   showed me here.  So I'm confused about what you're asking me.

 7   Q.   Is it your testimony, sir, that Mr. Cinque -- even

 8   though it was a different case -- wouldn't have told you

 9   about the Judge's opinion in the *Robinson Against Sanctuary*

10   case, sir?

11   A.   I don't recall him telling me.  And I haven't seen this

12   opinion until today.

13           MR. KLAUS:  I have no further questions at this

14   time, Your Honor.

15           THE COURT:  All right.  Let's go ahead and take a

16   15-minute break.  We'll resume in 15 minutes.

17           Remember not to discuss the case among yourselves

18   or with anyone else.  Don't form or express any opinions

19   about the case until it's finally submitted to you.

20           And we'll see you in 15 minutes.

21           (Open court - jury not present.)

22           THE COURT:  Mr. Pomerantz, go ahead and -- how long

23   do you anticipate your direct examination of your -- your

24   expert?

25           MR. POMERANTZ:  I keep slashing questions,

```
 1   Your Honor.  I would guess an hour, give or take a little
 2   bit on either side.
 3            THE COURT:  I'm going to check with the jur- --
 4   we're going to finish today.  So we're going to stay late and
 5   finish today unless some juror has a daycare issue or
 6   caregiver issue or transportation problems.
 7            MR. POMERANTZ:  That's fine.  Your Honor.
 8            THE COURT:  All right.
 9            MR. POMERANTZ:  Your Honor, just -- I'm sorry.
10            THE COURT:  Also I just was reminded, Juror
11   Number 3, Aimee Vargas, needs to leave tomorrow at
12   4:00 o'clock for a job interview.  So if we're in
13   deliberations, we're going to break at 4:00 o'clock
14   tomorrow to accommodate that request.
15            Anything else?
16            MR. POMERANTZ:  No, Your Honor.  I guess we do want
17   to make our motions.  And I don't know -- I don't want to
18   waste time with the jury.  I have to wait until Mr. Busch
19   is -- is done.  And I just want to do it in a way that it
20   saves time, Your Honor.  I don't know how Your Honor wants
21   to handle that.
22            THE COURT:  Why don't we stipulate that the motion
23   would be timely if made at the end of the day.
24            Is that acceptable, Mr. Busch?
25            MR. BUSCH:  That's fine, Your Honor.
```

```
 1              (Recess from 3:15 p.m. to 3:30 p.m.)

 2              THE COURT:  Mr. Busch, redirect?

 3              MR. BUSCH:  Just a couple questions, Your Honor.

 4                    REDIRECT EXAMINATION

 5   BY MR. BUSCH:

 6   Q.   At the end of your examination, Mr. Klaus pointed out a

 7   decision of the Southern District of New York.

 8              Do you recall that testimony?

 9   A.   Yes.

10   Q.   Okay.  And Mr. Klaus also pointed out that you were

11   involved with a deposition with the same lawyer that was

12   involved in that case in another deposition.

13              Do you recall that?

14   A.   Yes.

15   Q.   Okay.  And Mr. Klaus made it sound like you must be

16   lying about not knowing about the decision because you sat in

17   a deposition with this lawyer and he must have told you about

18   the decision in connection with that deposition.

19              Do you recall that?

20   A.   Yes.

21   Q.   Okay.  The deposition that you had with the lawyer that

22   Mr. Klaus was referring to, he didn't show the date of the

23   deposition, did he?

24   A.   Not to me, no.

25   Q.   Okay.  And do you know the date?
```

```
1    A.    Not offhand.

2    Q.    Okay.  Do you know if it was February 28th, 2008?

3    A.    Yes.

4    Q.    Okay.  Would you like to see it to refresh your memory

5    that it was February 28th, 2008?

6    A.    Please.

7    Q.    Okay.  So you were in the deposition that Mr. Klaus was

8    referring to with the lawyer on February 28th, 2008; right?

9    A.    If that's what it says, yeah.

10   Q.    Okay.

11            MR. BUSCH:  Your Honor, may I publish it to refresh

12   his recollection?

13            THE COURT:  You may.

14            MR. BUSCH:  Okay.

15            THE WITNESS:  I see it.

16   BY MR. BUSCH:

17   Q.    And the date of the decision that Mr. Klaus pointed you

18   to, can you tell me the date of the decision?

19   A.    Appears to be March 25th, 2008, which is a month after

20   the Malmsteen deposition.

21   Q.    So the deposition that Mr. Klaus stood up and made it

22   appear that you -- it was unbelievable that a lawyer wouldn't

23   have mentioned it to you that deposition occurred before the

24   decision came out?

25   A.    Yes.
```

```
1              MR. BUSCH:  That's all I have.

2              THE COURT:  Redirect?

3              MR. KLAUS:  No further questions, Your Honor.

4              THE COURT:  You may step down.  Thank you.

5              Plaintiffs' next witness.

6              MR. BUSCH:  We will call Ethan Gustav by video

7    deposition, Your Honor.

8              THE COURT:  You may.

9              (Whereupon the videotaped deposition was played in

10             open court and not reported pursuant to

11             stipulation.)

12    Ethan Gustav, Witness testimony by videotaped deposition,

13             MR. BUSCH:  That's all we have, Your Honor.

14             THE COURT:  All right.  Subject to the addition of

15   additional experts, does the plaintiff rest?

16             MR. BUSCH:  The plaintiff rests.

17             THE COURT:  All right.  Defendants' next witness.

18             MR. POMERANTZ:  Your Honor, we call Jeff Harleston.

19             Jeffrey Harleston, witness, sworn

20             THE CLERK:  For the record, sir, please state your

21   full name and spell your last name.

22             THE WITNESS:  Jeffrey Harleston, H-A-R-L-E-S-T-O-N.

23             THE COURT:  You may inquire.

24             MR. POMERANTZ:  May I approach, Your Honor?

25             THE COURT:  You may.
```

```
 1                    DIRECT EXAMINATION
 2    BY MR. POMERANTZ:
 3    Q.   Good afternoon, Mr. Harleston.
 4    A.   Good afternoon.
 5    Q.   What do you do for a living?
 6    A.   I am senior vice president of business and legal affairs
 7    for Universal Music Group.
 8    Q.   And how long have you held that position for?
 9    A.   I've held that position for the last almost six months.
10    Q.   And how long have you worked for some entity as part of
11    the Universal Music Group?
12    A.   I have worked for Universal Music Group for over
13    15 years.
14    Q.   Where did you go to college?
15    A.   I went to Williams College in Williamstown,
16    Massachusetts, and --
17    Q.   Did you go to law school?
18    A.   Yeah.  I went to law school at U.C. Berkeley.
19    Q.   And when did you graduate from U.C. Berkeley?
20    A.   1988.
21    Q.   And what was your first job after law school?
22    A.   My first job after law school I worked for a firm in
23    San Francisco called Morrison & Foerster, a law firm doing
24    litigation.
25    Q.   How long did you stay there?
```

1    A.    I stayed there for a little over a year, and then I

2    moved to Washington, D.C. to work for a firm called

3    Covington & Burling, again in litigation.

4    Q.    What kind of work did you do at Covington & Burling?

5    A.    I was a litigation associate.

6    Q.    What kind of work did you work on?

7    A.    Oh, what kind of work?  A variety of civil and criminal

8    litigation.  One of our biggest clients was the National

9    Football League, and I worked on a lot of National Football

10   League matters.

11   Q.    And at some point did you leave Covington & Burling and

12   take another job?

13   A.    Yes, I did.  In -- I guess it was late '91, early '92,

14   I left Covington and joined the Office of Independent

15   Counsel, which is a special prosecutor's office in -- oops.

16   Sorry.

17            THE COURT:  Can you slow down.

18            THE WITNESS:  Sorry.

19            In late '91 and early '92 I left Covington and

20   joined the Office of Independent Counsel, which is a special

21   prosecutor's office in Washington, D.C.

22   BY MR. POMERANTZ:

23   Q.    All right.  And then at some point did you leave

24   Washington, D.C.?

25   A.    I did.  In May of '93 I left Washington and came to

```
 1   Los Angeles to work for what was then called M.C.A. Records.
 2   Q.    How did that job come about?
 3   A.    It was a bit of a fluke.  The prosecutor's office I was
 4   working at was a special limited time prosecution.  And when
 5   that ended, I was trying to figure out my next move when I
 6   was fortunate to get a call from a classmate of mine from law
 7   school who was working at M.C.A. Records and said, "You would
 8   be great at this and send your résumé."  And I did and they
 9   hired me and I came.
10   Q.    And what was your first position when you joined
11   M.C.A. Records?
12   A.    I believe my title was associate director or business
13   and legal affairs, which basically meant the most junior
14   lawyer in the company.
15   Q.    And what kind of things did you work on?
16   A.    Recording agreements, some publishing agreements, but
17   primarily recording agreements.
18   Q.    And how long did you remain in that position for?
19   A.    I was associate director for a year and a half to two
20   years.  Then I became director of business legal affairs.
21   I was in that position for two years.  Then I became vice
22   president of business legal affairs.  And each -- with each
23   promotion it was basically the same job with additional
24   responsibilities, bigger deals, you now, bigger -- bigger
25   artists, label deals, production deals, distribution deals,
```

1    that kind of thing.

2    Q.    And what was your next position?

3    A.    In '99 I became senior vice president of business legal

4    affairs for M.C.A. Records, which means -- meant I was the

5    head of the department; so now I ran the business legal

6    affairs department at M.C.A.

7    Q.    And what was M.C.A. Records?  Was that a label?

8    A.    That was -- that was one of the record labels under the

9    Universal Music Group umbrella.

10   Q.    So Interscope was one label and M.C.A. Records was

11   another?

12   A.    On the west coast we had Interscope and M.C.A.; on the

13   east coast we had Island Def Jam and Universal Motown.

14   Q.    And how long did you remain head of the department at

15   M.C.A. Records?

16   A.    For -- it was until the beginning of 2003; so four and a

17   half, maybe five years.

18   Q.    And then what position did you take?

19   A.    In 2003 -- at the beginning of 2003 the -- our business

20   was undergoing some transition and contraction, and so the

21   decision was made to merge M.C.A. and what was Geffen Records

22   and what was Dreamworks Records into one label and call it

23   Geffen Records, and I was made the general manager of

24   Geffen Records at that time.

25   Q.    And were you still acting as a lawyer in that position?

1    A.    In the position as general manager, I was not

2    functioning as a lawyer.

3    Q.    What were your responsibilities?

4    A.    A general manager of a record company is basically like

5    a plumber.  You kind of -- it's like a glorified C.O.O., but

6    you go around basically unclog all of the clogged pipes and

7    fix the things that need to be fixed and keep the operation

8    moving.  So in my job I was involved in all aspects, from the

9    creative side in the A&R to the business side with overseeing

10    deal negotiations, business legal affairs and finance and

11    marketing and promotion.

12    Q.    And while you were at Geffen in your job as general

13    manner, did you continue to have some involvement in

14    negotiating recording agreements?

15    A.    Yes.

16    Q.    What was your role there?

17    A.    Anytime an artist was signed to Geffen I would approve

18    the term of the deals, and oftentimes I would be involved in

19    the negotiation of the deals, the initial negotiations, the

20    basic structure of the deal, kind of the frame of the house

21    for the deal, so to speak.

22    Q.    And how long did you remain as the general manager of

23    Geffen?

24    A.    I was in that position until September of 2008; so about

25    five years.

```
 1   Q.   And then what position did you take in September of
 2   2008?
 3   A.   In September of 2008 I left the label Geffen and moved
 4   to the Universal Music Group, the corporate parent, in the
 5   capacity of business legal affairs.
 6   Q.   And what is your current job -- what is your
 7   responsibilities in your current job?
 8   A.   Currently my responsibilities are involved in various
 9   deal making in all of our labels in the Universal Music
10   Group, as well as overseeing the business legal affairs
11   department at our catalog company, which is called U.M.E.,
12   and some government affairs work and some business
13   development and business strategy.
14   Q.   So in your 15 years since you've been -- almost 16 years
15   since you've been in the -- in the music business,
16   approximately how many different recording agreements have
17   you been involved in negotiating or drafting?
18   A.   Over a hundred.  I don't know exactly the number.
19   Q.   And have you had an opportunity to review the recording
20   agreements that are at issue in this lawsuit?
21   A.   Yes, I have.
22   Q.   We have marked them as Exhibits 5, 9, 10, and 17; those
23   are the '98 agreement, the 2000 Novation, the 2003 agreement,
24   and the 2004 amendment.
25            Have you had a chance to read all those documents?
```

```
 1   A.   Yes, I have.
 2   Q.   Are you familiar with permanent downloads?
 3   A.   Yes, I am.
 4   Q.   Did you negotiate recording agreements before permanent
 5   downloads became popular?
 6   A.   Yes, I did.
 7   Q.   And how about afterwards?  Have you negotiated recording
 8   agreements after permanent downloads became popular?
 9   A.   Yes.  Although I haven't, you know -- since 2003, I
10   wasn't really in on the drafting side of things.  I certainly
11   was negotiating deals, you know, regarding new artists and
12   labels and ventures and things that -- that Geffen would be
13   getting involved with.
14   Q.   All right.  So let's look at this process of signing an
15   artist to a contract.  Could you just briefly describe what
16   really goes on when a record company decides that they want
17   to sign an artist to a record contract?
18             MR. BUSCH:  Your Honor, I have an objection.  I'd
19   like to be heard at sidebar, please.
20             THE COURT:  No.
21             You may proceed.
22   BY MR. POMERANTZ:
23   Q.   Do you have the question in mind, Mr. Harleston?
24   A.   Yes.
25             Basically, it all starts with our A&R; that stands
```

1    for artists and repertoire.  And they're the talent finders.

2    They're the guys that are out at the clubs at night, getting

3    tapes, going over various -- seeing various artists at

4    performances.  When they determine there's an artist they

5    want to sign, they notify the business affairs department,

6    which then sits down with the artist representative -- and

7    there's always an artist representative, usually a lawyer;

8    occasionally it's a manager -- and negotiate the basic terms

9    of the deal.  And then after that it's then papered, we call

10   it.  It's been -- the contract is drafted that's ultimately

11   signed by the artist and the company.

12   Q.   When you say that you negotiate up front the basic terms

13   of the deal, what are the kind of basic terms that typically

14   get negotiated upfront?

15   A.   Certainly the territories, a worldwide deal or a

16   U.S.-only deal.  The terms -- we do deals typically for a

17   term of albums, not a term of years.  Sometimes an artist

18   does an album every year; sometimes they do it every five

19   years; so how long?  Is it a four-album deal?  A five-album

20   deal?  Certainly the advances, we call it, the money, you

21   know, how much we're going to pay to fund the making of the

22   record and some -- some money for the artist to have as a

23   salary while they're making the record.  The royalty

24   provisions, which you've heard a lot about today.  The basic

25   album royalty, is it going to be 12 percent?  15 percent?

1           And mechanical royalties, which are the

2    royalties -- there's a royalty that's paid for the sale of

3    the record, and there's also a royalty that's paid for the

4    song; so sometimes the artist is the songwriter; sometimes

5    the artist isn't, but the songwriter gets a royalty as well,

6    and that is something that the label pays, and there's a

7    certain negotiation that goes along with that.

8    Q.   And are there certain provisions that then get added

9    to the drafted agreement that are not part of that upfront

10   negotiation?

11   A.   There are lots of other terms that are -- that are

12   usually discussed as we move to drafting, usually a lot of

13   them focus around marketing commitments.  Will we commit to

14   make a video?  If so, how much will we spend?  Will we commit

15   to hire an independent publicist?  Will we provide tour

16   support, which is when the artist goes out on tour?  If it's

17   a new artist, typically they don't generate enough income to

18   cover their costs; so oftentimes the label will -- will

19   provide support to go out and tour and do gigs.

20   Q.   You've seen -- you've been in court and saw some of the

21   testimony here today?

22   A.   Yes, I have.

23   Q.   And you saw the masters license provision from one of

24   the agreements put up on the screen?

25   A.   Yes, I did.

1  Q.   Is a masters license provision one of those provisions

2  that is typically heavily negotiated between the two sides?

3  A.   No.

4  Q.   Why not?

5  A.   In my experience, every -- you know, usually -- the

6  universe of -- of music -- you know, artist representatives

7  and record company lawyers is not that big.  And everybody

8  who has been experienced knows what these provisions --

9  what -- what different provisions mean and how they are to be

10  applied.

11         And the -- the masters use provision -- or some

12  people call it the net receipts provision -- the net receipts

13  clause, everybody knows that's -- you know, what that stands

14  for.  That is for certain kinds of master use licenses, we

15  call them.  Third-party licensing that we might do, and it's

16  really not something that's -- that, in my experience, has

17  been in any way something that people -- is really

18  controversial in negotiation.

19  Q.   Now, another term that I take it people often use in

20  these negotiations is the term "record."

21         That's a common term?

22  A.   Yes.

23  Q.   And What do you understand a record means in the context

24  of these kinds of negotiations?

25  A.   The term "record" is -- is -- is -- how do I describe

1    it?  The performance recorded in any means, whether it's

2    vinyl, CD, DVD.  It can be audio or visual.  Oftentimes it's

3    a defined term in a contract that -- that -- to make sure it

4    encompasses all possible types of recording; you know,

5    anything that can fix the performance into a recording.

6    Q.   Is it common in recording agreements for the two parties

7    to agree to certain specific types of formats in the

8    definition of record or do they keep it more open ended?

9    A.   Typically the -- the definition of a record includes

10   some reference to, you know, any other means now known or

11   hereafter -- hereinafter devised to take into account the

12   fact that technology changes.

13        I mean, we have -- we have artists signed to our

14   label, for example, someone like, you know, Buddy Holly.  You

15   know, when he was making records there was vinyl.  There

16   wasn't cassettes.  There wasn't eight tracks.  There weren't

17   CDs.  And so you need that language to ensure that as the

18   technology changes we have the ability to put out the records

19   in the additional technologies or technological formats.

20   Q.   And I take it that the download -- download format today

21   is a popular format for a record?

22   A.   Very much so.

23   Q.   What is going to be the next popular configuration?

24   A.   I have no idea, except I'm sure there will be another

25   one.

```
 1   Q.   What kinds of things have you been seeing coming across

 2   your desk?

 3   A.   There's -- there's one thing now, it's called -- I think

 4   it's called a Sand Disc or Slot Music.  It's this little chip

 5   that you can stick into your U.S.B. drive on your -- on your

 6   computer, and it has the music loaded on that and you can

 7   load more music on.  Or you can even take a smaller version

 8   of it and pop it in your phone or your BlackBerry and it has

 9   the song and the artwork and the booklet, and everything is

10   all in there.

11   Q.   And when you take all of these different configurations

12   of music that you've mentioned -- different configurations of

13   record -- the vinyl, the CD, the download, et cetera -- are

14   there material differences between these different

15   configurations?

16   A.   Material differences?  Well, they're all different in

17   terms of physical size and durability and things like that,

18   but the -- the essence is the same in the sense that it's the

19   same music.  It's the same artwork.  It's the same music

20   sequenced the same way, which is very important to the

21   artist.  I mean, you know, artists are very specific about

22   they want this to be Track 1, this to be Track 6.

23        I mean, it is the same -- you pick up -- whether

24   it's vinyl, whether it's a CD, whether it's -- you are buying

25   an album digitally at iTunes, you'll find it's the same
```

```
 1    sequence, the same art, the same album, the same edits, the
 2    same mixes, everything.
 3              MR. POMERANTZ:  Mr. Nichols, could you put up
 4    paragraph -- the definition of "record" from the '98
 5    agreement.  I think it's on Page 13, Paragraph 16.  It's the
 6    definition of "record."
 7              Thank you.
 8    BY MR. POMERANTZ:
 9    Q.   Mr. Harleston, you've read this definition before;
10    correct?
11    A.   Yes, I have.
12    Q.   In your view, is a download of an Eminem recording a
13    record under this definition?
14    A.   Yes, it is.
15    Q.   Why?
16    A.   Because it is definitely a reproduction that embodies
17    a sound, and it is -- it is certainly distributed and
18    manufactured for -- you know, for home use is the term
19    that -- historically, when you bought an album, like a vinyl
20    album, you only had record players at home.  The concept with
21    home use is what the -- it's an old term that stayed around
22    in record contracts for a long time.  And the option was
23    either you're playing it in your house or you're playing it
24    on the radio or in a club or something commercial.  You're
25    somehow having a commercial exploitation of it as opposed to
```

```
 1    a personal exploitation of it.  So that's what home use
 2    means.
 3    Q.   And you heard Mr. Berman testify that cassettes are
 4    something that became primarily used outside of the home.
 5         Did you hear that testimony?
 6    A.   Yes.  I heard something to that effect.
 7    Q.   And have you ever heard anybody say that a cassette was
 8    not a record under any recording agreement?
 9    A.   No, I have not.
10    Q.   You also have heard the term "master tone" thrown around
11    in the courtroom?
12    A.   Yes.
13    Q.   And you know what a master tone is; correct?
14    A.   Yes, I do.
15    Q.   Is a master tone a download?
16    A.   In my opinion, a master tone is definitely a download,
17    yes.
18    Q.   And is a master tone a record under this definition?
19    A.   Yeah.  A download is a record.  A master tone is a
20    record.
21    Q.   All right.  Let's now talk about how record companies go
22    about selling records.  Okay?
23         Could you just step back and say, sort of in a big
24    picture sense, what does a record company do?
25    A.   I'll try.
```

```
 1              A record company exists to sell records.  That is
 2     our primary focus.  That's why we -- we contract with the
 3     artist, for the sale of records.  What we do is -- one part
 4     is certainly the A&R in terms of helping to identify talent.
 5     And then once we've identified talent, helping them find
 6     songs, producers, craft a record.
 7              The other -- the other big part of what we do is
 8     market.  We help an artist find their image, find their
 9     style, find their -- their -- their niche in the marketplace,
10     and then communicate that message, whether it's, you know, on
11     the marketing side, developing -- certainly a photo shoot is
12     very important so you can develop the image.  A video has
13     become increasingly more important so the artist can visually
14     portray who they are.
15              And then it's a series of -- of exercises that
16     are -- are designed to generate interest in the consumers and
17     the record-buying public as to what this artist is all about,
18     getting the word out.  Some people calling it building a
19     buzz.  And the way you do that is a variety of things from --
20     as simple as -- as simple as printing up postcards and
21     passing them out.  You may go to a concert, and you find that
22     your windshield has posters on it to turning on the T.V.
23     tonight on Jay Leno and, you know, seeing an artist.
24              Let me give you an example.  U2 is performing on
25     "Letterman" tonight.  U2 put out a record yesterday.  They
```

```
 1    are one of our artists.  That is part of what we do.

 2              THE COURT:  I'm sorry, Mr. Harleston.

 3              THE WITNESS:  I'm sorry.

 4              THE COURT:  Slow down.

 5              THE WITNESS:  U2 is on "Letterman" tonight.  They

 6    put out a record yesterday.  They are one of our artists, and

 7    one of the things that we helped do was get them a booking on

 8    "Letterman" every night this week.

 9              Those are the kinds of things a record company does

10    to try and increase awareness and present the music to the

11    public.

12    BY MR. POMERANTZ:

13    Q.  Now, we've talked about these different configurations

14    of a record, a U2 record or an Eminem record, a cassette, a

15    CD, download.

16              Does a record company market to the consumer

17    differently if it's one configuration versus another?

18    A.  No.  We -- you market -- each configuration -- the --

19    whether it's a cassette, a CD, or vinyl -- I have props;

20    right?

21              Okay.  Whether it's -- you know, whether it is a CD

22    or whether it's a vinyl or whether it's a download, it's the

23    same album.  And the way we market albums, our albums come

24    out on a specific date, the street date.  It's very

25    important.  And like I said a second ago, U2's album came out
```

1    yesterday.  So that was the street date that was decided

2    several months ago, and there's a number of activities

3    designed to maximize the noise and the impact for that street

4    date.

5           And by street date, that's a term that basically

6    means that's the date you can buy the record in the store.

7    It's always a Tuesday, you know, with some rare exceptions.

8    Sometimes we have leaks and we have to go earlier, but we

9    will always go on the same date, whether it's a C.D., whether

10   it's a cassette, whether it's vinyl, or whether it's a

11   download.

12          And that means that you can go to Target and get

13   the CD on the -- on whatever day -- what was yesterday, the

14   3rd?  March 3rd you can go to Target and you can get U2's

15   album.  On March 3rd you can go to iTunes and get U2's album.

16   On March 3rd you can get go to Amoeba and get U2's album.  It

17   doesn't matter, you know, what record store or what place you

18   go to buy your music, it's always available on the same day.

19   Q.   How do -- how does a record company like Universal or

20   Interscope -- how does it work with retailers to try to help

21   get consumers to go and buy the new record?

22   A.   Well, we -- we early on -- when we know -- once we have

23   a date locked in where we want to release a record we start

24   talking to our retail partners to try and create

25   opportunities for the artist in their respective retail

```
 1    locations.

 2            So I think you've heard testimony about pricing and

 3    positioning.  Positioning is very, very important.  You know

 4    you want to try to make sure that -- that the record is -- is

 5    visible in the stores, whether it is through posters or what

 6    we call standies, something like the cardboard cutouts that

 7    have the artist's picture and sometimes a bin to hold CDs.

 8            The Sunday flyers, we call them circulars you get

 9    that have, you know, Circuit City or Best Buy, and they will

10    have the featured, you know, records of the week.  All of

11    those things are things that our sales department does to try

12    and make sure that our product is visible when we have it --

13    when we have it in the market place and we have it in the

14    stores.  And we do this for -- whether it's a big store, like

15    Best Buy, a small store, an independent record store that

16    maybe has only one location -- we'll try and do something

17    personal for them.

18            And also for the digital partners, whether it's an

19    Amazon or an iTunes, we try and make sure we're prominently

20    featured at those places and have programs with them where

21    maybe you can pre -- you can pre buy it; so you can buy it,

22    you know, a month in advance and you'll, you know, already

23    have it so when the day -- when the release day comes, it

24    downloads it automatically to your computer, things like

25    that.
```

1    Q.   All right.  Let's look at manufacturing for a moment.

2         Could you just briefly describe how Universal goes

3    about manufacturing its compact discs?

4    A.   Okay.  When we're done with the recording process and

5    the record is -- is -- you know, the record, the album is

6    finished and -- mixed is the last thing we do to get -- to

7    get the sound just perfect and we master it, we then -- when

8    it leaves the mastering studio, for physical it goes --

9    there's -- there's a master that is sent to a -- to a

10   pressing plant that actually presses out CDs, or in the case

11   of vinyl.  We don't make many cassettes these days, but

12   certainly we do make vinyl and we make CDs.

13        At the same time that the -- that the physical disc

14   is being sent to the pressing plant, a digital file is sent

15   to the retail partners to perform the same function.  When

16   someone goes to an iTunes or an Amazon and wants to purchase

17   the record digitally that digital partner will have it.

18   Q.   Did you say whose -- who does the physical

19   manufacturing?

20   A.   Oh, the physical manufacturing?  On the physical side,

21   we have -- we -- we don't own pressing plants anymore.  Once

22   upon a time we did.  We don't anymore; so we send it to a

23   variety of CD manufacturers around the country that actually

24   press the CDs for us.

25   Q.   And those CD manufacturers are not owned by Universal?

1    A.    They're not owned by Universal, no.

2    Q.    Now, in order for Universal to send the digital files to

3    iTunes or Amazon or any of the other online retailers, did

4    Universal have to develop any technology or equipment to

5    enable it to do that?

6    A.    Yes.  Several years ago, as the -- as digital downloads

7    and the whole digital market started to grow, we undertook

8    development of several systems that would allow us to, one,

9    you know, get the -- the music piece of it, the digital files

10   actually put into a format that would be adequate for the

11   various digital partners.  And -- and my understanding is

12   that most digital partners have different formats; so you

13   have to create a system that allows it to be -- the files to

14   be created into different ways for different digital

15   partners.

16          And, similarly, there's something called -- I think

17   the technical name is like, metadata, which is basically all

18   of the -- the stuff that comes with it:  The artwork, if

19   there's liner notes, if there's any -- you know, any other

20   materials.  Sometimes there's information about the producers

21   or lyrics, that kind of stuff.  The metadata is all put into

22   a file as well.

23          And we have systems that have been developed over

24   the course of easily the last five to seven years that --

25   that allow all of this process to happen through our --

```
1    our -- the accommodation of our production department, which
2    is at the label, and our distribution group, which has a
3    function that, you know, services all of the -- whether it's
4    physical and digital, all of the -- the retail partners.
5    Q.   Do you know how much money Universal has spent to
6    develop the technology it's currently using to send the
7    digital files to the digital retailers?
8    A.   I don't know the exact amount, but it's in the
9    neighborhood of $10 million.
10            MR. POMERANTZ:  Mr. Nichols, could you put up
11   Paragraph 4(a) of the '98 agreement.
12   BY MR. POMERANTZ:
13   Q.   Mr. Harleston, you've read this provision; correct?
14   A.   Yes, I have.
15   Q.   All right.  And this is the provision that governs
16   royalties for records sold through normal retail channels;
17   correct?
18   A.   Yes, it does.
19   Q.   If the costs to manufacture a particular configuration
20   skyrocketed -- the cost to manufacture vinyl skyrocketed,
21   would that change the royalty rate under this agreement for
22   records sold through normal retail channels?
23   A.   No, it would not.
24   Q.   And if, instead, the cost to manufacture a particular
25   configuration plummeted, would that change the royalty rate?
```

1    A.   No, it would not.

2    Q.   And so if technology allowed the cost to manufacture to

3    drop to a very low number, would that change the royalty rate

4    for a record sold through a normal retail channel?

5    A.   No.

6    Q.   Okay.  You know, we -- we're getting near the end of

7    this trial, and we have yet to actually see iTunes and how it

8    works.

9         Are you familiar with iTunes?

10   A.   Yes, I am.

11   Q.   Could you walk the jury through, just very basically,

12   how one would go about buying an Eminem record through

13   iTunes?

14   A.   Sure.

15   Q.   All right.  We have -- it's been preadmitted --

16   exhibit -- I think it's 929, which is pages from the iTunes

17   site?

18        MR. POMERANTZ:  Mr. Nichols, do you have that ready

19   to go?  If you can get it going.

20   BY MR. POMERANTZ:

21   Q.   And then, Mr. Harleston, if you can walk through, and if

22   you need Mr. Nichols to stop it at some point, could you just

23   tell Mr. Nichols to stop it?

24   A.   Yes.

25   Q.   Okay.

```
 1              MR. POMERANTZ:  Could you pull up Exhibit 929,
 2   please.
 3              THE COURT:  I'm sorry.  I don't have 929 as
 4   admitted.
 5              MR. POMERANTZ:  It was one that we discussed at the
 6   end of the day yesterday, Your Honor.
 7              THE COURT:  Is there any objection?
 8              MR. BUSCH:  No, Your Honor.
 9              THE COURT:  All right.  Admitted.
10              (Exhibit 929 received.)
11   BY MR. POMERANTZ:
12   Q.   All right.  Let's -- can you just explain what this is?
13   A.   Is this -- is this moving or is this paused?
14              Okay.  This is the home page -- front page of the
15   Apple iTunes store.  I imagine many of you are familiar with
16   it.  And like any other store, the -- it's got a front --
17   kind of a front door, which is those three boxes at the top,
18   which are the most sought after real estate on the iTunes
19   store by far.  And that's what -- when -- when we have a new
20   release, that's where our sales department is targeting to
21   get our artist placed, particularly that box on the right
22   where you see Sara Bareilles, that box is the most
23   sought-after box.  And these -- and these rotate, and you can
24   even -- if you are really good, you can try and make sure
25   that you don't rotate as much as the other boxes.
```

1    Q.    Mr. Harleston, why do you say that that's the most

2    valuable real estate on this home page?

3    A.    Because research -- research has shown that people's eye

4    goes to the top right-hand corner for some reason, and

5    that's -- that's where everybody wants to be.  But that top

6    row, those three boxes there are the most sought after.

7    Q.    So -- so -- just to be clear, so does -- does Universal

8    or Interscope have a sales staff that is going to iTunes and

9    trying to persuade iTunes to put an Interscope record on --

10   on one of those top three boxes?

11   A.    Every one of our labels has a sales staff that deals

12   with the records from those labels.  And our sales staff

13   interfaces with the folks from the iTunes store, you know,

14   very regularly.  In fact, there's -- they -- they -- the

15   store even has representatives that are assigned to each

16   label; so there's a -- there's a constant dialog.

17            And, yes, as we're preparing a release, we'll meet

18   with Apple.  They'll play the music, sometimes bring the

19   artist up to Apple's headquarters there and have the artist

20   perform and try and see what kind of -- of opportunities they

21   can -- they can get in the store in terms of visibility.

22   Q.    So -- so when the next Eminem record comes out, will

23   somebody from Interscope be contacting somebody from iTunes

24   and trying to get that box in the upper right-hand corner for

25   the Eminem record?

```
 1   A.   Without a doubt, or something bigger.  As you can see,
 2   Eminem has the -- this was a few weeks ago, but he has the
 3   top song right there.
 4   Q.   All right.  And then could you explain what -- what's in
 5   the middle of the page?
 6   A.   Okay.  In the middle box where it says --
 7           THE COURT:  I'm sorry.  You need to slow down,
 8   please.
 9           THE WITNESS:  Okay.  In the middle where it says
10   "new and noteworthy," those are the new releases.  And it --
11   you can -- you can cycle through.  There's probably --
12   there's these eight, and there's probably another 16 or so
13   titles there.
14           As you can see, the way the -- the records are
15   marketed, it's with the album covers.  We call them album
16   minis, but it's basically the same album artwork that you'll
17   find on the CD, smaller, and that's the image that you have
18   to purchase the new releases.  And they have albums mixed in
19   with singles, as you can tell.
20   Q.   What's -- what's the box at the bottom of the page
21   there?
22   A.   At the bottom, what's that?  This is actually the middle
23   of the page.  I don't think this scrolls down any lower, but
24   there is -- there usually is some stuff below.  But this
25   middle section is usually kind of like the promotion section.
```

1    The -- where it says, "Alela Diane, single of the week,"

2    that's a free download of the week that Apple offers every

3    week, and that's something that, believe it or not, we fight

4    very hard -- there's a lot of competition between labels to

5    try to get a new and developing artist in that slot because a

6    lot of eyes and a lot of downloads go along with that.

7    Q.    All right.  And so could you then now take us through

8    the iTunes store and how one would go about --

9    A.    Sure.

10   Q.    -- show us how you purchase an Eminem record?

11   A.    Okay.  If your associate could -- I think it runs.

12          The first thing, in the right-hand corner you'll

13   see the name Eminem is typed in and then clicked, which will

14   then take you to an Eminem section, which has a collection of

15   some of the albums and a lot of songs, every song that comes

16   up with Eminem.  So we're clicking on "The Real Slim Shady."

17   And that actually took you to a bigger page which has --

18   whoops, it's moving quickly -- a bigger page that -- all of

19   the Eminem albums.  And now, clicking on one album, *Encore,*

20   it takes you to *Encore*, and you can see all of the tracks

21   from the *Encore* album listed, which are the same as the

22   tracks that are listed on the physical CD with the same

23   artwork.

24          And you see that you want to purchase the *Encore*

25   album.

```
 1   Q.   And what do you -- how do you -- what are you going to
 2   click to purchase it?
 3   A.   To purchase the album you go to buy album.  And you have
 4   the option of obviously getting the clean or explicit.  You
 5   decide which one you want.  I think in this demonstration you
 6   would be sampling the song first.  Going back to the main
 7   page, saying I don't think I want Encore.  I think I want
 8   this other album.  Putting in the information, the customer
 9   information.  And then the buy button.  And then you could
10   see a green arrow showing that is downloading to your
11   computer.  And here is the download page that shows -- the
12   blue bar shows the songs one by one downloading into your --
13   into your hard drive of your computer.
14   Q.   And so at the end of this process a copy of the Eminem
15   record is now on the hard drive of your computer?
16   A.   At the end of this process, yes.  You have -- you have
17   purchased the Eminem album, and I think this one was Curtain
18   Call.  And you -- you own it.  It's yours.  You can -- you
19   can burn a copy of it so you can have it in CD format as
20   well.  And you're good to go.
21        And here you can see there's artwork that came with
22   the purchase, and you can scroll through the artwork and find
23   out who produced what songs and who -- who the guest artists
24   are and whatever else -- who Eminem chose to thank and that
25   kind of thing.
```

```
1   Q.   So when you heard Mr. Berman testify, and he said you

2   didn't get, you know, the booklet and other things, is this

3   an example of the booklet that comes along with the Curtain

4   Call album?

5   A.   Yes, it is.

6   Q.   And so -- and this is something that you get when you

7   download Curtain Call from iTunes; correct?

8   A.   That's correct.

9            MR. POMERANTZ:  All right.  I think we can stop

10  this demonstration now.

11  BY MR. POMERANTZ:

12  Q.   Let's go to the recording agreement now, Mr. Harleston.

13           When a record -- whether a record is bought from a

14  physical retail store like Best Buy, or an online retail

15  store like iTunes, how does a recording contract compensate

16  an artist for a sale of that record?

17  A.   In a -- in a recording agreement -- excuse me -- for a

18  sale of a -- well, for sale of any record, I think in this

19  instance we're talking primarily about sales of albums,

20  there's a royalty provision that reflects for the sale of any

21  album through typically its normal retail channels, there's a

22  specific royalty attached to that sale, and the artist will

23  get it -- will get that percentage.  Say, it's 18 percent,

24  20 percent of the retail price, and that is payable to the

25  artist.
```

 1          MR. POMERANTZ:  Can you put Paragraph 4(a) of the

 2     '98 agreement back up, please.

 3     BY MR. POMERANTZ:

 4     Q.    Is this an example of the kind of provision you were

 5     just referring to?

 6     A.    Yes, it is.

 7     Q.    And is there any difference under this provision if that

 8     record is sold in the digital download format rather than the

 9     compact disc format?

10     A.    No.  A sale is a -- a sale of a record is a sale of a

11     record provided -- in this instance, this provision requires

12     it to be through normal retail channels.  And certainly

13     *Amazon.com*, iTunes, any digital retailer these days is a

14     normal retail channel.

15     Q.    Why do you say that?

16     A.    Because a normal retail channel is a -- is a term

17     that -- that basically means a place a consumer would go to

18     purchase music.  And certainly I think Apple, last year, was

19     named the largest retailer of music in the country, maybe the

20     world, but certainly in the United States.  So that is

21     certainly a normal retail channel.

22          But it's not necessarily the size that makes it a

23     normal retail channel as the fact that it's a retailer that

24     is in the business of selling music.

25     Q.    Now, suppose instead, Mr. Harleston, that a television

```
 1    producer wants to use an Eminem recording on a T.V. show like
 2    "C.S.I.," let's say.
 3              Would this contract provision here apply?
 4    A.   No.  If you -- if you were going to use a master or a
 5    portion of a master for a T.V. show, like, for example,
 6    "C.S.I." is a great example because we have -- The Who is
 7    another one of our artists, and their song is the theme song
 8    for "C.S.I."  That's a master use license, and that would
 9    be -- that would be covered by the master license provision.
10              MR. POMERANTZ:  Okay.  So let's put up 4(c)(v) from
11    the '98 agreement.  And this means you can get rid of the
12    highlighting on this, Mr. Nichols.
13              All right.  I won't have that slow us down.
14    BY MR. POMERANTZ:
15    Q.   Is this an example of a masters license provision?
16    A.   Yes, it is.
17    Q.   And why does this provision -- why is it this provision
18    applies when there's a master use license, such as using an
19    Eminem recording in a T.V. show?
20    A.   Well, it's mastered -- it's -- the master has been
21    licensed to a -- to someone other than us, who is then taking
22    it and embodying it into their products; so it says for --
23    licensed to others for their manufacture or sale of records
24    or any other uses.  And that is typically what this is
25    designed to capture --
```

```
 1   Q.   So --
 2   A.   -- one of -- one of the uses.  There's other uses as
 3   well.
 4   Q.   Can you give me examples of other kinds of uses of
 5   masters that would be covered by a masters license provision?
 6   A.   I know that there's been testimony about compilation
 7   albums, and soundtrack albums are great examples.  License of
 8   a song in a film.  License of a song in a video game, which
 9   is becoming a very popular situation.  Those are all examples
10   of -- of master use licenses.
11   Q.   And in those situations when the Eminem recording is
12   being used, whose product is it being used in?
13   A.   It's being used in -- in the licensee's or the other
14   person -- other party's product.  And you can't enjoy the
15   master really outside of using their product.  You know, you
16   can't -- if you license a song to a film, you have to watch
17   the film to hear the song.
18   Q.   And are you aware whether Eminem recordings have
19   actually been used in any movies or T.V. shows?
20   A.   Outside of "Eight Mile," I don't -- I'm not aware.
21   Q.   Have you -- have you ever seen the movie "Cradle to the
22   Grave"?
23   A.   I have not.
24   Q.   Have -- are you aware if the -- if an Eminem recording
25   has ever been used in a compilation record?
```

```
 1    A.    Probably.

 2    Q.    Do you own a copy of the Best of Rap City record?

 3    A.    No.  But I have one here with me, and there's an Eminem

 4    track on it.

 5    Q.    All right.

 6    A.    "My Name Is."

 7    Q.    Now, Mr. Harleston, are you aware that the word

 8    "license" can have a generic meaning in the world at large?

 9    A.    Yes.

10    Q.    What do you understand the generic meaning of "license"

11    to be?

12    A.    I think of license to mean authorization, permission.

13    Q.    And can you give examples of licenses out there in the

14    world that give permission or authorization?

15    A.    Yeah.  A driver's license, marriage license, fishing

16    license.

17    Q.    And from time to time have you used the term "license"

18    in a more generic sense?

19    A.    Yes, I have.

20    Q.    Now, do you recall being deposed -- having your

21    deposition taken by Mr. Busch a couple months ago?

22    A.    Yes, I do.

23    Q.    And do you recall that at the very end of that

24    deposition Mr. Busch showed you a copy of some testimony that

25    you gave at a Senate hearing last summer?
```

1    A.    Yes, I do.

2    Q.    What was that hearing about?

3    A.    In July of last year I was asked to testify at a hearing

4    before a subcommittee to the Senate judiciary committee that

5    was investigating -- not investigating, but examining the

6    question of satellite -- not satellite.  Internet radio and

7    how Internet radio broadcasters have, by statute -- let me

8    back up.

9         Internet radio broadcasters have to compensate

10   artists and record companies for broadcasting their songs

11   on Internet radio.  And there's statutes that govern the

12   rates -- excuse me -- that different Internet radio

13   broadcasters have to pay for use of those -- for use of

14   those masters in broadcasting.

15        And there's been some dispute among the Internet

16   broadcasting community and the artist community and the

17   record company community about how those rates should be

18   determined.  And the United States Senate decided to have a

19   hearing to understand the issue and to see if there was some

20   way the Government could help in resolving that issue.

21   Q.    Now, did any of those issues regarding Internet radio

22   have anything to do with any of the issues with this lawsuit?

23   A.    Not at all.

24   Q.    Have anything to do with this masters license provision?

25   A.    No.

1    Q.   Okay.  Now, at the time that Mr. Busch showed you your

2    Senate testimony at the end of the deposition, did you recall

3    that testimony at that moment?

4    A.   No, I did not.

5    Q.   And since that time, have you had a chance to go back

6    and review that testimony?

7    A.   Yes, I did.

8         MR. POMERANTZ:  Mr. Nichols, could you please put

9    up Exhibit 129.  And could you maybe pull up both pages up,

10   and then pull up --

11        THE COURT:  Can you hold on one second,

12   Mr. Pomerantz?

13        MR. POMERANTZ:  Sure.

14        THE COURT:  While we were in our private

15   discussions we had discussed 129, but we had not formally

16   admitted it.  It's admitted now.

17        MR. POMERANTZ:  Thank you.

18        **(Exhibit 129 received.)**

19   BY MR. POMERANTZ:

20   Q.   All right.  Can you read that, Mr. Harleston?

21   A.   Yes.

22   Q.   All right.  And you use the term "license" in here;

23   correct?

24   A.   Yes, I do.

25   Q.   And you talk about licensing our recordings to hundreds

```
 1    of companies.  You mentioned Amazon and Verizon.  I see
 2    Wal-Mart, and I see iPods.
 3             Do you see all of that?
 4    A.   Yes.
 5    Q.   All right.  When you used "license" in this Senate
 6    testimony, did it have anything to do with the masters
 7    license provision that we've been talking about in this
 8    trial?
 9    A.   No, it did not.  I used the term "license" -- I was
10    addressing Senators in Congress who are not necessarily, you
11    know, as knowledgeable about the music industry, and I was
12    using the term "license" in terms of permission.  The point
13    was -- that I was trying to make was that we, in the artist
14    and record community, would prefer to negotiate individually
15    with -- with the various Web broadcasters and reach agreement
16    as to what the compensation should be, as opposed to have the
17    Government tell us what -- what they think the proper fee
18    would be.  So it had nothing to do with anything related to
19    this.
20    Q.   All right.  Can we go back for a second?
21             MR. POMERANTZ:  You can take that down.
22             Thank you.
23    BY MR. POMERANTZ:
24    Q.   Can we go back for a second to CD manufacturing.
25             I think you said that Universal hires a third party
```

1   to manufacture its CDs; correct?

2   A.   Yes.

3   Q.   And when -- and Universal gives the third-party CD

4   manufacturer a copy of the -- of record, of the recording;

5   correct?

6   A.   Yes.

7   Q.   And then the CD manufacturer goes ahead and makes the

8   CDs; right?

9   A.   Right.

10  Q.   When Universal gives the -- the recording to the

11  manufacturer and permits it to make copies, could someone

12  refer to that as a license?

13  A.   Sure.

14  Q.   Because that's permission; correct?

15  A.   They have the authority and the permission to exploit

16  our -- our music, to make the copies, sure.

17  Q.   But when a CD gets sold through a retailer to a

18  consumer, is that sale -- is the royalty for that sale

19  governed by the masters license provision or the records sold

20  through normal retail channels provision?

21  A.   I'm sorry.  When a CD is sold --

22  Q.   I'll say it again.  I'm sorry.

23       When the third-party manufactures the CD pursuant

24  to the license, and then that CD is sold through a retailer

25  to a consumer, is that sale governed by the records sold

```
 1    through normal retail channels provision or the masters
 2    license provision?
 3    A.   It's governed by the records sold through retail
 4    channels provision.
 5    Q.   Why?
 6    A.   Again, it's -- the concept is we market to the consumer,
 7    we sell to the consumer, and the sale through the retail
 8    channel is -- you know, the only way I can describe it is we
 9    can't set up a card table in front of our company and sell
10    CDs when we're ready to have them, you know, open --
11    available to the consumer.  We have to have retail partners.
12    So we -- what we do is we use our retail partners as the --
13    the storefront to sell the music to the consumer.  So the
14    sale -- the ultimate sale is the purchase by the consumer.
15    And we -- and it's -- whether it's through Wal-Mart, whether
16    it's through Best Buy, whether it's through iTunes, whether
17    it's through Borders, it's all the same thing.  It's through
18    the retail channel.
19    Q.   All right.  Just a few more questions, Mr. Harleston.
20            You were in the courtroom again when Mr. Berman
21    gave his testimony; correct?
22    A.   Yes, I was.
23    Q.   And he listed a bunch of factors that he thought
24    suggested that permanent downloads were licenses.
25            Do you remember that?
```

```
 1   A.   Yes, I do.

 2   Q.   And I want to ask you about a few of those factors -- or

 3   "indicia," I think, was the word that was used.

 4             In your experience, does it matter whether the

 5   record company is doing its own manufacturing in order to

 6   determine which royalty provision applies?

 7   A.   No.

 8   Q.   And so if Universal doesn't manufacture CDs and if

 9   Universal doesn't manufacture downloads, does that matter for

10   royalty purposes?

11   A.   Not at all.  It's the sale to the consumer through the

12   retail channel.

13   Q.   Another point that Mr. Berman mentioned was that in the

14   deals between Universal and download retailers, like Apple or

15   iTunes, that the price is sometimes based upon a percentage

16   of the retail price rather than a flat wholesale price.

17             Do you remember that testimony?

18   A.   Yes.

19   Q.   Does that make a difference as to which of the two

20   royalty provisions applies?

21   A.   No, it does not.

22   Q.   Why not?

23   A.   Because it's -- it's -- it's not -- well, because again,

24   it's the sale to the consumer through the retail channel,

25   regardless of how, you know, the compensation with our retail
```

```
 1    partner -- whatever arrangements we work out, that is not
 2    determinative of a license or a sale.
 3    Q.    One other question about Mr. Berman's opinions.
 4          Do you remember in his opinion he was talking about
 5    the records sold provision and the masters license provision
 6    and the words notwithstanding "at the foregoing" in between
 7    those?
 8    A.    Yes.
 9    Q.    Does the words "notwithstanding the foregoing" have any
10    bearing at all on whether 4(a) or 4(c)(v) apply?
11    A.    Not in my opinion.  It does not.
12    Q.    Why not?
13    A.    Because once you've determined that it's a -- you know,
14    a record that's being sold and -- you know, through the
15    normal retail channels and that provision applies, the -- the
16    notwithstanding to me means that said.  You know -- you
17    know -- okay.  So we -- we know that's the way it is.  That
18    said, these other situations are handled this way.
19          For example, I believe there's a provision for
20    record clubs and mail order.  There's a provision -- this is
21    all after the notwithstanding in the contract.  There's a
22    provision for midline and budget reductions.  It's other
23    things.
24    Q.    Have you ever seen a situation where some transaction is
25    both a records sold through normal retail channel and a
```

1    masters license?

2    A.    A records sold through a retail channel in a master --

3    Q.    Yes.

4    A.    Other -- other than a -- if I license a master for a --

5    to another company -- to, say, Columbia Records and not a

6    Universal company and they have a compilation and that

7    compilation is sold through normal retail channels, I guess

8    that would be something that would be a license of a master

9    on -- on a record that is ultimately sold through normal

10    retail channels.

11    Q.    Right.

12          But when we're talking about -- let's take an

13    Eminem record, which is Aftermath's own record.

14    A.    Right.

15    Q.    Have you ever seen a situation where a record company

16    is selling its own record through a normal retail channel,

17    and the masters license provision also applies?

18    A.    I don't believe so, no.

19    Q.    So after reviewing all of the evidence you've seen in

20    this case and taking into account your experience in the

21    music business, do you have an opinion about the way that

22    permanent downloads and master tones should be accounted for

23    for royalty purposes under the agreements in this case?

24    A.    Yes, I do.

25    Q.    What is your opinion?

A.    My opinion is that digital downloads, permanent
downloads, master tones should be accounted for through the
records sold provision, for the reasons I've already stated
about the definition of record and the sale through normal
retail channels, but also because, more importantly, it's
about the sale of the record.

Whether the record is, you know, in the form of
vinyl or CD or -- or electronic transmission, download,
whatever you want to call it, it's the same thing.  It just
doesn't make sense that you would have an album -- and say
we're paying the artist, let's say, a 20 percent royalty on
the album.  Okay?

Oops.  I spilled the water.

The same album and CD form, we're paying the artist
20 percent royalty on that.  And here's the same album, but
it's now on my iPod, and I'm going to pay the artist
50 percent of the net receipts?  It just didn't make sense.

I mean, being in the record business, let me tell
you.  We do a lot of whacky things, but we're not that
whacky.  We would not -- we would not create a system whereby
we would pay one amount for this and one amount for this and
a drastically different amount for this.  We wouldn't offer
the digital sale.  We wouldn't offer the digital download if
that were the case.  It just doesn't make sense.

MR. POMERANTZ:  No further questions, Your Honor.

```
 1              THE COURT:  Mr. Busch, on the deposition of

 2    Mr. Gustav was there an allocation?

 3              MR. BUSCH:  We only used about three minutes of the

 4    entire time ourselves.

 5              THE COURT:  So three and eight?

 6              MR. BUSCH:  What's that?

 7              THE COURT:  Three and eight.

 8              MR. BUSCH:  Three for us; eight for them.

 9              THE COURT:  Okay.  All right.  You may.

10              MR. BUSCH:  Okay.

11                        CROSS-EXAMINATION

12    BY MR. BUSCH:

13    Q.   Mr. Harleston, hello.

14    A.   Good afternoon.

15              How are you?

16    Q.   You worked for Universal; is that right?

17    A.   Yes, I do.

18    Q.   You work for Michael Ostroff at Universal; is that

19    right?

20    A.   That is correct.

21    Q.   Michael Ostroff is your boss?

22    A.   Michael Ostroff is my boss.

23    Q.   Okay.  You work with Rand Hoffman; is that right?

24    A.   We work at the same company, but -- yeah.  We don't --

25    Q.   Your livelihood is based upon your job at Universal and
```

 1    has been for the past 15 years; isn't that right?

 2    A.    Yeah.

 3    Q.    You get your paycheck every two weeks or month or

 4    whenever you get it from Universal; is that right?

 5    A.    Yes.

 6    Q.    Okay.  Now, you were copied, were you not --

 7              MR. BUSCH:  Will you put up 777, please.

 8    BY MR. BUSCH:

 9    Q.    And we've talked today about -- we talked in this case

10    about a memorandum that Michael Ostroff wrote in 2002 to

11    several people.  Would you look, Mr. Harleston?

12              You were copied on that memo, were you not?

13    A.    Yes, I was.

14    Q.    Okay.  And this related to the creation of a new royalty

15    for permanent downloads.

16              Is that one thing that was covered in this memo?

17    A.    I believe so.  Is there an exhibit number?  I'm sorry.

18    Q.    777.

19    A.    Thank you.

20    Q.    And another -- when you have it in front of you, let me

21    know.

22    A.    Okay.  Last one.  Got it.

23    Q.    And another issue that was covered in this was the

24    renegotiation of recording agreements with artists to include

25    a specific provision relating to how permanent downloads

1   would be paid; is that correct?

2   A.   Yes.

3   Q.   Okay.  Now, Mr. Harleston, I deposed you in this case,

4   and isn't it correct that you told me that a concern about

5   downloads being claimed to be licenses did not in any way,

6   shape, or form -- was not in any way, shape, or form a

7   concern in connection with the revising of the Interscope

8   form agreement?

9        Do you recall telling me that?

10   A.   That was my understanding, yes.

11   Q.   Okay.  And you said you got that understanding from

12   speaking to Mr. Rand Hoffman.

13        Do you recall that, among others?

14   A.   Something to that effect.

15   Q.   Okay.  Do you know that Mr. Hoffman testified in this

16   case that that was a concern in connection with the amending

17   of the agreement?

18   A.   I'm aware he testified, but --

19   Q.   Are you aware that he testified that it was a concern

20   with respect to the changing of Interscope's form agreement?

21   A.   I'll accept that.

22   Q.   You were here; correct?

23   A.   I was here for most of it, I believe, yes.

24   Q.   Okay.  All right.  Now, at your deposition -- and I just

25   want to start with something you just said at the end.

1          Do you recall Mr. Pomerantz asking you a moment ago

2    about the "notwithstanding the foregoing" language?

3    A.   Yes.

4    Q.   And do you recall saying that it didn't mean to you that

5    what comes next is superior over what comes before?

6          Do you recall saying that a minute ago?

7    A.   Something to that effect, yes.

8    Q.   Okay.  Do you recall me questioning you about that at

9    your deposition?

10   A.   Yes, I do.

11   Q.   And do you recall me first asking you what

12   "notwithstanding the foregoing" in a recording agreement

13   meant to you, and you said you wouldn't know or didn't know

14   without seeing it in context?

15         Do you recall that?

16   A.   Yes, I do.

17   Q.   Okay.  And then do you recall me showing you later in

18   your deposition the "notwithstanding the foregoing," and do

19   you recall telling me -- or agreeing with me -- when I

20   questioned you about it at your deposition agreeing with me

21   that, in fact, "notwithstanding the foregoing" in a recording

22   agreement means that what comes next is the superior over

23   what comes before in the event of a conflict?

24         Do you recall that?

25   A.   I recall something to that effect.

1    Q.   Okay.

2             MR. BUSCH:  Your Honor, may I play Page 160, Line 9

3    through 160, Line 24 --

4             THE COURT:  One moment.

5             MR. BUSCH:  -- to refresh the witness's

6    recollection?

7             THE COURT:  You may.

8             MR. BUSCH:  Thank you.

9             (Whereupon, the videotaped deposition was played in

10            open court.)

11                "QUESTION:  And what does that phrase mean in

12            this context?

13                "ANSWER:  That phrase means notwithstanding

14            anything to the contrary contained in this

15            agreement.  How best to articulate this.

16                "QUESTION:  Would it be fair to say that it

17            means -- if I'm wrong, correct me.  But would it be

18            fair to say that it means that if there is anything

19            to the contrary in the agreement that this

20            provision would prevail?

21                "ANSWER:  Yes.  In a general sense, yeah."

22    BY MR. BUSCH:

23    Q.   So, Mr. Harleston, is it correct that you testified at

24    your deposition that the language that follows

25    "notwithstanding the foregoing" in a recording agreement

```
1    prevails over things that preceded that would be contrary?

2    A.   I'm sorry.  I believe this said "notwithstanding

3    anything to the contrary."  And Mr. Pomerantz asked me about

4    notwithstanding anything -- "notwithstanding the foregoing."

5    Q.   So your testimony is that notwithstanding anything to

6    the contrary is different than notwithstanding the foregoing?

7              Is that your testimony?

8    A.   Yes.

9    Q.   Mr. Harleston, in your deposition, do you recall me

10   asking you specifically about what "subject to the foregoing"

11   means?

12   A.   Somewhat.  That sounds familiar, yes.

13   Q.   And do you recall me asking you what -- and you said you

14   could not tell me what "subject to the foregoing" means

15   either, could you?

16   A.   I believe I could not, no.

17   Q.   Okay.  And then I asked you what "notwithstanding the

18   foregoing" means, and you gave me the same answer; isn't that

19   right?

20   A.   I believe I said I needed context.

21   Q.   But without context, it was your testimony that you

22   could not tell me what "notwithstanding the foregoing" meant;

23   is that right?

24   A.   I believe I needed context; correct.

25   Q.   The answer is correct; right?
```

1    A.    Yes.

2    Q.    Now, Mr. Harleston, you've never been an expert before;

3    is that right?

4    A.    No, I have not.

5    Q.    And you testified, did you not, that you were not

6    involved with the negotiation of any download agreements?

7         Isn't that fair to say?

8         You were not involved in the negotiation directly

9    with any download agreements between Universal and any

10   third-party download provider; is that correct?

11   A.    That's correct.

12   Q.    Okay.  And it's also your testimony, is it not, that

13   prior to permanent downloads you could not tell us -- or you

14   cannot think of any licenses by the record label to third

15   parties that would not fall under the licensing provision of

16   the recording contract, other than record clubs, which are

17   specifically provided for in agreements?

18        Isn't that correct?

19   A.    That sounds correct, yes.

20   Q.    And just so that we're very clear, it was your testimony

21   when I questioned you at your deposition that you could not

22   think of any licenses prior to permanent downloads that would

23   not fall under the master licensing provision of recording

24   agreements, other than something specifically identified,

25   like a record club in the agreement; isn't that correct?

```
 1   A.    That sounds correct, yes.
 2   Q.    And isn't it also your testimony that you do not recall
 3   ever seeing language in a licensing provision that has the
 4   "or any other uses" language that is in this agreement?
 5         Isn't that your testimony as well?
 6   A.    I believe that's my testimony, yes.
 7   Q.    Okay.  And then I asked you, did I not, about
 8   conditional downloads and permanent downloads?
 9         Do you recall that?
10   A.    Yes, I do.
11   Q.    And do you recall telling me you did not think you could
12   get artwork with conditional downloads as a difference
13   between conditional downloads and permanent downloads?
14         Do you recall that?
15   A.    I do recall that.
16   Q.    Okay.  Do you know if that's correct or not?
17   A.    I don't know whether it's correct or not.  That was my
18   understanding then, and it's still my understanding.
19   Q.    Okay.  And isn't it also your testimony that you don't
20   know if the master recording that is provided to third
21   parties for compilation albums or soundtrack albums is any
22   different than what is supplied to the digital download
23   companies like iTunes?
24         Isn't that correct?
25   A.    I'm sorry.  Could you repeat the question.
```

1    Q.    Isn't it correct that you do not know if the master that

2    is provided to third-party compilation companies or to other

3    third parties for soundtracks or anything else is different

4    in any way from the digital file that is supplied to the

5    permanent downloads or conditional download companies?

6            Isn't that correct?

7    A.    That's correct.

8    Q.    And I asked you at your deposition if the digital

9    download agreements between Universal and iTunes were

10   licenses.

11           Do you recall that?

12   A.    Yes, I do.

13   Q.    And you told me that the agreements between the digital

14   download companies and Universal were not licenses.

15           Do you recall telling me that?

16   A.    Yes, I do.

17   Q.    Okay.  And then do you recall me also asking you whether

18   Universal licenses recordings to iTunes for permanent

19   downloads?

20           Do you recall me asking you that?

21   A.    Yes, I do.

22   Q.    And do you recall telling me that Universal does not

23   license master rec- -- or recordings to iTunes for permanent

24   downloads?

25           Do you recall telling me that?

1    A.   Yes, I do.

2    Q.   Okay.  Now, Mr. Harleston -- Mr. Pomerantz -- excuse

3    me -- talked to you a little bit about your Senate testimony

4    in this case.

5              Do you recall him asking you about that?

6    A.   Yes.

7    Q.   Okay.  And your deposition in this case was in December

8    of 2008; correct?

9    A.   Yes.

10   Q.   And you testified before the United States Senate a few

11   months before that, did you not?

12   A.   In July of 2008, yes.

13   Q.   Okay.  And you were only asked to be an expert in

14   October of 2008; isn't that right?

15   A.   Yes.

16   Q.   Okay.  And at your deposition, when you said that

17   Universal does not license its recordings to iTunes, you did

18   not know that I had your Senate testimony, did you?

19   A.   No, I did not.

20   Q.   Okay.  And when I asked you whether Universal enters

21   into license agreements with iTunes for permanent downloads,

22   and you said there was -- it was not a license agreement, you

23   didn't know I had your Senate testimony; is that correct?

24   A.   That's correct.

25   Q.   And when I asked you whether Universal enters into

```
 1    license agreements with cellular phone companies to license
 2    recordings to those phone -- mobile phone companies for
 3    master tones, you said they do not; correct.
 4            They were not licenses; correct?
 5    A.   That's correct.
 6    Q.   And that Universal did not license master recordings or
 7    recordings to cell phone companies.
 8            Do you recall saying that?
 9    A.   That's sounds right.
10    Q.   Okay.  And then, Mr. Harleston, I pulled out your Senate
11    testimony.
12            Do you recall that?
13    A.   Yes, I do.
14    Q.   And when I pulled out your Senate testimony, I showed
15    you specifically your testimony before the United States
16    Senate.
17            Do you recall that?
18    A.   Yes, I do.
19    Q.   Now, before you read what you said to Senators Leahy,
20    Specter, Feinstein, and Brownback, you first said that it was
21    under oath.
22            Do you recall saying that?
23    A.   Yes.  And then subsequently I remembered it was not
24    under oath.
25    Q.   And then after you read what you said, then you said it
```

```
 1   might not be under oath.

 2              Do you recall that?

 3   A.   Yes, I do.

 4   Q.   Okay.  And do you recall specifically, sir -- excuse me.

 5              Do you recall specifically, sir, me pointing you to

 6   different portions of your testimony before the United States

 7   Senate in your deposition?

 8   A.   Yes, I do.

 9   Q.   Okay.  And I asked you, "Did you prepare this Senate

10   testimony with lawyers at Universal?"

11              Do you recall that?

12   A.   Yes, I do.

13   Q.   And do you recall me saying to you, "Did you read it?

14   Did you believe it was true, honest, accurate, and that

15   lawyers at Universal worked with you on it?"

16              And you assured me when you said what you said in

17   this Senate testimony it was true, it was correct, and it was

18   accurate; correct?

19   A.   That's correct.

20              MR. BUSCH:  Could you put up the paragraph that

21   begins with "Although our industry."

22              THE COURT:  This is Exhibit 129.

23              MR. BUSCH:  Would you highlight -- there you go.

24   BY MR. BUSCH:

25   Q.   And so when you testified before the United States
```

```
 1   Senate, you said:

 2              "Although our industry is facing some major

 3        challenges, we have plenty to be excited about.  An

 4        increasingly active part of what we do as a major

 5        record label is the licensing of our music, often

 6        to those that are perfecting the last great idea

 7        and those who have a vision of the next one."

 8        When you said that to United States Senate, that

 9   was correct; right?

10   A.   That's correct.

11   Q.   Okay.  And iTunes had a great idea; right?

12        Apple had a great idea; isn't that right?

13   A.   Yeah.  They sure did.

14   Q.   They sure did.

15        iTunes was the next -- was a great idea that --

16   that the people at Apple had; right?

17   A.   Yes.

18   Q.   Universal --

19        Are you familiar with Blue Matter?

20   A.   Yes, I am.

21   Q.   Universal tried to build an infrastructure and to create

22   download system of their own but failed; isn't that right?

23   A.   That's correct.

24   Q.   Okay.  So Universal could not sell downloads themselves

25   on their own platform and on their own structure, but they
```

UNITED STATES DISTRICT COURT

```
 1   had entered into an agreement with iTunes in order for it to
 2   be made available on the iTunes system and other systems like
 3   iTunes; correct?
 4   A.   Pretty much.  I mean, we could sell downloads.  It
 5   wasn't a successful business.
 6   Q.   Okay.
 7   A.   The iTunes model was much more successful.
 8   Q.   Okay.  So when you were talking about the company with
 9   the next great idea or the last great idea, that -- that
10   company could have been Apple, correct, that you're referring
11   to there?
12   A.   It could've been.
13   Q.   Okay.
14        MR. BUSCH:  Now let's go to the last paragraph on
15   the first page.
16        And highlight, "For example."
17             "For example, at Geffen Records we license the
18             use of our recordings to hundreds of companies,
19             from Amazon.com, MTV, MySpace, and Verizon."
20   BY MR. BUSCH:
21   Q.   Do you see that?
22   A.   Yes, I do.
23   Q.   And do you recall me asking you when you referred to
24   licensing to Verizon whether you were referring to licensing
25   your recordings to Verizon for master tones?
```

```
 1              Do you recall me asking you that?

 2    A.    Yes, I do.

 3    Q.    And do you recall you telling me no?

 4    A.    Yes.

 5    Q.    And then do you recall me saying to you, "Well, what did

 6    you mean then?"  And do you recall you telling me, "I don't

 7    know"?

 8    A.    Yes, I do.

 9    Q.    Okay.  And it's true that Geffen and Interscope and

10    Universal licenses or enters into agreements with Amazon.com.

11              Amazon.com, by the way, offers permanent downloads,

12    do they not?

13    A.    Yes, they do.

14    Q.    Okay.  And MTV music might appear on MTV; so you entered

15    into a licensing agreement with them; correct?

16              Isn't that right?

17    A.    Yes.

18    Q.    Okay.  And for things like television programs; isn't

19    that right?

20    A.    Yes.

21    Q.    And you included Verizon in the list of companies for

22    whom Universal licenses its recordings; correct?

23    A.    That's correct.

24    Q.    Okay.

25              MR. BUSCH:  Let's turn to the next page, if we
```

 1    could.

 2           So would you highlight "What is important."

 3    BY MR. BUSCH:

 4    Q.   And do you see where you wrote on the very next

 5    paragraph, "What is important is that the negotiation of

 6    the license in each instance takes into account the market

 7    considerations.  For example, a license of a recording for

 8    a toothbrush will have a different fee than the license of

 9    the same recording when it was selected on demand and

10    downloaded to an iPod"?

11           Do you see that?

12    A.   Yes, I do.

13    Q.   Okay.  And do you recall me asking you whether you --

14    after testifying under oath in this case that Universal does

15    not license its recordings to Apple, do you recall me asking

16    you and -- confronting you with this and asking you, "Is it

17    now correct, sir, having seen this, that Universal does

18    license its recordings to Apple as part of the iTunes?"

19           And do you recall telling me no, that they don't?

20    A.   Yes.

21    Q.   And do you then recall me saying to you, "Well, sir, if

22    that is not correct -- if what you said to the Senate wasn't

23    correct, then what do you mean?"

24           And do you remember telling me, you couldn't think

25    of what you meant if it wasn't a license of the recordings to

1    Apple?

2         Do you recall saying you couldn't think of

3    anything?

4    A.   Yes.

5    Q.   Okay.  You didn't say you were using license in a

6    different way or a different vernacular or with some

7    limitation, did you?

8    A.   No, I did not.

9    Q.   You didn't come up with the excuse that you came up with

10   in connection with Mr. Pomerantz's statement when -- or

11   questions when I asked you the question.

12        You just said you didn't know; isn't that right?

13   A.   Could you repeat the question.  I don't --

14   Q.   Your only answer back to me when I asked you why you

15   said that Apple is getting a license from Universal for its

16   recordings -- why you said that, if, in fact, it's not true,

17   you said you didn't know?

18   A.   That's correct.

19   Q.   I just have a few other questions for you.

20        MR. BUSCH:  Could you put up 4(c)(v) and 5 C.V.,

21   please?  4(c)(v) of the '98 agreement, please.

22   BY MR. BUSCH:

23   Q.   A moment ago I asked you -- oh, by the way, sir, it's

24   correct that Universal does, in fact, pay under the licensing

25   fee for conditional downloads -- the master license provision

```
 1    for conditional downloads; is it not?
 2    A.    I don't know whether it's under the licensing provision,
 3    but there -- yeah.  There's a compensation scheme for
 4    conditional downloads similar to what is provided in -- in
 5    this licensing provision.
 6    Q.    Okay.  Other than the fact that the permanent download
 7    is -- someone, when they get a permanent download, they can
 8    have it forever; and a conditional download is something that
 9    someone has to continue paying a subscription for in order to
10    have access to.
11          When I asked you at your deposition whether you
12    could think of any difference between permanent downloads and
13    conditional downloads, didn't you tell me you couldn't think
14    of anything, other than the fact you might get -- you might
15    not get artwork with a conditional download?
16          Do you recall saying that?
17    A.    Other than the permanence factor; that you own it and
18    it's yours and you have it forever and it doesn't go away --
19    Q.    Yes.  Other than that.
20    A.    -- and all those other factors that go with that.  Other
21    than that, yes.
22    Q.    Okay.  And you told me that the -- the sound recording,
23    the recording that is provided to the -- the single digital
24    file with the recording is the same thing provided by the
25    record company to the download provider, whether it is
```

1    permanent or conditional; right?

2    A.    That's correct.

3    Q.    Okay.  So looking at 4(c)(v) here, where it says, "On

4    masters licensed by us or our licensees to others for their

5    manufacture and sale of records or any other uses."

6         Do you see that?

7    A.    Yes, I do.

8    Q.    Okay.  Assuming that the master is the same and that the

9    agreement between Universal and the download providers are

10   licenses, you would agree then, by the language of that

11   agreement, 4(c)(v) would apply, do you not?

12   A.    No, I would not.

13   Q.    Even though before permanent downloads you can think of

14   no licenses where there's a license of a master recording

15   that would not fall under 4(c)(v); isn't that correct?

16   A.    That -- that doesn't change my -- that doesn't change my

17   interpretation of the provision at all.

18   Q.    What I'm asking you is, sir, the interpretation is based

19   upon the language and the language of the definition of

20   record that you went over; correct?

21   A.    Right.

22   Q.    And just a few last things.

23        The record definition is the def- -- for records is

24   what is in the contract; correct?

25   A.    Correct.

```
 1   Q.   And the language of this agreement talks about masters
 2   being licensed for the manufacture and sale of records or for
 3   any other uses; correct?
 4   A.   Right.
 5   Q.   Okay.  And --
 6   A.   By others.
 7   Q.   By others.
 8        And what we have is records, under your definition
 9   of it, is a download; correct?
10        A download is a record; right?
11   A.   A download is a record, but it's -- this -- nowhere in
12   here does it talk about normal retail channels sales or
13   anything like that.
14        Maybe I'm misunderstanding your question.  I'm
15   sorry.
16   Q.   When a licensee sells a record from Universal, it's
17   often sold in normal retail channels, is it not?
18        For soundtracks, for compilations, for different
19   things, those are sales by licensees in normal retail
20   channels, is it not?
21   A.   Correct.  Yes, it is.
22        MR. BUSCH:  Okay.  I've got nothing else.
23        THE COURT:  We're going to adjourn for the day.
24        Ladies and gentlemen, if you'd like to know where
25   we're at, we're going to have just a few more minutes of
```

1    testimony tomorrow, and then you're going to get the

2    instructions on the law and the arguments of counsel, and

3    then the case will be submitted to you by lunchtime tomorrow

4    for your deliberations.

5            Until then, Remember not to discuss the case among

6    yourselves or with anyone else.  Do not form or express any

7    opinions about the case.

8            And we'll see you tomorrow morning at 9:00 o'clock.

9            THE CLERK:  All rise.

10           (Open court - jury not present.)

11           THE COURT:  Mr. Pomerantz, how much more time do

12   you have on redirect?

13           MR. POMERANTZ:  I would expect less than ten

14   minutes, Your Honor.

15           THE COURT:  All right.  I'm going to take a recess,

16   and then we'll wrap up what we need to wrap up for the

17   evening to get ready to instruct tomorrow.

18           In terms -- were you going to make -- am I going to

19   have to rule on the motion with regard to additional rebuttal

20   witnesses or is that issue gone?

21           MR. POMERANTZ:  That issue is gone, Your Honor.

22           THE COURT:  All right.  It's relatively moot, but

23   the -- there was a question asked about 49 minutes for the

24   defense.  But the defense did get additional time without

25   having to take the verbal abuse that Mr. Busch took in asking

1     for more time.  He is now -- the defense is now at eight

2     hours and 19 minutes, and I really think it should have been

3     done under eight.  I thought, again, the cross on both

4     experts was -- I overruled the asked and answered objections,

5     but it was repetitive, and we shouldn't be here.

6              But in any event, Mr. Pomerantz -- and Mr. Busch,

7     you're at 8:46.  You have about three minutes.  So you are

8     probably fine.

9              MR. BUSCH:  I think -- his redirect is ten minutes.

10    I might have a minute or two, but that should be fine.

11             THE COURT:  All right.  Okay.  We'll see you in ten

12    minutes.

13             (Recess from 5:07 p.m. to 5:21 p.m.)

14             THE COURT:  Mr. Busch, were there some exhibits

15    that you wanted to have admitted --

16             MR. BUSCH:  Yes, Your Honor.

17             THE COURT:  -- as part of your case?

18             And then what happened -- or did that go by the

19    wayside with, I believe, interrogatory --

20             MR. BUSCH:  Yes.  Interrogatory Number 26.  And it

21    was -- they were going to advise whether they wanted the

22    objection also in or just the answer, and I have not heard

23    anything back.

24             THE COURT:  What is the defense's position with

25    regard to Interrogatory Number 26?

1          MR. POMERANTZ:  Your Honor, as long as the

2    objection and the answer is given, we have no problem with

3    that.

4          THE COURT:  All right.  So that will be part of the

5    record.

6          How do you intend to handle it?  Are you going to,

7    on rebuttal, just reopen and read it?  Or what are you -- how

8    about an argument?  What are you going to do?

9          MR. BUSCH:  That may be the way to do it is to

10   reopen and read it or just use it in my closing argument now

11   that it's in evidence.  I'll speak to --

12         THE COURT:  Okay.  Just let me know.

13         MR. BUSCH:  Okay.

14         MR. POMERANTZ:  Your Honor, what I'm -- I guess

15   there is a cover e-mail that is, right now, part of the

16   exhibit.  We don't think that should be what is submitted to

17   the jury.

18         MR. BUSCH:  That's fine.  That's fine.

19         What exhibit number is that?

20         MR. GUILFORD:  I believe it's 790.

21         THE COURT:  90?

22         MR. GUILFORD:  790.

23         THE COURT:  And 790 includes the e-mail?

24         MR. GUILFORD:  It does.

25         THE COURT:  All right.  So 790 is admitted with

1    the -- solely as to the interrogatory and the response

2    without the e-mail.

3                Any others?

4                MR. BUSCH:  Yes, Your Honor.

5                Your Honor, the F.B.T. royalty statements that we

6    would like to have into evidence that were issued to F.B.T.

7    by the defendants --

8                THE COURT:  There are numbers?

9                MR. BUSCH:  Yes, there are.

10               The ones that we want into evidence are 514, 515,

11   541, 567, 572, 573, 580, 582, 583, 602, 603, 604, 673, 677,

12   687, 688, 705, 706, 707, and 711.

13               THE COURT:  Any objections to the royalty

14   statement?

15               MR. POMERANTZ:  I'm going to have Ms. LeMoine go

16   through the -- them quickly.

17               Yes, Your Honor.  Our concern is that we don't

18   believe that most, if not all, of these royalty statements

19   concern the particular transactions that are the subject of

20   this lawsuit that are the basis of their damage calculations.

21   We -- when the exhibit process began, they put a whole bunch

22   of royalty statements on the list -- the exhibit list, and we

23   told them that most of those have nothing to do with the

24   actual issues being litigated here.

25               And it's frustrating that we're here on the eve of

 1  the final day of trial and we're just getting this list now.

 2  We told them which ones we thought were part of the case, and

 3  that's the ones that were deemed admitted already because we

 4  both agreed on that.

 5          But so far as we thought, Your Honor, all of these

 6  other royalty statements are for other pieces of the Eminem

 7  recordings and people who have various interests for various

 8  reasons, but I do not believe that they relate to the

 9  particular issues that we've been litigating.

10          THE COURT:  Let me have Mr. Busch -- so the

11  objection is relevance.  They're not relevant to this case?

12          MR. BUSCH:  Your Honor, those agreements are in not

13  only for purposes of the royalty statement that concern

14  damages --

15          THE COURT:  Okay.

16          MR. BUSCH:  -- but also because it shows how

17  they're paying for different licensed income.

18          THE COURT:  Don't they -- don't the agreements that

19  are in already show that?

20          MR. BUSCH:  It shows in some cases but not all, and

21  it doesn't show all of the different types of license income

22  that we were able to determine.  And we think that we're just

23  talking about 10 exhibits, 10 or 15 exhibits here.

24          THE COURT:  If it is already included, isn't it --

25  I mean, I think what -- the point that you make is a valid

 1   point, but can't you already do it with the licenses that

 2   have -- the royalty statements that have been admitted

 3   already?

 4            MR. BUSCH:  Again, I don't believe, Your Honor --

 5   and if Your Honor would just like to hold off until tomorrow

 6   morning I can give you specific details.  But our review of

 7   it shows that there is license income that relates to

 8   different forms of licensing that are contained in these that

 9   are not necessarily contained in all of the different royalty

10   statements.

11            THE COURT:  But won't you find that -- different

12   species of conditional download, streaming, movies, won't

13   those also be --

14            MR. BUSCH:  Ring-back tones, things of that nature.

15            THE COURT:  But won't those already be in the

16   agreements that have already been admitted of every species?

17            MR. BUSCH:  Let me give Your Honor an example.  The

18   agreements that I believe the defendants have admitted are

19   F.B.T. -- F.B.T. exhibits.  We've identified the

20   corresponding Eminem royalty statements, for example, because

21   when you combine the two, I believe, that's where you're able

22   to show that they're paying 50 percent of receipts without

23   any deductions for certain licensing income.  So that's one

24   example of a reason to -- to put that in.

25            THE COURT:  I mean, again, that type of an example

 1    isn't found in the royalty statements somewhere that we've

 2    already admitted?

 3              MR. BUSCH:  Not if they're just F.B.T. royalty

 4    statements.  There's a royalty statement, I believe for

 5    F.B.T. and, I believe, a separate royalty statement for

 6    Eminem that is not in -- in the -- not in evidence.  And so

 7    in order to show that they're getting 50 percent of the

 8    receipts you would need to have both into evidence.

 9              THE COURT:  But then just looking quickly at the

10    dates, it seemed, for example, 514 and 15, a quick look --

11    and I could be wrong -- relate to the periods not discussed

12    by the experts.

13              Let me start with '04.  Your damages calculations

14    starts with '04?

15              MR. BUSCH:  No, sir.  2003 is in there as well.

16              THE COURT:  I see what you're --

17              MR. BUSCH:  Yeah.

18              THE COURT:  I see.  Okay.

19              MR. POMERANTZ:  Your Honor, I'm sure I don't have

20    all of the reasons why this is irrelevant because I haven't

21    looked at them, but let me give you a few.

22              First, as Mr. Busch said, these are Eminem royalty

23    statements; so there should be the same transactions if it's

24    the same record on both royalty statements.  Mr. Mathers gets

25    his share; F.B.T. gets its share.

1          What Mr. Busch was saying there at the end, I just

2     don't think it makes sense.  What he's saying is if we paid

3     50 percent of a net receipt -- of a receipt that we received

4     from some third party, we know what the royalty share is

5     between Eminem and F.B.T.  So F.B.T. would get its 40 percent

6     and Eminem would get his 60 percent.

7          And so if there was no deductions at all from the

8     receipt -- from the gross receipts, then you would see

9     40 percent of 50 percent in the F.B.T. account and 60 percent

10    of the 50 percent in the Eminem account.  You don't need to

11    inundate the jury and the record with irrelevant royalty

12    statements that went to Eminem, who was a party -- who was

13    not a party to this case that has the same transactions in it

14    that the F.B.T. statements have.

15          THE COURT:  The last word, Mr. Busch, because,

16    realistically, you cannot -- you're not expecting the jurors

17    are going to go back -- they're going to go through 15 sets

18    of royalty statements, so....

19          MR. BUSCH:  No, sir.  I'm not.

20          THE COURT:  I want to make sure I'm not precluding

21    you at closing argument to make the pitch that you want to

22    make and that these exhibits somehow -- if I don't allow you

23    these exhibits, then you're not going to be able to

24    coherently make the pitch, but the way Mr. Pomerantz and I

25    said it, I don't see how, when you have the statements that

1    are in, you can't explain what you just explained to me.

2            MR. BUSCH:  Because without the line -- first of

3    all, the jury would have to do the math -- I'd have to go

4    back and show this is the percentage F.B.T. gets versus the

5    percentage that Eminem gets.  But if you had both line items

6    and you showed that this is what Eminem got and this is what

7    F.B.T. got, it adds up to 50 percent exactly of the gross

8    receipts that is shown by -- by Aftermath.  There's no

9    explanation required.  There's nothing that needs to be done

10   other than point to that and be able -- and move on.  If I

11   don't have those in, then it's a belabored explanation that

12   I think is more time consuming.

13           THE COURT:  But if -- for example, on the

14   conditional downloads, why can't you -- why couldn't you

15   speak to or address the statements that are in and say, look.

16   Nothing was deducted?

17           And no one is going to contest that, are they?

18           MR. BUSCH:  Because I think the way it looks is you

19   have the gross receipts and then you have the amount F.B.T.

20   received, but it's not going to show what happened to the

21   other percent, the other amount.  You have to have the Eminem

22   share to add together to go to the 100 percent.

23           THE COURT:  Are there other exhibits as well?

24           MR. BUSCH:  Yes, there are some.

25           Exhibit Number 127, Your Honor, that is the

1    testimony by the CFO -- Interscope's CFO at trial, where

2    he testified about in physical sales title passing to the

3    retailer, as well as crediting of the account of the artist

4    at the time of the sale to the retailer.

5            THE COURT:  The whole testimony?

6            MR. BUSCH:  No.  No.  Just -- just that portion.

7    We -- we submitted that to Your Honor, I believe.

8            THE COURT:  Tell me everything --

9            MR. BUSCH:  Okay.  The -- Clive Ellis --

10           THE COURT:  No.  Tell me all of the exhibits.

11   I want a laundry list.

12           MR. BUSCH:  Okay.  The others are -- and this is

13   just belt and suspenders, Your Honor.

14           THE COURT:  That's -- then that tells me it's

15   cumulative.

16           MR. BUSCH:  Well, no, it's not.

17           THE COURT:  All right.  How is that not a belt and

18   suspenders?

19           MR. BUSCH:  Because it's an extension of -- it is

20   an amendment or extension of a term of a download agreement.

21           THE COURT:  I asked for a list.  I won't interrupt

22   you.

23           MR. BUSCH:  Okay.  882, 885.

24           THE COURT:  Go slowly.

25           880 what?

```
 1              MR. BUSCH:  882, 885, 886, 887, 888, 889, 890

 2      through 899.  And those are all -- and then we have a few

 3      others in the same category, 938 through 957.  And then 123A

 4      and B.

 5              THE COURT:  What are you trying to do to this jury?

 6              MR. BUSCH:  I'm not trying to do anything to this

 7      jury.

 8              THE COURT:  I'm not saying this half joking.  They

 9      already have -- you've presented their case.  They have --

10      this case has been -- it's a dead horse right in front of me

11      from both sides on cross-examination and examination.  They

12      know what -- they know what -- they know this case.

13              MR. BUSCH:  This is -- the only reason that those

14      exhibits were marked, Your Honor, is that we went through all

15      of the download agreements that the defendants produced to

16      us --

17              THE COURT:  Right.

18              MR. BUSCH:  -- and we put them on the exhibit list.

19      There were some that were just merely extensions of term.

20      And there's no -- nothing -- these are those.  And just

21      because of Your Honor's ruling on summary judgment, I did not

22      want to, you know, not have these extensions that brought

23      these things up to date, and that's essentially what these

24      are.

25              THE COURT:  Didn't the summary charts address that
```

 1   situation?

 2          MR. BUSCH:  The summary charts, Your Honor, have

 3   the substantive terms of the agreements.  We did not

 4   initially include these because they were just extensions of

 5   the term essentially, but we just wanted to make sure that

 6   there was no allegation or accusation by the defendants that

 7   we did not have the agreements that were produced in the case

 8   as exhibits.  These that I've just identified are simply

 9   nonsubstantive extensions of term that we just have -- we

10   just marked protectively, and we are asking for admission

11   protectively so there is no --

12          THE COURT:  Couldn't that be handled by a paragraph

13   stipulation?

14          MR. BUSCH:  We've asked for it, and the defendants

15   wouldn't give it to me; so that's why we're here on this.

16          THE COURT:  And the agreements are -- which

17   segments are these?  Are they the 800 series and the 900

18   series documents?

19          MR. BUSCH:  Yes, Your Honor.

20          The agreements that I just read to you are the --

21   the 800 series documents going over to -- yeah, the 800

22   series documents essentially, Your Honor.  And again -- and

23   it goes over to a few in the nines as well.

24          And, again, Your Honor, I asked the defendants for

25   a stipulation that this would not be relevant -- these

1    agreements would not be relevant, they are just extensions of

2    terms, and I was basically told no.

3           THE COURT:  But also, too -- I'm looking at

4    objections also.  Apparently they're not timely.

5           MR. BUSCH:  Again, what happened, Your Honor, was

6    after the summary judgment ruling -- well, what happened --

7    this is what happened.  What happened when we first made our

8    exhibit list, we were very careful in going through these

9    exhibits and download agreements and only put the ones that

10   were substantive in nature on the list and not to include

11   nonsubstantive extensions of term.

12          We were -- I began discussing the issue with

13   opposing counsel very early on, and we were actually

14   discussing the issue prior to the pretrial order being due.

15   We were never able to reach an agreement about these and,

16   therefore, they were added to the exhibit list prior to the

17   final exhibit list being submitted.

18          THE COURT:  And tell me about 127.

19          What do you want to the do with Mr. Ellis's

20   testimony?

21          MR. BUSCH:  Mr. Ellis is the CFO of Interscope --

22   was the CFO of Interscope.  He testified at a trial where he

23   testified that title to the physical CDs passed to the

24   retailer at the time of the purchase by the retailer and that

25   the artist's account is credited by Interscope at that time.

1           And we want that to show the difference between the

2    physical retail sales and the licensing situation.  And it's

3    directly on point to this -- to the issue in this case.

4           THE COURT:  I'm just confused as to the form of the

5    request.  Are we just going to give a -- we're just going to

6    give deposition transcript testimony.

7           MR. BUSCH:  It's not a deposition --

8           THE COURT:  It's going to be a trial testimony

9    transcript to the jurors?

10          MR. BUSCH:  Just ten pages of his testimony on

11   this -- on this issue.  We had supplied it to opposing

12   counsel.  At first there is -- there is no objection to

13   foundation, no objection to authentication.  The only

14   objection is somehow it's hearsay, which we don't believe it

15   is.  It's an admission or adopted admission, and somehow it's

16   prejudicial.

17          But I don't -- again, it is about ten pages of

18   Mr. Ellis's testimony from a trial where he testified.

19          THE COURT:  Mr. Pomerantz?

20          MR. POMERANTZ:  Let me start with the last issue,

21   Your Honor, Mr. Ellis's testimony.

22          Mr. Busch misspoke, I think.  That testimony

23   does -- Mr. Ellis did say in that testimony that title

24   transferred to the retailer of a physical good, just what

25   Mr. Ostroff said on the stand here.  Not a disputed fact in

```
 1    this case.
 2           The second part of what Mr. Busch said, that is,
 3    that the artist's royalty account is credited at that time, I
 4    don't believe it's at all in the testimony.  He did say that
 5    the books -- it's accrued on Universal's books at that point
 6    in time.
 7           So first -- the first thing is -- what I think the
 8    only thing that Mr. Busch is asking for would be like a
 9    question and answer in the transcript, not ten pages.
10           Second, though, it is hearsay.  Mr. Ellis was not
11    a Universal employee at the time he gave the testimony.  He
12    had resigned.  He was moving back to England, as I recall.
13    He had done it shortly before the deposition.  So he was not
14    an official -- he was not an employee or representative of
15    Universal at that point when he testified, which is important
16    for hearsay.
17           Second, we weren't there at that trial for purposes
18    of this case.  And had we been there, we would have clarified
19    the point -- the point in that case was not when artists's
20    royalties are paid what causes artists's royalties to be paid
21    or anything like that.
22           The questioning there had to do with issues of
23    transfer of title.  And my recollection is they were talking
24    about a warehouse catching on fire and, you know, things of
25    that sort.
```

1          So he wants to put the testimony that title

2     transferred and I guess something else, I'm not sure, in

3     front of the jury when we didn't have a chance to question

4     Mr. Ellis about issues relating to this case, which is

5     precisely what the hearsay rule would be designed to avoid.

6     And if what he cares about is title, I mean, we can look at

7     the Ostroff testimony, but my recollection is that Mr.

8     Ostroff already testified that title transfers.

9          THE COURT:  And then the 800 series and the 900 and

10    then --

11         MR. POMERANTZ:  Well, first on timing, Your Honor,

12    Mr. -- again, Mr. Busch is incorrect.  When we submitted the

13    joint exhibit list, when it was due under the Court rules,

14    none of those exhibits were on the list.

15         They attempted to add them afterwards, and one of

16    the objections we had was on timeliness grounds.  When they

17    told us they wanted to add them, it was in words similar to

18    what Mr. Busch is still using today, belt and suspenders,

19    protective, et cetera.  And we said okay.  But why are they

20    relevant?  What issue are they relevant to in this case?  We

21    didn't hear it then, and I don't think I heard it here today.

22         THE COURT:  All right.  And then what is 123-A and

23    B?

24         MR. POMERANTZ:  I think that's the same -- I think

25    that's just -- they're included in the same group of -- we

 1    don't have any objection to 123-A and B.

 2              THE COURT:  123-A and B are admitted.

 3              **(Exhibits 123-A and B received.)**

 4              THE COURT:  Just a last question on Ellis.

 5              If he's not an employee, how is -- if he's left the

 6    company, how is that an admission?

 7              But second of all, is that really a disputed issue

 8    anymore?

 9              MR. BUSCH:  Your Honor, as to your first question,

10    the Universal people put him on the witness stand.  It's

11    clearly under the law an adopted admission if they're

12    claiming he was no long -- he just resigned 10 days earlier.

13    They put him on the witness stand.  He was their 30(b)(6)

14    representative at the deposition.  And then they put him on

15    as their person at trial.  So as to that, it's clearly an

16    admission or adopted admission.

17              But as to the second point, again, it seems to me

18    that the defendants are making a point in this case that the

19    actual construct of the sale of physical goods from Universal

20    to a retailer, and this whole through issue, is that it's the

21    same as digital downloads because the consumer's purchase is

22    the end game of it.  And I think it's clear that with respect

23    to the sale of physical goods, the royalty account is the --

24    royalty is accrued, as Mr. Berman testified, when the

25    retailer purchases it subject to reserve.

```
 1              THE COURT:  Is that really -- maybe I missed
 2     something, but it seems to me that point is undisputed.
 3     Nobody is disputing that title transfers to the retailer.
 4     Nobody -- I think the testimony has been consistent that the
 5     royalty accrues at that point.  And everybody, I think, is
 6     consistent that for whatever reason is returned, it's a book
 7     entry and the accrual is reversed out.
 8              Isn't -- I mean, isn't that --
 9              MR. BUSCH:  If the defendants are saying that that
10     is, in fact, the case --
11              THE COURT:  I don't think I heard any evidence to
12     the contrary, have I?
13              MR. POMERANTZ:  Your Honor, I am sometimes
14     forgetting what I hear outside the courtroom and inside the
15     courtroom.
16              THE COURT:  It's only but eight hours a side, but
17     it feels like weeks.
18              MR. POMERANTZ:  It sure does.
19              The one -- the only, I think, distinction -- and it
20     may be one without a difference that I would offer -- is that
21     we pay royalties at the end of every six-month period.
22              THE COURT:  Right.
23              And that, I think, is also undisputed.
24              MR. POMERANTZ:  It is.
25              And so -- and so it's not as if, you know, for the
```

1    royalty purposes the artist gets paid -- whether that --

2    whether the sale occurs on January 2nd or June 29th, if it's

3    accrued during that period, the actual time that royalty is

4    entered when the artist is due is at the end of the royalty

5    period.

6            THE COURT:  Right.

7            But nobody is contesting that, okay.  So Best Buy

8    buys the CD and pays $5.  Okay?  That, on the books

9    somewhere, is a $5 entry with a royalty accruing to the

10   artist.

11           That CD is returned before the end of the

12   statement.  Nobody is disputing that that goes -- why -- that

13   somewhere -- there's an accountant somewhere or a computer

14   saying, okay.  Now we wipe out the $5 sale and that artist is

15   not entitled to it.  Then the royalty statement goes out the

16   artist gets zero.  I don't understand.

17           MR. POMERANTZ:  I think, Your Honor, whether all of

18   that is in the record, that -- I don't think there's any

19   disagreement on that.

20           THE COURT:  About that issue, and that's why I

21   think Mr. Ellis is cumulative.  I don't think there's --

22           MR. BUSCH:  If Mr. Pomerantz is saying that it's

23   the position of Universal that the royalty is accrued at the

24   time of the sale to the retailer subject to the reserves,

25   then that's -- then that would be acceptable.

```
 1              MR. POMERANTZ:  Your Honor, I'm not saying that.

 2              THE COURT:  He's not saying that, but you both are

 3     going to argue -- what I described is -- what I described are

 4     facts.  What you both just said are arguments.  Do you see

 5     what I'm saying?

 6              Nobody is going to -- am I wrong?

 7              Nobody is going to contest that some -- there's

 8     some book entry that this CD was sold for five bucks to

 9     Best Buy and there's some book entry that the artist has

10     accrued a dollar.  And then the CD is returned.  There is

11     some accounting mechanism that all of a sudden, well, that CD

12     wasn't sold, and it's wiped off the books.  A month later the

13     statement goes out, and the artist gets zero.  To me those

14     are factual questions.  How you argue it seems to be

15     something different.

16              MR. BUSCH:  Okay, Your Honor.

17              THE COURT:  The 123-A and B are admitted.

18              The remaining objections are sustained with regard

19     to the 500, 600, and 700 series as relevance.

20              And the 800 and 900 series as untimely.

21              The 127 is cumulative.

22              And the 123-A and B are admitted.

23              And then Interrogatory Number 26, don't forget to

24     tell me how you want to proceed with that, Mr. Busch.

25              MR. BUSCH:  Yes.
```

```
1              THE COURT:  Anything else?

2              MR. POMERANTZ:  Yes, Your Honor.  We would like to

3      make our motion for judgment as a matter of law.

4              Is this the appropriate time?

5              THE COURT:  Go ahead.

6              MR. POMERANTZ:  Your Honor, with respect to the

7      first cause of action, we think that the evidence that the

8      plaintiffs have put on in this case require judgment in our

9      favor in a finding that there has been no breach.

10             We believe that at this point, looking at evidence

11     that they've proffered, that no reasonable jury could find

12     for the plaintiffs.

13             First, we would point to the clear language of the

14     contract.  What is now apparent, Your Honor, is that

15     downloads are records, and they're sold through normal retail

16     channels.  And virtually no witness said otherwise.  Even

17     their expert said, "I just don't venture into that area."

18             And so whatever masters license means doesn't

19     really matter at this point because what we know is that a

20     download sold through iTunes is a record sold through a

21     normal retail channel.

22             Whether there's any ambiguity in that is erased by

23     the 2004 amendment because, true, it does -- that key

24     sentence does say it's for purpose of escalations, but the

25     rest of the words are in there, and you can't understand them
```

1    except to say that a download is viewed by both sides as a

2    sale of a record, as a sale of an album.

3              And so we think that just on the language, now that

4    we've seen it in this case -- you can look at contracts and

5    say that permanent downloads are sales of records through

6    normal retail channels, and they have to be covered by 4(a)

7    and 5-A, their respective agreements.

8              If Your Honor were to go to extrinsic evidence that

9    has been offered in this case, at least the admissible

10   extrinsic evidence, there's still nothing that changes that

11   result that a download is a record and that it is sold

12   through normal retail channels.  So we think that with

13   respect to the first cause of action that even if -- once

14   Your Honor considers all of the evidence that has come into

15   this case during the plaintiff's case, that we're entitled to

16   a judgment in our favor.

17             I can go on to the other --

18             THE COURT:  Go ahead.

19             MR. POMERANTZ:  With respect to the second cause of

20   action, we also think that the judgment should be entered in

21   our favor.  There's not been any evidence that we owe

22   $159,000 to anybody.  I think it's also clear that no other

23   audit claim is being raised in this case.  It's just that

24   matter of that 159-, and I don't think there's any evidence

25   that -- that we haven't paid it already and that we owe it to

```
 1    anybody.

 2           Two other subsidiary issues are -- are -- I think

 3    have been litigated that can be resolved now as a matter of

 4    law, if Your Honor wasn't going to grant judgment on the

 5    entirety of the first cause of action.

 6           The first is with respect to the soundtrack album.

 7    We think that the language of the contract is clear that the

 8    contracts -- that the masters that are part of the soundtrack

 9    album, the Eight Mile soundtrack album, are not covered by

10    the masters license provision in the '98 and 2003 agreement.

11    They're simply not covered by it.

12           And so in a case in which the core issue that

13    they're presenting in the first cause of action is whether

14    the masters license provision applies or doesn't apply to

15    permanent downloads and master tones, it's simply these

16    soundtrack recordings are not covered -- are not part of the

17    case.  And there's been no extrinsic evidence offered that

18    would change that result.

19           The final issue, Your Honor, that I would raise as

20    part of our motion for judgment as a matter of law is we

21    actually have four defendants in this case:  Aftermath, and

22    then the three parties that own Aftermath.  And I think as to

23    those other three parties, there hasn't been any evidence

24    that they would be liable for any damages in this case.

25    Aftermath is the only party to the agreement, and I don't
```

 1    think that any of the other defendants -- that there's any

 2    evidence that any of the other defendants would be liable.

 3         THE COURT:  Mr. Busch, just a few of the issues you

 4    need to address.  Address Count 2, the soundtrack, and the

 5    three other defendants.

 6         MR. BUSCH:  Okay.  As to Count 2, Your Honor, in

 7    fact, we would ask for judgment on matter of law for

 8    ourselves.  The undisputed evidence is that F.B.T. was not

 9    paid $159,000.  There's absolutely no evidence that -- to the

10    contrary.  In fact, Mr. Hu, Ping Hu, admitted that fact, and

11    this issue cannot and should not go to the jury on that

12    point.

13         As to the other two issues, which are the

14    soundtrack issue and the other defendant issue -- as to the

15    soundtrack issue, Your Honor, the contracts and the testimony

16    in this case is that F.B.T. is entitled to revenue under the

17    2000 Novation for any and all masters released.  And if you

18    look at the 2000 -- released or created by Eminem and F.B.T.

19    And if you look at the 2000 Novation, there's actually a

20    provision for side projects, but it does not affect the fact

21    that all terms of the '98 recording agreement are pulled into

22    the 2000 Novation, and it's included specifically by its

23    terms.

24         So I'm not sure Mr. Pomerantz didn't point to any

25    specific language that is supporting his claim.  But, in

1    fact, there is nothing in this record to suggest that the

2    soundtrack album, even if it is a side project, that F.B.T.

3    is not entitled to licensing revenue under the 4(c)(v) of the

4    '98 agreement, which is incorporated by its terms in the 2000

5    Novation.

6            I'm happy to address any other issues with respect

7    to that.

8            THE COURT:  The other three defendants.

9            MR. BUSCH:  The other three defendants.  Okay.

10           As far as the other three defendants is concerned,

11   Interscope actually is -- Interscope and U.M.G. actually are

12   signatories to the 2003 agreement and to the 2000 Novation.

13   As to the 2000 Novation, Interscope has clear obligations

14   under both -- I'm sorry.  Let me back up one second.

15           Under the 1998 agreement, Paragraph 12, Interscope

16   has independent obligations under that agreement.  Under the

17   2000 Novation, Interscope is a signatory to the 2000 Novation

18   and is also a signatory to the 2003 agreement.  And

19   Interscope is an unincorporated division of U.M.G.

20           Since they are signatories to the 2000 Novation,

21   which amends the '98 agreement, and they have independent

22   obligations under those agreements, which have been breached

23   in this case, Interscope is an appropriate defendant.

24           Specifically, the 2000 Novation and 2003 agreement

25   reads that "Interscope hereby acknowledges that as long as it

1    is the distributor of records released under the agreement,

2    it shall send separate accounting statements, together with

3    respective payments, directed artists," and F.B.T. and

4    Interscope assumes the same obligation in the 2003 agreement.

5            In addition, in both agreements Interscope is

6    frequently referred to alongside Aftermath.  Under California

7    law, the existence -- at the --

8            I'm sorry.

9            THE COURT:  Well, then, what about

10   U.M.G. Recordings and Ary?

11           MR. BUSCH:  As to U.M.G. Recordings, U.M.G.

12   Recordings is the corporation.  Interscope is an

13   unincorporated division of U.M.G. Recordings, Inc.; so there

14   is no -- there is no basis to -- in other words, that's the

15   formal organization is U.M.G. Recordings, Inc.  So

16   Interscope, being a division, U.M.G. Recordings, Inc., is

17   Interscope; so they should be defendant as well.

18           And then there has been ample testimony about the

19   fact that Interscope is Aftermath's distributor, responsible

20   for all marketing efforts.  And Mr. Hoffman, throughout his

21   testimony, talked about the fact that Interscope currently

22   owns Aftermath; that Interscope purchased the masters of

23   Eminem from Aftermath, the '98 agreement has an assignment

24   provision in it that allows Interscope to do that, to assume

25   obligations.  And for all those reasons, Your Honor,

1   Mr. Hoffman testified at length between the relationship

2   between Interscope and Aftermath and the purchases of the

3   master recordings and its independent obligations as a

4   distributor.

5           THE COURT:  Ary.

6           MR. BUSCH:  Ary is Dr. Dre's company.  I

7   actually -- they are the joint venture partner with

8   Aftermath, and I actually asked Mr. Pomerantz -- I told him

9   that as far as Ary is concerned, we have no problem with Ary

10  being released.

11          And Mr. Pomerantz has declined my invitation on

12  that.

13          THE COURT:  Mr. Pomerantz, last word on -- I want

14  to hear about the other defendants and that's it.

15          MR. POMERANTZ:  Sure.

16          All right.  Just on the other defendants then,

17  Your Honor.

18          What the agreement says -- the 2003 agreement says

19  in the signature line, it says, "Accepted and agreed," and it

20  has a signature by Aftermath.  It's the only party that

21  signed under that line.  Then underneath that it says,

22  "Acknowledge and agreed to insofar as saying pertains to it."

23  And underneath that is where Interscope signs, where F.B.T.

24  signs, et cetera.

25          Under this agreement, Aftermath is the one with the

1    obligation to pay royalties, and that is what this case is

2    about.  Interscope, as the distributor, does have the

3    obligation to send out the royalty statements, and no one is

4    contending we weren't sending out royalty statements.  But

5    the allegation in this case is you're paying the wrong

6    amount.  That obligation is Aftermath's.  Aftermath is the

7    party who has taken on the responsibility of paying royalties

8    under this agreement.

9           Now, Mr. -- so what this agreement is clearly doing

10   is it is specifying that the basic agreement is between

11   Aftermath and Mr. Mathers, but certain provisions apply to

12   F.B.T., certain provisions apply to Interscope, et cetera.

13   And so those parties also signed.  Mr. Busch also misspoke

14   when he said that Interscope is U.M.G.

15          There's three defendants here.  There's an

16   Interscope defendant.  There's a U.M.G. defendant.  And

17   there's Ary -- besides Aftermath -- I'm putting aside

18   Aftermath.

19          Interscope, because of, I'm sure, just historical

20   corporate restructuring, is both an independent partnership,

21   I think it is, an independent entity.  And the another

22   company called Interscope as the label is part of the

23   U.M.G. Recordings.  And I think that has to do with how

24   Mr. Field -- you heard Mr. Iovine talk about coming together

25   with Mr. Field, the way he -- I think it has to do with

1    corporate restructuring over the years.

2              So there is another Interscope entity that has had

3    nothing to do with this lawsuit by the way, but it did have

4    an ownership interest, and he does have an ownership interest

5    in Aftermath, and that's why I think they've been named here

6    as a party.

7              So what you -- you know, there are three other

8    defendants:  Interscope, this entity; U.M.G. Recordings,

9    which has Interscope as an unincorporated division; and Ary.

10   And I think since this case involves payment of royalty and

11   whether we paid correctly or not, the only party who is

12   charged with paying the royalties in the correct amount under

13   this agreement is Aftermath.

14             THE COURT:  What about the structuring and the

15   point that Mr. Busch makes about U.M.G. -- the point that

16   Mr. Busch made about U.M.G.?

17             MR. POMERANTZ:  I'm now sure about the point.

18             U.M.G., through its Interscope, Unincorporated,

19   division, has certain responsibilities under this agreement,

20   but it's not to pay the correct amount of royalties.  That's

21   Aftermath's responsibility.  I mean, we're not walking away

22   from that obligation.  It's just that Aftermath is the party

23   with the obligation.

24             And one of the services that Universal provides to

25   Aftermath is that they have to send out the royalty

1    statements in a timely way.  And Eminem, as a party to the

2    contract, said, "I want my royalty statements in a timely

3    way.  Please make sure that Interscope commits to doing

4    that," and that's what Interscope commits to do under this

5    agreement.

6            MR. BUSCH:  Your Honor, under the 2000 Novation,

7    which -- which amends the '98 agreement but incorporates all

8    of its terms, Interscope Records, a division of U.M.G.

9    Recordings, Inc., is a signatory to the 2000 Novation,

10   agreeing to the terms contained within it.

11           The testimony in this case is that Interscope

12   Records, a division of U.M.G. Recordings, Inc., has acquired

13   Aftermath, has made the decisions about how these downloads

14   are going to be paid.  It has a specific duty to render

15   accurate accounting statements, to pay F.B.T. according to

16   those accounting statements.

17           Rand Hoffman, Michael Ostroff, all of those

18   parties -- people are entities, are senior executives with

19   U.M.G.  Recordings, Inc., and U.M.G. Recordings, Inc., is

20   a signatory of a 2000 Novation which amends the '98 recording

21   agreement specifically.  Rand Hoffman also testified about

22   the masters that they are purchased; that they had acquired

23   Aftermath.

24           And so, Your Honor, as it relates to U.M.G. and

25   Interscope, they have independent obligations that relate

1    specifically to the allegations in this case, which is that

2    they did not account and pay to F.B.T. appropriately.

3            THE COURT:  The -- anything to add onto your

4    motion, other than you said the 169?  Is there anything else

5    you want to add?

6            MR. BUSCH:  There is nothing else that I want to

7    add.

8            THE COURT:  All right.  The motions for judgment

9    are denied, except with respect to Ary, Inc.

10           Now, last, with regard to the jury instructions,

11   are they -- will they be ready to go tomorrow morning?

12           MS. LEMOINE:  Yes, Your Honor.  I have them right

13   here.

14           THE COURT:  Do you have the interrogatory issue

15   resolved?

16           MS. LEMOINE:  Yes, I believe so.

17           THE COURT:  Okay.  And Mr. Busch, have you seen

18   them?

19           MR. BUSCH:  I have not.  I specifically asked about

20   one or two issues about the identity of how the defendants

21   were going to be identified, and I did not get an answer to

22   that.

23           MS. LEMOINE:  Your Honor, I think Mr. Busch is

24   confused.  He's talking about the verdict form.  You and I

25   are talking about the instructions.

```
 1              THE COURT:  We're talking about the instructions.
 2              MR. BUSCH:  I'm sorry.
 3              The instructions are fine, Your Honor.
 4              THE COURT:  All right.  Go ahead and take a look at
 5      those.
 6              MR. POMERANTZ:  Your Honor, on the verdict form,
 7      we -- I think the only last disagreement on that -- it's a
 8      pretty simple verdict form -- is whether the actual names of
 9      the defendants are -- and plaintiffs are mentioned.
10      Mr. Busch doesn't want them mentioned, and we decided they
11      should be because, among other things, there is an
12      instruction in the -- in the jury instructions about looking
13      at each defendant individually.
14              THE COURT:  Well, can you agree to just submit the
15      opposing?
16              MR. BUSCH:  The issue, Your Honor, is they have it
17      do you find for the -- that --
18              THE COURT:  That's fine.  That's fine.
19              We'll have some time on these issues.  I'll have
20      them both in front of me, and then you can make your pitch.
21              MR. BUSCH:  Okay.
22              THE COURT:  I don't have them both in front of me
23      right now, so....
24              MR. BUSCH:  All right.
25              THE COURT:  We'll have time to do that.
```

1        MR. BUSCH:  Can I just say one thing about that or

2   not?

3        THE COURT:  Go ahead.

4        MR. BUSCH:  Okay.  When I spoke to Mr. Pomerantz

5   about this issue, he told me that he was not -- they were not

6   going to make an argument to the jury that if you find that

7   Aftermath is liable that you might not find that Interscope

8   is liable.

9        In light of that statement that Mr. Pomerantz made

10  to me, on this point I'm not confused.  I would suggest that

11  this idea that the -- each individual defendant should be

12  listed on one question would be confusing and wrong to the

13  jury because the jury wouldn't -- depending on what

14  Mr. Pomerantz argues, I think it doesn't make any sense,

15  but --

16        THE COURT:  All right.  Let's see how -- when I

17  look at them.

18        Again, I don't want to create busywork.  It doesn't

19  matter to me, but the parties don't mind that the

20  instructions start with Number 2?  That won't be confusing to

21  the jurors?  It doesn't matter to me.  There's an index,

22  but -- I just wanted to be sure that everyone thought about

23  it.

24        MR. POMERANTZ:  Your Honor, we --

25        THE COURT:  We don't get a question, where's

1    Number 1?

2                MR. POMERANTZ:  Yeah.  You know what?  We should

3    probably go back because there's actually an exhibit -- I'm

4    sorry.  An Instruction 25 that is in there that I think we

5    have now agreed should be withdrawn because that is one which

6    had -- I forget how it is worded, but there -- Your Honor,

7    would have had to make certain legal rulings.

8                THE COURT:  Right.

9                That was one that was supposed to be reserved.

10   There was two of them I thought that we talked about.

11               You're talking about 25-A?

12               MR. POMERANTZ:  Yes.

13               And so maybe what we should do is just bring in

14   another set tomorrow morning early before, and we'll have it

15   numbered one through whatever, and we will delete that

16   instruction.

17               MR. BUSCH:  That's fine.

18               THE COURT:  Right.  That should be deleted, 25-A.

19               And wasn't there another one?  I don't have it off

20   the top of my head, but there might be a pitch -- or let me

21   get my list.

22               MR. POMERANTZ:  I think maybe the interrogatory

23   one, Your Honor.  But since we're now putting one into the

24   record, I think that one stays in.

25               THE COURT:  Let me double-check my notes.

```
 1              I have looked at my notes.  What needs to be
 2     done -- a couple of things.
 3              One, Mr. Pomerantz is correct.  I think 25-A needs
 4     to be deleted.  What I'd like to see, two changes.  It
 5     happens in a couple of places, but the jury instructions just
 6     should be numbered sequentially, starting at one and then
 7     without gaps because I don't want a jury note back asking
 8     about are we missing something.
 9              The other thing too, have the parties thought about
10     the use of -- do you really want the -- the -- using the
11     first example.  First, do you really want the index?  That's
12     the first thing.  And it relates to my second question on the
13     jury instructions.
14              Do you really want the summary at the top?  For
15     example, just number on Page 1, duty of jury at the end of
16     the case.  Do you really want that as opposed to just the
17     words of the instruction?
18              I'll defer to the --
19              MR. POMERANTZ:  I think, Your Honor, our preference
20     would be -- and I didn't know if we were using a form that
21     Your Honor had or not.  Our preference would be to have no
22     index and no -- and no headings.
23              THE COURT:  That's typically how I do it.  Unless
24     both sides want to do it some other way, I think we're
25     inviting problems if we --
```

```
 1              MR. BUSCH:  We're fine with that, Your Honor.
 2    We're fine with that.
 3              THE COURT:  Okay.  So the clean set then will
 4    delete the index and delete the -- other than saying Court
 5    Instruction Number 1 and then sequentially numbered.
 6              And then on the -- if you could -- in preparing the
 7    caption, if we can delete the parties and just simply have
 8    the case caption with the -- with the Court's jury
 9    instructions and then delete everything else.
10              And then also at the footer -- and then also delete
11    clean set and then delete the footer, jury instructions,
12    clean set, so that all the jurors have is a blank caption and
13    then the words -- the text of the instructions.
14              Does that make sense?
15              MR. POMERANTZ:  That makes sense, Your Honor.
16              THE COURT:  All right.
17              MR. POMERANTZ:  One other question on jury
18    instructions, Your Honor.
19              If you could look at the Instruction 13.  I hope
20    this is one that Mr. Busch and I will agree on.
21              THE COURT:  It has to also be amended.
22              MR. POMERANTZ:  Which one do you want us to put in?
23              THE COURT:  They will be left -- when you leave
24    here -- well, this is at the end now; so -- let me see if
25    there -- 13 is not relevant anymore.  Shouldn't we just
```

```
 1    delete them?  They've taken notes.
 2            MR. POMERANTZ:  And are we going to tell them that
 3    they should be left in -- I mean, at the end of the day --
 4            THE COURT:  At the end of my instruction and
 5    argument they're going to go back.  I think it should be
 6    deleted.  This is the instruction --
 7            MR. POMERANTZ:  Well, Your Honor, I guess the
 8    question that Ms. LeMoine is raising to me is whether the
 9    second paragraph, which is really saying the --
10            THE COURT:  Right.
11            MR. POMERANTZ:  That seems still pertinent.
12            THE COURT:  That still is pertinent, so....
13            MR. POMERANTZ:  So we'll leave in this instruction.
14            THE COURT:  Whether or not you took notes, you
15    should rely on your own memory of the evidence.
16            MR. POMERANTZ:  That's fine.
17            THE COURT:  Yeah.
18            MR. POMERANTZ:  So we'll get rid of the first
19    paragraph and leave in the second paragraph.
20            THE COURT:  Exactly.
21            MR. POMERANTZ:  Okay.  It's good to have
22    Ms. LeMoine around.
23            All right.  Anything else?
24            THE COURT:  I think that's -- I think we're ready.
25            Then when you have the final clean set, run them by
```

1    Mr. Busch.

2            And then let me know, Mr. Busch, if you -- if there

3    is some last-minute issue with them.  What we'll do is if I

4    can see -- not necessarily -- I will be here at 8:30.

5    Hopefully at 8:30 you can give me back the final set, and

6    we'll have copies made for everyone, and then we'll be ready

7    to go at 9:00 o'clock.

8            What I intend to do is take shorter breaks; so

9    we'll have the 10, 15 minutes of testimony; whether or not

10   you reopen to do the interrogatory.  I'll go right into the

11   preinstruction.  I'll take a break after preinstruction, five

12   or ten minutes, and allow Mr. Busch to set up.  We'll have

13   Mr. Busch's statement.  Take about a real short, five- to

14   ten-minute break again, allow Mr. Pomerantz to set up.  You

15   give your statement, and then we'll take, again, a short,

16   five-minute break, and then we'll have final closing.

17           And we're going to go straight through.  We

18   won't -- and then if it takes us to 1:00 o'clock or 1:30,

19   we're just going to go straight through, and then the jurors

20   can decide if they want to go to lunch first or if they want

21   to order in, whatever they want to do.

22           MR. POMERANTZ:  That would be great, Your Honor.

23           THE COURT:  And let me go ahead and return the set

24   of jury instructions and -- all I'll need tomorrow, then, is

25   the clean set.  I won't need three versions.  I'll just need

 1     the one clean set that everybody has agreed to.

 2             MR. BUSCH:  Your Honor, the other thing is -- just

 3     two more things.

 4             One is we have the summary chart binder.

 5             THE COURT:  Hold on one second.  Let me keep the

 6     one that I wrote the notes on so I can compare it to the

 7     changes.  Let me just keep the one set.  Okay.

 8             MR. BUSCH:  The summary chart binder for the jury.

 9             THE COURT:  We've marked it.

10             MR. BUSCH:  It's 964.

11             THE COURT:  All right.  So submit that to

12     Ms. Hernandez.

13             MR. BUSCH:  And then I had asked for Mr. Cohen's

14     exhibits, expert reports, and information to be marked for

15     identification as exhibits.  They're all on the exhibit list.

16             THE COURT:  Go ahead and premark them and submit

17     them to Ms. Hernandez, and they'll be marked and part of the

18     record.

19             You're not moving to admit them?

20             MR. BUSCH:  Just for identification.

21             THE COURT:  Okay.  All right.  Just make sure you

22     get those to Ms. Hernandez.

23             MR. BUSCH:  As well as the two -- as well as the

24     two demonstratives that were used as part of Mr. Cohen's

25     presentation.

1          THE COURT:  That's fine.  Just as long as they're

2     just marked.

3          MR. BUSCH:  Thank you.

4          THE COURT:  All right.  We'll see you tomorrow.

5          (Whereupon proceedings were concluded 6:18 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,474,270** [1] - 34:19
**$1.474** [1] - 34:11
**$10** [1] - 107:9
**$120,000** [1] - 37:12
**$159,000** [3] - 56:24, 169:22, 171:9
**$159,332** [2] - 58:4, 59:19
**$160,000** [1] - 29:4
**$20** [1] - 53:3
**$21,125,406** [1] - 56:11
**$260,000** [1] - 35:12
**$290,000** [1] - 37:1
**$360,000** [2] - 36:14, 37:5
**$360,692** [1] - 70:10
**$5** [1] - 166:8
**$512,000** [1] - 54:25

**'**

**'01** [1] - 56:12
**'04** [2] - 154:13, 154:14
**'07** [1] - 56:13
**'91** [2] - 88:13, 88:19
**'92** [2] - 88:13, 88:19
**'93** [1] - 88:25
**'98** [13] - 92:23, 99:4, 107:11, 115:2, 116:11, 144:21, 170:10, 171:21, 172:4, 172:21, 173:23, 177:7, 177:20
**'99** [1] - 90:3

**0**

**07-3314-PSG** [1] - 1:8

**1**

**1** [6] - 63:14, 78:8, 98:22, 181:1, 182:15, 183:5
**1.3** [1] - 37:13
**1.474** [1] - 35:25
**1.5** [2] - 37:18, 37:19
**10** [8] - 63:11, 63:12, 63:16, 92:22, 152:23, 164:12, 185:9
**100** [1] - 156:22
**103** [2] - 49:8, 50:9
**104** [2] - 49:8, 50:9
**109** [1] - 3:12
**11893** [1] - 1:23

**11th** [3] - 30:15, 34:16, 35:8
**12** [5] - 33:7, 78:1, 78:8, 94:25, 172:15
**120** [1] - 3:12
**123-A** [7] - 3:13, 163:22, 164:1, 164:2, 164:3, 167:17, 167:22
**123A** [1] - 158:3
**127** [3] - 156:25, 160:18, 167:21
**128** [1] - 3:8
**129** [6] - 3:12, 51:20, 120:9, 120:15, 120:18, 139:22
**13** [3] - 99:5, 183:19, 183:25
**130** [2] - 33:4, 51:21
**1330** [1] - 4:1
**13685** [2] - 60:4, 60:15
**14** [3] - 33:20, 78:2, 78:8
**15** [11] - 25:6, 82:16, 82:20, 87:13, 92:14, 94:25, 129:1, 152:23, 154:10, 155:17, 185:9
**15-minute** [1] - 82:16
**159** [2] - 59:6, 169:24
**159,332** [1] - 57:2
**15th** [1] - 78:13
**16** [3] - 92:14, 99:5, 111:12
**160** [2] - 132:2, 132:3
**164** [1] - 3:13
**169** [1] - 178:4
**17** [4] - 51:21, 59:25, 60:4, 92:22
**18** [3] - 60:1, 60:4, 114:23
**18.2** [1] - 33:11
**181-K** [1] - 1:24
**19** [1] - 149:2
**1983** [1] - 24:20
**1985** [1] - 24:21
**1988** [1] - 87:20
**1998** [6] - 8:17, 9:4, 45:4, 46:16, 47:8, 172:15
**1999** [1] - 26:21
**1:00** [1] - 185:18
**1:30** [1] - 185:18

**2**

**2** [8] - 47:14, 53:10, 53:15, 54:18, 67:9, 171:4, 171:6, 180:20
**2.6** [1] - 55:14
**20** [4] - 33:9, 114:24,

127:11, 127:15
**2000** [17] - 31:19, 45:6, 92:23, 171:17, 171:18, 171:19, 171:22, 172:4, 172:12, 172:13, 172:17, 172:20, 172:24, 177:6, 177:9, 177:20
**2001** [3] - 26:21, 27:10, 52:25
**2002** [7] - 26:20, 27:15, 28:2, 54:7, 54:15, 56:9, 129:10
**2003** [19] - 8:17, 8:20, 9:5, 35:2, 45:8, 47:14, 63:16, 90:16, 90:19, 92:23, 93:9, 154:15, 170:10, 172:12, 172:18, 172:24, 173:4, 174:18
**2004** [10] - 27:19, 30:15, 34:16, 34:22, 35:2, 35:4, 35:5, 45:10, 92:24, 168:23
**2005** [3] - 28:2, 28:3, 43:9
**2006** [3] - 29:13, 40:23, 41:2
**2007** [1] - 29:15
**2008** [17] - 30:10, 30:15, 34:16, 35:8, 75:8, 77:22, 79:11, 85:2, 85:5, 85:8, 85:19, 91:24, 92:2, 92:3, 137:8, 137:12, 137:14
**2009** [3] - 1:20, 4:1, 68:8
**207** [2] - 59:21, 59:24
**21** [1] - 3:4
**211** [1] - 43:3
**213** [1] - 1:25
**22** [1] - 51:20
**220** [1] - 14:24
**23** [3] - 3:4, 67:10, 79:23
**24** [3] - 3:5, 46:23, 132:3
**25** [2] - 27:1, 181:4
**25-A** [3] - 181:11, 181:18, 182:3
**255** [1] - 1:24
**25th** [3] - 75:8, 78:15, 85:19
**26** [3] - 149:20, 149:25, 167:23
**280** [3] - 14:24, 15:1, 15:2
**28th** [3] - 85:2, 85:5,

85:8
**295,000** [1] - 37:6
**29th** [1] - 166:2
**2nd** [1] - 166:2

**3**

**3** [2] - 79:22, 83:11
**30** [3] - 13:23, 33:3, 54:7
**30(b)(6** [1] - 164:13
**30th** [2] - 28:2, 54:15
**31** [1] - 26:21
**315** [1] - 2:4
**35** [1] - 33:19
**355** [1] - 2:11
**360,000** [1] - 70:11
**37201** [1] - 2:5
**38** [1] - 3:5
**3:15** [1] - 84:1
**3:30** [1] - 84:1
**3rd** [4] - 103:14, 103:15, 103:16

**4**

**4** [8] - 1:20, 3:3, 4:1, 14:24, 15:3, 15:4, 15:6, 15:8
**4(a** [12] - 9:9, 10:9, 17:20, 18:21, 20:23, 44:3, 44:7, 73:19, 107:11, 115:1, 125:10, 169:6
**4(c)(v** [14] - 17:20, 19:7, 20:24, 21:23, 22:5, 22:11, 116:10, 125:10, 144:20, 144:21, 146:3, 146:11, 146:15, 172:3
**4-C** [1] - 11:25, 44:11
**40** [4] - 33:13, 33:19, 155:5, 155:9
**400,000** [1] - 34:13
**49** [1] - 148:23
**4:00** [2] - 83:12, 83:13

**5**

**5** [8] - 1:18, 49:8, 50:9, 79:22, 92:22, 144:20, 166:9, 166:14
**5-A** [1] - 169:7
**50** [17] - 9:17, 22:14, 34:8, 35:15, 43:16, 62:6, 62:18, 62:25, 66:11, 78:17, 127:17, 153:22, 154:7, 155:3, 155:9, 155:10, 156:7
**500** [4] - 25:8, 54:5,

85:8
**295,000** [1] - 37:6
**29th** [1] - 166:2
**2nd** [1] - 166:2

**54:18**, 167:19
**514** [2] - 151:10, 154:10
**515** [1] - 151:10
**541** [1] - 151:11
**567** [1] - 151:11
**572** [1] - 151:11
**573** [1] - 151:11
**580** [1] - 151:11
**582** [1] - 151:11
**583** [1] - 151:11
**5:07** [1] - 149:13
**5:21** [1] - 149:13

**6**

**6** [2] - 75:14, 98:22
**60** [2] - 155:6, 155:9
**600** [1] - 167:19
**602** [1] - 151:11
**603** [1] - 151:11
**604** [1] - 151:11
**65** [2] - 78:1, 78:8
**673** [1] - 151:11
**677** [1] - 151:11
**687** [1] - 151:12
**688** [1] - 151:12
**6:18** [1] - 187:5

**7**

**7** [5] - 49:8, 50:9, 63:12, 63:16, 67:9
**7.28** [1] - 33:14
**70** [1] - 33:18
**700** [1] - 167:19
**705** [1] - 151:12
**706** [1] - 151:12
**707** [1] - 151:12
**711** [1] - 151:12
**777** [2] - 129:7, 129:18
**790** [4] - 150:20, 150:22, 150:23, 150:25

**8**

**8** [1] - 33:8
**80** [1] - 67:9
**800** [5] - 159:17, 159:21, 163:9, 167:20
**84** [1] - 3:6
**85** [1] - 46:23
**86** [3] - 3:6, 3:7, 46:23
**87** [1] - 3:8
**880** [1] - 157:25
**882** [2] - 157:23, 158:1

**885** [2] - 157:23, 158:1
**886** [1] - 158:1
**887** [1] - 158:1
**888** [1] - 158:1
**889** [1] - 158:1
**890** [1] - 158:1
**894-2853** [1] - 1:25
**899** [1] - 158:2
**8:30** [2] - 185:4, 185:5
**8:46** [1] - 149:7

### 9

**9** [6] - 46:16, 46:24, 47:8, 76:6, 92:22, 132:2
**90** [1] - 150:21
**900** [3] - 159:17, 163:9, 167:20
**900,000** [1] - 37:17
**90012** [1] - 1:24
**90071** [2] - 2:13
**929** [5] - 3:12, 108:16, 109:1, 109:3, 109:10
**938** [1] - 158:3
**957** [1] - 158:3
**964** [1] - 186:10
**9:00** [2] - 148:8, 185:7

### A

**A&R** [3] - 91:9, 93:25, 101:4
**ability** [4] - 16:17, 16:24, 97:18
**able** [6] - 24:23, 152:22, 153:21, 155:23, 156:10, 160:15
**absent** [1] - 13:9
**absolutely** [3] - 16:10, 65:17, 171:9
**Absolutely** [4] - 19:8, 21:1, 21:11, 73:17
**abuse** [1] - 148:25
**accept** [1] - 130:21
**acceptable** [2] - 83:24, 166:25
**Accepted** [1] - 174:19
**accepted** [2] - 26:5, 29:19
**access** [1] - 145:10
**accommodate** [1] - 83:14
**accommodation** [1]

- 107:1
**according** [1] - 177:15
**account** [19] - 57:14, 57:16, 58:5, 58:16, 58:17, 58:20, 59:5, 59:8, 70:10, 97:11, 126:20, 143:6, 155:9, 155:10, 157:3, 160:25, 162:3, 164:23, 178:2
**accountant** [6] - 24:12, 24:15, 24:23, 39:16, 39:18, 166:13
**accounted** [4] - 49:3, 49:19, 126:22, 127:2
**accounting** [6] - 24:20, 25:1, 167:11, 173:2, 177:15, 177:16
**Accounting** [1] - 81:7
**accounts** [1] - 57:12
**accrual** [1] - 165:7
**accrued** [6] - 43:16, 162:5, 164:24, 166:3, 166:23, 167:10
**accrues** [1] - 165:5
**accruing** [1] - 166:9
**accurate** [6] - 25:22, 77:13, 77:19, 139:14, 139:18, 177:15
**accusation** [1] - 159:6
**Acknowledge** [1] - 174:22
**acknowledges** [1] - 172:25
**acquired** [2] - 177:12, 177:22
**Act** [2] - 13:22, 16:23
**acting** [1] - 90:25
**action** [8] - 56:21, 61:13, 61:14, 168:7, 169:13, 169:20, 170:5, 170:13
**actions** [3] - 14:19, 15:12, 15:19
**active** [1] - 140:4
**activities** [1] - 103:2
**actual** [5] - 32:1, 151:24, 164:19, 166:3, 179:8
**add** [10] - 37:2, 37:12, 38:3, 55:24, 156:22, 163:15, 163:17, 178:3, 178:5, 178:7
**added** [4] - 37:10, 38:1, 95:8, 160:16
**addition** [2] - 86:14,

173:5
**additional** [6] - 20:18, 86:15, 89:23, 97:19, 148:19, 148:24
**address** [4] - 156:15, 158:25, 171:4, 172:6
**Address** [1] - 171:4
**addressed** [1] - 28:14
**addressing** [1] - 121:10
**adds** [1] - 156:7
**adequate** [1] - 106:10
**adjourn** [1] - 147:23
**admissible** [2] - 23:13, 169:9
**admission** [7] - 159:10, 161:15, 164:6, 164:11, 164:16
**admit** [1] - 186:19
**admitted** [15] - 54:1, 109:4, 120:16, 149:15, 150:25, 152:3, 153:2, 153:16, 153:18, 154:2, 164:2, 167:17, 167:22, 171:10
**Admitted** [1] - 109:9
**adopted** [3] - 161:15, 164:11, 164:16
**advance** [1] - 104:22
**advances** [2] - 59:2, 94:20
**advise** [2] - 45:16, 149:21
**advocate** [2] - 40:1, 40:3
**advocating** [2] - 40:10, 42:12
**affairs** [11] - 87:6, 89:13, 89:20, 89:22, 90:4, 90:6, 91:10, 92:5, 92:10, 92:12, 94:5
**affect** [1] - 171:20
**AFTERMATH** [2] - 1:10, 2:10
**Aftermath** [45] - 12:23, 31:18, 32:3, 42:2, 51:11, 52:19, 53:8, 53:21, 54:13, 58:4, 58:9, 58:15, 58:24, 59:10, 59:11, 59:18, 60:12, 61:5, 62:14, 63:8, 66:19, 73:9, 73:14, 156:8, 170:21, 170:22, 170:25, 173:6, 173:22, 173:23,

174:2, 174:8, 174:20, 174:25, 175:6, 175:11, 175:17, 175:18, 176:5, 176:13, 176:22, 176:25, 177:13, 177:23, 180:7
**Aftermath's** [7] - 62:24, 63:3, 68:11, 126:13, 173:19, 175:6, 176:21
**afternoon** [7] - 4:5, 4:10, 4:11, 38:10, 87:3, 87:4, 128:14
**afterwards** [2] - 93:7, 163:15
**ago** [11] - 36:16, 80:18, 81:2, 102:25, 103:2, 106:6, 111:2, 118:21, 131:1, 131:6, 144:23
**agree** [11] - 6:12, 51:5, 51:8, 56:16, 61:3, 69:10, 72:11, 97:7, 146:10, 179:14, 183:20
**agreed** [13] - 42:6, 44:18, 44:23, 60:17, 60:19, 60:22, 65:22, 66:8, 152:4, 174:19, 174:22, 181:5, 186:1
**Agreed** [1] - 44:20
**agreeing** [3] - 131:19, 131:20, 177:10
**agreement** [90] - 7:4, 8:20, 9:4, 9:5, 11:1, 11:19, 14:2, 14:17, 23:7, 36:9, 44:7, 44:15, 45:4, 45:8, 46:16, 47:8, 47:14, 48:11, 48:14, 48:17, 48:21, 49:2, 49:5, 49:17, 49:23, 50:3, 51:3, 55:4, 63:1, 63:6, 63:16, 65:8, 65:12, 65:13, 66:1, 92:23, 95:9, 99:5, 100:8, 107:11, 107:21, 114:12, 114:17, 115:2, 116:11, 121:15, 130:8, 130:17, 130:20, 131:12, 131:22, 132:15, 132:19, 132:25, 134:25, 135:4, 137:22, 141:1, 142:15, 144:21, 146:9, 146:11, 147:1, 157:20, 160:15,

170:10, 170:25, 171:21, 172:4, 172:12, 172:15, 172:16, 172:18, 172:21, 172:24, 173:1, 173:4, 173:23, 174:18, 174:25, 175:8, 175:9, 175:10, 176:13, 176:19, 177:5, 177:7, 177:21
**agreements** [60] - 8:18, 8:19, 8:21, 11:1, 13:18, 13:24, 35:14, 45:2, 45:12, 45:14, 45:18, 45:25, 47:21, 47:25, 48:4, 48:7, 50:3, 50:15, 52:19, 52:23, 53:3, 63:8, 68:25, 73:17, 73:20, 89:16, 89:17, 91:14, 92:16, 92:20, 93:4, 93:8, 95:24, 97:6, 126:23, 129:24, 134:6, 134:9, 134:17, 134:24, 136:9, 136:13, 137:21, 138:1, 142:10, 152:12, 152:18, 153:16, 153:18, 158:15, 159:3, 159:7, 159:16, 159:20, 160:1, 160:9, 169:7, 172:22, 173:5
**agrees** [1] - 61:6
**ahead** [12] - 61:21, 80:7, 80:22, 82:15, 82:22, 122:7, 168:5, 169:18, 179:4, 180:3, 185:23, 186:16
**aid** [1] - 34:2
**Aimee** [1] - 83:11
**AL** [2] - 1:10, 2:10
**album** [54] - 6:25, 8:1, 19:22, 20:4, 20:24, 31:2, 31:5, 31:16, 31:23, 33:8, 33:16, 37:10, 37:12, 71:15, 71:17, 71:18, 71:19, 72:13, 72:21, 94:18, 94:19, 94:25, 98:25, 99:1, 99:19, 99:20, 102:23, 102:25, 103:15, 103:16, 105:5, 111:15, 111:16, 112:19, 112:21, 112:25, 113:3, 113:8, 113:17, 114:4, 114:21, 127:10, 127:12, 127:14,

127:15, 169:2, 170:6, 170:9, 172:2
**albums** [18] - 6:23, 7:5, 7:7, 7:9, 35:11, 36:17, 94:17, 102:23, 111:18, 112:15, 112:19, 114:19, 117:7, 135:21
**Alela** [1] - 112:1
**allegation** [2] - 159:6, 175:5
**allegations** [1] - 178:1
**allocation** [6] - 28:18, 29:2, 29:17, 29:24, 29:25, 128:2
**allow** [6] - 37:15, 106:8, 106:25, 155:22, 185:12, 185:14
**allowed** [3] - 17:1, 23:10, 108:2
**allows** [2] - 106:13, 173:24
**almost** [3] - 17:2, 87:9, 92:14
**alongside** [1] - 173:6
**Amazon** [7] - 18:16, 18:23, 20:24, 104:19, 105:16, 106:3, 121:1
**Amazon.com** [13] - 18:2, 18:7, 18:12, 18:20, 19:2, 19:6, 19:20, 20:14, 20:23, 115:13, 141:19, 142:10, 142:11
**ambiguity** [1] - 168:22
**amended** [2] - 68:8, 183:21
**amending** [1] - 130:16
**amendment** [4] - 45:10, 92:24, 157:20, 168:23
**amends** [3] - 172:21, 177:7, 177:20
**Amoeba** [1] - 103:16
**amount** [43] - 4:22, 6:22, 32:2, 32:18, 33:22, 34:8, 35:9, 35:10, 35:19, 36:12, 36:21, 37:10, 42:15, 42:17, 43:20, 54:20, 54:25, 55:3, 55:6, 55:7, 55:13, 55:17, 55:24, 56:11, 56:15, 56:23, 58:12, 58:13, 58:17, 59:6, 62:6, 62:13, 67:2, 70:8,

107:8, 127:21, 127:22, 156:19, 156:21, 175:6, 176:12, 176:20
**amounts** [6] - 55:22, 56:8, 66:18, 67:13, 67:19, 68:11
**ample** [1] - 173:18
**analysis** [9] - 25:19, 30:20, 31:24, 32:24, 37:15, 38:14, 39:3, 39:9, 74:24
**Angeles** [1] - 89:1
**ANGELES** [4] - 1:19, 1:24, 2:12, 4:1
**ANSWER** [23] - 47:10, 47:12, 47:15, 47:17, 52:3, 52:8, 52:12, 52:14, 52:16, 67:17, 67:22, 67:25, 68:2, 78:11, 80:4, 80:6, 81:2, 81:4, 81:7, 81:12, 81:16, 132:13, 132:21
**answer** [10] - 49:2, 49:20, 80:10, 133:18, 133:25, 144:14, 149:22, 150:2, 162:9, 178:21
**answered** [1] - 149:4
**anticipate** [1] - 82:23
**Anytime** [1] - 91:17
**apparent** [2] - 51:17, 168:14
**appear** [3] - 54:12, 85:22, 142:14
**Apple** [28] - 14:17, 14:19, 15:10, 15:11, 15:14, 15:18, 16:3, 16:16, 16:20, 16:21, 17:8, 17:9, 18:17, 22:10, 23:8, 48:15, 109:15, 110:18, 112:2, 115:18, 124:14, 140:12, 140:16, 141:10, 143:15, 143:18, 144:1, 144:15
**Apple's** [1] - 110:19
**applicable** [1] - 16:25
**applied** [3] - 41:21, 47:24, 96:10
**applies** [18] - 9:10, 9:15, 10:2, 10:4, 20:23, 20:24, 33:18, 39:5, 41:6, 41:17, 62:5, 65:14, 116:18, 124:6, 124:20, 125:15, 126:17,

170:14
**apply** [12] - 22:9, 22:11, 44:3, 44:7, 44:11, 66:13, 116:3, 125:10, 146:11, 170:14, 175:11, 175:12
**appreciate** [1] - 61:21
**approach** [5] - 22:25, 23:24, 38:6, 75:2, 86:24
**appropriate** [3] - 70:14, 168:4, 172:23
**appropriately** [1] - 178:2
**approve** [1] - 91:17
**approximate** [1] - 39:2
**area** [2] - 17:12, 168:17
**argue** [2] - 167:3, 167:14
**argues** [1] - 180:14
**argument** [5] - 150:8, 150:10, 155:21, 180:6, 184:5
**arguments** [2] - 148:2, 167:4
**arrangements** [1] - 125:1
**arrow** [1] - 113:10
**art** [6] - 20:3, 20:4, 20:6, 20:10, 20:15, 99:1
**articulate** [1] - 132:15
**artist** [57] - 5:25, 20:1, 20:2, 25:21, 26:1, 31:17, 32:7, 32:8, 33:10, 36:3, 51:14, 60:2, 60:3, 60:9, 60:15, 70:18, 91:17, 93:15, 93:17, 94:4, 94:6, 94:7, 94:11, 94:17, 94:22, 95:4, 95:5, 95:16, 95:17, 96:6, 98:21, 101:3, 101:8, 101:13, 101:17, 101:23, 103:25, 109:21, 110:19, 112:5, 114:16, 114:22, 114:25, 119:16, 121:13, 127:11, 127:14, 127:16, 157:3, 166:1, 166:4, 166:10, 166:14, 166:16, 167:9, 167:13
**artist's** [3] - 104:7,

160:25, 162:3
**artists** [21] - 5:8, 24:13, 25:9, 25:10, 25:11, 25:16, 26:6, 36:3, 89:25, 93:11, 94:1, 94:3, 97:13, 98:21, 102:1, 102:6, 113:23, 116:7, 119:10, 129:24, 173:3
**Artists** [1] - 66:9
**artists's** [2] - 162:19, 162:20
**artwork** [9] - 98:9, 98:19, 106:18, 111:16, 112:23, 113:21, 113:22, 135:12, 145:15
**Ary** [8] - 173:10, 174:5, 174:6, 174:9, 175:17, 176:9, 178:9
**aside** [4] - 6:3, 6:10, 48:3, 175:17
**aspects** [1] - 91:8
**assigned** [2] - 27:1, 110:15
**assignment** [3] - 26:25, 27:3, 173:23
**associate** [4] - 89:5, 89:12, 89:19, 112:11
**assume** [4] - 18:11, 57:17, 69:8, 173:24
**assumes** [1] - 173:4
**assuming** [1] - 8:1
**Assuming** [1] - 146:8
**assumption** [3] - 39:4, 39:8, 77:4
**assure** [1] - 71:7
**assured** [1] - 139:16
**attached** [1] - 114:22
**attempted** [1] - 163:15
**attention** [2] - 54:5, 75:14
**attorney** [4] - 46:2, 50:2, 79:1
**attorneys** [3] - 78:21, 78:23, 79:1
**attributable** [1] - 64:2
**audio** [1] - 97:2
**audit** [28] - 25:2, 25:3, 26:20, 27:7, 27:8, 27:10, 27:20, 27:24, 27:25, 28:1, 28:3, 28:5, 28:8, 28:15, 29:1, 29:11, 29:14, 40:4, 40:8, 40:20, 41:4, 41:13, 43:25, 48:5, 48:14,

59:11, 61:12, 169:23
**auditing** [1] - 25:23
**auditor** [2] - 52:18, 75:22
**audits** [9] - 24:13, 24:24, 25:7, 25:18, 39:20, 39:22, 39:25, 64:24
**authentication** [1] - 161:13
**authority** [1] - 122:15
**authorization** [2] - 118:12, 118:14
**automatically** [1] - 104:24
**available** [3] - 103:18, 123:11, 141:2
**AVENUE** [1] - 2:11
**avoid** [1] - 163:5
**aware** [11] - 18:15, 20:10, 35:21, 36:19, 77:8, 117:18, 117:20, 117:24, 118:7, 130:18, 130:19
**awareness** [1] - 102:10

**B**

**bachelor** [1] - 24:19
**background** [3] - 24:18, 39:15, 77:14
**backing** [1] - 70:13
**BAIRD** [1] - 1:23
**bar** [1] - 113:12
**Bareilles** [1] - 109:22
**base** [1] - 34:9
**based** [9] - 23:11, 32:21, 34:3, 37:14, 65:11, 77:15, 124:15, 128:25, 146:18
**basic** [7] - 68:10, 91:20, 94:8, 94:12, 94:13, 94:24, 175:10
**basing** [1] - 77:19
**basis** [7] - 30:16, 32:14, 53:8, 68:17, 76:22, 151:20, 173:14
**Beach** [1] - 25:14
**bear** [5] - 36:3, 66:9, 70:18, 72:2, 73:12
**bearing** [4] - 31:24, 73:9, 73:11, 125:10
**bears** [1] - 72:6
**Beatles** [1] - 25:12
**became** [7] - 25:3, 89:20, 89:21, 90:3, 93:5, 93:8, 100:4
**become** [2] - 77:8,

101:13
  **becoming** [1] - 117:9
  **began** [3] - 34:22,
  151:21, 160:12
  **begin** [1] - 26:18
  **beginning** [3] -
  30:15, 90:16, 90:19
  **begins** [1] - 139:21
  **behalf** [3] - 25:10,
  27:25, 29:5
  **BEHALF** [2] - 2:3,
  2:9
  **behind** [1] - 50:19
  **belabored** [1] -
  156:11
  **believes** [1] - 50:18
  **below** [1] - 111:24
  **belt** [3] - 157:13,
  157:17, 163:18
  **Berkeley** [2] - 87:18,
  87:19
  **Berman** [19] - 4:10,
  4:12, 12:4, 13:5,
  13:11, 15:18, 21:6,
  21:7, 21:12, 50:17,
  68:22, 69:2, 69:13,
  81:13, 100:3, 114:1,
  123:20, 124:13,
  164:24
  **Berman's** [2] - 23:4,
  125:3
  **best** [6] - 40:5, 40:6,
  40:7, 40:11, 77:15,
  132:15
  **Best** [9] - 7:23, 8:12,
  104:9, 104:15,
  114:14, 118:2,
  123:16, 166:7, 167:9
  **between** [30] - 18:17,
  23:8, 26:6, 37:17,
  48:10, 48:15, 48:17,
  48:21, 49:18, 60:6,
  60:8, 63:8, 65:3, 68:8,
  96:2, 98:14, 112:4,
  124:14, 125:6, 134:9,
  135:13, 136:9,
  136:13, 145:12,
  146:9, 155:5, 161:1,
  174:1, 174:2, 175:10
  **Between** [1] - 18:18
  **big** [4] - 96:7,
  100:23, 101:7, 104:14
  **bigger** [7] - 43:1,
  89:24, 111:1, 112:17,
  112:18
  **biggest** [1] - 88:8
  **bin** [1] - 104:7
  **Binder** [3] - 53:10,
  53:15, 63:14
  **binder** [6] - 54:6,

55:11, 63:12, 63:13,
186:4, 186:8
  **binders** [1] - 42:22
  **Bing** [2] - 25:14,
  26:11
  **bit** [7] - 4:21, 5:11,
  18:19, 68:19, 83:2,
  89:3, 137:3
  **Black** [1] - 25:13
  **BlackBerry** [1] - 98:8
  **blank** [1] - 183:12
  **Blue** [1] - 140:19
  **blue** [1] - 113:12
  **book** [5] - 59:22,
  59:23, 165:6, 167:8,
  167:9
  **booking** [1] - 102:7
  **booklet** [6] - 19:14,
  20:17, 20:21, 98:9,
  114:2, 114:3
  **books** [5] - 77:14,
  162:5, 166:8, 167:12
  **Borders** [1] - 123:17
  **boss** [2] - 128:21,
  128:22
  **botch** [1] - 80:11
  **bottom** [10] - 9:14,
  15:4, 15:6, 34:2,
  34:11, 34:18, 54:20,
  75:16, 111:20, 111:22
  **bottom-line** [1] -
  34:2
  **bought** [9] - 5:21,
  8:1, 19:5, 19:20,
  20:15, 20:22, 20:24,
  99:19, 114:13
  **box** [6] - 109:21,
  109:22, 109:23,
  110:24, 111:6, 111:20
  **boxes** [4] - 109:17,
  109:25, 110:6, 110:10
  **Boys** [1] - 25:14
  **breach** [1] - 168:9
  **breached** [1] -
  172:22
  **break** [7] - 4:17,
  38:2, 82:16, 83:13,
  185:11, 185:14,
  185:16
  **breaks** [1] - 185:8
  **briefly** [6] - 24:17,
  24:23, 40:21, 41:15,
  93:15, 105:2
  **bring** [8] - 38:11,
  42:19, 54:18, 62:1,
  63:15, 79:25, 110:18,
  181:13
  **broad** [1] - 5:11
  **broadcasters** [4] -
  119:7, 119:9, 119:13,

121:15
  **broadcasting** [3] -
  119:10, 119:14,
  119:16
  **broader** [1] - 7:25
  **brought** [2] - 54:3,
  158:22
  **Brownback** [1] -
  138:20
  **bucks** [1] - 167:8
  **Buddy** [1] - 97:14
  **budget** [1] - 125:22
  **build** [2] - 77:15,
  140:21
  **building** [1] - 101:18
  **built** [1] - 77:3
  **bunch** [3] - 15:5,
  123:23, 151:21
  **burden** [1] - 73:13
  **Burling** [3] - 88:3,
  88:4, 88:11
  **burn** [1] - 113:19
  **Busch** [36] - 38:12,
  40:21, 64:19, 68:21,
  74:10, 83:18, 83:24,
  84:2, 118:21, 118:24,
  120:1, 128:1, 148:25,
  149:6, 149:14,
  152:10, 154:22,
  155:1, 155:15,
  161:22, 162:2, 162:8,
  163:12, 163:18,
  167:24, 171:3,
  175:13, 176:15,
  176:16, 178:17,
  178:23, 179:10,
  183:20, 185:1, 185:2,
  185:12
  **BUSCH** [117] - 2:3,
  21:5, 21:23, 21:24,
  22:20, 23:15, 23:19,
  23:25, 24:2, 26:13,
  26:16, 26:17, 37:22,
  37:24, 38:4, 46:20,
  46:22, 46:25, 49:9,
  83:25, 84:3, 84:5,
  85:11, 85:14, 85:16,
  86:1, 86:6, 86:13,
  86:16, 93:18, 109:8,
  128:3, 128:6, 128:8,
  128:10, 128:12,
  129:7, 129:8, 132:2,
  132:5, 132:8, 132:22,
  139:20, 139:23,
  139:24, 141:14,
  141:20, 142:25,
  143:3, 144:20,
  144:22, 147:22,
  149:9, 149:16,
  149:20, 150:9,

150:13, 150:18,
151:4, 151:9, 152:12,
152:16, 152:20,
153:4, 153:14,
153:17, 154:3,
154:15, 154:17,
155:19, 156:2,
156:18, 156:24,
157:6, 157:9, 157:12,
157:16, 157:19,
157:23, 158:1, 158:6,
158:13, 158:18,
159:2, 159:14,
159:19, 160:5,
160:21, 161:7,
161:10, 164:9, 165:9,
166:22, 167:16,
167:25, 171:6, 172:9,
173:11, 174:6, 177:6,
178:6, 178:19, 179:2,
179:16, 179:21,
179:24, 180:1, 180:4,
181:17, 183:1, 186:2,
186:8, 186:10,
186:13, 186:20,
186:23, 187:3
  **Busch's** [1] - 185:13
  **business** [22] -
  24:24, 81:11, 81:13,
  87:6, 89:12, 89:20,
  89:22, 90:3, 90:5,
  90:19, 91:9, 91:10,
  92:5, 92:10, 92:12,
  92:13, 92:15, 94:5,
  115:24, 126:21,
  127:18, 141:5
  **busywork** [1] -
  180:18
  **button** [1] - 113:9
  **buy** [15] - 5:14, 7:20,
  7:24, 8:4, 11:9, 18:2,
  19:1, 20:14, 103:6,
  103:18, 103:21,
  104:21, 113:3, 113:9
  **Buy** [8] - 7:23, 8:12,
  104:9, 104:15,
  114:14, 123:16,
  166:7, 167:9
  **buying** [8] - 11:6,
  11:10, 11:12, 15:23,
  18:25, 98:24, 101:17,
  108:12
  **buys** [4] - 11:9, 17:1,
  18:20, 166:8
  **buzz** [1] - 101:19
  **BY** [48] - 2:10, 4:9,
  12:2, 17:21, 21:5,
  21:24, 24:2, 26:17,
  38:9, 39:14, 42:21,
  43:24, 47:18, 49:16,

150:13, 150:18,
151:4, 151:9, 152:12,
152:16, 152:20,
153:4, 153:14,
153:17, 154:3,
154:15, 154:17,
155:19, 156:2,
156:18, 156:24,
157:6, 157:9, 157:12,
157:16, 157:19,
157:23, 158:1, 158:6,
158:13, 158:18,
159:2, 159:14,
159:19, 160:5,
160:21, 161:7,
161:10, 164:9, 165:9,
166:22, 167:16,
167:25, 171:6, 172:9,
173:11, 174:6, 177:6,
178:6, 178:19, 179:2,
179:16, 179:21,
179:24, 180:1, 180:4,
181:17, 183:1, 186:2,
186:8, 186:10,
186:13, 186:20,
186:23, 187:3

                    **C**

  **C-o-h-e-n** [1] - 23:23
  **C.D** [2] - 20:5, 103:9
  **C.O.O** [1] - 91:5
  **C.P.A** [1] - 24:21
  **C.S.I** [3] - 116:2,
  116:6, 116:8
  **C.V** [1] - 144:20
  **calculate** [3] - 62:11,
  73:25, 74:5
  **calculated** [1] - 70:8
  **calculation** [26] -
  30:22, 31:6, 32:1,
  32:21, 33:17, 34:3,
  34:14, 34:18, 36:12,
  36:18, 36:22, 38:18,
  61:15, 61:18, 61:23,
  62:5, 62:20, 65:10,
  65:21, 66:17, 73:24,
  73:25, 74:6, 74:7,
  76:14, 77:19
  **calculations** [7] -
  30:16, 65:10, 65:11,
  66:13, 74:9, 151:20,
  154:13
  **CALIFORNIA** [5] -
  1:2, 1:19, 1:24, 2:12,
  4:1
  **California** [1] - 173:6
  **cannot** [3] - 134:14,
  155:16, 171:11
  **capacity** [1] - 92:5
  **caption** [3] - 183:7,
  183:8, 183:12
  **capture** [1] - 116:25
  **card** [1] - 123:9
  **cardboard** [1] -
  104:6
  **careful** [1] - 160:8
  **caregiver** [1] - 83:6
  **cares** [1] - 163:6
  **Carlos** [1] - 25:13
  **carryover** [1] - 75:16
  **case** [105] - 19:13,

19:21, 20:9, 22:6, 26:23, 28:13, 28:15, 30:5, 30:9, 31:3, 32:8, 33:14, 35:18, 36:16, 37:16, 38:19, 39:23, 40:21, 45:3, 46:5, 54:2, 56:21, 60:3, 62:2, 70:16, 70:22, 71:19, 72:20, 72:24, 73:8, 73:24, 74:17, 74:20, 74:23, 75:7, 76:3, 76:5, 77:9, 77:12, 77:13, 77:17, 79:1, 79:7, 79:11, 79:13, 79:14, 79:17, 79:18, 79:19, 82:5, 82:8, 82:10, 82:17, 82:19, 84:12, 105:10, 126:20, 126:23, 127:24, 129:9, 130:3, 130:16, 137:4, 137:7, 143:14, 148:3, 148:5, 148:7, 149:17, 152:2, 152:11, 155:13, 158:9, 158:10, 158:12, 159:7, 161:3, 162:1, 162:18, 162:19, 163:4, 163:20, 164:18, 165:10, 168:8, 169:4, 169:9, 169:15, 169:23, 170:12, 170:17, 170:21, 170:24, 171:16, 172:23, 175:1, 175:5, 176:10, 177:11, 178:1, 182:16, 183:8

**cases** [5] - 26:5, 51:3, 72:12, 74:11, 152:20
**cash** [3] - 58:20, 58:21, 58:23
**cassette** [4] - 100:7, 102:14, 102:19, 103:10
**cassettes** [3] - 97:16, 100:3, 105:11
**catalog** [1] - 92:11
**catching** [1] - 162:24
**categories** [1] - 64:9
**category** [1] - 158:3
**causes** [1] - 162:20
**CD** [40] - 5:1, 5:3, 7:24, 15:25, 17:1, 18:3, 18:20, 18:23, 18:25, 19:14, 20:11, 20:17, 20:21, 20:22, 97:2, 98:13, 98:24, 102:15, 102:19, 102:21, 103:13,

105:23, 105:25, 111:17, 112:22, 113:19, 121:24, 122:3, 122:7, 122:17, 122:21, 122:23, 122:24, 127:8, 127:14, 166:8, 166:11, 167:8, 167:10, 167:11
**CDs** [10] - 97:17, 104:7, 105:10, 105:12, 105:24, 122:1, 122:8, 123:10, 124:8, 160:23
**cell** [1] - 138:7
**cellular** [1] - 138:1
**CENTRAL** [1] - 1:2
**cents** [4] - 33:11, 33:15, 33:18, 33:20
**certain** [25] - 4:12, 4:18, 4:20, 7:20, 8:5, 11:3, 14:19, 15:11, 15:12, 15:19, 23:12, 35:19, 58:12, 74:9, 95:7, 95:8, 96:14, 97:7, 153:23, 175:11, 175:12, 176:19, 181:7
**certainly** [11] - 12:21, 12:22, 93:10, 99:17, 101:4, 101:11, 105:12, 115:12, 115:18, 115:20, 115:21
**Certainly** [2] - 94:15, 94:20
**certainty** [1] - 59:4
**certified** [5] - 24:15, 24:21, 24:22, 39:18, 77:18
**cetera** [5] - 20:5, 98:13, 163:19, 174:24, 175:12
**CFO** [4] - 157:1, 160:21, 160:22
**challenges** [1] - 140:3
**chance** [3] - 92:25, 120:5, 163:3
**change** [6] - 107:21, 107:25, 108:3, 146:16, 170:18
**changes** [5] - 97:12, 97:18, 169:10, 182:4, 186:7
**changing** [1] - 130:20
**channel** [25] - 5:6, 9:11, 9:12, 10:18, 11:15, 11:18, 17:24, 18:5, 18:8, 18:12,

18:16, 108:4, 115:14, 115:16, 115:21, 115:23, 123:8, 123:18, 124:12, 124:24, 125:25, 126:2, 126:16, 168:21
**channels** [22] - 8:25, 10:10, 21:16, 44:2, 71:24, 107:16, 107:22, 114:21, 115:12, 122:20, 123:1, 123:4, 125:15, 126:7, 126:10, 127:5, 147:12, 147:17, 147:20, 168:16, 169:6, 169:12
**charge** [4] - 58:19, 59:19, 60:2, 60:15
**charged** [7] - 28:20, 58:11, 58:12, 58:13, 58:14, 59:7, 176:12
**charges** [2] - 59:7, 59:12
**chart** [4] - 38:12, 57:6, 186:4, 186:8
**charts** [2] - 158:25, 159:2
**check** [2] - 83:3, 181:25
**chip** [1] - 98:4
**choice** [1] - 6:23
**choose** [2] - 7:2, 7:3
**chose** [1] - 113:24
**Cinque** [13] - 79:2, 79:3, 79:4, 79:6, 79:10, 79:14, 81:16, 81:21, 82:3, 82:5, 82:7
**Circuit** [1] - 104:9
**circulars** [1] - 104:8
**City** [2] - 104:9, 118:2
**civil** [1] - 88:7
**claim** [7] - 39:4, 56:18, 57:20, 62:11, 77:15, 169:23, 171:25
**claimed** [2] - 36:16, 130:5
**claiming** [1] - 14:18, 164:12
**claims** [3] - 60:6, 60:14, 65:5
**clarified** [1] - 162:18
**clarify** [1] - 53:19
**classmate** [1] - 89:6
**clause** [4] - 35:14, 69:16, 70:1, 96:13
**clean** [7] - 113:4, 183:3, 183:11, 183:12, 184:25,

185:25, 186:1
**clear** [16] - 34:15, 57:4, 60:16, 62:23, 65:19, 65:24, 66:15, 71:5, 73:23, 110:7, 134:20, 164:22, 168:13, 169:22, 170:7, 172:13
**clearly** [5] - 22:12, 22:15, 164:11, 164:15, 175:9
**CLERK** [3] - 23:21, 86:20, 148:9
**click** [1] - 113:2
**clicked** [1] - 112:13
**clicking** [2] - 112:16, 112:19
**client** [5] - 40:1, 40:11, 40:17, 42:18, 77:13
**client's** [3] - 66:2, 66:5, 79:15
**clients** [4] - 40:23, 42:12, 42:16, 88:8
**Clive** [1] - 157:9
**clogged** [1] - 91:6
**closing** [3] - 150:10, 155:21, 185:16
**club** [16] - 6:18, 6:21, 7:12, 7:14, 7:19, 7:22, 8:2, 8:4, 8:8, 10:6, 10:17, 11:10, 11:12, 11:14, 99:24, 134:25
**clubs** [14] - 6:14, 6:15, 7:11, 8:16, 8:24, 9:23, 10:3, 10:4, 10:14, 10:24, 11:2, 94:2, 125:20, 134:16
**coast** [2] - 90:12, 90:13
**Cohen** [36] - 3:4, 23:19, 23:20, 23:23, 24:3, 24:10, 26:13, 26:18, 28:13, 33:22, 37:14, 38:11, 39:4, 39:15, 41:4, 43:4, 44:1, 47:19, 48:14, 49:17, 52:18, 53:17, 53:21, 58:2, 61:21, 64:15, 64:24, 65:21, 66:17, 68:5, 69:21, 71:6, 71:10, 75:5, 75:22, 77:8
**Cohen's** [13] - 37:25, 46:19, 49:7, 50:10, 51:20, 67:9, 76:9, 76:12, 76:23, 77:3, 79:22, 186:13, 186:24
**coherently** [1] - 155:24

**Coles** [1] - 26:10
**collection** [1] - 112:14
**college** [1] - 87:14
**College** [1] - 87:15
**Columbia** [1] - 126:5
**column** [4] - 32:25, 55:19, 75:16, 76:18
**combine** [1] - 153:21
**combining** [1] - 55:16
**coming** [6] - 44:17, 65:20, 72:15, 73:23, 98:1, 175:24
**comment** [1] - 61:10
**comments** [2] - 60:20, 61:12
**commercial** [3] - 71:13, 99:24, 99:25
**commit** [2] - 95:13, 95:14
**commitment** [2] - 8:3, 11:3
**commitments** [1] - 95:13
**commits** [3] - 7:20, 177:3, 177:4
**committed** [1] - 8:4
**committee** [1] - 119:4
**common** [2] - 96:21, 97:6
**communicate** [1] - 101:10
**communications** [1] - 48:10
**community** [4] - 119:16, 119:17, 121:14
**compact** [2] - 105:3, 115:9
**companies** [14] - 22:10, 71:21, 100:21, 119:10, 121:1, 135:23, 136:2, 136:5, 136:14, 138:1, 138:2, 138:7, 141:18, 142:21
**company** [34] - 5:25, 6:6, 26:25, 40:13, 51:3, 72:1, 72:15, 72:22, 73:12, 73:20, 89:14, 91:4, 92:11, 93:16, 94:11, 96:7, 100:24, 101:1, 102:9, 102:16, 103:19, 119:17, 123:9, 124:5, 126:5, 126:6, 126:15, 128:24, 141:8, 141:10, 145:25, 164:6, 174:6, 175:22

**Company** [1] - 25:2
**company's** [1] - 71:17
**compare** [1] - 186:6
**compensate** [2] - 114:15, 119:9
**compensation** [3] - 121:16, 124:25, 145:3
**competent** [1] - 60:24
**competition** [1] - 112:4
**compilation** [10] - 71:15, 72:13, 72:20, 72:21, 117:6, 117:25, 126:6, 126:7, 135:21, 136:2
**compilations** [3] - 70:24, 71:3, 147:18
**complaint** [2] - 68:18
**complete** [1] - 54:1
**completely** [2] - 31:16, 72:18
**component** [1] - 38:23
**composition** [1] - 37:8
**computation** [1] - 38:13
**computer** [6] - 98:6, 104:24, 113:11, 113:13, 113:15, 166:13
**concept** [2] - 99:20, 123:6
**concern** [8] - 81:10, 130:4, 130:7, 130:16, 130:19, 151:17, 151:19, 152:13
**concerned** [2] - 172:10, 174:9
**concert** [1] - 101:21
**conclude** [1] - 76:23
**concluded** [2] - 23:17, 187:5
**conclusion** [8] - 23:11, 29:9, 44:14, 44:17, 45:23, 49:5, 60:18, 61:3
**conclusions** [1] - 60:23
**conditional** [21] - 36:6, 66:11, 70:25, 71:2, 71:6, 71:7, 72:24, 73:1, 135:8, 135:12, 135:13, 136:5, 144:25, 145:1, 145:4, 145:8, 145:13, 145:15, 146:1, 153:12, 156:14

**conduct** [1] - 24:13
**conference** [2] - 23:2, 23:17
**configuration** [5] - 97:23, 102:17, 102:18, 107:19, 107:25
**configurations** [4] - 98:11, 98:12, 98:15, 102:13
**conflict** [1] - 131:23
**confronting** [1] - 143:16
**confused** [4] - 82:6, 161:4, 178:24, 180:10
**confusing** [2] - 180:12, 180:20
**Congress** [1] - 121:10
**connection** [15] - 22:1, 28:5, 28:7, 29:1, 30:20, 41:13, 54:13, 64:11, 64:25, 66:20, 67:14, 84:18, 130:7, 130:16, 144:10
**consequence** [3] - 58:20, 58:21, 58:23
**conservative** [1] - 34:14
**consider** [3] - 11:14, 12:12, 30:22
**consideration** [2] - 52:9, 73:14
**considerations** [1] - 143:7
**considered** [2] - 10:20, 30:23
**considers** [2] - 50:22, 169:14
**consistent** [3] - 16:23, 165:4, 165:6
**constant** [1] - 110:16
**constitutes** [1] - 31:24
**construct** [1] - 164:19
**consumer** [20] - 7:23, 17:10, 18:2, 18:20, 18:24, 19:5, 19:9, 19:19, 19:20, 102:16, 115:17, 122:18, 122:25, 123:6, 123:7, 123:11, 123:13, 123:14, 124:11, 124:24
**consumer's** [1] - 164:21
**consumers** [5] - 5:21, 6:5, 16:17, 101:16, 103:21

**consuming** [1] - 156:12
**contacting** [1] - 110:23
**contained** [6] - 33:16, 63:25, 132:14, 153:8, 153:9, 177:10
**contains** [1] - 65:1
**contending** [1] - 175:4
**contest** [2] - 156:17, 167:7
**contesting** [1] - 166:7
**context** [7] - 67:25, 96:23, 131:14, 132:12, 133:20, 133:21, 133:24
**continue** [2] - 91:13, 145:9
**contract** [15] - 8:23, 23:13, 93:15, 93:17, 94:10, 97:3, 101:2, 114:15, 116:3, 125:21, 134:16, 146:24, 168:14, 170:7, 177:2
**contraction** [1] - 90:20
**contracts** [8] - 33:7, 44:21, 50:16, 69:13, 99:22, 169:4, 170:8, 171:15
**contrary** [9] - 60:21, 63:24, 132:14, 132:19, 133:1, 133:3, 133:6, 165:12, 171:10
**controversial** [1] - 96:18
**conversation** [1] - 77:23
**conversations** [2] - 25:23, 68:9
**Coopers** [1] - 24:25
**copied** [2] - 129:6, 129:12
**copies** [3] - 122:11, 122:16, 185:6
**copy** [11] - 13:3, 13:9, 16:24, 17:1, 17:2, 113:14, 113:19, 118:2, 118:24, 122:4
**copyright** [17] - 12:9, 12:11, 12:12, 12:14, 12:18, 12:21, 12:24, 13:2, 13:4, 13:6, 13:10, 13:12, 13:13, 13:16, 13:20, 14:2
**Copyright** [2] - 13:22, 16:23

**core** [1] - 170:12
**corner** [3] - 110:4, 110:24, 112:12
**corporate** [3] - 92:4, 175:20, 176:1
**corporation** [1] - 173:12
**Corporation** [1] - 24:10
**correct** [180] - 4:13, 4:14, 4:25, 5:4, 5:7, 5:10, 5:12, 5:15, 5:16, 5:18, 5:19, 5:23, 6:6, 6:16, 7:12, 7:17, 7:24, 8:6, 8:7, 8:10, 8:11, 8:15, 8:18, 8:25, 9:7, 9:11, 9:12, 9:15, 9:16, 9:18, 9:19, 9:25, 10:3, 10:4, 10:7, 10:8, 10:18, 10:22, 11:4, 11:11, 11:19, 13:17, 13:20, 16:5, 16:9, 16:10, 18:22, 19:7, 19:8, 20:16, 20:25, 27:5, 28:15, 28:16, 29:6, 29:7, 29:21, 29:22, 31:7, 34:19, 35:16, 35:17, 39:5, 39:16, 39:18, 39:20, 39:23, 41:2, 41:13, 42:12, 43:9, 43:12, 43:21, 44:4, 44:8, 44:12, 44:15, 44:19, 44:24, 46:12, 50:15, 50:19, 52:19, 55:5, 55:18, 55:21, 55:25, 56:19, 57:13, 57:14, 57:16, 58:2, 58:4, 58:9, 58:17, 62:8, 62:18, 62:21, 63:2, 63:4, 63:20, 64:7, 65:8, 65:12, 68:16, 70:23, 71:13, 71:18, 72:7, 73:3, 73:18, 74:1, 74:8, 74:20, 78:13, 78:15, 79:18, 80:3, 99:10, 100:13, 107:13, 107:17, 114:7, 114:8, 120:23, 122:1, 122:5, 122:14, 123:21, 128:20, 130:1, 130:4, 130:22, 132:17, 132:23, 133:24, 133:25, 134:10, 134:11, 134:18, 134:19, 134:25, 135:1, 135:16, 135:17, 135:24, 136:1, 136:6, 136:7, 137:8, 137:23,

137:24, 138:3, 138:4, 138:5, 139:17, 139:18, 139:19, 140:9, 140:10, 140:23, 141:3, 141:10, 142:15, 142:22, 142:23, 143:17, 143:22, 143:23, 144:18, 144:24, 146:2, 146:15, 146:20, 146:24, 147:3, 147:9, 176:12, 176:20, 182:3
**Correct** [11] - 10:15, 41:3, 55:2, 62:9, 62:19, 67:6, 71:14, 72:4, 78:14, 146:25, 147:21
**correctly** [1] - 176:11
**corresponding** [1] - 153:20
**cost** [14] - 29:17, 29:24, 29:25, 58:10, 64:24, 70:2, 70:18, 72:2, 72:7, 73:9, 73:11, 107:20, 107:24, 108:2
**costs** [16] - 28:11, 28:18, 28:20, 29:2, 51:4, 56:19, 58:3, 58:10, 64:10, 69:4, 69:14, 69:15, 70:4, 95:18, 107:19
**could've** [1] - 141:12
**counsel** [5] - 67:7, 68:9, 148:2, 160:13, 161:12
**Counsel** [2] - 88:15, 88:20
**Count** [2] - 171:4, 171:6
**country** [1] - 105:23, 115:19
**couple** [6] - 27:17, 54:11, 84:3, 118:21, 182:2, 182:5
**course** [17] - 6:17, 7:7, 8:5, 12:16, 40:3, 41:4, 43:25, 45:1, 45:12, 47:19, 48:13, 57:24, 66:16, 67:7, 74:15, 104:24
**COURT** [166] - 1:1, 1:23, 4:5, 21:3, 22:21, 22:23, 23:16, 23:18, 23:24, 26:15, 37:23, 38:2, 38:5, 38:7, 46:21, 47:1, 47:4, 49:11, 49:15, 50:11, 51:22, 57:7, 57:21,

67:11, 75:3, 78:4, 78:7, 79:24, 80:7, 80:22, 82:15, 82:22, 83:3, 83:8, 83:10, 83:22, 84:2, 85:13, 86:2, 86:4, 86:8, 86:14, 86:17, 86:23, 86:25, 88:17, 93:20, 102:2, 102:4, 109:3, 109:7, 109:9, 111:7, 120:11, 120:14, 128:1, 128:5, 128:7, 128:9, 132:4, 132:7, 139:22, 147:23, 148:11, 148:15, 148:22, 149:11, 149:14, 149:17, 149:24, 150:4, 150:12, 150:21, 150:23, 150:25, 151:8, 151:13, 152:10, 152:15, 152:18, 152:24, 153:11, 153:15, 153:25, 154:9, 154:16, 154:18, 155:15, 155:20, 156:13, 156:23, 157:5, 157:8, 157:10, 157:14, 157:17, 157:21, 157:24, 158:5, 158:8, 158:17, 158:25, 159:12, 159:16, 160:3, 160:18, 161:4, 161:8, 161:19, 163:9, 163:22, 164:2, 164:4, 165:1, 165:11, 165:16, 165:22, 166:6, 166:20, 167:2, 167:17, 168:1, 168:5, 169:18, 171:3, 172:8, 173:9, 174:5, 174:13, 176:14, 178:3, 178:8, 178:14, 178:17, 179:1, 179:4, 179:14, 179:18, 179:22, 179:25, 180:3, 180:16, 180:25, 181:8, 181:18, 181:25, 182:23, 183:3, 183:16, 183:21, 183:23, 184:4, 184:10, 184:12, 184:14, 184:17, 184:20, 184:24, 185:23, 186:5, 186:9, 186:11, 186:16, 186:21, 187:1, 187:4
    **Court** [8] - 26:8,

26:10, 75:6, 75:19, 76:12, 76:22, 163:13, 183:4
    **court** [8] - 4:4, 47:6, 51:24, 82:21, 86:10, 95:20, 132:10, 148:10
    **Court's** [2] - 77:25, 183:8
    **courtroom** [4] - 100:11, 123:20, 165:14, 165:15
    **cover** [10] - 19:22, 20:3, 20:4, 20:6, 20:10, 20:15, 56:12, 60:13, 95:18, 150:15
    **covered** [17] - 8:17, 8:20, 10:24, 18:21, 19:7, 26:21, 28:1, 35:2, 55:4, 116:9, 117:5, 129:16, 129:23, 169:6, 170:9, 170:11, 170:16
    **covers** [2] - 22:15, 111:15
    **Covington** [5] - 88:3, 88:4, 88:11, 88:14, 88:19
    **Cradle** [1] - 117:21
    **craft** [1] - 101:6
    **create** [5] - 103:24, 106:13, 127:20, 140:21, 180:18
    **created** [2] - 106:14, 171:18
    **creating** [1] - 64:25
    **creation** [2] - 64:11, 129:14
    **creative** [1] - 91:9
    **credit** [5] - 59:5, 59:19, 60:3, 60:11, 60:15
    **credited** [4] - 37:3, 58:5, 160:25, 162:3
    **crediting** [3] - 58:15, 58:16, 157:3
    **credits** [1] - 20:19
    **criminal** [1] - 88:7
    **Crosby** [2] - 25:14, 26:11
    **CROSS** [6] - 3:3, 3:5, 3:8, 4:8, 38:8, 128:11
    **cross** [2] - 149:3, 158:11
    **Cross** [1] - 37:23
    **cross-examination** [1] - 158:11
    **CROSS-EXAMINATION** [6] - 3:3, 3:5, 3:8, 4:8, 38:8, 128:11

**Cross-examination** [1] - 37:23
    **crux** [1] - 22:5
    **CSR** [1] - 1:23
    **cumulative** [3] - 157:15, 166:21, 167:21
    **current** [2] - 92:6, 92:7
    **Curtain** [6] - 31:1, 37:9, 37:11, 113:17, 114:3, 114:7
    **custom** [5] - 23:5, 23:12, 68:22, 69:11, 69:12
    **customer** [4] - 16:4, 16:5, 16:8, 113:8
    **cutouts** [1] - 104:6
    **CV** [1] - 1:8
    **cycle** [1] - 111:11

# D

**D.C** [3] - 88:2, 88:21, 88:24
    **D.R.M** [1] - 14:21
    **damage** [8] - 30:22, 31:6, 34:18, 36:18, 36:22, 36:25, 151:20
    **damages** [30] - 24:4, 26:6, 26:14, 30:5, 31:4, 32:2, 35:9, 37:10, 37:12, 37:16, 38:18, 39:3, 61:23, 62:11, 62:20, 65:21, 66:17, 70:8, 73:24, 73:25, 74:5, 74:12, 74:23, 75:20, 76:14, 81:8, 152:14, 154:13, 170:24
    **Damages** [1] - 37:1
    **date** [22] - 34:15, 34:20, 35:3, 45:3, 47:1, 61:2, 78:13, 78:15, 81:22, 84:22, 84:25, 85:17, 85:18, 102:24, 103:1, 103:4, 103:5, 103:6, 103:9, 103:23, 158:23
    **dated** [1] - 75:7
    **dates** [1] - 154:10
    **David** [1] - 81:13
    **DAY** [1] - 1:18
    **daycare** [1] - 83:5
    **days** [4] - 78:17, 105:11, 115:13, 164:12
    **dead** [1] - 158:10
    **deal** [13] - 40:12, 40:16, 91:10, 91:20,

91:21, 92:9, 94:9, 94:13, 94:15, 94:16, 94:19, 94:20
    **deals** [11] - 40:15, 89:24, 89:25, 91:18, 91:19, 93:11, 94:16, 110:11, 124:14
    **December** [5] - 26:21, 30:15, 34:16, 35:8, 137:7
    **decide** [2] - 113:5, 185:20
    **decided** [8] - 18:24, 19:1, 41:5, 43:25, 44:10, 103:1, 119:18, 179:10
    **decides** [1] - 93:16
    **decision** [15] - 77:21, 78:15, 78:16, 78:17, 78:20, 78:22, 78:23, 82:5, 84:7, 84:16, 84:18, 85:17, 85:18, 85:24, 90:21
    **decisions** [1] - 177:13
    **declined** [1] - 174:11
    **deduct** [10] - 36:5, 37:6, 62:24, 68:10, 69:3, 69:25, 70:1, 70:14, 72:15, 72:23
    **deducted** [14] - 32:20, 34:8, 35:24, 36:2, 36:11, 37:5, 66:18, 67:2, 67:13, 67:19, 69:15, 70:9, 156:16
    **deductions** [10] - 37:15, 63:6, 64:7, 66:3, 66:4, 66:6, 66:7, 66:12, 153:23, 155:7
    **deemed** [1] - 152:3
    **Def** [1] - 90:13
    **def** [1] - 146:23
    **defendant** [7] - 171:14, 172:23, 173:17, 175:16, 179:13, 180:11
    **DEFENDANT** [1] - 2:9
    **defendants** [21] - 151:7, 153:18, 158:15, 159:6, 159:14, 159:24, 164:18, 165:9, 170:21, 171:1, 171:2, 171:5, 172:8, 172:9, 172:10, 174:14, 174:16, 175:15, 176:8, 178:20, 179:9
    **Defendants** [1] -

1:12
    **Defendants'** [1] - 86:17
    **defended** [2] - 79:10, 79:14
    **defense** [3] - 148:24, 149:1
    **defense's** [1] - 149:24
    **defer** [1] - 182:18
    **defined** [1] - 97:3
    **definitely** [2] - 99:16, 100:16
    **definition** [21] - 13:11, 13:13, 13:15, 13:19, 13:22, 36:8, 63:5, 63:7, 66:9, 70:4, 97:8, 97:9, 99:4, 99:6, 99:9, 99:13, 100:18, 127:4, 146:19, 146:23, 147:8
    **definitions** [1] - 69:14
    **delete** [6] - 181:15, 183:4, 183:7, 183:9, 183:10, 183:11, 184:1
    **deleted** [3] - 181:18, 182:4, 184:6
    **deliberations** [2] - 83:13, 148:4
    **demand** [2] - 16:20, 143:9
    **demonstration** [2] - 113:5, 114:10
    **demonstrative** [2] - 32:22, 34:1
    **demonstratives** [1] - 186:24
    **denied** [3] - 23:16, 50:11, 178:9
    **Dennis** [1] - 26:10
    **department** [10] - 25:2, 25:24, 90:5, 90:6, 90:14, 92:11, 94:5, 104:11, 107:1, 109:20
    **depose** [1] - 79:9
    **deposed** [8] - 46:5, 46:7, 46:9, 77:22, 78:18, 81:22, 118:20, 130:3
    **deposition** [59] - 3:7, 16:12, 16:13, 21:19, 42:23, 46:14, 46:19, 47:5, 49:7, 51:20, 51:23, 67:9, 68:4, 77:24, 78:13, 79:10, 79:12, 79:15, 79:22, 80:2, 80:18, 81:1, 81:21, 82:2, 82:4,

84:11, 84:12, 84:17, 84:18, 84:21, 84:23, 85:7, 85:20, 85:21, 85:23, 86:7, 86:9, 86:12, 118:21, 118:24, 120:2, 128:1, 130:24, 131:9, 131:18, 131:20, 132:9, 132:24, 133:9, 134:21, 136:8, 137:7, 137:16, 139:7, 145:11, 161:6, 161:7, 162:13, 164:14

**derivative** [1] - 27:4
**describe** [4] - 93:15, 96:25, 105:2, 123:8
**described** [3] - 46:4, 167:3
**designed** [4] - 101:16, 103:3, 116:25, 163:5
**desk** [1] - 98:2
**destroyed** [2] - 6:1, 6:4
**detailed** [1] - 30:14
**details** [1] - 153:6
**determination** [3] - 49:25, 50:4, 50:7
**determinative** [1] - 125:2
**determine** [16] - 25:20, 32:2, 32:10, 49:18, 55:16, 55:24, 62:25, 64:16, 66:20, 67:4, 67:15, 67:21, 68:12, 94:4, 124:6, 152:22
**determined** [4] - 24:5, 44:6, 119:18, 125:13
**determining** [4] - 32:18, 69:3, 69:25, 70:15
**develop** [3] - 101:12, 106:4, 107:6
**developed** [1] - 106:23
**developing** [2] - 101:11, 112:5
**development** [2] - 92:13, 106:8
**device** [1] - 16:18
**devised** [1] - 97:11
**dialog** [1] - 110:16
**Diane** [1] - 112:1
**difference** [6] - 115:7, 124:19, 135:12, 145:12, 161:1, 165:20
**differences** [2] -

98:14, 98:16
**different** [44] - 7:22, 8:3, 8:22, 10:22, 10:23, 11:22, 19:14, 19:15, 19:23, 20:11, 71:18, 71:21, 72:19, 77:12, 77:20, 79:14, 82:5, 82:8, 92:16, 96:9, 98:11, 98:12, 98:14, 98:16, 102:13, 106:12, 106:14, 119:12, 127:22, 133:6, 135:22, 136:3, 139:6, 143:8, 144:6, 147:18, 152:17, 152:21, 153:8, 153:9, 153:11, 167:15
**differently** [1] - 102:17
**digital** [51] - 14:20, 15:12, 15:15, 15:20, 15:23, 15:24, 16:5, 16:19, 16:24, 17:8, 17:10, 22:10, 27:21, 28:23, 29:20, 31:14, 32:6, 33:6, 33:15, 33:21, 33:23, 43:12, 43:14, 51:12, 52:1, 52:5, 104:18, 105:14, 105:17, 106:2, 106:6, 106:7, 106:9, 106:11, 106:12, 106:14, 107:4, 107:7, 115:8, 115:13, 127:1, 127:23, 135:22, 136:4, 136:8, 136:13, 145:23, 164:21
**digitally** [2] - 98:25, 105:17
**DIRECT** [4] - 3:5, 3:8, 24:1, 87:1
**direct** [8] - 9:22, 54:5, 64:10, 64:24, 69:3, 70:2, 75:14, 82:23
**directed** [1] - 173:3
**direction** [1] - 27:2
**directly** [3] - 70:18, 134:8, 161:3
**director** [3] - 89:12, 89:19, 89:20
**disagree** [4] - 14:22, 56:14, 56:16, 69:10
**disagreement** [2] - 166:19, 179:7
**disagrees** [1] - 29:9
**disc** [2] - 105:13, 115:9
**Disc** [1] - 98:4
**discern** [1] - 30:18

**discs** [1] - 105:3
**discuss** [2] - 82:17, 148:5
**discussed** [6] - 40:21, 70:25, 95:12, 109:5, 120:15, 154:11
**discussing** [5] - 17:23, 28:23, 64:18, 160:12, 160:14
**discussion** [1] - 18:12
**discussions** [1] - 120:15
**dispute** [2] - 29:21, 119:15
**disputed** [3] - 29:17, 161:25, 164:7
**disputes** [1] - 26:6
**disputing** [2] - 165:3, 166:12
**distinction** [2] - 16:2, 165:19
**distribute** [1] - 51:7
**distributed** [1] - 99:17
**distribution** [4] - 9:22, 51:4, 89:25, 107:2
**distributor** [4] - 173:1, 173:19, 174:4, 175:2
**District** [3] - 75:6, 84:7
**DISTRICT** [3] - 1:1, 1:2, 1:23
**divide** [1] - 62:17
**divided** [2] - 32:6, 34:10
**divides** [1] - 33:18
**division** [8] - 25:3, 172:19, 173:13, 173:16, 176:9, 176:19, 177:8, 177:12
**document** [2] - 54:16, 75:15
**documents** [7] - 47:20, 48:3, 53:22, 92:25, 159:18, 159:21, 159:22
**dollar** [7] - 6:22, 43:20, 56:23, 58:17, 60:5, 167:10
**dollar-for-dollar** [1] - 58:17
**dollars** [1] - 37:17
**done** [13] - 25:7, 36:12, 53:25, 56:2, 59:9, 76:2, 80:16, 83:19, 105:4, 149:3, 156:9, 162:13, 182:2

**door** [1] - 109:17
**Doris** [1] - 25:14
**double** [2] - 33:21, 181:25
**double-check** [1] - 181:25
**doubt** [1] - 111:1
**down** [12] - 11:21, 22:23, 39:12, 43:23, 86:4, 88:17, 94:6, 102:4, 111:7, 111:23, 116:13, 121:21
**download** [68] - 16:3, 16:17, 18:18, 19:2, 19:6, 20:14, 20:24, 22:10, 28:23, 33:6, 33:15, 33:21, 39:1, 39:6, 41:6, 41:18, 41:22, 43:15, 47:24, 48:21, 49:3, 51:5, 51:12, 52:6, 61:9, 73:2, 73:8, 97:20, 98:13, 99:12, 100:15, 100:16, 100:19, 102:15, 102:22, 103:11, 112:2, 113:11, 114:7, 115:8, 124:14, 127:8, 127:23, 134:6, 134:9, 134:10, 135:22, 136:5, 136:9, 136:14, 140:22, 145:6, 145:7, 145:8, 145:15, 145:25, 146:9, 147:9, 147:10, 147:11, 153:12, 157:20, 158:15, 160:9, 168:20, 169:1, 169:11
**downloaded** [1] - 143:10
**downloading** [2] - 113:10, 113:12
**downloads** [69] - 24:6, 27:21, 29:21, 31:14, 32:6, 33:23, 34:7, 34:12, 36:6, 39:3, 42:2, 43:12, 44:3, 44:8, 44:12, 48:18, 52:1, 61:16, 62:14, 65:6, 66:11, 66:20, 67:3, 67:15, 67:20, 70:25, 71:2, 71:7, 72:25, 93:2, 93:5, 93:8, 104:24, 106:6, 112:6, 123:24, 124:9, 126:22, 127:1, 127:2, 129:15, 129:25, 130:5, 134:13, 134:22, 135:8, 135:12,

135:13, 136:5, 136:19, 136:24, 137:21, 140:24, 141:4, 142:11, 144:25, 145:1, 145:4, 145:12, 145:13, 146:13, 156:14, 164:21, 168:15, 169:5, 170:15, 177:13
**Dr** [1] - 174:6
**draft** [4] - 30:1, 40:25, 42:7, 60:20
**drafted** [2] - 94:10, 95:9
**drafting** [3] - 92:17, 93:10, 95:12
**drafts** [1] - 48:7
**drastically** [1] - 127:22
**Dre's** [1] - 174:6
**Dreamworks** [1] - 90:22
**drive** [3] - 98:5, 113:13, 113:15
**driver's** [1] - 118:15
**drop** [1] - 108:3
**due** [5] - 54:21, 55:17, 160:14, 163:13, 166:4
**durability** [1] - 98:17
**during** [5] - 21:19, 53:6, 55:4, 166:3, 169:15
**duty** [2] - 177:14, 182:15
**DVD** [1] - 97:2

## E

**e-mail** [7] - 43:7, 43:8, 48:2, 48:3, 150:15, 150:23, 151:2
**early** [6] - 41:1, 88:13, 88:19, 103:22, 160:13, 181:14
**earned** [1] - 55:7
**easily** [2] - 35:1, 106:24
**east** [1] - 90:13
**EAST** [1] - 1:24
**economic** [10] - 5:17, 50:14, 50:18, 50:22, 51:11, 51:15, 51:17, 51:25, 52:4, 61:11
**economically** [1] - 52:11
**edits** [1] - 99:1
**educational** [1] - 24:17

**effect** [4] - 100:6, 130:14, 131:7, 131:25
**effectively** [1] - 58:8
**effort** [1] - 4:22
**efforts** [1] - 173:20
**Eight** [8] - 31:1, 31:4, 31:23, 36:17, 36:22, 36:23, 117:20, 170:9
**eight** [8] - 97:16, 111:12, 128:5, 128:7, 128:8, 149:1, 149:3, 165:16
**either** [9] - 5:20, 6:5, 19:21, 52:10, 58:11, 80:10, 83:2, 99:23, 133:15
**electronic** [1] - 127:8
**Ellis** [7] - 157:9, 160:21, 161:23, 162:10, 163:4, 164:4, 166:21
**Ellis's** [3] - 160:19, 161:18, 161:21
**Em2M** [8] - 26:23, 26:24, 26:25, 27:1, 52:22, 55:14, 57:17, 57:18
**Em2M's** [2] - 27:4, 55:8
**embodies** [1] - 99:16
**embodying** [2] - 13:1, 116:22
**Eminem** [86] - 5:1, 5:2, 5:8, 7:24, 8:1, 9:10, 11:6, 20:10, 20:12, 20:22, 20:23, 26:19, 27:7, 27:8, 27:25, 29:3, 29:6, 29:8, 30:18, 30:21, 30:25, 31:2, 31:15, 31:16, 32:8, 32:11, 32:15, 33:2, 33:10, 33:16, 39:1, 41:9, 41:11, 58:4, 58:9, 58:11, 58:14, 58:18, 59:1, 59:3, 59:12, 59:16, 60:3, 60:6, 60:12, 60:17, 60:19, 61:5, 62:16, 63:8, 99:12, 102:14, 108:12, 110:22, 110:25, 111:2, 112:10, 112:13, 112:14, 112:16, 112:19, 113:14, 113:17, 113:24, 116:1, 116:19, 117:11, 117:18, 117:24, 118:3, 126:13, 152:6,

153:20, 154:6, 154:22, 155:5, 155:6, 155:10, 155:12, 156:5, 156:6, 156:21, 171:18, 173:23, 177:1
**Eminem's** [5] - 33:7, 33:24, 46:2, 57:14, 58:16
**employed** [2] - 74:15, 78:10
**employee** [3] - 162:11, 162:14, 164:5
**employees** [1] - 25:24
**empty** [1] - 53:15
**enable** [1] - 106:5
**encompasses** [1] - 97:4
**Encore** [6] - 31:1, 112:19, 112:20, 112:21, 112:24, 113:7
**end** [24] - 5:7, 5:20, 7:25, 37:18, 78:20, 83:23, 84:6, 108:6, 109:6, 113:14, 113:16, 118:23, 120:2, 130:25, 155:1, 164:22, 165:21, 166:4, 166:11, 182:15, 183:24, 184:3, 184:4
**ended** [2] - 89:5, 97:8
**ending** [2] - 54:7, 54:15
**ends** [1] - 35:8
**engaged** [4] - 27:6, 30:8, 61:10, 61:14
**England** [1] - 162:12
**enhancing** [1] - 15:14
**enjoy** [1] - 117:14
**ensure** [1] - 97:17
**entered** [4] - 141:1, 142:14, 166:4, 169:20
**enters** [3] - 137:20, 137:25, 142:10
**entertainment** [2] - 24:12, 25:1
**entire** [2] - 19:14, 128:4
**entirety** [3] - 23:4, 23:11, 170:5
**entities** [1] - 177:18
**entitled** [8] - 33:13, 33:14, 33:20, 40:17, 166:15, 169:15, 171:16, 172:3
**entitlement** [1] - 33:19

**entity** [4] - 87:10, 175:21, 176:2, 176:8
**entry** [4] - 165:7, 166:9, 167:8, 167:9
**equal** [1] - 62:6
**equipment** [1] - 106:4
**erased** [1] - 168:22
**error** [2] - 38:14, 38:22
**escalations** [1] - 168:24
**essence** [2] - 60:7, 98:18
**essentially** [6] - 4:19, 7:8, 7:9, 158:23, 159:5, 159:22
**estate** [2] - 26:12, 109:18, 110:2
**estimate** [1] - 77:3
**et** [5] - 20:5, 98:13, 163:19, 174:24, 175:12
**ET** [2] - 1:10, 2:10
**Ethan** [3] - 3:6, 86:6, 86:12
**eve** [1] - 151:25
**evening** [1] - 148:17
**event** [3] - 5:24, 131:23, 149:6
**eventually** [1] - 25:3
**evidence** [21] - 54:2, 126:19, 150:11, 151:6, 151:10, 154:6, 154:8, 165:11, 168:7, 168:10, 169:8, 169:10, 169:14, 169:21, 169:24, 170:17, 170:23, 171:2, 171:8, 171:9, 184:15
**ex** [1] - 79:15
**exact** [1] - 107:8
**Exactly** [1] - 184:20
**exactly** [8] - 9:5, 14:13, 19:9, 19:16, 20:5, 76:4, 92:18, 156:7
**EXAMINATION** [14] - 3:3, 3:4, 3:5, 3:5, 3:6, 3:8, 3:8, 4:8, 21:4, 24:1, 38:8, 84:4, 87:1, 128:11
**examination** [5] - 37:23, 82:23, 84:6, 158:11
**examining** [1] - 119:5
**example** [23] - 38:20, 38:21, 50:17, 54:5,

97:14, 101:24, 114:3, 115:4, 116:5, 116:6, 116:15, 125:19, 141:16, 141:17, 143:7, 153:17, 153:20, 153:24, 153:25, 154:10, 156:13, 182:11, 182:15
**examples** [4] - 117:4, 117:7, 117:9, 118:13
**except** [4] - 17:2, 97:24, 169:1, 178:9
**exception** [1] - 72:10
**exceptions** [1] - 103:7
**excerpt** [1] - 54:11
**excess** [2] - 25:8, 53:2
**excited** [1] - 140:3
**exclude** [1] - 6:8
**excluded** [1] - 36:23
**excluding** [1] - 6:11
**exclusive** [1] - 31:17
**excuse** [6] - 18:17, 114:17, 119:12, 137:2, 139:4, 144:9
**executives** [1] - 177:18
**exercises** [1] - 101:15
**exhibit** [14] - 14:25, 108:16, 129:17, 150:16, 150:19, 151:21, 151:22, 158:18, 160:8, 160:16, 160:17, 163:13, 181:3, 186:15
**Exhibit** [16] - 3:12, 3:12, 14:24, 15:1, 43:3, 54:18, 59:21, 63:12, 63:16, 109:1, 109:10, 120:9, 120:18, 139:22, 156:25
**exhibits** [16] - 38:1, 42:23, 149:14, 152:23, 153:19, 155:22, 155:23, 156:23, 157:10, 158:14, 159:8, 160:9, 163:14, 186:14, 186:15
**EXHIBITS** [1] - 3:11
**Exhibits** [3] - 3:13, 92:22, 164:3
**existence** [1] - 173:7
**exists** [1] - 101:1
**expect** [1] - 148:13

**expecting** [1] - 155:16
**experience** [6] - 64:23, 69:13, 96:5, 96:16, 124:4, 126:20
**experienced** [2] - 80:2, 96:8
**expert** [27] - 12:11, 12:12, 23:10, 26:5, 26:14, 30:5, 30:8, 37:25, 61:11, 61:14, 67:5, 68:6, 69:20, 74:4, 74:11, 75:21, 79:5, 79:11, 79:15, 79:16, 81:8, 82:24, 134:2, 137:13, 168:17, 186:14
**expertise** [1] - 25:25
**experts** [3] - 86:15, 149:4, 154:12
**explain** [7] - 4:15, 6:18, 24:23, 38:22, 109:12, 111:4, 156:1
**explained** [1] - 156:1
**explanation** [2] - 156:9, 156:11
**explicit** [1] - 113:4
**exploit** [1] - 122:15
**exploitation** [3] - 64:12, 99:25, 100:1
**exploited** [1] - 76:21
**exploiting** [1] - 64:25
**export** [1] - 68:6
**express** [2] - 82:18, 148:6
**extension** [2] - 157:19, 157:20
**extensions** [6] - 158:19, 158:22, 159:4, 159:9, 160:1, 160:11
**extrinsic** [3] - 169:8, 169:10, 170:17
**eye** [1] - 110:3
**Eyed** [1] - 25:13
**eyes** [1] - 112:6

**F**

**F.B.T** [92] - 1:4, 2:3, 5:2, 5:8, 14:18, 18:15, 24:5, 26:19, 26:22, 27:1, 27:7, 27:8, 27:25, 28:19, 28:20, 29:3, 29:6, 29:24, 30:8, 30:17, 30:22, 31:13, 31:14, 32:3, 32:8, 32:11, 32:12, 32:15, 32:19, 33:1, 33:10, 33:12, 33:19,

33:20, 33:23, 34:3, 34:6, 34:9, 34:19, 35:15, 38:25, 39:5, 39:22, 41:20, 42:8, 52:21, 52:22, 53:6, 53:7, 53:22, 54:13, 55:4, 55:10, 55:14, 55:18, 56:19, 58:3, 58:11, 58:13, 58:20, 58:21, 59:16, 60:3, 60:6, 60:9, 61:15, 63:8, 151:5, 151:6, 153:19, 154:3, 154:5, 154:25, 155:5, 155:9, 155:14, 156:4, 156:7, 156:19, 171:8, 171:16, 171:18, 172:2, 173:3, 174:23, 175:12, 177:15, 178:2
**F.B.T.'s** [6] - 27:4, 32:10, 33:8, 52:18, 57:16, 58:17
**facing** [1] - 140:2
**fact** [25] - 8:22, 25:21, 36:16, 45:22, 51:1, 61:17, 74:22, 79:9, 97:12, 110:14, 115:23, 131:21, 144:16, 144:24, 145:6, 145:14, 161:25, 165:10, 171:7, 171:10, 171:20, 172:1, 173:19, 173:21
**factor** [3] - 38:14, 38:22, 145:17
**factors** [4] - 14:8, 123:23, 124:2, 145:20
**facts** [1] - 167:4
**factual** [1] - 167:14
**failed** [1] - 140:22
**fair** [7] - 10:17, 11:18, 17:7, 37:14, 132:16, 132:18, 134:7
**fairly** [2] - 53:15, 53:22
**fall** [3] - 134:15, 134:23, 146:15
**familiar** [11] - 26:24, 50:21, 51:1, 74:17, 74:22, 76:2, 93:2, 108:9, 109:15, 133:12, 140:19
**familiarity** [1] - 25:25
**far** [4] - 109:19, 152:5, 172:10, 174:9
**fat** [1] - 42:25
**favor** [3] - 168:9, 169:16, 169:21
**featured** [2] - 104:10,

104:20
**February** [5] - 29:13, 41:1, 85:2, 85:5, 85:8
**Federal** [1] - 26:8
**fee** [3] - 121:17, 143:8, 144:25
**Feinstein** [1] - 138:20
**felt** [1] - 61:16
**Fergie** [1] - 25:13
**few** [13] - 39:15, 49:13, 111:2, 123:19, 124:2, 137:10, 144:19, 146:22, 147:25, 154:21, 158:2, 159:23, 171:3
**Field** [2] - 175:24, 175:25
**FIFTH** [1] - 2:12
**fight** [1] - 112:3
**figure** [3] - 40:12, 53:5, 89:5
**figures** [1] - 34:2
**file** [14] - 14:20, 15:15, 15:20, 15:24, 16:5, 16:19, 16:24, 17:8, 17:10, 105:14, 106:22, 136:4, 145:24
**filed** [2] - 61:13, 61:14
**files** [6] - 15:12, 15:23, 106:2, 106:9, 106:13, 107:7
**film** [3] - 117:8, 117:16, 117:17
**final** [7] - 41:1, 152:1, 160:17, 170:19, 184:25, 185:5, 185:16
**finally** [2] - 36:8, 82:19
**finance** [1] - 91:10
**finders** [1] - 91:7
**findings** [2] - 27:14, 29:12
**fine** [14] - 83:7, 83:25, 149:8, 149:10, 150:18, 179:3, 179:18, 181:17, 183:1, 183:2, 184:16, 187:1
**finish** [3] - 69:21, 83:4, 83:5
**finished** [2] - 40:22, 105:6
**fire** [1] - 162:24
**firm** [8] - 25:1, 25:4, 25:5, 81:13, 87:22, 87:23, 88:2
**first** [51] - 10:9,

26:18, 27:24, 28:17, 28:25, 30:2, 34:6, 38:11, 42:8, 43:6, 46:4, 54:6, 59:10, 59:22, 59:23, 62:12, 65:15, 68:6, 68:13, 69:7, 72:17, 75:10, 76:11, 76:18, 77:8, 79:1, 87:21, 87:22, 89:10, 112:12, 113:6, 131:11, 138:20, 141:15, 156:2, 160:7, 161:12, 162:7, 163:11, 164:9, 168:7, 169:13, 170:5, 170:6, 170:13, 182:11, 182:12, 184:18, 185:20
**First** [6] - 66:25, 68:21, 71:5, 154:22, 168:13, 182:11
**fishing** [1] - 118:15
**five** [9] - 90:17, 91:25, 94:18, 94:19, 106:24, 167:8, 185:11, 185:13, 185:16
**five-album** [1] - 94:19
**five-minute** [1] - 185:16
**fix** [2] - 91:7, 97:5
**fixed** [1] - 91:7
**flat** [1] - 124:16
**flawed** [1] - 77:3
**FLOOR** [1] - 2:12
**fluke** [1] - 89:3
**flyers** [1] - 104:8
**focus** [2] - 95:13, 101:2
**focusing** [2] - 12:3, 17:12
**Foerster** [1] - 87:23
**folks** [1] - 110:13
**follow** [3] - 74:5, 74:8, 76:12
**followed** [2] - 73:24, 74:24
**follows** [1] - 132:24
**Football** [2] - 88:9
**footer** [2] - 183:10, 183:11
**foregoing** [15] - 22:2, 22:16, 125:6, 125:9, 131:2, 131:12, 131:18, 131:21, 132:25, 133:4, 133:6, 133:10, 133:14, 133:18, 133:22
**foreign** [1] - 28:10

**forever** [2] - 145:8, 145:18
**forget** [3] - 7:14, 167:23, 181:6
**forgetting** [1] - 165:14
**form** [14] - 8:20, 82:18, 127:7, 127:14, 130:6, 130:8, 130:20, 148:6, 161:4, 178:24, 179:6, 179:8, 182:20
**formal** [1] - 173:15
**formally** [1] - 120:15
**format** [9] - 18:25, 19:2, 19:15, 97:20, 97:21, 106:10, 113:19, 115:8, 115:9
**formats** [3] - 97:7, 97:19, 106:12
**forms** [1] - 153:8
**fortunate** [1] - 89:6
**foundation** [1] - 161:13
**four** [6] - 6:23, 7:5, 7:8, 90:16, 94:19, 170:21
**four-album** [1] - 94:19
**frame** [1] - 91:20
**Francisco** [1] - 87:23
**free** [1] - 112:2
**frequently** [3] - 5:24, 8:19, 173:6
**front** [12] - 53:10, 56:4, 94:12, 109:14, 109:16, 109:17, 123:9, 129:20, 158:10, 163:3, 179:20, 179:22
**frustrating** [1] - 151:25
**full** [6] - 7:9, 23:22, 35:10, 76:18, 76:21, 86:21
**function** [2] - 105:15, 107:3
**functioning** [1] - 91:2
**fund** [1] - 94:21
**fuzzy** [1] - 12:20

## G

**G.C.C** [2] - 60:4, 60:15
**gained** [1] - 25:25
**game** [2] - 117:8, 164:22
**gaps** [1] - 182:7
**Gary** [6] - 3:4, 23:19,

23:20, 23:23, 24:10, 75:22
**Geffen** [10] - 90:21, 90:23, 90:24, 91:12, 91:17, 91:23, 92:3, 93:12, 141:17, 142:9
**general** [7] - 72:10, 90:23, 91:1, 91:4, 91:12, 91:22, 132:21
**Generally** [1] - 32:4
**generally** [7] - 5:9, 5:11, 7:3, 7:6, 10:19, 25:19, 27:13
**generate** [3] - 35:2, 95:17, 101:16
**generic** [3] - 118:8, 118:10, 118:18
**gentleman** [1] - 79:2
**gentlemen** [1] - 147:24
**gigs** [1] - 95:19
**given** [9] - 28:4, 30:13, 42:22, 54:12, 59:2, 60:5, 61:11, 77:20, 150:2
**GLENN** [1] - 2:10
**glorified** [1] - 91:5
**goods** [2] - 164:19, 164:23
**govern** [1] - 119:11
**governed** [4] - 14:3, 122:19, 122:25, 123:3
**government** [1] - 92:12
**Government** [2] - 119:20, 121:17
**governs** [1] - 107:15
**graduate** [1] - 87:19
**GRAND** [1] - 2:11
**grant** [1] - 170:4
**granted** [1] - 13:3
**granting** [1] - 12:24
**Grave** [1] - 117:22
**Great** [1] - 61:24
**great** [10] - 89:8, 116:6, 117:7, 140:6, 140:11, 140:12, 140:15, 141:9, 185:22
**green** [1] - 113:10
**gross** [8] - 64:2, 66:19, 67:3, 67:14, 67:20, 155:8, 156:7, 156:19
**grounds** [1] - 163:16
**Group** [6] - 87:7, 87:11, 87:12, 90:9, 92:4, 92:10
**group** [2] - 107:2, 163:25
**Groups** [1] - 74:18

**grow** [1] - 106:7
**guess** [9] - 7:25, 78:16, 83:1, 83:16, 88:13, 126:7, 150:14, 163:2, 184:7
**guessing** [2] - 73:11, 73:16
**guest** [1] - 113:23
**GUILFORD** [3] - 150:20, 150:22, 150:24
**Guilford** [1] - 2:4
**Gustav** [4] - 3:6, 86:6, 86:12, 128:2
**GUTIERREZ** [1] - 1:3
**guys** [1] - 94:2

**H**

**H-A-R-L-E-S-T-O-N** [1] - 86:22
**half** [7] - 28:3, 32:7, 33:18, 62:18, 89:19, 90:17, 158:8
**hand** [4] - 32:25, 110:4, 110:24, 112:12
**handed** [2] - 75:5, 75:15
**handle** [2] - 83:21, 150:6
**handled** [2] - 125:18, 159:12
**hap** [1] - 73:6
**happy** [1] - 172:6
**hard** [4] - 57:9, 112:4, 113:13, 113:15
**Harleston** [24] - 3:7, 86:18, 86:19, 86:22, 87:3, 93:23, 99:9, 102:2, 107:13, 108:21, 110:1, 114:12, 115:25, 118:7, 120:20, 123:19, 128:13, 129:11, 130:3, 132:23, 133:9, 134:2, 137:2, 138:10
**head** [4] - 16:14, 90:5, 90:14, 181:20
**headings** [1] - 182:22
**headquarters** [1] - 110:19
**hear** [5] - 100:5, 117:17, 163:21, 165:14, 174:14
**heard** [21] - 6:15, 11:23, 12:8, 12:14, 21:12, 21:16, 21:18, 26:22, 50:17, 93:19,

94:24, 100:3, 100:6, 100:7, 100:10, 104:2, 114:1, 149:22, 163:21, 165:11, 175:24
**hearing** [4] - 118:25, 119:2, 119:3, 119:19
**hearsay** [4] - 161:14, 162:10, 162:16, 163:5
**heavily** [1] - 96:2
**held** [2] - 87:8, 87:9
**hello** [1] - 128:13
**help** [6] - 32:23, 49:2, 61:20, 101:8, 103:20, 119:20
**helped** [1] - 102:7
**helping** [2] - 101:4, 101:5
**hereafter** [1] - 97:11
**hereby** [1] - 172:25
**herein** [1] - 63:25
**hereinafter** [1] - 97:11
**hereunder** [1] - 64:3
**Hernandez** [3] - 186:12, 186:17, 186:22
**high** [1] - 37:18
**highlight** [3] - 139:23, 141:16, 143:2
**highlighting** [1] - 116:12
**Hill** [3] - 26:9, 74:19, 74:20
**hire** [1] - 95:15
**hired** [1] - 89:9
**hires** [2] - 40:4, 121:25
**historical** [1] - 175:19
**historically** [2] - 10:19, 99:19
**Historically** [2] - 4:16, 6:21
**Hoffman** [7] - 128:23, 130:12, 130:15, 173:20, 174:1, 177:17, 177:21
**Hold** [3] - 46:21, 78:4, 186:5
**hold** [6] - 51:8, 71:2, 78:4, 104:7, 120:11, 153:5
**holding** [1] - 20:8
**Holly** [1] - 97:14
**home** [7] - 99:18, 99:20, 99:21, 100:1, 100:4, 109:14, 110:2
**honest** [1] - 139:14
**Honor** [101] - 4:7,

22:22, 22:25, 23:3, 23:25, 26:13, 37:22, 37:24, 38:6, 46:18, 46:20, 46:25, 47:3, 49:6, 49:10, 49:14, 50:8, 51:19, 57:5, 67:8, 75:2, 78:6, 82:14, 83:1, 83:7, 83:9, 83:16, 83:20, 83:25, 84:3, 85:11, 86:3, 86:7, 86:13, 86:18, 86:24, 93:18, 109:6, 109:8, 127:25, 132:2, 148:14, 148:21, 149:16, 150:1, 150:14, 151:4, 151:5, 151:17, 152:5, 152:12, 153:4, 153:5, 153:17, 154:19, 156:25, 157:7, 157:13, 158:14, 159:2, 159:19, 159:22, 159:24, 160:5, 161:21, 163:11, 164:9, 165:13, 166:17, 167:1, 167:16, 168:2, 168:6, 168:14, 169:8, 169:14, 170:4, 170:19, 171:6, 171:15, 173:25, 174:17, 177:6, 177:24, 178:12, 178:23, 179:3, 179:6, 179:16, 180:24, 181:6, 181:23, 182:19, 182:21, 183:1, 183:15, 183:18, 184:7, 185:22, 186:2
**Honor's** [2] - 79:21, 158:21
**HONORABLE** [1] - 1:3
**hope** [1] - 183:19
**Hopefully** [1] - 185:5
**horse** [1] - 158:10
**hour** [1] - 83:1
**hours** [3] - 21:7, 149:2, 165:16
**house** [2] - 91:20, 99:23
**Hu** [2] - 171:10
**hundred** [1] - 92:18
**hundreds** [2] - 120:25, 141:18
**hypothesizing** [2] - 18:7, 18:9
**hypothetical** [1] - 65:5

**I**

**idea** [9] - 15:14, 97:24, 140:6, 140:11, 140:12, 140:15, 141:9, 180:11
**identical** [1] - 13:8
**identification** [3] - 37:25, 186:15, 186:20
**identified** [5] - 101:5, 134:24, 153:19, 159:8, 178:21
**identify** [4] - 38:3, 49:21, 49:24, 101:4
**identity** [1] - 178:20
**ignore** [2] - 65:15, 65:17
**image** [3] - 101:8, 101:12, 111:17
**imagine** [1] - 109:15
**impact** [1] - 103:3
**impeachment** [4] - 47:2, 47:3, 49:11, 49:12
**implicit** [1] - 45:19
**important** [12] - 40:10, 44:17, 44:23, 74:7, 98:20, 101:12, 101:13, 102:25, 104:3, 143:2, 143:5, 162:15
**importantly** [1] - 127:5
**imposes** [1] - 16:21
**IN** [2] - 2:3, 2:9
**Inc** [8] - 173:13, 173:15, 173:16, 177:9, 177:12, 177:19, 178:9
**include** [5] - 33:24, 64:17, 129:24, 159:4, 160:10
**included** [12] - 30:23, 30:24, 31:5, 31:10, 31:11, 37:20, 54:4, 60:1, 142:21, 152:24, 163:25, 171:22
**includes** [3] - 57:17, 97:9, 150:23
**Includes** [1] - 57:18
**including** [2] - 9:23, 25:11
**income** [8] - 51:12, 63:18, 63:20, 95:17, 152:17, 152:21, 153:7, 153:23
**inconsistent** [1] - 50:9
**incorporated** [1] -

172:4
**incorporates** [3] - 71:12, 71:17, 177:7
**incorrect** [1] - 163:12
**increase** [1] - 102:10
**increasingly** [2] - 101:13, 140:4
**incurred** [2] - 58:10, 69:4, 70:2
**independent** [8] - 95:15, 104:15, 172:16, 172:21, 174:3, 175:20, 175:21, 177:25
**Independent** [2] - 88:14, 88:20
**INDEX** [1] - 3:1
**index** [4] - 180:21, 182:11, 182:22, 183:4
**indicates** [1] - 55:3
**indicia** [3] - 17:9, 17:13, 124:3
**individual** [1] - 180:11
**individually** [2] - 121:14, 179:13
**industry** [5] - 23:5, 24:12, 121:11, 139:21, 140:2
**information** [7] - 77:14, 77:16, 77:17, 106:20, 113:8, 113:9, 186:14
**infrastructure** [1] - 140:21
**infringer** [2] - 13:2, 13:9
**initial** [1] - 91:19
**inquire** [1] - 86:23
**inquiry** [3] - 45:20, 46:1, 48:1
**insert** [1] - 19:23
**inserts** [1] - 16:16
**inside** [1] - 165:14
**insofar** [1] - 174:22
**instance** [4] - 12:23, 114:19, 115:11, 143:6
**Instead** [2] - 23:7, 37:5
**instead** [4] - 18:25, 58:16, 107:24, 115:25
**instruct** [1] - 148:17
**instructed** [1] - 33:3
**instruction** [6] - 179:12, 181:16, 182:17, 184:4, 184:6, 184:13
**Instruction** [3] - 181:4, 183:5, 183:19

**instructions** [15] - 28:5, 148:2, 178:10, 178:25, 179:1, 179:3, 179:12, 180:20, 182:5, 182:13, 183:9, 183:11, 183:13, 183:18, 185:24
**insufficiently** [1] - 76:13
**intend** [2] - 150:6, 185:8
**interest** [7] - 27:1, 31:15, 32:9, 76:21, 101:16, 176:4
**interests** [1] - 152:7
**interfaces** [1] - 110:13
**internal** [1] - 28:9
**Internet** [7] - 119:6, 119:7, 119:9, 119:11, 119:12, 119:15, 119:21
**interpretation** [3] - 23:14, 146:17, 146:18
**interrogatory** [5] - 149:19, 151:1, 178:14, 181:22, 185:10
**Interrogatory** [3] - 149:20, 149:25, 167:23
**interrupt** [2] - 17:5, 157:21
**Interscope** [50] - 27:2, 28:9, 31:17, 32:3, 90:10, 90:12, 103:20, 110:8, 110:9, 110:23, 130:7, 142:9, 160:21, 160:22, 160:25, 172:11, 172:13, 172:15, 172:17, 172:19, 172:23, 172:25, 173:4, 173:5, 173:12, 173:16, 173:17, 173:19, 173:21, 173:22, 173:24, 174:2, 174:23, 175:2, 175:12, 175:14, 175:16, 175:19, 175:22, 176:2, 176:8, 176:9, 176:18, 177:3, 177:4, 177:8, 177:11, 177:25, 180:7
**Interscope's** [3] - 43:17, 130:20, 157:1
**interview** [1] - 83:12
**inundate** [1] - 155:11
**inventory** [1] - 51:8
**investigating** [5] -

45:13, 48:4, 48:13, 119:5
**investigation** [1] - 45:2
**invitation** [1] - 174:11
**inviting** [1] - 182:25
**invoices** [1] - 28:11
**involved** [13] - 14:9, 28:15, 50:14, 78:21, 84:11, 84:12, 91:8, 91:18, 92:8, 92:17, 93:13, 134:6, 134:8
**involvement** [2] - 78:21, 91:13
**involves** [1] - 176:10
**involving** [1] - 56:18
**Iovine** [1] - 175:24
**iPod** [3] - 16:18, 127:16, 143:10
**iPods** [1] - 121:2
**irrelevant** [2] - 154:20, 155:11
**Island** [1] - 90:13
**issuance** [1] - 29:23
**issue** [56] - 18:19, 28:22, 28:23, 29:11, 29:17, 29:20, 29:24, 30:3, 41:5, 41:9, 41:17, 41:19, 41:21, 42:9, 42:11, 42:14, 44:19, 45:13, 47:19, 47:22, 47:23, 48:5, 48:13, 60:18, 60:23, 61:3, 61:6, 65:7, 81:10, 83:5, 83:6, 92:20, 119:19, 119:20, 129:23, 148:20, 148:21, 160:12, 160:14, 161:3, 161:11, 161:20, 163:20, 164:7, 164:20, 166:20, 170:12, 170:19, 171:11, 171:14, 171:15, 178:14, 179:16, 180:5, 185:3
**issued** [7] - 29:5, 30:2, 41:1, 42:4, 42:5, 74:23, 151:6
**issues** [17] - 28:14, 28:18, 50:14, 74:12, 81:9, 119:21, 119:22, 151:24, 152:9, 162:22, 163:4, 170:2, 171:3, 171:13, 172:6, 178:20, 179:19
**Item** [1] - 33:3
**Items** [2] - 59:25,

60:4
**items** [2] - 60:1, 156:5
**itself** [2] - 17:15, 17:18
**iTunes** [42] - 16:4, 16:8, 33:6, 49:18, 73:8, 73:12, 73:15, 98:25, 103:15, 104:19, 105:16, 106:3, 108:7, 108:9, 108:13, 108:16, 109:15, 109:18, 110:8, 110:9, 110:13, 110:23, 112:8, 114:7, 114:15, 115:13, 123:16, 124:15, 135:23, 136:9, 136:18, 136:23, 137:17, 137:21, 140:11, 140:15, 141:1, 141:2, 141:3, 141:7, 143:18, 168:20

## J

**Jam** [1] - 90:13
**January** [7] - 28:2, 30:1, 40:23, 42:7, 56:12, 68:8, 166:2
**Jay** [1] - 101:23
**Jeff** [1] - 86:18
**Jeffrey** [3] - 3:7, 86:19, 86:22
**Jersey** [1] - 24:9
**jewel** [2] - 19:13, 19:21
**Jim** [1] - 81:16
**job** [14] - 40:10, 65:20, 65:25, 83:12, 87:21, 87:22, 88:12, 89:2, 89:23, 91:8, 91:12, 92:6, 92:7, 128:25
**Joel** [1] - 26:25
**join** [1] - 6:21
**joined** [3] - 88:14, 88:20, 89:10
**joint** [2] - 163:13, 174:7
**joking** [1] - 158:8
**Joseph** [1] - 25:1
**Judge** [2] - 74:14, 81:23
**JUDGE** [1] - 1:3
**judge** [1] - 78:9
**Judge's** [1] - 82:9
**judgment** [10] - 158:21, 160:6, 168:3, 168:8, 169:16,

169:20, 170:4, 170:20, 171:7, 178:8
**judiciary** [1] - 119:4
**July** [3] - 47:14, 119:3, 137:12
**jumped** [1] - 61:21
**June** [6] - 28:2, 54:7, 54:15, 56:9, 56:12, 166:2
**junior** [1] - 89:13
**jur** [1] - 83:3
**juror** [1] - 83:5
**Juror** [1] - 83:10
**jurors** [5] - 155:16, 161:9, 180:21, 183:12, 185:19
**JURY** [1] - 1:17
**jury** [31] - 4:4, 6:18, 24:18, 32:23, 34:2, 82:21, 83:18, 108:11, 148:10, 150:17, 155:11, 156:3, 158:5, 158:7, 163:3, 168:11, 171:11, 178:10, 179:12, 180:6, 180:13, 182:5, 182:7, 182:13, 182:15, 183:8, 183:11, 183:17, 185:24, 186:8
**justification** [5] - 51:11, 51:15, 51:18, 52:1, 52:5
**justifications** [2] - 50:19, 50:22
**justified** [1] - 52:11

## K

**keep** [8] - 5:17, 57:22, 57:23, 82:25, 91:7, 97:8, 186:5, 186:7
**KELLY** [1] - 2:10
**key** [1] - 168:23
**kind** [15] - 39:22, 88:4, 88:6, 88:7, 89:15, 90:1, 91:5, 91:20, 94:13, 106:21, 109:17, 110:20, 111:25, 113:25, 115:4
**kinds** [5] - 96:14, 96:24, 98:1, 102:9, 117:4
**KLAUS** [47] - 2:10, 38:6, 38:9, 39:12, 39:14, 42:19, 42:21, 43:23, 43:24, 46:18, 46:23, 47:3, 47:18, 49:6, 49:13, 49:16, 50:8, 50:12, 50:13,

51:19, 52:17, 54:17, 54:19, 57:5, 57:8, 57:24, 58:1, 61:25, 62:3, 63:15, 63:19, 67:8, 68:3, 75:2, 75:4, 77:25, 78:6, 78:8, 78:12, 79:21, 79:25, 80:8, 80:9, 80:24, 81:17, 82:13, 86:3
**Klaus** [11] - 47:2, 57:21, 80:7, 80:22, 84:6, 84:10, 84:15, 84:22, 85:7, 85:17, 85:21
**knowing** [3] - 32:14, 73:5, 84:16
**knowledgeable** [1] - 121:11
**known** [1] - 97:10
**knows** [2] - 96:8, 96:13

## L

**L.P** [9] - 18:3, 18:21, 18:25, 19:5, 19:20, 20:11, 20:16, 30:25
**label** [14] - 71:20, 89:25, 90:7, 90:10, 90:22, 92:3, 95:6, 95:18, 97:14, 107:2, 110:16, 134:14, 140:5, 175:22
**labels** [7] - 26:7, 90:8, 92:9, 93:12, 110:11, 110:12, 112:4
**Ladies** [1] - 147:24
**language** [19] - 12:3, 14:5, 48:20, 49:1, 49:21, 61:18, 97:17, 131:2, 132:24, 135:3, 135:4, 146:10, 146:19, 147:1, 168:13, 169:3, 170:7, 171:25
**large** [2] - 59:2, 118:8
**largest** [1] - 115:19
**Last** [1] - 129:22
**last** [21] - 22:1, 23:22, 46:10, 86:21, 87:9, 105:6, 106:24, 115:18, 118:25, 119:3, 140:6, 141:9, 141:14, 146:22, 155:15, 161:20, 164:4, 174:13, 178:10, 179:7, 185:3
**last-minute** [1] - 185:3
**late** [3] - 83:4, 88:13,

88:19
**latter** [1] - 28:3
**laundry** [1] - 157:11
**law** [19] - 12:11, 12:13, 13:12, 13:14, 13:16, 16:15, 87:17, 87:18, 87:21, 87:22, 87:23, 89:6, 148:2, 164:11, 168:3, 170:4, 170:20, 171:7, 173:7
**laws** [2] - 12:9, 13:20
**lawsuit** [4] - 92:20, 119:22, 151:20, 176:3
**lawyer** [9] - 84:11, 84:17, 84:21, 85:8, 85:22, 89:14, 90:25, 91:2, 94:7
**lawyers** [4] - 81:14, 96:7, 139:10, 139:15
**League** [2] - 88:9, 88:10
**Leahy** [1] - 138:19
**leaks** [1] - 103:8
**least** [3] - 64:16, 64:17, 169:9
**leave** [6] - 83:11, 88:11, 88:23, 183:23, 184:13, 184:19
**leaves** [2] - 34:11, 105:8
**left** [9] - 32:25, 55:19, 88:14, 88:19, 88:25, 92:3, 164:5, 183:23, 184:3
**left-hand** [1] - 32:25
**legal** [12] - 23:9, 23:11, 87:6, 89:13, 89:20, 89:22, 90:3, 90:5, 91:10, 92:5, 92:10, 181:7
**LeMoine** [3] - 151:15, 184:8, 184:22
**LEMOINE** [4] - 2:11, 178:12, 178:16, 178:23
**length** [1] - 174:1
**Leno** [1] - 101:23
**Less** [2] - 64:4, 64:8
**less** [4] - 4:20, 59:7, 64:8, 148:13
**letter** [2] - 27:2, 29:14
**Letterman** [3] - 101:25, 102:5, 102:8
**letters** [1] - 38:13
**liable** [4] - 170:24, 171:2, 180:7, 180:8
**License** [2] - 117:7, 117:8
**license** [119] - 8:17,

8:23, 10:21, 10:24, 11:25, 12:5, 12:15, 12:17, 12:18, 12:24, 13:3, 13:4, 13:6, 13:7, 13:9, 13:10, 13:12, 13:14, 13:15, 13:19, 13:22, 14:7, 14:9, 14:22, 16:9, 17:9, 17:13, 17:24, 18:18, 22:15, 23:8, 23:12, 35:15, 39:5, 41:6, 41:17, 41:21, 44:11, 45:25, 47:23, 48:23, 49:4, 49:19, 50:1, 50:5, 50:6, 50:7, 50:19, 50:23, 51:2, 51:6, 51:13, 52:2, 52:7, 61:9, 61:12, 62:1, 62:5, 62:11, 70:16, 71:10, 71:11, 71:20, 72:1, 72:5, 95:23, 96:1, 116:8, 116:9, 116:15, 116:18, 117:5, 117:16, 118:8, 118:10, 118:12, 118:15, 118:16, 118:17, 119:24, 120:22, 121:5, 121:7, 121:9, 121:12, 122:12, 122:19, 122:24, 123:2, 125:2, 125:5, 126:1, 126:4, 126:8, 126:17, 136:23, 137:17, 137:21, 137:22, 138:1, 138:6, 141:17, 143:6, 143:7, 143:8, 143:15, 143:18, 143:25, 144:5, 144:15, 144:25, 146:14, 152:21, 153:7, 168:18, 170:10, 170:14
**licensed** [9] - 9:15, 13:1, 22:12, 70:17, 116:21, 116:23, 146:4, 147:2, 152:17
**licensee** [8] - 12:25, 65:3, 72:6, 72:12, 72:13, 72:22, 147:16
**licensee's** [1] - 117:13
**licensees** [2] - 146:4, 147:19
**licenses** [25] - 14:3, 22:9, 24:7, 36:7, 46:3, 51:9, 61:17, 70:23, 71:4, 96:14, 117:10, 118:13, 123:24,

130:5, 134:14, 134:22, 136:10, 136:14, 136:18, 138:4, 142:10, 142:22, 146:10, 146:14, 153:1
**licensing** [18] - 14:1, 72:2, 96:15, 120:25, 134:15, 134:23, 135:3, 140:5, 141:24, 142:15, 144:24, 145:2, 145:5, 153:8, 153:23, 161:2, 172:3
**licensor** [2] - 65:3, 72:23
**light** [1] - 180:9
**limit** [1] - 16:24
**limitation** [2] - 9:23, 144:7
**Limited** [1] - 74:18
**limited** [1] - 89:4
**Line** [10] - 46:23, 46:24, 49:8, 51:20, 51:21, 67:9, 67:10, 132:2, 132:3
**line** [7] - 34:2, 34:6, 34:18, 156:2, 156:5, 174:19, 174:21
**liner** [3] - 19:22, 20:18, 106:19
**lines** [1] - 30:20
**Lines** [3] - 78:1, 78:8, 79:22
**list** [16] - 38:3, 142:21, 151:22, 152:1, 157:11, 157:21, 158:18, 160:8, 160:10, 160:16, 160:17, 163:13, 163:14, 181:21, 186:15
**listed** [7] - 17:14, 17:15, 32:5, 112:21, 112:22, 123:23, 180:12
**listened** [1] - 21:8
**lists** [2] - 54:20, 76:20
**litigated** [2] - 151:24, 170:3
**litigating** [1] - 152:9
**litigation** [4] - 87:24, 88:3, 88:5, 88:8
**livelihood** [1] - 128:25
**living** [2] - 39:20, 87:5
**LLC** [1] - 1:4
**LLP** [1] - 2:9
**load** [1] - 98:7

**loaded** [1] - 98:6
**location** [1] - 104:16
**locations** [1] - 104:1
**locked** [1] - 103:23
**long-term** [1] - 11:3
**look** [41] - 14:23, 15:4, 41:5, 41:9, 41:16, 41:20, 43:3, 43:6, 45:10, 47:20, 48:3, 48:7, 48:10, 48:14, 48:17, 48:20, 49:17, 49:22, 50:3, 53:7, 56:4, 58:25, 59:15, 59:20, 59:25, 60:4, 60:15, 75:15, 76:6, 93:14, 105:1, 129:11, 154:10, 156:15, 163:6, 169:4, 171:18, 171:19, 179:4, 180:17, 183:19
**looked** [11] - 45:2, 45:4, 45:6, 45:8, 47:25, 55:19, 57:13, 60:24, 62:2, 154:21, 182:1
**looking** [20] - 32:11, 38:17, 44:1, 45:3, 45:12, 47:1, 47:19, 47:22, 49:25, 53:12, 53:16, 65:7, 65:9, 81:20, 82:1, 146:3, 154:9, 160:3, 168:10, 179:12
**looks** [1] - 156:18
**Los** [1] - 89:1
**LOS** [4] - 1:19, 1:24, 2:12, 4:1
**Lose** [2] - 37:9, 37:11
**lost** [1] - 11:8
**low** [2] - 37:18, 108:3
**lower** [2] - 51:14, 111:23
**lunch** [1] - 185:20
**lunchtime** [1] - 148:3
**Lybrand** [1] - 24:25
**lying** [1] - 84:16
**lyrics** [1] - 106:21

**M**

**M.C.A** [11] - 26:12, 89:1, 89:7, 89:11, 90:4, 90:6, 90:7, 90:10, 90:12, 90:15, 90:21
**Mahmsteen** [5] - 80:11, 80:13, 80:14, 81:4, 81:12
**mail** [10] - 9:22, 43:7,

43:8, 48:2, 48:3, 125:20, 150:15, 150:23, 151:2
**main** [1] - 113:6
**major** [2] - 140:2, 140:4
**Malmsteen** [1] - 85:20
**malpractice** [1] - 81:7
**management** [1] - 81:13
**manager** [5] - 90:23, 91:1, 91:4, 91:22, 94:8
**manner** [1] - 91:13
**manufacture** [14] - 12:25, 22:13, 51:7, 64:12, 107:19, 107:20, 107:24, 108:2, 116:23, 122:1, 124:8, 124:9, 146:5, 147:2
**manufactured** [1] - 99:18
**manufacturer** [3] - 122:4, 122:7, 122:11
**manufacturers** [2] - 105:23, 105:25
**manufactures** [1] - 122:23
**manufacturing** [8] - 51:4, 64:25, 105:1, 105:3, 105:19, 105:20, 121:24, 124:5
**MARCH** [2] - 1:20, 4:1
**March** [8] - 46:16, 47:8, 75:8, 78:15, 85:19, 103:14, 103:15, 103:16
**Mark** [1] - 2:4
**marked** [7] - 92:22, 158:14, 159:10, 186:9, 186:14, 186:17, 187:2
**market** [8] - 101:8, 102:16, 102:18, 102:23, 104:13, 106:17, 123:6, 143:6
**marketed** [1] - 111:15
**marketing** [4] - 91:11, 95:13, 101:11, 173:20
**marketplace** [1] - 101:9
**marriage** [1] - 118:15
**Marshall** [6] - 18:3, 18:21, 18:25, 19:5,

20:15, 30:25
  **Mart** [2] - 121:2,
123:15
  **Martin** [5] - 41:24,
66:18, 66:22, 66:25,
67:12
  **Martin's** [2] - 26:25,
67:7
  **Massachusetts** [1] -
87:16
  **master** [61] - 12:22,
13:1, 22:9, 22:15,
24:6, 27:21, 30:21,
31:15, 32:6, 32:12,
33:1, 33:15, 34:7,
34:13, 37:9, 46:3,
48:22, 51:5, 52:2,
52:7, 61:11, 61:16,
61:17, 62:15, 65:6,
70:17, 96:14, 100:10,
100:13, 100:15,
100:16, 100:18,
100:19, 105:7, 105:9,
116:4, 116:5, 116:8,
116:9, 116:18,
116:20, 117:10,
117:15, 126:2, 126:4,
126:8, 126:22, 127:2,
134:23, 135:20,
136:1, 136:23, 138:3,
138:6, 141:25,
144:25, 146:8,
146:14, 170:15, 174:3
  **mastered** [1] -
116:20
  **mastering** [1] - 105:8
  **masters** [56] - 8:17,
8:23, 9:15, 10:21,
10:24, 11:25, 12:4,
12:17, 13:5, 17:24,
22:12, 30:23, 30:24,
33:24, 35:14, 39:5,
41:5, 41:17, 41:21,
44:11, 45:24, 47:23,
49:3, 50:19, 50:22,
51:2, 51:13, 61:9,
62:1, 62:5, 62:8,
62:11, 62:16, 95:23,
96:1, 96:11, 116:15,
117:5, 119:14,
119:24, 121:6,
122:19, 123:1, 125:5,
126:1, 126:17, 146:4,
147:1, 168:18, 170:8,
170:10, 170:14,
171:17, 173:22,
177:22
  **material** [1] - 98:14
  **Material** [1] - 98:16
  **materials** [1] -

106:20
  **math** [1] - 156:3
  **mathematical** [1] -
74:9
  **Mathers** [8] - 18:3,
18:21, 18:25, 19:5,
20:15, 30:25, 154:24,
175:11
  **Matter** [1] - 140:19
  **matter** [20] - 16:15,
17:4, 18:19, 27:16,
27:17, 80:20, 81:3,
81:4, 81:5, 103:17,
124:4, 124:9, 168:3,
168:19, 169:24,
170:3, 170:20, 171:7,
180:19, 180:21
  **matters** [1] - 88:10
  **maven** [1] - 20:12
  **maximize** [1] - 103:3
  **mean** [22] - 14:21,
17:5, 34:21, 52:22,
64:1, 96:9, 97:13,
98:21, 98:23, 118:12,
127:18, 131:4,
132:11, 141:4, 142:6,
143:23, 152:25,
153:25, 163:6, 165:8,
176:21, 184:3
  **meaning** [3] - 60:3,
118:8, 118:10
  **means** [28] - 12:18,
13:6, 22:17, 40:3,
46:16, 47:9, 47:14,
63:3, 64:7, 64:8, 90:4,
96:23, 97:1, 97:10,
100:2, 103:6, 103:12,
115:17, 116:11,
125:16, 131:22,
132:13, 132:17,
132:18, 133:11,
133:14, 133:18,
168:18
  **meant** [8] - 11:18,
45:25, 66:1, 89:13,
90:4, 131:13, 133:22,
143:25
  **mechanical** [21] -
35:20, 35:23, 36:3,
36:6, 36:13, 64:18,
64:21, 64:23, 65:2,
65:4, 66:10, 66:12,
70:9, 70:15, 70:18,
72:2, 72:14, 72:17,
73:2, 73:21, 95:1
  **mechanicals** [6] -
36:2, 37:3, 37:5, 37:6,
72:7, 72:14
  **mechanism** [1] -
167:11

**meet** [1] - 110:17
  **MELINDA** [1] - 2:11
  **member** [4] - 7:19,
8:4, 8:8, 11:9
  **members** [1] - 7:11
  **memo** [2] - 129:12,
129:16
  **memorandum** [1] -
129:10
  **memory** [5] - 14:14,
15:9, 77:11, 85:4,
184:15
  **mentioned** [7] - 27:6,
85:23, 98:12, 121:1,
124:13, 179:9, 179:10
  **merely** [1] - 158:19
  **merge** [1] - 90:21
  **message** [1] -
101:10
  **metadata** [2] -
106:17, 106:21
  **method** [1] - 9:23
  **methodology** [17] -
38:18, 38:21, 62:10,
62:13, 62:17, 62:20,
62:23, 65:21, 74:1,
74:2, 74:5, 74:8,
74:14, 74:24, 76:23,
78:10, 81:23
  **Michael** [5] - 128:18,
128:21, 128:22,
129:10, 177:17
  **middle** [10] - 4:23,
9:20, 27:15, 46:9,
63:22, 111:5, 111:6,
111:9, 111:22, 111:25
  **midline** [1] - 125:22
  **might** [11] - 6:4,
55:7, 73:14, 96:15,
139:1, 142:14,
145:14, 149:10,
180:7, 181:20
  **mike** [1] - 57:22
  **Mile** [8] - 31:1, 31:4,
31:23, 36:17, 36:22,
36:23, 117:20, 170:9
  **million** [8] - 34:11,
34:12, 37:13, 37:17,
37:18, 53:3, 55:14,
107:9
  **mind** [2] - 93:23,
180:19
  **mine** [1] - 89:6
  **minis** [1] - 111:16
  **minute** [5] - 131:6,
149:10, 185:3,
185:14, 185:16
  **minutes** [12] - 82:16,
82:20, 128:3, 147:25,
148:14, 148:23,

149:2, 149:7, 149:9,
149:12, 185:9, 185:12
  **MIRIAM** [1] - 1:23
  **missed** [1] - 165:1
  **missing** [1] - 182:8
  **misspoke** [2] -
161:22, 175:13
  **misunderstanding**
[1] - 147:14
  **mixed** [2] - 105:6,
111:18
  **mixes** [1] - 99:2
  **mobile** [5] - 24:6,
51:5, 61:16, 65:6,
138:2
  **model** [1] - 141:7
  **moment** [10] - 23:1,
36:15, 70:13, 71:4,
75:10, 105:1, 120:3,
131:1, 132:4, 144:23
  **Monel** [1] - 23:9
  **money** [12] - 4:20,
5:22, 35:19, 40:7,
40:12, 42:15, 42:18,
58:8, 58:15, 94:20,
94:22, 107:5
  **Monica** [1] - 26:11
  **month** [11] - 6:23,
6:24, 7:3, 7:15, 8:10,
30:2, 85:19, 104:22,
129:3, 165:21, 167:12
  **months** [11] - 34:17,
79:11, 80:18, 81:2,
81:22, 82:2, 82:4,
87:9, 103:2, 118:21,
137:11
  **moot** [2] - 36:9,
148:22
  **morning** [4] - 148:8,
153:6, 178:11, 181:14
  **Morrison** [1] - 87:23
  **most** [14] - 40:11,
50:16, 80:2, 80:17,
80:25, 89:13, 106:12,
109:18, 109:22,
110:1, 110:6, 130:23,
151:18, 151:23
  **motion** [7] - 23:4,
23:16, 83:22, 148:19,
168:3, 170:20, 178:4
  **motions** [2] - 83:17,
178:8
  **Motown** [1] - 90:13
  **move** [5] - 37:24,
57:5, 89:5, 95:12,
156:10
  **moved** [2] - 88:2,
92:3
  **movie** [2] - 71:13,
117:21

**movies** [2] - 117:19,
153:12
  **moving** [5] - 91:8,
109:13, 112:18,
162:12, 186:19
  **MR** [243] - 4:7, 4:9,
11:24, 12:2, 17:19,
17:21, 21:2, 21:5,
21:23, 21:24, 22:20,
22:22, 22:25, 23:3,
23:15, 23:19, 23:25,
24:2, 26:13, 26:16,
26:17, 37:22, 37:24,
38:4, 38:6, 38:9,
39:12, 39:14, 42:19,
42:21, 43:23, 43:24,
46:18, 46:20, 46:22,
46:23, 46:25, 47:3,
47:18, 49:6, 49:9,
49:13, 49:16, 50:8,
50:12, 50:13, 51:19,
52:17, 54:17, 54:19,
57:5, 57:8, 57:24,
58:1, 61:25, 62:3,
63:15, 63:19, 67:8,
68:3, 75:2, 75:4,
77:25, 78:6, 78:8,
78:12, 79:21, 79:25,
80:8, 80:9, 80:24,
81:17, 82:13, 82:25,
83:7, 83:9, 83:16,
83:25, 84:3, 84:5,
85:11, 85:14, 85:16,
86:1, 86:3, 86:6,
86:13, 86:16, 86:18,
86:24, 87:2, 88:22,
93:18, 93:22, 99:3,
99:8, 102:12, 107:10,
107:12, 108:18,
108:20, 109:1, 109:5,
109:8, 109:11, 114:9,
114:11, 115:1, 115:3,
116:10, 116:14,
120:8, 120:13,
120:17, 120:19,
121:21, 121:23,
127:25, 128:3, 128:6,
128:8, 128:10,
128:12, 129:7, 129:8,
132:2, 132:5, 132:8,
132:22, 139:20,
139:23, 139:24,
141:14, 141:20,
142:25, 143:3,
144:20, 144:22,
147:22, 148:13,
148:21, 149:9,
149:16, 149:20,
150:1, 150:9, 150:13,
150:14, 150:18,
150:20, 150:22,

150:24, 151:4, 151:9, 151:15, 152:12, 152:16, 152:20, 153:4, 153:14, 153:17, 154:3, 154:15, 154:17, 154:19, 155:19, 156:2, 156:18, 156:24, 157:6, 157:9, 157:12, 157:16, 157:19, 157:23, 158:1, 158:6, 158:13, 158:18, 159:2, 159:14, 159:19, 160:5, 160:21, 161:7, 161:10, 161:20, 163:11, 163:24, 164:9, 165:9, 165:13, 165:18, 165:24, 166:17, 166:22, 167:1, 167:16, 167:25, 168:2, 168:6, 169:19, 171:6, 172:9, 173:11, 174:6, 174:15, 176:17, 177:6, 178:6, 178:19, 179:2, 179:6, 179:16, 179:21, 179:24, 180:1, 180:4, 180:24, 181:2, 181:12, 181:17, 181:22, 182:19, 183:1, 183:15, 183:17, 183:22, 184:2, 184:7, 184:11, 184:13, 184:16, 184:18, 184:21, 185:22, 186:2, 186:8, 186:10, 186:13, 186:20, 186:23, 187:3
**MS** [3] - 178:12, 178:16, 178:23
**MTV** [3] - 141:19, 142:14
**MUNGER** [1] - 2:9
**Music** [8] - 26:11, 87:7, 87:11, 87:12, 90:9, 92:4, 92:9, 98:4
**music** [23] - 19:18, 19:25, 81:11, 92:15, 96:6, 98:6, 98:7, 98:12, 98:19, 102:10, 103:18, 106:9, 110:18, 115:18, 115:19, 115:24, 121:11, 122:16, 123:13, 126:21, 140:5, 142:14
**musician** [1] - 81:12
**must** [3] - 69:1,

84:15, 84:17
**MVB11893@aol. com** [1] - 1:25
**MySpace** [1] - 141:19

**N**

**Name** [1] - 118:6
**name** [7] - 23:22, 80:10, 86:21, 106:17, 112:13
**named** [1] - 79:2, 115:19, 176:5
**names** [2] - 25:9, 179:8
**NASHVILLE** [1] - 2:5
**National** [2] - 88:8, 88:9
**nature** [1] - 50:3, 153:14, 160:10
**near** [1] - 108:6
**nearly** [1] - 37:17
**necessarily** [4] - 115:22, 121:10, 153:9, 185:4
**need** [13] - 40:16, 69:21, 91:7, 97:17, 108:22, 111:7, 148:16, 154:8, 155:10, 171:4, 185:24, 185:25
**needed** [2] - 133:20, 133:24
**needs** [4] - 83:11, 156:9, 182:1, 182:3
**negative** [1] - 59:15
**negotiate** [4] - 93:4, 94:8, 94:12, 121:14
**negotiated** [3] - 93:7, 94:14, 96:2
**negotiating** [5] - 13:18, 69:13, 91:14, 92:17, 93:11
**negotiation** [10] - 45:14, 65:3, 72:8, 91:19, 95:7, 95:10, 96:18, 134:6, 134:8, 143:5
**negotiations** [5] - 45:17, 91:10, 91:19, 96:20, 96:24
**neighborhood** [1] - 107:9
**net** [41] - 9:17, 22:14, 34:8, 35:15, 35:24, 36:2, 36:8, 62:7, 62:25, 63:3, 63:5, 63:7, 64:1, 64:16, 65:8, 65:9, 65:11,

65:23, 66:1, 66:9, 66:11, 66:20, 67:4, 67:15, 67:21, 68:12, 68:20, 68:22, 69:3, 69:11, 69:14, 69:15, 69:25, 70:1, 70:5, 70:15, 72:15, 96:12, 127:17, 155:3
**netted** [1] - 59:16
**netting** [1] - 60:6
**never** [13] - 13:19, 13:21, 13:23, 39:9, 41:11, 41:16, 45:13, 45:23, 78:16, 78:19, 78:21, 134:2, 160:15
**nevertheless** [1] - 76:19
**new** [9] - 93:11, 95:17, 103:21, 109:19, 111:10, 111:18, 112:5, 129:14
**New** [8] - 24:9, 24:20, 24:21, 26:9, 26:10, 46:12, 75:7, 84:7
**newly** [1] - 38:1
**next** [14] - 23:18, 86:5, 86:17, 89:5, 90:2, 97:23, 110:22, 131:5, 131:22, 140:7, 140:15, 141:9, 142:25, 143:4
**niche** [1] - 101:9
**Nichols** [14] - 17:19, 39:13, 42:19, 54:17, 61:25, 63:15, 63:17, 99:3, 107:10, 108:18, 108:22, 108:23, 116:12, 120:8
**night** [2] - 94:2, 102:8
**nines** [1] - 159:23
**Nobody** [5] - 165:3, 165:4, 166:12, 167:6, 167:7
**nobody** [1] - 166:7
**noise** [1] - 103:3
**nominal** [1] - 6:22
**non** [1] - 71:20
**non-Universal** [1] - 71:20
**none** [2] - 8:12, 163:14
**None** [1] - 42:1
**nonsubstantive** [2] - 159:9, 160:11
**normal** [45] - 5:5, 5:6, 8:24, 9:11, 9:12, 10:10, 10:17, 11:7, 11:10, 11:15, 11:16,

11:18, 17:23, 18:5, 18:7, 18:12, 18:16, 21:15, 44:2, 71:23, 107:16, 107:22, 108:4, 114:21, 115:12, 115:14, 115:16, 115:21, 115:23, 122:20, 123:1, 125:15, 125:25, 126:7, 126:9, 126:16, 127:4, 147:12, 147:17, 147:19, 168:15, 168:21, 169:6, 169:12
**normally** [1] - 7:8
**note** [4] - 33:6, 34:25, 46:4, 182:7
**notebooks** [1] - 54:3
**noted** [2] - 34:13, 47:25
**notes** [8] - 19:22, 20:18, 106:19, 181:25, 182:1, 184:1, 184:14, 186:6
**noteworthy** [1] - 111:10
**nothing** [11] - 7:5, 72:22, 121:18, 147:22, 151:23, 156:9, 158:20, 169:10, 172:1, 176:3, 178:6
**Nothing** [2] - 22:20, 156:16
**notice** [1] - 10:9
**notify** [1] - 94:5
**noting** [1] - 27:3
**Notwithstanding** [1] - 63:24
**notwithstanding** [19] - 22:1, 22:16, 125:6, 125:9, 125:16, 125:21, 131:2, 131:12, 131:18, 131:21, 132:13, 132:25, 133:2, 133:4, 133:5, 133:6, 133:17, 133:22
**Novation** [16] - 31:19, 45:6, 92:23, 171:17, 171:19, 171:22, 172:5, 172:12, 172:13, 172:17, 172:20, 172:24, 177:6, 177:9, 177:20
**November** [2] - 43:9, 68:7
**nowhere** [1] - 147:11
**Number** [12] - 15:8,

54:5, 54:18, 63:14, 83:11, 149:20, 149:25, 156:25, 167:23, 180:20, 181:1, 183:5
**number** [13] - 7:7, 7:20, 8:5, 35:25, 54:2, 56:8, 62:18, 92:18, 103:2, 108:3, 129:17, 150:19, 182:15
**numbered** [4] - 15:5, 181:15, 182:6, 183:5
**numbers** [4] - 38:13, 60:8, 77:20, 151:8

**O**

**o'clock** [5] - 83:12, 83:13, 148:8, 185:7, 185:18
**oath** [4] - 138:21, 138:24, 139:1, 143:14
**objected** [1] - 18:15
**objection** [9] - 93:18, 109:7, 149:22, 150:2, 152:11, 161:12, 161:13, 161:14, 164:1
**objections** [5] - 149:4, 151:13, 160:4, 163:16, 167:18
**obligated** [1] - 7:16
**obligation** [7] - 8:8, 173:4, 175:1, 175:3, 175:6, 176:22, 176:23
**obligations** [7] - 8:13, 172:13, 172:16, 172:22, 173:25, 174:3, 177:25
**obviously** [1] - 113:4
**occasionally** [1] - 94:8
**occasions** [1] - 79:6
**occupation** [1] - 24:11
**occurred** [1] - 85:23
**occurs** [1] - 166:2
**October** [1] - 137:14
**OF** [4] - 1:2, 1:16, 2:3, 2:9
**offer** [4] - 50:17, 127:22, 127:23, 165:20
**offered** [3] - 19:19, 169:9, 170:17
**offering** [1] - 13:5
**offers** [2] - 112:2, 142:11
**offhand** [1] - 85:1
**Office** [2] - 88:14, 88:20

**office** [4] - 24:9, 88:15, 88:21, 89:3
**OFFICIAL** [1] - 1:23
**official** [1] - 162:14
**offset** [1] - 60:1
**offsetting** [1] - 60:8
**often** [4] - 69:16, 96:19, 140:5, 147:17
**oftentimes** [2] - 91:18, 95:18
**Oftentimes** [1] - 97:2
**old** [1] - 99:21
**OLSON** [1] - 2:9
**Once** [3] - 26:8, 61:13, 105:21
**once** [7] - 26:10, 26:11, 46:9, 101:5, 103:22, 125:13, 169:13
**one** [113] - 5:14, 8:23, 8:24, 9:9, 9:14, 9:20, 9:21, 10:9, 10:13, 14:16, 15:9, 16:14, 16:16, 17:12, 17:15, 21:6, 26:22, 28:17, 29:21, 34:11, 36:15, 38:25, 41:4, 41:20, 42:22, 42:25, 43:1, 43:11, 46:19, 49:7, 54:15, 55:7, 55:17, 58:22, 63:7, 63:17, 64:9, 65:13, 69:18, 69:24, 70:13, 71:16, 73:5, 77:3, 78:1, 78:4, 79:22, 90:8, 90:10, 90:22, 95:23, 96:1, 97:25, 98:3, 101:3, 102:1, 102:6, 102:7, 102:17, 104:16, 106:8, 108:12, 109:5, 110:10, 110:11, 112:8, 112:19, 113:5, 113:12, 113:17, 116:7, 117:2, 118:3, 120:11, 127:21, 129:16, 129:22, 140:7, 153:23, 156:17, 163:15, 165:19, 165:20, 172:14, 174:25, 175:3, 176:24, 178:20, 180:1, 180:12, 181:5, 181:9, 181:15, 181:19, 181:23, 181:24, 182:6, 183:20, 183:22, 186:1, 186:5, 186:6, 186:7
**One** [9] - 8:23, 14:6,

14:8, 88:8, 125:3, 132:4, 182:3, 183:17, 186:4
**ones** [5] - 20:8, 151:10, 152:2, 152:3, 160:9
**online** [2] - 106:3, 114:14
**Oops** [1] - 127:13
**oops** [1] - 88:15
**Open** [3] - 4:4, 82:21, 148:10
**open** [6] - 47:6, 51:24, 86:10, 97:8, 123:10, 132:10
**opens** [1] - 76:11
**operation** [1] - 91:7
**opinion** [24] - 13:5, 18:10, 24:4, 31:9, 36:1, 43:14, 45:15, 45:20, 74:23, 75:5, 75:12, 75:21, 76:6, 76:12, 77:9, 77:12, 82:9, 82:12, 100:16, 125:4, 125:11, 126:21, 126:25, 127:1
**opinions** [3] - 82:18, 125:3, 148:7
**opportunities** [2] - 103:25, 110:20
**opportunity** [3] - 49:7, 51:20, 92:19
**opposed** [6] - 15:22, 15:23, 51:12, 99:25, 121:16, 182:16
**opposing** [3] - 160:13, 161:11, 179:15
**option** [2] - 99:22, 113:4
**order** [19] - 9:22, 30:11, 49:25, 62:24, 66:20, 67:4, 67:15, 67:21, 68:11, 75:20, 106:2, 124:5, 125:20, 141:1, 145:9, 154:7, 160:14, 185:21
**organization** [1] - 173:15
**originally** [1] - 33:15
**Ostroff** [8] - 128:18, 128:21, 128:22, 129:10, 161:25, 163:7, 163:8, 177:17
**otherwise** [4] - 6:12, 6:25, 71:24, 168:16
**ourselves** [2] - 128:4, 171:8
**outside** [4] - 69:1, 100:4, 117:15, 165:14

**Outside** [1] - 117:20
**overall** [2] - 32:19, 33:13
**overcharge** [2] - 56:18, 58:3
**overcharged** [1] - 29:3
**overruled** [1] - 149:4
**overseeing** [2] - 91:9, 92:10
**owe** [2] - 169:21, 169:25
**owed** [7] - 24:5, 32:2, 32:9, 32:15, 33:23, 34:3, 34:19
**own** [17] - 15:14, 24:9, 25:5, 71:12, 105:21, 113:18, 118:2, 124:5, 126:13, 126:16, 140:22, 140:25, 145:17, 170:22, 184:15
**owned** [4] - 12:22, 15:24, 105:25, 106:1
**owner** [2] - 15:25, 16:19
**ownership** [4] - 15:15, 76:21, 176:4
**owning** [1] - 8:2
**owns** [2] - 16:19, 173:22

## P

**p.m** [5] - 84:1, 149:13, 187:5
**P.M** [1] - 1:18
**Page** [18] - 46:23, 49:8, 50:9, 51:20, 51:21, 63:11, 63:12, 63:16, 67:9, 75:14, 76:6, 78:1, 79:22, 99:5, 132:2, 182:15
**PAGE** [1] - 3:2
**page** [14] - 54:16, 80:4, 109:14, 110:2, 111:5, 111:20, 111:23, 112:17, 112:18, 113:7, 113:11, 141:15, 142:25
**pages** [7] - 54:11, 59:15, 108:16, 120:9, 161:10, 161:17, 162:9
**paid** [44] - 4:24, 5:2, 5:9, 5:25, 28:12, 30:19, 31:13, 32:13, 33:1, 33:10, 33:21, 34:7, 34:9, 35:18, 36:7, 36:13, 38:25,

39:2, 40:17, 46:3, 52:21, 52:22, 53:2, 53:6, 55:3, 55:6, 56:8, 58:4, 58:6, 72:21, 95:2, 95:3, 130:1, 155:2, 162:20, 166:1, 169:25, 171:9, 176:11, 177:14
**panicking** [1] - 53:20
**papered** [1] - 94:9
**Paragraph** [12] - 14:24, 15:3, 15:4, 15:6, 44:3, 44:7, 44:11, 63:17, 99:5, 107:11, 115:1, 172:15
**paragraph** [15] - 43:6, 63:18, 63:20, 63:22, 75:17, 76:11, 76:18, 99:4, 139:20, 141:14, 143:5, 159:12, 184:9, 184:19
**parameters** [1] - 28:5
**parcel** [2] - 69:4, 70:2
**parent** [1] - 92:4
**parse** [1] - 61:18
**part** [29] - 13:10, 25:24, 30:22, 38:18, 40:10, 65:13, 65:25, 69:4, 69:20, 70:2, 74:7, 87:10, 95:9, 101:3, 101:7, 102:1, 140:4, 143:18, 149:17, 150:4, 150:15, 152:2, 162:2, 170:8, 170:16, 170:20, 175:22, 186:17, 186:24
**particular** [11] - 12:4, 14:3, 32:12, 53:6, 58:6, 61:1, 66:14, 107:19, 107:24, 151:19, 152:9
**particularly** [1] - 109:21
**parties** [18] - 28:12, 44:18, 44:20, 44:21, 48:11, 65:22, 70:17, 97:6, 134:15, 135:21, 136:3, 170:22, 170:23, 175:13, 177:18, 180:19, 182:9, 183:7
**partner** [4] - 25:3, 105:17, 125:1, 174:7
**partners** [9] - 103:24, 104:18, 105:15, 106:11, 106:12, 106:15, 107:4, 123:11, 123:12

**partnership** [1] - 175:20
**party** [26] - 40:6, 43:15, 48:21, 64:10, 70:24, 71:11, 71:16, 72:6, 72:25, 73:1, 96:15, 121:25, 122:3, 122:23, 134:10, 136:2, 155:4, 155:12, 155:13, 170:25, 174:20, 175:7, 176:6, 176:11, 176:22, 177:1
**party's** [2] - 44:15, 117:14
**passed** [1] - 160:23
**passing** [2] - 101:21, 157:2
**past** [2] - 21:7, 129:1
**paused** [1] - 109:13
**pay** [18] - 6:21, 7:9, 7:16, 10:6, 51:4, 51:6, 51:14, 66:10, 94:21, 119:13, 127:16, 127:21, 144:24, 165:21, 175:1, 176:20, 177:15, 178:2
**payable** [3] - 55:16, 55:22, 114:24
**paycheck** [1] - 129:3
**payee** [3] - 54:20, 55:17
**paying** [14] - 19:14, 36:3, 52:1, 52:5, 72:14, 73:2, 127:11, 127:14, 145:9, 152:17, 153:22, 175:5, 175:7, 176:12
**payment** [2] - 64:11, 176:10
**payments** [3] - 70:19, 73:14, 173:3
**pays** [5] - 65:2, 66:10, 73:20, 95:6, 166:8
**Peas** [1] - 25:13
**penalized** [1] - 4:19
**penny** [1] - 33:9
**people** [11] - 23:6, 42:1, 96:12, 96:17, 96:19, 101:18, 129:11, 140:16, 152:7, 164:10, 177:18
**people's** [1] - 110:3
**per** [4] - 33:6, 33:15, 33:20, 50:2
**percent** [37] - 9:17, 22:14, 27:1, 33:3, 33:4, 33:7, 33:8, 33:9, 33:13, 33:19, 34:8, 35:15, 43:16, 62:6,

62:18, 62:25, 66:11, 94:25, 114:23, 114:24, 127:11, 127:15, 127:17, 153:22, 154:7, 155:3, 155:5, 155:6, 155:9, 155:10, 156:7, 156:21, 156:22
**percent/50** [1] - 62:18
**percentage** [7] - 4:18, 4:21, 32:14, 114:23, 124:15, 156:4, 156:5
**perfect** [1] - 105:7
**perfecting** [1] - 140:6
**perform** [2] - 105:15, 110:20
**performance** [2] - 97:1, 97:5
**performances** [1] - 94:4
**performing** [1] - 101:24
**perhaps** [1] - 50:7
**period** [11] - 26:21, 28:1, 53:7, 54:7, 54:15, 55:1, 55:4, 56:9, 165:21, 166:3, 166:5
**periodic** [1] - 53:8
**periodically** [1] - 25:21
**periods** [2] - 37:19, 154:11
**permanence** [1] - 145:17
**permanent** [40] - 24:6, 34:7, 34:12, 39:3, 44:3, 44:7, 44:12, 47:24, 48:18, 61:16, 62:14, 65:6, 66:20, 67:3, 67:15, 67:20, 93:2, 93:4, 93:8, 123:24, 126:22, 127:1, 129:15, 129:25, 134:13, 134:22, 135:8, 135:13, 136:5, 136:18, 136:23, 137:21, 142:11, 145:6, 145:7, 145:12, 146:1, 146:13, 169:5, 170:15
**permission** [10] - 46:18, 50:9, 67:8, 77:25, 79:21, 118:12, 118:14, 121:12, 122:14, 122:15

**permits** [1] - 122:11
**perpetuity** [1] - 16:20
**person** [5] - 8:12, 40:4, 42:8, 117:14, 164:15
**personal** [2] - 100:1, 104:17
**persuade** [1] - 110:9
**pertains** [1] - 174:22
**pertinent** [2] - 184:11, 184:12
**Petty** [1] - 25:14
**PHILIP** [1] - 1:3
**phone** [5] - 98:8, 138:1, 138:2, 138:7
**photo** [1] - 101:11
**phrase** [3] - 16:13, 132:11, 132:13
**physical** [16] - 15:25, 98:17, 105:8, 105:13, 105:18, 105:20, 107:4, 112:22, 114:14, 157:2, 160:23, 161:2, 161:24, 164:19, 164:23
**pick** [2] - 17:15, 98:23
**picture** [2] - 100:24, 104:7
**pictures** [1] - 20:18
**pie** [1] - 32:10
**piece** [2] - 32:10, 106:9
**pieces** [1] - 152:6
**Ping** [1] - 171:10
**pipes** [1] - 91:6
**pitch** [4] - 155:21, 155:24, 179:20, 181:20
**place** [3] - 103:17, 104:13, 115:17
**placed** [1] - 109:21
**places** [2] - 104:20, 182:5
**plain** [1] - 76:19
**PLAINTIFF** [1] - 2:3
**plaintiff** [3] - 26:23, 86:15, 86:16
**plaintiff's** [1] - 169:15
**plaintiffs** [7] - 26:22, 37:16, 75:20, 76:20, 168:8, 168:12, 179:9
**Plaintiffs** [1] - 1:6
**plaintiffs'** [1] - 76:20
**Plaintiffs'** [2] - 23:18, 86:5
**plant** [2] - 105:10,

105:14
**plants** [1] - 105:21
**platform** [1] - 140:25
**play** [11] - 16:17, 39:9, 46:18, 49:7, 50:9, 51:20, 67:9, 78:1, 78:6, 110:18, 132:2
**played** [4] - 47:5, 51:23, 86:9, 132:9
**players** [1] - 99:20
**playing** [2] - 99:23
**plenty** [1] - 140:3
**plumber** [1] - 91:5
**plummeted** [1] - 107:25
**podium** [1] - 54:3
**point** [33] - 4:18, 17:17, 36:9, 50:4, 50:8, 58:18, 59:3, 88:11, 88:23, 108:22, 121:12, 124:13, 152:25, 153:1, 156:10, 161:3, 162:5, 162:15, 162:19, 164:17, 164:18, 165:2, 165:5, 168:10, 168:13, 168:19, 171:12, 171:24, 176:15, 176:17, 180:10
**pointed** [6] - 14:8, 15:17, 41:19, 84:6, 84:10, 85:17
**pointing** [1] - 139:5
**points** [2] - 15:5, 15:10
**Pomerantz** [36] - 4:6, 4:11, 21:8, 21:13, 21:14, 21:15, 21:18, 21:25, 22:21, 46:7, 46:14, 77:21, 78:18, 79:12, 80:1, 80:15, 81:22, 82:22, 120:12, 131:1, 133:3, 137:2, 148:11, 149:6, 155:24, 161:19, 166:22, 171:24, 174:8, 174:11, 174:13, 180:4, 180:9, 180:14, 182:3, 185:14
**POMERANTZ** [79] - 2:10, 4:7, 4:9, 11:24, 12:2, 17:19, 17:21, 21:2, 22:22, 22:25, 23:3, 82:25, 83:7, 83:9, 83:16, 86:18, 86:24, 87:2, 88:22, 93:22, 99:3, 99:8, 102:12, 107:10,

107:12, 108:18, 108:20, 109:1, 109:5, 109:11, 114:9, 114:11, 115:1, 115:3, 116:10, 116:14, 120:8, 120:13, 120:17, 120:19, 121:21, 121:23, 127:25, 148:13, 148:21, 150:1, 150:14, 151:15, 154:19, 161:20, 163:11, 163:24, 165:13, 165:18, 165:24, 166:17, 167:1, 168:2, 168:6, 169:19, 174:15, 176:17, 179:6, 180:24, 181:2, 181:12, 181:22, 182:19, 183:15, 183:17, 183:22, 184:2, 184:7, 184:11, 184:13, 184:16, 184:18, 184:21, 185:22
**Pomerantz's** [1] - 144:10
**pop** [1] - 98:8
**popular** [5] - 93:5, 93:8, 97:21, 97:23, 117:9
**portable** [1] - 16:18
**portion** [2] - 116:5, 157:6
**portions** [1] - 139:6
**portray** [1] - 101:14
**position** [24] - 16:7, 19:6, 20:22, 35:23, 40:4, 42:6, 61:15, 66:2, 66:5, 66:8, 66:14, 87:8, 87:9, 89:10, 89:18, 89:21, 90:2, 90:18, 90:25, 91:1, 91:24, 92:1, 149:24, 166:23
**positioning** [1] - 104:3
**Positioning** [1] - 104:3
**positive** [2] - 13:13, 59:16
**possible** [3] - 53:4, 59:3, 97:4
**postcards** [1] - 101:20
**posters** [2] - 101:22, 104:5
**practically** [1] - 7:5
**practice** [2] - 23:5,

23:13
**pre** [2] - 104:21
**preadmitted** [1] - 108:15
**preceded** [3] - 22:17, 61:12, 133:1
**precedence** [1] - 22:18
**precise** [1] - 57:2
**precisely** [1] - 163:5
**preclude** [1] - 16:23
**precludes** [1] - 16:17
**precluding** [1] - 155:20
**predicated** [1] - 39:4
**prefer** [1] - 121:14
**preference** [2] - 182:19, 182:21
**preinstruction** [2] - 185:11
**prejudicial** [1] - 161:16
**premark** [1] - 186:16
**prepare** [2] - 30:11, 139:9
**prepared** [1] - 34:1
**preparing** [3] - 67:22, 110:17, 183:6
**present** [4] - 4:4, 82:21, 102:10, 148:10
**presentation** [1] - 186:25
**presented** [1] - 158:9
**presenting** [1] - 170:13
**president** [3] - 87:6, 89:22, 90:3
**PRESIDING** [1] - 1:3
**press** [1] - 105:24
**presses** [1] - 105:10
**pressing** [3] - 105:10, 105:14, 105:21
**pretrial** [1] - 160:14
**pretty** [1] - 179:8
**Pretty** [1] - 141:4
**prevail** [1] - 132:20
**prevails** [1] - 133:1
**previous** [1] - 64:1
**previously** [1] - 14:8
**price** [10] - 7:10, 19:15, 33:3, 33:4, 33:5, 33:18, 114:24, 124:15, 124:16
**pricing** [1] - 104:2
**primarily** [4] - 24:13, 89:17, 100:4, 114:19
**Primarily** [1] - 39:21
**primary** [1] - 101:2
**printing** [1] - 101:20

**private** [1] - 120:14
**problem** [2] - 150:2, 174:9
**problems** [2] - 83:6, 182:25
**proceed** [3] - 26:15, 93:21, 167:24
**proceeded** [1] - 62:20
**PROCEEDINGS** [1] - 1:16
**proceedings** [1] - 187:5
**process** [6] - 93:14, 105:4, 106:25, 113:14, 113:16, 151:21
**produced** [3] - 113:23, 158:15, 159:7
**producer** [1] - 116:1
**producers** [2] - 101:6, 106:20
**product** [4] - 104:12, 117:12, 117:14, 117:15
**production** [2] - 89:25, 107:1
**PRODUCTIONS** [2] - 1:4, 2:3
**products** [1] - 116:22
**Professor** [1] - 23:9
**proffered** [1] - 168:11
**program** [1] - 71:13
**programs** [2] - 104:20, 142:18
**prohibited** [2] - 15:11, 15:18
**prohibits** [1] - 14:19
**project** [1] - 172:2
**projects** [3] - 31:20, 31:24, 171:20
**prominently** [1] - 104:19
**promotion** [3] - 89:23, 91:11, 111:25
**pronounce** [1] - 80:12
**proper** [1] - 121:17
**props** [1] - 102:19
**prosecution** [1] - 89:4
**prosecutor's** [3] - 88:15, 88:21, 89:3
**protective** [1] - 163:19
**protectively** [2] - 159:10, 159:11
**prove** [1] - 75:20

**provide** [4] - 48:19, 48:24, 95:15, 95:19
**provided** [10] - 34:25, 77:16, 77:18, 115:11, 134:17, 135:20, 136:2, 145:4, 145:23, 145:24
**provider** [4] - 48:18, 48:22, 134:10, 145:25
**providers** [4] - 18:18, 62:15, 73:8, 146:9
**provides** [2] - 9:24, 176:24
**providing** [1] - 73:1
**provision** [85] - 8:17, 8:21, 9:10, 10:2, 10:5, 10:21, 10:22, 10:23, 10:25, 11:25, 12:4, 14:1, 14:4, 17:24, 39:5, 41:6, 41:17, 41:21, 44:2, 44:6, 44:11, 45:24, 45:25, 47:23, 49:1, 49:4, 49:24, 50:19, 50:23, 51:2, 61:9, 62:1, 62:4, 62:5, 64:17, 65:14, 73:19, 95:23, 96:1, 96:11, 96:12, 107:13, 107:15, 114:20, 115:4, 115:7, 115:11, 116:3, 116:9, 116:15, 116:17, 117:5, 119:24, 121:7, 122:19, 122:20, 123:1, 123:2, 123:4, 124:6, 125:5, 125:15, 125:19, 125:20, 125:22, 126:17, 127:3, 129:25, 132:20, 134:15, 134:23, 135:3, 144:25, 145:2, 145:5, 146:17, 170:10, 170:14, 171:20, 173:24
**provisions** [13] - 8:23, 9:5, 9:6, 17:22, 45:24, 94:24, 95:8, 96:1, 96:8, 96:9, 124:20, 175:11, 175:12
**public** [5] - 24:15, 24:22, 39:18, 101:17, 102:11
**publicist** [1] - 95:15
**publish** [1] - 56:3, 79:22, 85:11
**publisher** [1] - 72:19
**publishers** [1] -

35:19
**Publishing** [1] - 26:11
**publishing** [2] - 36:5, 89:16
**pull** [4] - 63:17, 109:1, 120:9, 120:10
**pulled** [4] - 9:4, 138:10, 138:14, 171:21
**purchase** [14] - 4:17, 7:4, 7:6, 105:16, 111:18, 112:10, 112:24, 113:2, 113:3, 113:22, 115:18, 123:14, 160:24, 164:21
**purchased** [3] - 113:17, 173:22, 177:22
**purchases** [2] - 164:25, 174:2
**purely** [1] - 16:16
**purpose** [4] - 46:20, 46:25, 49:10, 168:24
**purposes** [9] - 28:13, 38:1, 57:12, 57:20, 124:10, 126:23, 152:13, 162:17, 166:1
**pursuant** [2] - 86:10, 122:23
**put** [37] - 6:3, 6:10, 9:2, 11:21, 11:24, 17:19, 21:23, 32:22, 32:23, 53:10, 55:22, 56:4, 95:24, 97:18, 99:3, 101:25, 102:6, 106:10, 106:21, 107:10, 110:9, 115:1, 116:10, 120:8, 129:7, 139:20, 144:20, 151:21, 153:24, 158:18, 160:9, 163:1, 164:10, 164:13, 164:14, 168:8, 183:22
**putting** [2] - 175:17, 181:23
**Putting** [1] - 113:8

## Q

**qualifications** [1] - 24:18
**qualified** [1] - 26:4
**quantity** [1] - 6:4
**quarter** [1] - 55:7
**QUESTION** [23] - 47:7, 47:11, 47:13, 47:16, 51:25, 52:4, 52:9, 52:13, 52:15,

67:12, 67:18, 67:24, 68:1, 78:9, 80:1, 80:5, 80:25, 81:3, 81:5, 81:10, 81:14, 132:11, 132:16
**questioned** [2] - 131:20, 134:21
**questioning** [3] - 31:4, 131:8, 162:22
**questions** [19] - 21:2, 21:6, 21:8, 21:12, 21:15, 21:18, 22:22, 39:15, 49:14, 81:25, 82:13, 82:25, 84:3, 86:3, 123:19, 127:25, 144:11, 144:19, 167:14
**quick** [1] - 154:10
**quickly** [3] - 112:18, 151:16, 154:9
**quite** [4] - 35:7, 59:1, 59:2, 60:16

## R

**radio** [7] - 99:24, 119:6, 119:7, 119:9, 119:11, 119:12, 119:21
**raise** [2] - 42:9, 170:19
**raised** [3] - 42:11, 42:14, 169:23
**raising** [1] - 184:8
**ran** [1] - 90:5
**Rand** [4] - 128:23, 130:12, 177:17, 177:21
**Rap** [1] - 118:2
**rare** [1] - 103:7
**Rascoff** [1] - 25:1
**rate** [5] - 9:24, 33:7, 107:21, 107:25, 108:3
**rates** [4] - 30:18, 32:11, 119:12, 119:17
**rather** [5] - 23:12, 52:2, 52:6, 115:8, 124:16
**ratio** [2] - 39:2, 58:12
**re** [1] - 67:19
**reach** [2] - 121:15, 160:15
**reached** [1] - 44:14
**reaching** [1] - 45:22
**read** [14] - 50:2, 68:18, 80:7, 80:22, 92:25, 99:9, 107:13, 120:20, 138:19, 138:25, 139:13, 150:7, 150:10, 159:20

**reading** [1] - 26:1
**reads** [1] - 172:25
**ready** [6] - 108:18, 123:10, 148:17, 178:11, 184:24, 185:6
**Real** [1] - 112:16
**real** [3] - 109:18, 110:2, 185:13
**realistically** [1] - 155:16
**really** [18] - 16:22, 36:9, 39:9, 93:10, 93:16, 96:16, 96:17, 109:24, 117:15, 149:2, 164:7, 165:1, 168:19, 182:10, 182:11, 182:14, 182:16, 184:9
**reason** [10] - 5:14, 29:8, 52:15, 56:14, 56:16, 66:6, 110:4, 153:24, 158:13, 165:6
**reasonable** [2] - 76:13, 168:11
**reasonably** [1] - 76:23
**reasons** [6] - 14:16, 76:12, 127:3, 152:8, 154:20, 173:25
**rebuttal** [2] - 148:19, 150:7
**rec** [1] - 136:23
**recalculation** [1] - 33:17
**receipt** [3] - 155:3, 155:8
**receipts** [52] - 9:17, 22:14, 34:8, 35:15, 36:3, 36:8, 43:17, 62:7, 62:24, 62:25, 63:3, 63:4, 63:5, 63:7, 64:1, 64:2, 64:16, 65:8, 65:9, 65:11, 65:23, 66:1, 66:9, 66:11, 66:16, 66:21, 67:3, 67:4, 67:14, 67:16, 67:20, 67:21, 68:11, 68:12, 68:20, 68:23, 69:3, 69:11, 69:14, 69:25, 70:1, 70:5, 70:15, 72:15, 96:12, 127:17, 153:22, 154:8, 155:8, 156:8, 156:19
**receive** [1] - 35:15
**received** [18] - 3:12, 3:12, 3:13, 7:16, 24:19, 32:19, 32:20, 33:14, 62:14, 66:19, 67:3, 67:14, 67:20,

109:10, 120:18, 155:3, 156:20, 164:3
**receives** [2] - 33:5, 53:8
**receiving** [1] - 40:7
**recent** [3] - 80:2, 80:17, 80:25
**recently** [1] - 81:21
**Recess** [2] - 84:1, 149:13
**recess** [1] - 148:15
**recollection** [9] - 7:7, 78:1, 79:23, 81:20, 82:1, 85:12, 132:6, 162:23, 163:7
**Record** [2] - 10:24, 74:18
**record** [159] - 5:9, 5:13, 5:15, 5:18, 5:25, 6:6, 6:14, 6:15, 6:18, 6:21, 7:11, 7:14, 7:19, 7:22, 8:2, 8:4, 8:8, 8:9, 8:16, 8:24, 9:1, 9:23, 10:3, 10:4, 10:6, 10:14, 10:17, 11:2, 11:6, 11:7, 11:9, 11:10, 11:12, 11:14, 19:1, 19:10, 19:12, 19:24, 20:11, 23:21, 24:24, 26:6, 40:13, 48:23, 51:3, 51:12, 52:2, 52:6, 71:17, 72:1, 72:15, 72:22, 73:12, 73:19, 73:20, 86:20, 90:8, 91:4, 93:16, 93:17, 94:22, 94:23, 95:3, 96:7, 96:20, 96:23, 96:25, 97:8, 97:9, 97:21, 98:13, 99:4, 99:6, 99:13, 99:20, 99:22, 100:8, 100:18, 100:19, 100:20, 100:21, 100:24, 101:1, 101:6, 101:17, 101:25, 102:6, 102:9, 102:14, 102:16, 103:6, 103:17, 103:19, 103:21, 103:23, 104:4, 104:15, 105:5, 105:17, 108:4, 108:12, 110:9, 110:22, 110:25, 112:10, 113:15, 114:13, 114:16, 114:18, 115:8, 115:10, 115:11, 117:25, 118:2, 119:10, 119:17,

121:14, 122:4, 124:5, 125:14, 125:20, 126:9, 126:13, 126:15, 126:16, 127:4, 127:6, 127:7, 127:18, 134:14, 134:16, 134:25, 140:5, 145:25, 146:20, 146:23, 147:10, 147:11, 147:16, 150:5, 154:24, 155:11, 166:18, 168:20, 169:2, 169:11, 172:1, 181:24, 186:18
**record-buying** [1] - 101:17
**recorded** [3] - 31:15, 62:16, 97:1
**Recording** [1] - 89:16
**recording** [55] - 12:22, 13:18, 13:24, 14:2, 14:10, 23:6, 24:13, 31:17, 35:14, 40:14, 47:20, 47:25, 48:4, 50:15, 68:25, 69:13, 71:12, 89:17, 91:14, 92:16, 92:19, 93:4, 93:7, 97:4, 97:5, 97:6, 99:12, 100:8, 105:4, 114:12, 114:15, 114:17, 116:1, 116:19, 117:11, 117:24, 122:4, 122:10, 129:24, 131:12, 131:21, 132:25, 134:16, 134:23, 135:20, 143:7, 143:9, 145:22, 145:23, 145:24, 146:14, 171:21, 177:20
**Recordings** [12] - 173:10, 173:11, 173:12, 173:13, 173:15, 173:16, 175:23, 176:8, 177:9, 177:12, 177:19
**recordings** [23] - 22:10, 30:21, 31:15, 70:17, 76:22, 117:18, 120:25, 136:18, 136:23, 137:17, 138:2, 138:6, 138:7, 141:18, 141:25, 142:22, 143:15, 143:18, 143:25, 144:16, 152:7, 170:16, 174:3

**RECORDS** [2] - 1:10, 2:10
**Records** [23] - 5:24, 5:25, 10:10, 10:13, 16:1, 26:9, 26:12, 89:1, 89:7, 89:11, 90:4, 90:7, 90:10, 90:15, 90:21, 90:22, 90:23, 90:24, 126:5, 141:17, 177:8, 177:12
**records** [44] - 4:13, 4:17, 5:20, 6:4, 7:20, 8:5, 8:24, 9:22, 12:25, 17:23, 20:7, 22:13, 44:2, 44:6, 45:24, 49:4, 62:7, 73:19, 77:14, 97:15, 97:18, 100:22, 101:1, 101:3, 104:10, 107:16, 107:22, 110:12, 111:14, 116:23, 122:19, 122:25, 123:3, 125:5, 125:25, 126:2, 127:3, 146:5, 146:23, 147:2, 147:8, 168:15, 169:5, 173:1
**recouped** [1] - 58:21
**Redirect** [2] - 21:3, 86:2
**REDIRECT** [4] - 3:4, 3:6, 21:4, 84:4
**redirect** [3] - 84:2, 148:12, 149:9
**reduce** [1] - 4:22
**reduced** [2] - 37:1, 37:2
**reductions** [1] - 125:22
**refer** [1] - 122:12
**reference** [2] - 31:20, 97:10
**referred** [5] - 30:16, 32:16, 73:25, 141:23, 173:6
**referring** [7] - 15:13, 16:15, 84:22, 85:8, 115:5, 141:10, 141:24
**reflects** [1] - 114:20
**refresh** [10] - 14:14, 15:9, 50:25, 78:1, 79:23, 81:20, 82:1, 85:4, 85:11, 132:5
**refreshed** [1] - 77:11
**refused** [2] - 48:19, 48:24
**regard** [5] - 29:9, 148:19, 149:25, 167:18, 178:10
**regarding** [5] - 43:12, 44:19, 50:21,

93:11, 119:21
**regardless** [1] - 124:25
**regularly** [1] - 110:14
**relate** [4] - 37:11, 152:8, 154:11, 177:25
**Related** [1] - 62:16
**related** [4] - 35:10, 81:11, 121:18, 129:14
**relates** [5] - 28:18, 36:21, 153:7, 177:24, 182:12
**relating** [3] - 27:21, 129:25, 163:4
**relation** [3] - 65:9, 65:10, 68:6
**relationship** [3] - 15:11, 18:17, 174:1
**relative** [2] - 30:18, 32:11
**relatively** [1] - 148:22
**release** [4] - 103:23, 104:23, 109:20, 110:17
**released** [5] - 78:17, 171:17, 171:18, 173:1, 174:10
**releases** [4] - 71:19, 71:23, 111:10, 111:18
**relevance** [2] - 152:11, 167:19
**relevant** [7] - 14:9, 152:11, 159:25, 160:1, 163:20, 183:25
**reliability** [1] - 76:9
**reliable** [3] - 76:13, 76:20, 76:24
**relied** [2] - 34:22, 75:21
**rely** [1] - 184:15
**remain** [3] - 89:18, 90:14, 91:22
**remained** [1] - 68:15
**remaining** [1] - 167:18
**remains** [1] - 15:15
**Remember** [2] - 82:17, 148:5
**remember** [8] - 8:9, 14:12, 38:16, 79:19, 123:25, 124:17, 125:4, 143:24
**remembered** [1] - 138:23
**reminded** [1] - 83:10
**render** [2] - 24:4, 177:14
**rendered** [2] - 25:21, 30:17

**renegotiation** [1] - 129:24
**reopen** [3] - 150:7, 150:10, 185:10
**repeat** [4] - 44:5, 80:15, 135:25, 144:13
**repertoire** [1] - 94:1
**repetitive** [1] - 149:5
**report** [42] - 14:23, 29:5, 29:11, 29:24, 30:1, 30:2, 30:11, 30:13, 30:14, 30:16, 30:24, 32:4, 34:15, 35:1, 35:2, 40:22, 40:25, 41:1, 42:4, 42:5, 53:14, 59:11, 59:14, 59:18, 59:20, 60:2, 60:5, 60:10, 60:17, 60:20, 60:25, 61:2, 61:12, 67:5, 67:22, 68:7, 68:13, 68:16, 69:20, 70:6, 74:2
**reported** [1] - 86:10
**REPORTER** [1] - 1:23
**REPORTER'S** [1] - 1:16
**reports** [6] - 28:9, 28:10, 32:21, 37:20, 37:25, 186:14
**represent** [1] - 69:7
**representation** [1] - 60:24
**representative** [4] - 94:6, 94:7, 162:14, 164:14
**representatives** [4] - 41:12, 66:24, 96:6, 110:15
**representing** [2] - 42:11, 81:14
**reproduction** [1] - 99:16
**request** [6] - 49:6, 50:11, 51:19, 67:8, 83:14, 161:5
**require** [2] - 54:2, 168:8
**required** [3] - 7:4, 7:6, 156:9
**requires** [1] - 115:11
**research** [2] - 110:3
**researched** [2] - 13:19, 13:21
**reserve** [1] - 164:25
**reserved** [1] - 181:9
**reserves** [1] - 166:24
**resigned** [2] - 162:12, 164:12

**resolution** [1] - 27:16
**resolved** [3] - 27:17, 170:3, 178:15
**resolving** [1] - 119:20
**respect** [11] - 23:6, 62:4, 63:25, 130:20, 164:22, 168:6, 169:13, 169:19, 170:6, 172:6, 178:9
**respective** [3] - 103:25, 169:7, 173:3
**respond** [1] - 29:14
**response** [3] - 29:18, 29:19, 151:1
**responsibilities** [5] - 89:24, 91:3, 92:7, 92:8, 176:19
**responsibility** [2] - 175:7, 176:21
**responsible** [1] - 173:19
**rest** [3] - 12:5, 86:15, 168:25
**restate** [1] - 14:7
**restriction** [3] - 14:10, 16:21, 17:4
**restrictions** [5] - 16:4, 16:9, 16:15, 16:22
**restrictive** [1] - 16:11
**restricts** [3] - 16:8, 17:7, 17:10
**restructuring** [2] - 175:20, 176:1
**rests** [1] - 86:16
**result** [8] - 40:5, 40:6, 40:7, 40:8, 40:11, 58:2, 169:11, 170:18
**resulted** [1] - 58:15
**results** [1] - 52:10
**resume** [2] - 4:6, 82:16
**RESUMED** [2] - 3:3, 4:8
**retail** [62] - 5:5, 5:6, 7:9, 8:25, 9:11, 9:12, 10:10, 10:18, 11:15, 11:18, 17:24, 18:5, 18:7, 18:12, 18:16, 21:16, 33:3, 33:7, 44:2, 71:23, 103:24, 103:25, 105:15, 107:4, 107:16, 107:22, 108:4, 114:14, 114:21, 114:24, 115:12, 115:14, 115:16,

115:21, 115:23, 122:20, 123:1, 123:3, 123:7, 123:11, 123:12, 123:18, 124:12, 124:16, 124:24, 124:25, 125:15, 125:25, 126:2, 126:7, 126:10, 126:16, 127:5, 147:12, 147:17, 147:19, 161:2, 168:15, 168:21, 169:6, 169:12
**retailer** [22] - 5:1, 5:13, 5:14, 5:17, 5:22, 11:7, 11:11, 11:17, 115:13, 115:19, 115:23, 122:17, 122:24, 157:3, 157:4, 160:24, 161:24, 164:20, 164:25, 165:3, 166:24
**retailers** [5] - 4:12, 103:20, 106:3, 107:7, 124:14
**retained** [3] - 12:23, 25:10, 74:11
**return** [11] - 4:12, 4:15, 4:16, 4:18, 4:20, 5:15, 5:22, 6:2, 6:22, 7:1, 185:23
**returned** [5] - 5:9, 6:5, 165:6, 166:11, 167:10
**returns** [2] - 4:22, 5:1
**Reup** [5] - 31:2, 31:5, 31:23, 36:17, 36:23
**revenue** [26] - 27:20, 30:13, 30:14, 30:24, 32:4, 32:5, 32:19, 32:21, 34:9, 34:14, 35:1, 36:21, 37:20, 39:6, 41:6, 41:18, 41:22, 42:2, 44:3, 44:8, 44:12, 47:24, 61:9, 62:14, 171:16, 172:3
**Revenue** [1] - 36:24
**reverse** [3] - 59:12, 59:19, 60:11
**reversed** [2] - 5:4, 165:7
**review** [4] - 28:7, 92:19, 120:6, 153:6
**reviewed** [4] - 28:9, 28:10, 28:11
**reviewing** [1] - 126:19
**revising** [1] - 130:7

**RICHARD** [1] - 2:3
**rid** [2] - 116:11, 184:18
**right-hand** [3] - 110:4, 110:24, 112:12
**rights** [2] - 4:12, 27:4
**Ring** [1] - 153:14
**Ring-back** [1] - 153:14
**rise** [1] - 148:9
**risk** [2] - 8:13, 8:14
**Risk** [1] - 8:14
**Robinson** [5] - 74:17, 74:19, 75:7, 79:6, 82:9
**role** [1] - 91:16
**Rolling** [1] - 25:12
**Roman** [1] - 44:11
**rotate** [2] - 109:23, 109:25
**roughly** [1] - 33:21
**row** [1] - 110:6
**royal** [1] - 52:23
**royalties** [37] - 14:18, 28:21, 35:20, 35:24, 36:4, 36:13, 40:7, 43:16, 51:14, 52:5, 52:23, 53:3, 53:6, 55:3, 55:7, 55:13, 55:24, 56:8, 56:15, 64:18, 64:21, 65:2, 65:4, 66:10, 70:9, 70:15, 72:2, 95:1, 95:2, 107:16, 162:20, 165:21, 175:1, 175:7, 176:12, 176:20
**royalty** [104] - 5:2, 9:24, 14:3, 17:22, 22:14, 24:13, 25:2, 25:3, 25:7, 25:10, 25:18, 25:20, 25:24, 26:1, 26:6, 26:20, 27:21, 30:17, 30:18, 32:11, 32:16, 33:9, 33:13, 36:6, 39:20, 39:25, 53:7, 53:13, 53:21, 54:1, 54:4, 54:6, 54:14, 55:23, 57:12, 57:14, 57:16, 59:7, 62:4, 62:6, 64:23, 66:12, 70:18, 72:14, 72:18, 72:19, 73:3, 73:9, 73:13, 73:21, 75:22, 94:23, 94:25, 95:2, 95:3, 95:5, 107:21, 107:25, 108:3, 114:20, 114:22, 122:18, 124:6, 124:10, 124:20, 126:23,

127:11, 127:15, 129:14, 151:5, 151:13, 151:18, 151:22, 152:6, 152:13, 153:2, 153:9, 153:20, 154:1, 154:3, 154:4, 154:5, 154:22, 154:24, 155:4, 155:11, 155:18, 162:3, 164:23, 164:24, 165:5, 166:1, 166:3, 166:4, 166:9, 166:15, 166:23, 175:3, 175:4, 176:10, 176:25, 177:2
**Royalty** [1] - 32:25
**rule** [3] - 72:10, 148:19, 163:5
**rules** [1] - 163:13
**ruling** [2] - 158:21, 160:6
**rulings** [1] - 181:7
**run** [1] - 184:25
**running** [1] - 25:5
**runs** [1] - 112:11
**résumé** [1] - 89:8

## S

**sake** [1] - 18:11
**salary** [1] - 94:23
**sale** [54] - 5:5, 5:6, 16:11, 16:19, 16:25, 17:11, 17:13, 18:5, 22:13, 44:2, 44:6, 48:23, 49:3, 49:4, 49:19, 50:1, 51:12, 52:2, 52:6, 62:7, 73:19, 95:2, 101:3, 114:16, 114:18, 114:20, 114:22, 115:10, 116:23, 122:18, 122:25, 123:7, 123:14, 124:11, 124:24, 125:2, 127:4, 127:6, 127:23, 146:5, 147:2, 157:4, 164:19, 164:23, 166:2, 166:14, 166:24, 169:2
**sales** [18] - 8:16, 28:9, 28:10, 35:10, 43:15, 51:9, 104:11, 109:20, 110:8, 110:11, 110:12, 114:19, 147:12, 147:19, 157:2, 161:2, 169:5
**sampling** [1] - 113:6
**San** [1] - 87:23
**Sanctuary** [5] - 26:9,

74:18, 75:7, 79:7, 82:9
**Sand** [1] - 98:4
**Santa** [1] - 26:11
**Santana** [1] - 25:13
**Sara** [1] - 109:22
**sat** [1] - 84:16
**satellite** [2] - 119:6
**saves** [1] - 83:20
**saw** [4] - 37:20, 60:20, 95:20, 95:23
**scheme** [1] - 145:3
**school** [5] - 87:17, 87:18, 87:21, 87:22, 89:7
**science** [1] - 24:20
**scope** [1] - 7:25
**screen** [5] - 9:2, 17:20, 21:23, 32:22, 95:24
**scroll** [1] - 113:22
**scrolls** [1] - 111:23
**se** [1] - 50:2
**second** [25] - 10:13, 27:25, 28:1, 28:22, 54:16, 56:20, 62:17, 68:15, 70:6, 75:16, 76:17, 78:4, 102:25, 120:11, 121:20, 121:24, 162:2, 164:7, 164:17, 169:19, 172:14, 182:12, 184:9, 184:19, 186:5
**Second** [2] - 162:10, 162:17
**section** [4] - 76:8, 111:25, 112:14
**Sedelmeyer** [8] - 41:12, 41:15, 41:16, 43:8, 45:15, 46:1, 48:1, 48:2
**see** [71] - 10:11, 12:6, 14:14, 15:5, 15:8, 15:13, 22:3, 22:5, 22:7, 33:2, 33:12, 43:18, 48:20, 49:5, 49:23, 54:9, 54:23, 56:2, 56:5, 56:7, 56:11, 59:15, 60:2, 63:5, 63:22, 64:5, 64:13, 73:17, 75:19, 75:23, 76:8, 76:15, 76:17, 76:25, 77:5, 77:12, 80:20, 81:18, 82:20, 85:4, 85:15, 108:7, 109:22, 110:20, 111:1, 111:14, 112:13, 112:20, 112:24, 113:10, 113:21,

119:19, 121:1, 121:2, 121:3, 141:21, 143:4, 143:11, 146:6, 148:8, 149:11, 154:16, 154:18, 155:8, 155:25, 167:4, 180:16, 182:4, 183:24, 185:4, 187:4

**seeing** [6] - 57:9, 94:3, 98:1, 101:23, 131:14, 135:3

**segments** [1] - 159:17

**selected** [1] - 143:9

**selection** [6] - 6:24, 7:2, 7:3, 7:15, 7:16, 7:17

**sell** [1] - 5:13, 5:18, 5:19, 6:2, 15:24, 101:1, 123:7, 123:9, 123:13, 140:24, 141:4

**selling** [4] - 12:21, 100:22, 115:24, 126:16

**sells** [3] - 9:10, 16:3, 147:16

**Senate** [18] - 118:25, 119:4, 119:18, 120:2, 121:5, 137:3, 137:10, 137:18, 137:23, 138:10, 138:14, 138:16, 139:7, 139:9, 139:17, 140:1, 140:8, 143:22

**Senators** [2] - 121:10, 138:19

**send** [10] - 6:23, 6:24, 7:15, 89:8, 105:22, 106:2, 107:6, 173:2, 175:3, 176:25

**sending** [1] - 175:4

**sends** [2] - 53:22, 54:13

**senior** [3] - 87:6, 90:3, 177:18

**sense** [14] - 5:17, 12:24, 13:4, 98:18, 100:24, 118:18, 127:10, 127:17, 127:24, 132:21, 155:2, 180:14, 183:14, 183:15

**sent** [6] - 4:22, 8:10, 43:8, 105:9, 105:14

**sentence** [6] - 12:5, 12:18, 13:6, 46:4, 64:1, 168:24

**separate** [2] - 154:5, 173:2

**September** [3] -

91:24, 92:1, 92:3

**sequence** [1] - 99:1

**sequenced** [1] - 98:20

**sequentially** [2] - 182:6, 183:5

**series** [8] - 101:15, 159:17, 159:18, 159:21, 159:22, 163:9, 167:19, 167:20

**served** [1] - 74:10

**service** [1] - 73:2

**services** [2] - 107:3, 176:24

**SESSION** [1] - 1:18

**set** [14] - 7:6, 123:9, 181:14, 183:3, 183:11, 183:12, 184:25, 185:5, 185:12, 185:14, 185:23, 185:25, 186:1, 186:7

**sets** [1] - 155:17

**setting** [1] - 48:2

**seven** [1] - 106:24

**several** [7] - 21:7, 52:19, 62:2, 62:21, 103:2, 106:8, 129:11

**Several** [1] - 106:6

**Shady** [2] - 30:25, 112:16

**shall** [4] - 22:14, 62:6, 64:1, 173:2

**shape** [2] - 130:6

**share** [8] - 32:9, 32:10, 33:24, 55:8, 154:25, 155:4, 156:22

**sheet** [4] - 54:13, 56:4, 59:25, 60:13

**sheets** [1] - 54:4

**shoot** [1] - 101:11

**short** [2] - 185:13, 185:15

**shorter** [1] - 185:8

**shortly** [1] - 162:13

**show** [13] - 21:25, 84:22, 112:10, 116:1, 116:5, 116:19, 152:19, 152:21, 153:22, 154:7, 156:4, 156:20, 161:1

**Show** [4] - 30:25, 33:2, 33:16, 39:1

**showed** [11] - 40:25, 42:6, 60:13, 60:14, 69:17, 78:21, 82:6, 118:24, 120:1, 138:14, 156:6

**showing** [2] - 113:10, 131:17

**shown** [2] - 110:3, 156:8

**shows** [1] - 33:8, 33:20, 34:6, 38:25, 113:11, 113:12, 117:19, 152:16, 152:20, 153:7

**side** [13] - 31:20, 31:24, 42:8, 81:15, 83:2, 91:9, 93:10, 101:11, 105:20, 165:16, 171:20, 172:2

**sidebar** [2] - 22:25, 93:19

**Sidebar** [2] - 23:2, 23:17

**sides** [5] - 42:10, 96:2, 158:11, 169:1, 182:24

**sign** [3] - 11:3, 93:17, 94:5

**signatories** [2] - 172:12, 172:20

**signatory** [4] - 172:17, 172:18, 177:9, 177:20

**signature** [2] - 174:19, 174:20

**signed** [6] - 7:6, 91:17, 94:11, 97:13, 174:21, 175:13

**significant** [3] - 42:15, 42:17, 43:20

**signing** [1] - 93:14

**signs** [3] - 7:19, 174:23, 174:24

**similar** [2] - 145:4, 163:17

**similarly** [1] - 106:16

**simple** [4] - 6:2, 101:20, 179:8

**simply** [5] - 54:3, 159:8, 170:11, 170:15, 183:7

**single** [2] - 112:1, 145:23

**singles** [1] - 111:19

**sit** [1] - 50:20

**site** [1] - 108:17

**sits** [1] - 94:6

**sitting** [3] - 58:7, 58:25, 77:9

**situation** [8] - 11:2, 71:11, 71:15, 117:9, 125:24, 126:15, 159:1, 161:2

**situations** [7] - 70:16, 71:25, 72:1, 72:5, 77:20, 117:11, 125:18

six [2] - 87:9, 165:21

**six-month** [1] - 165:21

**size** [2] - 98:17, 115:22

**sizewise** [1] - 20:5

**skyrocketed** [2] - 107:20

**slashing** [1] - 82:25

**slide** [1] - 22:1

**Slim** [2] - 30:24, 112:16

**Slot** [1] - 98:4

**slot** [1] - 112:5

**slow** [4] - 16:12, 88:17, 111:7, 116:13

**Slow** [1] - 102:4

**slowly** [1] - 157:24

**small** [3] - 6:3, 6:7, 104:15

**smaller** [2] - 98:7, 111:17

**so...** [4] - 31:18, 155:18, 179:23, 184:12

**sold** [35] - 5:21, 6:5, 8:24, 9:22, 10:6, 10:10, 10:13, 17:23, 18:23, 45:24, 73:19, 107:16, 107:22, 108:4, 115:8, 122:17, 122:19, 122:21, 122:24, 122:25, 123:3, 125:5, 125:14, 125:25, 126:2, 126:7, 126:9, 127:3, 147:17, 167:8, 167:12, 168:15, 168:20, 169:11

**solely** [1] - 64:2, 151:1

**someone** [6] - 97:14, 105:16, 116:21, 122:11, 145:7, 145:9

**Sometime** [2] - 26:20, 27:15

**sometime** [3] - 28:3, 34:22, 40:23

**Sometimes** [3] - 94:17, 103:8, 106:20

**sometimes** [7] - 94:18, 95:4, 104:7, 110:18, 124:15, 165:13

**Somewhat** [1] - 133:12

**somewhere** [6] - 37:17, 74:2, 154:1, 166:9, 166:13

**song** [12] - 71:11,

95:4, 98:9, 111:3, 112:15, 113:6, 116:7, 117:8, 117:16, 117:17

**songs** [5] - 101:6, 112:15, 113:12, 113:23, 119:10

**songwriter** [2] - 95:4, 95:5

**songwriters** [1] - 24:14

**Sorry** [4] - 53:18, 69:22, 88:16, 88:18

**sorry** [25] - 14:25, 17:5, 19:19, 20:6, 21:14, 46:22, 57:21, 63:12, 69:21, 81:25, 83:9, 102:2, 102:3, 109:3, 111:7, 122:21, 122:22, 129:17, 133:2, 135:25, 147:15, 172:14, 173:8, 179:2, 181:4

**sort** [2] - 100:23, 162:25

**sorts** [1] - 71:21

**sought** [2] - 109:18, 109:23, 110:6

**sought-after** [1] - 109:23

**sound** [6] - 12:22, 31:5, 84:15, 99:17, 105:7, 145:22

**sounds** [4] - 133:12, 134:19, 135:1, 138:9

**soundtrack** [14] - 31:1, 31:23, 36:17, 36:23, 117:7, 135:21, 170:6, 170:8, 170:9, 170:16, 171:4, 171:14, 171:15, 172:2

**soundtracks** [2] - 136:3, 147:18

**SOUTH** [2] - 2:11

**Southern** [2] - 75:6, 84:7

**speaking** [3] - 5:11, 32:4, 130:12

**special** [4] - 11:2, 88:15, 88:20, 89:4

**species** [2] - 153:12, 153:16

**specific** [15] - 45:19, 49:1, 49:21, 69:3, 69:4, 70:1, 70:2, 97:7, 98:21, 102:24, 114:22, 129:25, 153:6, 171:25, 177:14

**Specifically** [1] - 172:24

**specifically** [15] -

10:4, 44:18, 60:22, 60:25, 65:4, 133:10, 134:17, 134:24, 138:15, 139:4, 139:5, 171:22, 177:21, 178:1, 178:19

**specified** [2] - 34:20, 69:16

**specify** [1] - 35:3

**specifying** [1] - 175:10

**Specter** [1] - 138:20

**speculation** [1] - 49:20

**spell** [2] - 23:22, 86:21

**spend** [1] - 95:14

**spent** [3] - 4:20, 9:20, 107:5

**spilled** [1] - 127:13

**split** [1] - 58:11

**spoken** [1] - 41:11

**staff** [3] - 110:8, 110:11, 110:12

**stake** [2] - 42:16, 56:23

**stand** [4] - 77:9, 161:25, 164:10, 164:13

**standies** [1] - 104:6

**stands** [2] - 93:25, 96:13

**start** [8] - 28:25, 34:15, 35:3, 103:23, 130:25, 154:13, 161:20, 180:20

**started** [2] - 25:4, 106:7

**starting** [1] - 182:6

**starts** [5] - 35:7, 76:8, 76:18, 93:25, 154:14

**State** [1] - 26:10

**state** [3] - 23:22, 24:21, 86:20

**statement** [17] - 33:1, 54:6, 55:5, 55:13, 55:17, 55:18, 144:10, 151:14, 152:13, 154:4, 154:5, 166:12, 166:15, 167:13, 180:9, 185:13, 185:15

**statements** [36] - 25:20, 26:2, 27:11, 28:11, 30:17, 32:16, 53:7, 53:13, 53:21, 54:1, 54:4, 54:14, 56:8, 151:5, 151:18, 151:22, 152:6, 153:2,

153:10, 153:20, 154:1, 154:4, 154:23, 154:24, 155:12, 155:14, 155:18, 155:25, 156:15, 173:2, 175:3, 175:4, 177:1, 177:2, 177:15, 177:16

**States** [8] - 75:6, 115:20, 119:18, 137:10, 138:15, 139:6, 139:25, 140:8

**STATES** [1] - 1:1

**states** [1] - 22:12

**statute** [1] - 119:7

**statutes** [1] - 119:11

**stay** [2] - 83:4, 87:25

**stayed** [2] - 88:1, 99:21

**stays** [1] - 181:24

**step** [5] - 22:23, 62:12, 62:17, 86:4, 100:23

**stepped** [1] - 69:1

**steps** [1] - 62:21

**stick** [1] - 98:5

**Stiffelman** [2] - 41:13, 41:14

**still** [6] - 90:25, 135:18, 163:18, 169:10, 184:11, 184:12

**stipulate** [1] - 83:22

**stipulation** [3] - 86:11, 159:13, 159:25

**stolen** [4] - 5:24, 6:4, 6:7, 6:8

**Stones** [1] - 25:12

**stood** [1] - 85:21

**stop** [3] - 108:22, 108:23, 114:9

**store** [15] - 17:1, 103:6, 103:17, 104:14, 104:15, 109:15, 109:16, 109:19, 110:13, 110:15, 110:21, 112:8, 114:14, 114:15

**storefront** [1] - 123:13

**stores** [2] - 104:5, 104:14

**straight** [3] - 33:8, 185:17, 185:19

**strategy** [1] - 92:13

**stream** [2] - 71:3, 73:2

**streaming** [3] - 66:12, 71:1, 153:12

**streams** [3] - 36:7,

71:7, 72:25

**STREET** [2] - 1:24, 2:4

**street** [4] - 102:24, 103:1, 103:3, 103:5

**strike** [1] - 23:4

**structure** [2] - 91:20, 140:25

**structuring** [1] - 176:14

**studio** [1] - 105:8

**stuff** [4] - 65:13, 106:18, 106:21, 111:24

**style** [1] - 101:9

**subcommittee** [1] - 119:4

**Subject** [1] - 86:14

**subject** [10] - 11:22, 14:17, 65:2, 80:20, 81:5, 133:10, 133:14, 151:19, 164:25, 166:24

**subjects** [1] - 43:11

**submit** [3] - 179:14, 186:11, 186:16

**submitted** [8] - 27:13, 68:7, 82:19, 148:3, 150:16, 157:7, 160:17, 163:12

**subscription** [1] - 145:9

**subsequent** [2] - 61:13, 79:8

**subsequently** [2] - 68:7, 138:23

**subsidiary** [1] - 170:2

**substance** [1] - 51:2

**substantive** [2] - 159:3, 160:10

**subtract** [1] - 36:22

**subtracting** [1] - 34:10

**successful** [2] - 141:5, 141:7

**sudden** [1] - 167:11

**sufficient** [2] - 17:16, 17:18

**Sugar** [3] - 26:9, 74:19, 74:20

**suggest** [2] - 172:1, 180:10

**suggested** [1] - 123:24

**summaries** [1] - 55:23

**summarized** [1] - 56:7

**summarizing** [1] -

60:14

**summary** [12] - 34:22, 54:4, 54:12, 59:15, 59:25, 158:21, 158:25, 159:2, 160:6, 182:14, 186:4, 186:8

**summer** [1] - 118:25

**Sunday** [1] - 104:8

**superior** [2] - 131:5, 131:22

**supplied** [5] - 32:5, 34:15, 135:22, 136:4, 161:11

**supply** [1] - 77:13

**support** [3] - 76:13, 95:16, 95:19

**supporting** [1] - 171:25

**suppose** [2] - 18:24, 115:25

**supposed** [1] - 181:9

**supposedly** [1] - 71:23

**supposition** [1] - 61:11

**suspenders** [3] - 157:13, 157:18, 163:18

**sustained** [1] - 167:18

**sworn** [4] - 3:4, 3:7, 23:20, 86:19

**synchronization** [5] - 70:23, 71:4, 71:9, 72:13, 72:18

**system** [5] - 73:13, 106:13, 127:20, 140:22, 141:2

**systems** [3] - 106:8, 106:23, 141:2

---

# T

**T.V** [5] - 101:22, 116:1, 116:5, 116:19, 117:19

**tab** [1] - 53:16

**table** [2] - 55:23, 123:9

**talent** [3] - 94:1, 101:4, 101:5

**talks** [1] - 147:1

**Tang** [1] - 26:10

**tapes** [1] - 94:3

**Target** [2] - 103:12, 103:14

**targeting** [1] - 109:20

**technical** [1] - 106:17

**technological** [2] - 16:16, 97:19

**technologies** [1] - 97:19

**technology** [5] - 97:12, 97:18, 106:4, 107:6, 108:2

**television** [3] - 71:13, 115:25, 142:18

**TEMPLE** [1] - 1:24

**ten** [9] - 25:4, 148:13, 149:9, 149:11, 161:10, 161:17, 162:9, 185:12, 185:14

**ten-minute** [1] - 185:14

**tender** [1] - 26:13

**term** [29] - 11:3, 46:15, 47:8, 47:14, 65:23, 68:22, 74:3, 91:18, 94:17, 96:19, 96:20, 96:21, 96:25, 97:3, 99:18, 99:21, 100:10, 103:5, 115:16, 118:17, 120:22, 121:9, 121:12, 157:20, 158:19, 159:5, 159:9, 160:11

**terms** [18] - 7:4, 94:8, 94:12, 94:13, 94:16, 95:11, 98:17, 101:4, 110:21, 121:12, 148:18, 159:3, 160:2, 171:21, 171:23, 172:4, 177:8, 177:10

**territories** [1] - 94:15

**test** [1] - 23:14

**testified** [19] - 10:19, 23:7, 26:4, 130:15, 130:18, 130:19, 132:23, 134:5, 137:10, 139:25, 157:2, 160:22, 160:23, 161:18, 162:15, 163:8, 164:24, 174:1, 177:21

**testify** [6] - 23:5, 23:10, 74:11, 100:3, 114:1, 119:3

**testifying** [1] - 143:14

**testimony** [73] - 3:6, 23:4, 23:11, 23:13, 50:10, 50:18, 50:20, 50:21, 58:22, 63:3, 66:15, 68:4, 70:12, 75:21, 76:13, 77:7, 78:20, 80:21, 81:6,

82:7, 84:8, 86:12, 95:21, 100:5, 104:2, 117:6, 118:24, 120:22, 120:3, 120:6, 121:6, 123:21, 124:17, 133:5, 133:7, 133:21, 134:12, 134:20, 135:2, 135:5, 135:6, 135:19, 137:3, 137:18, 137:23, 138:11, 138:14, 138:15, 139:6, 139:10, 139:17, 148:1, 157:1, 157:5, 160:20, 161:6, 161:8, 161:10, 161:18, 161:21, 161:22, 161:23, 162:4, 162:11, 163:1, 163:7, 165:4, 171:15, 173:18, 173:21, 177:11, 185:9

**text** [2] - 60:5, 183:13

**THE** [178] - 2:3, 2:9, 4:5, 21:3, 22:21, 22:23, 23:16, 23:18, 23:21, 23:23, 23:24, 26:15, 37:23, 38:2, 38:5, 38:7, 46:21, 47:1, 47:4, 49:11, 49:15, 50:11, 51:22, 57:7, 57:21, 63:18, 67:11, 75:3, 78:3, 78:4, 78:7, 79:24, 80:7, 80:22, 82:15, 82:22, 83:3, 83:8, 83:10, 83:22, 84:2, 85:13, 85:15, 86:2, 86:4, 86:8, 86:14, 86:17, 86:20, 86:22, 86:23, 86:25, 88:17, 88:18, 93:20, 102:2, 102:3, 102:4, 102:5, 109:3, 109:7, 109:9, 111:7, 111:9, 120:11, 120:14, 128:1, 128:5, 128:7, 128:9, 132:4, 132:7, 139:22, 147:23, 148:9, 148:11, 148:15, 148:22, 149:11, 149:14, 149:17, 149:24, 150:4, 150:12, 150:21, 150:23, 150:25, 151:8, 151:13, 152:10, 152:15, 152:18, 152:24, 153:11, 153:15, 153:25, 154:9,

154:16, 154:18, 155:15, 155:20, 156:13, 156:23, 157:5, 157:8, 157:10, 157:14, 157:17, 157:21, 157:24, 158:5, 158:8, 158:17, 158:25, 159:12, 159:16, 160:3, 160:18, 161:4, 161:8, 161:19, 163:9, 163:22, 164:2, 164:4, 165:1, 165:11, 165:16, 165:22, 166:6, 166:20, 167:2, 167:17, 168:1, 168:5, 169:18, 171:3, 172:8, 173:9, 174:5, 174:13, 176:14, 178:3, 178:8, 178:14, 178:17, 179:1, 179:4, 179:14, 179:18, 179:22, 179:25, 180:3, 180:16, 180:25, 181:8, 181:18, 181:25, 182:23, 183:3, 183:16, 183:21, 183:23, 184:4, 184:10, 184:12, 184:14, 184:17, 184:20, 184:24, 185:23, 186:5, 186:9, 186:11, 186:16, 186:21, 187:1, 187:4

**theme** [1] - 116:7

**themselves** [2] - 47:21, 140:24

**therefore** [1] - 160:16

**they've** [4] - 53:2, 77:18, 168:11, 176:5

**They've** [1] - 184:1

**thin** [1] - 42:25

**third** [19] - 28:11, 43:15, 48:21, 55:19, 64:10, 70:17, 70:24, 71:11, 71:16, 72:6, 121:25, 122:3, 122:23, 134:10, 134:14, 135:20, 136:2, 136:3, 155:4

**Third** [1] - 96:15

**third-party** [8] - 43:15, 48:21, 64:10, 70:24, 122:3, 122:23, 134:10, 136:2

**Third-party** [1] - 96:15

**THIRTY** [1] - 2:12

**THIRTY-FIFTH** [1] - 2:12

**three** [20] - 8:22, 9:1, 9:2, 9:6, 34:17, 109:17, 110:6, 110:10, 128:3, 128:5, 149:7, 170:22, 170:23, 171:5, 172:8, 172:9, 172:10, 175:15, 176:7, 185:25

**Three** [3] - 26:8, 128:7, 128:8

**throughout** [1] - 173:20

**thrown** [1] - 100:10

**thumb** [1] - 75:11

**timeliness** [1] - 163:16

**timely** [4] - 83:23, 160:4, 177:1, 177:2

**timing** [2] - 79:20, 163:11

**title** [10] - 32:25, 89:12, 157:2, 160:23, 161:23, 162:23, 163:1, 163:6, 163:8, 165:3

**titles** [1] - 111:13

**TN** [1] - 2:5

**to/through** [1] - 18:19

**today** [11] - 4:16, 24:3, 82:12, 83:4, 83:5, 94:24, 95:21, 97:20, 129:9, 163:18, 163:21

**together** [6] - 32:23, 55:23, 56:4, 156:22, 173:2, 175:24

**TOLLES** [1] - 2:9

**Tom** [1] - 25:14

**tomorrow** [11] - 83:11, 83:14, 148:1, 148:3, 148:8, 148:17, 153:5, 178:11, 181:14, 185:24, 187:4

**tone** [8] - 51:5, 62:15, 100:10, 100:13, 100:15, 100:16, 100:18, 100:19

**tones** [14] - 24:6, 27:22, 32:6, 33:24, 34:7, 34:13, 61:16, 65:6, 126:22, 127:2, 138:3, 141:25, 153:14, 170:15

**tonight** [3] - 101:23, 101:25, 102:5

**took** [8] - 32:4,

61:15, 62:10, 66:3, 66:6, 112:17, 148:25, 184:14

**toothbrush** [1] - 143:8

**top** [11] - 9:9, 16:14, 34:10, 80:4, 109:17, 110:4, 110:5, 110:10, 111:3, 181:20, 182:14

**total** [13] - 32:7, 33:8, 33:9, 55:13, 55:16, 55:20, 56:11, 56:14, 62:13, 62:18, 63:4, 68:11

**totally** [1] - 8:3

**tour** [3] - 95:15, 95:16, 95:19

**Tower** [1] - 16:1

**Track** [2] - 98:22

**track** [3] - 31:5, 71:16, 118:4

**tracked** [1] - 71:20

**tracks** [3] - 97:16, 112:20, 112:22

**training** [1] - 24:23

**transaction** [15] - 7:22, 7:23, 16:7, 16:19, 23:8, 23:12, 48:22, 49:19, 50:6, 59:17, 60:8, 69:5, 70:3, 73:6, 125:24

**transactions** [3] - 151:19, 154:23, 155:13

**TRANSCRIPT** [1] - 1:16

**transcript** [3] - 161:6, 161:9, 162:9

**transcripts** [1] - 42:23

**transfer** [1] - 162:23

**transferred** [2] - 161:24, 163:2

**transfers** [2] - 163:8, 165:3

**transition** [1] - 90:20

**transmission** [1] - 127:8

**transportation** [1] - 83:6

**treated** [1] - 43:15

**treating** [1] - 51:11

**trial** [10] - 9:21, 108:7, 121:8, 152:1, 157:1, 160:22, 161:8, 161:18, 162:17, 164:15

**TRIAL** [1] - 1:17

**tried** [1] - 140:21

**true** [6] - 48:25,

139:14, 139:17, 142:9, 144:16, 168:23

**trumps** [1] - 22:18

**try** [19] - 8:9, 16:12, 38:22, 40:5, 49:13, 53:19, 61:20, 65:21, 100:25, 102:10, 103:20, 103:24, 104:4, 104:11, 104:16, 104:19, 109:24, 110:20, 112:5

**Try** [1] - 11:8

**trying** [9] - 40:11, 53:5, 74:5, 89:5, 110:9, 110:24, 121:13, 158:5, 158:6

**Tuesday** [1] - 103:7

**Turn** [1] - 61:8

**turn** [6] - 6:14, 30:4, 40:20, 56:17, 63:11, 142:25

**turned** [1] - 42:17

**turning** [1] - 101:22

**turns** [1] - 17:9

**Twice** [1] - 46:6

**twice** [1] - 46:7

**Two** [1] - 170:2

**two** [33] - 16:15, 17:22, 20:7, 21:6, 28:14, 28:25, 36:16, 36:17, 42:22, 52:10, 57:12, 79:11, 80:18, 81:2, 81:22, 81:25, 82:2, 82:4, 89:19, 89:21, 96:2, 97:6, 124:19, 129:3, 149:10, 153:21, 171:13, 178:20, 181:10, 182:4, 186:3, 186:23, 186:24

**type** [8] - 25:18, 49:1, 49:24, 54:12, 64:18, 72:19, 77:12, 153:25

**typed** [1] - 112:13

**types** [3] - 97:4, 97:7, 152:21

**typical** [3] - 71:10, 71:25, 72:11

**typically** [13] - 5:15, 66:9, 70:16, 70:22, 72:3, 73:20, 94:13, 94:16, 95:17, 96:2, 114:21, 116:24, 182:23

**Typically** [5] - 5:16, 36:2, 40:2, 72:5, 97:9

**U**

**U.C** [2] - 87:18, 87:19
**U.M.E** [1] - 92:11
**U.M.G** [20] - 172:11, 172:19, 173:10, 173:11, 173:13, 173:15, 173:16, 175:14, 175:16, 175:23, 176:8, 176:15, 176:16, 176:18, 177:8, 177:12, 177:19, 177:24
**U.S** [1] - 1:23
**U.S.-only** [1] - 94:16
**U.S.B** [1] - 98:5
**U2** [4] - 101:24, 101:25, 102:5, 102:14
**U2's** [4] - 102:25, 103:14, 103:15, 103:16
**ultimate** [1] - 123:14
**ultimately** [2] - 94:10, 126:9
**umbrella** [1] - 90:9
**unable** [1] - 5:13
**unbelievable** [1] - 85:22
**unclog** - 91:6
**Under** [4] - 172:15, 172:16, 173:6, 174:25
**under** [52] - 7:4, 13:12, 13:13, 13:15, 13:19, 13:22, 14:7, 32:25, 49:3, 52:18, 52:22, 52:23, 53:3, 55:4, 55:23, 56:8, 62:25, 65:8, 73:19, 90:8, 99:13, 100:8, 100:18, 107:21, 115:7, 126:23, 134:15, 134:23, 138:21, 138:24, 139:1, 143:14, 144:24, 145:2, 146:15, 147:8, 149:3, 163:13, 164:11, 171:16, 172:3, 172:14, 172:16, 172:22, 173:1, 174:21, 175:8, 176:12, 176:19, 177:4, 177:6
**undercharged** [1] - 29:3
**undergoing** [1] - 90:20
**underlying** [1] - 28:11

**underneath** [2] - 174:21, 174:23
**underpaid** [3] - 27:9, 31:13, 42:2
**understood** [4] - 23:6, 65:7, 65:22, 66:2
**undertook** [1] - 106:7
**undisputed** [3] - 165:2, 165:23, 171:8
**Unincorporated** [1] - 176:18
**unincorporated** [3] - 172:19, 173:13, 176:9
**UNION** [1] - 2:4
**unit** [1] - 38:25
**UNITED** [1] - 1:1
**United** [8] - 75:6, 115:20, 119:18, 137:10, 138:15, 139:6, 139:25, 140:8
**Universal** [105] - 5:2, 8:20, 9:10, 12:23, 14:17, 14:18, 15:10, 15:16, 17:7, 18:18, 18:23, 22:9, 22:13, 22:15, 23:8, 25:11, 25:16, 25:24, 26:12, 27:3, 28:10, 28:12, 29:14, 29:17, 29:21, 30:13, 31:3, 32:5, 33:1, 33:5, 33:10, 35:1, 35:13, 35:18, 36:5, 36:13, 36:16, 37:3, 37:16, 48:15, 48:17, 48:19, 48:21, 48:24, 49:18, 51:9, 59:2, 61:5, 66:10, 71:20, 77:18, 87:7, 87:11, 87:12, 90:9, 90:13, 92:4, 92:9, 103:19, 105:2, 105:25, 106:1, 106:2, 106:4, 107:5, 110:7, 121:25, 122:3, 122:10, 124:8, 124:9, 124:14, 126:6, 128:16, 128:18, 128:25, 129:4, 134:9, 136:9, 136:14, 136:18, 136:22, 137:17, 137:20, 137:25, 138:6, 139:10, 139:15, 140:18, 140:21, 140:24, 142:10, 142:22, 143:14, 143:17, 144:15, 144:24, 146:9,

147:16, 162:11, 162:15, 164:10, 164:19, 166:23, 176:24
**Universal's** [2] - 26:1, 162:5
**Universal-Apple** [2] - 14:17, 15:10
**universe** [1] - 96:6
**University** [2] - 24:19, 24:20
**Unless** [1] - 182:23
**unless** [4] - 6:25, 7:1, 13:3, 83:5
**unrecouped** [2] - 58:19, 59:1, 59:4
**unreliable** [4] - 74:15, 74:24, 78:10, 81:24
**untimely** [1] - 167:20
**up** [52] - 7:19, 8:2, 9:2, 11:3, 11:25, 16:13, 17:20, 20:9, 32:22, 38:11, 42:19, 54:3, 54:18, 55:24, 57:23, 62:1, 63:15, 65:20, 70:13, 72:15, 73:23, 79:25, 85:21, 94:12, 95:24, 98:23, 99:3, 101:20, 107:10, 109:1, 110:19, 112:16, 115:2, 116:10, 119:8, 120:9, 120:10, 123:9, 129:7, 139:20, 144:9, 144:20, 148:16, 156:7, 158:23, 172:14, 185:12, 185:14
**upfront** [2] - 94:14, 95:9
**upper** [1] - 110:24
**usable** [1] - 77:13
**usage** [3] - 68:22, 69:11, 69:12
**uses** [10] - 22:14, 62:8, 72:18, 116:24, 117:2, 117:4, 135:4, 146:5, 147:3

**V**

**valid** [1] - 152:25
**valuable** [1] - 110:2
**value** [1] - 60:5
**Vargas** [1] - 83:11
**variety** [3] - 88:7, 101:19, 105:23
**various** [8] - 38:13, 92:8, 94:3, 106:11,

121:15, 152:7
**venture** [2] - 168:17, 174:7
**ventures** [1] - 93:12
**verbal** [1] - 148:25
**verbatim** [1] - 80:23
**verdict** [3] - 178:24, 179:6, 179:8
**Verizon** [5] - 121:1, 141:19, 141:24, 141:25, 142:21
**vernacular** [1] - 144:6
**version** [1] - 98:7
**versions** [1] - 185:25
**versus** [4] - 26:9, 32:15, 102:17, 156:4
**vice** [3] - 87:6, 89:21, 90:3
**video** [8] - 63:18, 63:20, 65:10, 69:16, 86:6, 95:14, 101:12, 117:8
**videos** [5] - 63:25, 64:2, 64:12, 65:5, 65:6
**videotaped** [6] - 3:6, 47:5, 51:23, 86:9, 86:12, 132:9
**view** [11] - 17:8, 68:10, 68:12, 68:15, 68:17, 69:11, 69:18, 69:20, 69:24, 70:20, 99:12
**viewed** [1] - 169:1
**vinyl** [13] - 20:11, 97:2, 97:15, 98:13, 98:24, 99:19, 102:19, 102:22, 103:10, 105:11, 105:12, 107:20, 127:8
**virtually** [1] - 168:16
**visibility** [1] - 77:13
**visible** [2] - 104:5, 104:12
**vision** [1] - 140:7
**visual** [1] - 97:2
**visually** [1] - 101:13
**voice** [2] - 57:22, 57:23
**Volume** [3] - 42:20, 42:23, 43:1
**voluminous** [1] - 53:22
**Vs** [1] - 1:8

**W**

**wait** [2] - 53:17, 83:18

**Wal** [2] - 121:2, 123:15
**Wal-Mart** [2] - 121:2, 123:15
**walk** [4] - 7:23, 32:23, 108:11, 108:21
**walking** [1] - 176:21
**walks** [1] - 8:12
**wants** [7] - 5:14, 7:23, 83:20, 105:16, 110:5, 116:1, 163:1
**warehouse** [1] - 162:24
**Washington** [4] - 88:2, 88:21, 88:24, 88:25
**waste** [1] - 83:18
**watch** [1] - 117:16
**water** [1] - 127:13
**ways** [1] - 106:14
**wayside** [1] - 149:19
**Web** [1] - 121:15
**WEDNESDAY** [2] - 1:20, 4:1
**week** [5] - 102:8, 104:10, 112:1, 112:2, 112:3
**weeks** [1] - 111:2, 129:3, 165:17
**west** [1] - 90:12
**whacky** [2] - 127:19, 127:20
**whereby** [2] - 4:18, 127:20
**whole** [6] - 18:19, 50:20, 106:7, 151:21, 157:5, 164:20
**wholesale** [4] - 33:4, 33:5, 33:17, 124:16
**whoops** [1] - 112:18
**William** [3] - 3:4, 23:20, 23:23
**Williams** [1] - 87:15
**Williamstown** [1] - 87:15
**willing** [1] - 18:10
**windshield** [1] - 101:22
**wipe** [1] - 166:14
**wiped** [1] - 167:12
**withdrawn** [1] - 181:5
**WITNESS** [10] - 3:2, 23:23, 63:18, 78:3, 85:15, 86:22, 88:18, 102:3, 102:5, 111:9
**witness** [17] - 3:4, 3:7, 23:18, 23:20, 75:22, 77:9, 79:5, 79:11, 79:15, 79:16,

81:8, 86:5, 86:17, 86:19, 164:10, 164:13, 168:16
**Witness** [2] - 3:6, 86:12
**witness's** [2] - 79:23, 132:5
**witnesses** [1] - 148:20
**word** [8] - 50:5, 50:6, 69:9, 101:18, 118:7, 124:3, 155:15, 174:13
**worded** [1] - 181:6
**words** [12] - 15:18, 15:21, 23:6, 59:18, 60:7, 125:6, 125:9, 163:17, 168:25, 173:14, 182:17, 183:13
**works** [6] - 4:15, 6:19, 7:8, 64:25, 73:7, 108:8
**world** [3] - 115:20, 118:8, 118:14
**worldwide** [1] - 94:15
**would've** [1] - 33:2
**wound** [1] - 8:2
**wrap** [2] - 148:16
**writing** [2] - 14:1, 75:19
**written** [1] - 48:10
**wrote** [5] - 43:11, 129:10, 143:4, 186:6
**Wu** [1] - 26:10
**Wu-Tang** [1] - 26:10

## Y

**Yale** [1] - 24:19
**year** [10] - 7:7, 8:5, 27:18, 29:15, 46:10, 88:1, 89:19, 94:18, 115:18, 119:3
**years** [19] - 13:23, 25:4, 25:6, 27:17, 52:19, 61:13, 87:13, 89:20, 89:21, 90:17, 91:25, 92:14, 94:17, 94:19, 106:6, 106:24, 129:1, 176:1
**yesterday** [5] - 101:25, 102:6, 103:1, 103:13, 109:6
**Yngwie** [5] - 80:11, 80:13, 80:14, 81:4, 81:12
**York** [7] - 24:20, 24:21, 26:9, 26:10, 46:12, 75:7, 84:7

**yourself** [1] - 40:1
**Yourself** [2] - 37:9, 37:11
**yourselves** [2] - 82:17, 148:6

## Z

**zero** [2] - 166:16, 167:13
**zone** [1] - 4:23