1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                                ---

4          THE HONORABLE PHILIP S. GUTIERREZ, JUDGE PRESIDING

5

6

7    F.B.T. Productions, LLC,              )

8                          Plaintiff,      )

9                                          )

10   vs.                                   )   Case No.

11                                         )   CV 07-3314-PSG(MANx)

12   Aftermath Records (dba Aftermath      )

13   Entertainment), et al.,               )

14                          Defendants.    )

15   _____       )

16

17

18           REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

19                     Day 6 (P.M. Session)

20                   Los Angeles, California

21                  Thursday, March 5, 2009

22   Pamela A. Seijas, CSR, FCRR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446

```
1    APPEARANCES:

2

3      FOR PLAINTIFF:          KING & BALLOW

4                              BY:  RICHARD BUSCH

5                                   MARC GUILFORD

6                              315 UNION STREET

7                              SUITE 1100

8                              NASHVILLE, TN  37201

9                              (615) 259-3456

10

11

12   FOR DEFENDANT:            MUNGER, TOLLES & OLSON, LLP

13                              BY:  GLENN D. POMERANTZ

14                                   MELINDA EADES LeMOINE

15                                   KELLY M. KLAUS

16                              355 SOUTH GRAND AVENUE

17                              35TH FLOOR

18                              LOS ANGELES, CA  90071-1560

19                              (213) 687-3702

20

21

22

23

24

25
```

1    Los Angeles, California, Thursday, March 5, 2009

2    10:00 a.m.

3    -oOo-

4    (Jury Out)

5    THE COURT:  With regard to the burden of proof with

6    regard to clear and convincing evidence, it's my

7    understanding -- correct me if I'm wrong -- that the parties are

8    requesting that I give Ninth Circuit Model Instruction 1.4 and

9    insert the first paragraph of 1.4 in Court's Instruction No. 3

10    as a second full paragraph; is that correct?

11    MS. LeMOINE:  That's correct, Your Honor.

12    MR. BUSCH:  Yes, Your Honor.

13    THE COURT:  So what I'm going to do, unless there is

14    an objection, is when the jurors come back, tell them I'm going

15    to reread Instruction No. 3; that my rereading of the

16    instruction governs and then reread it as I just indicated, and

17    then we're working on fixing the -- their copy as we speak.

18    Is that acceptable?

19    MS. LeMOINE:  Yes.  Thank you.

20    MR. BUSCH:  Yes.

21    THE COURT:  All right.  Let's go ahead and bring the

22    jurors out.  Last thing -- I'm sorry -- then with regard to

23    Mr. Pomerantz's suggestion with regard to changing Jury

24    Instruction No. 34 to simply change it to 35, without reread.

25    MR. BUSCH:  That's fine.

```
 1              THE COURT:  All right.

 2                    (Jury In)

 3              THE COURT:  Ladies and gentlemen, briefly before we

 4    have closing argument there is one jury instruction that I need

 5    to reread.  It's different than the one read before.  It's going

 6    to be in your packet as Jury Instruction No. 3.  And my

 7    former -- or this reading prevails over any other reading.

 8              When a party has the burden of proof on any claim or

 9    affirmative defense by a preponderance of the evidence, it means

10    you must be persuaded by the evidence that the claim or

11    affirmative defense is more probably true than not true.

12              When a party has the burden of proving any claim or

13    defense by clear and convincing evidence, it means you must be

14    persuaded by the evidence that the claim or defense is highly

15    probable.  This is a higher standard of proof than proof by a

16    preponderance of the evidence.  You should base your decision on

17    all of the evidence, regardless of which party presented it.

18              Thank you.  Mr. Busch, closing argument.

19              MR. BUSCH:  Thank you, Your Honor.

20                  Plaintiff's Opening Argument

21              MR. BUSCH:  Good morning.  When I -- first of all, I

22    would like to thank you all for the time and for the attention

23    that you've paid to this matter.  I know this case has gone on a

24    little bit longer than what we had hoped for, but on behalf of

25    myself and my clients and Jeff Bass and Joel Martin and Mark
```

```
 1    Bass as well, I want to thank you all for paying attention and
 2    for the time that -- I know this has been an inconvenience, this
 3    part of the process, and I just want to thank you.
 4            When I first started this case, I told that you that
 5    it concerned defendants' refusal to honor clear language in a
 6    contract.  I told you that defendants would try to distract you
 7    by using technical sounding terms like "normal retail channels"
 8    and by distracting you from what was the issue in this case.
 9    And I told you that it was my job in this case to bring you back
10    to what really mattered.
11            The Eminem/F.B.T./Aftermath agreements in this case,
12    the contracts themselves are relatively straightforward.  I
13    realize that they're not contracts that you'd ever seen before
14    this case.  But they're ones that I know you now have made sense
15    of and that you understand.
16            These contracts relate to how the income associated
17    with master recordings created by Eminem and F.B.T. that are
18    exploited, how the income from those master recordings will be
19    divided up between Eminem, F.B.T. and Aftermath.
20            Now, the defendants in this case have told you over
21    and over again that a record is a record is a record.  They've
22    told you over and over again that there are various types of
23    records, vinyls, cassettes, CDs, and now downloads.  And they've
24    told you that when that record is sold, automatically Universal
25    and Aftermath pay a certain percentage of the royalties.  And
```

1    they've told you that it falls under what is the records sold

2    provision by UMG where UMG gets the lion's share of the revenue.

3              As I'm going to show you -- or I have shown you in

4    this case that's not correct.  There is another provision in

5    this contract that applies.  And let me back up for one second.

6              When UMG is selling, manufacturing and distributing,

7    we don't object to the fact that the revenue received by UMG, by

8    Universal, by Aftermath, falls into this bucket.  We don't

9    dispute that.

10             You heard from David Berman that the structure of the

11   record contracts took into account the fact that when records

12   are sold by Universal, by Interscope, by Aftermath, they're

13   manufacturing, they're distributing and they're selling, and

14   that they -- the records sold provision was created with that in

15   mind.

16             But there is a second provision in the contract.  And

17   the second provision in the contract relates to how the income

18   associated with different modes of exploiting sound recordings

19   when there is a license to a third party where the third party

20   is manufacturing and distributing records -- how the revenue is

21   generated in those cases.  And what the record contract says is

22   "notwithstanding the foregoing" and every witness that you have

23   heard in this case has told you that "notwithstanding the

24   foregoing" means that if there is a conflict, what comes next

25   controls over what came before.  Every witness, Peter Paterno,

1  the person who drafted the form, told you that and every other

2  fact witness.

3          The only person who was wishy-washy on that was Jeff

4  Harleston, the same Jeff Harleston who went to the United States

5  Senate and testified that that Universal licenses its recordings

6  to iTunes and others but then came in this case and told you

7  something completely different.  The same Jeff Harleston who

8  just today upon questioning by Mr. Pomerantz tried to get you to

9  believe that when he referenced Wal-Mart, as far as licensing

10 recordings to Wal-Mart, he was talking about CDs that are being

11 sold by Universal when, in fact, Wal-Mart has a digital download

12 company and that's clearly what he was referencing.

13         "Notwithstanding the foregoing" means what Peter

14 Paterno and everyone else says it means; that when Universal

15 licenses a master recording to someone else to manufacture and

16 distribute a record, the license provision applies.

17         Now, let's illustrate.  No one will disagree that when

18 the Marshall Mathers LP is sold, manufactured, and distributed

19 by Universal, that the revenue from that sale goes into this

20 bucket.  No one disagrees with that.  And that the revenue --

21 and that under those circumstances, F.B.T. and Eminem get about

22 18 to 22 percent of the suggested retail list price.  No one

23 objects to that, no one disputes it.

24         Now, it's actually less than Eminem and F.B.T. get

25 because there are certain deductions that are taken, but no one

1  disputes this.

2        Let's take a look at another album.  *Hip Hop Hits*

3  *No. 6* -- Volume 6.  This contains an Eminem recording *Without Me*

4  by Eminem.  And in this recording, this actual recording, was

5  sold -- it's a compilation album sold by Def Jam Recordings.

6  Def Jam Recordings is a Universal record label.  You remember

7  Mr. Pomerantz told that you with respect to compilation albums,

8  it falls in the license bucket.  Well, it doesn't just because

9  it's a compilation album.  Because there is no license here,

10 because it's a Universal record label selling this album, the

11 royalties go into this bucket.  There's no license.  They don't

12 need a license.  This is a Universal record label.

13        Very easy.  Very simple.

14        Now, Mr. Pomerantz also showed you something else.  He

15 showed you a different compilation album, a compilation album

16 that's released by Virgin Records.  It's a third party.  Virgin

17 Records had to have a license in order to have *My Name Is* by

18 Eminem on that album.  Universal doesn't dispute the fact that

19 when revenue is received by that because there's a license, the

20 revenue falls into this bucket.  Why?  Because there's a license

21 and notwithstanding the foregoing, if there's a master licensed

22 by Aftermath or its licensees, Universal to others, for their

23 manufacture and sale of records, it goes in that bucket.

24        Now, remember what you've heard, and Mr. Pomerantz

25 spent hours yesterday grilling Mr. Berman about normal retail

1    channels and "to" and "through."  You remember all of that.

2    Right here you can see why it just doesn't matter.  Mr. Berman

3    told you it doesn't matter and it doesn't matter.  Because when

4    Virgin Records sells this album, it's selling to or through

5    normal retail channels.  It sells it to Best Buy or Tower.

6    Virgin Records is selling this album.  But it still goes into

7    this bucket for licensing revenue.  The master licensed

8    provision.  Why?  Because it all goes back to the original

9    agreement between Universal and Virgin Records, the license

10   agreement.  And because it's being licensed, it goes in this

11   bucket.  It's a very simple thing.  The only transaction that

12   matters in this case is the transaction between Universal on the

13   one hand and the third party, and is it a license.  That's all

14   that matters.

15         Let's take Rhapsody, for example.  You have heard

16   about Rhapsody.  And, by the way, with respect to Rhapsody, with

17   respect to Virgin, with respect to these third parties, they are

18   doing the manufacturing, they are doing the distributing, they

19   are doing the selling.  All Universal is doing is supplying them

20   with a digital file and then they do the rest.  Precisely what

21   happens with respect to Rhapsody and, as I will show you in a

22   moment, with respect to iTunes.

23         Now, Rhapsody, as you have heard, is a conditional

24   download, it's a subscription service.  Universal licenses

25   master recordings to Rhapsody.  You've heard in this case that

1    Rhapsody then takes that -- the master recording and the

2    metadata that's provided to it, combines it into one file and

3    then sells a download.  It's a conditional download but that

4    doesn't matter, as I'll show you in a moment.  Universal admits

5    that under those circumstances, the master licensed provision

6    applies.  They admit that with respect to the Rhapsody

7    conditional downloads, they owe Eminem and F.B.T. 50 percent of

8    their receipts from that.  Why?  Because it's a license of the

9    master.

10           Now, what's their -- what's their distinction that

11   they're drawing between Rhapsody and iTunes?  They're saying

12   well, Rhapsody is only a conditional download.  With respect to

13   iTunes, you get the permanent download permanently.  You can see

14   by this language in this -- in the contracts, it doesn't matter.

15   Notwithstanding the foregoing, masters license, that's exactly

16   what Universal is doing with Rhapsody and with iTunes, to others

17   for their manufacture -- you heard Mr. Kenswil say, they take

18   the master recording, they take the metadata, they combine it,

19   it's the same process of manufacturing and sale of records.  So

20   if it's a sale of record, which iTunes does, or for any other

21   use, a temporary use, doesn't matter.  As long as it's a master

22   license, that's all that counts to others for their manufacture

23   and either sale of records or for any other use.  That's the

24   inquiry.  That's the only inquiry you need to make in this case

25   is are these licenses.

```
 1              Here's iTunes.  As we talked about, this is where one
 2    of the big -- the real battles -- battle lies but it doesn't
 3    make any difference.  With iTunes, just as with Rhapsody, you've
 4    heard the same exact procedure's in place.  No difference.
 5    Universal takes a master recording, it takes a -- a second file
 6    that has some information on it.  It supplies it to iTunes.
 7    iTunes then takes those two files, manufactures it into a
 8    record, and sells it.  Universal sells nothing.  It can't fall
 9    under the records sold provision because Universal isn't selling
10    anything.  Apple is doing the sale.
11              Now, Mr. Pomerantz spent a long time talking about
12    "to" and "through" and arguing with Mr. Berman about whether
13    Apple is or is not a normal retail channel and arguing about
14    whether it is or is not a record.  Mr. Berman, who's been in the
15    business for 35 years, who has been the president of Capitol
16    Records, who's been in charge of the legal department at almost
17    every major -- including one that is now part of Universal --
18    told you specifically it doesn't matter.
19              Because if iTunes is a normal retail channel and
20    they're selling it pursuant to a license, the license provision
21    applies.  The only thing that matters is is it a license between
22    Universal and iTunes.  That's it.  The fact that Universal --
23    that the consumer does an end user agreement and then has the
24    download permanently doesn't matter at all.  Why?  For the same
25    reason I have said over and over again with respect to Rhapsody
```

1    and with respect to the third -- other third party licenses,

2    where consumers purchase a record.  It doesn't matter.  Because

3    under this provision it says if it's a master that is licensed

4    to others and they're manufacturing and selling a record, the

5    master licensed provision applies, period.  End of story, no

6    dispute.  "Notwithstanding the foregoing" means, as everyone has

7    told you in this case, that if there is a conflict between it

8    and the records sold -- and the records provision, it controls.

9    Period.

10            Let's talk about T-Mobile for a second and the

11   conditional -- and the mastertone.  Same things.  Now, with

12   respect -- you heard that with respect to T-Mobile, Universal

13   licenses a master, just 30 seconds of the master, by the way, to

14   T-Mobile, and T-Mobile does exactly the same thing.  It then

15   manufactures it into a mastertone that it then sells to a third

16   party.  Period.  There's no dispute about that.  That's exactly

17   what they do, and you heard from Ethan Gustav.  What did he tell

18   you in the video deposition?  He told you that T-Mobile is not

19   in the business of acquiring anything.  They don't buy anything.

20   They don't buy anything from Universal at all.  They simply

21   license that 30 second master and then they manufacture it into

22   a mastertone and sell it.  It's not a sale -- it's not a sale by

23   Universal to anyone.

24            You take the single.  It goes in this bucket.  Why?

25   Because it's a master licensed by Aftermath or its licensees --

 1   Interscope, UMG -- to others for their manufacture and sale of

 2   either a record or for any use.  It doesn't matter.

 3            Now, we're going to talk about the economics of this

 4   in a moment, but there's one thing that I really want to make

 5   very clear in this case to all of you.  And I think it's been

 6   made clear.  The one thing that I really want you to understand

 7   here is that we're not saying -- Mr. Pomerantz has said over and

 8   over again his theme is that a record is a record is a record,

 9   and we think a download is different.  He's wrong.  We don't.

10   Downloads aren't different.

11            The problem is Universal tried over and over and over

12   again to create their own platform to sell permanent downloads

13   themselves.  You heard about Blue Matter.  What is Blue Matter?

14   Blue Matter was their own attempt to sell downloads.  It failed.

15            You heard about Total Music from Mr. Kenswil ten years

16   later.  They tried again and they failed.

17            However, if Universal had been able to create their

18   own download service, sell records, sell downloads themselves,

19   not have to license the masters to third parties for them to

20   sell, we wouldn't fight them.  If it was on their system, on

21   their platform, they were manufacturing, distributing and

22   selling, it would fall into that bucket.  A record is a record

23   is a record is irrelevant.  It's a smokescreen.  What the issue

24   is is Universal/Interscope/Aftermath licensing the master

25   recording to a third party to then manufacture and sell

1    downloads or for some other use.  That's it.  That's the only

2    question in this case.

3         And it's a complete misrepresentation of our position

4    to say we're saying a download is somehow different.  No, we're

5    not.  We're saying you have licensed the masters.  Someone else

6    is manufacturing and selling the download.  Because you've

7    licensed it, you pay under the licensing provision.  That's the

8    contract.  And that's what we're saying.

9         Now, let's talk about the logic behind this.  And

10   you've heard about this throughout this case.  The logic behind

11   this is -- and Mr. Berman told you this -- that the records sold

12   provision was structured and the royalty structure took into

13   account the fact that Universal, the record label, would be

14   performing the tasks of manufacturing, would have inventory,

15   would be doing the distribution.  The last witness in this case,

16   their expert, Mr. Harleston, what did he tell you?  He told you

17   that when they create -- when they sell records themselves, when

18   they're manufacturing it, they pay a dollar to $1.25 per CD.  He

19   admitted it.

20        So if Universal is selling -- and this is why this was

21   structured in the way it was.  If Universal is -- and they are

22   responsible for their manufacturing when they sell, if they sell

23   10 million albums, they have a cost of 10 to 12 and a half

24   million dollars to sell those CDs.  They have inventory.  They

25   have an entire sales staff whose job it is around the country to

 1    sell to the various retailers.  They have to get the items to

 2    the retailers.  They have warehousing, they have to package all

 3    of these products.

 4         On the other hand, when they license a master

 5    recording, they provide iTunes with a digital file.  That 12 and

 6    a half million dollar cost on 10 million CDs goes away.  They

 7    provide a digital file to iTunes or to Rhapsody -- it's the same

 8    thing -- which again shows you how silly it is that they want to

 9    distinguish between the two, because the procedures between the

10    permanent and the conditional downloads is precisely the same.

11    They send the digital files.  And then the defendants,

12    Mr. Kenswil told you, there is no additional manufacturing

13    charges.  They try to say oh, we built some platform and it cost

14    us millions of dollars.  You're not going to see any -- you

15    aren't going to see any evidence of that.  They just came in and

16    made that up.

17         But what's important and what's relevant is when they

18    sell -- when Apple sells the download, whether it's one time,

19    ten million times or a hundred million times, that's just money

20    for Universal.  Their share just comes back to them.  They don't

21    have to worry about creating CD after CD after CD.  He said --

22    Mr. Harleston said, "We're whackey but we're not that whackey."

23    They're not whackey.  They don't have any costs.  They're trying

24    to get away with not paying artists what they deserve and

25    keeping all the money when they don't have to manufacture a

 1  thing.  That's what's at issue higher.  That's what is at issue
 2  here.
 3          Now, let's talk about the evidence in this case, the
 4  evidence that you've seen.  Trial testimony.  You have seen
 5  various people come in and testify in this case.  Peter Paterno.
 6  Now, who is Peter Paterno?  Peter Paterno is the lawyer for
 7  Aftermath.  He's the person who drafted the agreements in this
 8  case.  Who would know better than Peter Paterno, Aftermath's own
 9  attorney, what's involved here?  Peter Paterno first said that
10  the words of the -- that he uses words of the contract to
11  express the intent of the parties.  Mr. Harleston came in here
12  today and he tried to tell you well, the master's license
13  provision may say it applies to all -- to manufacture and sell
14  records or any other uses but really it means it only applies to
15  someone else's product or it really means there is some other
16  meaning to it.  Okay?
17          Mr. Paterno told you that's not true.  Mr. Paterno
18  told you it applies to just what he says it applies to.  I asked
19  him that exact question.  "Isn't it true that you at your
20  deposition said that 4(c)(v) applies to just what it says, when
21  there is a license of the master to others for their manufacture
22  and sale of records or for any other use, it applies?  Isn't
23  that what you said?"  And he said "Yeah."  He didn't say, "Umm,
24  I really meant it only applies to compilation albums and I
25  really only meant that it really only applies to soundtracks and

1   what we really meant was" -- no.  It means what it says and

2   that's what it says.

3          It appears that the defendants are also saying, as you

4   can see, that records, when used in the records sold provision,

5   means something different than when records are used in the

6   master licensed provision.  That's the only thing they could be

7   saying.  Because if a record means any record at all and they're

8   saying a download is a record, then the masters license

9   provision applies.  Mr. Paterno told you that there is one

10  definition of record, and whenever it's used, it means exactly

11  the same thing.  So when Aftermath and Universal licenses a

12  master for the manufacture and sale of a record -- and it's

13  their position that a download is a record -- the master

14  licensed provision applies.

15         What else did Mr. Paterno tell you?

16         Mr. Paterno told you about "notwithstanding the

17  foregoing."  I mentioned that to you earlier.  That every

18  witness said it means that whatever comes next controls over

19  what came before.  He told you that at the trial in this case.

20         The next slide I'm going to show you is very important

21  because it directly responds to what Mr. Pomerantz's main theme

22  or argument in this case is.  Mr. Pomerantz has told you over

23  and over and over again that where there's a sale of a record,

24  period, in or through -- to or through -- you endured that for

25  about two hours yesterday -- normal retail channels, the records

1    sold provision applies.

2          What did Mr. Paterno tell you?  Mr. Paterno told you

3    something quite different.  It could be a normal retail channel

4    sale for the person who sells it.  It wouldn't be a normal

5    retail channel sale for Interscope if they had somebody else

6    doing it.  That's precisely the point that I made at the very

7    beginning of my closing, which is this:  Universal sells a

8    record to Tower Records or Best Buy.  They sell it to or through

9    normal retail channels, it doesn't matter.  But if Universal or

10   Interscope or Aftermath licenses the master recording and then

11   someone -- to Best Buy or to Tower or to iTunes, and iTunes then

12   sells it, and they're a normal retail channel vendor, it's a

13   normal retail channel sale by them, but the licensing provision

14   still applies because they got it pursuant to the license.

15   That's just what he's telling you here.

16          And this idea that whenever there's a record sold, if

17   it's through normal retail channels or to normal retail channels

18   the record sold provision applies is nonsense.  If it's a

19   license to third party and they then sell it to or through

20   normal retail channels, the licensing provision applies, period.

21   And they admit -- and I'll show you more testimony -- they admit

22   that licensees often sell to or through normal retail channels

23   but the licensing provision applies.  Mr. Paterno confirmed that

24   in this next bit of testimony.

25          Now, who else did you hear from in this case?  You

heard from Gary Stiffelman.  Gary Stiffelman was Eminem's

attorney.  And Gary Stiffelman negotiated the 2000 novation, he

negotiated the 2003 agreement and the 2004 amendment to the 2003

agreement.  And he has also been a lawyer in private practice

here in Los Angeles for about 30 years he said.  He told you

that the master licensed provision clearly applies to the

license between Universal and Apple and the other third parties.

He told you that specifically.  He says it was the language of

the contract and how it had been applied in other circumstances

that were licenses, and my view was this was a license like all

those other circumstances and that this was the appropriate

treatment.

        He explained to you the same logic that I explained to

you a minute ago right here.  They don't press records.  They

don't have to spend $1.25 per unit.  They provide a digital

file.  One.  That's it.  They can then get the revenue from a

hundred million downloads without any cost for the manufacturing

of any additional units.  At all.  He also explained to you that

he expressed that very clearly to Mr. Hoffman at Universal.

        Now, you were instructed by the judge before I began

my closing argument that one thing that you can take into

consideration in determining what the parties meant by their

language or whether this licensing situation was envisioned to

be -- include for permanent downloads was how did the parties

act after the issue arose but before there was a dispute.

1           And Mr. Stiffelman came in here and told you -- and
2    you heard and I will go over this further in a moment --
3    Mr. Stiffelman came in here and told you that Rand Hoffman at
4    Universal tried to get him, in the 2003 agreement, to carve out
5    permanent downloads from the licensing provision and to agree to
6    a separate provision where permanent downloads would be paid as
7    if it was a records sold by Universal.  Why would he do that if
8    he didn't know and Universal didn't know that they had a big
9    problem?  There's no answer to it.  They tried to be
10   mealymouthed and wishy-washy about it and tried to avoid having
11   to answer my questions directly, but ultimately they had to
12   admit that their concern was -- even though Mr. Harleston said
13   he wasn't aware of it in his deposition -- their concern was the
14   licensing provision and that downloads would be covered by it.
15   This is what Mr. Stiffelman told you.

16           Mr. Stiffelman told you that it was specifically
17   addressed with him and that he said no.  He also said it was his
18   position that the licensing provision covered it perfectly.
19   Mr. Stiffelman followed up his 2003 agreement with an email
20   making sure Universal fully understood Eminem -- Eminem's
21   position on this.

22           Now, one last thing when it comes to Mr. Stiffelman.
23   Mr. Stiffelman and the defendants have raised an amendment, the
24   2004 amendment, and as you can see here, it was understood by
25   everyone that Eminem and F.B.T. -- Eminem, through

1  Mr. Stiffelman, specifically complained about this treatment and

2  that they would not agree that downloads could be treated as

3  record royalty sales, period.  No doubt -- no doubt about it.

4          In 2004, there was an amendment, and Mr. Stiffelman

5  and Mr. Hoffman both told you that in that negotiation,

6  Mr. Stiffelman asked Mr. Hoffman to say that for purposes of

7  escalations -- let me just explain what an escalation is.  Where

8  Universal is selling a record, there might be a royalty rate for

9  the first million units sold, but after a million units, for the

10 million and first the artist will get a little bit of a higher

11 royalty rate.  That is called an escalation.

12         Mr. Stiffelman just asked Mr. Hoffman to include sales

13 of albums by permanent downloads to get to the million figure.

14 Mr. Stiffelman was very clear it had nothing to do with

15 royalties, no change of position as far as how royalties for

16 downloads should be accounted to, and it was absolutely not

17 addressed, discussed or intended.  He made that very clear.

18         To show you that it was clear, I have on the screen

19 here two different provisions.  The one on the left is

20 Interscope's form agreement and it says, "Sales of albums by way

21 of permanent download shall be treated as net sales for the

22 purposes of Article 9."  And Article 9 is royalties, so that's

23 for all purposes, that's in their form agreement.

24         Mr. Hoffman, because that wasn't the deal, changed it

25 so that it was only for the purposes of escalations.  That shows

```
 1   right there that there was no intention whatsoever to include it
 2   for royalty purposes or change anything.  It just related to
 3   escalations.  And, by the way, it only related to album -- full
 4   album sales.  Mr. Hoffman and Mr. Stiffelman both agreed that
 5   this provision has nothing to do with individual track
 6   downloads, mastertones, anything.  In fact, Mr. Hoffman said he
 7   wouldn't agree to that.  He wouldn't agree to count towards
 8   escalations 14 individual tracks of a download as an album,
 9   period.  This is a red herring.  It's an attempt to pull the
10   wool over our eyes.  It has nothing to do with this case.
11            Now, let's talk about Mr. Ostroff for a moment.
12   Mr. Ostroff is the head lawyer at Universal.  Mr. Ostroff told
13   you that it's important to pay according to the language of a
14   contract of the artist.  That's what he told you.  What he also
15   told you in this next slide is very important.  He told you that
16   with respect to the masters licensed provision, there is
17   absolutely nothing in it that would suggest that Universal,
18   Aftermath, Interscope doesn't have to pay under the licensing
19   provision if they're licensing the masters to iTunes.  He said
20   it.
21            Now, you remember a moment ago I told that you
22   Mr. Ostroff said that it's important to pay according to the
23   language of the contracts with the artists.  Again, let's look
24   at what Universal did when this permanent download issue became
25   an issue.  What did Universal do?  They created a new royalty
```

```
 1   structure out of thin air.  Out of thin air.  They didn't pay
 2   under the records sold provision.  They created something
 3   entirely different.  Why?  Because they knew that they could not
 4   justify that these were licenses and they were going to try and
 5   appease the artist, hope that the artist would feel like half a
 6   loaf was better than none and just accept what Universal was
 7   selling.  That was the point of this.  He admits that they
 8   created an entire new royalty structure to pay for permanent
 9   downloads, something not found in the agreements at all.  Not at
10   all.
11        On the other hand, with conditional downloads and
12   streams, he admits they are paying according to the terms of the
13   contract.  And what are they admitting the terms of the contract
14   require?  They're admitting that the terms of the contract
15   require that since it's a license, a license of the master to
16   these conditional download companies, which is the same process
17   and procedure as with iTunes, that they're paying 50 percent
18   under the master licensing provision.
19        Why?  There is only one reason.  Because conditional
20   downloads and streams don't bring in nearly the money that
21   permanent downloads do.  And they -- they couldn't even begin to
22   imagine a way to get out from under conditional downloads and
23   streams and paying them under the license provision.
24        The truth is why did they do it?  You remember
25   Mr. Ostroff telling you on the witness stand first denying -- he
```

first denied the fact that the licensing provision in the

contract motivated their decision.  That's what he first told

you.  Then when I asked him a question and kept on, he finally

admitted that there were artist representatives that argued that

the license provision applied.  They knew what was going on here

and they thought they could get away with it.

     Do you remember this?  Mr. Ostroff first said that

they amended their contract because if they paid the artist more

than what the artist was entitled to under the records sold

provision, if they didn't take container deductions -- in other

words, if they can take these deductions to lower the royalty

but if they didn't take them, artist representatives would say,

"Hold on, what do you mean you're taking away container

charges?"  As if to say, "Why are you paying me more money than

I deserve?"  That's nonsense, absolute nonsense.

     Mr. Ostroff confirmed the same thing, the same exact

thing that Mr. Paterno told you.  And that's the same thing that

Mr. Pomerantz has misled you about, which is that if there is a

sale through normal retail channels, it automatically goes under

the records sold provision.  Mr. Ostroff told you licensees sell

in normal retail channels, but because they sell to or through

normal retail channels because they got their rights pursuant to

a license, the master licensing provision applies.  Period.

This whole nonsense about "to/through" normal retail channels it

is an absolute red herring in this case, meant to distract you

1   from the one and only issue.

2          Mr. Harleston came up and told you -- and we talked

3   about record clubs quite a bit.  Mr. Harleston came up and told

4   you, well, the licensing provision only applies to someone

5   else's product.  Mr. Pomerantz told you the licensing provision

6   only applies when it's someone else's product.  Record clubs put

7   the lie to that.  Record clubs is a situation, as you heard,

8   where the license -- where Universal is licensing their albums

9   to a record club and the record club is then manufacturing and

10  distributing.  They have the cost of each unit.

11          How does Universal pay?  50/50.  Why?  That's the

12  economics of it.  They'll say, well, in this contract the record

13  club provision is in a different paragraph.  So what?  It's --

14  in other contracts it's in the licensing provision.  It doesn't

15  matter.  What matters is that they pay 50/50.  It's the same

16  economic logic.  No difference.

17          Michael Ostroff's memo, we've gone over this, and in

18  2002, we talked about the fact they did two things.  One,

19  Universal changed the whole royalty, invented a royalty system

20  out of whole cloth for permanent downloads.  Two, he instructed

21  his people go back and amend existing recording agreements to

22  include a specific provision that permanent downloads will be

23  paid as record sales.  That's what he instructed his people to

24  do.  Okay?  He did that because he knew that without it, the

25  licensing provision would apply.

1        Now, as we talked about, he did -- they did change the
2   form.  And this is what the form now says:  "If the company
3   sells or licenses to any third party the right to sell permanent
4   downloads or records hereunder, this is what royalty provision
5   will apply."  Why did they do that?  It's clear.  They did it
6   because they knew without it the master licensing provision
7   would apply.  That's why.

8        You also met Mr. Kenswil.  You remember Mr. Kenswil,
9   he was the head of Elabs, the head of the department that
10  negotiates these third party licenses.  Mr. -- their entire --
11  their argument here is that Universal is selling something to
12  Apple and Apple is then reselling it.  That's their argument.

13       Do you remember, Mr. Weinberg told you that's the
14  nature of the transaction.  Mr. Kenswil told you that's not
15  true.  Apple does not obtain ownership of anything from
16  Universal.  I asked him, "Does Apple obtain ownership of the
17  digital file that it receives from Universal?"  "My answer would
18  be no."  If Universal is not selling anything to Apple, if
19  Universal is only licensing the product -- the master recording,
20  and Apple is then selling, it can't be a sale by Universal that
21  falls under the records sold provision.  There is no sale by
22  Universal at all.  It's a license, and if Apple is not getting
23  ownership of anything, what is Universal selling to it?
24  Nothing.

25       Mr. Kenswil also told you just what I've told you and

 1    what Mr. Harleston didn't want to admit today, which is there's

 2    no marginal cost to Universal on increased costs due to it being

 3    downloaded several times.  He told you that specifically.

 4    Universal just sits back and gets the money when a download

 5    occurs on Apple ten times or a hundred million times, once it

 6    provides the digital file.

 7            Not only -- not only does Universal have a small

 8    cost -- and there is an interrogatory in this case that is in

 9    evidence.  It's -- what number is that?  It's Interrogatory

10    No. 26, which is Exhibit 790.  And in that, Universal has stated

11    that they have basically an $800 cost -- $899 cost to create all

12    the information in the digital file, the metadata, everything

13    that goes with it.  That's what they said.  They also admit they

14    have no additional manufacturing costs once that file goes,

15    whether it's downloaded ten times or ten million.

16            Mr. Kenswil tells us, and you'll see in the

17    agreements, that Universal asks the download companies to

18    reimburse them a service fee for the cost that's incurred by

19    their creation of the digital file.  So not only do they not

20    have the cost of each individual CD or album, they're getting

21    reimbursed for the cost of the digital file they provide.

22            And it's nonsense about, oh, we have spent millions of

23    dollars -- some unknown millions of dollars developing some

24    platform.  What platform?  To create a digital file to send to

25    Apple?  That's -- it's nonsense.  They might have spent millions

of dollars to try to create a platform that they couldn't do, to sell their own downloads themselves, but they failed. And they admit they failed, and they failed -- they failed every single time.

Mr. Kenswil -- this is an admission by Mr. Kenswil. That Apple receives the right to reproduce the digital files supplied to it by Universal. Okay?

You heard what Mr. Berman said. Mr. Berman said when there's a sale to a retailer, the retailer has title to everything; they can do with it what they want. What can't they do? They can't reproduce it. What can a licensee do? The only thing they can do, reproduce it. They're granting them that license to reproduce. He admits it's a copyright license. Now, let me back up for one second because there is something they say along these lines that I want you to fully understand.

They try to say well, you know, up until a couple of years ago, we had our own manufacturing plant but now when we sell records, we have another -- we have a third party that we hire to manufacture and so we have to give them a license so it's really no different than what is going on with Apple.

Nonsense. Universal pays for the manufacturer -- manufacturer to manufacture those CDs. The manufacturer then sends them back to Universal and Universal sells them. What the manufacturer does is not a royalty bearing event. They're not selling anything, the manufacturer is not selling anything.

1  They're manufacturing CDs, giving it back to Universal,

2  Universal is then selling it.  They're hoping you don't

3  understand this.

4          Now, Mr. Kenswil also admitted that what Apple was

5  doing is akin to what a manufacturer does as far as

6  manufacturing -- the manufacturing process, and that the

7  download is not created until and unless someone downloads

8  the -- downloads a download.  So what occurs here is -- and

9  that's why the master licensing provision applies.  Remember

10  what I said.  The master licensing provision says

11  notwithstanding the foregoing, if there's a master license --

12  Mr. Kenswil tells you it's a master that's being provided to the

13  master and file with metadata for the manufacture -- to others

14  for the manufacture -- Apple is doing the manufacture -- and

15  sale of records -- fine, records is a download.  No problem --

16  sale of records, the master licensing provision applies,

17  notwithstanding anything to the contrary before.  Period.

18  That's it.  That's the analysis.  Apple hasn't bought anything.

19  This is a shell game is what's going on here.

20          Another shell game.  Mr. Weinberg, if you remember

21  when I questioned Mr. Weinberg, he tried to say, "Well, I know

22  it says 'license' in some of these agreements we didn't draft,

23  but there's a wholesale/retail price structure.  You have to

24  look at that.  We sell it at wholesale and, you know, they then

25  sell it at retail and we get our wholesale price back."

1          I showed you two things in this case.  One,

2    Mr. Kenswil says you can call it whatever you want.  Universal

3    is not getting any money unless and until a download occurs, and

4    they're not selling anything, they're just getting a fee back

5    for the license.  It's a license fee.  That's it.  And I also

6    showed you that with ringback tones -- remember we talked about

7    ringback tones a little bit?  Those are like 12 months, you get

8    them for 12 months.  You don't get them permanently.  They have

9    the same wholesale/retail price structure there even though

10   Universal admits it's a license, and Universal pays ringback

11   tones as licenses.  See, they can't keep their story straight.

12   You can't keep it all straight when you're trying to pull the

13   wool over people's eyes.  Sometimes you're going to mess up.

14          Mr. Kenswil also admitted that record clubs are

15   licenses to them where they're manufacturing and distributing

16   Universal albums.  They pay 50/50.  Why?  Because they're doing

17   the manufacturing and distributing.

18          Now, Rand Hoffman also came in and testified.  What

19   did Mr. Hoffman tell you?  Mr. Hoffman told you that record

20   companies draft the master licensing provision purposefully

21   broadly.  You can't draft something purposefully broadly, okay,

22   and then say let's construe it narrowly.  You can't do it.  They

23   drafted it broadly.  It's on their form.  It's on their

24   document.  It's in their record contract.  And they want you to

25   come in now and say, yeah, we drafted it and we're record

1    company executives and we have all these lawyers, but it doesn't
2    mean what it says.
3            The next thing that Mr. Hoffman says in this screen is
4    also very important.  Mr. Hoffman says that by 1998 record
5    companies knew that digital downloads would be a form of
6    exploitation.  If they knew it by 1998 and they wanted to carve
7    it out of the master licensing provision, they could have and
8    should have done it but they didn't.  They didn't.
9            Again, we've gone over this and Mr. Hoffman tried to
10   say, before we had the Ostroff memo, that it was only new
11   agreements.  New agreements drafted from scratch where they were
12   supposed to change the provision.  The Ostroff memo tells you
13   that's not true.  Mr. Stiffelman tells you that Mr. Hoffman
14   tried to get him to change the form language to agree to new
15   language and he refused.  Told you that.
16           He also told you that the reason they added the new
17   language, one reason, was because they knew that the licensing
18   provision would apply.  Or that people would claim that it would
19   apply.  They knew that.  He didn't want to admit it at first.
20   He also tried to say -- then he tried to backtrack a little bit
21   and say, well, we changed our form because we're paying the
22   artist more than what they were entitled to and we needed to
23   have that in writing.  But then I got him to admit, not true.
24   They get paid more under this whole cloth invented royalty
25   scheme but they don't get paid more, artists, if the licensing

1   provision applies, which it does and which it should.

2        Now, you heard from David Weinberg and you heard from

3   Ethan Gustav.  David Weinberg is the person who changed the --

4   struck out the word "license" in the T-Mobile agreement.  He

5   tried to say that, well, look, I didn't scratch it out in other

6   places, but remember those other places were for gratis, royalty

7   free.  Where there wasn't a consequence of a license, no royalty

8   to be paid to an artist, he didn't worry about it.  He only

9   scratched it out where the license occurred in the document.

10       Now, remember I told you that when you're trying to

11  cover something up, you can't cover all your bases.  Here are

12  just some examples.

13       Digital licensees of Universal get an asset and

14  metadata recipient guide and it goes to both the permanent

15  download companies and the conditional download companies.  It

16  says in the front cover that it's for the digital licensees of

17  Universal.  It also says under the purpose -- sorry -- under

18  "Purpose," Page 2 of the document, that the document details

19  asset and metadata delivery standards for digital licensees.

20  And on content delivery it says that it's for licensees.

21       Very importantly, there were three or four companies

22  that I talked to you about that Mr. Weinberg admitted required

23  that the agreements with them be on their forms and not on

24  Universal's forms.  Remember that?  It was Cingular, it was

25  Nextel, it was Sprint.  They required that the agreements for

```
1    those mastertones be on their forms.  They weren't willing to
2    negotiate to let Mr. Weinberg and Universal change language to
3    camouflage the fact that these were license agreements.  So
4    these agreements for mastertones which are on their forms --
5    these third parties had no incentive to try to cover up what the
6    true nature of the transaction was.  They didn't care.
7    Universal cares.  They don't want to pay under the licensing
8    provision but they don't care.
9           So each one of these, the Sprint agreement says that
10   it's a license, license grant.  The Nextel agreement says it's a
11   license grant to license the master recordings to create
12   mastertones.  The Cingular agreement says it's a license rights
13   that include the licensing of the -- of masters to Cingular for
14   them to create, manufacture and sell mastertones.
15          The conditional download agreements which are the same
16   also -- here is an example -- say that the agreement is a
17   license.  On the secondary claim in this case, the $159,000
18   claim, Ping Hu came in and testified and he admitted that F.B.T.
19   was overcharged the amount of $159,000 and Eminem was
20   undercharged in the same amount.  Mr. Cohen came in and told you
21   that was correct.  He told you his report was on behalf of both
22   F.B.T. and Eminem and that Eminem never said that wasn't
23   correct.  There is no dispute that Universal owes us money.  I
24   want to talk to you very briefly about what UMG says in their
25   opening statement.
```

1          Your Honor, I am reserving 15 minutes for response so
2    I have 10 minutes left in this.
3          THE COURT:  All right.
4          MR. BUSCH:  In their opening statement these are
5    things that Universal's lawyers told you.  The words that are
6    actually in the contract say exactly the opposite of what F.B.T.
7    is telling you.  What the words in the actual contract actually
8    say is that if a record is sold in any format, in any format
9    through a retailer to a consumer, that F.B.T. gets the same
10   royalty rate.  That is blatantly false.  If it is a license and
11   the licensee then sells a record in any format to a consumer,
12   the licensing provision applies.  Licensees sell in normal
13   retail channels to or through, it doesn't matter.  That is a
14   blatantly false statement.
15         What else did Mr. Pomerantz say?  In particular, if a
16   record was sold through a normal retail channel, then F.B.T. got
17   18 to 23 percent.  That was the deal.  False.  If there was a
18   license and then the licensee sold through a normal retail
19   channel, Eminem and F.B.T. get 50 percent.
20         He says first we're going to demonstrate under the
21   contract that a record is a record.  Okay.  No dispute.
22         He says the second thing that we'll demonstrate to you
23   is that if a record is sold to a consumer through a store, even
24   if that store is on the Internet instead of on a street corner,
25   that's a record sold through a normal retail channel.  It's

1  irrelevant.  If the -- if the license and the licensee is

2  selling a record to or through a normal retail channel, that's

3  what counts.

4         He says the third thing that we'll demonstrate to you

5  is that the provision that F.B.T. wants to focus you on, the

6  so-called master licensed provision, well, it does not apply to

7  a situation where the record company is selling its own records

8  through a retailer such as permanent downloads.

9         There is absolutely no evidence of that in this case.

10  If it's a license -- if it's a license, the record -- the

11  license provision applies.  That's a statement with absolutely

12  no evidence.

13         He says the words in the contract had a real meaning

14  to the parties when they signed the agreement in 1998.  And they

15  both signed the agreement.

16         Mr. Paterno told you that's true.  The masters

17  licensed provision applies to just what it says it applies to:

18  Everything.  There is no limitation that they're trying to

19  create.  It's not in there.

20         UMG smokescreen, the smokescreen that has been set up.

21  A record is a record is a record.  Irrelevant.

22         Normal retail channels.  Irrelevant.

23         Downloads are coming to replace CDs.  Irrelevant.

24         Permanent download is a sale/resale transaction.

25  Wrong.  No evidence of that.  No one is buying -- the download

1    company is not buying anything.

2          Master licensed provision does not apply to

3    Universal's product.  You know that's wrong.  There is nowhere

4    in the contract that says it.

5          Sales of albums by way of permanent downloads used for

6    escalation.  Irrelevant.  Escalation has nothing to do with this

7    case at all.

8          F.B.T. is opportunistic and passive.  This one really

9    gets me.  It's wrong, it's irrelevant, and it's insulting.  As

10   if it matters how much money F.B.T. has made.  What they're

11   trying to tell you is -- what they are going to stand up and

12   tell you is F.B.T. has made a lot of money in this case.  F.B.T.

13   has made a lot of money through this contract, through their

14   hard work in this case.  So you know what?  Because we want you

15   to think, well, they've made enough money, they don't have the

16   right to have their contract honored, that is insulting.  That's

17   insulting to the people that worked on these records, who won an

18   Academy Award for the record, who won Grammy Awards, and they're

19   going to come here and tell you, well, they've made enough money

20   so don't make us honor our contract.  That is essentially what

21   they're telling you.

22         If UMG licenses, authorizes or grants a right to a

23   third party to reproduce a sound recording master, it's a

24   license.  And if it's a license to manufacture and sell a record

25   or for any other use, then Eminem and F.B.T. receive 50 percent

1  of net receipts.

2       You have -- you will have in your -- when you go back

3  for jury deliberations -- a binder that has cutouts of the

4  permanent download and the subscription compilation -- I'm

5  sorry -- subscription conditional download and mobile agreements

6  that show that the provisions in the agreements are essentially

7  the same.  There is no distinction really.

8       For the permanent download and conditional download

9  agreements, Universal has audit rights.  Same content delivery.

10  Service charge.  Download provider takes responsibility for

11  doing everything, the manufacturing and the distributing and all

12  of that.  Have to sign end user agreement.  There is a grant of

13  rights.  Only the rights we grant you do you have.  All UMG

14  intellectual property is retained by UMG.  Rights reserved,

15  nothing that we haven't provided to you is granted to you in

16  this license.

17       No right to resell.  You know, they made a big deal

18  about the permanency and that's okay.  But when you buy an

19  album, you can go on eBay and resell it.  You can't do anything

20  with a download, other than listen to it.  You can't go on eBay

21  with that.  It's in the agreement.  Right, title and interest.

22  Everything provided by Universal to the download company is --

23  remains the ownership of Universal.  Nothing is sold.  If all

24  right, title and interest stays with Universal, how is there a

25  sale?

Take-down rights. You have to take it down when we tell you to. Just digital files are being provided. Termination rights and consumer downloads only. In other words, iTunes can't even sell to a business. They can only sell to consumers.

You've heard a lot about compilation agreements. You will have some exhibits that you can look back in the jury room. These are Exhibits 103, 105, 106, 107, 108 and, 775. Just like with the conditional download agreements, Universal admits these are licenses, and you will see that the provisions here are almost identical to the ones with the permanent download and conditional downloads. Same type of things because it's a license. It's the same transaction.

When there's a sale, on the other hand, Universal is responsible for the manufacturing and reproducing each record. Not the license. Responsible for fabricating insert, artwork and packaging for each record. Responsible for distribution. Responsible for inventory. They have a huge sales staff. Sales to the retailers. Title of what's -- the CD passes to the retailer. The artist is credited with royalty upon the sale to the retailer. The retailer can throw away, give away or sell. All of these things the retailer can't reproduce. This is a sale. This is a sale. These are the things you see when you see a sale. Not when you see a license. And when you see a license, you see the things that we just talked about.

1        Jeffrey Harleston, the supposed expert, who came in

2    here who has only worked for Universal other than with a law

3    firm.  The only job he has ever had in the record industry was

4    with Universal.  He came in and admitted, just what I'm telling

5    you, in testimony before the United States Senate.  You know

6    what, you can't go to the United States Senate and say one thing

7    and then come into court and say something directly opposite.

8    And that's exactly what he did before he knew I had his Senate

9    testimony.  Okay.  He tried to get -- to pull the wool over our

10   eyes.

11       But he went to the United States Senate and he said,

12   "We license our music to the people having the next great idea."

13   And he specifically said, "We license the use of our recordings

14   to Verizon."  He couldn't explain what he meant by that if it

15   wasn't for mastertones.  He came in here this morning and

16   Mr. Pomerantz tried to get him to say that, "Well, when I meant

17   license, I meant something different, and you see Wal-Mart, and

18   Wal-Mart is a retailer that sells physical CDs so, see, I really

19   didn't mean license."

20       And then I got up and said, "Wait a second, Wal-Mart

21   also sells permanent downloads pursuant to a license by

22   Universal, right?  And that's what you were referring to?"

23       Mr. Pomerantz said that in his opening statement.  He

24   admitted that the license of a recording for a toothbrush will

25   have a different fee than the license of the same recording when

it's selected on demand and downloaded to an iPod.  Before he
knew I had his Senate testimony, he said that Universal doesn't
license recordings to Apple.  He said it's not a license
agreement.  He said to the United States Senate exactly the
opposite.

You heard from Gary Cohen, and I feel compelled to say
something about this.  This is Mr. Cohen's chart here.
Yesterday -- the way this process works is the plaintiffs can do
a -- designate an expert for damages and the defendants have the
right to designate their own expert on damages if they think
that the calculation by the plaintiff's expert is wrong.  You
didn't hear any economic expert designated by the defendants.
They didn't challenge Mr. Cohen's calculations.  This is a man
who's done work for The Beatles, The Rolling Stones, Carlos
Santana, The Beach Boys, Tom Petty, Bing Crosby, Doris Day.
Okay?  They didn't challenge his calculations to this case.
What did they want to do?  They wanted to embarrass him.  That's
what they wanted to do.  And hope that by embarrassing him, that
somehow you would think that he wasn't telling the truth and not
give credit to his analysis.  They couldn't challenge his
calculations, mind you, so instead they said well, isn't there a
case -- isn't there a case where the judge didn't -- didn't
accept your findings?  And they tried to make it sound like
Mr. Cohen was not telling you the truth.

What they didn't tell you -- and this is the kind of

1  slight of hand we have to deal with here -- what they didn't

2  tell you is they made it sound like Mr. Cohen was in a

3  deposition with that lawyer after the decision came out and so

4  obviously the lawyer would have told him about that decision,

5  but what they didn't tell you and what I told you when I got up

6  here was that deposition occurred prior to the decision.  It was

7  a complete attempt to make him look bad because they couldn't

8  challenge his findings in this case.

9         And what did Mr. Cohen tell you?  He told you that

10  basically F.B.T. is getting $0.07 by the calculation that

11  Universal is doing now.  By the correct calculation, they should

12  get $0.14.  And that he told you that the total damages were

13  $1,474,270.  He talked about certain deductions that you might

14  want to give Universal possibly, and he said that depending on

15  those deductions, basically it's between a million and

16  $1.5 million, depending on how you want to end up with your

17  analysis.

18         And that's what I would ask you to award.  I would ask

19  you to award the 1.474, or if you want to give Universal the

20  deduction for the mechanical royalties, that's okay.

21         All right.  This case is about the principle of this

22  matter.  This case is about them trying to pull the wool over

23  our eyes, trying to trick people and not pay them what they're

24  owed.  That's what this case is about.

25         The one last thing that I want to tell you is you

1    received some jury instructions, and one of the jury

2    instructions talks about the statute of limitations.  Just so

3    you're clear.  What that relates to is damages.  So that if

4    there is any download revenue that occurred prior to May of

5    2003, that unless you find that F.B.T. could not have discovered

6    it, F.B.T. doesn't get that.  But as you heard, that amounts to

7    less than a thousand dollars.  The download revenue in this case

8    primarily all relates to the period of April 2004 to December of

9    2008 and the latter half of 2003.  So that's -- that's not an

10   issue.

11            The plain language of this case, the plain language of

12   this contract says that on masters licensed, notwithstanding the

13   foregoing, F.B.T. is entitled to have downloads paid under the

14   master licensing provision.  I ask that you find in favor of

15   F.B.T., that you award them the damages that Mr. Cohen found,

16   and that you award them, on the second cause of action, the

17   $159,000.  There is no evidence that there is any dispute on

18   that.  And that's what I would ask that you find in this case.

19   Thank you.

20            I will reserve my time.

21            THE COURT:  Thank you.

22            Ladies and gentlemen, we are going to break for

23   10 minutes and then you will hear defendant's closing argument.

24   Until the case is finally submitted to you, do not discuss the

25   case among yourselves or with anyone else.  Don't form or

```
 1   express any opinions about the case until it's finally submitted
 2   to you.  We will see you again in ten minutes.
 3                         (Jury Out)
 4            THE COURT:  For the persons in the audience that may
 5   be unfamiliar with the Court rules, I ask that you turn off your
 6   cell phones or your Blackberrys, that you do not receive or send
 7   out emails or text messages during the proceedings.  It's an
 8   important case to both sides, and I don't want jurors distracted
 9   by anything that goes on in the audience.  So if you have a
10   cell phone or Blackberry, please shut it off and not read or
11   send text messages or emails.  Thank you.
12                        (Recess taken)
13                         (Jury Out)
14            THE COURT:  Mr. Pomerantz, I think you had an issue,
15   you said, or Mr. Klaus?
16            MR. KLAUS:  Yes, Your Honor, thank you.  Yes.  We have
17   an objection to something that Mr. Busch stated in his closing
18   that we wanted to bring to the Court's attention and ask for a
19   curative instruction.
20            And that is that Mr. Busch said to the jury that -- he
21   put up this slide and said if UMG licenses, authorizes or grants
22   a right to a third party to reproduce a sound recording master,
23   it is a license.
24            And there is no evidence in the record to support
25   that.  There is no witness who has come in and said that's what
```

```
 1   it means.  There is no document that says what it means.  And

 2   it's improper in closing argument for counsel to make reference

 3   to a matter that is not supported by the record.  We would

 4   object and ask for a curative instruction, Your Honor.

 5             MR. BUSCH:  Your Honor --

 6             THE COURT:  Just briefly.

 7             MR. BUSCH:  We gave them a copy of the slide as part

 8   of our demonstratives yesterday at noon.  Never raised an

 9   objection.  Never said a word.  There is evidence in the record

10   from Mr. Kenswil about authorizing for a copyright license, and

11   we think that that is absolutely nothing wrong.  There is

12   evidence in the record about licensing and granting and those

13   types of things as being part of a license.

14             THE COURT:  Fine.  I will not give a curative

15   instruction.

16             MR. KLAUS:  Thank you, Your Honor.

17             THE COURT:  And then Mr. Busch, you have 13 minutes

18   left.

19             MR. BUSCH:  Thank you, Your Honor.

20             THE COURT:  Anything else?  Let's go ahead and bring

21   the jurors out.

22                        (Jury Out)

23             THE COURT:  Mr. Pomerantz, you may proceed with

24   closing.

25             MR. POMERANTZ:  Thank you, Your Honor.
```

1                    <u>Defense Closing Argument</u>

2              MR. POMERANTZ:  Thank you, Your Honor.

3              Someone once said that facts are very stubborn things.

4    You can argue all you want, you can make all the claims you

5    want, but at the end of the day the facts don't change.  And

6    that saying has particular application in this case, particular

7    application after that closing argument.

8              F.B.T. just made a lot of arguments, they made a lot

9    of claims, they made a lot of accusations, but none of that

10   changes the facts.  The facts are stubborn.

11             Almost two weeks ago we all got together in this

12   courtroom for the first time to begin to learn and to hear about

13   the facts.  You learned about Eminem and about digital

14   downloads.  You learned about a Detroit record company called

15   F.B.T. Productions.  You learned about Dr. Dre and his record

16   label, Aftermath.  You met and learned about Jimmy Iovine and

17   Interscope Records.

18             And you learned about what we're here disputing, about

19   whether a digital download is a record sold through a normal

20   retail channel like iTunes or whether the parties intended the

21   masters licensed provision to cover Aftermath sales of digital

22   downloads through online retailers.  And you have heard a lot

23   over the last week about what we dispute.

24             I'd like to start with what we don't dispute, what

25   right now I think everybody is in agreement with.  We all agree

1  that F.B.T. has already been paid $21 million under the

2  contract.  And we agree that F.B.T. will continue to get paid

3  millions of dollars as Eminen releases his next three albums.

4       But here's the thing.  Aftermath and Interscope

5  doesn't begrudge one penny of that.  F.B.T. is entitled to it.

6  That was the deal.  That was the deal that F.B.T. signed and

7  Aftermath signed and Eminem signed.

8       And when Eminem and Aftermath and F.B.T. signed their

9  deal, everybody agreed that when Aftermath sells a record

10  through a normal retail channel, F.B.T. gets 40 percent of that.

11  And Eminem gets 60 percent of the royalty.  And that's okay

12  because that's what we agreed to do.

13       And what the contract says is it doesn't matter what

14  F.B.T. contributes to that record.  It doesn't matter if they

15  contribute a lot or a little bit.  They get their 40 percent

16  because that was the deal.  So we have heard that on the first

17  album, the *Slim Shady* LP, the first one that Aftermath put out,

18  Mr. Bass contributed quite a bit to that.  He produced a lot of

19  the recordings on that.  Not the first single, hit single, but

20  most of the recordings.  And we heard that -- and you can see on

21  the back of the *Encore* album that he didn't write or produce any

22  of the tracks on the *Encore* album but it doesn't matter.  F.B.T.

23  gets 40 percent of the royalty.  That's the deal.  And they'll

24  keep getting it because that was the deal.

25       But they shouldn't get what no one agreed to pay.  No

1    one agreed to pay 50 percent for downloads.  That wasn't the

2    deal.  What F.B.T. has come here and argued to you is ignore the

3    facts, ignore the facts.  Why do I say that?  Why do I say to

4    you that what F.B.T. is really saying to you is ignore the

5    facts?  Let me try to visualize this for you.  I'm going to use

6    this.

7            Let me create two columns, Column A and Column B.  And

8    let's put down two eyes under each column.  And let's put down

9    two ears, put down a mouth, and a body and two legs.  If I

10   created a chart like that for you, you'd say they look the same,

11   two people, Person A, Person B.  But what if I told you that A

12   is a person and B is an ostrich?  All of these facts are true

13   for both of them.  But you would say I left something out.  I

14   left something out that was important.

15           That's what F.B.T. is doing in this case.  Let's look

16   at the chart that they created during trial.  Mr. Busch showed

17   you an almost identical chart during his opening today.  Do you

18   see this chart over here?  He has two columns, one that is for

19   the conditional downloads and one that's for the permanent

20   downloads.  And what he's trying to show by the fact that there

21   is the same thing in both columns is that they're the same.

22   That conditional downloads and permanent downloads are the same

23   thing.  And he wants to argue that to you because he wants to

24   say that if you pay conditional downloads as a masters licensed,

25   then you should do the same thing for permanent downloads.

 1              But nowhere on the chart are the facts that really
 2    matter.  For example, that the consumer owns the permanent
 3    download permanently.  It's his.  It's hers.  They keep it
 4    forever.  That's not on the list at all.  It doesn't say on the
 5    conditional download that you only get to keep it for a limited
 6    number of days unless you pay another fee.  It's just like
 7    walking into Best Buy or Target and buying a DVD and walking
 8    out.  You own it.  It's yours to keep.  If instead you walk into
 9    Blockbuster or you subscribe to Netflix and you get that DVD for
10    a limited number of days, it's different.  It's different.  One
11    is a sale; you bought it.  The other is not a sale; you're
12    renting it, you're borrowing it.

13              And on the conditional download you can't just go to a
14    store and say I'd like to buy a conditional download.  You have
15    to subscribe to an entire subscription service.  And the Eminem
16    recordings are just a small piece of that service.  That's
17    nowhere on that list.  It's not there at all.  Those are the
18    facts that matter in this case.  Are you selling an Eminem
19    record, an Eminem record, the album that Aftermath has put out,
20    or are you taking an Eminem recording and letting somebody else
21    use it in their product?  You can create all the lists you want,
22    but if you leave out the relevant facts, you end up with an
23    ostrich.

24              Now, let me give you another example.  Let me turn
25    this off.  F.B.T. told you throughout this trial that they were

1    going to show you that they were going -- that -- how downloads

2    were treated customarily in the industry.  What's customary?

3    What's the customs and usage in the industry?  How do people

4    look at these contracts?  What's customary about these terms?

5           Well, what could be more relevant about what's the

6    customary thing to do with downloads?  How do record companies

7    and artists both understand how to account for downloads than to

8    look at what happens with other artists?  What happens with

9    other artists?  What could be more relevant than that?

10          Did F.B.T. offer a single piece of evidence that said

11   how other artists get paid?  Did they offer to you a single

12   witness who said here's how Artist X or Artist Y or Artist Z

13   gets paid?  This shows you how it's customary to pay.  Did a

14   witness say that?  No.  Did they show you some documents, some

15   agreements, some charts?  No.  That evidence wasn't offered.

16   They have not offered a single shred of evidence showing how

17   other artists get paid.  They haven't shown you that a single

18   artist gets paid under a masters license provision for

19   downloads.  They haven't shown you that a single artist gets

20   paid 50 percent of net receipts for downloads.  Not The Rolling

21   Stones, not Bruce Springsteen, not Elton John, not U2, not

22   Beyonce.  They haven't shown you anybody that gets paid

23   50 percent of net receipts.

24          Why didn't F.B.T. present that evidence to you?

25   Because they wanted you to believe that in 1998, when Eminem was

1   an unknown artist, when the best record he had sold had sold 30

2   copies, that somehow Aftermath agreed with F.B.T. that F.B.T.

3   would get 50 percent of net receipts.  That it would be treated

4   as a masters licensed.  Well, that wasn't the deal, and the

5   evidence proves that that wasn't the deal.

6           We would like to thank you for your service as well,

7   for your willingness to show up here every day and to watch and

8   to listen.  We know that all of have you lives outside this

9   courtroom and that you had to interrupt those lives to come down

10  here.  We heard it when the judge questioned you at the

11  beginning of the case.  We know that.  And we thank you for it.

12          Or system doesn't work, our jury system doesn't work

13  unless people like you are willing to put aside your life for a

14  week or two and join us in here and listen to us and watch us

15  and do your best.  And we greatly appreciate that.

16          I would also like to thank the Court staff who I know

17  worked hard to try to keep us on track and to keep all of us

18  moving forward.

19          And for the past week, a little over a week now, while

20  we have all been together in the courtroom, you have had a

21  chance to sit and listen to the witnesses and watch the

22  documents be presented.  But today the roles are going to be

23  reversed.  It's going to be time for us to sit down and wait for

24  you.  And you have a very important role here.  It's going to be

25  up to you to decide what the facts really are.  And you're going

1    to base that on what the witnesses said, what you believed.

2    You're going to base that on the documents that you read, the

3    contracts, what do the words say.  And just as importantly,

4    you're going to base your decision on what was not said, what

5    was not shown to you.  It's going to be you and only you, not

6    me, not Mr. Busch, not anybody else in this courtroom, who are

7    going to decide what the facts are.

8            Now, words like "nonsense" and "shell games" and

9    "smokescreens," they're not facts.  Those are pejorative terms,

10   terms that really don't have a place in a court of law.  Those

11   kind of words, they don't change the facts.  And whether I say

12   words really loudly or really softly won't change the facts

13   either.  You saw what you saw, you heard what you heard.  If I

14   say things in a sarcastic manner, it doesn't change the facts.

15   The facts are the facts.

16           And when you hear the words "normal retail channel"

17   referred to as a "smokescreen," you know better.  You saw those

18   words in the contract.  We're not making up these words, they're

19   not a smokescreen.  They're in the contract.  The parties signed

20   that contract.  It's not a smokescreen to ask you to look at the

21   words "normal retail channel."  Facts are stubborn things.  They

22   don't change.

23           Now, this trial is not about who can create the most

24   charts for your closing argument, who can create some pictures

25   that go past you, pictures you have never seen before.  If that

1  was the test of who won this trial, they win hands down.  We

2  didn't create a whole bunch of new charts for this closing

3  argument.  And we didn't do that because what we told you at the

4  opening is what we tried to prove during this trial and it's

5  what we're going to tell you in this closing argument.  I'm

6  going to say the say the same thing to you now that I said

7  during the opening and that we discussed during the witness

8  testimony.

9       But let me say a few things about some of these new

10  charts that were going past you pretty fast during F.B.T.'s

11  closing argument.  Let me put one of them up.  This is, I think,

12  the very first one that Mr. Busch showed you.  Now, you'll see

13  that on the right-hand chart, there's a quote and there is words

14  in the quote and you know why that's quoted, because those words

15  are in the contract.  And that's why Mr. Busch quoted those

16  words.  But in the bucket on the left, there is no quote.  It

17  says "A," but there is no quote.  It just says "Records sold by

18  UMG."

19       But that's not what Paragraph 4(a) or 5(a) say.  You

20  know that.  You've seen it over and over again in this trial.

21  What that provision says is "records sold through normal retail

22  channels."  It doesn't say "records sold by UMG."  It doesn't

23  say "records sold to normal retail channels."  It says "records

24  sold through normal retail channels."  That's the words.

25       Now, when Mr. Berman took the stand -- and now with

1   this slide, it seems as if F.B.T. doesn't want you to look at

2   the words "through normal retail channels."  Ask yourself, why

3   is F.B.T. so afraid to put those words in front of you?  Why

4   didn't they quote both of them there just to be fair, just to

5   give you the words in both provisions?

6           Well, here's why:  Because they know that if you

7   really focused on the words "records sold through normal retail

8   channels," they lose.  That's the case.  Game over.  And they

9   don't want you to understand that the case is that simple, but

10  it really is that simple.  Just look at words of the contract.

11  We want you to look at the words of both of these provisions and

12  the definitions and the amendments.  Look at them all.  And

13  you'll see that the words matter, that "records sold through

14  normal retail channels" matter.

15          And then Mr. Busch showed you a whole bunch of slides

16  about what witnesses said during the trial.  And you probably

17  saw what I saw, you saw that sometimes in those quotes there

18  would be like a dot, dot, dot and then some words, dot, dot,

19  dots.  You know what that is.  That's like leaving out the words

20  there and leaving out the words there and giving you the words

21  that they want you to focus on.  I know you were watching and I

22  know you were listening.  Don't be fooled by somebody picking

23  out a few words here and a few words and saying, "Ah-hah, here's

24  what happened during the trial."  You know what happened during

25  the trial.  You sat here.  You listened to witnesses.  You can

1    assess their credibility.  You can take the totality of what

2    they say and remember it and then use it in your deliberations.

3              Now, at the outset of this case in our opening

4    statements, F.B.T.'s counsel and I both told you that we were

5    going to prove something during this trial.  I would like to

6    look back and see how each of us did.  A little report card.  I

7    told you that we were going to prove three things, and I think

8    as you review the evidence when you go back to the jury room, I

9    think you'll see that we proved those three things.

10             The first thing we showed is that a download is a

11   record.  I wish Mr. Busch had told me before this trial started

12   that he was going to agree with me by the end of the case, but I

13   didn't know that.  I thought I had to prove to you that a

14   download is a record, that they were disputing that.  I kind of

15   thought Mr. Berman and Mr. Martin were sort of disputing that a

16   little bit by saying, "Well, maybe it is, or maybe it's not home

17   use, I don't know," but it sounds like that issue is now beside

18   us; that everybody agrees that a download is a record.

19             One thing Mr. Busch said in his closing caught my

20   attention.  He said that we say record means one thing in one

21   part of the contract and something different in a different part

22   of the contract.  We've never said that.  We've never said that.

23   The provisions means something different.  You have to know what

24   the provisions mean.  Certainly 4(a), when it's talking about

25   records sold through normal retail channels, is intended to

1    cover something different than 4(c)(v), the one that says

2    masters licensed.  You know they had to be covering something

3    different.  Why else would they have two different provisions?

4    So you know they're different.  The provisions are different.

5    They cover different things.  We don't dispute that the word

6    "record" is a record at all.

7            Now, the second thing that we told you that we would

8    prove is that downloads are sold through normal retail channels.

9    So that again presents the question what is a normal retail

10   channel?  It just means a retailer, a store that sells records,

11   as we now both agree a record is, whatever the format.

12           And they've never come into court here through any

13   witness, or even through Mr. Busch's arguments, and suggested a

14   different definition for "record."  A record -- I'm sorry -- a

15   normal retail channel -- a different definition for "normal

16   retail channel."  Excuse me.  They have never suggested a

17   different definition for "normal retail channel."  It's just a

18   record -- a store that sells records.

19           Now, you heard Mr. Berman, he was here yesterday, and

20   he told you that he doesn't have an opinion about what a normal

21   retail channel is.  He couldn't look you in the eye and say

22   iTunes is a normal retail channel.  He couldn't get himself to

23   say that.  Because he knows it is.  He knows iTunes is a normal

24   retail channel.  But what he told you instead was that since he

25   had already concluded that downloads should be covered by the

1  masters licensed provision, it was irrelevant to him whether

2  iTunes is a normal retail channel.

3          Ladies and gentlemen, I submit to you that you should

4  question someone who starts with their conclusion and then just

5  assumes, once he has that conclusion, that everything else is

6  irrelevant, that everything else doesn't matter.  He claims he

7  has been in the record business for 30 years, but he wouldn't

8  answer my question about whether iTunes is a normal retail

9  channel.  We all know today that iTunes is the largest retailer

10  of records in the United States.  It's hard to imagine a

11  retailer that is more normal today than iTunes.

12          Now, the third thing that I said in my opening that we

13  would prove to you is that the masters licensed provision does

14  not apply to Eminem records themselves.  The albums that

15  Aftermath itself puts out with Eminem's recordings, that the

16  masters licensed provision does not apply to that.  People in

17  the music business know what the masters licensed provision

18  applies to.  And it only applies when an Eminem recording is

19  being put into someone else's product, someone else's movie, TV

20  show, compilation record, video game, subscription service or a

21  lot of other things where some third party wants to put an

22  Eminem recording into their product.

23          It does not apply when it's Aftermath's own Eminem

24  records.  Now, how do you know that what I just said is true?

25  You heard some of the witnesses.  You can choose which version

1    of that provision makes the most sense to you.  But here's a

2    fact that no one can dispute.  F.B.T. did not show you a single

3    example of where the masters licensed provision had been applied

4    to an Eminem record itself put out by Aftermath.  Mr. Busch kept

5    talking about compilation records and being sold through same

6    retail channels as Eminem records.  But that's not the issue

7    here.  Is it an Eminem record put out by Aftermath?  We saw them

8    here.  We saw the records we're talking about.  There's five of

9    them.  We've seen them all.  And we have seen the individual

10   tracks on them.  There is not a single example that has been

11   shown to you where an Eminem record was treated as a masters

12   licensed under the masters licensed provision because it doesn't

13   apply to the record company's own records of their own artist.

14   It applies when they permit some third party to take the Eminem

15   recording and put it into their product.

16           That's not what a download is.  A download is not

17   something going into someone else's product.  It is the record

18   itself.  That's the issue that Mr. Busch just agreed with me on

19   in his closing.

20           Now, Mr. Busch said that we were asking you to

21   construe the masters licensed provision narrowly even though

22   Mr. Hoffman said that it should be construed broadly.  That's

23   not true.  What we want you to do is look at that masters

24   licensed provision and construe it fairly, to construe it to

25   what the parties intended.  Look at it and say how have the

1   parties actually acted under this provision?  Has it ever, ever

2   been applied where Aftermath's own record was being sold?  Where

3   it's its own record, the Eminem albums that we've seen in this

4   case.  Now that's what I said we would prove and I am going to

5   come back to those points a little bit later.

6          But let me talk to you now about what Mr. Busch said

7   they would prove at the outset.  First what he said was that if

8   a transaction is what Mr. Busch says is a license, then the

9   masters licensed provision must apply.  Here's what he said in

10  his opening.  "The license provisions that I just told you about

11  have always applied to every license of a master recording ever.

12  That's what it meant to do.  It applies to every license."  And

13  Mr. Busch told you that this was the only issue in the case.

14  You didn't have to look at anything else.  He said everything

15  else in a contract is irrelevant.

16         Well, here's where those stubborn facts get in the

17  way.  Because we don't have to look very far to see that that's

18  not right.  Remember, you heard from many witnesses that

19  Universal no longer manufactures its own compacts discs.  It

20  hires someone else to do it.  It has done that for years now.

21  And when it has someone else manufacture its compact discs, it

22  has to send the masters to the manufacturer, and it has to then

23  permit the manufacturer to make copies of that master in the

24  form of compact discs.  And that permission is a license.

25  That's what a license is.  It gives you permission.

1          But no one says that that's a masters licensed under

2     the contract.  No one says that.  Because when that manufacturer

3     gets permission to make the CDs and then those CDs -- assume

4     they're Eminem CDs -- are sold through retailers to consumers,

5     we all know it's a record sold through a normal retail channel.

6     F.B.T. has not disputed that.

7          So just because a transaction may have as part of it

8     something called a license doesn't mean it's a masters license,

9     as the parties intended that.  We know that's not true because

10    that's not the way they acted.  Look at the way the parties

11    acted under the agreement.  That tells you a lot about what both

12    sides understood.  F.B.T. has never said that CDs sold through

13    normal retail channels are masters licensed just because we

14    license a third party to manufacture CDs.

15         And you remember that there was testimony about this

16    thing called a copyright license?  Mr. Busch showed you some

17    testimony about that.  I think it was Mr. Kenswil's.  Again,

18    they're trying to take a word over here, "copyright license," or

19    maybe stray words in contracts, remember he kept showing you

20    license here and license there and saying that is what the

21    parties must have meant by masters licensed, by the provision

22    that gives them 50 percent of net receipts.

23         But Mr. Berman told that you masters licensed doesn't

24    mean the same thing as copyright license.  He said he didn't

25    even know how to define a license under the copyright laws.  The

 1   issue in this case is not what is a copyright license but what

 2   is licensed used in some context?  It's licensed use in the

 3   masters licensed clause.  What did parties mean by that?  That's

 4   what you're being asked to consider.  And I would suggest to you

 5   that when you know that there is no evidence that that clause

 6   has ever been applied to Aftermath's Eminem records, Eminem

 7   albums, then you know the parties didn't intend that.  Because

 8   that's the way they both behaved under the contract.

 9        Now, what F.B.T. has done to try to persuade you that

10   they know what a license is and that that must be what a masters

11   licensed is meant to cover, is they have created lists, sort of

12   like that list over there.  They create lists and they write

13   things down.  And they think if they write down things on a

14   list, it makes it official.  But more often than not, F.B.T.'s

15   list makes it an ostrich, not an official list.  So let's look

16   at a list that Mr. Busch just showed you.

17        So this is -- says "License Agreements" again and then

18   he puts down a whole bunch of things.  Who testified that these

19   are the kind of things that make something a license, that make

20   something a masters licensed?  You know what?  No one did.  Oh,

21   there is a piece here and a piece there that Mr. Berman might

22   have mentioned, but there's many things on this list that no one

23   said to you, "Hey, if you have that, it must be a license."

24   That didn't happen.  Go back and check your notes.  Check your

25   recollections.  It didn't happen.

1          Let me give you an example here.  You see some of

2     these things like grants of rights, audit rights, payment terms,

3     those kind of things.  You know what?  Those are in the

4     recording agreements in this case, the '98 agreement, the 2003

5     agreement.  No one says that those are license agreements.

6     Those are recording agreements.  There is a lot of contracts

7     that have payment terms.  Do you think that makes it a license

8     because it has payment terms?  Do you think it makes it a

9     license because it has audit rights?  This is just a list to

10    make it look official.  This has nothing to do with what the

11    parties actually intended masters licensed to mean.

12          And you know what?  You can look at the recording

13    agreements.  I encourage you when you go back to the jury room

14    to take out Exhibit 5, the 1998 agreement, take out Exhibit 10,

15    the 2003 agreement, and look to see if license is defined by any

16    of these terms.  See if the parties agreed that when we said

17    masters licensed, this is what we meant.  You're not going to

18    find it.  The contract doesn't say that any of these things are

19    what you should looking for to decide whether the masters

20    licensed provision applies.  It's not why it applies.  It

21    applies because Aftermath has decided to let somebody else use

22    an Eminem recording in their product.

23          Now, let's look at what F.B.T. has told you the

24    parties' deal is.  And let's look at really how they tried to

25    prove that.  Most of their witnesses could not testify to what

1  the deal meant, to what the parties intended.  Mr. Jeff Bass

2  didn't say that, nor did Mr. Mark Bass.  Mr. Joel Martin didn't

3  really say that either.

4       The witness who came in and said, "I know what the

5  deal meant" is David Berman, their paid expert.  And what

6  Mr. Berman did is he came in here and he gave you -- I think he

7  used the word indicia.  He had a bunch of indicia that he said

8  made something a license that would be covered by that masters

9  licensed provision.  But think about what he did in his

10  testimony.  Did he ever say to you, "This is the indicia and I

11  got it from right here in Paragraph X of the contract?"  He

12  never did that.  He never pointed you to anything in the

13  agreement saying, "That's what makes it a license, I know that

14  because it says it right here in the contract."

15       Well, maybe that -- he went and he spoke with the

16  people who negotiated the contract and they told him that's what

17  we agreed to.  That would be relevant if it occurred, but he

18  didn't say that.  Because it didn't occur.  He didn't say he was

19  basing whatever he calls a license based upon what somebody who

20  negotiated the deal told him.

21       And he didn't show you any evidence that shows well,

22  this is the custom in the industry that if I give you this whole

23  list of factors, those are what everybody in the industry agrees

24  is a license covered by the masters licensed provision.  He

25  didn't give you any evidence of that either.  He didn't say

1   that.  He just made up this list.  And then F.B.T.'s lawyers

2   wrote them down on a paper and published them to you and said,

3   "Ah-hah, it's a license."

4           That's not facts, that's not evidence.  That's just

5   lawyers arguing, putting together words and trying to persuade

6   you that must be what a license is.

7           Now, Mr. Berman told you more than what I just said.

8   He told you over and over and over again that only one thing

9   matters.  Is it a license?  Mr. Busch said the same thing.

10  That's all that matters.  Is it a license?  And Mr. Berman said

11  and Mr. Busch said that if it's a license, it's covered by the

12  masters licensed provision, end of story.  I think that was the

13  words, end of story.

14          But they're wrong.  The masters licensed provision is

15  not the end of the story.  Mr. Berman doesn't give you the law.

16  Mr. Busch doesn't give you the law.  The judge gives you the

17  law.  You heard the instructions.  You'll see them when you go

18  back in the jury room.  And what the Judge -- what the Judge's

19  instructions tell you to do is exactly the opposite of what

20  Mr. Berman said and what Mr. Busch said.  What the instructions

21  say is not to consider just one isolated paragraph in the

22  contract.  It says exactly the opposite.  It says look at the

23  whole contract and figure out what the contract as a whole

24  means, and understand each paragraph in the context of the other

25  paragraphs.

1            We want you to look at the masters licensed provision.

2    It's relevant.  And we want you to look at the records sold

3    provision, because it's also relevant, and so are the

4    definitions of "records" and "new medium records" and so is the

5    2004 amendment that refers to permanent downloads as a method of

6    sale.  They're all relevant.  And you should look at them all.

7    That's what the Judge instructed you to do.

8            And let's look at what Mr. Berman didn't tell you.  He

9    wouldn't tell you whether any online record store is a normal

10   retail channel.  He just kept saying over and over and over

11   again that it didn't matter.  Think about Amazon.com.  You can

12   go there and buy a CD.  You can go there and buy a download.  On

13   the same website.  Normal retail channel?  Well, I think you'll

14   probably remember it, but just to remind you, here is what

15   Mr. Berman said when I asked him is Amazon.com a normal retail

16   channel.  What he said is that, "I don't care if it is or if

17   it's not.  I'm not saying that it is or it isn't.  I just don't

18   care."  That's what Mr. Berman said.

19           And then I asked him the same question about iTunes,

20   is it a normal retail channel.  And here's what he said:  He

21   said, "It's irrelevant to me.  You know, it's definitely -- I

22   don't know whether to consider that a normal retail channel."

23   That's their -- that's their industry expert.  That's the person

24   who says he knows what terms of recording agreements mean.

25           Now, you know that the sale of records through normal

1  retail channels is one of the provisions that matters in this

2  case.  It matters.  Those are words in the contract.  We pay

3  royalties under that.  We have been doing that since 1998.  And

4  you know that this case is about whether sales through iTunes

5  and through Amazon are sales through normal retail channels.

6  That's an issue in this case.  It matters.

7         But Mr. Berman won't tell you if these stores are

8  normal retail channels.  And it's obvious why he won't tell you.

9  Because if he told you the truth, what he really believes, it

10  would undermine F.B.T.'s case.  And he's been paid not to

11  undermine F.B.T.'s case.

12         And Mr. Berman didn't tell you just to ignore the

13  words "normal retail channels," that he doesn't have a view on

14  that.  He tells you to ignore the word "through normal retail

15  channels."  He says not really ignore it; change it.  Change it

16  to "to normal retail channels."  Why?  Because you have to take

17  his word for it.  That's what they must have really intended.

18         And how does he deal with the fact that even though he

19  says that's what they must have really intended, well, but the

20  parties wrote through, that's what they wrote, that's what they

21  all signed.  So how does he explain that even though it says

22  "through," it really means "to."  Here is what Mr. Berman said:

23         He said -- I asked him, "It says 'through', doesn't

24  it?"

25         And he said, "Yes, but words can be deceptive and

1   words can be ambiguous and words can be wrong.  The fact is --

2   not the words but the absolute fact is Universal sells their CDs

3   to the retailer."  So the word "through" is deceptive or

4   ambiguous or just wrong, according to Mr. Berman.

5        And then I asked him, if you remember, about the 2004

6   amendment, the one that says sales of albums by way of permanent

7   downloads, the provision that Mr. Busch referred to as dealing

8   with escalations.  I asked him about some of the words in that

9   sentence.  For example, the words that say "USNRC" and the words

10  that say "method of sale."  And I asked him, you know, who would

11  use the expression "method of sale" if what they meant was

12  "method of license," that downloads were licenses?  Who would

13  use the word "sale" five times in that sentence and the word

14  "license" not once if what they really meant was "license" not

15  "sale?"  And here is what Mr. Berman said:

16       He said, "Well, that was sloppy drafting.  They didn't

17  really mean it.  They didn't mean the words that they wrote

18  down.  They didn't mean the words in the contract that they all

19  signed."

20       So think about what Mr. Berman was really saying.

21  What was the bottom line of what he was saying?  He was saying

22  focus on just one provision in the contract and don't worry

23  about anything else.  He didn't care if -- he didn't probably

24  know that the judge's instructions were going to tell you

25  exactly the opposite.  And then when he came across terms that

1  he didn't like, he either said "Well, they don't matter, they're

2  irrelevant," or he said "They're sloppy.  They're wrong."

3  That's what he said.

4        Now, let me go to this language about "notwithstanding

5  the foregoing."  It's gotten a lot of discussion during the

6  trial and in Mr. Busch's closing.  He claims that these

7  three words mean that everything that came before it doesn't

8  matter and that whatever follows matters.  And I don't have it

9  here -- but you see I have 4(a) here and then 4(c)(v) down at

10 the bottom.  In between these two is where the words

11 "notwithstanding the foregoing" are in the agreement, and then

12 there is a bunch of things under that in (c)(i)?  Well, what

13 Mr. Busch told you was that this provision applies; that is,

14 "notwithstanding the foregoing" applies only when there's a

15 conflict between what's above it and what's below it.  It only

16 applies in this situation when both 4(a) and 4(c)(v) would

17 apply.  That's the conflict.  They both apply as a conflict so

18 which one do you choose?  That's when "notwithstanding the

19 foregoing" would apply.

20       But it has no relevance here.  Not a single witness

21 has shown you a transaction or a product that would be covered

22 both by 4(a) and 4(c)(v).  There isn't one.

23       Remember, I showed Mr. Berman his deposition

24 testimony?  And what he said under oath at that time was that he

25 couldn't think of a single transaction where both of them would

1    apply.  He said it's either one or it's the other.  It's not

2    both.  So there is no conflict.  You have to decide which of the

3    two provisions applies.  There is no trumping going on by

4    "notwithstanding the foregoing."

5         And what we have shown is that when an Eminem album is

6    sold through a normal retail channel, it's 4(a).  When an Eminem

7    recording is licensed to a third party so they can put it into

8    their product, it's 4(c)(v).  And "notwithstanding the

9    foregoing" doesn't change that one bit.

10        Now, Mr. Busch told you that there are compilation

11   records that are covered by 4(c)(v), and that's true.  We all

12   agree with that.  If it's a compilation record put out by a

13   third party, *The Best of Rap City*, compilation record, Virgin's

14   record, then that's covered by 4(c)(v).  We all agree with that.

15        And then Mr. Busch said well, you know what?  But

16   sometimes Universal itself puts out a compilation record.  And

17   we all agree that's not covered by 4(c)(v) because it's not

18   putting it into someone else's product.  It's our product.  We

19   all agree with that.  There is no confusion here.

20        Remember when Mr. Martin tried to make that point when

21   I was questioning him and he said well, Universal puts out

22   compilation records.  It was right near the end of my

23   examination of Mr. Martin.  And what I showed him is there is a

24   very special provision in the contract, not 4(c)(v), not 4(a),

25   and what it says is that when Universal puts out its own

1  compilation record and there is an Eminem recording, just one or

2  two, whatever, on that compilation record, this is how you'll

3  pay.  And it's not 50 percent of net receipts.

4         So don't get confused when Mr. Busch says, "Oh, wait,

5  there is compilation records that Universal puts out and there

6  is compilation records covered by 4(c)(v)."  What 4(c)(v), what

7  the masters licensed provision applies to is when it's somebody

8  else's record, when it's somebody else's movie or TV show.

9         Now, let me go over a few of the indicia of a license

10 that Mr. Berman mentioned and that Mr. Busch mentioned.  Who

11 does the manufacturing of the record?  You heard that a lot.

12 That that somehow matters here.  But it doesn't.  It doesn't

13 matter which of the two provisions applies.  Universal doesn't

14 manufacture compact discs.  Somebody else does.  But everybody

15 agrees that if that compact disc is an Eminem record and it's

16 sold through a normal retail channel, 4(a) applies.  It doesn't

17 matter who manufactures.

18        And Mr. Berman and Mr. Busch also got the facts wrong

19 about the costs of manufacturing.  The royalty provision doesn't

20 have anything to do with the costs.  Let's look at 4(a).  If you

21 remember, I asked Mr. Berman and I asked Mr. Martin if it costs

22 more to manufacture one kind of record than another, does the

23 royalty rate in this provision change?  And everybody said no.

24 If it costs more to manufacture a vinyl record than a CD, it's

25 still an 18 percent royalty rate.  And if it costs even less to

1    manufacture a download, it doesn't change the royalty rate.

2         You know what changes?  The retail price.  Downloads

3    cost $0.99 a track.  But the royalty rate is the same.  So don't

4    let them confuse you and say the costs of manufacturing matter.

5    Because you have heard from the witnesses.  Those are the

6    stubborn facts that can't be changed by argument.  The stubborn

7    facts are that the costs of manufacturing has never mattered and

8    does not matter to whether this royalty rate applies.  The costs

9    of manufacturing is irrelevant.

10         And there is another stubborn fact that Mr. Busch

11    ignored.  He didn't ignore it, he actually just disputed it

12    without any evidence to back it up.  Universal does incur

13    manufacturing costs in connection with downloads.  It's not on a

14    per unit basis in the same way as a compact disc.

15         But we heard Mr. Harleston say that Universal had

16    incurred millions and millions of dollars to create the

17    technology that is necessary to send downloads to Apple and then

18    in a different format to Microsoft and yet another one to

19    Amazon, etc.  They spent millions of dollars.

20         Now, what did Mr. Busch say?  He said we made that up.

21    What's the proof of that?  What's the proof that we made that

22    up?  Who came in and said, with any knowledge of what we've

23    done, that we didn't incur millions and millions of dollars in

24    costs to create the technology that allows us to send the

25    downloads to the online retailers?  No one came in and said

1    that.  Because it's not true.  It's not true.

2         Now, Mr. Berman also talked about title changing.

3    That's an easy one to get rid of.  Where in the contract does it

4    say you need to have title go to the retailer and then title

5    again go to the consumer in order for it to be a sale of a

6    record through a normal retail channel?  That's why the word

7    "through" is in there.  What they're talking about is a process.

8    The record going from the record company through the retailer to

9    the consumer.  The consumer ends up with a permanent copy of the

10   record, CD, download, whatever.

11        But there's nothing in the contract -- look at the

12   contracts, Exhibits 5 and Exhibit 10, see if you can find where

13   it says that you need to have title transferred to the retailer

14   for it to be a record sold through the normal retail channels.

15   Trust the contracts, trust your common sense.

16        Mr. Berman said that another reason why the deal

17   between Universal and Apple is a license and somehow therefore

18   covered by the masters licensed provision is because Universal

19   gets paid by Apple not based on just a flat fee, a flat price,

20   but it has a percentage in it.  $0.70 or 70 percent of the

21   retail price.  Remember, Mr. Berman referring to that?  And he

22   says because it's a percentage of the retail price in there,

23   somehow that percentage makes it a license and not a sale.

24        Where in the world does the contract say that?  Look

25   at Exhibit 5, look at Exhibit 10.  And you know what?  It

1    doesn't make any sense.

2          If I wanted to buy your car and I said, "I'll pay you

3    70 percent of the Blue Book value," does that mean that I

4    licensed your car from you?  Of course not.  Just because a

5    percentage is used in a pricing formula, it doesn't matter if

6    it's a percentage of a retail price or a percentage of Blue

7    Book, you can use percentages to set prices.  It happens all the

8    time.  The fact that Universal and Apple agreed that Apple would

9    pay Universal a price of $0.70 or 70 percent of retail,

10   whichever is greater, doesn't mean it's a license.  You didn't

11   hear Mr. Cue say that.  You didn't hear anybody say that.

12         Restrictions on use.  Mr. Berman pointed to that.  He

13   said that because Universal restricts what Apple can do with the

14   digital file that Universal sends to it, that's an indicia of a

15   license.  But remember what happened when I asked him about

16   Apple restricting what the consumer can do with the digital file

17   that Apple sends to the consumer through iTunes?  He said that's

18   not a license, that's a restrictive sale.

19         Come on.  It's a restriction on the use of a digital

20   file.  It's not in the contracts anywhere that says that if you

21   have that kind of restriction, it must be a license, a masters

22   licensed.  They're just making up this criteria to try to create

23   an official looking list.  Look at the contracts, use your

24   common sense.

25         Record clubs.  Mr. Busch mentioned record clubs.  And

1  he said, well, that supports their position because they're
2  covered by the masters licensed provision.  And then he said
3  well, not the masters licensed provision.  They're actually
4  covered by a separate provision but it has the same royalty
5  rate, 50 percent of net receipts.  But that's the difference
6  between night and day.  The record club is not covered by the
7  masters licensed provision.  You know that.  Just read the
8  contracts.  You'll see the record club provision is different
9  than the masters licensed provision.  It doesn't say license.
10 It says records sold through record clubs, through mail order
11 and record clubs.  It's a records sold through something.  It
12 just happens not to be through a normal retail channel.

13        And the reason why they have a special royalty
14 provision for record clubs separate from 4(a) or 4(c)(v) is
15 because record clubs are a special situation.  A lot of free
16 records being given, a long term commitment.  It's a totally
17 different economic proposition for the record company, for the
18 record club, for the record club member.  And that's why there
19 is a special royalty provision in it.  It has nothing to do with
20 masters licensed and doesn't suggest anything at all about
21 whether the masters licensed provision should apply to an Eminem
22 record.  There's never been an Eminem record that Aftermath has
23 put out that has been covered by the masters licensed provision.
24 Never.  They're trying to get something that has never, ever
25 occurred, and records clubs are not the answer.  It's a totally

1  separate provision.

2       Now, you remember that Mr. Busch told you at the very

3  beginning that Interscope and Universal tried to camouflage what

4  they were doing.  I think he used the word fictions.  That's a

5  pretty strong word, camouflage.  He said we were engaged in an

6  all-out effort to hide what we were really doing with downloads.

7  The evidence that has come out in this trial shows that's not

8  the case.

9       In fact, the evidence shows everyone knew what we were

10  doing in terms of how we were paying for downloads.  Everyone

11  knew it because we told everybody.  We told everybody what we

12  were doing.  We were totally upfront with it.

13       Remember the testimony of Mr. Stiffelman?  That's

14  Eminem's lawyer.  He didn't say we hid anything from him.  He

15  didn't say anything about that at all.  He said he knew exactly

16  what we were doing and how we were paying.

17       Remember this email exchange between Mr. Hoffman, who

18  you met also, and Mr. Stiffelman?  And in the bottom email,

19  Mr. Stiffelman says, "I told Paul" -- that's Paul Rosenberg,

20  Mr. Mathers' manager -- he said, "I would ask" -- "I told Paul I

21  would ask you to send me a breakdown of how the $0.99 that Apple

22  pays is divvied up."  And he sent that on October 26th at 5:29

23  p.m.

24       On October 27th at 9:39 a.m., so about 14 hours,

25  16 hours later, Mr. Hoffman responded with the truth, that we

 1   were paying it with an artist royalty; that we were not paying

 2   50 percent of net receipts, we were paying the artist royalty.

 3   That's a reference to 4(a).  Not only did he not hide anything

 4   from Mr. Stiffelman, he rushed his answer to him.  Why?  Because

 5   I think if I remember what Mr. Hoffman said, "I love Gary."

 6   They get along well.  They're upfront with each other.  There

 7   was nothing hidden here.

 8            And think back to Mr. Martin's testimony.  Remember

 9   when I was asking him about the royalty statements and I showed

10   him the first one -- the first half of 2002, and it said the

11   word "burns" and he said he didn't know that that was a

12   reference to permanent downloads, so I showed him the second one

13   of 2002, the one that covers the second half of the year, and

14   this is what that one said -- and if you could just make that a

15   little clearer, Mr. Nichols.

16            And what this one said, this royalty statement that

17   was sent to F.B.T., for the second half of 2002, it says:

18   "Permanent downloads," you can see it in the highlighted, and

19   those are lists of tracks on an Eminem record.  And this clearly

20   is putting it into the "records sold through normal retail

21   channel" provision for anybody who reads royalty statements, as

22   F.B.T. does, since it receives millions of dollars every

23   six months for that.

24            Now, Mr. Martin said he's not sure if he got it

25   three months after the close of the period or nine months later,

1    he is not sure if he read it then or read it later.  And we can

2    decide whether that makes sense or not.

3            But the one thing you know for certain is Universal

4    wasn't hiding anything.  This is what they said in their

5    royalties statement in 2002, in 2003, in 2004, in 2005.  And

6    F.B.T. never objected.  They never said, "Whoa, we know that

7    this is happening through iTunes.  We live in the modern world.

8    We know iTunes is out there.  We have iPods."  They didn't say

9    that.  They have never objected to this even though they were

10   getting royalty statements in '02, in '03, in '04 and '05.  The

11   first time they objected was after Mr. Cohen, their auditor who

12   was trying to get them as much money as he could, suggested that

13   they make this argument.  That's the first time that F.B.T.

14   said, "Oh, well, maybe these things are licenses and we should

15   get more money."

16           Now, they also mentioned the 2003 negotiations.  If

17   you remember that's where Mr. Stiffelman and Mr. Hoffman were

18   working on the next version of the agreement.  And Mr. Busch

19   told you that this Interscope form and this Ostroff memo somehow

20   were a factor in that negotiation.  That's what Mr. Busch told

21   you.  That's not what Mr. Stiffelman said.  And it's not what

22   Mr. Hoffman said.  They were the ones who actually had the

23   discussion.  And if you look at your notes and think back to

24   what Mr. Stiffelman said and to what Mr. Hoffman said, they

25   really are in agreement.  They both said, "Hey, we want to get

1    this done, this deal done quickly, get this new agreement done

2    quickly." Why? Because Eminem wants his money. He's getting

3    another seven and a half million dollar advance. So they agreed

4    because they wanted to get done quickly just to make the changes

5    that were required because of the new business terms that they

6    had agreed to and not make any other changes in the wording of

7    the agreement.

8          None of them said -- neither of them said that the

9    Interscope form agreement came up in their discussions. That

10   wasn't mentioned by Mr. Stiffelman or by Mr. Hoffman. And

11   neither of them said that Mr. Ostroff's memo about lowering --

12   reducing -- sorry, removing certain deductions for downloads

13   came up in the discussion either. That wasn't part of the 2003

14   negotiations.

15         Now, Mr. Busch took us to task, I guess, for

16   eliminating certain deductions on downloads. Remember him

17   saying that, that it was -- I forget the word, if it was sham or

18   shell game, it was one of those. And he said that that was just

19   a way of trying to trick the artist. No one said that. Look

20   back at your notes.

21         Remember back to what happened when people who were

22   asked about that Ostroff memorandum and the policy embodied in

23   it; what everyone said was that it was at a pivotal point in the

24   music industry and it was at a time when the music industry was

25   trying to figure out how to make a legitimate business on the

1    Internet work.  And the record companies realized that to the

2    consumer, they don't care about record companies.  They care

3    about artists.  And the record companies wanted the artists on

4    their side working hand-in-hand in trying to make an online

5    business work.  And so they went to the artist and said, "We're

6    not going to take the following deductions that we could take

7    under the agreement."  And they didn't.  And that applied to

8    Eminem.  Even though it wasn't in this 2003 agreement, it was a

9    company-wide policy at Universal, and it applied to Eminem and

10   to F.B.T..

11          So let's look at the part -- at what we know about

12   the -- what the evidence shows about the parties in this case.

13   Let's start with F.B.T.  You met Jeff Bass.  He told you that he

14   doesn't do the business side of F.B.T.  He doesn't know about

15   the royalty provisions or the contract provisions.  Like other

16   record companies, his job was to go out and find artists and

17   work with the artist to try to create the best music possible.

18          And as for Eminem, Mr. Bass worked with Eminem on some

19   of his recordings.  And on the first album put out by Aftermath,

20   *Slim Shady*, he worked on quite a few of the recordings.  And

21   then if you look at the albums, his involvement declined.  He

22   still had some work on the second and on the third.  On the

23   fourth, *Encore*, he had none.

24          And then you met his brother, Mark Bass, and he also

25   said he didn't have anything to with the business side of it and

1   he leaves that to others; he's on the creative side.  And he

2   told you that he is the one who has groomed Eminem.  He admitted

3   that after three years of grooming Eminem, the first album that

4   they put out, *Infinite*, flopped.  But he said that wasn't the

5   problem with Eminem or his grooming.  That the world just wasn't

6   quite yet ready for Eminem.  And he said that two years later,

7   the world was ready.  Well, two years later they also had a deal

8   with Aftermath and Interscope.  And Dr. Dre worked with Eminem

9   to help create that next record, as did Mr. Bass.

10          And Dr. Dre worked with Eminem to create all of the

11  next records that came out.  That first record was a success,

12  the one that came out in 1998, and everybody deserves credit.

13  Eminem most certainly, Dr. Dre, Aftermath, Interscope and the

14  Basses, they all deserve credit for that.

15          Now, you met Joel Martin.  He is the F.B.T. business

16  guy.  He was the one who was involved in making sure that there

17  was a contract signed with Eminem back in 1995 when he was

18  unknown.  We've seen that earlier.  This is the exclusive artist

19  recording agreement that Mr. Mathers signed with F.B.T. back in

20  1995.  And you remember this from earlier in the trial.  This is

21  the one that locked up Eminem, that made him exclusive to

22  F.B.T., and that exclusivity was really important here because

23  what that meant was that in 1998 when Aftermath wanted to sign

24  him, they had to sign him through F.B.T., and that exclusivity

25  meant that when in 2000, that 2000 novation, and Eminem was

1  going to have a direct relationship with Aftermath, well, F.B.T.

2  had rights.  They had -- they still had exclusive rights, and

3  they were willing to relinquish some of those exclusive rights

4  in exchange for a share of the royalties.  They wanted to make

5  sure they got their share, and everybody agreed they would get

6  their 40 percent, and that's what happened.

7          Now, let's talk about the -- about Aftermath and

8  Interscope.  You met Mr. Iovine.  We didn't call him as a

9  witness, Mr. Busch did.  But you heard his background.  And you

10  heard how he and Mr. Field and others created Interscope and

11  took it from nothing to what it is today.  And you heard him say

12  how excited he was when he heard Eminem's demo tape and then he

13  rushed it over to Dr. Dre because he thought he was the right

14  producer to work with this new hip hop artist, and Dr. Dre was

15  also excited and wanted him signed and he was.  And you heard

16  Mr. Iovine and others talk about what Interscope and Universal

17  did to try to make the Eminem record a success, take them to

18  radio stations all across the country, go to retailers, both

19  digital and physical.

20          You heard a lot about Mr. Mathers, Eminem in this

21  case.  He's not a party but he was obviously the biggest reason

22  that all of these albums were a success.  He's not suing

23  Aftermath and Interscope in this lawsuit.  According to

24  Mr. Martin, Mr. Martin was the one who decided to have only

25  F.B.T. sue and not to have Eminem sue.  Well, we all know in

1  this courtroom that Eminem's not here.  He's not a party to this

2  lawsuit and Eminem is not here asking for any more money.  But

3  we do know that Mr. Mathers is indirectly involved in at least

4  one of the claims, that second claim, that claim for $159,000.

5  F.B.T. claims that the $159,000 was credited to Eminem's account

6  when it should have been credited to F.B.T.'s account.

7          Well, our position is very simple.  Does Eminem agree

8  with that?  We asked Mr. Cohen that here, and he said he doesn't

9  know if Eminem agrees that he was overpaid $159,000.  We're okay

10  with paying the $159,000 to Eminem or F.B.T. , but we're not

11  okay with paying it twice.  F.B.T. and Eminem should get

12  together and figure it out.

13          So let me go back to my three things that I promised

14  you we'd prove.  The first is that a download is a record.  We

15  have proven that and it's been conceded.

16          Now let's talk about normal retail channels and sales

17  through normal retail channels.  Could you put up 4(a), Phil?

18          The contract doesn't define "normal retail channels."

19  But nothing in the contract says it's limited to a certain type

20  of store.  Nothing says that it's only record stores with

21  physical locations.  The word physical isn't in the contract.

22  You can check it out for yourself.  And we know that normal

23  retail channels aren't limited to physical retailers.

24  Amazon.com has been around for a long time now selling CDs of

25  Eminem, and we've been paying F.B.T. under the "records sold

1  through normal retail channels" for sales through Amazon.com and

2  F.B.T. has never, ever objected.

3       Obviously retailers have revolved from the mom-and-pop

4  record shops to the big record stores like Tower or Virgin

5  Megastores, Best Buy, Circuit City, Wal-Mart, then Amazon.com on

6  the Internet and now iTunes.  But they're all stores that sell

7  records.  Mr. Berman said that even Christian bookstores are

8  record stores because they sell Gospel music.  It's a store that

9  sells records.

10       Let me go to the third issue that I told you we would

11  prove, and that's that the masters licensed provision does not

12  apply to Eminem records in download format or any other format.

13  The evidence shows why this provision does not apply to

14  downloads of Eminem records; that it only applies when an Eminem

15  recording is used in somebody else's product.

16       How will you know that for sure?  Well, you will know

17  it for several reasons.  First, there is evidence that the

18  masters licensed provision has never been applied to any other

19  situation.  I've said that before.  No one has given you a

20  situation where the masters licensed provision has applied to an

21  Eminem record that Aftermath put out.  It hasn't happened.

22       Second, the words of the masters licensed provision

23  are totally consistent with what we are saying.  If the masters

24  licensed -- if you could put that up, 4(c)(v), Phil.

25       If the masters licensed -- if the masters licensed to

1    others for their manufacture -- to others for their

2    manufacture -- this is talking about giving it to someone else

3    for them to use in their product.  Either a compilation record

4    for their manufacture and sale of records.  That's Virgin

5    putting out a compilation record or for any other uses.  That's

6    a catchall for any other use where someone is using the

7    recording in their product.  Movies, TV shows, video games, etc.

8            Third, there are other provisions in the agreement

9    that tell you that this masters licensed provision does not

10   apply.  The "records sold" provision, the definition of

11   "records," the definition of "new medium records."

12           Paragraph 2(a) of the 2004 amendment, let's put that

13   up for a second.  Remember these words.  The words "sales" is in

14   the sentence five times.  "USNRC are normal retail channels."

15   "Top line sales categories."  "Method of sale."  There is not a

16   word about license.  It says in the very beginning,

17   Paragraph 5(a)(i), that's the records sold through normal retail

18   channels.  True, this provision applies to purposes of

19   escalation.  We don't deny that.  But the words matter.  Why

20   would they describe downloads as a method of sale if it was a

21   method of license?

22           Look at those words and think what would somebody be

23   thinking if that's what they wrote.  And, finally, we know that

24   this masters licensed provision doesn't apply to downloads of

25   the Eminem records themselves because of the instructions the

```
 1    Judge has read to you.  Don't consider an isolated part of the
 2    contract.  Words are used in their technical sense.  Look at
 3    what the industry means.  "Masters licensed" is a technical word
 4    in the music industry.  What do they mean by that?  What do
 5    people who do recording agreements mean?  Listen to
 6    Mr. Harleston.  He explained that to you.  And look at what the
 7    parties did before the disagreement arose.  Never, never did
 8    anybody apply the masters licensed provision to an Eminem record
 9    sold and offered by Aftermath.
10            Now, Mr. Busch -- I'm just about done -- Mr. Busch
11    gets a few more minutes with you.  I don't get to respond to
12    that.  That's the way the process works.  He gets to speak first
13    and he gets to speak last.  So before I sit down, I want to ask
14    you to evaluate what he's about to say with the following
15    questions in mind.  See if he answers them.  See if he even
16    tries to answer them.
17            Isn't iTunes, the most popular store in the
18    United States today -- popular music store -- isn't it a normal
19    retail channel?
20            Doesn't the masters licensed provision apply to money
21    that the record company receives when it lets someone else use
22    an Eminem recording in their product?
23            Do artists and record companies think that digital
24    downloads on iTunes -- do they think of that as their core
25    product or just letting someone else use their music?
```

1          If there is no evidence that any other artist, not U2,

2    not Bruce Springsteen, not anybody else, gets 50 percent of net

3    receipts for digital downloads, how did F.B.T. get such a great

4    deal back in 1998 when their prior record just sold 30 copies?

5          If F.B.T. admits, as they have, that records -- that

6    downloads are records, then how are records sold through normal

7    retail channels, even though someone else manufactures them --

8    when someone else manufactures them?

9          See if Mr. Busch answers the question, why does

10    manufacturing matter if we have someone else manufacture our

11    CDs?  What does it matter?

12          Why didn't Mr. Busch mention the fact that digital

13    downloads and conditional downloads are actually different with

14    these lists that he created?  Why didn't he say that?  Why

15    didn't he say that one is a purchase, the other is a rental?

16    Why didn't he put that on his list?  It is nowhere on his list.

17    Why didn't he say that one, you own an Eminem record and the

18    other one is an Eminem recording as a small piece of someone

19    else's product?

20          Why didn't Mr. Berman have an opinion about whether a

21    download is a record or whether iTunes is a normal retail

22    channel?  And why does he think that the word "through" really

23    means "to," even though the contract clearly says "through"?

24          I suspect that Mr. Busch isn't going to answer all

25    those questions or some others.  I suspect he won't do so for

1    the following reason.  Because facts are stubborn.  You can't

2    change them with arguments and you can't change them with

3    accusations.  They won't change no matter how hard he tries.

4           F.B.T. has made more than $21 million under this deal

5    and they're going to make millions more as Eminem releases each

6    of the next three albums.  But they've come to you and asked you

7    for even more and they don't deserve it.  That just wasn't the

8    deal.  And so we ask you to return a verdict in favor of the

9    defendants.

10           Thank you very much.

11           THE COURT:  Ladies and gentlemen, we are going to take

12    a short five to ten-minute break.  I will let you stretch your

13    legs and then you will hear the rebuttal argument from Mr. Busch

14    and then the case will finally be submitted to you.  Until then,

15    don't discuss the case among yourselves or with anyone else.

16    Don't form or express any opinions about the case until it's

17    finally submitted.  We will see you in ten minutes.

18                        (Jury Out)

19                        (Recess taken)

20                        (Jury In)

21           THE COURT:  Mr. Busch, you may proceed.

22           MR. BUSCH:  Okay.

23                  Plaintiff's Closing Argument

24           MR. BUSCH:  I have about 13 minutes so I'm going to do

25    as much as I can in the 13 minutes.

```
 1              The first thing I want to address is Mr. Pomerantz in
 2     his close said that Mr. Stiffelman never said that Rand Hoffman
 3     tried to get him to agree to language that would change or carve
 4     out permanent downloads from the licensing provision.  He said
 5     Rand Hoffman and Gary were friends and that it was never
 6     discussed.  I showed you specifically in my closing argument the
 7     exact testimony by Mr. Stiffelman, so I don't know what
 8     Mr. Pomerantz was talking about.
 9              Mr. Stiffelman said did you -- "Would you agree to put
10     a specific provision in the agreement saying that permanent
11     downloads will be paid as record sales?"
12              He says, "It was suggested."
13              "And did you agree?"
14              "No."
15              "Why did you disagree?"
16              "I don't think -- I didn't think it was consistent
17     with what the contract provided and I saw no reason to agree to
18     something that was inferior to what already existed.  The point
19     of the amendment was to improve Marshall's participation."
20              And Mr. Stiffelman testified specifically that
21     Mr. Hoffman tried to get him to include permanent downloads to
22     be treated as record royalties and he refused.
23              Mr. Pomerantz just a moment ago, in saying that I
24     ignored the facts or the facts are stubborn things, said that I
25     never mentioned the difference between conditional downloads and
```

1    permanent downloads.  In fact, I did.  I said conditional

2    downloads is something that someone gets when they paid a

3    subscription.  Permanent downloads are permanent.  What I said

4    was it's irrelevant for this case.  Why is it irrelevant?  It's

5    irrelevant because -- would you put 4(c)(v) and 5 CV -- it is

6    irrelevant because of the language of the agreement that we're

7    talking about in this case.

8           Mr. Pomerantz says that this provision -- you have to

9    look at the language of the contract -- and that this provision

10   says that it only applies to someone else's product like a

11   compilation album or soundtrack agreement.  It doesn't say that

12   anywhere.  He's adding words.  Mr. -- he didn't mention the fact

13   that Mr. Paterno, Aftermath's own lawyer -- you didn't hear

14   Mr. Paterno's name once in Mr. Pomerantz's response.  Why?

15   Because Mr. Paterno, who is aligned with this side of the table,

16   with Aftermath, came in here and told you that the masters

17   licensed provision applies to just what it says it applies to.

18   Where a master is licensed to others for their manufacture --

19   that's what Mr. Kenswil and others said the download companies

20   do -- and sale of records, any records or for any other uses,

21   your royalty shall be under the 50 percent provision.  It's as

22   clear as night and day.

23          Mr. Pomerantz says over and over again about the

24   normal retail channel.  That's irrelevant.  Licensees -- and he

25   criticized Mr. Berman much in his response.  But it's

1    irrelevant.  Why?  Because what Mr. Berman really said was the

2    reason I don't care whether it's normal retail channel sale or

3    not is because if it's a license -- not that I have made up my

4    mind already -- but if it's a license, then the licensing

5    provision applies because licensees sell through normal retail

6    channels too.  But the question is is it a license.

7           Mr. Pomerantz went to length to discuss the list like

8    this was a list-making contest.  It's not a list-making contest,

9    I agree with that.  What is it though is there are factors that

10   are understood to be within license agreements.  Compilation

11   agreements, conditional download agreements.  All types of

12   agreements.  They are for a term.  They have different

13   reservations of rights.  There is no sale.  In order for

14   Universal to be selling something and for the records sold

15   provision to apply, they have to be selling something.  They're

16   not.  They're not selling anything.  They're licensing their

17   master to the download companies.  To the conditional download

18   and permanent download companies.

19          Now, what else did Mr. Pomerantz say to you?  He said

20   that with respect to -- that there is no Eminem record for which

21   50 percent has been paid under the masters licensed provision.

22   You know what?  You know that's not true.  Universal pays under

23   the 50 percent license provision for the same record that is

24   downloaded through the subscription conditional download

25   services, the same exact record.  Their core product.  They're

```
1   paying 50 percent on it.  If they license it to a record club
2   they would be paying 50 percent.
3           He says a record club is different.  A record club is
4   only different because Universal -- it's not different from the
5   license because the third party is doing the distribution and
6   the manufacturing just like with the downloads.  That's --
7   that's the end-all/be-all of this entire issue.
8           If the third party -- the master is being licensed to
9   a third party for the manufacture and sale of records or any
10  other use, that master licensed provision applies.  That's what
11  the language says, that's what Mr. Paterno who drafted the
12  agreement says.  Who better to tell you what it means than the
13  person who drafted the agreement?  They're trying to run away
14  from their own attorney.  They can't.  He was not mentioned once
15  by Mr. Pomerantz.  Why?  Because he told you that the masters
16  licensed provision applies to just what it says it applies to.
17          And all of this stuff about normal retail channel
18  sales again is irrelevant because licensees sell through normal
19  retail channels just like Universal does, but when it's a
20  licensee doing it, as Mr. Paterno said, Interscope/Aftermath is
21  not doing the selling.  If it's being done by a third party and
22  it's pursuant to a license, the licensing provision applies.
23  That's simple.  Record means a record in both contexts.  In the
24  "record sold" provision it doesn't mean all records, and in the
25  masters licensed provision it doesn't mean compilation
```

1  agreements or records or soundtracks records.  It doesn't say

2  that anywhere in the contract.  The contract defines "record"

3  one way.  And the masters licensed provision says specifically

4  that if it's a license and it's for the manufacture -- the

5  license of the master for the manufacture and sale of records or

6  for any other uses, the masters licensed provision applies.

7      Now, one thing Mr. Pomerantz said that I do have to

8  respond to is he said we didn't come to court and tell you that

9  Madonna or some third party is being paid 50 percent.  Who would

10  know that?  Would we know that?  Would F.B.T. know that?  Or

11  would Universal be in the position to know?  They have the

12  contract.  They have the agreements, and they didn't say -- if

13  you listen to Mr. Pomerantz words very closely, he is very

14  careful with his language -- he didn't say no one is getting

15  50 percent under the masters licensed.  He never said that.

16  What he said was we didn't come in here and say Bruce

17  Springsteen is getting 50 percent.  Don't you think that if

18  everyone in the industry was getting -- was not getting

19  50 percent, he would have come into court as the biggest record

20  label in the world and told you that?  He didn't tell you that.

21      He also said that we didn't complain about this until

22  2005.  Well, I am going to address that very briefly.  You saw

23  the email from Mr. Stiffelman in 2003, Eminem's recording

24  agreement, F.B.T. is a signatory to that, they were put on

25  notice about the position that Eminem had in this case; that the

1    downloads were licenses and should be paid under the licensing

2    provision.

3            As soon as F.B.T. could do an audit -- remember they

4    have the right to do it once every three years -- they did the

5    first audit, permanent downloads weren't part of it, and then

6    they did the second audit, and as soon as they did the second

7    audit, they raised their claims.  That's when they were to raise

8    their claims.  Universal was on clear notice by Gary

9    Stiffelman's email, "You're doing this wrong."

10           Now, Mr. Pomerantz also criticized me, I think he said

11   that some of my cutouts here had a dot dot dot and that somehow

12   maybe I was misleading you about testimony.  Did you see him put

13   up any testimony on the board to say Mr. Busch was misleading

14   you?  Mr. Busch was not showing you the correct testimony.  He

15   just said it, but didn't do it because, in fact, the testimony

16   was exactly what I showed you.

17           Again, he said that there's no Eminem record for which

18   50 percent is being paid.  Wrong.  Mr. Harleston admitted that

19   there is the record -- the same record for conditional downloads

20   is being done for permanent downloads.  Now, let's talk about

21   Mr. Harleston for one second.  Universal is the biggest record

22   label in the world.  Did they bring in an outside industry

23   expert as their expert?  Did they bring in a third party who has

24   knowledge of how different recording agreements throughout the

25   industry are being understood?

1          They brought in someone who works for Michael Ostroff.
2    They couldn't get anybody outside of Universal to come in and
3    sell -- and have you buy what they're selling.  They had their
4    own lawyer come in as their expert.  They couldn't get anybody
5    outside of Universal to say what Mr. Harleston had to say
6    because he works for the head lawyer at Universal.

7          Mr. Pomerantz also made the point that the 2004
8    amendment -- it says, "Sales of albums by way of permanent
9    download."  Yeah, it does, because we don't dispute that Apple
10   is selling downloads.  That's the only time that Universal gets
11   any money is when Apple sells a download.  It has nothing to do
12   with the issue in this case, and Mr. Pomerantz admitted that it
13   was only an issue for escalation, what I described to you
14   earlier.  And it's on Universal's form and the one word that
15   Mr. Stiffelman cared about was taken out.  The word about
16   royalties was taken out, that it applied for royalties and the
17   word "escalation" was put in.  It's a red herring.

18         We talked about the fact that -- again, this issue
19   about manufacturing keeps coming up.  Universal has -- it
20   doesn't matter.  Universal has their own manufacturing plant or
21   whether Universal is paying someone for each unit and then they
22   send it back to Universal.  To suggest that there's some kind of
23   inconsistency by us saying the masters licensed provision
24   applies to masters licensed for the manufacture and sale of
25   records when they are sending it out to their manufacturer for

1    whom they pay and that somehow that manufacturer's license

2    should come under that provision is not -- is nonsense.  I don't

3    even understand it.  The manufacturer is selling nothing.  They

4    are shipping it back to Universal.  Universal is paying them a

5    dollar to $1.25 a unit and then Universal's doing the selling.

6    It's not a royalty bearing event at all.  This is just an

7    attempt to trick.  It really is.

8          At the end of the day, there's nothing in their

9    agreements that say it's -- the masters licensed provision only

10   applies to their product.  There is nothing in the masters

11   licensed provision that discusses anything that Mr. Pomerantz

12   says it applies to.  Mr. Paterno told you it applies to

13   everything he says it applies to.

14         He had some last questions that he wanted you to think

15   about.  I have my own final questions that I want you to think

16   about when you go in the jury room.

17         If the masters licensed provision does not apply to

18   permanent downloads and mastertones, why did David Weinberg

19   scratch out the word "license" and replace it with "authorize?"

20         If it doesn't apply to permanent downloads -- if -- if

21   the licenses doesn't apply to permanent downloads, the masters

22   licensed provision, why did Jeffrey Harleston, when he had

23   nothing to lose on it and didn't know he was going to be an

24   expert witness, testify before Congress that they do license

25   their recordings to iTunes for permanent downloads?  And that

1   they do license their masters -- their recordings to Verizon for

2   mastertones?  But then without knowing I had his Senate

3   testimony, why did he say they weren't license agreements?

4   That's a big one.  Why would he say that?  Why would he change

5   that testimony before he knew I had that Senate testimony?  Why

6   would he change his testimony in this case to say that if he

7   didn't realize it was very important?  He changed his testimony

8   to what -- to something different than what he said before the

9   United States Senate because he didn't know I had his Senate

10  testimony and because he realized that if he admitted that these

11  were licenses, and that they were license agreements, then

12  Universal would be on the hook under the masters licensed

13  provision.  That's the only explanation that makes sense.

14          Why did Universal's top lawyer instruct all the

15  company's lawyers to change their recording contract forms in

16  2002 to include new language pulling permanent downloads out of

17  the master licensed provision?  There is only one answer to

18  that.  Because if they don't pull it out, the masters licensed

19  provision applies to permanent downloads.

20          Why did Rand Hoffman try to get Eminem's lawyer to

21  accept new language in the 2003 agreement?  And why did

22  Mr. Stiffelman refuse?  Mr. Hoffman offered it because he

23  realized that without it, the masters licensed provision

24  applied.  Did Mr. Stiffelman refuse?  Because he understood that

25  the masters licensed provision covered him perfectly for

1    licenses for permanent downloads.

2              You know, in 2002, there was a meeting at Universal

3    and Rand Hoffman was there, Jeffrey Harleston was there, and

4    Michael Ostroff was there.  And during that meeting, they

5    hatched this plan that they would construct out of whole cloth a

6    new royalty system for permanent downloads so that they could

7    avoid having to pay artists under the masters licensed

8    provision.  They didn't think the artists had the wherewithal to

9    do anything about it.  They thought the artist would accept half

10   a loaf is better than none and they thought they would go away

11   with it.  This is the first lawsuit that I know of where this

12   issue is being decided and there is only seven of you now who

13   can decide this issue and tell Universal as a matter of law that

14   what they did was wrong and that they should honor their

15   contracts.

16             Thank you.

17             THE COURT:  Will the clerk swear in the bailiff,

18   please.

19             THE CLERK:  Please state your name for the record and

20   raise your right hand.

21             THE BAILIFF:  Stoney Jackson.

22                 Stoney Jackson, Bailiff, was sworn

23             THE COURT:  You may.

24             THE CLERK:  If the jurors can rise and follow the

25   bailiff.

1                        (Jury Out)

2             MR. POMERANTZ:  Your Honor, may I be heard?

3             THE COURT:  You may.

4             MR. POMERANTZ:  That very last comment there was

5    exactly the conversation that Your Honor said was not admissible

6    in this case, a conversation amongst lawyers about the 2002

7    policy.  We discussed that before trial.  It was inappropriate

8    to mention that.

9             There was also mentions of other things that were not

10   at all in the record.  Universal being the largest record

11   company in the world.  Who said that?  Your Honor, Mr. Busch

12   throughout his initial hour and his next 15 minutes continued to

13   not only put things to the jury that were not in the record, but

14   he also put things in front of the jury that Your Honor said

15   were expressly not to be put in front of the jury.

16            We would ask for a curative instruction, Your Honor.

17            THE COURT:  With regard to the 2000 -- Mr. Pomerantz,

18   I just had a question about the 2002 argument that was just

19   made.  Without violating -- does that reference -- can that

20   reference be made by simply talking about the Ostroff memo?

21   That's how I read it without violating a court order.

22            MR. POMERANTZ:  He --

23            THE COURT:  Go ahead.

24            MR. POMERANTZ:  I'm sorry.

25            THE COURT:  My tentative when I heard that they went

 1   up, but as I listened he said everyone is cc'd on that memo.

 2        MR. POMERANTZ:  Your Honor, he didn't say here is what

 3   the memo said.  That's in evidence.  We don't dispute that.  He

 4   said these three people got together, talked, hatched a plan or

 5   conspiracy or something of that sort.  He was referring to a

 6   conversation.  Your Honor, he was trying to create an

 7   implication -- we couldn't go into that conversation --

 8        THE COURT:  I see what you're saying.

 9        MR. POMERANTZ:  -- and explain.  There was no

10   conspiracy hatched.  And -- because there was a privilege there

11   and Your Honor prohibited him from making inquiry of that.

12        THE COURT:  All right.

13        MR. BUSCH:  Your Honor, Mr. Hoffman and Mr. Harleston

14   all testified that they had an understanding, and Mr. Ostroff

15   did too, about whether they did this, whether they made this

16   discussion -- this agreement based upon a concern about the

17   licensing provision or not.  There was a lot of testimony in

18   this case about that.  There was a lot of testimony about the

19   Ostroff memo.  There was a lot of testimony about the fact that

20   Mr. Ostroff said it first or denied it first, that it was done

21   to -- because of the concern of the licensing provision.  He

22   said it was done because they were going to increase the

23   royalties.

24        Mr. Hoffman said it was done because they were

25   increasing royalties specifically.

 1          They all testified that there were meetings about
 2    this.  This is just a -- an extension of exactly what the
 3    testimony was in this case.  There is absolutely no prejudice at
 4    all and there is absolutely -- plenty of evidence on this very
 5    point.
 6          THE COURT:  All right, the Court will not give an
 7    instruction.
 8          I would like to talk just briefly about the general
 9    verdict forms.  And I have one concern about -- initially, I was
10    going to use the form about multiple boxes, but on second
11    thought I have a concern about it, if counsel could address it.
12          With regard to the three boxes, the concern that I
13    have is this:  At least at this point in time all of us just
14    want to do this one time.  And we can agree on that, just at
15    this point.
16          MR. BUSCH:  I can agree on that as well.
17          THE COURT:  When it's done, you might want to do it
18    again.  But anyway -- listen, the thing that I'm worried about
19    is the reason I was going to give it is because we tell them you
20    have to consider each defendant separately.  But the concern
21    that I had was okay, so let's say there is these three boxes and
22    let's say from your perspective you win, they check the box,
23    defendant Aftermath Records.  But they don't check the next box.
24    So we won't have -- because it's a general verdict, we will get
25    back and we will have to send them back.  For you to prevail in

1  total, they would have to check both boxes.

2       MR. POMERANTZ:  That's their form, Your Honor.

3       MR. GUILFORD:  The only difference is that we

4  separated Aftermath and Interscope into a separate --

5       THE COURT:  Do you see my concern, though?  Because I

6  am going to look at it and send them back and we are going to

7  have to come up with an explanation to them as they also need to

8  consider the other defendants.

9       Okay.  So which one was -- then I am confused.  Which

10  one was defendant's proposed?

11       MS. LeMOINE:  Your Honor, the defendants' proposed has

12  Count 1, two boxes.  The first is plaintiff F.B.T. Productions,

13  Em2M LLC, and the second is all three defendants.

14       THE COURT:  Okay.  And then the plaintiffs is just

15  plaintiffs and defendants.  Why do you care?  Mr. Busch?

16       MR. BUSCH:  The only thing I can think of is if the

17  jury -- Mr. Pomerantz -- Mr. Pomerantz told me, and he did not

18  argue any differently in his closing argument, that they're not

19  going to argue or contend that if -- that there should be a

20  separation, find Aftermath liable or not liable and Interscope

21  something different.

22       THE COURT:  It's a post trial motion, maybe.

23       MR. BUSCH:  So my question to you -- my concern was if

24  that's the case, if they're saying it doesn't really matter, if

25  Aftermath is found liable, Interscope can be found liable, if

1  they're not, then they both should not.  I think that it's

2  better to have plaintiffs, defendants.  That way that

3  consideration doesn't have to be made by the jury and the jury

4  is not confused, saying, well, do we have to find Aftermath,

5  Interscope, that kind of thing.

6            THE COURT:  Okay.  I am going to send back the general

7  verdict form that just includes plaintiffs and defendants.

8            Anything else before we leave?

9            MR. BUSCH:  No, Your Honor.

10           THE COURT:  All right.  Thank you.

11                (Proceedings adjourned at 1:10 p.m.)

12

13

14                           CERTIFICATE

15

16      I hereby certify that pursuant to Section 753, Title 18,
   United States Code, the foregoing is a true and correct
17  transcript of the stenographically reported proceedings held in
   the above-entitled matter and that the transcript page format is
18  in conformance with the regulations of the Judicial Conference
   of the United States.

19

20

   _____              _____
21  Pamela A. Seijas, CSR No. 3593                Date
   Official Reporter

22

23

24

25

I N D E X

                                                          PAGE
  PLAINTIFF'S OPENING ARGUMENT                             4

  DEFENDANTS' CLOSING ARGUMENT                            45

  PLAINTIFF'S CLOSING ARGUMENT                            86


WITNESSES FOR THE
DEFENSE:            DIRECT      CROSS     REDIRECT    RECROSS


PLAINTIFF EXHIBITS:          MARKED          RECEIVED


DEFENSE EXHIBITS:            MARKED          RECEIVED

**$**

**$0.07** [1] - 41:10
**$0.14** [1] - 41:12
**$0.70** [2] - 71:20, 72:9
**$0.99** [2] - 70:3, 74:21
**$1,474,270** [1] - 41:13
**$1.25** [3] - 14:18, 19:15, 94:5
**$159,000** [7] - 33:17, 33:19, 42:17, 81:4, 81:5, 81:9, 81:10
**$21** [2] - 46:1, 86:4
**$800** [1] - 27:11
**$899** [1] - 27:11

**'**

**'02** [1] - 76:10
**'03** [1] - 76:10
**'04** [1] - 76:10
**'05** [1] - 76:10
**'98** [1] - 61:4
**'license'** [1] - 29:22
**'through'** [1] - 65:23

**0**

**07-3314-PSG(MANx** [1] - 1:11

**1**

**1** [1] - 100:12
**1.4** [2] - 3:8, 3:9
**1.474** [1] - 41:19
**1.5** [1] - 41:16
**10** [8] - 14:23, 15:6, 34:2, 42:23, 61:14, 71:12, 71:25
**103** [1] - 38:8
**105** [1] - 38:8
**106** [1] - 38:8
**107** [1] - 38:8
**108** [1] - 38:8
**10:00** [1] - 3:2
**1100** [1] - 2:7
**12** [4] - 14:23, 15:5, 30:7, 30:8
**13** [3] - 44:17, 86:24, 86:25
**14** [2] - 22:8, 74:24
**15** [2] - 34:1, 97:12
**16** [1] - 74:25

**18** [4] - 7:22, 34:17, 69:25, 101:16
**181-l** [1] - 1:24
**1995** [2] - 79:17, 79:20
**1998** [9] - 31:4, 31:6, 35:14, 49:25, 61:14, 65:3, 79:12, 79:23, 85:4
**1:10** [1] - 101:11

**2**

**2** [1] - 32:18
**2(a** [1] - 83:12
**2000** [4] - 19:2, 79:25, 97:17
**2002** [9] - 25:18, 75:10, 75:13, 75:17, 76:5, 95:16, 96:2, 97:6, 97:18
**2003** [14] - 19:3, 20:4, 20:19, 42:5, 42:9, 61:4, 61:15, 76:5, 76:16, 77:13, 78:8, 91:23, 95:21
**2004** [9] - 19:3, 20:24, 21:4, 42:8, 64:5, 66:5, 76:5, 83:12, 93:7
**2005** [2] - 76:5, 91:22
**2008** [1] - 42:9
**2009** [2] - 1:21, 3:1
**213** [2] - 1:25, 2:19
**22** [1] - 7:22
**23** [1] - 34:17
**255** [1] - 1:23
**259-3456** [1] - 2:9
**26** [1] - 27:10
**26th** [1] - 74:22
**27th** [1] - 74:24

**3**

**3** [3] - 3:9, 3:15, 4:6
**30** [6] - 12:13, 12:21, 19:5, 50:1, 56:7, 85:4
**315** [1] - 2:6
**34** [1] - 3:24
**35** [2] - 3:24, 11:15
**355** [1] - 2:16
**3593** [1] - 101:21
**35TH** [1] - 2:17
**37201** [1] - 2:8

**4**

**4** [1] - 102:3

**4(a** [9] - 52:19, 54:24, 67:9, 67:16, 67:22, 68:24, 69:16, 73:14, 81:17
**4(a)** [3] - 68:6, 69:20, 75:3
**4(c)(v** [11] - 16:20, 55:1, 67:9, 67:16, 68:11, 68:17, 68:24, 69:6, 73:14, 82:24, 88:5
**4(c)(v)** [4] - 67:22, 68:8, 68:14, 69:6
**40** [4] - 46:10, 46:15, 46:23, 80:6
**45** [1] - 102:4

**5**

**5** [6] - 1:21, 3:1, 61:14, 71:12, 71:25, 88:5
**5(a** [1] - 52:19
**5(a)(i** [1] - 83:17
**50** [23] - 10:7, 23:17, 34:19, 36:25, 47:1, 49:20, 49:23, 50:3, 59:22, 69:3, 73:5, 75:2, 85:2, 88:21, 89:21, 89:23, 90:1, 90:2, 91:9, 91:15, 91:17, 91:19, 92:18
**50/50** [2] - 25:11, 25:15, 30:16
**5:29** [1] - 74:22

**6**

**6** [3] - 1:19, 8:3
**60** [1] - 46:11
**615** [1] - 2:9
**687-0446** [1] - 1:25
**687-3702** [1] - 2:19

**7**

**70** [3] - 71:20, 72:3, 72:9
**753** [1] - 101:16
**775** [1] - 38:8
**790** [1] - 27:10

**8**

**86** [1] - 102:5

**9**

**9** [2] - 21:22
**90012** [1] - 1:24
**90071-1560** [1] - 2:18
**9:39** [1] - 74:24

**A**

**a.m** [2] - 3:2, 74:24
**able** [1] - 13:17
**above-entitled** [1] - 101:17
**absolute** [3] - 24:15, 24:25, 66:2
**absolutely** [7] - 21:16, 22:17, 35:9, 35:11, 44:11, 99:3, 99:4
**Academy** [1] - 36:18
**accept** [4] - 23:6, 40:23, 95:21, 96:9
**acceptable** [1] - 3:18
**According** [1] - 80:23
**according** [4] - 22:13, 22:22, 23:12, 66:4
**account** [5] - 6:11, 14:13, 49:7, 81:5, 81:6
**accounted** [1] - 21:16
**accusations** [2] - 45:9, 86:3
**acquiring** [1] - 12:19
**act** [1] - 19:25
**acted** [3] - 58:1, 59:10, 59:11
**action** [1] - 42:16
**actual** [2] - 8:4, 34:7
**added** [1] - 31:16
**adding** [1] - 88:12
**additional** [3] - 15:12, 19:18, 27:14
**address** [1] - 87:1, 91:22, 99:11
**addressed** [2] - 20:17, 21:17
**adjourned** [1] - 101:11
**admissible** [1] - 97:5
**admission** [1] - 28:5
**admit** [9] - 10:6, 18:21, 20:12, 27:1, 27:13, 28:3, 31:19, 31:23
**admits** [7] - 10:4,

23:7, 23:12, 28:13, 30:10, 38:9, 85:5
**admitted** [12] - 14:19, 24:4, 29:4, 30:14, 32:22, 33:18, 39:4, 39:24, 79:2, 92:18, 93:12, 95:10
**admitting** [2] - 23:13, 23:14
**advance** [1] - 77:3
**afraid** [1] - 53:3
**Aftermath** [41] - 1:12, 5:19, 5:25, 6:8, 6:12, 8:22, 12:25, 16:7, 17:11, 18:10, 22:18, 45:16, 45:21, 46:4, 46:7, 46:8, 46:9, 46:17, 48:19, 50:2, 56:15, 57:4, 57:7, 61:21, 73:22, 78:19, 79:8, 79:13, 79:23, 80:1, 80:7, 80:23, 82:21, 84:9, 88:16, 99:23, 100:4, 100:20, 100:25, 101:4
**Aftermath's** [5] - 16:8, 56:23, 58:2, 60:6, 88:13
**ago** [5] - 19:14, 22:21, 28:17, 45:11, 87:23
**agree** [21] - 20:5, 21:2, 22:7, 31:14, 45:25, 46:2, 54:12, 55:11, 68:12, 68:14, 68:17, 68:19, 81:7, 87:3, 87:9, 87:13, 87:17, 89:9, 99:14, 99:16
**agreed** [13] - 22:4, 46:9, 46:12, 46:25, 47:1, 50:2, 57:18, 61:16, 62:17, 72:8, 77:3, 77:6, 80:5
**agreement** [44] - 9:9, 9:10, 11:23, 19:3, 19:4, 20:4, 20:19, 21:20, 21:23, 32:4, 33:9, 33:10, 33:12, 33:16, 35:14, 35:15, 37:12, 37:21, 40:4, 45:25, 59:11, 61:4, 61:5, 61:14, 61:15, 62:13, 67:11, 76:18, 76:25, 77:7, 77:7, 77:9, 78:7, 78:8, 79:19, 83:8, 87:10, 88:6, 88:11, 90:12, 90:13, 91:24, 95:21, 98:16

**agreements** [35] -
5:11, 16:7, 23:9,
25:21, 27:17, 29:22,
31:11, 32:23, 32:25,
33:3, 33:4, 33:15,
37:5, 37:6, 37:9, 38:6,
38:9, 49:15, 61:4,
61:5, 61:6, 61:13,
64:24, 84:5, 89:10,
89:11, 89:12, 91:1,
91:12, 92:24, 94:9,
95:3, 95:11
**Agreements** [1] -
60:17
**agrees** [4] - 54:18,
62:23, 69:15, 81:9
**ahead** [3] - 3:21,
44:20, 97:23
**air** [2] - 23:1
**akin** [1] - 29:5
**al** [1] - 1:13
**album** [22] - 8:2, 8:5,
8:9, 8:10, 8:15, 8:18,
9:4, 9:6, 22:3, 22:4,
22:8, 27:20, 37:19,
46:17, 46:21, 46:22,
48:19, 68:5, 78:19,
79:3, 88:11
**albums** [17] - 8:7,
14:23, 16:24, 21:13,
21:20, 25:8, 30:16,
36:5, 46:3, 56:14,
58:3, 60:7, 66:6,
78:21, 80:22, 86:6,
93:8
**aligned** [1] - 88:15
**all-out** [1] - 74:6
**all/be** [1] - 90:7
**allows** [1] - 70:24
**almost** [3] - 11:16,
38:11, 47:17
**Almost** [1] - 45:11
**Amazon** [2] - 65:5,
70:19
**Amazon.com** [5] -
64:11, 64:15, 81:24,
82:1, 82:5
**ambiguous** [2] -
66:1, 66:4
**amend** [1] - 25:21
**amended** [1] - 24:8
**amendment** [9] -
19:3, 20:23, 20:24,
21:4, 64:5, 66:6,
83:12, 87:19, 93:8
**amendments** [1] -
53:12
**amount** [2] - 33:19,
33:20
**amounts** [1] - 42:6

**analysis** [3] - 29:18,
40:20, 41:17
**ANGELES** [1] - 2:18
**Angeles** [4] - 1:20,
1:24, 3:1, 19:5
**answer** [2] - 20:9,
20:11, 26:17, 56:8,
73:25, 75:4, 84:16,
85:24, 95:17
**answers** [2] - 84:15,
85:9
**anyway** [1] - 99:18
**APPEARANCES** [1] -
2:1
**appease** [1] - 23:5
**Apple** [30] - 11:10,
11:13, 15:18, 19:7,
26:12, 26:15, 26:16,
26:18, 26:20, 26:22,
27:5, 27:25, 28:6,
28:20, 29:4, 29:14,
29:18, 40:3, 70:17,
71:17, 71:19, 72:8,
72:13, 72:16, 72:17,
74:21, 93:9, 93:11
**application** [2] -
45:6, 45:7
**applied** [12] - 19:9,
24:5, 57:3, 58:2,
58:11, 60:6, 78:7,
78:9, 82:18, 82:20,
93:16, 95:24
**applies** [63] - 6:5,
7:16, 10:6, 11:21,
12:5, 16:13, 16:14,
16:18, 16:20, 16:22,
16:24, 16:25, 17:9,
17:14, 18:1, 18:14,
18:18, 18:20, 18:23,
19:6, 24:23, 25:4,
25:6, 29:9, 29:16,
32:1, 34:12, 35:11,
35:17, 56:18, 57:14,
58:12, 61:20, 61:21,
67:13, 67:14, 67:16,
68:3, 69:7, 69:13,
69:16, 70:8, 82:14,
83:18, 88:10, 88:17,
89:5, 90:10, 90:16,
90:22, 91:6, 93:24,
94:10, 94:12, 94:13,
95:19
**apply** [27] - 25:25,
26:5, 26:7, 31:18,
31:19, 35:6, 36:2,
56:14, 56:16, 56:23,
57:13, 58:9, 67:17,
67:19, 68:1, 73:21,
82:12, 82:13, 83:10,
83:24, 84:8, 84:20,

89:15, 94:17, 94:20,
94:21
**appreciate** [1] -
50:15
**appropriate** [1] -
19:11
**April** [1] - 42:8
**argue** [4] - 45:4,
47:23, 100:18, 100:19
**argued** [2] - 24:4,
47:2
**arguing** [3] - 11:12,
11:13, 63:5
**argument** [19] - 4:4,
4:18, 17:22, 19:21,
26:11, 26:12, 42:23,
44:2, 45:7, 51:24,
52:3, 52:5, 52:11,
70:6, 76:13, 86:13,
87:6, 97:18, 100:18
**ARGUMENT** [3] -
102:3, 102:4, 102:5
**Argument** [4] - 4:20,
45:1, 86:23
**arguments** [3] -
45:8, 55:13, 86:2
**arose** [2] - 19:25,
84:7
**Article** [2] - 21:22
**Artist** [3] - 49:12
**artist** [24] - 21:10,
22:14, 23:5, 24:4,
24:8, 24:9, 24:12,
31:22, 32:8, 38:20,
49:18, 49:19, 50:1,
57:13, 75:1, 75:2,
77:19, 78:5, 78:17,
79:18, 80:14, 85:1,
96:9
**artists** [14] - 15:24,
22:23, 31:25, 49:7,
49:8, 49:9, 49:11,
49:17, 78:3, 78:16,
84:23, 96:7, 96:8
**artwork** [1] - 38:16
**aside** [1] - 50:13
**assess** [1] - 54:1
**asset** [2] - 32:13,
32:19
**associated** [2] -
5:16, 6:18
**assume** [1] - 59:3
**assumes** [1] - 56:5
**attempt** [4] - 13:14,
22:9, 41:7, 94:7
**attention** [4] - 4:22,
5:1, 43:18, 54:20
**attorney** [3] - 16:9,
19:2, 90:14
**audience** [2] - 43:4,

43:9
**audit** [7] - 37:9, 61:2,
61:9, 92:3, 92:5, 92:6,
92:7
**auditor** [1] - 76:11
**authorize** [1] - 94:19
**authorizes** [2] -
36:22, 43:21
**authorizing** [1] -
44:10
**automatically** [2] -
5:24, 24:19
**AVENUE** [1] - 2:16
**avoid** [2] - 20:10,
96:7
**award** [4] - 41:18,
41:19, 42:15, 42:16
**Award** [1] - 36:18
**Awards** [1] - 36:18
**aware** [1] - 20:13

**B**

**background** [1] -
80:9
**backtrack** [1] - 31:20
**bad** [1] - 41:7
**bailiff** [2] - 96:17,
96:25
**BAILIFF** [1] - 96:21
**Bailiff** [1] - 96:22
**BALLOW** [1] - 2:3
**base** [4] - 4:16, 51:1,
51:2, 51:4
**based** [3] - 62:19,
71:19, 98:16
**bases** [1] - 32:11
**basing** [1] - 62:19
**basis** [1] - 70:14
**Bass** [9] - 4:25, 5:1,
46:18, 62:1, 62:2,
78:13, 78:18, 78:24,
79:9
**Basses** [1] - 79:14
**battle** [1] - 11:2
**battles** [1] - 11:2
**Beach** [1] - 40:15
**bearing** [2] - 28:24,
94:6
**Beatles** [1] - 40:14
**became** [1] - 22:24
**began** [1] - 19:20
**begin** [2] - 23:21,
45:12
**beginning** [4] - 18:7,
50:11, 74:3, 83:16
**begrudge** [1] - 46:5
**behalf** [2] - 4:24,
33:21

**behaved** [1] - 60:8
**behind** [2] - 14:9,
14:10
**believes** [1] - 65:9
**below** [1] - 67:15
**Berman** [40] - 6:10,
8:25, 9:2, 11:12,
11:14, 14:11, 28:8,
52:25, 54:15, 55:19,
59:23, 60:21, 62:5,
62:6, 63:7, 63:10,
63:15, 63:20, 64:8,
64:15, 64:18, 65:7,
65:12, 65:22, 66:4,
66:15, 66:20, 67:23,
69:10, 69:18, 69:21,
71:2, 71:16, 71:21,
72:12, 82:7, 85:20,
88:25, 89:1
**beside** [1] - 54:17
**best** [3] - 50:1,
50:15, 78:17
**Best** [6] - 9:5, 18:8,
18:11, 48:7, 68:13,
82:5
**better** [6] - 16:8,
23:6, 51:17, 90:12,
96:10, 101:2
**between** [16] - 5:19,
9:9, 9:12, 10:11,
11:21, 12:7, 15:9,
19:7, 41:15, 67:10,
67:15, 71:17, 73:6,
74:17, 87:25
**Beyonce** [1] - 49:22
**big** [5] - 11:2, 20:8,
37:17, 82:4, 95:4
**biggest** [3] - 80:21,
91:19, 92:21
**binder** [1] - 37:3
**Bing** [1] - 40:15
**bit** [11] - 4:24, 18:24,
21:10, 25:3, 30:7,
31:20, 46:15, 46:18,
54:16, 58:5, 68:9
**Blackberry** [1] -
43:10
**Blackberrys** [1] -
43:6
**blatantly** [2] - 34:10,
34:14
**Blockbuster** [1] -
48:9
**Blue** [5] - 13:13,
13:14, 72:3, 72:6
**board** [1] - 92:13
**body** [1] - 47:9
**Book** [2] - 72:3, 72:7
**bookstores** [1] -
82:7

**borrowing** [1] - 48:12
**bottom** [3] - 66:21, 67:10, 74:18
**bought** [2] - 29:18, 48:11
**box** [2] - 99:22, 99:23
**boxes** [5] - 99:10, 99:12, 99:21, 100:1, 100:12
**Boys** [1] - 40:15
**break** [2] - 42:22, 86:12
**breakdown** [1] - 74:21
**briefly** [5] - 4:3, 33:24, 44:6, 91:22, 99:8
**bring** [7] - 3:21, 5:9, 23:20, 43:18, 44:20, 92:22, 92:23
**broadly** [4] - 30:21, 30:23, 57:22
**brother** [1] - 78:24
**brought** [1] - 93:1
**Bruce** [3] - 49:21, 85:2, 91:16
**bucket** [11] - 6:8, 7:20, 8:8, 8:11, 8:20, 8:23, 9:7, 9:11, 12:24, 13:22, 52:16
**Building** [1] - 1:23
**built** [1] - 15:13
**bunch** [5] - 52:2, 53:15, 60:18, 62:7, 67:12
**burden** [3] - 3:5, 4:8, 4:12
**burns** [1] - 75:11
**Busch** [49] - 4:18, 43:17, 43:20, 44:17, 47:16, 51:6, 52:12, 52:15, 53:15, 54:11, 54:19, 57:4, 57:18, 57:20, 58:6, 58:8, 58:13, 59:16, 60:16, 63:9, 63:11, 63:16, 63:20, 66:7, 67:13, 68:10, 68:15, 69:4, 69:10, 69:18, 70:10, 70:20, 72:25, 74:2, 76:18, 76:20, 77:15, 80:9, 84:10, 85:9, 85:12, 85:24, 86:13, 86:21, 92:13, 92:14, 97:11, 100:15
**BUSCH** [17] - 2:4, 3:12, 3:20, 3:25, 4:19, 4:21, 34:4, 44:5, 44:7,

44:19, 86:22, 86:24, 98:13, 99:16, 100:16, 100:23, 101:9
**Busch's** [2] - 55:13, 67:6
**business** [11] - 11:15, 12:19, 38:4, 56:7, 56:17, 77:5, 77:25, 78:5, 78:14, 78:25, 79:15
**Buy** [5] - 9:5, 18:8, 18:11, 48:7, 82:5
**buy** [8] - 12:19, 12:20, 37:18, 48:14, 64:12, 72:2, 93:3
**buying** [3] - 35:25, 36:1, 48:7
**BY** [2] - 2:4, 2:13

---

**C**

**c)(i** [1] - 67:12
**CA** [1] - 2:18
**calculation** [3] - 40:11, 41:10, 41:11
**calculations** [3] - 40:13, 40:16, 40:21
**CALIFORNIA** [1] - 1:2
**California** [3] - 1:20, 1:24, 3:1
**camouflage** [3] - 33:3, 74:3, 74:5
**Capitol** [1] - 11:15
**car** [2] - 72:2, 72:4
**card** [1] - 54:6
**care** [7] - 33:6, 33:8, 64:16, 64:18, 66:23, 78:2, 89:2, 100:15
**cared** [1] - 93:15
**careful** [1] - 91:14
**cares** [1] - 33:7
**Carlos** [1] - 40:14
**carve** [3] - 20:4, 31:6, 87:3
**case** [79] - 4:23, 5:4, 5:8, 5:9, 5:11, 5:14, 5:20, 6:4, 6:23, 7:6, 9:12, 9:25, 10:24, 12:7, 13:5, 14:2, 14:10, 14:15, 16:3, 16:5, 16:8, 17:19, 17:22, 18:25, 22:10, 24:25, 27:8, 30:1, 33:17, 35:9, 36:7, 36:12, 36:14, 40:16, 40:22, 41:8, 41:21, 41:22, 41:24, 42:7, 42:11, 42:18, 42:24,

42:25, 43:1, 43:8, 45:6, 47:15, 48:18, 50:11, 53:8, 53:9, 54:3, 54:12, 58:4, 58:13, 60:1, 61:4, 65:2, 65:4, 65:6, 65:10, 65:11, 74:8, 78:12, 80:21, 86:14, 86:15, 86:16, 88:4, 88:7, 91:25, 93:12, 95:6, 97:6, 98:18, 99:3, 100:24
**Case** [1] - 1:10
**cases** [1] - 6:21
**cassettes** [1] - 5:23
**catchall** [1] - 83:6
**categories** [1] - 83:15
**caught** [1] - 54:19
**cc'd** [1] - 98:1
**CD** [9] - 14:18, 15:21, 27:20, 38:19, 64:12, 69:24, 71:10
**CDs** [16] - 5:23, 7:10, 14:24, 15:6, 28:22, 29:1, 35:23, 39:18, 59:3, 59:4, 59:12, 59:14, 66:2, 81:24, 85:11
**cell** [2] - 43:6, 43:10
**CENTRAL** [1] - 1:2
**certain** [7] - 5:25, 7:25, 41:13, 76:3, 77:12, 77:16, 81:19
**Certainly** [1] - 54:24
**certainly** [1] - 79:13
**CERTIFICATE** [1] - 101:14
**certify** [1] - 101:16
**challenge** [4] - 40:13, 40:16, 40:20, 41:8
**chance** [1] - 50:21
**Change** [1] - 65:15
**change** [23] - 3:24, 21:15, 22:2, 26:1, 31:12, 31:14, 33:2, 45:5, 51:11, 51:12, 51:14, 51:22, 65:15, 68:9, 69:23, 70:1, 86:2, 86:3, 87:3, 95:4, 95:6, 95:15
**changed** [6] - 21:24, 25:19, 31:21, 32:3, 70:6, 95:7
**changes** [4] - 45:10, 70:2, 77:4, 77:6
**changing** [2] - 3:23, 71:2
**channel** [39] - 11:13,

11:19, 18:3, 18:5, 18:12, 18:13, 34:16, 34:19, 34:25, 35:2, 45:20, 46:10, 51:16, 51:21, 55:10, 55:15, 55:16, 55:17, 55:21, 55:22, 55:24, 56:2, 56:9, 59:5, 64:10, 64:13, 64:16, 64:20, 64:22, 68:6, 69:16, 71:6, 73:12, 75:21, 84:19, 85:22, 88:24, 89:2, 90:17
**channels** [42] - 5:7, 9:1, 9:5, 17:25, 18:9, 18:17, 18:20, 18:22, 24:19, 24:21, 24:22, 24:24, 34:13, 35:22, 52:22, 52:23, 52:24, 53:2, 53:8, 53:14, 54:25, 55:8, 57:6, 59:13, 65:1, 65:5, 65:8, 65:13, 65:15, 65:16, 71:14, 81:16, 81:17, 81:18, 81:23, 82:1, 83:14, 83:18, 85:7, 89:6, 90:19
**charge** [2] - 11:16, 37:10
**charges** [2] - 15:13, 24:14
**chart** [7] - 40:7, 47:10, 47:16, 47:17, 47:18, 48:1, 52:13
**charts** [4] - 49:15, 51:24, 52:2, 52:10
**check** [5] - 60:24, 81:22, 99:22, 99:23, 100:1
**Check** [1] - 60:24
**choose** [2] - 56:25, 67:18
**Christian** [1] - 82:7
**Cingular** [3] - 32:24, 33:12, 33:13
**Circuit** [2] - 3:8, 82:5
**circumstances** [4] - 7:21, 10:5, 19:9, 19:11
**City** [2] - 68:13, 82:5
**claim** [9] - 4:8, 4:10, 4:12, 4:14, 31:18, 33:17, 33:18, 81:4
**claims** [8] - 45:4, 45:9, 56:6, 67:6, 81:4, 81:5, 92:7, 92:8
**clause** [2] - 60:3, 60:5
**clear** [12] - 3:6, 4:13, 5:5, 13:5, 13:6, 21:14,

21:17, 21:18, 26:5, 42:3, 88:22, 92:8
**clearer** [1] - 75:15
**clearly** [5] - 7:12, 19:6, 19:19, 75:19, 85:23
**clerk** [1] - 96:17
**CLERK** [2] - 96:19, 96:24
**clients** [1] - 4:25
**close** [2] - 75:25, 87:2
**closely** [1] - 91:13
**CLOSING** [2] - 102:4, 102:5
**closing** [18] - 4:4, 4:18, 18:7, 19:21, 42:23, 43:17, 44:2, 44:24, 45:7, 51:24, 52:2, 52:5, 52:11, 54:19, 57:19, 67:6, 87:6, 100:18
**Closing** [2] - 45:1, 86:23
**cloth** [3] - 25:20, 31:24, 96:5
**club** [10] - 25:9, 25:13, 73:6, 73:8, 73:18, 90:1, 90:3
**clubs** [11] - 25:3, 25:6, 25:7, 30:14, 72:25, 73:10, 73:11, 73:14, 73:15, 73:25
**Code** [1] - 101:16
**Cohen** [8] - 33:20, 40:6, 40:24, 41:2, 41:9, 42:15, 76:11, 81:8
**Cohen's** [2] - 40:7, 40:13
**Column** [2] - 47:7
**column** [1] - 47:8
**columns** [3] - 47:7, 47:18, 47:21
**combine** [1] - 10:18
**combines** [1] - 10:2
**coming** [2] - 35:23, 93:19
**comment** [1] - 97:4
**commitment** [1] - 73:16
**common** [2] - 71:15, 72:24
**compact** [5] - 58:21, 58:24, 69:14, 69:15, 70:14
**compacts** [1] - 58:19
**companies** [16] - 23:16, 27:17, 30:20, 31:5, 32:15, 32:21,

49:6, 78:1, 78:2, 78:3, 78:16, 84:23, 88:19, 89:17, 89:18
**company** [12] - 7:12, 26:2, 31:1, 35:7, 36:1, 37:22, 45:14, 71:8, 73:17, 78:9, 84:21, 97:11
**company's** [2] - 57:13, 95:15
**company-wide** [1] - 78:9
**compelled** [1] - 40:6
**compilation** [23] - 8:5, 8:7, 8:9, 8:15, 16:24, 37:4, 38:6, 56:20, 57:5, 68:10, 68:12, 68:13, 68:16, 68:22, 69:1, 69:2, 69:5, 69:6, 83:3, 83:5, 88:11, 90:25
**Compilation** [1] - 89:10
**complain** [1] - 91:21
**complained** [1] - 21:1
**complete** [2] - 14:3, 41:7
**completely** [1] - 7:7
**conceded** [1] - 81:15
**concern** [10] - 20:12, 20:13, 98:16, 98:21, 99:9, 99:11, 99:12, 99:20, 100:5, 100:23
**concerned** [1] - 5:5
**concluded** [1] - 55:25
**conclusion** [2] - 56:4, 56:5
**conditional** [29] - 9:23, 10:3, 10:7, 10:12, 12:11, 15:10, 23:11, 23:16, 23:19, 23:22, 32:15, 33:15, 37:5, 37:8, 38:9, 38:12, 47:19, 47:22, 47:24, 48:5, 48:13, 48:14, 85:13, 87:25, 88:1, 89:11, 89:17, 89:24, 92:19
**Conference** [1] - 101:18
**confirmed** [2] - 18:23, 24:16
**conflict** [6] - 6:24, 12:7, 67:15, 67:17, 68:2
**conformance** [1] - 101:18
**confuse** [1] - 70:4

**confused** [3] - 69:4, 100:9, 101:4
**confusion** [1] - 68:19
**Congress** [1] - 94:24
**connection** [1] - 70:13
**consequence** [1] - 32:7
**consider** [6] - 60:4, 63:21, 64:22, 84:1, 99:20, 100:8
**consideration** [2] - 19:22, 101:3
**consistent** [2] - 82:23, 87:16
**conspiracy** [2] - 98:5, 98:10
**construct** [1] - 96:5
**construe** [4] - 30:22, 57:21, 57:24
**construed** [1] - 57:22
**consumer** [12] - 11:23, 34:9, 34:11, 34:23, 38:3, 48:2, 71:5, 71:9, 72:16, 72:17, 78:2
**consumers** [3] - 12:2, 38:5, 59:4
**container** [2] - 24:10, 24:13
**contains** [1] - 8:3
**contend** [1] - 100:19
**content** [2] - 32:20, 37:9
**contest** [2] - 89:8
**context** [2] - 60:2, 63:24
**contexts** [1] - 90:23
**continue** [1] - 46:2
**continued** [1] - 97:12
**contract** [64] - 5:6, 6:5, 6:16, 6:17, 6:21, 14:8, 16:10, 19:9, 22:14, 23:13, 23:14, 24:2, 24:8, 25:12, 30:24, 34:6, 34:7, 34:21, 35:13, 36:4, 36:13, 36:16, 36:20, 42:12, 46:2, 46:13, 51:18, 51:19, 51:20, 52:15, 53:10, 54:21, 54:22, 58:15, 59:2, 60:8, 61:18, 62:11, 62:14, 62:16, 63:22, 63:23, 65:2, 66:18, 66:22, 68:24, 71:3, 71:11, 71:24, 78:15, 79:17, 81:18, 81:19, 81:21, 84:2, 85:23,

87:17, 88:9, 91:2, 91:12, 95:15
**contracts** [17] - 5:12, 5:13, 5:16, 6:11, 10:14, 22:23, 25:14, 49:4, 51:3, 59:19, 61:6, 71:12, 71:15, 72:20, 72:23, 73:8, 96:15
**contrary** [1] - 29:17
**contribute** [1] - 46:15
**contributed** [1] - 46:18
**contributes** [1] - 46:14
**controls** [3] - 6:25, 12:8, 17:18
**conversation** [4] - 97:5, 97:6, 98:6, 98:7
**convincing** [2] - 3:6, 4:13
**copies** [3] - 50:2, 58:23, 85:4
**copy** [3] - 3:17, 44:7, 71:9
**copyright** [7] - 28:13, 44:10, 59:16, 59:18, 59:24, 59:25, 60:1
**core** [2] - 84:24, 89:25
**corner** [1] - 34:24
**correct** [9] - 3:7, 3:10, 3:11, 6:4, 33:21, 33:23, 41:11, 92:14, 101:16
**cost** [13] - 14:23, 15:6, 15:13, 19:17, 25:10, 27:2, 27:8, 27:11, 27:18, 27:20, 27:21, 70:3
**costs** [13] - 15:23, 27:2, 27:14, 69:19, 69:20, 69:21, 69:24, 69:25, 70:4, 70:7, 70:8, 70:13, 70:24
**counsel** [3] - 44:2, 54:4, 99:11
**count** [1] - 22:7
**Count** [1] - 100:12
**country** [2] - 14:25, 80:18
**counts** [2] - 10:22, 35:3
**couple** [1] - 28:16
**course** [1] - 72:4
**COURT** [32] - 1:1, 3:5, 3:13, 3:21, 4:1, 4:3, 34:3, 42:21, 43:4,

3:14, 44:6, 44:14, 44:17, 44:20, 44:23, 86:11, 86:21, 96:17, 96:23, 97:3, 97:17, 97:23, 97:25, 98:8, 98:12, 99:6, 99:17, 100:5, 100:14, 100:22, 101:6, 101:10
**Court** [3] - 43:5, 50:16, 99:6
**court** [1] - 39:7, 51:10, 55:12, 91:8, 91:19, 97:21
**Court's** [2] - 3:9, 43:18
**courtroom** [5] - 45:12, 50:9, 50:20, 51:6, 81:1
**cover** [8] - 32:11, 32:16, 33:5, 45:21, 55:1, 55:5, 60:11
**covered** [17] - 20:14, 20:18, 55:25, 62:8, 62:24, 63:11, 67:21, 68:11, 68:14, 68:17, 69:6, 71:18, 73:2, 73:4, 73:6, 73:23, 95:25
**covering** [1] - 55:2
**covers** [1] - 75:13
**create** [22] - 13:12, 13:17, 14:17, 27:11, 27:24, 28:1, 33:11, 33:14, 35:19, 47:7, 48:21, 51:23, 51:24, 52:2, 60:12, 70:16, 70:24, 72:22, 78:17, 79:9, 79:10, 98:6
**created** [11] - 5:17, 6:14, 22:25, 23:2, 23:8, 29:7, 47:10, 47:16, 60:11, 80:10, 85:14
**creating** [1] - 15:21
**creation** [1] - 27:19
**creative** [1] - 79:1
**credibility** [1] - 54:1
**credit** [3] - 40:20, 79:12, 79:14
**credited** [3] - 38:20, 81:5, 81:6
**criteria** [1] - 72:22
**criticized** [1] - 88:25, 92:10
**Crosby** [1] - 40:15
**CROSS** [1] - 102:9
**CSR** [2] - 1:22, 101:21
**Cue** [1] - 72:11
**curative** [4] - 43:19,

44:4, 44:14, 97:16
**custom** [1] - 62:22
**customarily** [1] - 49:2
**customary** [4] - 49:2, 49:4, 49:6, 49:13
**customs** [1] - 49:3
**cutouts** [2] - 37:3, 92:11
**CV** [2] - 1:11, 88:5

## D

**damages** [5] - 40:9, 40:10, 41:12, 42:3, 42:15
**Date** [1] - 101:21
**David** [5] - 6:10, 32:2, 32:3, 62:5, 94:18
**days** [2] - 48:6, 48:10
**dba** [1] - 1:12
**deal** [24] - 21:24, 34:17, 37:17, 41:1, 46:6, 46:9, 46:16, 46:23, 46:24, 47:2, 50:4, 50:5, 61:24, 62:1, 62:5, 62:20, 65:18, 71:16, 77:1, 79:7, 85:4, 86:4, 86:8
**dealing** [1] - 66:7
**December** [1] - 42:8
**deceptive** [2] - 65:25, 66:3
**decide** [6] - 50:25, 51:7, 61:19, 68:2, 76:2, 96:13
**decided** [3] - 61:21, 80:24, 96:12
**decision** [8] - 4:16, 24:2, 41:3, 41:4, 41:6, 51:4
**declined** [1] - 78:21
**deduction** [1] - 41:20
**deductions** [8] - 7:25, 24:10, 24:11, 41:13, 41:15, 77:12, 77:16, 78:6
**Def** [2] - 8:5, 8:6
**DEFENDANT** [1] - 2:12
**defendant** [2] - 99:20, 99:23
**defendant's** [2] - 42:23, 100:10
**defendants** [13] - 5:6, 5:20, 15:11, 17:3, 20:23, 40:9, 40:12, 86:9, 100:8, 100:13,

100:15, 101:2, 101:7
**Defendants** [1] -
1:14
**DEFENDANTS'** [1] -
102:4
**defendants'** [2] - 5:5,
100:11
**DEFENSE** [2] -
102:9, 102:20
**Defense** [1] - 45:1
**defense** [4] - 4:9,
4:11, 4:13, 4:14
**define** [2] - 59:25,
81:18
**defined** [1] - 61:15
**defines** [1] - 91:2
**definitely** [1] - 64:21
**definition** [6] - 17:10,
55:14, 55:15, 55:17,
83:10, 83:11
**definitions** [2] -
53:12, 64:4
**deliberations** [2] -
37:3, 54:2
**delivery** [3] - 32:19,
32:20, 37:9
**demand** [1] - 40:1
**demo** [1] - 80:12
**demonstrate** [3] -
34:20, 34:22, 35:4
**demonstratives** [1] -
44:8
**denied** [2] - 24:1,
98:20
**deny** [1] - 83:19
**denying** [1] - 23:25
**department** [2] -
11:16, 26:9
**deposition** [6] -
12:18, 16:20, 20:13,
41:3, 41:6, 67:23
**describe** [1] - 83:20
**described** [1] - 93:13
**deserve** [4] - 15:24,
24:15, 79:14, 86:7
**deserves** [1] - 79:12
**designate** [2] - 40:9,
40:10
**designated** [1] -
40:12
**details** [1] - 32:18
**determining** [1] -
19:22
**Detroit** [1] - 45:14
**developing** [1] -
27:23
**difference** [6] - 11:3,
11:4, 25:16, 73:5,
87:25, 100:3
**different** [40] - 4:5,

6:18, 7:7, 8:15, 13:9,
13:10, 14:4, 17:5,
18:3, 21:19, 23:3,
25:13, 28:20, 39:17,
39:25, 48:10, 54:21,
54:23, 55:1, 55:3,
55:4, 55:5, 55:14,
55:15, 55:17, 70:18,
73:8, 73:17, 85:13,
89:12, 90:3, 90:4,
92:24, 95:8, 100:21
**differently** [1] -
100:18
**digital** [27] - 7:11,
9:20, 15:5, 15:7,
15:11, 19:15, 26:17,
27:6, 27:12, 27:19,
27:21, 27:24, 28:6,
31:5, 32:16, 32:19,
38:2, 45:13, 45:19,
45:21, 72:14, 72:16,
72:19, 80:19, 84:23,
85:3, 85:12
**Digital** [1] - 32:13
**direct** [1] - 80:1
**DIRECT** [1] - 102:9
**directly** [3] - 17:21,
20:11, 39:7
**disagree** [2] - 7:17,
87:15
**disagreement** [1] -
84:7
**disagrees** [1] - 7:20
**disc** [2] - 69:15,
70:14
**discovered** [1] - 42:5
**discs** [4] - 58:19,
58:21, 58:24, 69:14
**discuss** [3] - 42:24,
86:15, 89:7
**discussed** [4] -
21:17, 52:7, 87:6,
97:7
**discusses** [1] -
94:11
**discussion** [4] -
67:5, 76:23, 77:13,
98:16
**discussions** [1] -
77:9
**dispute** [14] - 6:9,
8:18, 12:6, 12:16,
19:25, 33:23, 34:21,
42:17, 45:23, 45:24,
55:5, 57:2, 93:9, 98:3
**disputed** [2] - 59:6,
70:11
**disputes** [2] - 7:23,
8:1
**disputing** [3] - 45:18,

54:14, 54:15
**distinction** [2] -
10:10, 37:7
**distinguish** [1] - 15:9
**distract** [2] - 5:6,
24:25
**distracted** [1] - 43:8
**distracting** [1] - 5:8
**distribute** [1] - 7:16
**distributed** [1] - 7:18
**distributing** [9] - 6:6,
6:13, 6:20, 9:18,
13:21, 25:10, 30:15,
30:17, 37:11
**distribution** [3] -
14:15, 38:17, 90:5
**DISTRICT** [2] - 1:1,
1:2
**divided** [1] - 5:19
**divvied** [1] - 74:22
**document** [5] -
30:24, 32:9, 32:18,
44:1
**documents** [3] -
49:14, 50:22, 51:2
**dollar** [4] - 14:18,
15:6, 77:3, 94:5
**dollars** [1] - 14:24,
15:14, 27:23, 28:1,
42:7, 46:3, 70:16,
70:19, 70:23, 75:22
**done** [16] - 31:8,
40:14, 58:20, 60:9,
70:23, 77:1, 77:4,
84:10, 90:21, 92:20,
98:20, 98:22, 98:24,
99:17
**Doris** [1] - 40:15
**dot** [5] - 53:18, 92:11
**dots** [1] - 53:19
**doubt** [2] - 21:3
**down** [15] - 38:1,
47:8, 47:9, 50:9,
50:23, 52:1, 60:13,
60:18, 63:2, 66:18,
67:9, 84:13
**download** [63] -
7:11, 9:24, 10:3,
10:12, 10:13, 11:24,
13:9, 13:18, 14:4,
14:6, 15:18, 17:8,
17:13, 21:21, 22:8,
22:24, 23:16, 27:4,
27:17, 29:7, 29:8,
29:15, 30:3, 32:15,
33:15, 35:24, 35:25,
37:4, 37:5, 37:8,
37:20, 37:22, 38:9,
38:11, 42:4, 42:7,
45:19, 48:3, 48:5,

48:13, 48:14, 54:10,
54:14, 54:18, 57:16,
64:12, 70:1, 71:10,
81:14, 82:12, 85:21,
88:19, 89:11, 89:17,
89:18, 89:24, 93:9,
93:11
**Download** [1] - 37:10
**downloaded** [4] -
27:3, 27:15, 40:1,
89:24
**Downloads** [3] -
13:10, 35:23, 70:2
**downloads** [91] -
5:23, 10:7, 13:12,
13:14, 13:18, 14:1,
15:10, 19:17, 19:24,
20:5, 20:6, 20:14,
21:2, 21:13, 21:16,
22:6, 23:9, 23:11,
23:20, 23:21, 23:22,
25:20, 25:22, 26:4,
28:2, 29:7, 29:8, 31:5,
35:8, 36:5, 38:3,
38:12, 39:21, 42:13,
45:14, 45:22, 47:1,
47:19, 47:20, 47:22,
47:24, 47:25, 49:1,
49:6, 49:7, 49:19,
49:20, 55:8, 55:25,
64:5, 66:7, 66:12,
70:13, 70:17, 70:25,
74:6, 74:10, 75:12,
75:18, 77:12, 77:16,
82:14, 83:20, 83:24,
84:24, 85:3, 85:6,
85:13, 87:4, 87:11,
87:21, 87:25, 88:1,
88:2, 88:3, 90:6, 92:1,
92:5, 92:19, 92:20,
93:10, 94:18, 94:20,
94:21, 94:25, 95:16,
95:19, 96:1, 96:6
**Dr** [6] - 45:15, 79:8,
79:10, 79:13, 80:13,
80:14
**draft** [1] - 29:22,
30:20, 30:21
**drafted** [7] - 7:1,
16:7, 30:23, 30:25,
31:11, 90:11, 90:13
**drafting** [1] - 66:16
**drawing** [1] - 10:11
**Dre** [6] - 45:15, 79:8,
79:10, 79:13, 80:13,
80:14
**due** [1] - 27:2
**during** [13] - 43:7,
47:16, 47:17, 52:4,
52:7, 52:10, 53:16,

53:24, 54:5, 67:5,
96:4
**DVD** [2] - 48:7, 48:9

**E**

**EADES** [1] - 2:14
**ears** [1] - 47:9
**East** [1] - 1:23
**easy** [2] - 8:13, 71:3
**eBay** [2] - 37:19,
37:20
**economic** [3] -
25:16, 40:12, 73:17
**economics** [2] -
13:3, 25:12
**effort** [1] - 74:6
**either** [8] - 10:23,
13:2, 51:13, 62:3,
62:25, 67:1, 68:1,
77:13
**Either** [1] - 83:3
**Elabs** [1] - 26:9
**eliminating** [1] -
77:16
**Elton** [1] - 49:21
**Em2M** [1] - 100:13
**email** [5] - 20:19,
74:17, 74:18, 91:23,
92:9
**emails** [2] - 43:7,
43:11
**embarrass** [1] -
40:17
**embarrassing** [1] -
40:18
**embodied** [1] - 77:22
**Eminem** [83] - 5:17,
5:19, 7:21, 7:24, 8:3,
8:4, 8:18, 10:7, 20:20,
20:25, 33:19, 33:22,
34:19, 36:25, 45:13,
46:7, 46:8, 46:11,
48:15, 48:18, 48:19,
48:20, 49:25, 56:14,
56:18, 56:22, 56:23,
57:4, 57:6, 57:7,
57:11, 57:14, 58:3,
59:4, 60:6, 61:22,
68:5, 68:6, 69:1,
69:15, 73:21, 73:22,
75:19, 77:2, 78:8,
78:9, 78:18, 79:2,
79:3, 79:5, 79:6, 79:8,
79:10, 79:13, 79:17,
79:21, 79:25, 80:17,
80:20, 80:25, 81:2,
81:7, 81:9, 81:10,
81:11, 81:25, 82:12,

82:14, 82:21, 83:25, 84:8, 84:22, 85:17, 85:18, 86:5, 89:20, 91:25, 92:17
**Eminem's** [9] - 19:1, 20:20, 56:15, 74:14, 80:12, 81:1, 81:5, 91:23, 95:20
**Eminem/F.B.T./ Aftermath** [1] - 5:11
**Eminen** [1] - 46:3
**Encore** [3] - 46:21, 46:22, 78:23
**encourage** [1] - 61:13
**end** [12] - 11:23, 37:12, 41:16, 45:5, 48:22, 54:12, 63:12, 63:13, 63:15, 68:22, 90:7, 94:8
**End** [1] - 12:5
**end-all/be-all** [1] - 90:7
**ends** [1] - 71:9
**endured** [1] - 17:24
**engaged** [1] - 74:5
**Entertainment** [1] - 1:13
**entire** [5] - 14:25, 23:8, 26:10, 48:15, 90:7
**entirely** [1] - 23:3
**entitled** [5] - 24:9, 31:22, 42:13, 46:5, 101:17
**envisioned** [1] - 19:23
**escalation** [6] - 21:7, 21:11, 36:6, 83:19, 93:13, 93:17
**Escalation** [1] - 36:6
**escalations** [5] - 21:7, 21:25, 22:3, 22:8, 66:8
**essentially** [2] - 36:20, 37:6
**et** [1] - 1:13
**etc** [2] - 70:19, 83:7
**Ethan** [2] - 12:17, 32:3
**evaluate** [1] - 84:14
**event** [2] - 28:24, 94:6
**evidence** [37] - 3:6, 4:9, 4:10, 4:13, 4:14, 4:16, 4:17, 15:15, 16:3, 16:4, 27:9, 35:9, 35:12, 35:25, 42:17, 43:24, 44:9, 44:12, 49:10, 49:15, 49:16,

49:24, 50:5, 54:8, 60:5, 62:21, 62:25, 63:4, 70:12, 74:7, 74:9, 78:12, 82:13, 82:17, 85:1, 98:3, 99:4
**exact** [5] - 11:4, 16:19, 24:16, 87:7, 89:25
**exactly** [14] - 10:15, 12:14, 12:16, 17:10, 34:6, 39:8, 40:4, 63:19, 63:22, 66:25, 74:15, 92:16, 97:5, 99:2
**examination** [1] - 68:23
**example** [8] - 9:15, 33:16, 48:2, 48:24, 57:3, 57:10, 61:1, 66:9
**examples** [1] - 32:12
**exchange** [2] - 74:17, 80:4
**excited** [2] - 80:12, 80:15
**exclusive** [4] - 79:18, 79:21, 80:2, 80:3
**exclusivity** [2] - 79:22, 79:24
**Excuse** [1] - 55:16
**executives** [1] - 31:1
**Exhibit** [6] - 27:10, 61:14, 71:12, 71:25
**exhibits** [1] - 38:7
**EXHIBITS** [2] - 102:16, 102:20
**Exhibits** [2] - 38:8, 71:12
**existed** [1] - 87:18
**existing** [1] - 25:21
**expert** [12] - 14:16, 39:1, 40:9, 40:10, 40:11, 40:12, 62:5, 64:23, 92:23, 93:4, 94:24
**explain** [4] - 21:7, 39:14, 65:21, 98:9
**explained** [4] - 19:13, 19:18, 84:6
**explanation** [2] - 95:13, 100:7
**exploitation** [1] - 31:6
**exploited** [1] - 5:18
**exploiting** [1] - 6:18
**express** [3] - 16:11, 43:1, 86:16
**expressed** [1] - 19:19

**expression** [1] - 66:11
**expressly** [1] - 97:15
**extension** [1] - 99:2
**eye** [1] - 55:21
**eyes** [5] - 22:10, 30:13, 39:10, 41:23, 47:8

## F

**F.B.T** [73] - 1:7, 5:17, 5:19, 7:21, 7:24, 10:7, 20:25, 33:18, 33:22, 34:6, 34:9, 34:16, 34:19, 35:5, 36:8, 36:10, 36:12, 36:25, 41:10, 42:5, 42:6, 42:13, 42:15, 45:8, 45:15, 46:1, 46:2, 46:5, 46:6, 46:8, 46:10, 46:14, 46:22, 47:2, 47:4, 47:15, 48:25, 49:10, 49:24, 50:2, 53:1, 53:3, 57:2, 59:6, 59:12, 60:9, 61:23, 75:17, 75:22, 76:6, 76:13, 78:13, 78:14, 79:15, 79:19, 79:22, 79:24, 80:1, 80:25, 81:5, 81:10, 81:11, 81:25, 82:2, 85:3, 85:5, 86:4, 91:10, 91:24, 92:3, 100:12
**F.B.T.** [1] - 78:10
**F.B.T.'s** [7] - 52:10, 54:4, 60:14, 63:1, 65:10, 65:11, 81:6
**fabricating** [1] - 38:16
**fact** [25] - 6:7, 6:11, 7:2, 7:11, 8:18, 11:22, 14:13, 22:6, 24:1, 25:18, 33:3, 47:20, 57:2, 65:18, 66:1, 66:2, 70:10, 72:8, 74:9, 85:12, 88:1, 88:12, 92:15, 93:18, 98:19
**factor** [1] - 76:20
**factors** [2] - 62:23, 89:9
**facts** [28] - 45:3, 45:5, 45:10, 45:13, 47:3, 47:5, 47:12, 48:1, 48:18, 48:22, 50:25, 51:7, 51:9, 51:11, 51:12, 51:14, 51:15, 58:16, 63:4,

69:18, 70:6, 70:7, 86:1, 87:24
**Facts** [1] - 51:21
**failed** [6] - 13:14, 13:16, 28:2, 28:3
**fair** [1] - 53:4
**fairly** [1] - 57:24
**fall** [2] - 11:8, 13:22
**falls** [5] - 6:1, 6:8, 8:8, 8:20, 26:21
**false** [2] - 34:10, 34:14
**False** [1] - 34:17
**far** [4] - 7:9, 21:15, 29:5, 58:17
**fast** [1] - 52:10
**favor** [2] - 42:14, 86:8
**FCRR** [1] - 1:22
**Federal** [1] - 1:23
**fee** [2] - 27:18, 30:4, 30:5, 39:25, 48:6, 71:19
**few** [6] - 52:9, 53:23, 69:9, 78:20, 84:11
**fictions** [1] - 74:4
**Field** [1] - 80:10
**fight** [1] - 13:20
**figure** [4] - 21:13, 63:23, 77:25, 81:12
**file** [7] - 9:20, 10:2, 11:5, 15:5, 15:7, 19:16, 26:17, 27:6, 27:12, 27:14, 27:19, 27:21, 27:24, 29:13, 72:14, 72:16, 72:20
**files** [4] - 11:7, 15:11, 28:6, 38:2
**final** [1] - 94:15
**finally** [6] - 24:3, 42:24, 43:1, 83:23, 86:14, 86:17
**findings** [2] - 40:23, 41:8
**fine** [2] - 3:25, 29:15
**Fine** [1] - 44:14
**firm** [1] - 39:3
**First** [2] - 58:7, 82:17
**first** [33] - 3:9, 4:21, 5:4, 16:9, 21:9, 21:10, 23:25, 24:1, 24:2, 24:7, 31:19, 34:20, 45:12, 46:16, 46:17, 46:19, 52:12, 54:10, 75:10, 76:11, 76:13, 78:19, 79:3, 79:11, 81:14, 84:12, 87:1, 92:5, 96:11, 98:20, 100:12
**five** [4] - 57:8, 66:13,

83:14, 86:12
**fixing** [1] - 3:17
**flat** [2] - 71:19
**FLOOR** [1] - 2:17
**flopped** [1] - 79:4
**focus** [3] - 35:5, 53:21, 66:22
**focused** [1] - 53:7
**follow** [1] - 96:24
**followed** [1] - 20:19
**following** [3] - 78:6, 84:14, 86:1
**follows** [1] - 67:8
**fooled** [1] - 53:22
**FOR** [3] - 2:3, 2:12, 102:8
**foregoing** [16] - 6:22, 6:24, 7:13, 8:21, 10:15, 12:6, 17:17, 29:11, 42:13, 67:5, 67:11, 67:14, 67:19, 68:4, 68:9, 101:16
**forever** [1] - 48:4
**forget** [1] - 77:17
**form** [18] - 7:1, 21:20, 21:23, 26:2, 30:23, 31:5, 31:14, 31:21, 42:25, 58:24, 76:19, 77:9, 86:16, 93:14, 99:10, 100:2, 101:7
**format** [8] - 34:8, 34:11, 55:11, 70:18, 82:12, 101:17
**former** [1] - 4:7
**forms** [6] - 32:23, 32:24, 33:1, 33:4, 95:15, 99:9
**formula** [1] - 72:5
**forward** [1] - 50:18
**four** [1] - 32:21
**fourth** [1] - 78:23
**free** [2] - 32:7, 73:15
**friends** [1] - 87:5
**front** [4] - 32:16, 53:3, 97:14, 97:15
**full** [2] - 3:10, 22:3
**fully** [2] - 20:20, 28:15

## G

**game** [4] - 29:19, 29:20, 56:20, 77:18
**Game** [1] - 53:8
**games** [2] - 51:8, 83:7
**Gary** [7] - 19:1, 19:2, 40:6, 75:5, 87:5, 92:8

**general** [3] - 99:8, 99:24, 101:6
**generated** [1] - 6:21
**gentlemen** [4] - 4:3, 42:22, 56:3, 86:11
**given** [2] - 73:16, 82:19
**GLENN** [1] - 2:13
**Gospel** [1] - 82:8
**governs** [1] - 3:16
**Grammy** [1] - 36:18
**GRAND** [1] - 2:16
**grant** [4] - 33:10, 33:11, 37:12, 37:13
**granted** [1] - 37:15
**granting** [2] - 28:12, 44:12
**grants** [3] - 36:22, 43:21, 61:2
**gratis** [1] - 32:6
**great** [2] - 39:12, 85:3
**greater** [1] - 72:10
**greatly** [1] - 50:15
**grilling** [1] - 8:25
**groomed** [1] - 79:2
**grooming** [2] - 79:3, 79:5
**guess** [1] - 77:15
**guide** [1] - 32:14
**GUILFORD** [2] - 2:5, 100:3
**Gustav** [2] - 12:17, 32:3
**GUTIERREZ** [1] - 1:4
**guy** [1] - 79:16

## H

**hah** [2] - 53:23, 63:3
**half** [9] - 14:23, 15:6, 23:5, 42:9, 75:10, 75:13, 75:17, 77:3, 96:9
**hand** [9] - 9:13, 15:4, 23:11, 38:14, 41:1, 52:13, 78:4, 96:20
**hand-in-hand** [1] - 78:4
**hands** [1] - 52:1
**hard** [4] - 36:14, 50:17, 56:10, 86:3
**Harleston** [19] - 7:4, 7:7, 14:16, 15:22, 16:11, 20:12, 25:2, 25:3, 27:1, 39:1, 70:15, 84:6, 92:18, 92:21, 93:5, 94:22, 96:3, 98:13

**hatched** [1] - 96:5, 98:4, 98:10
**head** [4] - 22:12, 26:9, 93:6
**hear** [9] - 18:25, 40:12, 42:23, 45:12, 51:16, 72:11, 86:13, 88:13
**heard** [43] - 6:10, 6:23, 8:24, 9:15, 9:23, 9:25, 10:17, 11:4, 12:12, 12:17, 13:13, 13:15, 14:10, 19:1, 20:2, 25:7, 28:8, 32:2, 38:6, 40:6, 42:6, 45:22, 46:16, 46:20, 50:10, 51:13, 55:19, 56:25, 58:18, 63:17, 69:11, 70:5, 70:15, 80:9, 80:10, 80:11, 80:12, 80:15, 80:20, 97:2, 97:25
**held** [1] - 101:17
**help** [1] - 79:9
**hereby** [1] - 101:16
**hereunder** [1] - 26:4
**herring** [3] - 22:9, 24:25, 93:17
**hid** [1] - 74:14
**hidden** [1] - 75:7
**hide** [2] - 74:6, 75:3
**hiding** [1] - 76:4
**higher** [3] - 4:15, 16:1, 21:10
**highlighted** [1] - 75:18
**highly** [1] - 4:14
**himself** [1] - 55:22
**Hip** [1] - 8:2
**hip** [1] - 80:14
**hire** [1] - 28:19
**hires** [1] - 58:20
**hit** [1] - 46:19
**Hits** [1] - 8:2
**Hoffman** [31] - 19:19, 20:3, 21:5, 21:6, 21:12, 21:24, 22:4, 22:6, 30:18, 30:19, 31:3, 31:4, 31:9, 31:13, 57:22, 74:17, 74:25, 75:5, 76:17, 76:22, 76:24, 77:10, 87:2, 87:5, 87:21, 95:20, 95:22, 96:3, 98:13, 98:24
**Hold** [1] - 24:13
**home** [1] - 54:16
**honor** [3] - 5:5, 36:20, 96:14
**Honor** [23] - 3:11,

3:12, 4:19, 34:1, 43:16, 44:4, 44:5, 44:16, 44:19, 44:25, 45:2, 97:2, 97:5, 97:11, 97:14, 97:16, 98:2, 98:6, 98:11, 98:13, 100:2, 100:11, 101:9
**HONORABLE** [1] - 1:4
**honored** [1] - 36:16
**hook** [1] - 95:12
**Hop** [1] - 8:2
**hop** [1] - 80:14
**hope** [2] - 23:5, 40:18
**hoped** [1] - 4:24
**hoping** [1] - 97:2
**hour** [1] - 97:12
**hours** [4] - 8:25, 17:25, 74:24, 74:25
**Hu** [1] - 33:18
**huge** [1] - 38:18
**hundred** [3] - 15:19, 19:17, 27:5

## I

**idea** [2] - 18:16, 39:12
**identical** [3] - 38:11, 47:17
**ignore** [7] - 47:2, 47:3, 47:4, 65:12, 65:14, 65:15, 70:11
**ignored** [2] - 70:11, 87:24
**illustrate** [1] - 7:17
**imagine** [2] - 23:22, 56:10
**implication** [1] - 98:7
**important** [11] - 15:17, 17:20, 22:13, 22:15, 22:22, 31:4, 43:8, 47:14, 50:24, 79:22, 95:7
**importantly** [2] - 32:21, 51:3
**improper** [1] - 44:2
**improve** [1] - 87:19
**inappropriate** [1] - 97:7
**incentive** [1] - 33:5
**include** [7] - 19:24, 21:12, 22:1, 25:22, 33:13, 87:21, 95:16
**includes** [1] - 101:7
**including** [1] - 11:17
**income** [3] - 5:16,

5:18, 6:17
**inconsistency** [1] - 93:23
**inconvenience** [1] - 5:2
**increase** [1] - 98:22
**increased** [1] - 27:2
**increasing** [1] - 98:25
**incur** [2] - 70:12, 70:23
**incurred** [2] - 27:18, 70:16
**indicated** [1] - 3:16
**indicia** [5] - 62:7, 62:10, 69:9, 72:14
**indirectly** [1] - 81:3
**individual** [4] - 22:5, 22:8, 27:20, 57:9
**industry** [13] - 39:3, 49:2, 49:3, 62:22, 62:23, 64:23, 77:24, 84:3, 84:4, 91:18, 92:22, 92:25
**inferior** [1] - 87:18
**Infinite** [1] - 79:4
**information** [2] - 11:6, 27:12
**initial** [1] - 97:12
**inquiry** [3] - 10:24, 98:11
**insert** [2] - 3:9, 38:16
**instead** [4] - 34:24, 40:21, 48:8, 55:24
**instruct** [1] - 95:14
**instructed** [4] - 19:20, 25:20, 25:23, 64:7
**instruction** [7] - 3:16, 4:4, 43:19, 44:4, 44:15, 97:16, 99:7
**Instruction** [5] - 3:8, 3:9, 3:15, 3:24, 4:6
**instructions** [7] - 42:1, 42:2, 63:17, 63:19, 63:20, 66:24, 83:25
**insulting** [3] - 36:9, 36:16, 36:17
**intellectual** [1] - 37:14
**intend** [1] - 60:7
**intended** [9] - 21:17, 45:20, 54:25, 57:25, 59:9, 61:11, 62:1, 65:17, 65:19
**intent** [1] - 16:11
**intention** [1] - 22:1
**interest** [2] - 37:21, 37:24

**Internet** [3] - 34:24, 78:1, 82:6
**interrogatory** [1] - 27:8
**Interrogatory** [1] - 27:9
**interrupt** [1] - 50:9
**Interscope** [20] - 6:12, 13:1, 18:5, 18:10, 22:18, 45:17, 46:4, 74:3, 76:19, 77:9, 79:8, 79:13, 80:8, 80:10, 80:16, 80:23, 100:4, 100:20, 100:25, 101:5
**Interscope's** [1] - 21:20
**Interscope/ Aftermath** [1] - 90:20
**invented** [2] - 25:19, 31:24
**inventory** [3] - 14:14, 14:24, 38:18
**involved** [3] - 16:9, 79:16, 81:3
**involvement** [1] - 78:21
**Iovine** [3] - 45:16, 80:8, 80:16
**iPod** [1] - 40:1
**iPods** [1] - 76:8
**irrelevant** [16] - 13:23, 35:1, 36:9, 56:1, 56:6, 58:15, 64:21, 67:2, 70:9, 88:4, 88:5, 88:6, 88:24, 89:1, 90:18
**Irrelevant** [4] - 35:21, 35:22, 35:23, 36:6
**isolated** [2] - 63:21, 84:1
**issue** [23] - 5:8, 13:23, 16:1, 19:25, 22:24, 22:25, 25:1, 42:10, 43:14, 54:17, 57:6, 57:18, 58:13, 60:1, 65:6, 82:10, 90:7, 93:12, 93:13, 93:18, 96:12, 96:13
**items** [1] - 15:1
**itself** [4] - 56:15, 57:4, 57:18, 68:16
**iTunes** [36] - 7:6, 9:22, 10:11, 10:13, 10:16, 10:20, 11:1, 11:3, 11:6, 11:7, 11:19, 11:22, 15:5, 15:7, 18:11, 22:19, 23:17, 38:4, 45:20, 55:22, 55:23, 56:2,

56:8, 56:9, 56:11, 64:19, 65:4, 72:17, 76:7, 76:8, 82:6, 84:17, 84:24, 85:21, 94:25

**J**

**Jackson** [2] - 96:21, 96:22
**Jam** [2] - 8:5, 8:6
**Jeff** [6] - 4:25, 7:3, 7:4, 7:7, 62:1, 78:13
**Jeffrey** [3] - 39:1, 94:22, 96:3
**Jimmy** [1] - 45:16
**job** [4] - 5:9, 14:25, 39:3, 78:16
**Joel** [3] - 4:25, 62:2, 79:15
**John** [1] - 49:21
**join** [1] - 50:14
**judge** [4] - 19:20, 40:22, 50:10, 63:16
**JUDGE** [1] - 1:4
**Judge** [3] - 63:18, 64:7, 84:1
**Judge's** [1] - 63:18
**judge's** [1] - 66:24
**Judicial** [1] - 101:18
**jurors** [5] - 3:14, 3:22, 43:8, 44:21, 96:24
**Jury** [10] - 3:4, 3:23, 4:2, 4:6, 43:3, 43:13, 44:22, 86:18, 86:20, 97:1
**jury** [17] - 4:4, 37:3, 38:7, 42:1, 43:20, 50:12, 54:8, 61:13, 63:18, 94:16, 97:13, 97:14, 97:15, 100:17, 101:3
**justify** [1] - 23:4

**K**

**keep** [8] - 30:11, 30:12, 46:24, 48:3, 48:5, 48:8, 50:17
**keeping** [1] - 15:25
**keeps** [1] - 93:19
**KELLY** [2] - 2:15
**Kenswil** [16] - 10:17, 13:15, 15:12, 26:8, 26:14, 26:25, 27:16, 28:5, 29:4, 29:12, 30:2, 30:14, 44:10, 88:19

**Kenswil's** [1] - 59:17
**kept** [4] - 24:3, 57:4, 59:19, 64:10
**kind** [9] - 40:25, 51:11, 54:14, 60:19, 61:3, 69:22, 72:21, 93:22, 101:5
**KING** [1] - 2:3
**Klaus** [1] - 43:15
**KLAUS** [3] - 2:15, 43:16, 44:16
**knowing** [1] - 95:2
**knowledge** [2] - 70:22, 92:24
**knows** [3] - 55:23, 64:24

**L**

**label** [7] - 8:6, 8:10, 8:12, 14:13, 45:16, 91:20, 92:22
**Ladies** [4] - 4:3, 42:22, 56:3, 86:11
**language** [20] - 5:5, 10:14, 19:8, 19:23, 22:13, 22:23, 31:14, 31:15, 31:17, 33:2, 42:11, 67:4, 87:3, 88:6, 88:9, 90:11, 91:14, 95:16, 95:21
**largest** [2] - 56:9, 97:10
**Last** [1] - 3:22
**last** [7] - 14:15, 20:22, 41:25, 45:23, 84:13, 94:14, 97:4
**latter** [1] - 42:9
**law** [6] - 39:2, 51:10, 63:15, 63:16, 63:17, 96:13
**laws** [1] - 59:25
**lawsuit** [3] - 80:23, 81:2, 96:11
**lawyer** [11] - 16:6, 19:4, 22:12, 41:3, 41:4, 74:14, 88:13, 93:4, 93:6, 95:14, 95:20
**lawyers** [6] - 31:1, 34:5, 63:1, 63:5, 95:15, 97:6
**learn** [1] - 45:12
**learned** [5] - 45:13, 45:14, 45:15, 45:16, 45:18
**least** [2] - 81:3, 99:13
**leave** [2] - 48:22, 101:8

**leaves** [1] - 79:1
**leaving** [2] - 53:19, 53:20
**left** [6] - 21:19, 34:2, 44:18, 47:13, 47:14, 52:16
**legal** [1] - 11:16
**legitimate** [1] - 77:25
**legs** [2] - 47:9, 86:13
**LeMOINE** [4] - 2:14, 3:11, 3:19, 100:11
**length** [1] - 89:7
**less** [3] - 7:24, 42:7, 69:25
**letting** [1] - 48:20, 84:25
**liable** [4] - 100:20, 100:25
**License** [1] - 60:17
**license** [138] - 6:19, 7:16, 8:8, 8:9, 8:11, 8:12, 8:17, 8:19, 8:20, 9:9, 9:13, 10:8, 10:15, 10:22, 11:20, 11:21, 12:21, 13:19, 15:4, 16:12, 16:21, 17:8, 18:14, 18:19, 19:7, 19:10, 23:15, 23:23, 24:5, 24:23, 25:8, 26:22, 28:13, 28:19, 29:11, 30:5, 30:10, 32:4, 32:7, 32:9, 33:3, 33:10, 33:11, 33:12, 33:17, 34:10, 34:18, 35:1, 35:10, 35:11, 36:24, 37:16, 38:13, 38:16, 38:24, 38:25, 39:12, 39:13, 39:17, 39:19, 39:21, 39:24, 39:25, 40:3, 43:23, 44:10, 44:13, 49:18, 58:8, 58:10, 58:11, 58:12, 58:24, 58:25, 59:8, 59:14, 59:16, 59:18, 59:20, 59:24, 59:25, 60:1, 60:10, 60:19, 60:23, 61:5, 61:7, 61:9, 61:15, 62:8, 62:13, 62:19, 62:24, 63:3, 63:6, 63:9, 63:10, 63:11, 66:12, 66:14, 69:9, 71:17, 71:23, 72:10, 72:15, 72:18, 72:21, 73:9, 83:16, 83:21, 89:3, 89:4, 89:6, 89:10, 89:23, 90:1, 90:5, 90:22, 91:4, 91:5, 94:1, 94:19, 94:24, 95:1, 95:3,

95:11
**licensed** [94] - 8:21, 9:7, 9:10, 10:5, 12:3, 12:5, 12:25, 14:5, 14:7, 17:6, 17:14, 19:6, 22:16, 35:6, 35:17, 36:2, 42:12, 45:21, 47:24, 50:4, 55:2, 56:1, 56:13, 56:16, 56:17, 57:3, 57:12, 57:21, 57:24, 58:9, 59:1, 59:13, 59:21, 59:23, 60:2, 60:3, 60:11, 60:20, 62:9, 62:24, 63:12, 63:14, 64:1, 68:7, 69:7, 71:18, 72:4, 72:22, 73:2, 73:3, 73:7, 73:9, 73:20, 73:21, 73:22, 82:11, 82:18, 82:20, 82:22, 82:24, 82:25, 83:9, 83:24, 84:3, 84:8, 84:20, 88:17, 88:18, 89:21, 90:8, 90:10, 90:16, 90:25, 91:3, 91:6, 91:15, 93:23, 93:24, 94:9, 94:11, 94:17, 94:22, 95:12, 95:17, 95:18, 95:23, 95:25, 96:7
**licensee** [5] - 28:11, 34:11, 34:18, 35:1, 90:20
**Licensees** [2] - 34:12, 88:24
**licensees** [10] - 8:22, 12:25, 18:22, 24:20, 32:13, 32:16, 32:19, 32:20, 89:5, 90:18
**licenses** [23] - 7:5, 7:15, 9:24, 10:25, 12:1, 12:13, 17:11, 18:10, 19:10, 23:4, 26:3, 26:10, 30:11, 30:15, 36:22, 38:10, 43:21, 66:12, 76:14, 92:1, 94:21, 95:11, 96:1
**licensing** [42] - 7:9, 9:7, 13:24, 14:7, 18:13, 18:20, 18:23, 19:23, 20:5, 20:14, 20:18, 22:18, 22:19, 23:18, 24:1, 24:23, 25:4, 25:5, 25:8, 25:14, 25:25, 26:6, 26:19, 29:9, 29:10, 29:16, 30:20, 31:7,

31:17, 31:25, 33:7, 33:13, 34:12, 42:14, 44:12, 87:4, 89:4, 89:16, 90:22, 92:1, 98:17, 98:21
**lie** [1] - 25:7
**lies** [1] - 11:2
**life** [1] - 50:13
**limitation** [1] - 35:18
**limitations** [1] - 42:2
**limited** [4] - 48:5, 48:10, 81:19, 81:23
**line** [2] - 66:21, 83:15
**lines** [1] - 28:15
**lion's** [1] - 6:2
**list** [18] - 7:22, 48:4, 48:17, 60:12, 60:14, 60:15, 60:16, 60:22, 61:9, 62:23, 63:1, 72:23, 85:16, 89:7, 89:8
**list-making** [2] - 89:8
**listen** [6] - 37:20, 50:8, 50:14, 50:21, 91:13, 99:18
**Listen** [1] - 84:5
**listened** [2] - 53:25, 98:1
**listening** [1] - 53:22
**lists** [5] - 48:21, 60:11, 60:12, 75:19, 85:14
**live** [1] - 76:7
**lives** [2] - 50:8, 50:9
**LLC** [2] - 1:7, 100:13
**LLP** [1] - 2:12
**loaf** [2] - 23:6, 96:10
**locations** [1] - 81:21
**locked** [1] - 79:21
**logic** [4] - 14:9, 14:10, 19:13, 25:16
**look** [39] - 8:2, 22:23, 29:24, 32:5, 38:7, 41:7, 47:10, 47:15, 49:4, 49:8, 51:20, 53:1, 53:10, 53:11, 54:6, 55:21, 57:23, 58:14, 58:17, 60:15, 61:10, 61:12, 61:15, 61:23, 61:24, 63:22, 64:1, 64:2, 64:6, 64:8, 69:20, 71:11, 71:25, 76:23, 78:11, 78:21, 84:6, 88:9, 100:6
**Look** [8] - 53:12, 57:25, 59:10, 71:24, 72:23, 77:19, 83:22, 84:2
**looking** [2] - 61:19, 72:23

**LOS** [1] - 2:18
**Los** [4] - 1:20, 1:24, 3:1, 19:5
**lose** [2] - 53:8, 94:23
**loudly** [1] - 51:12
**love** [1] - 75:5
**lower** [1] - 24:11
**lowering** [1] - 77:11
**LP** [2] - 7:18, 46:17

**M**

**Madonna** [1] - 91:9
**mail** [1] - 73:10
**main** [1] - 17:21
**major** [1] - 11:17
**man** [1] - 40:13
**manager** [1] - 74:20
**manner** [1] - 51:14
**manufacture** [33] - 7:15, 8:23, 10:17, 10:22, 12:21, 13:1, 13:25, 15:25, 16:13, 16:21, 17:12, 28:19, 28:22, 29:13, 29:14, 33:14, 36:24, 58:21, 59:14, 69:14, 69:22, 69:24, 70:1, 83:1, 83:2, 83:4, 85:10, 88:18, 90:9, 91:4, 91:5, 93:24
**manufactured** [1] - 7:18
**manufacturer** [11] - 28:21, 28:22, 28:24, 28:25, 29:5, 58:22, 58:23, 59:2, 93:25, 94:3
**manufacturer's** [1] - 94:1
**manufactures** [6] - 11:7, 12:15, 58:19, 69:17, 85:7, 85:8
**manufacturing** [33] - 6:6, 6:13, 6:20, 9:18, 10:19, 12:4, 13:21, 14:6, 14:14, 14:18, 14:22, 15:12, 19:17, 25:9, 27:14, 28:17, 29:1, 29:6, 30:15, 30:17, 37:11, 38:15, 69:11, 69:19, 70:4, 70:7, 70:9, 70:13, 85:10, 90:6, 93:19, 93:20
**MARC** [1] - 2:5
**March** [2] - 1:21, 3:1
**marginal** [1] - 27:2
**Mark** [3] - 4:25, 62:2,

78:24
**MARKED** [2] - 102:16, 102:20
**Marshall** [1] - 7:18
**Marshall's** [1] - 87:19
**Mart** [7] - 7:9, 7:10, 7:11, 39:17, 39:18, 39:20, 82:5
**Martin** [10] - 4:25, 54:15, 62:2, 68:20, 68:23, 69:21, 75:24, 79:15, 80:24
**Martin's** [1] - 75:8
**Master** [1] - 36:2
**master** [52] - 5:17, 5:18, 7:15, 8:21, 9:7, 9:25, 10:1, 10:5, 10:9, 10:18, 10:21, 11:5, 12:3, 12:5, 12:13, 12:21, 12:25, 13:24, 15:4, 16:21, 17:6, 17:12, 17:13, 18:10, 19:6, 23:15, 23:18, 24:23, 26:6, 26:19, 29:9, 29:10, 29:11, 29:12, 29:13, 29:16, 30:20, 31:7, 33:11, 35:6, 36:23, 42:14, 43:22, 58:11, 58:23, 88:18, 89:17, 90:8, 90:10, 91:5, 95:17
**master's** [1] - 16:12
**masters** [81] - 10:15, 13:19, 14:5, 17:8, 22:16, 22:19, 33:13, 35:16, 42:12, 45:21, 47:24, 49:18, 50:4, 55:2, 56:1, 56:13, 56:16, 56:17, 57:3, 57:11, 57:12, 57:21, 57:23, 58:9, 58:22, 59:1, 59:8, 59:13, 59:21, 59:23, 60:3, 60:10, 60:20, 61:11, 61:17, 61:19, 62:8, 62:24, 63:12, 63:14, 64:1, 69:7, 71:18, 72:21, 73:2, 73:3, 73:7, 73:9, 73:20, 73:21, 73:23, 82:11, 82:18, 82:20, 82:22, 82:23, 82:25, 83:9, 83:24, 84:8, 84:20, 88:16, 89:21, 90:15, 90:25, 91:3, 91:6, 91:9, 93:23, 93:24, 94:9, 94:10, 94:17, 94:21, 95:1, 95:12, 95:18, 95:23, 95:25,

96:7
**Masters** [1] - 84:3
**mastertone** [3] - 12:11, 12:15, 12:22
**mastertones** [8] - 22:6, 33:1, 33:4, 33:12, 33:14, 39:15, 94:18, 95:2
**Mathers** [4] - 7:18, 79:19, 80:20, 81:3
**Mathers'** [1] - 74:20
**matter** [40] - 4:23, 9:2, 9:3, 10:4, 10:14, 10:21, 11:18, 11:24, 12:2, 13:2, 18:9, 25:15, 34:13, 41:22, 44:3, 46:13, 46:14, 46:22, 48:2, 48:18, 53:13, 53:14, 56:6, 64:11, 67:1, 67:8, 69:13, 69:17, 70:4, 70:8, 72:5, 83:19, 85:10, 85:11, 86:3, 93:20, 96:13, 100:24, 101:17
**Matter** [3] - 13:13, 13:14
**mattered** [2] - 5:10, 70:7
**matters** [12] - 9:12, 9:14, 11:21, 25:15, 36:10, 63:9, 63:10, 65:1, 65:2, 65:6, 67:8, 69:12
**mealymouthed** [1] - 20:10
**mean** [19] - 24:13, 31:2, 39:19, 54:24, 59:8, 59:24, 60:3, 61:11, 64:24, 66:17, 66:18, 67:7, 72:3, 72:10, 84:4, 84:5, 90:24, 90:25
**meaning** [2] - 16:16, 35:13
**means** [24] - 4:9, 4:13, 6:24, 7:13, 7:14, 12:6, 16:14, 16:15, 17:1, 17:5, 17:7, 17:10, 17:18, 44:1, 54:20, 54:23, 55:10, 63:24, 65:22, 84:3, 85:23, 90:12, 90:23
**meant** [18] - 16:24, 16:25, 17:1, 19:22, 24:25, 39:14, 39:16, 39:17, 58:12, 59:21, 60:11, 61:17, 62:1, 62:5, 66:11, 66:14, 79:23, 79:25

**mechanical** [1] - 41:20
**medium** [2] - 64:4, 83:11
**meeting** [2] - 96:2, 96:4
**meetings** [1] - 99:1
**Megastores** [1] - 82:5
**MELINDA** [1] - 2:14
**member** [1] - 73:18
**memo** [9] - 25:17, 31:10, 31:12, 76:19, 77:11, 97:20, 98:1, 98:3, 98:19
**memorandum** [1] - 77:22
**mention** [3] - 85:12, 88:12, 97:8
**mentioned** [9] - 17:17, 60:22, 69:10, 72:25, 76:16, 77:10, 87:25, 90:14
**mentions** [1] - 97:9
**mess** [1] - 30:13
**messages** [2] - 43:7, 43:11
**met** [7] - 26:8, 45:16, 74:18, 78:13, 78:24, 79:15, 80:8
**metadata** [6] - 10:2, 10:18, 27:12, 29:13, 32:14, 32:19
**method** [6] - 64:5, 66:10, 66:11, 66:12, 83:20, 83:21
**Method** [1] - 83:15
**Michael** [3] - 25:17, 93:1, 96:4
**Microsoft** [1] - 70:18
**might** [5] - 21:8, 27:25, 41:13, 60:21, 99:17
**million** [18] - 14:23, 14:24, 15:6, 15:19, 19:17, 21:9, 21:10, 21:13, 27:5, 27:15, 41:15, 41:16, 46:1, 77:3, 86:4
**millions** [12] - 15:14, 27:22, 27:23, 27:25, 46:3, 70:16, 70:19, 70:23, 75:22, 86:5
**mind** [4] - 6:15, 40:21, 84:15, 89:4
**minute** [2] - 19:14, 86:12
**minutes** [10] - 34:1, 34:2, 42:23, 43:2, 44:17, 84:11, 86:17,

86:24, 86:25, 97:12
**misleading** [2] - 92:12, 92:13
**misled** [1] - 24:18
**misrepresentation** [1] - 14:3
**mobile** [1] - 37:5
**Mobile** [6] - 12:10, 12:12, 12:14, 12:18, 32:4
**Model** [1] - 3:8
**modern** [1] - 76:7
**modes** [1] - 6:18
**mom** [1] - 82:3
**mom-and-pop** [1] - 82:3
**moment** [7] - 9:22, 10:4, 13:4, 20:2, 22:11, 22:21, 87:23
**money** [18] - 15:19, 15:25, 23:20, 24:14, 27:4, 30:3, 33:23, 36:10, 36:12, 36:13, 36:15, 36:19, 76:12, 76:15, 77:2, 81:2, 84:20, 93:11
**months** [5] - 30:7, 30:8, 75:23, 75:25
**morning** [4] - 4:21, 39:15
**most** [5] - 46:20, 51:23, 57:1, 79:13, 84:17
**Most** [1] - 61:25
**motion** [1] - 100:22
**motivated** [1] - 24:2
**mouth** [1] - 47:9
**movie** [2] - 56:19, 69:8
**Movies** [1] - 83:7
**moving** [1] - 50:18
**MR** [28] - 3:12, 3:20, 3:25, 4:19, 4:21, 34:4, 43:16, 44:5, 44:7, 44:16, 44:19, 44:25, 45:2, 86:22, 86:24, 97:2, 97:4, 97:22, 97:24, 98:2, 98:9, 98:13, 99:16, 100:2, 100:3, 100:16, 100:23, 101:9
**MS** [3] - 3:11, 3:19, 100:11
**multiple** [1] - 99:10
**MUNGER** [1] - 2:12
**Music** [1] - 13:15
**music** [9] - 39:12, 56:17, 77:24, 78:17, 82:8, 84:4, 84:18, 84:25

**must** [10] - 4:10, 4:13, 58:9, 59:21, 60:10, 60:23, 63:6, 65:17, 65:19, 72:21

**N**

**Name** [1] - 8:17
**name** [2] - 88:14, 96:19
**narrowly** [2] - 30:22, 57:21
**NASHVILLE** [1] - 2:8
**nature** [2] - 26:14, 33:6
**near** [1] - 68:22
**nearly** [1] - 23:20
**necessary** [1] - 70:17
**need** [6] - 4:4, 8:12, 10:24, 71:4, 71:13, 100:7
**needed** [1] - 31:22
**negotiate** [1] - 33:2
**negotiated** [4] - 19:2, 19:3, 62:16, 62:20
**negotiates** [1] - 26:10
**negotiation** [2] - 21:5, 76:20
**negotiations** [2] - 76:16, 77:14
**net** [10] - 21:21, 37:1, 49:20, 49:23, 50:3, 59:22, 69:3, 73:5, 75:2, 85:2
**Netflix** [1] - 48:9
**Never** [4] - 44:8, 44:9, 73:24, 84:7
**never** [22] - 33:22, 51:25, 54:22, 55:12, 55:16, 59:12, 62:12, 70:7, 73:22, 73:24, 76:6, 76:9, 82:2, 82:18, 84:7, 87:2, 87:5, 87:25, 91:15
**New** [1] - 31:11
**new** [15] - 22:25, 23:8, 31:10, 31:14, 31:16, 52:2, 52:9, 64:4, 77:1, 77:5, 80:14, 83:11, 95:16, 95:21, 96:6
**next** [14] - 6:24, 17:18, 17:20, 18:24, 22:15, 31:3, 39:12, 46:3, 76:18, 79:9, 79:11, 86:6, 97:12, 99:23

**Nextel** [2] - 32:25, 33:10
**Nichols** [1] - 75:15
**night** [2] - 73:6, 88:22
**nine** [1] - 75:25
**Ninth** [1] - 3:8
**none** [4] - 23:6, 45:9, 78:23, 96:10
**None** [1] - 77:8
**nonsense** [8] - 18:18, 24:15, 24:24, 27:22, 27:25, 51:8, 94:2
**Nonsense** [1] - 28:21
**noon** [1] - 44:8
**Normal** [2] - 35:22, 64:13
**normal** [79] - 5:7, 8:25, 9:5, 11:13, 11:19, 17:25, 18:3, 18:4, 18:9, 18:12, 18:13, 18:17, 18:20, 18:22, 24:19, 24:21, 24:22, 24:24, 34:12, 34:16, 34:18, 34:25, 35:2, 45:19, 46:10, 51:16, 51:21, 52:21, 52:23, 52:24, 53:2, 53:7, 53:14, 54:25, 55:8, 55:9, 55:15, 55:17, 55:20, 55:22, 55:23, 56:2, 56:8, 56:11, 59:5, 59:13, 64:9, 64:15, 64:20, 64:22, 64:25, 65:5, 65:8, 65:13, 65:14, 65:16, 68:6, 69:16, 71:6, 71:14, 73:12, 75:20, 81:16, 81:17, 81:18, 81:22, 82:1, 83:14, 83:17, 84:18, 85:6, 85:21, 88:24, 89:2, 89:5, 90:17, 90:18
**notes** [3] - 60:24, 76:23, 77:20
**nothing** [19] - 11:8, 21:14, 22:5, 22:10, 22:17, 36:6, 37:15, 44:11, 61:10, 71:11, 73:19, 75:7, 80:11, 81:19, 93:11, 94:3, 94:8, 94:10, 94:23
**Nothing** [3] - 26:24, 37:23, 81:20
**notice** [2] - 91:25, 92:8
**Notwithstanding** [3] - 7:13, 10:15, 12:6

**notwithstanding** [13] - 6:22, 6:23, 8:21, 17:16, 29:11, 29:17, 42:12, 67:4, 67:11, 67:14, 67:18, 68:4, 68:8
**novation** [1] - 19:2, 79:25
**nowhere** [4] - 36:3, 48:1, 48:17, 85:16
**number** [3] - 27:9, 48:6, 48:10

**O**

**oath** [1] - 67:24
**object** [2] - 6:7, 44:4
**objected** [4] - 76:6, 76:9, 76:11, 82:2
**objection** [3] - 3:14, 43:17, 44:9
**objects** [1] - 7:23
**obtain** [2] - 26:15, 26:16
**obvious** [1] - 65:8
**obviously** [2] - 41:4, 80:21
**Obviously** [1] - 82:3
**occur** [1] - 62:18
**occurred** [5] - 32:9, 41:6, 42:4, 62:17, 73:25
**occurs** [3] - 27:5, 29:8, 30:3
**October** [2] - 74:22, 74:24
**OF** [2] - 1:2, 1:18
**offer** [2] - 49:10, 49:11
**offered** [4] - 49:15, 49:16, 84:9, 95:22
**official** [4] - 60:14, 60:15, 61:10, 72:23
**Official** [2] - 1:22, 101:21
**often** [2] - 18:22, 60:14
**OLSON** [1] - 2:12
**once** [8] - 27:5, 27:14, 45:3, 56:5, 66:14, 88:14, 90:14, 92:4
**one** [89] - 4:4, 4:5, 6:5, 7:17, 7:20, 7:22, 7:23, 7:25, 9:13, 10:2, 11:1, 11:17, 13:4, 13:6, 15:18, 17:9, 19:21, 20:22, 21:19, 23:19, 25:1, 28:14,

31:17, 33:9, 35:25, 36:8, 39:6, 41:25, 42:1, 46:5, 46:17, 46:25, 47:1, 47:18, 47:19, 52:11, 52:12, 54:20, 55:1, 57:2, 59:1, 59:2, 60:20, 60:22, 61:5, 63:8, 63:21, 65:1, 66:6, 66:22, 67:18, 67:22, 68:1, 68:9, 69:1, 69:22, 70:18, 70:25, 71:3, 75:10, 75:12, 75:13, 75:14, 75:16, 76:3, 77:18, 77:19, 79:2, 79:12, 79:16, 79:21, 80:24, 81:4, 82:19, 85:15, 85:17, 85:18, 91:3, 91:7, 91:14, 92:21, 93:14, 95:4, 95:17, 99:9, 99:14, 100:9, 100:10
**One** [5] - 19:16, 25:18, 30:1, 48:10, 54:19
**ones** [3] - 5:14, 38:11, 76:22
**online** [4] - 45:22, 64:9, 70:25, 78:4
**oOo** [1] - 3:3
**OPENING** [1] - 102:3
**opening** [9] - 33:25, 34:4, 39:23, 47:17, 52:4, 52:7, 54:3, 56:12, 58:10
**Opening** [1] - 4:20
**opinion** [2] - 55:20, 85:20
**opinions** [2] - 43:1, 86:16
**opportunistic** [1] - 36:8
**opposite** [6] - 34:6, 39:7, 40:5, 63:19, 63:22, 66:25
**order** [5] - 8:17, 71:5, 73:10, 89:13, 97:21
**original** [1] - 9:8
**ostrich** [3] - 47:12, 48:23, 60:15
**Ostroff** [18] - 22:11, 22:12, 22:22, 23:25, 24:7, 24:16, 24:20, 31:10, 31:12, 76:19, 77:22, 93:1, 96:4, 97:20, 98:14, 98:19, 98:20
**Ostroff's** [2] - 25:17, 77:11
**outset** [2] - 54:3,

58:7
**outside** [4] - 50:8, 92:22, 93:2, 93:5
**overcharged** [1] - 33:19
**overpaid** [1] - 81:9
**owe** [1] - 10:7
**owed** [1] - 41:24
**owes** [1] - 33:23
**own** [22] - 13:12, 13:14, 13:18, 16:8, 28:2, 28:17, 35:7, 40:10, 48:8, 56:23, 57:13, 58:2, 58:3, 58:19, 68:25, 85:17, 88:13, 90:14, 93:4, 93:20, 94:15
**ownership** [4] - 26:15, 26:16, 26:23, 37:23
**owns** [1] - 48:2

**P**

**p.m** [2] - 74:23, 101:11
**P.M** [1] - 1:19
**package** [1] - 15:2
**packaging** [1] - 38:17
**packet** [1] - 4:6
**Page** [1] - 32:18
**page** [1] - 101:17
**PAGE** [1] - 102:3
**paid** [25] - 4:23, 20:6, 24:8, 25:23, 31:24, 31:25, 32:8, 42:13, 46:1, 46:2, 49:11, 49:13, 49:17, 49:18, 49:20, 49:22, 62:5, 65:10, 71:19, 87:11, 88:2, 89:21, 91:9, 92:1, 92:18
**Pamela** [2] - 1:22, 101:21
**paper** [1] - 63:2
**paragraph** [5] - 3:9, 3:10, 25:13, 63:21, 63:24
**Paragraph** [4] - 52:19, 62:11, 83:12, 83:17
**paragraphs** [1] - 63:25
**part** [11] - 5:3, 11:17, 44:7, 44:13, 54:21, 59:7, 77:13, 78:11, 84:1, 92:5
**participation** [1] -

87:19
**particular** [3] - 34:15, 45:6
**parties** [24] - 3:7, 9:17, 13:19, 16:11, 19:7, 19:22, 19:24, 33:5, 35:14, 45:20, 51:19, 57:25, 58:1, 59:9, 59:10, 59:21, 60:3, 60:7, 61:11, 61:16, 62:1, 65:20, 78:12, 84:7
**parties'** [1] - 61:24
**party** [29] - 4:8, 4:12, 4:17, 6:19, 8:16, 9:13, 12:1, 12:16, 13:25, 18:19, 26:3, 26:10, 28:18, 36:23, 43:22, 56:21, 57:14, 59:14, 68:7, 68:13, 80:21, 81:1, 90:5, 90:8, 90:9, 90:21, 91:9, 92:23
**passes** [1] - 38:19
**passive** [1] - 36:8
**past** [3] - 50:19, 51:25, 52:10
**Paterno** [22] - 6:25, 7:14, 16:5, 16:6, 16:8, 16:9, 16:17, 17:9, 17:15, 17:16, 18:2, 18:23, 24:17, 35:16, 88:13, 88:15, 90:11, 90:20, 94:12
**Paterno's** [1] - 88:14
**Paul** [3] - 74:19, 74:20
**pay** [24] - 5:25, 14:7, 14:18, 22:13, 22:18, 22:22, 23:1, 23:8, 25:11, 25:15, 30:16, 33:7, 41:23, 46:25, 47:1, 47:24, 48:6, 49:13, 65:2, 69:3, 72:2, 72:9, 94:1, 96:7
**paying** [19] - 5:1, 15:24, 23:12, 23:17, 23:23, 24:14, 31:21, 74:10, 74:16, 75:1, 75:2, 81:10, 81:11, 81:25, 90:1, 90:2, 93:21, 94:4
**payment** [3] - 61:2, 61:7, 61:8
**pays** [4] - 28:21, 30:10, 74:22, 89:22
**pejorative** [1] - 51:9
**penny** [1] - 46:5
**People** [1] - 56:16
**people** [14] - 16:5, 25:21, 25:23, 31:18,

36:17, 39:12, 41:23, 47:11, 49:3, 50:13, 62:16, 77:21, 84:5, 98:4
**people's** [1] - 30:13
**per** [3] - 14:18, 19:15, 70:14
**percent** [34] - 7:22, 10:7, 23:17, 34:17, 34:19, 36:25, 46:10, 46:11, 46:15, 46:23, 47:1, 49:20, 49:23, 50:3, 59:22, 69:3, 69:25, 71:20, 72:3, 72:9, 73:5, 75:2, 80:6, 85:2, 88:21, 89:21, 89:23, 90:1, 90:2, 91:9, 91:15, 91:17, 91:19, 92:18
**percentage** [7] - 5:25, 71:20, 71:22, 71:23, 72:5, 72:6
**percentages** [1] - 72:7
**perfectly** [2] - 20:18, 95:25
**performing** [1] - 14:14
**period** [7] - 12:5, 17:24, 18:20, 21:3, 22:9, 42:8, 75:25
**Period** [4] - 12:9, 12:16, 24:23, 29:17
**permanency** [1] - 37:18
**Permanent** [3] - 35:24, 75:18, 88:3
**permanent** [46] - 10:13, 13:12, 15:10, 19:24, 20:5, 20:6, 21:13, 21:21, 22:24, 23:8, 23:21, 25:20, 31:11, 39:21, 47:19, 47:22, 47:25, 48:2, 64:5, 66:6, 71:9, 75:12, 87:4, 87:10, 87:21, 88:1, 88:3, 89:18, 92:5, 92:20, 93:8, 94:18, 94:20, 94:21, 94:25, 95:16, 95:19, 96:1, 96:6
**permanently** [4] - 10:13, 11:24, 30:8, 48:3
**permission** [3] - 58:24, 58:25, 59:3
**permit** [2] - 57:14, 58:23

**person** [8] - 7:1, 7:3, 16:7, 18:4, 32:3, 47:12, 64:23, 90:13
**Person** [2] - 47:11
**persons** [1] - 43:4
**perspective** [1] - 99:22
**persuade** [2] - 60:9, 63:5
**persuaded** [2] - 4:10, 4:14
**Peter** [7] - 6:25, 7:13, 16:5, 16:6, 16:8, 16:9
**Petty** [1] - 40:15
**Phil** [2] - 81:17, 82:24
**PHILIP** [1] - 1:4
**phone** [1] - 43:10
**phones** [1] - 43:6
**physical** [5] - 39:18, 80:19, 81:21, 81:23
**picking** [1] - 53:22
**pictures** [2] - 51:24, 51:25
**piece** [5] - 48:16, 49:10, 60:21, 85:18
**Ping** [1] - 33:18
**pivotal** [1] - 77:23
**place** [2] - 11:4, 51:10
**places** [2] - 32:6
**plain** [2] - 42:11
**Plaintiff** [1] - 1:8
**plaintiff** [1] - 100:12
**PLAINTIFF** [2] - 2:3, 102:16
**plaintiff's** [1] - 40:11
**PLAINTIFF'S** [2] - 102:3, 102:5
**Plaintiff's** [2] - 4:20, 86:23
**plaintiffs** [5] - 40:8, 100:14, 100:15, 101:2, 101:7
**plan** [2] - 96:5, 98:4
**plant** [2] - 28:17, 93:20
**platform** [6] - 13:12, 13:21, 15:13, 27:24, 28:1
**plenty** [1] - 99:4
**point** [9] - 18:6, 23:7, 68:20, 77:23, 87:18, 93:7, 99:5, 99:13, 99:15
**pointed** [2] - 62:12, 72:12
**points** [1] - 58:5
**policy** [3] - 77:22, 78:9, 97:7

**POMERANTZ** [10] - 2:13, 44:25, 45:2, 97:2, 97:4, 97:22, 97:24, 98:2, 98:9, 100:2
**Pomerantz** [31] - 7:8, 8:7, 8:14, 8:24, 11:11, 13:7, 17:22, 24:18, 25:5, 34:15, 39:16, 39:23, 43:14, 44:23, 87:1, 87:8, 87:23, 88:8, 88:23, 89:7, 89:19, 90:15, 91:7, 91:13, 92:10, 93:7, 93:12, 94:11, 97:17, 100:17
**Pomerantz's** [3] - 3:23, 17:21, 88:14
**pop** [1] - 82:3
**popular** [2] - 84:17, 84:18
**position** [9] - 14:3, 17:13, 20:18, 20:21, 21:15, 73:1, 81:7, 91:11, 91:25
**possible** [1] - 78:17
**possibly** [1] - 41:14
**post** [1] - 100:22
**practice** [1] - 19:4
**precisely** [2] - 15:10, 18:6
**Precisely** [1] - 9:20
**prejudice** [1] - 99:3
**preponderance** [2] - 4:9, 4:16
**present** [1] - 49:24
**presented** [2] - 4:17, 50:22
**presents** [1] - 55:9
**president** [1] - 11:15
**PRESIDING** [1] - 1:4
**press** [1] - 19:14
**pretty** [2] - 52:10, 74:5
**prevail** [1] - 99:25
**prevails** [1] - 4:7
**price** [10] - 7:22, 29:23, 29:25, 30:9, 70:2, 71:19, 71:21, 71:22, 72:6, 72:9
**prices** [1] - 72:7
**pricing** [1] - 72:5
**primarily** [1] - 42:8
**principle** [1] - 41:21
**private** [1] - 19:4
**privilege** [1] - 98:10
**probable** [1] - 4:15
**problem** [4] - 13:11, 20:9, 29:15, 79:5
**procedure** [1] -

23:17
**procedure's** [1] - 11:4
**procedures** [1] - 15:9
**proceed** [2] - 44:23, 86:21
**Proceedings** [1] - 101:11
**proceedings** [2] - 43:7, 101:17
**PROCEEDINGS** [1] - 1:18
**process** [7] - 5:3, 10:19, 23:16, 29:6, 40:8, 71:7, 84:12
**produce** [1] - 46:21
**produced** [1] - 46:18
**producer** [1] - 80:14
**product** [24] - 16:15, 25:5, 25:6, 26:19, 36:3, 48:21, 56:19, 56:22, 57:15, 57:17, 61:22, 67:21, 68:8, 68:18, 82:15, 83:3, 83:7, 84:22, 84:25, 85:19, 88:10, 89:25, 94:10
**Productions** [3] - 1:7, 45:15, 100:12
**products** [1] - 15:3
**prohibited** [1] - 98:11
**promised** [1] - 81:13
**proof** [6] - 3:5, 4:8, 4:15, 70:21
**property** [1] - 37:14
**proposed** [2] - 100:10, 100:11
**proposition** [1] - 73:17
**prove** [11] - 52:4, 54:5, 54:7, 54:13, 55:8, 56:13, 58:4, 58:7, 61:25, 81:14, 82:11
**proved** [1] - 54:9
**proven** [1] - 81:15
**proves** [1] - 50:5
**provide** [4] - 15:5, 15:7, 19:15, 27:21
**provided** [6] - 10:2, 29:12, 37:15, 37:22, 38:2, 87:17
**provider** [1] - 37:10
**provides** [1] - 27:6
**proving** [1] - 4:12
**provision** [151] - 6:2, 6:4, 6:14, 6:16, 6:17, 7:16, 9:8, 10:5, 11:9,

11:20, 12:3, 12:5, 12:8, 14:7, 14:12, 16:13, 17:4, 17:6, 17:9, 17:14, 18:1, 18:13, 18:18, 18:20, 18:23, 19:6, 20:5, 20:6, 20:14, 20:18, 22:5, 22:16, 22:19, 23:2, 23:18, 23:23, 24:1, 24:5, 24:10, 24:20, 24:23, 25:4, 25:5, 25:13, 25:14, 25:22, 25:25, 26:4, 26:6, 26:21, 29:9, 29:10, 29:16, 30:20, 31:7, 31:12, 31:18, 32:1, 33:8, 34:12, 35:5, 35:6, 35:11, 35:17, 36:2, 42:14, 45:21, 49:18, 52:21, 56:1, 56:13, 56:16, 56:17, 57:1, 57:3, 57:12, 57:21, 57:24, 58:1, 58:9, 59:21, 61:20, 62:9, 62:24, 63:12, 63:14, 64:1, 64:3, 66:7, 66:22, 67:13, 68:24, 69:7, 69:19, 69:23, 71:18, 73:2, 73:3, 73:4, 73:7, 73:8, 73:9, 73:14, 73:19, 73:21, 73:23, 74:1, 75:21, 82:11, 82:13, 82:18, 82:20, 82:22, 83:9, 83:10, 83:18, 83:24, 84:8, 84:20, 87:4, 87:10, 88:8, 88:9, 88:17, 88:21, 89:5, 89:15, 89:21, 89:23, 90:10, 90:16, 90:22, 90:24, 90:25, 91:3, 91:6, 92:2, 93:23, 94:2, 94:9, 94:11, 94:17, 94:22, 95:13, 95:17, 95:19, 95:23, 95:25, 96:8, 98:17, 98:21
**provisions** [16] - 21:19, 37:6, 38:10, 53:5, 53:11, 54:23, 54:24, 55:3, 55:4, 58:10, 65:1, 68:3, 69:13, 78:15, 83:8
**published** [1] - 63:2
**pull** [5] - 22:9, 30:12, 39:9, 41:22, 95:18
**pulling** [1] - 95:16
**purchase** [2] - 12:2, 85:15
**purpose** [1] - 32:17

**Purpose** [1] - 32:18
**purposefully** [2] - 30:20, 30:21
**purposes** [6] - 21:6, 21:22, 21:23, 21:25, 22:2, 83:18
**pursuant** [6] - 11:20, 18:14, 24:22, 39:21, 90:22, 101:16
**put** [33] - 25:6, 43:21, 46:17, 47:8, 47:9, 48:19, 50:13, 52:11, 53:3, 56:19, 56:21, 57:4, 57:7, 57:15, 68:7, 68:12, 73:23, 78:19, 79:4, 81:17, 82:21, 82:24, 83:12, 85:16, 87:9, 88:5, 91:24, 92:12, 93:17, 97:13, 97:14, 97:15
**puts** [6] - 56:15, 60:18, 68:16, 68:21, 68:25, 69:5
**putting** [4] - 63:5, 68:18, 75:20, 83:5

## Q

**questioned** [2] - 29:21, 50:10
**questioning** [2] - 7:8, 68:21
**questions** [5] - 20:11, 84:15, 85:25, 94:14, 94:15
**quickly** [3] - 77:1, 77:2, 77:4
**quite** [5] - 18:3, 25:3, 46:18, 78:20, 79:6
**quote** [5] - 52:13, 52:14, 52:16, 52:17, 53:4
**quoted** [2] - 52:14, 52:15
**quotes** [1] - 53:17

## R

**radio** [1] - 80:18
**raise** [2] - 92:7, 96:20
**raised** [2] - 20:23, 44:8, 92:7
**Rand** [6] - 20:3, 30:18, 87:2, 87:5, 95:20, 96:3
**Rap** [1] - 68:13
**rate** [9] - 21:8, 21:11, 34:10, 69:23, 69:25,

70:1, 70:3, 70:8, 73:5
**read** [8] - 4:5, 43:10, 51:2, 73:7, 76:1, 84:1, 97:21
**reading** [2] - 4:7
**reads** [1] - 75:21
**ready** [2] - 79:6, 79:7
**real** [2] - 11:2, 35:13
**realize** [2] - 5:13, 95:7
**realized** [3] - 78:1, 95:10, 95:23
**really** [38] - 5:10, 13:4, 13:6, 16:14, 16:15, 16:24, 16:25, 17:1, 28:20, 36:8, 37:7, 39:18, 47:4, 48:1, 50:25, 51:10, 51:12, 53:7, 53:10, 61:24, 62:3, 65:9, 65:15, 65:17, 65:19, 65:22, 66:14, 66:17, 66:20, 74:6, 76:25, 79:22, 85:22, 89:1, 94:7, 100:24
**reason** [11] - 11:25, 23:19, 31:16, 31:17, 71:16, 73:13, 80:21, 86:1, 87:17, 89:2, 99:19
**reasons** [1] - 82:17
**rebuttal** [1] - 86:13
**receipts** [10] - 10:8, 37:1, 49:20, 49:23, 50:3, 59:22, 69:3, 73:5, 75:2, 85:3
**receive** [2] - 36:25, 43:6
**received** [3] - 6:7, 8:19, 42:1
**RECEIVED** [2] - 102:16, 102:20
**receives** [4] - 26:17, 28:6, 75:22, 84:21
**Recess** [2] - 43:12, 86:19
**recipient** [1] - 32:14
**recollections** [1] - 60:25
**record** [167] - 5:21, 5:24, 6:11, 6:21, 7:16, 8:6, 8:10, 8:12, 10:20, 11:8, 11:14, 12:2, 12:4, 13:2, 13:8, 13:22, 13:23, 14:13, 17:7, 17:8, 17:10, 17:12, 17:13, 17:23, 18:8, 18:16, 18:18, 21:3, 21:8, 25:3, 25:9, 25:12, 25:23, 30:14,

30:19, 30:24, 30:25, 31:4, 34:8, 34:11, 34:16, 34:21, 34:23, 34:25, 35:2, 35:7, 35:10, 35:21, 36:18, 36:24, 38:15, 38:17, 39:3, 43:24, 44:3, 44:9, 44:12, 45:14, 45:15, 45:19, 46:9, 46:14, 48:19, 49:6, 50:1, 54:11, 54:14, 54:18, 54:20, 55:6, 55:11, 55:14, 55:18, 56:7, 56:20, 57:4, 57:7, 57:11, 57:13, 57:17, 58:2, 58:3, 59:5, 64:9, 68:12, 68:13, 68:14, 68:16, 69:1, 69:2, 69:8, 69:11, 69:15, 69:22, 69:24, 71:6, 71:8, 71:10, 71:14, 72:25, 73:6, 73:8, 73:10, 73:11, 73:14, 73:15, 73:17, 73:18, 73:22, 75:19, 78:1, 78:2, 78:3, 78:16, 79:9, 79:11, 80:17, 81:14, 81:20, 82:4, 82:8, 82:21, 83:3, 83:5, 84:8, 84:21, 84:23, 85:4, 85:17, 85:21, 87:11, 87:22, 89:20, 89:23, 89:25, 90:1, 90:3, 90:23, 90:24, 91:2, 91:19, 92:17, 92:19, 92:21, 96:19, 97:10, 97:13
**Record** [4] - 25:6, 25:7, 72:25, 90:23
**recording** [37] - 7:15, 8:3, 8:4, 10:1, 10:18, 11:5, 13:25, 15:5, 18:10, 25:21, 26:19, 36:23, 39:24, 39:25, 43:22, 48:20, 56:18, 56:22, 57:15, 58:11, 61:4, 61:6, 61:12, 61:22, 64:24, 68:7, 69:1, 79:19, 82:15, 83:7, 84:5, 84:22, 85:18, 91:23, 92:24, 95:15
**recordings** [17] - 5:17, 5:18, 6:18, 7:5, 7:10, 9:25, 33:11, 39:13, 40:3, 46:19, 46:20, 48:16, 56:15, 78:19, 78:20, 94:25, 95:1
**Recordings** [2] - 8:5,

8:6
**Records** [11] - 1:12, 8:16, 8:17, 9:4, 9:6, 9:9, 11:16, 18:8, 45:17, 52:17, 99:23
**records** [87] - 5:23, 6:1, 6:11, 6:14, 6:20, 8:23, 10:19, 10:23, 11:9, 12:8, 13:18, 14:11, 14:17, 16:14, 16:22, 17:4, 17:5, 17:25, 19:14, 20:7, 23:2, 24:9, 24:20, 26:4, 26:21, 28:18, 29:15, 29:16, 35:7, 36:17, 52:21, 52:22, 52:23, 53:7, 53:13, 54:25, 55:10, 55:18, 56:10, 56:14, 56:24, 57:5, 57:6, 57:8, 57:13, 60:6, 64:2, 64:4, 64:25, 68:11, 68:22, 69:5, 69:6, 73:10, 73:11, 73:16, 73:25, 75:20, 79:11, 81:25, 82:7, 82:9, 82:12, 82:14, 83:4, 83:10, 83:11, 83:17, 83:25, 85:5, 85:6, 88:20, 89:14, 90:9, 90:24, 91:1, 91:5, 93:25
**RECROSS** [1] - 102:9
**red** [3] - 22:9, 24:25, 93:17
**REDIRECT** [1] - 102:9
**reducing** [1] - 77:12
**reference** [5] - 44:2, 75:3, 75:12, 97:19, 97:20
**referenced** [1] - 7:9
**referencing** [1] - 7:12
**referred** [2] - 51:17, 66:7
**referring** [3] - 39:22, 71:21, 98:5
**refers** [1] - 64:5
**refusal** [1] - 5:5
**refuse** [2] - 95:22, 95:24
**refused** [2] - 31:15, 87:22
**regard** [6] - 3:5, 3:6, 3:22, 3:23, 97:17, 99:12
**regardless** [1] - 4:17
**regulations** [1] -

101:18
reimburse [1] - 27:18
reimbursed [1] - 27:21
relate [1] - 5:16
related [2] - 22:2, 22:3
relates [3] - 6:17, 42:3, 42:8
relationship [1] - 80:1
relatively [1] - 5:12
released [1] - 8:16
releases [2] - 46:3, 86:5
relevance [1] - 67:20
relevant [8] - 15:17, 48:22, 49:5, 49:9, 62:17, 64:2, 64:3, 64:6
relinquish [1] - 80:3
remains [1] - 37:23
Remember [12] - 29:9, 32:24, 58:18, 67:23, 68:20, 71:21, 74:13, 74:17, 75:8, 77:16, 77:21, 83:13
remember [24] - 8:6, 8:24, 9:1, 22:21, 23:24, 24:7, 26:8, 26:13, 29:20, 30:6, 32:6, 32:10, 54:2, 59:15, 59:19, 64:14, 66:5, 69:21, 72:15, 74:2, 75:5, 76:17, 79:20, 92:3
remind [1] - 64:14
removing [1] - 77:12
rental [1] - 85:15
renting [1] - 48:12
replace [2] - 35:23, 94:19
report [2] - 33:21, 54:6
reported [1] - 101:17
Reporter [1] - 1:22, 101:21
REPORTER'S [1] - 1:18
representatives [2] - 24:4, 24:12
reproduce [7] - 28:6, 28:11, 28:12, 28:13, 36:23, 38:22, 43:22
reproducing [1] - 38:15
requesting [1] - 3:8
require [2] - 23:14, 23:15

required [3] - 32:22, 32:25, 77:5
reread [4] - 3:15, 3:16, 3:24, 4:5
rereading [1] - 3:15
resell [2] - 37:17, 37:19
reselling [1] - 26:12
reservations [1] - 89:13
reserve [1] - 42:20
reserved [1] - 37:14
reserving [1] - 34:1
respect [14] - 8:7, 9:16, 9:17, 9:21, 9:22, 10:6, 10:12, 11:25, 12:1, 12:12, 22:16, 89:20
respond [2] - 84:11, 91:8
responded [1] - 74:25
responds [1] - 17:21
response [3] - 34:1, 88:14, 88:25
responsibility [1] - 37:10
responsible [2] - 14:22, 38:15
Responsible [3] - 38:16, 38:17, 38:18
rest [1] - 9:20
restricting [1] - 72:16
restriction [2] - 72:19, 72:21
Restrictions [1] - 72:12
restrictive [1] - 72:18
restricts [1] - 72:13
retail [88] - 5:7, 7:22, 8:25, 9:5, 11:13, 11:19, 17:25, 18:3, 18:5, 18:9, 18:12, 18:13, 18:17, 18:20, 18:22, 24:19, 24:21, 24:22, 24:24, 29:25, 34:13, 34:16, 34:18, 34:25, 35:2, 35:22, 45:20, 46:10, 51:16, 51:21, 52:21, 52:23, 52:24, 53:2, 53:7, 53:14, 54:25, 55:8, 55:9, 55:15, 55:16, 55:17, 55:21, 55:22, 55:24, 56:2, 56:8, 57:6, 59:5, 59:13, 64:10, 64:13, 64:15, 64:20, 64:22, 65:1, 65:5, 65:8, 65:13,

65:14, 65:16, 68:6, 69:16, 70:2, 71:6, 71:14, 71:21, 71:22, 72:6, 72:9, 73:12, 75:20, 81:16, 81:17, 81:18, 81:23, 82:1, 83:14, 83:17, 84:19, 85:7, 85:21, 88:24, 89:2, 89:5, 90:17, 90:19
retailer [16] - 28:9, 34:9, 35:8, 38:20, 38:21, 38:22, 39:18, 55:10, 56:9, 56:11, 66:3, 71:4, 71:8, 71:13
retailers [9] - 15:1, 15:2, 38:19, 45:22, 59:4, 70:25, 80:18, 81:23, 82:3
retained [1] - 37:14
return [1] - 86:8
revenue [11] - 6:2, 6:7, 6:20, 7:19, 7:20, 8:19, 8:20, 9:7, 19:16, 42:4, 42:7
reversed [1] - 50:23
review [1] - 54:8
revolved [1] - 82:3
Rhapsody [14] - 9:15, 9:16, 9:21, 9:23, 9:25, 10:1, 10:6, 10:11, 10:12, 10:16, 11:3, 11:25, 15:7
RICHARD [1] - 2:4
rid [1] - 71:3
right-hand [1] - 52:13
rights [14] - 24:22, 33:12, 37:9, 37:13, 38:1, 38:3, 61:2, 61:9, 80:2, 80:3, 89:13
Rights [1] - 37:14
ringback [3] - 30:6, 30:7, 30:10
rise [1] - 96:24
role [1] - 50:24
roles [1] - 50:22
Rolling [2] - 40:14, 49:20
room [5] - 38:7, 54:8, 61:13, 63:18, 94:16
Room [1] - 1:24
Rosenberg [1] - 74:19
royalties [14] - 5:25, 8:11, 21:15, 21:22, 41:20, 65:3, 76:5, 80:4, 87:22, 93:16, 98:23, 98:25

royalty [38] - 14:12, 21:3, 21:8, 21:11, 22:2, 22:25, 23:8, 24:11, 25:19, 26:4, 28:24, 31:24, 32:6, 32:7, 34:10, 38:20, 46:11, 46:23, 69:19, 69:23, 69:25, 70:1, 70:3, 70:8, 73:4, 73:13, 73:19, 75:1, 75:2, 75:9, 75:16, 75:21, 76:10, 78:15, 88:21, 94:6, 96:6
Roybal [1] - 1:23
rules [1] - 43:5
run [1] - 90:13
rushed [2] - 75:4, 80:13

## S

sale [47] - 7:19, 8:23, 10:19, 10:20, 10:23, 11:10, 12:22, 13:1, 16:22, 17:12, 17:23, 18:4, 18:5, 18:13, 24:19, 26:20, 26:21, 28:9, 29:15, 29:16, 37:25, 38:14, 38:20, 38:23, 38:24, 48:11, 64:6, 64:25, 66:10, 66:11, 66:13, 66:15, 71:5, 71:23, 72:18, 83:4, 83:15, 83:20, 88:20, 89:2, 89:13, 90:9, 91:5, 93:24
sale/resale [1] - 35:24
sales [17] - 14:25, 21:3, 21:12, 21:21, 22:4, 25:23, 38:18, 45:21, 65:4, 65:5, 66:6, 81:16, 82:1, 83:13, 83:15, 87:11, 90:18
Sales [4] - 21:20, 36:5, 38:18, 93:8
Santana [1] - 40:15
sarcastic [1] - 51:14
sat [1] - 53:25
saw [10] - 51:13, 51:17, 53:17, 57:7, 57:8, 87:17, 91:22
scheme [1] - 31:25
scratch [3] - 31:11, 32:5, 94:19
scratched [1] - 32:9
screen [2] - 21:18, 31:3

second [23] - 3:10, 6:5, 6:16, 6:17, 11:5, 12:10, 12:21, 28:14, 34:22, 39:20, 42:16, 55:7, 75:12, 75:13, 75:17, 78:22, 81:4, 83:13, 92:6, 92:21, 99:10, 100:13
Second [1] - 82:22
secondary [1] - 33:17
seconds [1] - 12:13
Section [1] - 101:16
see [34] - 9:2, 10:13, 15:14, 15:15, 17:4, 20:24, 27:16, 38:10, 38:23, 38:24, 38:25, 39:17, 39:18, 43:2, 46:20, 47:18, 52:12, 53:13, 54:6, 54:9, 58:17, 61:1, 61:15, 63:17, 67:9, 71:12, 73:8, 75:18, 86:17, 92:12, 98:8, 100:5
See [5] - 30:11, 61:16, 84:15, 85:9
Seijas [2] - 1:22, 101:21
selected [1] - 40:1
sell [35] - 12:22, 13:12, 13:14, 13:18, 13:20, 13:25, 14:17, 14:22, 14:24, 15:1, 15:18, 16:13, 18:8, 18:19, 18:22, 24:20, 24:21, 26:3, 28:2, 28:18, 29:24, 29:25, 33:14, 34:12, 36:24, 38:4, 38:21, 82:6, 82:8, 89:5, 90:18, 93:3
selling [34] - 6:6, 6:13, 8:10, 9:4, 9:6, 9:19, 11:9, 11:20, 12:4, 13:22, 14:6, 14:20, 21:8, 23:7, 26:11, 26:18, 26:20, 26:23, 28:25, 29:2, 30:4, 35:2, 35:7, 48:18, 81:24, 89:14, 89:15, 89:16, 90:21, 93:3, 93:10, 94:3, 94:5
sells [21] - 9:4, 9:5, 10:3, 11:8, 12:15, 15:18, 18:4, 18:7, 18:12, 26:3, 28:23, 34:11, 39:18, 39:21, 46:9, 55:10, 55:18, 66:2, 82:9, 93:11

**Senate** [11] - 7:5, 39:5, 39:6, 39:8, 39:11, 40:2, 40:4, 95:2, 95:5, 95:9

**send** [12] - 15:11, 27:24, 43:6, 43:11, 58:22, 70:17, 70:24, 74:21, 93:22, 99:25, 100:6, 101:6

**sending** [1] - 93:25

**sends** [3] - 28:23, 72:14, 72:17

**sense** [8] - 5:14, 57:1, 71:15, 72:1, 72:24, 76:2, 84:2, 95:13

**sent** [2] - 74:22, 75:17

**sentence** [3] - 66:9, 66:13, 83:14

**separate** [5] - 20:6, 73:4, 73:14, 74:1, 100:4

**separated** [1] - 100:4

**separately** [1] - 99:20

**separation** [1] - 100:20

**service** [7] - 9:24, 13:18, 27:18, 48:15, 48:16, 50:6, 56:20

**Service** [1] - 37:10

**services** [1] - 89:25

**Session** [1] - 1:19

**set** [2] - 35:20, 72:7

**seven** [2] - 77:3, 96:12

**several** [2] - 27:3, 82:17

**Shady** [2] - 46:17, 78:20

**shall** [2] - 21:21, 88:21

**sham** [1] - 77:17

**share** [4] - 6:2, 15:20, 80:4, 80:5

**shell** [4] - 29:19, 29:20, 51:8, 77:18

**shipping** [1] - 94:4

**shops** [1] - 82:4

**short** [1] - 86:12

**show** [15] - 6:3, 9:21, 10:4, 17:20, 18:21, 21:18, 37:6, 47:20, 49:1, 49:14, 50:7, 56:20, 57:2, 62:21, 69:8

**showed** [16] - 8:14, 8:15, 30:1, 30:6, 47:16, 52:12, 53:15,

54:10, 59:16, 60:16, 67:23, 68:23, 75:9, 75:12, 87:6, 92:16

**showing** [3] - 49:16, 59:19, 92:14

**shown** [8] - 6:3, 49:17, 49:19, 49:22, 51:5, 57:11, 67:21, 68:5

**shows** [9] - 15:8, 21:25, 49:13, 62:21, 74:7, 74:9, 78:12, 82:13, 83:7

**shred** [1] - 49:16

**shut** [1] - 43:10

**side** [5] - 78:4, 78:14, 78:25, 79:1, 88:15

**sides** [2] - 43:8, 59:12

**sign** [3] - 37:12, 79:23, 79:24

**signatory** [1] - 91:24

**signed** [12] - 35:14, 35:15, 46:6, 46:7, 46:8, 51:19, 65:21, 66:19, 79:17, 79:19, 80:15

**silly** [1] - 15:8

**simple** [6] - 8:13, 9:11, 53:9, 53:10, 81:7, 90:23

**simply** [3] - 3:24, 12:20, 97:20

**single** [3] - 12:24, 28:3, 46:19, 49:10, 49:11, 49:16, 49:17, 49:19, 57:2, 57:10, 67:20, 67:25

**sit** [3] - 50:21, 50:23, 84:13

**sits** [1] - 27:4

**situation** [7] - 19:23, 25:7, 35:7, 67:16, 73:15, 82:19, 82:20

**six** [1] - 75:23

**slide** [5] - 17:20, 22:15, 43:21, 44:7, 53:1

**slides** [1] - 53:15

**slight** [1] - 41:1

**Slim** [2] - 46:17, 78:20

**sloppy** [2] - 66:16, 67:2

**small** [3] - 27:7, 48:16, 85:18

**smokescreen** [6] - 13:23, 35:20, 51:17, 51:19, 51:20

**smokescreens** [1] -

51:9

**so-called** [1] - 35:6

**softly** [1] - 51:12

**sold** [59] - 5:24, 6:1, 6:12, 6:14, 7:11, 7:18, 8:5, 11:9, 12:8, 14:11, 17:4, 18:1, 18:16, 18:18, 20:7, 21:9, 23:2, 24:9, 24:20, 26:21, 34:8, 34:16, 34:18, 34:23, 34:25, 37:23, 45:19, 50:1, 52:17, 52:21, 52:22, 52:23, 52:24, 53:7, 53:13, 54:25, 55:8, 57:5, 58:2, 59:4, 59:5, 59:12, 64:2, 68:6, 69:16, 71:14, 73:10, 73:11, 75:20, 81:25, 83:10, 83:17, 84:9, 85:4, 85:6, 89:14, 90:24

**Someone** [2] - 14:5, 45:3

**someone** [25] - 7:15, 16:15, 18:11, 25:4, 25:6, 29:7, 56:4, 56:19, 57:17, 58:20, 58:21, 68:18, 83:2, 83:6, 84:21, 84:25, 85:7, 85:8, 85:10, 85:18, 88:2, 88:10, 93:1, 93:21

**Sometimes** [1] - 30:13

**sometimes** [2] - 53:17, 68:16

**soon** [2] - 92:3, 92:6

**sorry** [6] - 3:22, 32:17, 37:5, 55:14, 77:12, 97:24

**sort** [3] - 54:15, 60:11, 98:5

**sound** [5] - 6:18, 36:23, 40:23, 41:2, 43:22

**sounding** [1] - 5:7

**sounds** [1] - 54:17

**soundtrack** [1] - 88:11

**soundtracks** [2] - 16:25, 91:1

**SOUTH** [1] - 2:16

**special** [4] - 68:24, 73:13, 73:15, 73:19

**specific** [2] - 25:22, 87:10

**specifically** [10] - 11:18, 19:8, 20:16, 21:1, 27:3, 39:13,

87:6, 87:20, 91:3, 98:25

**spend** [1] - 19:15

**spent** [5] - 8:25, 11:11, 27:22, 27:25, 70:19

**Springsteen** [3] - 49:21, 85:2, 91:17

**Sprint** [2] - 32:25, 33:9

**staff** [3] - 14:25, 38:18, 50:16

**stand** [3] - 23:25, 36:11, 52:25

**standard** [1] - 4:15

**standards** [1] - 32:19

**start** [2] - 45:24, 78:13

**started** [2] - 5:4, 54:11

**starts** [1] - 56:4

**state** [1] - 96:19

**statement** [7] - 33:25, 34:4, 34:14, 35:11, 39:23, 75:16, 76:5

**statements** [4] - 54:4, 75:9, 75:21, 76:10

**States** [10] - 7:4, 39:5, 39:6, 39:11, 40:4, 56:10, 84:18, 95:9, 101:16, 101:18

**STATES** [1] - 1:1

**stations** [1] - 80:18

**statute** [1] - 42:2

**stays** [1] - 37:24

**stenographically** [1] - 101:17

**Stiffelman** [33] - 19:1, 19:2, 20:1, 20:3, 20:15, 20:16, 20:19, 20:22, 20:23, 21:1, 21:4, 21:6, 21:12, 21:14, 22:4, 31:13, 74:13, 74:18, 74:19, 75:4, 76:17, 76:21, 76:24, 77:10, 87:2, 87:7, 87:9, 87:20, 91:23, 93:15, 95:22, 95:24

**Stiffelman's** [1] - 92:9

**still** [5] - 9:6, 18:14, 69:25, 78:22, 80:2

**Stones** [2] - 40:14, 49:21

**Stoney** [2] - 96:21, 96:22

**store** [10] - 34:23,

34:24, 48:14, 55:10, 55:18, 64:9, 81:20, 82:8, 84:17, 84:18

**stores** [5] - 65:7, 81:20, 82:4, 82:6, 82:8

**story** [5] - 12:5, 30:11, 63:12, 63:13, 63:15

**straight** [2] - 30:11, 30:12

**straightforward** [1] - 5:12

**stray** [1] - 59:19

**streams** [3] - 23:12, 23:20, 23:23

**street** [1] - 34:24

**Street** [1] - 1:23

**STREET** [1] - 2:6

**stretch** [1] - 86:12

**strong** [1] - 74:5

**struck** [1] - 32:4

**structure** [6] - 6:10, 14:12, 23:1, 23:8, 29:23, 30:9

**structured** [2] - 14:12, 14:21

**stubborn** [9] - 45:3, 45:10, 51:21, 58:16, 70:6, 70:10, 86:1, 87:24

**stuff** [1] - 90:17

**submit** [1] - 56:3

**submitted** [4] - 42:24, 43:1, 86:14, 86:17

**subscribe** [2] - 48:9, 48:15

**subscription** [7] - 9:24, 37:4, 37:5, 48:15, 56:20, 88:3, 89:24

**success** [3] - 79:11, 80:17, 80:22

**sue** [2] - 80:25

**suggest** [4] - 22:17, 60:4, 73:20, 93:22

**suggested** [5] - 7:22, 55:13, 55:16, 76:12, 87:12

**suggestion** [1] - 3:23

**suing** [1] - 80:22

**SUITE** [1] - 2:7

**supplied** [1] - 28:7

**supplies** [1] - 11:6

**supplying** [1] - 9:19

**support** [1] - 43:24

**supported** [1] - 44:3

**supports** [1] - 73:1

**supposed** [2] -

31:12, 39:1
**suspect** [2] - 85:24, 85:25
**swear** [1] - 96:17
**sworn** [1] - 96:22
**system** [5] - 13:20, 25:19, 50:12, 96:6

## T

**T-Mobile** [6] - 12:10, 12:12, 12:14, 12:18, 32:4
**table** [1] - 88:15
**Take-down** [1] - 38:1
**talks** [1] - 42:2
**tape** [1] - 80:12
**Target** [1] - 48:7
**task** [1] - 77:15
**tasks** [1] - 14:14
**technical** [3] - 5:7, 84:2, 84:3
**technology** [2] - 70:17, 70:24
**Temple** [1] - 1:23
**temporary** [1] - 10:21
**ten** [8] - 13:15, 15:19, 27:5, 27:15, 43:2, 86:12, 86:17
**ten-minute** [1] - 86:12
**tentative** [1] - 97:25
**term** [2] - 73:16, 89:12
**Termination** [1] - 38:3
**terms** [15] - 5:7, 23:12, 23:13, 23:14, 49:4, 51:9, 51:10, 61:2, 61:7, 61:8, 61:16, 64:24, 66:25, 74:10, 77:5
**test** [1] - 52:1
**testified** [7] - 7:5, 30:18, 33:18, 60:18, 87:20, 98:14, 99:1
**testify** [3] - 16:5, 61:25, 94:24
**testimony** [28] - 16:4, 18:21, 18:24, 39:5, 39:9, 40:2, 52:8, 59:15, 59:17, 62:10, 67:24, 74:13, 75:8, 87:7, 92:12, 92:13, 92:14, 92:15, 95:3, 95:5, 95:6, 95:7, 95:10, 98:17, 98:18, 98:19, 99:3

**text** [2] - 43:7, 43:11
**THE** [36] - 1:4, 3:5, 3:13, 3:21, 4:1, 4:3, 34:3, 42:21, 43:4, 43:14, 44:6, 44:14, 44:17, 44:20, 44:23, 86:11, 86:21, 96:17, 96:19, 96:21, 96:23, 96:24, 97:3, 97:17, 97:23, 97:25, 98:8, 98:12, 99:6, 99:17, 100:5, 100:14, 100:22, 101:6, 101:10, 102:8
**theme** [2] - 13:8, 17:21
**themselves** [7] - 5:12, 13:13, 13:18, 14:17, 28:2, 56:14, 83:25
**therefore** [1] - 71:17
**they've** [6] - 5:23, 6:1, 36:15, 36:19, 55:12, 86:6
**They've** [1] - 5:21
**thin** [2] - 23:1
**thinking** [1] - 83:23
**third** [33] - 6:19, 8:16, 9:13, 9:17, 12:1, 12:15, 13:19, 13:25, 18:19, 19:7, 26:3, 26:10, 28:18, 33:5, 35:4, 36:23, 43:22, 56:12, 56:21, 57:14, 59:14, 68:7, 68:13, 78:22, 82:10, 90:5, 90:8, 90:9, 90:21, 91:9, 92:23
**Third** [1] - 83:8
**thousand** [1] - 42:7
**three** [14] - 32:21, 46:3, 54:7, 54:9, 67:7, 75:25, 79:3, 81:13, 86:6, 92:4, 98:4, 99:12, 99:21, 100:13
**throughout** [4] - 14:10, 48:25, 92:24, 97:12
**throw** [1] - 38:21
**Thursday** [2] - 1:21, 3:1
**title** [7] - 28:9, 37:21, 37:24, 71:2, 71:4, 71:13
**Title** [2] - 38:19, 101:16
**TN** [1] - 2:8
**to/through** [1] - 24:24
**today** [9] - 7:8,

16:12, 27:1, 47:17, 50:22, 56:9, 56:11, 80:11, 84:18
**together** [5] - 45:11, 50:20, 63:5, 81:12, 98:4
**TOLLES** [1] - 2:12
**Tom** [1] - 40:15
**tones** [3] - 30:6, 30:7, 30:11
**took** [5] - 6:11, 14:12, 52:25, 77:15, 80:11
**toothbrush** [1] - 39:24
**Top** [1] - 83:15
**top** [1] - 95:14
**total** [2] - 41:12, 100:1
**Total** [1] - 13:15
**totality** [1] - 54:1
**totally** [4] - 73:16, 73:25, 74:12, 82:23
**towards** [1] - 22:7
**Tower** [4] - 9:5, 18:8, 18:11, 82:4
**track** [3] - 22:5, 50:17, 70:3
**tracks** [4] - 22:8, 46:22, 57:10, 75:19
**transaction** [10] - 9:11, 9:12, 26:14, 33:6, 35:24, 38:13, 58:8, 59:7, 67:21, 67:25
**TRANSCRIPT** [1] - 1:18
**transcript** [2] - 101:17, 101:17
**transferred** [1] - 71:13
**treated** [6] - 21:2, 21:21, 49:2, 50:3, 57:11, 87:22
**treatment** [2] - 19:12, 21:1
**Trial** [1] - 16:4
**trial** [17] - 17:19, 47:16, 48:25, 51:23, 52:1, 52:4, 52:20, 53:16, 53:24, 53:25, 54:5, 54:11, 67:6, 74:7, 79:20, 97:7, 100:22
**TRIAL** [1] - 1:18
**trick** [3] - 41:23, 77:19, 94:7
**tried** [22] - 7:8, 13:11, 13:16, 16:12, 20:4, 20:9, 20:10,

29:21, 31:9, 31:14, 31:20, 32:5, 39:9, 39:16, 40:23, 52:4, 61:24, 68:20, 74:3, 87:3, 87:21
**tries** [2] - 84:16, 86:3
**true** [18] - 4:11, 16:17, 16:19, 26:15, 31:13, 31:23, 33:6, 35:16, 47:12, 56:24, 57:23, 59:9, 68:11, 71:1, 89:22, 101:16
**True** [1] - 83:18
**trumping** [1] - 68:3
**Trust** [1] - 71:15
**trust** [1] - 71:15
**truth** [5] - 23:24, 40:19, 40:24, 65:9, 74:25
**try** [13] - 5:6, 15:13, 23:4, 28:1, 28:16, 33:5, 47:5, 50:17, 60:9, 72:22, 78:17, 80:17, 95:20
**trying** [17] - 15:23, 30:12, 32:10, 35:18, 36:11, 41:22, 41:23, 47:20, 59:18, 63:5, 73:24, 76:12, 77:19, 77:25, 78:4, 90:13, 98:6
**turn** [2] - 43:5, 48:24
**TV** [3] - 56:19, 69:8, 83:7
**twice** [1] - 81:11
**two** [22] - 11:7, 15:9, 17:25, 21:19, 25:18, 30:1, 45:11, 47:7, 47:8, 47:9, 47:11, 47:18, 50:14, 55:3, 67:10, 68:3, 69:2, 69:13, 79:6, 79:7, 100:12
**Two** [1] - 25:20
**type** [2] - 38:12, 81:19
**types** [3] - 5:22, 44:13, 89:11

## U

**U2** [2] - 49:21, 85:1
**ultimately** [1] - 20:11
**UMG** [13] - 6:2, 6:6, 6:7, 13:1, 33:24, 35:20, 36:22, 37:13, 37:14, 43:21, 52:18, 52:22
**Umm** [1] - 16:23

**under** [43] - 6:1, 7:21, 10:5, 11:9, 12:3, 14:7, 22:18, 23:2, 23:18, 23:22, 23:23, 24:9, 24:19, 26:21, 31:24, 32:17, 33:7, 34:20, 42:13, 46:1, 47:8, 49:18, 57:12, 58:1, 59:1, 59:11, 59:25, 60:8, 65:3, 67:12, 67:24, 78:7, 81:25, 86:4, 88:21, 89:21, 89:22, 91:15, 92:1, 94:2, 95:12, 96:7
**undercharged** [1] - 33:20
**undermine** [2] - 65:10, 65:11
**understood** [6] - 20:20, 20:24, 59:12, 89:10, 92:25, 95:24
**unfamiliar** [1] - 43:5
**UNION** [1] - 2:6
**unit** [5] - 19:15, 25:10, 70:14, 93:21, 94:5
**United** [10] - 7:4, 39:5, 39:6, 39:11, 40:4, 56:10, 84:18, 95:9, 101:16, 101:18
**UNITED** [1] - 1:1
**units** [2] - 19:18, 21:9
**Universal** [132] - 5:24, 6:8, 6:12, 7:5, 7:11, 7:14, 7:19, 8:6, 8:10, 8:12, 8:18, 8:22, 9:9, 9:12, 9:19, 9:24, 10:4, 10:16, 11:5, 11:8, 11:9, 11:17, 11:22, 12:12, 12:20, 12:23, 13:11, 13:17, 14:13, 14:20, 14:21, 15:20, 17:11, 18:7, 18:9, 19:7, 19:19, 20:4, 20:7, 20:8, 20:20, 21:8, 22:12, 22:17, 22:24, 22:25, 23:6, 25:8, 25:11, 25:19, 26:11, 26:16, 26:17, 26:18, 26:19, 26:20, 26:22, 26:23, 27:2, 27:4, 27:7, 27:10, 27:17, 28:7, 28:21, 28:23, 29:1, 29:2, 30:2, 30:10, 30:16, 32:13, 32:17, 33:2, 33:7, 33:23, 37:9, 37:22, 37:23,

37:24, 38:9, 38:14, 39:2, 39:4, 39:22, 40:2, 41:11, 41:14, 41:19, 58:19, 66:2, 68:16, 68:21, 68:25, 69:5, 69:13, 70:12, 70:15, 71:17, 71:18, 72:8, 72:9, 72:13, 72:14, 74:3, 76:3, 78:9, 80:16, 89:14, 89:22, 90:4, 90:19, 91:11, 92:8, 92:21, 93:2, 93:5, 93:6, 93:10, 93:19, 93:20, 93:21, 93:22, 94:4, 95:12, 96:2, 96:13, 97:10

**Universal's** [6] - 32:24, 34:5, 36:3, 93:14, 94:5, 95:14

**Universal/ Interscope/ Aftermath** [1] - 13:24
**unknown** [3] - 27:23, 50:1, 79:18
**unless** [6] - 3:13, 29:7, 30:3, 42:5, 48:6, 50:13
**up** [40] - 5:19, 6:5, 15:16, 20:19, 25:2, 25:3, 28:14, 28:16, 30:13, 32:11, 33:5, 35:20, 36:11, 39:20, 41:5, 41:16, 43:21, 48:22, 50:7, 50:25, 51:18, 52:11, 63:1, 70:12, 70:20, 70:22, 71:9, 72:22, 74:22, 77:9, 77:13, 79:21, 81:17, 82:24, 83:13, 89:3, 92:13, 93:19, 98:1, 100:7
**upfront** [2] - 74:12, 75:6
**usage** [1] - 49:3
**user** [2] - 11:23, 37:12
**uses** [5] - 16:10, 16:14, 83:5, 88:20, 91:6
**USNRC** [2] - 66:9, 83:14

**V**

**value** [1] - 72:3
**various** [3] - 5:22, 15:1, 16:5
**vendor** [1] - 18:12
**verdict** [4] - 86:8,

99:9, 99:24, 101:7
**Verizon** [2] - 39:14, 95:1
**version** [2] - 56:25, 76:18
**video** [3] - 12:18, 56:20, 83:7
**view** [2] - 19:10, 65:13
**vinyl** [1] - 69:24
**vinyls** [1] - 5:23
**violating** [2] - 97:19, 97:21
**Virgin** [8] - 8:16, 9:4, 9:6, 9:9, 9:17, 82:4, 83:4
**Virgin's** [1] - 68:13
**visualize** [1] - 47:5
**Volume** [1] - 8:3
**vs** [1] - 1:10

**W**

**wait** [2] - 50:23, 69:4
**Wait** [1] - 39:20
**Wal** [7] - 7:9, 7:10, 7:11, 39:17, 39:18, 39:20, 82:5
**Wal-Mart** [7] - 7:9, 7:10, 7:11, 39:17, 39:18, 39:20, 82:5
**walk** [1] - 48:8
**walking** [2] - 48:7
**wants** [5] - 35:5, 47:23, 56:21, 77:2
**warehousing** [1] - 15:2
**washy** [2] - 7:3, 20:10
**watch** [3] - 50:7, 50:14, 50:21
**watching** [1] - 53:21
**website** [1] - 64:13
**week** [4] - 45:23, 50:14, 50:19
**weeks** [1] - 45:11
**Weinberg** [8] - 26:13, 29:20, 29:21, 32:2, 32:3, 32:22, 33:2, 94:18
**whackey** [1] - 15:22, 15:23
**whatsoever** [1] - 22:1
**wherewithal** [1] - 96:8
**whichever** [1] - 72:10
**Whoa** [1] - 76:6

**whole** [11] - 24:24, 25:19, 25:20, 31:24, 52:2, 53:15, 60:18, 62:22, 63:23, 96:5
**wholesale** [2] - 29:24, 29:25
**wholesale/retail** [2] - 29:23, 30:9
**wide** [1] - 78:9
**willing** [3] - 33:1, 50:13, 80:3
**willingness** [1] - 50:7
**win** [2] - 52:1, 99:22
**wish** [1] - 54:11
**wishy** [2] - 7:3, 20:10
**wishy-washy** [2] - 7:3, 20:10
**witness** [15] - 6:22, 6:25, 7:2, 14:15, 17:18, 23:25, 43:25, 49:12, 49:14, 52:7, 55:13, 62:4, 67:20, 80:9, 94:24
**witnesses** [8] - 50:21, 51:1, 53:16, 53:25, 56:25, 58:18, 61:25, 70:5
**WITNESSES** [1] - 102:8
**won** [3] - 36:17, 36:18, 52:1
**wool** [4] - 22:10, 30:13, 39:9, 41:22
**word** [23] - 32:4, 44:9, 55:5, 59:18, 62:7, 65:14, 65:17, 66:3, 66:13, 71:6, 74:4, 74:5, 75:11, 77:17, 81:21, 83:16, 84:3, 85:22, 93:14, 93:15, 93:17, 94:19
**wording** [1] - 77:6
**words** [55] - 16:10, 24:11, 34:5, 34:7, 35:13, 38:3, 51:3, 51:8, 51:11, 51:12, 51:16, 51:18, 51:21, 52:13, 52:14, 52:16, 52:24, 53:2, 53:3, 53:5, 53:7, 53:10, 53:11, 53:13, 53:18, 53:19, 53:20, 53:23, 59:19, 63:5, 63:13, 65:2, 65:13, 65:25, 66:1, 66:2, 66:8, 66:9, 66:17, 66:18, 67:7, 67:10, 82:22, 83:13, 83:19, 83:22, 88:12, 91:13

**Words** [1] - 84:2
**works** [4] - 40:8, 84:12, 93:1, 93:6
**world** [7] - 71:24, 76:7, 79:5, 79:7, 91:20, 92:22, 97:11
**worried** [1] - 99:18
**worry** [3] - 15:21, 32:8, 66:22
**write** [3] - 46:21, 60:12, 60:13
**writing** [1] - 31:23
**wrote** [5] - 63:2, 65:20, 66:17, 83:23

**Y**

**year** [1] - 75:13
**years** [10] - 11:15, 13:15, 19:5, 28:17, 56:7, 58:20, 79:3, 79:6, 79:7, 92:4
**Yesterday** [1] - 40:8
**yesterday** [4] - 8:25, 17:25, 44:8, 55:19
**yourself** [2] - 53:2, 81:22
**yourselves** [2] - 42:25, 86:15