1   RICHARD S. BUSCH (No. 014594) (*Pro Hac Vice*)
    Email: rbusch@kingballow.com
2   KING & BALLOW
    315 Union Street, Suite 1100
3   Nashville, Tennessee  37201
    Telephone:  615/259-3456
4   Facsimile:   615/726-5417

5   JEROME B. FALK, JR. (No. 39087)
    Email: jfalk@howardrice.com
6   DANIEL B. ASIMOW (No. 165661)
    Email: dasimow@howardrice.com
7   HOWARD RICE NEMEROVSKI CANADY
         FALK & RABKIN
8   A Professional Corporation
    Three Embarcadero Center, 7th Floor
9   San Francisco, California  94111-4024
    Telephone:  415/434-1600
10  Facsimile:   415/217-5910

11  Attorneys for Plaintiffs
    F.B.T. PRODUCTIONS, LLC, and Em2M, LLC

12  ***Co-Counsel Listed On Following Page***

13

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                     WESTERN DIVISION

17

| | |
|---|---|
| 18  F.B.T. PRODUCTIONS, LLC, and Em2M, LLC, | No. CV 07-03314 PSG (MANx) |
| 19                          Plaintiffs, | Action Filed: May 21, 2007 |
| 20           v. | PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR NEW TRIAL AND RELIEF FROM JUDGMENT ON COUNTS I AND III (Fed. R. Civ. P. 59(a), 60(b)(1)) |
| 21  AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC., and ARY, INC., | |
| 22 | |
| 23 | |
| 24                          Defendants. | Date:      May 11, 2009 Time:      1:30 p.m. Courtroom: 790 Judge:     Hon. Philip S. Gutierrez |
| 25 | |
| 26 | Trial Date:  February 20, 2009 |
| 27 | |
| 28 | |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    *Co-Counsel*

2    PAUL H. DUVALL (No. 73699)
      Email: pduvall@kingballow.com
3    KING & BALLOW
      9404 Genesee Avenue, Suite 340
4    La Jolla, California  92037-1355
      Telephone:  858/597-6000
5    Facsimile:    858/597-6008

6    MARK L. BLOCK (No. 115457)
      Email: mblock@glaserweil.com
7    GLASER, WEIL, FINK, JACOBS &
             SHAPIRO, LLP
8    10250 Constellation Blvd., 19th Floor
      Los Angeles, California  90067
9    Telephone:  310/553-3000
      Facsimile:    310/556-2920

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

# TABLE OF CONTENTS

2                                                                                    **Page**

3    INTRODUCTION AND SUMMARY OF ARGUMENT                                             1

4    PROCEDURAL HISTORY                                                               2

5           A.    Plaintiffs' Motion For Summary Judgment.                            2

6           B.    Plaintiffs' Memorandum Of Contentions Of Fact And
                  Law.                                                                3
7
            C.    The Court's Ruling On Summary Judgment And
8                 Plaintiffs' Proposed Supplemental Jury Instruction.                 3

9           D.    Trial And Judgment.                                                 4

10   ARGUMENT                                                                         5

11   I.     A NEW TRIAL IS REQUIRED BECAUSE
            INTERPRETATION OF THE RECORDING AGREEMENTS
12          WAS IMPROPERLY SUBMITTED TO THE JURY.                                     6

13          A.    Contract Interpretation Is A Question Of Law For The
                  Court Unless There Are Material Extrinsic Facts In
14                Dispute.                                                            6

15          B.    This Case Presents No Material Extrinsic Fact Disputes
                  Bearing On Credibility.                                             7
16
17   II.    THE COURT SHOULD HAVE DETERMINED AS  A
            MATTER OF LAW THAT THE THIRD PARTY
            AGREEMENTS WERE LICENSES, OR AT A MINIMUM
18          INSTRUCTED THE JURY ON THIS ISSUE.                                        10

19          A.    Characterization Of The Third Party Agreements Was A
                  Contract Interpretation Issue For The Court.                        11
20
21          B.    Even If Interpretation Of The Third Party Agreements
                  Presented A Jury Issue, The Court Failed To Properly
                  Instruct The Jury.                                                  11
22
23   III.   THE COURT SHOULD ADOPT PLAINTIFFS'
            INTERPRETATION OF THE RELEVANT AGREEMENTS,
            OR AT A MINIMUM FIND THAT THE VERDICT WAS
24          AGAINST THE CLEAR WEIGHT OF THE EVIDENCE.                                 13

25          A.    The Undisputed Evidence Overwhelmingly Supported
                  Plaintiffs' Interpretation Of The Recording Agreements.            13
26
27          B.    The Undisputed Evidence Overwhelmingly Supported
                  Plaintiffs' Position That The Third Party Agreements
                  Were Licenses.                                                      18
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

# TABLE OF CONTENTS

2

**Page**

3

IV.    EVIDENTIARY ERRORS SEVERELY PREJUDICED
PLAINTIFFS AND SHOULD BE REMEDIED BY THE

4          GRANT OF A NEW TRIAL.       20

5        A.    It Was Error To Exclude The March 24, 2004 Letter For
Its Substance And For Impeachment.      20

6

       B.    The Court Improperly Excluded The Pre-Litigation

7            Statements Of Universal And Apple Employees
Characterizing Universal's Agreements With Download

8            Providers As "Licenses."      22

9        C.    The Court Improperly Excluded The Testimony Of
Professor Menell.      24

10

       D.    The Court Improperly Allowed Defendants To Argue

11            Plaintiffs Were Merely "Lucky" To Have Met And
Signed Eminem.      24

12

CONCLUSION      25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 79 Cal. Rptr. 2d 273 (1998)          6

*Baker v. Delta Air Lines*, 6 F.3d 632 (9th Cir. 1993)          22

*Boston Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102 (N.D. Cal. 2008)          5

*California Nat'l Bank v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137, 78 Cal. Rptr. 561 (2008)          10

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 75 Cal Rptr. 3d 333 (2008)          6

*Clarendon Nat'l Ins. Co. v. Ins. Co. of the W.*, 442 F. Supp. 2d 914 (E.D. Cal. 2006), *aff'd*, 290 Fed. App'x 62 (9th Cir. Cal. 2008)          6

*Dean v. TWA*, 924 F.2d 805 (9th Cir. 1991)          22

*Del Monte Dunes v. City of Monterey*, 95 F.3d 1422 (9th Cir. 1996), *aff'd*, 526 U.S. 687, 143 L. Ed. 882, 119 S. Ct. 1624 (1999)          5

*Dorn v. Burlington N. Santa Fe R.R.*, 397 F.3d 1183 (9th Cir. 2005)          5

*Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 81 Cal. Rptr. 3d 282 (2008)          17, 18

*Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296 (9th Cir. 1978)          13

*Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 204 Cal. Rptr. 435 (1984)          7

*Goodman v. United States*, 369 F.2d 166 (9th Cir. 1966)          22

*Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 117 Cal. Rptr. 3d 220 (2002)          7

*Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 206 Cal. Rptr. 585 (1984)          21

*Jenkins v. Union Pac. R.R.*, 22 F.3d 206 (9th Cir. 1994)          12

*Jerden v. Amstutz*, 430 F.3d 1231 (9th Cir. 2005)          20

*Kendall-Jackson Winery v. E.&J. Gallo Winery*, 150 F.3d 1042 (9th Cir. 1998)          5

*Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347 (9th Cir. 1999)          5

*McDowell v. Calderon,* 197 F.3d 1253 (9th Cir. 1999)          5

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**TABLE OF AUTHORITIES**

**Page(s)**

*Med. Operations Mgmt., Inc. v. Nat'l Health Labs., Inc.*, 176 Cal. App. 3d 886, 222 Cal. Rptr. 2d 220 (1986)  6, 7, 10

*Microsoft Corp v. DAK Indus.*, 66 F.3d 1091 (9th Cir. 1995)  12

*Murphy v. City of Long Beach*, 914 F.2d 183 (9th Cir. 1990)  13

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005)  5, 20

*Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 44 Cal. Rptr. 767 (1965)  6, 10

*Qualls v. Lake Berryessa Enters., Inc.*, 76 Cal. App. 4th 1277, 91 Cal. Rptr. 2d 143 (1999)  6

*Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323 (9th Cir. 1995)  5

*Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758, 110 Cal. Rptr. 2d 844 (2001)  17

*Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882 (6th Cir. 2004)  12

*UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055 (C.D. Cal. 2008)  12, 19

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853 (9th Cir. 1992)  6

*United States v. 99.66 Acres of Land,* 970 F.2d 651 (9th Cir. 1992)  5

*United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999)  22

*United States v. Wise*, 550 F.2d 1180 (9th Cir. 1977)  12

*Vision Info. Servs, LLC v. Comm'r*, 419 F.3d 554 (6th Cir. 2005)  11

*Winet v. Price*, 4 Cal. App. 4th 1159, 6 Cal. Rptr. 2d 554 (1992)  7

*Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 76 Cal. Rptr. 3d 585 (2008)  6

**Statutes**

Fed. R. Civ. P.
  §59(a)(1)  1, 5
  §60(b)(1)  1, 5, 6

Local R. 59-1  1

Code Civ. Proc. §1858  17

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Other Authorities**

4    A. Kohn & B. Kohn, *Kohn on Music Licensing* 428 (3d ed. 2002)                 19

5    11 C. Wright, et al., *Federal Practice and Procedure*, §2805 (1995)            5

6    12 J. Moore, *Moore's Federal Practice* ¶59.13[2][b][i][B] (3d ed. 2009)    5, 11

7    J. Dratler, Jr., *Licensing of Intellectual Property* §1.01 (2008)           18, 19

8

9

10

11

12

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs F.B.T. Productions, LLC ("F.B.T.") and Em2M, LLC (collectively, "Plaintiffs") hereby move for a new trial pursuant to Federal Rule of Civil Procedure 59 and Local Rule 59-1 on Counts I and III of their Second Amended Complaint. In addition, Plaintiffs move for an order relieving them from the judgment under Federal Rule of Civil Procedure 60(b)(1). As discussed more fully below, a new trial and/or relief from judgment is warranted on several independent grounds.

First, the Court should have interpreted the contracts at issue in this action as a matter of law. Interpretation of a contract is a question of law unless there are material extrinsic facts in dispute. A material extrinsic fact dispute is (1) a conflict over historical facts, such as what was said during negotiations (as distinguished from a dispute over the appropriate inferences to be drawn from established facts); and (2) one which, depending on the factual determination, is outcome-determinative. There were no disputed material extrinsic facts in this case—*i.e.*, no factual disputes that, if resolved favorably to Defendants, would lead to their interpretation of the contract. Therefore, although the parties strongly disagreed as to the appropriate inferences that should be drawn from those facts, it was the obligation of the Court to interpret the contract. Submission of the issue of interpretation of these complex commercial agreements to a lay jury was error requiring a new trial.

Second, the Court should also have determined whether the third party agreements between defendant and digital download providers were licenses and not submitted this contract interpretation issue to the jury. Furthermore, even if there were disputed material extrinsic facts bearing on the interpretation of these agreements, the jury should have been instructed as to the appropriate legal test for determining whether these agreements were licenses. The improper submission to the jury and the failure to instruct properly on this central issue requires a new trial.

Third, on this motion, the Court is required to weigh the evidence and grant a new trial if the verdict was against the clear weight of the evidence. This is true even if

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    "substantial" evidence supported the verdict. Here, not only did the great weight of

2    the evidence support Plaintiffs—practically all of it did. Given the evidence, the

3    Court should interpret the relevant agreements against the defendants and the verdict

4    should not stand.

5        Finally, certain evidentiary rulings of the Court were erroneous, and, as the trial

6    unfolded, severely prejudicial to Plaintiffs. These evidentiary rulings precluded

7    Plaintiffs from submitting highly relevant evidence and allowed Defendants to offer

8    misleading testimony without fear of impeachment, while at the same time

9    disparaging Plaintiffs as opportunistic, unreasonable and downright greedy. Had the

10   jury known that the very attorney who drafted and negotiated the 1998 Agreement for

11   Defendants signed a letter advocating Plaintiffs' interpretation, the trial would have

12   played out very differently. A new trial is warranted on this independent ground.[1]

### PROCEDURAL HISTORY

**A.    Plaintiffs' Motion For Summary Judgment.**

15       On December 3, 2008, Plaintiffs and Defendants moved for summary judgment.

16   Doc. Nos. 170, 175. Plaintiffs asked the Court to rule as a matter of law that

17   Defendants licensed master recordings to third parties so that those third parties could

18   sell downloads and mastertones, and that paragraph 4(c)(v) of the 1998 Recording

19   Agreement, and paragraph 5(c)(v) of the 2003 Recording Agreement (the "Masters

20   Licensed provision") applied to those transactions.[2]    Defendants filed papers in

---

[1]The Court made clear at trial it would not revisit its motion in limine rulings. *See* 2/20/09 a.m. Reporter's Transcript ("RT") at 132:22-133:11; 2/24/09 p.m. RT at 61:9-63:25; 2/25/09 p.m. RT at 3:5-4:20. Plaintiffs raise these issues here to show how the exclusion of this evidence at trial ultimately prejudiced Plaintiffs in real terms, and to ensure the preservation of the issues for appeal.

[2]As this Court is aware, the 1998 Recording Agreement was the original recording agreement between Defendants and Plaintiff F.B.T., under which F.B.T. furnished the services of Eminem. *See* Trial Exhibit ("TE") 5 at 1. Paragraph 4(a)(i) is a provision of the recording agreement that specifies the royalty to be paid F.B.T. where records are being sold by Defendants through normal retail channels. *Id.* ¶4(a)(i). The 1998 Recording Agreement provides that, "notwithstanding" paragraph 4(a)(i), a different royalty will apply when Defendants license masters to others "for their manufacture and sale of records or for any other uses." *Id.* ¶4(c), ¶4(c)(v). In 2000, the parties
(continued . . .)

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  opposition on December 29, 2008, and Plaintiffs filed a reply on January 5, 2009.

2  **B.    Plaintiffs' Memorandum Of Contentions Of Fact And Law.**

3      On December 22, 2008, Plaintiffs filed their Memorandum of Contentions of Fact

4  and Law setting forth Plaintiffs' claims and the evidence supporting them, and also

5  identifying five "issues of law" they anticipated the Court deciding, including both

6  "[w]hether defendants' relationships with permanent download and Mastertone

7  providers constitute licenses of the Eminem masters" and, if so, "whether the Master

8  License provision of the 1998 and 2003 Recording Agreements specifies the

9  applicable royalty."  Doc. No. 244 at 26-29.  Consistent with the belief that the Court

10  should interpret the Recording Agreements as a matter of law, the parties also

11  submitted a joint proposed jury instruction, to be filled out by the Court, by which the

12  Court would instruct the jury as to any aspects of contractual interpretation it decided

13  as a matter of law.  *See* Doc. No. 347 at 27.

14  **C.    The Court's Ruling On Summary Judgment And Plaintiffs' Proposed
        Supplemental Jury Instruction.**

15      The Court denied both parties' summary judgment motions on January 20, 2009.

16  Doc. No. 349.  In its decision, the Court stated that summary judgment was only

17  appropriate if the agreements were "unambiguous" and found the Recording

18  Agreements "reasonably susceptible to more than one interpretation" based on the

19  extrinsic evidence before it.  *Id.* at 6, 10.  Notably, the Court did not identify a single

20  material dispute over the historic facts.  The only disputes identified concerned the

21  proper inferences to be drawn from the historic facts.  Nonetheless, the Court found

22

23  ────────────────

    ( . . . continued)

24  entered into an amendment to the 1998 Recording Agreement, the 2000 Novation,
    under which F.B.T. became a royalty participant and Defendants and Eminem were

25  given a direct relationship, but all terms of the 1998 Recording Agreement remained
    in full force and effect.  2/24/09 a.m. RT at 76:8-16; 2/26/09 a.m. RT at 21:11-17;

26  TE 9, ¶21 at 14.  In 2003, Eminem and Defendants entered into a new agreement that
    terminated the 1998 Recording Agreement while incorporating verbatim paragraphs

27  4(a)(i) and 4(c)(v) of the 1998 Recording Agreement.  TE 10, ¶¶5(a)(i), 5(c)(v).  The
    1998 and 2003 agreements are referred to collectively herein as the "Recording

28  Agreements."

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   that the parties' differing interpretation of the Recording Agreements presented

2   "triable issues of material fact." *Id*. at 10.

3       The Court further noted that Plaintiffs had presented evidence "which would

4   support a finding that at least some of the agreements between Defendants and third-

5   party permanent download providers are licenses," but declined to rule that the

6   agreements before it were in fact licenses. *Id*. at 6-7. In discussing this issue the

7   Court identified the evidence it considered relevant to this determination, including

8   whether Defendants obtained recurring benefits from the single transaction, and

9   whether title to anything was passing to the download providers. *Id*.

10      Given the language in this order, Plaintiffs drafted and submitted to the Court a

11  proposed jury instruction (the "Instruction") on this issue. Doc. No. 378. Defendants

12  subsequently submitted an opposition, and Plaintiffs replied. Doc. Nos. 391, 413. In

13  the Instruction and in the reply, Plaintiffs stated that the Instruction should be given

14  only if the Court did not find as a matter of law that the third party agreements were

15  licenses. 1/26/09 RT at 27:4-7; Doc. No. 378 at 3:10-12; Doc. No. 413 at 1-2.[3] On

16  March 2, 2009, after ruling on other outstanding instructions, the Court stated it had

17  reviewed the Instruction and it would not be given. 3/02/09 RT at 15:12-14.

18      **D.    Trial And Judgment.**

19      Trial commenced on February 20, 2009. After several days of testimony, the case

20  was submitted to the jury on March 5. The next day, the jury returned a verdict in

21  favor of Defendants on count 1 and in favor of Plaintiffs on count 2. The Court

22  entered an order on count 3 and final judgment on all three counts on March 17.

23  _____

24      [3]On February 5-6, 2009, the Court denied Plaintiffs' motion in limine No. 4,
    granted Defendants' motion in limine Nos. 1, 4 and 6. Doc. Nos. 404, 411. The
25  Court did so in each case without explanation. Prior to the trial, the Court gave each
    side 10 hours to present their case. *See* Doc. No. 384. Following its rulings on the
26  motions in limine, the Court asked the Plaintiffs to submit a memorandum explaining
    why the time period should not be reduced. Doc. No. 455. Plaintiffs complied with
27  that request and expressly requested leave to use the material excluded by the motions
    in limine at least for impeachment. Doc. No. 453 at 7 n.6. The Court thereafter
28  advised that it would not allow Plaintiffs to do so. 2/20/09 a.m. RT at 132:22-133:6.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

## ARGUMENT

Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted "on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). A new trial may be granted to correct "manifest error of law or fact." *See, e.g.*, *Boston Sci. Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102 (N.D. Cal. 2008). Under Rule 59, "[a]ny error of law, if prejudicial, is a good ground for a new trial." 11 C. Wright, et al., *Federal Practice and Procedure*, §2805 (1995).

Errors of law that should be remedied through the grant of a new trial include misapplication of state law (*see, e.g.*, *Dorn v. Burlington N. Santa Fe R.R.*, 397 F.3d 1183 (9th Cir. 2005)) and improper submission of an issue to the jury. *See, e.g.*, *Del Monte Dunes v. City of Monterey*, 95 F.3d 1422, 1426 (9th Cir. 1996), *aff'd*, 526 U.S. 687, 143 L. Ed. 882, 119 S. Ct. 1624 (1999). The Ninth Circuit has explained that "a new trial should be granted when a district court erroneously submits to a jury an issue that should have been decided as a matter of law and the basis of the jury's general verdict is unknown." *Kendall-Jackson Winery v. E.&J. Gallo Winery*, 150 F.3d 1042, 1050 (9th Cir. 1998). A new trial also should be granted where—as here—an "erroneous evidentiary ruling 'substantially prejudiced' a party" (*Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (quoting *United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992)); *Obrey v. Johnson*, 400 F.3d 691, 699 (9th Cir. 2005) (prejudice presumed if error shown)), or a court failed to give adequate instructions to the jury (12 J. Moore, *Moore's Federal Practice* ¶59.13[2][b][i][B] (3d ed. 2009) ("12 J. Moore")).

In addition, Federal Rule of Civil Procedure 60(b)(1) authorizes relief from an adverse judgment caused by "mistake." Under Ninth Circuit precedent, a judicial error justifies relief under this rule, and indeed failure to correct a clear legal error constitutes an abuse of discretion. *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.4 (9th Cir. 1999); *see also Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

347, 350 (9th Cir. 1999) (Rule 60(b)(1) reaches "mistake and inadvertence by the judge"). The Court's errors in submitting contract interpretation issues to the jury, improperly instructing the jury, excluding relevant evidence, and admitting unduly prejudicial evidence constitute "mistakes" requiring relief under Rule 60(b)(1).

## I.   A NEW TRIAL IS REQUIRED BECAUSE INTERPRETATION OF THE RECORDING AGREEMENTS WAS IMPROPERLY SUBMITTED TO THE JURY.

### A.   Contract Interpretation Is A Question Of Law For The Court Unless There Are Material Extrinsic Facts In Dispute.

Unless there are material extrinsic fact disputes bearing on credibility, the interpretation of a contract is a question of law for the court. *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992) (once disputes concerning the credibility of extrinsic evidence are resolved "the interpretation of the agreement in light of those facts is a question of law"); *Clarendon Nat'l Ins. Co. v. Ins. Co. of the W.*, 442 F. Supp. 2d 914, 922 (E.D. Cal. 2006), *aff'd*, 290 Fed. App'x 62 (9th Cir. 2008) ("Unless it turns on the credibility of conflicting extrinsic evidence or on underlying facts that are in dispute, the interpretation of an insurance policy is solely a question of law"); *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 75 Cal Rptr. 3d 333 (2008); *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865-66, 44 Cal. Rptr. 767 (1965); *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126-27, 1134, 76 Cal. Rptr. 3d 585 (2008); *Qualls v. Lake Berryessa Enters., Inc.*, 76 Cal. App. 4th 1277, 1283, 91 Cal. Rptr. 2d 143 (1999); *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 799, 79 Cal. Rptr. 2d 273 (1998). "[I]t is solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." *Parsons*, 62 Cal. 2d at 865.

This rule applies even when extrinsic evidence has been admitted on the contract interpretation issue, so long as there are no material factual disputes as to "foundational extrinsic evidence." *See id.*; *Badie*, 67 Cal. App. 4th at 799. "Foundational extrinsic evidence," a phrase taken from *Medical Operations*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

*Management, Inc. v. National Health Laboratories, Inc.*, 176 Cal. App. 3d 886, 891, 222 Cal. Rptr. 2d 220 (1986), refers to disputes over the historic facts—*i.e.*, disputes about "the credibility of extrinsic evidence" (*id.*), such as whether a particular letter was sent, or a particular statement made, during the contract negotiations. *See, e.g.*, *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 527, 117 Cal. Rptr. 3d 220 (2002). The rule also applies if the only disputed extrinsic evidence is irrelevant or otherwise inadmissible. *See Winet v. Price*, 4 Cal. App. 4th 1159, 1165-66 & n.3, 6 Cal. Rptr. 2d 554 (1992).

Finally, contract interpretation remains an issue of law even where disputes exist about the inferences to be drawn from uncontradicted extrinsic evidence:

> [I]t is only when conflicting inferences arise from conflicting evidence, not from uncontroverted evidence, that the trial court's resolution is binding. The very possibility of . . . conflicting inferences, actually conflicting inter-pretations, far from relieving the appellate court of the responsibility of interpretation, signalizes the necessity of its assuming that responsibility. (*Med. Operations Mgmt., Inc.*, 176 Cal. App. 3d at 891 (quoting *Parsons*, 62 Cal. 2d at 866 n.2 (citation and internal quotation marks omitted)))

*See also Garcia v. Truck Ins. Exch.*, 36 Cal. 3d 426, 439, 204 Cal. Rptr. 435 (1984) ("It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, *even when conflicting inferences may be drawn*") (emphasis added).

## B. This Case Presents No Material Extrinsic Fact Disputes Bearing On Credibility.

One of the two primary issues in this case involves the proper interpretation of the 1998 and 2003 Recording Agreements. Specifically, does the Masters Licensed provision apply to all licenses of master recordings not otherwise specifically provided for in the agreement? Applying the law of contract interpretation discussed in Part I(A), *supra*, to the evidence presented demonstrates that the Court should have resolved this issue as a matter of law since there were no material factual disputes as to the historical facts. What was disputed was what the extrinsic evidence *meant,* not the extrinsic evidence itself. In essence, extrinsic evidence was admitted in the

following broad categories—all without dispute as to the historic or "foundational" facts:

- Amendment of Form for New Agreements. It is undisputed that starting in around 2002, just as Universal began entering into third party digital download agreements, both Aftermath and UMG/Interscope amended their form agreements to specify that digital downloads would be paid as record sales by the record companies, and not as licenses, even if the new agreements were licenses. *See, e.g.*, TE 13 at Ex. B at 24, ¶9.02(c)(1)(i); TE 7 at Ex. A at A3, ¶A-1(d)(7); 2/24/09 p.m. RT at 49:8-52:7; 2/25/09 a.m. RT at 54:4-56:9, 57:17-59:2; 2/26/09 a.m. RT at 29:18-30:6.

- Attempt to Amend Existing Agreements. There is no dispute that in 2002, UMG's General Counsel instructed all labels, including Interscope and Aftermath, to offer to amend existing recording agreements to provide that this new royalty arrangement would apply to license agreements under which third parties sold permanent downloads. *See* TE 777; 2/25/09 a.m. RT at 49:24-52:25, 53:18-23; 2/26/09 a.m. RT at 22:6-23:7, 27:21-25.

- Contemporaneous Expressions of Intent. There was no material conflict in the evidence about the negotiations of the Recording Agreements. For instance, it is undisputed that, prior to entering into the 1998 Recording Agreement, neither party expressed its understanding as to whether the Masters Licensed provision covered all licenses of master recordings not otherwise provided for.[4]

- Prior Licensing Arrangements. It is undisputed that prior to Defendants' decision not to pay royalties for licenses for others to sell permanent downloads under

---

[4]There is some dispute over whether Interscope attempted to include a provision concerning this new royalty arrangement in the 2003 Recording Agreement, but this dispute is not material. Defendants' evidence that the new arrangement was not discussed does not support Defendants' interpretation, and Plaintiffs need not—and do not—rely on the recollection of Stiffelman that the proposal was made and rejected. Whichever recollection is correct, the fact remains that the royalty formula in the 1998 agreement was not changed. Accordingly, the difference of recollections about the 2003 discussions would not affect the outcome of the case and provides no basis for submitting contract interpretation to the jury.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

the Masters Licensed provision, no license agreements had ever been excluded from that or similar clauses. *See* 2/26/09 p.m. RT at 82:7-21, 85:3-5; 3/4/09 p.m. RT at 134:12-135:1. Likewise undisputed was evidence that on occasion Defendants licensed entire albums to record clubs for the clubs' manufacture and sale of records and paid 50% royalties to artists under the Masters Licensed provision. 2/24/09 p.m. RT at 26:20-28:11; 2/25/09 a.m. RT at 18:6-17; 2/25/09 p.m. RT at 82:8-84:1.[5]

- Royalties for Conditional Downloads. It is undisputed that Interscope/UMG paid Plaintiffs and others for conditional downloads and streams under the Masters Licensed provision. *See* TE 777; 2/25/09 a.m. RT at 28:24-29:2, 38:8-13, 43:21-24, 77:22-24; 2/25/09 p.m. RT at 37:21-38:11. Nor is it disputed that in these situations Defendants provide the same electronic file to third parties as they do with permanent downloads and that the download companies—whether permanent, conditional, or both—are put to the same requirements. *See, e.g.*, 2/25/09 a.m. RT at 41:2-43:16; 2/25/09 p.m. RT at 18:24-19:5, 20:19-25, 34:6-18, 38:23-39:6, 41:7-42:25, 51:4-65:4; 2/26/09 p.m. RT at 26:21-28:8; *see* TE 326 at Ex. D.

- Royalties for Permanent Downloads. It is undisputed that Interscope/UMG created a new royalty structure, not expressly provided in the Recording Agreements, to pay Plaintiffs (and others under their similar agreements) for permanent downloads and mastertones. *See* TE 777; 2/25/09 a.m. RT at 43:21-48:14.

- Historic Basis for Different Royalty Rates. There was no conflict in the testimony as to the reasoning for the different royalties in the Records Sold versus Masters Licensed provisions. The Records Sold provision is designed to apply where the Defendants are selling records themselves, and therefore have manufacturing, distribution, and inventory responsibilities and/or costs associated with each

---

[5] Although record clubs are addressed in a separate paragraph of the Recording Agreements at issue here, they are frequently covered by the masters licensing provision of recording agreements, including in Universal's amended 2003 form agreement. *See* 3/4/09 p.m. RT at 8:16-21.

-9-

1    individual unit sold.  2/26/09 p.m. RT at 76:20-80:3, 82:12-83:13.  In the context of a

2    license, Defendants bear no individual unit or manufacturing responsibilities or costs.

3    2/24/09 a.m. RT at 83:20-84:14; 2/25/09 p.m. RT at 19:11-18; TE 790.

4        As this review shows, none of the material foundational extrinsic evidence was

5    disputed.  Conflicting *opinion* testimony was offered about what the foundational

6    extrinsic evidence *meant* and what inferences could be drawn from it, and a number

7    of witnesses opined on the ultimate legal issue.  *See, e.g.*, 3/4/09 p.m. RT at 126:19-

8    127:24, 125:9-23; 2/24/09 p.m. RT at 28:12-29:14; 2/26/09 p.m. RT at 82:4-91:24.

9    Such testimony does not create a material extrinsic fact dispute, however, because it

10   goes not to historical facts or the credibility of extrinsic evidence, but to the ultimate

11   issue of law—the meaning of the contracts—which can only be resolved by the Court.

12   Even if admissible, such testimony does not create a conflict in the foundational

13   extrinsic evidence.  It is rather information that the Court may use, if it wishes, in

14   deciding how to weigh the extrinsic evidence in interpreting the contract.  *See, e.g.*,

15   *Med. Operations Mgmt., Inc.*, 176 Cal. App. 3d at 891; *Parsons*, 62 Cal. 2d at 866

16   n.2; *see also California Nat'l Bank v. Woodbridge Plaza LLC*, 164 Cal. App. 4th 137,

17   143, 78 Cal. Rptr. 561 (2008) (conflicting testimony concerning the parties' differing

18   interpretations of the contract does not amount to a conflict in the extrinsic evidence).

19   Under controlling California law, contract interpretation in this case was a matter for

20   the Court, and delegation of this function to the jury was error requiring a new trial.

21   **II.    THE COURT SHOULD HAVE DETERMINED AS  A MATTER OF LAW**
         **THAT THE THIRD PARTY AGREEMENTS WERE LICENSES, OR AT**
22       **A MINIMUM INSTRUCTED THE JURY ON THIS ISSUE.**

23       In addition to allowing the jury to interpret the Recording Agreements, the Court

24   permitted the jury to decide whether the third party agreements with providers of

25   permanent downloads and mastertones were licenses.  This too was a matter of law

26   that should have been decided by the Court.  At the least, the Court should have

27   instructed the jury as to the proper legal standard for making this determination.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

**A.    Characterization Of The Third Party Agreements Was A Contract Interpretation Issue For The Court.**

Whether an agreement constitutes a license or a sale is a question of contract interpretation which, like every question of contract interpretation, is a question of law unless there are material extrinsic facts in dispute.  *See* Part I, *supra*; *Vision Info. Servs., LLC v. Comm'r*, 419 F.3d 554, 558 (6th Cir. 2005) (determining the "legal issue" of whether an agreement constituted a sale or a license by applying standard principles of contract interpretation).

There was no conflicting material evidence on this issue. The terms of the agreements were undisputed.  Nor was there any dispute about the other "foundational extrinsic evidence" presented on this issue, such as whether Defendants obtain recurring benefits from the single transaction.  *See* Declaration of Richard Busch, filed concurrently herewith ("Busch Decl.") Ex. 1; TE 70-80, 326-492, 875-881, 964; 2/25/09 p.m. RT at 51:20-52:17, 21:17-24:8.  Where there was conflict was in the *opinion* testimony offered about the ultimate legal issue—*i.e.*, whether the agreements were licenses or sales.  *See, e.g.*, 2/26/09 p.m. RT at 43:18-45:6, 85:12-86:21.  As discussed above, however, such testimony does not create a material extrinsic fact dispute that warrants removal of the issue from the jury.  *See* Part I(A), *supra*. Accordingly, as with the question of how to interpret the Recording Agreements, the issue presented was the inferences to draw from undisputed facts.  This was an issue for the Court to decide, and it was error to delegate the issue to the jury.

**B.    Even If Interpretation Of The Third Party Agreements Presented A Jury Issue, The Court Failed To Properly Instruct The Jury.**

Moreover, even if the issue of whether the third party agreements were licenses was a jury question, it was error not to instruct the jury on the proper legal standard for making this determination.  "A new trial may be properly granted when a judge issues incorrect jury instructions, or fails to give a properly requested jury instruction, that would taint the deliberation process."  12 J. Moore, ¶59.13[2][b][i][B].  Where a

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    court errs in not giving a jury instruction, and that error is not harmless, the verdict

2    cannot be allowed to stand. *See, e.g.*, *Jenkins v. Union Pac. R.R.*, 22 F.3d 206, 210

3    (9th Cir. 1994). On appeal, failure to give a jury instruction is reversible error if "(1)

4    the omitted instruction is a correct statement of the law, (2) the instruction is not

5    substantially covered by other delivered charges, and (3) the failure to give the

6    instruction impairs the requesting party's theory of the case." *Tompkin v. Philip*

7    *Morris USA, Inc.*, 362 F.3d 882, 901 (6th Cir. 2004).

8      Plaintiffs proposed a specific instruction on this issue. *See* Doc. No. 378. The

9    Instruction was a correct statement of Ninth Circuit law, setting forth the factors

10    found in *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1060 (C.D. Cal.

11    2008): intent to regain (or retain) possession of the item at issue, recurring benefits

12    accruing to the contractor, and a "benefit" to the contractor such as facilitating a given

13    transaction without jeopardizing intellectual property rights. Further, *Augusto* drew

14    these factors directly from Ninth Circuit precedent: *Microsoft Corp v. DAK Indus.*, 66

15    F.3d 1091, 1095 (9th Cir. 1995), and *United States v. Wise*, 550 F.2d 1180, 1190 (9th

16    Cir. 1977). Although Defendants argued in their opposition to the Instruction that

17    these were in some way *not* the proper factors, this Court already signaled its approval

18    of those factors in its decision denying summary judgment, when it considered these

19    very factors, cited *Augusto*, and noted that the evidence it viewed "suggests that the

20    [Apple] agreement was a license." Doc. No. 349 at 6-7.

21      The failure to give the Instruction substantially impaired Plaintiffs' theory of the

22    case. No other instruction gave the jury any basis to determine whether Defendants'

23    agreements with download providers were "licenses" or "sales." Without guidance

24    from the Court, the jury was at sea in attempting to evaluate both Defendants' claim

25    that the third party agreements were sales arrangements and Plaintiffs' considerable

26    evidence that the agreements bore the indicia of licenses. Indeed, the jury was even

27    led by Defendants to believe that Plaintiffs had wasted its time by presenting evidence

28    going to the factors in the Instruction. 3/5/09 p.m. RT at 59:15-61:11.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

-12-

1
2
3

**III.  THE COURT SHOULD ADOPT PLAINTIFFS' INTERPRETATION OF THE RELEVANT AGREEMENTS, OR AT A MINIMUM FIND THAT THE VERDICT WAS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE.**

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

For the reasons discussed in Parts I and II, *supra*, contract interpretation in this case was a question of law.  Based on the evidence at trial, the issue should have been resolved in favor of Plaintiffs, and the Court should now correct its judgment in this regard.  However, even if the Court believes that the jury should have interpreted the contracts, a new trial is still required because the verdict was against the clear weight of the evidence.  On a new trial motion, a court has "the duty [] to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence."  *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).  The judge can weigh the evidence and assess witness credibility, and need not view the evidence from the perspective most favorable to the prevailing party.  *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1302 (9th Cir. 1978).  On both of the critical issues in the case—whether the Masters Licensed provision applied to all licenses, and whether the third party agreements were licenses—the relevant evidence overwhelmingly favored Plaintiffs.

19
20

**A.  The Undisputed Evidence Overwhelmingly Supported Plaintiffs' Interpretation Of The Recording Agreements.**

21
22
23
24
25
26
27
28

We start with the language of the Recording Agreements and several observations about it.  The "Records Sold" provision of the Recording Agreements specifies the royalty on "full-price records sold in the United States . . . through normal retail channels."  TE 5, ¶4(a)(i)(A); TE 10, ¶5(a)(i).  The "Masters Licensed" provision, which is preceded by the phrase "Notwithstanding the foregoing" provides a different royalty for "masters licensed by us or our [NRS] Licensees to others for their manufacture and sale of records or for any other uses."  TE 5, ¶¶4(c), 4(c)(v); TE 10, ¶¶5(c), 5(c)(v).  By their terms, both clauses apply to "records."  The Records Sold

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

provision is limited to sales through "normal retail channels," but the Masters Licensed provision contains no such limitation in its text, thus apparently reaching licenses for the sale of records by others whether or not through normal retail channels. The provisions appear to overlap substantially, but with the key distinction that the Masters Licensed provision covers transactions in which the master is "licensed" to "others" and it is the "others" who sell "records." Finally, in the event a particular transaction could be read to be covered by both provisions, the phrase "[n]otwithstanding the foregoing" means that the Masters Licensed provision should control. The logical, straightforward reading of this language is that the Masters Licensed clause covers licenses to third parties—whether or not those third parties used their licenses to manufacture "records" and whether or not those third parties sold through "normal retail channels."

The extrinsic evidence admitted by the Court overwhelmingly supported this straightforward reading of the Recording Agreements. Peter Paterno, who represented Aftermath in connection with the 1998 Recording Agreement (2/24/09 p.m. RT at 15:17-16:9, 19:21-20:7), confirmed that the Masters Licensed provision was intended to apply to just what it said—and not anything less. 2/24/09 p.m. RT at 28:20-29:14. He and others confirmed that licensees may sell records through normal retail channels and that the license provision in recording agreements has always applied to all sales by licensees, whether through normal retail channels or not. 2/24/09 p.m. RT at 26:1-18, 29:8-14; 2/25/09 a.m. RT at 19:6-20:2; 2/26/09 p.m. RT at 13:24-14:9, 85:3-10, 91:20-23; 3/4/09 a.m. RT at 33:9-14; 3/4/09 p.m. RT at 125:24-126:10, 147:16-21. The only question in determining whether the licensing provision applies has always been simply whether the transaction between the record label and a third party doing the selling is a license. *See* 2/24/09 p.m. RT at 8:21-24, 9:1-8; 2/26/09 p.m. RT at 82:7-21, 85:3-5; 3/4/09 a.m. RT at 33:9-14, 57:1-12, 72:7-10. Plaintiffs' expert, David Berman, confirmed this fact repeatedly, and Defendants' expert, Jeffrey Harleston, who works directly for UMG's General Counsel, also

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

-14-

admitted he knew of no license agreements to which the licensing provision has not historically applied.[6]  2/26/09 p.m. RT at 82:7-21, 85:3-5; 3/4/09 p.m. RT at 134:12-135:1.  There is no evidence in this record to the contrary.[7]

Reasonable inferences drawn from Defendants' conduct also support Plaintiffs' interpretation.  Although Defendants offered other explanations for their decision to amend their form agreement, the most reasonable inference to draw from this fact is that Defendants were concerned about the applicability of the Masters Licensed provision under the pre-existing agreements.  Indeed, the senior lawyer at Interscope admitted that concern about such claims was "one reason" they amended the form.  2/26/09 a.m. RT at 30:11-31:17.

Finally, Plaintiffs presented uncontradicted evidence that the lower royalty rate in the Records Sold provision was intended to compensate Defendants for the responsibility and costs of manufacturing, storing, and distributing each individual unit—and that no such cost is borne by Defendants when they provide a digital file to a third party and license that party to make records.  2/24/09 a.m. RT at 83:20-84:14; 2/26/09 p.m. RT at 76:20-80:3, 82:12-83:13; 2/25/09 p.m. RT at 19:11-18; TE 790.  The senior vice president of business and legal affairs at Universal Music Group testified that the cost to Defendants for the sale of physical CDs is approximately

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

---

[6]Michael Ostroff, UMG's General Counsel, also testified there was nothing in paragraph 4(c)(v) limiting what it applied to, and stated he was unaware of language anywhere else in the 1998 Recording Agreement that would limit its reach.  2/25/09 a.m. RT at 27:21-25, 37:9-14.  Mr. Rand Hoffman, the senior legal officer at defendant Interscope, likewise confirmed that master license provisions in recording agreements are purposefully drafted broadly.  2/26/09 a.m. RT at 17:2-6.

[7]Defendants argue that the third parties hired to manufacture Defendants' CDs need a "copyright license" and that Defendants do not pay for CDs under the Masters Licensed provision in this situation. 3/5/09 p.m. RT at 58:18-59:6.  It is undisputed, however, that Defendants pay for each individual CD so manufactured, that the manufacturer returns the CDs to Defendants, and that Defendants then sell the CDs to retailers through their own distribution company.  2/25/09 p.m. RT at 84:24-85:10; 2/26/09 p.m. RT at 76:20-79:19; 3/4/09 a.m. RT at 25:3-12; 3/4/09 p.m. RT at 105:2-106:1.  Accordingly, Defendants are not licensing anything to another for the "manufacture *and sale of records.*"  To the contrary, Defendants are selling the CDs themselves.  2/25/09 p.m. RT 84:24-85:10.  These sales, not the manufacturing of the CDs, are the royalty bearing events.  2/26/09 p.m. RT at 80:24-81:10.

-15-

$1.25 per unit.  3/5/09 a.m. RT at 10:2-22.  Meanwhile, the cost to Defendants to create a digital file of an entire Eminem album is approximately $800—and the download providers are required to reimburse Defendants even for that.  2/25/09 p.m. RT at 21:2-9; TE 790; TE 964 at 03B001-03C005.  Furthermore, there are no individual unit manufacturing or distribution costs incurred thereafter regardless of how many times the album, or an individual track, is downloaded.  2/25/09 p.m. RT at 25:3-14; TE 790.  The sale of ten million CDs of an Eminem album results in Defendants incurring more than $12 million in manufacturing costs (before counting the significant costs of warehousing and distributing the goods), while the download of ten million of the same album on iTunes ultimately costs them nothing in manufacturing and distribution costs.  3/5/09 a.m. RT at 10:2-22.[8]

In response to the clear language of the agreements and the overwhelming inferences in favor of Plaintiffs from the extrinsic evidence, Defendants offered only evidence that was, for all practical purposes, beside the point.  First, Defendants adduced testimony that permanent downloads are considered "records" and argued that "a record is a record is a record."  *See, e.g.*, 2/24/09 a.m. RT at 45:14-23, 46:11-18, 47:1-6, 52:21-53:10, 53:18-23, 59:21-23, 62:5-8, 70:16-19; 3/4/09 p.m. RT at 96:23-97:22, 99:3-100:20; 3/5/09 p.m. RT at 54:10-18, 81:13-15.  But because *both* the Masters Licensed and Records Sold provision cover records, that is irrelevant to determining which provision applies.  Similarly, Defendants presented testimony that they regard iTunes and other permanent download providers as "normal retail

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[8]One of Defendants' witnesses asserted that Universal spent approximately $10 million for a system to provide digital files to download companies.  3/4/09 p.m. RT at 106:2-107:9.  This evidence has little weight given that: (1) it was unclear what it covered (*e.g.*, did it include Defendants' failed attempt to build their own digital distribution platform?), (2) the same system provides files to download companies offering conditional downloads and streams, which Defendants pay for under the license provision; and (3) the royalty rate in the Records Sold provision was intended to compensate Defendants for the *per unit* cost of manufacturing, storing and distributing individual records, not fixed costs.  2/26/09 p.m. RT at 82:22-83:13, 76:20-78:1.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  channels" (*see, e.g.*, 2/24/09 a.m. RT at 46:11-18, 47:14-17, 59:10-60:24, 70:20-71:2;

2  3/4/09 p.m. RT at 115:7-24, 126:19-127:17; 3/5/09 p.m. RT at 55:7-56:11, 64:8-65:6,

3  84:17-19), but that also is irrelevant since the question remains whether Defendants

4  are licensing their master recordings to these providers or not.  The uncontested

5  evidence showed that various licensees of Defendants sold "records" through normal

6  retail channels and such sales had always been paid under the Masters Licensed

7  provision (*see, e.g.*, 2/25/09 a.m. RT at 19:6-20:2; 2/26/09 p.m. RT at 85:3-10, 91:20-

8  23).[9]

9      Defendants also asserted that the Masters Licensed provision applies only to

10  licenses for uses within someone else's product, and not to licenses of Defendants'

11  own "core" product.  2/24/09 a.m. RT at 47:24-48:3, 62:9-63:15; 3/4/09 p.m. RT at

12  116:17-117:17.  This argument is unsupported by any contractual language; to the

13  contrary, the clause in questions refers to masters licensed "for any use."  It would be

14  improper for the Court to read such a limitation into the contract.  Doing so would

15  violate the "fundamental principle that in interpreting contracts . . . courts are not to

16  insert what has been omitted."  *Safeco Ins. Co. of Am. v. Robert S.*, 26 Cal. 4th 758,

17  764, 110 Cal. Rptr. 2d 844 (2001); *see also* Code Civ. Proc. §1858 ("In the

18  construction of a statute or instrument, the office of the Judge is simply to ascertain

19  and declare what is in terms or substance contained therein, not to insert what has

20  been omitted, or to omit what has been inserted"); *Edwards v. Arthur Andersen LLP*,

21

22  ───────────
     [9]On November 1, 2004, Eminem and Defendants entered into an amendment of the
23  2003 Recording Agreement.  TE 17.  The amendment provided that "[s]ales of
     [a]lbums by way of permanent download will be treated as USNRC net sales for
24  *purposes of escalations.*" *Id.* ¶2(a) (emphasis added).  This language was inserted at
     the request of Eminem's attorney, Gary Stiffelman, so that sales of full albums by
25  iTunes and other download providers would be counted towards the escalation
     numbers.  2/24/09 a.m. RT at 85:22-86:20, 87:12-88:8; 2/26/09 a.m. RT at 37:10-
26  38:10.  There was no discussion at the time or intent by the parties that this language
     changed the position of Eminem or Plaintiffs that third party digital downloads should
27  be paid for under the Masters Licensed provision (2/24/09 a.m. RT at 82:22-83:11,
     87:12-88:8).  The testimony also was consistent that this provision had no application
28  to individual track downloads or mastertone sales by iTunes or similar companies.
     2/26/09 a.m. RT at 38:11-39:9; *see* TE 17 ¶2(a); Doc. No. 349 at 9 n.6.

44 Cal. 4th 937, 954, 81 Cal. Rptr. 3d 282 (2008).  Moreover, although Defendants pointed out several examples of instances where a licensing provision was applied to licenses for uses within someone else's product, there was no testimony or evidence offered to show that other types of licenses were excluded.  In fact, the testimony established just the opposite.  Mr. Harleston—Defendants' own expert and the senior vice president of business and legal affairs at Universal Music Group—admitted that he could not think of any licenses that historically had been excluded from the Masters Licensed provision.  3/4/09 p.m. RT at 134:12-135:1.  And as discussed above, the undisputed evidence showed that entire albums (which Defendants characterize as their product) have historically been licensed by Defendants to record clubs and paid under the master licensing provision of recording agreements.[10]  The only difference is that licensing has grown to be a significant part of Defendants' business and Defendants are resisting the economic changes in their relationships with artists that follow.[11]

**B.    The Undisputed Evidence Overwhelmingly Supported Plaintiffs' Position That The Third Party Agreements Were Licenses.**

Plaintiffs presented overwhelming evidence that the Third Party Agreements with providers of permanent downloads and mastertones were licenses.  In its summary judgment ruling, the Court identified a number of factors that indicated a particular transaction was a license and not a sale.  Doc. No. 349 at 6-7; *accord*, J. Dratler, Jr.

---

[10]Mastertones—thirty seconds of an individual song—would in any event not be considered Defendants' core product, and no evidence was offered showing that it is considered to be such.  There was, therefore, not any evidence presented or shown by Defendants that their "our product" argument could conceivably apply to third party sales of mastertones pursuant to a license by Defendants *even under Defendants' interpretation of the contract*.

[11]On summary judgment, Defendants raised language from the 2000 Novation, and 2003 Recording Agreement, which referred to Plaintiffs sharing in Eminem's royalties for all purposes, including ancillary uses of master recordings, and argued that this language meant that the master license provision only applied to so-called ancillary uses of master recordings.  Doc. No. 170-2 at 20:14-19.  At trial, however, Defendants abandoned that argument, and neither presented evidence that such was the case, nor argued that such was the case.

HOWARD RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   *Licensing of Intellectual Property* §1.01 (2008); A. Kohn & B. Kohn, *Kohn on Music*

2   *Licensing* 428 (3d ed. 2002). The evidence on these factors was overwhelming and

3   essentially uncontradicted. Defendants do not sell anything to the download provid-

4   ers, the download providers do not obtain title of the digital files, ownership of all

5   information remains with Defendants, the download providers have no first sale

6   rights, and Defendants obtain recurring benefits from the single transaction. Busch

7   Decl. Ex. 1; TE 70-80, 326-492, 875-881, 964; 2/25/09 p.m. RT at 21:17-24:8, 51:20-

8   52:17. In contrast, when Defendants sell a record to a retailer, title immediately

9   passes to the retailer, the retailer has first sale rights, the retailer can do with the

10  record what it wants, the retailer can resell the record, and the record label credits the

11  artist's account at the time of the sale. 2/25/09 a.m. RT at 42:17-43:16; 2/25/09 p.m.

12  RT at 30:18-31:6, 32:23-33:13, 36:13-17; 2/26/09 p.m. RT at 80:11-81:10.

13      Defendants attempted to rebut this position with evidence that the third party

14  agreements utilized a wholesale/retail price structure, more typically associated with a

15  sale than a license. 2/25/09 p.m. RT at 59:22-60:13. But such a structure was also

16  used in connection with other digital products that Defendants admit are licenses.

17  2/26/09 p.m. RT at 31:25-32:19, 35:9-15. The bottom line is that Defendants are only

18  paid if and when a consumer downloads a song, and the download providers owe

19  nothing if that never occurs. 2/25/09 p.m. RT at 52:3-52:13. The way that

20  Defendants label these agreements does not change the essential characteristic—that

21  digital download providers receive a license from UMG to reproduce and distribute

22  the sound recording masters in question.[12] *See Augusto*, 558 F. Supp. 2d at 1060;

23  *Microsoft Corp.*, 66 F.3d at 1095 (economic realities rather than labels control the

24  characterization of an agreement).

25      In sum, the verdict was against the overwhelming weight of the evidence, both as

26  

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

27  [12]Moreover, the mastertone agreements drafted by the third parties mobile phone companies actually identify themselves as license agreements. *See* Busch Decl. Ex. 1;

28  TE 70-80, 326-492, 875-81, 964; 2/25/09p.m. RT at 21:17-24:8.

-19-

to the meaning of the Recording Agreements and the nature of the third party agreements. This is a case in which a jury, asked to construe a complex agreement and sort through a number of confusing arguments without proper instruction not only got it wrong, but reached a verdict unsupported by the evidence. Plaintiffs should be granted a new trial.

## IV. EVIDENTIARY ERRORS SEVERELY PREJUDICED PLAINTIFFS AND SHOULD BE REMEDIED BY THE GRANT OF A NEW TRIAL.

The Court excluded from any use in this case the following: (1) a March 24, 2004 letter signed by Mr. Paterno (and others) (the "2004 Letter") stating that the major labels' position "that paid downloads are equivalent to sales of CDs . . . deprives [artists] of the benefits of their contracts and unjustly enriches the labels" (Doc. No. 227-4); (2) testimony and statements by multiple representatives of Defendants and third party download providers to the effect that the third party agreements were licenses; and (3) the testimony of Plaintiffs' expert, Professor Peter Menell. In addition, the Court permitted Defendants to argue that Plaintiffs were lucky to have met and signed Eminem and to emphasize the amount of money Plaintiffs had earned, testimony that was not relevant to any issue in the case. These rulings were erroneous, severely prejudicial, and constitute independent grounds for a new trial. *See Obrey v. Johnson*, 400 F.3d 691, 699 (9th Cir. 2005) (prejudice presumed if error shown); *Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir. 2005).

### A. It Was Error To Exclude The March 24, 2004 Letter For Its Substance And For Impeachment.

Defendants' Motion in limine Number 4 ("MIL 4") asked the Court to exclude the 2004 Letter from evidence for all purposes. The Court granted Defendants' motion without hearing or explanation. Doc. No. 404. Twice during trial Defendants explicitly opened the door to introduction of the letter, but the Court again ruled it could not be introduced. The Court stated then that it was maintaining its position because the 2004 Letter was not specifically tied to the agreements at issue in this

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   action.    2/24/09 p.m. RT at 62:17-63:2.    This decision was error and severely

2   prejudiced Plaintiffs.

3       As an initial matter, the undisputed evidence at trial was that the Masters Licensed

4   provision is a standard provision in recording agreements, as is paragraph 4(a)(i), and

5   no reason appears that this most critical piece of evidence uniquely should have been

6   excluded because it references this standard provision generally found in recording

7   agreements rather than the 1998 and 2003 Recording Agreements specifically.

8   Moreover, it was undisputed that Mr. Paterno represented Aftermath and drafted the

9   1998 Recording Agreement using his standard form.    Thus, the 2004 Letter

10  constitutes a direct admission by the adverse party—through its attorney—concerning

11  the parties' intent.    While unexpressed intent ordinarily should not be considered in

12  interpreting a contract, there is a fundamental exception: an admission by the adverse

13  party to a contract that its understanding at the time of contracting was consistent with

14  the other side's proposed interpretation is admissible to help interpret the contract,

15  even if the witness never expressed that understanding during the negotiations. *See*

16  *Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 413-15, 206 Cal. Rptr. 585

17  (1984).  The 2004 Letter falls squarely within this doctrine.

18      Exclusion of the 2004 Letter severely prejudiced Plaintiffs.  Mr. Paterno was the

19  key witness in the case; it would have been explosive—to put it mildly—for the jury

20  to learn that Defendants' own contract negotiator agreed with Plaintiffs' interpretation

21  and had stated specifically that it was not appropriate under similar recording

22  agreements to treat third party download sales as if the record labels were selling CDs

23  through normal retain channels.  Moreover, exclusion of the 2004 Letter prevented

24  Plaintiffs from having their expert, David Berman, use it to support his custom and

25  practice position. *See* Busch Decl. Ex. 2.  The exclusion of the Letter also allowed

26  several other witnesses to testify without fear of being confronted with a letter from

27  Defendants' own attorney, and allowed counsel for Defendants to state in closing

28  argument that Plaintiffs had not shown that any other artist got the treatment Plaintiffs

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

were seeking—without fear that Plaintiffs could show that nearly every major artist representative had complained about the treatment. The exclusion of the Letter was nothing short of devastating to Plaintiffs' case and its exclusion warrants a new trial. *See, e.g.*, *Baker v. Delta Air Lines*, 6 F.3d 632 (9th Cir. 1993).

Even more troubling, the Court also ruled that the 2004 Letter could not be used to impeach Mr. Paterno. Even if the 2004 Letter were irrelevant on its merits, it should have been admitted to impeach a witness's testimony. *See, e.g.*, *United States v. Hands*, 184 F.3d 1322, 1327 (11th Cir. 1999); *Goodman v. United States*, 369 F.2d 166, 169 (9th Cir. 1966). This ruling seriously compromised the integrity of the trial. First, Mr. Paterno testified at his deposition that he viewed lawsuits such as this case as "baseless." *See* Doc. No. 318 at 3. This testimony occurred before he knew Plaintiffs were aware of his letter or an email he sent an associate stating that the letter was unlikely to yield results and therefore a particular rights-holder "should sue." *See* Doc. No. 318 at 3-4; Doc. No. 326 ¶¶34-35. The jury should have been allowed to see that one of Defendants' central witnesses had advocated the very position he now called "baseless." Second, Mr. Paterno testified that he did not amend his own form agreement because of a concern that artist representatives could argue the licensing provision applied to permanent downloads and mastertones. 2/24/09 p.m. RT at 55:2-22, 56:21-57:11. He said such a concern had never crossed his mind. 2/24/09 p.m. RT at 56:21-57:11. Plaintiffs should have been permitted to introduce the Letter to impeach this testimony. Disallowing the use of this letter for impeachment severely prejudiced Plaintiffs and is alone a sufficient basis for the grant of a new trial. *See, e.g.*, *Dean v. TWA*, 924 F.2d 805, 812 (9th Cir. 1991).

**B.   The Court Improperly Excluded The Pre-Litigation Statements Of Universal And Apple Employees Characterizing Universal's Agreements With Download Providers As "Licenses."**

As a result of the Court's decision to grant Defendants' Motion in limine Number 6 ("MIL 6") (Doc. No. 404), Plaintiffs were prevented from offering: (1) pre-litigation testimony by Larry Kenswil, head of UMG's eLabs division, in which he repeatedly

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    stated that Defendants license their recordings for downloads (Doc. No. 227-9);

2    (2) testimony by Eddie Cue, the head of Apple's iTunes division, who also repeatedly

3    testified that Apple licenses recordings from the major record labels (Doc. No. 227-

4    16); (3) an essay authored by Steve Jobs of Apple, in which he repeatedly stated the

5    same (Doc. No. 227-8); and (4) statements by Jimmy Iovine, Chairman of defendant

6    Interscope, who also stated that Defendants license their recordings for digital

7    downloads. *See* Doc. No. 326-23 at 133:21-136:12; Doc. No. 227-10.  At trial, the

8    Court explained that it granted MIL 6 because the declarants were "unconnected to

9    the recording agreements." 3/3/09 RT at 3:12-14:7.  With all due respect, this missed

10   the point of the proffered testimony.  The issue was the characterization of third party

11   agreements with permanent download providers.  Defendants offered testimony at

12   trial that the third party agreements were not licenses.  *See, e.g.*, 2/26/09 p.m. RT at

13   30:8-31:23, 43:18-45:6; 3/4/09 p.m. RT at 136:1-137:1, 137:25-138:9.  The excluded

14   testimony was directly pertinent to this issue and would have tended to show that, at

15   less guarded moments, Defendants' representatives and the parties on the other side of

16   the third party agreements freely conceded that the agreements were licenses.  It also

17   would have severely (and justifiably) undermined the credibility of key defense

18   witnesses and would have reinforced one of Plaintiffs' primary themes: the lengths to

19   which Defendants went to camouflage the download agreements as something other

20   than a license agreement,[13] when they knew full and well these were licenses.[14]  In the

21   context of this case, where Plaintiffs were limited to eight hours of testimony and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[13]Most importantly, David Weinberg claimed he scratched out the word "license" in a draft mastertone agreement prepared by T-Mobile not out of a concern about the master license provision but because the nature of the transaction was a sale/resale transaction.  2/26/09p.m. RT at 38:2-12, 43:18-44:23.  The sworn testimony of his boss, Larry Kenswil, before the Copyright Royalty Board, that these agreements are indeed license agreements, would have been used to show this testimony to be false. *See* Doc. No. 227-9.  All of the above would also have been used to respond to Mr. Hoffman's claim that the relationship with Apple and others was a sale/resale agreement.  2/26/09 a.m. RT at 32:18-33:4; TE 19.

[14]The Court's ruling on MIL No. 7 to exclude admissions by Defendants in the *Eight Mile Style* litigation was also prejudicial error for the same reasons.

could not possibly present evidence about the specifics of each of these third party agreements, the inability to introduce Defendants' summary characterizations of the agreements was severely prejudicial.

## C.    The Court Improperly Excluded The Testimony Of Professor Menell.

Defendants' Motion in limine Number 1 asked the Court to exclude the testimony of Plaintiffs' expert, Prof. Peter Menell, on the grounds that it was inadmissible legal opinion and without foundation. Doc. No. 225. After a full briefing (Doc. Nos. 316, 356, 398), the Court granted Defendants' motion without hearing or explanation. Doc. No. 411. Although the issue was fully briefed before trial, we raise it again to show that Plaintiffs suffered prejudice from the ruling. The jury was given no instruction on how to distinguish between a sale and a license. Prof. Menell would have testified as to custom and usage in digital licensing as well as the legal and economic difference between the two types of transactions, thus aiding the jury in placing the testimony received in context. Prof. Menell also would have explained the evolution of economic functions in the recording industry, providing the jury was a cohesive understanding of the rationale for the royalty structure of recording agreements. *See* Doc. No. 316 at 10, 12-13, 17-19. This was a pertinent area of extrinsic evidence (and one in which the Court admitted other testimony) and its exclusion severely prejudiced Plaintiffs' case.

## D.    The Court Improperly Allowed Defendants To Argue Plaintiffs Were Merely "Lucky" To Have Met And Signed Eminem.

Plaintiffs' Motion *in limine* 4 asked the Court to preclude Defendants from arguing Plaintiffs are "lucky" or "fortunate," since the evidence would have had no purpose other than to imply "that [P]laintiffs are not entitled to have their contracts honored, or that they have reaped all that they are entitled to, or that the [D]efendants are somehow more deserving of the monies earned through exploitation of the Eminem masters despite the language of the agreements." Doc. No. 235 at 3. The Court denied Plaintiffs' motion without articulating its reasoning or basis therefore.

1    Doc. No. 404.  Allowing this evidence was prejudicial error.

2        The denial of this motion allowed Defendants to make the very argument

3    articulated in Plaintiffs' memorandum, which became one of the themes of their case:

4    because Plaintiffs "got rich" and "made millions," the jury should not find in their

5    favor.  2/24/09 a.m. RT at 43:7-9, 71:21-24, 73:4-21; 3/5/09 p.m. RT at 75:19-23,

6    86:4-8.  Defendants' punctuated their argument by references to the sentence in the

7    2000 Novation stating Plaintiffs were, as of that agreement, "passive income

8    participants" (2/24/09 a.m. RT at 72:15-25, 73:9-14), and Defendants used this

9    language to repeatedly imply that Plaintiffs received monies from the exploitation of

10   the Eminem masters in return for nothing.  Indeed, one only need read Defendants'

11   closing argument to see that this was the main theme of the case: Plaintiffs have made

12   a lot of money, and will continue to make a lot of money, even though they are

13   supposedly not writing songs for Eminem any longer.  3/5/09 p.m. RT at 46:13-24,

14   75:19-23, 78:18-23, 86:4-8.  This improper argument was meant only to arouse the

15   passion and prejudice of the jury, and should result in the ordering of a new trial.

16                                    **CONCLUSION**

17       For the foregoing reasons, Plaintiffs respectfully request that the Court set aside

18   the jury's verdict, and order a new trial.

19   DATED: March 30, 2009.

20   Respectfully,

21   RICHARD S. BUSCH                    JEROME B. FALK, JR.
22   PAUL H. DUVALL                      DANIEL B. ASIMOW
     KING & BALLOW                       HOWARD RICE NEMEROVSKI
23                                          CANADY FALK & RABKIN
                                         A Professional Corporation
24

25   By: _____/s/_____              By: _____/s/_____
              RICHARD S. BUSCH                   DANIEL B. ASIMOW

26   Attorneys for Plaintiffs F.B.T.     Attorneys for Plaintiffs F.B.T.
27   PRODUCTIONS, LLC, and Em2M, LLC     PRODUCTIONS, LLC, and Em2M, LLC

28   W03 033009-178190001/Y10/1556268/F

                                         -25-