GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
Melinda.LeMoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC., <br><br> Defendants. | CASE NO.  CV 07-03314 PSG (MANx) <br><br> OPPOSITION TO PLAINTIFFS' MOTION FOR A NET TRIAL AND RELIEF FROM JUDGMENT ON COUNTS 1 AND III <br><br> Judge:  Hon. Philip S. Gutierrez <br> Date:   May 11, 2009 <br> Time:   1:30 P.M. <br> Ctrm:   Roybal 790 |

7635196.1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

II.   LEGAL STANDARD ..................................................................... 2

III.  ARGUMENT ............................................................................... 3

    A.   Plaintiffs Expressly Waived Any Claim that the Court Erred By
        Failing to Rule as a Matter of Law that All Licenses Are Subject
        to the "Masters Licensed" Provision ...................................... 3

    B.   The Court Did Not Err in Submitting the Issue to the Jury ................. 6

        a.   The jury had to weigh competing expert testimony
            regarding music industry custom and practice................ 7

        b.   The jury had to weigh competing evidence of the
            parties' pre-dispute course of performance.................... 12

        c.   The jury had to weigh the credibility of additional
            evidence to determine which interpretation was
            more reasonable.............................................. 13

    C.   The Court Did Not Err in Refusing to Rule or Instruct the Jury
        on the Legal Meaning of the Disputed Term "License".................... 15

        1.   Plaintiffs waived any claim that the Court should have
            ruled as a matter of law that the Third-Party Agreements
            were "licenses." ............................................ 15

        2.   Plaintiffs were not entitled to a ruling or instruction on the
            Third-Party Agreements being "licenses" as a legal matter..... 16

    D.   The Jury's Verdict Was Not Against the Clear Weight of the
        Evidence......................................................... 18

    E.   The Court Correctly Barred Irrelevant and Unfairly Prejudicial
        Evidence......................................................... 22

        1.   The Court properly excluded the March 2004 letter ............... 22

        2.   The Court properly excluded stray uses of the word
            "license." ................................................. 24

        3.   The Court properly excluded Plaintiffs' "legal" expert .......... 24

        4.   Plaintiffs were not prejudiced by any reference to their
            "good luck." .............................................. 25

1

**TABLE OF CONTENTS**
**(continued)**

2

**Page**

3    IV.    CONCLUSION ................................................................................................ 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FEDERAL CASES

*Beech Aircraft Corp. v. United States,*
   51 F.3d 834 (9th Cir. 1995)...............................................................................4, 16

*Fireman's Fund Ins. Co. v. Aalco Wrecking Co.,*
   466 F.2d 179 (8th Cir. 1972)....................................................................................3

*In re DAK Indus., Inc.,*
   66 F.3d 1091 (9th Cir. 1995)..................................................................................18

*Kaiser Steel Corp. v. Frank Coluccio Const. Co.,*
   785 F.2d 656 (9th Cir. 1986)....................................................................................4

*Landes Constr. Co. v. Royal Bank of Canada,*
   833 F.2d 1365 (9th Cir. 1987)..................................................................................3

*Nationwide Trans. Fin. v. Cass Info. Systems, Inc.,*
   523 F.3d 1051 (9th Cir. 2008)..........................................................................17, 25

*Palmer v. Hoffman*
   318 U.S. 109 (1943)................................................................................................6

*Passantino v. Johnson & Johnson Consumer Prods.,*
   212 F.3d 493 (9th Cir. 2000)....................................................................................3

*Porterco, Inc. v. Igloo Prods. Corp.,*
   955 F.2d 1164 (8th Cir. 1992)..................................................................................5

*Reed v. AMF Western Tool, Inc.,*
   431 F.2d 345 (9th Cir. 1970)....................................................................................4

*Ruvalcaba v. City of Los Angeles,*
   64 F.3d 1323 (9th Cir. 1995)..................................................................................22

*Shimko v. Guenther,*
   505 F.3d 987 (9th Cir. 2007)....................................................................................3

*Slaven v. American Trading Transp. Co., Inc.*
   146 F.3d 1066 (9th Cir. 1998)............................................................................4, 16

*Union Oil Co. v. Terrible Herbst, Inc.,*
   331 F.3d 735 (9th Cir. 2003)....................................................................................3

*Voohries-Larson v. Cessna Aircraft Co.,*
   241 F.3d 707 (9th Cir. 2001)....................................................................................5

*Wallace v. City of San Diego,*
   479 F.3d 616 (9th Cir. 2007)....................................................................................3

*Zhang v. Am. Gem Seafoods, Inc.,*
   339 F.3d 1020 (9th Cir. 2003)..............................................................................2, 5

### STATE CASES

*City of Hope Nat'l Med. Ctr v. Genentech, Inc.,*
   43 Cal. 4th 375 (2008)....................................................................................6, 7, 15

*Crestview Cemetery Ass'n v. Dieden,*
   54 Cal. 2d 744 (1960).......................................................................................12, 20

*Employers Reinsurance Co. v. Superior Court,*
   161 Cal. App. 4th 906 (2008).............................................................................21, 22

### STATE CASES (CONT.)

*Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuit, Inc.*,
   59 Cal. App. 3d 948 (1976) ........................................................................................ 8

*Warner Constr. Corp. v. City of Los Angeles*,
   2 Cal. 3d 285 (1970) ................................................................................................. 8

*Wolf v. Superior Court*,
   114 Cal. App. 4th 1343 (2004) ("Wolf I") ............................................................. 8, 9


### STATE STATUTES

Cal. Civ. Code § 1644, § 1645 ........................................................................................ 8


### FEDERAL RULES

Fed. R. Civ. P. 51 .......................................................................................................... 5

Fed. R. Civ. P. 51(c)(1) ................................................................................................. 5

Fed. R. Civ. P. 51(d)(1)(B) ........................................................................................... 5

Fed. R. Civ. P. 59 .......................................................................................................... 2

Fed. R. Civ. P. 59(a)(1)(A) ........................................................................................... 2

C.D. Cal. Civil Local Rule. 59-1.3 ............................................................................. 23

Fed. R. Evid. 402 ........................................................................................................ 24

Fed. R. Evid. 403 ........................................................................................................ 23

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Not one of the grounds in Plaintiffs' Motion for a New Trial or for Relief from Judgment ("Motion") presents the Court with any cause to grant a new trial:

***Plaintiffs waived their claims that the Court should have ruled as a matter of law in their favor.***  In their first and second claims of error, Plaintiffs ask for rulings as a matter of law that they *never asked for* during trial.  The failure to object or seek that relief before judgment constitutes a waiver this Court should strictly enforce.

***The Court's submission of the case to the jury was not error.***  Plaintiffs' claim is simply wrong.  This Court already concluded at summary judgment that issues of fact precluded ruling as a matter of law.  Summary Judgment Order (Doc. No. 349).  At trial, the witnesses' credibility was critical in resolving conflicts in the evidence, especially as to industry custom and practice – which Plaintiffs' Motion completely ignores.  As permitted under California law, the jury made the necessary credibility determinations and interpreted the contracts accordingly.

***A ruling or instruction on the legal definition of the word "license" was wholly unsupported by the evidence.***   Plaintiffs argue that the jury should have been instructed on a legal definition of the word "license," or told that the agreements between UMG Recordings and download and mastertone providers ("Third-Party Agreements") were "licenses."  Plaintiffs still fail to recognize that the issue in this case is *what the parties intended* by the terms of the recording agreements at issue ("Recording Agreements")[1].  The issue is not what constitutes a "license" under the federal copyright law or another legal standard – it is *what the parties' expectations were* about which royalty treatment would apply to new configurations, like permanent downloads and mastertones.  Summary Judgment Order at 10.  This Court correctly refused Plaintiffs' instruction because there was

---

[1] The Recording Agreements at issue are trial exhibits (TE)  5, 9, 10 and 17.

1   absolutely no evidence that any party intended the word "license" in the Recording

2   Agreements to have a meaning defined by some case law or statute, and indeed

3   Plaintiffs' own expert refuted that theory.

4       ***The clear weight of the evidence favored Defendants, not Plaintiffs.***  Even

5   if Plaintiffs' claimed errors had any basis – and they do not – the outcome would

6   still have to be exactly the same.  The clear weight of the evidence supports

7   Defendants' interpretation and the jury's verdict.  A download sold through iTunes

8   is simply the sale of a record through a normal retail channel – and the royalty paid

9   for such a sale reflects the parties' reasonable expectations at the time of

10  contracting.  Plaintiffs' perfunctory arguments do not show that the verdict was

11  against the clear weight of the evidence, so there is no basis for a new trial.

12      ***This Court's evidentiary rulings present no reason to grant Plaintiffs a new***

13  ***trial***.  In a series of arguments Plaintiffs concede are made purely to preserve the

14  issues for appeal, Plaintiffs again dredge up this Court's decisions on the motions *in*

15  *limine*.  The Court correctly excluded several pieces of evidence that held at most

16  only marginal relevance, and would have consumed needless hours of trial time

17  with distracting and unfairly prejudicial side-issues.  Plaintiffs cannot show

18  substantial prejudice, and have given this Court no reason to reconsider any of

19  those rulings.

20      All of these claims can be easily dismissed, and the Court should deny the

21  Motion in its entirety.

22  **II.    LEGAL STANDARD**

23      Because Federal Rule 59 authorizes the district court to grant a new jury trial

24  "for any reason for which a new trial has heretofore been granted in an action at law

25  in federal court," Fed. R. Civ. P. 59(a)(1)(A), the courts are "bound by those

26  grounds that have been historically recognized."  *Zhang v. Am. Gem Seafoods, Inc.*,

27  339 F.3d 1020, 1035 (9th Cir. 2003) (affirming district court's denial of motions for

28  new trial and judgment as a matter of law).  The Ninth Circuit has stated that "[t]he

trial court may grant a new trial *only* if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Shimko v. Guenther*, 505 F.3d 987, 993 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n. 15 (9th Cir. 2000)) (emphasis added).

Plaintiffs have not met this heavy burden and do not come close to establishing a basis for a new trial. It is well settled that mere "[d]oubts about the correctness of the verdict are not sufficient grounds for a new trial." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987). Accordingly, a district court may only grant a new trial because of insufficient evidence when the court "is left with the definite and firm conviction that a mistake has been committed" by the jury. *Id.* at 1371-72. *See also Wallace v. City of San Diego*, 479 F.3d 616, 631 (9th Cir. 2007) (reversing grant of new trial and holding that "the jury's verdict was not against the great weight of the evidence"); *Union Oil Co. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003) (reversing grant of new trial and noting "[i]t is not the court's place to substitute our evaluations for those of the jurors"); *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.,* 466 F.2d 179, 187 (8th Cir. 1972) (reversing grant of new trial and observing that "the jury's verdict must at least be against the great weight of the evidence before a new trial may be granted").

The Court should deny the Motion in its entirety.

## III.  **ARGUMENT**

### A.  **Plaintiffs Expressly Waived Any Claim that the Court Erred By Failing to Rule as a Matter of Law that All Licenses Are Subject to the "Masters Licensed" Provision.**

Plaintiffs' Motion urges that the Court erred by failing to rule as a matter of law that the "masters licensed" provision applies "to all licenses of master recordings not otherwise specifically provided for in the agreement." Mot. at 7. Plaintiffs may not assert this claim of error. Plaintiffs *specifically waived* this

1    argument when the jury instructions were settled, and failed to revisit it before the

2    matter was submitted to the jury.  *See Beech Aircraft Corp. v. United States*, 51

3    F.3d 834, 841 (9th Cir. 1995) (presentation of error for the first time in post-trial

4    motions constitutes waiver); *accord Reed v. AMF Western Tool, Inc*., 431 F.2d 345,

5    349 n.2 (9th Cir. 1970); *Slaven v. American Trading Transp. Co., Inc.* 146 F.3d

6    1066, 1069 (9th Cir. 1998) (failure to raise claim of error before judgment

7    constitutes waiver); *Kaiser Steel Corp. v. Frank Coluccio Const. Co.*, 785 F.2d 656,

8    657-58 (9th Cir. 1986) (waiver from failure to object before post-verdict motion).

9        Plaintiffs claim that the Court should have ruled as a matter of law because

10    the extrinsic evidence did not conflict.  Mot at 7-8.  Before trial, the parties

11    submitted a jury instruction intended to cover precisely the situation Plaintiffs now

12    claim arose at trial.  Joint Instruction No. 25A was entitled "No Conflict in

13    Extrinsic Evidence - Court Interprets Contract."  Doc. No. 347 at 27.  The

14    instruction provided a form for the Court to instruct the jury on the substance of any

15    interpretation made as a matter of law.  The parties included a note, stating that the

16    instruction was to be given if – as Plaintiffs now argue – "there is no conflict in the

17    extrinsic evidence that the jury must resolve."  *Id.*

18        Plaintiffs dismissed this instruction in the midst of trial.  Before the final day

19    of testimony, at the conference held to settle the instructions, the Court asked the

20    parties whether Joint Instruction 25A applied in the case.  Plaintiffs' counsel

21    responded: "[W]e believe 25A is not applicable." RT 14:6-16 3/2/09.  Defendants

22    reserved their rights as to 25A pending a motion for judgment as a matter of law.

23    *Id.*  But Plaintiffs *specifically disavowed* the precise argument they now make in

24    their Motion – that the evidence did not conflict, and that it was up to the Court to

25    interpret any aspect of the Recording Agreements.  They cannot now base a motion

26    for a new trial on a claim of error they explicitly waived.  *See, e.g.* 9B Wright &

27    Miller, Federal Practice & Procedure, § 2472 ("A party will not be allowed to

28    speculate with the court by letting error go without any comment and then seek a

1    new trial on the basis of the error if the outcome of the case is unfavorable.");

2    *Porterco, Inc. v. Igloo Prods. Corp.*, 955 F.2d 1164, 1173 (8th Cir. 1992) ("Once

3    the district court had expressed its intention to send the issues . . . to the jury, it was

4    incumbent upon Igloo to call the court's attention to any incipient error.").

5         Plaintiffs essentially argue that the Court erred in failing to give Joint

6    Instruction 25A, or in failing to otherwise instruct the jury that the "masters

7    licensed" provision applies to any and all licenses not otherwise provided for. Mot.

8    at 7. "This argument fails for the simple reason that they never sought such an

9    instruction." *Zhang,* 339 F.3d at 1030.  Under Federal Rule of Civil Procedure 51,

10   Plaintiffs' failure to raise this objection before the jury retired precludes this claim

11   of error.  This would be true even if Plaintiffs had not specifically told the Court

12   that 25A was not applicable.

13        Federal Rule of Civil Procedure 51 provides that a party may claim the

14   failure to give an instruction as error only if the instruction was properly requested

15   and the error was properly objected to.  Fed. R. Civ. P. 51(d)(1)(B).  At the hearing

16   between the Court and the parties to settle the instructions, the party claiming error

17   must object "on the record, stating distinctly the matter objected to and the grounds

18   for the objection."  Fed. R. Civ. P. 51(c)(1).  The Ninth Circuit "has long enjoyed

19   the reputation as the strictest enforcer of Rule 51."  *Voohries-Larson v. Cessna*

20   *Aircraft Co.*, 241 F.3d 707, 713 (9th Cir. 2001).  Under controlling Ninth Circuit

21   authority, Plaintiffs' failure to object to the lack of an instruction on this point

22   constitutes waiver that is beyond review.  *Id*.

23        Enforcing the waiver only makes sense, especially in this case when

24   Plaintiffs not only failed to object, but *specifically disavowed* the instruction.

25   Plaintiffs' failure to raise any claim of error before the jury retired would give them

26   "two bites at the apple" if they were allowed to obtain a new trial on that basis now.

27   They cannot sit by silent and claim error only if the verdict does not come back as

28   they had hoped.  *See Palmer v. Hoffman*  318 U.S. 109, 119 (1943) (holding that

1    "in fairness to the trial court and the parties," a claimed error in instructions will not

2    garner a new trial unless brought to the court's attention before the verdict).  Under

3    clear, applicable Ninth Circuit precedent, the failure to present this claim of error

4    before the verdict constitutes a waiver that this Court should strictly enforce.

5              **B.    The Court Did Not Err in Submitting the Issue to the Jury.**

6              Even if it were not waived, Plaintiffs' claim of error has no merit. The ruling

7    Plaintiffs say they should have received – that all "licenses" are subject to the

8    "masters licensed" provision – begs the question that was at the heart of this case.

9    What did the parties intend to be subject to the "masters licensed" provision?  Did

10   the parties reasonably expect permanent downloads and mastertone sales to be

11   treated as "licenses" under that provision, or did the parties reasonably expect that

12   they would be treated instead as "records sold . . . through normal retail channels"?

13   As the Court correctly held in denying Plaintiffs' summary judgment motion, the

14   factual disputes about what is covered by the "masters licensed" provision

15   precluded ruling for Plaintiffs as a matter of law.  Similarly, at trial, the competing

16   evidence precluded the broad ruling Plaintiffs now claim they should have received.

17             In order to rule in Plaintiffs' favor on the scope of the "masters licensed"

18   provision, the Court would have had to resolve the conflicting evidence and make

19   critical credibility determinations in Plaintiffs' favor.  That would have been error.

20   Under California law, the jury – not the Court – properly makes these kinds of

21   credibility assessments and then interprets the contract.  *See City of Hope Nat'l*

22   *Med. Ctr v. Genentech, Inc.,* 43 Cal. 4th 375, 395 (2008) (holding that, when the

23   intent of the parties "depends on the credibility of extrinsic evidence, that

24   credibility determination *and the interpretation of the contract* are questions of fact

25   that may properly be resolved by the jury.") (emphasis added).[2]

26

27   _____

     [2] Defendants maintain that the evidence was sufficient to establish that Defendants'
     interpretation is the correct one as a matter of law.  But the submission of the case

28   to the jury could not have prejudiced Plaintiffs.

1    Plaintiffs' Motion adopts a limited view of what kind of conflicting evidence

2    a jury may resolve – dismissing all of the conflicting evidence in this case as

3    somehow outside the jury's purview.  According to Plaintiffs, a jury resolves only

4    conflicts in "foundational extrinsic evidence," such as whether a letter was sent, or

5    whether a statement was made during negotiations.  Mot. at 7.   Plaintiffs dismiss

6    the considerable conflicting evidence in this case as either "immaterial" evidence or

7    "opinion" evidence.  Mot. at 8 n.4, 10.  That misstates both the law and the record.

8    A jury's role in contract interpretation is not as confined as Plaintiffs

9    contend.  "Juries are not prohibited from interpreting contracts."  *City of Hope*,  43

10   Cal. 4th at 395.  If they were, then there would be no reason for California's Civil

11   Jury Instructions to include the several form instructions on tools of interpretation

12   the Court used to instruct the jury in this case.  *See* CACI, § 314-320.  Nor are

13   juries limited to considering only the "historical" or "foundational" evidence, and

14   none of the cases Plaintiffs cite say that.  Rather, when interpretation of a contract

15   depends on the credibility of conflicting extrinsic evidence, the jury makes the

16   credibility determination and interprets the contracts.  *City of Hope*,  43 Cal. 4th at

17   395.  In addition to conflicting evidence about the "historical" or "foundational"

18   negotiations of the contract, the jury evaluates other conflicting facts such as any

19   conflicting evidence of industry custom and practice, and conflicting versions of the

20   parties' pre-dispute course of performance.  *All* of these types of conflicting

21   evidence were presented in this case.

22          **a.     *The jury had to weigh competing expert testimony***
23          ***regarding music industry custom and practice****.

24   Under long-settled California law, the jury's role in contract interpretation

25   includes evaluating the credibility of conflicting expert testimony, like that

26   presented in this case regarding custom and practice in the recording industry.  As

27   the California Supreme Court has held:

28          We hold that, since the interpretation of the crucial
             provisions turned on the credibility of expert testimony,

1
2

> the court did not err in submitting the construction of the contract to the jury.

3    *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 289 (1970); *see also*

4    *Heggblade-Marguleas-Tenneco, Inc. v. Sunshine Biscuit, Inc.*, 59 Cal. App. 3d

5    948, 956 (1976) (noting that issues of credibility arising from extrinsic evidence in

6    contract interpretation are for the jury as the trier of fact). Here, evidence of the

7    parties' understanding of the contract terms included expert testimony on the

8    meaning that is usually given to those terms by people who work in the recording

9    industry. *See* Instruction No. 28-29; Cal. Civ. Code § 1644, § 1645. When such

10   evidence conflicts, the jury assesses witness credibility and resolves the conflict.

         The recent case of *Wolf v. Walt Disney Pictures & Television* is on point, and

11   solidly refutes Plaintiffs' cramped version of what evidence the jury may consider.

12   162 Cal. App. 4th 1107, 1115 (2008) ("*Wolf II*"). In *Wolf I & II*, the parties

13   disputed the meaning of the contract term "gross receipts." *Id*. at 1117. There was

14   *no* evidence of any discussion about the key disputed term during contract

15   negotiations. *See Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1346-47 (2004)

16   ("*Wolf I*"). The only extrinsic evidence offered was testimony – including expert

17   testimony – about the general understanding of "gross receipts" in the entertainment

18   industry. *Wolf II*, 162 Cal. App. 4th at 1117-18. The trial court initially rejected

19   the evidence and ruled as a matter of law. *Id*. at 1115. The Court of Appeal

20   reversed and remanded, holding that the expert testimony raised a triable issue of

21   fact. *Wolf I*, 114 Cal. App. 4th at 1354-55. The Court of Appeal later affirmed the

22   trial court's submission of the meaning of the term "gross receipts" to the jury, even

23   though the case involved *none* of the conflicting "historical" or "foundational"

24   evidence Plaintiffs here insist the jury is limited to resolving. *Wolf II*, 162 Cal.

25   App. 4th at 1117-18. Here, just as in *Wolf I & II*, conflicting extrinsic evidence –

26   including expert testimony – defeated ruling for Plaintiffs as a matter of law, and

27   the Court's submission of the dispute to the jury did not constitute prejudicial error

28

1  to Plaintiffs.

2         Plaintiffs' Motion whistles past the graveyard, completely ignoring the

3  conflicting expert testimony that was at the heart of this trial. The parties' experts,

4  Mr. David Berman for Plaintiffs and Mr. Jeffrey Harleston for Defendants, sharply

5  disagreed about how contract terms such as "masters licensed," "records sold,"

6  "sales through normal retail channels," and others were understood in the recording

7  industry. These disputes precluded the legal ruling Plaintiffs now say they were

8  entitled to:

9         • Mr. Berman testified that the custom and practice in the recording
              industry was to apply the "masters licensed" provision to *every*
10             transaction involving a license, and that the presence of some aspect of
              a license was the end of the inquiry. RT 84:4-10, 85:3-5 /26/08 PM.
11

12        • By contrast, Mr. Harleston explained that the "masters licensed"
              provision in the recording industry is typically understood to apply
13             only when the record company's recordings are incorporated into
              another party's products, not to sales of the record company's own
14             records. RT 96:1-18; 115:25-117:17; 125:24-126:18 3/4/09 PM.

15        • Mr. Berman offered several "indicia" he claimed were historically
              understood within the industry to determine whether the "masters
16             licensed" provision applied, including whether title passes, whether the
              record company bears costs, and whether the sale price was expressed
17             as a percentage of retail. RT 86:2-87:2 2/26/09 PM.

18        • According to Mr. Harleston's description of recording industry
              practice, *none* of Mr. Berman's "indicia" affected the royalty
19             determination. RT 123:19-127:24; 115:25-118:6 3/4/09 PM.

20        • Mr. Berman also testified that the application of Sections 4(a) and 5(a)
              of the Recording Agreements to permanent downloads and
21             mastertones was wrong, because the clause "sales *through* normal
              retail channels" in those provisions actually was understood to mean
22             "sales *to* normal retail channels." Applying his "indicia," Mr. Berman
              contended the industry would understand the Third Party Agreements
23             to be "licenses" under the "masters licensed" provision. So, even if
              the iTunes Store could be considered a normal retail channel
24             (something Mr. Berman would not testify to), the transaction would be
              understood as a "license to" and not a "sale to" that normal retail
25             channel. Therefore, Mr. Berman explained that the industry would
              understand Sections 4(a) and 5(a) as inapplicable in the case of
26             downloads and mastertones, because there was no sale "*to*" a normal
              retail channel to be covered by Sections 4(a) and 5(a). RT 32:8-34:6;
27             60:6-64:19 3/4/09 AM; 71:6-72:10 3/4/09 PM; 76:12-19, 85:12-25,

28

86:23-87:24, 91:16-23 2/26/09 PM.

- By contrast, Mr. Harleston explained that the phrase "sales through normal retail channels" meant just what it said, sales *through* retailers to the consumer. Mr. Harleston explained the concept of a "normal retail channel" in the industry as a place where records are purchased, including the iTunes Store or amazon.com. RT 115:7-24 3/4/09 PM. He further explained that the industry understood and applied the provision to records sold *through* those retailers to customers, regardless of whether someone viewed the transaction with the retailer as a license or a sale. RT 122:17-123:18 3/4/09 PM. He explained that industry custom and practice is to account for sales of the record company's own records *through* those retailers under the "sales through normal retail channels" provision regardless of configuration – whether as compact discs, cassettes, vinyl, 8-track, or permanent download. RT 114:12-115:24, 127:1-24 3/4/09 PM. He demonstrated the iTunes Store, and showed how record companies market their products on the website just as they do their physical product in record stores. RT 109:12-114:8 3/4/09 PM.[3] According to Mr. Harleston, the accepted practice is to treat all configurations of records -- including permanent downloads and mastertones -- similarly from both a marketing and royalty perspective. RT 102:13-104:25; 127:1-24 3/4/09 PM.

The experts thus presented critical factual disputes about the accepted understandings and practices in the recording industry with regard to key provisions at issue. Both versions of accepted recording industry practice could not be true. To resolve this factual dispute, the jury had to weigh the experts' competing credibility, decide which one to believe, and interpret the contracts based on the facts. The jury did exactly that, electing to believe Mr. Harleston over Mr. Berman, and with good reason.

In their response to Defendants' motion *in limine* arguing for Mr. Berman's exclusion, Plaintiffs argued that Mr. Berman's lack of relevant experience would be appropriate material for "vigorous cross-examination" rather than grounds for exclusion. Doc. No. 320 at 7. While Defendants still believe Mr. Berman should have been excluded, Plaintiffs were correct that his lack of experience provided

---

[3] Mr. Harleston's testimony was consistent with that of Eddy Cue, the iTunes vice president who explained that the iTunes Store was meant to be exactly like physical record stores like Target or Best Buy. RT 8:5 2/26/09 AM; Cue Dep., 194:2-7.

fertile ground for cross-examination.  On cross, Defendants revealed several problems with Mr. Berman's credibility:

- Mr. Berman had not worked in the music industry since 2001, two years before the iTunes store opened.  He had no experience interpreting or negotiating contracts involving permanent downloads, the critical issue in the case.  RT 10:6-15:20 3/4/09 AM.

- Mr. Berman repeatedly refused, often angrily, to opine on whether either iTunes or amazon.com was a "normal retail channel."  RT 32:16-33:2; 50:24-52:12 3/4/09 AM.  He insisted that he did not care, and dismissed the questions as "a smokescreen."  RT 71:6-15 3/4/09 AM.  It was not a smokescreen, it was an element of the competing royalty provision and a critical part of Defendants' case.  The jury was entitled to conclude that Mr. Berman just did not want to offer an opinion that could be unhelpful to Plaintiffs.

- The jury saw that Mr. Berman changed his testimony in deposition after conferring with Plaintiffs' counsel about what he should say.  After Mr. Berman testified that a sale of a permanent download through iTunes was a sale through a normal retail channel, he and Plaintiffs' counsel took a break.  When he returned, Mr. Berman backpedaled considerably, insisting that his answer was not meant to "push" the transaction into Defendants' royalty provision.  RT 60:11-69:2 3/4/09 AM.

- When asked whether Plaintiffs' counsel suggested that he use certain words, Mr. Berman initially claimed not to remember, but then was impeached with his deposition testimony.  Mr. Berman testified that Plaintiffs' counsel had reminded him to call the relationship between Universal and Apple a "license," and not to refer to Apple's "distribution."  RT 73:7-75:8 3/4/09 AM.

- Mr. Berman insisted that the contract, by referring to "sales *through* a normal retail channel," actually meant "sales *to* a normal retail channel," because under his theory Universal does not sell anything through retailers to consumers, but only sells records to retailers.  When the conflict in the contractual text was pointed out, Mr. Berman dismissed the contract's provision as "deceptive," and that "words can be deceptive and words can be ambiguous and words can be wrong."  RT 33:19-24 3/4/09 AM.

- When confronted with contractual language that favored Defendants' interpretation, Mr. Berman just dismissed it as "sloppy drafting."  RT 95:11-97:13 3/4/09 AM.

Mr. Harleston presented a more credible counter[4] to Mr. Berman's testimony. By contrast to Mr. Berman, Mr. Harleston had actual experience negotiating and interpreting contracts in the post-download era, including applying contracts from the pre-download era to today's distribution of permanent downloads and mastertones.  RT 92:14-93:13 3/4/09 PM.  Mr. Berman's refusal to entertain any theory other than his own and his obvious efforts to bend over backwards for Plaintiffs' counsel simply did not make for a credible witness.  The jury was entitled to dismiss Mr. Berman's description of industry custom and practice and instead credit Mr. Harleston's.

### b.    *The jury had to weigh competing evidence of the parties' pre-dispute course of performance.*

The parties also introduced conflicting evidence of their performance under the contracts before this dispute arose.  Such evidence is entitled to "great weight" as a "reliable means of interpreting an ambiguous contract." *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 752-53 (1960).

Defendants introduced evidence that Plaintiffs knew how they were being paid for permanent downloads and accepted that royalty treatment for years without comment.  That acceptance without objection is strong evidence that the accounting treatment was consistent with what the parties agreed to in the Recording Agreements.  Witnesses testified that as far back as 2003, it was widely known in the industry how record companies were paying artists for permanent downloads. RT 31:8-21 2/26/09 AM.  Defendants also demonstrated that royalty statements sent to Plaintiff F.B.T. as far back as 2002 tracked sales of permanent downloads and treated them as record sales. RT 108:4-116:7 2/26/09 AM.  But Plaintiffs'

---

[4] As the Court will recall, attacking Mr. Harleston's credibility was a very important issue for Plaintiffs at trial.  They accused him of lying either to the Senate or to the jury, and alleged bias because he "work[ed] for Michael Ostroff."  RT 128:18-22; 143:13-144:18 3/4/09 PM.  It is disingenuous for Plaintiffs to have engaged in a full-on battle of expert credibility before the jury, only to turn around and claim there is no conflict in the evidence for the jury to resolve when they lose that battle.

1  manager, Joel Martin, testified that F.B.T. was unaware of how it was being paid

2  for permanent downloads until 2006, and denied having any knowledge of how

3  permanent downloads were paid in 2002 and 2003.  RT 105:8-24, 114:14-116:7

4  2/26/09 AM.  The jury was entitled to evaluate the conflicting evidence on the

5  disputed fact of F.B.T.'s knowledge, and determine whether Mr. Martin was telling

6  the truth about whether he and F.B.T. long understood exactly how they were being

7  paid for permanent downloads.   If they had understood but never complained, that

8  is strong evidence that Defendants' accounting treatment was consistent with the

9  Recording Agreements.

10      Plaintiffs emphasized at trial a conversation that Gary Stiffelman (Eminem's

11  attorney) testified took place about amending the contracts to specifically address

12  permanent downloads during the 2003 Recording Agreement negotiations.  Rand

13  Hoffman (Interscope's head of business affairs) disputed whether such a

14  conversation took place, and Plaintiffs made much of this conflict during their

15  Closing Argument.  RT 28:1-14 2/26/09 AM; 20:1-21; 31:3-15 3/5/09 PM.  In this

16  Motion, Plaintiffs bury this key piece of evidence for them at trial in a footnote,

17  proclaiming it "immaterial" because they do not rely on it.  Regardless of whether

18  they rely on it now, at trial it was a major part of their case.  They cannot eliminate

19  conflicting evidence by hiding it in footnotes and disclaiming reliance on it.

20          **c.**    ***The jury had to weigh the credibility of additional
21          evidence to determine which interpretation was more
           reasonable.***

22      The rest of the evidence presented by the parties aided the jury in deciding

23  which facts were to be believed.  For example, the jury saw that the parties agreed

24  to the broad definition of "record" in the Recording Agreements as "all forms of

25  reproductions" that Aftermath had the right to exploit "in any and all forms of

26  media now known and hereinafter developed."  TE 5 ¶ 16(e); ¶ 8.  They saw that

27  the parties agreed that "new medium records" would include records that were

28  transmitted directly into the home, like permanent downloads.  TE 5 ¶ 16(h).  The

- 13 -

1    jury had to consider the lay and expert witnesses' competing testimony in context

2    of the language and structure of the Recording Agreements – including these key

3    definitions – to make its credibility determination and decide what the "records sold

4    through normal retail channels" and "masters licensed" provisions covered.

5         The jury also heard that Defendants' distribution chain for physical records

6    sold as compact discs (CDs) involves a "license" in the same way the Plaintiffs

7    argued the Third-Party Agreements involved a "license."  To manufacture and sell

8    CDs, Defendants contract with a third party to press their CDs, and the third-party

9    distributes those CDs to retailers.  Defendants presented evidence that that

10   transaction could be considered a "license" as defined by the copyright laws.  RT

11   73:18-75:3 2/25/09 PM.  But not even Plaintiffs contend that CDs are somehow

12   subject to the "masters licensed" provision just because some aspects of the

13   distribution chain involve licenses.  Defendants' physical distribution model refutes

14   Plaintiffs' newly requested ruling as a matter of law – that all "licenses" are

15   encompassed within the "masters licensed" provision – on its face.

16        Plaintiffs cite several "broad categories" of evidence they claim require the

17   Court to have ruled as a matter of law that all licenses are subject to the "masters

18   licensed" provision.  *See* Mot. at 8-9.  But none of their supposedly "undisputed"

19   evidence answers the essential question of what the "masters licensed" provision

20   was intended to cover.  For example, Plaintiffs cite Defendants' amendments to

21   form contracts in 2002 and the Ostroff memorandum on the treatment of permanent

22   downloads as somehow supporting the ruling they insist should have been given.

23   But the fact that Defendants amended its form recording agreements has no bearing

24   on whether "all licenses not specifically provided for" are encompassed within the

25   "masters licensed" provision of the specific Recording Agreements in this case.

26   Nor does the supposedly undisputed evidence of how conditional downloads are

27   treated for royalty purposes define the provisions' scope.  *None* of these "broad

28   categories" justify the ruling Plaintiffs claim they were entitled to.

Plaintiffs insist that competing inferences alone are insufficient to create a jury question, but those cases are not controlling here. This case involved not just competing *inferences*, but also conflicting *facts*. A conflict in what the typical industry custom and practice is as to a particular contract term was a disputed fact, not just a disputed inference. Whether the parties performed for years without objection, fully understanding that the contract was being administered in accordance with one side's interpretation and not the other's, was a disputed fact, not just a disputed inference. Whether Gary Stiffelman and Rand Hoffman discussed permanent downloads during the 2003 negotiation was a disputed fact, not just a disputed inference. The Court did not err to Plaintiffs' detriment by entrusting the jury to weigh the witnesses' credibility, resolve the fact questions, and then interpret the Recording Agreements based on those facts. *See City of Hope*, 43 Cal. at 395. That was entirely proper under California law.

### C. The Court Did Not Err in Refusing to Rule or Instruct the Jury on the Legal Meaning of the Disputed Term "License".

Plaintiffs argue that the Court should have ruled as a matter of law that the Third-Party Agreements were "licenses," or in the alternative instructed the jury on what a "license" is. The Court correctly did not do either.

#### 1. Plaintiffs waived any claim that the Court should have ruled as a matter of law that the Third-Party Agreements were "licenses."

Plaintiffs waived the argument that the Court failed to rule as a matter of law that the Third-Party Agreements were licenses. Plaintiffs *never asked* the Court for that ruling during trial. At the final pretrial conference, Plaintiffs' counsel, in asking to submit an additional jury instruction on whether the Third-Party Agreements were "licenses," said: "It seems to us to be a mixed question of fact and law. The decisions that we've read, the *Augusto* case and others do resolve the case on summary judgment. It may be at the close of the case, we'll ask Your Honor for a ruling that they are licenses so that issue doesn't have to go to the

jury."  RT 27:2-7 1/26/09.  Plaintiffs never did that, waiving the argument altogether.  They cannot claim now that the failure to rule as a matter of law that the Third-Party Agreements were licenses is prejudicial error requiring a new trial.  *See Beech Aircraft Corp.*, 51 F.3d at 841; *accord Slaven,* 146 F.3d at 1069.

> **2.    Plaintiffs were not entitled to a ruling or instruction on the Third-Party Agreements being "licenses" as a legal matter.**

There was no basis in the record for the Court to rule as a matter of law that the Third-Party Agreements were "licenses," or to instruct the jury on the legal meaning of the term "license."  As Plaintiffs *still* refuse to acknowledge, the issue at trial was *not* what a "license" is as a matter of law – under federal copyright law, under bankruptcy law, or any other legal scheme.  The trial turned on "the reasonable expectations of the parties" to the Recording Agreements.  Summary Judgment Order at 9-10.  Therefore, the issue was *what the parties to the Recording Agreements intended* when they agreed to pay and accept certain royalties for "sales through normal retail channels," and certain royalties for "masters licensed."  At trial, not a single piece of evidence suggested that the parties intended the legal definition of "license" to determine which royalty provision applied.  In fact, Mr. Berman, Plaintiffs' own expert on custom and practice testified that *he did not know what a license was* under copyright law, and that he had never incorporated copyright law into his negotiations of recording agreements in thirty years of experience:

> Q.  Mr. Berman, you're not offering the opinion that masters license in this sentence means the same thing as a copyright license, are you?
>
> A.  They're – they're not identical, but you do have to have a license to copy, absent which you're an infringer.  So yes, there is a copyright license as a part of this.
>
> Q.  Mr. Berman, you don't even know what the definition of a license is under the copyright law, do you?
>
> A.  I'm not positive what the definition is under copyright law.  I know what a license is.

1

Q.   You don't know what the definition of license is under the copyright law?

2

A.   That's correct.

3

Q.   And when you were negotiating recording agreements, you never researched the definition of a license under the copyright laws; correct?

4

5

A.   I never -- I don't believe I ever researched the definition of license under the Copyright Act.

6

7

Q.   You never did that in your 30 years of working on recording agreements, did you?

8

A.   Not that I recall.

9

Q.   And you don't recall ever writing a licensing provision in a recording agreement in which you said that copyright licenses will be governed by this particular royalty provision, did you?

10

11

12

A.   I wouldn't have used that language, no.

13

RT 12:8-14:5 3/4/09 PM.

14

On this record, there was no reason for the Court to rule that the Third-Party

15

Agreements were "licenses" as a legal matter because it would have been entirely

16

irrelevant to the issue of the parties' intent.  Nor was there a reason to instruct the

17

jury on that point.  Plaintiffs are not entitled to an instruction that is wholly

18

unsupported by the evidence.  *Nationwide Trans. Fin. v. Cass Info. Systems, Inc.*,

19

523 F.3d 1051, 1064 (9th Cir. 2008).[5]

20

Even if it had been error not to rule as a matter of law or to refuse the

21

instruction – which it was not – any error was harmless.  Plaintiffs sought the ruling

22

and instruction to establish that the Third-Party Agreements were "licenses" as the

23

term is defined by law.  At trial, Plaintiffs were able to elicit testimony

24

---

[5] Further, Plaintiffs are not entitled to an instruction that misstates the law, as their
25
Proposed Supplemental Instruction did.  Plaintiffs proposed to instruct the jury to consider "[w]hether there are recurring benefits to the copyright owner, *including*
26
*payment of a certain amount for each item sold*" in determining whether a transaction is a license.  Doc. No. 378 (emphasis added).  The italicized portion
27
misstates the law.  Transactions that provide for payment per unit sold are more likely to be sale agreements than license agreements.  *See In re DAK Indus., Inc.*,
28
66 F.3d 1091 (9th Cir. 1995).

- 17 -

acknowledging that those agreements contained aspects of "licenses," as the term is legally understood. *See e.g.,* RT 33:15-34:5 2/25/09 PM. Plaintiffs had ample opportunity to exploit that evidence. RT 28:5-13 3/5/09 PM. Plaintiffs also provided their own definition of "license" on a powerpoint slide at closing, in essence giving the jury an unauthorized instruction on this point. *See* RT 43:14-44:16 3/5/09 PM; Ex. A (Plaintiffs' referenced powerpoint slide). What they could not and did not do at trial was prove that the parties reasonably expected that their royalty rate would depend on whether any aspect of the distribution chain involved a "license" in the legal sense. There was not a scintilla of evidence introduced to support that point, and Plaintiffs' own expert refuted it. This Court's refusal to rule as a matter of law or give the instruction was entirely proper.

### D.    The Jury's Verdict Was Not Against the Clear Weight of the Evidence.

In ruling on the Motion, the issue is not what the Court would have done had the Court been a juror, it is whether the verdict was so fundamentally wrong as to be against the "clear weight of the evidence."[6] Considering the evidence as a whole – including the evidence already catalogued in Section B above – the verdict was not against the clear weight of the evidence. Indeed, every piece of competent evidence *supported* Defendants' interpretation and the jury's verdict.

***The Language and Structure of the Recording Agreements.*** The parties clearly understood that permanent downloads and mastertones – undisputedly Aftermath's "records"[7]– would be accounted for under Sections 4(a) and 5(a) of the Recording Agreements, the artist's ordinary royalty provisions for sales of records

---

[6] Of course, if the Court would have ruled as a matter of law for Defendants in any event, then Plaintiffs' claims of error about submission to the jury are entirely harmless. If the Court agreed with the verdict, there could be no prejudice for Plaintiffs' claimed failure to submit the issue to the jury.

[7] Although the issue was disputed until closing argument, Plaintiffs apparently finally conceded that permanent downloads and mastertones are "forms of reproduction," and thus "records" under the applicable Recording Agreements. RT 34:20-21 3/5/09 PM.

through normal retail channels.  Plaintiffs insisted throughout trial that the only provisions of any consequence were Sections 4(c)(v) and 5(c)(v), the "masters licensed" provisions.  But that provision does not exist in a vacuum.  Before one even gets to that provision in the contracts, the analysis begins with the "records sold" provision.  Under that provision, for "records sold" "through normal retail channels," the artist receives a certain percentage of the "Royalty Base Price."   TE 5, ¶ 4(a); TE 10 ¶ 5(a).

The contractual text showed that royalties for sales of Aftermath's "records" – even in new, unforeseen configurations – would be accounted for under the "records sold" provision.  The parties explicitly agreed that "records" would include all configurations, or "all forms of reproductions," and that Aftermath would have the right to distribute those records "in any and all forms of media now known and hereinafter developed." TE 5 ¶ 16(e); ¶ 8.  The parties understood that "records" would include "new medium records," or "records . . . in any software medium" including "transmission directly into the home."  TE 5 ¶ 16(h).  The text thus revealed that the parties reasonably expected sales of permanent downloads and mastertones – just the next configuration of records – would be treated under Sections 4(a) and 5(a), as "records sold . . . through normal retail channels" like all of the other configurations of Defendants' records.

The parties used language that revealed they understood exactly how permanent downloads were treated under the Recording Agreements.  In an amendment to Section 5(a), the "records sold" provision, the parties added a sentence that reads:

> Sales of Albums by way of permanent download shall be treated as USNRC Net Sales for the purposes of escalations, provided that the sales price concerned falls within a top-line sales price category applicable to such method of sale.

TE 17 ¶ 2(a).  Plaintiffs' entire case depended on their insistence that Defendants do not sell records in the form of permanent downloads and mastertones, and that

1   Defendants only license masters to others to create permanent downloads and

2   mastertones.  RT 59:18-21; 92:7-94:19 3/4/09 AM.  If that was the parties'

3   understanding, this provision would make no sense.  It refers to permanent

4   downloads as "Sales of Albums," as a "method of sale," and to their "sales price."

5   It refers to permanent downloads as falling within a "top-line sales price category,"

6   when price categories only exist in the "records sold" paragraphs. RT 98:2-19

7   3/4/09 AM.  Plaintiffs contended this provision applies only to escalations, and not

8   to the royalty rate.  But that does not explain the use of language entirely

9   inconsistent with Plaintiffs' theory.  The only way Plaintiffs' expert could explain it

10  was to dismiss it as "sloppy drafting."  RT 95:1-97:13 3/4/09 AM.

11        Plaintiffs emphasized the phrase "notwithstanding the foregoing" in the

12  Recording Agreements, and urged that it meant that everything that followed

13  "trumped" or "controlled" what came before.  The three-word phrase could not

14  withstand the weight Plaintiffs insisted that it bear.  As the parties testified, the

15  phrase only comes into play in the event of a conflict – in other words, when both

16  provisions apply to the same transaction.  RT 23:11-16 2/24/09 AM; 31:19-32:6

17  2/25/09 AM.  *But no witness could think of any instance in which both provisions*

18  *applied to the same transaction.*  As Mr. Berman and Mr. Harleston both testified,

19  either one or the other provisions apply.  RT 57:1-60:23 3/4/09 AM; 125:24-18

20  3/4/09 PM.  If that is so, then "notwithstanding the foregoing" never matters.

21        ***The Pre-dispute Course of Performance.***  Under California law, the parties'

22  pre-dispute conduct is entitled to "great weight," *Crestview*, 54 Cal. 2d at 753, as

23  the "best" and "most reliable evidence of their intentions." *Employers Reinsurance*

24  *Co. v. Superior Court*, 161 Cal. App. 4th 906, 921 (2008).  The parties'

25  performance before the dispute arose supported Defendants' interpretation.

26  Defendants introduced evidence that the "records sold" provision supplies the

27  royalty rate for Aftermath's records sold through normal retail channels *regardless*

28  of the particular configuration in which the record is sold.  RT 114:13-115:24

3/4/09 PM; 79:11-81:6 2/26/09 AM.  Defendants further introduced evidence, including testimony from Plaintiffs' own expert, to show that permanent downloads are just the next iteration of a record.  RT 43:1-47:15 3/4/09 AM.  Based on the parties' past performance, they understood that Aftermath's records would be subject to the "records sold" provision, regardless of the records' configuration.

Defendants also introduced evidence that Plaintiff F.B.T., through its manager, had known about and accepted payment for permanent downloads under the "records sold" provision for years before finally objecting in 2006.  RT 105:8-24; 108:4-116:7 2/26/09 AM.  The fact that Plaintiffs said nothing for years indicates that the Recording Agreements were being administered according to the parties' expectations.  *See Employers Reinsurance*, 161 Cal. App. 4th at 922 ("If the parties to a contract have, for years, harmoniously performed the contract in a way that reflects a particular, reasonable, understanding of the terms of the contract, that performance is relevant to determining the meaning of the contract.").  Although Mr. Martin insisted he did not know how permanent downloads were accounted for until 2006, Defendants presented evidence to the contrary.  Through documents and testimony, Defendants revealed F.B.T. silently accepted the accounting treatment for years until their auditor came up with the novel "masters licensed" theory in late 2005, promising it could yield "significant $$."  TE 211.

***Music Industry Custom and Practice.***  As discussed at length in Section B above, the parties' evidence of industry custom and practice also clearly supports Defendants' view.  Defendants' expert explained that the "masters licensed" provision and others like it apply only when the record company licenses their product to another company for use in the other company's products. RT 96:1-18; 115:25-117:17; 125:24-126:18 3/4/09 PM.  When Aftermath licenses an Eminem recording for use in a television show or commercial, for example, or to another record company for use on a compilation album, the "masters licensed" provision supplies the proper royalty rate. *Id*.  Significantly, neither expert could give *any*

- 21 -

example of the "masters licensed" provision applying to an Aftermath record sold through a normal retail channel. RT 54:3-57:9 3/4/09 AM; 126:15-18 3/4/09 PM.

Considering the language and structure of the Recording Agreements, the pre-dispute performance of the parties, and the credibility and experience of the parties' competing experts and their testimony – the jury correctly found that Plaintiffs had not met their burden of proof as to their claimed construction. The clear weight of the evidence, instead, supported Defendants interpretation.

### E.    The Court Correctly Barred Irrelevant and Unfairly Prejudicial Evidence.

Plaintiffs rehash several arguments on evidentiary issues purely for appellate purposes, none of which require a new trial. The Court's *in limine* rulings were entirely correct, and Plaintiffs' claims of prejudice ring hollow. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (to obtain new trial based on an alleged evidentiary error, party must show "substantial prejudice[]").

### 1.    The Court properly excluded the March 2004 letter.

As Plaintiffs make clear in their Motion, they would have insisted that the March 2004 letter expressed *Defendants'* interpretation of the Recording Agreements at the time of contracting. Mot. at 21. That would have unfairly prejudiced Defendants. There is no evidence of that, and the Court's decision to exclude the letter as irrelevant was well-founded. The March 2004 letter was an advocacy position written on behalf of 27 different individual lawyers, not on behalf of any particular client and without reference to any specific recording agreement. There is no indication that Peter Paterno signed the letter on behalf of Aftermath – the client he represented in the Eminem negotiations in 1998 – or any client. Nor is there any evidence that in 1998 Mr. Paterno held the view espoused in the letter he signed *six years later*. Indeed, in contemporaneous emails, Mr. Paterno revealed that he did not agree with the letter at all. *See* Doc. No. 227, Ex.'s FF, GG, HH, II. Plaintiffs' introduction of the letter at trial would have led to a

1    distracting sideshow.  Defendants would have had to introduce evidence of what the

2    lawyers who signed the letter were actually trying to achieve, that the letter was not

3    directed at Universal but instead other record companies, and that Mr. Paterno did

4    not agree with its message.  Under Rule 403, especially in view of the letter's

5    marginal (if any) relevance, the waste of time and unfair prejudice to Defendants

6    that would have resulted from the letter's introduction was wisely avoided.

7         Plaintiffs' claim of prejudice falls flat.  Mr. Paterno had no conversations

8    with anyone during the negotiations about either one of the provisions at issue.  He

9    had essentially no involvement with the 2003 Recording Agreement, the first of the

10   Recording Agreements to be negotiated in the post-download era.  He cannot be

11   considered "the key witness in the case," as Plaintiffs now claim he was. Mot. at 21.

12   Nor did the letter's exclusion prohibit Mr. Berman from rendering a complete

13   opinion on industry custom and practice.**8**  If Plaintiffs thought it necessary, Mr.

14   Berman could have relied on Mr. Stiffelman's testimony to make the point that

15   artists' representatives did not all acquiesce in Defendants' royalty treatment of

16   permanent downloads.  Exclusion of the letter was simply not "devastating" to

17   Plaintiffs case, as they claim it was.  Mot. at 22.

18        Finally, the Court properly did not allow Plaintiffs to use the letter to

19   impeach Mr. Paterno.  Mr. Paterno did not testify that he never espoused the belief

20   that the "masters licensed" provision might apply; rather, he said the threat of the

21   "masters licensed" provision's application to permanent downloads was not why he

22   changed his form *in 2001*– two years before the iTunes store ever opened.  RT

23   56:21-57:11 2/24/09 PM.  The Court properly refused to allow Plaintiffs to impeach

24   Mr. Paterno with the March 2004 letter – sent three years later – because Mr.

25   Paterno's signature on the letter is simply not inconsistent with the testimony

26   _____

27   **8** Plaintiffs submit Mr. Berman's "Rebuttal Expert Report" in support of their
     Motion.  The Report was objected to and never admitted into evidence at trial.
     Defendants object to its inclusion as a part of the record on this Motion, and ask the

28   Court to strike it. *See* L.R. 59-1.3 (specifying grounds for including new evidence).

1   Plaintiffs' counsel sought to impeach.

### 2.     The Court properly excluded stray uses of the word "license."

Plaintiffs sought to introduce several examples of senior executives at Universal and Apple using the word "license."  The Court correctly excluded them. As the Court noted, these executives had no connection to the Recording Agreements.  RT 3:15-4:4 3/2/09.  There was no evidence that the executives in question had even *read* them.  The introduction of these examples of use of the word "license" as somehow relevant to the use of the phrase "masters licensed" in the Recording Agreements would have run afoul of Rules 402 and 403.  Defendants would have had to counter that evidence with a lengthy side-show about what these individuals meant when they uttered the word "license," when the relevance was simply nonexistent.  Moreover, allowing Plaintiffs to contend that the word "license" meant the same thing when these executives used it as it does in the Recording Agreements would have unfairly prejudiced Defendants.

The Court's ruling could not have prejudiced Plaintiffs.  They were able to cross-examine Defendants' *own, designated expert*, Mr. Harleston, on exactly this kind of stray use of "license" in his Senate Testimony.  TE 129; RT 143:13-144:18 3/4/09 PM.  Plaintiffs had the opportunity with Mr. Harleston to make whatever point they had hoped to make with other witnesses.

### 3.     The Court properly excluded Plaintiffs' "legal" expert.

An expert may not testify to his or her legal conclusion, or instruct the jury on the law. *Nationwide Transp. Fin.*, 523 F.3d at 1058.  Instruction on the law is the exclusive province of the trial judge. *Id*.  As the Court noted:  "An expert may testify to industry custom and usage with respect to particular contract terms, but may not offer an opinion on the ultimate contract interpretation issue."  Doc. 349 at 8 n. 5.  Plaintiffs can barely conceal that they hired Professor Peter Menell to do the latter, not the former.  Mot. at 24 (stating that Prof. Menell would testify to the

"legal" difference between a sale and a license). Although they still try to disguise Professor Menell as a "custom and usage" expert, he has **no** experience in the music industry. The "baby band" hypotheticals presented in his law school class have no relationship to the contractual provisions in this case. Any "custom and usage" opinions would lack all foundation. The Court properly excluded his testimony.

### 4. Plaintiffs were not prejudiced by any reference to their "good luck."

Defendants did not improperly refer to Plaintiffs' luck in meeting Eminem or argue that Plaintiffs were not entitled to have their contracts honored. In fact, in closing, Defendants said the exact opposite – Plaintiffs are entitled to exactly what they contracted for. RT 45:24-46:24 3/5/09 PM. At trial, Plaintiffs emphasized their relationship with Eminem and their contributions to his career. RT 81:17-90:13; 106:10-109:24 2/24/09 PM. Defendants had the right to respond. Further, **Plaintiffs** repeatedly referred at trial to Defendants allegedly having made money they did not deserve from Eminem recordings. RT 18:17-21:4 2/26/09 AM. Defendants' allegedly minimal costs of digital distribution were one of Plaintiffs' primary themes. Defendants had the right to respond in kind by referring to Plaintiffs' own profits from the labor and talent of others.

## IV.   CONCLUSION

For all of these reasons, Plaintiffs offer this Court no valid reason to overturn the jury's verdict. The Motion should be denied in its entirety.

DATED: April 20, 2009                    Munger, Tolles & Olson LLP


By:    /s/ *Glenn D. Pomerantz*
          GLENN D. POMERANTZ

Attorneys for Defendants