GLENN D. POMERANTZ (State Bar No. 112503)
Glenn.Pomerantz@mto.com
KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
Melinda.Lemoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC,<br><br>               Plaintiffs,<br><br>    vs.<br><br>AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC.,<br><br>               Defendants. | CASE NO.  CV 07-03314 PSG (MANx)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR ATTORNEY'S FEES AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Judge:   Hon. Philip S. Gutierrez<br>Date:    June 1, 2009<br>Time:   1:30 P.M.<br>Dept:   Roybal 790 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 2

II.   PROCEDURAL AND FACTUAL BACKGROUND.................................. 3

    A.    Plaintiffs Initiate This Case.................................................. 4

    B.    Plaintiffs File The *Eight Mile Style* Action............................ 5

    C.    Plaintiffs File Yet Another Case, The Second F.B.T. Case................ 6

    D.    Plaintiffs Engage In Excessive Discovery, Unwarranted Motions And A Protracted Trial.................................................... 7

    E.    The Parties Conduct Expert Discovery, File Dispositive Motions, And Prepare And Conduct Trial............................ 11

    F.    Defendants Endeavored Throughout This Litigation To Keep Fees And Costs As Reasonable As Possible.......................... 13

III.  ARGUMENT ...................................................................... 15

    A.    Defendants Are The Prevailing Party, And Thus Are Entitled To Their "Reasonable And Actual Attorney's Fees And Costs" Under The Contracts ..................................................... 15

    B.    The Attorney's Fees Sought Are "Reasonable And Actual Attorney's Fees And Costs" Under The Contracts............................ 17

        1.    Defense counsel's hourly rates in this matter are actually below market for comparable legal services in the Los Angeles market ........................................... 18

        2.    Having "litigated tenaciously," Plaintiffs cannot now complain about the hours Defendants were forced to incur in response ................................................. 19

        3.    Defendants' approach to this case kept the amount of their attorney's fees reasonable during this litigation...................... 20

IV.   CONCLUSION .................................................................. 23

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Berberena v. Coler*,
    753 F.2d 629 (7th Cir. 1985) ................................................................. 18

*Champion Produce, Inc. v. Ruby Robinson Co., Inc.*,
    342 F.3d 1016 (9th Cir. 2003) ............................................................... 15

*Jorgensen v. Cassiday*,
    320 F.3d 906 (9th Cir. 2003) ................................................................. 17

*Moore v. IMCO Recycling of Calif.*,
    2005 WL 5887180 (C.D. Cal. Sept. 28, 2005) ...................................... 15

*Moss v. Associated Press*,
    956 F. Supp. 891 (C.D. Cal. 1996) ........................................................ 17

*United Steelworkers of America v. Retirement Income Plan For
    Hourly-Rated Employees of ASARCO, Inc.*,
    512 F.3d 555 (9th Cir. 2008) ................................................................. 18

*Wolf v. Frank*,
    555 F.2d 1231 (5th Cir. 1977) ........................................................... 3, 20

## STATE CASES

*Bruckman v. Parliament Escrow Corp.*,
    190 Cal. App. 3d 1051 (1987) ............................................................... 17

*Davis v. City of San Diego*,
    106 Cal. App. 4th 893 (2003) ................................................................ 18

*Hsu v. Abbara*,
    9 Cal. 4th 863 (1995) ................................................................... 2, 15, 16

*Martino v. Denevi*,
    182 Cal. App. 3d 553 (1988) ................................................................. 21

*Palmer v. Shawback*,
    17 Cal. App. 4th 296 (1993) ................................................................. 15

*Peak-Las Positas Partners v. Bollag*,
    172 Cal. App. 4th 101 (2009) ............................................................ 3, 20

*PLCM Group v. Drexler*,
    22 Cal. 4th 1084 (2000) ................................................................. 18, 23

*Sears v. Baccaglio*,
    60 Cal. App. 4th 1136 (1998) ............................................................... 16

*Serrano v. Unruh*,
    32 Cal. 3d 621 (1982) ...................................................................... 3, 20

*Stokus v. Marsh*,
    217 Cal. App. 3d 647 (1990) ............................................................ 3, 19

## STATUTES AND RULES

Cal. Civ. Code § 1717(b)(1) ...................................................................... 15

Cal. Civ. Code § 1717(b)(2) ........................................................................ 2

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

### TABLE OF AUTHORITIES
#### (continued)

**Page**

Cal. Civ. Code. § 1717.................................................................................15

Cal. Civ. Proc. Code § 1021 .........................................................................15

Fed. R. Civ. Pro. 54(b)..................................................................................21

### OTHER AUTHORITIES

Amy Kaufman, *Eminem Loses Case to Universal Music Group*, March 6, 2009, available at http://www.thewrap.com/article/1750 (*visited on* May 4, 2009)...................................................................................4

Dawn Chmielewski, *Universal Music Wins Eminem Song Royalty Lawsuit,* Los Angeles Times, March 7, 2009, archived copy available at http://www.latimes.com/business/la-fi-cotown-eminem7-2009mar07,0,5160214story (*visited on* May 4, 2009).......................17

Edvard Patterson & Valerie Reitman, *Universal Music Wins Trial Over Eminem Royalties*, Bloomberg, March 6, 2009 .........................................17

Ryan Nakashima, *Eminem's Former Producers Lose Royalty Lawsuit,* AP Business Wire, March 6, 2009 ................................................................17

TO THE COURT, PLAINTIFFS, AND ALL INTERESTED PARTIES:

PLEASE TAKE NOTICE that on June 1, 2009 at 1:30 P.M. or as soon thereafter as counsel may be heard, before the Honorable Philip S. Gutierrez, in Courtroom 790 of the United States District Court for the Central District of California, located at 255 S. Temple Street, Los Angeles, California, Defendants Aftermath Records d/b/a Aftermath Entertainment, Interscope Records, UMG Recordings, Inc., and ARY, Inc. will and hereby do move for an award of attorney's fees in the amount of $2,262,890.85, to be supplemented at the hearing with a submission requesting an additional amount of fees and costs for post-trial motions and fee motions.  Such an award is proper pursuant to the March 3, 1998 and  July 2, 2003 recording agreements between and among Plaintiff F.B.T. Productions, LLC and Defendant Aftermath Records, California Civil Code Section 1717, California Civil Procedure Code Section 1021, Federal Rule of Civil Procedure 54, and Civil Local Rule 54.

This Motion is made following the conferences of counsel pursuant to L.R. 7-3 which took place on March 20, 2009, and thereafter.  This Motion is based upon the Memorandum of Points and Authorities attached hereto, the declarations of Glenn D. Pomerantz, Kelly M. Klaus, Melinda E. LeMoine, Kimberly D. Encinas, Jillian Song, Phil Nickels, Luis Li, Sonia Arteaga, Ki Lee, Nelson Marinero and Jose Geronimo and attached exhibits filed herewith, all pleadings and records on file in this action, and such additional authority and argument as may be presented at any hearing on this Motion.

DATED:  May 4, 2009                    MUNGER, TOLLES & OLSON LLP


                                       By: _____*/s/ Glenn D. Pomerantz*_____
                                              Glenn D. Pomerantz
                                              Attorneys for Defendants

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

3    As the Court will recall, Plaintiffs F.B.T. Productions, LLC and

4 Em2M, LLC ("Plaintiffs") and Defendant Aftermath Records are parties to certain

5 recording contracts that provide for royalty payments to Plaintiffs for the sales of

6 recordings by the recording artist Marshall Mathers p/k/a Eminem ("Recording

7 Agreements").[1]  Throughout this nearly two-year litigation, the case primarily

8 concerned a single claim of breach – the parties disputed which royalty provision

9 applies to the sale of Eminem recordings in the form of permanent downloads and

10 mastertones.  Plaintiffs sought in excess of $1.4 million, plus a significant increase

11 in prospective royalties.  Aftermath and its co-defendants ("Defendants")[2]

12 prevailed after a jury trial on that issue, winning Counts One and Three of

13 Plaintiffs' Second Amended Complaint.

14    As the prevailing party in this action, Defendants are entitled to their

15 "reasonable and actual attorney's fees and costs" under the terms of the Recording

16 Agreements.  Tr. Ex. 10 ¶ 25; *see also* Second Amended Compl., Doc. No. 100 at

17 16 ¶ 42.  Under applicable California law, Defendants undisputedly prevailed

18 because they received the "greater relief" in this breach of contract case.  Cal. Civ.

19 Code § 1717(b)(2); *see also Hsu v. Abbara,* 9 Cal. 4th 863, 875 (1995).  The fees

20 Defendants seek are also entirely reasonable, both in terms of the number of hours

21 worked and the hourly rates.  Defense counsel's hourly rates in this action are

22 actually *lower* than market rates for comparable attorney services.  The hours

23 incurred to litigate this case are also reasonable, particularly given the way

24 Plaintiffs chose to litigate – indeed, *overlitigate* – this case.  Plaintiffs chose to

25 depose 15 individuals in fact discovery (Defendants deposed only 4); Plaintiffs

26 ――――――――――――――
[1] The Recording Agreements are Trial Exhibits (Tr. Ex.) 5, 9, 10, and 17.

27 [2] The four defendants are Aftermath Records, Interscope Records, UMG
Recordings, Inc. and ARY, Inc.  The Court dismissed defendant ARY, Inc. at the
28 close of Plaintiffs' case at trial.

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

chose to initially identify nearly 800 trial exhibits (Defendants initially identified less than 150); Plaintiffs designated deposition testimony from 14 witnesses and then offered virtually none of this testimony at trial; and Plaintiffs called 16 witnesses to testify live at trial when far fewer were necessary. This kind of excessive litigation substantially increased the fees Defendants had to incur. In such circumstances, California law makes clear that "[p]arties who litigate with no holds barred in cases such as this, in which the prevailing party is entitled to a fee award, assume the risk they will have to reimburse the excessive expenses they force upon their adversaries." *Stokus v. Marsh,* 217 Cal. App. 3d 647, 654 (1990).[3]

The record of the pre-trial and trial proceedings in this case, which spans from May 21, 2007 (when the complaint was filed) to March 6, 2009 (when the jury returned its verdict), makes clear that Defendants are entitled to the full $2.26 million in attorney's fees they seek. These fees are fully supported by accompanying declarations and exhibits, as well the Court's own knowledge of the record in this case and experience presiding over the trial. Defendants are also entitled to additional fees related to Plaintiffs' post-trial motions and this fee motion, and request the opportunity to supplement their fee request at the appropriate time.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

As this Court is aware, this case was a hotly contested battle that culminated in a jury verdict in Defendants' favor on the critical issues. Although the amount of past damages Plaintiffs demanded was relatively small for a major piece of federal court litigation, the principles at stake were deeply held by both

---

[3] *See also Serrano v. Unruh,* 32 Cal. 3d 621, 638 (1982) (a party "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the [other side] in response"); *Peak-Las Positas Partners v. Bollag,* 172 Cal. App. 4th 101, 114 (2009) (holding that the opposing side's "aggressive litigation posture" is a factor to be weighed in assessing reasonableness of hours spent); *accord Wolf v. Frank,* 555 F.2d 1231, 1217 (5th Cir. 1977) (acknowledging in a fee award, "Obviously, the more stubborn the opposition the more time would be required . . .").

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

1   sides.  Plaintiffs thought this case was about "the future" – their focus was not on

2   the demanded past royalties but on the prospect for future royalties.  RT 8:1-7

3   1/26/09 (Pretrial Conference).  Plaintiffs also saw themselves somehow as fighting

4   for the digital interests of artists everywhere, pursuing their creative royalty theory

5   with almost revolutionary zeal.  RT 96:1-15 3/5/09 PM.  As Plaintiffs' manager,

6   Joel Martin, told the press, Plaintiffs hoped the case would "really make a

7   difference" for other artists because "the name Eminem holds so much weight."

8   Amy Kaufman, *Eminem Loses Case to Universal Music Group*, March 6, 2009,

9   available at http://www.thewrap.com/article/1750 (*visited on* May 4, 2009).[4]

10          By contrast, Defendants maintained that the advent of a new

11   distribution technology for records does not change the essential terms of the deal,

12   even if the parties had no way to anticipate the new technology at the time of

13   contracting.  The costs of distribution do not affect the royalty rates that the parties

14   agreed to pay and accept for sales of records through normal retail channels, or for

15   any other means of distributing records.  These are simple, bedrock principles that

16   Defendants ultimately had to defend to a jury in this case.

17          From the day this action was filed, Plaintiffs directed their

18   revolutionary-style zeal towards their goal of winning at any cost.  An essential part

19   of their strategy was to make this litigation as expensive as possible.  Each decision

20   they made can be explained by reference to that central, governing principle – the

21   more burdensome and expensive this litigation could be made for Defendants, the

22   better.

23   **A. <u>Plaintiffs Initiate This Case.</u>**

24          Plaintiffs filed this action in May of 2007 after their royalty audit

25

26   [4] After their loss, Plaintiffs' manager still urged artists to "go to their record companies and say, "What does our contract really entail?" and take it to court to

27   see if it's right."  Amy Kaufman, *Eminem Loses Case to Universal Music Group*, March 6, 2009, available at http://www.thewrap.com/article/1750 (*visited on* May

28   4, 2009).

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
                                      AND MEM. OF P'S AND A'S IN SUPPORT

1   remained unresolved.  The initial Complaint alleged a claim for breach and a claim

2   for declaratory relief.[5]  Both claims made the same contention:  that Defendants

3   had breached the contracts by failing to pay royalties for certain "digital uses" –

4   permanent downloads and mastertones – under the "masters licensed" provision of

5   the Recording Agreements.

6       **B.  Plaintiffs File The *Eight Mile Style* Action**

7           Just two months after they filed this case, the same real-parties-in-

8   interest as Plaintiffs here, represented by the same counsel, filed another case in the

9   Eastern District of Michigan.  Captioned *Eight Mile Style, LLC v. Apple Computer*

10  (the "*Eight Mile Style* Action"), that case related to the same Recording Agreements

11  and to the distribution of Eminem sound recordings in the form of permanent

12  downloads.  Plaintiffs alleged that Apple was not authorized to distribute the

13  musical compositions embodied in the Eminem recordings sold as permanent

14  downloads through Apple's iTunes Store.  As Plaintiffs acknowledged in the *Eight*

15  *Mile Style* Action's Complaint, Apple distributes the compositions embodied in

16  Eminem sound recordings under authorization from Aftermath.  *See Eight Mile*

17  *Style v. Apple*, Case No. 2:07-cv-13164-ADT-DAS, E.D. Mich., Doc. No. 1 ¶ 12.

18  That authorization comes from the Recording Agreements in this case.

19          Aftermath asked Plaintiffs to stipulate to have the *Eight Mile Style*

20  Action related to this one and transferred to Los Angeles, but Plaintiffs refused.  A

21  motion to transfer was denied, so Aftermath has had to litigate issues arising out of

22  its permanent download sales and distribution in two different forums.  Plaintiffs'

23  filing of a separate case in another, distant jurisdiction was a clear effort to

24  advantage themselves.  Plaintiffs wanted to claim in one forum that Aftermath paid

25  them the wrong royalty for sales of permanent downloads, while claiming in

26  _____

27  [5] After the Court issued an Order to Show Cause why the case should not be
    dismissed on jurisdictional grounds, Plaintiffs re-filed a First Amended Complaint
    with more specific allegations supporting federal diversity jurisdiction.  The First

28  Amended Complaint remained the operative complaint until May of 2008.

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
                                                                    AND MEM. OF P'S AND A'S IN SUPPORT

1  another that the sales were wholly unauthorized. As Aftermath later learned,

2  Plaintiffs sought to elicit some sort of admission in the *Eight Mile Style* Action

3  regarding wholly unrelated "licenses" – mechanical licenses permitting the

4  distribution of compositions – in an effort to bring in confusing, irrelevant and

5  distracting evidence regarding the "masters licensed" provision in the Recording

6  Agreements in this case. This Court properly rejected this tactic when it granted

7  Defendants' Motion in Limine No. 7 (but, of course, only after Defendants had to

8  incur the cost of that motion).

9        Significantly, in this Motion, Defendants *do not* seek fees for *any* time

10  spent litigating the *Eight Mile Style* Action, and have taken steps to ensure that this

11  Motion includes only fees attributable to the *F.B.T.* case. *See* Declaration of

12  Melinda Eades LeMoine (LeMoine Decl.), ¶¶ 7-13.

13  **C. Plaintiffs File Yet Another Case, The Second *F.B.T.* Case.**

14        While Plaintiffs were contesting Defendants' effort to streamline these

15  two pieces of litigation into the same courtroom and serving their first-of-many

16  discovery salvos, the Court's deadline to amend the pleadings in this case came and

17  went. Apparently, Plaintiffs belatedly decided that they wanted to add additional

18  claims of breach arising out of the same audit. Rather than seeking leave from

19  either Defendants or this Court to amend the pleadings in this case, Plaintiffs filed

20  yet another lawsuit against Defendants (the "Second F.B.T. Case"). The Second

21  F.B.T. Case raised numerous additional issues that had arisen in the same audit,

22  including claims relating to costs for foreign television licensing, characterization

23  of records as "mid-price" or "budget," the misallocation of producer royalties, and

24  many others. Even though the case arose out of the same audit of the same

25  Recording Agreements, Plaintiffs refused to acknowledge that it was related. *See*

26  Case No. 08-01563-JFW, Doc. No. 10 at 2-3 n.3. Not relishing the prospect of

27  defending themselves on yet a *third* front, Defendants filed a Notice of Related

28  Case to have the matters assigned to the same judge. Defendants also moved to

dismiss the Second F.B.T. Case, arguing that it was an improper attempt to split claims under Ninth Circuit law.  Instead of filing a separate case alleging additional breaches of the same contract that had arisen as part of the same audit, Defendants argued that Plaintiffs should have amended their complaint in *this* case before the deadline set for amendments had passed.

This Court *sua sponte* consolidated the Second F.B.T. Case into this one and ordered Plaintiffs to file a consolidated complaint.  *See* Docket No. 93. When Plaintiffs amended, they included a new claim of breach alleging that Defendants improperly allocated $159,332 in costs between Plaintiff F.B.T. and Eminem ("Count Two").[6]  The claims relating to payment for permanent downloads and mastertones that had been a part of the case all along became the first claim for breach ("Count One"), and the third claim for declaratory relief ("Count Three").

### D. Plaintiffs Engage In Excessive Discovery, Unwarranted Motions And A Protracted Trial.

At the end of 2007, Plaintiffs launched a discovery plan clearly aimed at making this litigation as burdensome and expensive for Defendants as it could be.  The majority of Plaintiffs' discovery efforts were directed at trying to uncover any evidence to support their theory that Defendant UMG Recordings, Inc. conspired with Apple and other providers to "disguise" agreements with permanent download and mastertone providers ("Third-Party Agreements") as wholesale-retail transactions.  In pursuit of this theory, Plaintiffs dragged Defendants through numerous wild goose chases in the course of discovery that never materialized into anything of evidentiary value as to the key issue in this case – namely, what did the

---

[6] While the claim for $159,332 was the only claim explicitly mentioned as part of Count Two, Plaintiffs refused to stipulate that their second cause of action was so limited.  Because the claim alleged that breach "for example and without limitation," it was not clearly settled that the myriad of other audit claims they had raised in the Second F.B.T. Case were not a part of this case until the trial.  *See* Doc. No. 559 at 1-2.

DEFENDANTS' MOT. FOR ATTORNEY'S FEES AND MEM. OF P'S AND A'S IN SUPPORT

parties intend with regard to the disputed provisions?  Instead, Plaintiffs focused on such far-flung topics as whether senior executives had ever used the term "license" in virtually any context related to the exploitation of recordings on the Internet, and whether witnesses who had never before seen the Recording Agreements and who had no legal training thought the Third-Party Agreements were "licenses." Plaintiffs' misguided focus resulted in discovery being much more expensive and burdensome than it ever needed to be.

Of the *fifteen* depositions Plaintiffs took in fact discovery in this action, only *four* deponents had any involvement in the negotiation of the Recording Agreements.  There can be little doubt that this number of depositions unnecessarily increased the costs to Defendants when one considers the following:

- Plaintiffs sought to depose Defendants' most senior executives even when they knew they had no relevant knowledge.  As one example, Plaintiffs insisted on deposing Jimmy Iovine, the Chairman of Interscope Records, even though they certainly knew that Mr. Iovine had no insight whatsoever to offer about the negotiating or drafting of the Recording Agreements.  Instead, Plaintiffs insisted on deposing Mr. Iovine to grill him about his colloquial use of the word "license" in an online interview wholly unrelated to the issues in this case, forcing Defendants to file a protective order that succeeded in limiting the deposition to two hours.

- Even after this Court had excluded any evidence of Mr. Iovine's use of the word "license," Plaintiffs *still* insisted on Mr. Iovine's attendance at trial.  After Mr. Iovine testified, Plaintiffs' counsel cross-examined UMG Recordings, Inc.'s General Counsel, Michael Ostroff and demanded that he defend the relevance of Mr. Iovine's testimony. RT 15:5-10 2/25/09 AM.  Obviously, Plaintiffs' goal was not to elicit potentially relevant evidence from Mr. Iovine.  It was to disrupt the life and business of a well-known record company executive.

- Plaintiffs also sought and obtained a two-hour deposition of yet another prominent and well-known executive, Apple's CEO Steve Jobs.  Mr. Jobs and Mr. Iovine had a lot in common.  They both had used the word "license" in public, and neither of them had ever read the Recording Agreements that were the basis for Plaintiffs' breach claim.  Also, neither of them had anything of relevance to offer.  Mr. Jobs was finally eliminated as a trial witness, but not until both the

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

Court and Defendants had spent all the time necessary to diligently object and rule on the objections to Mr. Jobs' video testimony.

- Once Plaintiffs had exhausted their ten deposition limit in discovery, they filed a motion for leave to take *eleven* more, and the Magistrate Judge granted them five more. None of these deponents had any connection to the Recording Agreements.

- Among those witnesses were Ethan Gustav (a third party representative of T-Mobile, whose deposition took place in Washington state), Scott Ravine, and Rio Caraeff – three witnesses that remained on Plaintiffs' witness list at trial and provided nothing of value then either. Mr. Caraeff (the head of UMG Recordings, Inc.'s eLabs division) was forced to spend more than a day at the courthouse to give less than five minutes of testimony that was never referred to again. RT 87:22-89:1 2/25/09 PM. Scott Ravine was finally excused by Plaintiffs after Mr. Ravine was forced to spend the entire day at the courthouse and only after this Court warned Plaintiffs that they were running short on time. Of course, Defendants could not know what Plaintiffs were planning for either witness in advance, so each had to be carefully prepared. Again, Plaintiffs' inability to focus succeeded only in driving up the costs of this litigation beyond what they ever needed to be.

- After their motion to exceed the 10-deposition limit was heard and resolved, Plaintiffs moved *yet again* for an additional deposition they had never asked for before – Eminem's counsel, Gary Stiffelman. Mr. Stiffelman actually might have had something to offer relating to the Recording Agreements at issue, since he was an actual negotiator. But Plaintiffs' failure to depose him as one of their allotted ten depositions, to ask for his deposition in their first motion to exceed the limit, or even to ask for his deposition until after the close of discovery, required them to move for leave to take it. Not surprisingly, the Court denied the motion – but Defendants still had no choice beforehand but to oppose it and incur those fees.

Plaintiffs were not only overbroad and indiscriminate in the manner in which they selected witnesses for deposition and trial. Plaintiffs' written discovery efforts were aimed at increasing fees due to their overly broad focus on issues that ultimately had little to do with their claim of breach. Plaintiffs served *eight* sets of document requests and *three* sets of compound, complex interrogatories. Defendants had to respond, collect, process and review hundreds of thousands of

- 9 -

pages of documents.  All told, Defendants had to review over half a million pages of documents for production and produced nearly 60,000 pages of documents beginning in March of 2008.  LeMoine Decl., ¶ 11.  That production included not only documents related to the drafting of the Recording Agreements, but also hundreds of Third-Party Agreements.

That was not enough for Plaintiffs.  In addition to *two* motions to compel additional depositions, Plaintiffs insisted on submitting several other discovery motions including:

- A motion to compel against Defendants focused on uncovering the negotiating history of the Third-Party Agreements, including identification of the negotiators for the other side for each of the hundreds of Third Party Agreements at issue.

- A motion to compel against Apple to require documents and emails relating to the history of the negotiations between UMG Recordings, Inc. and Apple for the agreements to distribute recordings through the iTunes Store.  That motion ultimately yielded thousands of additional pages of documents produced, not one of which ever made an appearance in this litigation again.  Defendants were forced to incur significant fees in representing their own interests in this contested motion and in reviewing thousands of pages regarding the Apple - UMG negotiation that turned out to yield Plaintiffs absolutely nothing.

- A motion to compel documents related to agreements by UMG Recordings, Inc.'s foreign affiliates with digital music providers, aimed solely at imposing nearly incapacitating discovery burdens on Defendants.  Although Defendants presented Plaintiffs with dispositive Ninth Circuit law precluding their entitlement to these documents, Plaintiffs nonetheless insisted on proceeding with the joint stipulation process.  Their motion was largely denied, but Defendants were compelled to produce a select few agreements with foreign subsidiaries (not affiliates).  Those agreements never made an appearance in this litigation again either.

The countless motions were not a surprise.  Plaintiffs signaled their willingness to file a motion regarding just about anything almost immediately.  For example, Plaintiffs moved to re-set the trial date early in the litigation, even though trial was not scheduled to take place until *seven months* later.  At the time, the trial

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

date was sandwiched between two other scheduled trials – one of which was the *Eight Mile Style* Action, and one of which was yet another case in which Plaintiffs' counsel was suing one of the Defendants.  The Court denied Plaintiffs' Motion, which, as Defendants had contended, was unnecessary and premature.[7]

Plaintiffs had already significantly overlitigated this case by the time fact discovery closed.  Thanks to Plaintiffs' aggressive litigation style, Plaintiffs had filed two more lawsuits and the parties had litigated nearly ten motions before the parties even *began* the critical work of expert discovery, summary judgment motions, and motions in limine.

E.  **The Parties Conduct Expert Discovery, File Dispositive Motions, And Prepare And Conduct Trial.**

Approaching the post-discovery period, Defendants focused on the experts at issue in this case, as Defendants thought testimony regarding the accepted industry custom and practice would be critical evidence to bring to the jury.  In November and December 2008, the parties deposed each other's experts – Defendants' expert, Mr. Jeffrey Harleston, and Plaintiffs' three experts, Prof. Peter Menell, Mr. Gary Cohen, and Mr. David Berman.  From November 2008 through the beginning of January 2009, the parties filed and briefed cross-motions for summary judgment and partial summary judgment.  The Court denied both sides' motions in January of 2009.

The pretrial filings required under the Central District's rules and this Court's Jury Trial Order largely consumed the parties' time in December 2008 and January 2009.  The parties filed fourteen motions *in limine*, joint exhibit and witness lists, memoranda of fact and law, joint and disputed jury instructions, trial briefs – and on and on.

---

[7] The trial dates in this case and the *Eight Mile Style* action moved and the third case resolved short of trial. Ultimately, Plaintiffs' counsel did not have any trials in September.  Unfortunately for Defendants, this meant that Plaintiffs' counsel had plenty of time to bring still more unwarranted motions.

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

1       Unfortunately, Plaintiffs continued to employ tactics up through trial

2  that required constant vigilance on Defendants' part.  Allegations stated as absolute

3  fact had to be researched and debunked. *See, e.g.* Doc. No. 397 at 9-10 (discussing

4  Plaintiffs' reliance on language from a dismissed complaint).  Joint filings and

5  deposition designations had to be checked and double-checked.  LeMoine Decl., ¶¶

6  14-18.  Inevitably Defendants would uncover errors in Plaintiffs' claims or

7  submissions that would have seriously disadvantaged Defendants if allowed to

8  stand.  *See id.* (discussing Plaintiffs' refusal to remove deposition testimony or

9  exhibits that had been excluded by this Court's in limine rulings).

10       Moreover, Plaintiffs refused to comply with the most basic of

11  professional courtesies and the Local Rules.  Requests which would ordinarily be

12  readily granted  – for instance, for extensions of time, or to meet and confer on a

13  joint submission –were routinely either refused or rebuffed until the last minute.

14  Surprise motions and "supplemental" submissions out of time would suddenly

15  appear, requiring Defendants to scramble to respond.

16       The Court saw some examples of this in the weeks before trial.  For

17  example, Plaintiffs filed a "supplemental" declaration from Professor Menell to

18  oppose Defendants' motion to exclude him, weeks after the motion was fully

19  briefed and without warning.  *See* Doc. No. 398.  Plaintiffs filed "supplemental"

20  jury instructions, weeks after the deadline had long passed, offering no reason why

21  they had not been included to begin with.  *See* Doc. No.'s 378, 487.  Plaintiffs filed

22  an "emergency" motion in limine about the soundtrack album to the *Eight Mile*

23  motion picture that accused Defendants of all sorts of misconduct.  *See, e.g.*, Doc.

24  374 at 1-2, 8-9.  All in all, Plaintiffs' "win-at-any-costs" tactics succeeded in

25  making this litigation far more expensive for Defendants than it ever should have

26  been in light of their straightforward claims.

27       In the midst of the constant barrage of filings, Defendants began

28  preparing for trial.  The trial date was pushed back twice – once to allow for a

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

1  criminal trial and once to try to find a means of resolving the case. When that was

2  not successful, the parties picked a jury on February 20, 2009. Two weeks and six

3  trial days later, the jury took only a few hours to return a verdict in favor of

4  Defendants on Counts One and Three, and a verdict in favor of Plaintiffs on a

5  minor claim for $159,332. This Court entered judgment on March 18, 2009.

6  **F.  <u>Defendants Endeavored Throughout This Litigation To Keep Fees And</u>**
   **<u>Costs As Reasonable As Possible.</u>**

7

8  Defendants staffed this case leanly, endeavoring to keep the team to

9  two or at most three lawyers at any time. This was difficult, as Plaintiffs at times

10 had as many as five lawyers aggressively pursuing discovery. But counsel knew

11 this case would be a marathon and not a sprint, and that the best hope of beating

12 back Plaintiffs' efforts to make the case as expensive as possible was to simply

13 limit the number of people billing. If the team is small, it is likely to be more

14 efficient because there is greater communication by necessity. Duplicating work is

15 not likely – or even possible – when a small team faces an aggressive opponent as

16 in this case. The work must be spread evenly among the members of a small team

17 to best suit each person's strengths, so that the aggressive opponent can be evenly

18 matched and overcome. Defense counsel thus aimed to keep the number of

19 attorneys and support staff limited, and increase the team only when absolutely

20 necessary to protect Defendants' interests.

21 Throughout the litigation, the actual people on the team shifted to

22 account for other commitments, both in life and work. Glenn D. Pomerantz, who

23 served as lead trial counsel, provided only strategic insight in the early days of the

24 litigation. In the first year the case was pending, Mr. Pomerantz's time was limited

25 to less than 20 hours on the matter. Two attorneys – Kelly M. Klaus and Kimberly

26 D. Encinas – handled the case day to day. *See* Declaration of Glenn Pomerantz

27 ("Pomerantz Decl.") ¶ 4. In April of 2008, Mr. Klaus left for paternity leave, and

28 Mr. Pomerantz stepped in to a day-to-day leadership role. *Id.* at ¶ 5. Melinda

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

1  LeMoine, a senior associate, joined Mr. Pomerantz and Ms. Encinas to help with an
2  onslaught of upcoming depositions in Mr. Klaus's absence. *Id.* When Mr. Klaus
3  returned and had transitioned back to the case, Ms. Encinas transitioned off the case
4  to other matters. Ms. LeMoine remained the sole associate billing on the matter up
5  to trial, with Mr. Pomerantz and Mr. Klaus partnering to serve as the senior lawyer
6  on the case. *Id.*

7  Whenever possible, the team utilized experienced and specialized
8  support staff to handle time-consuming tasks like document management, legal
9  cite-checking and exhibit compilation. Jillian Song, an experienced paralegal with
10  the firm, performed this essential support. For electronic document productions,
11  database management, and assistance with trial exhibits and demonstratives, the
12  team had the help of Phil Nickels, part of the firm's technical support staff. Again,
13  by keeping the number of regular support staff small, Defendants attempted to
14  curtail Plaintiffs' effort to force them to incur excessive costs and fees. *See*
15  Pomerantz Decl., ¶ 6.

16  The team remained at three lawyers and two staff members until trial
17  preparation began in earnest. At that time, the team added members to perform
18  other discrete and specialized tasks. *See* Pomerantz Decl., ¶ 7-8. Ms. Encinas
19  rejoined the trial team to assist with the motions in limine and provide assistance
20  throughout trial. Luis Li, another Munger, Tolles & Olson attorney, also joined the
21  team shortly before trial to assist with the myriad of trial preparation tasks
22  (demonstratives, witness preparations, etc.). *Id.* As the number of necessary
23  pretrial filings increased, the support staff increased to meet the needs of the team,
24  but never beyond what was necessary. For pretrial filings and all of the mechanics
25  involved in trial (organizing documents, transporting them to the court, responding
26  to requests for information from Court personnel or opposing counsel, etc.),
27  Defendants added two paralegals and two case clerks to assist the team. *Id.*
28  Defendants also tried to create efficiencies throughout this case

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

wherever possible due to the fact that they were litigating the *Eight Mile Style Action* at the same time.  Although the simultaneous litigations created more problems than they solved, they did allow for some consolidation of discovery efforts.  For example, some depositions were taken for both cases.  Defendants have taken those efficiencies into account in bringing this fee motion, as described in the body of this brief.  *See* LeMoine Decl., ¶ 7-13.

## III.  <u>ARGUMENT</u>

Under California law, the parties may agree to provide for attorney's fees to the prevailing party in the event of a breach action.  *See Palmer v. Shawback*, 17 Cal. App. 4th 296 (1993); *see also* Cal. Civ. Proc. Code § 1021 (stating that "compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties"); Cal. Civ. Code. § 1717 (defining law of contractual fee awards in California).  Attorney's fee awards under contract in California may also specifically include costs, as the contracts in this case provide.  *See Moore v. IMCO Recycling of Calif.,* 2005 WL 5887180 at *2-3 (C.D. Cal. Sept. 28, 2005).  Under the Recording Agreements, Defendants are entitled to their "reasonable and actual attorney's fees and costs" as the prevailing party in this case.  Tr. Ex. 10 ¶ 25.

### A.  <u>Defendants Are The Prevailing Party, And Thus Are Entitled To Their "Reasonable And Actual Attorney's Fees And Costs" Under The Contracts.</u>

This Court determines whether Plaintiffs or Defendants are the prevailing party and thus entitled to fees and costs.  *See* Cal. Civ. Code § 1717(b)(1).[8]  The California Supreme Court has explained that the prevailing party determination is based on "substance rather than form" and is guided by "equitable considerations."  *Hsu*, 9 Cal. 4th at 877.  The prevailing party is the party that

---

[8] California law governs the attorney's fee issues.  *See Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1024-25 (9th Cir. 2003) ("An award of attorney's fees incurred in a suit based on state substantive law is generally governed by state law.").

DEFENDANTS' MOT. FOR ATTORNEY'S FEES AND MEM. OF P'S AND A'S IN SUPPORT

1    achieved a "main litigation objective." *Id*.  The party that achieved its "main

2    litigation objective" is not necessarily the party that achieved a monetary recovery.

3    *See Sears v. Baccaglio*, 60 Cal. App. 4th 1136, 1151 (1998) (holding that prevailing

4    party status and "greater relief" under the statute does not depend on which party

5    receives a greater monetary judgment).

6           Instead, to assess which party prevailed, the Court should look at the

7    case holistically and make an assessment as to which party prevailed based on all

8    the circumstances.  As the California Supreme Court has explained, the Court's task

9    is to "compare the relief awarded on the contract claim or claims with the parties'

10   demands on those same claims and their litigation objectives, as disclosed by the

11   pleadings, trial briefs, opening statements, and similar sources." *Hsu*, 9 Cal. 4th at

12   876.  The Court determines the prevailing party by "a comparison of the extent to

13   which each party has succeeded and failed to succeed in its contentions." *Id*.

14          Applying that standard here, Plaintiffs cannot seriously contest

15   Defendants' prevailing party status.  Defendants prevailed on the main objective of

16   the lawsuit, as reflected in the "pleadings, trial briefs, opening statements, and

17   similar sources."  Defendants lost only Count Two, a minor claim introduced after

18   this case had been pending for almost a year, and for which Plaintiffs ultimately

19   sought and recovered only less than fifteen percent (15%) of the total damages

20   sought in the lawsuit.  Unlike Counts One and Three, the claim in Count Two

21   related to a one-time accounting entry and alleged no prospective value – it claimed

22   a simple overcharge.  The relative insignificance of Count Two as compared to

23   Counts One and Three was obvious.  In this hotly litigated action, Plaintiffs served

24   eight sets of document requests, three sets of interrogatories, and deposed 16

25   witnesses.  Almost none of that discovery had anything to do with Count Two.  On

26   Count Two, the parties deposed only one witness each, with the total time for each

27   witness's deposition regarding Count Two lasting less than two hours.  The trial in

28   this case consumed over 1300 transcript pages, but only 30 of those pages (i.e.,

- 16 -

1    approximately 2%) refer to Count Two.  There can be no doubt about the parties'

2    focus, especially after Plaintiffs' post-trial remarks to the press, expressing

3    disappointment and confusion at the verdict on Counts One and Three and never

4    mentioning the insignificant result on Count Two.[9]  The parties "main litigation

5    objective" thus obviously was to win Counts One and Three – the counts on which

6    Defendants prevailed and the main thrust of the lawsuit – not Count Two, the minor

7    claim on which Plaintiffs prevailed.

8            In light of the relative success of each party and the relative

9    significance of the claims, Defendants are the prevailing party under California law.

10   The only remaining question for this Court to decide is whether the attorney's fees

11   and costs sought are reasonable.  They are, and the Court should determine as

12   much.

13   **B.   The Attorney's Fees Sought Are "Reasonable And Actual Attorney's**
     **Fees And Costs" Under The Contracts.**

14

15            It is well established that "[t]he matter of reasonableness of attorney's

16   fees is within the sound discretion of the trial judge."  *Bruckman v. Parliament*

17   *Escrow Corp.*, 190 Cal. App. 3d 1051, 1062 (1987); *see also Jorgensen v.*

18   *Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("[T]he trial court has broad discretion

19   as to the reasonableness of fees").  When the amount of the fees and charges are

20   supported by billing records, the billing rates are reasonable, and the total fee is

21   reasonable considering the difficulty of the case and the amount involved, the trial

22   court is within its discretion to award such fees.  *See Bruckman*, 190 Cal. App. 3d at

23   1062; *Moss v. Associated Press*, 956 F. Supp. 891, 895 (C.D. Cal. 1996).

24   [9] *See, e.g.,* Dawn Chmielewski, *Universal Music Wins Eminem Song Royalty*
     *Lawsuit,* Los Angeles Times, March 7, 2009, archived copy available at

25   http://www.latimes.com/business/la-fi-cotown-eminem7-
     2009mar07,0,5160214.story (*visited on* May 4, 2009) ("We are surprised and

26   confused by the jury's verdict."); Ryan Nakashima, *Eminem's Former Producers*
     *Lose Royalty Lawsuit,* AP Business Wire, March 6, 2009 ("We are disappointed by

27   the decision."); Edvard Patterson & Valerie Reitman, *Universal Music Wins Trial*
     *Over Eminem Royalties*, Bloomberg, March 6, 2009 (quoting Joel Martin

28   describing the verdict as a "big disappointment.").

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
                                          AND MEM. OF P'S AND A'S IN SUPPORT

"The fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." *PLCM Group v. Drexler*, 22 Cal. 4th 1084, 1095 (2000). A "reasonable hourly rate" is determined by reference to market rates within the community for similar work. *Id*. Once the lodestar has been determined, the amount may be adjusted based on a consideration of several factors in order to ensure that an award represents the fair market value for the legal services performed. *Id*. Here, the fees incurred that Defendants seek – a total of $2,262,890.85 – were wholly reasonable, because the hourly rate is reasonable and the amount of hours spent on each task is reasonable. Although Defendants would be well within their rights to ask for a multiplier to increase these fees and account for the significance of this case, Defendants ask the Court only for the costs actually incurred which are clearly reasonable under the circumstances.

### 1. Defense counsel's hourly rates in this matter are actually below market for comparable legal services in the Los Angeles market.

To determine whether counsel's rates are reasonable, this Court may independently rely on its own experience to assess the value of services rendered. *See PLCM Group*, 22 Cal. 4th at 1095 (stating that an "experienced trial judge is the best judge of the value of professional services rendered in his court" ). Alternatively, the Court can rely on a declaration from counsel as to counsel's own rates. *Davis v. City of San Diego,* 106 Cal. App. 4th 893, 903  (2003) (counsel's declaration sufficient); *see also United Steelworkers of America v. Retirement Income Plan For Hourly-Rated Employees of ASARCO, Inc*., 512 F.3d 555, 565 (9th Cir. 2008) (holding that affidavit from plaintiffs' counsel as to reasonableness of rates compared to prevailing rates is sufficient basis to find a rate reasonable). Or, the Court may rely on information from billing surveys of what other firms charge in the same market. *See Berberena v. Coler*, 753 F.2d 629, 633 (7th Cir. 1985) (relying on *National Law Journal* survey in assessing reasonableness). Here,

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

the Court need not rely on only one of these single grounds to support a finding of reasonableness.  All three are available, and all three support a finding that Defendants' fees are reasonable.

The principal attorneys on this matter, Mr. Pomerantz, Mr. Klaus, Ms. LeMoine and Ms. Encinas, as well as Mr. Li who assisted only at trial, each charge a reasonable hourly rate for legal services that compares favorably to the rates for similar firms within the Los Angeles market.  As set out in Mr. Pomerantz's attached declaration, Defendants' customary billing rates either match or come in significantly below billing rates in the Los Angeles market.  *See* Pomerantz Decl., ¶¶ 11-14, Ex. B (chart comparing Defendants' counsel's fees to other Los Angeles firms from public filings of fees).  For example, court filings report that attorneys at O'Melveny & Myers LLP's Los Angeles office with the same or *less* experience than the lawyers on this team charge rates in excess of $100 *more* an hour. Pomerantz Decl., ¶ 14, Ex. B.  Rates are similarly comparable to publicly available reported rates from the Los Angeles offices of Manatt, Phelps and Loeb & Loeb. *Id.*  Moreover, Defendants' counsel's customary billing rates ranging from $395 to $650, are discounted for this litigation to range between $315 and $617.50. Pomerantz Decl., ¶¶11-13.  Especially as charged in this litigation, Defendants rates are wholly reasonable by reference to rates routinely charged for equivalent legal services within the Los Angeles legal market.

**2. Having "litigated tenaciously," Plaintiffs cannot now complain about the hours Defendants were forced to incur in response.**

The amount of hours expended by defense counsel here are reasonable, especially in light of Plaintiffs' aggressive litigation style.  Under settled California law:  "Parties who litigate with no holds barred in cases such as this, in which the prevailing party is entitled to a fee award, assume the risk they will have to reimburse the excessive expenses they force upon their adversaries."  *Stokus*, 217 Cal. App. 3d at 654.  Plaintiffs here ran that risk, and cannot now complain about

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

the number of hours Defendants and their counsel were forced to spend to respond to Plaintiffs' aggressive litigation tactics. *See also Serrano v. Unruh*, 32 Cal. 3d 621, 638 (1982) (a party "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the [other side] in response"); *Peak-Las Positas Partners v. Bollag*, 172 Cal. App. 4th 101, 114 (2009) (holding that the opposing side's "aggressive litigation posture" is a factor to be weighed in assessing reasonableness of hours spent); *accord Wolf v. Frank*, 555 F.2d 1231, 1217 (5th Cir. 1977) (acknowledging in a fee award, "Obviously, the more stubborn the opposition the more time would be required . . .").

As described at length in Sections II.A-D, Plaintiffs have made every effort since this case has been pending to ensure that this litigation would be extremely burdensome and expensive for Defendants. Plaintiffs demanded excessive and expensive discovery not only about the actual Recording Agreements at issue, but also about hundreds of Third-Party Agreements. Plaintiffs aimed to transform every small disagreement into a fight to the death, and to force litigation to proceed on dual and triple tracks.

**3. Defendants' approach to this case kept the amount of their attorney's fees reasonable during this litigation.**

To counter Plaintiffs' scorched-earth style, Defendants strived to maintain a small, experienced, and efficient team of lawyers who responded when necessary to defend or protect their clients' interests. Defendants accordingly kept costs and fees within reason, seeking to avoid duplication of effort whenever possible. While Defendants' counsel kept their clients' litigation goals in mind and responded to Plaintiffs' salvos to protect their clients' interests, they sought to do so efficiently.

Defendants further attempted to counter Plaintiffs' counsel's aggressive and overbroad approach to this litigation by maintaining a sharp focus on what Defendants saw as the sole issue in the case – the parties' intent underlying

the disputed royalty provisions at issue. Defendants' measured response is evident when one compares the tactics each side pursued. Plaintiffs demanded *twenty-two* fact depositions in this case, and took 15. LeMoine Decl., ¶ 8. Defendants took only five. Plaintiffs insisted on including between 700 and 800 exhibits in the Joint Exhibit List at trial in addition to 107 core documents the parties agreed on. Defendants settled on 35. *Id*. at ¶ 15-16. Plaintiffs insisted on designating deposition testimony for trial for 14 witnesses, including many hundreds of pages and thousands of lines. *Id*. at ¶ 18. Defendants designated only four transcripts, yielding total page and line numbers of approximately 1/20[th] of Plaintiffs' total. *Id*. At every turn, the parties' relative styles were evident. Plaintiffs sought to broaden the scope of this case at every turn, while Defendants wanted to focus it more sharply on the issues that Defendants thought mattered most.

Especially in view of Plaintiffs having overlitigated this case, the fees sought in this Motion are reasonable, and were necessarily incurred in the defense of this litigation. Exhibit A to Mr. Pomerantz's Declaration contains a summary of each timekeeper's rate, hours and total amount sought. The hours worked by each timekeeper on each particular category of tasks is provided in summary chart form as Exhibit 1 to Ms. LeMoine's Declaration. This showing is more than sufficient to support a fee award under California law. In California, an attorney's testimony alone is sufficient to establish a basis for a fee award. *See Martino v. Denevi*, 182 Cal. App. 3d 553, 559 (1988) ("Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records." ). Here, Defendants provide much more than that – including summaries of contemporaneous time records allowing the Court to evaluate how much time was spent on what tasks and by which lawyer.[10]

---

[10] As contemplated by Federal Rule of Civil Procedure 54(b), Defendants ask for the opportunity to provide further detail on any fee or cost request contained in this application, should the Court need more support than the detailed spreadsheets and

1    Defendants have been careful to limit the fees and costs sought in this

2   Motion only to those reasonable fees and costs that are attributable to the claims on

3   which Defendants prevailed in *this* litigation.  Defendants do not seek in this

4   Motion any fees or costs attributable to Count Two, the count that Plaintiffs won.

5   Very little time was spent throughout the litigation on Count Two, but Defendants

6   have excluded all of that time by a careful line-by-line review of billing records.

7   *See* LeMoine Decl., ¶ 6.

8    Defendants have also accounted for the fact that the *Eight Mile Style*

9   Action was being conducted at the same time as this lawsuit.  To the extent that

10  legal fees were incurred solely in connection with the *Eight Mile* Style Action, that

11  time was billed specifically to the clients and is not part of the fees requested in this

12  Motion.  In addition, counsel applied a 50% deduction to the attorney time spent

13  preparing for and taking or defending many of the depositions in this case because

14  certain depositions applied to both cases.  LeMoine Decl., ¶¶ 7-13.  A 50%

15  deduction is more than is necessary to exclude any time attributable to the *Eight*

16  *Mile Style* Action.  Between the two cases, this case has always been both

17  Plaintiffs' and Defendants' primary focus.  Even for depositions that applied in

18  both cases, the time spent preparing for or conducting the depositions did not

19  actually break down to 50% for each case.  Because of the primacy and

20  comparative complexity of issues in *this* case, the majority of time in those

21  depositions was spent on issues relating to *this* case.  By way of example, a review

22  of Mr. Hoffman's deposition reveals that instead of a 50-50 split between the cases,

23  Mr. Hoffman's deposition was approximately 25% dedicated to Eight Mile Style,

24  with the rest dedicated solely to F.B.T.  LeMoine Decl., ¶ 13.  Nevertheless,

25  Defendants applied a 50% reduction to attorney's fees across the board in all

26  depositions that were attributable to both cases in an effort to ensure no time was

28  summaries attached.

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

1  accidentally included that should be properly confined to the *Eight Mile Style*

2  Action.  *Id.*

3        Defendants also excluded significant time spent on the initial large-

4  scale document review and production, which was conducted for both cases.

5  Again, although the bulk of that work was likely attributable to this case rather than

6  the *Eight Mile Style* Action, Defendants nonetheless exclude it here to ensure that

7  no time attributable to the *Eight Mile Style* Action is at issue in this Motion.  *Id.* at ¶

8  11. To further ensure that this Motion does not include any fees that might have

9  been erroneously billed to this matter rather than the *Eight Mile Style* Action,

10  Defendants' counsel reviewed the years of time records in this case line by line to

11  make sure this motion included only time attributable to this case.  *See* LeMoine

12  Decl., ¶ 7.

13        Defendants also exclude certain fees that would be well within their

14  right to demand.  For example, Defendants do not seek fees for in-house counsel's

15  time, although California law allows it.  *See PLCM Group*, 22 Cal. 4th at 1093-94

16  (prevailing parties can seek reimbursement for time spent on matters by in-house

17  counsel).  Nor do Defendants seek fees for support staff that assisted Ms. Song and

18  Mr. Nickels before trial, or other attorneys that may have provided spot research or

19  discrete assistance during non-critical periods of the case.  Defendants seek only

20  those reasonable attorney's fees incurred for time spent necessarily litigating this

21  case.  Those fees are Plaintiffs' responsibility under the Recording Agreements and

22  the Court should so decide.

23  **IV.    CONCLUSION**

24        Defendants are clearly entitled to their fees as the prevailing party in

25  this action under California law.  Further, this Court should award Defendants the

26  $2,262,890.85 in fees sought because those fees are reasonable.  First, Defendants'

27  counsel's hourly rates are well below their own routinely charged rates and the rates

28  of comparable providers of legal services in the Los Angeles market.  Second,

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT

Defendants countered Plaintiffs' aggressive litigation style with measured responses from a small team of lawyers that kept the fees and costs incurred in this action wholly reasonable.  The total fees and costs sought should thus be awarded to Defendants as the prevailing party, as anticipated in the Recording Agreements.


DATED:   May 4, 2009                          MUNGER, TOLLES & OLSON LLP


                                             By: */s/ Glenn D. Pomerantz*
                                                   Glenn D. Pomerantz
                                                   Attorneys for Defendants

DEFENDANTS' MOT. FOR ATTORNEY'S FEES
AND MEM. OF P'S AND A'S IN SUPPORT