**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

Present: The Honorable Philip S. Gutierrez, United States District Judge

| Wendy K. Hernandez | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

Attorneys Present for Plaintiff(s):    Attorneys Present for Defendant(s):

Not Present    Not Present

**Proceedings:** (In Chambers) Order Denying Plaintiffs' Motion for New Trial

Before the Court is Plaintiffs' motion for a new trial and relief from judgment on Counts 1 and 3. After considering the moving and opposing papers, as well as oral argument heard on May 11, 2009, the Court DENIES the motion.

I.  Background

Plaintiffs F.B.T. Productions, LLC ("FBT") and Em2M, LLC are entities that receive royalties payable for the use and exploitation of master recordings by Marshall B. Mathers III, better known as the rapper Eminem. Defendants are Aftermath Records ("Aftermath"), a joint venture, and its owners, Interscope Records, UMG Recordings, Inc., and Ary, Inc. The primary question presented by this case is what royalty is due Plaintiffs when a consumer downloads an Eminem song to her computer or purchases an Eminem ringtone for her mobile phone.

A.  The Eminem Agreements

In approximately 1995, Jeff and Mark Bass signed Eminem to an exclusive record deal with FBT, their production company. On March 9, 1998, FBT entered into an agreement ("the 1998 Agreement") to furnish Eminem's recordings to Aftermath. The 1998 Recording Agreement contains two royalty provisions. First, paragraph 4(a) sets a royalty for "full-price records sold in the United States" that varies between 12 and 20% (the "Records Sold"

O

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

provision).[1]  "Records" are defined as "all forms of reproductions, whether embodying sound alone or sound together with visual images, manufactured or distributed primarily for home use."

    Second, paragraph 4(c)(v) of the 1998 Agreement states that "[o]n masters licensed by us . . . to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from other uses of the masters"  ("the Masters Licensed" provision).  A "master" is defined as "a recording of a sound, without or with visual images, which is used or useful in the recording, production or manufacture of records."   In 2000, the parties to the 1998 Agreement entered into a novation that established a direct contractual relationship between Eminem and Aftermath ("the 2000 Novation").  The 2000 Novation transferred the obligation to provide Aftermath with Eminem's recording services from FBT directly to Eminem.  FBT became a "passive income participant," retaining a right to royalty income from Eminem's recordings. Aftermath agreed to render separate accountings to FBT and Eminem, and the 2000 Novation specified the royalty share of each.

    In 2003, Aftermath and Eminem entered into a new recording contract, which terminated the 1998 Agreement ("the 2003 Agreement").  Plaintiffs retained the right to receive royalties on Eminem's recordings under the 2003 Agreement.  The structure of the 2003 Agreement was similar to the 1998 Agreement, but included an increased advance and higher royalties reflecting Eminem's rise to stardom.  Like the 1998 Agreement, the 2003 Agreement set forth two royalty rates, one for "records sold," and one for "masters licensed . . . to others for their manufacture and sale of records or for any other uses."

    In November 2004, the parties entered into the "2004 Amendment," which altered the 2003 Agreement to increase the advance for an upcoming LP, the fraction of FBT's passive income participation, and certain royalty rates.

    B.    <u>UMG's Agreements with Third Party Digital Media Providers</u>

    Since approximately 2001, UMG has entered into agreements with various third parties

---

[1] According to Defendants, the artist's basic royalty rate varies with the artist's popularity.  The 1998 Agreement provides for "escalations," meaning that the royalty rate increases as certain sales targets are met.

O

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

granting those entities rights to distribute music to consumers over the internet in various forms, including permanent downloads. Permanent downloads are digital copies of recordings that, once downloaded, remain permanently on an end-user's computer, iPod, or other hardware device.[2] Apple's iTunes music store, which launched in 2003, quickly became the largest source of legal permanent downloads.

In approximately 2003, UMG began entering into contracts with major cellular telephone network carriers, including Sprint, Nextel, Cingular, and T-Mobile, to provide UMG recordings for use on mobile phones as mastertones. "Mastertones" is a term that refers to more than one type of digital media; most commonly, mastertones are short clips of a song that play on a cellular phone to signal an incoming call. Typically, the user permanently downloads the mastertone onto her mobile device.

In 2005, FBT and Eminem hired an accounting firm to audit Defendants' accounting records for the period beginning January 1, 2002 and ending June 30, 2005. The audit revealed that UMG was paying Plaintiffs royalties for permanent downloads and mastertones based on the rate set forth in the "Records Sold" provision of the Eminem Agreements. Based on Plaintiffs' belief that royalties on permanent downloads and mastertones should be paid at the higher rate set forth in the "Masters Licensed" provision, the auditor calculated that Defendants had underpaid Plaintiffs by at least $650,000. Defendants responded to the audit report in a letter dated May 8, 2007, contesting the determination that certain royalties had been underpaid.

C.   Procedural History

On May 21, 2007, Plaintiffs filed a complaint for breach of contract and declaratory judgment based on Defendants' alleged underpayment of royalties for digital uses of Eminem's recordings. On March 6, 2008, Plaintiffs filed a second lawsuit for breach of contract and declaratory judgment, also claiming that Defendants had failed to properly account and pay

---

[2] In contrast, the "streaming" of music allows a user to listen to a song online, but no copy is created on her local machine. A consumer can only listen to a streamed song contemporaneously with its transmission; it is not possible to listen to the song again without reconnecting to the provider. "Conditional downloads" are a form of download restricted such that a user must maintain a subscription to a given service in order to continue to listen to the downloaded songs.

O

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

royalties due to Plaintiffs. *See F.B.T. Productions, LLC, et al. v. Aftermath Records, et al., No. CV 08-1563 PSG (CWx)*. The Court consolidated the two actions on May 19, 2008 and ordered Plaintiffs to file an amended complaint. Plaintiffs did so and later filed a second amended complaint ("SAC"), which asserted two counts for breach of contract and a third count for declaratory relief. On January 20, 2009, the Court denied the parties' cross-motions for summary judgment.

  D. Jury Trial

  Trial commenced on February 20, 2009, and the case was submitted to the jury on March 5, 2009. The jury returned a verdict in favor of Defendants on Counts 1 and 3 and in favor of Plaintiffs on Count 2. The Court entered final judgment on March 17. Plaintiffs now move for a new trial on Counts 1 and 3 on several grounds.

II. Legal Standard

  After a jury trial, the court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Such a motion may be granted if the jury's verdict is against the clear weight of the evidence. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). There is no clear formulaic test for determining whether this standard has been met. However, the Ninth Circuit has explained that a judge should not set aside a jury verdict absent a "definite and firm conviction that a mistake has been committed by the jury." *Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987).

  Additionally, a new trial is warranted if an erroneous evidentiary ruling substantially prejudiced a party. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995). Erroneous jury instructions and the failure to give adequate instructions are also grounds for a new trial, unless the error was harmless. *Murphy v. City of Long Beach*, 914 F.2d 183, 1990 (9th Cir. 1990); Robert E. Jones, et al., Federal Civil Trials & Evidence § 20:242 (The Rutter Group 2008).

III. Discussion

  Plaintiffs argue that several grounds entitle them to a new trial: (1) the Court improperly submitted the task of interpreting the Eminem Agreements to the jury; (2) the Court should have

**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

determined, as a matter of law, that the third-party agreements are licenses, or, at a minimum, instructed the jury on this issue; (3) the jury's verdict was against the clear weight of the evidence; and (4) several evidentiary errors severely prejudiced Plaintiffs. The Court will address each argument in turn.

    A.    <u>Submission of Contract Interpretation to the Jury</u>

Plaintiffs first argue that the Court should have interpreted the Eminem Agreements as a matter of law. According to Plaintiffs, the Court erred in submitting this issue to the jury because there were no material extrinsic facts in dispute.

Plaintiffs waived this argument by failing to raise it prior to submission of the case to the jury. Before trial, the parties submitted a jury instruction entitled, "NO CONFLICT IN EXTRINSIC EVIDENCE - COURT INTERPRETS CONTRACT." The instruction, No. 25A, required the Court to tell the jury what the recording agreements meant. The parties included a note, stating that the agreement was only to be given if the Court found that any of the disputed contractual provisions were not "reasonably susceptible" to the parties' competing interpretations. Before the final day of testimony, the Court held a conference with the parties to finalize the jury instructions. At that time, in response to the Court's question, "Is 25A not applicable?," Plaintiffs' counsel stated, "[W]e believe 25A is not applicable." 3/2/09 Transcript (Docket No. 500) 14:6-16. Because Plaintiffs failed to object to the jury instructions, they waived any claim that the Court erred by failing to interpret the contracts as a matter of law. *See McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 360 (9th Cir. 1996); *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 841 (9th Cir. 1995) (Plaintiffs waived argument that district court erred in allocating burden of proof by failing to raise it until post-trial motion); *Porterco, Inc. v. Igloo Prods. Corp.*, 955 F.2d 1164, 1173 (8th Cir. 1992) ("Once the District Court had expressed its intention to send the issues . . . to the jury, it was incumbent upon Igloo to call the court's attention to any incipient error.").

Plaintiffs argue that a formal objection was not required because the Court previously denied their motion for summary judgment. The Court recognizes that "the failure to object to an instruction may be disregarded if the party's position previously has been made clear to the trial judge and it is plain that a further objection would be unavailing." 9C C. Wright, et al., *Federal Practice and Procedure* § 2553 (2008). Plaintiffs also point to *Medtronic, Inc. v. White*, 526 F.3d 487, 495 (9th Cir. 2008). In *Medtronic*, the Ninth Circuit held that a party had not waived its challenge to jury instructions where counsel stated, "I think that's fine" after the trial

**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

court read the disputed instructions because the court was aware of the party's objections and a further objection would have been futile. *Id*. at 495-96.

Here, however, Plaintiffs never disputed the propriety of the Court's ruling on summary judgment, sought reconsideration of that decision, informed the Court that they believed it was error to submit the issue to the jury, or objected to the jury instructions. Plaintiffs suggest that simply because the Court declined to grant summary judgment, any further objection would have been futile. However, Plaintiffs have cited no authority to support this proposition. Further, the fact that the Court dealt with No. 25A by asking the parties a question—rather than definitively ruling that it would not give the instruction— undermines Plaintiffs' assumption that objection would have been futile. As a matter of fairness, Plaintiffs cannot remain silent during trial and claim error only in the face of an unfavorable verdict. Rather, parties ought "to bring possible errors to light while there is still time to correct them without entailing the cost, delay and expenditure of judicial resources occasioned by retrials." *Monsma v. Cent. Mut. Ins. Co.*, 392 F.2d 49, 52 (9th Cir. 1968) (citation omitted) (discussing failure to object to jury instruction); *see also Beech Aircraft*, 51 F.3d at 841.

Furthermore, while Plaintiffs have cast their motion as one for a new trial, their briefs repeatedly assert that the Court should interpret the Eminem Agreements, as a matter of law, in Plaintiffs' favor. This is, in essence, a request for judgment as a matter of law. However, Plaintiffs did not move for JMOL at the close of evidence. Accordingly, the relief that Plaintiffs seek is not available. *See, e.g., Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 886-888 (9th Cir. 2002). Under Ninth Circuit precedent, Plaintiffs' motion for summary judgment and trial brief do not satisfy the requirement that they bring a preverdict motion for JMOL. *Id.* at 886-87.

Next, assuming that Plaintiffs did not waive this argument, the Court did not err when it submitted the issue to the jury. Under California law, when the intent of the parties "depends upon the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury." *City of Hope Nat'l Med. Ctr. v. Genetech, Inc.*, 43 Cal. 4th 375, 395, 75 Cal. Rptr. 3d 333 (2008). Plaintiffs contend that it is only the province of the jury to resolve conflicts in "foundational extrinsic evidence" or historic facts. A recent case, *Wolf v. Sup. Ct.*, 114 Cal. App. 4th 1343, 8 Cal. Rptr. 3d 649 (2004), which the Court cited in its order on the parties' motions for summary judgment, is strikingly similar to the case at bar and confutes Plaintiffs' unduly narrow conception of the jury's role. *Wolf* involved a dispute over the meaning of the contractual term "gross receipts." Neither side presented any direct evidence of the negotiating parties' understanding of the term

**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

at the time they entered into the contract. *Id.* at 1359-60. The parties offered extrinsic evidence of industry custom and usage, which revealed that "gross receipts" was reasonably susceptible to more than one possible meaning. *Id.* at 1350, 1353-1355. The Court of Appeal vacated the trial court's entry of summary judgment, holding that conflicting expert testimony regarding industry custom and usage raised a triable issue of fact. *Id.* at 1354-55.

Similarly, in the instant case, there was no direct evidence of the parties' expressed intent at the time of contractual negotiations. Accordingly, the Court had to look to extrinsic evidence. As explained in the Court's order denying summary judgment, Plaintiffs failed to establish that industry custom and practice mandated a particular interpretation of the Masters Licensed provision. Instead, the parties' conflicting evidence created a triable issue of fact.

At trial, the parties presented conflicting expert testimony, and it was the task of the jury to resolve the factual conflict by assessing the credibility of the witnesses. For instance, David Berman, Plaintiffs' expert, testified that the custom and practice in the recording industry was to apply the "masters licensed" provision to every transaction involving a license, and that the presence of "indicia" of a license was the end of the inquiry. In contrast, Jeffrey Harleston, Defendants' expert, testified that the "masters licensed" provision customarily applies only when recordings are incorporated into a third party's products. Although Plaintiffs maintain that no material extrinsic evidence was disputed, both versions of the accepted recording industry practice could not be true.[3]

In sum, conflicting extrinsic evidence precluded the Court from interpreting the Eminem Agreements as a matter of law. *See Wolf*, 114 Cal. App. 4th at 1359; *City of Hope*, 43 Cal. 4th at 394-95. The Court did not err when it entrusted the jury to weigh the credibility of the parties' experts, resolve the factual disputes, and interpret the contract accordingly. *City of Hope*, 43 Cal. 4th at 394-95.

    B.    <u>Interpretation of the Third-Party Agreements</u>

---

[3] Indeed, Plaintiffs implicitly acknowledge the existence of conflicting expert testimony and the significance of credibility issues when they argue that they were severely prejudiced by the exclusion of the March 24, 2004 letter because, *inter alia*, Mr. Berman could not use it to support his custom and practice position.

**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

As an alternate basis for a new trial, Plaintiffs argue that the Court erred by not ruling as a matter of law that the agreements between UMG and third-party providers of digital content were "licenses." However, Plaintiffs waived any claim that the Court should have ruled as a matter of law that the third-party agreements were licenses because they never sought such a ruling prior to the submission of the issue to the jury. *See discussion* pp. 6-8, *supra*.

Plaintiffs further contend that as a minimum, the Court should have instructed the jury on as to the proper legal standard for determining whether the third-party agreements were licenses. Plaintiffs submitted an instruction, based on *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055 (C.D. Cal. 2008), that outlined factors indicative of whether a transaction is a sale or a license under copyright law. *See* Docket No. 378. The Court refused to give that instruction.

Plaintiffs have failed to show why this supposed error entitles them to a new trial. Plaintiffs argue that "no other instruction gave the jury any basis to determine whether Defendant's [third-party] agreements were 'licenses' or 'sales.'" The issue for the jury, however, was not what a license is as a matter of copyright law, but rather what the parties intended when they agreed to the "records sold" and "masters licensed" provisions in the Eminem Agreements. Accordingly, the Court did not err when it declined to instruct the jury on what a "license" is in copyright law.

    C.    <u>Clear Weight of the Evidence</u>

Next, Plaintiffs maintain that a new trial is required because the jury's verdict was against the clear weight of the evidence. The judge may not grant a new trial simply because he would have arrived at a different verdict; rather, he must have a firm conviction that the jury has made a mistake. *Wallace v. City of San Diego*, 479 F.3d 616, 630-31 (9th Cir. 2007); *Landes*, 833 F.2d at 1372. Having sat through the trial and after reviewing the record, the Court finds that the jury's verdict was not against the clear weight of the evidence.

    D.    <u>Evidentiary Rulings</u>

Finally, Plaintiffs contend that several of the Court's evidentiary rulings were erroneous and substantially prejudiced Plaintiffs.

        *(1)*    *Exclusion of the March 24, 2004 Letter*

**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

First, Plaintiffs argue that the Court should have admitted a March 24, 2004 letter bearing the signature of 27 self-described "music industry attorneys" to the heads of five major record companies. The letter argued that record companies should account for permanent downloads as "licenses" rather than "records sold." One of the 27 signatories was Mr. Paterno, who represented Aftermath in negotiations over the 1998 Eminem Agreement. According to Plaintiffs, the letter "constitutes a direct admission by the adverse party—through its attorney—concerning the parties' intent."

Plaintiffs' argument is flawed. The letter postdates the 1998 and 2003 Eminem Agreements by several years, and there is no evidence that Mr. Paterno signed the letter on behalf of Aftermath.[4] Therefore, the letter is not admissible under *Heston v. Farmers Ins. Group*, 160 Cal. App. 3d 402, 413-415, 206 Cal. Rptr. 585 (1984); it is not relevant to show Defendants' intent at the time they entered into the contracts.

Plaintiffs also contend that it was error to preclude them from using the letter for impeachment. However, Plaintiffs fail to explain how Mr. Paterno's signature on the letter was inconsistent with his testimony at trial. Furthermore, because the letter was irrelevant to task of contractual interpretation, to allow Plaintiffs to question Mr. Paterno about it would have confused the jury. The Court properly excluded the letter under Fed. R. Evid. 402 and 403.

(2) *Exclusion of Prelitigation Statements by Universal and Apple Employees*

Second, Plaintiffs contend that the Court erred when it excluded: (1) a 2007 essay by Steve Jobs, CEO of Apple, entitled "Thoughts on Music"; (2) a written statement to the Copyright Board from Eddy Cue, Vice President of iTunes; (3) 2006 testimony of Lawrence Kenswil, Executive Vice President of Business Strategy for Universal Music Group and former head of Universal eLabs, before the Copyright Royalty Board; and (4) a 2005 magazine interview with Jimmy Iovine, Chairman of Interscope Records. The Court excluded this evidence on the ground that its probative value, if any, was outweighed by the danger of unfair prejudice to Defendants. Plaintiffs argued that these statements demonstrated Defendants' understanding of the nature of their agreements with third-party digital download providers and demonstrated Apple's understanding of its agreements with Defendants. However, these stray uses of the word "license" were made by individuals who were not parties to and did not

---

[4] Mr. Paterno was not even involved in the negotiation of the 2003 Agreement.

**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

negotiate the Eminem Agreements. Furthermore, none of the statements explicitly or implicitly referenced the contracts at issue in this case. The Court properly excluded this evidence because it was not relevant to what Defendants meant when they used the phrase "masters licensed" in the contracts. Introduction of these random uses of the word "license" by individuals unconnected to the Eminem Agreements would have wasted time and would likely have confused and mislead the jury.

Finally, even assuming this evidentiary ruling was error, Plaintiffs have not demonstrated that it was so prejudicial that it more likely than not tainted the verdict, thus warranting a new trial. *See Gribben v. United Parcel Serv., Inc.*, 528 F.3d 1166, 1172 (9th Cir. 2008).

### (3) *Exclusion of Testimony of Peter Menell*

Plaintiffs' next contention is that the Court erroneously excluded testimony from Plaintiffs' proffered expert, Professor Peter Menell. Although Plaintiffs attempted to characterize Mr. Menell as a "custom and usage" expert, the bulk of his expert report was devoted to establishing legal opinions as to the meaning of the provisions of the Eminem Agreements at issue—not to providing evidence of common practice in the recording industry. For instance, in his report, Mr. Menell described his assignment and summarized his conclusions as follows:

> FBT, through its counsel, has asked me to provide my opinion as to whether the allocation of revenue that Aftermath Entertainment ("Aftermath") has received and continues to receive from third parties (such as Apple, Sprint PCS, T-Mobile, Nextel, and Cingular Wireless) for permanent digital downloads (including master tones) of sound records governed by the 1998 and 2003 Aftermath-FBT agreements are governed by the standard royalty provision . . . , the masters license provision . . . , or some other clause. As set forth below, I conclude based on the contracts at issue, the contractual provisions and economic realities of the UMG-third party relationships, and a functional analysis of the recording industry that the permanent digital download (including master tones) revenues at issue in this case should be governed by the masters license provision.

It is well-settled that an expert witness may not offer, as her opinion, a legal conclusion.

**O**

Link to doc 533

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | May 12, 2009 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, et al. v. Aftermath Records, et al. | | |

*E.g., Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). Thus, an expert may testify to industry custom and usage with respect to particular contract terms, but he or she may not give an opinion on the ultimate contract interpretation issue. *Morrow v. Los Angeles Unified Sch. Dist.*, 149 Cal. App. 4th 1424, 1444-45, 57 Cal. Rptr. 3d 885 (2007). Here, Mr. Menell reached legal conclusions based on his construction of the Eminem Agreements, as opposed to providing his opinion as to how "masters licensed" provisions are typically used in the recording industry. The Court properly excluded Mr. Menell's legal opinion testimony. To the extent that Plaintiffs proffered Mr. Menell to testify to "the evolution of economic functions in the recording industry," his opinions lacked a proper foundation.

*(4)     Argument that Plaintiffs Were "Lucky"*

Finally, Plaintiffs argue that the Court erred in denying their motion to preclude Defendants from referring to Plaintiffs as "lucky" or characterizing Plaintiffs' royalties as a windfall. However, Plaintiffs have pointed to no occasion where Defendants improperly referred to Plaintiffs' luck in meeting Eminem or argued that Plaintiffs' contractual entitlements should not be honored. And while Plaintiffs complain that Defendants stated at trial that Plaintiffs "got rich" and "made millions" off the Eminem Agreements, Plaintiffs' counsel also questioned Defendants' witnesses as to how many millions of dollars Defendants had "made on Eminem." Plaintiffs have not shown that they were substantially prejudiced by these comments.

IV.     Conclusion

For the foregoing reasons, the motion for a new trial is DENIED.

**IT IS SO ORDERED.**