UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION


| | | |
|---|---|---|
| F.B.T. PRODUCTIONS, LLC, ET AL., | ) ) ) | CASE NO: CV-07-3314-PSG(MANx) |
| Plaintiffs, | ) ) | CIVIL |
| vs. | ) ) | Los Angeles, California |
| AFTERMATH RECORDS, ET AL., | ) ) | Thursday, October 23, 2008 |
| Defendants. | ) | (10:08 a.m. to 10:44 a.m.) |


PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

BEFORE THE HONORABLE MARGARET A. NAGLE,
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For Plaintiffs: | RICHARD S. BUSCH, ESQ. King and Ballow 315 Union Street, Suite 1100 Nashville, TN 37201 |
| For Defendants: | KELLY M. KLAUS, ESQ. Munger, Tolles & Olson, LLP 355 South Grand Ave, 35th Flr. Los Angeles, CA 90071 |
| Court Reporter: | Recorded; CourtSmart |
| Deputy Clerk: | E. Carson |
| Transcriber: | Exceptional Reporting Services, Inc. 14493 S. Padre Island Drive Suite A-400 Corpus Christi, TX 78418 361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    **Los Angeles, California; Thursday, October 23, 2008; 10:08 a.m.**

2                        **(Call to Order)**

3            **THE CLERK:**  All rise and come to order.  This United

4    States District Court is now is session, The Honorable Margaret

5    A. Nagle, presiding.

6            **THE COURT:**  Good morning, gentlemen.  You may be

7    seated.

8            **THE CLERK:**  Calling Case Number CV 07-3314-PSG

9    (MANx); *F.B.T. Productions, LLC et al versus Aftermath Records,*

10   *et al.*  Counsel, please state your appearance for the record.

11           **MR. BUSCH:**  Richard Busch on behalf of the

12   plaintiffs.

13           **THE COURT:**  Good morning, Mr. Busch.

14           **MR. BUSCH:**  Good morning, your Honor.

15           **MR. KLAUS:**  Kelly Klaus on behalf of the defendants.

16           **THE COURT:**  Good morning, Mr. Klaus.  Counsel, let me

17   apologize for the delay this morning.  It's been a bit of a

18   chaotic morning.  My usual CRD, Mrs. Carson, has been at the

19   top of the UCLA transplant list -- kidney transplant -- and was

20   on her way to the court and called in and said she was

21   reversing direction because she's going into surgery.  Mel is

22   subbing in, but we had to scramble there and then we had sound

23   system problems.  I don't know if you saw the gentleman who was

24   up here fixing them.

25           I participated yesterday in a panel in a county bar

1  and federal bar association joint presentation on the state of

2  the district court and magistrate judges going on the wheels

3  and one of the things that the organizers from the litigation

4  section of the county bar wanted us to do was to give tips to

5  practitioners on how to make overworked, underpaid and

6  therefore often a bit cranky judges more able to do what they

7  have to do with less aggravation.  And I have a tip for you.

8        I really hate it when I have to put my index tabs in

9  to flip back and forth through papers.  I know that we're e-

10  filing things, but when I have to deal with a 200-plus page

11  joint stipulation, it really is kind of difficult when you have

12  to dive through it to find the Exhibit A that's buried up or

13  Exhibit B or this declaration or that declaration, because we

14  have a far greater facility to do it quickly if I have the tabs

15  there and I can just dive in and out.  I complement you, Mr.

16  Klaus, for providing the cases.  It made it really easy to just

17  have them right there.

18        The other thing, though, is since the joint stip is

19  in accordance with the rules sequentially numbered, the absence

20  of tabs would have been obviated somewhat if the references to

21  declarations like Mr. Ostroff's with paragraph numbers had been

22  accompanied by page references, because then I wouldn't have

23  been finding my tabs and sticking them on.  And I don't mean to

24  be a cranky judge focusing on nitpicking things, but we really

25  have so much going on.

1          Tuesday, I planned to be off; instead, I came in to

2    help process some of the Mongols who you may have read about

3    who were brought in, because we were flooded with them.  You

4    know, work gets pushed and these little things seem little, but

5    they really are a bit of a problem.

6          The other thing is, Mr. Klaus, in making your

7    arguments, you indicated that it's not even clear that the --

8    or you may have more boldly asserted that the documents sought

9    by the motion were not requested when you look at the

10   definitions of you and your.  I've got lots of copies of

11   responses.  I don't think I have -- if I did, I couldn't

12   readily find it -- the requests themselves that have the you

13   and your definition.  And if I missed it, point it out to me,

14   but it certainly wasn't highlighted in the pleadings in a way

15   that I readily saw it.  And when I flipped through the exhibits

16   that I was trying to tab I didn't readily see it, either.  Hard

17   for me to consider that argument when I don't have the

18   definition in front of me.

19          So, let me do something I try not to do.  I try and

20   give tentatives or to dive right in, but I've got background

21   questions that I can't quite sort out here.

22          First is one of the arguments is that the documents

23   weren't requested -- the definitions.  Were they or weren't

24   they?  It seems that foreign agreements, payments, royalties

25   are at issue in the operative pleadings.  Is there any dispute

1  as to that?

2      **MR. BUSCH:**  No, your Honor, in fact they were

3  requested.  In fact, in the request that we set out in our

4  joint stipulation, if your Honor looks at --

5      **THE COURT:**  I saw some of them did make reference --

6  some of the discovery requests at issue did refer to foreign

7  interrogatory 9, for example, and it says "To specify all

8  sources of revenue, both foreign and domestic."  I don't know

9  that that's exactly requesting the documents you now want.

10      **MR. BUSCH:**  And then we have a document request

11  asking for the document relating to that interrogatory.  But

12  beyond that, on page 10, if you look at the request, it doesn't

13  relate to you or your.  It is each and every agreement with any

14  party, including but not limited to the mastertone and digital

15  music providers concerning the distribution of the Eminem

16  masters, including but not limited to for permanent and

17  conditional downloads, streaming mastertones and ringtones --

18      **THE COURT:**  I see that.  That's request number 12.

19      **MR. BUSCH:**  Yes.  So, there's no reference to you or

20  your agreements between you and your every agreement, so -- and

21  then with the request for every document relating to the

22  royalties in the document request asking for the documents

23  concerning those, I think that the documents were requested.

24      **THE COURT:**  Well, that's the buzzing problem that

25  didn't get sorted out yet this morning, so I'm told that it's

1  recording just fine and I apologize for any annoyance from

2  that.

3          Mr. Klaus?

4          **MR. KLAUS:**  Yes.  First of all, I'm not pointing

5  fingers that this was their joint stipulation.  Quite frankly,

6  it could have been our joint stipulation.  I'm not sure we

7  would have thought to put the tabs on the courtesy copies and I

8  think, for both of us, it's a good lesson not just for your

9  Honor but for the other judges of the court.

10         The requests themselves are at Exhibit A to my

11 declaration, which starts at page 152 --

12         **THE COURT:**  I've got yours tabbed.

13         **MR. KLAUS:**  -- of the joint stipulation.  And the

14 definition of you and the definition of UMG is on --

15         **THE COURT:**  Page 154.

16         **MR. KLAUS:**  -- page 154.

17         **THE COURT:**  All right.

18         **MR. KLAUS:**  Does not include affiliates.  And in

19 response to Mr. Busch's statement that the title of the request

20 all agreements without referencing you or UMG, in fact, the

21 document requests themselves start by saying "Plaintiffs F.B.T.

22 by its attorneys request that defendants produce and make

23 available for inspection and copy of these documents."  I think

24 the direction that it's to the named defendants in the case

25 comes from the introduction to the requests themselves.

1          **THE COURT:**  All right.

2          **MR. KLAUS:**  And I think that just logically has to be

3    implied in all requests.

4          **THE COURT:**  So, your saying if you wanted to seek or

5    if plaintiffs wanted to seek materials beyond agreements

6    between the defendants and any other parties' relevant

7    agreements, they would have to broaden the request by

8    specifically flagging that here they meant foreign subsidiaries

9    or affiliates.

10         **MR. KLAUS:**  Or at minimum affiliated companies,

11   correct.

12         **THE COURT:**  All right, Mr. Busch, what precisely is

13   the nature of the contracts that you're seeking?  Are these

14   contracts in which you think they'll be different?  Well,

15   they're not going to be different royalty payments because

16   they're in the master agreement.  You're looking for something

17   that shows how compensation was given for downloads?  What is

18   it you're looking for in them?  What is the relevance of them?

19         **MR. BUSCH:**  Your Honor, defendants in this case have

20   produced 150 or so, or more, domestic agreements that Universal

21   has entered into with various mastertone and digital download

22   providers.  I believe 150 is a good number.  And in the cases

23   where Universal's legal department here domestically has

24   drafted the agreements, they are more careful to try to

25   characterize the documents as this resale rather than license

1  agreement.

2         There are, on the other hand, agreements that have

3  been produced where the documents were drafted by the

4  mastertone providers, for example, that Universal agreed to.

5  Those mastertone providers do not have the same incentive that

6  Universal had to characterize the documents a certain way,

7  because they don't care how artists are being paid; whereas,

8  Universal we believe very much cared and crafted these

9  documents to try to avoid the licensing provision within the

10  recording agreements.

11         In the agreements that were drafted by these -- for

12  example, mastertone providers -- they flat out they're

13  licensing the master recordings from Universal to reproduce,

14  distribute and sell.  We think that's smoking gun material that

15  will -- might be ripe grounds for summary judgment on that

16  point.

17         We believe that when these same types of agreements -

18  - and so, for example, Universal has an agreement with Apple

19  here domestically for permanent downloads that was drafted by

20  Universal's in-house counsel, Universal International also has

21  an agreement with these digital download providers, much the

22  same that Universal's domestic company here has that agreement.

23  We believe that those documents will, like the mastertone

24  agreements, those international agreements -- those parties

25  drafting them probably did not have the same incentive or were

1  aware perhaps of the result of characterizing it one way versus

2  the other.  And we believe that those documents will clearly

3  show what they are, which is license agreements.

4          This is not a case of copyright infringement where

5  there's a question about domestic or international

6  infringement.

7          **THE COURT:**  I understand that.

8          **MR. BUSCH:**  We are entitled to 50 percent of net

9  receipts for all licenses and domestic or foreign agreements.

10          **THE COURT:**  Have you been given information about

11  revenues domestically and foreign?

12          **MR. BUSCH:**  Yes, we have.

13          **THE COURT:**  And what percentage, if you know, of the

14  revenues are foreign versus domestic?

15          **MR. BUSCH:**  Well, I don't know what percentage of the

16  revenues from downloads are foreign versus domestic.  I cannot

17  answer that question.  But we are accounted to on --

18          **THE COURT:**  By agreement?

19          **MR. BUSCH:**  No, under the recording agreement, we are

20  accounted to in the same manner for domestic exploitation as we

21  are for foreign exploitation.

22          **THE COURT:**  But does the accounting in any way break

23  the source agreement pursuant to which the revenues are

24  obtained?

25          **MR. BUSCH:**  No, it does not.  No, it does not.  So,

1    we -- and as we put in our papers -- Mr. Ostroff testified that

2    all it would take --

3            **THE COURT:**  Ah, but you do have the citric acid case,

4    which we'll get to in a minute.

5            **MR. BUSCH:**  We'll get to that.

6            **THE COURT:**  So, again, I'm trying to get a sense of

7    how big an issue for you this is, which I'm not saying controls

8    the day, but I'm just trying to get an understanding.

9            **MR. BUSCH:**  No, it is an important issue to us

10   because the entire centers around these agreements and whether

11   they are license agreements or not and if we have evidence for

12   the agreements themselves --

13           **THE COURT:**  You want a bigger stack where the term

14   license is used, which Mr. Klaus will probably argue is being

15   used loosely and not in a way that defines how it slots in

16   under your agreement, but still, you'd rather have a bigger

17   stack to shove in front of the jury, I take it.

18           **MR. KLAUS:**  He has a stack, your Honor, not just of

19   150 agreements.  He has a stack of over 500 agreements and

20   amendments thereto.  There was 150 different entities, but

21   there are over 500 different agreements.

22           **THE COURT:**  Do you have any idea what the breakdown

23   is in revenue from foreign versus domestic?

24           **MR. KLAUS:**  I know that it is majority and I think it

25   is a sizable majority of the revenue is domestic as compared to

1  foreign.  That said, the underlying artist is --

2          THE COURT:  International favored, yeah.

3          MR. KLAUS:  -- truly an internationally well-known

4  and popular artist --

5          THE COURT:  I understand that.

6          MR. KLAUS:  -- and so, his songs do sell

7  significantly overseas.  But I think the lion's share of it is

8  domestic.

9          Yes, the problem with Mr. Busch's argument is, first

10 of all, he's provided absolutely no reason to think -- I

11 disagree in the first instance with his statement that simply

12 because a document uses the word license, that that is smoking

13 gun proof.

14         THE COURT:  I anticipated you would disagree with

15 that.

16         MR. KLAUS:  But that said, all he's offered is pure

17 speculation that this is what the foreign agreements may have.

18 He has a stack of 500 different agreements.  When he says there

19 are certain documents with mastertone providers, he's pointed

20 to exactly two mastertone providers where the word license

21 happens to be there and he's used it in the same "aha" way he's

22 tried to use it in the way that when Mr. Jobs made a speech

23 when he referred to getting licenses.  He said, "There's the

24 smoking gun.  That's -- it proves that the transaction is

25 whether it's a license.

12

1          **THE COURT:**  Well, now he's got three.

2          **MR. KLAUS:**  I think that the problem is it is -- Mr.

3   Busch has taken the -- now we're saying that he's taken over

4   the ten deposition limit, that he's gone over it.  He's taken

5   the depositions of exactly two other third parties.  He's taken

6   deposition of Apple witnesses and he's taken depositions --

7   he's going to take a deposition of T-Mobile next week.

8          The discovery in this case has been proceeding for a

9   year now.

10          **THE COURT:**  A long time.

11          **MR. KLAUS:**  We're closing discovery in a week and I

12   just don't -- the foreign agreements are not likely to add

13   anything more and there's certainly no -- there's nothing that

14   he's provided to indicate that there's any reason to think that

15   the foreign agreements were either drafted by counter parties,

16   that they were drafted by people --

17          **THE COURT:**  Well, that may be a bit of a red herring,

18   although I'm the one who raised it.  Let's get to the core of

19   this.  For a while when I was reading this, I thought, "All

20   righty.  If Universal Music Group is indicating on websites

21   that its," well, how was it put?  "And its Mr. Ostroff

22   dismisses the characterization on the website as colloquial,"

23   yes, here it is.

24          "Universal Music International is referred to as a

25          division of Universal Music Group and a division that

1          manages Universal Music Group's business in countries

2          outside of North America."

3          I'm reading from page 213 of the joint stip,

4    paragraph 9 of Mr. Ostroff's declaration -- on page 3 of that.

5    He dismisses these statements as colloquial references, not

6    references to legal entities.

7          When I first read in the plaintiffs' portion of this

8    joint stipulation that Universal Music International is

9    purported to be a division of Universal Music Group, I thought,

10   "Well, the control issue is certainly much muddier than the

11   table of contents suggests that it is."  But I do have a

12   declaration which clearly is designed to slot right into the

13   citric acid litigation and it states that the bulk, if not all

14   -- I'll get to the "if not all" in a minute -- of these foreign

15   affiliates are not entities over which Universal Music Group in

16   the U.S. has control; that there's no right of legal control

17   and citric acid is a Coopers and Lybrand U.S. versus Coopers

18   and Lybrand Switzerland.

19         Seems to be extremely apt; right on point for much of

20   the dispute here.  And I suppose one could take issue and

21   subsequent cases which haven't cited a controlling citric acid

22   litigation case have gone in a different direction, but it's

23   always been my understanding that the Ninth Circuit authority

24   controls and it appears to be right on point here; except,

25   perhaps, to the extent that there are references periodically

1    in the papers to foreign subs versus foreign affiliates.

2         And I note on page 22 in the defense portion,

3    starting at line 19 and a half, 20, "As to the foreign

4    subsidiaries and as to the foreign affiliates, should the Court

5    reach the issue, the motion should be denied because the

6    relevance is minimal."

7         Mr. Klaus, what are the foreign subsidiaries?

8         **MR. KLAUS:**  There are a handful of companies that

9    distribute the recorded music of UMG Recordings, Inc. that are

10   either directly or indirectly owned subsidiaries of UMG

11   Recordings, Inc., which is the defendant in this action.

12        I believe we list the particular countries in which

13   they are in in footnote 3 on page 4.  It's Chile, Hong Kong,

14   Mexico, Singapore, Spain, Sweden and Thailand.  And those

15   entities are not under -- they are in the parent subsidiary

16   relationship with UMG Recordings, Inc., whereas the other

17   foreign affiliates, which are underneath Universal

18   International Music --

19        **THE COURT:**  All right.  Well, isn't there a legally

20   significant distinction between foreign subsidiaries and

21   foreign affiliates here?

22        **MR. KLAUS:**  And I think we've tried to make that

23   clear.  I think we actually put in our portion of the joint

24   stipulation a case that says the analysis is different when it

25   is a wholly owned subsidiary.

1        **THE COURT:**  Right.

2        **MR. KLAUS:**  And as to those subsidiaries, we are not

3  relying on the citric acid test.  We're relying on the fact

4  that there is minimal, if any, relevance and the obvious fact

5  that going and getting foreign agreements that are probably

6  written in foreign languages outweighs any conceivable claim of

7  relevance.

8        So, with respect to those subsidiaries, they are in

9  different --

10        **THE COURT:**  Has anybody check as to what languages

11  these are in?

12        **MR. KLAUS:**  I've not checked.

13        **THE COURT:**  Because that would, with this little time

14  remaining, create an additional burden, obviously.  And I take

15  it --

16        **MR. KLAUS:**  I gotcha and I should also add that I

17  don't know which or how many agreements that we're talking

18  about with respect to these subsidiaries.

19        **THE COURT:**  A little checking might be in order.  I'm

20  certainly inclined as to the foreign affiliates over which

21  there is no legal control and right to legally demand -- not

22  nicely asked for and maybe get or maybe not get, but given

23  citric acid, the fact that if you nicely ask, you may or may

24  not get is really not controlling.  It boils down to do you

25  have the legal right to say, "Give me the documents"?  Do you

have that effective control?  And I'm inclined to follow that

case and say that as to foreign affiliates, the motion must be

denied under citric acid.

As to the foreign subsidiaries, however, I think

there's a different issue and I don't know what the burden is

because I don't have answers to some of the foundational

questions as in how many agreements are there?  Are they all in

foreign languages?  And it may be a burden that you both share

if they're in foreign languages.

I think there is some relevance, but not a huge

amount of relevance to how the agreements with other parties

characterize the granting of the rights to use Eminem materials

for dialtones or for downloads.  Seems to me that there's a

core legal issue of contract interpretation that has to be

resolved and whether a Swedish or Thai download agreement

characterizes something as a license versus something else

probably isn't going to drive the result legally in the case

and the royalties can be appropriately reallocated, if

required, based on the result in the case.

And we are at the tail end of this discovery.  I

don't really have -- one of my pet peeves at the tail end of

the panel I was on was that Rule 37-2.1, I believe it is,

requires that the parties indicate how they propose to resolve

the dispute; i.e., what their proposal for a compromise was

after their meet and confer.  I don't really see that here.

```
1    And it is required by the Rule.

2            Have either of you -- and I do see Mr. Klaus'

3    declaration that he provided citric acid and other authority --

4    relevant authority -- and have intended to meet and confer some

5    more after you reviewed the authority, but instead the joint

6    stip came the next day.  Now, I understand since you're at the

7    tail end of this, Mr. Busch, you really didn't have a lot more

8    time to meet and confer in it, but do either of you have a

9    proposal on how this might be fairly and appropriately resolved

10   that's other than all or nothing?

11           MR. BUSCH:  Your Honor, there's a couple of things

12   that I would like to say, if I could.

13           THE COURT:  Yes.

14           MR. BUSCH:  The first thing I'd like to say is that

15   we met and conferred on this for a lengthy bit of time.

16           THE COURT:  I see that.  I see it goes back to this

17   past May, at least.

18           MR. BUSCH:  Yes, we did.  And we had multiple

19   conversations about this and at the end of the day, Mr. Klaus

20   never advised us that there were multiple subsidiaries that

21   were on a different footing than others.  That was never raised

22   with us at any time.

23           THE COURT:  So, you first saw it in the footnote?

24           MR. BUSCH:  Yes, yes, ma'am.

25           THE COURT:  All right.
```

1        **MR. BUSCH:**  So, there was no way for us to

2   compromise.  We were just told, "N-O spells no.  We're not

3   going to produce the documents because we don't have actual

4   control."  And the first time we knew anything different was

5   when we saw this footnote.

6        So, as for as a compromise is concerned, we had

7   multiple conversations --

8        **THE COURT:**  Well, Mr. Busch, there are a number of

9   countries -- Chile, Hong Kong, Mexico, Singapore, Spain, Sweden

10  and Thailand -- in which UMG has subsidiaries.  I am inclined

11  to believe that certainly if I'd had this motion in front of me

12  earlier, I'd be even more strongly inclined to believe that the

13  agreements in those countries made by the direct or indirect

14  subsidiaries should be produced absent a showing, which I don't

15  have, of competent evidence that there would be some real

16  burden in producing these.

17       I'm inclined to order that the motion be granted to

18  the following limited extent and that is that UMG shall produce

19  the agreements sought in -- as described in request number 12.

20  Wouldn't that be the key request?

21       **MR. BUSCH:**  Yes, your Honor.

22       **THE COURT:**  For this small number of direct or

23  indirect subsidiaries identified in footnote 3; and given the

24  lateness of this discovery and given that the cutoff dates and

25  related case management order make clear that motions should be

1    brought sufficiently in advance so that discovery can be

2    completed, if any is ordered, before the cutoff, it seems to me

3    that it would be fair and reasonable, Mr. Klaus, if on doing

4    the checking that hasn't been done, you quickly find out that

5    this is a hydro-headed monster, that there aren't one agreement

6    in Thailand and two in Chile, but rather some exponential

7    number of them, then I'm prepared to get on the telephone and

8    have a conference call to sort out the muck that may be

9    created.  But right now, I have no appropriate showing of any

10   burden and I do think they're in different categories legally.

11        **MR. BUSCH:**  We would be willing, if it is a large

12   number, to meet with Mr. Klaus and limit the number of

13   agreements.

14        **THE COURT:**  And I'd be inclined, which is why I say

15   if it's a problem, to have a conference call in which I'd

16   probably do it for you if you did not agree.

17        **MR. KLAUS:**  I can try to get the information starting

18   today, your Honor, on that.  We can have a meet and confer with

19   Mr. Busch and if we can't work the issue out ourselves, we can

20   get on the phone with you as to the subsidiaries.

21        **THE COURT:**  All right.  I'm going to issue an order

22   denying the motion except that the agreements that were the

23   subject of requests for production number 12 are to be produced

24   for those direct or indirect subsidiaries identified in

25   footnote number 3.  The basis for so limiting the grant of the

 1    motion really is under the controlling citric acid case.  I

 2    don't believe there's any ability, given the Ostroff

 3    declaration, to compel the discovery you want regarding foreign

 4    agreements from foreign affiliates, over which there is not

 5    legal control.

 6          Also, I haven't gone through, as I am usually wont to

 7    do, each of the discovery requests because we're at the tail

 8    end of this and if I start ordering further discovery beyond

 9    that which I'm ordering as a grant, subject to a hearing that

10    there's no monstrous issue lurking, if I order more, it can't

11    get done in accordance with the case management order.  So, I

12    realize you met and conferred over a period of time, Mr. Busch,

13    but frankly at some point if you have to comply with the case

14    management order, you've got to get in here earlier so that if

15    you really need it and can make a good showing, it can be

16    ordered in a more timely fashion.

17          So, you're a little late on this and, as a

18    consequence, the Court has to limit it more and my order is

19    subject to modification if after the initial investigation is

20    done and you have met and conferred there is a major issue in

21    terms of logistics here.  And in that case, you're directed to

22    call the courtroom deputy clerk and we'll set up a telephonic

23    conference call and if it's necessary to modify the order, it

24    will be modified.

25          If you agree to something, you can present a joint

1   stipulation and attendant order which just amends this ruling.

2   Does that seem appropriate?

3         **MR. BUSCH:**  Your Honor, just for the record so I feel

4   better -- maybe I should just quit while I'm ahead.

5         **THE COURT:**  Yeah, you might consider doing that, but

6   if you must, go ahead.

7         **MR. BUSCH:**  In the citric acid case, the foreign

8   affiliate or the foreign company, specifically refused to

9   provide the information.

10         **THE COURT:**  I understand that, but it does not seem

11   to be essential to the Court's holding.  The case has been

12   quoted appropriately in the defense portion.  I have reviewed

13   the case and while it may be nice if someone asks and is

14   refused, it certainly is not critical to the decision, which is

15   again a bright line test.  Do you have the right to legally

16   require someone to give you the agreements?  And I don't think

17   there's been a showing of that kind of control here and so I'm

18   drawing the distinction between the affiliates and the

19   subsidiaries.

20         **MR. BUSCH:**  Thank you, your Honor.

21         **THE COURT:**  Mr. Klaus, anything you need to say for

22   the record?

23         **MR. KLAUS:**  Nothing further, your Honor.  We did have

24   one additional issue that we wanted to raise with the Court.

25         **THE COURT:**  Go ahead.

1     **MR. KLAUS:**  But I don't think it requires any action.

2  We have -- the discovery cutoff is November the 3rd.  In

3  connection with -- there are three depositions that we've been

4  trying to schedule and to make work before November the 3rd and

5  which we've been unable to.  Yesterday, at the deposition of

6  another witness, my colleague Mr. Pomerantz and Mr. Busch put

7  on the record a stipulation between the parties that with

8  respect to those three depositions they would -- we would try

9  to schedule them after November 3rd but before Thanksgiving.

10  We think they have no effect on the case management schedule or

11  any dates before the Court.  But we just wanted to have a

12  record.

13     **THE COURT:**  Well, you'll all be bound by that.

14  Technically, you probably should go to the district judge and

15  get the good seal of approval, but you've all put on the record

16  that you're going to agree to be bound by it.  You're not going

17  to ask for any spillover of other dates.  So, you've probably

18  taken care of it in a reasonable way and if anything caused an

19  issue, call me and I'll call the district judge and say, "Oh, I

20  should have pushed them harder to go to you."  I think you're

21  fine.

22     **MR. KLAUS:**  Thank you very much.

23     **MR. BUSCH:**  Thank you, your Honor.

24     **THE COURT:**  You're welcome.  Have a good afternoon.

25  Again, sorry to delay you.

(Proceeding was adjourned at 10:44 a.m.)


## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    **August 19, 2009**
          **Signed**                                       **Dated**




**_TONI HUDSON, TRANSCRIBER_**