O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | | Date | October 31, 2011 |
|---|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | | |

| Present: | The Honorable Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy K. Hernandez | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

Attorneys Present for Plaintiff(s):　　　　Attorneys Present for Defendant(s):

　　　　Not Present　　　　　　　　　　　　　Not Present

**Proceedings:**　　**(In Chambers) Order Denying Plaintiffs' Motion for Summary Judgment and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment**

Pending before the Court are Plaintiffs' and Defendants' cross-motions for summary judgment. The Court heard argument on the motions on October 11, 2011. After considering the moving and opposing papers and the arguments made at the hearing, the Court DENIES Plaintiffs' Motion for Summary Judgment, and GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

I.　　<u>Background</u>

Plaintiffs F.B.T. Productions, LLC ("FBT") and Em2M, LLC ("Em2M") (collectively as "Plaintiffs") are entities that receive royalties payable for the use and exploitation of master recordings by Marshall B. Mathers III, better known as the rapper Eminem. Defendants are Aftermath Records, a joint venture ("Aftermath"), and its owners, Interscope Records ("Interscope"), UMG Recordings, Inc. ("UMG"), and Ary, Inc. ("Ary") (collectively as "Defendants").

A.　　<u>The Eminem Agreements</u>

In approximately 1995, Jeff and Mark Bass signed Eminem to an exclusive record deal with FBT, their production company.[1] In March 1998, FBT entered into an agreement (the

---

[1] Except where otherwise indicated, these background facts are drawn from this Court's previous Order regarding summary judgment. *See* Dkt. #349.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|----------------------|------|------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

"1998 Agreement") to furnish Eminem's recordings to Aftermath. The 1998 Agreement bound FBT and Eminem to a recording commitment of seven albums. *1998 Agreement* ¶ 2. In general, Aftermath owed escalating advances and royalties for each successive album. *Id.* ¶¶ 3, 4.

The 1998 Recording Agreement contains two royalty provisions. First, paragraph 4(a) sets a royalty for "full-price records sold in the United States" that varies between 12 and 20% (the "Records Sold" provision). *Id.* ¶ 4(a)(i). "Records" are defined as "all forms of reproductions, whether embodying sound alone or sound together with visual images, manufactured or distributed primarily for home use." *Id.* ¶ 16(e).

Second, paragraph 4(c)(v) of the 1998 Agreement states that "[o]n masters licensed by us . . . to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from other uses of the masters" (the "Masters Licensed" provision). *Id.* ¶ 4(c)(v). A "master" is defined as "a recording of a sound, without or with visual images, which is used or useful in the recording, production or manufacture of records." *Id.* ¶ 16(d).

In 2000, the parties to the 1998 Agreement entered into a novation that established a direct contractual relationship between Eminem and Aftermath (the "Novation"). The Novation transferred the obligation to provide Aftermath with Eminem's recording services from FBT directly to Eminem. FBT became a "passive income participant," retaining a right to royalty income from Eminem's recordings. Aftermath agreed to render separate accountings to FBT and Eminem, and the Novation specified the royalty share of each.

The Novation also included provisions for master recordings for projects "other than in satisfaction of [Eminem's] recording commitment." *Novation* ¶ 7(d). These projects "includ[e] without limitation, projects for third parties and projects for other Aftermath, Interscope or Shady Records artists." *Id.* These projects are generally referred to as "Side Projects." *Id.*

In 2003, Aftermath and Eminem entered into a new recording contract (the "2003 Agreement"), which terminated the 1998 Agreement. Plaintiffs retained the right to royalties from Eminem's recordings under the 2003 Agreement. The structure of the 2003 Agreement was similar to the 1998 Agreement, but included an increased advance and higher royalties reflecting Eminem's rise to stardom. Like the 1998 Agreement, the 2003 Agreement set forth two royalty rates, one for "records sold," *2003 Agreement* ¶ 5(a)(i), and one for "masters

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

licensed . . . to others for their manufacture and sale of records or for any other uses," *Id*. ¶ 5(c)(v).[2]  The 2003 Agreement also included the language from the Novation regarding Side Projects.  *Id.* ¶ 12(b).

In November 2004, the parties entered into the "2004 Amendment," which altered the 2003 Agreement to increase the advance for an upcoming LP, the fraction of FBT's passive income participation, and certain royalty rates.

### B.     UMG's Agreements with Third Party Digital Media Providers

Beginning in approximately 2001, UMG entered into agreements with various third parties granting those entities rights to distribute music to consumers over the internet in various forms, including permanent downloads.  Permanent downloads are digital copies of recordings that, once downloaded, remain permanently on an end-user's computer, iPod, or other hardware device.  Apple's iTunes music store, which launched in 2003, quickly became the largest source of legal permanent downloads.

In approximately 2003, UMG began entering into contracts with major cellular telephone network carriers, including Sprint, Nextel, Cingular, and T-Mobile, to provide UMG recordings for use on mobile phones as "mastertones."  Mastertones is a term that refers to more than one type of digital media; most commonly, mastertones are short clips of a song that play on a cellular phone to signal an incoming call.  Typically, the user permanently downloads the mastertone onto her mobile device.

In 2005, FBT and Eminem hired an accounting firm to audit Defendants' accounting records for the period beginning January 1, 2002 and ending June 30, 2005.  The audit revealed that UMG was paying Plaintiffs royalties for permanent downloads and mastertones based on the rate set forth in the Records Sold provision of the Agreements.  Based on Plaintiffs' belief that royalties on permanent downloads and mastertones should be paid at the higher rate set forth in the Masters Licensed provision, the auditor calculated that Defendants had underpaid

---

[2] For ease of reference, the Court will refer to the Masters Licensed provision and the Records Sold provision in the singular, even though the respective provisions appear in both the 1998 Agreement and the 2003 Agreement.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|------------------------|------|-------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

Plaintiffs. Defendants responded to the audit report, contesting the determination that certain royalties had been underpaid.

In May 2007, Plaintiffs filed a complaint for breach of contract and declaratory judgment based on Defendants' alleged underpayment of royalties for digital uses of Eminem's recordings. In March 2008, Plaintiffs filed a second lawsuit for breach of contract and declaratory judgment, also claiming that Defendants had failed to properly account and pay royalties due to Plaintiffs. *See F.B.T. Productions, LLC, et al. v. Aftermath Records, et al.,* No. CV 08-1563 PSG (CWx) (Docket No. 1). The Court consolidated the two actions and ordered Plaintiffs to file an amended complaint. Plaintiffs did so and later filed a second amended complaint ("SAC"), which asserted two counts for breach of contract and a third count for declaratory relief.

In December 2008, the parties filed cross-motions for summary judgment as to whether the Records Sold or the Masters Licensed provision set forth the applicable royalty rate for permanent downloads and mastertones. *See* Dkt. #170, 175. The Court denied both motions. *See* Dkt. #349. The case proceeded to trial in March 2009, where a jury found the Plaintiffs were not entitled to royalties under the Masters Licensed provision for permanent downloads and mastertones. *See* Dkt. #528. Plaintiffs appealed the judgment.

In April 2009, approximately two months after the verdict and while appeal was pending, Eminem and Aftermath entered into the "2009 Agreement." SFD ¶ 31.[3] The 2009 Agreement increased Eminem's royalty rate and set the terms for future commitment albums. *2009 Agreement* ¶¶ 2, 5. This Agreement also now explicitly addressed the issue of permanent downloads and mastertones. *Id.* ¶ 5(d)(ii). Eminem agreed to receive a particular royalty for downloads and mastertones, as opposed to a share of Aftermath's net receipts. *Id.* Although FBT was referenced in the 2009 Agreement, FBT was not a signatory. SFD ¶ 120.

In October 2009, with appeal still pending, the parties to a related action in Michigan reached a settlement (the "Settlement Agreement"). SFD ¶ 115. Aftermath was a party to that

_____

[3] References to "SFD" are to Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment. *See* Dkt. #734. References to "SFP" are to Plaintiffs' Reply to Defendants' Statement of Genuine Disputes of Material Fact in Opposition to Plaintiffs' Motion for Summary Judgment. *See* Dkt. #725.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|----------------------|------|------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

action and a party to the Settlement Agreement. SFD ¶¶ 111, 115. Joel Martin, the manager of
FBT, was also a signatory to the Settlement Agreement. SFD ¶ 116. However, Mr. Martin
signed the Agreement on behalf of the plaintiffs in that action, namely Eight Mile Style, LLC
and Martin Affilliated, LLC. *Id.* FBT was not a party to the Michigan action and was not a
signatory to the Settlement Agreement. SFD ¶¶ 112, 117.

In September 2010, the Ninth Circuit reversed this Court's summary judgment ruling and
held the royalties due from downloads and mastertones fell, as a matter of law, under the
Masters Licensed provision of the agreements. *See F.B.T. Prods., LLC v. Aftermath Records*,
621 F.3d 958, 967 (9th Cir. 2010). The Ninth Circuit remanded the case to this Court for further
proceedings. *Id.* Accordingly, the Court set a new trial date and briefing dates for the cross-
motions for summary judgment that the parties indicated they would file. *See* Dkt. #671. Before
the Court are those cross-motions for summary judgment.

II.   Legal Standard

Federal Rule of Civil Procedure 56(a) establishes that a "court shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may move for
summary judgment not only as to an entire case, but also as to a claim, defense, or part of a
claim or defense. *Id.* The movant bears the initial burden to demonstrate the lack of a genuine
issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant
satisfies the burden, the nonmovant must set forth specific evidence showing that there remains a
genuine issue for trial, and "may not rest upon mere allegation or denials of his pleading." *See
Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).

An issue of fact is a genuine and material issue if it cannot be reasonably resolved in
favor of either party and may affect the outcome of the suit. *See Anderson*, 477 U.S. at 249-50.
A party asserting that a fact cannot be genuinely disputed, must support that assertion by citing
to "materials in the record, including depositions, documents, electronically stored information,
affidavits or declarations, stipulations (including those made for purposes of the motion only),
admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A party
may object that material cited would not be admissible in evidence. *See id.* 56(c)(2).
Admissible declarations or affidavits must be based on personal knowledge, must set forth facts

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|------------------------|------|-------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

that would be admissible in evidence, and must show that the declarant or affiant is competent to testify on the matters stated. *See id.* 56(c)(4).

III.   Discussion

The Ninth Circuit's decision has established the liability of Defendants for contractual damages. Defendants had been paying Plaintiffs royalties at the lesser rate contained in the Records Sold provision. Defendants now owe some amount of damages for not having paid Plaintiffs under the Masters Licensed provision. The parties' cross-motions for summary judgment seek to settle the amount owed by Defendants. However, as is usually the case, the parties differ on how the calculation of damages should be made.

Plaintiffs advance two initial arguments. First, Plaintiffs argue the Ninth Circuit's decision has already resolved the calculation of damages. Allegedly, the Ninth Circuit's decision should be read to award Plaintiffs 50% of Defendants' revenues derived from licensing permanent downloads and mastertones, notwithstanding any other provisions in the agreements. *See Plt. Mot.* 1:25-2:3. Second, and in the alternative, Plaintiffs argue that the trial record is uncontroverted on the issue of damages, and the Court should enter damages of $1,474,270. *Id.* 2:4-9. As a necessary corollary to this argument, Plaintiffs assert that, for purposes of these proceedings following remand, the Court should limit its review to the trial record. *Id.* In other words, the Court should not accept any new argument or evidence from Defendants.

On the other side, Defendants move for summary judgment as to their interpretation of the agreements. Defendants argue that various provisions of the agreements at issue inform (and reduce) the amount of money owed by Defendants. *See Def. Mot.* 1:15-21.

In order to resolve these motions, the Court will first address Plaintiffs' antecedent arguments, namely the extent of the Ninth Circuit's mandate and whether review on remand will be limited to the trial record. After resolving these issues, the Court will consider the parties' conflicting interpretations of the agreements.

A.   The Ninth Circuit's Mandate

Under "the rule of mandate," a district court is obliged to execute the terms of a mandate from an appellate court. *US v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000). The opinion of

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

the appellate court "may be consulted to ascertain what was intended by its mandate." *See In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895). The "ultimate task" for the district court is "to distinguish matters that have been decided on appeal, and are therefore beyond the jurisdiction of the lower court, from matters that have not." *Kellington*, 217 F.3d at 1093. In order to practice this discernment, a district court should assess what was before the appellate court and what was disposed of by the decree of the appellate court. *Id.* Any matters not disposed of by a mandate are left to the district court; "mandates require respect for what the higher court decided, not for what it did not decide." *Id.* (quotation marks omitted).

The Ninth Circuit's mandate in this matter is simple: "The judgment in favor of Aftermath is REVERSED . . . and the case is REMANDED for further proceedings consistent with this opinion." *F.B.T.*, 621 F.3d at 967. Plaintiffs argue that the mandate "forecloses a reduction of F.B.T.'s royalty under the Recording Agreements to less than 50% of Defendants' net receipts." *Plt. Proposed Judgment* ¶ 2. Plaintiffs base their argument on a single sentence in the Ninth Circuit's opinion: "In sum, the agreements unambiguously provide that 'notwithstanding' the Records Sold provision, Aftermath owed F.B.T. a 50% royalty under the Masters Licensed provision for licensing the Eminem masters to third parties for any use." *F.B.T.*, 621 F.3d at 967. The Court disagrees with Plaintiffs' position.

As is apparent from the text of the opinion, the Ninth Circuit's mandate did not extend to the calculation of damages. The dispute on appeal was "whether the contracts' 'Records Sold' provision or 'Masters Licensed' provision sets the royalty rate for sales of Eminem's records in the form of permanent downloads and mastertones." *F.B.T.*, 621 F.3d at 961. The dispute over which royalty provision applied was first adjudicated by this Court's denial of cross-motions for summary judgment in January 2009. It was that Order that the Ninth Circuit reversed. *Id.* Accordingly, all of the Ninth Circuit's analysis is focused on the Records Sold and the Masters Licensed provisions. There is no analysis on the calculation of damages. The sentence quoted by Plaintiffs simply parrots the general language of the Masters Licensed provision, which states that a 50% royalty rate applies. Stating this fact does not determine how that 50% is calculated.

The Ninth Circuit's opinion does not extend to matters beyond the question of which royalty provision applies, because neither party submitted argument on the matter of damages. SFP ¶ 70. Neither parties' briefs addressed which masters were subject to the 1998 and 2003 Agreements, *see id.* ¶ 66; neither parties' briefs addressed the definition of "net receipts," *see id.* ¶ 67; and neither parties' briefs addressed the potential deductions to Masters Licensed royalties,

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|------------------------|------|------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

*see id.* ¶ 68.  Plaintiffs framed the issue for the Ninth Circuit as "[w]hether [Aftermath] should pay royalties on permanent downloads and mastertones pursuant to the provision in the parties' contract that applies to 'masters licensed.'"  *See Def. Opp.* 6:23-27.  Indeed, it would have been strange for either party to raise the issue of damages, or the Ninth Circuit to take up damages, considering the jury decided against Plaintiffs and there were thus no findings as to damages.

Plaintiffs' current position is further undermined by Plaintiffs' own assurances to the Ninth Circuit at oral argument.  Plaintiffs' counsel informed the Ninth Circuit: "[B]y the way, we're not asking for judgment here.  This case isn't over.  If we are right in our contract interpretation, then the damages still have to be determined."  SFP ¶ 63.  It is odd, to say the least, for Plaintiffs to assure the Ninth Circuit that on remand damages would still have to be determined, but to now inform this Court that the Ninth Circuit has already decided the damages issues.

The Ninth Circuit only determined that the Masters Licensed provision dictates the royalty rate for proceeds from permanent downloads and mastertones.  Under the Masters Licensed provision, FBT and Eminem are generally due royalties of 50%.  It remains to be determined what figure that 50% is applied to.

### B.   Whether the Record is Limited to the Trial Record

Following remand from the Ninth Circuit, this Court ordered a new trial to resolve the remaining issues.  *See* Dkt. #671.  A new trial proceeds de novo, under the broad discretion of a district court judge to supervise trials.  *See Dowling v. American Hawaii Cruises, Inc.*, 869 F. Supp. 806, 807-08 (D. Hawaii 1994); *see also United States v. Laurins*, 857 F.2d 529, 537 (9th Cir. 1988).  A district court judge's discretion extends to whether to allow additional evidence.  *See Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 572 (1943).

Plaintiffs argue that Defendants should not be permitted to raise new arguments or introduce new evidence on remand.  *Plt. Mot.* 11:18-19.  Plaintiffs contend that Defendants "chose for the most part" not to submit evidence or argument at the first trial on the issue of damages.  *Id.* 2:5-7.  Because Defendants made this "tactical decision" at trial, Plaintiffs now urge the Court to limit Defendants to their trial presentation.  *Id.* 11:9-19.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

Plaintiffs believe that this Court's discretion should be guided by a three-factor test that Plaintiffs have derived from a footnote in a Third Circuit opinion from 1975. *See id.* 12:4-7 (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 n.6 (3rd Cir. 1975)). The three factors the Third Circuit suggested are the burden on the parties, the prejudice that may result by not taking new evidence, and judicial economy. *Id.* Even if these were the three factors that controlled this Court's discretion, the factors would counsel for the admission of new evidence.

First, the burden on the parties is minimal. In the fifth year of litigating this case, all of the potential evidence at issue is well known to the parties. Second, the exclusion of any new evidence would be unduly prejudicial to the Defendants. At the first trial, the Court limited each party to eight hours for its presentation. The Defendants chose to focus the jury's attention on the Records Sold and Masters Licensed provisions – a tactic which paid off when the jury found for Defendants on this issue. *Def. Opp.* 11:2-8. Even Plaintiffs recognize the strategy underlying Defendants' decision: "[Defendants] did not want to lend credibility to F.B.T.'s liability argument by explaining to the jury how damages would be calculated under that theory." *Plt. Opp.* 2:24-26. It would be unfair and prejudicial to now strictly limit Defendants to the evidence they raised in their eight hours in front of the jury. The prejudice is compounded by the fact that Defendants did raise, albeit in a much-reduced manner, many of the issues at trial that they now seek to raise on summary judgment. *See* SFP ¶¶ 23, 24, 26, 31, 34, 50, 51. Finally, the burden on the Court is also limited, because the new evidence is not unfamiliar to the Court.

This case is akin to *John Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342 (Fed. Cir. 1998). In *John Hopkins*, a district court made a legal ruling after trial and ordered a retrial. *Id.* at 1356. In light of the changes brought about by the district court's legal ruling, the defendant sought to introduce evidence in the second trial that the defendant had chosen not to enter in the first trial. *Id.* The district court barred the defendant from introducing the new evidence, but the Federal Circuit reversed this decision. *Id.* at 1357. The Federal Circuit held the trial court's legal ruling had "changed the rules of the game." *Id.* The defendant could not be held to decisions it made in the first trial when the legal backdrop was different. *Id.*

Similarly, here the Ninth Circuit's ruling has clearly established the liability of Defendants for damages. This has "changed the rules of the game." Defendants should not be held to the tactical decision to emphasize contractual liability in front of a jury, when Defendants did not know that liability would later be held to exist as a matter of law. *See also Moses Lake*

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|----------------------|------|------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

*Homes, Inc. v. Grant County*, 276 F.2d 836, 853 (9th Cir. 1960) *reversed on other grounds* 365 U.S. 744 (1961) (holding a party should be given an opportunity to present new evidence when the evidence had not been previously entered because of a misunderstanding of law shared by the parties and the trial court).

Because the Court will consider Defendants' new evidence, Plaintiffs' claim that the trial record entitles them to $1,474,270 in damages, is rendered moot. Plaintiffs' remaining arguments over the correct interpretation of the agreements are intertwined with Defendants' competing interpretations of the agreements. The Court will, therefore, turn to the interpretation of the agreements.

C.    Interpretation of the Agreements

Under California law, a contract is to be interpreted so as "to give effect to the mutual intention of the parties as it existed at the time of contracting." Cal. Civ. Code § 1636. The mutual intent of the parties is to be determined from the language of a contract, "if the language is clear and explicit, and does not involve an absurdity." *See id.* § 1638. "Parol evidence is properly admitted to construe a contract only when its language is ambiguous." *F.B.T.*, 621 F.3d at 963. A court first "provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126, 76 Cal. Rptr. 3d 585 (2008). If in light of the extrinsic evidence the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid in interpreting the contract. *Wolf v. Sup. Ct.*, 114 Cal. App. 4th 1343, 1351, 8 Cal. Rptr. 3d 649 (2004). When there is no material conflict in the extrinsic evidence, the court interprets the contract as a matter of law. *Walt Disney*, 162 Cal. App. 4th at 1126. The court must settle the proper interpretation of a contract as a matter of law even when conflicting inferences can be drawn from undisputed extrinsic evidence, or where that extrinsic evidence renders the contract language susceptible to more than one reasonable interpretation. *Id.* However, if there is a conflict in the extrinsic evidence, then the jury must resolve the factual conflict. *See City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395, 75 Cal. Rptr. 3d 333 (2008).

The parties disagree over the potential application of various terms of the agreements to the calculation of royalties under the Masters Licensed provision. The disagreements concern Side Projects, the application of the 2009 Agreement and the Settlement Agreement, the

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

meaning of the phrase "our net receipts" in the Masters Licensed provision, and the "New Medium" and "Container Charge" deductions.  While both parties offer extrinsic evidence to support their interpretations of the agreements, the parties concur that there are no factual disputes to be settled.  The Court agrees; all of the disputes over extrinsic evidence are battles over competing inferences.  Thus, the interpretation of the agreements is a matter of law to be decided by the Court.  *See Walt Disney*, 162 Cal. App. 4th at 1126-27.

    1.    <u>Side Projects</u>

    The 1998 Agreement did not contemplate any Side Projects.  However, beginning with the Novation and then continuing with the 2003 Agreement, the parties agreed Eminem could complete certain Side Projects.  Side Projects were defined as masters "which may be recorded and/or released embodying [Eminem's] featured vocal performances rendered by [Eminem] . . . for projects other than in satisfaction of [Eminem's] recording commitment."  *Novation* ¶ 7(d); *2003 Agreement* ¶ 12(b).  Side Projects "includ[e] without limitation, projects for third parties and projects for other Aftermath, Interscope or Shady Records artists."  *Id.*  Defendants argue that Side Projects are not subject to the Masters Licensed provision.  *Def. Mot.* 13:13-15.  Defendants further argue that *Music from and Inspired by the Movie 8 Mile* (the "*8 Mile Soundtrack*")[4] and *Eminem Presents the Re-Up* (the "*Re-Up*") are both Side Projects.  *Id.* 15:14-19.  Plaintiffs disagree.  Plaintiffs argue that all masters, including masters from Side Projects, are subject to the Masters Licensed provision, and thus Plaintiffs are entitled to a 50% royalty rate on all Side Project masters licensed by Defendants.  *Plt. Opp.* 4:14-22.  Plaintiffs also contest whether the *8 Mile Soundtrack* and *Re-Up* are Side Projects.  *Id.* 8:3-7.

    The 1998 Agreement and the 2003 Agreement are clear on which recordings they apply to.  The 1998 Agreement set forth Eminem's recording commitment as seven albums.  *1998 Agreement* ¶ 2.  The 2003 Agreement, which was signed after Eminem had completed three albums under the 1998 Agreement, covered a recording commitment of four more albums.  *2003 Agreement* ¶ 2; SFD ¶¶ 24, 25.  The Side Projects provision in the Novation and the 2003 Agreement expressly places certain projects outside of these recording commitments.  *2003*

---

[4] The Court will refer to the *8 Mile Soundtrack* as a whole for ease of reference, even though only three masters ("8 Mile," "Lose Yourself," and "Rabbit Run") on the *8 Mile Soundtrack* are Eminem masters.  SFD ¶ 50.

**O**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|----------------------|------|------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

*Agreement* ¶ 12(b).  Instead, Side Projects are covered by their own extensive contractual obligations.  *See id.* ¶¶ 12(b)(I)-(iv).

Side Projects are not subject to the Masters Licensed provision.  Rather, Side Projects are covered by the paragraphs relating to Side Projects.  *See id.*  Despite these provisions, Plaintiffs argue the Masters Licensed provision applies to Side Projects because the Masters Licensed provision does not "state – or even imply – that it applies only to masters from numbered, full length albums delivered in satisfaction of Eminem's recording commitment."  *Plt. Opp.* 5:1-2.  Plaintiffs' reading would have the Masters Licensed provision apply to any Eminem master ever recorded – even masters recorded after Eminem's recording commitment is complete.  This is not a plausible reading.  The Masters Licensed provision must be read in conjunction with the rest of the agreement.  *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").  Each agreement is clear that it pertains to a specific recording commitment from Eminem.  As with all other provisions, the Masters Licensed provision is limited to the recording commitments.

Next, it must be determined which albums constitute Side Projects.  As noted, Side Projects are "master recordings which may be recorded and/or released" pursuant to "projects for third parties and projects for other Aftermath, Interscope or Shady Records artists."  *2003 Agreement* ¶ 12(b).  The masters recorded by Eminem for the *8 Mile Soundtrack* were delivered pursuant to an agreement between Eminem and Shady Records.  SFD ¶ 51.  Neither party has presented an agreement between Eminem and a third party regarding the *Re-Up*.  Nonetheless, Side Projects are defined as masters "recorded and/or released" by third parties,  *see 2003 Agreement* ¶ 12(b), and it is undisputed that both the *8 Mile Soundtrack* and the *Re-Up* were released by Shady Records, *see* SFD ¶¶ 54, 55, 58, 59.[5]  Accordingly, the *8 Mile Soundtrack* and

---

[5] Plaintiffs argue that because of a statement made in a brief filed in related litigation in Michigan, Defendants have conceded that the *8 Mile Soundtrack* and the *Re-Up* were delivered as part of Eminem's commitment under the 1998 and 2003 Agreements.  *See Plt. Opp.* 10:1-17.  Defendants, for their part, claim they made the statement inadvertently and later retracted it.  *See Def. Reply* 5:24-6:9.  While Plaintiffs intimate Defendants should be estopped from their present argument, Plaintiffs do not attempt to show why judicial estoppel should apply.  The Court declines to exercise its discretion to apply judicial estoppel.  *See United States v. Ibrahim*, 522 F.3d 1003, 1009 (9th Cir. 2008).

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

the *Re-Up* meet the definition of Side Projects, as agreed to by the parties, and are not covered by the Masters Licensed provision.

      2.    <u>The 2009 Agreement and the Settlement Agreement</u>

      In April 2009, Eminem and Aftermath entered into a new agreement.  The 2009 Agreement increased Eminem's royalty rate and set the terms for future commitment albums. *2009 Agreement* ¶¶ 2, 5.  Although FBT was referenced in this agreement, FBT was not a signatory to the 2009 Agreement.  SFD ¶ 120.  In October 2009, the Settlement Agreement was signed by the parties involved in related litigation in Michigan.  Aftermath was a party to that action and a party to the Settlement Agreement.  *Id.* ¶¶ 110, 111, 115.  Joel Martin, the manager of FBT, was also a signatory to the Settlement Agreement.  *Id.* ¶¶ 1, 116.  However, Mr. Martin signed the Agreement on behalf of the plaintiffs in that action, namely Eight Mile Style, LLC and Martin Affiliated, LLC.  *Id.*  FBT was not a party to the Michigan action and was not a signatory to the Settlement Agreement.  *Id.* ¶¶ 110, 112, 117.

      Defendants argue that the albums *Recovery* and *Relapse* are governed by the 2009 Agreement between Eminem and Aftermath and, therefore, the royalties for those albums are dictated by the 2009 Agreement.  *Def. Mot.* 17:20-24.  Defendants also assert that FBT agreed to the royalty rates set in the 2009 Agreement when Joel Martin signed the Settlement Agreement. *Id.* 18:6-18.  Consequently, Defendants conclude they do not owe Plaintiffs royalties for *Recovery* and *Relapse* under the Masters Licensed provision of the 2003 Agreement.

      The Court cannot agree.  As Defendants acknowledge, FBT was not a party to the 2009 Agreement nor to the Settlement Agreement.  SFD ¶ 120.  As such, Plaintiffs cannot be bound by the provisions of those agreements.  Although Joel Martin is the manager of FBT, he signed the Settlement Agreement on behalf of Eight Mile Style, LLC and Martin Affiliated, LLC, as can be ascertained by a brief glance at the signature lines of the Settlement Agreement. *Settlement Agreement* at 5.  Furthermore, the Settlement Agreement states it "is entered into by the parties to [the Michigan action]."  *Id.* at 1.  FBT was not a party to the Michigan case.  SFD ¶¶ 110, 112.  The Settlement Agreement also refers specifically to the present case before this Court: UMG agreed to certain undertakings "[w]ithout prejudice to the litigation positions taken by any party in the California Action."  *Settlement Agreement* ¶ 3.  It is hornbook law that a contract can benefit a nonparty – and such intended beneficiary can sue on the contract.  *See* Cal. Civ. Code § 1559.  However, a contract cannot bind a nonparty, whether the nonparty is an

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

intended beneficiary or not. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").

Eminem's royalties for *Recovery* and *Relapse* may be dictated by the separate deal he struck with Aftermath in the 2009 Agreement. But, even Defendants admit the two albums were still counted as part of Eminem's recording commitment under the 2003 Agreement. *See Hilderly Decl.*, Ex. E. Therefore, Defendants owe Plaintiffs royalties from the licensing of masters from *Recovery* and *Relapse* in accordance with the 2003 Agreement.

      3.   <u>Net Receipts</u>

The Masters Licensed provision states that FBT and Eminem's "royalty shall be an amount equal to [50%] of our net receipts." *2003 Agreement* ¶ 5(c)(v). The parties dispute what comprises "our net receipts." Defendants argue that net receipts means the revenue Aftermath receives from licensing downloads and mastertones less Aftermath's direct costs from that licensing. *Def. Mot.* 20:2-5. These direct costs include mechanical royalties and distribution fees. *Id.* 21:23-24. Plaintiffs argue that neither mechanical royalties nor distribution fees should be deducted from the gross revenue that Aftermath receives from licensing. *Plt. Opp.* 19:20-23.

First, it is clear that the term "our" refers to Aftermath. Aftermath is the only entity responsible for licensing that signed the agreements. It is also clear that "net receipts" contemplates some type of deduction. The definition of "net" is "free from, or not subject to, any deduction; remaining after all necessary deductions have been made." Oxford English Dictionary at 340 (2d ed. 1989). Moreover, the term "net" was used elsewhere by the parties to denote a subtraction. In the provision dealing with the licensing of videos, the parties defined "net receipts" as "gross receipts solely attributable to Videos hereunder less (1) any and all direct costs and/or third party payments in connection with the creation, manufacture, exploitation or use of said Videos; and (2) an additional fee in lieu of any overhead or distribution fee of twelve percent (12%) of the gross receipts in connection therewith." *2003 Agreement* ¶ 5(g)(i). Similarly, section 16(a) defines "Net Sales" as "gross sales, less returns, credits and reserves against anticipated returns and credits." And section 12(b) defines "net" as "the amount otherwise payable to Artist after deducting all third party reductions." In accord with these definitions, net receipts is reasonably read to mean Aftermath's gross revenue from licensing less Aftermath's direct costs associated with licensing.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|----------------------|------|------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

Plaintiffs urge a different interpretation of "our net receipts" based on extrinsic evidence. *Plt. Opp.* 19:20-23. Plaintiffs argue that testimony and exhibits introduced at trial show that Aftermath does not deduct mechanical royalties or distribution fees from the licensing income received from conditional downloads and streams. *Id.* 19:20-20:2. Thus, Plaintiffs conclude, mechanical royalties and distribution fees should not be deducted when it comes to permanent downloads and mastertones. Plaintiffs' conclusion does not follow from the evidence. The reason Aftermath does not deduct mechanical royalties or distribution fees from income received from licensing conditional downloads and streams is because Aftermath does not pay those costs for licensing conditional downloads and streams. SFD ¶ 137. In contrast, it is undisputed Aftermath does have to pay mechanical royalties and distribution fees for permanent downloads and mastertones. SFD ¶¶ 70-76, 78.[6] Aftermath's practice with regard to costs that do not exist for conditional downloads and streams cannot be relevant to whether Aftermath may deduct costs that indisputably do exist for permanent downloads and mastertones. Accordingly, Aftermath's "net receipts" are its gross revenues from the licensing of masters, less the direct costs of mechanical royalties and distribution fees.

### 4.    New Medium and Container Charge Deductions

Defendants also argue that other provisions in the agreements should be read to apply to the Masters Licensed royalty rate. Section 5(f) of the 2003 Agreement states "[t]he royalty payable to you for New Mediums will be seventy five percent (75%) of the otherwise applicable royalty rate." New Mediums are "records . . . in any software medium (including, without limitation, 'digital audio tape,' 'digital compact disc,' 'and mini-disc' and transmission directly into the home) in which recorded music is not in general commercial distribution in the United States as of January 1, 1997." *2003 Agreement* ¶ 16(h).[7]

---

[6] Plaintiffs argue that Defendants conceded in an interrogatory response that any direct costs associated with licensing are "negligible" and that Defendants should not now be heard to contradict this sworn response. *Plt. Opp.* 21:26-28 n.13. Defendants did not concede their costs were negligible. Defendants explained that their interrogatory response did not include "payments of any type of royalty" or "the distribution and administrative fee that Aftermath pays to Interscope." *See Busch Decl.,* Ex. 10. These are precisely the costs that are now at issue.

[7] The New Medium and Container Charge provisions also appear in the 1998 Agreement, but for simplicity the Court will only cite to the 2003 Agreement.

---

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|------------------------|------|-------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

Defendants further argue they are entitled to take a deduction known as a "Container Charge." *Def. Mot.* 24:8-22. The agreements provide that "[f]or purposes of computing royalties, there will be deducted from the [applicable price] . . . twenty-five percent (25%) thereof for records in the form of digital records (including, without limitation, Compact Discs), and for all records in any other form now known or hereafter devised." *2003 Agreement* ¶ 5(d)(iii).

The meaning of the New Medium and Container Charge deductions in relation to the Masters Licensed provision is unclear from the plain language of the agreements. In the New Medium definition, the phrase "transmission directly into the home" could be reasonably read to apply to permanent downloads. *See id.* ¶ 16(h). On the other hand, the types of "records" specifically contemplated by the New Medium provision are audio tapes, compact discs, and mini-discs. *See id.* These physical mediums suggest the parties contemplated the application of the New Medium deduction to the Records Sold provision and not the Masters Licensed provision. Likewise, the Container Charge provision specifically contemplates compact discs. *See id.* ¶ 5(d)(iii). And even the term "Container Charge," which Defendants themselves use to refer to this charge, suggests a product sold in a "container," not the mere licensing of container-less downloads and mastertones.

Due to the ambiguous language of these clauses, the Court will turn to extrinsic evidence to shed light on their meaning. *See Sup. Ct.*, 114 Cal. App. 4th at 1351. It is undisputed that the licensing of conditional downloads and streams is covered by and paid under the Masters Licensed provision. SFD ¶ 134. It is also undisputed that conditional downloads and streams utilize the same technology as permanent downloads. SFP ¶ 47. At trial, Defendants agreed that they pay for conditional downloads and streams "according to the terms of the contract." *Aug. 29 Busch Decl.*, Ex. 1, 11:22-24. Lastly, Defendants concede they have never taken a New Medium or Container Charge deduction from royalties for licensing of conditional downloads and streams. SFD ¶¶ 135, 136, 148. Defendants have, therefore, admitted they do not read the agreements to allow for a New Medium or Container Charge deduction from Masters Licensed royalties derived from the licensing of conditional downloads and streams. Defendants do not offer any reason, and the terms of the agreements do not admit of any reason, why these deductions would apply to permanent downloads and mastertones under the Masters Licensed provision, but not to products utilizing the same technology under the same Masters Licensed provision. The Court concludes that Defendants' course of performance demonstrates that, before this litigation arose, Defendants did not understand the agreements to allow for these

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|----------|------------------------|------|------------------|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

deductions under the Masters Licensed provision. The parties' pre-dispute understanding of the terms of the agreements controls over the post-dispute interpretation offered by Defendants. *See Lix v. Edwards*, 82 Cal. App. 3d 573, 579, 147 Cal. Rptr. 294 (1978) ("[G]reat weight is given to the contemporaneous construction of the contract by the parties themselves prior to the time controversy over its meaning arose."); *see also Auto. Salesmen's Union v. Eastbay Motor Car Dealers, Inc.*, 10 Cal. App. 3d 419, 424, 89 Cal. Rptr. 20 (1970) (holding that conduct of the parties months prior to the contract dispute demonstrated what the contract language meant and such meaning even prevails over the court's "strict, literal interpretation of the contract").

Defendants contend that the Ninth Circuit's *F.B.T.* opinion found that the parties' course of performance could not change the language of a contract and therefore Defendants' past practice in regards to the New Medium and Container Charge deductions is irrelevant. *Def. Mot.* 24:23-27. The Ninth Circuit held that none of the evidence offered by the parties "regarding industry custom or the parties' course of performance support[ed] Aftermath's interpretation." *F.B.T.*, 621 F.3d at 966. As this sentence plainly indicates, the Ninth Circuit did not hold that a parties' course of performance cannot be used to inform the meaning of contractual terms. Rather, the Ninth Circuit only held that the course of performance evidence proffered by Defendants on appeal did not support the contract interpretation urged by Defendants. In contrast, here the course of performance evidence directly supports the interpretation, proffered by Plaintiffs, that the New Medium and Container Charge deductions do not apply to the Masters Licensed provision. Consequently, Defendants may not argue that the New Medium and Container Charge deductions apply, when the parties' performance shows these deductions do not apply to the Masters Licensed provision.

V.    Conclusion

The Court DENIES Plaintiffs' motion for summary judgment. The Court DENIES in part and GRANTS in part Defendants' motion for summary judgment. Specifically, the Court finds the Eminem masters from the *8 Mile Soundtrack* and the *Re-Up* are Side Projects and not subject to the Masters Licensed provision; the masters from *Recovery* and *Relapse* constituted part of Eminem's recording commitment under the 2003 Agreement and are subject to the Masters Licensed provision; the phrase "our net receipts" in the Masters Licensed provision means Aftermath's gross revenue from licensing, less the direct costs of mechanical royalties and distribution fees; and the New Medium and Container Charge deductions do not apply to the Masters Licensed provision.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-3314 PSG (MANx) | Date | October 31, 2011 |
|---|---|---|---|
| Title | F.B.T. Productions, LLC, *et al.* v. Aftermath Records, *et al.* | | |

**IT IS SO ORDERED.**