KELLY M. KLAUS (State Bar No. 161091)
Kelly.Klaus@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
Melinda.Lemoine@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA  90071-1560
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC, | CASE NO. CV 07-03314 PSG (MANx) |
| Plaintiffs, | **REDACTED PUBLIC VERSION** |
| vs. | DEFENDANTS' NOTICE OF MOTION AND MOTION *IN LIMINE* NO. 1 TO EXCLUDE EXPERT TESTIMONY OF GARY COHEN |
| AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC., | Judge:   Hon. Philip S. Gutierrez<br>Date:    April 3, 2012<br>Time:    9:00 AM<br>Crtrm:   Roybal 880 |
| Defendants. | |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on April 3, 2012 at 9:00 AM, or as soon thereafter as counsel may be heard, in the Courtroom of the Honorable Philip S. Gutierrez, United States District Judge, Central District of California, located in Courtroom Roybal 880 at 255 E. Temple Street, Los Angeles, California, 90012, defendants Aftermath Records, UMG Recordings, Inc., and Interscope Records (collectively, "Aftermath") will and hereby do move *in limine* to exclude the testimony of Gary Cohen on the grounds that his opinion is unreliable because it is inconsistent with the law of the case, relies on indisputably incorrect facts, and is based on unsupported speculation and subjective opinion.

This motion is based upon this Notice of Motion, the Memorandum of Points and Authorities attached hereto, any further submissions in support of the motion, argument of counsel, and such other matters as the Court may consider.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on February 8, 2012.


DATED:  February 17, 2012               MUNGER, TOLLES & OLSON LLP


                                        By:   _s/Kelly M. Klaus_____
                                               Kelly M. Klaus
                                              Attorneys for Defendants

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

1

# TABLE OF CONTENTS

2

**Page**

3    I.    INTRODUCTION ...........................................................................................1

4    II.    BACKGROUND ............................................................................................2

5        A.    The Court's October 31, 2011 Summary Judgment Ruling
             Mandates the Methodology for Computing Royalties Under the
             Masters Licensed Provision ...............................................................2

6        B.    Gary Cohen ........................................................................................4

7        C.    Cohen's "Expert Opinions" ...............................................................5

8            1.    Failure to Deduct Distribution Fees .........................................6

9            2.    Improperly Basing a Calculation on the Receipts of
                 Foreign Affiliates.....................................................................6

10           3.    Inclusion of "Side Projects" ....................................................7

11           4.    Using Plainly Incorrect Mechanical Royalty Rates .................8

12    III.    ARGUMENT ...............................................................................................10

13       A.    *Daubert* Requires The Court To Exclude Unreliable Expert
             Testimony.........................................................................................10

14       B.    Mr. Cohen's Expert Testimony Is Unreliable And Must Be
             Excluded...........................................................................................12

15           1.    Mr. Cohen's Calculations Of Receipts From Foreign
                 Exploitation Are Not Based On Aftermath's Net Receipts......12

16           2.    Mr. Cohen Improperly Included Royalties For "Lose
                 Yourself"—A Master Created For A Side Project—In His
                 Damages Calculation ..............................................................15

17           3.    Mr. Cohen Used Mechanical Royalty Rates That He
                 Knew To Be Incorrect .............................................................18

18           4.    Mr. Cohen's Opinion Of Damages Without A
                 Distribution Fee Deduction Is Contrary To The Law Of
                 The Case..................................................................................21

19       C.    Mr. Cohen's Expert Testimony Should Be Excluded In Its
             Entirety.............................................................................................22

20    IV.    CONCLUSION ...........................................................................................23

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ................................................................ 22

*Avila v. Willits Environmental Remediation Trust*,
    633 F.3d 828 (9th Cir. 2011) ............................................................... 10

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
    No. 96-3281, 2003 WL 22038700 (C.D. Cal. Aug. 8, 2003) ........... 11, 12, 17, 22

*Christophersen v. Allied-Signal Corp.*,
    939 F.2d 1106 (5th Cir. 1991) ....................................................... 11, 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .............................................................. passim

*Davis v. Ashcroft*,
    2003 WL 25665777 (D.D.C. Aug. 19, 2003) .................................. 11, 20

*De Saracho v. Custom Food Machinery, Inc.*,
    206 F.3d 874 (9th Cir. 2000) ............................................................. 11

*Diviero v. Uniroyal Goodrich Tire Co.*,
    114 F.3d 851 (9th Cir. 1997) ...................................................... 11, 22

*Gable v. National Broadcasting Co.*,
    727 F. Supp. 2d 815 (C.D. Cal. 2010) ........................................... 22, 23

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
    254 F.3d 825 (9th Cir. 2001) ............................................................. 12

*Guillory v. Domtar Indus.*,
    95 F.3d 1320 (5th Cir. 1996) ............................................................. 11

*In re Commercial Money Center, Inc., Equipment Lease Litigation*,
    Nos. 02-16000, 02-16001, 02-16005, 02-16013, 02-16027, 2007 WL
    1514282 (N.D. Ohio May 22, 2007) ........................................ 11, 13, 17, 22

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ............................................................... 22

*In re REMEC Inc. Securities Litigation*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ............................................... 22

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ....................................................................... 15

*Michigan First Credit Union v. CUMIS Ins. Soc'y, Inc.*,
    No. 05-74423, 2009 WL 43479 (E.D. Mich. Jan. 5, 2009) .............. 11, 13, 17, 22

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    146 F.3d 1088 (9th Cir. 1998) ........................................................... 10

*Robinson v. Sanctuary Record Groups, Ltd.*,
    542 F. Supp. 2d 284 (S.D.N.Y. 2008) ......................................... 4, 5, 9, 23

*Torch Energy Mktg., Inc. v. Pac. Gas & Elec. Co.*,
    No. 01-3402, 2003 WL 22703235 (S.D. Tex. March 31, 2003) ................ 20

1

2

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

3   *United States v. Freeman*,
         498 F.3d 893 (9th Cir. 2007) ................................................................. 18

4   *United States v. Sandoval-Mendoza*,

5         472 F.3d 645 (9th Cir. 2006) ........................................................... 15, 18

    *Wyler Summit Partnership v. Turner Broadcasting System, Inc.*,
6         235 F.3d 1184 (9th Cir. 2000) ............................................................... 10

7                               STATE CASES

8   *Wolf v. Walt Disney Pictures & Television*,
         162 Cal. App. 4th 1107 (2008) ................................................................. 3

9                             FEDERAL RULES

10  Fed. R. Evid. 702 ..................................................................................... 10, 12

11                          OTHER AUTHORITIES

12  http://www.copyright.gov/licensing/m200a.pdf ........................................ 10

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

The Court should exclude Plaintiffs' royalty auditor and proposed damages expert, Gary Cohen, from testifying in this case.  The opinions that Plaintiffs want to elicit from Mr. Cohen—those disclosed in his expert report, as well as opinions that Mr. Cohen disclosed for the first time at his deposition—are inadmissible for numerous reasons.  Mr. Cohen's opinions flatly defy a number of the Court's rulings in its Summary Judgment Order regarding how royalties are to be calculated.  October 31, 2011 Summary Judgment Order (Dkt. No. 737) ("Order").  Mr. Cohen's opinions are based on facts that he knew to be wrong and as to which he had access to information (either in his own files or those of Plaintiffs) that would have given him correct data.  And still other opinions are based on pure conjecture.  Among the many flaws in his analysis:

- Although the Court ruled that "our net receipts" means *Aftermath's* net receipts, Order at 14, Mr. Cohen calculated "our net receipts" for foreign exploitation of masters in permanent download and mastertone form based on amounts received by foreign entities affiliated with Aftermath, rather than on the amounts that Aftermath actually received.

- Mr. Cohen included revenues in his damages analysis received from every permanent download and mastertone exploitation of the Eminem recording "Lose Yourself" after the second half of 2005—even though the Court found that "Lose Yourself" was a Side Project and that "Side Projects are not subject to the Masters Licensed provision." Order at 11-13.

- Although the Court ruled that mechanical royalties must be deducted in calculating Aftermath's "net receipts," Order at 15, ███████

- 1 -                                DEFENDANTS' MOTION *IN LIMINE* NO. 1
                                         TO EXCLUDE EXPERT TESTIMONY

1

2

3

4

5

6

7   •     Mr. Cohen purports to offer a damages analysis with no deduction for

8           distribution fees—and to opine on why no distribution fee is

9           appropriate—even though the Court has said that Aftermath is entitled

10          to deduct distribution fees actually incurred in calculating its net

11          receipts.  Order at 15.

12        Mr. Cohen's work is not the product of an expert applying a reliable analysis

13  to the facts in light of the law of the case.  Rather, it is the work of a partisan

14  advocate who willfully ignored the rules the Court has laid down regarding the

15  calculation of damages and the evidence that he either had or had ready access to.

16  Mr. Cohen's refusal to abide by the Court's rulings regarding the computation of

17  damages has resulted in a damages opinion that overstates by millions of dollars the

18  amount that Plaintiffs actually are entitled to receive based upon the Court's

19  rulings.  Mr. Cohen's report and testimony should be excluded in their entirety.

20  **II.**     **BACKGROUND**

21        **A.**     **The Court's October 31, 2011 Summary Judgment Ruling**

22             **Mandates the Methodology for Computing Royalties Under the**
           **Masters Licensed Provision**

23        The Court's Order lays out the clear methodology that should be applied to

24  calculate the amount of royalties that Plaintiffs are entitled to under the ruling that

25  the "Masters Licensed" provision applies to permanent downloads and mastertones

26  exploited through digital retailers.  *See* Order at 2-3, citing 1998 Agreement

27  ¶ 4(c)(v) ("On masters licensed by us . . . to others for their manufacture and sale of

28  records or for any other uses, your royalty shall be an amount equal to fifty percent

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

1    (50%) of our net receipts from the same of those records or from other uses of the

2    masters"); 2003 Agreement ¶ 5(c)(v).  The Order makes it clear that the Court

3    determined as a matter of law how such royalties must be calculated.  *See* Order at

4    11 (citing *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107,

5    1126-27 (2008)).

6         The royalty calculation the Court prescribes follows three steps.

7         *First*, it must be determined which master recordings are subject to the

8    royalties under the Masters Licensed provision.  As relevant here, "Side Projects"—

9    which are master recordings featuring Eminem's performance for projects other

10   those in satisfaction of Eminem's recording commitment— "are not subject to the

11   Masters Licensed provision."  Order at 12.  In particular, master recordings created

12   for the albums *Music From and Inspired by the Movie 8 Mile* (the "*8 Mile*

13   *Soundtrack*") and *Eminem Presents the Re-Up* are Side Projects that are "not

14   covered by the Masters Licensed provision."  *Id.* at 13.  This ruling has particular

15   relevance for this motion, because the master recording for the popular song "Lose

16   Yourself" was created and delivered as part of the *8 Mile Soundtrack*.  As discussed

17   below, Mr. Cohen has improperly included in his damages calculation receipts from

18   every single permanent download and mastertone of "Lose Yourself" since late

19   2005.

20        *Second*, the royalty calculation of "*our* net receipts" is performed only on

21   *Aftermath's* net receipts.  "[I]t is clear that the term 'our' refers to Aftermath.

22   Aftermath is the only entity responsible for licensing that signed the agreements."

23   *Id.* at 14.  This is important because, when a permanent download or mastertone is

24   exploited outside the United States, Aftermath does not receive the wholesale price

25   on that exploitation.  Aftermath is a U.S. company; it does not conduct business in

26   foreign territories.  The wholesale receipts in foreign territories are received by

27   affiliates of UMG Recordings, Inc. ("UMG") and only a portion of those receipts

28   are remitted to the United States repertoire owner (here, Aftermath).  Nevertheless,

DEFENDANTS' MOTION *IN LIMINE* NO. 1
                                                TO EXCLUDE EXPERT TESTIMONY

1   as he has done in royalty audits for Plaintiffs in the past (as discussed in

2   Defendants' summary judgment motion on the "our net receipts" issue, and as

3   discussed in Defendants' concurrently filed Motion *in Limine* No. 2), Mr. Cohen

4   calculated damages in this case based on *the foreign entities'* receipts and not on

5   what Aftermath actually received.  *See* Summ. J. Mot. at 20 (Dkt. No. 692).

6       *Third*, "Aftermath's 'net receipts' are its gross revenues from the licensing of

7   masters, less the direct costs of mechanical royalties and distribution fees."  Order

8   at 15.  As discussed below, Mr. Cohen intends to offer "opinions" that there should

9   be no deduction at all for distribution fees and that the deduction for mechanical

10  royalties for Aftermath's exploitation of mastertone should be based on a

11  mechanical royalty that Plaintiffs and Mr. Cohen know is substantially below the

12  actual mechanical royalties which Aftermath paid on such exploitation, which is

13  especially egregious given that much of those mechanical royalties were paid to

14  Plaintiffs' publishing entities (*i.e.*, Mr. Cohen's calculations would result in a

15  double payment to Plaintiffs).

16      **B.    Gary Cohen**

17      Plaintiffs' damages expert, Gary Cohen, is an accountant and royalty auditor.

18  As the Court will recall from the first trial in this matter, Mr. Cohen has been

19  Plaintiffs' auditor for a number of years.  In addition to his work as an auditor, Mr.

20  Cohen frequently is offered as an expert for royalty recipients on damages in

21  royalty disputes, as he has been offered in this case.  *See* Declaration of Kelly Klaus

22  ("Klaus Decl.") Ex. 1 at 1 (Dep. Ex. 965) (Cohen Rep.); *id*. Ex. 2 (Dep. Ex. 966)

23  (Cohen's expert witness engagements since 2005).

24      This is not the first motion to exclude Mr. Cohen's testimony under *Daubert*.

25  In *Robinson v. Sanctuary Record Groups, Ltd.*, 542 F. Supp. 2d 284, 290-

26  94 (S.D.N.Y. 2008), *vacated on other grounds*, *Robinson v. Sanctuary Music*, 383

27  F. App'x 54 (2nd Cir. 2010), the district court excluded Mr. Cohen's expert report

28  and testimony on *Daubert* grounds as insufficiently reliable.  The court held that

1    Mr. Cohen's methodology was "founded on hearsay supplied by Plaintiffs' counsel,
2    . . . incomplete comparisons, and dubious assumptions." *Id.* at 292.  The court
3    further held that Mr. Cohen's damages analysis was:

> built upon one flawed assumption after another, and despite Plaintiffs'
> complaints of discovery abuse, the record reflects that Defendants
> produced sufficient documentation to permit Plaintiffs to test the
> reliability of Cohen's assumptions. However, Cohen and Cinque
> [Plaintiffs' counsel, who employed Mr. Cohen] never tested their
> calculations as commended by *Daubert,* instead relying exclusively on
> their many faulty assumptions.

*Id.* at 292-93.  The *Robinson* plaintiffs tried to defend Mr. Cohen's flawed
methodology and analysis on the ground "that they did not have sufficient
documentation to make accurate accounting." *Id.* at 293.  The court rejected this
argument, holding that the plaintiffs' and Mr. Cohen's excuses did "not by some
unknown alchemy convert unreliable evidence into reliable evidence." *Id.*[1]

As demonstrated below, the *Robinson* district court's assessment of Mr.
Cohen's opinions apply with full force to the opinions Mr. Cohen offers here.

### C.    Cohen's "Expert Opinions"

Plaintiffs produced an expert report from Mr. Cohen on January 4, 2012.
Klaus Decl. Ex. 1.  Mr. Cohen states that Plaintiffs retained him to "form an
opinion regarding the amount of damages due Plaintiffs" through and including
June 30, 2011.  *Id.* at 2.  Mr. Cohen's opinions fall short of the requirements for
admissibility in four key areas:

---

[1] The district court excluded Mr. Cohen's testimony in the *Robinson* case on March 25, 2008.  On May 15, 2008, Mr. Cohen was deposed in this case, and testified that he did not recall a court ever concluding that his damages methodology was unreliable—even though the *Robinson* court had done just that 50 days earlier.  *See* Klaus Decl. Ex. 3 (Cohen 5/15/2008 Dep. at 65:12-14).

DEFENDANTS' MOTION *IN LIMINE* NO. 1
                                             TO EXCLUDE EXPERT TESTIMONY

### 1.     Failure to Deduct Distribution Fees

Mr. Cohen offers two alternative damages calculations:  one that includes a deduction for a distribution fee of 10%, and another with no distribution fee deduction.  Notwithstanding the Court's Order holding that Aftermath may deduct the distribution fee to arrive at its own "net receipts," Order at 15, Mr. Cohen proffers his own "position" that there should be no distribution fee deduction, because "Defendants do not incur any manufacturing or inventory related costs." Klaus Decl. Ex. 1 at 3.  ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  *Id*. at 4.

### 2.     Improperly Basing a Calculation on the Receipts of Foreign Affiliates

In calculating Aftermath's receipts from foreign exploitations, Mr. Cohen did not attempt to calculate the amount that *Aftermath* actually received from such exploitation.  Mr. Cohen instead constructed a foreign wholesale price received by the foreign entities that engaged in the exploitation—*i.e.*, an amount that was paid at wholesale to the foreign entities for the exploitation—and plugged those numbers in as the amount that *Aftermath* received.  *Id*. at 3.  By basing his calculation of foreign receipts on the amount that the foreign entities received instead of the amount that Aftermath actually received from those foreign entities, Mr. Cohen blatantly ignored the Court's Order that "our net receipts" means *Aftermath's* net receipts and greatly overstated his damages calculation.

Mr. Cohen not only ignored the Court's Order—he ignored his own knowledge of how Aftermath Records receives revenue from the exploitation of recordings worldwide.  In the case of exploitations of masters subject to the Masters Licensed provision in the form of permanent downloads or mastertones outside the United States, Aftermath is not the entity that receives the wholesale price from such exploitation.  Declaration of Ping Hu ("Hu Decl.") ¶ 3.  Rather, that money is

1    received by various foreign entities authorized to exploit Aftermath's master

2    recordings in their particular territory. *Id.* Pursuant to the Intercompany License

3    Agreement ("ICLA") among companies affiliated worldwide with Universal Music

4    Group, the foreign entities are obligated to remit a specified royalty from their

5    exploitation to the domestic repertoire owner (in this case, Aftermath) through the

6    international processing entity, colloquially referred to as the "Centre." *Id.* ¶ 2.

7    The specific percentage of the amount received by the foreign entity that is remitted

8    to the domestic repertoire owner is set forth in schedules to the ICLA. *Id.* ¶ 3.  The

9    royalties paid to the domestic repertoire owner (*e.g.*, Aftermath) are reflected in

10   statements generated in the ordinary course of business called "All-in-Fee"

11   statements ("AIF"), which contain, among other things, the royalty percentage and

12   the amount of receipts remitted to the domestic repertoire owner. *Id.* ¶ 4.  Because

13   only Aftermath's receipts count for purposes of the Masters Licensed royalty

14   calculation, only the amount actually received by Aftermath as reflected on the AIF

15   statements can factor into the damages calculation in this case.

16        Mr. Cohen knows all of this, as he has routinely requested and received the

17   AIF statements that detail the royalties received by Aftermath for foreign

18   exploitation, including for permanent downloads and mastertones.  But his opinion

19   ignores that information and the Court's Order.

20              **3.    Inclusion of "Side Projects"**

21        Mr. Cohen's report also purports to calculate Plaintiffs' damages claimed to

22   be owed on large numbers of permanent download and mastertone copies of "Lose

23   Yourself"—notwithstanding that the Court previously ruled that because "Lose

24   Yourself" was recorded for the *8 Mile Soundtrack*, it is a "Side Project," and not

25   subject to the Masters Licensed provision.  Order at 11-13.  In his report, Mr.

26   Cohen stated that he was "advised by Plaintiffs' attorney that the [sic] 'Lose

27   Yourself' should be included in my damages calculation only as it relates to its

28   inclusion on the album 'Curtain Call.'"  Klaus Decl. Ex. 1 at 4. *Curtain Call* is the

DEFENDANTS' MOTION *IN LIMINE* NO. 1
                                          TO EXCLUDE EXPERT TESTIMONY

Eminem Greatest Hits album released in late 2005.  Mr. Cohen cannot explain how

a track recorded as a Side Project can transform from a Side Project to a master

subject to the Masters Licensed provision by its subsequent inclusion on a greatest

hits album.  Mr. Cohen nevertheless included in his damages calculation every

single permanent download and mastertone exploitation of "Lose Yourself"

reflected on any royalty report dated after June 30, 2005.  *Id.*

### 4.   Using Plainly Incorrect Mechanical Royalty Rates

Mr. Cohen's report purports to deduct mechanical royalties incurred by

Aftermath to arrive at Aftermath's net receipts, based upon the Court's

determination that such royalties must be deducted.  Order at 15.  However, Mr.

Cohen dramatically understated the mechanical royalty expense incurred by

Aftermath for permanent downloads and mastertones by applying incorrect royalty

rates.  With respect to mastertones, Mr. Cohen imputed a mechanical royalty rate of

8.5 cents before March 1, 2009, and 9.1 cents thereafter.  Klaus Decl. Ex. 4 (Dep.

Ex. 977).  Although those rates represented the minimum statutory mechanical

royalty rate for *permanent downloads* during those time periods, Aftermath

incurred a much higher mechanical royalty expense for *mastertones*.

For many years, mastertone releases of Eminem's recordings were subject to

a separate "Mastertone Agreement" with Eight Mile Style LLC and Martin

Affiliated LLC, the publishing entities owned and controlled by the same

individuals (Jeff and Mark Bass, and Joel Martin) who own and control the

Plaintiffs in this case.  *Id.* Ex. 5 (Dep. Ex. 975).  That Mastertone Agreement set a

minimum mechanical royalty rate of ███████████—more than twice the

rate that Mr. Cohen artificially imputed for mechanical royalties on mastertone.  *Id.*

at 3-4 ¶ 3(a).  And, following the adoption of a statutory mechanical royalty rate

applicable to mastertones, the mechanical royalty expense Aftermath incurred

increased to 24 cents per mastertone.  Klaus Decl. Ex. 4 (Dep. Ex. 977).  As a

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

1  result, Mr. Cohen drastically understated the mechanical royalty expense incurred

2  by Aftermath with respect to mastertones.

3       Even as to permanent downloads, Mr. Cohen's imputed royalty rate was

4  wrong in a number of cases.  Although Mr. Cohen applied the "minimum" statutory

5  mechanical royalty rate for permanent downloads, the statutory royalty rate

6  increased by an additional 1.75 cents per minute (or fraction thereof) for permanent

7  downloads with a playing time of five minutes or longer.  *Id.*  Mr. Cohen ignored

8  the so-called "long song" mechanical royalty rate in his calculation for the

9  applicable Eminem tracks longer than five minutes, which resulted in an

10  understatement of the mechanical royalty expense incurred by Aftermath.  *Id.* Exs.

11  6-9 (iTunes screenshots of album and track listings).

12                                    \* \* \*

13       Mr. Cohen's justification for many of the slipshod errors in his report is the

14  same one that he relied on in the *Robinson* case: that Aftermath purportedly refused

15  to produce underlying financial data in discovery.  Klaus Decl. Ex. 1 (Dep. Ex. 965)

16  at 3.  That excuse is a complete red herring.

17       *First*, Mr. Cohen and/or Plaintiffs had the materials necessary to perform

18  proper calculations.  As noted, Mr. Cohen is Plaintiffs' royalty auditor.  As such, he

19  had in his possession from prior audits the royalty statements that he used to

20  calculate the damages figures he included in his expert report.  *Id.* at 2; *id*. Ex. 10

21  (Cohen Dep. Tr.) at 49:4-50:10; 148:11-19.  Mr. Cohen also had numerous

22  additional documents that he could have used to calculate, among other things,

23  Aftermath's actual receipts based on foreign exploitations (*e.g.*, the AIF

24  statements), and mechanical royalties on mastertones and "long songs" (*e.g.*,

25  mechanical royalty statements rendered to Plaintiffs' publishing entities, the

26  "Mastertone Agreement" with Plaintiffs' publishing entities, label copy showing

27  the length of the applicable songs, and access to the Copyright Office's website

28  which sets forth the applicable statutory mechanical royalty rates for mastertones,

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

see http://www.copyright.gov/licensing/m200a.pdf).  As discussed below, Mr. Cohen availed himself of none of these readily available sources, for the obvious reason that doing so would have reduced the amount of his clients' damages claim.

*Second*, to the extent that Plaintiffs contend Mr. Cohen needed additional documents to perform his calculations, discovery in this case closed before the first trial, and Plaintiffs never made a proper motion to reopen discovery.  (Plaintiffs did file an *ex parte* application, seeking to validate Plaintiffs' discovery requests, but the Court denied that procedurally improper application.  Dkt. No. 746.)

## III.   ARGUMENT

### A.   *Daubert* Requires The Court To Exclude Unreliable Expert Testimony

To be admissible, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue," and must be "based on sufficient facts or data," and be "the product of reliable principles and methods" that the witness has applied "reliably . . . to the facts of the case."  Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court made it clear that the District Court must exercise a "gatekeeping role" to exclude expert testimony that is not sufficiently reliable or relevant.  *Id.* at 597; *see, e.g.*, *Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828 (9th Cir. 2011).  As relevant to this motion, Rule 702 and *Daubert* impose several requirements for admissible expert testimony that Mr. Cohen's opinions fail to satisfy.

*First*, an expert cannot offer testimony in contravention of binding law, including the Court's decisions that are law of the case.  *See Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000) (expert testimony cannot create a disputed issue on summary judgment when "the expert offers an opinion that courts have rejected as a matter of law").  *Accord Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1095 (9th Cir. 1998).  "[I]t is beyond meaningful debate that the Court has the authority to restrict expert

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

testimony that is at odds with the Court's own purely legal rulings." *In re Commercial Money Center, Inc., Equipment Lease Litigation*, Nos. 02-16000, 02-16001, 02-16005, 02-16013, 02-16027, 2007 WL 1514282, at *3-*4 (N.D. Ohio May 22, 2007). For example, "an expert in a patent case may not proffer a claim construction at odds with the Court's construction [and] an expert in a securities case may not declare something to be a security where the Court has declared, as a matter of law, that the particular instrument does not qualify as such." *Id.* Likewise, an expert may not offer opinion about the purported ambiguity of contract language if the court has already interpreted the language as a matter of law. *See Michigan First Credit Union v. CUMIS Ins. Soc'y, Inc.*, No. 05-74423, 2009 WL 43479, at *2 (E.D. Mich. Jan. 5, 2009); *see also Carson Harbor Village, Ltd. v. Unocal Corp.*, No. 96-3281, 2003 WL 22038700, at *2-*3 (C.D. Cal. Aug. 8, 2003) (excluding expert testimony that lead contaminants were present in storm water during a certain time period because the Ninth Circuit had already held that there was "no evidence" of such contaminants during that period).

   *Second*, experts may not offer opinions based on facts that are indisputably wrong. "Even if Rule 703 will not require the exclusion of such an unfounded opinion, general principles of relevance will. In other words, an opinion based totally on incorrect facts will not speak to the case at hand and hence will be irrelevant." *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114-15 (5th Cir. 1991) (en banc), *overruled on other grounds, Daubert,* 509 U.S. at 587 n.5; *see also Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (same); *De Saracho v. Custom Food Machinery, Inc.*, 206 F.3d 874, 879 n.5 (9th Cir. 2000) (same); *Davis v. Ashcroft*, 2003 WL 25665777, at *1 (D.D.C. Aug. 19, 2003) ("expert opinion based on incorrect data is not admissible").

   *Third*, experts must have sufficient expertise for the opinions they offer. Opinions based on the expert's "unsubstantiated speculation and subjective beliefs" must be excluded. *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th

DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EXPERT TESTIMONY

Cir. 1997) (citing *Daubert*, 509 U.S. at 590); *see Guidroz-Brault v. Missouri Pac.
R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).

### B.   Mr. Cohen's Expert Testimony Is Unreliable And Must Be Excluded

Mr. Cohen's testimony should be excluded because his proffered opinions
are not "the product of reliable principles and methods." Fed. R. Evid. 702. His
proposed testimony on each of four major issues violates one or more of the
preceding limitations on expert testimony. We discuss Mr. Cohen's opinions on
each of these issues in turn.

### 1.   Mr. Cohen's Calculations Of Receipts From Foreign Exploitation Are Not Based On *Aftermath's* Net Receipts

The Court's Order holds that "our net receipts" in the Masters Licensed
provision refers to the revenue received *by Aftermath*, and not by any other entity.
*See* Order at 14. "[I]t is clear that the term 'our' refers to Aftermath. Aftermath is
the only entity responsible for licensing that signed the agreements." *Id.*

Mr. Cohen's calculation of damages, however, ignores this aspect of the
Court's Order, and attempts to calculate Aftermath's "net receipts" based on the
amount received by foreign affiliates. Mr. Cohen thus takes the position that
Aftermath's receipts are the entire wholesale amount received and retained by the
foreign entities, including the portion never paid to or received by Aftermath.
Klaus Decl. Ex. 1 (Dep. Ex. 965) at 3.[2] Mr. Cohen admitted that he did not reduce
this wholesale amount to reflect the fact that Aftermath itself only receives a
portion of the revenue from foreign exploitation of permanent downloads and
mastertones. *Id.* Ex. 10 (Cohen Dep. Tr.) at 91:15-92:4. By treating the entirety of
the wholesale price received by the foreign entity at the source as money that

---

[2] As explained in Defendants' Motion *in Limine* No. 2, Mr. Cohen made this
argument in the 2006 audit report that precipitated this lawsuit. Plaintiffs
abandoned it before the first trial, in addition to losing it on the merits in the recent
summary judgment Order. Defendants incorporate the discussion of that procedural
history here by reference.

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

1    *Aftermath* received, Mr. Cohen computes damages contrary to the law of the case,

2    namely, that "our net receipts" refers to the net receipts of Aftermath.  His opinion,

3    therefore, must be excluded.  *See, e.g.*, *Carson Harbor Village*, 2003 WL

4    22038700, at *2-*3; *In re Commercial Money Center*, 2007 WL 1514282, at *3-*4;

5    *Michigan First Credit Union*, 2009 WL 43479, at *2.

6          Plaintiffs' and Mr. Cohen's primary justification for ignoring what Aftermath

7    receives from foreign exploitation—and instead focusing on a constructed

8    wholesale price received in the foreign territory—is that he allegedly did not have

9    documents showing the amount of revenue Aftermath received from such foreign

10   exploitations.  Klaus Decl. Ex. 10 (Cohen Dep. Tr.) at 93:4-7 ("If you would like to

11   provide me or Universal would like to provide me with more detailed information, I

12   will be glad to consider that.").  This justification fails, however, because, as Mr.

13   Cohen admitted at deposition, he previously requested *and received* AIF statements

14   from Aftermath for the years 2002-2009.  *Id.* at 103:19-22, 105:7-12, 108:16-23.

15   *See also* Hu Decl. Ex. 2, at 2 ¶ 8 (Dep. Ex. 968) (Mr. Cohen's request for AIF

16   statements from 2005-2009 audit); *id.* Ex. 1, at 1 ¶ 6 (Dep. Ex. 969) (same for

17   2002-2005 audits).  As noted, the AIF statements reflect the royalty percentage of

18   the price paid to distributors that Aftermath received for permanent downloads and

19   mastertones in foreign territories, and the amounts remitted to Aftermath based on

20   such foreign exploitations.  *See* Hu Decl. ¶ 4; Klaus Decl. Ex. 11, at 1 (Dep. Ex.

21   970) (sample AIF statement); *id.* Ex. 10 (Cohen Dep. Tr.) at 108:16-23.  Mr. Cohen

22   admitted that he did not consult the AIF statements that were in his possession

23   when he purported to calculate Aftermath's net receipts from foreign exploitation of

24   permanent downloads and mastertones.  *Id.* at 118:3-11; *see also id.* at 106:15-19,

25   107:3-5.  Mr. Cohen also admitted that he has never questioned the accuracy of any

26   amounts reported on the AIF statements.  *Id.* at 116:12-16.

27         When confronted with the AIF statements at deposition, Mr. Cohen

28   ultimately admitted that *even if he knew* that Aftermath received only a percentage

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

of the wholesale price received by the foreign entity for the foreign exploitation of a master, that would not have changed his damages calculation at all.  *Id*. at 118:25-119:5.  Mr. Cohen admitted that his refusal to consider the amounts actually remitted was based on his "speculation" that the entities that exploited the recordings in the foreign territories are unnecessary and thus not entitled to retain any portion of the revenue.  *Id*. at 125:14-17.  When asked at deposition why he considered amounts received by foreign affiliates to be revenue received *by Aftermath*, Mr. Cohen repeatedly asserted that it was because, in his personal opinion, he did not believe that the foreign affiliates were "actually performing any function."  *Id*. at 120:22-23; *see also id*. at 96:5-97:8 ("Q. [W]hy are the amounts that are received by a foreign affiliate amounts received by Aftermath? . . . A. These licenses could have been entered into directly by Aftermath and they didn't need a foreign affiliate to take a cut.").  He explained that, in his opinion, "Aftermath is fully capable of taking a download file and e-mailing it to any country in the world. . . . I think any 12 year old would know that.  You send an e-mail with a file attached to it and some meta data that can be uploaded into iTunes and used."  *Id*. at 121:4-18; *see also id*. at 121:23-122:19 ("Q.  Is that, to your knowledge, all that's entailed in the dissemination of . . . a permanent download or a . . . mastertone . . . in a foreign country?  A.  In the -- for the distribution, I think that's what goes on, but I'm not sure.  Q. . . . [T]hat's speculation on your part?  A.  I think Aftermath is capable of doing that without intermediaries.  Much as it's capable of doing it in the U.S., it can do it overseas as easily. . . . Q. . . . [W]hat's the basis for your belief in that regard?  A.  The Internet is very interactive and files can be sent all over the world very easily.  And if there's some encryption involved, that's a -- a minor point.").

Mr. Cohen, an accountant, is clearly not qualified to testify as an expert on whether record companies located throughout the world are necessary for the marketing, promotion and exploitation of permanent downloads and mastertones in

1   their respective countries.  He admitted at deposition that his views about the role of

2   foreign affiliates were pure speculation and not based on any expertise he

3   possessed.  *Id.* at 125:14-17 ("Q.  And that's not based on any expertise you have.

4   That's just based on your understanding of the Internet?  A.  That's speculation,

5   yes."); *see also, e.g.*, *Daubert*, 509 U.S. at 590 (precluding expert opinion based on

6   speculation and subjective opinion).  Mr. Cohen also conceded that he had no

7   knowledge regarding the role played by foreign affiliates in the taxation, regulation,

8   and infrastructure for exploitation of permanent downloads and mastertones in their

9   particular countries.  Klaus Decl. Ex. 10 (Cohen Dep. Tr.) at 124:14-125:12.

10       None of Mr. Cohen's speculation is disclosed in his expert report.  And, even

11   if it had been disclosed, it would not be admissible.  Testimony that is based on the

12   expert's musings about matters outside his expertise is not admissible.  *Kumho Tire*

13   *Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *United States v. Sandoval-Mendoza*,

14   472 F.3d 645, 654 (9th Cir. 2006) (expert testimony "is reliable if the knowledge

15   underlying it has a reliable basis in the knowledge and experience of [the relevant]

16   discipline.") (quoting *Kumho Tire*, 526 U.S. at 149).

17           **2.    Mr. Cohen Improperly Included Royalties For "Lose**
                     **Yourself"—A Master Created For A Side Project—In His**
18                   **Damages Calculation**

19       Mr. Cohen's damages opinion also ignores the Court's Order regarding Side

20   Projects.  The Order squarely holds that the *8 Mile Soundtrack*—for which, as the

21   Court noted in its Order, "Lose Yourself" is one of the three Eminem tracks created

22   for and included on that album—is a Side Project that is "not covered by the

23   Masters Licensed provision."  Order at 11-13 & n. 4.  Even though "Lose Yourself"

24   is plainly part of this Side Project—and not subject to a Masters Licensed royalty,

25   Mr. Cohen nevertheless included in his report royalties from every permanent

26   download or mastertone of "Lose Yourself" reported after June 30, 2005.  Mr.

27   Cohen said in his report that this treatment was justified because, per a discussion

28   with counsel, "Lose Yourself" was subject to a Masters Licensed royalty when it

DEFENDANTS' MOTION *IN LIMINE* NO. 1
                                             TO EXCLUDE EXPERT TESTIMONY

1    was included on *Curtain Call*, the 2005 Eminem greatest hits album.  Klaus Decl.

2    Ex. 1 (Dep. Ex. 965) at 4; *id*. Ex. 10 (Cohen Dep. Tr.) at 190:23-25.  At deposition,

3    Mr. Cohen confirmed that his damages calculation included revenues from every

4    permanent download and mastertone sale of "Lose Yourself" from the second half

5    of 2005 forward, *even where* customers purchased the downloaded track as part of a

6    download of the entire *8 Mile Soundtrack*, or even where the customer purchased

7    the track from an iTunes screen-shot listing the tracks on the *8 Mile Soundtrack*.  *Id*.

8    Ex. 10 (Cohen Dep. Tr.) at 181:5-11 ("Q. . . .  So even if the download that was

9    purchased through iTunes came off of the 8 Mile soundtrack album, you still

10   included that in your damages calculation so long as . . . the sale was reported on a

11   royalty report dated after June 30th, 2005?  A.  Yes.").

12          Contrary to Mr. Cohen's assertion, "Lose Yourself" did not cease being a

13   Side Project—and become a master subject to a Masters Licensed provision—when

14   that track was included (with others) on the *Curtain Call* album.  Plaintiffs have not

15   pointed to (and cannot point to) anything in the Court's Order or the underlying

16   agreements that says that a track created as a Side Project magically transforms into

17   a track created in furtherance of Eminem's recording commitment to Aftermath—

18   and subject to a Masters Licensed provision—if the track is subsequently included

19   on a greatest hits album.  Indeed, as the evidence at summary judgment showed, the

20   greatest hits album is not even a commitment album, but instead is governed by a

21   separate agreement.  Declaration of Susan Hilderley in support of Def's Mot. for

22   Summ. Judg., Ex. D.  It is hardly surprising, therefore, that royalties to Plaintiffs for

23   "Lose Yourself" are tracked in a separate royalty account for the *8 Mile*

24   *Soundtrack*.  Klaus Decl. Ex. 10 (Cohen Dep. Tr.) at 191:8-13, 191:18-192:7; *see*

25   *also id*. Ex. 1 (Ex. 965) at 12, 20 (summary of Mr. Cohen's analysis of royalties for

26   "Lose Yourself" sales as recorded in FBT's royalty account for *8 Mile*).  Royalties

27   for "Lose Yourself"—whether on the *8 Mile Soundtrack* or on *Curtain Call*—have

28   always been treated as Side Projects for which Plaintiffs are paid 35% of the

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

royalties due to Eminem. *Id.* Ex. 10 (Cohen Dep. Tr.) at 192:8-12. And, as Mr. Cohen conceded, Plaintiffs have never complained about this. *Id.* at 192:13-193:5. Mr. Cohen's inclusion of receipts for *any* exploitation of "Lose Yourself" is inconsistent with the Court's Order, and must therefore be excluded. *See, e.g.*, *Carson Harbor Village*, 2003 WL 22038700 at *2-*3; *In re Commercial Money Center*, 2007 WL 1514282, at *3-*4; *Michigan First Credit Union*, 2009 WL 43479, at *2.

In addition to improperly including certain exploitation of "Lose Yourself" in his damages analysis, Mr. Cohen should be precluded from offering the opinion put forward at his deposition (but not contained in his report) that, since the *8 Mile Style* soundtrack "was released in 2002, and it pretty much [had] run its sales course by 2005, that any sales [of "Lose Yourself"] after 2005 would be related predominantly to the -- to the Greatest Hits album. That's the -- the theoretical basis for it." Klaus Decl. Ex. 10 (Cohen Dep. Tr.) at 182:20-183:2. *First*, Mr. Cohen should be precluded from offering this opinion because it was not contained in his report. *See id.* Ex. 1 (Dep. Ex. 965) at 4.

*Second*, the Order already establishes that "Lose Yourself" is a Side Project not governed by the Masters Licensed provision, and Mr. Cohen cannot offer an opinion contrary to the law of the case. *See* Defs.' Motion *in Limine* No. 2.

*Third*, even if Mr. Cohen was not otherwise prohibited from offering this opinion, he would not be qualified to offer the opinion. Mr. Cohen is an accountant, not an expert in the field of what is (or is not) responsible for the popularity of a recording. He admitted that there was no research by him or anyone else that backed up his pure conjecture about *Curtain Call* being responsible for post-2005 sales of "Lose Yourself." Klaus Decl. Ex. 10 (Cohen Dep. Tr.) at 185:22-186:22. Mr. Cohen said that his previously undisclosed revelation about what lay behind the popularity of "Lose Yourself" during this time period arose out of "[p]erhaps" "a collaborative opinion" between himself and Plaintiffs' counsel, or

DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EXPERT TESTIMONY

"[c]ommon sense." *Id.* at 183:20-185:9. Plaintiffs' attorneys are no more expert in
this area than Mr. Cohen; the "collaboration" between Mr. Cohen and Plaintiffs'
counsel does not transform Mr. Cohen's conjecture into expert opinion. *See, e.g.*,
*Sandoval-Mendoza*, 472 F.3d at 654. Nor is Mr. Cohen's purported "common
sense" a proper basis for expert testimony, since that is not expertise at all. *See
United States v. Freeman*, 498 F.3d 893, 905 (9th Cir. 2007).

All of Mr. Cohen's "opinions" regarding the treatment of "Lose Yourself"—
those set forth in his report and those revealed for the first time at deposition—are
improper and should be struck.

### 3.   Mr. Cohen Used Mechanical Royalty Rates That He Knew To Be Incorrect

The Court's Order holds that, to calculate Aftermath's net receipts, the direct
costs of, *inter alia*, mechanical royalties incurred by Aftermath must be deducted.
Order at 15. As discussed, Mr. Cohen's calculation of mechanical license royalties
applied an imputed mechanical royalty rate of 8.5 cents and 9.1 cents to all
exploitation of mastertones and permanent downloads without regard to the royalty
expense actually incurred. Klaus Decl. Ex. 1 (Ex. 965) at 3; *id.* Ex. 10 (Cohen Dep.
Tr.) at 144:16-19. This had the effect of understating the actual mechanical royalty
deduction in two major respects. First, with respect to mastertones, *see id.* Ex. 1
(Dep. Ex. 965) at 25-26, the 8.5 cent/9.1 cent imputed royalty is significantly below
the mechanical royalties that Aftermath actually incurred ▇▇▇▇▇▇▇
▇▇▇▇▇▇▇ with Plaintiffs' publishing
companies, and 24 cents per mastertone once the statutory mechanical royalty rate
was established). Second, with respect to permanent downloads, the mechanical
royalty rate imputed by Mr. Cohen applies to tracks five minutes in duration or
shorter. However, because several of the Eminem recordings are longer than five
minutes, Aftermath was required to pay the higher mechanical royalty rate
applicable to such "long songs." As a result, Mr. Cohen's imputed mechanical

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

1  royalty numbers understate the mechanical royalty expense actually incurred by

2  Aftermath for permanent downloads.  Mr. Cohen's damages calculations in his

3  report do not separately break out his damages computations for mastertones from

4  permanent downloads, or the computations for individual "long song" tracks, so it

5  is not possible to identify the precise impact of his error understating mechanical

6  royalties.  However, the summary schedules appended to Mr. Cohen's report

7  identify royalties in various accounts for mastertones that total more than ███████

8  just for the 2005-2009 period alone.  *See id.* Ex. 1 (Dep. Ex. 965) at 25-27.  Hence,

9  Mr. Cohen's use of a mechanical royalty deduction two to three times less than

10  what Aftermath actually incurred obviously has a substantial effect on damages

11  calculated over a period extending through June 2011.

12      Mr. Cohen admitted that he knew his imputed mechanical royalty deductions

13  were not correct.  For example, he said that he knew that Joel Martin, Plaintiffs'

14  owner/manager, had entered into the Mastertone Agreement, which established a

15  mechanical royalty rate for mastertones higher than Mr. Cohen's imputed number.

16  Klaus Decl. Ex. 5 (Cohen Dep. Ex. 975) (Mastertone Agreement) at 3-4 ¶ 3(a); *id.*

17  Ex. 10 (Cohen Dep. Tr.) at 158:11-16, 159:16-22.  Mr. Cohen also admitted that he

18  knew that the Copyright Royalty Board subsequently established a statutory

19  mechanical royalty rate of 24 cents for mastertones, which, by law, applies to the

20  exploitation of mastertones in 2009 and thereafter.  *Id.* Ex. 10 (Cohen Dep. Tr.) at

21  165:4-12 (Q.  Do you know, Mr. Cohen, whether the Copyright Royalty Board

22  issued . . . a statutory rate for mechanicals on mastertones?  A.  Yes, they did. . . .

23  Q.  Do you know what the statutory rate is?  A.  I believe it's 24 cents.").  Mr.

24  Cohen was also aware that the statutory mechanical royalty rate for permanent

25  downloads longer than five minutes was higher than the 9.1 and 8.5 cent rate he

26  used in his damages calculation, *id.* at 173:22-174:9; *id.* at 176:16-177:2, and that

27  there are several Eminem tracks at issue which are longer than five minutes in

28  duration, *id.* at 177:3-6.

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

1         Mr. Cohen thus based the mechanical royalty portion of his analysis on facts

2    that he knew to be wrong.  Such testimony, based on facts that Mr. Cohen has

3    himself conceded to be incorrect, is irrelevant and must be excluded.  *See, e.g.*,

4    *Christophersen*, 939 F.2d at 1113; *Davis*, 2003 WL 25665777 at *1; *Torch Energy*

5    *Mktg., Inc. v. Pac. Gas & Elec. Co.*, No. 01-3402, 2003 WL 22703235, at *9-*10

6    (S.D. Tex. March 31, 2003).

7         Mr. Cohen once again tried to justify his shortcomings by claiming that

8    Aftermath had failed to provide him with reports showing the mechanical royalties

9    paid.  *See* Klaus Decl. Ex. 1 (Dep. Ex. 965) at 2; *id*. Ex. 10 (Cohen Dep. Tr.) at

10   145:17-22.  Here, too, the claim of lack of information is a red herring.  Mr.

11   Cohen's client—both for his expert witness services and as an auditor—is Joel

12   Martin.  Mr. Martin not only controls the Plaintiffs in this case, but the music

13   publishing companies (Eight Mile Style and Martin Affiliated) that control the

14   publishing rights for the large majority of the compositions in issue.  That means

15   that Mr. Martin and his companies have in their possession the actual mechanical

16   royalty statements—not to mention the Mastertone Agreement—that show the

17   mechanical royalties Aftermath incurred on mastertones and "long songs."  *Id.* Ex.

18   10 (Cohen Dep. Tr.) at 145:23-146:14.  Mr. Cohen, however, never made any effort

19   to request this information from Mr. Martin.  *Id.* at 147:10-14, 150:10-23.

20   Moreover, Mr. Cohen himself obtained a number of statements reporting

21   mechanical royalties paid for the Eminem recordings when he prepared his

22   damages report in the *Eight Mile Style* litigation in Detroit.  *Id.* at 148:11-19.  Mr.

23   Cohen made no effort, however, to review any of these statements for information

24   about the mechanical royalties incurred on mastertones and "long songs."

25   Moreover, as admitted at his deposition, Mr. Cohen was aware of the statutory rates

26   for mechanical royalties and permanent downloads, yet failed to apply those rates

27   when performing this calculations.

28

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

When confronted with all of these facts at deposition, Mr. Cohen retreated to claiming that his report was "an overall estimate" done using the "least time consuming methodology." *Id*. at 155:11-12; *id.* at 156:8-11 ("I did the best, most reasonably least time consuming methodology of trying to estimate the mechanical royalties.  None of this is actual."); *id.* at 172:7-9 ("That's my best estimate given the information provided to me."); *id.* at 174:5-9 ("I was using a number to come to a ratio and not trying to go on a song-by-song, line-by-line recalculation which would have been onerous in this type of situation.").  Mr. Cohen's report does not disclose that he was only attempting to calculate an "overall estimate."  It says that he was retained "to form an opinion regarding the amount of damages[.]" *Id*. Ex. 1 (Dep. Ex. 965) at 2.  And, as demonstrated, Mr. Cohen's justification for making estimates rather than calculating damages—that he did not have access to information allowing him to make a calculation—does not hold water.  Mr. Cohen has no excuse for offering a ballpark estimate of damages, and Plaintiffs have no right to present Mr. Cohen's demonstrably unreliable testimony as expert opinion.

### 4.    Mr. Cohen's Opinion Of Damages Without A Distribution Fee Deduction Is Contrary To The Law Of The Case

The Court's Order holds that Aftermath is entitled to deduct from its receipts distribution fees that it incurred.  Order at 15.  Inexplicably, Mr. Cohen offered alternative damages calculations with and without a distribution fee.  Klaus Decl. Ex. 1 (Dep. Ex. 965) at 3-4.  At deposition, Mr. Cohen attempted to justify offering an alternative damages calculation—one that ignores the Court's Order—based on his speculation that Aftermath "does not incur much in the way of fees for distributing digital downloads." *Id*. Ex. 10 (Cohen Dep. Tr.) at 199:11-15.

The error of Mr. Cohen's alternative analysis by now is familiar.  Plaintiffs and Mr. Cohen did not like the Court's ruling, and so Plaintiffs propose to have Mr. Cohen offer an opinion that is contrary to the ruling.  Once again, such opinions that ignore the law of the case must be excluded. *See, e.g.*, *Carson Harbor Village*,

DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EXPERT TESTIMONY

2003 WL 22038700 at *2-*3; *In re Commercial Money Center*, 2007 WL 1514282, at *3-*4; *Michigan First Credit Union*, 2009 WL 43479, at *2.

### C.   Mr. Cohen's Expert Testimony Should Be Excluded In Its Entirety

Mr. Cohen's report should be excluded in its entirety.  He has shown a pattern of disregard for the law of the case.  He ignored factual information in his possession that would have undermined his erroneous calculations in Plaintiffs' favor.  He did not make any attempt to obtain information that he knew Plaintiffs had and that would have further undermined his erroneous conclusions.  And he repeatedly opined at deposition based on speculation and conjecture, rather than matters on which he has any expertise.

Courts routinely preclude expert testimony in its entirety where the expert's opinion is not a product of reliable methodology.  *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("[T]he Daubert 'requirement that the expert testify to scientific knowledge-conclusions supported by good grounds for each step in the analysis-means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*.'") (*quoting In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir. 1994)).  For example, in *Diviero*, the Ninth Circuit held that the testimony of a scientific expert who could not dismiss other possible causes of the incident he sought to explain and inability to satisfactorily explain the reasoning behind his opinions "was unsubstantiated and subjective, and therefore unreliable and inadmissible."  114 F.3d at 853.  The court precluded the expert from testifying. *Id.; see also In re REMEC Inc. Securities Litigation,* 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) (excluding an expert report where the expert predetermined results of his analysis).  Likewise, in *Gable v. National Broadcasting Co.*, 727 F. Supp. 2d 815 (C.D. Cal. 2010), the court excluded an expert as unreliable in part because his methodology was "unsupported and conclusory" and because some of his opinions

DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO EXCLUDE EXPERT TESTIMONY

1    were merely "personal opinion[s]" that are "not based on specialized knowledge
2    and does not assist the trier of fact."  *Id.* at 830.

3         As was the case with his proposed expert testimony in *Robinson* where his
4    testimony was previously excluded, Mr. Cohen's proposed expert testimony in this
5    case is utterly unreliable and flawed.  *Robinson*, 542 F. Supp. 2d at 292-93.  As the
6    Court did in that case, the Court should exclude Mr. Cohen's testimony and report
7    in their entirety.

8    **IV.    CONCLUSION**

9         Defendants respectfully request that the Court exclude the testimony and
10   report of Gary Cohen in their entirety.  To the extent the Court does not exclude
11   Mr. Cohen's testimony and report *in toto*, Defendants respectfully request that the
12   Court exclude Mr. Cohen from testifying to each of the matters discussed in this
13   motion.

14
15   DATED:   February 17, 2012          MUNGER, TOLLES & OLSON LLP
16                                       By:  _/s Kelly M. Klaus_
17                                            Kelly M. Klaus
                                              Attorneys for Defendants
18
19
20
21
22
23
24
25
26
27
28