# EXHIBIT 4

Paul H. Duvall (State Bar No. 73699)
KING & BALLOW
9404 Genesee Avenue, Suite 340
La Jolla, CA 92037-1355
(858) 597-6000 Facsimile: (838) 597-6008

Mark L. Block (State Bar No. 115457)
Christensen, Glaser, Fink, Jacobs, Weil, & Shapiro, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
(310) 553-3000 Facsimile: (310) 556-2920

Attorneys for Plaintiffs F.B.T. Productions, LLC and Em2M, LLC

FILED
2008 MAR -6 PM 1:26

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **F.B.T. PRODUCTIONS, LLC, and Em2M, LLC,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC.,**<br><br>**Defendants.** | ) | **Case No.** CV08-01563 JFW (AGR)<br><br>**COMPLAINT FOR BREACH OF CONTRACT; DECLARATORY JUDGMENT**<br><br>**JURY DEMAND** |

Plaintiffs F.B.T. Productions, LLC, and Em2M, LLC (collectively "Plaintiffs"), by and through their attorneys, for their Complaint against the Defendants named above allege as follows:

## I. NATURE OF THE ACTION

1. This action for breach of contract against Defendants named herein arises from Defendants' failure to properly account to and pay Plaintiffs royalties with respect to master recordings of the musical performances by Marshall B. Mathers III professionally known as Eminem ("Eminem"), which are the subject of various agreements by and between Plaintiffs, Eminem and Defendants (detailed further below, but referred to herein collectively as the "Agreements"). The Agreements provide, among other things, the means by which Plaintiffs would receive royalty payments from Defendants for sales of records containing, and licensing of, the master sound recordings (the "Eminem masters").

2. This action seeks remedies for Defendants' knowing violations of the terms of the Agreements, whereby Defendants have paid Plaintiffs significantly less royalties than are owed to Plaintiffs for sales of records containing, and licensing of, the Eminem masters.

3. The Agreements require Defendants to pay Plaintiffs a royalty for sales of records containing, or licensing of, the Eminem masters. The royalty payable to Plaintiffs under the Agreements varies according to certain factors including, without limitation, the number of records sold, the country in which such sales take place, and the retail price of the records sold.

4. Defendants have incorrectly calculated the royalty payable to

Plaintiffs pursuant to several provisions in the Agreements, resulting in significant underpayment of royalties to Plaintiffs (detailed further below).

5. The Agreements further permit Defendants to charge certain costs, including the payment of producer royalties, to Plaintiffs and to Eminem and to allocate these costs and producer royalties between Plaintiffs and Eminem. For example, paragraph 8 of the 2000 Novation (detailed further below) to the Agreements states that "all recoupable costs incurred after the effective date shall be charged to FBT and [Eminem] in proportion to their fractional interest in the applicable Basic Rate..."

6. Defendants have incorrectly allocated certain costs and producer royalties to Plaintiffs that properly should have been charged to Eminem, resulting in an underpayment of royalties to Plaintiffs.

7. Defendants have, in a letter to Plaintiffs dated May 8, 2007, expressly acknowledged those underpayments of royalties due Plaintiffs stemming from the aforementioned incorrect allocation. Despite Defendants' admission of the error, the resulting underpayment of royalties due Plaintiffs, and the amount of such underpayment, Defendants have failed or refused to remit payment to Plaintiffs.

8. As a result of Defendants' numerous contractual breaches, including Defendants' admitted breach regarding the improper allocation between Plaintiffs and Eminem, Plaintiffs have been damaged by the loss of royalty payments in

excess of the jurisdictional limits of this Court which royalty payments Defendants have retained for their own benefit.

9. Plaintiffs seek compensatory damages in the amount of royalties underpaid by Defendants, as well as attorneys' fees and other costs associated with bringing this action as provided in the August 22, 2003 Agreement between Plaintiffs, Eminem and Defendants.

**PARTIES**

10. Plaintiff F.B.T. Productions LLC ("F.B.T.") is a Michigan limited liability company. The members comprising F.B.T. are Mark Bass and Jeff Bass. Both members are natural persons and United States citizens. Both reside in Michigan. Each member intends to reside in Michigan permanently, and therefore is domiciled in Michigan. F.B.T. is a citizen of Michigan.

11. Plaintiff Em2M LLC ("Em2M") is a Michigan limited liability company. Joel Martin, a natural person, is the sole member of Em2M. Mr. Martin is a United States citizen and a resident of the State of Michigan. He intends to reside in Michigan permanently, and therefore is domiciled in Michigan. Em2M is a citizen of Michigan.

12. Defendant Aftermath Records and Aftermath Records doing business as Aftermath Entertainment ("Aftermath") is a joint venture between three entities: (1) Interscope Records, a California general partnership (the "Interscope

Partnership"), (2) Interscope Records, an unincorporated division of UMG Recordings, Inc., a Delaware corporation authorized to do business in the State of California ("UMG"), and (3) ARY, Inc., a California corporation ("ARY"). The Interscope Partnership is a California general partnership comprised of three entities: (a) Interscope Records, an unincorporated division of UMG, (b) UMG, and (c) PRI Productions, Inc., a Delaware Corporation. Defendant Aftermath is a citizen of California and Delaware.

13.  UMG Recordings, Inc. is organized under the laws of the State of Delaware and is a citizen of that state, as is its unincorporated division, Interscope Records. UMG and its divisions also are citizens of the state that is UMG's principal place of business, which is California. According to its website, "UMG's corporate headquarters are located at 2220 Colorado Avenue, Santa Monica, CA 90404 and 1755 Broadway, New York, NY 10019." According to its registration on file with the California Secretary of State, UMG is registered in the State of Delaware and its offices are located at "10 Universal City Plaza, Universal City, California, 91608." Lastly, UMG's copyright and licensing department (both critical to this action) and its Film & TV Licensing departments are located in California as well. On information and belief, Plaintiffs allege that UMG employs a majority of its employees in California, and the majority of its executive and administrative functions are performed in California because (a) at least one of its

two headquarters are located in California, (b) UMG's critical licensing and copyright divisions are located in California, and (c) a majority of its operations, both executive and administrative, take place in California.

14. PRI Productions, Inc., ("PRI") is a Delaware Corporation registered to do business in California. It lists its address with the California Secretary of State as "10 Universal City Plaza, Universal City, CA, 91608." This address is the exact same address as UMG registered with the California Secretary of State. On information and belief, Plaintiffs allege that PRI is involved in the entertainment and music industries and performs the majority of its operations in California in concert with UMG. Additionally, Plaintiffs allege on investigation and discovery that PRI has no executive and no administrative staff operating outside of California. All of its operations therefore take place in California. It is a citizen of California and Delaware.

15. Interscope Records, a California Partnership, is comprised of partners, UMG and PRI, and is a citizen of Delaware and California because UMG and PRI are both citizens of Delaware and California. Interscope Records, an unincorporated division of UMG, is legally indistinguishable from UMG, and its citizenship is the same as UMG. As explained above, UMG is a citizen of Delaware and California.

16. ARY, Inc. ("ARY") is a registered California corporation. Plaintiffs

allege on information and belief that ARY is owned and operated solely by Andre Rommel Young, Jr., professionally known as "Dr. Dre." ARY's mailing address, registered with the California Secretary of State, is 10100 Santa Monica Blvd., Suite 1300, Los Angeles, California 90067. ARY lists its agent for service of process as Howard King of the law firm King, Holmes, Paterno & Berliner, LLP, located at 1900 Avenue of the Stars, 25th Floor, Los Angeles, California 90067. On information and belief, Plaintiffs allege that Mr. Young lives in California and runs ARY exclusively from California. Also on information and belief, Plaintiffs allege that ARY has no employees other than Andre R. Young, Jr. and has no assets and no operations outside of California. ARY's principal place of business is in California, and ARY is a citizen of California.

17. For purposes of diversity jurisdiction, Defendants Aftermath, the Interscope Partnership and UMG are all citizens of Delaware and California. Defendant ARY is a citizen of California. Plaintiffs, as citizens of Michigan, are diverse from Defendants' citizenship.

**JURISDICTION AND VENUE**

18. The jurisdiction of this Court is based upon 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs. The cause of action for declaratory judgment is brought pursuant to 28 U.S.C. §2201 which is

within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. §1331. Venue is proper in this District pursuant to 28 U.S.C. §§1391 and 1400(a).

19. Personal jurisdiction over each of the Defendants is proper in this Court, among other reasons, on the grounds that (a) Defendants and/or Defendants' agents transact business in the State of California; (b) Defendants' wrongful conduct alleged herein occurred in the State of California and this District; and (c) the Agreements that are the subject of this action were entered into in this District.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(c).

**GENERAL ALLEGATIONS**

21. On November 28, 1995, F.B.T. entered into an Exclusive Artist's Recording Agreement with Eminem ("1995 Agreement"). The 1995 Recording Agreement between F.B.T. and Eminem subsequently was amended on November 5, 1998, February 22, 1999 and November 28, 1999.

22. On March 9, 1998 F.B.T. and Aftermath entered into a written agreement whereby F.B.T. agreed to furnish to Aftermath the exclusive recording services of Eminem. ("1998 Agreement") On March 9, 1998, Eminem also entered into a Letter of Inducement with Aftermath whereby Eminem acknowledged and approved of the agreement between F.B.T. and Aftermath for Eminem's exclusive recording services. ("Letter of Inducement")

23. On September 27, 2000, F.B.T., Eminem and Aftermath entered into a novation of the March 9, 1998 Agreement between F.B.T. and Eminem, whereby F.B.T. assigned all of its rights under the March 9, 1998 Agreement to Eminem, Eminem assumed all of F.B.T's rights and obligation to Aftermath, and Aftermath assumed F.B.T.'s obligations to Eminem so that Eminem would have a direct relationship with Aftermath effective September 27, 2000 ("Novation").

24. Pursuant to the terms of the Novation, among other things, F.B.T. remained an income participant with respect to all master recordings released by Aftermath under the Novation and to which F.B.T. would have had rights prior to the execution of the Novation. Further, pursuant to the terms of the Novation, the 1995 Agreement with its three subsequent modifications as well as the March 9, 1998 Agreement and Letter of Inducement were affirmed by the parties. One of the terms of the Novation provided that the royalties owed by Aftermath pursuant thereto were to be divided and paid by Aftermath directly to Joel Martin (an acknowledged third-party beneficiary under the Novation), F.B.T. and Eminem. Aftermath's payment to Joel Martin under the Novation is to be twenty-five percent (25%) of the monies payable to F.B.T. under the Novation at the same times and on the same basis as Aftermath accounts to F.B.T.

25. On or about August 22, 2003 and effective as of July 2, 2003, a new agreement was entered into between Aftermath and Eminem regarding, among

other things, the Eminem masters ("2003 Agreement"). Pursuant to the terms of the 2003 Agreement, all "Prior Agreements" are affirmed expressly including (a) the 1995 Recording Agreement and amendments thereto; (b) the March 9, 1998 Agreement and Letter of Inducement; and (c) the September 27, 2000 Novation.

26. On September 20, 2004, Joel Martin assigned all of his interests in and to the 2000 Novation and under the 2003 Agreement to Em2M LLC, and all payments and accountings otherwise due to Joel Martin thereafter were due to be made by Defendants to Em2M LLC.

27. On November 1, 2004, F.B.T. and Eminem, on the one hand, and Aftermath, on the other hand, entered into a written modification of the Novation. ("2004 Amendment").

28. Pursuant to the terms of the foregoing Agreements referenced hereinabove, F.B.T. and Eminem caused certain recorded performances of Eminem to be delivered to Defendants, and Defendants agreed to manufacture, distribute, sell, and license for sale and distribution those master recordings in various configurations throughout the Universe.

29. Plaintiffs have each performed their respective material obligations pursuant to the terms of each of the Agreements referenced hereinabove.

30. Pursuant to the terms of the March 9, 1998 Agreement and the 2003 Agreement, Defendants were to provide certain remuneration to Plaintiffs,

including royalties, and to furnish Plaintiffs with semi-annual royalty accounting statements setting forth the computations of each Plaintiffs' entitlement to royalties for the commercial exploitation of the Eminem masters, which statements were to be accompanied by any royalty payments due.

31. Under the Agreements entered into between Plaintiffs and Defendants, Defendants were obligated to act in good faith in their dealings with Plaintiffs and to render accurate royalty accounting statements, and to properly credit and account for the royalties generated by the commercial exploitation of the Eminem masters.

32. During the period January 1, 2002 to present, Defendants have licensed the Eminem masters to various third parties and foreign affiliates. Further, during this same period, Defendants or Defendants' licensees have sold records containing the Eminem masters to various retailers, end users and other third parties, both in the United States and in foreign territories.

33. In 2005, F.B.T. and Eminem retained an accounting firm to review the accounting records of Defendants and to perform a royalty audit on behalf of Plaintiffs for the periods January 1, 2002 through and including June 30, 2005. On February 10, 2006, the accounting firm submitted its audit report to Defendants. As a result, the February 10, 2006 audit showed, among other things, that due to erroneous royalty accounting procedures, Plaintiffs, collectively, have been

underpaid by Defendants for the sales of records containing, and licensing of, the Eminem recordings by an amount exceeding one million dollars ($1,000,000).

34. On May 8, 2007, Defendants submitted a written response to the February 10, 2006 audit contesting the claimed underpayments. In Defendants' written response, Defendants specifically acknowledged that costs and producer royalties chargeable to Eminem and Defendants were incorrectly allocated and that the result of Defendants' error was an underpayment of royalties due Plaintiffs in the amount of $159,333.

**CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

35. Plaintiffs reallege each and every allegation in Paragraphs 1 through 34 hereof as if fully set forth herein.

36. Defendants have failed to comply with the terms of the March 9, 1998 Agreement and the 2003 Agreement by failing to account and pay Plaintiffs the full royalty amounts due Plaintiffs due to Defendants' incorrectly accounting for sales of records embodying, or licensing of, the Eminem masters. For example, and without limitation, Defendants have violated the terms of the Agreements as set forth in the following paragraphs.

37. The 1998 Agreement provides that the royalty rate payable to Plaintiffs is to escalate once the number of records sold in the United States, either through normal retail channels or to United States military facilities, exceeds

certain thresholds. Defendants have failed to apply the contractual rate increases to sales of certain records embodying the Eminem masters sold in the black vinyl format or sold through military exchanges. As a result, Defendants have underpaid royalties to Plaintiffs.

38. Defendants have incorrectly designated significant sales of records as "mid-price" and "budget" (and thus subject to a reduced royalty rate of 2/3 and 1/2 of the otherwise applicable rate, respectively), despite a lack of definition in the Agreements as to what constitutes a "budget" or "mid-price" record. The preambles of both the 1998 Agreement and the 2003 Agreement provide that Plaintiffs and Aftermath shall negotiate in good faith any terms not contained in the Agreements and that Defendants would include "provisions usually included in "high end" recording agreements, including such matters as greatest hits advances, longer periods to audit records, bring lawsuits, etc." Given Eminem's status as a superstar and one of the top recording artists in the world, the Agreements should clearly include "high end" definitions of "budget" and "mid-price," among other superstar provisions. As a result of Defendants erroneously categorizing sales as "budget" or "mid price," Plaintiffs have been underpaid royalties for such sales.

39. Defendants have incorrectly calculated the royalty payable to the producers of the Eminem masters, resulting in an overpayment of royalties to said producers and a consequent underpayment of royalties to Plaintiffs. Further, the

1998 Agreement and the 2003 Agreement provide that the royalty payable to the producers of the Eminem masters shall be allocated between Plaintiffs and Eminem. Defendants have incorrectly allocated these royalties and, as a result, Defendants have underpaid royalties to Plaintiffs.

40. Defendants improperly calculated royalties due to Plaintiffs from foreign licensing of the Eminem masters by not accounting for amounts which were incorrectly retained by Defendants' foreign affiliates. As a result, Defendants pay royalties to Plaintiffs based on this incorrectly reduced amount and Plaintiffs are underpaid.

41. Defendants have improperly exceeded the contractual limit set for records containing the Eminem masters that may (a) be sold at discounted prices, or (b) distributed as free goods, both within the United States and in foreign territories. As a result, Defendants have failed to pay Plaintiffs royalties for such discounted and/or free goods.

42. Defendants provided Plaintiffs a report of sales identified as "unmatched." This report indicates that royalties were neither reported nor paid to Plaintiffs for sales of records containing the Eminem masters. As a result, Defendants have failed to pay Plaintiffs royalties for these "unmatched" sales.

43. Defendants have further failed to comply with the terms of the Agreements by incorrectly reducing foreign royalty amounts, as well as overstating

and incorrectly charging various costs, expenses and charges to Plaintiffs.

44. Defendants have, as stated herein above, incorrectly allocated costs and producer royalties to Plaintiffs that should properly have been to be allocated to Eminem. Defendants have acknowledged this error in writing, as well as the resulting underpayment of royalties to Plaintiffs in the amount of $159,333.

45. Defendants have deducted from foreign royalties the amount withheld by foreign governments from earned royalties. The amounts withheld are available as direct credits against Defendants' income tax liability. Defendants' use or deferral of such credits results in an underpayment of royalties to Plaintiffs. Plaintiffs have requested information concerning Defendants' use of income tax credits. Despite Plaintiffs' request, Defendants have failed or refused to provide such information.

46. Defendants have incorrectly charged costs incurred for foreign television advertising costs against Plaintiffs' royalty account. These costs are to be shared with the producers of the Eminem masters. As a result of Defendants not charging the producers a percentage of these costs, Plaintiffs' royalties have been underpaid and producer royalties have been overpaid.

47. Plaintiffs have requested documentation and records from Defendants pertaining to sales and licensing activity regarding the Eminem masters, including, without limitation, documentation pertaining to income received by Defendants for

public performances of the Eminem masters, sales to record clubs, and certain costs appearing on royalty statements to Plaintiffs. To date, Defendants have failed or refused to provide this information to Plaintiffs. Upon receipt and review of such documentation, Plaintiffs may discover further contractual breaches by Defendants resulting in the underpayment of royalties to Plaintiffs.

48. On November 26, 2007, and pursuant to paragraph 15(b) of the March 9, 1998 Agreement and the 2003 Agreement, Plaintiffs sent written notice to Defendants by certified mail, return receipt requested, advising Defendants of their breaches of said agreements and requesting that Defendants cure the breach within thirty (30) days after the date of the notice.

49. Despite said notice, Defendants have failed and refused to cure the breach by paying the acknowledged amount due Plaintiffs and continue to incorrectly calculate royalties in violation of the March 9, 1998 Agreement and 2003 Agreement. As a result of Defendants' improper allocation of costs and producer royalties, and the resulting miscalculation of royalties, Defendants have further breached said agreements by their failure (a) to account properly, (b) to credit and pay the correct amount of royalties due to Plaintiffs; and (c) to render royalty statements reflecting the correct amount of royalties due to Plaintiffs.

50. By reason of the foregoing and other acts and omissions not presently known by Plaintiffs, Defendants have knowingly and materially breached their

contractual obligations to Plaintiffs under the March 9, 1998 Agreement and the 2003 Agreement, and have wantonly and recklessly disregarded the rights of Plaintiffs.

51. Pursuant to the terms of the 2003 Agreement, should any party institute any action or proceeding at law or in equity to enforce any provision of the 2003 Agreement, including an action for declaratory relief, or for damages by reason of an alleged breach of any provision of the 2003 Agreement, or otherwise in connection with the 2003 Agreement or any of its provisions, the prevailing party is entitled to recover from the non-prevailing party reasonable and actual attorneys' fees and costs for services rendered to the prevailing party in such action or proceeding.

52. As a result of the wrongful conduct of Defendants alleged hereinabove, Plaintiffs have been damaged in an amount to be determined at the time of trial.

**SECOND CAUSE OF ACTION**
**(DECLARATORY JUDGMENT)**

53. Plaintiffs reallege each and every allegation in Paragraphs 1 through 52 hereof as if fully set forth herein.

54. Pursuant to 28 U.S.C. §2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and

effect of a final judgment or decree and shall be reviewable as such.

55. Plaintiffs contend, and seek a declaration, that, pursuant to the March 9, 1998 Agreement and the 2003 Agreement, the calculations for payment of royalties, and all future payments of such royalties to Plaintiffs, be in accordance with those procedures set forth in Plaintiffs' audit report, as opposed to the incorrect royalty accounting procedures proffered by Defendants as set forth herein.

56. Plaintiffs have no adequate remedy at law.

57. By reason of the foregoing, there is a present controversy between Plaintiffs and Defendants for which a declaratory judgment should be entered determining that the March 9, 1998 Agreement and the 2003 Agreement obligate Defendants to pay Plaintiffs royalties according to those procedures proffered by Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand a jury trial against Defendants on those matters to be determined by a jury and further pray for judgment against Defendants, and each of them, as follows:

1. On the First Cause of Action, judgment awarding Plaintiffs compensatory damages, the exact amount is to be determined at the time of trial;

2. On the Second Cause of Action, an Order and judgment declaring that

the Agreements obligate Defendants to calculate, account and pay royalties to Plaintiffs in accordance with the accounting procedures proffered by Plaintiffs;

3. An award of reasonable and actual attorneys' fees and costs for services rendered to Plaintiffs in this action;

4. An award of pre- and post-judgment interest;

5. Such other and further relief as the Court deems just and proper.

DATED: March 4, 2008

Respectfully submitted,

KING & BALLOW

Paul H. Duvall (State Bar No. 73699)
9404 Genesee Avenue, Suite 340
La Jolla, CA 92037-1355
Telephone: (858) 597-6000
Facsimile: (838) 597-6008
pduvall@kingballow.com

Mark Block (State Bar No. 115457)
Christensen, Glaser, Fink, Jacobs, Weil, & Shapiro, LLP
10250 Constellation Blvd. 19th Floor
Los Angeles, CA 90067
Telephone: (310) 282-6240
Facsimile: (310) 556-2920
mblock@chrisglase.com

Attorneys for Plaintiffs