# EXHIBIT 15

EXPERT REBUTTAL REPORT OF DAVID BERMAN

*F.B.T. Productions, LLC et al. v. Aftermath Records d/b/a Aftermath Entertainment et al.*

United States District Court Central District of California Western Division
Case No. CV 07-03314 PSG (MANx)

This rebuttal report is made in my capacity as an expert witness for F.B.T. Productions, LLC and Em2M, LLC. My qualifications have already been presented in my Expert Report dated November 3, 2008, and are incorporated herein.

My conclusions herein are based on my years of experience in the music industry, the sources listed on my November 3, 2008 Expert Report, and my review of the following:

i. Depositions of Jeffrey Harleston and Eddy Cue
ii. November 12, 2003 Email from Gary Stiffelman to Rand Hoffman
iii. March 24, 2004 letter from music industry attorneys to major record companies
iv. "Thoughts on Music" Essay by Steve Jobs
v. Eddy Cue testimony before the Copyright Royalty Board
vi. May 16, 2005 article in *Advertising Age* quoting Jimmy Iovine
vii. July 29, 2008 testimony of Jeffrey Harleston before U.S. Senate Committee on the Judiciary

1. I attended the deposition, and read the deposition transcript, of Defendant's expert witness, Jeffrey Harleston. Mr. Harleston has asserted that the transaction between Universal and the various permanent download providers is a sale of a "record" by Universal to the download provider even though, among other things: a) there is no transfer of title of anything from Universal to the providers, b) all of the agreements bear all of the indicia of a license and not a sale (See Berman Expert Report Par. 4.), and c) the agreements for Mastertone digital downloads between UMG and Sprint Spectrum L.P., Nextel Operations, Inc., and Cingular Wireless LLC all refer to a license from UMG to the download providers. Those agreements were drafted by the mobile carriers and they

1

did not care to call the documents something other than what they understood them to be: license agreements. (The subscription agreements are apparently admitted to being licenses by the Defendants.) Even in the permanent download and Mastertone agreements that do not use the term "license," the actual grant of rights is for all intents and purposes the same as those which do use the term "license". Furthermore, in the course of revising the UMG/ T-Mobile USA, Inc. agreement for Mastertones, Defendant's attorney, David Weinberg, changed the phrase "Ringtone Distribution License" to "Ringtone Distribution Authorization" and "grants ... [a] ...license" to "grants ...[a]...right". Substituting "authorization" or "grant" for "license" does not change the essential nature of the arrangement. . As noted below, even Mr. Harleston, in Senate testimony that directly contradicts his testimony in this case referred to the fact that UMG licenses its "recordings" to various digital download providers; Apple for ITunes and Verizon for Mastertones. There is no benefit to the download providers in characterizing the transaction as a sale. There is, however, a great benefit to Universal if the license could be characterized as a sale; namely taking the transaction out of the general licensing provisions of artist contracts. Indeed this is the sole purpose for attempting to so characterize the relationship with the download providers.

    2. There is also no basis for Mr. Harleston's claim that Universal is supplying a "record" to the download providers. The core difference between a master and a record is that a master is the thing from which the record is reproduced. While a CD is a record that embodies a master and while one can "burn" a CD from a CD; that is not how CDs are manufactured. CDs are reproduced from a "glass master" not from another CD. By the same token while a digital file and a download can both be said to contain the master

2

it is the digital file that is used to reproduce the download. The download is not used to create or reproduce the digital file. The digital file (the master) reproduces the download (the record). Indeed, Mr. Larry Kenswil of Universal testified that it is the master that is supplied to, at least, the subscription (*i.e.* conditional) services for downloads; and there has also been testimony that there is no difference between the music file sent by Universal to the permanent download providers and the music file sent to the conditional download services.

    3. Mr. Harleston's assertion on pages 50 to 51 of his deposition that Universal never thought of or considered that the relationship between UMG and the download providers might implicate the licensing provisions of the 1998 and 2003 FBT/Aftermath agreements (the "1998 Agreement" and "2003 Agreement" respectively) simply defies belief. Indeed, as noted above, when Mr. Harleston gave testimony on July 29, 2008 before a Senate Judiciary Committee Sub-Committee he specifically referred to licensing music to, among others, Verizon and for downloading to an IPod, *i.e.*, to Apple. Nor is Mr. Harleston alone. Steve Jobs, CEO of Apple, Eddie Cue, head of Apple's ITunes, and Jimmy Iovine, Chairman of Defendant's Interscope Records have all made public statements in which they refer to this relationship as a license of UMG music. In light of Mr. Harleston's own Senate testimony as well as the patently obvious attempt made by Universal to camouflage and avoid using the word license in their agreements with Apple and other third party download providers and the fact that the standard licensing provision is contained in practically every recording contract, it is inconceivable that Universal was not aware that the relationship with the download providers could easily

3

be thought of as that of a licensing arrangement. Indeed, Mr. Gary Stiffelman, whom I understand represents Eminem, sent a letter to Rand Hoffman of Interscope dated November 12, 2003, in which he explicitly takes the view that the licensing provision applies to both permanent downloads and Mastertones. The same argument was again made in a 2004 letter signed by many of the lawyers representing artists in the music industry, including Aftermath's own attorney.

4. In his deposition Mr. Harleston stated (pg. 72 lines 18, 19) that he could not think of any situation for UMG prior to the advent of digital downloads where a licensing arrangement that was not otherwise covered in a recording agreement would not fall under the general licensing provisions of the agreement. In my opinion, the reason he could not think of one is because there were none.

5. Mr. Harleston asserts on pages 78 & 79 of his deposition that UMG pays an artist 50% of its net receipts under the licensing provisions of the artist's contract on conditional downloads and streams but not on permanent downloads because the later is a sale of a record to the end user while the former is not. First of all, this is a distinction without a difference. In both cases the end user has possession of and access to the identical record. Secondly, there are many instances where a licensing arrangement results in the sale of a record to the consumer and the artist receives 50% of net receipts. Record clubs are just one example. Finally, the specific language of Par 4 (c) (v) and 5 (c) (v) of the 1998 and 2003 Agreements covers licenses "for…[the]…manufacture and sale of records *or for any other uses*." As long as the relationship between UMG and the download provider is that of licensor/licensee it makes no difference if the record is sold to the end user or he or she is given conditional rights to it; the transaction is covered by

4

the licensing provision.

      6. Mr. Harleston alleges that the sale of records by a record club is "somewhat of a ... hybrid" (pg 102 lines 16-18) or like a "premium" or a "conditional download" (pg 103 lines 14-21). This is simply not the case. There is nothing "hybrid" about a sale of a record by a record club. It is, pursuant to a license from the record company, the sale by the record club to a consumer of the same record that the label itself is selling where the net income therefrom is split 50/50 with the artist. Nor is it anything like a premium or a conditional download. A premium is a record that is given away or sold very cheaply in connection with the sale of another product. A conditional download is where a consumer must continue to make periodic payments in order to continue to have access to the record. None of these factors for a premium or conditional download are applicable to a sale by a record club where the consumer is not obligated to purchase something other than a record and where he or she owns the record that is purchased in perpetuity. When a consumer purchases a record from a record club they are purchasing the same piece of product that Universal considers as its "core" product but Universal nevertheless splits the receipts from this sale 50/50 with the artist.

      7. When Mr. Harleston was asked whether he would agree that when an artist has no other record company vying for his or her services the company interested in the artist has greater bargaining power than the artist he answered "No, I would not." It is axiomatic to say nothing but pure common sense to understand that when there is no competition for the artist's services that the record company has greater leverage.

      8. Mr. Harleston gave testimony (pg 165-166) regarding the 2003 modifications to the Interscope form recording agreement ("2003 Interscope Form") with respect to the

provision that "sales of albums by way of permanent download shall be treated as USNRC net sales for the purposes of Article 9 hereof." Article 9 of the 2003 Interscope Form refers to the entire royalty provision of that contract. In the 2004 amendment to the FBT agreement ("2004 Amendment") there is similar language, but one very important limiting difference: it refers to downloads being treated as USNRC net sales only "for the purposes of escalations." Mr. Harleston correctly states (pg 164) that escalations refer to "an increase in the royalty rate based upon the achievement of a certain sales level." The distinction between an album download being a USNRC net sale for all royalty purposes as opposed to *only* for escalation purposes is clearly indicative of the fact that the 2003 Agreement and the 2004 Amendment in no way equate a digital download to a USNRC sale. In any event, and as Mr. Harleston acknowledged, the 2004 Amendment does not have any impact on the treatment of downloads of individual tracks or Mastertones but only refers to the download of full albums from the download provider, and as Mr. Harleston admitted would only apply to the download of an entire album for escalation purposes (the only purpose of the last sentence of Paragraph 2 (a) of the 2004 Amendment).

9. Mr. Harleston testified that *vis-à-vis* the artist the royalty bearing event is the sale of the record to the consumer (pg 178). This is blatantly not true. Subject to reserves and returns, a royalty is earned by or credited to an artist's account when the record is sold by the distributor to the retail account. There is no ambiguity to this and any statement to the contrary is simply false. So long as the record in question is not returned by the retailer to the distributor it doesn't matter if the retail account never sells the record. This position was confirmed by Interscope-Geffen-A&M's former CFO, Clive

6

Ellis, when he gave sworn testimony at trial in another matter. When asked when, from an accounting standpoint, the company books a sale he stated "We book the sale on shipment. The right of title passes when the goods are delivered to the customer." (See Harleston Deposition, pg 202.) In light of this the royalty language in the 1998 and 2003 Agreements which speak of a royalty on records sold "through" a retail channel must be interpreted as meaning on records sold "to" a retail channel since it is at the time of the sale to the retail account that title passes and the royalty is earned and not at the point in time when the retailer sells the record to the consumer.

10. Mr. Harleston states (pg 184, 185) that retail accounts advise Universal as to the number of units of UMG records they have sold and, at least, implies that this information is used to determine royalties due to an artist. While some retail accounts may on some occasions give sales reports to UMG this is not and has never been the basis for royalty accountings.

11. Mr. Harleston testified that Universal's "core" business is the selling of albums and singles, and that there are other uses of master recordings that are ancillary to the core business of the record label, (pg. 67-69) and also stated that whether something is "ancillary" in this regard is determined by the use of the master recording and not the revenue generated by it (pg. 75-76). He claims that it is only these ancillary uses of master recordings that are covered by the master licensing provision of recording agreements. I have addressed elsewhere in this rebuttal report, and in my original report, my disagreement with the restriction of the application of the master license provision to what Mr. Harleston would call ancillary uses of master recordings as well as his interpretation of what is ancillary. Furthermore, to Mr. Harleston's point, the core

7

business of a record label is the selling of records itself, which it reproduces, distributes. In cases where the record label licenses the masters to third parties to reproduce and distribute, record labels have paid artists 50% of net receipts. Where some other party bears the costs of the reproduction, distribution (and usually marketing) through its own platform that it controls, and obtains the right to sell a record through a license, the record label is not selling records and there is no legitimate reason not to apply the master licensing provision of the recording agreement. The master license provision has been applied this way irrespective of the fact that the record label may have originally incurred A & R, marketing, or other costs associated with the creation of the album and its sales thereof. Here, for example, if Universal had its own digital download service and sold downloads themselves through this platform, without a license to a third party, then Universal would be selling records themselves and the master licensing provision would not apply. Unfortunately for Universal, it tried to create such a platform, but it was not successful. On the other hand, where, as here, Universal licenses its master recordings to a third party, who then encodes it with Digital Rights Management technology, and/or otherwise reproduces it using the technology and platform that it owns and controls, and then distributes and sells it itself, there is no legitimate basis not to apply the master licensing provision of the recording agreement, as it has been under similar circumstances. Third party Mastertone and permanent download providers here also incur significant marketing costs, as testified to by, for example, Eddy Cue of Apple. (Deposition of Eddy Cue at 138, 141-144.)

Finally, I note that, even under Mr. Harleston's analysis that a record label's core business is the selling of albums and singles, there is no way that the licensing of 30

8

seconds of a song to a telephone company so that up to 30 seconds plays when a telephone rings, would be part of a record label's "core" business, as defined by Mr. Harleston.

12. Finally, Mr. Harleston (pg 242, 243) alleges that "logic" would dictate that a 50/50 split of net income would not be appropriate for permanent download sales when that was not how the CD or other versions of the same record were treated. There is nothing illogical about a 50/50 split of net income on licensed sales. That is how income from master use licenses, record club licenses and other licenses are dealt with. The 1998 and 2003 Agreements are clear on how licensing income is to be treated. To the extent that he is alleging that such a split of income would be economically burdensome to UMG; a deal is still a deal; especially when UMG did not in the 2003 renegotiation avail itself of the perfect opportunity to correct what they would consider to be a bad deal. Indeed, if UMG had followed prior industry custom and practice (as well as what I believe to be their own policy) and gone back to the parties on older agreements and insisted on specific download royalty changes all of this could have been avoided, if, of course, and FBT agreed to do so. It is quite possible (and it is my opinion) that Universal intentionally did not attempt to clarify their position on download royalties at the time of the 2003 re-negotiation because they were afraid that Eminem's bargaining strength was such that they would lose the point.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 19th day of December, 2008, in Tarzana, California.

David Berman

9

**EX 15, PAGE 231**