# EXHIBIT 17

November 15, 2010

FBT Productions, LLC
c/o Joel Martin
1525 East Nine Mile Road
Ferndale, Michigan 48220

Gentlemen,

Pursuant to your request we applied certain procedures to the accounting records of Interscope Records ("Interscope") as distributor for Aftermath Entertainment ("Aftermath") for the period July 1, 2005 through December 31, 2009 as they relate to the interests of FBT Productions, LLC ("FBT") in the recordings of Eminem ("Artist").

Our review was undertaken for the purpose of determining compliance with certain provisions of the agreement between FBT Productions ("FBT") and Aftermath dated March 9, 1998 ("1998 Agreement"), the agreement among FBT, Artist and Aftermath dated September 27, 2000 ("2000 Agreement"), the agreement between Artist and Aftermath dated July 2, 2003 ("2003 Agreement"), the agreement among Artist, FBT and Aftermath dated July 7, 2004 ("2004 Settlement Agreement"), the amendments to the 2003 Agreement dated November 1, 2004 ("2004 Amendment") and October 14, 2005 ("2005 Amendment"), and the agreement between Artist and Aftermath dated April 22, 2009 ("2009 Agreement").  Our engagement included such tests of the Aftermath royalty accounting records and such other procedures as we considered necessary in the circumstances.

We were not engaged to and did not perform an audit the objective of which would be the expression of an opinion on the specified elements, accounts or items.  Accordingly, we do not express such an opinion.  Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

A summary of our findings follows, accompanied by detailed explanations.  Working papers setting forth the computations underlying our findings will be furnished to the appropriate representatives of Aftermath.

Respectfully submitted,

Gary Cohen Corporation

EXHIBIT 972 2/3/12

FBT Productions, LLC –w- Aftermath Records
Summary of Findings
July 1, 2005 through December 31, 2009

1. Incorrect Royalty Rates
   A. Black Vinyl Rate Reduction           $    12,069
   B. Black Vinyl Rate Escalations                307
   C. Military Sales Escalations                  574
   D. Litigation Settlements Participation Percentage    386
   E. NA
   F. Permanent Digital Downloads           3,810,256
   G. Budget Sales – "Curtain Call"           152,374
   H. Mid-price/Budget Permanent Downloads     18,906
   I. NA
   J. Foreign Licensing                       131,749

2. Failure to Report Royalties
   A. Factoring Returns for Free Goods          3,865
   B. Excess Record Club Free Goods             8,302
   C. Excess Foreign Free Goods               207,357
   D. Video Clip Income

3. Third Party Royalties
   A. "Stan" – "Curtain Call"                 130,878
   B. Dr. Dre Compact Discs                     4,720
   C. "Encore"                                 26,834
   D. Foreign Pricing                          32,188
   E. TV Advertising Costs – Understated Producer Credit    17,371

4. Other
   A. Overstated Costs                         40,895
   B. Overstated TV Advertising Costs         361,915
   C. Aerosmith Sample Allocation              11,165
   D. TV Advertising Cost Allocation           28,169
   E. Foreign Income Taxes                     68,680
   F. TV Advertising Costs Reserve – "Relapse"    15,527
   G. YouTube Litigation Settlement Income     86,398
   H. Legal Hold                            2,068,337
   I. Dr. Dre Shared Costs
   J. Public Performance
   K. Other Income

5. Interest on Claims

6. Open Items

## 1. Incorrect Royalty Rates

### A. Black Vinyl Rate Reduction - $12,069

Aftermath computes FBT royalties at 66-2/3% of the contractual rate for the black vinyl releases of the albums "Slim Shady LP" and "Marshall Mathers LP" and 72.77% of the applicable rate for the albums "Eminem Show", "Encore", "Curtain Call", "8 Mile Soundtrack" and "The Re-Up". This practice results in an understatement of royalties.

### B. Black Vinyl Rate Escalations - $307

Paragraph 4(a)(i) of the 1998 Agreement stipulates that the royalty rate payable to FBT shall escalate on USA Net Sales through Normal Retail Channels in excess of 500,000 and 1,000,000 units. Aftermath failed to apply the contractually stipulated rate increases to black vinyl sales of the albums "Slim Shady LP", "Marshall Mathers LP" and "Eminem Show".

### C. Military Sales Escalations - $574

Paragraph 4(a)(i) of the 1998 Agreement stipulates that the royalty rate shall escalate on USA Net Sales through Normal Retail Channels in excess of 500,000 and 1,000,000 units. Similarly, paragraph 7(a) of the 2000 Amendment stipulates that the royalty rate shall escalate on USNRC sales of LP 3 ("Eminem Show") in excess of 2,000,000 and 4,000,000 units.

Paragraph 4(c)(iii) of the 1998 Agreement stipulates that on records sold to the United States Government military facilities the royalty rate shall be one-half of the otherwise applicable royalty rate. We could not find language in the 1998 Agreement which excludes Military Sales from USNRC sales. Aftermath failed to apply the contractually stipulated rate escalations to Military Sales.

It should be noted that the wholesale and retail prices of Military Sales is similar to that of sales through Normal Retail Channels. There is no economic justification for the payment of royalties on these sales at 50% of the applicable rate. If royalties on Military Sales were paid at the full rate, Artist and FBT royalties would have been significantly greater.

### D. Litigation Settlements Participation Percentage - $386

Aftermath computes FBT royalties at 66-2/3 of the applicable rate (i.e. 50% of net receipts) for litigation settlement income received from Kazaa and Napster allocated to the albums "Slim Shady LP" and "Marshall Mathers LP" and 72.77% of the applicable rate allocated to the albums "Eminem Show" and "Encore". This practice results in an understatement of FBT royalties.

**E. NA**

**F. Permanent Digital Downloads - $3,810,256**

Paragraph 4(c)(v) of the 1998 Agreement stipulates:

"On masters licensed by us or our NRS Licensees to others for their manufacture and sale of records or for any other uses, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from those other uses of the masters."

Aftermath licenses Artist's masters to i-Tunes and other digital download providers. Aftermath pays royalties on these sales applying the applicable album rate to the retail price of the download without a packaging or configuration deduction. In a published decision dated September 3, 2010 in the case of FBT v. Aftermath, the United States Court of Appeals for the Ninth Circuit ruled that permanent digital downloads are licensed product. Accordingly, FBT royalties should be computed at 50% of Aftermath's receipts.

**G. Budget Sales – "Curtain Call" - $152,374**

The deluxe compact disc version of the album "Curtain Call" (catalog #60249889084) sells for a retail price of $19.98. However, Aftermath incorrectly categorizes sales of this release as Budget and pays FBT royalties at half the applicable rate.

**H. Mid-price/Budget Permanent Downloads - $18,906**

Aftermath incorrectly classifies certain album and individual track Download sales as Mid-price and Budget and pays FBT royalties at 2/3 and 1/2 of the applicable rate, respectively. This error results in an understatement of FBT royalties.

**I. NA**

**J. Foreign Licensing - $131,749**

Aftermath's foreign affiliates remit to Aftermath USA 75% of the income they receive from third party licensees, including record clubs. FBT is paid 50% of the income received by Aftermath USA without regard to income retained by foreign affiliates.

**2. Failure to Report Royalties**

**A. Factoring Returns for Free Goods - $3,865**

The percentage of returned units allocated to Free Goods is lower than the percentage of Free Goods at the time of sale. As a result, Aftermath overstates royalty bearing returned units and understates FBT royalties.

### B. Excess Record Club Free Goods - $8,302

Aftermath provided us with schedules detailing the amount of royalties due FBT for Excess Record Club Free Goods. The amounts appearing on the royalty statements rendered to FBT are less than the amounts on the schedules provided.

### C. Excess Foreign Free Goods – $207,357

Each of the Agreements stipulates that Special Program Free Goods shall not exceed 10%. It is our understanding that there are no Standard Free Goods programs in territories outside the USA. Accordingly, all Free Goods distributed in foreign territories are Special Program Free Goods. We compared the number of Free Goods distributed in the foreign territories with the total number of units distributed in these territories. We determined that Aftermath distributes foreign Special Program Free Goods in excess of the contractual limitation.

### D. Video Clip Income – To Be Determined

Paragraph 12(e) of the 2003 Agreement stipulates, "Further, notwithstanding anything that may be contained herein to the contrary, the royalties (other than publishing royalties, if applicable) payable to FBT shall not apply to audio-visual recordings except to the extent they embody master recordings originally contained on audio-only records hereunder."

In practice, Aftermath does not account to FBT for video clip income using Artist's masters.

### 3. Third Party Royalties

### A. "Stan" – "Curtain Call" - $130,878

The master "Stan" as it appears on the album "Marshall Mathers LP" contains a sample of the Dido recording "Thank You". Pursuant to the agreement between Arista Records and Aftermath Records dated May 31, 2000, Dido is to receive 50% of FBT/Artist's net royalty, after producer, from the exploitation of this master.

The album "Curtain Call" also contains a recording of the song "Stan". The version on this album is a live duet recorded by Artist with Elton John at the Grammy Awards. Artist's representatives advised us that the Dido sample is not used in this recording. Accordingly, Aftermath incorrectly deducted royalties paid to Arista Records and Cheeky Records related to sales of this album.

**B. Dr. Dre Compact Discs - $4,720**

Paragraph 4(f) of the 1998 Agreement stipulates that the royalty on Compact Discs shall be 90% of the otherwise applicable royalty rate. Paragraph 7(c) of the 2000 Amendment modifies paragraph 4(f) by deleting the Compact Disc royalty reduction for sales after June 30, 2000 for LP's 2 through 8 for Artist only and not FBT.

Paragraph 3 of the 1998 Agreement stipulates that Dr. Dre is to receive a producer royalty of 4% of the Royalty Base Price, prorated by the total number of masters on the applicable LP. Absent language to the contrary, it is typical that producer royalties are calculated in the same manner as Artist royalties effective on the date of the producer agreement. Subsequent improvements in the Artist deal do not benefit the producer.

For sales of the albums "Slim Shady LP", "Marshall Mathers LP" and "Eminem Show" after June 30, 2000, Aftermath incorrectly increased Dr. Dre's Compact Disc royalty from 90% of the applicable rate to 100%. It should be emphasized that on "Slim Shady LP", Dr Dre is given an increase that Artist did not receive. It should also be noted that the 1998 Agreement and 2000 Amendment are between FBT and Aftermath and that FBT did not receive a Compact Disc royalty increase on LP 2 and LP 3.

**C. "Encore" - $26,834**

Paragraph 3 of the 2003 Agreement stipulates that Dr. Dre is to receive a producer royalty of 4% of the Royalty Base Price, prorated by the total number of masters on the applicable LP.

The album "Encore" contains 16 masters and 3 additional masters on a bonus CD. Dr. Dre produced 8 masters. However, he receives a royalty based on 8/16 of the album instead of 8/19. Eminem produced 11/19 of the album. The net result is that Dr. Dre is overpaid and FBT is underpaid.

**D. Foreign Pricing – $32,188**

Absent language to the contrary, it is typical that Producer and other third party royalties are calculated in the same manner as Artist royalties effective on the date of the producer agreement. Subsequent improvements in the Artist deal do not benefit the producer.

Paragraphs 16(b)(2) of the 1998 Agreement and 2003 Agreement define Suggested Retail List Price for sales outside the USA as the applicable retail price in the country of manufacture or sale. Pursuant to paragraph 3(a) of the 2004 Agreement, the Suggested Retail Price for foreign sales reported to Artist and FBT after December 31, 2001 is changed to 126% of the published dealer price (130% in Canada). Aftermath incorrectly applies this increase to third party producers and other royalty recipients.

### E. TV Advertising Costs – Understated Producer Credit - $17,371

Paragraph 3(b) of the 2004 Settlement Agreement stipulates, "Commencing with sales reported to you for the accounting periods after the accounting period ending December 31, 2001 the Recording Agreements shall be deemed modified to provide that the royalty rate on any record sold outside the United States by Aftermath or its Licensees in the country where a radio or television advertising campaign originates will be reduced by ½ of the otherwise applicable rate, until the aggregate amount of money not accrued to your account because of the royalty reduction permitted hereunder equals fifty percent (50%) of the total costs incurred by Aftermath and its Licensees and paid to third parties in connection with such television or radio advertising campaign(s) provided such reduction shall be limited to campaigns for records featuring Artist (as opposed to compilation albums)." Paragraph 5(c)(vi) of the 2009 Agreement contains similar language.

In practice, Aftermath reduces producers' royalty rates by an aliquot share of the TV advertising costs. However, the aggregate amount allocated to producers of the albums "Eminem Show" and "Curtain Call" is understated.

### 4. Other

### A. Overstated Costs - $40,895

We reviewed a sample of invoices underlying costs charged against FBT's account and found these costs to be overstated for the following reasons.

   A. Air Charters – $33,925. Aftermath charged FBT's account with the cost of chartering airplanes for Dr. Dre. These costs are excessive.
   B. Courier - $6,970. Aftermath charged FBT's account with the cost of shipping master tapes by courier. This cost is excessive.

### B. Overstated TV Advertising Costs - $361,915

As noted in item #3E of this report, FBT's royalty rate on sales in conjunction with TV Advertising campaigns is reduced until 50% of the costs of such campaign are recouped by this reduction. In practice, with respect to foreign TV Advertising campaigns for the albums "Eminem Show" and "Relapse", Aftermath reduces FBT's royalty rate without applying the cost cap limitation.

In addition, Aftermath overstates the TV Advertsing costs applied to FBT's account for the following reasons:

   1. The TV Advertising Campaign 05GB2001829 for the album "Curtain Call" includes a charge for BPS 80,000 which in the invoice is identified as "various artists" and not Eminem. Also, a cost credit memo is not posted.

2. The TV Advertising Campaign 05GR2022651 for the album "Curtain Call" excludes royalties reported in periods subsequent to the campaign.
3. The production costs relating to the creation of the commercial for the United Kingdom TV Advertising campaign for "Curtain Call" exceed $300,000. This is excessive.

### C. Aerosmith Sample Allocation – $11,165

The Aerosmith master "Dream On" is used on the master "Sing for the Moment" appearing on the albums "Eminem Show" and "Curtain Call". Aerosmith receives a royalty of $.07 per unit. Pursuant to paragraph 12(c) of the 2003 Agreement, all producer and third party royalties are to come "off the top". On the album "Curtain Call", Aftermath incorrectly allocates 8/20 of the sample cost to FBT. The correct allocation is 8/22. This error results in an understatement of FBT royalties and an overstatement of Artist royalties.

### D. TV Advertising Cost Allocation – $28,169

Artist and FBT share royalties in the ratio of 14 to 8 for masters on the albums "Encore", "Curtain Call" and "Relapse" and 12 to 8 for masters on the album "Eminem Show". TV Advertising costs should be split in the same ratio as royalties. We reviewed the allocation of TV Advertising costs on each foreign TV Advertising campaign and found instances where the allocation of costs is not correct.

### E. Foreign Income Taxes - $68,680

Aftermath deducts from foreign royalties the amount withheld by foreign governments from earned royalties. The amounts withheld are available as direct credits against Aftermath or its parent company's income tax liability. Aftermath's use or deferral of these credits should not alter royalty earnings due FBT.

### F. TV Advertising Costs Reserve – "Relapse" - $15,527

Aftermath charged FBT's account a reserve for certain TV Advertising campaigns but was unable to provide any substantiation for the amounts charged.

### G. YouTube Litigation Settlement Income - $86,398

Aftermath received a significant litigation settlement from YouTube. Aftermath credited Artist's share of this income to Artist's video accounts. However, during the time period related to the settlement, most of the videos on YouTube were user generated and not Aftermath financed video clips. Accordingly, the income received from YouTube should be posted to Artist/FBT's audio account. As noted in item #2D of this report, Aftermath did not render video clip royalty statements to FBT.

It should be noted that we requested but did not receive documentation detailing the amount of the overall YouTube settlement, Aftermath's share of the settlement, legal costs and a detailed schedule showing Artist's aliquot share.

**H. Legal Hold - $2,068,337**

Aftermath withheld royalties otherwise payable to FBT as an offset against attorney's fees and costs awarded by the District Court for the Central District of California in the case of FBT v. Aftermath. However, in a published decision dated September 3, 2010 the United States Court of Appeals for the Ninth Circuit reversed the district court's order. Accordingly, royalties withheld by Aftermath should be promptly refunded.

**I. Dr. Dre Shared Costs – To Be Determined**

During the course of reviewing invoices and other source documentation related to costs charged to Artist's account, we noted that certain costs were shared between Artist and Dr. Dre. It appears that Dr. Dre was simultaneously recording tracks for his own album at the same time as he was producing Artist's album. The methodology of the cost sharing is not clear. It is our opinion that Aftermath should render a detailed accounting.

**J. Public Performance – To Be Determined**

Aftermath reports to FBT a share of public performance income received by its affiliate in the United Kingdom for the source periods 1998 through 2007, excluding the years 2001 and 2005. We requested documentation detailing the amount of income received by Aftermath's affiliates from public performance sources and the allocation method used to calculate FBT's share. Aftermath refused to provide this information. Further, Aftermath failed to account to FBT for a share of public performance income received from societies in Germany, Australia and other territories. There is a significant amount of public performance income paid by the societies in these and other territories.

**K. Other Income – To Be Determined**

Aftermath receives advertising and other fees and revenue shares from licensees such as Vevo, YouTube, Spotify and Playlist who stream FBT's audio and audio visual masters through the internet. In addition, Aftermath licenses its catalog to foreground music, in-flight music and others. It does not appear that Aftermath accounts to FBT for any portion of the income received from these sources.

**5. Interest on Claims – To Be Determined**

**6. Open Items**

We requested certain information from representatives of Aftermath which to date has not been provided.

A. Detailed listing of income received by Aftermath or its affiliated licensees from public performance and blanket licensing sources, including any flat payments received from the record clubs and other sources.
B. Video royalty statements for videos from the albums "Curtain Call" and "Relapse" in Excel format with .pdf cover sheets.
C. Royalty statements for video account 24064700 in Excel format with .pdf cover sheets.
D. Remaining documentation underlying costs charged against Artist's account.
E. Remaining documentation supporting TV Advertising Costs.
   1. 02GB2022767 - $258,665.84.
   2. 04NO2021208 - $117,870.18
   3. 04GB2002399 - $623,976.79
F. Documentation detailing the amount of the litigation settlements with Napster, Kazaa, YouTube and others including the overall settlement amount, Aftermath's share of the settlement, legal costs and a detailed schedule showing FBT's aliquot share.
G. Advertising Revenue received from digital subscription licensees, streaming sources such as YouTube and Vevo and other sources. This should include a detailed description of how this income is allocated to FBT's account.
H. Are there any long form videos other than "All Access"?
I. Have any audits been conducted of third party licensees, including permanent and temporary digital licensees? If so, please provide a copy of the report and the disposition of claims presented in the report.
J. How are exchange rates determined for applying foreign TV Advertising Costs to FBT's account? Is there any consistency to the exchange rate date used?
K. The master "We Made You" on the album "Relapse" is produced by Dr. Dre and Eminem. Dr. Dre's 4% royalty is not reduced by the 1.5% royalty paid to Eminem. Is this correct?

Foreign Licensing
Related licensees retain 25%
fbt 24145600

|  | A | B | | | |
|---|---|---|---|---|---|
|  | roylty pd | roylty pd | total | factor | due |
| fgn 3rd party | 1405.18 | 4880.99 | 6286.17 | 0.333333 | 2095.39 |
| public perf | 162642.15 | 93469.34 | 256111.49 | 0.333333 | 85370.50 |
| port subscription | 10371.11 | 16390.54 | 26761.65 | 0.333333 | 8920.55 |
| record club | 2615.77 | 1616.38 | 4232.15 | 0.333333 | 1410.72 |
| ringbacks | 10554.73 | 17314.87 | 27869.60 | 0.333333 | 9289.87 |
| streams | 25804.82 | 43302.82 | 69107.64 | 0.333333 | 23035.88 |
| sync | 4877.75 |  | 4877.75 | 0.333333 | 1625.92 |
|  |  |  |  |  | **131748.82** |

A. 24145600
B. 20087112, 20424757, 24145602/5603/5604